KLEMM, BLAIR, STERLING & JOHNSON
A PROFESSIONAL CORPORATION
1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910
TELEPHONE 477-7857

By THOMAS C. STERLING

Attorneys for *Defendant Black Construction Corporation*

FILED
DISTRICT COURT OF GUAM
OCT 28 2004
MARY L. M. MORAN
CLERK OF COURT

# IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| S.J. GARGRAVE SYNDICATE AT LLOYDS,<br><br>      Plaintiff,<br><br>vs.<br><br>BLACK CONSTRUCTION CORPORATION and WINZLER & KELLY CONSULTING ENGINEERS and ENGINEERING, MANAGEMENT & PLANNING SERVICES CORPORATION,<br><br>      Defendants. | CIVIL CASE NO. CV03-00009<br><br>**DEFENDANT BLACK CONSTRUCTION CORPORATION'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTIONS FOR PARTIAL SUMMARY JUDGMENT OR, ALTERNATIVELY, TO DISMISS** |

## I. STATEMENT OF THE CASE

This case was instituted on March 18, 2003 with the filing of an initial complaint by Plaintiff Leslie Wilton, representing Underwriters at Lloyds of London, against Defendant **BLACK CONSTRUCTION CORPORATION** (hereinafter "Black") and **WINZLER AND KELLY CONSULTING ENGINEERS** (hereinafter "Winzler") seeking property damages allegedly arising out of defective construction and design work performed on the Port Authority of Guam's (hereinafter "Port") Foxtrot Pier and dolphins. The initial Complaint alleged that

Black and Winzler had breached their contracts and negligently performed construction and design work resulting in Foxtrot Pier and its dolphins sustaining damage in an October 2001 earthquake.[1] Wilton alleged that the Port made an earthquake claim and had been paid "an amount exceeding $3 million" and that Wilton had thereby been subrogated to those claims.

Wilton delivered Initial Disclosures (Sterling Aff. Ex. A) to the Defendants on June 26, 2003 which indicated that his damages were now "over $5 million" based on the earthquake claims submitted and additional claims which were pending.

A First Amended Complaint was filed on December 23, 2003 which substituted the **S.J. GARGRAVE SYNDICATE AT LLOYDS** (hereinafter "Gargrave") for Wilton as Plaintiff and also added **ENGINEERING, MANAGEMENT & PLANNING SERVICES CORPORATION** (hereinafter "EMPSCO") as an additional defendant. The First Amended Complaint indicated that Gargrave had paid the Port's claim and had thereby been subrogated to all of its rights and causes of action indicating, as had the initial Complaint, that its damages were "in excess of $3 million."

Gargrave finally clarified its damage claims on January 12, 2004 in its response to Black's First Set of Interrogatories which indicated that the total damages which it was seeking were

---

[1] Subsequent discovery has confirmed that neither Black nor Winzler worked on the pier itself so this action is limited to damage claims relating to the dolphins only.

now in the amount of $6,157,443 consisting of $1,947,443 representing repair costs for the dolphins, $2,000,000 for loss of future pier rental, $1,500,000 for diminution in pier value, $100,000 for sue and labor, $500,000 for attorneys' fees and expert fees, and $110,000 in interest. (Sterling Aff. Ex. B)

## II. FACTS

The Pleadings in this case and discovery conducted to date have established the following undisputed facts.

In 1996, Black entered into a written contract (First Amended Complaint, Ex. A) with the Port to renovate the dolphins[2] at the Port's Foxtrot, also referred to as F-1, Pier. Part of the scope of work under that contract involved the refurbishing of the pilings and the reattachment of the pilings to the underside of the pile caps using flanges and epoxy bolts. The original design for the project had been prepared for the Port by EMPSCO and Winzler subsequently prepared an alternative design for the piling to pile cap connections which was the design utilized for that portion of the work during construction. Black finished the project in 1997.

