KLEMM, BLAIR, STERLING & JOHNSON
A PROFESSIONAL CORPORATION
1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910
TELEPHONE 477-7857

By **THOMAS C. STERLING**

Attorneys for   *Defendant Black Construction Corporation*

# IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| S.J. GARGRAVE SYNDICATE AT LLOYDS, )<br><br>Plaintiff, )<br><br>vs. )<br><br>BLACK CONSTRUCTION )<br>CORPORATION and WINZLER & )<br>KELLY CONSULTING ENGINEERS and )<br>ENGINEERING, MANAGEMENT & )<br>PLANNING SERVICES CORPORATION, )<br><br>Defendants. ) | CIVIL CASE NO. CV03-00009<br><br><br>**AFFIDAVIT OF THOMAS C. STERLING RE DISCOVERY EXCERPTS** |

ISLAND OF GUAM      )
                                    ) ss:
CITY OF HAGÅTÑA    )

I, **THOMAS C. STERLING**, being first duly sworn do state that:

1.    I have personal knowledge of all matters set forth in this affidavit and if called to testify as to said matters I could and would competently do so.

2.    Attached hereto as Exhibit "A" is a true and correct portion of the Initial Disclosures served on our office on June 26, 2003 by the Plaintiff's counsel.

3.    Attached hereto as Exhibit "B" is a true and correct portion of the Plaintiff's Answers to Black Construction Corporation's (hereinafter "Black") First Set of Interrogatories.

4.    Attached hereto as Exhibit "C" is a true and correct copy which was delivered to our office as part of discovery by counsel for Plaintiff who represented that this was the policy issued to Lloyds under which the Port Authority of Guam's October 2001 earthquake claim was adjusted and settled.

5.    Attached hereto as Exhibit "D" are selected portions of the Port Authority of Guam's (hereinafter "Port") October 2001 earthquake claim which was authenticated during the deposition of Peter MacLeod (hereinafter "Mr. MacLeod").

6.    Attached hereto as Exhibit "E" is an estimate for the repair of the balance of the piling connections not repaired in the initial temporary repair which was prepared by Smithbridge Construction, submitted to Mr. MacLeod and authenticated in the MacLeod deposition.

7.    Attached hereto as Exhibit "F" is a claim settlement summary, also referred to as a settlement spreadsheet, which was prepared by Mr. MacLeod subsequent to the settlement with the Port and which was authenticated in Mr. MacLeod's deposition.

//

KLEMM, BLAIR,
STERLING & JOHNSON
A PROFESSIONAL CORPORATION
1008 PACIFIC NEWS BLDG
238 ARCHBISHOP
F.C. FLORES ST.
HAGÅTÑA, GUAM 96910
TELEPHONE 477-7857

8.    Attached hereto as Exhibit "G" are three (3) Loss and Subrogation forms which were authenticated during the MacLeod deposition.

9.    Attached hereto as Exhibit "H" are excerpts of the deposition of Mr. MacLeod.

Further, affiant sayeth naught.

DATED: OCTOBER 28, 2004

_____
**THOMAS C. STERLING**

**SUBSCRIBED AND SWORN** to before me this ____ day of October, 2004, by **THOMAS C. STERLING**.

_____
*(official signature and seal of notary)*

**JENNIFER D.S. MENDIOLA**
**NOTARY PUBLIC**
In and For Guam, U.S.A.
My Commission Expires: Jan 08, 2006
1008 Pacific News Building, 238 Archbishop
F.C. Flores St., Hagåtña, Guam 96910

**ATTACHMENTS: EXHIBITS "A" – "H"**

E62:49\27946-29
G:\WORD97\OFFICE\WORDDOC\PLD\TCS\185-AFF OF TCS RE
DISCOVERY EXCERPT RE GARGRAVE V BLACK ET AL.DOC

KLEMM, BLAIR,
STERLING & JOHNSON
A PROFESSIONAL CORPORATION
1008 PACIFIC NEWS BLDG
238 ARCHBISHOP
F.C. FLORES ST.
HAGÅTÑA, GUAM 96910
TELEPHONE 477-7857

- 3 -

# EXHIBIT "A"



CARLSMITH BALL LLP

DAVID LEDGER
ELYZE McDONALD
134 West Soledad Avenue
Bank of Hawaii Bldg., Suite 401
P.O. Box BF
Hagåtña, Guam  96932-5027
Tel. No. (671) 472-6813

Attorneys for Plaintiff
Leslie Wilton

IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| LESLIE WILTON,           ) | CIVIL CASE NO. 03-00009 |
|                   ) | |
|         Plaintiff,    ) | |
|                   ) | |
|     vs.             ) | **PLAINTIFF'S INITIAL DISCLOSURES** |
|                   ) | |
| BLACK CONSTRUCTION   ) | |
| CORPORATION and WINZLER   ) | |
| & KELLY CONSULTING     ) | |
| ENGINEERS,          ) | |
|                   ) | |
|         Defendants.   ) | |
|                   ) | |

Plaintiff hereby provides the following initial disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1).

**A.**     **Persons With Discoverable Information and the Subject of the Information:**

        1.     Frank Dennis, OCEL Consultants Limited, with information pertaining to the engineering of Pier F-1, at the Port Authority of Guam.

        2.     Manager, Port Authority of Guam, with information pertaining to the repairs and upgrading of Pier F-1.

3.      Captain Jurgen Unterburg, Oceaneer Enterprises Inc., with information pertaining to surveys conducted on Pier F-1.

4.      Personnel at Black Construction Corporation, including Lito Tabilas and Jose Perfecto, with information pertaining to the repairs and upgrading of Pier F-1.

5.      Personnel at Winzler & Kelly Consulting Engineers with information pertaining to the engineering of the repairs and upgrading of Pier F-1.

6.      Peter Macleod, Macleod Claims Management Ltd., with information pertaining to claims made on the damage of Pier F-1.

7.      Representative from Lloyds Underwriters Concerned.

8.      Experts to be disclosed at a later date, pursuant to Federal Rule of Civil Procedure 26(a)(2).

9.      Further percipient witness will be disclosed in supplemental pleadings as they are discovered.

**B.      Documents, Data and Tangible Things:**

1.      Video Survey of Pier F-1.

2.      Photographs of Pier F-1.

3.      April 8, 1996 Construction Contract between Port Authority of Guam and Black Construction Corporation, and Supplemental Agreement to Construction Contract.

4.      Proposed Pile Repair Details, prepared by Winzler & Kelly.

5.      As-Built Record of Materials submitted by Black Construction Corporation.

6.     Specification for Repairs to Dolphins A, B, C & D Foxtrot (F-1) Pier, prepared by Winzler & Kelly.

7.     Correspondence between Black Construction Corporation and Port Authority of Guam regarding repairs and upgrading to Foxtrot "F-1" Pier, and Bid Schedules.

8.     Report of survey conducted by Captain Unterburg.

9.     Further documents, data, and tangible things will be disclosed in supplemental pleadings as they are discovered.

**C.     Damages:**

Damages are currently estimated at over $5 million, based on claims submitted by the Port Authority of Guam to Plaintiff, that have been paid by Plaintiff, and for additional claims presented by the Port Authority of Guam to Plaintiff.

SUBMITTED this 26th day of June 2003.

CARLSMITH BALL LLP

*Elyze McDonald*
DAVID LEDGER
ELYZE McDONALD
Attorneys for Plaintiff
Leslie Wilton

# EXHIBIT "B"

# ORIGINAL

CARLSMITH BALL LLP

DAVID LEDGER
ELYZE McDONALD
Bank of Hawaii Bldg., Suite 401
134 West Soledad Avenue, P.O. Box BF
Hagåtña, Guam 96932-5027
Tel No. 671.472.6813

Attorneys for Plaintiff
S.J. Gargrave Syndicate at Lloyds





IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| S.J. GARGRAVE SYNDICATE AT LLOYDS, | CIVIL CASE NO. CV03-00009 |
| Plaintiff, | **PLAINTIFF'S RESPONSE TO DEFENDANT BLACK CONSTRUCTION CORPORATION'S FIRST SET OF INTERROGATORIES PROPOUNDED TO PLAINTIFF LESLIE WILTON; DECLARATION OF SERVICE** |
| vs. | |
| BLACK CONSTRUCTION CORPORATION, WINZLER & KELLY, and ENGINEERING MANAGEMENT & PLANNING SERVICES CORPORATION, | |
| Defendants. | |

Plaintiff submits its response to Defendant Black Construction Corporation's First

Set of Interrogatories.

**INTERROGATORY NO. 1:**     Please identify the person or persons who

assisted in the preparation of the answers to these Interrogatories.

**RESPONSE:**     Peter MacLeod, Counsel for Plaintiff, and Litigation

consultants retained by Plaintiff.

**INTERROGATORY NO. 2:**     Please state the total amount of damages

4847-9641-5488.1.055639-00001

which you allege to have suffered as a result of the acts and omissions of Black as alleged in your Complaint and state in detail how that number has been calculated.

**RESPONSE:** Plaintiff notes that discovery is ongoing, and therefore plaintiff's response to this interrogatory is of necessity subject to change. Plaintiff reserves the right to add to or amend this answer as further facts are discovered. Additionally, this interrogatory answer supercedes Plaintiff's Second Supplemental Disclosure and calculation of damages.

| | |
|---|---|
| Damages and cost of repairing pier: | $1,947,443. |
| Sue and labor: | $ 100,000. |
| Interest: | $ 110,000. |
| Attorneys' and experts' fees: | $ 500,000. |
| Loss of future pier rental: | $2,000,000. |
| Diminution in pier value: | $1,500,000. |
| TOTAL: | $6,157,443. |

**INTERROGATORY NO. 3:** Please identify all persons who determined on your behalf that the damages to the Foxtrot Pier dolphins for which the Port made claim had, in fact, resulted from the earthquake of October 2001 rather than some other cause.

**RESPONSE:** The following individuals made or contributed to the determination that the damage to Pier F-1 resulted from the earthquake of October 2001, whether they made such determination or contribution on behalf of plaintiff or otherwise:

Peter MacLeod;

Frank Dennis, OCEL Consultants;

Ben Casey, Vice President, Smithbridge Construction;

Simeon Delos Santos and Mel Junsay, Port Engineers, Port of Guam;

# EXHIBIT "C"

FP



ENDORSEMENT attaching to and forming part of Policy Number 00HV0051F in the name of: PORT AUTHORITY OF GUAM

Port Authority Package Insurance          36 months @ 1st October,1999-etc.



Noted and agreed cover hereunder to continue from 1st October 2001 (for third of three annual periods) on all same terms, clauses and conditions other than:

Property Limit Amended to:

$25,000,000 CSL Property and Business Interruption

Full Value Equipment $17,416,116

Excluding Terrorism and Sabotage absolutely (exclusion 4 amended accordingly)

Premium:

Broker Policy No.     01HV0065F

U.S Classification Non-Regulated

All other terms, clauses and conditions remain unaltered.

61053*27-11-2001     07  (SECT 1)

61083*27-11-2001     08  (SECTS 2/3)

51045*27-11-2001     09  (SECT 4)

0753

FP                                                                    99HV0067F

ENDORSEMENT attaching to and forming part of Policy Number 99HV0067F in the name of: PORT AUTHORITY OF GUAM

PORT AUTHORITY PACKAGE INSURANCE          36 months @ 1st October, 1999.

---

Noted and agreed cover hereunder to continue from 1st October 2000 (for second of three annual periods) on all same terms, clauses and conditions, other than :

Deductible with respect Earthquake, Flood and Windstorm exposures increased from USD250,000 to USD500,000

To allow a separate 5% NCB feature against Section IV hereunder (Liabilities), effective from anniversary dated 1st October 2000 – subject to the following wording :

"It is hereby noted and agreed that following payment of NCB under Liability section hereon, if at any time in the future any claim is made against the said policy year, the amount of any NCB paid will be treated as additional deductible hereon".

Premium :                  USD1,140,000 in full per annum (after application of LTA feature).

Broker Policy No.          00HV0051F

Insurers :                 Lloyd's Underwriters 100% (as per schedule attached respect Sections 1 – 4)
LESS4% (tax only)          U.S.Classification non regulated

All other terms, clauses and conditions remain unaltered.

```
51183*29-11-2000    04      Section 4

61754*29-11-2000    05      section I

61765*29-11-2000    06      Section 2|:
```

Case 1:03-cv-00009     Document 64     Filed 10/28/2004     Page 13 of 115

| PORT AUTHORITY OF GUAM | .UPDATED |
|---|---|
| EQUIPMENT SCHEDULE | August 23, 2001 |

| Ln | Tractors | Description | ID No.s | Unit Cost | Quant | Total Cost | Assigned | Deductible |
|---|---|---|---|---|---|---|---|---|
| 1 | 1998 | Ottawa/Commando 50 | T59-T74 | 61,831 | 16 | 989,296 | Transportation | 2,000 |
| 2 | 1998 | Ottawa/Commando 50 | T56-T58 | 69,898 | 3 | 209,694 | Transportation | 2,000 |
| 3 | 1995 | Ottawa/Commando 50 | T51-T55 | 57,443 | 5 | 287,215 | Transportation | 2,000 |
| 4 | 1993 | Ottawa/ YT - 50 | T46,T49 | 56,444 | 2 | 112,888 | Transportation | 2,000 |
| 5 | | | | Sub-Total | 26 | 1,599,093 | | |
| 6 | | | | | | | | |
| 7 | Forklifts | | | | | | | |
| 8 | 1998 | Hyster 5.5T | FL98-30/39 | 40,793 | 10 | 407,930 | Transportation | 2,000 |
| 9 | 1996 | Caterpillar 10T | FL 96-163 | 99,769 | 1 | 99,769 | Transportation | 5,000 |
| 10 | 1996 | Caterpillar 20T | FL 96-164 | 265,159 | 1 | 265,159 | Transportation | 2,000 |
| 11 | 1992 | Hyster 5T | FL92-24,25,27,29 | 39,900 | 4 | 159,600 | Transportation | 2,000 |
| 12 | 1992 | Hyster 10T | FL-92-161 | 76,300 | 1 | 76,300 | Transportation | 2,000 |
| 13 | 1990 | Komatsu 20 T | FL 90-162 | 142,000 | 1 | 142,000 | Transportation | 5,000 |
| 14 | 1988 | Toyota 3T 5FD-30 | FL 88-09,10,12 | 21,449 | 3 | 64,347 | Transportation | 2,000 |
| 15 | | | | Sub-Total | 21 | 1,215,105 | | |
| 16 | | | | | | | | |
| 17 | Toplifters | | | | | | | |
| 18 | 1990 | Clark/C500Y800D | | 339,724 | 1 | 339,724 | Transportation | 5,000 |
| 19 | 1987 | Clark/C500Y800D | | 290,960 | 1 | 290,960 | Transportation | 5,000 |
| 20 | | | | Sub-Total | | 630,684 | | |
| 21 | | | | | | | | |
| 22 | Sidelifters | | | | | | | |
| 23 | 1998 | Hyster Empty Ctr lift H330X6V,47V,61V | | 160,000 | 3 | 480,000 | Transportation | 5,000 |
| 24 | 1996 | Hyster Empty Ctr Lift H10 58T | | 141,501 | 1 | 141,501 | Transportation | 5,000 |
| 25 | | | | Sub-Total | | 621,501 | | |
| 26 | | | | | | | | |
| 27 | Other | | | | | | | |
| 28 | | Onan Genset 455 KW | | 60,000 | 1 | 60,000 | From FEMA | |
| 29 | | Onan Genset 275KW | | 40,000 | 1 | 40,000 | From FEMA | |
| 30 | | Onan Genset 275KW | | 40,000 | 1 | 40,000 | From FEMA | |
| 31 | | Onan Genset 455 KW | | 60,000 | 1 | 60,000 | From FEMA | |
| 32 | | | | Sub-Total | | 200,000 | | |
| 33 | | | | | | | | |
| 34 | | Barge YFN 814 | | 55,000 | 1 | 55,000 | | |
| 35 | 1995 | Ford Fuel Truck | | 69,694 | 1 | 69,694 | | |
| 36 | 1998 | Rider Sweeper | | 48,885 | 1 | 48,885 | | 2,000 |
| 37 | 1998 | Articulating Boom Platforms ( Grove Manlft) | | 137,000 | 1 | 137,000 | | 5,000 |
| 38 | 1988 | Miller Air Pac Welder | | 18,000 | 1 | 18,000 | Welders | 2,000 |
| 39 | 1994 | Miller Air Pac Welder | | 18,000 | 2 | 36,000 | Welders | 2,000 |
| 40 | 1993 | Grove Mobile Crane 150 LT | | 941,864 | 1 | 941,864 | Stevedore | 10,000 |
| 41 | 1993 | Ingersoll CFM600 Air Compressor | | 50,000 | 1 | 50,000 | Preventive | 2,000 |
| 42 | 1997 | Sullair 185CFM Air Compressor | | 18,000 | 1 | 18,000 | Preventive | 2,000 |
| 43 | 1981 | Joy 185 CFM Air Compressor | | 18,000 | 1 | 18,000 | Preventive | 2,000 |
| 44 | 1991 | Straddle Hoist " Echo " | | 1,597,347 | 1 | 1,597,347 | Stevedore | 10,000 |
| 45 | 1995 | SWAGE Pressure Machine | | 61,596 | 1 | 61,596 | CM | 2,000 |
| 46 | 1991 | Straddle Hoist " Foxtrot " | | 1,597,347 | 1 | 1,597,347 | Stevedore | 10,000 |
| 47 | 1979 | Gantry Crane # 2 40LT | | 4,100,000 | 1 | 4,100,000 | Stevedore | 10,000 |
| 48 | 1969 | Gantry Crane # 1 30 LT | | 4,100,000 | 1 | 4,100,000 | Stevedore | 10,000 |
| 49 | | | | Sub-Total | | 13,148,733 | | |
| 50 | | | | Total | | 17,416,116 | | |

