1  BERMAN O'CONNOR MANN & SHKLOV
   MICHAEL J. BERMAN
2  DANIEL J. BERMAN
   ROBERT J. O'CONNOR
3  Suite 503, Bank of Guam Building
   111 Chalan Santo Papa
4  Hagåtña, Guam 96910
   Telephone: (671) 477-2778
5  Facsimile: (671) 499-4366

6  Attorneys for Defendant
   Winzler & Kelly Consulting Engineers
7

8                    IN THE DISTRICT COURT OF GUAM

9  S.J. GARGRAVE SYNDICATE           )   Civ. No. CIV 03-0009
   AT LLOYD'S,                       )
10                                   )
                                     )
11              Plaintiff,           )
                                     )   MEMORANDUM
12       vs.                         )   IN SUPPORT OF MOTION
                                     )   FOR SUMMARY JUDGMENT
13 BLACK CONSTRUCTION CORP.,         )   ON FIFTH CAUSE OF ACTION
   WINZLER & KELLY CONSULTING        )   (BREACH OF CONTRACT
14 ENGINEERS and ENGINEERS           )   AGAINST WINZLER & KELLY
   MANAGEMENT & PLANNING             )   CONSULTING ENGINEERS)
15 SERVICES CORP.,                   )
                                     )
16              Defendants.          )
   _____   )
17

18                              Introduction.

19       This case arises out of damages incurred by Pier F-1 dolphins at the Port of Guam. After an

20 earthquake in 2001, it was discovered that, among other things, a number of supporting piles had

21 pulled loose from the bottom of F-1's adjoining dolphins.[1] Five years previously, in 1996, Winzler

22 & Kelly Consulting Engineers ("Winzler & Kelly"), an engineering consultant to Black Construction

23 Corporation ("Black") had prepared plans for the repair of those piles, and is sued herein on the

24 theory that its plans were defective.  Three claims are asserted against it by Plaintiff Gargrave

25 Syndicate: 1) Negligent Property Damage; 2) Breach of Contract; and 3) Breach of Warranty of

26

27 _____

28      [1]  "Dolphins" are small satellite docks connected to a main pier by walkways.

   E:\Deenie\Pldgs\MJB\Winzler & Kelly\MtnSJ-5thCause-Bolts.wpd

                              **ORIGINAL**

1

2

3

S.J. Gargrave Syndicate at Lloyd's v. Black Construction Corp., et al.
U.S.D.C. Civil Case No. CIV03-00009
MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
ON FIFTH CAUSE OF ACTION (BREACH OF CONTRACT AGAINST
WINZLER & KELLY CONSULTING ENGINEERS)

Workmanlike Performance. See First Amended Complaint (Second, Fifth and Ninth Causes of Action).

The Syndicate's claim for Breach of Contract against Winzler & Kelly states in full as follows:

> Winzler breached its contract with Black by failing to exercise adequate skill and competence to design and specify the Project that would be sufficiently strong to withstand future earthquakes and typhoons. Winzler further breached its contract with Black by recommending and making improper and negligent changes at the Project, and by failing to note and observe errors and omissions by contractors performing the Contract.

> The Port Authority is an assignee and/or a third-party beneficiary of the contract between Black and Winzler. *These breaches of contract by Winzler directly caused damage and losses to Plaintiff.*

First Amended Complaint at paragraphs 27-28 (emphasis added). The actual terms of the contract alleged to have been breached by Winzler are described in brief as follows:

> Black then engaged the services of Winzler to provide revised design and engineering specifications for the repair work.

First Amended Complaint at paragraph 8.

The Complaint at several points emphasizes that Winzler and Kelly's design was actually used in performing the repair work, and that the damage to the Pier resulted from the use of that design:

> The repair work, including that which was *done pursuant to Winzler's revised design and engineering specifications for the repair work,* is hereinafter called the "Project."

First Amended Complaint at paragraph 8 (emphasis added).

> Specifically, serious damage was done to F pier, and the dolphins thereof, which had previously been repaired by Black, *pursuant to the plans and specifications prepared by, and under the supervision of, Winzler* and/or EMPSCO.

