1  **BERMAN O'CONNOR MANN & SHKLOV**
   **DANIEL J. BERMAN**
2  **ROBERT J. O'CONNOR**
   **Suite 503, Bank of Guam Building**
3  **111 Chalan Santo Papa**
   **Hagåtña, Guam 96910**
4  **Telephone: (671) 477-2778**
   **Facsimile: (671) 499-4366**
5
   **Attorneys for Defendant**
6  **Winzler & Kelly Consulting Engineers**

**FILED**
DISTRICT COURT OF GUAM

NOV - 9 2004

MARY L. M. MORAN
CLERK OF COURT

7

8                    **UNITED STATES DISTRICT COURT**

9                      **FOR THE DISTRICT OF GUAM**

10 | S.J. GARGRAVE SYNDICATE AT            ) | **CIVIL CASE NO.: CIV03-00009**
   | LLOYDS,                               )
11 |                                       )
   |                    Plaintiff,         ) | **DECLARATION OF ROBERT J.**
12 |                                       ) | **O'CONNOR IN SUPPORT OF**
   |              v.                       ) | **MOTION FOR SUMMARY**
13 |                                       ) | **JUDGMENT ON FIFTH CAUSE OF**
   | BLACK CONSTRUCTION                    ) | **ACTION (BREACH OF CONTRACT**
14 | CORPORATION, WINZLER & KELLY          ) | **AGAINST WINZLER & KELLY**
   | CONSULTING ENGINEERS and              ) | **CONSULTING ENGINEERS)**
15 | ENGINEERING, MANAGEMENT &             )
   | PLANNING SERVICES CORPORATION,        )
16 |                                       )
   |                    Defendants.        )
17 |_____)

18

19

20          I, Robert J. O'Connor, hereby declare:

21

22          That I am the attorney or Winzler & Kelly Consulting Engineers ("Winzler & Kelly")

23  in the above-entitled action. This declaration is based upon my personal knowledge and I am

24  competent to testify to the matters contained therein.

25

26          During the course of litigation in this matter, the plaintiff has disclosed to the parties

27  various reports prepared by Peter MacLeod, a representative of the plaintiff and a structural

28  engineer, Frank Dennis, from the New Zealand engineering firm, OCEL.

1     Peter MacLeod was retained by the plaintiff to investigate and negotiate with Young's

2    Adjustment, an adjustment company representing the Port Authority of Guam on its insurance

3    claims for damages caused by the October, 2001 earthquake to pier F-1 and its dolphins.

4

5    Frank Dennis and his company, OCEL, were hired by Peter MacLeod to assist him in

6    his investigation into the damage to pier F-1.

7

8    Attached to this declaration are the following reports on pier F-1 dolphin damage

9    prepared by these representatives of the plaintiff:

10

11       • Peter MacLeod's Report No. 3: Earthquake Damage Claim – Port Authority of

12         Guam – Loss 13th October, 2001, March 15, 2002 (Exhibit "A");

13

14       • OCEL Report from Frank Dennis to Peter MacLeod. December 21, 2001 (Exhibit

15         "B");

16

17       • OCEL Report from Frank Denis to Peter MacLeod. October 9, 2002 (Exhibit "C");

18

19    I was present at the oral depositions of Bruce Swanney, Ben Casey and Frank Dennis.

20    They were placed under oath and the excerpts of their testimony attached to this motion are

21    accurate.

22

23    I swear under penalty of perjury that the foregoing is true and correct.

24

25    Signed on Saipan, Commonwealth of the Northern Mariana Islands, on November 4,

26    2004.

27

28

Robert J. O'Connor

**COMMONWEALTH OF THE NORTHERN )**
**MARIANA ISLANDS                        ) ss.**
**ISLAND OF SAIPAN                      )**
_____)

     On this 4th day of November, 2004, before me, a Notary Public in and for the Commonwealth of the Northern Mariana Islands personally appeared **ROBERT J. O'CONNOR**, known to me to be the same person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same as his free and voluntary act and deed for the uses and purposes therein set forth.

     **IN WITNESS WHEREOF**, I have hereunto set my hand and affixed my Official Seal the day and year first above-written.



2003-08-041103-PL-Decl-ROC.doc

    NOTARY PUBLIC

NOTARY PUBLIC
Commonwealth of the Northern
Mariana Islands
My Commission expires: Sep. 15, 2006
P.O. Box 501969 CK
Saipan, MP 96950-1969

# MACLEOD CLAIMS MANAGEMENT LTD

P O Box 36162
Merivale
Christchurch
New Zealand

Telephone (643) 356-1098
Fax:      (643) 356-1097
E-Mail:
Peter.MacLeod@xtra.co.nz

Our Reference:      1/1844
Your Reference:     Please Confirm
Date:               15th March 2002

The Claims Managers
The Lloyds Underwriters Concerned
C/- Ropner Insurance Services
**London**

