| | |
|---|---|
| 1 | BERMAN O'CONNOR MANN & SHKLOV |
| | DANIEL J. BERMAN |
| 2 | ROBERT J. O'CONNOR |
| | Suite 503, Bank of Guam Building |
| 3 | 111 Chalan Santo Papa |
| | Hagåtña, Guam 96910 |
| 4 | Phone: (671) 477-2778 |
| | Fax: (671) 499-4366 |
| 5 | |
| 6 | Attorneys for Defendant |
| | Winzler & Kelly Consulting Engineers |



FILED
DISTRICT COURT OF GUAM
NOV 26 2004
MARY L. M. MORAN
CLERK OF COURT

IN THE DISTRICT COURT OF GUAM

S.J. GARGRAVE SYNDICATE AT LLOYD'S,

    Plaintiff,

vs.

BLACK CONSTRUCTION CORP., WINZLER & KELLY CONSULTING ENGINEERS and ENGINEERING MANAGEMENT & PLANNING SERVICES CORP.,

    Defendants.

Civ. No. CIV 03-0009

DEFENDANT WINZLER & KELLY CONSULTING ENGINEERS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON FIFTH CAUSE OF ACTION (BREACH OF CONTRACT AGAINST WINZLER & KELLY); CERTIFICATE OF SERVICE

Date: December 3, 2004
Time: 9:00 a.m.
Judge: Hon. A. Wallace Tashima
       Senior Circuit Judge

### Introduction.

Winzler & Kelly, an architectural and engineering firm, contracted with Black Construction, the prime contractor on the F-1 pier repair project at the Port of Guam, to design a method for securing the piles to the underside of the pier and its dolphins. The plaintiff Syndicate, as subrogee of the third party beneficiary Port Authority, has sued Winzler & Kelly for breaching that contract by providing an allegedly faulty design.

Winzler & Kelly has moved for summary judgment on this breach of contract claim – the Fifth Cause of Action in the First Amended Complaint – on the ground that *its design was not used*, and therefore, even if it was faulty, could not possibly have caused the damage that was ultimately incurred by the Port. The Syndicate has opposed this motion by first throwing up a series of non-substantial procedural roadblocks, and then, when finally forced to address the merits, by citing only evidence that *one aspect* of Winzler & Kelly's design (the use of eight bolts) was employed in the construction.

- 1 -

It has never been controverted, however, that eight bolts were used. The issue is whether another crucial element of the design -- the *bolt adhesion system* -- was used. Winzler & Kelly's motion has always been based on the fact that that system was not used. The Syndicate offers no evidence that the bolt adhesion system was used as required by Winzler & Kelly's design. Nor does it dispute that the bolt adhesion system was a crucial component of the original design, which needed to be done correctly and in conformance with the plans in order for the design as a whole to work properly. Summary judgment ought therefore to be granted.

**Hearing Date Agreement Under Local Rule 7.1.**

The first of the non-substantial procedural roadblocks (or, in its own phrase, "threshold issues") that the Syndicate attempts to raise is its contention that the parties have not agreed to the December 3 hearing date as required by Local Rule 7.1. See Opposition at pages 2-3. With respect to this issue, Winzler & Kelly refers the court to the Affidavit of Thomas C. Sterling. In Response To Objection and in Opposition To Request For Rule 56(f) Continuance (hereinafter the "Sterling Affidavit"), filed by counsel for Black Construction. His affidavit and attached correspondence amply demonstrate that counsel for the Syndicate was fully aware of the December 3 hearing date, and of the fact that defense counsel understood such date to be agreeable to all parties, but that they raised no objection to it.

**No Necessity of Additional Discovery.**

The Syndicate's second attempt to throw up a procedural roadblock is its argument, based on Rule 56(f), that it needs time to conduct further discovery. See Opposition at pages 3-4. However, Rule 56 does not require discovery to be complete before a summary judgment motion can be heard. There need only have been a reasonable *opportunity* to conduct discovery. See, e.g., Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2514 (1986) (summary judgment against plaintiff appropriate "as long as the plaintiff has had a full opportunity to conduct discovery"); Celotex Corp. v. Catrett, 106 S.Ct. 2548, 2552 (1986) (summary judgment appropriate "after adequate time for discovery"). There has been plenty of time and opportunity to conduct extensive discovery in this case.

Rule 56(f) is an available escape hatch, but not an automatic one. It does not allow a party facing summary judgment to get extra time for discovery simply by asking for it. On the contrary, a party must have made diligent efforts to obtain it in order to be entitled to Rule 56(f) relief. For example, in Burlington Coat Factory Warehouse v. Esprit de Corp, 597 F.Supp. 1199 (S.D.N.Y. 1984), aff'd in relevant part 769 F.2d 919 (2nd Cir. 1985), the court held that "a dilatory plaintiff cannot rely on Rule 56(f)." Id. at 1202. It elaborated:

> With respect to the plaintiff's wish to depose Wicks and Federico, plaintiff was aware of these individuals at the time of the filing of the complaint yet failed to notice such depositions until recently.
>
> Thus, plaintiff has not been diligent in pursuing discovery but now opposes defendants' motion for summary judgment claiming the need for additional discovery. Yet, plaintiff has not offered any reasons why the discovery it seeks now, which is assertedly crucial to plaintiff's case, was not conducted earlier.

Id. See also, e.g., Resolution Trust Corp. v. North Bridge Associates, Inc., 22 F.3d 1198, 1203 (1st Cir. 1994) ("Rule 56(f) is designed to minister to the vigilant, not to those who slumber upon perceptible rights."); C-B Kenworth, Inc. v. General Motors Corp., 118 F.R.D. 14, 16 (D.Me. 1987) ("Only parties who have diligently pursued discovery are entitled to the protections afforded under Rule 56(f).").

