CARLSMITH BALL LLP

DAVID LEDGER
ELYZE McDONALD
134 West Soledad Avenue
Bank of Hawaii Bldg., Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Tel No. (671) 472-6813



**FILED**
DISTRICT COURT OF GUAM

DEC 30 2004

MARY L.M. MORAN
CLERK OF COURT

128

COZEN O'CONNOR

FORREST BOOTH
ERIK M. KOWALEWSKY
425 California Street, Suite 2400
San Francisco, CA 94104-2215
Tel No. (415) 617-6100

Attorneys for Plaintiff
S.J. Gargrave Syndicate at Lloyds

## IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| S.J. GARGRAVE SYNDICATE AT LLOYDS, <br><br> Plaintiff, <br><br> vs. <br><br> BLACK CONSTRUCTION CORPORATION, WINZLER & KELLY, and ENGINEERING MANAGEMENT & PLANNING SERVICES CORPORATION, <br><br> Defendants. | CIVIL CASE NO. CV03-00009 <br><br> **PLAINTIFF'S BRIEF IN RESPONSE TO ORDER TO SHOW CAUSE RE: SUBJECT MATTER JURISDICTION; EXHIBIT A; DECLARATION OF SERVICE** |

/ / /

/ / /

/ / /

4825-5752-9344.1.055639-00001

# TABLE OF CONTENTS

(Page)

I.      THIS COURT HAS DIVERSITY JURISDICTION........................................................ 1

   A.   Plaintiff Is An English Lloyds of London Syndicate, Comprised Solely Of English
        Corporations.................................................................................................................... 1

   B.   All Defendants Are Citizens Of A U.S. State Or Territory ............................................ 3

II.     THIS COURT ALSO HAS ADMIRALTY JURISDICTION ....................................... 3

   A.   There Is Admiralty Jurisdiction Over Plaintiff's Breach Of Contract Claims .............. 4

      1.   Admiralty Jurisdiction Is Broadly Construed To Cover Contracts Involving Ships,
           Maritime Services And Other Maritime-Related Transactions ................................... 4

   B.   A Contract To Repair A Marine Oil Terminal (Including Its Wharf, Pilings And Other
        Aids To Vessel Navigation) Is Inherently "Maritime".................................................... 5

   C.   The Contracts At Issue Directly Relate To The Protection Of Maritime Commerce In
        Guam............................................................................................................................... 8

   D.   The Only Case Cited By Defendants Is Both Inapposite And Has Been Implicitly
        Overruled By The Supreme Court ................................................................................ 10

   E.   There Is Admiralty Jurisdiction Over Plaintiff's Maritime Tort Claims...................... 13

      1.   The U.S. Supreme Court Has Specifically Held That Tortious Damage To
           Dolphins/Pilings Gives Rise To Admiralty Jurisdiction.......................................... 14

      2.   Admiralty Tort Jurisdiction Also Exists Under The Supreme Court's Reasoning In
           Sisson And Executive Jet......................................................................................... 15

   F.   If Any Damage To The Dolphins Was Caused By A Ship, There Is Clear Admiralty
        Jurisdiction.................................................................................................................... 16

III.    CONCLUSION............................................................................................................. 17

# TABLE OF AUTHORITIES

## Cases

Aqua-Marine Constructors, Inc. v. Banks, 110 F.3d 663 (9th Cir. 1997) .................................... 11

Berwind-White Coal Mining Co. v. City of New York, 135 F.2d 443 (2d Cir. 1943) ................................................................................................................................. 12

Bohemia, Inc. v. The Home Ins. Co., 725 F.2d 506 (9th Cir. 1984) ............................................................................................. 11

Bunge Corp. v. Freeport Marine Repair, Inc., 240 F.3d 919 (11th Cir. 2001) ............................ 10

Certain Underwriters at Lloyd's, London v. Superior Court (Powerine), 24 Cal.4[th] 945 (2001)............................................................................................................................ 2

Certain Underwriters of Lloyds v. General Accident Ins. Co., 909 F.2d 228 (7th Cir. 1990)...................................................................................................................................... 2

Colip v. Clare, 26 F.3d 712 (7th Cir. 1994)........................................................................... 2

D.M. Picton & Co. v. Eastes, 160 F.2d 189 (5th Cir. 1947), cert. denied, 331 U.S. 859 (1947) ................................................................ 12

Duncanson-Harrelson Co. v. Director, 644 F.2d 827 (9th Cir. 1981) ............................................................................................... 9

East River Steamship Corp. v. Transamerica Delaval, Inc., 476 U.S. 858 (1986) ...................... 3

Eastern Mass. Street Railway Co. v. Transmarine Corp., 42 F.2d 58 (1st Cir. 1930)................ 12

Edinburgh Assurance Co. v. R.L. Burns Corp., 479 F.Supp. 138 (C.D. Cal. 1979), aff'd. (with an immaterial exception), 669 F.2d 1259 (9th Cir. 1982) ................................ 1, 2

Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249 (1972).............................. 15, 16

Exxon Corp. v. Central Gulf Lines, Inc., 500 U.S. 603 (1991) ....................................... 5, 7, 8, 10

FMC Corp. v. Plaisted and Companies, 61 Cal.App.4[th] 1132 (1998) ............................................................................................... 2

Foremost Ins. Co. v. Richardson, 457 U.S. 668 (1982)...................................................................................................... 8

Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527 (1995)........................ 11, 14, 15

Indiana Gas Co., Inc. v. Home Ins. Co., 141 F.3d 314 (7th Cir. 1998) ............................................................................................... 2

Ins. Co. v. Dunham, 78 U.S. 1 (1871) ................................................................................... 8

International Surplus Lines Ins. Co. v. Certain Underwriters and Underwriting Syndicates at Lloyd's of London, 868 F.Supp. 917 (S.D. Ohio 1994).................................... 2

Kossick v. United Fruit Co., 365 U.S. 731 (1961)......................................................................................................... 9

La Reunion Francaise SA v. Barnes, 247 F.3d 1022 (9th Cir. 2001) ............................................................................................. 11

