FILED
DISTRICT COURT OF GUAM
JAN 28 2005
MARY L.M. MORAN
CLERK OF COURT

130

THOMAS C. STERLING
KLEMM, BLAIR, STERLING & JOHNSON, P.C.
1008 Pacific News Building
238 Archbishop F.C. Flores Street
Hagåtña , Guam 96910
Telephone: (671) 477-7857
Facsimile: (671) 472-4290
*Attorneys for Defendant Black Construction Corporation*

THOMAS M. TARPLEY, JR.
TARPLEY & MORONI, LLP
A Law Firm including a Professional Corporation
Bank of Hawaii Building
134 West Soledad Avenue, Suite 402
Hagåtña, Guam 96910
Telephone: (671) 472-1539
Facsimile: (671) 472-4526
*Attorneys for Defendant Engineering, Management
& Planning Services Corporation*

ROBERT J. O'CONNOR
O'CONNOR BERMAN DOTTS & BANES
Second Floor, Nauru Building
P.O. Box 501969
Saipan, MP 96950-1969
Telephone: (670) 234-5684
Facsimile: (670) 234-5683
*Attorneys for Defendant Winzler & Kelly Consulting Engineers*

# IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| S.J. GARGRAVE SYNDICATE AT LLOYDS, <br><br> Plaintiff, <br><br> vs. <br><br> BLACK CONSTRUCTION CORPORATION and WINZLER & KELLY CONSULTING ENGINEERS and ENGINEERING, MANAGEMENT & PLANNING SERVICES CORPORATION, <br><br> Defendants. | CIVIL CASE NO. CV03-00009 <br><br><br> **DEFENDANTS' JOINT BRIEF RE DIVERSITY AND ADMIRALTY JURISDICTION** |

/ /

ORIGINAL

## INTRODUCTION

Plaintiff has failed to show cause why this matter should not be dismissed for lack of diversity jurisdiction. It has provided no information whatsoever regarding the citizenship of Leslie Wilton, the plaintiff at the commencement of the action, the time as of which diversity jurisdiction is properly determined. What information Plaintiff has provided relates only to the current Plaintiff, the S.J. Gargrave Syndicate, and even this information is incomplete. Nor has Plaintiff provided any information regarding the other underwriters whom first Wilton, and now Gargrave, purport to represent, whose citizenship must also be taken into account in determining diversity. Accordingly, the complaint should be dismissed.

## PLAINTIFF CITES IRRELEVANT CASES AND IGNORES RELEVANT ONES

The issue before the court - namely, the law regarding the citizenship of Lloyd's underwriters for purposes of diversity jurisdiction -- has been the subject of numerous cases in the federal district courts over the past several years (see, e.g., Humm v. Lombard World Trace, Inc., 916 F.Supp. 291 (S.D.N.Y. 1996); Bath Iron Works Corp. v. Certain Members Companies of Institute of London Underwriters, 870 F.Supp. 3 (D. Maine 1994)), and there are now at least five thorough discussions of the issue in the circuit courts of appeals: Certain Interested Underwriters at Lloyd's, London, England v. Layne, 26 F.3d 39 (6th Cir. 1994); Indiana Gas Co. v. Home Insurance Co., 141 F.3d

- 2 -

314 (7th Cir. 1998); E.R. Squibb & Sons, Inc. v. Accident & Casualty Insurance Co., 160 F.3d 925 (2nd Cir. 1998), and later proceedings on appeal after remand, 241 F.3d 154 (2nd Cir. 2001); Chemical Lehman Tank Lines, Inc. v. Aetna Casualty & Surety Co., 177 F.3d 210, (3rd Cir. 1999); and Corfield v. Dallas Glen Hills LP, 355 F.3d 853 (5th Cir. 2003).

