ORIGINAL

CARLSMITH BALL LLP

DAVID LEDGER
ELYZE McDONALD
134 West Soledad Avenue
Bank of Hawaii Bldg., Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Tel No. (671) 472-6813

COZEN O'CONNOR

FORREST BOOTH
ERIK M. KOWALEWSKY
425 California Street, Suite 2400
San Francisco, CA 94104-2215
Tel No. (415) 617-6100

Attorneys for Plaintiff
S.J. Gargrave Syndicate at Lloyds

FILED
DISTRICT COURT OF GUAM
FEB 1 1 2005
MARY L.M. MORAN
CLERK OF COURT



IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| S.J. GARGRAVE SYNDICATE AT LLOYDS,<br><br>　　　　　　　Plaintiff,<br><br>vs.<br><br>BLACK CONSTRUCTION CORPORATION, WINZLER & KELLY, and ENGINEERING MANAGEMENT & PLANNING SERVICES CORPORATION,<br><br>　　　　　　　Defendants. | CIVIL CASE NO. CV03-00009<br><br>**PLAINTIFF'S REPLY BRIEF IN RESPONSE TO ORDER TO SHOW CAUSE RE: SUBJECT MATTER JURISDICTION; DECLARATION OF SERVICE** |

/ / /

/ / /

/ / /

## TABLE OF CONTENTS

(Page)

I. DEFENDANTS HAVE SUBMITTED NO EVIDENCE WHICH CALLS INTO QUESTION THE EXISTENCE OF SUBJECT MATTER JURISDICTION .................... 1

    A. Plaintiff's Proof Of Complete Diversity Is Uncontradicted ..................... 1

    B. Defendants' Effort To Bring Non-Parties Into The Lawsuit, To Defeat Diversity Jurisdiction, Must Fail ..................... 2

II. THIS COURT HAS ADMIRALTY JURISDICTION AS WELL ..................... 5

    A. Defendants Have Pointed To No Cases Disputing Admiralty Jurisdiction Over This Maritime Breach of Contract Case ..................... 5

    B. Plaintiff's Maritime Tort Claims Are Within Admiralty Jurisdiction ..................... 7

III. CONCLUSION ..................... 10

# TABLE OF AUTHORITIES

(Page)

**Cases**

Aetna Cas. & Sur. Co. v. Iso-Tex, Inc., 75 F.3d 216 (5th Cir. 1996) .................................................. 4

Aqua-Marine Constructors, Inc. v. Banks, 110 F.3d 663 (9th Cir. 1997),
   cert. denied, 522 U.S. 933 (1997) ............................................................................................ 6

Berwind-White Coal Mining Co. v. City of New York,
   135 F.2d 443 (2d Cir. 1943) ..................................................................................................... 7

Bunge Corp. v. Freeport Marine Repair, Inc., 240 F.3d 919, 924 (11th Cir. 2001) ...................... 9

Certain Interested Underwriters at Lloyds, London, England v. Layne,
   26 F.3d 39, 42 (6th Cir. 1994) .......................................................................................... 1, 2, 4

Certain Underwriters of Lloyds v. General Accident Ins. Co.,
   909 F.2d 228 (7th Cir. 1990) .................................................................................................... 5

Chemical Leaman Tank Lines, Inc. v. Aetna Cas. and Sur. Co.,
   177 F.3d 210, 223 (3d Cir. 1999) ............................................................................................ 3

Colip v. Clare, 26 F.3d 712 (7th Cir. 1994) .................................................................................... 5

Corfield v. Dallas Glen Hills LP, 355 F.3d 853 (5th Cir. 2003) ............................................. 2, 3, 4

D.M. Picton & Co. v. Eastes, 160 F.2d 189 (5th Cir. 1947),
   cert. denied, 331 U.S. 859 (1947) ............................................................................................ 7

Duncanson-Harrelson Co. v. Director, 644 F.2d 827 (9th Cir. 1981) ........................................... 9

E.R. Squibb & Sons v. Accident & Cas. Ins. Co.,
   160 F.3d 925, 929 (2d Cir. 1998) ......................................................................................... 3, 4

E.R. Squibb & Sons v. Lloyd's & Cos.,
   241 F.3d 154, 161-162 (2d Cir. 2001) ..................................................................................... 3

Eastern Mass. St. R. Co. v. Transmarine Corp., 42 F.2d 58 (1st Cir. 1930) ................................. 7

Ex Parte Easton, 95 U.S. 68, 75-76 (1877) .................................................................................... 6

Foremost Ins. Co. v. Richardson, 457 U.S. 668, 674-675 (1982) ............................................ 8, 10

Grubart v. Great Lakes Dredge & Dock Co., 513 U.S. 527 (1995) ............................................... 7

