FILED

DISTRICT COURT OF GUAM

APR 1- 8 2005

MARY L.M. MORAN
CLERK OF COURT

142

DISTRICT COURT OF GUAM

TERRITORY OF GUAM

S.J. GARGRAVE SYNDICATE AT LLOYDS,

        Plaintiff,

        vs.

BLACK CONSTRUCTION CORPORATION,
WINZLER & KELLY, and ENGINEERING
MANAGEMENT & PLANNING SERVICES
CORPORATION,

        Defendants.

Civil Case No. 03-00009

ORDER

    This matter is before the Court on the following motions: 1) Defendant, Black Construction Corporation's Motion for Partial Summary Judgment, or Alternatively, to Dismiss; 2) Defendant, Winzler & Kelly's Motion for Judgment on the Pleadings, on Ninth Cause of Action; 3) Defendant, Winzler & Kelly's Motion for Judgment on the Pleadings, on Second Cause of Action; 4) Defendant, Winzler & Kelly's Motion for Judgment on the Pleadings, on Fifth Cause of Action; 5) Defendant, Engineering, Management, & Planning Services Corporation for Summary Judgment and for Judgment on the Pleadings. After hearing argument from counsel and reviewing the parties' submissions, as well as relevant caselaw and authority, the Court hereby memorializes the bases for its rulings herein.

**ORIGINAL**

## BACKGROUND

This case concerns the plaintiff's, S.J. Gargrave Syndicate Lloyds ("plaintiff") subrogation claim against the defendants, Black Construction Corporation ("Black"), Winzler & Kelly Consulting Engineers ("Winzler & Kelly") and Engineering, Management & Planning Services Corporation ("EMPSCO") after satisfying a claim by its insured, the Port Authority of Guam ("Port"). The Port is a municipal corporation, which owns and operates piers, wharves, marinas, dolphins[1] and other structures located in the port of Guam, which service and accommodate maritime trade and commerce. The plaintiff is subrogated to the Port's rights to recover property damages allegedly caused by the defective construction and design work performed by the defendants. See First Amended Complaint at ¶ 16.

In August of 1993, Guam suffered a severe earthquake, estimated to be a magnitude of 8.1. See First Amended Complaint at ¶ 7. The earthquake did severe damage to a number of the Port's piers, docks, dolphins and other Port facilities and property. Id. The Port employed defendant, EMPSCO as its engineering consultant to provide engineering consulting services for the repair work. See First Amended Complaint at ¶ 8. EMPSCO drafted the original design for the repair project. Id. In 1996, Black entered into a written contract with the Port with a substantial change of design to renovate the dolphins at the Port's Foxtrot Pier. Id., Ex. A attached thereto. The original scope of work as designed by EMPSCO included the refurbishing of the pilings and the reattachment of the pilings to the underside of pile caps:

> To repair the dolphin piles the Port Authority of Guam proposed to encase the top of the pile tube from the deck to 1.52 m (5 feet) below mean low water with 178 mm (7 inches) of reinforced concrete. The main reinforcing was to be eight 25 mm (1 inch) bars which were to be grouted 500 mm (20 inches) into holes drilled in the underside of the deck. Assuming the development length of the bars into the underside of the deck was adequate this connection would be similar in strength to the pre 1993 connection. For reasons of time and cost this repair proposal was replaced with one

---

[1] A dolphin is a group of piles driven close together and placed to protect piers or docks to possible damage by collision with the water or marine traffic. There are two types of dolphins, berthing dolphins and mooring dolphins. Berthing dolphins are adjacent to the pier and the vessels tie up against these dolphins whereas the mooring dolphins are farther away from the dock and the mooring vessels attach to those dolphins by mooring lines.

2

1
2
3

which required the top 4.57 m (15 feet) of the pile to be replaced with a similar sized tube . . . The top connection to the concrete deck was by eight 3/4 inch diameter Grade 304 stainless steel bolts through a flange welded to the top of the tube extension and epoxy grouted 170 mm (6 3/4 inches) into the deck.

4 See O'Connor Decl., Ex. B, (OCEL Report) attached thereto.

5          However, the cost of repairs pursuant to EMPSCO's design exceeded the Port's financial

6 means. First Amended Complaint at ¶ 8. So, Black Construction engaged the services of the

7 defendant, Winzler & Kelly to provide an alternative design for the piling to pile cap connections.

8 Allegedly, the Winzler & Kelly design was then used for that portion of the work. Black

9 Construction completed the project in 1997. "Upon completion, Defendants, Black Construction

10 and EMPSCO represented and warranted to the Port Authority that the work was adequate, had

11 been properly performed, and was appropriate and strong enough for an earthquake-prone and

12 typhoon-prone location such as Guam." Id. at ¶ 14.

13          On or about October 13, 2001, an earthquake struck Guam and damaged the Port's

14 property. The Port's facilities and structures were insured under a property policy issued by the

15 plaintiff. See Sterling Aff. (Docket No. 61), Ex. C, attached thereto. The Port made a claim

16 against the plaintiff. Thereafter, the plaintiff retained the services of Mr. Peter MacLeod ("Mr.

17 MacLeod") to investigate and adjust the claim. Id., Ex. H2-3 attached thereto. Mr. MacLeod

18 investigated the matter and concluded that the dolphins had been defectively designed and

19 constructed as many of the pilings supporting the pile caps had come loose due to what Mr.

20 MacLeod identified as failure of the epoxy bolts. Id., Ex. H4, attached thereto. Of the 216 bolts

21 Black Construction installed in dolphin A, only 2 remained undisturbed after the earthquake. See

22 Tarpley Decl., Ex.1, attached thereto.

23          The Port's total claim against its insurance policy was for approximately $14,000,000 which

24 included damages for a number of facilities and structures other than Foxtrot Pier and its dolphins,

25 which are the subject of this lawsuit. See Sterling Aff. (Docket No. 61), Ex. D, attached thereto.

26 Mr. MacLeod arranged for the "temporary repair" of the dolphins which involved the reattachment

27 of 26 of the pilings to the pile caps for which Lloyds paid a total of $523,135.12 to Smithbridge

28 Construction ("Smithbridge") and others associated with the repair. See Sterling Aff. (Docket No.

3

1  61), Exs. F and H14-15, attached thereto. Smithbridge also provided a quote to repair the balance
2  of the piling to pile cap connections for $1,420,000. See Sterling Aff. (Docket No. 61), Ex. E,
3  attached thereto.