On or about October 13, 2001, an earthquake struck Guam and damaged the Port's property. The Port's facilities and

---

[2] Dolphins are stand-alone structures separate from the pier itself which are essentially large concrete slabs (pile caps) sitting on a large number of pilings. There are two types of dolphins, berthing dolphins and mooring dolphins. Berthing dolphins are adjacent to the pier and the vessels actually tie up against those dolphins whereas the mooring dolphins are farther away from the dock and the mooring vessels attach to those dolphins by mooring lines.

structures were insured under a property policy issued by Lloyds of London (Sterling Aff. Ex. C) The Port made a claim against Lloyds and Lloyds retained Peter MacLeod (hereinafter "MacLeod") to investigate and adjust the claim. (Sterling Aff. Ex. H2-3) Foxtrot Pier and its dolphins were included in the claim as facilities allegedly damaged by the earthquake.

MacLeod inspected the dolphins and found that many of the pilings supporting the pile caps had come loose due to what MacLeod identified as failure of the epoxy bolts which he almost immediately decided was due to defective construction and design. (Sterling Aff. Ex. H4)

The Port's total claim against Lloyds' policy in connection with the October 2001 earthquake damage was for approximately $14,000,000 and included a number of facilities and structures other than Foxtrot Pier and its dolphins including the Administration Building, the Hagåtña Marina, the Agat Pier, the CFS Building, the CSX Building, the F5 Pier, gantry cranes, the Golf Pier, the Maintenance Building, the Old Tower Building, rails, and Warehouses 1 and 2. (Sterling Aff. Ex. D)

MacLeod arranged for what he called a "temporary repair" of the dolphins which involved reattachment of 26 of the pilings to the pile caps for which Lloyds paid Smithbridge Construction and others associated with the repair a total of $523,135.12. (Sterling Aff. Exs. F, H14-15) Smithbridge also provided MacLeod

- 4 -

with a quote (Sterling Aff. Ex. E) to repair the balance of the piling to pile cap connections using the identical technique for $1,420,000.

Ultimately, in or about December 2002, MacLeod and Lloyds settled the Port's October 2001 earthquake claim for a negotiated figure of $8,000,000 resulting in a $7.5 million payment to the Port due to a $500,000 deductible. Of the total $8,000,000 settlement amount, $1,946,135.10 was allocated by MacLeod to the dolphins (Sterling Aff. Exs. F, H16-17) which consisted of the Smithbridge temporary repair costs and the Smithbridge estimate to complete the repair.[3] The Port executed a Loss and Subrogation Form in consideration for total payments by Lloyd's of $7,500,000 (Sterling Aff. Ex. G)

MacLeod testified in deposition that Lloyds did not pay anything to the Port for loss of future pier rental, diminution in pier value, or anything other than the repair costs. (Sterling Aff. Exs. H5-6, 12-13)

### III. POINTS AND AUTHORITES

#### A. GARGRAVE, AS A SUBROGATED INSURER, MAY NOT RECOVER MORE THAN IT PAID UNDER ITS POLICY

As indicated hereinabove, Gargrave is seeking damages of over $6.1 million from Black when it is undisputed that it paid slightly less than $2,000,000 to the Port under its policy in

---

[3] Black is uncertain as to the explanation for the approximate $1,300 discrepancy in the interrogatory response pertaining to dolphin repair costs and the amount allocated to the repair in the settlement spreadsheet.

- 5 -

connection with earthquake damage to the dolphins.[4] For the reasons set forth hereinafter, Gargrave is not entitled to recover millions of dollars from Black representing future pier rental, diminution in pier value, sue and labor, or any other items for which it never paid the Port anything.

Subrogation as applied to an insurer is its right to be put in the position of its insured against third parties legally responsible to its insured for the loss which the insurer has both insured and paid. <u>Liberty Mut. Fire Ins. Co. v. Auto Spring Supply Co.</u>, 59 Cal.App.3d 860, 864, 131 Cal.Rptr. 211 (1976); <u>Century Indem. Co. v. London Underwriters</u>, 12 Cal.App.4th 1701, 16 Cal.Rptr. 393, 397 (1993). Subrogation has the objective of reimbursing the insurer for the payment it has made. 16 Couch on Insurance 3d §222:8 (2000).