2:50 PM
insurance schedules

Prepared by HTP

# PORT AUTHORITY OF GUAM
# PROPERTY SCHEDULE

**Updated: August 23, 2001**

| | Description | Building | Contents | Total | Built | Area | Sto |
|---|---|---|---|---|---|---|---|
| 1 | Administration | $ 2,100,000.00 | $ 1,000,000.00 | $ 3,100,000.00 | 1969 | 26283 | 3 |
| 2 | Computer Hardware ( Port wide) | | $ 2,000,000.00 | | | | |
| 3 | Container Freight Station | $ 3,146,850.00 | $ - | $ 3,146,850.00 | 1969 | 27000 | 1=3 |
| 4 | BOD Building ( Sealand ) | $ 840,000.00 | $ 5,000.00 | $ 845,000.00 | 1969 | 5000 | 2 |
| 5 | Fuel Pier F-1 | $ 5,250,000.00 | $ - | $ 5,250,000.00 | | 345 LF. | |
| 6 | Janitorial (Old Gas Station) | $ 78,750.00 | $ 3,000.00 | $ 81,750.00 | 1969 | 1066 | 1 |
| 7 | Golf Pier | $ 4,200,000.00 | $ - | $ 4,200,000.00 | | 200 LF | |
| 8 | Hazmat Station | $ 105,000.00 | $ - | $ 105,000.00 | | - | 1 |
| 9 | Hotel Wharf | $ - | $ - | $ - | | 500 LF | |
| 10 | Maintenance & Repair Shop | $ 3,150,000.00 | $ 1,500,000.00 | $ 4,650,000.00 | 1969 | 23439 | 1=3 |
| 11 | New Control Tower | $ 105,000.00 | $ 10,000.00 | $ 115,000.00 | 1969 | 1400 | 2 |
| 12 | Old Control Tower | $ 255,150.00 | $ 5,000.00 | $ 260,150.00 | 1969 | 932 | 3 |
| 13 | Port Police | $ 525,000.00 | $ 30,000.00 | $ 555,000.00 | 1969 | 3720 | 2 |
| 14 | Port Beach ( Pavilion & Rest.) | $ 31,500.00 | $ - | $ 31,500.00 | | | |
| 15 | Rig & Loft | $ 525,000.00 | $ 20,000.00 | $ 545,000.00 | 1969 | 3600 | 1=3 |
| 16 | Gate House No. 1 | $ 15,750.00 | $ - | $ 15,750.00 | 1976 | 50 | |
| 17 | Gate House No. 2 Checkpoint | $ 503,370.00 | $ 20,000.00 | $ 523,370.00 | 1980 | 5310 | 1 |
| 18 | Transit Shed No. 1 | $ 6,825,000.00 | $ - | $ 6,825,000.00 | 1969 | 52978 | |
| 19 | Transit Shed No. 2 | $ 6,546,540.00 | $ 200,000.00 | $ 6,746,540.00 | 1969 | 54000 | |
| 20 | Wharfs F-2- F-6 | $ 55,125,000.00 | $ - | $ 55,125,000.00 | VRS | 3225 | |
| 21 | Restroom Fac., TS2 West | $ 89,250.00 | $ 5,000.00 | $ 94,250.00 | 1969 | 1167 | |
| 22 | Restroom Fac., TS2 North | $ 89,250.00 | $ 5,000.00 | $ 94,250.00 | 1998 | | |
| 23 | Restroom Fac., BOD | $ 89,250.00 | $ 5,000.00 | $ 94,250.00 | 1998 | | |
| 24 | Miscellaneous Lighting & Fencin | $ 550,000.00 | $ - | $ 550,000.00 | Various | | |
| 25 | Harbor of Refuge Warehouse | $ 179,550.00 | $ - | $ 179,550.00 | 1992 | | |
| 26 | Substations 1,2,3 & 4 | $ 1,260,000.00 | $ - | $ 1,260,000.00 | 96/97 | | |
| 27 | Terminal Yard & Paving | $ 10,400,000.00 | $ - | $ 10,400,000.00 | Various | | |
| 28 | Tank No. 7 | $ 336,000.00 | $ - | $ 336,000.00 | | | |
| 29 | Subtotals - Cabras Island | $ 102,321,210.00 | $ 4,808,000.00 | $ 107,129,210.00 | | | |
| 30 | | | | | | | |
| 31 | **Agat Marina** | | | | | | |
| 32 | Admin Building | $ 260,400.00 | $ 2,000.00 | $ 262,400.00 | 1985 | | |
| 33 | Restaurant | $ 492,660.00 | $ - | $ 492,660.00 | 1985 | | |
| 34 | Floating Docks | $ 945,000.00 | $ - | $ 945,000.00 | 1985 | | |
| 35 | Bunkering Wharf | $ 100,000.00 | $ - | $ 100,000.00 | | | |
| 36 | Sub-Totals- Agat | $ 1,798,060.00 | $ 2,000.00 | $ 1,800,060.00 | | | |
| 37 | | | | | | | |
| 38 | **Gregorio D. Perez Marina** | | | | | | |
| 39 | Floating Docks | $ 235,620.00 | $ - | $ 235,620.00 | | | |
| 40 | Restroom Facility | $ 21,000.00 | $ 2,000.00 | $ 23,000.00 | | | |
| 41 | Sub-Totals - Hatgatna | $ 256,620.00 | $ 2,000.00 | $ 258,620.00 | | | |
| 42 | | | | | | | |
| 43 | Totals | $ 104,375,890.00 | $ 4,812,000.00 | $ 109,187,890.00 | | | |
| 44 | | | | | | | |

4:27 PM
8/23/01                         FINANCE DIVISION                    insurance schedules

| 45 | | | | | | | |
|----|----|----|----|----|----|----|----|
| 46 | | | | | | | |
| 47 | | | | | | | |
| 48 | | | | | | | |
| 49 | Revenue ( Blanket ) | | | | | | |
| 50 | Operating Revenue | | | $ 20,000,000.00 | | | |
| 51 | Rental Income | | | $ 4,000,000.00 | | | |
| 52 | Miscellaneous | | | $ 2,200,000.00 | | | |
| 53 | Total | | | $ 26,200,000.00 | | | |
| 54 | | | | | | | |
| 55 | Notes: | | | | | | |
| 56 | 1. Building values shown with the exception of PAG Administration are 100% appraised insurable replacement | | | | | | |
|    | costs + appreciation to date. | | | | | | |
| 57 | 2.Wharf values calculated using the lineal cost of wharves F3-F6 less cost of spur rail. | | | | | | |
| 58 | 3. Hotel Wharf will be separately insured by a private development group. PAG reserves the right to add | | | | | | |
|    | back to coverage should developer default. | | | | | | |

Policy No     01HV0065F

SECTION 01     P.D.

CLOSING OFF SLIP
INCEPTING:

| | | |
|---|---|---|
| 92.0000% | (Underwriters at Lloyds) | |
| 13.6000% | 2724 SJG | NAE291115T73 |
| 20.0000% | 0033 HIS | 24025STAAPBA |
| 16.0000% | 1225 AES | 01N03730JAPD |
| 6.0000% | 1036 COP | T7555Q01FY |
| 6.0000% | 0102 GOS | H1109A00AABA |
| 6.4000% | 0079 PJG | 115TBOF9983A |
| 4.0000% | 1243 EUL | MO2314X01AHL |
| 2.1200% | 0588 NKB | 03E30817V08Z |
| 1.8800% | 1209 XLB | 03E30817V08Z |
| 1.4400% | 0861 NJM | 03A84194L03Z |
| 2.5600% | 1209 XLB | 03A84194L03Z |
| 12.0000% | 0535 COT | 203BE405L01 |

SECTION 02 /3 O l.)


| 92.0000% | | (Underwriters at Lloyds) | |
|---|---|---|---|
| 13.6000% | 2724 | SJG | NAC491115T72 |
| 20.0000% | 0033 | HIS | 24025STBAP0A |
| 16.0000% | 1225 | AES | 01N03730JAPD |
| 6.0000% | 1036 | COP | T7555Q01FY |
| 6.0000% | 0102 | GOS | H1109A00AABA |
| 6.4000% | 0079 | PJG | 115TBOF9983A |
| 4.0000% | 1243 | EUL | M02314X01AHL |
| 2.1200% | 0588 | NKB | 03E30817V08Z |
| 1.8800% | 1209 | XLB | 03E30817V08Z |
| 1.4400% | 0861 | NJM | 03A84194L03Z |
| 2.5600% | 1209 | XLB | 03A84194L03Z |
| 12.0000% | 0535 | COT | 203BE405L01 |

SECTION 04

| 92.0000% | (Underwriters at Lloyds) | | |
|---|---|---|---|
| 13.6000% | 2724 | SJG | NAT291115T71 |
| 20.0000% | 0033 | HIS | 24025STCAMSA |
| 16.0000% | 1225 | AES | 01N03730JAGX |
| 6.0000% | 1036 | COP | LI794Q01FY |
| 6.0000% | 0102 | GOS | H1109B00AAHA |
| 6.4000% | 0079 | PJG | 115TB1V5482A |
| 4.0000% | 1243 | EUL | M02314X01ALB |
| 2.1200% | 0588 | NKB | 07E30817V08Z |
| 1.8800% | 1209 | XLB | 07E30817V08Z |
| 1.4400% | 0861 | NJM | 07A84194L03Z |
| 2.5600% | 1209 | XLB | 07A84194L03Z |
| 12.0000% | 0535 | COT | 233BE405L01 |

| BROKER Ropner Insurance Services | BROKER L.P.S.O. No. 856 | CURRENCY INSD | | GROSS PREMIUM | |
|---|---|---|---|---|---|
| | | | | IN ALL | MARINE WAR |

| ATTACHING TO POLICY NO. 01KV0065F | ENDORSEMENT REF. | | TOTAL | | |
|---|---|---|---|---|---|
| REGISTRATION | V.A.T. | T.O.C. TRIBUNAL | LLOYD'S | | |

| SERIAL | REGISTRATION CATEGORY | SETT.DUE DATE | DEF. | ADJ. | ILU | | |
|---|---|---|---|---|---|---|---|
| | | 1/12/01 | | | LIRMA | | |

| ASSURED/ACCOUNT | LEADING U/WERS | OTHER COMPANIES | | |
|---|---|---|---|---|
| The Port of Guam. | | | | |

Coverage hereon continues for Third of Three year period . (12 months at 1st October 2001)

Property Limit Amended to ;

$25,000,000 CSL Property and Business Interruption

Full Value Equipment $17,~~400,000~~    *sm*    416 116   *sm*

Premium US$ ~~

*Excluding Terrorism & Sabotage absolutely (Exclusion 4 amended accordingly)*

London 15th October 2001.

*INFO : NO EXCESS PURCHASED )*

| INITIAL | | | | | | |
|---|---|---|---|---|---|---|
| SYND./COY | | | | | | |

.P.S.O. NUMBER AND DATE

*New 01KV1167 for*
*12 mos...*



# ENDORSEMENT

Lessee/Licensee:  PORT AUTHORITY OF GUAM

Agreement No. (or replacement agreement):  NS704393RP00004

Location:  DRYDOCK ISLAND, APRA HARBOR, GUAM

The following endorsements are attached to and form part of Policy No(s):  01HV0065F

Issued by:  Underwriters at Lloyd's of London, Lime Street, London, England – Period of insurance 12 months

at 1ˢᵗ October 2001 _____ (name & address of Company) in the amounts specified by said p

| TYPE | PER PERSON | PER ACCIDENT | TYPE | PER PERSON | PER ACCIDENT |
|---|---|---|---|---|---|
| Third Party Personal Injury | $100,000 | $300,000 | Fire & Extended Coverage | N/A | $500,000 |
| Third Party Property Damage | N/A | $50,000 | Other | $ | $ |

a.    CANCELLATION/REVISION CLAUSE:   It is understood and agreed that in the event of cancellation or any material change to this policy made by the Company, the Company agrees to notify in writing the Commander (Attn Code 24), Pacific Division, Naval Facilities Engineering Command, Pearl Harbour, Hawaii 96860, not less than thirty (30) days prior to the effective date of the cancellation or change.

b.    WAIVER OF RIGHT OF SUBROGATION:   The insurer waives any right of subrogation against the United States of America which might arise by reason of any payment made under this policy

c.    ADDITIONAL INSURED:   The United States of America, Department of the Navy, is an additional insured under this policy.

d.    LOSS PAYABLE:   Loss, if any, under this policy, shall be adjusted with the above-named Lessee or Licensee and the proceeds, at the direction of the United States of America, shall be payable to said Lessee or Licensee and the proceeds not paid thereto shall be payable to the Treasurer of the United States of America. (THIS CLAUSE APPLIES ONLY TO FIRE AND EXTENDED COVERAGE INSURANCE AND TO ANY OTHER INSURANCE RQUIRED FOR LOSS OF OR DAMAGE TO GFOVERNMENT PROPERTY.)

e.    PAYMENT:   It is understood and agreed that the United States of America, Department of the Navy, is not responsible for payment of any premium now due or to become due under this policy.

Date: ____16 November 2001____    By: _____S1/Grgrave_____

Signature of Insurer's Representative

(In Ink)

This endorsement to be attached to all insurance policies and certificates of insurance covering use of Navy property by private organisations under lease or license agreement.)

17%  *(signature)*  ⚓ **SJG**
**2724**

| N | A | T | 2 | 9 | 1 | 1 | 1 | S | T | 7 | 1 |
|---|---|---|---|---|---|---|---|---|---|---|---|

Sectn 4    G

**S.J. GARGRAVE**

| N | A | C | 4 | 9 | 1 | 1 | 1 | S | T | 7 | 2 |
|---|---|---|---|---|---|---|---|---|---|---|---|

Sectn 2 & 3   PB

| N | A | E | 2 | 9 | 1 | 1 | 1 | S | T | 7 | 3 |
|---|---|---|---|---|---|---|---|---|---|---|---|

Sectn 1    PB

Leader purchases R/I.

25%  ⚜ *(signature)* 15/10/1  **HIS**
**HISCOX** ☭ **33**

| 2 | 4 | 0 | 2 | S | | T | A | A | | P | B | A |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

Section I

ALS 4

| 2 | 4 | 0 | 2 | S | S | T | B | A | P | O | A |
|---|---|---|---|---|---|---|---|---|---|---|---|

Section II & III

| 2 | 4 | 0 | 2 | S | S | T | C | A | M | S | A |
|---|---|---|---|---|---|---|---|---|---|---|---|

Section IV

20%  **AES** 15/10/01 ▲**AEGIS** ⚓ **AES**
**1225**

| 0 | 1 | N | 0 | 3 | 7 | 3 | 0 | J | A | P | D |
|---|---|---|---|---|---|---|---|---|---|---|---|

PD    SEC 1–3

| 0 | 1 | N | 0 | 3 | 7 | 3 | 0 | J | A | G | X |
|---|---|---|---|---|---|---|---|---|---|---|---|

G    SEC 4

# 🌊 Navigators

0707

| L | J | 0 | 1 | P | T | 8 | 5 | 6 | 9 | 5 | 2 | 0 | 1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**N.C.A.D.**    HUA

17 1/6   AS COMPANY
LEAD.

102

Case 1:03-cv-00009   Document 31   Filed 10/28/2004   Page 22 of 115

SPD 1.12.01   **NO FRONTING**   Excl. NCB



| Signed | Line | % |
| --- | --- | --- |



*17/10/01*  COP 1036

7.5 ·  `7 7 5 5 5 Q 0 1 F Y` 1/2/3 PD

`L 1 7 9 4 Q 0 1 F Y` 4 G

7.5 %
Excluding
Hotel

*16/10/01*

GOSHAWK  GOS 102

`H 1 1 0 9 A 0 0 A A B A` PD

`H 1 1 0 9 B 0 0 A A H A` G

8 %

*25 10 01*

PJG 79

`1 1 5 T B 0 F 9 9 8 3 A` PD

`1 1 5 T B 1 V 5 4 8 2 A` G

0765




| Signed Line | % |
| --- | --- |

EUL ⚓ EUL ⚓ 1243

5

| M | 0 | 2 | 3 | 1 | 4 | X | 0 | 1 | A | H | L | PD |

| M | 0 | 2 | 3 | 1 | 4 | X | 0 | 1 | A | L | B | G |

**XL BROCKBANK**   (53%) NKB 588   2.65
**LIABILITY** ⚓ 50%   (47%) XLB 1209   2.35

| 0 | 7 | E | 3 | 0 | 8 | 1 | 7 | V | 0 | 8 | Z | G |
| 0 | 3 | E | 3 | 0 | 8 | 1 | 7 | V | 0 | 8 | Z | PD |

10%

XLB

17/10/01

(36%) NJM 861   1.8
⚓ 50%   (64%) XLB 1209   3.2

| 0 | 7 | A | 8 | 4 | 1 | 9 | 4 | L | 0 | 3 | Z | G |
| 0 | 3 | A | 8 | 4 | 1 | 9 | 4 | L | 0 | 3 | Z | PD |

~~Premium to be submitted to the LPSO within ___ days of inception~~

15% LW ⚓ COT 885 18/10/01

PD

| 2 | 0 | 5 | B | E | 4 | 0 | 5 | L | 6 | 1 | 7 |

G

| 2 | 3 | 5 | B | E | 4 | 0 | 5 | L | 6 | 1 | 1 |

125%



# Lloyd's Policy

**We, Underwriting Members** of the Syndicates whose definitive numbers and proportions are shown in the Table attached hereto (hereinafter referred to as 'the Underwriters'), hereby agree, in consideration of the payment to Us by or on behalf of the Assured of the Premium specified in the Schedule, to insure against loss, including but not limited to associated expenses specified herein, if any, to the extent and in the manner provided in this Policy.

**The Underwriters** hereby bind themselves severally and not jointly, each for his own part and not one for another, and therefore each of the Underwriters (and his Executors and Administrators) shall be liable only for his own share of his Syndicate's proportion of any such Loss and of any such Expenses. The identity of each of the Underwriters and the amount of his share may be ascertained by the Assured or the Assured's representative on application to Lloyd's Policy Signing Office, quoting the Lloyd's Policy Signing Office number and date or reference shown in the Table.

If the Assured shall make any claim knowing the same to be false or fraudulent, as regards amount or otherwise, this Policy shall become void and all claim hereunder shall be forfeited.

**In Witness** whereof the General Manager of Lloyd's Policy Signing Office has signed this Policy on behalf of each of Us.



**LLOYD'S POLICY SIGNING OFFICE**
General Manager



| Policy No | 99HV0067F |
|---|---|

| FORM | J(A) |
|---|---|

| ASSURED | Port Authority of Guam |
|---|---|

| PERIOD | 36 months at 1st October, 1999 – Subject to Annual Review. |
|---|---|

| INTEREST | SECTION I | Equipment of every description. |
|---|---|---|
| | SECTION II | Property of every description. |
| | SECTION III | Loss of Revenue/Business Interruption |
| | SECTION IV | Port Authority Legal and/or Public Liabilities. |

| SUM INSURED | SECTION I | USD24,829,106 being total of Equipment Schedule, as attached. |
|---|---|---|
| | SECTION II } | |
| | SECTION III} | USD50,000,000 Combined Single Limit and in the aggregate separately in respect of Flood and Earthquake Shock. |
| | SECTION IV | USD50,000,000 any on accident and/or occurrence. |

**CONDITIONS
SECTION 1**

All risks of physical loss or damage to equipment, cranes, forklifts, trucks, conveyors, machinery etc., the property of the Insured, or leased or on hire for which the Insured is responsible whether in transit or otherwise, on land or afloat, in port area or in transit elsewhere.

Including War whilst afloat, Terrorism, Strikes, Riots, Civil Commotion and Malicious Damage but excluding wear and tear and gradual deterioration. It shall be understood and agreed that such exclusions shall be limited to that part of the equipment directly involved and shall not extend to other equipment and/or property, damaged by such wear and tear and gradual deterioration.

Noted and agreed that Assured has the ability to add additional items hereunder up to 10% of the total equipment schedule per annum without additional premium.

Subject to deductibles as detailed in the attached schedule each and every loss or losses arising out of any one accident or series arising out of any one event.



**SECTION II**

All risks of physical loss or damage to all wharves, ramps, dock gates, jetties, pipelines, transformers, boilers, pumps and all other appliances, berths, office buildings and contents, other assets, property and/or contents of the Insured of every and any description whatsoever.



The definition of property is to be extended to include money, burglary, debris removal, professional fees and engineering.

It is also extended to include computers with cover for damage to mainframe computer, data carrying material, cost of reinstatement of data and increased cost of working.