First Amended Complaint at paragraph 15 (emphasis added).

E:\Deenie\Pldgs\MJB\Winzler & Kelly\MtnSJ-5thCause-Bolts.wpd   - 2 -

1    S.J. Gargrave Syndicate at Lloyd's v. Black Construction Corp., et al.
     U.S.D.C. Civil Case No. CIV03-00009
2    MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
     ON FIFTH CAUSE OF ACTION (BREACH OF CONTRACT AGAINST
3    WINZLER & KELLY CONSULTING ENGINEERS)

> This investigation disclosed that the repair of the 1993 earthquake
> damage had been designed and done improperly by and under the
> supervision of Defendants. The repairs, or the Project, done in 1996-
> 1997 were inadequate, improperly done, and insufficiently strong to
> withstand future earthquakes and typhoons. The inadequacy and
> incompetence of the design, plans, specifications, and repair work
> performed by or approved by Defendants *directly caused and led to
> further damage* to the property of the Port Authority during the year
> 2001 earthquake, and *caused and directly led to damage* to and losses
> by Plaintiff, as is set forth more fully hereinafter.

First Amended Complaint at paragraph 17 (emphasis added).

In fact, however, the repair work was *not* done in accordance with Winzler & Kelly's design, and that design, even if it was inadequate, improper and negligent, did not cause, and could not have caused, any damage that may have been incurred by the Port Authority. Accordingly, summary judgment should be entered in Winzler & Kelly's favor as the Fifth Cause of Action.

## Summary Judgment Standard.

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. The moving party bears the initial burden of demonstrating, generally by the submission of affidavits, that no genuine issue of material fact exists. Once he had done so, the burden shifts to the non-moving party to demonstrate that such an issue does exist. Mere conclusory allegations or reliance on the complaint is insufficient to defeat a motion for summary judgment. See generally Fed.R.Civ.P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505 (1986).

## Winzler & Kelly's Design Was Not Used.

Winzler & Kelly's design for the repair to the piles is set forth in a drawing known as "VE-1." VE-1 provides in pertinent part that:

E:\Deenie\Pldgs\MJB\Winzler & Kelly\MtnSJ-5thCause-Bolts.wpd  - 3 -

> Adhesive anchors to be stainless steel red head "Redi-Chem" by Phillips Drill Co., Catalog No. CE3495 or approved equal. Install per manufacturer's recommended procedures.

VE-1 at Note 2 (upper right hand corner of drawing). VE-1 is attached to Declaration of Bruce Swanney in support of this motion as Exhibit "A". In the Redi-Chem system a glass capsule is inserted in to the bolt hole. Inside of the capsule are two chemical compounds, one separated from the other with a second glass vial. In the course of installation per "Manufacturer's Recommended Procedures" the bolt is then inserted at the end of a drill into the capsule rupturing the capsule and its glass vial and mixing the two chemical compounds, achieving the desired epoxy bond. See Bruce Swanney Deposition Transcript at page 118 and Declaration of Bruce Swanney in support of this motion (describing procedure). Inserting the capsule in this manner displaces all the air in the hole, and the mixing action ensures that the adhesive completely fills and coats the inside surfaces of the hole and the anchor rod.

The selection of this particular type of anchoring system for use in the repairs was not made randomly, but deliberately and purposefully, as former Winzler & Kelly engineer Bruce Swanney, who prepared VE-1, testified at his deposition:

Q:     Okay. Why did you select that particular product?

A:     It was the most appropriate for the application. It takes a lot of the construction variables out of the installation. It's a lot – it requires a lot less skill to install it, and there's more – it's more – you're increasing your chances of having the connection constructed correctly.

Bruce Swanney Deposition Transcript at page 118. The plans allowed for the possibility of an "approved equal" system being used instead, but Black Construction, the contractor doing the repair work, never asked Winzler & Kelly to approve any substitute system:

Q:     Did Black ever come – or EMPSCO or anyone ever come to you and say: Would XYZ product be the equivalent of what you specified?

A:     No, no one did.