**Attention:  John Boyt and Darren Nuding**

## REPORT NUMBER 3
## EARTHQUAKE DAMAGE CLAIM
## PORT AUTHORITY OF GUAM – LOSS 13TH OCTOBER 2001

| | |
|---|---|
| **Policy Number** | Please Confirm. |
| **The Insured** | Port Authority of Guam (PAG)<br>1026 Cabras Highway<br>Suite 201, Piti, Guam 96915 |
| **Situation of Damage** | Apra Harbour, Port of Guam, Agat Marina and Agana Marina, Guam. |
| **Trade/Business** | Port Authority. |
| **Usage of Buildings & Plant** | Operations of a Port Authority and Marina Manager. |
| **Time, Day and Date of Loss** | 1.02a.m. Saturday 13th October 2001. |
| **Point of Origin** | 45 miles south-south-east of Hagatna, Guam. 7.0 magnitude earthquake 43 miles deep at 12.8° North Latitude and 144.9° East Longitude. |
| **Reserve for Insurers** | US$6,000,000.00. |

| Description | Sum Insured | Reserve for Insurers |
|---|---|---|
| All assets | Please Confirm | US$6,000,000.00 |

| | |
|---|---|
| **Deductible** | US$500,000.00. |

Chartered Loss Adjusters • Marine Surveyors • Dispute Resolution

**EXHIBIT "A"**

*16*

## Balance of Reserve for Insurers

| Item | Reserve $ | Payment | Balance |
|------|-----------|---------|---------|
| All assets | US$6 Million | US$1.5 Million | US$4.5 Million |

**Description of Premises** }
**Description of Business** }
**Earthquake** } Refer Report Number 1
**Initial Measures** }
**Business Interruption** }
**Nature and Extent of Loss** }

## Consultant Engineer Failure of Connection Investigation

We met with Mr Frank Dennis form OCEL Consultants, the proposed contractor "Smithbridge", Port Authority of Guam management and the earthquake management team mid December. Following our on site inspections and discussions Mr Dennis provided us with a report dated 21st December 2001 with the proposed drawings for the temporary works of Shell F-1 pier. The investigation of the failure cause is dealt with in the attached report confirming that the design completed by Winzler and Kelly Consulting Engineers, Guam was marginal to safely resist the loads that could be imposed upon it. Had Black Construction installed the bolt, chem set joint correctly, the design may have been satisfactory.

It is clear that Black Construction have not completed the construction of this pier up to acceptable standard. They have failed to check the quality control at the time of construction back in 1996 and as a result the recent earthquake has broken nearly all of the bolt connection points. This was due to the inadequate retention of the bolt in the upper deck aperture to which it was supposed to have been fixed. Installing epoxy resin type fixings upside down into a concrete block above is a difficult assignment for any contractor but there are fixing methods available that chemically set after the seal is broken. It is the adequacy of this connection joint and the chemical setting of the chem set that has not operated correctly.

The report deals with the structural requirements for the main pier and the dolphins that absorb impact. The pier has performed adequately since 1996 and this is the first sign of failure. The photographs we provided with our earlier reports clearly show that the parting from the upper deck of the pile connection were fresh and caused by the October earthquake.

**17**

## Recovery

From the information available it seems that you may have grounds for pursuing a recovery against Black Construction. Our Terry Thompson has been in contact with Black Construction to advise them of the potential claim against them. The management denied any knowledge of any problem but were intending to look into the matter. They have since advised Mr Thompson that the papers for this contract were not available but they would be in contact. They have not been in contact since the December discussion.

We have addressed recovery action in Guam previously on a contingency basis through Cozen and O'Connor Attorneys, U.S.A. This legal firm act on a contingency basis and have an office in London. A copy of a circular received in December from this legal firm is attached for your information. We would appreciate your consideration of the position here and if you approve we feel that a briefing should be held with Cozen and O'Connor to understand the entire claim. We would brief them on whatever is required for them to pursue recovery of the F-1 Shell pier loss from Black Construction if you approve. The temporary work will cost in excess of US$400,000.00. No final figure has been placed on the final works as yet. Please confirm.

## Temporary Works

Following receipt of the 21st December 2001 report from OCEL Consultant, Mr Dennis also advised Smithbridge Contractors of the proposed repair procedure for the damaged pier. Drawings were supplied as per copy attached for the drilling of a shaft into the existing concrete pile and securing this through the upper pier deck. We requested costings be prepared by Smithbridge that were subsequently provided. These were based on the costings they use for the U.S. Navy work service in Apra Harbour, Guam. Costings were agreed for the temporary works to proceed but unfortunately, we could not get agreement with the insured due to the tendering process required by the U.S. Government. The Port Authority of Guam (PAG) could not authorise temporary works with Smithbridge Contractors on the agreed rates as this totally went against their standard practice of tendering for all contracts. After various meetings the matter was not resolved before our departure.

We departed from Guam awaiting the report from Mr Dennis and then proceeded back to Guam 18th January 2002. Further meetings were completed with the Port Authority of Guam, Smithbridge and Shell. After considerable discussion PAG advised us that Shell have a lease agreement with the insured that enables them to complete maintenance to the pier and invoice PAG. As a result of discussions it seemed more practical for Shell Oil Ltd to arrange the contract with Smithbridge and forward on progress payments to PAG via AM Insurance and onto us for approval of payment. A contract was finally signed on Wednesday 23rd January 2002. We advised Smithbridge to proceed with the work and preliminary investigations commenced two weeks later.

**18**

The first preliminary and general works was to check all piles of the F-1 pier including the dolphins to determine which piles were in satisfactory condition to complete temporary attachment to. The reason for this was to take advantage of the temporary works becoming a permanent repair following completion of the temporary works. By way of temporary works we mean securing sufficient pier piles to supply the strength and resistance qualities that the pier required when working under restricted conditions. The piles have now been selected and temporary works are proceeding. We will shortly be returning to Guam to progress the matter, inspect progress, agree costings and arrange payments. Photographs of the temporary works progress will be supplied in our following report.

## Buildings Consultant

PAG approved the initial appointment of Taniguchi Ruth Architects Inc. (TRA) to review the damage to buildings and provide a scope of works for reinstatement. We requested a submission on the history of the company, which has now been supplied. This was followed with a draft on what service they could provide on scope of works for reinstatement including the necessary works to bring the damaged beams up to standard. The preliminary submission was rejected and a further submission was requested. We have now received the latest submission from TRA, which is attached to this report. The fees attached to each assignment seem expensive and we will discuss the matter further during our forthcoming return to Guam.