The Syndicate has not been diligent in pursuing discovery. It could have noticed the depositions of Perfecto Jose and Rod Bismonte long before now. There have already been two Rule 30(b)(6) depositions of Black. Black already produced Bismonte at its first 30(b)(6) deposition, and the Syndicate did not ask him anything. Of the four depositions that the Syndicate claims to need to review the transcripts of, two of them were never even taken. The Syndicate did not take a 30(b)(6) deposition of Winzler & Kelly on September 21, or at any other time. (At any rate, the actual "person most knowledgeable" for Winzler & Kelly is Bruce Swanney, whose deposition was already taken, and portions of whose transcript are already attached to the Syndicate's affidavit.) The Syndicate also did not take the deposition of the Guam Department of Public Works on September 20. The Jurgen Unterberg deposition actually was taken, but the transcript of it is already available, and was available before the Syndicate filed its Opposition brief. And if the September Black deposition transcript was still not available, Plaintiff's counsel (who was present) could have, by affidavit, summarized the salient portions for this motion.

To invoke the protection of Rule 56(f), a party opposing summary judgment must also set forth

specifically the facts which he still needs, and explain how further discovery will help him obtain them

> Rule 56(f) permits a party who has no specific evidence contradicting an opponent's motion for summary judgment to survive the motion by both presenting valid reasons for the lack of proof *and showing how postponement of a ruling will enable a non-movant to rebut the movant's showing.*

Otto v. Variable Annuity Life Insurance Co., 814 F.2d 1127, 1138 (7th Cir. 1986) (emphasis added). See also, e.g., Puckett v. Cook, 864 F.2d 619, 622 (8th Cir. 1989) ("A party invoking the protections of [Rule 56(f)] *must* do so by affirmatively demonstrating . . . how postponement of a ruling will enable him to rebut the movant's showing of the absence of a genuine issue of fact.") (emphasis added); Trebor Sportswear Co. v. The LTD Stores, Inc., 865 F.2d 506, 512 (2nd Cir. 1989) ("[P]laintiffs proffered no persuasive basis for the district court to conclude that further discovery would yield proof of a written agreement that would satisfy the statute of frauds, which was, after all, the nub of the appellee's motion for summary judgment.").

Plaintiff does not explain how he thinks further discovery will help him defeat this motion for partial summary judgment. Neither Perfecto Jose nor Rod Bismonte know anything about the issue on this motion – whether Winzler & Kelly's design was actually followed by Black. Indeed, the Syndicate's own expert report concedes that neither Redi-Chem nor its approved equal was used. Even if they were to be deposed, therefore, their testimony would yield nothing of relevance to this motion.

### The Stricken Declarations.

The Syndicate's third procedural roadblock is to argue that the Motion for Summary Judgment should be denied on the ground that the faxed Declarations filed in support of it have been stricken by the Court. Opposition at pages 7-8. This is a moot point, however, since the original signed declarations were received and filed with the court as soon as they arrived on Guam from overseas, and before the Syndicate filed its Opposition.[1] See Defendant Winzler & Kelly Consulting Engineers' Response To Plaintiff's Evidentiary Objections To Winzler & Kelly's Two Declarations Filed In Support Of Motion For Summary Judgment.

---

[1] The Syndicate filed and served its Opposition brief beyond the deadline mandated by this court's local rules.

- 4 -

### It Is Undisputed That The Redi-Chem Bolt Adhesion System Was Not Used.

Now, after eight pages, we reach the only substantive argument advanced by the Syndicate in opposition to Winzler & Kelly's Motion For Summary Judgment. It is woefully short of sufficient to defeat the motion. The Syndicate relied entirely on Bruce Swanney's deposition testimony that he designed the connection to have eight bolts. He did. But -- although one would not know it from reading the Syndicate's Motion -- that is not the end of the story.

Winzler & Kelly's design, as pointed out in its Original Memorandum in Support of this Motion, had two principal components. One of these was the use of eight bolts per pile, each bolt 6 3/4" long, passing upward through a metal collar in the shape of a flanged ring encircling the top of each pile, into the underside of the dolphin. This portion of the design was used.

What was not used, however, was the other, at least equally important, component of the design – the method of securing the bolts to the dolphin. Winzler & Kelly's design explicitly called for the use of the Redi-Chem epoxy system, or an "approved equal," meaning "approved" *by* Winzler & Kelly. Black instead used a different and inferior system, without Winzler & Kelly's knowledge or approval. When the pile connections were inspected after the earthquake, it was plainly observed, as even the Syndicate admits, that:

> [M]any bolts had no epoxy on them, and they simply fell out of their holes. Many other bolts had epoxy on only 1-2 inches of their shafts.

Opposition at page 6.

The Syndicate simply ignores the point which is the entire gravamen of Winzler & Kelly's motion – that Black did not follow Winzler & Kelly's design *with respect to the method of securing the bolts*. There is therefore no genuine dispute as to this material fact. Nor does the Syndicate argue any law to the effect that Winzler & Kelly is not entitled to judgment as a matter of law on those undisputed facts.