Norfolk Southern Railway Co. v. James N. Kirby, PTY Ltd., 125 S.Ct. 385, 2004

U.S. LEXIS 7510 (2004) ............................................................................... 4, 9, 10

Olympic Club v. Underwriters at Lloyds' London, 991 F.2d 497 (9th Cir. 1993) ........................ 2

Royal Ins. Co. v. Pier 39 Limited Partnership, 738 F.2d 1035 (9th Cir. 1984) ......... 10, 11, 12, 13

Shell Oil Co. v. Boston Fuel Transportation, Inc., 1983 U.S. Dist. LEXIS 11689
(D.Mass. 1983) ........................................................................................................... 7

Shell Oil Co. v. Winterthur Swiss Ins. Co.,
12 Cal.App.4th 715 (1993) ........................................................................................... 2

Sisson v. Ruby, 497 U.S. 358 (1990) ........................................................... 8, 10, 14, 15

Sulphur Terminals Co. v. Pelican Marine Carriers, Inc., 281 F.Supp. 570 (E.D.
La. 1968) ................................................................................................................... 17

Syndicate 420 at Lloyd's, London v. Glacier General Assurance Co., 604 F.Supp.
1443 (E.D. La. 1985) ................................................................................................... 2

The Cox Syndicate at Lloyd's v. Labarca,
260 F.3d 3 (1st Cir. 2001) ............................................................................................ 2

The PLYMOUTH, 70 U.S. 20, 36 (1866) ................................................................ 13

The Watkins Syndicate at Lloyd's of London v. Tampa Airlines, S.A., 2004 U.S.
Dist. LEXIS 20406 (S.D.N.Y. 2004) ............................................................................. 2

United States v. Matson Navigation Co.,
201 F.2d 610 (9th Cir. 1953) ..................................................................... 3, 13, 15, 17

Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310 (1955) ......................... 11


**Statutes**
28 U.S.C. § 1332(a)(2) ............................................................................................... 1, 3
28 U.S.C. § 1333(1) .................................................................................................... 3, 8
33 U.S.C. § 903(a) ......................................................................................................... 9
33 U.S.C. §§ 901, et seq., Longshore and Harbor Workers' Compensation Act ......... 9
46 U.S.C. § 740, Extension of Admiralty Jurisdiction Act ......................................... 17

4825-5752-9344.1.055639-00001

Plaintiff S.J. GARGRAVE SYNDICATE AT LLOYDS (hereinafter "Plaintiff")
files herewith its brief in response to the Court's order to show cause, issued on December 3,
2004, regarding this Court's subject matter jurisdiction herein.

## I. THIS COURT HAS DIVERSITY JURISDICTION[1]

28 U.S.C. § 1332(a)(2) provides that federal district courts have original
jurisdiction, when the matter in controversy exceeds $75,000, and the dispute is between
"citizens of a State and citizens or subjects of a foreign state". That is the case here. This case
involves Plaintiff's claims for damage to a marine pier and other facilities in an amount
exceeding $6 million. Plaintiff is a citizen of the United Kingdom, and the three Defendants are
citizens of a U.S. state or territory.

### A. Plaintiff Is An English Lloyds of London Syndicate, Comprised Solely Of English Corporations

Ten, twenty and more years ago, syndicates at Lloyds were made up of individual
human beings, called "Names", whose personal assets backed, and provided the underwriting
capital for, the syndicate. See generally, Edinburgh Assurance Co. v. R.L. Burns Corp., 479
F.Supp. 138, 144 (C.D. Cal. 1979), aff'd. (with an immaterial exception), 669 F.2d 1259 (9th Cir.
1982). Those days are gone[2], and Lloyd's syndicates today are backed by limited liability
corporations set up specifically to make corporate capital available to back the syndicate.[3] In

---

[1]      None of the Defendants hereto has ever challenged the diversity jurisdiction of this Court, by means of a
written or oral motion, or otherwise. Rather, the matter was raised *sua sponte* by the Court during the December 3,
2004 hearing.

[2]      See, http://www.capitalz.com/czf/insurance_descrip.html, concerning the establishment in 1994 of the first
Lloyd's syndicate backed wholly by corporate capital; see also, Financial Times of London article dated 12-14-95,
describing the move of Lloyds away from individual "names" and toward corporate capital backing;
http://www.lexis.com/research/retrieve?_m=b18295f496f649cc7580c14451b4d116&docnum=35&_fmtstr=FULL&
_startdoc=31&wchp=dGLbVzb-zSkAV&_md5=3b6fb7ddc9f5c7b64e43687155f94112&focBudTerms=
Lloyds%20corporate%20capital&focBudSel=all,

[3]      See, Financial Times of London article dated 01-21-99, reporting on CGU Insurance Company's having set
up a new £100 million Lloyd's Syndicate (Marlborough), backed solely by CGU corporate capital;

2001, when Plaintiff paid the claim which is the subject of this action, Plaintiff was solely

backed by (and thus composed of) a single U.K. corporation, QBE Corporate Limited, which has

its only place of business in London, England. See Declaration of Graeme Sprowson

(hereinafter "Sprowson Declaration"), Exhibit A hereto, ¶¶ 3,5,7. There were no individuals (or

"Names") who were members of the syndicate at any time from 2001 to the present. Id., ¶ 4.

Today, 2004, the syndicate is still composed solely of corporate members. There

are now three U.K. corporations which constitute the syndicate and provide its financial backing.

Sprowson Declaration, ¶¶ 6,7. There are still no individual Names, however. Id., ¶ 4. The same

was true in 2003. Id., ¶¶ 4,6,7. The syndicate does business in the Underwriting Room at

Lloyds in London, and only there. Edinburgh Assurance Co., supra, 479 F.Supp. at 144-145.

Plaintiff is a single U.K. entity capable of litigating in its own right, in diversity or on other

authorized bases, as Lloyds Underwriters have done over the years in literally hundreds of cases

throughout the country.[4] However, to the extent the syndicate may be compared to a partnership

(which it is not), see Indiana Gas Co., Inc. v. Home Ins. Co., 141 F.3d 314, 319 (7th Cir. 1998) (a

case originally filed in 1995, dealing with Lloyd's syndicates which operated over decades

---

http://www.lexis.com/research/retrieve?_m=221896b70a234578175073d8e249964c&docnum=8&_fmtstr=FULL&_
startdoc=1&wchp=dGLbVzb-SkAV&_md5=c2eb0ec27da415aef91c6e49ed27fae2&focBudTerms=
Lloyds%20corporate%20capital&focBudSel=all.