Plaintiff mentions only one of these cases in its brief (Indiana Gas),[1] and cites instead to a number of federal cases which, while containing interesting discussions of such matters as seaworthiness, the Warsaw Convention, and the "follow the fortunes" doctrine, say nothing whatsoever about the question of diversity jurisdiction, as well as three California state court cases in which there could not have been such a question in the first place. See Plaintiff's Brief In Response at 2, fn. 4. Since the issue of jurisdiction was not litigated in any of these cases, they are of course of no value whatsoever to the Court's present inquiry. Cf. Indiana Gas, supra, 141 F.3d at 319 ("Many courts of appeals, including this one, have resolved litigation by or against London syndicates under sec. 1332, but none discusses the potential significance of the names'

---

[1]     Plaintiff attempts to characterize Indiana Gas as representing an antiquated picture of Lloyd's. See Brief in Response at 2-3. Corfield, however – a case decided only a year ago and in full recognition of the existence of corporate Names and single-Name syndicates (see Corfield, supra, 355 F.3d at 859 ("Syndicate 190 is a single-Name Syndicate with Liberty [Liberty Corporate Capital, Ltd.] as its sole Name and underwriting member") -- continues to find relevant and apply the legal principles set out in Indiana Gas, Squibb, and the other earlier cases.

- 3 -

citizenship, and therefore none expresses a holding on the subject.") (citing as an example Certain Underwriters of Lloyd's v. General Accident Insurance Co., 909 F.2d 228 (7th Cir. 1990), one of the cases to which Plaintiff now refers the Court in its footnote 4). Instead, the principles enunciated in the cases cited in the preceding paragraph may better guide the Court in its resolution of the same issue as it is presented in this case, and, as shown below, those principles lead inevitably to the conclusion that Plaintiff has not come close to demonstrating the existence of diversity jurisdiction.

### NEITHER THE COMPLAINT NOR THE BRIEF IN RESPONSE ADDRESSES THE CITIZENSHIP OF EITHER WILTON OR THE NAMES

Plaintiff is barking up the wrong tree not only on the law, but on the facts as well. Its response deals exclusively with the citizenship of itself, the current plaintiff, the S.J. Gargrave Syndicate. The Gargrave Syndicate, however, is not the original plaintiff, and diversity is determined at the time the action is filed:

> The citizenship of a party at the *commencement* of the action is controlling for purposes of determining diversity jurisdiction and subsequent actions do not affect the court's jurisdiction. Jurisdiction cannot be created retroactively by substituting a diverse claimant for a nondiverse party.

Aetna Casualty & Surety Co. v. Hillman, 796 F.2d 770, 776 (5th Cir. 1986) (emphasis in original) (citations omitted) (a case in which one member of a group of allied insurance companies was

substituted in as plaintiff for another member of the same group, upon discovery that the original plaintiff was non-diverse). See also, e.g., Morongo Band of Mission Indians v. California State Board of Equalization, 858 F.2d 1376, 1380 (9th Cir. 1988) ("In determining federal court jurisdiction, we look to the original, rather than to the amended, complaint."). The relevant citizenship for our initial consideration, therefore, is not that of the Gargrave Syndicate, but rather that of the original plaintiff, who was one Leslie Wilton. See Complaint (filed in this matter March 18, 2003).

The original complaint alleged the basis for diversity jurisdiction as follows:

> Plaintiff Leslie Wilton is an insurance Underwriter at Lloyds, London. He resides in England, and has his principal place of business in London. Plaintiff appears herein on his own behalf, and on behalf of all other Lloyd's Underwriters who subscribed, each of his own and not for the other, to a certain policy of insurance, providing first-party property insurance to the Port Authority of Guam.

Complaint at paragraph 3. This is defective on its face, to begin with, because Wilton's citizenship is not alleged. His residence and his place of business are, but that is not the same thing. See, e.g., Kanter v. Warner-Lambert Co., 265 F.3d 853, 857 (9th Cir. 2001) ("[T]he diversity jurisdiction statute, 28 U.S.C. 1332, speaks of citizenship, not of residency."). After all, a person may reside and do business in a place where he is not a citizen, and indeed it is likely that thousands of

- 5 -

people reside and do business in England who are not British subjects. For all we know, Wilton may be one of them.