Indiana Gas Co. v. Home Ins. Co., 141 F.3d 314 (7th Cir. 1998) .............................................. 2, 3

Kathriner v. Unisea, Inc., 975 F.2d 657 (9th Cir. 1992) ................................................................ 8

La Reunion Francaise SA v. Barnes, 247 F.3d 1022 (9th Cir. 2001) ......................................... 6, 8

McDermott Int'l v. Wilander, 498 U.S. 337, 354 (1991) .................................................................. 8

Norfolk Southern Railway Co. v. James N. Kirby, PTY Ltd., ___ U.S. ___,
   125 S.Ct. 385, 2004 U.S. LEXIS 7510 (2004) ...................................................................... 6

Pederson v. Powell-Duffryn Terminals, Inc., 34 F.Supp.2d 915 (D.N.J. 1999) ........................... 9

Royal Ins. Co. of Am. v. Pier 39 Limited Partnership,
   738 F.2d 1035 (9th Cir. 1984) ........................................................................................ 5, 6, 7

Sisson v. Ruby, 497 U.S. 358 (1990) ............................................................................................ 8

Soucie v. Trautwein Bros., 275 Cal.App.2d 20, 28 (1969) .......................................................... 7

Syndicate 420 at Lloyd's, London v. Glacier Gen. Assurance Co.,
   604 F.Supp. 1443 (E.D. La. 1985) ........................................................................................ 5

The Cox Syndicate at Lloyds v. Labarca, 260 F.3d 3 (1st Cir. 2001) .......................................... 5

THE DANIEL BALL, 77 U.S. 557 (1871) ................................................................................. 10

The Watkins Syndicate at Lloyd's of London v. Tampa Airlines, S.A.,
   2004 U.S. Dist. LEXIS 20406 (S.D.N.Y. 2004) ................................................................... 5

United States v. Matson Navigation Co., 201 F.2d 610 (9th Cir. 1953) ...................................... 9

United States v. Reliable Transfer Co., 421 U.S. 397, 409 (1975) .............................................. 6

**Statutes**

28 U.S.C. § 1332(a)(2) .................................................................................................................. 1

28 U.S.C. § 1332(c)(1) .................................................................................................................. 2

46 U.S.C. § 688 .............................................................................................................................. 8

46 U.S.C. § 740 .............................................................................................................................. 9

**Other Authorities**

Charles A. Wright, Arthur R. Miller and
   Mary Kay Kane, 7C Federal Practice and Procedure 223 (1986) ........................................ 5

**Rules**

Fed.R.Civ.P. 17(b) ........................................................................................................................ 3

## I. DEFENDANTS HAVE SUBMITTED NO EVIDENCE WHICH CALLS INTO QUESTION THE EXISTENCE OF SUBJECT MATTER JURISDICTION

Defendants' Brief has created a fiction involving Lloyds syndicates like those of the 1980's, allegedly composed of individual human beings called "Names".[1] In fact, there are no individual Names here: Plaintiff consists solely of three English corporations.

### A. Plaintiff's Proof Of Complete Diversity Is Uncontradicted

The Declaration of Graeme Sprowson clearly shows what the Plaintiff syndicate was (and is) comprised of: In 2003, when the original Complaint herein was filed, the syndicate consisted of three corporations only, all incorporated and with their sole places of business in the United Kingdom: QBE Corporate Limited, Limit (No. 2) Limited, and Limit (No. 3) Limited.[2] This fact is uncontroverted.[3]

The original plaintiff herein, Leslie Wilton, is a citizen, domiciliary and resident of the United Kingdom.[4] Plaintiff syndicate is an unincorporated association consisting of three U.K. corporations.[5] At the time this case was first filed, there was complete diversity; Wilton was a citizen, domiciliary and resident of the United Kingdom, and the Defendants were one California and one Guam corporation. Now, under the First Amended Complaint, complete diversity still exists.[6] See, 28 U.S.C. § 1332(a)(2).

---

[1] As even the cases cited by Defendants make clear, "Names" are not corporations. They are individuals, who in prior years were members of Lloyd's syndicates, and provided its underwriting capacity. Certain Interested Underwriters at Lloyds, London, England v. Layne, 26 F.3d 39, 42 (6th Cir. 1994).

[2] Declaration of Graeme Sprowson, filed herein (hereinafter the "Sprowson Decl."), ¶¶ 6,7. That was all there was to the syndicate. "There were no individuals (commonly called 'Names') who were members of the syndicate for any year from 2001 onward." Sprowson Decl., ¶ 4. Defendants make the amazing statement at pp. 10-11 of their Brief that "... we are not told who were members of the Syndicate (only that 'no individuals' were among them), or even who provided the 'financial backing'". It seems that Defendants did not read the Sprowson Decl.. Also, had they chosen to do any discovery, Defendants would have learned these facts long before now.