4          In or about December 2002, the plaintiff settled the Port's claim for a negotiated figure of
5  $8,000,000 minus a $500,000 deductible. Of the total settlement amount, $1,943,135.12 was
6  allocated by Mr. MacLeod to the repair of the dolphins which consisted of the Smithbridge
7  temporary repair costs and the Smithbridge estimate to complete the repair. See Sterling Aff.
8  (Docket No. 61), Ex. F. The Port executed a Loss and Subrogation Form in consideration for total
9  payments by the plaintiff of $7,500,000. Id., Ex. G, attached thereto. The plaintiff made no
10 payments for the loss of future pier rental, diminution in pier value, or anything other than the
11 repair costs. Id., Ex. H5-6, 12-13, attached thereto.

12         A First Amended Complaint was filed on December 23, 2003.[2] Therein, the plaintiff sought
13 the recovery of general damages in excess of $3 million. See First Amended Complaint.   In the
14 plaintiff's response to Black Construction's First Set of Interrogatories, the plaintiff indicated that
15 the total damages it was seeking was in the amount of $6,157,443 consisting of $1,947,443 for the
16 cost of the repairs to the dolphins, $2,000,000 for loss of future pier rental, $1,500,000 for
17 diminution in pier value, $100,000 for sue and labor, $500,000 for attorneys' fees and expert fees,
18 and $110,000 in interest. See Sterling Aff. (Docket No. 61), Ex. B, attached thereto.

19                                          **DISCUSSION**

20         Black Construction now moves for partial summary judgment or, alternatively, to dismiss

21

22         [2] The First Amended Complaint alleges the following causes of action:

23         I.      Negligent Property Damage (Against Black Construction);
24         II.     Negligent Property Damage (Against Winzler & Kelly);
           III.    Negligent Property Damage (Against EMPSCO);
25         IV.     Breach of Contract (Against Black Construction);
           V.      Breach of Contract (Against Winzler & Kelly);
26         VI.     Breach of Contract (Against EMPSCO);
27         VII.    Breach of Warranty of Workmanlike Performance (Against Black);
           VIII.   Breach of Warranty of Workmanlike Performance (Against EMPSCO); and
28         IX.     Breach of Warranty of Workmanlike Performance (Against Winzler & Kelly).

4

1  the plaintiff's First and Seventh causes of action under Federal Rule of Civil Procedure, Rule 56

2  and Rule 12 (b) and a limitation of the Plaintiff's claims in subrogation to claims for repair costs

3  for the F1 Pier Dolphins in an amount not to exceed $1,947,443.[3]  Summary judgment is

4  appropriate when the evidence, read in the light most favorable to the nonmoving party,

5  demonstrates that there is no genuine issue as to any material fact, and the moving party is entitled

6  to judgment as a matter of law. Fed. R. Civ. P. 56(c). The party opposing summary judgment

7  cannot rest on conclusory allegations, but must set forth specific facts showing that there is a

8  genuine issue for trial. Leer v. Murphy, 844 F.2d 628, 631 (9th Cir. 1988). Moreover, to defeat a

9  summary judgment motion, the nonmoving party must come forward with evidence sufficient to

10  establish the existence of any disputed element essential to that party's case, and for which that

11  party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 102 S.Ct.

12  2548 (1986).

13  Pursuant to Fed.R.Civ.P. 12(b)(6), the defendants request this Court to dismiss various

14  causes of action of the Plaintiffs' First Amended Complaint. A motion to dismiss under Rule

15  12(b)(6) must not be granted "unless it appears beyond doubt that the plaintiff can prove no set of

16  facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41,

17  45-46, 78 S. Ct. 99, 102 (1957). A motion to dismiss for failure to state a claim is viewed with

18  disfavor and is rarely granted. Gilligan v. Jamco Dev. Corp., 108 F.3d 246, 249 (9th Cir. 1997)

19  (citing Hall v. City of Santa Barbara, 833 F.2d 1270, 1274) (9th Cir. 1986), *cert. denied*, 485

20  U.S. 940, 108 S. Ct. 1120 (1988)(overruled on other grounds)). All allegations of material fact

21  must be taken as true and construed in the light most favorable to the plaintiff. Desaigoudar v.

22  Meyercord, 223 F.3d 1020, 1021 (9th Cir. 2000), *cert. denied*, 532 U.S. 1021, 121 S. Ct. 1962

23  (2001). The Court's role at this stage of the proceedings is not to evaluate the strengths or

24  weaknesses of the claims. See Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 1686 (1974).

25  Before addressing the merits of the motions, the plaintiff objects to the defendants' motions

26

27

28  [3] Both defendants EMPSCO and Winzler & Kelly join in Black Construction's motion for partial summary judgment on the limit of damages sought.

5

1 on the basis of Local Rule 7.1, which states that "[i]t shall be the responsibility of the requesting
2 party to contact the attorney for each party . . . and propose a date for oral argument. Once the
3 parties have agreed on a date for oral argument, the moving party shall clear the date with the
4 clerk." The plaintiff claims that it never agreed to the hearing date. Although plaintiff's counsel,
5 Stephen Smith stated he was "generally in agreement" with the December 3 date, it was
6 conditioned upon his first taking two depositions and obtaining approval of co-counsel. This
7 argument is unavailing to the plaintiff's position. The Agreement of Hearing Date was filed on
8 October 28, 2004. The Plaintiff took no action refuting its tacit agreement to the hearing date until
9 November 17, 2004, two days before its filings were due.

10        The defendant, EMPSCO now moves to strike the plaintiff's opposition papers because they
11 were not timely filed. Local Rule 7.1.(d) (1)(A) requires the opposing party to serve upon all
12 parties and file its opposition "not less than fourteen (14) days preceding the noticed date of oral
13 argument." The plaintiff did not serve the defendant until November 20, 2004 and did not file its
14 opposition papers until November 22, 2004 at 3:00 p.m. Although the Court notes that it could
15 disregard the plaintiff's papers on this basis, the Court recognizes that the plaintiff was only one
16 day late in its filings. Moreover, the Court prefers to look at the merits of the case. Therefore, it
17 denies EMPSCO's motion. See Local Rule 7.1.(f). However, the plaintiff is warned that should
18 it subsequently fail to adhere to the filing dates, the Court will not be as lenient the next time.