The distinction between legal and conventional subrogation was discussed at 16 Couch on Insurance 2d §61:2 as follows:

> The distinction is sometimes made between legal and conventional subrogation, legal subrogation being that which arises by operation of law, while conventional subrogation is that which arises by convention or the contract of the parties.
>
> Otherwise stated, the insurer's right to subrogation may rest either upon the operation of law, upon the fact of payment by the insurer, or upon the contract between the insurer and the insured expressly providing for subrogation. <u>In most instances, this distinction has no significance for the same facts</u>

---

[4] For the purposes of this Motion only, Black will not dispute that the damage was earthquake damage or that Gargrave made the payment due to the requirements of its policy rather than as a mere volunteer.

KLEMM, BLAIR, STERLING & JOHNSON
A PROFESSIONAL CORPORATION
1008 PACIFIC NEWS BLDG
238 ARCHBISHOP
F.C. FLORES ST.
HAGÅTÑA, GUAM 96910

<u>which give rise to subrogation by operation of law are ordinarily the same facts which entitle a person to claim the benefit of a contract or convention for subrogation.</u>

The right of subrogation is one of indemnity only and the insurer is not entitled to recover a greater amount than it has paid to its insured. <u>Bituminous, Etc. v. Culligan Fyrprotexion Inc.</u>, 437 N.E.2d 1360, 1371 (Ind.App. 1982) <u>See also</u>, 16 Couch on Insurance 3d §223:85 (2000) As stated in <u>Offer v. Superior Court</u>, 194 Cal. 114, 118, 228 P.11 (1924):

> However, it is plain that the insurer on paying the amount of loss on the property insured is subrogated only in a corresponding amount to the insured's right of action against any other person responsible for the loss. <u>Liverpool and Great Western Steam Co. v. Phenix Ins. Co.</u>, 129 U.S. 397 [32 L.Ed. 78] . . .

In <u>Lexington Ins. Co. v. Baltimore Gas and Elec. Co.</u>, 979 F.Supp. 360 (D.Md. 1997), a subrogation claim for damages similar to Gargrave's was rejected. In that case, a fire insurer paid its insured $1,425,000 for fire damage to buildings and $198,188 for loss of rental income under its policy. The insurer then sought to recover $4,400,000 from a third party in subrogation based upon a cost of restoration theory. The court held that an insurer suing in subrogation could not recover more than the <u>actual amount paid</u> under the policy regardless of the applicable measure of damages. As such, the court limited the insurer's maximum recovery to "$1,425,000 for property damage

//

- 7 -

Case 1:03-cv-00009  Document 62  Filed 10/28/2004  Page 7 of 13

and destruction, and $198,188 for lost rents." 979 F.Supp. at 362.

The cases have refused to allow an insurer to recover pursuant to subrogation any amounts beyond that which it paid to its insured. Scott v. Prudential Property and Cas. Ins., 561 N.E.2d 812, 814 (Ind.App. 1990) [subrogated insurer not entitled to recover insured's medical expenses which it did not pay]; Employers Ins. of Wausau v. Dunaway, 626 F.Supp. 1145, 1146 (S.D.Miss. 1986) [fire insurer that paid $189,013.41 for a fire loss not entitled to recover any amount over and above its payment]; Utica Mut. Ins. Co. v. Denwat Corp., 778 F.Supp. 592, 594 (D.Conn. 1991) [subrogated insurer not allowed punitives although insured would have been entitled]; Colorado Farm Bureau Mut. Ins. Co. v. CAT, 649 F.Supp. 49 (D.C.Colo. 1986)

Gargrave did not pay the Port $6.1 million for damage to the dolphins. It paid only slightly less than $2 million to compensate the Port for the cost of repairing the dolphins. It has no rights whatsoever in excess of the payments it actually made for repair costs.