Included under this section are the accessories, electrical installations, also all mooring facilities, fenders permanently fixed or not, also all foundations, groundwork and structures of any kind whatsoever.

Including Terrorism, Strikes, Riots, Civil Commotions and Malicious Damage.

Excluding losses or damage caused by wear and tear and gradual deterioration.

It shall be understood and agreed that such exclusion shall be limited to that part of the property directly involved and shall not extend to other equipment and/or property, damaged by such wear and tear and/or gradual deterioration.

Subject to deductibles:

USD50,000 each and every loss or losses arising out of any one accident or series of accidents and/or out of any one event or series of events BUT USD250,000 in respect of Earthquake Shock, Flood, and Windstorm each occurrence.

USD1,000 in respect of computer equipment.

SECTION III    To indemnify the Insured for loss of revenues arising out of the loss or damage to assets insured under Sections I and II which bring a claim, including but not limited to:

Loss of Revenue due to damage to any of the Insured's properties or interruption of the normal operation of the Port.

Loss of Revenue resulting from denial of access.

Loss of Revenue resulting from damage to premises of customers or suppliers.

Increased cost of working due to disruption.

Including blockage to and/or of channels, berths or access waters from any cause whatsoever.

Subject to deductible 72 hours. In respect of the perils of Earthquake Shock, Flood and Windstorm 72 hours waiting period increased to 168 hours.

Excluding the application of any other deductible under this policy.

SECTION IV    To cover the Assured for their legal liabilities, contractual, statutory or otherwise including, but not limited to terminal operators, wharfingers, stevedores and warehouse operators liability, as applicable, as per wording attached.



Including Seepage and Pollution as per wording.

Including costs of removal of wreck for owned and/or non-owned vessels and/or any other obstructions.

Including Public Officials liabilities (as per Public Officials Liability Definition attached) but sub-limited to USD5,000,000 any one accident or occurrence.

Excluding cleaning of ships tanks

Excluding liabilities arising from the provision of labour to the Military Authorities or Federal Government in respect of the handling of explosives and/or munitions.

Excluding liabilities arising from shiprepairing operations on Dry-dock Island

Warranted that all tenants of the marina maintain full liability insurances in respect of all operations associated thereto.

Warranted separate D&O insurance policy maintained throughout the period of this policy. Excluding any and all D&O claims hereunder.

Subject to deductible:

USD10,000 any one accident and/or occurrence.

**GENERAL**

**CONDITIONS**

Including Additional Named Insureds and Waivers of Subrogation as required by written contract.

Including removal of wreck and/or debris or any other thing regardless of ownership.

Noted and agreed that deductibles under section I of this policy are not to be aggregated with any other deductible within this policy in the event that a loss occurs which affects more than one section of the policy simultaneously – applicable to Sections I & II only.

No Claims Bonus applicable to Sections I, II and III only

In the event of no claims being made during the next 3 years Underwriters hereon agree to allow the following No Claims Bonus payable as a return premium at expiry each year, subject to renewal with the principal lead Underwriters via Ropner Insurance Services Limited:

| 1999-2000 | 7.5% |
| 1999-2001 | 10% |
| 1999-2002 | 12.5% |

Subject to Long Term Agreement Clause of 5% per N. M. A. 1743 – subject to Review of Terms Clause as attached.

Subject to EDRC LSW 1065B - subject to review upon receipt of satisfactory information.



Underwriters hereby note:-

In order for the Port to agree to have the terms of its insurance policy for more than one year, Guam law requires that there be a provision or clause in the policy stating that the annual renewal of the insurance policy for each of the three (3) years are subject to the availability of funds.

## Port Authority of Guam

It is noted and agreed that blanket values apply hereon with no individual amount shown restricting the indemnity provided under the policy.

In certain circumstances the values given for underwriting criteria may not represent full replacement cost and under which circumstances underwriters agree to replacement cost on the item affected provided that the replacement cost does not exceed 120% of the valuation for the item shown in the schedule. In the event of the item exceeding this figure then the indemnity provided will be market value but only in respect of total loss.

Such agreement will not prejudice any other item insured under the policy or be in breach of the insureds rights of recovery under the terms and conditions of the policy.

Institute Radioactive Contamination Exclusion Clause (Cl.356).

Cancellation Notice Clause (856ROP00182).

PREMIUM ~~~~~~~~~~~~~~~~~ iew.

# PORT AUTHORITY OF GUAM



## Annual Declaration of Values for Insurance Purposes

<u>USD</u>

Blanket, all real and personal Property of an insurable nature belonging to the Insured and Property of others for which the Insured may be responsible (excluding Business interruption which detailed below).

USD155,590,995          (includes USD10,700,000  paving,  not  on schedule)

Valuable Papers, Records and Computer Media

USD1,000,000

Property in Transit   USD250,000

Newly acquired property

USD1,000,000

Money and negotiable documents

USD5,000

Earnings per annum

USD27,000,000

The Schedules of Property and Equipment that appear in these specifications represent, to the best of the Authority's knowledge, a complete listing of all it's owned and leased real and personal property and the current replacement values thereof. The schedules are printed solely to enable Underwriters to view the distribution of values and determine a probable maximum loss for the purposes of reinsurance. The schedules are not to be used to establish sub-limits of coverage, nor are they to be considered as any form of valuation warranty.

# PORT AUTHORITY OF GUAM



## 36 months at 1st October, 1999

## Review of Terms

36 month policy, subject to review of terms not less than 60 days prior to anniversary date.

If, as a result of the above review procedure, Underwriters and the Assured are unable to agree terms then the policy is automatically cancelled at the anniversary date (subject to payment by Assured of any outstanding premiums and refund of any Long Term Agreement discount).

At any time the Assured can reduce or cancel an individual Underwriter's participation on the policy if during the policy period, in the sole judgement of the Assured, (a) there exists a potential for such Underwriter to become either insolvent or cease trading or (b) the claims paying ability of such Underwriter is, or could become impaired.

It is hereby understood and agreed that Notice of Cancellation is given 90 days prior to each anniversary date.

All other terms and conditions remain unaltered.



# PORT AUTHORITY OF GUAM

## SECTION I AND II - DIRECT PHYSICAL LOSS
## OR DAMAGE WORDING FOR EQUIPMENT AND PROPERTY

SUBJECT TO THE EXCLUSIONS, CONDITIONS AND LIMITATIONS CONTAINED HEREIN, this Policy insures (1) the Property of the Assured which has been declared to and agreed by Underwriters and (2) the property of others which is (a) in the Assured's care, custody, and control, and (b) for which the Assured is legally liable, against ALL RISKS OF DIRECT PHYSICAL LOSS OR DAMAGE and losses consequential thereto occurring during the period of this Policy.

## EXCLUDED CAUSES OF LOSS

UNLESS OTHERWISE STATED THIS POLICY DOES NOT INSURE AGAINST:-

1) Wear, tear or gradual deterioration; Wet rot, dry rot or mould; Spoilage, decay or decomposition; Normal settling, shrinking or expansion in buildings, structures or foundations; Corrosion or rust; Erosion; Leakage; any other gradually occurring loss; or any loss which commenced prior to the inception of this Policy.

2) Loss or damage caused by error in design, Faulty workmanship; or Faulty or unsuitable materials. However, if Fire or Explosion results, then any loss or damage arising directly from that Fire or Explosion shall not be excluded hereunder.

3) Loss or damage caused by Moths, Insects; Vermin; Inherent vice or latent defect; Dampness or dryness of atmosphere; Condensation; Smog or fog; or extremes or changes in atmospheric temperature. However, if a cause not otherwise excluded by this Policy results, then any loss or damage arising directly from that cause shall not be excluded hereunder.

4) Loss or damage caused by War, Invasion, Acts of foreign enemies, Hostilities (whether war be declared or not) Civil War, Rebellion, Revolution, Insurrection, Military or usurped power, Martial law, or Warlike operations.

5) Loss or damage caused by Confiscation, Requisition, Detention, Legal or illegal occupation, Embargo, Quarantine, or any result of any order of Public or Government authority, which deprives the Assured of the use or value of its property, not for loss or damage arising from acts of Contraband or Illegal transportation or Illegal trade.

6) Loss, damage or increased cost caused by enforcement of any ordinance or law regulating the use, reconstruction, repair or demolition of any property insured hereunder, NOR any loss, damage, costs, expenses, fine or penalty which is incurred, or sustained by or imposed on the Assured at the order of any Governmental Agency, Court, or other Authority arising from any cause whatsoever.

EXCEPT this Policy shall not exclude damage to, or destruction of, said property by Civil Authority during a conflagration and for the sole purpose of retarding the same, PROVIDED that neither such conflagration nor such damage or destruction is caused or contributed to by War, Invasion, Hostilities, Acts of foreign enemies, Civil War, Revolution, Rebellion, Insurrection, Military or usurped power, Martial law or Warlike operations.

7) Loss or damage caused by Nuclear reaction, Nuclear radiation or Radioactive contamination as per Clause CL.356 contained in the General Conditions of this policy howsoever such Nuclear reaction, Nuclear radiation or Radioactive contamination may have been caused. NEVERTHELESS, if a fire arises directly or indirectly from Nuclear reaction, Nuclear radiation or Radioactive contamination, any loss or damage arising directly from that fire shall (subject to the provisions of this Policy) be covered EXCLUDING however all loss or damage caused by Nuclear reaction, Nuclear radiation or Radioactive contamination arising directly or indirectly from that Fire.

8) Loss or damage caused by backing up of Sewers and/or drains; or Seepage of any substance.

9) Loss of use, delay or loss of markets; however caused or arising, and despite any preceding loss insured hereunder.

10) Mysterious disappearance or Inventory shortage.

11) Theft, fraud, or any kind of wrongful conversion or abstraction, whether committed alone or in collusion with others by:-

 a) The Assured or any Associate, Officer or Employee thereof;
 b) Any Bailee or any Associate or Officer thereof;

 all while working or otherwise.

12) Loss or damage caused by the Insolvency or any financial impairment of any person or organisation to whom the Assured's property may be entrusted.

13) Loss or damage caused by Processing, Renovating, Repairing or working upon. However, if Fire or Explosion results, then any loss or damage arising directly from that Fire or Explosion shall not be excluded by this clause.

14) Loss or damage caused by Cessation, fluctuation or variation in, or insufficiency of, water, gas or electricity supplies.

15) Loss or damage caused by:-

    a)    theft

           or

    b)    exposure to weather conditions

where any personal property insured is left in the open or not contained in buildings which are on permanent foundations and capable of secure storage.

## EXCLUDED PROPERTY

UNLESS OTHERWISE STATED THIS POLICY DOES NOT INSURE:-

1) Land (including but not limited to land on which the property is located) or any other naturally occurring substance; or water (other than water contained in plumbing or firefighting installations).

2) Shafts, Mines, Tunnels, Wells, Ponds and Dikes and the like.

3) Driveways, Pavements, Curbing and Culverts.

4) Buildings or structures in process of construction or materials and supplies therefor.

5) Power Transmission or feeder lines not on the Assured's premises unless they are included within the schedule of property insured hereunder.

6) Neon Signs and automatic or mechanical and/or electric signs, awnings.

7) Property sold by or under encumbrance to the Assured after it leaves the custody of the Assured or an employee of the Assured.

8) Accounts, bills, notes, securities, deeds, evidence of debt and valuable papers.

9) Aircraft or any other Aerial device, Watercraft, Vehicles designed for highway use, or Locomotives or Rolling Stock designed for Railroad use.

10) Animals, Plants and living things of all types.

11) Jewellery, Precious Stones, Furs and Garments.



## OTHER INSURANCE

THIS POLICY DOES NOT INSURE:-

a)   Any loss or damage, or any property which is more specifically insured elsewhere

   nor

b)   any loss or damage, or any property which but for the existence of this Policy would be insured elsewhere

except, where such amounts insured elsewhere are less than the applicable limit or sub limit insured by this Policy, this Policy insures for the difference between the amounts insured elsewhere and the applicable limit or sub limit of this Policy, subject always to this Policy's deductible.

## TERRITORIAL LIMITS

This Policy insures at the location(s) declared to and agreed by Underwriters and stated in the Schedule attached hereto.

## SUM INSURED

This Policy shall not cover for more than the sum(s) stated in the Schedule in respect of each loss occurrence nor for more than the aggregate amount(s) separately stated in the Schedule in respect of specified causes.

## DEDUCTIBLE

Each loss occurrence shall be adjusted separately, and from the amount of each adjusted loss occurrence the applicable sum stated in the Schedule shall be deducted.

## CONDITIONS

1)   DUE DILIGENCE

   The Assured shall use due diligence and do and concur in doing all things reasonable to avoid or diminish any loss of or damage to the property insured.



2) <u>PROTECTION MAINTENANCE</u>

It is agreed that any protection provided for the safety of the insured property shall be maintained in good order throughout the currency of this Policy and shall be in use at all relevant times, and that such protection shall not be withdrawn or varied to the detriment of the interests of the Underwriters without their consent.

3) <u>VALUES DECLARED (AND INCORRECT DECLARATION PENALTY)</u>

The premium for this Policy has been based on a statement of values declared to and agreed by Underwriters at the Inception of this Policy and stated in the Schedule.

If the values declared are less than the actual values (See Condition (5) "Valuation"), then any recovery otherwise due hereunder shall be reduced in the same proportion that the values declared above bear to the values that should have been declared, and the Assured shall Co-insure for the balance.

4) <u>AUDIT</u>

The Underwriters may examine and audit the Assured's books and records at any time during the Policy period and extensions thereof and within three years after the termination of this Policy, as far as they relate to the subject matter of this insurance.

5) <u>VALUATION (SEE ALSO CONDITION (3) "VALUES DECLARED") AND/OR</u>
<u>REINSTATEMENT OF ALL PROPERTY</u>

For the assessment of premium and for adjustment in the event of loss or damage insured under this Policy the basis of valuation shall be as follows:-

a) Any settlement shall be based on whichever is the least of the cost of repairing, replacing or reinstating the destroyed or damaged property with material of like, kind and quality.

b) The repair, replacement or reinstatement (all hereinafter referred to as 'replacement') shall be on the same site and intended for the same occupancy as the destroyed or damaged property.

c) The replacement must be executed with due diligence and despatch.

d) Until replacement has been effected the amount of liability under this Policy in respect of loss shall be limited to the actual cash value at the time of the loss.

e) If replacement with material of like, kind and quality is restricted or prohibited by any by-laws, ordinance or law, any increased cost of replacement due thereto shall not be covered by this Endorsement.

f) On documents not specifically excluded, (except film, tape, disc, drum, cell and other magnetic recording or storage media for electronic data processing), to not exceeding the cost of blank material plus the cost of labour incurred by the Assured for transcribing or copying such records.

g) On film, tape, disc, drum, cell and other magnetic recording or storage media for electronic data processing, to not exceeding the costs of such media in unexposed or blank form plus the cost of labour incurred by the Assured for transcribing or copying such records.

Underwriters' liability for loss under this Policy shall not exceed the smallest of the following amounts:

i) the amount of the Policy applicable to the destroyed or damaged property

ii) the replacement cost of the property or any part thereof with such property and intended for the same occupancy and use

iii) the amount actually and necessarily expended in replacing said property or any part thereof.

6) NOTIFICATION OF CLAIMS AND PROOF OF LOSS

The Assured, upon knowledge of any occurrence likely to give rise to a claim hereunder, shall give immediate written advice thereof to the person(s) or firm named for the purpose in the Schedule.

The Assured shall render a signed and sworn proof of loss within sixty (60) days after the occurrence of a loss (unless such period be extended by the written agreement of Underwriters) stating the time, place and cause of loss, the interest of the Assured and of all others in the Property, the sound value thereof and the amount of loss or damage thereto.

7) ABANDONMENT

There shall be no abandonment to the Underwriters of any property.



8) EXAMINATION UNDER OATH

If required by Underwriters, in the event of a claim being made under this Policy, the Assured; or, if a company or other body then the appropriate representatives; shall submit to examination on oath at such reasonable times and places as may be arranged.

9) MISREPRESENTATION AND FRAUD

This entire Policy shall be void if the Assured has wilfully concealed or misrepresented, in writing or otherwise, any material facts or circumstances concerning this insurance or the subject matter thereof, or if the Assured shall make any attempt to defraud either before or after a loss.

10) SUBROGATION AND SUBROGATION WAIVER

If the Underwriters become liable for any payment under this Policy in respect of loss or damage, the Underwriters shall be subrogated, to the extent of such payment, to all the rights and remedies of the Assured against any party in respect of such loss or damage and shall be entitled at their own expense to sue in the name of the Assured.

The Assured shall give to the Underwriters all such assistance in his power as the Underwriters may require to secure their rights and remedies and, at the Underwriters request, shall execute all documents necessary to enable Underwriters effectively to bring suit in the name of the Assured including the execution and delivery of the customary form of loan receipt.

The Underwriters hereon agree that this insurance shall not be invalidated should the Assured waive in writing, prior to loss affected thereby, any or all rights of recovery against any party for loss or damage occurring to the property described herein. Underwriters expressly waive subrogation against any subsidiary, parent, associated, or affiliated company of the Assured, BUT THE ABOVE WAIVERS SHALL NOT APPLY where the party otherwise protected thereunder is supplying or receiving goods or services for which a reward, recompense or consideration passes between the Assured and such other party.

11) SALVAGE AND RECOVERIES

All salvages, recoveries and payments recovered or received subsequent to a loss settlement under this Policy shall be applied as if recovered or received prior to the said settlement and all necessary adjustments shall be made by the parties hereto.



12)  ARBITRATION

If the Assured and Underwriters fail to agree in whole or in part regarding any aspect of this Policy, each party shall, within ten (10) days after the demand in writing by either party, appoint a competent and disinterested arbitrator and the two chosen shall before commencing the arbitration select a competent and disinterested umpire. The arbitrators together shall determine such matters in which the Assured and Underwriters shall so fail to agree and shall make an award thereon, and if they fail to agree, they will submit their differences to the umpire and the award in writing of any two, duly verified, shall determine the same.

The Parties to such arbitration shall pay the arbitrators respectively appointed by them and bear equally the expenses of the arbitration and the charges of the umpire.

13)  INSPECTION

The Underwriters shall be permitted, but not obliged, to inspect the Assured's property at any time. Neither the Underwriters' right to make inspections nor the making thereof nor any report thereon shall constitute an undertaking, on behalf of or for the benefit of the Assured or others, to determine or warrant such property is safe.

14)  ASSIGNMENT

Assignment or transfer of this Policy shall not be valid except with the written consent of Underwriters.

15)  CANCELLATION

This Policy may be cancelled by the Assured at any time by written notice or by surrender of this Policy. This Policy may also be cancelled by or on behalf of the Underwriters by delivering to the Assured or their representatives or by mailing to the Assured or their representatives, by registered, certified or other first class mail, at the Assured's or their representatives address as shown in this Insurance, written notice stating when, not less than 60 days thereafter, the cancellation shall be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice and this Insurance shall terminate at the date and hour specified in such notice.

If this Insurance shall be cancelled by the Assured the Underwriters shall retain the customary short rate proportion of the premium hereon, except that if this Insurance is on an adjustable basis the Underwriters shall receive the earned premium hereon or the short rate proportion of any minimum or deposit premium stipulated herein whichever is the greater.