E:\Deenie\Pldgs\MJB\Winzler & Kelly\MtnSJ-5thCause-Bolts.wpd    - 4 -

4

5  Id. at 119. Indeed, Winzler and Kelly was never made aware, before this lawsuit was filed, that

6  Black did not use the Redi-Chem system that it was supposed to use in accordance with the plans.

7  See id. at 117 (Swanney did not know the Black had substituted a different product); 158 (Swanney

8  did not know whether Black was using the Redi-Chem anchor system). But in fact, Black did not

9  use it. Instead, it substituted the Anchor It Epoxy System HR200 -- a "different system" from the

10 Redi-Chem, id. at 121, in which the epoxy adhesive has to pre-mixed on site by the contractor and

11 then injected by a machine up into the hole. Id. at 125. When the two adhesive chemicals are not

12 mixed in the proper proportion or are not injected all the way up into the top of the hole (problems

13 which cannot occur with the Redi-Chem or its equivalent system), then the bolts can easily pull loose

14 because the epoxy does not harden or does not cover entire length of the bolt. There is no genuine

15 dispute as to any of these facts.

16     The inspection on site after the earthquake found multiple bolts with very little or no epoxy

17 coverage, multiple bolts with soft and pliable epoxy, and multiple bolt holes where the epoxy had

18 drooled out of the holes.[2]

19     Nor is there any dispute that Winzler & Kelly's original design at least could have worked,

20 had it been followed by Black. Winzler & Kelly itself, of course, maintains that it would have

21 worked perfectly well. More importantly, even the Syndicate's own investigators concede, however

22 grudgingly, that it might well have held up, indeed *probably would have*, and averted the damage

23

24

---

25     [2] See Frank Dennis deposition (Exhibit "A" attached hereto): ("Q: Is it possible that if the Winzler & Kelly design
   had been followed, and the bolts installed properly, that the piles to deck connections would have performed satisfactorily in this
26 earthquake? A: Yes. It's --- That's possible." p. 214); (He was able to pull out some bolts by hand; not very much epoxy on
   these bolts. p. 30); (Some of the epoxy on the bolts he pulled out was soft and some granular. pps. 31-2, 34); ("If all the bolts
27 had remained in position, and the epoxy had set properly, it is quite possible that the dolphins would have been alright." p. 71);
   (Agrees if bolts properly fixed it's possible the pile to deck connections would not have failed. p. 208).
28
       See Ben Casey deposition (Exhibit "B" attached hereto): (He saw soft and pliable epoxy which would indicate the
   epoxy chemicals had not mixed properly, he saw that epoxy had run out of some of the holes. pps. 39, 87, 88, 139); (50% of the
   800 bolts had soft or leaking epoxy. pps. 139-140).

E:\Deenie\Pldgs\MJB\Winzler & Kelly\MtnSJ-5thCause-Bolts.wpd  - 5 -

the occurred in its absence. Peter MacLeod of MacLeod Claims Management Ltd. wrote to Lloyd's on March 15, 2002, as follows:

> The investigation of the failure cause is dealt with in the attached report confirming that *the design completed by Winzler and Kelly Consulting Engineers, Guam was marginal to safely resist the loads that could be imposed upon it. Had Black Construction installed the bolt, chem set joint correctly, the design may have been satisfactory.*

MacLeod's *Report Number 3: Earthquake Damage Claim – Port Authority of Guam – Loss 13th October 2001*, attached as Exhibit "A" to Declaration of Robert O'Connor (filed herewith), at page 2 (emphasis added). OCEL Consultants Limited, the investigator engaged by the Syndicate through MacLeod, stated the same conclusion on several occasions. For example:

> It is possible that had the bolts been properly installed the pile to deck connection would have performed satisfactorily in the recent earthquake.

December 21, 2001, Report of F. E. Dennis of OCEL to MacLeod, attached as Exhibit "B" to Declaration of Robert O'Connor, at page 3. He later wrote again that:

> Had the bolts all been properly installed *the joint would probably not have failed.*

October 9, 2002, Report of F. E. Dennis of OCEL to MacLeod, attached as Exhibit "C" to Declaration of Robert O'Connor, at page 8 (emphasis added).