## Public Loss Adjuster

PAG are not comfortable managing this entire claim themselves. During previous claims they have engaged public loss adjusters from U.S.A. and are currently considering the options available. They have requested submissions from three companies in U.S.A. and will hopefully make a decision on this. We are reluctant to engage TRA for this assignment if public loss adjusters are to be appointed. The public adjuster would complete their own assessment of damage and submit this as part of the claim, which would be a duplication of services. We will, therefore, hold off any decision on appointing TRA to the building consultant role until the insured have made a decision on the public loss adjuster appointment.

## Wharf Survey

Generalis Villafores professional land surveyors have completed a survey of the wharves F-4 to F-6. Apparently a report has now been supplied but has not been copied through to us as yet. It is awaiting our arrival in Guam for discussion. Apparently there is substantial distortion to the gantry crane rails that require urgent attention. We will address this matter during our next visit to Guam. In the meantime we have asked Smithbridge to review the report and advise us of any temporary works that can be instigated to make the gantry rail safe in the meantime.

*19*

6855

## Advance Payment

Thank you for the prompt attention to servicing the request for an advance payment. The insured have expressed their thanks for this. Part payment has been completed to the insured. The balance is being held by AM Insurance for payment to contractors.

## Comments

We await Underwriters instructions for the recovery aspect and briefing of the appointed Legal Firm. (via Bateman Chapman London Office)

We will forward our further report as our negotiations progress.

We attach a progress fee of our costs to date.


Yours faithfully
**MacLeod Claims Management Ltd**



**Peter MacLeod**


**20**

# OCEL CONSULTANTS LIMITED

OCEL House
276 Antigua Street
PO Box 877
Christchurch
New Zealand
Tele (03) 3790444
Fax (03) 3790333
Email: mail@ocel.co.nz

21 December 2001

MacLeod Claims Management Limited
PO Box 36162
Merivale
CHRISTCHURCH

Attention Mr Peter MacLeod

Dear Sir

## PORT AUTHORITY OF GUAM – SHELL F-1 PIER

On 7 December 2001 we inspected the pier and associated berthing and mooring dolphins at the Shell F-1 Terminal in the Port of Guam. These structures were reportedly damaged in an earthquake approximately 2 months earlier, the major damage to the pier being broken piles and cracked and spalled concrete, and to the dolphins the pile to deck connection, a bolted detail constructed in 1996 to repair damage caused by an earthquake in 1993.

The damages to the pier are probably due to the ravages of time on unprotected or inadequately protected steel in a marine environment. On some piles the steel tube has completely corroded right round the pile and the remainder will be close to this state. On the precast beams and deck units cover appears to be of the order of 25 mm (1 inch) which is inadequate to protect reinforcing steel in a marine environment (modern codes require a minimum of 50 mm (2 inches) cover and 50 MPa (7250 psi) concrete). The reinforcing steel has corroded and caused the concrete to crack. Certainly the recent earthquake may have dislodged some of this cracked concrete and broken the unreinforced concrete filling in the corroded piles but we doubt it 'caused' the damage.

Following the 1993 earthquake the dolphin piles were found to be unserviceable due to above water corrosion of the steel tubes, a similar condition to that existing today on the pier piles. To repair the dolphin piles the Port Authority of Guam proposed to encase the top of the pile tube from the deck to 1.52 m (5 feet) below mean low water with 178 mm (7 inches) of reinforced concrete. The main reinforcing was to be eight 25 mm (1 inch) bars which were to be grouted 500 mm (20 inches) into holes drilled in the underside of the deck. Assuming the development length of the bars into the underside of the deck was adequate this connection would be similar in strength to the pre 1993 connection. For reasons of time and cost this repair proposal was replaced with one which required the top 4.57 m (15 feet) of the pile to be replaced with a similar sized tube (559 OD x 9.53 WT – 22 inches OD x 3/8 inch WT). The bottom connection to the old pile some 1.2 m (4 feet) below low water was a butt joint with a 450 mm long x 12.7 mm thick (18 inch x 1/2 inch) welded sleeve. The top connection to the concrete deck was by eight 3/4 inch diameter Grade 304 stainless steel bolts through a flange welded to the top of the tube extension and epoxy grouted 170 mm (6 3/4 inches) into the deck. In proposing this repair the Port Authority of Guam must have been satisfied that the steel pile tube below low water was in a reasonable condition. The repairs were carried out in 1996.

**EXHIBIT "B"**

During the recent earthquake the pile to deck connection failed on 92 of the 99 piles in dolphins A, B, C, D and G. Of the 792 bolts inserted into the deck through the flanges of these 99 piles 248 (31%) were missing, 452 (57%) were in place but had been extracted by varying amounts up to 100 mm (4 inches) and 92 (12%) were still tight. Some of the extracted bolts had been bent by relative lateral movement between the pile and deck and some had broken. Of the 92 tight bolts 64 were in dolphin A, the mooring dolphin in the deepest water at the south west end.

There are two main issues:

- were the bolts installed properly using sound epoxy?
- was the design of the joint sufficient for the loads that could be reasonably expected?

Chemset anchors or bolts set in epoxy have to be very carefully placed. The holes have to be accurately drilled for diameter and length to match the capsuled volume of epoxy mix, the holes must be clean, for bolts inserted horizontally or upside down the hole must be sealed and the epoxy mix and bolt must be installed in accordance with the manufacturers instructions. Quality control is vital particularly in difficult situations.