### The "Background Facts" Are Unsupported; the Actual Facts Are Undisputed.

The Syndicate begins its Opposition with a lengthy section of so-called "Background Facts." See Opposition at pages 2-4. Several significant assertions therein are made without any evidentiary support

- 5 -

whatsoever, including assertions that Winzler's contract with Black encompassed more than simply preparing a design for pile connections, and that Winzler supervised Black's repair work, and made representations to the Port regarding its quality. The Syndicate offers no evidence in support of these inaccurate statements of "fact," and they ought not to be considered by the court in any way in ruling on this motion. See Defendant Winzler & Kelly Consulting Engineers' Objections To Factual Assertions Made In Plaintiff's Opposition Briefs Which Are Unsupported By Any Evidence.

When the actual facts -- i.e., the facts supported by evidence -- are considered, it is apparent that the following material facts remain undisputed:

- Winzler & Kelly's contractual obligation to Black was to provide revised design and engineering specification for the repair work.

- Winzler & Kelly performed its part of the contract with Black by producing the design known as VE-1.[2]

- VE-1 required the use of the Redi-Chem adhesive system "or approved equal" to secure the bolts to the dolphins.

- "Approved equal" requires the approval of Winzler & Kelly

- Black did not use the Redi-Chem system to secure the bolts, nor did it use any "approved equal" to Redi-Chem. It used the Anchor-It system instead.

- The integrity of the design depended on the use of the Redi-Chem system or an approved equal. Anchor-It is not an approved equal, and is a substantial deviation from Redi-Chem

- The Anchor-It system makes connection and adhesion more difficult than in the case of Redi-Chem, because potential problems in mixing and injecting the epoxy under the Anchor-It system can result in the epoxy not hardening, not covering the entire length of the bolt, or both. Redi-Chem is designed to avoid these problems.

- After the earthquake, it was observed that many of the bolts and bolt-holes lacked epoxy, or has only minimal epoxy, and that these bolts had not adhered to the concrete dolphins

---

[2]EMPSCO claims in its brief in support of its motion for summary judgment that Winzler & Kelly was responsible for VE-1. Fine, so far as it goes, but EMPSCO approved significant changes to the VE-1 design (see Exhibit A attached hereto). These changes were made without Winzler & Kelly being advised, and when an engineer requires on a design drawing a particular material or system "or approved equal" (as was does on the VE-1 for the Redi-Chem bolt anchoring system), it is undisputed that *only* the engineer who specified that material or system can approve its substitution (see uncontradicted declaration of Bruce Swanney attached to Winzler & Kelly's Motion For Summary Judgment herein). Winzler & Kelly cannot be held liable for a design that was substantially changed without its knowledge or consent, especially when an intervening engineer, EMPSCO, approved the change and did so without any attempt to inform Winzler & Kelly.

- 6 -

- If the bolts has been installed properly the connection would probably not have failed.

The Syndicate, meanwhile, does not even attempt to dispute Winzler & Kelly's arguments as to the second point for a summary judgment motion – namely, that on these facts, Winzler & Kelly is entitled to judgment as a matter of law.

## Conclusion.

A designer cannot be held liable for the failure of a design different from the one that it designed. That is the undisputed law on the subject, as well as the inevitable conclusion of all known principles of fairness and common sense. Winzler & Kelly's design was undisputedly not used in the pier repair project as that project was actually carried out. Even if it was a bad design, therefore, that is utterly immaterial. A bad design that is not used causes no damages. The damages in this case, if in fact they were caused, in whole or in part, by any design at all, must necessarily have been caused by a design different from the one Winzler & Kelly created, because that it is the only kind of design that was used.

There is therefore no genuine dispute as to any material fact, and Winzler & Kelly is entitled to judgment in its favor as a matter of law as to the Fifth Cause of Action (breach of contract).

Respectfully submitted this 26th day of November, 2004.

> BERMAN O'CONNOR MANN & SHKLOV
> Attorneys for Defendant
> Winzler & Kelly Consulting Engineers
>
> By: *Seth Forman*
> Seth Forman for
> Daniel J. Berman/Robert J. O'Connor

# CERTIFICATE OF SERVICE

I, **SETH FORMAN**, hereby declare under penalty of perjury of the laws of the Unites States, that on the **26** day of November, 2004, I caused to be served, via **HAND DELIVERY** ~~transmission~~, a true and correct copy of **DEFENDANT WINZLER & KELLY CONSULTING ENGINEERS' REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON FIFTH CAUSE OF ACTION (BREACH OF CONTRACT AGAINST WINZLER & KELLY)** upon Plaintiff and Defendants Counsel of record as follows:

> David Ledger, Esq.
> Carlsmith Ball LLP
> 134 West Soledad Avenue
> Bank of Hawaii Building, Suite 401
> P.O. Box BF
> Hagåtña, Guam 96932-5027
> Telefax: (671) 477-4375
>
> Attorneys for Plaintiff S.J. Gargrave Syndicate at Lloyds
>
> Thomas C. Sterling, Esq.
> Klemm, Blair, Sterling & Johnson
> Suite 1008, Pacific News Building
> 238 Archbishop F.C. Flores Street
> Hagåtña, Guam 96910
> Telefax: (671) 472-4290
>
> Attorneys for Defendant Black Construction Company
>
> Thomas M. Tarpley, Esq.
> Law Office of Thomas M. Tarpley, Jr.
> 2nd Floor, American Life Building
> 137 Murray Boulevard
> Hagåtña, Guam 96910
> Telefax: (671) 472-4526
>
> Attorneys for Defendant
> Engineering, Management & Planning Services Corporation

Dated this **26** day of November, 2004.