[4]     The Cox Syndicate at Lloyd's v. Labarca, 260 F.3d 3 (1st Cir. 2001); The Watkins Syndicate at Lloyd's of
London v. Tampa Airlines, S.A., 2004 U.S. Dist. LEXIS 20406 (S.D.N.Y. 2004); Syndicate 420 at Lloyd's, London
v. Glacier General Assurance Co., 604 F.Supp. 1443 (E.D. La. 1985); International Surplus Lines Ins. Co. v. Certain
Underwriters and Underwriting Syndicates at Lloyd's of London, 868 F.Supp. 917 (S.D. Ohio 1994) (diversity
action); Colip v. Clare, 26 F.3d 712 (7th Cir. 1994) (diversity action against one Lloyds Underwriter on behalf of his
syndicate); Certain Underwriters of Lloyds v. General Accident Ins. Co., 909 F.2d 228, 229 (7th Cir. 1990) (action
by "Certain Underwriters of Lloyds" as plaintiff, based on diversity). See also FMC Corp. v. Plaisted and
Companies, 61 Cal.App.4th 1132 (1998) (suit against Lloyd's Underwriters filed only against lead underwriter
Mr. Plaisted); Olympic Club v. Underwriters at Lloyds' London, 991 F.2d 497 (9th Cir. 1993) (Underwriters of
directors and officers liability insurance sued in diversity as "Underwriters at Lloyds' London"); Certain
Underwriters at Lloyd's, London v. Superior Court (Powerine), 24 Cal.4th 945 (2001) (declaratory judgment action
filed in the name of "Certain Underwriters at Lloyd's, London"); and Shell Oil Co. v. Winterthur Swiss Ins. Co., 12
Cal.App.4th 715 (1993) (defendants included more than 400 Lloyd's underwriting syndicates, sued in the name of a
representative underwriter, Mr. Froude. 12 Cal.App.4th at 731, n.1).

predating that year), the plaintiff is, and its U.K. corporate members are, all "citizens or subjects of a foreign state". 28 U.S.C. § 1332(a)(2).

**B.    All Defendants Are Citizens Of A U.S. State Or Territory**

According to their answers filed herein, the Defendants are all citizens of either a U.S. state or territory.  Winzler & Kelly Consulting Engineers is a California corporation, according to paragraph 1 of its answer to Plaintiff's First Amended Complaint.  This is consistent with the records of the Secretary of State of the State of California.  See Declaration of Forrest Booth (hereinafter "Booth Declaration"), Exhibit A.  Black Construction Corporation is a Guam corporation, with its principal place of business in Guam, according to its answer to the First Amended Complaint, paragraph 4.  Engineering, Management & Planning Services Corporation (hereinafter "EMPSCO") is also a Guam corporation, also with its principal place of business in Guam, according to paragraph 6 of EMPSCO's answer to the First Amended Complaint. Because there is a United Kingdom entity (or entities) as Plaintiff, and one California corporation and two Guam corporations as Defendants, complete diversity of citizenship exists, and this Court has subject matter jurisdiction. 28 U.S.C. § 1332(a)(2).

**II.    THIS COURT ALSO HAS ADMIRALTY JURISDICTION[5]**

"… the Constitution grants the federal courts jurisdiction over all cases of admiralty and maritime jurisdiction without exception …" United States v. Matson Navigation Co., 201 F.2d 610, 616 (9th Cir. 1953).  28 U.S.C. § 1333(1) provides that this Court shall have original jurisdiction of "Any civil case of admiralty or maritime jurisdiction …".  The historical

---

[5]    None of the Defendants hereto has ever challenged the admiralty jurisdiction of this Court, by means of either a written or oral motion.  Black mentioned it, almost as a throwaway, in its brief in support of its motion for partial summary judgment in connection with the economic loss doctrine, while at the same time relying on the Supreme Court's admiralty decision in East River Steamship Corp. v. Transamerica Delaval, Inc., 476 U.S. 858 (1986) for a large part of its argument.  Black's co-defendant EMPSCO admits in its answer that the Court has admiralty jurisdiction, however.

trend has been to expand the admiralty jurisdiction of the federal courts, consistent with the

constitutional grant of such authority in Article III, Section 2[1]. United States v. Matson, *supra*,

201 F.2d at 616 (judicial experience and new conditions require that former, more limited views

of admiralty jurisdiction be abandoned).

### A. There Is Admiralty Jurisdiction Over Plaintiff's Breach Of Contract Claims

#### 1. Admiralty Jurisdiction Is Broadly Construed To Cover Contracts Involving Ships, Maritime Services And Other Maritime-Related Transactions

The breadth of admiralty jurisdiction is greater than many lawyers, and many

judges, believe. In the U.S. Supreme Court's most recent admiralty case, Justice O'Connor

began the opinion of the Court by stating "This is a maritime case about a train wreck." Norfolk

Southern Railway Co. v. James N. Kirby, PTY Ltd., 125 S.Ct. 385, 2004 U.S. LEXIS 7510

(2004). In that case, although the subject of the lawsuit occurred almost 366 miles inland from

the Port of Savannah, Georgia, where the cargo had been discharged, Opinion, p. 33[6], the Court

found that admiralty law controlled, even though the basis for jurisdiction pled by the plaintiff

was diversity and not admiralty. Opinion, p. 17.

> To ascertain whether a contract is a maritime one, we cannot look
> to whether a ship or other vessel was involved in the dispute, as we
> would in a putative maritime tort case … Instead, the answer
> "depends upon … the nature and character of the contract," and the
> true criterion is whether it has "reference to maritime service or
> maritime transactions."

Opinion, pp. 18-19 (citations omitted).