Moreover, even if Wilton had been alleged to be a British subject, that would not be the end of the inquiry, because he purports to sue in a representative capacity for all other Lloyd's underwriters who subscribed to the Port Authority's insurance policy. See Complaint at paragraph 3 ("Plaintiff appears herein on his own behalf, and on behalf of all other Lloyd's Underwriters who subscribed, each of his own and not for the other, to a certain policy of insurance . . ."). According to the policy itself, this includes eleven different syndicates. See Exhibit A hereto (Table of Syndicates).[2] Each of these syndicates, under the Lloyd's system, is made up of at least some number of Names - possibly only one or two, possibly hundreds or even thousands. The representative capacity that Wilton asserts, moreover, is not merely formal, but affects substantive rights and liabilities of the parties, for he seeks to recover not only his own several portion of the payment (which is not stated, but cannot be more than 22% of the total, since that is the full amount of liability of the most liable syndicate), but that of all the other underwriters as well.

---

[2]     The Table of Syndicates forms the last two pages of the Port Authority's policy with Lloyd's. The full policy is already part of the record in this matter, being appended as Exhibit C to the Affidavit of Thomas C. Sterling Re Discovery Excerpts, filed on October 28, 2004, in support of Black's Motion For Partial Summary Judgment or to Dismiss. For the Court's easy reference, only the Table of Syndicates is attached hereto.

In such a situation, the citizenship of all the other underwriters, or Names, is relevant to diversity as well. See, e.g., E.R. Squibb, supra, 160 F.3d at 939 ("[W]e hold that when a Lloyd's underwriter is sued in a representative capacity (but not in a class action) *each and every Name whom the lead underwriter represents must be completely diverse.*") (emphasis added); Indiana Gas, supra, 141 F.3d at 317, 319 (holding that "the [Lloyd's] underwriting syndicates must be treated like partnerships when determining their citizenships" - i.e., that they "*have the citizenships of every name*") (emphasis added); Bath Iron Works, supra, 870 F.Supp. at 7 ("[T]he citizenship of each defendant (*i.e.*, each Name) should be considered for diversity purposes."). Cf. Corfield, supra, 355 F.3d 853 (only individual underwriter's citizenship need be considered *when he sues only on his own behalf*); Chemical Lehman, supra, 177 F.3d at 222 (finding only individual underwriter's citizenship to be relevant, based on lack of basis in the complaint for binding all other underwriters, and lack of any claim against a syndicate itself); Layne, supra, 26 F.3d at 42 (only representative's citizenship relevant in case where the Names' interest is only "formal or nominal").[3]

---

[3]     Layne's holding was based on an idiosyncratic interpretation of Tennessee agency law which has been either distinguished or rejected outright by virtually every other court to consider the question since then. See, e.g., Indiana Gas, supra, 141 F.3d at 319; Squibb, 160 F.3d at 931; Bath Iron Works, supra, 870 F.Supp. at 6-7; Humm, supra, 916 F.Supp. at 295-96.

<u>Humm v. Lombard World Trade, Inc.</u>, 916 F.Supp. 291 (S.D.N.Y. 1996), presents a scenario similar to this case. The plaintiff, Humm, was an underwriter with one of the fifty-six syndicates underwriting a Lloyd's policy that had been issued to the defendant, Lombard. Humm brought an action to recover an overpayment on the policy, suing "on behalf of himself and all interested Underwriters" on the policy. <u>Id.</u> at 292. The court found that the citizenship of each of the Names comprising the syndicates represented by Humm must be considered for diversity jurisdiction purposes, and concluded:

> Since it is conceded that at least one Name was a citizen of New York when this action was commenced, diversity is not complete. Accordingly, the Court lacks subject matter jurisdiction over the action, and it must be dismissed.

<u>Id.</u> at 298-99. The citizenship of the names is not alleged in the Complaint, making it for this reason as well, defective on its face.

In its response to the Court's Order to Show Cause, Plaintiff does not address either Wilton's citizenship or the citizenship of the vast bulk of the other underwriters.