[3] Defendants took the deposition of Plaintiff's representative Mr. Peter MacLeod for two full days in Guam, but surprisingly, none of the attorneys present ever asked him any questions about the syndicate or what comprises it. Likewise no Defendant ever addressed any discovery to Plaintiff on this issue.

[4] Declaration of Leslie Wilton, filed herewith (hereinafter the "Wilton Decl."), ¶ 1.

[5] Sprowson Decl., ¶¶ 6,7.

[6] Plaintiff is a syndicate consisting of three U.K. corporations, there are no individual members of Plaintiff, and the Defendants are one California and two Guam corporations. Plaintiff's claims, which exceed $6 million, greatly exceed the amount in controversy requirement of $75,000.

## B. Defendants' Effort To Bring Non-Parties Into The Lawsuit, To Defeat Diversity Jurisdiction, Must Fail

Since complete diversity exists, Defendants are forced to attempt legal sleight of hand. Defendants' Brief, while citing no controlling Ninth Circuit authority,[7] attempts to convince this Court that diversity must be decided based on the citizenship of unknown individuals who are not parties to this litigation, and, in this case, do not even exist. Defendants' efforts at revising history must fail.

Like the plaintiff[8] in Corfield v. Dallas Glen Hills LP, 355 F.3d 853 (5th Cir. 2003), Plaintiff here consists solely of three U.K. corporations and therefore also has U.K. citizenship.[9] When faced with the same argument Defendants are making herein, the Fifth Circuit in Dallas Glen Hills decided that "The other subscribing Names are not parties before the Court and their citizenship need not be considered when determining whether the parties are completely diverse." 355 F.3d at 866.[10]

Most of the cases cited by Defendants which discuss individual "Names" can safely be ignored; there are no Names. Defendants' request that this Court base its decision on non-existent, allegedly non-diverse individuals is ridiculous. Although inartfully drafted, Defendants' Brief appears to argue that the citizenship of the members of all the following syndicates involved in the policy (which syndicates are not parties to this litigation) should be considered. No case has ever so held when a single syndicate is the plaintiff.[11]

---

[7] There being no Ninth Circuit rule, this Court should find the recent decision of Dallas Glen Hills, *infra*, more persuasive than the trial court decisions from Maine and New York which Defendants have cited.

[8] Liberty Syndicate 190, a British corporation incorporated, domiciled and with its principal place of business in the United Kingdom (355 F.3d at 859).

[9] A corporation is a citizen of any state in which it has been incorporated, and of the state where it has its principal place of business. 28 U.S.C. § 1332(c)(1). Plaintiff, consisting solely of three U.K. corporations, enjoys their citizenship.

[10] The Fifth Circuit reversed the dismissal (for lack of subject matter jurisdiction) which had been entered by the court below. Accord, Certain Interested Underwriters at Lloyd's, London, England v. Layne, 26 F.3d 39, 42 (6th Cir. 1994) (syndicate members other than the active underwriters are not real parties in interest and therefore may be ignored for jurisdictional purposes).

[11] Even Indiana Gas Co. v. Home Ins. Co., 141 F.3d 314 (7th Cir. 1998), a short decision (regarding a petition for rehearing) upon which Defendants primarily rely, does not hold that all members of all syndicates must be lumped together into one plaintiff "megasyndicate" for purposes of diversity jurisdiction, when the plaintiff

4834-5871-6672.1.055639-00001                                   2.
Case 1:03-cv-00009   Document 143   Filed 02/11/2005   Page 6 of 15

As the Third Circuit noted in another case relied on by Defendants, <u>Chemical Leaman Tank Lines, Inc. v. Aetna Cas. and Sur. Co.</u>, 177 F.3d 210, 223 (3ᵈ Cir. 1999), "... While the absent Names would be proper parties to the suit, they are not necessary parties." Even if there were individual Names, they are not parties here, and "The citizenship of one who has an interest in the lawsuit but who has not been made a party to the lawsuit ... cannot be used ... to defeat diversity jurisdiction." <u>Dallas Glen Hills</u>, *supra*, 355 F.3d at 864-865, citing <u>Chemical Leaman</u>, *supra*, 177 F.3d at 223.[12]

Under Lloyd's Rules and the terms of the policy of insurance, the following syndicates are bound by the acts of the lead syndicate.[13] However,

---

syndicate is an interested party and not merely a representative. Rather, <u>Indiana Gas</u> held that:

> Indiana Gas [the plaintiff and policyholder] does not have claims against the lead underwriters ... It has claims against the underwriters of the policies of insurance, which is to say the syndicates as entities.

141 F.3d at 321-322. In fact, <u>Indiana Gas</u> actually supports Plaintiff's position here, given the alignment of parties in this case. <u>Indiana Gas</u> notes that "Plaintiffs have several ways to bring partnerships and other unincorporated associations into litigation [such as] ... suing one member of the association as representative of the others, and suing one partner as an individual while allowing that partner to seek indemnity from others." *Id.*, at 321.