19        The plaintiff also requests a continuance of the defendants' various motions pursuant to
20 Federal Rules of Civil Procedure, Rule 56(f) claiming that it cannot properly oppose the motions
21 without taking two depositions, of Messrs. Jose and Bismonte. The Court denies the request. The
22 plaintiff has failed to indicate what it believes either deponent, Mr. Jose or Mr. Bismonte will say
23 at the depositions which would assist it in opposing the motions. Moreover, the Court notes that
24 this case was filed on March 18, 2003. The plaintiff provides no explanation as to why these two
25 depositions were not taken in the last sixteen months.

26        Defendant, Winzler & Kelly moves this Court to strike from the plaintiff's briefs
27 "background facts" which allegedly are unsubstantiated. Winzler & Kelly claim that the plaintiff
28 made up the following facts: 1) that Black Construction Corporation ("Black") entered into a

6

1  contract with Winzler & Kelly to study and assess the damages to F-1, to perform structural and
2  other engineering calculations, and to prepare plans and specifications to put the work out to bid;
3  2) that Winzler & Kelly supervised Black's repair work; and 3) that Winzler & Kelly made
4  representations to the Port at the conclusion of the repairs, concerning the adequacy of those
5  repairs. Winzler & Kelly claims that any such contract, if it exists, should have been attached as
6  an exhibit to the pleadings.

7       In reviewing the factual record made by the plaintiff in its oppositions papers, the Court
8  finds that the facts objected to by Winzler & Kelly are set forth without any supporting
9  documentation, such as a declaration, deposition excerpt, letter or memo. The Court will consider
10  only facts properly put into evidence by the pleadings. FED R. CIV. P. 56 (e). Accordingly, the
11  Court grants Winzler & Kelly's motion to strike and will ignore any "facts" set forth in the
12  plaintiff's unsworn memorandum of law. Lacey v. Lumber Mutual Fire Insurance Co., 554 F.2d
13  1204 (1 Cir., 1977); Flaherty v. Warehousemen, Garage & Service Station Employees' Local Union
14  No., 334, 574 F.2d 484 (9th Cir., 1978) (legal memoranda and oral argument are not evidence).

15       **Joint Motion for Partial Summary Judgment on the Limitation of Damages**.

16       Turning to the motions, Black Construction, joined by defendants EMPSCO and Winzler
17  & Kelly, argue that the plaintiff, as the subrogated insurer, may not recover more than it paid to
18  the Port under its policy. In this instance, Black Construction argues that it is undisputed that the
19  plaintiff paid slightly less that $2,000,000 to the Port in connection with the earthquake damage
20  to the dolphins. However, the plaintiff is seeking more than $6.1 million from Black Construction
21  and the other defendants, jointly and severally. Black Construction contends that the plaintiff is
22  not entitled to recover monies representing future pier rental, diminution in pier value, sue and
23  labor, or any other items for which it never paid the Port anything.

24       "The general rule is that an insurer, on paying a loss, is subrogated in a corresponding
25  amount to the insured's right of action against any other person responsible for the loss." Mohl v.
26  NTC of America, Inc., 564 F.Supp. 401, 403 (D. Colo. 1982). "Because subrogation does not
27  attach until the insurer has paid its insured, the insurer 'is not entitled to be subrogated to rights
28  which are held to enforce payment of other sums which remain unpaid." Colorado Farm Bureau

7

1   _Mutual Insurance Company v. CAT Continental, Inc._, 649 F.Supp. 49, 52 (D. Colo. 1986)

2   (citations omitted). The plaintiff agrees with the general rule that an insurer's right of subrogation

3   allows it to recover only the amounts the insurer has paid its insured. However, it argues that its

4   rights extend beyond the right of subrogation. As part of its settlement with the Port, the Port

5   expressly assigned all of its rights and claims arising from the October 13, 2001, earthquake to it:

6                            **LOSS AND SUBROGATION FORM**

7         THE ASSURED AGREES TO FULL SETTLEMENT FROM LLOYD'S OF
        LONDON AND LONDON COMPANIES, ROPNER INSURANCE SERVICES

8         LTD. AND AM INSURANCE in the amount of <u>Seven Million Five Hundred
        Thousand Dollars ($7,500,000.00)</u> U.S. Dollars net of the deductible in full

9         satisfaction compromise and discharge of all claims for loss and expense sustained
        to property insured under policy No: Port Authority of Guam by reason of

10        Earthquake which occurred on October 13, 2001 and in consideration of which the
        undersigned hereby assigns and transfers to the said Company each and all claims

11        and demands against any person, persons, corporation or property arising from or
        connected with such loss or damage and the said Company is subrogated in the

12        place of and to the claims and demands of the undersigned against said person,
        persons, corporation or property in the premises to the extent of the amount above

13        named.

14   <u>See</u> McDonald Decl., Ex. A, attached thereto.

15        The Court notes that the plaintiff has not cited to any case law in support of its position.

16   Instead it relies upon the language of the Loss and Subrogation Form. Upon review of the

17   assignment of rights, the Court finds that the plaintiff was subrogated in the place of the Port in

18   connection with its claims up to the amount it paid the Port, a figure of $7.5 million. The policy

19   at issue provides that the plaintiff is entitled to "be subrogated, to the extent of such payment."

20   <u>See</u> Sterling Aff. (Docket No. 61), Ex. C attached thereto. The plaintiff has not demonstrated why

21   this Court should find it has more rights than as set forth under the policy.

22           When the right of the insurer to subrogation is formalized by the
          execution of an express assignment of the claim against the

23           tortfeasor, the status of the insurer is nevertheless that of a subrogee
          rather than an assignee. The assignment adds nothing to the rights

24           vested in the surety by the doctrine of subrogation.