For the foregoing reasons, Black respectfully submits that any recovery by Gargrave in this action is limited to dolphin repair costs in the maximum amount of $1,947,443 for which Lloyds paid the Port under its policy. The claims for lost pier

//

- 8 -

Case 1:03-cv-00009   Document 62   Filed 10/28/2004   Page 8 of 13

rental, diminution in pier value and sue and labor should be dismissed with prejudice.[5]

### B. GARGRAVE'S FIRST CAUSE OF ACTION FOR NEGLIGENT PROPERTY DAMAGE IS BARRED BY THE ECONOMIC LOSS DOCTRINE

Although many courts once allowed tort claims to be maintained based upon a simple breach of contract, the trend in cases now, including construction defect cases such as this one, is to limit an aggrieved party's remedies to contract remedies in the absence of personal injury or property damage. The reasoning behind this economic loss doctrine was discussed in <u>Moorman Mfg. Co. v. National Tank Co.</u>, 435 N.E.2d 443, 450 (1982) wherein the plaintiff sought damages for the cost of repairing a grain storage tank as well as damages for loss of use. The court noted:

> We . . . hold that, where only the defective product is damaged, economic losses caused by qualitative defects falling under the ambit of a purchaser's disappointed expectations cannot be recovered under a strict liability theory. . . . <u>This was not the type of sudden and dangerous occurrence best served by the policy of tort law</u> that the manufacturer should bear the risk of hazardous products . . . the harm resulted from a qualitative defect relating to the purchaser's expectation in terms of the product's fitness to perform its intended function. Plaintiff suffered a commercial loss of the type that the law of warranty is designed to protect. Consequently, repair and reinforcement of the tank and loss of the tank's use constitute economic loss for which plaintiff cannot recover under a theory of strict liability and tort.

//

---
[5] Black will not address the claims for attorneys' fees and interest at this time since they raise separate and distinct issues.

<u>Our conclusion that qualitative defects are best handled by contract, rather than tort, law applies whether the tort theory involved is strict liability or negligence.</u> Tort theory is appropriately suited for personal injury or property damage resulting from a sudden or dangerous occurrence. . . . <u>The remedy for economic loss, loss relating to a purchaser's disappointed expectations due to deterioration, internal breakdown or non-accidental cause, on the other hand, lies in contract.</u>

The policy considerations against allowing recovery for solely economic loss in strict liability cases apply in negligence actions as well. When the defect is of a qualitative nature and the harm relates to the consumer's expectations that the product is a particular quality so that it is fit for ordinary use, contract rather than tort law provides the appropriate set of rules for recovery. (Emphasis added)

As stated in <u>Calloway v. City of Reno</u>, 993 P.2d 1259, 1264 (Nev. 2000), in which the court rejected an effort by plaintiffs to maintain negligence claims for purely economic loss resulting from construction defects:

Because of this doctrinal development, and the resulting confusion created between tort and warranty theories, the economic loss doctrine gained recognition and support. <u>The doctrine serves to distinguish between tort, or duty-based recovery, and contract, or promise-based recovery, and clarifies that economic losses cannot be recovered under a tort theory.</u> (Emphasis added)

The economic loss doctrine is clearly applicable in the event this Court has admiralty jurisdiction. <u>East River Steamship Corp. v. Transamerica Delaval, Inc.</u>, 476 U.S. 858 (1986) However, since this case involves only a dock repair contract, Black does not believe this case falls within the

//

- 10 -

Case 1:03-cv-00009    Document 62    Filed 10/28/2004    Page 10 of 13

Court's admiralty jurisdiction. <u>Royal Insurance Co. of America v. Pier 39 Ltd.</u>, 738 F.2d 1035, 1037 (9th Cir. 1984)

> ["If there is no connection to a specific vessel, however, contracts relating to wharves generally are not within admiralty jurisdiction."]