If this insurance shall be cancelled by or on behalf of the Underwriters, the Underwriters shall retain the pro rata proportion of the premium hereon except that if this Insurance is on an adjustable basis the Underwriters shall receive the earned premium hereon or the pro rata proportion of any minimum premium stipulated herein whichever is the greater.

Payment or tender of any unearned premium by the Underwriters shall not be a condition precedent to the effectiveness of Cancellation but such payment shall be made as soon as practicable.

If the period of limitation relating to the giving of notice is prohibited or made void by any law controlling the construction thereof, such period shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

## DEFINITIONS

## LOSS OCCURRENCE

The words "loss occurrence" shall mean all individual losses or damage arising out of and directly occasioned by one event. However, if the following causes are insured by this Policy the duration and extent of any "loss occurrence" so defined shall be limited to:

a)   72 consecutive hours as regards a hurricane, a typhoon, windstorm, rainstorm, hailstorm and/or tornado.

b)   72 consecutive hours as regards earthquake, tsunami or seaquake, and/or volcanic eruption.

c)   72 consecutive hours and within the limits of one City, Town or Village as regards riots, civil commotions and malicious damage.

d)   72 consecutive hours as regards any "loss occurrence" which includes individual loss or losses from any of the causes mentioned in (a), (b) or (c) above.

and no individual loss from whatever insured cause, which occurs outside these periods or areas, shall be included in that "loss occurrence."

The Assured may choose the date and time when any such period of consecutive hours commences and if any event is of greater duration than the above period, the Assured may divide that event into two or more "loss occurrences," provided no two periods overlap and provided no period commences earlier than the date and time of the happening of the first recorded individual loss to the Assured in that event during the policy period.



## PORT AUTHORITY OF GUAM

### AUTOMATIC ACQUISITION

It is understood and agreed that this Policy is extended to cover additional property and interests as described in this Policy, which may be acquired or otherwise become at the risk of the Assured during the period of this Policy, subject to the total values at that time not exceeding the highest values at any location already included for coverage.

### DEBRIS REMOVAL ENDORSEMENT

Nothing contained herein shall override any Seepage and/or Pollution and/or Contamination Exclusion or any Radioactive Contamination Exclusion or any other Exclusion applicable to this Policy.

In the event of direct physical damage to or destruction of property, for which Underwriters hereon agree to pay, or which but for the application of a deductible or underlying amount they would agree to pay (hereinafter referred to as "Damage or Destruction"), this Policy also insures, within the Sum Insured and to all the other terms and conditions of the Policy, costs or expenses.

### PROFESSIONAL FEES

The sums insured herein are deemed to include architects', surveyors' and consultants' fees necessarily incurred by the Assured in the reinstatement of the property following upon its destruction or damage by any peril insured against (but not any fees for the preparation of a claim or an estimate of loss) subject to the scales of professional charges prevailing at the time of the destruction or damage.

0789

# PORT AUTHORITY OF GUAM

## SECTION III - GROSS EARNINGS BUSINESS INTERRUPTION EXTENSION



### INSURING CLAUSE

In consideration of the premium paid and subject to the terms, conditions and exclusions of the policy to which this Extension is attached, and to the following terms and conditions, this Insurance is extended to cover:-

Against loss resulting directly from necessary INTERRUPTION OF BUSINESS caused by Direct Physical Loss or Damage, as covered by the policy to which this Extension is attached, to real and/or personal property, occurring during the term of this Policy on premises occupied by the Assured and situated as specified in the Schedule.

In the event of such loss or damage Underwriters shall be liable for the Actual Loss Sustained by the Assured resulting directly from such interruption of business, but not exceeding the Loss of income, meaning the net income (net profit before income taxes) that would have been earned during the interruption of business; for only such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of the property as has been lost or damaged, commencing with the date of such loss or damage and not limited by the date of expiration of this Policy. Due consideration shall be given to the continuation of normal charges and expenses including payroll expenses, to the extent necessary to resume operations of the Assured with the same quality of service which existed immediately preceding the loss.

### SUM INSURED

The Underwriters hereon shall not be liable for more than the Sum Insured stated in the schedule in respect of each and every loss, irrespective of the number of locations suffering an interruption of business.

### CONDITIONS

1)    DIRECT DAMAGE

No claims shall be sustained against this Extension resulting from the necessary interruption of business unless and until a loss has been paid, or liability admitted, in respect of direct physical damage to property insured under the policy to which this Extension is attached, giving rise to business interruption.

This Condition shall not apply if no such payment shall have been made nor liability admitted solely owing to the operation of a Deductible in such policy excluding liability for losses below a specified amount.

2) <u>RESUMPTION OF OPERATIONS</u>



If the Assured could reduce the loss resulting from the interruption of business

    a)    by complete or partial resumption of operation of the property whether or not such property be lost or damaged, or

    b)    by making use of merchandise or other property at the Assured's locations or elsewhere.

such reduction shall be taken into account in arriving at the amount of loss hereunder.

3) <u>EXPENSES TO REDUCE LOSS</u>

This Extension also covers such expenses as are necessarily incurred for the purpose of reducing loss under this Extension (except expenses incurred to extinguish a fire); but in no event to exceed the amount by which loss under this Extension is thereby reduced. Such expenses shall not be subject to the application of any contribution clause.

4) <u>SPECIAL EXCLUSIONS</u>

Underwriters shall not be liable for any increase of loss which may be occasioned by any local or state ordinance or law regulating construction or repair of buildings or structures, nor by the suspension, lapse or cancellation of any lease or licence, contract or order, nor for any increase of loss due to interference at the described premises by strikers or other persons with rebuilding or replacing the property or with the resumption or continuance of the business; nor shall Underwriters be liable for any other consequential or remote loss.

0765

# PORT AUTHORITY OF GUAM

## SUPPLIERS AND CUSTOMERS EXTENSION (GROSS EARNINGS)



### INSURING AGREEMENT

In consideration of the premium paid by the ASSURED to the Underwriters and subject to the terms, clauses, conditions and definitions incorporated in and added by the GROSS EARNINGS Business Interruption Extension, this Insurance is extended to insure the actual loss of earnings sustained by the ASSURED when property of the type insured hereunder as INSURED PROPERTY but belonging to either suppliers or customers of the ASSURED, is physically lost or physically damaged by a peril insured under the Insurance to which this Extension is attached.

Any amount recoverable under this Suppliers and Customers Extension shall not exceed the reduction in GROSS EARNINGS less charges and expenses which do not necessarily continue during the interruption of business for only such length of time, never to exceed 12 calendar months, as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of the property of the supplier or customer as has been physically lost or physically damaged commencing with the time and date of PHYSICAL LOSS OR DAMAGE and not limited by the date of expiration of this Insurance.

# PORT AUTHORITY OF GUAM



## DENIAL OF ACCESS CLAUSE

It is hereby agreed that, subject to the terms, conditions and exclusions of this Insurance, loss as insured by this Section resulting from interruption or interference with the Business in consequence of Damage (as defined herein) to property in the vicinity of the Premises which shall prevent or hinder the use thereof or access thereto, whether the Premises or property therein shall be damaged or not, shall be deemed to be loss resulting from Damage to property used by the Assured at the premises.

# PORT AUTHORITY OF GUAM



## SECTION IV - LIABILITY

This insurance applies in respect of all the Assured's liability arising out of all activities consisting principally of but not limited to PORT OPERATIONS, port maintenance and improvements, warehousing and terminal operations.

1.  **COVERAGE**

    In consideration of the payment of premium, the Underwriters agree to pay on behalf of the Assured, liabilities to others arising out of the activities and/or operations of the Assured which they may incur as a Port Authority and/or Terminal Owner/Operator and/or Stevedore and/or Warehouseman and/or Tenant and/or Property Owner, including losses consequential thereto and are:-

    a)  imposed upon the Assured by law, and/or;

    b)  assumed under contract or agreement by the Assured and/or any officer, director, stockholder, partner or employee of the Assured, while acting in his capacity as such, and/or;

    c)  in respect of any statutory liability for damages in respect of a Claim against the Assured during the period of this Policy and which arises by reason of:

        a)    bodily injury

        b))   personal injury;

        c)    property damage;

        d)    advertising liability;

        e)    additional expenses

        resulting from an accident and/or occurrence at any of the Assured's premises and/or by operations and/or activities anywhere in the world.

        Without prejudice to the generality of the foregoing this Section includes but is not limited to:

foul berthing and/or in respect of pilotage or any other activities in connection with the navigation of mooring and/or docking or undocking of vessels and/or craft of any description whatsoever including removal of wreck

negligence of the harbour master, wharf superintendent, his assistants and/or any director, officer or stockholder and/or any other employees or persons for whose actions the Assured may be held responsible

detention of ships

use, ownership, leasing or responsibility for craft and/or plant and/or apparatus of any description.

Excess Collision Liability, protection & Indemnity and towage liability in respect of owned or operated vessels excess of hull value up to limits hereon.

the Assured's liability as Bailees

embarkation and disembarkation of passengers (by tender or otherwise) including whilst on piers, gangways, landing stages, etc. and all accesses thereto.

loading or unloading of vessels, vehicles or trucks including the delivery and collection of goods in connection therewith, or from anything falling and/or striking a vessel.

explosion or collapse of vessels apparatus subject to pressure, including oxy-acetylene or kindred type cylinders, propane gas installation, liquid oxygen plant and supply lines.

diving operations.

absence, misplacement or faulty working of buoys, lights and/or other navigational aids which it is the Assured's responsibility to provide

in connection with all lands, breakwaters, piers, premises , plant and equipment

the presence of a wreck or part thereof or any other floating or submerged object or obstruction whatsoever in or near the Assured's area of the waters approaching thereto, whether or not such wreck, has arisen due to the negligence of the Assured or their servants

property held in the Assured's trust, care, custody or control or for which the Assured is responsible, including loading or unloading of vessels or vehicles and carriage by land, air, sea or inland waterway

responsibilities to or for sub-contractors, including loss of life and/or personal injury to workmen in the employ of sub-contractors. It is a condition of this coverage that the Assured contractually endeavours and makes every reasonable effort to confirm that all sub-contractors maintain E.L./W.C.A. coverage to at least USD5,000,000 and such coverage be fundamental hereto.

out of or caused to hull, machinery, equipment, goods etc., sold, supplied, processed, repaired, worked upon, disposed of or replaced by the Assured or their sub-contractors including liabilities by reason of any obligation expressed or implied under contract and/or common law to make good defective workmanship and/or materials

from occasional operations outside the general course of business, and liabilities arising from our caused by employees in the temporary service of directors or officials in their private capacity

from use of or hire of tractors, trailers, fork-lift trucks, cranes, vehicles, motor and/or pedal cycles but always in excess of any more specific insurance if it should be insured.

from the ownership, occupation or use of harbours, wharves, quays, docks or craft including foul berth and the presence of wreckage or floating object or submerged obstruction in the water or approaches thereto

out of any other operation, accident or act of negligence, occurring in or about the docks, work premises or anywhere else in Guam or in the World, in connection with the Assured's business or for which the Assured may be responsible,, including ownership and/or use of passenger and/or goods lifts, miscellaneous tackle, gamma ray apparatus and isotopes and other items of property as per Schedule; also defects in buildings, ways, works, machinery or plant, owned or used, borrowed or hired by the Assured or their sub-contractors in connection with their business, including social and welfare or otherwise and deleterious matter in food or drink

any indemnity the Assured are required to give to their harbour master(s) and pilot(s) whether they are acting on their own behalf or on behalf of their employees or as agents of their employers or in any other capacity, but always in respect of port operations

from providing work experience for trainees who are not employees of the Assured whilst in the Assured's care, custody or supervision.

## 2. LIMITS OF LIABILITY

Insurers shall only be liable for Ultimate Net Loss of USD50,000,000 any one accident or occurrence.

## 3. CONDITIONS

This Section of the Policy is subject to the following conditions:

(i) **Insolvency**

The insolvency, bankruptcy receivership or any refusal or inability to pay off the Assured and/or any Insurer shall not operate to:

(a) increase Insurers' liability under this Section of the Policy;

(b) increase any Insurer's share of liability under this Section of the Policy.

In no event, shall any Insurer of this Policy assume the responsibilities and/or obligations of the Assured and/or any Insurer.



(ii)    Other Insurance

Where the Assured is, irrespective of this Section of the Policy, entitled to be indemnified in whole or in part by any other insurance in respect of any damage which would otherwise have been indemnifiable in whole or in part by the Insurers of this Section of the Policy, there shall be no contribution or participation by the Insurers of this Section of the policy on the basis of any deficiency, concurrent or double insurance for such damages or that part of such damages for which the Assured is entitled to be indemnified by such other insurance. This condition will apply whether or not the Assured is actually indemnified by such other insurance.

(iii)   Appeals

In the event that the Assured elects not to appeal against a judgement which may, in whole or in part, involve indemnity under this Section of the Policy, with unanimous consent Insurer may, following discussion with the Assured, elect to make such appeal at their own cost and expense and shall be liable for the taxable costs and disbursements and any additional liability and interest incidental to such appeal, but, in these circumstances, the liability of Insurers may exceed the relevant limits of liability set out in Item 2 of the Schedule plus such cost, expense, costs, disbursements and interest.

(iv)    Subrogation

Where an amount is paid by Insurers under this Section of the Policy, the Assured's rights of recovery against any other person or entity in respect of such amount shall be exclusively subrogated to Insurers. At Insurer's request, the Assured will assist, co-operate and lend its name to the exercise of Insurers' rights of subrogation. The Assured is hereby authorised to waive any rights of recovery in relation to any other party, provided such waiver is given in writing prior to the relevant accident.

(v)     Application of Recoveries

All recoveries or payments recovered or received subsequent to a payment by Underwriters under this Section of the Policy, after deduction of all recovery expenses, shall be applied as if recovered or received prior to such payment and all necessary adjustments shall then be made between the Assured and Insurers.

(vi)    Waiver or Change

Notice to or knowledge possessed by any person shall not effect a waiver or change in any part of this Section of the Policy nor stop Underwriters from asserting any risk waived or changed, except by endorsement issued to form a part hereof, signed by Insurers.



### (vii)  Assignment

Assignment of interest under this Section of the Policy shall not bind Insurers unless and until their written agreement thereto is secured.

### (viii)  Inspection and Investigation

In addition to the notice requirements in this Section of the Policy, on request by Insurers, the Assured will provide full details of all accidents or occurrences which may deplete any underlying amount applicable hereto or which may ultimately give rise to indemnity under this Section of the Policy.

The Assured will co-operate fully with Insurers should Insurers decide to investigate any accident or occurrence notified to Insurers, and in this connection, Insurers may inspect the Assured's property or operations at any time during normal working hours.

## 4.  EXCLUSIONS

This Section of the Policy does not apply to liability:

i)  arising out of an accident, claim, potential claim, circumstance or loss discovered in respect of which the Assured either has given notice to the Insurers of any other insurance before the inception date of this Section of the Policy, or where such notice is treated by any Insurers as received by such Insurers before such inception date;

ii)  for any claim arising directly or indirectly under Workman's Compensation or Employers' Liability Acts or any other Statutory or Common Law Liability in respect of loss of life, bodily injury or illness of any workman or other person employed in any capacity whatsoever by the Assured, when such loss of life, bodily injury or illness arises out of or in the course of the employment of such workman or other person;

iii)  covered by the Road Traffic Act.

iv)  for Property Damage to the Assured's products arising out of such products or any part of such products;

v)  for Property Damage to work performed by or on behalf of the Assured arising out of such work or any portion thereof, or out of the materials, parts or equipment furnished in connection therewith;

vi)     for Advertising Liability arising out of:

    a)     failure to perform under any contract, but this shall not relate to claims for unauthorised appropriation of ideas based upon alleged breach of an implied contract;

    b)     infringement of registered trade marks, service mark or trade name by use thereof as the registered trade mark, service mark or trade name of goods or services sold, offered for sale or advertised, but this shall not relate to titles or slogans;

    c)     incorrect description of any article or commodity;

    d)     mistake in advertised price;

vii)    for discrimination and humiliation;

viii)   for Property Damage to:

    i)     property owned by the Assured;

    ii)     property leased, rented or occupied by the Assured in circumstances where the Assured is required to arrange the full property insurance. Nevertheless, the Assured's liability in respect of losses consequent upon loss of or damage to property owned, leased, rented or occupied by the Assured is not hereby excluded;

ix)     For removal of wrecks or other obstruction insofar as recoverable under other Sections of this Policy;

x)     for handling, processing, treatment, storage, disposal or dumping of any waste materials or substances, or arising out of such waste materials during transportation but this exclusion shall not apply in respect of any waste material or substance which is held solely for the purpose of onward transit in any premises owned, leased or otherwise occupied by the Assured, including any such premises occupied by tenants or licensees of the Assured, or on board any ship within any navigable area over which the Assured have jurisdiction.

xi)     for Personal Injury or Property Damage directly or indirectly caused or arising out of seepage into or onto and/or pollution of and/or contamination or air, land, water and/or any other property however caused and wherever happening;

This exclusion shall <u>not</u> apply where all of the following conditions are shown  by the Assured to have been met:

a)    the accident was sudden and was unexpected and unintended;

b)    the accident first commenced at a specific time and date during the period of this Section of the Policy;

c)    the accident became known to the Assured within 168 hours of its commencement;

d)    the accident was reported in writing to Underwriters within 120 days after having become known to the Assured;

e)    the accident did not result from the Assured's intentional and wilful violation of any government statute, rule or regulation.

Nothing contained in this endorsement shall operate to provide any coverage hereon with respect to:

fines, penalties, punitive damages, exemplary damages, including treble damages or any further damages resulting from or multiplication of compensatory damages.

Subject always to the provisions of this exclusion (xi), this Section of the Policy includes the Assured's liability for the cost of evaluation and/or monitoring and/or controlling and/or removing and/or nullifying and/or cleaning-up of seeping and/or polluting and/or contamination substances and materials;

xii)  directly or indirectly occasioned by, happening through or in consequence of war, invasion, acts of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation or nationalisation or requisition or destruction of or damage to property by or under the order of any government or public or local authority. In respect of excess vessel liabilities insured under this Section of the Policy, this exclusion shall be replaced by the war etc. inclusion and cancellation provisions contained within Section I Hull etc., including war etc. conditions

This exclusion does not apply in respect of terrorism or person acting maliciously or from a political motive.

xiii)  arising out of advice given for a fee (except in respect of pickets or in connection with the navigation or docking or undocking of vessels);



xiv) fines, penalties, punitive or exemplary damages;

xv) for Advertising Liability arising out of unfair competition.

xvi) actual or alleged liability arising out of an Insured's capacity, duty or responsibility as an Officer, Director or Trustee of a corporation by reason of any breach of fiduciary duty or improper conduct or conflict of interest in the performance of an Insured's duties, responsibilities or accountability as an Officer, Director or Trustee, including, without limitation, any actual or alleged misstatement, misleading statement, gain of personal profit or advantage to which the Insured was or is not entitled legally, any dishonest act, or bad faith conduct, in the Insured's capacity as an Officer, Director or Trustee, or with respect to the capital or assets of the corporation, or any action taken beyond the scope of the Insured's authority as an Officer, Director or Trustee;

xvii) any negligence, error or omission, malpractice or mistake of a professional nature committed or alleged to have been committed by or on behalf of the Insured in the conduct of any of the insured's business activities. Professional services includes but is not limited to the preparation or approval of maps, plans, opinions, reports, surveys, designs or specifications and supervisory, inspection, engineering, or data processing services,

xviii) any liability for Personal Injury and/or Property Damage made by or on behalf of any person or persons directly on indirectly on account of continuous, intermittent or repeated exposure to, ingestion, inhalation, or absorption of, any substance, material, product, waste, emission, noise or environmental disturbance where the Insured is or may be liable as a result of the manufacture, production, extraction, sale, handling, utilisation, distribution, disposal or creation by or on behalf of the Insured of such substance, material, product, waste, emission, radioactive substance, noise or environmental disturbance.