### An Architect Cannot Be Held Liable On Plans That Are Not Used.

Winzler & Kelly is entitled to summary judgment based on the undisputed facts alone, because it is undisputed that Winzler & Kelly's actual design was not used by Black. The longstanding rule applicable to such situations is:

> When a case is based upon negligence of an architect or engineer in preparing plans, it is essential that the plaintiff prove that construction of the project designed was accomplished in compliance with the plans and specifications provided by the defendant, at least with respect to that portion of the work claimed to be defective.

Covil v. Robert & Co. Associates, 144 S.E.2d 450, 455 (Ga. App. 1965) (citations omitted). The issue is one of causation -- i.e., if the plans were not followed, they could not have caused the injury. In Wheat Street Two, Inc. v. James C. Wise, Simpson, Aiken & Associates, Inc., 208 S.E.2d 359 (1974), the court approved the following jury instruction:

> In order for an architect to be held liable for alleged negligent design, it must first be shown that the work claimed to be defective was constructed in accordance with the plans and specifications provided by the architect[,]

noting that it "says no more than that the architect cannot be held liable for negligent design if the negligent design is not a part of the proximate cause of the damages." Id. at 362.

In Lake v. McElfatrick, 34 N.E. 922 (N.Y. 1893), an architect was hired to design an opera house. His design called for the proscenium arch to be supported by stone "skewbacks," but the contractor made the skewbacks out of brick instead, and the arch collapsed. The Court of Appeals held that the owner's complaint for breach of contract against the architect ought to have been dismissed:

> When it was conceded that the plaintiff's assignor had not followed the plans in this respect, and it appeared that the failure to put in the stone skewbacks may have caused the loss, which the plaintiff is seeking to impose upon the defendants, they were entitled to a ruling, as a matter of law, that the plaintiff could not recover, and the complaint should have been dismissed. He had failed to establish the performance of the condition precedent, which was essential to the support of his cause of action. . . . .

> [W]here the variance is not disputed, and involves the integrity of the mode of construction of the affected part, and is so far material that it may have been the direct cause of the injury for which the owner seeks to hold the architect responsible, it must be held, we think, that the plaintiff has failed to establish the cause of action upon which he relies.

Id. at 924-25.

Courts have followed this rule in numerous other cases in which a situation of this type has arisen. For example, in Weston v. New Bethel Missionary Baptist Church, 598 P.2d 411 (Wash.

App. 1979), the architect's design had called for a 16-foot-high rockery. The rockery was actually

built 22 feet high, however, and then had collapsed. The court granted the architect's motion for

summary judgment on the owner's claim against him, stating: "Since Jepson's plans were not

followed or relied upon, Jepson could not be guilty of negligence that caused damages to plaintiff's

property." Id. at 414.

Likewise, in Sanders v. Kalamazoo Tank & Silo Co., 171 N.W. 523 (Mich. 1917), the

contractor admitted having deviated from the architect's plans in the construction of a derrick:

> "Larger bolts than I had would have enabled me to bolt them together
> at that point and carried out the directions. Instead of that, I took the
> shorter bolts and bolted it 18 inches up the braces. It would only have
> taken a bolt about an eighth of an inch
> longer."

Id. at 527. The trial court granted judgment n.o.v. in favor of the architect, and the state Supreme

Court agreed:

> One cannot read this record without being of the opinion that had the
> instructions, especially the assembling diagram as shown in Exhibit
> D, been followed and complied with, in all probability this deplorable
> accident would not have happened. We think the duty and burden
> were placed upon the plaintiff to show a substantial compliance with
> the plans and instructions accompanying the derrick when it was
> purchased, and that burden has not been sustained, and that, in this
> case, the plaintiff is in no position to recover a judgment for damages.

Id. See also, e.g., Bayne v. Everham, 163 N.W. 1002 (Mich. 1917) (architect was entitled to directed

verdict in his favor, in case where his plans and specifications were not followed).

## Conclusion.

In this case, there is no dispute that the anchor bolt system prescribed by Winzler & Kelly

or its approved equal was not used. Because Winzler & Kelly's design, not having been used, could

not possibly have caused the damages, and because if it had been used the damages would likely

4

5  have been avoided, Winzler & Kelly cannot be liable for those damages, and summary judgment

6  must therefore be entered in its favor as to the Fifth Cause of Action.