There is no doubt something was wrong with the bolt installation; some bolts had only 20-30 mm of set epoxy round them and that would have been inside the steel flange and not the concrete deck, there were many holes with soft epoxy still in place, one bolt removed had granular material on most of its length with little set epoxy, and there was at least one double hole. In all , 88% of the bolts were displaced from their original position. The remainder that are still tight can be tested with a torque wrench to the recommended torque for this size of bolt, about 21 kgm (150 ft/lb). This will give some measure of their competence. Alternatively, if the pile flanges can be removed pull out tests can be done. Because of the inherent risks associated with this type of fixing Factors of Safety of 3.5 to 4.0 are used. In Ultimate Limit State terms this probably relates to a capacity reduction factor of 0.4 to 0.45 compared to 0.9 for steel and 0.85 for most reinforced concrete.

The ultimate strength of the eight bolts in each pile head connection based on the shear strength of the concrete or the yield strength of the bolt is about 96 T, close to the 114 T of the pre 1993 reinforced concrete and the original repair proposal. In working stress design for reinforced concrete Factors of Safety of 1.67 are common where as for the bolts 3.5 is the recommended minimum which leads to safe working loads of 27 tons for the bolt group and 68 T for the reinforcing. In Ultimate Limit State terms the design load, which includes load factors, cannot be greater than about 43 T for the bolts (96 T x capacity reduction factor of 0.45) and 97 T for the reinforcing (114 T x 0.85). Whichever way the design is done, the maximum bolt design load is less than half that of the reinforced concrete option. This does not prove the bolts will fail; it requires a design level earthquake or a mooring or berthing incident to generate the maximum forces, and the capacity reduction factor is not absolute but more a 'confidence' factor in the material and its use. The new piles installed for the reconstructed dolphin H in 1996 were connected to the deck with only four 25 mm bars which giving a design load of 48 tons if they were grade 275 (40) which is not much more than the bolt group at 43 T, or 72 T if they were grade 415 (60). There was no damage to the pile deck connection on this dolphin.

The dolphin piles are the primary force resisting system for seismic loads and modern material codes applicable to these regions (New Zealand and parts of the United States included) require special detailing in these elements and their connections. Because this detailing is not easy in the dolphin repair they should be considered as elastically responding structures, which means the structure attracts a higher seismic load for design purposes than a ductile structure which can deform without strength loss and absorb energy. Using the New Zealand Code as a guide the horizontal seismic load factor for dolphin B, the one in the shallowest water, is between 0.7 and 0.8 (175 T to 200 T) at the Ultimate Limit State which according to our model can generate a maximum pile tension of about 82 T. This must be compared with the maximum design load of 43 T for the bolt group, 48 T for dolphin H using grade 275 (40) reinforcing, or 96 T for the reinforcing of the original connection. Dolphins A,

C, D, G and H are in deeper water and will attract a lower seismic load factor.. Factored loads for mooring to dolphins A and B could be as high as 160 T and fendering forces to dolphins C, D, G and H as high as 180 T. All these forces could have been resisted by the original reinforced concrete joint.

It is possible that had the bolts been properly installed the pile to deck connection would have performed satisfactorily in the recent earthquake. However, the bolt embedment into the underside of the deck is only 170 mm (6 3/4 in) which may not have penetrated the bottom reinforcing mat of the deck meaning that at the Ultimate Limit State the bolt is relying on the strength of unreinforced cover concrete in shear which is not permitted in modern codes which have strict rules regarding bar and bolt anchorages in primary earthquake force resisting elements.

Our conclusions then are:

- The installation of the majority of the 3/4 inch grade 304 stainless steel chemset bolts was faulty; the material, the placement, or both.
- The design of the 1996 repair of the pile to deck joint was at best marginal to safely resist the loads that could be imposed upon it. The joint should have been at least the equivalent of the original reinforced concrete one.

Yours faithfully
**OCEL Consultants Limited**

F E Dennis

# OCEL CONSULTANTS LIMITED

OCEL House
276 Antigua Street
PO Box 877
Christchurch
New Zealand
Tele (03) 3790444
Fax (03) 3790333
Email: mail@ocel.co.nz

D R A F T 01105.doc

9 October 2002

MacLeod Claims Management Limited
PO Box 36162
Merivale
CHRISTCHURCH

Attention Mr Peter MacLeod

Dear Sir

## PORT AUTHORITY OF GUAM – SHELL F-1 PIER DOLPHINS – REPORT FOR Mr FORREST BOOTH

During our visit to Guam between 6 and 9 September 2002 we met briefly with Mr Forrest Booth, Attorney at Law. We understand that Mr Booth is acting for the insurers of the Shell F-1 Pier for the purpose of recovering some or all of the repair costs from the parties involved in the 1996 repair to the dolphin structures. Mr Booth left a list of questions which we will endeavour to answer. They were:

1. **Piling**
   - composition of seabed material
   - were the piles driven to refusal
   - were the original piles supposed to be concrete filled
   - should the 1996 repair contractors have questioned the piling and noted the lack of concrete filling
   - if the 1996 repairs had included concrete filling would it have changed the present (2001) damage
   - should the piles be tested and how
   - what needs to be done now.

2. **Pile Dolphin Connection**
   - was sufficient attention paid to earthquake accelerations and loadings
   - was there a duty on the part of the designers and contractors to advise the Port Authority for further study, the need for strengthening or for redesign

**EXHIBIT "C"**

- what effect did the change from 1 inch grouted reinforcing to grouted bolts have
- were the ¾ inch bolts strong enough
- were the 1996 repairs adequate
- did the repairs constitute good engineering practice
- were the 1996 repairs in compliance with the Guam Building Code.