*Seth Forman*

2003-08-041122-PL-M summary judgment-REP BR.wpd

ITEM # 51

| EMPSCO-ENGINEERING CONSULTANTS | TO: | N.C. MACARIO ASSOCIATES |
| --- | --- | --- |
| P.O. BOX 21734 GMF, GUAM 96921 | ATTN: | MANUELITO SOLEZ |
| TEL(671)477-4715/5716 FAX(671)472-2136 | DATE: | 24 MAY 1996 |
| | FROM: | BUTCH ARCE |
| | SUBJECT: | FOXTROT "F-1" PIER |
| | NO. OF PAGE (S) 1 | FAX NO.: (671) 646-0991 |

REF: Submittal No. 18a – Epoxy Bolts for Steel Plate Anchor

Review of submittal No. 18a is hereby forwarded with the following comments:

(a) This submittal applies to the use of epoxy resin materials

(b) Submit other pertinent items relevant to the use of epoxy bolts for this project.

(c) Submit manufacturer's certificate of compliance.

(d) Submit test datas by independent laboratory testing.

We recommend approval of this submittal subject to the above comments.

*[signature]* 5-24-96

EXHIBIT "A" (11 pages)



June 6, 1996 NCM-07

NC Macario and Associates, Inc.
Suite 201 Boon Bldg., 1270 North Marine Drive
Tamuning, Guam, 96911
Tel 646-0901  Fax 464-0991

Attention    :   Nemencio C. Macario

Subject      :   Repairs and Upgrading to Foxtrot "F-1" Pier, Apra Harbor

Gentlemen:

This is in reference to Submittal no. 18a Epoxy Bolts for Pile Repairs. Attached herewith six (6) copies of additional information as required per approval notes b to d, in lieu of Certificate of Compliance we are providing product description and test data from independent testing laboratory ICBO Evaluation Sheet.

Respectfully Yours,
Black Construction Corporation

Rod F. Bismonte
QC Engineer

165

neral Contractors   PO Box 24667, GMF Guam 96921   Telephone (671) 646-4861-5   Fax (671) 646-9086   Telex 7216110

# *Anchor-it* EPOXY SYSTEMS

## HS200/HR200 SOLIDBOND ADHESIVE PASTE
### READY TO USE CARTRIDGES

## USES
ANCHOR BOLT GROUTING
SURFACE PATCHING PASTE
CRACK FILLER BONDS CONCRETE,
METAL, WOOD,
AND MOST PLASTICS

## FEATURES
SMOOTH CREAMY PASTE
MOISTURE INSENSITIVE
CONCRETE GRAY COLOR
CONFORMS TO ASTM C-881
CONVENIENT CARTRIDGE FORM

## PRODUCT DESCRIPTION

Solidbond HS200 (Standard Set) is a balanced blend of state of the art epoxy resins and hard angular quartz aggregate fillers of almost microscopic size, that combine to form a tough, rigid, creep resistant grout with a wide range of jobsite uses. The non-sag, creamy consistency makes this product a favorite for surface filling, bolt grouting and many other uses. A long pot life and short strength gain upon cure gives workmen maximum application time and reduces wasted product. Solidbond HS200 is moisture insensitive and will adhere to moist or damp surfaces. ( To attain maximum bond, however is is always better to work on dry surfaces) For a faster curing time or in temperatures below 50 degrees use the corresponding product Solidbond HrR200 (rapid set)

Solidbond HR200 conforms to ASTM C-881 Type 1&3, Grade 3, Class B&C
Solidbond HS200 conforms to ASTM C-881 Type 1&3, Grade 3, Class A&B

## INSTRUCTIONS FOR USE AS SURFACE FILLER AND BONDING AGENT

Bonding broken concrete: Place cartridge in dispenser, extrude small amount of epoxy, and mix. Using throwaway nozzle is not necessary. With gloved hand or stiff brush place thin coat on each piece, press firmly together and secure until cured. Use extra bonder to fill gaps and holes, then grind smooth for perfect job.

Surface filler: Mix as above then place in void or crack with putty knife, trowel, or squeegee. Leave slightly overfull if exact surface match is necessary, then grind smooth with right angle grinder after curing.

Crack Injection paste: Place over port base and crack. Leave no gaps or holes.

## INSTRUCTIONS FOR USE AS ANCHOR BOLT GROUT

Vertical and overhead anchoring: Drill holes 1/8" larger than bolt size up to 1 inch.. dia. then 1/4" larger. Place cartridge in dispenser and extrude product until both components appear at opening. Install mixing nozzle and insert to back of hole. Fill hole approximately 2/3 full, then gently push bolt into the hole, twisting slightly to insure thread coverage. For unreinforced masonry, fill the proper screen with epoxy, insert in hole and push in bolt. Allow to cure appropriate time before loading.

Both HS200 and HR200 come in convenient cartridge form and bulk goods containers. Ask your distributor for details.

---

"ADHESIVES AND COATING SYSTEMS FOR INDUSTRY"
MANUFACTURED BY
ADHESIVES TECHNOLOGY CORPORATION    8041 S. 228TH, SUITE 101, KENT, WA 98032    (206) 850-2400



# ICBO Evaluation Service, Inc.

*A subsidiary corporation of the* International Conference of Building Officials

## EVALUATION REPORT

Report No. 4388
April, 1988

Filing Category: FASTENERS—Concrete and Masonry Anchors

ANCHOR-IT FASTENING SYSTEM,
SOLID BOND HS-200 EPOXY AND HST-200 ADHESIVE
ADHESIVES TECHNOLOGY CORPORATION
21128 84th PLACE, SOUTH
KENT, WASHINGTON 98031

I. Subject: Anchor-It Fastening System, Solid Bond HS-200 Epoxy and HST-200 Adhesive.

II. Description: A. General: Anchor-It is a two-part system composed of an anchor and epoxy paste. The anchor is available in $\frac{3}{8}$-, $\frac{1}{2}$- and $\frac{3}{4}$-inch threaded rod sizes, manufactured from ASTM A 307 Grade 2 material or ASTM A 19 B-7 material and No. 4, No. 5 and No. 6 deformed-shank reinforcing bars fabricated from ASTM A 615 Grade 60 steel.