Plaintiff's First Amended Complaint herein contains causes of action for breach

of contract, negligent property damage, and breach of the maritime warranty of workmanlike

---

[6]     The official reporter does not yet contain this opinion, which was handed down on November 9, 2004; the only pagination available is that of the slip opinion.

performance. In inquiring whether admiralty jurisdiction exists over a maritime contract dispute, the Supreme Court said in Exxon Corp. v. Central Gulf Lines, Inc., "… the trend in modern admiralty case law … is to focus the jurisdictional inquiry upon whether the nature of the transaction was maritime". 500 U.S. 603, 611 (1991) (reversing trial court's refusal to exercise admiralty jurisdiction over agency contract, overturning 1855 decision which refused to exercise such jurisdiction).

Procedurally the "suggestion" that there may not be admiralty jurisdiction in the instant case is an afterthought by Black, and is wrong. No Defendant has ever formally challenged the admiralty jurisdiction of this Court, by either a written or oral motion, and the issue has never been briefed to the Court.[7] In fact, Defendant EMPSCO admits that this Court has admiralty jurisdiction, in ¶ 1 of its answer to the First Amended Complaint. Winzler & Kelly has waffled on this issue. Winzler, in its answer to the original complaint herein, admitted that this Court has admiralty jurisdiction, but has now changed its mind in response to the same jurisdictional allegations of Plaintiff in the First Amended Complaint. See Winzler's answer to the First Amended Complaint, ¶ 4.

**B.** **A Contract To Repair A Marine Oil Terminal (Including Its Wharf, Pilings And Other Aids To Vessel Navigation) Is Inherently "Maritime"**

The subject of this litigation is the negligent design and repair of a marine oil terminal operated by the Port Authority of Guam (hereinafter "the Port") in Apra Harbor, Guam's deep-water commercial seaport.[8] Such negligence was also, of course, a breach of Defendants' contract to properly design and repair the terminal's marine appurtenances.

---

[7] Black did make passing reference to one Ninth Circuit case, which will be discussed *infra*.

[8] http://www.investguam.com/iio/imminvopp.html

The Port handles almost 2 million revenue tons of cargo inbound to Guam every year, and almost 1 million tons of shipments out of Guam. See AAPA Port Profiles, Port Authority of Guam, Booth Declaration, Exhibit F.[9] The F-1 pier, also known as Foxtrot 1 pier, is a fuel and liquefied petroleum gas facility leased to Shell Guam. *Id.* It is the one and only source of supply of liquefied petroleum gas ("LPG") to Guam, and one of only two sources of fuel oil, gasoline and other refined petroleum products; it is the source of fuel to the electric power generators of the Guam Power Authority ("GPA") and the Agat gasoline stations on Guam. See Booth Declaration, Exhibit C, a letter to EMPSCO from the Vice President – Operations of Shell Guam, Inc. Without the F-1 pier, there would be no way to import LPG to Guam, the supply of fuel oil to GPA's electric generating station would be interrupted, and adequate supplies of gasoline and diesel fuel for vehicles could not be delivered to the island.

The F-1 pier consists of a concrete main wharf offshore, supported by pilings driven into the seabed. See Booth Declaration, Exhibit E. Catwalks for personnel lead from there out over the water to dolphins, which are used to moor ocean-going tankers as long as 700 to 800 feet, when they deliver their cargoes of petroleum products to Shell. See Booth Declaration, Exhibit B. Photographs B1, B2 and B3 show the dolphins, which are thick concrete caps approximately 32 feet wide, 44 feet long, and between 6 and 8.5 feet thick. They, too, are suspended over the navigable waters of Apra Harbor, supported by large steel pilings (shown in the photographs) driven into the seabed, which is 35 to 40 feet below the surface of the harbor. See Booth Declaration, Exhibit F. From 1998 to 2001, a total of 219 large, ocean-going oil tankers, LPG carriers and refined product tankers called at the F-1 pier. See Booth Declaration, Exhibit D (Shell's F-1 pier vessel movement report).

---

[9]     http://www.aapadirectory.com/cgi-bin/showportprofile.cgi?id=3782&region=US

As can be seen in the two drawings of the F-1 pier, Exhibit E to the Booth Declaration, there are two types of dolphins at the facility. When a ship ties up at the pier, it actually rests against "breasting" dolphins, labeled as C, D, G and H in Exhibit E-2. <u>See generally</u>, <u>Shell Oil Co. v. Boston Fuel Transportation, Inc.</u>, 1983 U.S. Dist. LEXIS 11689 (D.Mass. 1983) (involving damage to breasting dolphin, Opinion, p.1). Dolphins A and B of Shell F-1, shown in Exhibit E-1, are "mooring" dolphins; the ship passes mooring lines across to those dolphins, but the sides of the ship never make contact with them. The main wharf, dolphins and catwalks, see Exhibit E-1 to the Booth Declaration, provide the sole means of access and egress to vessels docked at the pier, via a ramp (shown) that leads from the main wharf to the seawall and dry land.

Since admiralty jurisdiction unquestionably extends to suits involving maritime contracts, <u>Exxon Corp. v. Central Gulf Lines, Inc.</u>, 500 U.S. at 608, the question presented here is whether the Defendants' written contracts to design and carry out repairs to the marine oil pier in Guam were maritime contracts. Clearly they were. As the Court will recall, Plaintiff's subrogee the Port entered into a written contract[10] with EMPSCO and agreed to pay it almost $300,000[11] to provide professional design services for "a full and complete design", EMPSCO Contract, ¶ 1.b., of repairs and improvements to the F-1 pier, including inspection, identification of necessary repairs to the dolphins, main wharf and walkways. EMPSCO, as a professional construction manager[12], EMPSCO Contract, ¶ 17, also undertook to perform construction

---

[10] The contract between EMPSCO and the Port (hereinafter the "EMPSCO Contract") is attached as Exhibit 1 to the Declaration of Reynaldo Arce, filed herein on November 12, 2004 in support of EMPSCO's motions for summary judgment and for judgment on the pleadings.

[11] Booth Declaration, Exhibit K, EMPSCO's Fee Breakdown.