---

We need not even go so far in this case, however, because there would be no jurisdiction shown even under the rule of <u>Layne</u>. Unlike <u>Layne</u> -- an action for declaratory relief, in which the represented underwriters' interest was "formal or nominal" -- this case is an action for money damages, at least 78% of which are sought on behalf of the represented parties, who are thus very much real parties in interest.

Plaintiff has therefore not shown that diversity exists, and has not shown cause why its complaint should not be dismissed for want of subject matter jurisdiction.

### EVEN THE INFORMATION ON THE GARGRAVE SYNDICATE IS INSUFFICIENT

Plaintiff's response is addressed solely to the citizenship of the S.J. Gargrave Syndicate, the new plaintiff as of the First Amended Complaint.[4] As noted above, however, the citizenship of the Gargrave Syndicate is not relevant (except to the extent its members are among the larger body of underwriters originally represented by Wilton), because diversity is determined as of the commencement of the action. Even if it were relevant, moreover, Plaintiff still would not have shown the existence of diversity jurisdiction. The complaint alleges only where the Syndicate is "organized" and where it does business. See First Amended Complaint at paragraph 3 ("It is organized in England, and has its principal place of business in London."). But the Syndicate is not a corporation, such that information of this type would be relevant. Cf. 28 U.S.C.

---

[4]    An amended complaint was filed December 23, 2003, with S.J. Gargrave Syndicate at Lloyd's substituted for Wilton. Diversity jurisdiction was alleged as follows:

> Plaintiff S.J. Gargrave Syndicate at Lloyds is an insurance Underwriter at Lloyds, London. It is organized in England, and has its principal place of business in London. Plaintiff appears herein on its own behalf, and on behalf of all other Lloyd's Underwriters who subscribed, each for their own and not for the other, to a certain policy of insurance, providing first-party property insurance to the Port Authority of Guam.

First Amended Complaint at paragraph 3.

1332(c) ("[A] *corporation* shall be deemed a citizen of any State by which it has been incorporated and of the State where it has its principal place of business") (emphasis added). It is an unincorporated association, and an unincorporated association has the citizenship of each of its members. See, e.g., Indiana Gas, supra, 141 F.3d at 317; Bath Iron Works, supra, 870 F.Supp. at 5. Neither the identity nor the citizenship of the Syndicate members is alleged in the First Amended Complaint, thus the citizenship of the Syndicate is not alleged.

Plaintiff attempts to rectify this in its Declaration of Graeme Sprowson, by listing the corporations who provided the "financial backing" for the Syndicate in 2001 (QBE Corporate Limited) and 2004 (QBE Corporate Limited and two others). Plaintiff's counsel, in his Brief in Response, jumps to this conclusion that the question of who provides "financial backing" for a Syndicate is identical to the question of who comprises the Syndicate itself (see, e.g., Brief In Response at 2 ("Plaintiff was solely backed by (and thus composed of) a single U.K. corporation"), but the Sprowson Declaration itself provides no support for this assumption. The relevant time, moreover -- if any time with respect to the Gargrave Syndicate could be called relevant at all -- would have to be either the time the original complaint was filed in March 2003 or the time Gargrave joined the case in December 2003, and we are not told who were

members of the Syndicate (only that "no individuals" were among them), or even who provided the "financial backing," at either time.

Finally, even if the citizenship of the Gargrave Syndicate could clearly and convincingly be shown to have been 100% British at the relevant time, there would still be the other underwriters whom the Syndicate now, like Wilton previously, claims to be representing. Although the Gargrave Syndicate (identified by Sprowson as Syndicate 2724) assumed 22% of the liability of the policy, see Exhibit A hereto, the citizenship of the Syndicates assuming the remaining 78% is not alleged in the First Amended Complaint, and is not touched upon in the response to the Order to Show Cause. Again, therefore, even if the Gargrave information is otherwise relevant, Plaintiff has still not shown that diversity exists.