Since the Court in <u>Indiana Gas</u> would allow litigation to go forward as a suit **against one** representative underwriter, it presumably would allow one representative underwriter (or syndicate) to also be the plaintiff (as is the case here). The Seventh Circuit noted that "... Fed.R.Civ.P. 17(b) permits suit against the syndicates through their lead underwriters, because the law of the United Kingdom permits the lead underwriters to represent the other names' interests – indeed, English law forbids suits by insureds directly against the names." *Id.* Again, what is proper with an underwriter defendant should work for an underwriter plaintiff just as well.

[12] <u>Chemical Leaman</u> properly points out that the only claims before the Court in a case against a Lloyds' underwriter are claims against him in his individual capacity. 177 F.3d at 222. The rationale of <u>Chemical Leaman</u> is even more persuasive when Lloyd's syndicates are bringing claims, as opposed to defending against them.

Plaintiff believes that it is authorized, by the cases it has cited and the Federal Rules, to proceed as the Plaintiff in this case in its representative capacity. However, should the Court feel that Plaintiff's representative status presents a problem with regard to subject matter jurisdiction, Plaintiff hereby offers to amend its Complaint to delete reference to its representative capacity, and continue as the Plaintiff only in its individual capacity. The Court approved this very dismissal in <u>Squibb II</u>, cited by Defendants (<u>E.R. Squibb & Sons v. Lloyd's & Cos.</u>, 241 F.3d 154, 161-162 (2ᵈ Cir. 2001) ("... the district court found that ... dismissing the suit against either Haycock or Merrett [the representative defendant underwriters] in their representative capacity would not result in the dismissal of indispensable parties ... We now ratify the district court's conclusion that subject matter jurisdiction over this suit can be established."). Of course, "... amendments to cure subject matter jurisdiction relate back." *Id.* at 163. Plaintiff is planning to make a motion for leave to amend its Complaint in any case, to clarify and state certain claims authorized by new law which was recently handed down.

[13] Wilton Decl., ¶ 4; <u>E.R. Squibb & Sons v. Accident & Cas. Ins. Co.</u>, 160 F.3d 925, 929 (2ᵈ Cir. 1998) (a case cited by Defendants, and hereinafter "<u>Squibb I</u>") ("When litigation over a Lloyd's policy occurs, only one Name ... is ordinarily sued. Nevertheless, all the Names subscribing to that policy are liable for their several shares

> The fact that the Names' contracts with the insured and the rules of Lloyds are structured such that the other Names are affected by the judgment against a single Name does not bring those other parties before the court or make them relevant for the citizenship determination.

Dallas Glen Hills, *supra*, 355 F.3d at 864. The active underwriter acts for the others in insurance matters; thus under F.R.C.P. 17(a) he is the real party in interest.

The fact that plaintiff here is a representative is no impediment to diversity jurisdiction. Dallas Glen Hills, 355 F.3d at 865, citing Aetna Cas. & Sur. Co. v. Iso-Tex, Inc., 75 F.3d 216 (5th Cir. 1996). The Layne case, *supra*, n.10, cited by Defendants, holds that a suit brought by the plaintiff lead underwriters only, as representatives of the members of their syndicates, is appropriate as long as the underwriters establish their British citizenship. *Id.*, 26 F.3d at 40, 44.[14]

While Defendants cite Squibb I for other purposes, they overlook its discussion of F.R.C.P. 23.2, which specifically authorizes[15] recharacterizing Plaintiff's suit herein as one on behalf of a representative[16] of the class of syndicates which insured the Port Authority of Guam, in order to preserve subject matter jurisdiction.[17] Taken as an entity under Rule 23.2, all the Lloyd's syndicates would

---

of any adverse judgment against the Lloyd's underwriters.")

[14] Here, Plaintiff has established the British citizenship of the three members of the Plaintiff syndicate, and therefore diversity jurisdiction has been established. It of course makes no difference to the Defendants whether they are being sued by one entity or ten for the same losses; under the Rules of Lloyds, Plaintiff's recovery against the Defendants herein will be shared by all of the syndicates according to their respective percentages. Wilton Decl., ¶ 4. Any concerns which some courts seem to have had in the past regarding collectibility of a judgment, when suit is brought **against** Lloyds' Underwriters, are irrelevant here when a Lloyd's syndicate is the plaintiff.

[15] The Court in that case felt that recharacterization should only be a last resort, 160 F.3d at 935, to be taken to save diversity jurisdiction only if no other mechanism were available, because the jurisdictional amount issue presented "substantive" difficulties in that case, *Id*. Fortunately, such problems are absent here.