25   <u>Garrity v. Rural Mutual Insurance Company</u>, 253 N.W.2d 512, 516 (Wis. 1977) quoting Couch on

26   Insurance 2d § 61:105.

27        Additionally, the Court is not convinced that the plaintiff should be able to recover monies

28   from the defendants beyond what it paid to its insured as a result of the damages allegedly caused

8

by the defendants. In other words, the plaintiff should not be able to recover up to $7.5 million in damages if the defendants allegedly only caused $3 million in damages.[4] "A subrogee is entitled to indemnity only to the extent of the money actually paid to discharge the obligation." <u>Colonial Penn Insurance Co. v. Ford</u>, 172 N.J.Super. 242, 411 A.2d 736, 737 (1979).

Accordingly, the Court grants in part the motion for partial summary judgment by Black Construction, joined by the other defendants, and holds that the plaintiff's right of recovery against the defendants is limited by the extent of its payment to its insured. However, the Court will not set a figure as to that amount. The plaintiff points out in its opposition that there was damage done beyond Pier F-1 and the dolphins as a result of the movement of the pilings. The plaintiff may be able to recover damages to the extent that it made payments for those additional repairs.

### 1st Cause of Action - Negligent Property Damage (Against Black Construction) and 2nd Cause of Action - Negligent Property Damage (Against Winzler & Kelly)

Defendants, Black Construction and Winzler & Kelly also seek to dismiss Lloyds first and second causes of action for negligent property damage. The defendants argue that under the Economic Loss Doctrine, these causes of action are barred because there was no damage beyond "economic loss," *i.e.* damage to the product itself. The Economic Loss Doctrine "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract." <u>Duquesne Light Co. v. Westinghouse Elec. Corp.</u>, 66 F.3d 604, 618 (3rd Cir. 1995). In other words, a party who sustains solely economic loss for a defective product or as a result of the breach of contract, is free to sue for breach of the contract, but may not sue for the same economic harm under negligence or other tort theories. The doctrine "marks the fundamental boundary between contract law, which is designed to enforce the expectancy interests of the parties, and tort law, which imposes a duty of reasonable care and thereby encourages citizens to avoid causing physical harm to others." <u>Calloway v. City of Reno</u>, 993 P.2d 1259, 1263 (Nev. 2000).

> When a defective product accidentally causes harm to persons or property, the resulting harm is treated as personal injury or property

---

[4] The Court also notes that both the plaintiff's original and amended complaint allege that its claims are being pursued in subrogation and not on the basis of an assignment.

9

| 1 | damage. But when damage occurs to the inferior product itself, through deterioration or non-accidental cause, the harm is characterized as economic loss. In general, persons must refrain from causing personal injury and property damage to third parties, but no corresponding tort duty exists with respect to economic loss. |
| 2 | |
| 3 | |

Ellis v. Robert C. Morris, Inc., 513 A.2d 951, 954 (N.H. 1986).

The defendants argue that there is a trend among courts to apply this doctrine in order to limit an aggrieved party's remedies to contract remedies in the absence of personal injury or property damage.

In applying the Economic Loss Doctrine to bar a plaintiff's recovery in East River Steamship Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 868, 106 S.Ct. 2295, 2302 (1986), the Supreme Court held, in part, as follows:

> Obviously, damage to a product itself has certain attributes of a products liability claim. But the injury suffered - the failure of the product to function properly - is the essence of a warranty action, through which a contracting party can seek to recoup the benefit of its bargain.

However, the plaintiff argues with respect to Winzler & Kelly, the Port had no contract with them. Unlike the plaintiff in East River, there is no contract remedy that it can fall back upon for recovery. Therefore, as to Winzler & Kelly, there can be no use of the Economic Loss Doctrine to shield itself from liability in this matter. The Court disagrees. The premise of the rule enunciated in East River is that a contract action is more appropriate for recovering economic losses than is a negligence action. See The Ocean Ritz of Daytonoa Condominium v. GGV Associates, Ltd., 710 F.Supp. 447, 449 (S.D.N.Y. 1990) (holding the economic loss rule bars a negligence action in the context of a third-party beneficiary of a professional consultant's contract when the plaintiff is seeking to recover only economic losses).

The plaintiff also argues that "other property" was damaged such that the Economic Loss Doctrine would not operate to preclude recovery in tort for damages sustained in the earthquake. The U.S. Supreme Court has held that in the traditional tort property damage cases, the defective product damages other property. East River Steamship Corp., 476 U.S. 858, 867, 106 S.Ct. 2295, 2300 (1986). Contrary to the assertion of the defendants that only F-1 pier and the dolphins were damaged, the plaintiff argues that "other Port facilities and property" were damaged by the failure

10

1  of the 1996 repairs and the resulting movement of the improperly-secured pile caps. The plaintiff
2  claims in its opposition, that such damaged property included pipelines, electrical lines, water lines,
3  fire mains, catwalks, manifolds and other equipment.

4  Winzler & Kelly state that upon close review of the plaintiff's First Amended Complaint,
5  there is no mention of damage to "other property." As drafted, the First Amended Complaint,
6  states:

> Although it was substantially less powerful than the earthquake of
> 1993, this earthquake too, did damage to the property and facilities
> owned by the Port Authority. Specifically, serious damage was
> done to F pier, and the dolphins thereof, which had previously been
> repaired by Black, pursuant to the plans and specifications prepared
> by, and under the supervision of, Winzler and/or EMPSCO.

See First Amended Complaint at ¶ 15.

Although the plaintiff mentions that damage was done to "property and facilities" owned
by the Port, it does not define property to include "the piers, dolphins, pipelines, electrical lines,
water lines, fire mains, catwalks, manifolds and other equipment." In fact, it defines damaged
property specifically as "F pier and dolphins thereof." The Court agrees with the defendants, as
drafted, the plaintiff has defined what property was damaged in its complaint as the F-1 pier and
the dolphins.