To the extent this Court is exercising diversity jurisdiction, it is unclear as to whether the Guam Supreme Court would necessarily apply the economic loss doctrine.[6] Nevertheless, the modern trend as now recognized in many jurisdictions is that negligence claims cannot be maintained against a contractor in connection with construction defects that do not result in bodily injury or property damage. <u>AAS v. Superior Court</u>, 24 Cal.4th 627, 101 Cal.Rptr.2d 718 (2000); <u>Calloway v. City of Reno</u>, *supra*; <u>Magestro v. North Star Environmental Const.</u>, 649 N.W.2d 722, 725 (Wis.App. 2002) [defective foundation resulting in cracks to building]; <u>Mars, Inc. v. Heritage Builders of Effingham, Inc.</u>, 763 N.E.2d 428, 434 (Ill.App. 2002) [building frame collapsed in severe thunderstorm]; <u>Selzer v. Brunsell Bros. Ltd.</u>, 652 N.W.2d 806, 817 (Wis.App. 2002) [economic loss doctrine prevented tort claim for damages for window rot since "the risk of this loss is precisely the risk that the parties allocated (or could have allocated) by contractual warranty provisions"]; <u>Chicago Heights Venture v. Dynamit Nobel of America</u>, 782 F.2d 723 (7th Cir. 1986)

---

[6] Black's research indicates that the Guam Supreme Court has not yet addressed the economic loss doctrine.

Case 1:03-cv-00009    Document 62    Filed 10/28/2004    Page 11 of 13

[roof material fell during windstorm]; Nastri v. Wood Bros. Homes Inc., 690 P.2d 158 (Ariz.App. 1984) [cracks and buckling of portions of a residence]; Casa Clara v. Charley Toppino & Sons, 620 S.2d 1244 (Fla. 1993) [defective concrete that cracked and broke off]; Chenango C. Indus. D.A. v. Lockwood Greene, 494 N.Y.S.2d 832 (1985) [cracks, splits and leaks in roof]

Gargrave's First Amended Complaint alleges, and it is undisputed, that the work which Black did for the Port on the Foxtrot Pier Dolphins was done pursuant to a written contract which is attached to the First Amended Complaint as Exhibit "A". Gargrave contends that the piling to pile cap connections constructed by Black failed during an earthquake resulting in the need for repair of those connections. Nobody sustained bodily injury and nobody's property was damaged.

Pursuant to the economic loss doctrine, this alleged breach of the construction contract, resulting only in economic loss, will not support a tort claim. As such, Gargrave's First Cause of Action against Black for Negligent Property Damage should be dismissed with prejudice.

### C. THE SEVENTH CAUSE OF ACTION FOR BREACH OF THE WARRANTY OF WORKMANLIKE PERFORMANCE FAILS AS A MATTER OF LAW

Gargrave's Seventh Cause of Action alleges a claim for relief based upon the purported breach of the maritime warranty of workmanlike performance.

//

The maritime warranty of workmanlike performance, initially recognized in <u>Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp.</u>, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), to the extent it has continued vitality, has been limited in this Circuit to seaman claims involving seaworthiness. Since this case involves neither seamen, a shipowner nor a request for full indemnity, it is clear that Gargrave has no right to pursue a claim against Black based on this maritime warranty. <u>Knight v. Alaska Trawl Fisheries, Inc.</u>, 154 F.3d 1042 (9th Cir. 1998)

The Seventh Case of Action for breach of the warranty of workmanlike performance fails as a matter of law and should be dismissed with prejudice.

### IV. CONCLUSION

For all the foregoing reasons, Defendant Black Construction Corporation respectfully requests an Order limiting Gargrave's recovery herein to dolphin repair costs not to exceed $1,947,443, dismissing the First Cause of Action for Negligent Property Damage with prejudice and dismissing the Seventh Cause of Action for Breach of the Warranty of Workmanlike Performance with prejudice.

**RESPECTFULLY SUBMITTED** this 28th day of July, 2004.

KLEMM, BLAIR, STERLING & JOHNSON
A PROFESSIONAL CORPORATION

BY: _____
THOMAS C. STERLING
*Attorneys for Defendant Black Construction Corporation*

E62:49\27946-29\G:\WORD97\OFFICE\WORDDOC\PLD\TCS\185-MEMO
OF P&A IN SUPP OF MTNS 4 PARTIAL SJ RE GARGRAVE V BLACK ET AL.DOC

- 13 -

KLEMM, BLAIR,
STERLING & JOHNSON
A PROFESSIONAL CORPORATION
1008 PACIFIC NEWS BLDG
238 ARCHBISHOP
F.C. FLORES ST.
HAGÅTÑA, GUAM 96910