5.  **DEFINITIONS**

The words and terms stated below are subject to the following conditions wherever used in this Section of the Policy:

i)  **Accident**

    The word "Accident" shall mean an event which occurs on or after the inception date of this policy.

ii) **Additional Expenses**

    The words "Additional Expenses", wherever used herein, shall mean any legal, defence and/or settlement costs and/or expenses incurred by an Assured with the consent of Underwriters in connection with claims made against this Policy:- such costs and/or expenses to be paid in full and without application of deductible.

In addition, the words "Additional Expenses", wherever used herein, shall include costs and/or expenses incurred by an Assured and arising from the Assured's liability to raise and/or remove non-owned, sunken and/or wrecked vessels and shall also include costs and/or expenses incurred by the Assured and arising from the Assured's liability for misdirection, delay in handling and/or wrongful delivery of cargo: such costs and/or expenses to be paid in full subject to policy limit and deductible.

iii) **Advertising Liability**

The term "Advertising Liability" shall mean:

1.    Libel, slander or defamation;

2.    any infringement of copyright of title of slogan;

3.    piracy or unfair competition or idea misappropriation under an implied contract;

4.    any invasion of right of privacy;

5.    any inadvertent false description of the Port services or facilities;

committed or alleged to have been committed in any advertisement, publicity article, broadcast or telecast and arising out of the Assured's advertising activities.

iv) **Assured**

Only the following are included in the definition of the word "Assured" under this Section of the Policy:

a)    the Named Assured, as set out in the Schedule of Assureds,

b)    the Named Assured's subsidiary, owned, controlled, associated or affiliated companies, including automatically newly formed or acquired companies.

If the anticipated annual turnover of any acquired company exceeds 5% of the Named Assured's most recently published or audited annual turnover, such acquisition shall be advised to Insurers within 60 days and any additional premium that may be required by them shall be paid.

The inception date for such acquired companies shall be the date from which the Assured's interest in the company begins unless otherwise agreed by Insurers hereon;

c) any person or entity to whom the Assured is obligated by virtue of a written contract entered into before any relevant accident, to provide insurance within the coverage afforded by this Section of the Policy. Said person or entity shall be covered only to the extent of such obligation of the Assured and then only in respect

of products manufactured by, or operations carried out by, or on behalf of the Assured, or of facilities of the Assured or facilities used by the Assured;

d) additional Assured, other than as provided for in b) or c) above, which have been declared to and accepted by Insurers at the inception date of this section of the Policy;

Insurers waive rights of subrogation in respect of the above additional assureds accordingly;

e) any officer, director, stockholder, partner or employee of an Assured, but only in respect of a claim made against him in his capacity as such;

f) such additional percentage of any joint venture, operation or partnership where the Assured is required by written contract to provide insurance for any other partner in the joint venture and which has been declared to and accepted by Insurers at the inception date of this Section of the Policy;

g) any person or entity that would otherwise fall under d) or f) above but for which the Named Assured first seeks coverage after the inception date and during the period of this Section of the Policy, will automatically be covered from the date which such coverage is required and provided satisfactory advice and full information is received by Insurers from the Named Assured of such additional person or entity within 45 days after the date from which such coverage is required. Insurers reserve the right to charge such additional premium and/or impose such specific terms, conditions and exclusions upon any person or entity covered under this paragraph g) as Insurers think fit;

h) any subsidiary or affiliated company insured under b), d), f) or g) above which ceases to be a subsidiary or affiliated company during the period of this Section of the Policy (as set out in Item 4 of the Schedule), but only with respect to the remainder of such period and only insofar as such former subsidiary or affiliated company does not have any other insurance as set out in Condition (ii) of this Section of the Policy.



v)   **Bodily Injury**

The words "Bodily Injury", wherever used in this Policy, shall mean all physical injury to any person including death, sickness, disease or disability and all mental injury, anguish or shock to that person resulting from such physical injury, and all mental injury, anguish or shock suffered by any relative of that person resulting from such physical injury.

vi)   **Claim**

The word "Claim" shall mean that part of each written demand received by the Assured for damages covered by this Section of the Policy, including the service of suit or institution of arbitration proceedings.

vii)   **Defence Expenses**

The term "Defence Expenses" shall mean investigation, adjustment, appraisal, defence and appeal costs and expenses and pre and post judgement interest, paid or incurred by or on behalf of the Assured.

viii)   **Personal Injury**

The term "Personal Injury" shall mean bodily injury (including death at any time resulting therefore), mental injury, mental anguish, shock, sickness, illness, disease, disability, false arrest, false imprisonment, wrongful eviction, detention, malicious persecution, also libel, slander or defamation of character or invasion of rights of privacy, except that which arises out of any advertising activities, including losses consequent therein.

ix)   **Property Damage**

The term "Property Damage" shall mean loss of or damage to or destruction of tangible property (other than property owned by the Named Assured) including losses consequent thereon.

x)   **Ultimate Net Loss**

The words "Ultimate Net Loss", wherever used in this Policy shall mean the amount the Assured is obligated to pay by judgement or settlement, as damages resulting from a Claim, including Defence Expenses in respect of such claim.

# PORT AUTHORITY OF GUAM



## Valuation

Recovery shall be made on the basis of one hundred percent (100%) of the property's current replacement value at the time and place of loss, subject to the limit of coverage provided by the policy.

## Waiver of Coinsurance or Average Clause

it is understood and agreed, that notwithstanding anything to the contrary in this policy or its endorsements, in the event of loss, there shall be no application of a coinsurance or average clause in determining the recover due to the Insured.

## Cancellation

It is understood and agreed that, notwithstanding anything to the contrary in this policy or its endorsements, if Underwriters desire to cancel this policy, they shall give Ninety (90) days prior written notice to the Insured, except for non-payment of premium which shall be ten (10) days, by Certified Mail to:

Capt. Eulogio Bermudes, General Manager
Port Authority of Guam
1026 Cabras Highway, Suite 201
Piti, Guam 96925

## Errors & Omissions Clause

It is understood and agreed that, notwithstanding anything to the contrary in this policy or its endorsements, the Insured shall not be prejudiced by an unintentional or inadvertent error, omission, incorrect valuation or incorrect description of the interest, risk or property; provided that such notice is given to Underwriters as soon as practical after discovery of any such error or omission.

## Waiver of Subrogation Clause

It is understood and agreed that, notwithstanding anything to the contrary in this policy or its endorsements, in event of loss, Underwriters waive their rights of subrogation against any tenant occupying, renting or leasing property from the Insured.



## Waiver of Sovereign Immunity

It is understood and agreed that, notwithstanding anything to the contrary in this policy or it's endorsements, that in the event of a claim, Underwriters waive any defence of Sovereign Immunity.

## Course of Construction Clause

It is understood and agreed that, notwithstanding anything to the contrary in this policy or its endorsements, all property under the course of construction as part of the Insured's Terminal Expansion Project shall be excluded from coverage by this policy. Further noted and agreed that property under the course of construction as part of the Insured's Earthquake repairs Project shall be excluded from coverage by this policy.

# PORT AUTHORITY OF GUAM



## Section I

Notwithstanding anything contained herein to the contrary hereby noted and agreed that Exclusion 15 as contained in the Direct Physical Loss or Damage Wording does not apply to Handling Equipment declared hereto.

The following definitions are agreed in respect of the undermentioned:-

## SECTION II

### TRANSIT EXTENSION

In consideration of the premium paid, and subject to the exclusions, conditions and limitations of the Policy to which this Extension is attached, and to the following additional exclusion and conditions this Policy is extended to cover the Personal Property hereinafter described, during transit within Guam, against All Risks of Direct Physical Loss or Damage.

### PROPERTY INSURED

1. Personal property of the Assured which has been declared to and agreed by Underwriters.

2. Personal property of others which is:

   a) in the Assured's care, custody and control for use by the Assured or for the purpose of sale or processing by the Assured,

**and**

   b) for which the Assured is legally liable.

### EXCLUSIONS

THIS POLICY DOES NOT INSURE:

1. Property of others which is in the Assured's possession for the principal purpose of transportation or storage.

2. Property in course of marine transit, but this shall not exclude whilst waterborne:

   a) on inland waterways

and/or

    b)    on regular ferry or other public vessels on coastal waterways.

3.    Property in course of air transit.

4.    Shipments by mail after delivery into the custody of the Post Office Department.

5.    Samples while in the care, custody or control of a salesman.



## SUM INSURED

This Extension shall not cover for more than the sum stated in the Schedule in respect of each loss occurrence.

## DEDUCTIBLE

Each loss occurrence shall be adjusted separately and from the amount of each such adjusted loss occurrence the sum stated in the Schedule shall be deducted.

## CONDITION

The Assured may accept without prejudice to this insurance the ordinary bills of lading or receipts issued by carriers including those containing released and/or partially released value provisions, but the Assured shall not enter into any special agreement with carriers releasing them from their common law or statutory liability.

## MUNICIPAL ORDINANCE EXTENSION

If:

1.    any building suffers direct physical damage and such damage is insured by this Policy, and

2.    there existed prior to that damage a law or ordinance which regulates the use of, and/or the building materials permitted to be used at, the site of such damage, and

3.    the implementation of that law or ordinance becomes enforceable, and is enforced, as a result of the insured direct physical damage,

then this Policy, within its limits and subject to its exclusions, conditions and limitations and to the following provisions, insures costs actually and necessarily incurred in (a) the demolition and clearing of the site of the undamaged portion of the insured building and (b) reconstructing the building to conform with the law or ordinance.

The increased amount of loss occasioned by the operation of this Extension shall not exceed at each building 10% of the monetary amount of the direct physical damage, as insured by this Policy, at each building so damaged.

## AUTOMATIC INCREASE CLAUSE

The amount of insurance shall automatically increase by 0.085% at the end of each month after the inception date, being 1st October, 1999.

## SECTION III

## RENTAL INCOME EXTENSION

In consideration of the premium paid, and subject to the EXCLUSIONS, CONDITIONS AND LIMITATIONS of the Policy to which this Extension is attached, and also to the following ADDITIONAL EXCLUSIONS AND LIMITATIONS, this Policy is extended to cover loss resulting from necessary untenantability caused by Direct Physical Loss or Damage, as covered by the Policy to which this Extension is attached, to property insured by this Policy.

In the event of such Direct Physical Loss or Damage, Underwriters shall be liable for the actual loss sustained by the Assured resulting directly from such necessary untenantability, but not exceeding the reduction in Rental Income, as defined hereunder, less charges and expenses which are necessary during the period of untenantability, for only such length of time as would be required, with the exercise of due diligence and dispatch to repair, rebuild or replace such part of the property as has been destroyed or damaged.

For the purposes of this Extension "Rental Income" is defined as the sum of:

(a)     The anticipated gross rental income from tenant occupancy of the described property as furnished and equipped by the Assured, and

(b)     The amount of all charges which are the legal obligations of the tenants and which would otherwise be the obligations of the Assured, and

(c)     The fair rental value of any portion of such property which is occupied by the Assured.

In determining Rental Income due consideration shall be given to the rental experience before the date of damage or destruction and the probable experience thereafter had no loss occurred.

## DIRECT DAMAGE CONDITION

No claim shall be payable under this Extension unless and until a claim has been paid, or liability admitted, in respect of direct physical damage to property insured under the Policy to which this Extension is attached and which gave rise to loss of Rental Income.

This Condition shall not apply if no such payment shall have been made, or liability admitted, solely owing to the operation of a Deductible in said Policy which excludes liability for losses below a specified amount.

## EXCLUSIONS

THIS EXTENSION DOES NOT INSURE AGAINST:

1.  Increase in loss resulting from interference at the insured premises, by strikers or other persons with rebuilding, repairing or replacing the property or with the resumption or continuation of operation

2.  Increase in loss caused by the suspension, lapse or cancellation of any lease, licence, contract or order, unless such results directly from the insured untenantability, and then Underwriters shall be liable for only such loss as affects the Assured's income during, and limited to, the period of untenantability covered under this Policy

3.  Increase in loss caused by the enforcement of any ordinance or law regulating the use, reconstruction, repair or demolition of any property insured hereunder.

4.  Any other consequential loss.

## EXTRA EXPENSE EXTENSION

In consideration of the premium paid and subject to the EXCLUSIONS, CONDITIONS AND LIMITATIONS of the Policy to which this Extension is attached, and also to the following ADDITIONAL EXCLUSIONS AND LIMITATIONS this Insurance is extended to cover the necessary Extra Expense incurred by the Assured in order to continue as nearly as practicable the normal conduct of the Assured's business following Direct Physical Loss or Damage as covered by the Policy to which this Extension is attached, to property insured by this Policy.

# DEFINITION OF EXTRA EXPENSE



"Extra Expense" shall mean the excess (if any) of the total cost during the period of restoration chargeable to the conduct of the Assured's business over and above the total cost that would normally have been incurred to conduct the Assured's business during the same period had no loss occurred.

The term "Extra Expense" includes the reasonable extra cost of temporary repair or of expediting the repair or replacement of such damaged property of the Assured, including overtime and the extra cost of express or other rapid means of transportation; and shall also include the cost incurred in obtaining property for temporary use during the period of restoration necessarily required for the conduct of the Assured's business.

The period of restoration shall be limited to the time required, with the exercise of due diligence and dispatch, to repair, rebuild or replace such damaged or destroyed property, commencing with the date of such damage or destruction and not limited by the Expiration date of this Policy.

## CONDITIONS

1. ## DIRECT DAMAGE

    No claim shall be payable under this Extension unless and until a claim has been paid, or liability admitted, in respect of Direct Physical Damage to property insured under the Policy to which this Extension is attached and which gave rise to Extra Expense.

    This Condition shall not apply if no such payment shall have been made, or liability admitted, solely owing to the operation of a Deductible in said Policy which excludes liability for losses below a specified amount.

2. ## RESUMPTION OF OPERATIONS

    It is a condition of this Policy that, as soon as practicable, the Assured shall resume normal operation of the business and shall dispense with such Extra Expense.

3. ## SALVAGE

    At the end of the period of restoration, any salvage value remaining in property obtained for temporary use shall be taken into consideration in the determination of such Extra Expense.



## <u>EXCLUSIONS</u>

THIS EXTENSION DOES NOT INSURE AGAINST:

1.  Increase in Extra Expense resulting from interference at the insured premises, by strikers or other persons, with rebuilding, repairing or replacing the property or with the resumption or continuation of operation.

2.  Increase in Extra Expense by the suspension, lapse, or cancellation of any lease, licence, contract or order.

3.  Increase in Extra Expense caused by the enforcement of any ordinance or law regulating the use, reconstruction, repair or demolition of any property insured hereunder.

4.  Loss of Earnings or any other consequential loss.

## PUBLIC OFFICIALS LIABILITY DEFINITION



The words "Public Officials Liability," wherever used herein, shall mean any actual or alleged act, error, misstatement, neglect, omission and/or breach of duty (including, but not limited to, misfeasance, malfeasance and/or nonfeasance) by officers and/or commissioners and/or employees and/or committee members (hereafter referred to a Public Officials) in the discharge of their duties as such and claimed against them solely by reason of their capacity as such with a port, harbor commission or public entity named herein.

"Public Officials Liability" shall not however include any claim based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way relating to any act, error or omission, malpractice or mistake committed or alleged to have been committed by or on behalf of the Assured in connection with the provision of "Professional Services" which, within the context of this clause, shall include but not be limited to the preparation or approval of maps, plans, opinions, reports, surveys, designs or specifications and supervisory or data processing services. It is understood, however, that "Professional Services" as used in this paragraph shall only apply to work performed by Public Officials directly for parties other than the port, harbor, commission or public entity with which the Public Official is affiliated.

Nor shall "Public Officials Liability" include any claim based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way relating to any actual or alleged liability arising out of a Public Official's capacity, duty or responsibility as a director, officer or trustee of a corporation, not being a port, harbor commission or public entity named herein.

Notwithstanding when the actual or alleged event giving rise to a claim under this section of the Policy may have or be deemed to have occurred, Underwriters shall only be liable for a claim of which the/an Assured first receives, within the term specified in this Policy, written notice from any party intending to hold the/an Assured responsible for any wrongful act as enumerated above.

## SERVICE OF SUIT



It is agreed that in the event of the failure of the Underwriters hereon to pay any amount claimed to be due hereunder, the Underwriters hereon, at the request of the Assured will submit to the jurisdiction of a Court of competent jurisdiction within the United States. Nothing in this Clause constitutes or should be understood to constitute a waiver of Underwriters' rights to commence an action in any Court of competent jurisdiction in the United States, to remove an action to an United States District Court, or to seek a transfer of a case to another Court as permitted by the laws of the United States or of any State in the United States. It is further agreed that service of process in such suit may be made upon AM Insurance, Suite 113F, Ada's Commercial Center, 215-A Chalan Santo Papa, Agana, Guam and, that in any suit instituted against any one of them upon this contract, Underwriters will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

The above-named are authorised and directed to accept service of process on behalf of Underwriters in any such suit and/or upon the request of the Assured to give a written undertaking to the Assured that they will enter a general appearance upon Underwriters' behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefore, Underwriters hereon designated the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Assured or any beneficiary hereunder arising out of this contract of insurance and hereby designated the above-named as the person to whom the said officer is authorised to mail such process or a true copy thereof.

## PORT AUTHORITY OF GUAM



Noted and agreed MacLeod Claims Management Ltd. of New Zealand to act as appointed Loss Adjusters in respect of all claims.

All other terms and conditions etc. remain unaltered.