7

8          Respectfully submitted this 5th day of November, 2004.

9

10                                      BERMAN O'CONNOR MANN & SHKLOV
                                        Attorneys for Defendant
11                                      *Winzler & Kelly Consulting Engineers*

12

13                              By: _____
14                                      MICHAEL J. BERMAN

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IN THE DISTRICT COURT OF GUAM

S.J. GARGRAVE SYNDICATE          CIVIL CASE NO. CV03-00009
AT LLOYDS,

                    Plaintiff,

     vs.

BLACK CONSTRUCTION
CORPORATION, WINZLER & KELLY,
and ENGINEERING MANAGEMENT &
PLANNING SERVICES CORPORATION,

                    Defendants.

---

DEPOSITION OF FRANK EDGERTON DENNIS


Taken on behalf of Plaintiff,

at the Law Offices of Carlsmith Ball LLP,

2200 American Savings Tower,

1001 Bishop Street, Honolulu, Hawaii,

commencing at 9:35 a.m.,

on Wednesday, July 21st, 2004, pursuant to Notice.


BEFORE:          HEDY COLEMAN,  CSR  NO. 116
                 Notary Public, State of Hawaii
                 Certified Shorthand Reporter

EXHIBIT "A"

1     Q    Right. So we're talking about the dolphins?

2     A    We're talking about the dolphins.

3     Q    But you say, "It is possible, had the bolts been

4 properly installed, the pile-to-deck connection would have

5 performed satisfactorily in the recent earthquake."

6         So, if Winzler & Kelly's design had been

7 followed, it's possible that the-pile-to-deck

8 connections would not have disconnected, is that

9 correct?

10    MR. BOOTH: I object to the form of the question.

11 Where he said Winzler & Kelly design was not followed,

12 Mr. Swanney testified he was. S-W-A-N-N-E-Y.

13    A    So will you repeat your question.

14 BY MR. O'CONNOR:

15    Q    Yeah. Is it possible that if the Winzler & Kelly

16 design had been followed, and the bolts installed properly,

17 that the pile-to-deck connections would have performed

18 satisfactorily in this earthquake?

19    A    Yes, it's -- that's possible.

20    Q    Your final conclusion on the same page says, "The

21 design of the 1996 repair of the pile-to-deck joint was at

22 best marginal to safely resist the loads that could be

23 imposed upon it."

24         And by that design are you referring to

25 the Winzler & Kelly design VE-1?

1       Q    Did any of them come out?

2       A    Yes, they did.

3       Q    What happened to the ones that you were able to

4 remove by hand?

5       A    We inspected the shank of the bolt, we inspected

6 the bolt, and any epoxy that was still attached to it.

7       Q    How much epoxy was on the bolts that you were able

8 to remove by hand?

9       A    Not very much.

10      Q    Was it down on the lower end, near the nut at the

11 bottom of the bolt?

12      A    Yes.

13      Q    Approximately how long were these bolts?

14      A    Eight inches, total length.

15      Q    Okay.  And can you estimate about how much of the

16 eight-inch length had epoxy on it?

17      A    No.

18      Q    During your inspection was there any sign that

19 epoxy had flowed over the flange and out and dripped down,

20 say, into the water?

21      A    No.

22      Q    Were any of the holes that had previously had

23 bolts in them accessible so that you could reach your finger

24 up into them?

25      A    The holes were accessible but they weren't real

1   big.

2        Q    Approximately what was the diameter of the holes?

3        A    Seven-eighths of an inch.

4        Q    Okay.  So you didn't have too much opportunity to

5   see up in there, is that fair to say?

6        A    Yes.

7        Q    Okay.  Were you able to put your finger up and

8   notice any epoxy in any of the holes?

9        A    No, I don't think we did.

10       Q    Was there any epoxy on the top of any of the

11  flanges that you inspected?

12       A    Not on the flanges, no.

13       Q    Did you notice any epoxy anywhere around the top

14  of the flange or the top of the pile?

15       A    No.

16       Q    There were some epoxy on some of the bolts that

17  you pulled out, though, is that right?