**3.** **Repair v Rebuild**
- consider whether the existing dolphins can be repaired or new structures built with particular reference to:
  - earthquake loads
  - severe hard docking
  - repeated wear and tear
  - deterioration from rusting reinforcing, cracked or spalled concrete.

Each of these questions will now be considered in detail.

**1.** **Piling**

The water depth varies between each dolphin location as follows:

| Dolphin A | 70-80 feet | (21-24 metres) |
|---|---|---|
| Dolphin B | 20-40 feet | (6-12 metres) |
| Dolphin C | 40-55 feet | (12-17 metres) |
| Dolphin D | 55-75 feet | (17-23 metres) |
| Dolphin E | On shore | |
| Dolphin F | On shore | |
| Dolphin G | 45-60 feet | (14-18 metres) |
| Dolphin H | 45-55 feet | (14-17 metres) |

This depth is important for computing the buckling load of the piles and for determining the stress and deflection of batter piles during concreting.

Two undated borehole logs are shown on Drawing C-1 of the set for the Repair and Upgrading of Foxtrot F1 Pier. Test Boring Number 1 was taken just off the southwest end of the pier (behind Dolphin G location) and Test Boring Number 2 through the northeast end of the pier (behind Dolphin H location). As the depth reference is the concrete deck of the pier the borings must have been drilled to provide information for the 1996 upgrading work, specifically the reconstruction of Dolphin H. The bore logs are as follows.

Boring Number 1

| Penetration below seabed | | Depth below deck | | Log |
|---|---|---|---|---|
| Feet | Metres | Feet | Metres | |
| 0 | 0 | 55 | 16.8 | Loose gravely sand |
| 6 | 1.8 | 61 | 18.6 | Becoming dense |
| 17 | 5.2 | 72 | 22.0 | Very dense layer |
| 37 | 11.3 | 92 | 28.1 | Very dense from 92 feet |
| 42 | 12.8 | 97 | 29.6 | Light grey sandy gravel very dense to hard |
| 90 | 27.4 | 145 | 44.2 | Light grey sandy coral gravel very dense |
| 99 | 30.2 | 154 | 47.0 | Light grey white coraline limestone |
| 105 | 32.0 | 160 | 48.8 | Hard from 160 feet |

## Boring Number 2

| Penetration below seabed | | Depth below deck | | Log |
|---|---|---|---|---|
| Feet | Metres | Feet | Metres | |
| 0 | 0 | 59 | 18.0 | Very loose |
| 5 | 1.5 | 64 | 19.5 | Medium dense from 64 feet |
| 10 | 3.0 | 69 | 21.0 | Light brown silty sandy gravel, dense with cobbles |
| 17 | 5.2 | 76 | 23.2 | Light grey brown sandy gravel medium dense with coral fingers and shell fragments |
| 29 | 8.8 | 88 | 26.8 | Light grey brown silty sand medium dense with coral finger fragments |
| 32 | 9.8 | 91 | 27.7 | Loose to medium dense from 91 feet |
| 42 | 12.8 | 101 | 30.8 | Light greyish brown silty sandy gravel. Loose to medium dense with coral fingers and shell fragments, |
| 52 | 15.9 | 111 | 33.8 | Light grey brown sandy gravels very dense with cobbles |
| 58 | 17.7 | 117 | 35.7 | Hard at 117 feet |
| 66 | 20.1 | 125 | 38.1 | Greyish green sandy silt, stiff with some coral finger gravel |

The terms loose, dense etc are geotechnical terms for sands and gravels and are normally determined by standard penetration test and referred to by an 'N' value which is the number of blows to advance the penetrometer by 12 inches thus: very loose is 0-4 blows, loose 4-10, medium 10-30, dense 30-50 and very dense over 50 blows. No penetration test results have been shown although to make the assessments they should have been taken at regular intervals.

Contract drawings S1, S2, S3 and S4 for the 1996 repairs show the piles for dolphins A, B, C and D respectively penetrating the coral formation by about 3 feet (1 m). Coralline limestone was shown at 154 feet (47 m) below the pier concrete in Boring Number 1 but was not found in Boring Number 2 for which the log stops at 135 feet (41 m). Contract drawing S14 shows what appears to be an interference drawing for the piles on existing Dolphin D and the new piles on reconstructed Dolphin H. The vertical distance of some of the Dolphin D piles adjusted to pier deck level are D6-144 feet (44 m), D8-160 feet (49 m), D19-160 feet (49 m) and D21-164 feet (50 m). The 'driven' lengths, shown in the table on the as built drawing S14 for new Dolphin H, which presumably includes the length above the seabed, are H6-185 feet (56 m), H7-184 feet (56 m), H8-140 feet (43 m), H9-156 feet (48 m), H10-163 feet (50 m), H11-165 feet (50 m) and H12-175 feet (53 m). Although we cannot say what the depths of the pile tips are because the datum is not known, these length are similar to those shown for Dolphin D.

From the foregoing information it appears that the piles have probably been driven into the top of the coralline limestone and the level of this varies from 140 feet (43 m) to 185 feet (56 m) below the pier concrete deck. To get to this level the piles must have penetrated at least 65 feet (20 m) of seabed soils some of which is classified as very dense as indicated by the bore logs.

The piling specification for the new piles on Dolphin H requires the piles to be driven to refusal or end bearing to sustain a capacity of 120 T according to the formula:

Case 1:03-cv-00009    Document 81    Filed 11/09/2004    Page 14 of 21

$R = 2WH/(5 + 0.1 \, P/W)$ where

$R$ = The allowable vertical pile load in pounds

$W$ = The weight of striking part of the hammer in pounds

$H$ = The effective height of the hammer fall in feet

$S$ = The average net penetration in inches per blow for the last 5 blows after the pile has been driven to a depth where successive blows produce approximately equal net penetration

$P$ = The weight of the pile in pounds and if P is less than W then P/W is taken as unity.