Solid Bond HS-200 is a two-component epoxy paste contained in a disposable cartridge which consists of a small cylinder within a larger cylinder. The small cylinder contains the hardener, which is kept separated from the resin until the two components are dispensed through a specially designed mixing nozzle. The nozzle mixes the components at an accurate two-to-one ratio with a caulking gun operated manually or by compressed air. The nozzles are available in several sizes to accommodate the installation of threaded rod sizes ranging in size from $\frac{3}{8}$ inch to $\frac{3}{4}$ inch and rebar ranging in size from No. 4 to No. 6.

HST-200 is a chemical modification of Solid Bond HS-200 to provide a higher heat deflection temperature.

Installation: The anchor is installed into a predrilled hole that has been cleaned, using either a wire brush and a vacuum or a wire brush and compressed air. A blowout bulb may be used if a vacuum or compressed air is not available. The size and depth of the hole and the minimum spacing, edge and end distances must conform to Table No. II.

A cartridge is inserted into the caulking gun equipped with a regulator and mixing nozzle. With the regulator set to approximately 90 pounds per square inch, the hole is filled approximately two-thirds full with epoxy paste. The anchor is then pushed manually into the hole, displacing the epoxy forward, and rotated approximately 360 degrees during placement. A small amount of epoxy should be apparent at the surface of the hole to assure proper placement. Care must be taken to ensure that the anchor bond is not disturbed for the initial cure period. The epoxy paste must be allowed to cure at the temperature and time periods noted in Table No. I before load application.

Dimension and installation criteria are noted in Table No. II.

Anchor-It anchors cannot be used to resist pullout forces in overhead and wall installations because the epoxy used with the anchors is temperature sensitive above approximately 125°F. Installations in walls and ceilings are permissible, provided proper consideration is given to fire.

Allowable tension and shear values are tabulated for various size threaded rods and deformed reinforcing bars in Table No. IV. Anchors using the Solid Bond HS-200 adhesive system may be installed where the concrete temperature does not exceed 125°F. Allowable loads assigned to anchors using the HST-200 adhesive system must be adjusted in accordance with Figure No. 1.

B. Installation in Existing Unreinforced Brick Walls: Installation of the $\frac{3}{4}$-inch-diameter A 307 threaded rod in existing unreinforced brick walls will require the following field justification:

a. For use of the $\frac{3}{4}$-inch-diameter threaded rod in tension:

(i) The anchor must be embedded to within a minimum of 1 inch of the exterior wall surface in a $\frac{7}{8}$-inch-diameter hole drilled at an angle of 22$\frac{1}{2}$ degrees measured from horizontal.

(ii) The design load must not exceed 1200 pounds with no increase for lateral loading.

(iii) Minimum wall thickness must be 13 inches.

(iv) Five percent of the anchors must be tested with a minimum of two tests. Where the wall thickness varies, at least one test must be performed on an anchor which has the least amount of embedment. The tests must show that the bolts can maintain a tensile load of 3000 pounds for a period of 5 minutes (10 percent deviation). The test report must include:
1. Test location(s)
2. Brick/mortar condition
3. Bolt movement/elongation
4. Embedment depth
5. Applied load

The project engineer and contractor must submit a test report to the local building department for each job.

(v) One-fifth (20 percent) of the installed anchors must be tested by a special inspector using a torque calibrated wrench to a minimum torque of 60 foot-pounds.

b. For use of the $\frac{3}{4}$-inch-diameter threaded rod in shear:

(i) The $\frac{3}{4}$-inch-diameter rod and No. 4 rebar must be embedded a minimum of 8 inches and 6 inches, respectively.

(ii) The $\frac{3}{4}$-inch-diameter rod must be embedded a minimum of 8 inches into a $\frac{7}{8}$-inch-diameter hole. The No. 4 deformed reinforcing bar must be embedded a minimum of 4 inches into a $\frac{5}{8}$-inch-diameter hole.

(iii) The design shear load for the $\frac{3}{4}$-inch-diameter rod and No. 4 rebar must not exceed 1000 and 500 pounds, respectively, with no increase for lateral loading.

(iv) Design shear value is applicable only to anchors where in-place shear test indicates a minimum mortar quality of 50 psi net.

(v) One-fourth (25 percent) of the anchors must be tested by a special inspector using a torque-calibrated wrench to a minimum torque of 60 foot-pounds.

(vi) Loads that will be imposed on the anchor must be from lateral loading only.

c. Use of the anchors must be approved by the design engineer.

d. The anchors must be installed under special inspection in accordance with Section 306 of the code.

C. Identification: Solid Bond HS-200 and HST-200 are identified in the field on the cartridge indicating the manufacturer's name and address, product name and batch number.

III. Evidence Submitted: Results of tension and shear tests and descriptive data.

Evaluation reports of ICBO Evaluation Service, Inc., are issued solely to provide information to Class A members of ICBO, utilizing the code upon which the report is based. Evaluation reports are not to be construed as representing aesthetics or any other attributes not specifically addressed nor as an endorsement or recommendation for use of the subject report.

This report is based upon independent tests or other technical data submitted by the applicant. The ICBO Evaluation Service, Inc., technical staff has reviewed the test results and/or other data, but does not possess test facilities to make an independent verification. There is no warranty by ICBO Evaluation Service, Inc., express or implied, as to any "Finding" or other matter in the report or as to any product covered by the report. This disclaimer includes, but is not limited to, merchantability.