[12] There is a dispute between Plaintiff and EMPSCO as to whether, and to what degree, EMPSCO was relieved of its contractual obligations to provide construction supervision services, and to what degree EMPSCO in fact continued to provide them.

consultation, soils investigation, preparation of shop drawings and catalog submittal review. EMPSCO Contract, Scope of Work attachment. The contract between EMPSCO and the Port contained a written warranty of workmanlike performance, EMPSCO Contract, ¶ 1.c., and a complete indemnity provision in favor of the Port. *Id.*, ¶ 4.

Black entered into a written contract with the Port to provide all the necessary labor, material, equipment, tools and services to complete the repairs to the F-1 pier (¶ I). Black's contract also contained an express warranty of workmanlike performance. *Id.* The contract between Black and the Port is attached as Exhibit A to Plaintiff's First Amended Complaint herein.

Winzler entered into a written contract with Black to provide a new and different design for the connection between the piles and the pile caps, as part of the repair project. The Port, as property owner, was an intended third party beneficiary of that contract.

## C. The Contracts At Issue Directly Relate To The Protection Of Maritime Commerce In Guam

28 U.S.C. § 1333(1) gives federal courts the right to hear "Any civil case of admiralty or maritime jurisdiction." The Supreme Court noted in Exxon Corp. v. Central Gulf Lines, a maritime contract dispute case, that "... the 'fundamental interest giving rise to maritime jurisdiction is 'the protection of maritime commerce,'"[13] citing Sisson v. Ruby, 497 U.S. 358, 367 (1990), in turn quoting Foremost Ins. Co. v. Richardson, 457 U.S. 668, 674 (1982). In 1871, the Supreme Court in Ins. Co. v. Dunham, stated that, in determining whether a contract falls within admiralty, "the true criterion is the nature and subject-matter of the contract, as whether it was a maritime contract, having reference to maritime service or maritime transactions." 78 U.S. 1, 26 (1871) (cited with approval in Exxon Corp. v. Central Gulf Lines). To ascertain whether a

---

[13] 500 U.S. at 608.

contract is maritime, one cannot look to the mere fact of whether a ship or other vessel was involved in the dispute. Norfolk Southern Railway, Opinion at 18. While maritime contracts may be made anywhere in the world, they should be judged by one law (admiralty) wherever they were made. Norfolk Southern Railway, Opinion at 28 citing Kossick v. United Fruit Co., 365 U.S. 731, 741 (1961).

The project to repair the dolphins, which EMPSCO and Winzler designed, and Black executed, involved traditional maritime employment performed by marine construction workers who were subject to the jurisdiction of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901, *et seq.*; Duncanson-Harrelson Co. v. Director, 644 F.2d 827, 830 (9th Cir. 1981) (dolphin work served an "essential maritime purpose"). Their work to cut off and replace the dolphin pilings was performed in part underwater[14], and from barges and workboats[15] on the navigable waters[16] of the Port at Apra Harbor. Booth Declaration, Exhibit F. The Court in Duncanson-Harrelson, *supra*, noted that such work is quintessentially maritime: "… work constructing a 'dolphin' (a place for incoming ships to tie up off the dock) served the essential maritime purpose of mooring a ship when it comes alongside the pier." *Id.*, at 830. The instant case, although it involves dolphin and pile **repair**[17] rather than new construction, is

---

[14]    Booth Declaration, Exhibit L (July, 1996 progress report to the Port on underwater welding and Black's underwater chipping work on Dolphins C and G).

[15]    Booth Declaration, Exhibit K (EMPSCO charges to Port for Workboat rental (pg. 3)) and Exhibit J (description of divers cutting off old piles four feet below the water line and splicing on new piles).

[16]    Navigable waters are defined for this purpose by 33 U.S.C. § 903(a) to include, in addition to Apra Harbor itself, "… any adjoining pier, wharf, dry dock, terminal … or other adjoining area customarily used by an employer in loading [or] unloading … a vessel."

[17]    The defective pile attachment designed by the Defendant engineers, and defective dolphin repair work by Black, damaged a major marine oil terminal which annually handles literally hundreds of ocean-going ships. Booth Declaration, Exhibit D. To use Shell's own words, "F-1 dock is Shell's life-line." Booth Declaration, Exhibit C. By providing a design which called for, and by installing, bolts which were undersized, were too few in number, were too short and had little or no epoxy to hold them in place, Booth Declaration, Exhibit M, the Defendants severely damaged the F-1 pier. Photograph B4, attached to the Booth Declaration, shows how one of the pilings

essentially identical; it served an essential maritime purpose, namely mooring ships when they came alongside the pier.

The pier, its catwalks and ramps are the only way for personnel to get ashore from ships tied up at the pier, and for workers to get to the ship to connect the hoses through which the oil and petroleum products flow to and from the ships. This case is clearly one where the "protection of maritime commerce" is involved. Exxon Corp. v. Central Gulf Lines, 500 U.S. at 608 (involving breach of contract). "No actual disruption of maritime commerce need occur in order to satisfy this query [whether the incident had a "potentially disruptive impact" on maritime commerce]". Bunge Corp. v. Freeport Marine Repair, Inc., 240 F.3d 919, 924 (11th Cir. 2001). Only a **potential** disruption, as occurred at the F-1 pier, is required. *Id.* Here, the Defendants' negligent work and design had the potential to put the whole fuel pier out of commission for months.

### D. The Only Case Cited By Defendants Is Both Inapposite And Has Been Implicitly Overruled By The Supreme Court

Black has cited Royal Ins. Co. v. Pier 39 Limited Partnership, 738 F.2d 1035 (9th Cir. 1984), for the proposition that there is no admiralty jurisdiction in the instant case. Black is wrong. Pier 39, a twenty year old decision (1984), was handed down when the Ninth Circuit did not have the benefit of at least four major U.S. Supreme Court decisions concerning admiralty jurisdiction, two involving contract disputes and two involving torts: Exxon Corp v. Central Gulf Lines, *supra* (breach of contract; 1991); Norfolk Southern Railway Co., *supra* (contract; 2004); Sisson v. Ruby, *supra* (tort; 1990); and Grubart, Inc. v. Great Lakes Dredge &

---

sheared off all 8 bolts and moved about two feet from the position where Black had affixed it. Photograph B6 shows another example of all 8 bolts being sheared off and the piling in question having dropped away from the pile cap and moved to the side about a foot. Another piling with similar damage is shown in Photograph B8. See also Exhibit M, survey report of earthquake damage, p. 2. The bolts, when they tore out of the concrete caps, damaged the concrete itself, as shown in photograph B6. Therefore the holes could not be reused, and a new and more expensive fixation system had to be devised.