### CONCLUSION RE DIVERSITY

Diversity of citizenship is one available basis for federal court jurisdiction. 28 U.S.C. 1332(a). For diversity jurisdiction to exist, however, there must be complete diversity. In other words, all plaintiffs must have diverse citizenship from all defendants. If any plaintiff has common citizenship with any defendant, there is no diversity, and jurisdiction cannot be founded on that basis. See, e.g., Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267 (1806). The

burden of showing complete diversity falls on the party claiming diversity jurisdiction. See, e.g., <u>McNutt v. General Motors Acceptance Corp.</u>, 298 U.S. 178, 189 (1936). The Syndicate has not met its burden, and its complaint should therefore be dismissed.

### THERE IS NO ADMIRALTY JURISDICTION OVER THE CONTRACT OR TORT CLAIMS IN THIS CASE

Plaintiff, in an effort to overcome the precedential value of <u>Royal Ins. Co. of America v. Pier 39 Ltd.</u>, 738 F.2d 1035, 1037-1038 (9th Cir. 1984), extracts language from various cases to fashion an argument that <u>Royal Insurance</u> has been overruled by implication and would be decided differently today. Gargrave's argument will not survive close scrutiny since it conveniently ignores the facts and holdings of the cited cases.

Gargrave relies heavily upon the Supreme Court's Decision in <u>Exxon Corp. v. Central Gulf Line</u>, 500 U.S. 603, 114 L.Ed.2d 649, 111 S.Ct. 2071 (1991), for the proposition that the "trend in modern admiralty case law" is to expand the definition of maritime contracts suggesting that this new expansive definition will encompass the dock repair contract at issue in this case. The limited issue presented in <u>Exxon Corp.</u> was whether admiralty jurisdiction should properly extend to claims arising under agency contracts. Moreover, the claim at issue in <u>Exxon Corp.</u> did not involve a dock repair contract but, rather, unpaid bills for fuel furnished to a vessel which was clearly a maritime

contract. As far as Gargrave's contention that the Exxon Corp. case deals with a "modern trend" which has developed subsequent to the Ninth Circuit's 1984 Royal Insurance decision, the cases cited in Exxon Corp. for the "modern" view were prior decisions of the Supreme Court decided in 1933 and 1961, decades prior to the decision in Royal Insurance. 500 U.S. at 611.

Gargrave cites Norfolk Southern Railway Co. v. James and Karby, PTY Ltd., 125 S.Ct. 385, 204 U.S. Lexis 795 (2004), apparently for the suggestion that the purported modern trend to expand maritime jurisdiction is sufficient to encompass maritime jurisdiction over even train wrecks! All the Supreme Court held in Norfolk was that, despite the fact the final leg of the journey was by train, the bills of lading at issue in that case were maritime contracts because their primary objective was to accomplish the transportations of goods by sea from Australia to the eastern coast of the United States.

Another case relied upon by Gargrave for its "modern trend" and "overruled by implication" arguments is the Supreme Court's case in Grubart Inc. v. Great Lakes Dredge and Dock Co., 513 U.S. 527, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995), which involved the extent of tort jurisdiction under the Extension of Admiralty Jurisdiction Act, 46 U.S.C.App. §740 (hereinafter "Extension Act"). In Grubart, a barge being towed by a tug on the Chicago River was engaged in a removal of pilings when it

- 13 -

damaged a tunnel under the river causing water from the river to travel down the tunnel flooding buildings adjoining the river. Gargrave maintains at p.14 of its brief that the Supreme Court in Grubart held "there is admiralty jurisdiction over tort cases involving repair work to dolphins." The case held no such thing.