[16] There of course can be no question of Plaintiff not fairly and adequately protecting the interests of the following underwriters, since pursuant to Lloyd's Regulations, the following underwriters are obliged to, and in fact did (and do), follow the actions taken by the lead syndicate; the recovery herein will be shared with the followers according to their respective percentages. Wilton Decl., ¶ 4.

[17] Rule 23.2 provides that:

> An action brought by or against the members of an unincorporated association as a class by naming certain members as representative parties may be maintained only if it appears that the representative parties will fairly and

constitute a U.K. entity which is diverse from all of the Defendants.

Defendants apparently overlook, and never mention, the illustrative cases (there are many others) noted by Plaintiff in its Opening Brief wherein Lloyds' syndicates were allowed to sue or be sued in their own name.[18] These cases, and others Plaintiff previously cited, clearly show that this case, as pled, is properly before this Court in diversity.

## II. THIS COURT HAS ADMIRALTY JURISDICTION AS WELL

Defendants' Brief discusses a mixture of maritime tort and contract cases, as if the U.S. Supreme Court had not made the proper analysis clear.

### A. Defendants Have Pointed To No Cases Disputing Admiralty Jurisdiction Over This Maritime Breach of Contract Case

It is telling that Defendants could find no case, other than the Pier 39[19] insurance declaratory judgment decision they had previously cited, to suggest that damage to Guam's major marine oil shipping terminal stemming from breach of contract, is not within this Court's admiralty jurisdiction. The Court in Pier 39 held that it did not have admiralty jurisdiction over an insurance dispute involving alleged concealment and misrepresentations concerning insurance for a breakwater in front of a series of restaurants and t-shirt shops in San Francisco.[20] 738 F.2d at 1038. The same Court would decide very differently this case involving damage to the deep-water marine oil terminal through which most of

---

adequately protect the interests of the association and its members.

Furthermore, the Advisory Committee Notes to this Rule, 1966 edition, inform us that "... the real or main purpose of this characterization has been to give 'entity treatment' to the association ...".[17] Accord, Charles A. Wright, Arthur R. Miller and Mary Kay Kane, 7C Federal Practice and Procedure 223 (1986) ("The Advisory Committee Note to Rule 23.2 ... lends support to the view that Rule 23.2 is a procedural device that provides a supplementary method for unincorporated associations to litigate in a federal court ...").

[18] Suit allowed by the First Circuit (The Cox Syndicate at Lloyds v. Labarca, 260 F.3d 3 (1st Cir. 2001)); the Seventh Circuit (Colip v. Clare, 26 F.3d 712 (7th Cir. 1994) (diversity case); Certain Underwriters of Lloyds v. General Accident Ins. Co., 909 F.2d 228 (7th Cir. 1990) (diversity case)); the Southern District of New York (The Watkins Syndicate at Lloyd's of London v. Tampa Airlines, S.A., 2004 U.S. Dist. LEXIS 20406 (S.D.N.Y. 2004)); and the Eastern District of Louisiana (Syndicate 420 at Lloyd's, London v. Glacier Gen. Assurance Co., 604 F.Supp. 1443 (E.D. La. 1985))

[19] Royal Ins. Co. of Am. v. Pier 39 Limited Partnership, 738 F.2d 1035 (9th Cir. 1984).

[20] It was critical to the Court's decision that, unlike here, in Pier 39 "... no related tort has been alleged." As is discussed in detail at Section II.B., *infra*, Plaintiff here alleges various maritime torts.

Guam's energy is imported.[21]

Defendants appear surprised that Plaintiff would suggest that <u>Norfolk Southern Railway Co. v. James N. Kirby, PTY Ltd.</u>, ___ U.S. ___, 125 S.Ct. 385, 2004 U.S. LEXIS 7510 (2004), holds that there is admiralty jurisdiction over a train wreck. Plaintiff did not make that ruling up; that is exactly what the U.S. Supreme Court said.[22] Decision, at 9. "To ascertain whether a contract is a maritime one, we cannot look to whether a ship or other vessel was involved ...". Decision, at 18. The true criterion is whether the contract has reference to maritime service or maritime transactions. Decision, at 19.