The Court finds that in this case, construing the facts contained in the First Amended
Complaint as true and resolving all reasonable inferences in favor of the Plaintiff, the Plaintiff has
not sufficiently alleged a cause of action for negligent property damage. Accordingly, defendants'
motions as to the First and Second causes of action are hereby granted.[5]

### 7th 8th and 9th Causes of Action - Breach of Warranty of Workmanlike Performance

Defendants, Black Construction, Winzler & Kelly and EMPSCO move for judgment on the
pleadings as to the plaintiff's causes of action for breach of the implied warranty of workmanlike

---

[5] In light of the Court's ruling with respect to this issue, the Court finds that the Plaintiff's Request
to Dismiss or Hold Pending Motions in Abeyance filed on February 11, 2005, does not need to be set for
a hearing and is hereby Denied. The Court makes this determination based on the state of the pleadings
at this time. The Plaintiff states therein that it plans to amend its Complaint. However, an Amended
Complaint is not presently before this Court.

performance as to each of them.[6] The defendants contend that the maritime implied warranty of

[6] In its Seventh cause of action, the Plaintiff states:

> Upon information and belief, the contract between Black and the Port
> Authority of Guam ... is a maritime contract, within the meaning of Rule
> 9(h) of the Federal Rules of Civil Procedure. Accordingly, there is
> implied in said contract a warranty of workmanlike performance owed to
> the Port Authority. Black breached said warranty of workmanlike
> performance in that it performed the Project carelessly, negligently, and
> incompletely, and did not perform certain repairs at all. Said breaches of
> the warranty of workmanlike performance have directly caused damage
> and losses to Plaintiff.

In its Eighth cause of action, the Plaintiff states:

> Upon information and belief, the contract between Black and Winzler is
> a maritime contract, within the meaning of Rule 9(h) of the Federal Rules
> of Civil Procedure. Accordingly, there is implied in said contract a
> warranty of workmanlike performance owed to the Port Authority as an
> assignee and/or third-party beneficiary of said contract. Winzler breached
> said warranty of workmanlike performance by providing plans and
> specifications for the Project, which were careless, inadequate,
> insufficient, and erroneous. In addition, Winzler breached the warranty
> of workmanlike performance owed to the Port Authority as an assignee
> and/or third party beneficiary of said contract by failing to report
> deficiencies in the plans and specifications to the Port Authority. These
> breaches of the warranty of workmanlike performance by Winzler have
> directly caused damage and losses to Plaintiff.

In its Ninth cause of action, the Plaintiff states:

> Upon information and belief, the contract between Black and Winzler is
> a maritime contract, within the meaning of Rule 9(h) of the Federal Rules
> of Civil Procedure. Accordingly, there is implied in said contract a
> warranty of workmanlike performance owed to the Port Authority as an
> assignee and/or third-party beneficiary of said contract. Winzler breached
> said warranty of workmanlike performance by providing plans and
> specifications for the Project, which were careless, inadequate,
> insufficient, and erroneous. In addition, Winzler breached the warranty
> of workmanlike performance owed to the Port Authority as an assignee
> and/or third party beneficiary of said contract by failing to report
> deficiencies in the plans and specifications to the Port Authority. These
> breaches of the warranty of workmanlike performance by Winzler have
> directly caused damage and losses to Plaintiff.

12

1 workmanlike performance has been limited in the Ninth Circuit to seaman claims i nvolving
2 seaworthiness.

3    The maritime warranty of workmanlike performance was first recognized by the Supreme
4 Court in Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U.S. 124, 76 S.Ct. 232 (1956), the
5 holding of which continues to be known as the "Ryan warranty." In Ryan, a longshoreman was
6 injured on a ship by materials that had been stored there in an unsafe manner by a stevedore. The
7 longshoreman successfully brought a claim of unseaworthiness against the shipowner. The
8 shipowner then sued the stevedoring company for indemnity. The Supreme Court upheld the
9 shipowner's claim against the stevedore for indemnity holding that such a claim arises out of an
10 implied warranty of workmanlike performance inherent in the stevedore's contract with the
11 shipowner for the loading of the materials. The Court wrote that the warranty "is of the essence
12 of petitioner's stevedoring contract. It is petitioner's warranty of workmanlike service that is
13 comparable to a manufacturer's warranty of the soundness of its manufactured product." Id., 350
14 U.S. 124, 132-33, 76 S.Ct. 232, 237.[7]

15    "[T]he Ryan warranty was established to correct a particular inequity: specifically, its
16 purpose was to allow a non-negligent shipowner to recoup from a negligent contractor damages
17 the ship owner was forced to pay to the injured party." United States v. C-Way Constr. Co., 909
18 F.2d 259, 264 (7th Cir. 1990). The Ryan warranty was also important in that it recognized the
19 necessity of maintaining a ship in seaworthy condition. See, e.g., Flunker v. United States, 528
20 F.2d 2 39, 2 42 ( 9th C ir. 1 975) (the d octrine o f s eaworthiness a rises f rom r ecognition o f " the
21 dangerous character of [seamen's] work and their quasi-captive status during a voyage"); See also
22 Fairmont Shipping Corp. v. Chevron International Oil Co., 511 F.2d 1252, 1257 (2nd Cir. 1975)("it
23 is the shipowner's strict liability for unseaworthiness that rests at the heart of Ryan indeminty").

24

25    [7] The "Ryan doctrine" was apparently abrogated by the 1972 amendments to the Longshoremen's
26 and Harbor Workers' Act, 33 U.S.C. s 901 *et seq.* The Congress eliminated the application of the doctrine
of unseaworthiness to longshoremen and also the remedy of indemnification. Although these changes
27 seemed to have overruled the applicability of Ryan, the Ninth Circuit, continues to recognize the "continued
vitality of *Ryan* indemnity in seamen cases." Knight v. Alaska Trawl Fisheries, Inc., 154 F.3d 1042, 1045
28 (9th Cir. 1998).

13

1    However, the more attenuated the facts are from those as found in <u>Ryan</u>, the less
2    justification there is to apply the warranty. "We, like other circuits, have declined to extend <u>Ryan</u>
3    into varied and more far-reaching fact scenarios than it contemplated." <u>Knight v. Alaska Trawl</u>
4    <u>Fisheries, Inc.</u>, 154 F.3d 1042 (9th Cir. 1998). The Court in <u>Knight</u> held that the warranty would
5    not be implied in favor of a party other than one who owes a no-fault duty to another (such as one
6    based on seaworthiness), for which it seeks indemnity.