QM10467a

# ENDORSEMENT

Lessee/Licensee: PORT AUTHORITY OF GUAM

Agreement No. (or replacement agreement): NS704393RP00004

Location: DRYDOCK ISLAND, APRA HARBOR, GUAM

The following endorsements are attached to and form part of Policy No(s): 99HV0067F

Issued by: Underwriters at Lloyd's of London, Lime Street, London, England – Period of insurance 12 months at 1st October 1999 _____ (name & address of Company) in the amounts specified by said policy, which amounts equal or exceed the following stated minimum amounts of insurance required by the Department of the Navy:

| TYPE | PER PERSON | PER ACCIDENT | TYPE | PER PERSON | PER ACCIDENT |
|---|---|---|---|---|---|
| Third Party Personal Injury | $100,000 | $300,000 | Fire & Extended Coverage | N/A | $500,000 |
| Third Party Property Damage | N/A | $50,000 | Other | $ | $ |

a. **CANCELLATION/REVISION CLAUSE:** It is understood and agreed that in the event of cancellation or any material change to this policy made by the Company, the Company agrees to notify in writing the Commander (Attn Code 24), Pacific Division, Naval Facilities Engineering Command, Pearl Harbour, Hawaii 96860, not less than thirty (30) days prior to the effective date of the cancellation or change.

b. **WAIVER OF RIGHT OF SUBROGATION:** The insurer waives any right of subrogation against the United States of America which might arise by reason of any payment made under this policy

c. **ADDITIONAL INSURED:** The United States of America, Department of the Navy, is an additional insured under this policy.

d. **LOSS PAYABLE:** Loss, if any, under this policy, shall be adjusted with the above-named Lessee or Licensee and the proceeds, at the direction of the United States of America, shall be payable to said Lessee or Licensee and the proceeds not paid thereto shall be payable to the Treasurer of the United States of America. (THIS CLAUSE APPLIES ONLY TO FIRE AND EXTENDED COVERAGE INSURANCE AND TO ANY OTHER INSURANCE RQUIRED FOR LOSS OF OR DAMAGE TO GFOVERNMENT PROPERTY.)

e. **PAYMENT:** It is understood and agreed that the United States of America, Department of the Navy, is not responsible for payment of any premium now due or to become due under this policy.

Date: 29.10.99        By: J. Crick
                          Signature of Insurer's Representative
                                  (In Ink)

                          froud on behalf of
                          certain Lloyds Underwriter

This endorsement to be attached to all insurance policies and certificates of insurance covering use of Navy property by private organisations under lease or license agreement.)

## LONG TERM AGREEMENT CLAUSE

A discount of 5 per cent has been allowed in arriving at the nett premium hereunder, in consideration of the Assured having undertaken to offer the renewal of this Insurance at the same terms and conditions for a period of 3 years from 1st October 1999 and to pay the premium annually in advance, provided, however, that:-

1. The sum insured may be reduced proportionately at any time to correspond with any reduction in

   (a) value, if this insurance covers property damage

   (b) the business, if this insurance covers consequential loss.

2. The undertaking shall be held to apply to any Policy or Policies issued in substitution hereof.

3. The premium shall be subject to revision at any time following any alteration in physical hazard.

4. At any renewal date the Underwriters may require revised terms or conditions and, if the Assured does not accept such terms or conditions, the agreement set out in this Clause shall lapse.

5. The Underwriters shall be under no obligation to accept an offer made under this Agreement.

22/4/71
NMA1743



## INSTITUTE RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE

**This clause shall be paramount and shall override anything contained in this insurance inconsistent therewith**

1.    In no case shall this insurance cover loss damage liability or expense directly or indirectly caused by or contributed to by or arising from

    1.1    ionising radiations from or contamination by radioactivity from any nuclear fuel or from any nuclear waste or from the combustion of nuclear fuel

    1.2    the radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear installation, reactor or other nuclear assembly or nuclear component thereof

    1.3    any weapon of war employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter.

1/10/90
CL356

## CANCELLATION CLAUSE

It is hereby agreed between the Underwriters and the Assured that in the event of the Assured, or their agents on whose instructions insurance may have been effected, failing to pay Ropner Insurance Services Limited (herein referred to as "the broker") the premium or any instalment thereof on the due date in full, this policy may be forthwith cancelled by the broker advising Underwriters in writing, and the Underwriters will thereupon return to the broker pro rata premium from the date of notice or from such later date as cancellation may be required in the said notice. The foregoing is subject to the broker giving 7 calendar days notice in writing to the Assured, or their agents on whose instructions insurance may have been effected, or in accordance with the terms and conditions of any letter of undertaking that may be issued in favour of any assignee or mortgagee of their insurance.

The broker is hereby authorised by the Assured and their agents on whose instructions insurance may have been effected to issue such notice as aforementioned and further authorised to collect and retain any return premium hereon. This clause shall not prejudice or affect the broker's lien on this policy for any amount remaining due to them whether in connection with the policy or otherwise or any right of the broker against the Assured or their agents on whose instructions insurance may have been effected.

Clause No 856ROP00182



**PORT AUTHORITY OF GUAM**
**EQUIPMENT SCHEDULE**
**26th July, 1999**

| Year Description | I.D. No. | Quant. | Total Cost | Assigned | Deductible |
|---|---|---|---|---|---|
| **Tractors** | | | | | |
| 1998 Ottawa/Commando 50 | T56 - T58 | 3 | 209,694 | Transportation | 2,000 |
| 1995 Ottawa/Commando 50 | T51 - T55 | 5 | 287,215 | Transportation | 2,000 |
| 1993 Ottawa/YT-50 | T46 - T50 | 5 | 282,220 | Transportation | 2,000 |
| 1990 Ottawa/YT-50 | T37, T39 | 2 | 24,224 | Transportation | 2,000 |
| 1988 Capacity/TJ-5500 | | 1 | 49,995 | Transportation | 2,000 |
| 1987 Ottawa/YT-50W | T27 - T29 | 3 | 25,283 | Transportation | 2,000 |
| 1975 Ottawa/Commando 30 | | 1 | 27,900 | Transportation | 2,000 |
| | | | | | |
| **Forklifts** | | | | | |
| 1996 Caterpillar 10T DP90D | FL96-163 | 1 | 99,769 | Transportation | 2,000 |
| 1996 Caterpillar 20T V550D | FL96-164 | 1 | 265,159 | Transportation | 5,000 |
| 1992 Hyster 5T H5.00XL | FL92-24 TO 29 | 6 | 239,400 | Transportation | 2,000 |
| 1992 Hyster 10T H9.00XL | FLK92-161 | 1 | 76,300 | Transportation | 2,000 |
| 1990 Komatsu 5T FD50 | FL90-20 | 1 | 40,250 | Transportation | 2,000 |
| 1990 Komatsu 10T FD100-5 | FL90-160 | 1 | 70,980 | Transportation | 2,000 |
| 1990 Komatsu 20T FD180-5 | FL90-162 | 1 | 142,000 | Transportation | 5,000 |
| 1990 Clark 6.5T C5Y135 | 1717 | 1 | 43,194 | Transportation | 2,000 |
| 1990 Hi Rise Bucket/AP90MH | FL90-19 | 1 | 199,856 | Transportation | 5,000 |
| 1989 Clark 5T C500Y100D | FL89-13,16 | 2 | 22,250 | Transportation | 2,000 |
| 1988 Toyota 5T 5FD-30 | FL88-09,10,12 | 3 | 64,347 | Transportation | 2,000 |
| 1986 Caterpillar 10T V200D (10 ton) | FL158 | 1 | 63,032 | Transportation | 2,000 |
| 1998 Hyster 5.5T H5.00XL | FL98-30,39 | 10 | 407,930 | Transportation | 2,000 |
| | | | | | |
| **Toplifters** | | | | | |
| 1990 Clark/C500Y800D | | 1 | 339,724 | Transportation | 5,000 |
| 1987 Clark/C500Y800D | | 1 | 290,960 | Transportation | 5,000 |
| | | | | | |
| **Sidelifter** | | | | | |
| 1996 Hyster Empty Ctr/H10 | D019E01958T | 1 | 141,501 | Transportation | 5,000 |
| 1998 Hyster Empty Ctr Lift H330XL | D019D02261V | 1 | 160,000 | Transportation | 5,000 |
| 1998 Hyster Empty Ctr Lift H330XL | D019E02247V | 1 | 160,000 | Transportation | 5,000 |
| 1998 Hyster Empty Ctr Lift H330XL | D019D02616V | 1 | 160,000 | Transportation | 5,000 |
| | | | | | |
| **Sweeper** | | | | | |
| 1998 Rider Sweeper | | 1 | 48,885 | | 2,000 |
| | | | | | |
| **Articulating Room Platform** | | | | | |
| 1998 | | 1 | 137,000 | | 5,000 |
| | | | | | |
| **Other** | | | | | |
| Onan Genset 455KW | | 1 | 60,000 | FEMA | 2,000 |
| Onan Genset 275KW | | 1 | 40,000 | FEMA | 2,000 |
| Onan Genset 275KW | | 1 | 40,000 | FEMA | 2,000 |
| Onan Genset 455KW | | 1 | 60,000 | FEMA | 2,000 |
| 1990 Chassis/Shoels 40Ft CC | 90--1 thru 90-12 | 12 | 273,480 | Transportation | 2,000 |

**PORT AUTHORITY OF GUAM**
**EQUIPMENT SCHEDULE**
**26th July, 1999**



| Year Description | I.D. No. | Quant. | Total Cost | Assigned | Deductible |
|---|---|---|---|---|---|
| 1988 Miller Air Pac Welder | | | 18,000 | Welders | 2,000 |
| 1994 Miller Air Pac Welder | 94-01,02 | 2 | 36,000 | Welders | 2,000 |
| 1993 Grove Mobil Crane | | 1 | 941,864 | | 10,000 |
| 1993 Ingersoll CFM600 Air Comp. | | 1 | 50,000 | Preventive | 2,000 |
| 1997 Sullair 185CFM Air Comp. | | 1 | 18,000 | Preventive | 2,000 |
| 1981 Joy 185 CFM Air Comp. | | 1 | 18,000 | Preventive | 2,000 |
| 1991 Straddle Hoist "Echo" | | 1 | 1,597,347 | | 10,000 |
| 1991 Straddle Hoist "Foxtrot" | | 1 | 1,597,347 | | 10,000 |
| 1979 Gantry Crane #2 | | 1 | 8,000,000 | | 10,000 |
| 1969 Gantry Crane #1 | | 1 | 8,000,000 | | 10,000 |

Total    24,829,106

**Notes**
1  The Onan generators are the property of FEMA; under the care, custody and control of PAG.



The Table of Syndicates referred to on the face of this Policy follows:

TABLE OF SYNDICATES APPLICABLE TO
RISK CODE P D    I

TABLE OF SYNDICATES APPLICABLE TO
RISK CODE P D    II  →  III

| | 0856 | 61512 26 11 99 |
|---|---|---|
| 71 | | |

| AMOUNT, PERCENTAGE OR PROPORTION | SYNDICATE | UNDERWRITER'S REFERENCE | PAGE 1 |
|---|---|---|---|
| PERCENT | | | |
| 22.00 | 2724 | NAE290913S24 | |
| 20.00 | 33 | 24025SPAAPBA | |
| 20.00 | 535 | 203BE405L99 | |
| 3.99 | 861 | 03A84194L01 | |
| 3.01 | 1209 | 03A84194L01 | |
| 1.98 | 588 | 03E30817V06 | |
| 1.02 | 1209 | 03E30817V06 | |
| 6.00 | 1036 | T7555Q99FY | |
| 12.00 | 79 | 916SB6F9983A | |
| 4.00 | 62 | Z5836N99A | |
| 6.00 | 1308 | 06302488AO2 | |

THE LIST OF UNDERWRITING MEMBERS
OF LLOYDS IS IN RESPECT OF 1999
YEAR OF ACCOUNT

| TOTAL LINE | NO. OF SYND. | FOR LPSO USE ONLY |
|---|---|---|
| 100.00 | 11 | USE 1    9644 |

| LPSO USE ONLY | BROKER 0856 | REFERENCES 61513 26 11 99 |
|---|---|---|
| 73 | | |

| AMOUNT, PERCENTAGE OR PROPORTION | SYNDICATE | UNDERWRITER'S REFERENCE | PAGE 1 |
|---|---|---|---|
| PERCENT | | | |
| 22.00 | 2724 | NAC490913S23 | |
| 20.00 | 33 | 24025SPBAPOA | |
| 20.00 | 535 | 203BE405L99 | |
| 3.99 | 861 | 03A84194L01 | |
| 3.01 | 1209 | 03A84194L01 | |
| 1.98 | 588 | 03E30817V06 | |
| 1.02 | 1209 | 03E30817V06 | |
| 6.00 | 1036 | T7555Q99FY | |
| 12.00 | 79 | 916SB6F9983A | |
| 4.00 | 62 | Z5836N99A | |
| 6.00 | 1308 | 06302488AO2 | |

THE LIST OF UNDERWRITING MEMBERS
OF LLOYDS IS IN RESPECT OF 1999
YEAR OF ACCOUNT

| TOTAL LINE | NO. OF SYND. | FOR LPSO USE ONLY |
|---|---|---|
| 100.00 | 11 | USE 1    9644 |

The List of Underwriting Members of Lloyd's mentioned in the above Table, shows their respective Syndicates and Shares therein and is deemed to be incorporated in and to form part of this Policy. It is available for inspection at Lloyd's Policy Signing Office by the Assured or his or their representatives and a true copy of the material parts of it certified by the General Manager of Lloyd's Policy Signing Office will be furnished to the Assured on application.



The Table of Syndicates referred to on the face of this Policy follows:

TABLE OF SYNDICATES APPLICABLE TO
RISK CODE   G7

| LPSO USE ONLY | BROKER | REFERENCES |
|---|---|---|
| 82 | 0856 | 51165 26 11 99 |

| AMOUNT, PERCENTAGE OR PROPORTION | SYNDICATE | UNDERWRITER'S REFERENCE | PAGE 1 |
|---|---|---|---|
| PERCENT | | | |
| 22.00 | 2724 | NAT290913S22 | |
| 20.00 | 33 | 24025SPCAMSA | |
| 20.00 | 535 | 233BE405L99 | |
| 3.99 | 861 | 07A84194L01 | |
| 3.01 | 1209 | 07A84194L01 | |
| 1.98 | 588 | 07E30817VO6 | |
| 1.02 | 1209 | 07E30817VO6 | |
| 6.00 | 1036 | L1794Q99FY | |
| 12.00 | 79 | 916SB7V5482A | |
| 4.00 | 62 | Z5836N99B | |
| 6.00 | 1308 | 04302488BO2 | |

THE LIST OF UNDERWRITING MEMBERS
OF LLOYDS IS IN RESPECT OF 1999
YEAR OF ACCOUNT

| TOTAL LINE | NO. OF SYND | FOR LPSO USE ONLY |
|---|---|---|
| 100.00 | 11 | USE 1   9644 |

The List of Underwriting Members of Lloyd's mentioned in the above Table, shows their respective Syndicates and Shares therein and is deemed to be incorporated in and to form part of this Policy. It is available for inspection at Lloyd's Policy Signing Office by the Assured or his or their representatives and a true copy of the material parts of it certified by the General Manager of Lloyd's Policy Signing Office will be furnished to the Assured on application.

# EXHIBIT "D"

Government of Guam
Port Authority of Guam
1026 Cabras Highway Suite 201
Piti, Guam  96925

Business Personal Property
Earthquake Loss: 10/13/01
01-237H

# LIST OF INSURANCE

| POLICY# | EXPIRES | INSURANCE |
|---------|---------|-----------|
| 01HV00065F | Underwriters at Lloyds | $25,000,000. |

**Coverage On:**      Business Personal Property

## RECAPITULATION

**Loss**

$13,542,597.37

# RECAPITULATION

| ITEM | DESCRIPTION | | AMOUNT |
|------|-------------|---|--------|
| 1 | ADMINISTRATION BUILDING | $ | 71,163.42 |
| 2 | AGANA MARINA | $ | 110,238.40 |
| 3 | AGAT PIER | $ | 122,706.09 |
| 4 | CFS BUILDING | $ | 411,857.56 |
| 5 | CSX BUILDING | $ | 61,989.79 |
| 6 | EXTRA EXPENSES including clean-up | $ | 1,651,438.80 |
| 7 | F1 PIER | $ | 7,767,452.74 |
| 8 | F 5 PIER | $ | 5,000.00 |
| 9 | GANTRY CRANES #1 & #2 | $ | 117,581.44 |
| 10 | GOLF PIER | $ | 207,203.62 |
| 11 | MAINTENANCE BUILDING | $ | 170,768.34 |
| 12 | OLD TOWER BUILDING | $ | 96,913.42 |
| 13 | RAILS | $ | 1,773,061.41 |
| 14 | RIGGING LOFT | $ | 70,076.91 |
| 15 | WAREHOUSE 1 | $ | 467,511.00 |
| 16 | WAREHOUSE 2 | $ | 437,634.43 |
| | TOTAL | $ | 13,542,597.37 |

YOUNG ADJUSTMENT COMPANY INC



December 9, 2002

Peter MacLeod
Macleod Claims Management Ltd.
PO Box 36162
Merivale
Christchurch, New Zealand 8001

**Re:     Earthquake - 10/13/01**
**Port Authority of Guam**
**Government of Guam**
**1026 Cabras Highway**
**Suite 201**
**Piti, Guam 96925**

Dear Mr. MacLeod:

Enclosed please find a copy of our estimate in the amount of $13,542,597.37 in connection with the above captioned Business Personal Property claim.

Sincerely,

Young Adjustment Company, Inc.

Joseph P. Markham
(slc)

Joseph P. Markham

JPM/slc
01-237H
cc: Frank Camacho, General Manager, Port Authority of Guam
US Mail Global Express 82 445 614 63

DEFENDANT'S DEPOSITION EXHIBIT
AA
PENGAD-Bayonne, N.J.

# PORT AUTHORITY OF GUAM
## 1026 CABRAS HIGHWAY
## PITI GUAM

## EXTRA EXPENSES

| LOCATION | DESCRIPTION | UNIT | | AMOUNT | TOTAL | CLAIM |
|---|---|---|---|---|---|---|
| Gantry Rails survey | Gene Villaflores survey | 1 | ea | 7,743.50 | 7,743.50 | |
| Gantry Rails survey | Gene Villaflores survey final invoice | 1 | ea | 7,743.50 | 7,743.50 | |
| Gantry Rail Monitoring | Gene Villaflores | 1 | ea | 2,500.00 | 2,500.00 | |
| Gantry Rails | Black Construction test excavation at lies | 1 | ea | 10,000.00 | 10,000.00 | |
| Crane Rail Spur Frog | Temporary repair to Rail Spur Frog | 1 | ea | 5,800.00 | 5,800.00 | |
| Subic Crane | Replacement of Wheels and Bearings | 1 | ea | 496,000.00 | 496,000.00 | |
| Gantry Cranes #1 & #2 | Temporary Repairs to Cracked Motor Housings | 1 | ls | 18,861.52 | 18,861.52 | |
| Shell F1 Pier | Smithbridge Guam Inc | 1 | ea | 63,980.94 | 63,980.94 | |
| Shell F1 Pier | Smithbridge Guam Inc | 1 | ea | 45,378.66 | 45,378.66 | |
| Shell F1 Pier | Smithbridge Guam Inc | 1 | ea | 45,848.46 | 45,848.46 | |
| Shell F1 Pier | Smithbridge Guam Inc | 1 | ea | 85,373.06 | 85,373.06 | |
| Shell F1 Pier | Smithbridge Guam Inc | 1 | ea | 66,510.11 | 66,510.11 | |
| Shell F1 Pier | Smithbridge Guam Inc | 1 | ea | 38,910.39 | 38,910.39 | |
| Shell F1 Pier | Smithbridge Guam Inc | 1 | ea | 56,727.86 | 56,727.86 | |
| F1 Pier | Temporary repairs to Pier by Shell | 1 | ea | 114,714.64 | 114,714.64 | |
| F1 Pier | Temporary relocation of pump manifold assembly | 1 | ea | 506,504.00 | 506,504.00 | |
| F3,F4,F5,F6,Agat & Agana | Pro Marine underwater inspections | 1 | ea | 2,691.00 | 2,691.00 | |
| Agana Marina | Repairs to washed out parking lot | 1 | ls | 4,881.92 | 4,881.92 | |
| Hotel Warf | Oceaneer Enterprises underwater inspections | 1 | ea | 1,125.24 | 1,125.24 | |
| Bank Fee | Guam bank | 1 | ea | 15.00 | 15.00 | |
| Bank Fee | Wire transfer | 1 | ea | 45.00 | 45.00 | |
| Port | Emergency Clean up labor | 1 | ea | 58,042.00 | 58,042.00 | |
| Yard | Black Construction repair water line | 1 | ea | 12,042.00 | 12,042.00 | |
| | TOTAL | | | $ 1,651,438.80 | $ 1,651,438.80 | $ 1,651,438.80 |

YOUNG ADJUSTMENT COMPANY INC.