18       A    Yes.

19       Q    What was the state of that?

20       A    Some of the epoxy on the bolts we pulled out, or

21  on some of the bolts that were actually sitting down from

22  the concrete that we didn't pull out, was soft, and some of

23  the bolts had a granular material on them like sand.

24       Q    Could you tell whether that was in fact sand or

25  something else?

1     A    It certainly wasn't sand.

2     Q    Is there anything in the process of mixing or

3 installing epoxy that's a granular material?

4     A    In my experience, there is a type of -- sorry --

5 in my experience, there is a type of two-part epoxy that has

6 a granular material and a liquid.

7     Q    Is the granular part called the resin?

8     A    Yes.  I suppose so, yes.

9     Q    Was there enough to be able to analyze or

10 determine what it really was?

11     A    Yes, I suppose there was.

12     Q    But you didn't perform an analysis, is that right?

13     A    No.

14     Q    Okay.  So this soft epoxy was found both on bolts

15 you were able to pull out and ones that were still hanging

16 up in the hole?

17     A    Yes.

18     Q    Okay.  Was some of the epoxy also hard?

19     A    Yes.

20     Q    You've described that some of the bolts were

21 missing and some were loose.  Was there any pattern to the

22 bolts being missing and looking loose that was different on

23 mooring dolphins A and B, versus breasting dolphins C, G and

24 D?

25     A    I think in general the damage suffered to A and B

1  it?

2      A    Plasticine.  Do you know what that is?

3      Q    I do, but I'm not sure that other people hearing

4  this may understand that.

5      A    Well, I think putty is not fair because putty can

6  be -- the consistency of putty depends on linseed oil, how

7  much linseed oil is in it.  In my experience, Plasticine is

8  Plasticine.  It's --

9      Q    Okay.

10     A    It was soft, you could squeeze it quite easily,

11  but it didn't fall apart.

12     Q    Similar to, say, squeezing the side of a tube of

13  toothpaste?

14     A    Yes.  Yeah.

15     Q    And it will deform, it will deflect if you squeeze

16  it?

17     A    Yes.

18     Q    Okay.  What did that mean to you, that it was soft

19  and pliable?

20     A    That it failed to set.

21     Q    When epoxy is used to set bolts in this type of

22  installation that we had on the dolphins at Shell F-1, is

23  the intention that ultimately the epoxy will set up and

24  become very hard?

25     A    Yes.

1    to fail."

2           I take it that was a conclusion you

3    reached based upon your observations at the

4    dolphins?

5       A    Yes.

6       Q    Okay.  And then you go on, "Just how the dolphins

7    would have performed had the bolts been properly fixed is

8    debatable."

9           What did you mean by that?

10      A    Well, if -- if all the bolts had remained in

11   position, and the epoxy had set properly, it is quite

12   possible that the dolphin would have been all right.  It's

13   very difficult to tell.  But I think on dolphin A, which is

14   the one that suffered the least damage, a lot of the

15   bolts -- most of the bolts that were still in place were on

16   that dolphin that suffered the least damage.

17          I can't say.  It was not a particularly

18   big earthquake, so I would have expected that the

19   loads imposed on the dolphins from that source would

20   have been well below the design level.

21      Q    Okay.  You go on to the next page, "Dolphin H,

22   which was a new construction in 1996, with the piles held in

23   by four adequately anchored number eight, one-inch bars

24   suffered very little damage."

25          How were you made aware that there were

1     chunks of concrete attached to them?

2        A     You mean epoxy?

3        Q     Concrete. There would be epoxy around the bolt,

4     and then concrete attached to the epoxy.

5        A     No.

6        Q     You didn't see any of those?

7        A     No.

8        Q     On the bottom of this same exhibit, page one --

9     page three, the last paragraph, you wrote, "There was little

10     doubt that the recent earthquake caused the pile head bolts

11     to fail. Just how the dolphins would have performed had the

12     bolts been properly fixed is debatable."

13        What did you mean by that last sentence?

14     By that last sentence did you mean that it's

15     possible that if the bolts had been properly placed,

16     that the dolphins' connections wouldn't have failed

17     in this earthquake?