We assume the 120 T is an allowable load. For this load on a 43 m pile, a 4 T hammer with an effective fall of 6 feet (1.8 m) produces a set of 0.26 inches (6.6 mm) which is reasonable.

However if layers of 'very dense' sands had been encountered the 120 T pile allowable load should have been achieved in these layers. It appears that the piles penetrated these layers and founded on or in the coraline limestone which means very hard driving unless other means were used for pile installation. The piles are too light to sustain hard driving without damage and should not have been driven to refusal. Calculating loads from very small sets may indicate very high capacities but may also indicate damaged piles.

We cannot be certain that the original construction in 1970 should have had concrete filled steel piles on the dolphins. EMPSCO design calculations For Repairs and Upgrading to Foxtrot "F-1" Pier, Apra Harbour, dated January 1996 has, in the paragraph General Project Description the following:

"1.      Structure ... D    Pile System ... steel pipe with concrete fill."

Also included is part of an unnumbered and undated drawing from Transen Associates Limited of Agana "Details of Mooring Dolphin "B" and "E" and Breasting Dolphin "C" and "D" Apra Harbour Guam" which shows 22 inch (559 mm) diameter x 3/8 inch (9.53 mm) thick pipe piles filled with concrete. Presumably this is for the original structure.

The design notes and drawings for new dolphin "H" also show that new piles shall be filled with concrete.

In the design calculations of Winzler and Kelly (WK) dated December 1995 mention is also made of the original design drawings but in their dynamic analysis of the dolphins the piles have been assumed to be full of water.

OCEL Consultants Limited drawing DR-011104-001 dated December 2001 for the proposed temporary repairs shows the top of the old concrete filled pile. This assumption was made because of the concrete filling on some of the pier piles. Unfortunately we have not yet seen the original drawings for the dolphins.

The effect of concrete filling to the piles is to increase their stiffness and load carrying capacity and reduce internal corrosion. There is adequate stiffness and load carrying capacity in the steel pile alone. If pile buckling is not an issue the ultimate load of the pile tube is 420 T. For piles between 43 feet (13 m) and 86 feet (26 m) between seabed and concrete buckling governs and the ultimate load varies between 360 T and 180 T all

4

adequately in excess of the allowable load of 120 T. Concrete filling increases these loads to 750 T, 690 T and 310 T respectively.

If there are any doubts about the pile capacities a vertical pile or number of vertical piles could be selected with due regard to providing the necessary reaction, and tested. Compression can be tested by cutting 12 to 18 inches (0.3-0.45 m) from the top of the pile, fitting a suitable steel plate to the top of the pile with a 200 T jack between the plate and deck. The pile should be loaded in increments up to a maximum of 1.5 times the allowable load (180 T) and kept at each increment as deflection is recorded. Deflection is the sum of the elastic deflection of the steel pile being tested and reaction piles plus that of the founding material and should be the same for each load increment, that is, the load/deflection graph is a straight line. Failure of the pile occurs when deflection for each load increment increases. On completion the load is removed, any permanent deflection measured, the top of the pile replaced and the pile connected to the concrete top of the dolphin.

Tension can be tested by drilling two, 2 inch (50 mm) holes through the concrete, one on each side of the pile. Steel bars are placed through these holes and welded to the pile. A headstock beam is fitted to the bars above the deck and this beam is then jacked off the deck in a similar manner to the compression test. The maximum tension test should not exceed 80 T.

During the repair to some of the dolphin piles carried out by Smithbridge during 2002 the top 15 feet (4.57 m) of the pile was concrete filled through a 5 inch (127 mm) hole bored through the deck. The concrete is supported inside the pile by an inflatable bung (inner tube) which is also inserted through the hole in the deck. Placing this bung, and pouring the concrete at such a rate that it was not dislodged proved difficult and the opinion of Smithbridge was that it would be cheaper to fill the pile with concrete. We agree with this. The tops of the piles, particularly the batter piles, will have to be securely braced.

It is debatable whether the 1996 repair contractor was expecting concrete filled piles on the dolphin structures or not. All they had were the contract drawings and specifications but not necessarily the original drawings. Contract drawing S-16 shows existing concrete filled steel piles on the pier, albeit on a joint sealing detail, and on drawing S-17 which shows some miscellaneous repair details the reference is only to 'existing broken steel piles". We have found no evidence that the contractor made any reference to concrete pile filling during construction but we suspect that had he done so and suggested filling the piles with concrete the cost of the 600 cubic yards (500 m³) of concrete required to fill all the piles on the dolphins would have been prohibitive.

In our opinion filling the piles with concrete during the 1996 repairs would not have had any beneficial effect during the 2001 earthquake. Concrete filling may have made matters worse because, having become detached from the deck concrete, the batter piles being much heavier could have fallen over completely and broken at seabed level.

Following the 2001 repairs a diving survey was carried out by Pacific Foundations Company Inc for Smithbridge. Their report dated 8 February 2002 for dolphins A and B states *...the upper recently replaced portions of all column piles inspected revealed steel in good condition with no visible pitting ... numerous pits were observed at the base of all piles surveyed. These pitted areas measured 0.165 inches (4.2 mm) consistently on all piles. Pits comprised approximately 50% of the areas surveyed."*

This could mean a maximum 25% loss of steel in this region of the pile in 32 years.