Page 1

## Findings

IV. Findings: That the Anchor-It Fastening Systems described in this report are alternate types of connections to that specified in the 1982 Uniform Building Code, subject to the following conditions:

1. Allowable shear and tension loads are set forth in Table No. IV.
2. Allowable loads for anchors subjected to combined shear and tension forces are determined by the ratio of actual shear to the allowable shear plus the ratio of actual tension to the allowable tension not exceeding 1.00.
3. Special inspection in accordance with Section 306 (a) 12 of the code must be provided for all anchor installations.
4. Calculations and details showing that the anchors comply with this report must be submitted to the local building official for approval.
5. Anchors using the Solid Bond HS-200 adhesive cannot be used where the concrete temperature exceeds 125°F. Allowable loads assigned to anchors using the HST-200 adhesive system must be adjusted in accordance with Figure No. 1.
6. The anchors cannot be used to support fire-resistive construction.
7. The anchors cannot be used to resist pullout forces in ceiling or wall installations, except as noted in this report.
8. The anchors are installed in holes predrilled with a carbide-tipped masonry drill bit manufactured within the range of the maximum and minimum drill bit dimensions of ANSI Standard B94.12-1977 for the allowable shear and tension values set forth in this report.
9. The anchors may be used in existing unreinforced brick walls, provided installation complies with Paragraph 11 B of this report.

This report is subject to re-examination in one year.

### TABLE NO. I
### RECOMMENDED HARDENING TIME FOR THE SOLID BOND HS-200 AND HST-200 ADHESIVE SYSTEMS

| CONCRETE TEMPERATURE | MINIMUM CURE TIME |
|---|---|
| Above 68°F. | 2 hr. 30 min. |
| 51°F. to 68°F. | 4 hr. |
| 40°F. to 50°F. | 12 hr. |
| 32°F. to 40°F. | 24 hr. |
| 0°F. to 32°F. | Not recommended |

### TABLE NO. II
### ANCHOR-IT FASTENING SYSTEMS
### SPECIFICATIONS AND INSTALLATION DETAILS



| DETAILS | ANCHOR-IT FASTENING SYSTEMS |||||| 
|---|---|---|---|---|---|---|
| | 1/4" Rod | 3/8" Rod | 3/4" Rod | No. 4 Bar | No. 5 Bar | No. 6 Bar |
| BD  Nominal bit diameter (inches) | 3/8 | 1/2 | 3/4 | 1/2 | 5/8 | 7/8 |
| E   Min. hole depth required/depth embed. (inches) | 3 1/2 | 5 1/2 | 6 1/2 | 4 1/2 | 5 1/2 | 6 1/2 |
| S   Anchor spacing (inches) | 4 1/2 | 5 1/2 | 6 1/2 | 4 1/2 | 5 1/2 | 6 1/2 |
| m   Edge distance (inches) | 4 1/2 | 5 1/2 | 10 | — | — | — |
| T   Max. tightening torque (ft.-lbs) | 22 | 55 | 105 | | | |

Case 1:03-cv-00009   Document 128   Filed 11/26/2004   Page 13 of 19

## TABLE NO. 11
### REDUCTION FACTORS[1,2]

| TENSION CAPACITY | | SHEAR CAPACITY | | |
|---|---|---|---|---|
| Spacing (S) and Edge distance (m) | Factor (FL) | Edge distance (m) | Direction of load | Factor (FL) |
| S min = 0.5S | 0.5 | m min = 0.5m | toward edge | 0.5 |
| m min = 0.5m | 0.5 | m min = 0.5m | not toward edge | 0.5 |

[1] Linear interpolation is allowed for edge distances which fall between 0.5m and 1.0m, and anchor spacing which falls between 0.5S and 1.0S.

[2] The application of load factors is cumulative.

Example: Four ½" ø Anchor-It threaded rods are installed in a 2500 psi concrete slab as shown below. Determine allowable tension capacity of anchor No. 1:



S1 = 4½ in.
S2 = 4 in.
S3 = 5 in.
From Tables Nos. 9 and 10
S = 6½ in.
S min = 3¼ in.
m = 6½ in.
m min = 3¼ in.
Tension reduction factors:
Spacing: FL = 0.5
Edge: FL = 0.5

1. Interpolate for reduced spacing:

$$FL_{s1} = FL + \frac{S1 - (S - S\,min)}{S - S\,min}(1.0 - FL)$$

   $FL_{s1} = 0.82$
   Similarly, $FL_{s2} = 0.73$ and $FL_{s3} = 1.0$.

2. Interpolate for reduced edge distance:

$$FL_{m1} = F + \frac{m1 - (m - m\,min)}{m - m\,min}(1.0 - F)$$

   $FL_{m1} = 0.55$
   Similarly, $FL_{m2} = 0.73$

3. Combine tension load reduction factors for anchor No. 1:
   $m1 \times m2 \times S1 \times S2 \times S3$
   $0.55 \times 0.73 \times 0.82 \times 0.73 \times 1.0 = .24$