Dock Co., *infra* Section II.B. (tort; 1995). Having the benefit of the Supreme Court's current views, it is clear that <u>Pier 39</u> would not have been decided today the way it was decided in 1984. See <u>La Reunion Francaise SA v. Barnes</u>, 247 F.3d 1022 (9th Cir. 2001) (decision reversed in an insurance declaratory judgment action; trial court ruled that federal court did not have admiralty jurisdiction over an insurance policy covering a small boat which was required to be stored on land for half the year, and use of the boat was restricted to inland waters of California only; the Ninth Circuit held that admiralty jurisdiction existed). <u>La Reunion Francaise</u> cited, and relied upon, <u>Sisson v. Ruby</u>, among other Supreme Court decisions.[18]

        <u>Pier 39</u> was a declaratory judgment action concerning two insurance policies. ("We therefore determine whether Royal's policies are within admiralty jurisdiction ...") *Id.*, at 1036. The insurance company plaintiff brought the declaratory judgment action because its insured had allegedly concealed and withheld material information during the underwriting process. These are matters which the Supreme Court has said are usually to be construed according to state law rather than federally-defined admiralty law, unless there is an established admiralty law rule or a need for uniformity in maritime law. <u>Wilburn Boat Co. v. Fireman's Fund</u>, *supra*. Therefore it was easy for the Court in <u>Pier 39</u> to say those insurance issues do not concern the admiralty. The construction and property damage issues in the instant case, by

---

[18]       Interestingly, immediately before one panel decided <u>Pier 39</u> in 1984, another panel of the Ninth Circuit reached the opposite conclusion in <u>Bohemia, Inc. v. The Home Ins. Co.</u>, 725 F.2d 506, 510 (9th Cir. 1984). In that case, which also involved a dispute over insurance, the court held that federal admiralty law (and not state law) applied, in spite of <u>Wilburn Boat Co. v. Fireman's Fund Ins. Co.</u>, 348 U.S. 310 (1955), which it cited. Clearly, the holding of <u>Pier 39</u> is outdated, and at best it should be confined to its limited facts.

      Another case which makes it unlikely that the Ninth Circuit would decide <u>Pier 39</u> today, the way it did in 1984, is <u>Aqua-Marine Constructors, Inc. v. Banks</u>, 110 F.3d 663 (9th Cir. 1997). In <u>Aqua-Marine Constructors</u>, the Court held that an action on a performance bond fell within admiralty jurisdiction. *Id.*, at 671. The Court held that "... a contract is maritime if it relates to a ship in its use as such, or to commerce or to navigation on navigable waters, or to transportation by sea, or to maritime employment." *Id.*, at 670-671. If a suit on a bond guaranteeing performance of a marine contract is in admiralty, then clearly the instant suit on marine contracts themselves is in admiralty also.

11.

contrast, directly involve international maritime commerce and transportation. Pier 39 is only a dining and shopping tourist attraction in San Francisco[19], not a working marine oil terminal in the mid-Pacific which handles hundreds of ships each year. The pier at Pier 39, full of tee shirt shops and restaurants, arguably has little to do with traditional maritime commerce.

In cases like the instant suit involving damage to maritime property, even the Pier 39 case indicates that admiralty jurisdiction is present. The Court in Pier 39 noted that contracts relating to construction or maintenance of docks or wharves is within admiralty jurisdiction, even though the contracts did not provide services to a specific vessel. *Id.*, at 1038. The Court cited Berwind-White Coal Mining Co. v. City of New York, 135 F.2d 443 (2d Cir. 1943); Eastern Mass. Street Railway Co. v. Transmarine Corp., 42 F.2d 58 (1st Cir. 1930); and D.M. Picton & Co. v. Eastes, 160 F.2d 189 (5th Cir. 1947), cert. denied, 331 U.S. 859 (1947) (a breach of contract case involving work on piles in navigable waters, wherein the Court stated that "... it would be difficult to imagine a contract more completely maritime." *Id.*, at 192). In Berwind-White Coal, another breach of contract case, the Court found admiralty jurisdiction because part of the work to be performed under the contract involved removal of clusters of piles from navigable waters. 135 F.2d at 445. Likewise, Eastern Mass. Street Railway Co. involved breach of a contract to provide a safe berth for ships, which was found to be within admiralty jurisdiction. 42 F.2d at 62-63. In those cases, as here, the breach of contract also led to tort damage. Pier 39, at 1038. No tort was alleged in the Pier 39 case. *Id.*

Coverage under, and formation of, the insurance contract issued by Plaintiff to the Port is in no way an issue in the instant litigation, as it was in Pier 39. The Port's claim for earthquake damage was covered by its insurance, and the claim was paid promptly by Plaintiff

---

[19]    http://www.pier39.com/

when an agreement was reached. Plaintiff herein is not seeking declaratory relief against its insured, and the insured Port is not even a party to the suit. The Pier 39 case is easily distinguished from the instant dispute, and indeed, the pier construction and maintenance cases which Pier 39 cites actually support Plaintiff's position herein that this is an admiralty case.

### E.  There Is Admiralty Jurisdiction Over Plaintiff's Maritime Tort Claims

It has long been the rule that "Every species of tort, however occurring, and whether on board a vessel or not, if upon the high seas or navigable waters, is of admiralty cognizance." The PLYMOUTH, 70 U.S. 20, 36 (1866). "Admiralty jurisdiction extends to every species of tort committed upon the high seas or on navigable waters." United States v. Matson, *supra*, 201 F.2d at 613. Plaintiff in its First Amended Complaint has alleged negligent property damage against the three Defendants.[20] Specifically, Plaintiff has alleged that the repairs designed and built by the Defendants were inadequately strong and were negligently performed. As a result, when a second earthquake occurred on October 13, 2001, essentially all of the pile-to-cap connections which had been repaired by the Defendants were destroyed. See Booth Declaration, Exhibit M. This led to and allowed movement of the caps relative to the piles, as is shown in the photographs B4, B5, B6 and B8 attached to the Booth Declaration. In addition, catwalks, water lines, fire lines, cargo hoses, cargo manifolds and electric lines were ripped out of place and damaged or destroyed (although these were not items which had been worked on by Black or designed by the other two Defendants).