The Court in Grubart pointed out that, prior to the existence of the Extension Act, admiralty courts lacked jurisdiction over damage resulting from a ship's collision with a pier "for admiralty law treated the pier as an extension of the land." 513 U.S. at 532. The Court then noted that the first prong of the tort jurisdiction test under the Extension Act was whether the "tort occurred on navigable waters or whether injury suffered on land was caused by a vessel on navigable water." The second prong requires a "connection with maritime activity." 513 U.S. at 534. The Court then went on to analyze whether jurisdiction existed under the Extension Act and concluded that it did since the plaintiffs' flood damage on land had been caused by a vessel on navigable waters engaged in traditional maritime activities. The Court did not hold, as Gargrave asserts, that admiralty jurisdiction extends to any tort claim involving repair work on dolphins. Most importantly, for purposes of determining whether there is jurisdiction over the tort claim herein, it is absolutely clear that the injury here

- 14 -

did not occur on navigable waters nor was it caused by a vessel on navigable water. Thus, Gargrave's tort claim clearly fails to satisfy the first prong of the jurisdictional test.

In footnote 18 of its brief, Gargrave contends that there is a conflict in this Circuit concerning the Royal Insurance holding since another panel in Bohemia Inc. v. The Home Ins. Co., 725 F.2d 506, 510 (9th Cir. 1984), "reached the opposite conclusion". The holding in Bohemia, *supra*, was simply that:

> "[S]tate law will control the interpretation of a marine insurance policy only in the absence of federal statute, a judicially fashioned admiralty rule, or a need for uniformity in admiralty practice." 725 F.2d. at 510.

The Court in Bohemia did not, as Gargrave suggests, even address the issue of whether admiralty jurisdiction extends to contracts pertaining to docks.[5]

Gargrave refers to a number of cases cited in Royal Insurance asserting that in "cases like the instant suit involving damage to maritime property" Royal Insurance indicates that there would be admiralty jurisdiction. Royal Insurance says no such thing. The cases referred to were cited in Royal Insurance (738 F.2d at 1038) as examples of some courts assuming admiralty jurisdiction in connection with contracts in a situation where traditional maritime torts have occurred.

---

[5]    In Bohemia, a barge and tug collided with a small boat on a river in Oregon resulting in a drowning and personal injuries.

*Berwind-White Coal Mining Co. v. City of New York*, 135 F.2d 443 (2nd Cir. 1943), [submerged pilings in navigable waters sunk a barge]; *Eastern Mass. St. Railway Co. v. Transmarine Corp.*, 42 F.2d 58 (1st Cir. 1930), [vessel pulled away from a dock and damaged another vessel]; *D.M. Picton & Co. v. Eastes*, 160 F.2d 189 (5th Cir. 1947), [motorboat struck submerged pilings in navigable waters and sunk]. No collision between vessels or damage to a vessel in navigable waters occurred in the instant case. No vessel is even involved in this case.

Gargrave argues that, because the defendants contend, as a defense, that the dock damage in this case occurred due to berthing incidents rather than faulty design or construction, admiralty jurisdiction exists pursuant to the Extension Act. Gargrave cites *Sulphur Terminals Co. v. Pelican Marine Carriers Inc.*, 281 F.Supp. 570, 575 (E.D.La. 1968), for the suggestion that admiralty jurisdiction exists when there is an allegation that a dock has insufficient strength to support docking pressures. This argument is simply wrong. 46 U.S.C. App. §740 creates admiralty jurisdiction in a situation where a "vessel on navigable water" causes damage on land. Gargrave does not allege, nor can it if it intends to continue pursuing these defendants, that the damage to F1 pier was caused by a vessel striking it, which was the type of claim at issue in *Sulphur Terminals*, *supra*. *Sulphur Terminals* involved an action by a

- 16 -

dock owner against a vessel for having damaged its dock which was precisely the type of claim the Extension Act was designed to bring within admiralty jurisdiction.

Gargrave also relies upon Sisson v. Ruby, 497 U.S. 358, 111 L.Ed.2d 292, 110 S.Ct. 2892 (1990), for its suggestion the modern view extends admiralty jurisdiction to dock repair contracts since there is a fundamental interest involved in protecting maritime commerce. Sisson was a tort case in which a pleasure boat caught fire in navigable waters and damaged other vessels. The Supreme Court discussed the location and connection with maritime activity requirements for tort jurisdiction. The Court noted in connection with maritime activities that:

> Here, the general features – a fire on a vessel docked at a marina on navigable waters – plainly satisfy the requirement of potential disruption to commercial maritime activity.