The contracts involved herein to repair, design and supervise the repairs of a marine oil terminal are clearly maritime contracts. As the Ninth Circuit noted in <u>Aqua-Marine Constructors, Inc. v. Banks</u>, 110 F.3d 663 (9th Cir. 1997), <u>cert.</u> denied, 522 U.S. 933 (1997), a case cited by Plaintiff and ignored by Defendants, such contracts are maritime if they relate to a ship, "... **or to commerce or to navigation on navigable waters, or to transportation by sea, or to maritime employment.**" *Id.*, at 670-671 (emphasis added). There, the Ninth Circuit found the necessary relationship to commerce. There was admiralty jurisdiction over a surety bond (not itself a contract requiring maritime activity), which guaranteed performance under another (maritime) contract. The dolphin repair contracts at issue here are far more "maritime" than a performance bond.[23]

Defendants are even wider of the mark when they attempt to distinguish the maritime contract

---

[21] Indeed, the Ninth Circuit reached the opposite conclusion to that reached in <u>Pier 39</u>, in one of the breach of contract cases cited by Defendants, <u>La Reunion Francaise SA v. Barnes</u>, 247 F.3d 1022 (9th Cir. 2001). In that case, the trial court had refused to exercise admiralty jurisdiction over an insurance declaratory judgment action, but the Ninth Circuit reversed and found that there was admiralty jurisdiction over the insurance contract, even though it covered on-land storage. That 2001 case reflects the contemporary, broader view of admiralty jurisdiction delineated by the U.S. Supreme Court over the last decade.

Defendants never discussed this trend in Supreme Court jurisprudence at all, which stems from the fact that admiralty law is largely judge-made. <u>United States v. Reliable Transfer Co.</u>, 421 U.S. 397, 409 (1975).

[22] Even though the cargo in question in that case had to travel hundreds of miles overland by train, there was still admiralty jurisdiction over the bill of lading (contract), which also involved a substantial sea voyage.

[23] It is clear that a contract to use a pier or wharf is a maritime contract. <u>Ex Parte Easton</u>, 95 U.S. 68, 75-76 (1877): "... wharves, piers, or landing-places are wellnigh as essential to commerce as ships and vessels ... the contract for wharfage is a maritime contract ...". *Id.* If a contract to use a pier or wharf is maritime, a contract to repair one logically must also be maritime, since the only use for such facilities is to foster maritime commerce.

cases Plaintiff cited, which are themselves cited by the Ninth Circuit in Pier 39.[24] Defendants attempt to dismiss those as cases wherein "traditional maritime torts have occurred".[25] Defendants' Brief at 15. In fact, each of those is a **contract**, not a tort case.[26]

### B. Plaintiff's Maritime Tort Claims Are Within Admiralty Jurisdiction

Defendants cannot distinguish Grubart v. Great Lakes Dredge & Dock Co., 513 U.S. 527 (1995). Grubart holds that there is admiralty jurisdiction over a suit "... claiming that in the course of replacing [dolphin] pilings Great Lakes had negligently weakened the tunnel structure [under a river], which Chicago (its owner) had not properly maintained." 513 U.S. at 530. Defendants deliberately misstate the facts of Grubart: "... a barge being towed by a tug on the Chicago River was engaged in a removal of pilings when it damaged a tunnel under the river ...". Defendants' Brief at 13-14. Although a tug and two barges had previously been involved in replacing the pilings of the dolphins, 513 U.S. at 530, they were long gone at the time the damage occurred **seven months later**. Id. The Court nowhere stated that the existence of admiralty jurisdiction was predicated solely upon the involvement of a vessel or vessels.[27] What is required is that a party seeking to invoke admiralty jurisdiction[28] over a tort claim "... must

---

[24]   Berwind-White Coal Mining Co. v. City of New York, 135 F.2d 443 (2d Cir. 1943); Eastern Mass. St. R. Co. v. Transmarine Corp., 42 F.2d 58 (1st Cir. 1930); and D.M. Picton & Co. v. Eastes, 160 F.2d 189 (5th Cir. 1947), cert. denied, 331 U.S. 859 (1947).

[25]   Plaintiff wonders why? Torts occurred in the instant case as well. This is no distinction.

[26]   Picton and Berwind-White Coal involved contracts to remove piles from the seabed; the allegation was that the contracts had been breached. The contracts were held to be maritime. 160 F.2d at 190; 135 F.2d at 447. Likewise, Eastern Mass. St. R. involved breach of a maritime contract (like those herein) to maintain a safe berth for ships, 42 F.2d at 62, which claim fell within admiralty jurisdiction.

[27]   Even if the direct involvement of a vessel was required (and in Grubart there was a seven month separation between cause and effect), Plaintiff has carried that burden. Defendants here (as in Grubart) performed a significant part of the repair work on the pilings from barges, from workboats and by using underwater divers. See Plaintiff's Brief In Response To Order To Show Cause Re: Subject Matter Jurisdiction, p. 9. Defendants have not disputed this. As the cases discussed in Grubart at p. 540 clearly show, there is admiralty jurisdiction over repair or maintenance work on piles, piers, bulkheads and docks performed using barges and other vessels, so long as the piles are located in navigable waters. In fact, employees who do such work from barges and boats are Jones Act seamen. Soucie v. Trautwein Bros., 275 Cal.App.2d 20, 28 (1969).