7    The defendants claim that the Plaintiff here is not seeking indemnity, neither is there the
8    duty of seaworthiness. <u>Davis v. Chas. Kurz & Co., Inc.</u>, 483 F.2d 184, 187 (9th Cir.1973) ("The
9    circumstance which gives rise to the implied warranty is the duty of seaworthiness owed by the
10   party seeking indemnification."). Therefore, since this case involves neither seamen, a shipowner
11   nor a request for full indemnity, the plaintiff has no right to pursue a claim against the defendants
12   on this basis. <u>Knight v. Alaska Trawl Fisheries, Inc.</u> 154 F.3d 1042 (9th Cir. 1998).

13   The plaintiff argues that the implied warranty of workmanlike performance applies in this
14   case because the parties expressly contracted for the warranty. The Construction Contract between
15   Black Construction and the Port, specifically provides that Black agrees to furnish all the ". . .
16   labor, materials, equipment, tools and services necessary to perform and complete in a
17   workmanlike manner all work required for the construction of the Project . . . " <u>See</u> First Amended
18   Complaint, Ex. A attached thereto. Additionally, Black agreed ". . . to bind every subcontractor
19   by the terms of this Contract and the contract documents." <u>Id.</u> The plaintiff argues that because
20   Black Construction bound itself and its subcontractor, Winzler & Kelly, to perform in a
21   workmanlike manner, they cannot now disavow their obligations.

22   In addition, the plaintiff relies upon Professor Thomas J. Schoenbaum's treatise <u>Admiralty</u>
23   <u>and Maritime Law</u>, and the Second Circuit decision, <u>Fairmont Shipping Corp. v. Chevron</u>
24   <u>International Oil Co.</u>, 511 F.2d 1252, 1259 (2nd Cir. 1975) for support. In <u>Fairmont Shipping</u> the
25   plaintiff entered into a contract with Chevron to supply bunker fuel to plaintiff's tanker. Pursuant
26   to the contract, tug assistance was provided to dock the tankers. On one occasion, while providing
27   tug services, the tanker was damaged. Thereafter, the owners of the tanker sued Chevron for
28   breach of the warranty of workmanlike performance implied in the contract to provide tug services.

14

1  After reviewing the facts of the case, the court remarked that the "instant case [was] not really a
2  Ryan case at all. The primary issue in Ryan was the indemnity problem, and the Court used the
3  warranty of workmanlike performance as a vehicle on which to base the stevedore's liability to
4  indemnify the shipowner." There was no indemnity sought in this case. However, the court found
5  that Ryan, by implication, confirmed the applicability "to maritime service contracts of the
6  hornbook rule of contract law that one who contracts to provide services impliedly agrees to
7  perform in a diligent and workmanlike manner." Id.

8      Winzler & Kelly states that the plaintiff is seeking to hold the defendant liable for a breach
9  of the Ryan maritime warranty, which is inapplicable. The Court agrees that in keeping with Ninth
10  Circuit precedent, such a cause of action is improper as this case does not involve seamen, a
11  shipowner or a request for any type of indemnity. Although the Court recognizes that there is a
12  general implied warranty of workmanlike performance in the contract, there is no need for it to be
13  separately asserted from the breach of contract cause of action. Accordingly, the Court grants the
14  defendants' motion as to the seventh, eighth and ninth causes of action.

15
### 3rd Cause of Action - Negligent Property Damage (Against EMPSCO) and 6th Cause of Action - Breach of Contract (Against EMPSCO)
16

17      EMPSCO moves for summary judgment and for judgment on the pleadings as to the third
18  and sixth causes of action. These causes of action are premised on the allegation that EMPSCO's
19  professional services provided the Port were performed negligently, resulting in the damages to
20  Foxtrot F-1 Pier following the earthquake of October 13, 2001. In its Third Cause of Action,
21  Lloyds claims that "EMPSCO" . . . negligently supervised the work performed by Black in
22  connection with the project. The negligence of EMPSCO directly led to losses and damage to
23  Plaintiff." See First Amended Complaint at ¶ 23. And, in its Sixth Cause of Action, Lloyds
24  claims that "EMPSCO breached its contract with the Port Authority of Guam by inadequately and
25  incompetently supervising work performed by Black . . . and by failing to note and observe the
26  errors and omissions by contractors performing the project." Id. at ¶ 31. Summary judgment is
27  appropriate when the evidence, read in the light most favorable to the nonmoving party,
28

15

1   demonstrates that there is no genuine issue as to any material fact, and the moving party is entitled
2   to judgment as a matter of law. Fed. R. Civ. P. 56(c).

3           As discussed above, in August of 1993, Guam suffered a severe earthquake, which severely
4   damaged the Port's facilities and property. In 1995, the Port contracted with EMPSCO to provide
5   the bid documents, plan specifications, and estimates for the repairs and upgrade to Foxtrot F-1
6   Pier. See Decl. Arce, P.E., at ¶ 3. The Port approved the documents prepared by EMPSCO and
7   the project design went out to bid. Black Construction was the lowest bidder. However, the bid
8   for the work as described in EMPSCO's plans and specifications exceeded the Port's budget.
9   Therefore, to reduce its bid, Black Construction submitted an alternate design for repair, which was
10  prepared by defendant, Winzler & Kelly. The alternate design was prepared by Bruce Swanney of
11  Winzler & Kelly, who is a registered structural engineer in Guam.

12          EMPSCO argues that it provided nothing less than professional services to the Port. Of
13  particular importance is the fact that the design used for the repairs was that of the defendant,
14  Winzler & Kelly. EMPSCO was not hired to perform a technical engineering review of Winzler
15  & Kelly's design, nor was EMPSCO asked or paid to conduct any structural or seismic calculations
16  on the design. See Decl. Arce, P.E. at ¶ 8. Additionally, EMPSCO claims that its responsibilities
17  under its contract with the Port ended on March 8, 1996, before Black Construction even began its
18  construction. Id., at Ex. 1 (Article 2), attached thereto.