1

# PORT AUTHORITY OF GUAM
## 1026 CABRAS HIGHWAY
## PITI GUAM

### FI PIER

| | LOCATION | DESCRIPTION | QTY | | UNIT | AMOUNT | TOTAL |
|---|---|---|---|---|---|---|---|
| * | F 1 | Replacement Dolphins | 1.00 | LS | | $ 4,048,051.00 | $ 4,048,051.00 |
| | | **MAIN PIER** | | | | | |
| * | F 1 | Main pier piles | 9,716 | LF | 82.8 | 804,484.80 | |
| * | F 1 | Main pier concrete | 346 | CY | 138 | 47,748.00 | |
| * | F 1 | Main pier concrete forms | 3,906 | SF | 3.11 | 12,147.66 | |
| * | F 1 | main pier rebar | 32,217 | LB | 0.41 | 13,208.97 | |
| * | F 1 | Main pier epoxy coating | 10,329 | SF | 6.97 | 71,993.13 | |
| * | F 1 | Main pier pile concrete fill | 122 | CY | 138 | 16,836.00 | |
| | | SUB TOTAL | | | | 966,418.56 | 966,418.56 |
| | | Main Pier Additional Components 2002 costs | | | | | |
| ** | F 1 | Precast deck | 5,370 | SF | 12 | $ 64,440.00 | |
| ** | F 1 | Demolition 51 piles | 51 | EA | 3,000 | $ 153,000.00 | |
| ** | F 1 | Demolition deck topping & plank | 6,307 | SF | 10 | $ 63,070.00 | |
| ** | F 1 | Demolition beams | 912.50 | LF | 37 | $ 33,762.50 | |
| * | F 1 | Derrick | 1.00 | EA | 47,610 | $ 47,610.00 | |

YOUNG ADJUSTMENT COMPANY INC.

1

# PORT AUTHORITY OF GUAM
## 1026 CABRAS HIGHWAY
## PITI GUAM

### FI PIER

| | LOCATION | DESCRIPTION | QTY | | UNIT | AMOUNT | | TOTAL | |
|---|---|---|---|---|---|---|---|---|---|
| | | Main Ramp & Piping Rack Assembly | | | | | | $ 361,882.50 | |
| * | F 1 | Piles | 4401 | LF | 82.8 | $ | 364,402.80 | | |
| * | F 1 | Concrete Fill of Piles | 30 | CY | 138 | $ | 4,140.00 | | |
| * | F 1 | Concrete Beam, Deck, & Girder | 94.3 | CY | 138 | $ | 13,013.40 | | |
| * | F 1 | Concrete Forms | 1065 | SF | 3.11 | $ | 3,312.15 | | |
| * | F 1 | Rebar | 9123 | LB | 0.41 | $ | 3,740.43 | | |
| * | F 1 | Epoxy coating | 2381 | SF | 6.91 | $ | 16,452.71 | | |
| | | | | | | $ | | $ 405,061.49 | |
| | | Additional Components Ramp & Piping Rack | | | | | | | |
| ** | F 1 | Precast Plank | 1488 | SF | 12 | $ | 17,856.00 | | |
| ** | F 1 | Demolition Piles | 27 | EA | 3000 | $ | 81,000.00 | | |
| ** | F 1 | Demolition Deck | 1488 | SF | 10 | $ | 14,880.00 | | |
| ** | F 1 | Demolition Beams | 507 | LF | 37 | $ | 18,759.00 | | |
| * | F 1 | Derrick | 1 | EA | 47610 | $ | 47,610.00 | | |
| | | | | | | $ | 180,105.00 | $ | 180,105.00 |

YOUNG ADJUSTMENT COMPANY INC.

2

# PORT AUTHORITY OF GUAM
## 1026 CABRAS HIGHWAY
## PITI GUAM

### FI PIER

| LOCATION | DESCRIPTION | QTY | UNIT | AMOUNT | TOTAL |
|---|---|---|---|---|---|
| | | | | | |
| F 1 | Temporary Piping & Manifold Job Sequencing for continuos operation of pier, with extra expenses | | | | |
| F 1 | Core borings including mobialzation,drawings engineering reports | 680 LF | 68.25 | $ 46,410.00 | |
| F 1 | On island debris disposal fees | 1 EA | 100000 | $ 100,000.00 | |
| | | | | $ 146,410.00 | $ 146,410.00 |
| | SUB TOTAL | | | | $ 6,107,928.55 |
| | Engineering Fees 15% of the cost of construction | 1 EA | | | $ 916,189.28 |
| | Construction Management Fee 8% | 1 EA | | | $ 488,634.28 |
| | Gross Receipts Tax | 1 EA | | | $ 254,700.62 |
| | TOTAL | | | | $ 7,767,452.74 |
| | | | | | |
| Foot note | 1988 construction costs multiplied by inflation | | | | |
| | factor of 38% = 2002 costs | | | | |

\*\*

\*\*

\*

YOUNG ADJUSTMENT COMPANY INC.

# PORT AUTHORITY OF GUAM
## 1026 CABRAS HIGHWAY
### PITI GUAM

## FI PIER

| LOCATION | DESCRIPTION | QTY | UNIT | AMOUNT | TOTAL |
|----------|-------------|-----|------|--------|-------|
| Foot note | 2002 costs | | | | |

**

YOUNG ADJUSTMENT COMPANY INC.

# EXHIBIT "E"

# |||SMITHBRIDGE

**GUAM INC**

**Guam Office:**
674 Harmon Loop Road
Suite 111 PMB 333
Dededo, GUAM 96912
Phone: (671) 653-5036
Fax: (671) 653-5040

**Head Office: Tauranga**
21 Aerodrome Road
Mount Maunganui
New Zealand
Phone: 64 7 575 2325
Fax: 64 7 575 6387

18th November 2002.

MacLeod Claims Management
P O Box 36162, Merivale,
Christchurch,
New Zealand
Fax : +64 3 356 1097



**RE:    Port Authority of Guam, Shell F1 Pier.
Permanent Earthquake Repairs to Mooring Dolphins.**

Dear Mr MacLeod,

We are please to be able to supply to you with a quotation for the above stated Contract Works. Our Lump Sum price to complete the below detailed works is $1,420,000.00.

## Item 1.    *Repair Pile to Concrete Connection as per previous Design.*

Provide Labor, Equipment and Materials to repair 75 Pile to Concrete Dolphin Connections on Mooring Dolphins A, B, C, D, & G. The repair is to be identical to that of the Previous Temporary Earthquake repair completed by Smithbridge in 2002 and Designed by OCEL Consultants and Duenas and Associates. The previous temporary Repairs are to be incorporated into and become part of the Final Repair. Below is a table of Piles already repaired during the Temporary Earthquake repairs and the number of piles still to be repaired under the Permanent Repairs.

Summary of Piles to be Repaired :

| Dolphin | Total no of Piles | Pile already repaired | Piles to be Repaired |
|---------|-------------------|-----------------------|----------------------|
| A | 14 | 4 | 10 |
| B | 18 | 4 | 14 |
| C | 27 | 6 | 21 |
| D | 27 | 7 | 20 |
| G | 14 | 4 | 10 |
| TOTALS | 100 | 25 | 75 |

## Item 2.    *Provide for Design and Permits.*

An allowance of $50,000.00 has been made for Design Fees and Local Building Permits.

This would be considered as a provisional sum item that may increase or decrease dependant on whether the repair should be considered as a design build or whether the design should be performed independently.

### Item 3.    *Provide for 800 linear feet of Epoxy injection to cracks on the dolphin concrete and 200 square feet of Spall Repair.*

We have allowed in the lump sum price to complete the above quantity of crack and spall repair. We have completed a survey of the dolphins to assess these estimated quantities and feel that this allowance will be sufficient to complete the necessary repair to the satisfaction of the client.

### Work specifically excludes the following items:

1. All bonding and liquidated damages.
2. Any work the main Jetty structure or their adjacent walkways.
3. Any Cathodic protection or any specialist coatings for corrosion protection.
4. Excludes for any repairs to the already damaged Ship Fendering System.
5. Any allowance for penalties or liquidated damages.
6. Any Permits, Bonding or Agency Fees. Other than those specifically stated above.

### Terms of Payment:-

Invoices will be issued upon completion of the work. This invoice is required to be paid in full within 30 days from the date of issue of the approved Invoice.

No Retention shall be held on any payment due.

Should you have any questions concerning this proposal, please do not hesitate to contact me.

Best Regards



**Ben Casey**
**Vice President**

# EXHIBIT "F"

# PORT AUTHORITY OF GUAM

| ITEM | DESCRIPTION | AMOUNT CLAIMED | OFFER OF SETTLEMENT | COMMENTS |
|---|---|---|---|---|
| 1 | Administration Building | $ 71,163.42 | $ 46,691.51 | Adjusted for market change to rates due to competitive element in Guam, pre-existing damage. |
| 2 | Agana Marina | $ 110,238.40 | $ 82,678.80 | Not all earthquake related. Have adjusted for pre-existing. |
| 3 | Agat Marina | $ 122,706.39 | $ 90,556.01 | Not all earthquake related, rebar expansion pre-existing. |
| 4 | CFS Building | $ 411,857.56 | $ 290,343.77 | Repair costs converted to normal repairs back to as was, competitive market rates applicable and excluding pre-existing rebar expansion cracks. |
| 5 | CSX Building | $ 61,989.79 | $ 47,000.00 | Repair costs converted to normal repairs back to as was, competitive market rates applicable and excluding pre-existing rebar expansion cracks. |
| 6 | Extra Expenses | $ 1,651,438.30 | $ 122,799.68 | Have excluded sublic ganty crane costs as not listed on the schedule the value of $498000.00. Shell F-1 relocated to Shell F-1 pier costs to repair mair pier $506504.00. Shell F-1 temporary costs transferred from this item number 3 to item number 7 F-1 Pier and Dolphins. |
| 7 | F-1 Pier and Dolphins $77674S2.74 plus extra expense tem 6 $523135.12 and extra expense element for man fold shift Shell F-1 $506504.00 | $ 8,273,356.74 | $ 4,936,135.12 | Dolphins temporary works $523135.12. Dolphins Smithbridge quote to complete repairs $142300C.00. Dolphin upper structure and walkway repairs $60000.00 Pier ramp, pipe work and manifold shift contribution $2930000.00. |
| 8 | F-5 Pier | $ 5,000.00 | $ 5,000.00 | Satisfactory. |
| 9 | Gantry Cranes #1 and #2 | $ 117,581.44 | $ 97,581.44 | Actual cost less deductible of $20000.00 (10K each) |

DEFENDANT'S DEPOSITION EXHIBIT

PENHO-Bayonne, N. J.

# PORT AUTHORITY OF GUAM

| ITEM | DESCRIPTION | AMOUNT CLAIMED | OFFER OF SETTLEMENT | COMMENTS |
|------|-------------|----------------|---------------------|----------|
| 10 | Golf Pier | $ 207,203.62 | $ 161,638.31 | Not convinced all damage is related to the earthquake. Market rate change. |
| 11 | Maintenance Building | $ 170,768.34 | $ 106,526.34 | Adjusted for market competitive rate remove down spouts pre-existing rebar expansion damage. |
| 12 | Old Tower Building | $ 96,913.42 | $ 75,000.00 | Adjusted for market competitive rate remove down spouts pre-existing rebar expansion damage. |
| 13 | Rails | $ 1,773,061.41 | $ 1,250,000.00 | We are not convinced that the full value of this claim can be related to earthquake damage. Allowance of $1,250,000.00 only. |
| 14 | Rigging Loft. | $ 70,078.91 | $ 50,000.00 | Adjusted for market competition, pre-existing damage rebar expansion. |
| 15 | Warehouse 1 | $ 467,511.00 | $ 310,961.75 | Substantial deduction by adjustment for this item and the next item. This is typical of the previous comments and considers the pre-existing damage by not only the 1993 earthquake but rusty rebar expansion not relevant to the earthquake and pre-existing. |
| 16 | Warehouse 2 | $ 427,634.43 | $ 320,460.67 | As for Warehouse 1. |
| | | $ 14,049,101.37 | $ 8,003,313.40 | Say $8 000 000.00 |

# EXHIBIT "G"



**PORT AUTHORITY OF GUAM**
ATURIDAT I PUETTON GUAHAN
Jose D. Leon Guerrero Commercial Port
**GOVERNMENT OF GUAM**
1026 Cabras Highway, Suite 201
Piti, Guam 96915



Telephone: (671) 477-5931/35
(671) 477-9683/85
Facsimile: (671) 477-9689/4445
Webpage: www.netpci.com/~pag4

**FELIX P. CAMACHO**
Governor of Guam

**KALEO S. MOYLAN**
Lieutenant Governor

## LOSS AND SUBROGATION FORM

$7,500,000.00                                    Date: 1/16/03

Claim No:  Port Authority of Guam

THE ASSURED AGREES TO FULL SETTLEMENT FROM LLOYD'S OF
LONDON AND LONDON COMPANIES, ROPNER INSURANCE SERVICES
LTD. AND AM INSURANCE in the amount of <u>Seven Million Five Hundred
Thousand Dollars ($7,500,000.00)</u> U.S. Dollars net of the deductible in full
satisfaction compromise and discharge of all claims for loss and expense sustained
to property insured under policy No:  Port Authority of Guam by reason of
Earthquake which occurred on October 13, 2002 and in consideration of which the
undersigned hereby assigns and transfers to the said Company each and all claims
and demands against any person, persons, corporation or property arising from or
connected with such loss or damage and the said Company is subrogated in the
place of and to the claims and demands of the undersigned against said person,
persons, corporation or property in the premises to the extent of the amount above
named.

WITNESS                          INSURED

                                 Port Authority of Guam

Date: 16 JAN 03

DEFENDANT'S DEPOSITION
EXHIBIT

PENGAD-Bayonne, N.J.



# PORT AUTHORITY OF GUAM
## ATURIDAT I PUETTON GUAHAN
### Jose D. Leon Guerrero Commercial Port
### GOVERNMENT OF GUAM
1026 Cabras Highway, Suite 201
Piti, Guam 96915



Telephone: (671) 477-5931/35
(671) 477-2683/85
Facsimile: (671) 477-2689/4445
Webpage: www.netpci.com/~pag4

**FELIX P. CAMACHO**
Governor of Guam

**KALEO S. MOYLAN**
Lieutenant Governor

## LOSS AND SUBROGATION FORM

$7,500,000.00                                       Date: 04/10/03

Claim No: Port Authority of Guam

THE ASSURED AGREES TO FULL SETTLEMENT FROM LLOYD'S OF LONDON AND LONDON COMPANIES, ROPNER INSURANCE SERVICES LTD. AND AM INSURANCE in the amount of Seven Million Five Hundred Thousand Dollars ($7,500,000.00) U.S. Dollars net of the deductible in full satisfaction compromise and discharge of all claims for loss and expense sustained to property insured under policy No: Port Authority of Guam by reason of Earthquake which occurred on October 13, 2001 and in consideration of which the undersigned hereby assigns and transfers to the said Company each and all claims and demands against any person, persons, corporation or property arising from or connected with such loss or damage and the said Company is subrogated in the place of and to the claims and demands of the undersigned against said person, persons, corporation or property in the premises to the extent of the amount above named.

WITNESS _____     INSURED _____
                                          Port Authority of Guam

DATE _____



# LOSS AND SUBROGATION FORM

$7,500,000.00                                            Date: 1/16/03

Claim No: Port Authority of Guam

THE ASSURED AGREES TO FULL SETTLEMENT FROM LLOYD'S OF LONDON AND LONDON COMPANIES, ROPNER INSURANCE SERVICES LTD. AND AM INSURANCE in the amount of Seven Million Five Hundred Thousand Dollars ($7,500,000.00) U.S. Dollars net of the deductible in full satisfaction compromise and discharge of all claims for loss and expense sustained to property insured under policy No: Port Authority of Guam by reason of Earthquake which occurred on October 13, 2001 and in consideration of which the undersigned hereby assigns and transfers to the said Company each and all claims and demands against any person, persons, corporation or property arising from or connected with such loss or damage and the said Company is subrogated in the place of and to the claims and demands of the undersigned against said person, persons, corporation or property in the premises to the extent of the amount above named.

WITNESS                              INSURED:



Port Authority of Guam

Date: 17 JAN 03

DEFENDANT'S DEPOSITION EXHIBIT

4

PENGAD-Bayonne, N. J.



# EXHIBIT "H"

IN THE DISTRICT COURT OF GUAM

1

2

3   S.J. GARGRAVE SYNDICATE    ) CIVIL CASE NO.   CV03-00009
    AT LLOYD'S,                )
4                              )
            Plaintiff,         )        DEPOSITION OF
5                              )       PETER M. MacLEOD
            vs.                )     MARCH 04 & 05, 2004
6                              )
    BLACK CONSTRUCTION         )
7   CORPORATION and WINZLER    )
    & KELLY CONSULTING         )
8   ENGINEERS and ENGINEERING,)
    MANAGEMENT & PLANNING      )
9   SERVICES CORPORATION,      )
                               )
10          Defendants.        )
    _____)

11

12      The deposition of Peter M. MacLeod, called by

13   Defendant Black Construction Corporation for

14   examination, pursuant to Notice and pursuant to Rule 30

15   of the Federal Rules of Civil Procedure, taken at the

16   law offices of Klemm Blair Sterling & Johnson, Suite

17   1008, Pacific Daily News, 238 Archbishop Street,

18   Hagatna, Guam, on the 04th and 05th of March, 2004, at

19   the hours of 9:50 a.m. and 9:00 a.m. respectively.

20          That at said time and place there transpired the

21   Following:

22

23                  Cecilia F. Flores
               Freelance Stenotype Reporter
24                        and
                   Cecille A. Flores
25             Certified Shorthand Reporter
          Tel: (671) 734-1041 or (671) 632-0727

1  was here, and they said we'd like you to come back and

2  look after all our claims.  I said, "Well, if you don't

3  put my name on the policy I won't be back."  Because

4  nobody would specifically appoint me from London unless

5  there was a reason to do so.  And the only way to do

6  that is to make arrangements for it.

7      Q.  Now how is it you first got contacted for this

8  claim?

9      A.  It'll just be by telephone.

10     Q.  And who contacted --

11     A.  Or e-mail or fax, or whatever.

12     Q.  Who contacted you?

13     A.  It would be AnnMarie Muna from AM Insurance.

14     Q.  Now since your client, or the insurer on this

15  particular loss, and for now we're just going to talk

16  about the October 2001 earthquake just so we're clear.