18        A     It can be shown that that is the case, yes.

19        Q     Help me out on this; you're the engineer, I'm not.

20     On the top of the next page, you write, "Dolphin H, which

21     was the new construction in 1996, with the piles held in by

22     four adequately anchored No. 8 one-inch bar, suffered very

23     little damage."

24        Here is my confusion. If the earth -- if

25     an earthquake is the force that caused all this

Case 1:03-cv-00009    Document 72    Filed 11/05/2004    Page 17 of 23

```
 1              IN THE DISTRICT COURT OF GUAM

 2  S.J. GARGRAVE SYNDICATE AT LLOYDS,)
         Plaintiff,                   )
 3                                    )
    vs.                               )    CIVIL CASE NO. CV03-00009
 4                                    )
                                      )
    BLACK CONSTRUCTION CORPORATION,   )
 5  WINZLER & KELLY, and ENGINEERING  )
    MANAGEMENT & PLANNING SERVICES    )
 6  CORPORATION,                      )
         Defendants.                  )
 7
 8
 9
10          **********************************************
11               ORAL AND VIDEOTAPED DEPOSITION OF
12                          BEN CASEY
13                       MARCH 23, 2004
14          **********************************************
15
16                       ORIGINAL
17
18       ORAL AND VIDEOTAPED DEPOSITION of BEN CASEY, produced as a
19  witness at the instance of the Plaintiff, and duly sworn, was
20  taken in the above-styled and numbered cause on the 23rd day of
21  March 2004, from 10:32 a.m. CST to 3:57 p.m. CST, before Dalia
22  F. Inman, CSR, in and for the State of Texas, reported by
23  machine shorthand, at the offices of Cozen O'Connor, 1717 Main
24  Street, Suite 2300, Dallas, Texas, pursuant to the agreements
25  stated on the record and the Federal Rules of Civil Procedure.
```

EXHIBIT "B"

1            Go ahead and answer.

2      Q     (BY MR. BOOTH)  You can answer.

3      A     My -- my experience, there were -- there were two

4  things that looked as though that had happened.  As -- as a

5  contractor who does this sort of retrofit type of repair -- and

6  I've had a lot of experience in retrofit -- fit repairs.  One,

7  the epoxy that holds the bolt in was soft and -- and pliable

8  which would indicate that the chemical reaction to harden epoxy

9  in this circumstance hadn't -- hadn't reacted or mixed properly

10 and provided a hard epoxy.  That was even on several occasions.

11 The other -- the other instance was where it did look as though

12 the actual earthquake had pulled the bolts out.

13            So there were two separate instances where, one,

14 it looked as though the bolts had possibly fallen out on their

15 own -- own behalf prior to the earthquake and instances where

16 some of these bolts had definitely been pulled out as a direct

17 cause of the earthquake.

18     Q     Okay.  You mentioned that some of the piles had been

19 displaced horizontally eight or nine inches, I think you said.

20 Did it appear that that had been caused by the earthquake?

21     A     Yes.  The direct displacement -- I felt that the

22 direct displacement had been the concrete cap had -- had moved

23 and left some of the piles in the same position, and some of

24 the piles that were still connected had actually a vertical --

25 or sorry, a horizontal displacement with them.  So the whole

1   dislodged from any of the piles?

2       A       The attachment bolts?

3       Q       Attachment bolts, yeah.

4       A       Yeah.  As I mentioned earlier, on a previous

5   occasion, I had a chance to visit this facility, and we had

6   noticed in the past that some bolts had appeared to be falling

7   out prior to that earthquake.

8       Q       Could you tell what had caused those to fall out?

9       A       We never looked at them or inspected them close

10  enough to be able to make a fair opinion on that.

11      Q       Okay.

12              Did you notice any of the piles had epoxy around

13  the tops that had run out of the holes?

14      A       Yeah.  On -- after the 2001 earthquake, on close

15  inspection, there were several areas where epoxy had sort of

16  settled onto the flange, and it had appeared that they had run

17  out of the -- out of the hole that they had initially been --

18  or that the epoxy had initially been placed into.

19      Q       And when you use the word "flange," that's the round

20  piece at the top of the pile that has the holes through it

21  through which the eight bolts were installed up into the cap?