Their report dated 18 February 2002 for dolphins C and D states *"...The older, lower sections, revealed less extensive pitting than the lower pile sections previously surveyed under dolphin A and B and the steel appeared to be in good condition...".*

Until such time that the pile is breached by external corrosion the internal corrosion is limited to that which is possible due to oxygen locked up inside the pile during construction.

Some further investigation of the condition of the piles, particularly on Dolphins A and B, to check the extent of external corrosion at seabed level and to determine if there has been significant internal corrosion.

Our opinion is that, even though there appear to be some anomalies in the subsoil information and driving records, we are satisfied a working load of 120 T in compression is reasonable. As far as we are aware there has never been any problem with the pile performance and there is no reason why the 1996 repair contractor should have questioned the state of the piles or by adequacy of their capacity unless they were so far out of position that the deflections could not have been elastic, which we believe was not the case.

2. **Pile – Dolphin Connection**

We have a copy of design calculations from EMPSCO and WK for the repairs to Dolphins A, B, C and D. Both sets are dated January 1996. The EMPSCO calculations were done for the Port Authority of Guam and the WK calculations for Shell. They are not necessarily the only calculations carried out. The EMPSCO calculations focus on the loads that can be transmitted through fenders; that is berthing and wind, for the reconstruction of Dolphin H and modifications to Dolphin G. Their loads seem to come from the original Transen calculations; berthing reaction to Dolphins C and D 204 T perpendicular to the dolphins and 62 T parallel, and a wind reaction of 227 T perpendicular to the dolphins. They have also calculations on the steel catwalks and for a cathodic protection system. While they mention the original allowable pile load of 120 T there is no mention of how the pile/concrete cap detail which ended up on the contract drawings, 8 – 1 inch (25 mm) grouted bars, was arrived at. There is no dynamic analysis.

By contrast the WK calculations are only a dynamic analysis. They have started with a detail which is very similar to the EMPSCO contract drawing with 9 – 1 inch (25 mm) bars in a 38 inch (965 mm) concrete jacket and the design is based on a bending moment of 157 K feet (70 T feet) justified by the analysis. For Dolphin A they have calculated a seismic factor of 0.046 (4.6%) from a deflection of 1.44 feet (439 mm) which gives a horizontal load of 36.1 K (16.1 T). Dolphin B presumably is similar. For Dolphin C (and D) they have calculated a seismic factor of 0.056 (5.6%) from a deflection of 0.14 feet (22 mm) which gives a horizontal load of 94.3 K (42.1 T). There are no other calculations.

In our appraisal of Dolphin B carried out in December 2000 we applied a 200 T ultimate load in four directions at right angles and had maximum ultimate pile loads of 140 T compression and 80 T tension. Similar results would be obtained for dolphin A and for Dolphins C and D if a 400 T load had been applied. These loads are consistent with working loads of:

Case 1:03-cv-00009    Document 81    Filed 11/09/2004    Page 17 of 21

Dolphins A and B – wind (mooring lines)
130 T x (FOS 1.5) = 195 T ult
– EQ 160 T (FOS 1.2) = 192 T ult

Dolphins C and D – wind
227 T (x FOS 1.5) = 340 T ult
– berthing
204 T (x FOS 1.5) = 306 T ult
– earthquake
300 T (x FOS 1.2) = 360 T ult

The 200 T ultimate load applied to our model may appear high but we did not think the resulting pile loads were hard to accommodate. Our loads are similar to those of EMPSCO but much higher than those of WK.

EMPSCO and WK both proposed a similar repair detail; jacket the top of the broken piles in concrete reinforced with 8 or 9 1 inch (25 mm) bars. These bars, as shown on EMPSCO contract drawing S17 were to be drilled and grouted 20 inches (508 mm) into the underside of the dolphin concrete. We consider that this would have provided a satisfactory joint, upside down grouting notwithstanding, as there is no suggestion that the original connecting bars, 8 – 1 inch (25 mm) diameter, were to be cut off.

A contract for the repairs was awarded to Black Construction in late January or early February 1996 at a price well in excess of the budget. Following this award discussions must have been held between the parties as to means of reducing the cost.

On or about 15 March 1996 Black Construction proposed the use of a proprietary system for the pile to concrete connection for the dolphins which involved cutting off the old pile at sound steel and welding on a new section of pile with a drilled flange on the top. This flange was to be connected to the deck with 8 – ¾ inch (19 mm) stainless steel chemset anchors. This system employs a glass or plastic sachet containing the two parts of an epoxy mix which is inserted into a drilled hole. The bolt, which has an end shaped like a bit, is then drilled into the sachet, breaking it and mixing the two parts. The bolt must be held in position until the epoxy has set and if the bolt is upside down or horizontal the hole must be sealed. Needless to say drilling the hole and placing the bolt requires good quality control. With this repair method the original reinforcing bars connecting the pile to the deck had to be cut.

As far as we can determine the original suggestion came from Black Construction to the Port Authority. We do not know if EMPSCO were released from their design brief at the time of awarding the contract or if they were still retained as advisers. N C Macario and Associates (Mr Macario is, we believe a structural engineer) were employed as Project Managers by March 1996. One of these organisations should have advised the Port Authority whether the Black proposal was appropriate for the conditions and strong enough and if they did not know they should have advised the Port Authority to seek further advice. Maybe they did. On 4 April 1996 WK produced a drawing that is included in the contract set. We do not know what role they played; were they purely draughtsmen or did they carry out structural checks? If anything required further examination and review it is the change to this bolted detail which appears to have been made on the grounds of cost alone.

Case 1:03-cv-00009    Document 81    Filed 11/09/2004    Page 18 of 21

Our previous report to MacLeod Claims Management Limited dated 21 December 2001 addressed the questions of design and construction standards without direct reference to the Guam Building Code.