4. Total tension capacity of the No. 1 anchor:
   $0.24 \times 3560\,lbs. = 860\,lbs.$

### TABLE NO. IV
### ALLOWABLE TENSION AND SHEAR VALUES FOR ANCHORS INSTALLED IN MINIMUM f'c = 2000 PSI STONE AGGREGATE CONCRETE (POUNDS)[1,4,7]

| ANCHOR SIZE | (illegible) (inches) | (illegible) (inches) | (illegible) (inches) | $f'_c$ = 2000 PSI | |
|---|---|---|---|---|---|
| | | | | Tension[2,3] | Shear |
| ASTM A 307 GRADE 2 THREADED ROD | | | | | |
| 1/4"Ø | 2½ | 3½ | 3½ | 635 | 490 |
| 3/8"Ø | 3½ | 3½ | 5½ | 1,550 | 1,110 |
| 1/2"Ø | 4½ | 6½ | 4½ | 1,940 | 1,390 |
| 5/8"Ø | 5½ | 5½ | 5½ | 2,930 | 2,300 |
| 3/4"Ø | 5½ | 5½ | 5½ | 3,820 | 3,020 |
| 7/8"Ø | 6½ | 6½ | 6½ | — | — |
| 1"Ø | 9 | 9 | 9 | 12,150 | 7,850 |
| 1¼"Ø | 11½ | 11½ | 11½ | 15,500 | 9,860 |
| ASTM A 615 GRADE 60 DEFORMED REINFORCING BAR[6] | | | | | |
| No. 4 | 4½ | 4½ | 4½ | 2,540 | Not Permitted |
| No. 5 | 5½ | 5½ | 5½ | 3,350 | Not Permitted |
| No. 6 | 6½ | 6½ | 6½ | 4,120 | Not Permitted |

[1] The tabulated tension and shear values are for anchors installed in stone aggregate concrete having the minimum designated ultimate compressive strength at time of installation.

[2] The allowable tension capacities shown reflect the higher short-term test values obtained reduced by 20 percent to account for the long-term loading-carrying capabilities characteristics of adhesive anchors; therefore, the allowable values noted above do not have to be reduced for long-term loading conditions.

[3] The allowable load values may be increased 33⅓ percent for duration of loading, such as seismic or wind.

[4] Anchor spacing may be reduced up to 50 percent of the values tabulated. A load reduction factor must be used for anchors installed at minimum spacing (0.36). See Table No. II. Linear interpolation may be used for intermediate spacings. Spacing reduction factors are cumulative for groups of three or more anchors.

[5] Tension and shear load reduction factors must be used for anchors installed at minimum edge distances (0.5m). See Table No. II. In the case of corner installations, both edges affect the anchor's capacity equally and the reduction factors are cumulative. Linear interpolation is allowed for intermediate edge distances.

[6] The anchors cannot be used to resist tension forces in overhead or wall installations. Also the tension values for this loading condition are affected by elevated temperature conditions. See Footing No. 5 for additional restrictions.

[7] Special inspection in accordance with Section 306 (a) 12 of the code must be provided for all anchor installation.

[8] Limited to use with the Solid Bond HIT-200 adhesive.



### FIGURE NO. 1
### CONCRETE TEMPERATURE SENSITIVITY
### LOAD FACTOR FOR HIT-500 ADHESIVE

## TABLE NO. 8
## ANCHOR-IT FASTENING SYSTEMS
## SPECIFICATIONS AND INSTALLATION DETAILS

### ANCHOR-IT FASTENING SYSTEMS

| DETAILS | 1/2" ø Rod | 5/8" ø Rod | 3/4" ø Rod | No. 4 Bar | No. 5 Bar | No. 8 Bar |
|---|---|---|---|---|---|---|
| BD — Nominal bit diameter (inches) | 5/8 | 3/4 | 7/8 | 5/8 | 3/4 | 1 |
| E — Min. hole depth required/depth embed. (inches) | 4 1/2 | 5 1/2 | 6 1/2 | 4 1/2 | 5 1/2 | 6 1/2 |
| S — Anchor spacing (inches) | 4 1/2 | 5 1/2 | 6 1/2 | 4 1/2 | 5 1/2 | 6 1/2 |
| m — Edge distance (inches) | 2 1/4 | 2 3/4 | 3 1/4 | — | — | — |
| T — Max. tightening torque (ft.-lbs) | 22 | 55 | 106 | — | — | — |

### ANCHOR-IT FASTENING SYSTEMS AND HST-200 ADHESIVE SYSTEMS

| CONCRETE TEMPERATURE | BONDING CURE TIME |
|---|---|
| Above 68°F. | 1 hr 30 min. |
| 55°F. to 68°F. | 6 hr. |
| 40°F. to 55°F. | 12 hr. |
| 37°F. to 40°F. | 24 hr. |
| 0°F. to 37°F. | Not recommended |