---

[20]    In addition, the Port, by written assignment, has conveyed its uninsured rights (including to its sizeable deductible) to Plaintiff.

### 1. The U.S. Supreme Court Has Specifically Held That Tortious Damage To Dolphins/Pilings Gives Rise To Admiralty Jurisdiction

The U.S. Supreme Court has decided the exact issue presented here: there is admiralty jurisdiction in a tort case involving repair work to <u>dolphins</u>. The case is <u>Grubart, Inc. v. Great Lakes Dredge & Dock Co.</u>, 513 U.S. 527 (1995). In that case, Great Lakes was engaged in replacing pilings (dolphins) around piers in the Chicago River, *Id.*, at 530; the dolphins there were used to keep ships from bumping into piers. *Id.* As a result of Great Lakes' activities, a freight tunnel under the river collapsed, flooding the basements of buildings in the Chicago Loop. *Id.* The first question the Supreme Court faced was whether admiralty had jurisdiction over the faulty work (tort) claims for the flood damage, *Id.*, at 531.

The Court answered in the affirmative. The Court, quoting from its decision in <u>Sisson v. Ruby</u>, *supra*, noted that it had to decide "... whether the incident involved was of a sort with the potential to disrupt maritime commerce." *Id.*, at 538. The Court noted that it is the <u>potential</u> effects, not the particular facts of the incident, which are important in determining whether the incident was likely to disrupt maritime commercial activity. *Id.* In the instant case, the potential damage to maritime commerce is obvious; the Defendants' defective design and construction work had the potential to, and nearly did, put the F-1 oil terminal facility completely out of business. The large concrete caps very nearly fell off the piles and into Apra Harbor, where they would have blocked shipping and prevented the docking and unloading of oil tankers for months, if not longer. This would have denied the island of Guam of all of its LPG, and half of all its supply of gasoline, diesel fuel and the fuel oil for its power plant. <u>See</u> Booth Declaration, Exhibit C.

The Court in <u>Grubart</u> then went on to the second inquiry mandated by <u>Sisson v. Ruby</u>, to determine whether the activity giving rise to the incident had a substantial relationship

to traditional maritime activity. <u>Grubart</u>, at 539. The Court surveyed a number of piledriving and pile repair cases, and found that such maritime construction activity had a sufficient nexus to traditional maritime activity, and that admiralty jurisdiction therefore was present.

> ... we need to look only to whether one of the arguably proximate causes of the incident originated in the maritime activity of a tortfeasor: as long as one of the putative tortfeasors was engaged in traditional maritime activity the allegedly wrongful activity will "involve" such traditional maritime activity and will meet the second nexus prong.

<u>Grubart</u>, at 541. Only one alleged tortfeasor must have been engaged in such activity. *Id.* As in maritime contract cases, the Supreme Court noted that the basic rationale for admiralty jurisdiction is the protection of maritime commerce through uniform rules of decision, *Id.*, at 544. Therefore, admiralty jurisdiction was present over the Chicago pile/dolphin damage case.

There are also many lower court cases, similar to <u>Grubart</u>, which involve damage to pilings and piers. One such case is <u>United States v. Matson</u>, *supra*. It involved damage to a dike attached to the shore, constructed of wooden pilings, 201 F.2d at 612. The Ninth Circuit held that there was admiralty jurisdiction.

## 2. Admiralty Tort Jurisdiction Also Exists Under The Supreme Court's Reasoning In <u>Sisson</u> And <u>Executive Jet</u>

While the instant case involves substantial (and expensive) marine construction activities, a direct commercial nexus is not required for admiralty jurisdiction to exist in a tort case. <u>Sisson v. Ruby</u>, *supra*, involved a fire in a washer/dryer unit in a pleasure boat docked at a marina on Lake Michigan. The Court held that "The jurisdictional inquiry does not turn on the *actual* effects on maritime commerce of the fire on Sisson's vessel; ... a court must assess the general features of the type of incident involved to determine whether such an incident is likely to disrupt commercial activity." 497 U.S. at 363. The Supreme Court in <u>Sisson</u> rejected the rationale of both the District Court and the Seventh Circuit below, which had reasoned that a fire

in a washing machine on a private yacht did not bear a significant relationship to traditional maritime activity. *Id.,* at 360-361. The defective work of the Defendants herein easily meets the Sisson test requirements. The instant case also satisfies the modified locality test of Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249 (1972), since the piles and dolphins are located in at least 35 feet of water in Apra Harbor, and are used for the navigation of large, ocean-going tankers. Booth Declaration, Exhibits D, E and F.

**F.     If Any Damage To The Dolphins Was Caused By A Ship, There Is Clear Admiralty Jurisdiction**

To attempt to escape liability for their defective work, the Defendants have hired a series of so-called experts to give the opinion that it was not the second earthquake which caused the obvious damage to the dolphins, but rather a series of (unidentified) ships bumping forcefully against them. For example, Messrs. Hayes and Trenkwalder, experts retained by Winzler & Kelly, state at page 7 of their report that "It is my [sic] opinion that the damage to the dolphin piles and connection was due to excessive [ship] berthing loads and not by [sic] any seismic forces." See Booth Declaration, Exhibit G, p. 7. The opinions of these individuals from Oakland, California, who have apparently never even seen the pier in question, are highly suspect. They are directly contradicted by all of the contemporaneous documents and the eyewitness testimony to the earthquake damage. Booth Declaration, Exhibit M (report by JT Developments Pty, Ltd. of survey conducted October 31, 2001 of the Shell F-1 pier "damage which had resulted from the [October 13[th]] earthquake"); Exhibit H (deposition of independent marine surveyor, Captain Jurgen Unterberg, who viewed and videotaped the damage to the dolphins on October 24, 2001, only 11 days after the 2001 earthquake; he also dove and inspected the piles under water, retrieving bolts which had fallen out of the pile caps during the earthquake; his testimony is clear at pages 7 and 10 that the damage he observed was caused by

that earthquake); and Exhibit I, ¶ 4 (earthquake damage to F-1 pier was extensive; bolted and flanged connections were not strong enough to withstand a major earthquake.)

If the Defendants really wish to allege that all of the damage to the pier and dolphins was in fact caused by ships, they have shot themselves in the foot, jurisdictionally. 46 U.S.C. § 740, the Extension of Admiralty Jurisdiction Act, specifically provides that "The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land." Congress' intent, in amending 46 U.S.C. in this manner in 1948, was to direct admiralty courts to take cognizance of actions involving damage caused by ships to piers, docks and similar structures. United States v. Matson, *supra*, 201 F.2d at 616. Plaintiff, in its First Amended Complaint, has alleged that the pier repair was improperly and negligently designed and the repairs were improperly executed, leading to the pier being substantially weaker than it originally was, should have been and needed to be for its intended service (docking ocean-going tankers), despite the Defendants' warranty that their work was adequate. If the unsubstantiated assertion of Defendants' experts proves true, and the damage was actually caused by the docking of tankers (which seems impossible because none of the ships ever hit the dolphins hard enough to puncture its side and spill oil), then Plaintiff still has the right to recover against the Defendants for the repairs which were inadequately strong. This Court clearly has admiralty jurisdiction of such claims, pursuant to 46 U.S.C. § 740. Sulphur Terminals Co. v. Pelican Marine Carriers, Inc., 281 F.Supp. 570, 575 (E.D. La. 1968) (damage to pilings; "… the dock should have sufficient strength to withstand the pressure" of ships berthing against it. *Id.*, at 573.)

## III. CONCLUSION

Because the wrongs of the Defendants bear a significant relationship to traditional

maritime activity, and threatened to disrupt vital maritime commerce in oil and gas in Apra Harbor, this Court has, and should exercise, admiralty jurisdiction over both Plaintiff's breach of contract and tort claims, in order to further the overriding federal interest in the protection of maritime commerce which the U.S. Supreme Court has clearly delineated.

DATED: Hagåtña, Guam, December 30, 2004.

CARLSMITH BALL LLP

for _____
DAVID LEDGER
ELYZE McDONALD
Attorneys for Plaintiff
S.J. Gargrave Syndicate at Lloyds

# EXHIBIT
## "A"

CARLSMITH BALL LLP

DAVID LEDGER
ELYZE McDONALD
134 West Soledad Avenue
Bank of Hawaii Bldg., Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Tel No. (671) 472-6813

COZEN O'CONNOR

FORREST BOOTH
ERIK M. KOWALEWSKY
425 California Street, Suite 2400
San Francisco, CA 94104-2215
Tel No. (415) 617-6100

Attorneys for Plaintiff
S.J. Gargrave Syndicate 2724 at Lloyds

## IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| S.J. GARGRAVE SYNDICATE AT LLOYDS,<br><br>    Plaintiff,<br><br>  vs.<br><br>BLACK CONSTRUCTION CORPORATION, WINZLER & KELLY, and ENGINEERING MANAGEMENT & PLANNING SERVICES CORPORATION,<br><br>    Defendants. | CIVIL CASE NO. CV03-00009<br><br>**DECLARATION OF GRAEME SPROWSON** |

I, Graeme Sprowson, declare:

1. I am the Claims Adjuster for Syndicate 2724 at Lloyds, London,

commonly known as and doing business as S.J. GARGRAVE SYNDICATE AT LLOYDS. I

**EXHIBIT A**

have responsibility, on behalf of the Underwriters of the Port Authority of Guam, for conducting the subrogation action herein. Syndicate 2724 was the lead syndicate for the Port Authority of Guam's property insurance for the 2001 year of account.

2.      I am over the age of 21 years, have personal knowledge of the facts stated in this Declaration, and if called as a witness to testify as to them, I can and will competently do so.

3.      In 2001, financial backing for Syndicate 2724, and therefore its underwriting capacity, was provided solely by its one corporate member, which was incorporated in the United Kingdom.

4.      There were no individuals (commonly called "Names") who were members of the syndicate for any year from 2001 onward.

5.      For 2001, the corporate vehicle backing Syndicate 2724 was QBE Corporate Limited.

6.      For the present year of account (2004), the financial backing of Syndicate 2724 is provided by its members QBE Corporate Limited, Limit (No. 2) Limited and Limit (No. 3) Limited.

7.      All of the aforesaid corporations are incorporated in the United Kingdom, and have their sole place of business at London, England.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at London, England on December __15__, 2004.

GRAEME SPROWSON

SANFRAN1\32111\2 123206.000

2.

## DECLARATION OF SERVICE

I, J.Patrick Mason, hereby declare under penalty of perjury of the laws of the

United States, that on December 30, 2004, I will cause to be served, via hand delivery, a true and

correct copy of PLAINTIFF'S BRIEF IN RESPONSE TO ORDER TO SHOW CAUSE RE:

SUBJECT MATTER JURISDICTION; EXHIBIT A; DECLARATION OF SERVICE upon

Defendants Counsel of record as follows:

> Robert J. O'Connor, Esq.
> Daniel J. Berman, Esq.
> Berman O'Connor Mann & Shklov
> Suite 503, Bank of Guam Building
> 111 Chalan Santo Papa
> Hagåtña, Guam 96910
>
> Thomas C. Sterling, Esq.
> Klemm Blair Sterling & Johnson, P.C.
> Suite 1008, Pacific News Building
> 238 Archbishop Flores Street
> Hagåtña, Guam 96910

and

> Thomas M. Tarpley, Esq.
> Law Offices of Tarpley & Moroni, LLP
> Suite 402, Bank of Hawaii Building
> 134 West Soledad Avenue
> Hagåtña, Guam 96910

Executed this 30th day of December 2004 at Hagåtña, Guam.

J.PATRICK MASON

SANFRAN1\32145\3 123206.000