Thus, the Supreme Court in Sisson was dealing with a vessel on navigable waters that caught fire and damaged other vessels thereby disrupting navigation. Jurisdiction over the tort claim was found since both the location and connection with maritime activity tests were met.

Notably, Justice Scalia, in his Concurring Opinion in Sisson, noted that the jurisdictional rule for maritime contracts is that they must relate to a vessel (497 U.S. at 372), which is the precise basis for the holding in Royal

Insurance. Thus, the Supreme Court decision in Sisson, through Justice Scalia's concurrence, directly supports the continued vitality of the Ninth Circuit's decision in Royal Insurance.

Royal Insurance continues to be cited with approval in this Circuit without any indication that it has been overruled in whole or in part by implication or otherwise. See, for example, La Reunion Francaise SA v. Barnes, 247 F.3d 1022, 1024 (9th Cir. 2001); Kathriner v. Unisea Inc., 975 F.2d 657, 663 (9th Cir. 1992).

## CONCLUSION RE ADMIRALTY JURISDICTION

In conclusion, there is no admiralty jurisdiction in connection with the contract claims alleged in this action since the contract at issue pertains to the repair of a dock and is not directly related to any specific vessel. Royal Insurance, supra. Moreover, there is no jurisdiction in connection with the tort claims alleged in this action since the injury occurred on land and was not caused by a vessel on navigable waters.[6]

//

//

//

//

---

[6]    Moreover, inasmuch as the defendants have a motion pending for dismissal of all tort claims based upon the economic loss rule, the purported tort underpinnings of admiralty jurisdiction may well evaporate upon the Court's ruling on that motion.

Thus, the jurisdictional requirements for a tort claim as discussed in _Sisson_, _supra_, and _Grubart_, _supra_, have not been met by the claims alleged herein.

**KLEMM, BLAIR, STERLING & JOHNSON**
A PROFESSIONAL CORPORATION

DATED: JANUARY 28 , 2005

BY: _____
**THOMAS C. STERLING**
_Attorneys for Defendant Black Construction Corporation_

**TARPLEY & MORONI, LLP**

DATED: JANUARY 28th 2005

BY: _____
**THOMAS M. TARPLEY, JR.**
_Attorneys for Defendant Engineering, Management & Planning Services Corporation_

**O'CONNOR BERMAN DOTTS & BANES**

DATED: JANUARY 28 , 2005

BY: _____
**ROBERT J. O'CONNOR**
_Attorneys for Defendant Winzler & Kelly Consulting Engineers_

**ATTACHMENT: EXHIBIT "A"**

E62\27946-29
G:\WORD97\OFFICE\WORDDOC\PLD\TCS\208-BLACK'S RESPONSE TO
OSC RE JURISDICTION RE GARGRAVE V BLACK ET AL.DOC

- 19 -



The Table of Syndicates referred to on the face of this Policy follows:

## TABLE OF SYNDICATES APPLICABLE TO RISK CODE P D I

| | | | |
|---|---|---|---|
| LPSO USE ONLY | BROKER 0856 | REFERENCES 61512 26\|11\|99 | |
| 71 | | | |

| AMOUNT, PERCENTAGE OR PROPORTION | SYNDICATE | UNDERWRITER'S REFERENCE | PAGE 1 |
|---|---|---|---|
| **PERCENT** | | | |
| 22.00 | 2724 | NAE290913S24 | |
| 20.00 | 33 | 24025SPAAPBA | |
| 20.00 | 535 | 203BE405L99 | |
| 3.99 | 861 | 03A84194L01 | |
| 3.01 | 1209 | 03A84194L01 | |
| 1.88 | 588 | 03E30817V06 | |
| 1.02 | 1209 | 03E30817V06 | |
| 6.00 | 1036 | T7555O99FY | |
| 12.00 | 79 | 916SB6F9983A | |
| 4.00 | 62 | Z5836N99A | |
| 6.00 | 1308 | 06302488A02 | |

THE LIST OF UNDERWRITING MEMBERS OF LLOYDS IS IN RESPECT OF 1999 YEAR OF ACCOUNT

| TOTAL LINE | NO. OF SYND. | FOR LPSO USE ONLY |
|---|---|---|
| 100.00 | 11 | USE1 9644 |

## TABLE OF SYNDICATES APPLICABLE TO RISK CODE P D II + III

| | | | |
|---|---|---|---|
| LPSO USE ONLY | BROKER 0856 | REFERENCES 61513 26\|11\|99 | |
| 73 | | | |

| AMOUNT, PERCENTAGE OR PROPORTION | SYNDICATE | UNDERWRITER'S REFERENCE | PAGE 1 |
|---|---|---|---|
| **PERCENT** | | | |
| 22.00 | 2724 | NAC490913S23 | |
| 20.00 | 33 | 24025PBAPOA | |
| 20.00 | 535 | 203BE405L99 | |
| 3.99 | 861 | 03A84194L01 | |
| 3.01 | 1209 | 03A84194L01 | |
| 1.88 | 588 | 03E30817V06 | |
| 1.02 | 1209 | 03E30817V06 | |
| 6.00 | 1036 | T7555O99FY | |
| 12.00 | 79 | 916SB6F9983A | |
| 4.00 | 62 | Z5836N99A | |
| 6.00 | 1308 | 06302488A02 | |

THE LIST OF UNDERWRITING MEMBERS OF LLOYDS IS IN RESPECT OF 1999 YEAR OF ACCOUNT

| TOTAL LINE | NO. OF SYND. | FOR LPSO USE ONLY |
|---|---|---|
| 100.00 | 11 | USE1 9644 |

The List of Underwriting Members of Lloyd's mentioned in the above Table, shows their respective Syndicates and Shares therein and is deemed to be incorporated in and to form part of this Policy. It is available for inspection at Lloyd's Policy Signing Office by the Assured or his or their representatives and a true copy of the material parts of it certified by the General Manager of Lloyd's Policy Signing Office will be furnished to the Assured on application.

**EXHIBIT "A"**

 The Table of Syndicates referred to on the face of this Policy follows:

## TABLE OF SYNDICATES APPLICABLE TO RISK CODE G7

| LPSO USE ONLY 82 | BROKER 0856 | REFERENCES 51165 26 | 11 | 99 | |
|---|---|---|---|---|---|

| AMOUNT, PERCENTAGE OR PROPORTION | SYNDICATE | UNDERWRITER'S REFERENCE | PAGE 1 |
|---|---|---|---|
| PERCENT | | | |
| 22.00 | 2724 | NAT290913S22 | |
| 20.00 | 33 | 24025SPCAMSA | |
| 20.00 | 535 | 233BE405L99 | |
| 3.99 | 861 | 07A64194L01 | |
| 3.01 | 1209 | 07A64194L01 | |
| 1.98 | 588 | 07E30817V06 | |
| 1.02 | 1209 | 07E30817V06 | |
| 6.00 | 1036 | L1794Q99FY | |
| 12.00 | 79 | 916SB7V5482A | |
| 4.00 | 82 | Z5836N99B | |
| 6.00 | 1308 | 04302488B02 | |

THE LIST OF UNDERWRITING MEMBERS
OF LLOYDS IS IN RESPECT OF 1999
YEAR OF ACCOUNT

| TOTAL LINE | NO. OF SYND. | FOR LPSO USE ONLY |
|---|---|---|
| 100.00 | 11 | USE1 9644 |

The List of Underwriting Members of Lloyd's mentioned in the above Table, shows their respective Syndicates and Shares therein and is deemed to be incorporated in and to form part of this Policy. It is available for inspection at Lloyd's Policy Signing Office by the Assured or his or their representatives and a true copy of the material parts of it certified by the General Manager of Lloyd's Policy Signing Office will be furnished to the Assured on application.