[28]   It is important to remember that the standard to be applied here is not the summary judgment standard, and that Plaintiff need not definitely **prove** what happened, in order to establish the Court's admiralty jurisdiction over its claims. It need only properly **plead** a claim which sounds admiralty. Grubart, 513 U.S. at 529 ("Allegedly, the

satisfy conditions both of location and of connection with maritime activity", *Id.*, at 534, and show that the incident causing the harm was likely (as it was here) to disrupt maritime commercial activity. *Id.*

Defendants' attempt to distinguish Sisson v. Ruby, 497 U.S. 358 (1990), is disingenuous. Defendants erroneously characterize the Sisson case as "... a tort case in which a pleasure boat caught fire in navigable waters and damaged other vessels." Defendants' Brief at 17. In reality, the crucial facts of Sisson are that a fire erupted in a washer-dryer on a private yacht, spread to several other vessels, and then spread to the **marina** itself. *Id.*, at 360. It is doubtful that a fire in a washer-dryer on a private yacht would have received the attention of the U.S. Supreme Court had the fire not done serious damage to the marina. "The jurisdictional inquiry does not turn on the *actual* effects on maritime commerce of the fire on Sisson's vessel ... Rather, a court must assess the general features of the type of incident involved to determine whether such an incident is likely to disrupt commercial activity." *Id.*, at 363.[29] Following Sisson, it cannot be disputed that, had the concrete caps of the dolphins fallen into Apra Harbor at Guam (which very nearly happened), maritime commerce would have been severely disrupted[30] for months or years.

The only cases cited by Defendants, which were not cited in Plaintiff's Opening Brief, do not help them. Kathriner v. Unisea, Inc., 975 F.2d 657 (9th Cir. 1992), is irrelevant, since it is a Jones Act[31] personal injury case. As was seen in Section II.A., *supra*, La Reunion Francaise found admiralty

---

flooding resulted from events several months earlier ..."). The Supreme Court's decision in Grubart never decides who or what caused the tunnel to flood. "The issue before us is whether a court of the United States has admiralty jurisdiction to **determine** and limit the extent of Great Lakes's tort liability." *Id.* (Emphasis added.)

[29] The Court found that there clearly was a potential to disrupt commercial maritime activity because the fire spread to the wooden floats and piers of the marina. Of course, "The federal interest in protecting maritime commerce cannot be adequately served if admiralty jurisdiction is restricted to those individuals actually *engaged* in commercial maritime activity." Foremost Ins. Co. v. Richardson, 457 U.S. 668, 674-675 (1982). Rather, the **potentially** disruptive impact on maritime commerce must be assessed. *Id.*, at 675.

[30] Indeed, all marine transportation of LPG to the island would have ceased, and the importation of gasoline, fuel oil and other refined petroleum products would have been drastically reduced. Booth Decl., Exhibit C.

[31] To bring a Jones Act claim, an individual must be employed as a **seaman**, 46 U.S.C. § 688, on a **vessel in navigation**, McDermott Int'l v. Wilander, 498 U.S. 337, 354 (1991). The floating fish processing plant involved in Kathriner, known as the UNISEA, was held not to be a vessel in navigation, and accordingly no Jones Act claim could lie. Kathriner says nothing about dolphins, caps and pilings.

jurisdiction over an insurance declaratory judgment action. Thus it supports Plaintiff's, not Defendants', position. It is also telling that Defendants could not distinguish, and therefore were forced to ignore, four tort cases[32] relied upon by Plaintiff (two of them issued by the Ninth Circuit).

Plaintiff's having pointed out the existence of 46 U.S.C. § 740[33] appears to have thrown confusion into the Defendants' ranks. They cannot now decide whether tort damage to the pier in Guam was caused by the docking of ships, as they and their experts have alleged, or not. On the one hand, Defendants in their Brief state that "No vessel is even involved in this case."[34] So much for Defendants' experts' theory. However, Defendants' attorneys also argue the **opposite**. They would like to have it both ways, since they admit that "... the defendants contend, as a defense,[35] that the dock damage in this case occurred due to [ship] berthing incidents ...". Defendants' Brief at 16.

If, as Defendants state, "... it is absolutely clear that the injury here did not occur on navigable waters[36] nor was it caused by a vessel on navigable water", Defendants' Brief, pp. 14-15, then Plaintiff's

---

[32] In Duncanson-Harrelson Co. v. Director, 644 F.2d 827 (9th Cir. 1981), the Court held that an individual injured while constructing a dolphin, which the Court held served an essential maritime purpose, was engaged in maritime employment. Id., at 830. If the work of constructing a dolphin is marine employment, the item constructed must itself be within maritime jurisdiction. Likewise, in United States v. Matson Navigation Co., 201 F.2d 610 (9th Cir. 1953), the Court held that damage to wooden pilings which constituted a dike was a claim within admiralty jurisdiction. Id., at 618. The Court reached a similar result in Pederson v. Powell-Duffryn Terminals, Inc., 34 F.Supp.2d 915 (D.N.J. 1999), wherein a diver was injured during underwater construction work on the piles for a pier. Id., at 919. The Court held that this work had a substantial relationship to traditional maritime activity and therefore there was maritime jurisdiction. Id. Finally, the Eleventh Circuit reiterated that no **actual** disruption of maritime commerce needs to occur for a claim to fall within admiralty jurisdiction; the potential for disruption is sufficient. Bunge Corp. v. Freeport Marine Repair, Inc., 240 F.3d 919, 924 (11th Cir. 2001).

[33] The Extension Of Admiralty Jurisdiction Act.

[34] Defendants' Brief at 16. Likewise, in their Conclusion, Defendants state that "... the injury occurred on land and was not caused by a vessel on navigable waters." Defendants' Brief at 18.

[35] Plaintiff is frankly puzzled by what this statement is supposed to mean; are Defendants conceding that this is not really their position, since it was only posited "as a defense"? Defendants' attorneys have certainly asserted the position, loud and long. See, the questions to and testimony of Black's Assistant General Superintendent, Joselito Gutierrez; Supplemental Declaration of Forrest Booth, filed herewith, Exhibit N. (Mr. Gutierrez did not recall any ship damage incidents because the contemporaneous evidence suggests that they never happened. But if they did, then the work the Defendants did and their design were not strong enough; this Court has jurisdiction over such property damage claims pursuant to 46 U.S.C. § 740.)

[36] There can be no doubt that the dolphins involved in this case are located in navigable waters. Those waters allow oil tankers displacing 100,000 tons and more to maneuver alongside and moor to the dolphins. The definition of navigable waters is, of course, well settled by U.S. Supreme Court authority, beginning with the seminal case of

task herein has been simplified considerably;[37] Defendants have no alternative causation theory left.

## III. CONCLUSION

Plaintiff has demonstrated that complete diversity exists; furthermore, its claims properly sound in admiralty. Defendants have failed to provide any reason or authority why either Plaintiff's breach of contract or tort claims fall outside of admiralty jurisdiction. This Court therefore has an obligation to protect maritime commerce by the appropriate exercise of its admiralty jurisdiction.[38]

DATED: Hagåtña, Guam, February 11, 2005.

CARLSMITH BALL LLP

_/s/ David Ledger_
DAVID LEDGER
ELYZE McDONALD
Attorneys for Plaintiff
S.J. Gargrave Syndicate at Lloyds

---

THE DANIEL BALL, 77 U.S. 557 (1871). The Supreme Court set forth the test for navigability (in that case, with regard to rivers):

> ... they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. And they constitute navigable waters of the United States ... when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries ....

_Id._, at 441-442. The Shell F-1 dolphins are not a wharf which is an extension of the land; they were installed offshore in deep water, to allow deep-draft ships to pull alongside them. See photographs attached as Exhibits B1, B2, B3 and B7 to the Declaration of Forrest Booth (hereinafter the "Booth Decl."), filed herewith. The 35-foot deep waters of Apra Harbor, into which the subject piles were driven, are unquestionably navigable waters. Defendants' statement that the injury here did not occur on navigable waters, Defendants' Brief at 14-15, is simply wrong.

[37] The trial in this matter will now be solely about the failure, during the 2001 earthquake, of the repairs done by Black, based upon Winzler & Kelly's defective design and EMPSCO's erroneous approval thereof.

[38] Foremost Ins. Co., _supra_, n.29, 457 U.S. at 674.

## DECLARATION OF SERVICE

I, David Ledger, hereby declare under penalty of perjury of the laws of the United States, that on February 11, 2005, I will cause to be served, via hand delivery, a true and correct copy of PLAINTIFF'S REPLY BRIEF IN RESPONSE TO ORDER TO SHOW CAUSE RE: SUBJECT MATTER JURISDICTION upon Defendants Counsel of record as follows:

> Robert J. O'Connor, Esq.
> Daniel J. Berman, Esq.
> Berman O'Connor Mann & Shklov
> Suite 503, Bank of Guam Building
> 111 Chalan Santo Papa
> Hagåtña, Guam 96910
>
> Thomas C. Sterling, Esq.
> Klemm Blair Sterling & Johnson, P.C.
> Suite 1008, Pacific News Building
> 238 Archbishop Flores Street
> Hagåtña, Guam 96910

and

> Thomas M. Tarpley, Esq.
> Law Offices of Tarpley & Moroni, LLP
> Suite 402, Bank of Hawaii Building
> 134 West Soledad Avenue
> Hagåtña, Guam 96910

Executed this 11th day of February, 2005 at Hagåtña, Guam.

_____
DAVID LEDGER