19          Although EMPSCO's contract with the Port states that its services were to be concluded
20  by March 8, 1996, there is some question as to whether in fact EMPSCO provided services beyond
21  that date. As raised by both EMPSCO and the plaintiff, there was a provision in the contract
22  between the Port and EMPSCO requiring EMPSCO to supervise the construction work performed
23  by Black Construction. As set forth in part, Article 17 of the contract states:

24                  17. Professional Liability. It [EMPSCO] warrants that it is an
                    experienced construction manager, properly and duly licensed under
25                  the Government of Guam. It hereby certifies and warrants that it
                    shall see that the contractor shall carry out and perform the work in
26                  a proper manner; and if done improperly by the contractor, then
                    Consultant hereunder shall be liable, like professionals, for damages
27                  and the Port's attorney's fees as a result of Consultant's improper or
                    negligent acts in performing its duties, and the terms and conditions
28                  under this contract.

16

EMPSCO states in its motion that the inclusion of this provision was deleted from EMPSCO's scope of work and that it was mutual mistake of the parties to have included it. For support, EMPSCO points to the deposition testimony of Mr. Simeon Delos Santos, the Port's Engineering Supervisor. Mr. Santos testified:

> Q. Why was that cut and pasted into the EMPSCO contract?
>
> A. That was something that was over – it was oversight that they weren't the construction manager because when we sent out an RFP for A&E design, it wasn't the intent to have a construction manager. It wasn't part of the RFP. It wasn't part of the scope of work.

See Decl. Tarpley, at Ex. 2, page 7:2-8.

The plaintiff claims that despite EMPSCO's self serving statement, and Mr. Santos's statement, EMPSCO has not provided the Court with any written agreement of the parties relieving EMPSCO of these responsibilities. Additionally, there is no mention concerning EMPSCO's agreement to provide inspection services and in fact there is evidence showing that EMPSCO did supervise Black Construction, or at a minimum, approved substitution of the Anchor-It Epoxy System for the Redi-Chem method of installation.

Moreover, the plaintiff points out that EMPSCO has claimed that its work on the project ended on March 9, 1996 pursuant to the contract. However, the plaintiff claims that the evidence thus far produced shows that EMPSCO was still involved in the project well after that date.[8] For example, in May of 1996, EMPSCO wrote a memorandum to Manuelito Golez regarding the repairs and upgrading to Foxtrot F-1 Pier. See MacDonald Decl., at p.3, and Ex. A, attached thereto. Then, on December 31, 1996, EMPSCO sent a memorandum to the Port, with attention to Mr. Delos Santos, concerning the Foxtrot F-1 Pier. Therein, Mr. Arce recommended and attached "sketches showing the proposed modifications to the existing fender support at Dolphin "G" after EMPSCO did a "site inspection on 30 December 1996 at Pier "F-1". Id.

On summary judgment all justifiable inferences must be drawn in favor of the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). In this instance, there are

---

[8] The plaintiff contends that there may be additional facts concerning this issue that will come out of future depositions it intends to take and deposition transcripts it has yet to receive.

17

1 factual issues raised both by the plaintiff and the moving party itself for which granting partial
2 summary judgment at this point in time would be improper as to the sixth cause of action.
3 However, the third cause of action will be dismissed on the basis that the Economic Loss Doctrine
4 prohibits the assertion of a tort claim as discussed above.

5       On a related matter, the plaintiff moves to strike the Declaration of Albert H. Tsutsui,
6 A.I.A., ("Mr. Tsutsui") filed by EMPSCO in support of its motion for summary judgment and
7 motion for judgment on the pleadings. The plaintiff claims that the declaration should be stricken
8 because Mr. Tsutsui is a not a professional engineer as indicated in EMPSCO's moving papers.
9 Mr. Tsutsui is a registered architect. See Decl. Tsutsui, at ¶ 1. Federal Rules of Evidence, Rule
10 702 states that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact
11 to understand the evidence or to determine a fact in issue, a witness qualified as an expert by
12 knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion
13 or otherwise." Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to
14 "ensure that any and all scientific testimony . . . is not only relevant, but reliable." Kumho Tier
15 Co., Ltd. v. Carmichael, 526 U.S. 137, 147, 119 S.Ct. 1167 (1999). Here, the plaintiff claims that
16 Mr. Tsutsui's testimony cannot be reliable, *per se*, on engineering matters because he is not an
17 engineer.

18       The Court notes that Mr. Tsutsui has completed an engineering workshop and has been an
19 architect for the past thirty years. It may or may not be that Mr. Tsutsui's experience and education
20 is insufficient to be recognized as an expert in the field of engineering. However, the Court does
21 not find that Mr. Tsutsui is providing expert testimony regarding the structural engineering aspects
22 of the project. Instead, Mr. Tsutsui's report concerns his opinion as to whether EMPSCO's
23 conduct was negligent under the circumstances. At this point in time, the Court finds that Mr.
24 Tsutsui's years of experience and education is sufficient to render such an opinion regarding the
25 industry standards. Accordingly, the Court denies the plaintiff's motion to strike.

26       **5th Cause of Action - Breach of Contract (Against Winzler & Kelly)**

27       Winzler & Kelly moves for summary judgment as to the fifth cause of action. In its Fifth
28 Cause of Action, the plaintiff claims that "Winzler breached its contract with Black by failing to

18

1   exercise adequate skill and competence to design and specify the Project that would be sufficiently
2   strong to withstand future earthquakes and typhoons. Winzler further breached its contract with
3   Black by recommending and making improper and negligent changes at the Project, and by failing
4   to note and observe errors and omissions by contractors performing the Project." Id. at ¶ 27.
5   Summary judgment is appropriate when the evidence, read in the light most favorable to the
6   nonmoving party, demonstrates that there is no genuine issue as to any material fact, and the
7   moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

8          Winzler & Kelly claims that the repair work to F-1 Pier was not done in accordance with
9   its design. Moreover, even if the design itself was inadequate, improper and negligent, it is not
10  what caused the damages incurred by the Port.[9]

11         Winzler & Kelly's design had two principal components. One, was the use of eight bolts
12  per pile, each bolt 8 3/4 inches long, passing up through a metal collar in the shape of a flanged ring
13  encircling the top of each pile, into the underside of the dolphin. The second, the use of a Redi-
14  Chem system or an approved equal to secure the bolts to the dolphins. The number and size of the
15  bolts was used as set forth under the design. However, instead of using the Redi-Chem epoxy
16  installation system, Black Construction substituted the Anchor It Epoxy System HR200.
17  Thereafter, the inspection after the earthquake found multiple bolts with very little or no epoxy
18  coverage, multiple bolts with soft and pliable epoxy, indicating incomplete mixture and multiple
19  bolt holes where epoxy had drooled out of the holes. However, had the bolts been properly
20  installed according to the Winzler & Kelly design, the design may have been satisfactory. See
21  Decl. O'Connor (filed on Nov. 9, 2004) at Ex. A, attached thereto.

22
23

24         [9] The Court notes that Winzler & Kelly's motion substantially rely upon two declarations that were
25  stricken from the record. The facsimile Declarations of Robert O'Connor and Bruce Swanney, filed on
    November 5, 2004 and docketed as entry numbers seventy-five and seventy-six, respectively, were stricken
26  from the record by Court Order dated November 10, 2004 because Winzler & Kelly had failed to obtained
    prior court permission to file facsimile copies. Accordingly, the Court will not rely upon these declarations.
27  However, Winzler & Kelly subsequently filed the originals of these declarations on November 9, 2004 and
    November 15, 2004. They are part of the Court record, and the Court finds that review of them in this
28  matter is appropriate and does not prejudice the plaintiff.

19

1    Since it is undisputed that Black Construction did not use the total design by Winzler &

2    Kelly by substituting the Redi-Chem system, it claims it is entitled to summary judgment.

3         The plaintiff claims that the structural engineer who worked for Winzler during the time

4    period at issue directly contradicts Winzler & Kelly's assertion that its design was not used on the

5    dolphin repair project. Mr. Bruce Swanney was a structural engineer for Winzler & Kelly in Guam

6    from 1989 to 1999. In his deposition, Mr. Swanney admitted that his design was used, he testified,

7    in part, as follows:

8              Q. Okay. But with regard to the design, you're the one that came
              up - sorry. Winzler & Kelly is the one that came up with the eight
9              bolts per pile, right?

10             A. We - yeah, we figured eight bolts is adequate, yes.

11             Q. Okay. So you were the designer of that connection between the
              pile and the cap, right?
12
              A. Yes.
13
              Q. Okay. And nobody ever came back and questioned that design?
14
              A. No.
15
     See Decl. McDonald, at Ex. C, page 163:7-18.
16
          The plaintiff argues that summary judgment is improper because Winzler & Kelly's design
17
     work is what was incompetently performed. Morever, in the plaintiff's expert report, Mr. Elliot
18
     H. Boone stated that:
19
              Disregarding the deficiencies in the design, the critical nature of this
20             connection should have required Winsler [sic] & Kelly to request
              Black Construction Co. to assure that special inspection was taken
21             during the installation of the epoxy, regardless of what product was
              used. This requirement would be even more important since their
22             product specification (Note 2 of Drawing Sheet VE-1) refers to the
              Redi-Chem Epoxy System or **approved equal**. This opens the door
23             for substitution and, owing to the variability in product application,
              it is the Engineer's responsibility to see that critical elements of his
24             design are correctly completed in accordance with his intentions.

25   See Tarpley Decl., Ex.1, (Booth Report) attached thereto.

26        With regard to the bolt group redesign, the OCEL Report Concluded: "whichever way the

27   design is done, the maximum bolt design load is less than half that of the reinforced concrete

28   option." See O'Connor Decl., Ex. B, (OCEL Report) attached thereto. While the report also

20

1  concluded that properly installed bolts may have performed satisfactorily in the recent earthquake,
2  the bolt group redesign was inadequate for anticipated horizontal seismic load factors incident to
3  a design level earthquake or mooring or berthing accident.

4      The Court finds that the OCEL report and Mr. Boone's report raise genuine issues of
5  material fact sufficient that preclude this Court from granting summary judgment on this count.
6  Accordingly, the Court denies Winzler & Kelly's Motion for Summary Judgment and for Judgment
7  on the Pleadings as to the Fifth cause of action.

8                              **CONCLUSION**

9      Based upon the foregoing, the Court hereby orders the following:

10     1. The Court GRANTS in part the Motion for Partial Summary Judgment, filed by Black
11 Construction and joined by defendants, EMPSCO and Winzler & Kelly, as to the limitation of
12 damages sought by the plaintiff. The plaintiff's right of recovery is limited to the extent of its
13 payment to its insured for the damages allegedly caused by the defendant(s).

14     2. The Court GRANTS defendant, Black Construction's Motion for Partial Summary
15 Judgment or, Alternatively, to Dismiss as to Counts One and Seven of the First Amended
16 Complaint.

17     3. The Court GRANTS defendant, EMPSCO's Motion for Summary Judgment and for
18 Judgment on the Pleadings as to Counts Three and Eight of the First Amended Complaint.

19     4. The Court GRANTS defendant, Winzler & Kelly's M otions for Judgment on the
20 Pleadings as to Counts Two and Nine of the First Amended Complaint.

21     5. F inding t hat t here a re i ssues o f f act c oncerning C ounts F ive a nd S ix o f t he F irst
22 Amended Complaint, the Court DENIES EMPSCO's Motion for Summary Judgment and for
23 Judgment on the Pleadings as to Count Six and Winzler & Kelly's Motion for Summary Judgment
24 on Fifth Cause of Action.

25     6. The Court DENIES EMPSCO's Motion to Strike.

26     7. The Court GRANTS Winzler & Kelly's Motion to Strike.

27     8. The Court DENIES the plaintiff's Motion to Strike the Declaration of Albert H. Tsutsui, A.I.A.

28

21

9. The Court DENIES the plaintiff's Suggestion of Mootness and Request to Dismiss or Hold in Abeyance.

SO ORDERED this 7th day of April, 2005.

ROBERT CLIVE JONES*
UNITED STATES DISTRICT JUDGE

Notice is hereby given that this document was
entered on the docket on __APR 1 1 2005__.
No separate notice of entry on the docket will
be issued by this Court.
            Mary L. M. Moran
        Clerk, District Court of Guam

By: _____  APR 1 1 2005
        Deputy Clerk              Date

_____

* The Honorable Robert Clive Jones, United States District Judge for Nevada, by designation.

22