17     A.  Sure.

18     Q.  It was Lloyd's.  Did you have any communications

19  with anybody at Lloyd's at the inception of this claim?

20     A.  I would have done so because I would have had to

21  issue a preliminary report.  There were no telephone

22  calls, hardly at all, so e-mails or whatever, faxes or

23  --

24     Q.  So you got contacted by Ms. Muna at AM Insurance,

25  and what did she ask you to do at that time?

1    *A.* "We just had an earthquake, would you come up

2  here as soon as you can?"

3    *Q.* And then --

4    *A.* So I just arrived as soon as I can into these

5  events.

6    *Q.* Other than the Port Authority, did you have any

7  other earthquake claims you were handling at that time?

8    *A.* Yes; yes.

9    *Q.* What other claims were you handling?

10    *A.* Century 21.

11    *Q.* So that would be all the condominiums that were

12  on the condominium --

13    *A.* Yes.

14    *Q.* -- it'll be Alupang, Las Palmas, all of those?

15    *A.* Yes, same old list.

16    *Q.* When did you first, if you can recall, get to

17  Guam to start work on these earthquake claims?

18    *A.* I generally get here within a couple of days,

19  through Continental. It's a very good connection

20  through Australia here, so I can get up here very

21  rapidly. So it would have been as soon as possible. I

22  can't be specific.

23    *Q.* In terms of focusing on the Port Authority claim

24  now, what's the first thing you did in connection with

25  the Port Authority claim? I mean, who did you talk to,

1   *Q.* Let me ask you this, if Ben Casey is a structural

2   engineer, why did he recommend you bring Frank Dennis in

3   to work on this?

4   *A.* Because he wanted someone to back him up and I

5   wanted someone to back me up. I always engage an

6   engineer when I have a complicated structural matter.

7   But over and above that, Frank Dennis did -- I can't

8   certify this on Guam -- you'll have to have a local

9   engineer to certify it, and that was Tom Camacho from

10  Duenas and Associates, to inspect the entire cleanup.

11  *Q.* When did you first seize upon the notion that the

12  problems at the dolphins were designed for construction

13  problems?

14  *A.* Immediately when I saw them; just with my basic

15  knowledge, I just thought, this is a strange way of

16  attaching a pile, that's all. It's just a general

17  conversation with the group, I guess, and observation.

18  I just knew something was wrong here.

19  *Q.* When was the first time you got any consultants

20  advice on whether this damage was a design or

21  construction error?

22  *A.* It's from Frank Dennis; when he gave me his

23  report, it confirmed what I had been thinking. But I'm

24  not in a position to comment really.

25  *Q.* Looking down to the next paragraph here, the last

1    *Q.*  So there was an extra expense element to this
2    claim; correct?

3    *A.*  Yes.

4    *Q.*  Do you know how much was paid for that?

5    *A.*  I'd have to see the claim documents to tell you
6    what that -- whatever it was within the claim documents,
7    it will be fully detailed.

8    *Q.*  What claim document would that be?

9    *A.*  The Young Adjustment Co. should have an extra
10   cost, extra expenses claim.

11   *Q.*  We'll look at that later.

12   *A.*  Yeah.

13   *Q.*  And what I was specifically referring to is, and
14   I'm just going to show you this document, this was some
15   interrogatory responses provided to us by Carlsmith
16   recently that indicates your current claim is
17   $6,157,443, which includes loss of future pier rental of
18   $2 Million and diminution in pier value of $1,500,000.
19   Do you know where those numbers came from?

20   *A.*  I would have to pass that one to Forrest.

21   *Q.*  Did you pay the Port Authority $6,157,443 on this
22   claim?

23   *A.*   No, we paid more than that; $8 Million.

24   *Q.*  Well, did you pay them $2 Million for loss of
25   future pier rental as part of the claim for the

1 dolphins?

2     A.  No; no.

3     Q.  You didn't pay them any diminution in pier value

4 as part of this claim either; did you?

5     A.  No.

6     Q.  Now looking at page 4 back on this big exhibit,

7 the next page under, let's see, it's in the third

8 paragraph, long paragraph, at the end it says:

9 "Observations from some of the engineering persons

10 inspecting these piles are that this damage would not

11 have occurred had the design and/or construction works

12 been completed more professionally."  Who were the

13 engineering persons who rendered those opinions prior to

14 your report of November 12, 2001?

15     A.  It would just be Ben Casey and Frank Dennis, Tom

16 Camacho, that was the engineering team.

17     Q.  Let's look at the next page, page 5, you make

18 reference in the third paragraph to "the oil tankers of

19 course are large and heavy and one major docking

20 incident could possibly collapse one of the platform."

21     A.  Yes.

22     Q.  Did you make any inquiries, and once again this

23 is something I think I asked you and I apologize if I'm

24 asking you again, did you make any inquiries with the

25 Port personnel at that time whether they had had any

1  January 1 on letterhead is F, and without letterhead is

2  H.

3          THE WITNESS:  So Exhibit H was rejected

4  because it wasn't on letterhead.  The other two appear

5  to be satisfactory.  But for the sake of correctness,

6  they did them both again.

7  BY MR. STERLING: (Continuing)

8    Q.  Let me ask you this.  Looking at these two

9  exhibits, F and G, actually all three of these, F, G,

10  and H, it refers to policy number blank, essentially.

11  Did anybody ever figure out what policy number these

12  claims were paid under?

13    A.  It'll be on the proof of loss document that

14  Young's prepared; there'll be a proof of loss document

15  there somewhere.  It's a big -- fully detailed document.

16    Q.  But anyway, to your knowledge, other than some

17  documents they may have signed in connection with

18  partial payments, proof of loss or thereabouts --

19    A.  Yes.

20    Q.  Well, let me ask you this.  What was the purpose

21  of these documents, F, G, and H?

22    A.  That's just agreeing that's the amount of money

23  they wish to claim for.

24    Q.  There's a reference in some correspondence in

25  this case among the lawyers to the Port Authority having

1 assigned all of its rights to Gargrave, basically.

2    A.  Yes; yes.

3    Q.  Other than these documents we're looking at, are

4 you aware of any other assignment form?

5    A.  No.

6    Q.  So if we want to determine the extent of Lloyd's

7 rights in connection with the $7-1/2 Million payment,

8 this would be the document that sets that forth?

9    A.  I think so, but you need to read the proof of

10 loss document.  I'm fairly sure I'm correct in saying

11 that, but not a 100 percent.

12    Q.  I don't see it.  Maybe at the lunch hour I can

13 look for some of those proof of loss documents, make

14 sure we know what we're talking about.

15    A.  Yes.

16    Q.  Let's move on with these requests here, and what

17 I'm trying to do is find out what there is that I may

18 not have yet.

19       Request No. 4 is basically any and all documents

20 under which you assert you have been subrogated the Port

21 Authority of Guam's rights.  We just talked about that.

22    A.  Yes.

23    Q.  It's either this loss and subrogation form we've

24 been discussing or something in the proof of loss.

25    A.  Yes.

1    *Q.*  To your knowledge, there's nothing else; correct?

2    *A.*  The policy, the policy talks about it.  There's a

3  paragraph in the policy that refers to subrogation.

4    *Q.*  Now, Request No. 5 is your claim file pertaining

5  to this claim.

6    *A.*  Yes.

7    *Q.*  Where do you maintain that file?

8    *A.*  At my home base.

9    *Q.*  Have you ever seen this request before?

10   *A.*  No.

11   *Q.*  Well, did anybody ever ask you for your claim

12  file pertaining to this claim?

13   *A.*  Yes, and I have discussed that since -- and I

14  interpret that to mean the Shell F-1 Dolphins claim,

15  which is all I have given.  I have a huge amount of

16  information about the gantry crane, for instance; the

17  contents of the offices; Warehouse I, Warehouse 2.  If

18  you want that, I have to give you boxes of paper.

19   *Q.*  No, that's not necessarily what I'm interested

20  in.  But to your knowledge, you have, from your claim

21  file, pulled out all of the material pertaining to the

22  dolphins --

23   *A.*  Yes.

24   *Q.*  -- that was in your possession?

25   *A.*  Yes.

1    *A.*  Yeah.

2    *Q.*  One other instruction I forgot to give you.

3    Since Cecilia is trying to take down everything we say,

4    sometimes you know what I'm going to say before I say

5    it, or I'm interrupting you, so let's try to speak one

6    at a time.

7    *A.*  Okay.

8    *Q.*  My question is, he might have said something

9    like, I can't believe the earthquake would have done

10   that.  Did he say anything like that?

11   *A.*  No, not at all.  It was totally focused on the

12   earthquake damage; there was never any suggestion of

13   anything else.

14        One thing that comes to mind is the bolts on the

15   seabed, for instance, were sitting on top of the silt,

16   and on the boat video they were nice and fresh.  They

17   weren't hidden, they were just right there.

18   *Q.*  Let's move on to the next report, starting on

19   page 16, which is a March 15, 2002 report.

20   *A.*  Yeah.

21   *Q.*  At the end of the first paragraph on page 17,

22   you make the statement in here:  "Had Black Construction

23   installed the bolts, chem set joint correctly, the

24   design may have been satisfactory."  Has anybody ever

25   done an analysis to establish whether -- First of all,

1   when you say "may have been satisfactory", what do you

2   mean by that?  Meaning does it meet code?  It would have

3   withstood the earthquake?  It was okay?  I mean, what do

4   you mean?

5       A.  Well, you have to go back to the paragraph and

6   read it in its entirety.  And why did I say that?  The

7   reason I said that is -- that's right, he made the

8   comment that the design of Winzler and Kelly was

9   marginal; and had the bolts been in place and the epoxy

10  resin set as it should have been done, had they

11  installed it correctly that maybe it might have all held

12  together.  Because we all know some epoxy resin is very

13  good.

14      Q.  Moving on to the next paragraph, you say, second

15  sentence, talking about Black:  "They have failed to

16  check the quality control at the time of construction

17  back in 1996."  What information did you have to

18  indicate there was a lack of quality control at the time

19  of construction?

20      A.  What date is this report?  I think I need to say

21  here that my comments come from discussions with

22  engineers, and I am passing on what I hear from my

23  consultants.

24      Q.  At the time of this report, if you can put

25  yourself in that time period, or let's just talk about

1    Q    Okay.  And then you gave it to them?

2    A    I would have used the document.  I would have

3    written on it.

4    Q    Is this the only spreadsheet of this sort you ever

5    prepared during your work --

6    A    I probably have three or four of these that I've

7    done just numbers on through this -- every claim.  I have

8    them on my file just for my own negotiating purposes and if

9    anyone asks me a question one day, I can say...well, these

10   were the numbers we were roughly talking about.  I can't tell

11   you the date of this, unfortunately.  I have to look at my

12   computer; when this was used.

13   Q    But anyway, when you offered them $5.49 Million,

14   they didn't accept it, am I correct in that?

15   A    That's right.

16   Q    Did you do another spreadsheet subsequently?

17   A    What I can confirm to you when I prepared this -- if

18   anything, it might have been a few days before we actually

19   settled the claim which became 8 Million.  We had a major

20   problem with the Shell F-1 Pier.  Not the dolphins, the pier.

21   In the end, I had to concede that the pier was insured for

22   replacement conditions and we had to become much more

23   generous with the pier.  The dolphin settlement figure did

24   not change because it was a fixed figure.

25   Q    What was the dolphin settlement figure?

Peter M. MacLeod: March 4, 2004

*12*

1      A    It was $2 Million.

2      Q    Where does that number appear in any of these

3   documents?

4      A    Well, it appears in the final summary of the claim.

5      Q    Can you show me where that is?

6      A    Well, if you have my final report there somewhere,

7   it'll be --

8      Q    Okay, let's do this --

9      A    -- in a spreadsheet with the --

10     Q    Okay, I think I know what you're talking about.

11  It's on Page 40?

12     A    No.

13     Q    Where it says Report Objective.

14     A    Oh.

15     Q    The last sentence in that paragraph says, "the

16  deductible relative to Gantry cranes was $20,000.00 was taken

17  into account during negotiations for those elements and is

18  detailed in the settlement spreadsheet attached."

19     A    Uh-huh.

20     Q    Is there such a document?

21     A    There should be, yes.

22     Q    Where is it?

23     A    I'm sure I've done it several times for lots of

24  people.

25     Q    Well, can we get a copy?

Peter M. MacLeod: March 4, 2004

*13*

1    dolphin repair -- "referred the matter back to Frank Dennis."

2    And this would have to have been -- this is a report in

3    February of 2003 "who confirms that he is satisfied with the

4    proposed repairs being adequate," et cetera, et cetera.

5           Did Frank Dennis issue another written report?  Is

6    this in writing?  His comments on this proposed repair?

7       A    I think it was just a telephone call to Frank just

8    to double check that he was happy with this repair to proceed

9    on the quote from Smithbridge.  But I will double check my

10   master report.

11      Q    So that was the quote from Smithbridge.  I know I

12   have a copy of that.

13      A    I think it was 1.4 Million, I think it was.

14      Q    Yes, but I just want to verify.  Yes, here it is.

15   Let's go ahead and mark this one just for the record.

16                        (Exhibit Q marked for

17                         identification: Smithbridge

18                         Quote, 11-18-02.)

19      A    I'll double check that.

20      Q    Just for the record, Exhibit Q is a November 18th

21   quote from Smithbridge to MacLeod in the amount of

22   $1,420,000.00.  Can you tell me how this came to be?  This

23   Exhibit Q.

24      A    It was a request to finish the job.

25      Q    That would be basically to -- and correct me if I'm

Peter M. MacLeod: March 4, 2004

*14*

1   wrong -- to do the balance of the pilings on the dolphins

2   basically the same as the temporary repair on the 25 or 26

3   that were initially done; is that correct?

4       A    Correct.

5       Q    Do you know how many pilings Black actually repaired

6   in the first repair they did?

7       A    I have no idea.  Should be the same.

8       Q    I've just seen Terry Thompson's report.  He talks

9   about 107 and they're talking about 100 here.  Does anybody

10  really know how many pilings Black actually worked on?

11      A    I don't know.  I'm pretty sure they did a lot.

12  Apart from one dolphin that was untouched.  It was okay.

13      Q    That was Dolphin H because it was completely

14  rebuilt; right?

15      A    It was written off, yeah.  In the earlier days.

16      Q    Because they decided they couldn't repair that;

17  right?

18      A    Yeah, something happened.

19      Q    It was so bad they just wrote it off and Black built

20  the new one?

21      A    Exactly, yes.

22      Q    Did you pay any money on the new one that Black

23  built?

24      A    No.

25      Q    It survived okay?

1  when you settle a claim, you reach a point where you stop

2  arguing about whether it hurt for six months or five months

3  or whether it's going to cost 1,100 or 1,600 and just get

4  right to it, you settle it and say I'm going to give you "X"

5  Dollars to settle this claim.

6      A    Yes.

7      Q    Is that what happened here when you get the Seven

8  and a Half Million?

9      A    You're just talking lumps.

10     Q    Right.  So we were talking lumps when you got to the

11 end of the day?

12     A    Yeah.  We had to concede a large lump on the Shell

13 F-1 Pier.  It was my main problem.

14     Q    So when you reached the Seven and a Half Million and

15 you finally said, okay, that's the number -- or 8 Million --

16     A    Yeah.

17     Q    Netted deductible, Seven and a Half Million.  Did

18 you then work back to fill out the settlement spreadsheet?

19 Or did you have the settlement spreadsheet first?

20     A    Because these numbers go out the window.

21     Q    Right.  So you could just put any number anywhere

22 you wanted, right?  As long as it totalled Seven and a Half

23 Million Dollars or $8 Million?

24     A    Probably.

25     Q    So you reached the lump sum of 8 Million?

Peter M. MacLeod: March 4, 2004

*16*

1       A     Yes.

2       Q     There was some compromise on both sides, no doubt?

3       A     Exactly.

4       Q     And then you worked back and created the spreadsheet

5  to show what you allocated it to?

6       A     You have to show how you do it.  You have to account

7  for your actions.

8       Q     But if you chose to put $4 Million on the F-1

9  dolphins and zero on some other item, you could do that;

10 right?  As long as it totalled $8 Million?

11      A     Not as simple as that, no.  It has to be realistic.

12      Q     But you have some room to move as long as it totals

13 8 Million?

14      A     Of course, yeah.

15      Q     I'm assuming that when you get to the closing stages

16 in negotiating this claim you're not using your calculators

17 and taking $100 here and 10,000 there because you settle for

18 a round number.  What was the last offer they made to you?

19 What was the last number they proposed to you?  Do you have

20 any idea?  Is there any document that reflects that?

21      A     That was all discussion.  It was around the table

22 and there was about ten people there.

23      Q     Who were the ten people that were there when this

24 thing was --

25      A     Joe Mesa, the team.  And we went outside.  Joe -- Ed

Peter M. MacLeod: March 4, 2004                                    *17*

1                          document of claim.)

2       Q    We marked this as HH.

3       A    And it follows on from Exhibit P.

4            MR. BOOTH:  Also, for the record, in Exhibit A

5  it would have been an attachment following after Page 47,

6  also Bates stamped 9 --

7       A    35.

8            MR. BOOTH:  -- 35.  I can't read the number, but

9  anyway, it would have been attached to your June 5, 2003

10 report as an attachment.

11      A    Yes.

12 BY MR. O'CONNOR: (Continuing)

13      Q    And this bears what relationship to Exhibit P?

14      A    Well, Exhibit P started my notes on the negotiation.

15 This is the final -- how I arrived at it.

16      Q    So Exhibit P preceeded HH?

17      A    Yes, yes.

18      Q    Let's go back to Exhibit DD which is the

19 Interrogatories.

20      A    Oh, yes.  Have I got Page 5 now?

21      Q    You should have a Page 5.

22      A    Oh, yes, I do.

23      Q    Let's go to Page 2.  Interrogatory No. 2.

24      A    Yes.

25      Q    The Answer to Interrogatory No. 1 says that Peter

Peter M. MacLeod: March 5, 2004

*18*

1  Exhibit AA which is a big thick exhibit which was the

2  December 9, 2002 Young Adjustment claim.

3      A    Yes.

4      Q    This claim was in the total amount of 13,500,000

5  round numbers.

6      A    Yes.

7      Q    If we look at HH, you called it a claim settlement

8  spreadsheet.

9      A    Yes.

10     Q    The total amount of the claim at that time was

11 $14,049,000; basically had increased by about Half a Million

12 Dollars from December to January.  Can you tell me off hand

13 where that additional $500,000 came from?

14     A    No, I can't without referring to my file.

15     Q    I think yesterday you testified that this Exhibit AA

16 was the last claim submitted to you.

17     A    Yes.

18     Q    I'm just wondering now, was there another claim

19 document Young Adjustment gave you after this AA?

20     A    I have a vague feeling that the front page they gave

21 me was incorrect and they might have faxed me another one,

22 but I can't really recall.  But I can check Young's for you.

23 Do you want me to do that?

24     Q    It basically goes from 15,500,000 to 14 Million.  So

25 it goes up 500,000.

Peter M. MacLeod: March 5, 2004

*19*