22      A       That is correct.

23      Q       Okay.

24              Where was the white bucket with the bolts in

25  them -- in it when you left Guam?

LegaLink Dallas
global court reporting * legal videography * trial services                800-966-4567
www.legalink.com

BEN CASEY                           3/23/2004

```
 1      A       From what I can recall, still in my old office in
 2  Smithbridge up on Route 15.
 3      Q       Okay.
 4              Did you feel the epoxy that was on those bolts
 5  to see if any of it was still soft?
 6      A       Not actually on the bolt itself.  But when -- when we
 7  inspected the facility, there are several areas where you could
 8  actually get ahold of the epoxy and grab it and peel it off,
 9  like on the flange or where it had dripped through the bolt
10  hole on the flange.  But not -- not specifically on the bolt,
11  no.
12      Q       Okay.  When you recovered some of that from the
13  flange or from the cap, was it still soft and pliable?
14      A       Yes, it was.  Uh-huh.
15      Q       Okay.  Could you tell what kind of epoxy it was?
16      A       No.  You couldn't -- couldn't make that assessment.
17      Q       Okay.  In 2001, when you were inspecting the damage
18  that was caused by the earthquake, was there any discussion by
19  anyone as to whether this facility had exceeded its useful life
20  and ought to be replaced rather than repaired?
21      A       I'm not sure whether it was just after the earthquake
22  or a long period of time after the earthquake, but I had heard
23  discussions through the Port -- and I can't particularly
24  remember the source that those comments came from.  But we had
25  heard that the Port's opinion was that they felt the facility
```

1    under the dolphins that -- I think you said some of the bolts

2    could simply be pulled out because the epoxy was soft, and then

3    you said later that you weren't sure whether you had, in fact,

4    pulled any out or not.  Did you, in fact -- when you were

5    inspecting after the earthquake, were you in a position to

6    actually pull on some of the bolts?

7        A    Yes.

8        Q    And if so, how did you go about that?

9        A    Yes.  In some of the locations, we could reach the

10   physical bolt.  My gray area there on whether we actually --

11   was whether we actually had collected a bolt at that stage.  My

12   recollection was that we definitely had our hand on the bolts

13   and we could definitely move them.  There was sufficient

14   movement to -- that they were loose in the holes but not

15   necessarily the fact that we could physically pull one out

16   because of the angle or how it was wedged in -- in that

17   condition.  So...

18       Q    You also mentioned that you had observed some holes

19   where there was no epoxy -- leaking epoxy, and I just wanted to

20   clarify.  I think you said the situations where you could

21   observe that was where there was no bolt at all.  Is that

22   correct?

23       A    No.  There was some situations where the bolt was

24   hanging half out of the hole where I mentioned that they were

25   actually loose.  There are indications there where -- where the

LegaLink Dallas
global court reporting * legal videography * trial services                    800-966-4567
www.legalink.com

☒025

BEN CASEY                          3/23/2004

1  epoxy had been leaking and was soft in those instances as well.

2      Q      Okay.  Do you recall how many bolts you saw that were

3  in that condition?

4      A      I'm going to say as a percentage, of which there's a

5  hundred piles, 800 bolts, that at least 50 percent of those

6  showed that damage.

7      Q      You also indicated that when you did an inspection

8  that some of the pilings were basically 8 or 9 inches from

9  where they had been originally on the cap --

10     A      Uh-huh.

11     Q      -- and it was your view that the cap had, I think,

12 lifted and basically physically moved.  Is that what your

13 testimony was?

14     A      Maybe not lifted and moved but in a different

15 position to where -- I can refer to the specific dolphins.

16 Dolphin C and dolphin D were the two dolphins that I'm

17 referring to.  In the plans, they have a transition point

18 underneath where they actually sit at two different levels, and

19 there's a -- a batter on the bottom surface of the concrete

20 like this.  Those particular dolphins were where -- where this

21 case had happened.

22             Now, when I say it had moved, the final position

23 indicated that it had displaced -- either with some existing

24 piles still connected had moved this way, and the piles that

25 were disconnected showed that they were out of position