In this report we noted that of the 792 bolts placed in the 1996 repair between the pile and the concrete of the dolphins, 248 were missing, 452 were in place but had been extracted from the concrete by up to 4 inches (100 mm) and only 92 or 12% were still tight. We noted the presence of double holes, soft epoxy, loose granular material and very little hard set epoxy. Our conclusion was that the epoxy material the placement of the epoxy and bolt or both were faulty.

The report also carried an assessment of the strengths of the bolted connection, the original connection with reinforcing bars. We noted that the 'capacity' (the failure load on the joint) was similar (96 T for the bolts and 114 T for the reinforcing) the 'working' load of the bolt group is less than half that of the reinforced connection (29 T for the bolts and 68 T for the reinforcing). This is because of the higher factor of safety required for the bolted connection. Our conclusion was that the bolted joint was marginal. Had the bolts all been properly installed the joint would probably not have failed. However we thought the bolted joint should have been the equivalent of the original reinforced joint.

It is worth noting that the repair first proposed in 1996 was for a concrete encapsulation to the top of the pile reinforced with eight 1 inch (25 mm) bars that were to be drilled and grouted 20 inches (500 mm) into the underside of the concrete. This would have at least maintained the strength of the original joint because the bars of this joint were not to be cut as they were with the bolted joint where the top of the pile was removed and replaced with a new flanged steel tube.

All other considerations aside our opinion is that the type of bolted joint employed is not appropriate for this type of connection in a major marine structure that can be subjected to impact and earthquake loads. The EMPSCO calculations have no assessment of seismic loads and the WK seismic factors appear to us to be far too low.

We are not familiar with the Guam Building Code but it will be similar to others in that it will set standards for design, materials and workmanship by reference to standard specifications and codes.

## 3.    Repair v Rebuild

In our opinion the repairs already carried out or some of the piles on dolphins A, B, C and D can be extended to the remaining piles for the additional cost of about $US 1,300,000, based on the cost of the repair work to date. The dolphins should operate satisfactorily for a further 25 years this being determined by the state of the pile tubes.

An estimate has been given by Young Adjustment Company of $US 4,048,051 for the replacement of the dolphins. Presumably this is for the replacement of not only dolphins A, B, C and D but also of the smaller dolphins G and H and includes the demolition and removal of the existing. If new dolphins were built the design loads could be higher although we do not think this is necessary. The advantage in a new structure is that it could be designed for an economic life of 50 or even 70 years.

Dolphin loads come from actions of the vessels during berthing and from environmental loads such as wind, earthquakes and oceanographic phenomena such as surge.

1662

Potentially the most destructive of these is berthing impact because of the considerable energy of a 100,000 tonne ship even when moving very slowly. This energy is partly absorbed by specially designed rubber fender units and partly by the displacement of water. Fender units absorb energy by deformation and in doing so produce a reaction onto the supporting structure. This reaction rises quickly to about 15% deformation and then remains approximately constant to about 55% deformation which is the practical limit. Energy absorption on the other hand rises linearly with deformation. If there is any energy left at 55% deformation this is taken by deformation of the ships hull, destruction of the fender unit or damage to the supporting structure, all producing very high reactions.

Obviously no ships master wants to berth his ship in such a manner as to damage it. However accidents do happen and judging by the cut off bolts (from old fender units?) and the state of some of the existing rubber units these are reasonably common or the fender units are too small.

Mooring line forces affect all dolphins and the maximum are likely to come from wind loads on the ships hull. EMPSCO show a design wind speed of 75 mph (120 kph) which may or may not be high enough in a country that has frequent typhoons. The prospect of high winds can no doubt be forecast and if typhoons are expected ships can possibly leave the berth. Wind forces can also produce compression loads on Dolphins C and D but probably not as high as a fender overload. We have heard of no evidence of surges or other oceanographic phenomena which may also produce mooring line forces.

Earthquake loads are generated by the response of the structure to (mainly) horizontal ground accelerations and the magnitude of these loads depends on the type of structure and its stiffness. Structures that are specifically designed to absorb earthquake energy by ductile performance (the ability to exhibit plastic deformation without significant strength loss) attract low seismic load coefficients. Structures which have not been or cannot be designed for this behaviour must be designed as partially ductile or elastically responding structures. The dolphin structures come into this latter category which attracts the highest earthquake load coefficient. Also because of the presence of batter piles the dolphin structures are reasonably stiff. With the number of piles in Dolphins A, B, C and D and with adequate rubber fenders on Dolphins C and D we do not think these loads should present a problem. The maximum pile loads of 140 T in compression and 80 T in tension that we have calculated can be easily accommodated in either a repair or in a new structure.

We do not think that wear and tear is an issue with the dolphins. As noted earlier it is the fender units that should suffer from this. We also do not think there is any issue with the reinforcing or with concrete being knocked off. There is though potentially a corrosion problem with the piles.

The pitting noted on the outside of the piles of Dolphins A and B just above seabed level shows that up to 25% of the steel may have disappeared in 32 years. At seabed level there is no affect on the buckling of the pile but its compression capacity could be reduced from 410 T to 308 T in 32 years, still well above the required structural requirement of 120 x 1.5 (FOS) or about 180 T. However, internal corrosion should be checked by ultrasonics or a similar method.

Should this be low or nonexistent we conclude that repair of the dolphin structures should be continued as it has been started.

Case 1:03-cv-00009    Document 81    Filed 11/09/2004    Page 20 of 21

Yours faithfully
**OCEL Consultants Limited**


F E Dennis