Case 1:03-cv-00009   Document 128   Filed 11/26/2004   Page 16 of 19

# Chemical & Mechanical Properties

| Material | Chemistry | | As Worked Condition (Typical Mechanical Properties) | | | Heat Treated Condition | |
|---|---|---|---|---|---|---|---|
| | | | Yield K.S.I. | Tensile K.S.I. | Elongation | Yield K.S.I. | Tensile K.S.I. |
| Stainless Steel Alloy 20 | C | .07 | 40 | 85 | 30% | | |
| | Mn | 2.00 | | | | | |
| | P | .045 | | | | | |
| | S | .035 | | | | | |
| | Si | 1.00 | | | | | |
| | Ni | 32.00 / 38.00 | | | | | |
| | Cr | 19.00 / 21.00 | | | | | |
| | Mo | 2.00 / 3.00 | | | | | |
| | Cu | 3.00 / 4.00 | | | | | |
| | Cb + Ta | 8 X C Min. Max | | | | | |
| Stainless Steel 302 HQ | C (max) | 0.15 | 35 | 95 | 50% | | |
| | Mn (max) | 2.00 | | | | | |
| | Si (max) | 1.00 | | | | | |
| | Cr | 17.00 / 19.00 | | | | | |
| | Ni | 8.00 / 10.00 | | | | | |
| | Cu | | | | | | |
| Stainless Steel 303 | C (max) | .15 | 35 | 90 | 50% | | |
| | Mn (max) | 2.00 | | | | | |
| | Si (max) | 1.00 | | | | | |
| | Cr | 17.00 / 19.00 | | | | | |
| | S (max) | 0.15 | | | | | |
| | Mo (max) | 0.60 | | | | | |
| | Ni | 8.00 / 10.00 | | | | | |
| Stainless Steel 304 | C (max) | 0.03 | 30 | 75 | 60% | | |
| | Mn (max) | 2.00 | | | | | |
| | Si (max) | 1.00 | | | | | |
| | Cr | 18.00 / 20.00 | | | | | |
| | Ni | 8.00 / 12.00 | | | | | |
| Stainless Steel 304L | C (max) | 0.03 | 30 | 75 | 60% | | |
| | Mn (max) | 2.00 | | | | | |
| | Si (max) | 1.00 | | | | | |
| | Cr | 18.00 / 20.00 | | | | | |
| | Ni | 8.00 / 12.00 | | | | | |
| Stainless Steel 309 | C (max) | 0.20 | 40 | 90 | 50% | | |
| | Mn (max) | 2.00 | | | | | |
| | Si (max) | 1.00 | | | | | |
| | Cr | 22.00 / 24.00 | | | | | |
| | Ni | 12.00 / 15.00 | | | | | |
| Stainless Steel 310 | C (max) | 0.25 | 40 | 80 | 47% | | |
| | Mn (max) | 2.00 | | | | | |
| | Si (max) | 1.50 | | | | | |
| | Cr | 24.00 / 26.00 | | | | | |
| | Ni | 19.00 / 22.00 | | | | | |
| Stainless Steel 316 | C (max) | 0.08 | 30 | 75 | 60% | | |
| | Mn (max) | 2.00 | | | | | |
| | Si (max) | 1.00 | | | | | |
| | Cr | 16.00 / 18.00 | | | | | |
| | Ni | 10.00 / 14.00 | | | | | |
| | Mo | 2.00 / 3.00 | | | | | |

THIS ATR IS T 304

For reference only
**INFINITY FASTENERS INCORPORATED**
UUI-1490

Section 15   Page 8

```
#:671(4460991)                           96 : 11:44 :                 I-380  P.010/011  F-507
   FROM : EMPSCO ENGINEERI. ...NSULTANTS  PHONE NO. : 472 2136                          P01
```

**EMPSCO-ENGINEERING CONSULTANTS**
P.O. BOX 21794 GMF, GUAM 96921
TEL(671)477-4716/5716  FAX(671)472-2136

| | |
|---|---|
| TO: | N.C. MACARIO & ASSOCIATES |
| ATTN: | MANUELITO GOLEZ |
| DATE: | JUNE 13, 1996 |
| FROM: | BUTCH ARCE |
| SUBJECT: | FOXTROT "F-1" PIER |
| NO. OF PAGE (S)  1 | FAX NO.: 646-0991 |

Re: Supplemental Data for Submittal # 18-a
    Epoxy Fastening Systems

Remarks:

Review of above reference submittal is hereby approve.

*[signature]*

## TRANSMITTAL FORM

JOB ORDER _____
CONTRACT _____
TITLE  **REPAIRS & UPGRADING TO FOXTROT F-1 PIER**

FROM: BLACK CONSTRUCTION CORPORATION, P.O. Box 24667, GMF, Guam, 96921        May 20, 1996
      (CONTRACTOR)                                                             (DATE)

TO: PORT AUTHORITY OF GUAM        SUBMITTAL NO. 18a        RESUBMITTAL OF SUBMITTAL NUMBER ____
ATTN: SIMEON DE LOS SANTOS - CIP COORDINATOR

SUBJ.: SUBMITTAL FOR PROJECT _____  LINE ITEM _____  IN ACCORDANCE WITH
       SPECIFICATION PARAGRAPH   Section 05500, para. 1.2.1 Epoxy Bolts for Steel Plate Anchor

TRANSMITTED HEREWITH ARE: Six (6) copies of Epoxy Anchor Bolts

FOR: [X] ACCEPTANCE OR APPROVAL    [ ] CLARIFICATION    [ ] SELECTION    [ ] _____

IT IS HEREBY CERTIFIED THAT THE MATERIAL SUBMITTED HEREIN CONFORMS TO CONTRACT REQUIREMENTS AND CAN BE INSTALLED IN THE ALLOCATED SPACES.

CONTRACTOR'S SIGNATURE  Rod F. Bismonte, QC Mgr.

FROM: Rod F. Bismonte                                          5-20-96
                                (SIGNATURE)                    (DATE)

TO: MC Macario & Associates, Inc.                FOR REVIEW AND COMMENT NO LATER
THAN  May 24, 1996   (MAXIMUM 5 WORKING DAYS)
       (DATE)

FROM: _____  (DATE)
TO:   _____
      [ ] APPROVED;  [ ] RETURNED FOR CORRECTION;  [ ] SOURCE INSPECTION REQUIRED;
      [ ] APPROVED AS NOTED;  [ ] DISAPPROVED
      [ ] _____
REMARKS:

FROM: _____  (DATE)
          (SIGNATURE)
TO:
SUBMITTAL IS: [ ] APPROVED; [ ] RETURNED FOR CORRECTION  [ ] SOURCE INSPECTION REQUIRED:
              [X] APPROVED AS NOTED
              (SEE ENRICO'S COMMENTS)
REMARKS: