FILED
DISTRICT COURT OF GUAM

APR 25 2005

MARY L.M. MORAN
CLERK OF COURT

(149)

LAW OFFICES
**TARPLEY & MORONI, LLP**
A Law Firm including a Professional Corporation
Bank of Hawaii Building
134 West Soledad Avenue, Ste 402
Hagåtña, Guam 96910
Telephone: (671) 472-1539
Fax: (671) 472-4526

32P6089
Attorney for Defendant Engineering, Management
& Planning Services Corporation

IN THE DISTRICT COURT OF GUAM

S.J. GARGRAVE SYNDICATE
AT LLOYDS,

    Plaintiff,

    v.

BLACK CONSTRUCTION
CORPORATION, WINZLER & KELLY
CONSULTING ENGINEERS and
ENGINEERING, MANAGEMENT,
& PLANNING SERVICES
CORPORATION,

    Defendants.

CIVIL CASE NO. CIV03-00009

DECLARATION OF
THOMAS M. TARPLEY, JR.
AND CERTIFICATIONS PER
LOCAL RULES 37.1 AND 7.1

I, Thomas M. Tarpley, Jr., hereby declare under penalty of perjury under the laws of the United States that the following statements are true.

1.   I am the counsel of record for Engineering, Management, & Planning Services Corporations ("EMPSCO") in the above-encaptioned matter.

2.   The last scheduling order applicable to this matter was issued on March 15, 2004, requiring Plaintiff to make all disclosures regarding its experts under FRCP Rule 26(a)(2) no later than May 14, 2004.  In compliance therewith Plaintiff provided EMPSCO and the other Defendants with the report of Elliott H.

ORIGINAL

1    Boone, of Cash & Associates, a true and correct copy of which is

2    attached to this Declaration as Exhibit A.

3    3.    Jury trial in this action is presently set for June 13,

4    2005.    The parties have mutually agreed to the taking of the

5    depositions of the named experts.    Pursuant to a conference call

6    among the attorneys, the deposition of Plaintiff's expert, Elliott

7    H. Boone, was scheduled for May 12, 2005 in San Francisco,

8    California.  During the call I informed Plaintiff's attorney that

9    I did not expect to attend the deposition of Mr. Boone because Mr.

10   Boone has expressed no opinion that EMPSCO breached a duty of care

11   or otherwise did anything wrong in connection with the Shell F-1

12   pier project.

13   4.    On April 19, 2005, I received the faxed letter from

14   Plaintiff's attorney, informing me of new opinions of Mr. Boone

15   pertaining to EMPSCO.  A copy of this letter is attached to this

16   Declaration as Exhibit B.

17   5.    Believing that these belated changes to its expert

18   disclosures (a mere six weeks before trial) is improper, and which

19   would require EMPSCO to travel to San Francisco for this deposition

20   unless a protective order could be obtained pursuant to the civil

21   rules, I met with Plaintiff's attorney David Ledger face-to-face

22   pursuant to Local Rule 37.1(a) in a good faith attempt to stop the

23   amendment of Mr. Boone's report.  Mr. Ledger and I were unable to

24   resolve the dispute.

25   6.    On April 22, I sent an email to Plaintiff's lead counsel,

26   Forrest Booth, informing him of the substance of EMPSCO's Emergency

27   Motion for a Protective Order and Motion in Limine Restricting

28   S.J. Gargrave Syndicate At Lloyds  v. Black Construction
Corporation, et.al., CIV03-00009
DECLARATION OF THOMAS M. TARPLEY, JR. AND CERTIFICATIONS
PER LOCAL RULES 37.1 AND 7.1

1  Expert's Testimony at Trial, and informed him I would be seeking an

2  ex parte order shortening the briefing schedule so that the Court

3  could make a determination on the motion significantly in advance

4  of Mr. Boone's deposition.  Pursuant to LR 7.1(k) I asked whether

5  Forrest Booth would stipulate to an expedited briefing schedule

6  whereby Plaintiff would file its responding brief within three days

7  after service and allowing EMPSCO to file its reply three days

8  thereafter.  On April 23 Mr. Booth informed me that he would not so

9  stipulate and that he would oppose all applications EMPSCO would

10 make in this regard.

11     Executed this 25th day of April, 2005, in Hagatna, Guam.

12     TARPLEY & MORONI, LLP

13

14



    By:  THOMAS M. TARPLEY, JR.,
15        Attorney for Defendant
16        ENGINEERING, MANAGEMENT, &
17        PLANNING SERVICES CORPORATION

18

19

20

21

22

23

24

25

26

27

28

S.J. Gargrave Syndicate At Lloyds  v. Black Construction
Corporation, et. al., CIV03-00009
DECLARATION OF THOMAS M. TARPLEY, JR. AND CERTIFICATIONS
PER LOCAL RULES 37.1 AND 7.1

Elliott H. Boone
Randy H. Mason
Wilfrido B. Simbol
Kerry M. Simpson

CASH & ASSOCIATES
Engineering and Architecture

May 12, 2004

Attention: Mr. Forrest Booth
Cozen O'Connor Attorneys
425 California Street, Suite 2400
San Francisco, CA 94104-2215

Attention: Mr. David Ledger
Carlsmith Ball LLP
P.O. Box BF
Hagatna, Guam 96932-5027

Subject:     FOXTROT PIER F1
             PORT AUTHORITY OF GUAM
             COZEN O'CONNOR REFERENCE NO. 123206
             (C&A Project No. 6090.00)

Gentlemen

The purpose of this report is to summarize the results of my investigation of structural damage observed at Foxtrot "F1" Pier in Apra Harbor, the sole motor fuel (gasoline and diesel) import location for Shell Guam Inc.

The scope of this investigation included the following tasks:

1.   Visit the site to visually observe the reported damage.

2.   Review project technical data and correspondence relating to the original design and subsequent repairs.

3.   Render an opinion as to the adequacy of the repair design prepared by Winzler & Kelly.

4.   Render an opinion of the connections installed by the Contractor.

The documents reviewed to develop this report are contained in Appendix A, Reference Listing.

**BACKGROUND**

Apra Harbor is considered a protected harbor with favorable berthing conditions. Information reviewed relating to the Foxtrot "F1" facility indicated that it was constructed in 1970 and originally designed to accommodate 90,000 DWT tanker vessels. The pier consists of an access ramp from the shore leading to the main wharf supporting the bulk fuel unloading arms.

5772 Bolsa Avenue, Suite 100 ▪ Huntington Beach, CA 92649 USA ▪ TEL:714.895.2072 ▪ FAX 714.895.1291
Web Site: www.cashassociates.com ▪ A California Corporation

Cozen O'Connor Attorneys
Mr. Forrest Booth
Carlsmith Ball LLP
Mr. David Ledger
May 12, 2004

FOXTROT PIER F1
PORT AUTHORITY OF GUAM
Cozen O'Connor Reference No. 123206
(C&A Project No. 6090.00)
Page 2

Catwalks, from the wharf, lead to offshore mooring dolphins "A" and "B". Two additional mooring dolphins, "E" and "F", are located onshore. Tanker berthing forces are absorbed by four breasting dolphins; "C", "D", "G" and "H" located outboard of the wharf. Breasting dolphins "C" and "D" were designed to accommodate the 90,000 DWT vessels, while breasting dolphins "G" and "H" were provided to accommodate smaller 21,000 to 28,000 DWT vessels.

## PREVIOUS REPAIR HISTORY

The Foxtrot "F1" facility was operational at the time of the 8.1 magnitude earthquake in August 1993 and the resulting damage from this event was significant. Preparation of contract documents for repair of the damage sustained by the facility pier was awarded to EMPSCO Engineering Consultants of Agana, Guam by the Port Authority in late 1994. The Port Authority approved contract documents prepared by EMPSCO for bid and local contractors were required to submit their proposals on January 26, 1996.

The apparent low bidder for the project was Black Construction Company, Tamung, Guam, however, their bid for the work as described in the plans and specifications exceeded the Port Authority's budget. In order to proceed with the project, Black Construction Company was requested to submit alternates that would reduce their bid. In response to that request, Black Construction Company using an alternate design developed by Winzler & Kelly Consulting Engineers, Agana, Guam made a revised proposal to the Port Authority.

The alternate design for the repair was identified on Drawing Sheet VE-1 (copy attached) prepared under the supervision of Bruce Swanney, of Winzler & Kelly. Mr. Swanney is registered to practice as a Structural Engineer in the Territory of Guam and his professional engineering seal appears on that drawing, dated April 4, 1996.

At his deposition, Bruce Swanney stated that the sole calculation undertaken in the design of the pile flange to deck connection, shown on Drawing Sheet VE-1, was to assume that the connection would only be required to resist pile withdrawal loads equal to one half the pile axial capacity of 200 tons. No calculations relating to the design shown on Drawing Sheet VE-1 were available for my review.

In general, the repair shown on Sheet VE-1, involved removing approximately 15 feet of the upper portion each of the existing steel pipe piles under the deck of the mooring and breasting dolphins. A 22-inch diameter replacement was then spliced to the remaining pile section, which is connected to the underside of the dolphin deck with a 1-inch thick flange plate, welded to the new section of pipe pile. The flange was, in turn, connected to the underside of the dolphin using 8-3/4 inch diameter, Grade 304 stainless steel bolts, embedded in epoxy.

As-built details and other documents of completed repairs were made available to Cash & Associates for review and are listed in Appendix A, Reference Listing.

It is our understanding that the facility was operational from the date that work was completed until 13 October 2001, when a subsequent 7.0 magnitude earthquake again damaged the facility.

Cozen O'Connor Attorneys
Mr. Forrest Booth
Carlsmith Ball LLP
Mr. David Ledger
May 12, 2004

FOXTROT PIER F1
PORT AUTHORITY OF GUAM
Cozen O'Connor Reference No. 123206
(C&A Project No. 6090.00)
Page 3

## VISUAL OBSERVATIONS

Oceaneer Enterprises, Inc, Piti, Guam performed a post-earthquake survey of the mooring and breasting dolphins on October 13, 2001. Their visual observation of the damage revealed that the epoxy securing the stainless steel bolts embedded into the underside of the dolphin had failed. In a high percentage of the total number bolts, the epoxy had failed to harden or in some cases was absent. In more than one bolt location epoxy that had flowed out of the predrilled hole was observed in and around the steel flange below it.

Of the 216 bolts securing the piles of Dolphin A, only two (2) remained undisturbed by the event. Failure of the epoxy is a technical consideration that is not part of this report, however, it is highly unusual for nearly all the connecting elements to fail if the design meets the service requirements contained in the Uniform Building Code.

On March 3, 2004, I was afforded the opportunity to observe the damage from the water using a port provided pram. At the time of my observations, initial repairs to the 2001 earthquake damage had been undertaken and pier Foxtrot "F1" was partially operational. Safety considerations prevented observations from beneath the deck. Dolphin H did not sustain damage as it had been completely replaced as part of the 1996 repairs, however unrepaired damage was clearly evident on Dolphins A, B C D and G. Each of these dolphins, with the exception of Dolphin H, exhibited common bolt withdrawal damage at the flange.

Digital photographs of the pile flange bolt failure, taken on the March 3, 2004, are included in Appendix B, Photographs.

## BOLT FAILURE

Review of the information provided to Cash & Associates indicated that Black Construction Company had submitted and the Port Authority (through their Projects representatives) had approved, with conditions, a substitution of the epoxy system used in anchoring the bolts to the concrete deck. The epoxy system proposed on Drawing Sheet VE-1 was Redi-Chem Anchors manufactured by Phillips Drill Company, Catalog Number CE 3495. The epoxy components (Parts A & B) of the Redi-Chem Anchor are encased in separate glass capsules that combine when the glass is ruptured after insertion in a predrilled hole. In practice, the threaded rod ruptures the capsule when forced through it and the components are then combined by rotation of the threaded rod with an ordinary power drill. The advantage of this system is that the components are pre-measured and mixing is assured once the threaded rod is spun for a few seconds with a drill.

Anchor-It Epoxy Systems, Solidbond HR 200, was the substitute product submitted (Project Submittal 18a, Epoxy Fastening System) by Black Construction Co as an equal to the specified Redi-Chem System. Approval was conditioned by four comments, Conditions (c) and (d), submit manufacturers certificate of compliance and submit test data by independent testing laboratory, and were never to the best of my knowledge received. Furthermore, the ICBO approval for use of this product (Report No. 4398) requires:

Cozen O'Connor Attorneys
Mr. Forrest Booth
Carlsmith Ball LLP
Mr. David Ledger
May 12, 2004

FOXTROT PIER F1
PORT AUTHORITY OF GUAM
Cozen O'Connor Reference No. 123206
(C&A Project No. 6090.00)
Page 4

*Special inspection in accordance with Section 306(a) 12 of the code shall be provided for all anchor installations.*

The Anchor-It Epoxy System relies on combining the two components in a mixing nozzle, which is then injected into the predrilled hole. In overhead installations, a plug is inserted into the predrilled hole to prevent the run out of the epoxy. The bolt is then inserted through the plug and the mixture allowed to cure. There are two inherent problems installing anchors in overhead applications. The first is assuring that adequate but not excessive epoxy is injected in the hole. Too little epoxy and there is insufficient material to assure a complete bond through the entire depth or if too much, the seal formed by the plug is voided and the epoxy will leak.

The system of mixing for the Anchor-It Epoxy is significantly more complex than that proposed by the Redi-Chem Epoxy System. The complexity of the overhead bolt installation combined with the critical nature of the bolt to pile connection should have placed a responsibility on Black Construction Co. to notify the port of the need for special inspection.

Black Construction Co. as a matter of proper construction practice, should have been aware of the critical importance of the pile flange to concrete connection. The performance of individual dolphins in berthing and mooring operations, not to mention seismic events, relied on the capacity of that connection. During the bolt installation process, the loss of epoxy would have been evident to those installing the materials on a daily basis. The critical nature this element should have made it obvious to Black Construction that minimum testing to establish full epoxy cure should have been undertaken as part of their ordinary quality control described in Section 1400 of the project specifications. This could have been accomplished with an ordinary deep socket and automotive torque wrench.

## SERVICE LOADING

Service load requirements for the dolphins at the Foxtrot "F1" facility fall into four categories as follows:

### Gravity Loads

Gravity loads on the surface due to equipment, product and personnel. These loads are insignificant in comparison to berthing, mooring and seismic loads

### Berthing Loads

Dynamic loads due to berthing forces generated during docking and/or maneuvering transmitted through the fender system to the structural elements. The critical elements in determining berthing forces are the vessel size combined with approach velocity and direction during this operation. According to the calculations prepared by EMPSCO Consulting Engineers, the facility was designed to accommodate 90,000 DWT vessels. Confirmation of the vessel size calling at Foxtrot "F1" was not received from Shell Guam Inc.

Cozen O'Connor Attorneys
Mr. Forrest Booth
Carlsmith Ball LLP
Mr. David Ledger
May 12, 2004

FOXTROT PIER F1
PORT AUTHORITY OF GUAM
Cozen O'Connor Reference No. 123206
(C&A Project No. 6090.00)
Page 5

It is generally accepted that the most severe angle at which the vessel will approach the berth is 10 degrees, measured relative to the centerline or keel relative to the face of the fender. Vessel speed is less exact and can vary with the capability of the pilot and tug assist at the berth. For design purposes, J.U. Brolsma, et al, developed the generally accepted variables for approach velocity, in his 1977 paper " On Fender Design and Berthing Velocities" presented to the PIANC 24th Congress, Leningrad. From Brolsma's graph of these variables, the approach velocity for a 100,000 DWT vessel is approximately 0.03 to 0.04 cm/sec. The as-built drawings identify the fenders as Trellex-Morse type MV 1250X900A and 1000X900A fenders for dolphins C/D and G/H respectively. The berthing energy obtained from the application manual for Type MV fenders published by Trellex-Morse in 1993 is as follows:

*Dolphins C/D, 355 Ft-Kips with a reaction force at maximum compression of 189 Kips for the MV 1250x900A fender*

*Dolphins G/H, 226 Ft-Kips with a reaction force at maximum compression of 151 Kips for the MV 1000X900A fender.*

A separate load acting parallel and equal to approximately one third the reaction force also is considered. The location of this load, at the face of the fender, induces a torsional moment around the pile group of the dolphin. The effect of torsional moment was considered in the overall berthing and mooring analysis that follows.

## Mooring Loads

Mooring dolphins at the Foxtrot "F1" facility are Dolphins A and B offshore and E and F onshore. Mooring loads generated by wind acting through mooring lines are limited to 100 tons by the Capstan Hook Assembly located at the center of each dolphin. . The capacity of this assembly was obtained from shop drawing data (Submittal Number 13) provided with other information to Cash & Associates. In my evaluation of the forces generated by the Capstan Hook Assembly, I have assumed that the mooring lines are positioned at an angle of 45 degrees to the face of the dolphin and at an angle above the horizon of 30 degrees. These angles will vary with each ship that is moored, its position relative to the loading arms on the main pier and with the tide.

## Seismic Loads

Seismic loading generated by earthquake activity and the resulting analyses are based on the 1994 Edition of the Uniform Building Code (UBC) which was the governing code in the Territory of Guam at the time of the original design. Two approaches were implemented; one using static analysis and the other using a computer generated dynamic analysis. The static analysis is based on the premise that the dolphins are non-building structures and therefore subject to a particular set of code requirements for determining the seismic forces in the structure. The computer generated dynamic analyses were based on the 1994 UBC Response Spectra (S1 Soil Profile assumed), scaled to 0.3 for Seismic Zone 3 (Guam). The results of the static analyses were used to check allowable bolt forces versus the code static force levels on a

Cozen O'Connor Attorneys
Mr. Forrest Booth
Carlsmith Ball LLP
Mr. David Ledger
May 12, 2004

working stress basis; whereas the dynamic analysis results was used to check anchor bolt adequacy using ultimate test capacities compared to the response spectra results unreduced by Rw (which would be 3 for this type of structure). As a general check on the compatibility of static and dynamic analyses, additional analyses were conducted using the dynamic analysis results scaled to the static level base shears.

Computer models of Dolphins A, B, C, D and H were developed and considered each of the loads described above.

**Computer Modeling**

SAP 2000 computer models were developed for each of the five dolphin structures noted above. The models were based entirely on the information presented in the as-built drawings prepared by EMPSCO Consulting Engineers and made available for review to Cash and Associates. The models were linear and three-dimensional, using thick concrete shell elements for the dolphin decks (which varied from about 4 feet to over 8 feet thick), and frame elements to model the piles (typically 22 inch diameter steel pipe).

The models were made as realistic as was reasonably achievable by modeling the pile depths in accordance with the seafloor contours provided in the as-built drawings; that is, each pile has a unique length/depth based on whether it is a vertical or battered pile, and at what depth it achieves effective fixity at the seafloor. Based on our experience, it was assumed that the effective depth of fixity was 8.5 feet below the surface seafloor contours as presented on the as-built drawings. For battered piles, we developed a methodology for determining point of pile fixity at the seafloor by establishing a system of linear equations, one equation for the pile and one equation for the sloping seafloor, and solved the set of equations for each pile to find the point of intersection.

Ship berthing forces consist of a component of force applied perpendicular to and toward the face of the dolphin, and a component parallel to the dolphin, acting in either parallel direction at a distance of 3 feet from the face of the dolphin. This offset resulted in a significant additional moment applied to the center of gravity (c.g.) of the dolphin deck.

Because both static and dynamic seismic analyses were conducted, and ship berthing and mooring forces were applied, numerous possible load combinations were considered. That is, the seismic forces can act positively or negatively in both the North/South and East/West directions, and the parallel ship berthing forces can act in either a westerly or easterly direction. The perpendicular ship berthing force was applied into the face (i.e. northerly) for all load cases. Based on a number of preliminary analyses, it was determined that 8 different load cases of static and dynamic seismic and berthing and mooring forces had to be considered for each pile structure. These load cases are detailed in Appendix C, Tables 1 through 11. Note that the static and dynamic analyses without ship berthing and mooring were also conducted to obtain a preliminary understanding of the connection adequacy based on code seismic requirements alone. Additionally, the plastic moment capacity of a 22-inch diameter pile was compared to the

Cozen O'Connor Attorneys
Mr. Forrest Booth
Carlsmith Ball LLP
Mr. David Ledger
May 12, 2004

capacity of the anchor bolts in the repair connection as an additional measurement of the adequacy of the connection.

## Analyses of Pile Flange Connection

The focus of the stress analysis work was solely on the anchor bolt capacity, primarily because this was the predominant mode of failure in these connections as a result of the 2001 earthquake. Thus, a simple model of the 8-bolt anchor bolt connection was developed to determine bolt loads based on the output from the detailed dolphin computer models. Specifically, the end forces in global coordinates from the piles at the underside of the dolphins were taken from the main computer analyses of the dolphins, and inserted into the three dimensional SAP 2000 model of the 8-bolt connection to determine forces in each bolt. All six (6) components of force (shears, tension and moments) were input. This simplified model of the 8-bolt connection was based on the assumption of a rigid based plate and large tension forces in combination with large bending forces that resulted in all bolts being in combined shear and tension. The analysis results proved this assumption to be correct for nearly every governing pile in each dolphin.

## Analysis, Results and Conclusions

Refer to the Appendix C, Tables 1 through 12 for details. For the purposes of determining the adequacy of the anchor bolts, manufacturer's data on the maximum allowable load per bolt was used for comparing to calculated demands. Since the specified Redi-Chem Anchors are no longer available, a similar glass capsule anchor bolt of the same size, material type and embedment was used in our analysis. The product selected is manufactured by ITW Ramset/Red Head, Catalog Reference Epcon A7 Adhesive Anchor. Manufacturer's data for ¾-inch diameter stainless steel bolts with a concrete embedment depth of 6-3/4 inches was used. This data showed that the maximum design load for shear and tension is based on bond capacity of the epoxy material. Those loads are 5,030 pounds in shear and 7,430 pounds in tension. The manufacturer notes that these values are based on a factor of safety of 4 applied to test results, so "ultimate" or test capacities for these bolts, when properly installed, were calculated to be 20,120 pounds in shear, and 29,720 pounds in tension.

The results of the seismic analysis, both with and without ship berthing and mooring forces, can be summarized as follows (note that gravity loads are included in all cases):

⋏   The bolts, even if properly installed, are inadequately designed based on any reasonable interpretation and application of the requirements of the 1994 UBC.

⋏   Based on static seismic analysis requirements for non-building structures of this type, in conjunction with the specified ship berthing and mooring forces, the demand/capacity (D/C) ratios vary from 3.4 to 7.1 on a working stress basis. A D/C of 1.0 maximum is acceptable; any values over 1.0 indicate an overstress condition.

Cozen O'Connor Attorneys
Mr. Forrest Booth
Carlsmith Ball LLP
Mr. David Ledger
May 12, 2004

FOXTROT PIER F1
PORT AUTHORITY OF GUAM
Cozen O'Connor Reference No. 123206
(C&A Project No. 6090.00)
Page 8

⋏   Based on dynamic analysis results, in conjunction with ship berthing and mooring forces, D/C ratios vary from 1.8 to 2.8 when comparing raw earthquake force levels to ultimate test capacities of the anchor bolts.

⋏   Based on dynamic analyses scaled down to static based shear levels for working stress comparison purposes, and eliminating the ship berthing and mooring forces, the D/C ratios vary from 2.3 to 3.6 on a working stress level.

⋏   For Dolphin A, applying only the static seismic forces yields a D/C of 3.43, whereas the dynamic result scaled to the static base shear for this same dolphin yielded a D/C of 3.61.

As shown above, all reasonable avenues of investigation have been considered and, in each case, it was shown that the anchor bolts are significantly overstressed for code level requirements regardless of whether berthing or mooring loads are considered in conjunction with seismic forces. The demand to capacity ratios for the bolts indicate that the design on Drawing Sheet VE-1 is incapable of meeting the requirements of the intended use of the Foxtrot "F1" facility, namely berthing and mooring of 90,000 DWT tankers. Detailed summaries of all loading combinations, displacements, reactions, bolt loadings for static and dynamic analysis and other details of the computer investigation are contained in Appendix C, Tables 1 through 12.

Technical information (i.e., code citations and equations, calculations, modeling details, and computer input and output data) are kept to a minimum in the narratives presented herein for brevity and simplicity. This information can be made available, if requested. Appendix C, Tables 1 through 12, are spreadsheets of project results and contain an appropriate amount of technical data as necessary to communicate the results of this work.

## EXECUTIVE SUMMARY

Seismic analyses of Dolphins A, B, C, D and G were conducted in accordance with the 1994 Edition of the Uniform Building Code (UBC). Computer runs were made with and without ship berthing and mooring forces acting in combination with earthquake forces. The adequacy of the anchor bolt designs in the failed connections was measured through the use of Demand/Capacity (D/C ratios). The "Demand" is the earthquake force level (in combination with gravity forces, and in some cases ship berthing and mooring forces), and "Capacity" is based on the anchor bolt manufacturer's test data, which has been approved for use by the International Conference of Building Officials (ICBO), the governing code authority. D/C ratios in excess of 1.0 are not acceptable as they indicate excessive stress levels.

We found that for all cases considering seismic, ship berthing and mooring loads, the D/C ratios varied from 1.78 to 7.13. In all cases where no ship berthing and mooring loads were considered in combination with seismic loads, the D/C ratios varied from 2.27 to 3.61. Based on these findings, it can be concluded that the design of the anchor bolts was not adequate relative to 1994 UBC requirements.

Cozen O'Connor Attorneys
Mr. Forrest Booth
Carlsmith Ball LLP
Mr. David Ledger
May 12, 2004

Reasonable analysis by Winzler & Kelley would have revealed deficiencies in their design. Even a simple static analysis would have shown that the bolts connecting the pile flange to the dolphins were insufficient in diameter and/or number. Disregarding the deficiencies in the design, the critical nature of this connection should have required Winzler & Kelley to request Black Construction Co. to assure that special inspection was taken during the installation of the epoxy, regardless of what product was used. This requirement would be even more important since their product specification (Note 2 of Drawing Sheet VE-1) refers to the Redi-Chem Epoxy System or **approved equal**. This opens the door for substitution and, owing to the variability in product application, it is the Engineer's responsibility to see that critical elements of his design are correctly completed in accordance with his intentions. If an equal were to be allowed, proper engineering practice would have been to see that adequate inspection was undertaken to assure the design would function as intended.

The substitution of the epoxy system was proposed by Black Construction Co. for their advantage, be it either in product availability or at lower cost. Black Construction Co. had a similar duty as Winzler & Kelley to the success of the project, namely to complete a repair project that met the functional requirements of the design. Black Construction Co. had a quality control requirement established in the specifications for this project, but absent that, it was their substitute product, Anchor-It Epoxy, that required special inspection. It would then follow that Black Construction Co, should have provided special inspection or insisted that the Port Authority provide it. Even if special inspection was not provided Black Construction Co. was aware of the critical nature of this connection and even a simple automotive torque wrench test would have identified uncured epoxy. Proper construction practice cannot be ignored where installation is difficult and the element under installation is so critical to the project.

I thank you for this opportunity to be of service in this matter. If you have any questions, please contact me.

Very truly yours,
CASH & ASSOCIATES

Elliott H. Boone, S.E.
Executive Vice President

EHB:cd
G:\projects\ehb\609000\Rule2reportpdf.doc

Attachments:

Drawing Sheet VE-1, Winzler & Kelley (Reduced Copy)
Appendix A     Reference Listing
Appendix B     Photographs
Appendix C     Table 1 – 11 Spreadsheets



# APPENDIX A

## REFERENCE LISTING

# APPENDIX A

## REFERENCE LISTING

### Port Authority of Guam

INDEX OF DOCUMENTS AND TESTIMONY REVIEWED

The following is a partial listing.

| Number | Subject of Documents |
|--------|----------------------|
| 1 | Drawings, Calculations, Correspondence and other documents produced in litigation by Winzler & Kelly concerning the repairs performed in 1996 – Bates Nos. 00028-00462 |
| 2 | Shell F-1 Pier Temporary Repair Evaluation prepared by Duenas & Associates |
| 3 | As Built drawings prepared by Black Construction Co for the project |
| 4 | Winzler & Kelly Drawing VE-1 |
| 5 | Structural Calculations for Repairs to Dolphins A, B, C, &D Foxtrot (F-1) Pier prepared by Winzler & Kelly dated December 1995 |
| 6 | Responses of Black Construction to Plaintiff S. J. Gargrave's First Set of Interrogatories |
| 7 | Report of video survey, Pier F 1, Commercial Port of Guam, Oceaneer Enterprises, Piti, Guam. Report number GUA-J-01-2519-UW |
| 8 | Various other documents produced by councel relative to this matter contained in 8 four inch thick three ring binders |
| 9 | Deposition of Bruce Swanney of Winzler & Kelly |

1 of 1

# APPENDIX B

## PHOTOGRAPHS



Dolphin A

Bolt Withdrawal at Dolphin A



Dolphin A



Bolt Withdrawal at Dolphin A

Bolt Withdrawal at Dolphin B



Bolt Withdrawal at Dolphin C



Bolt Withdrawl – Dolphin Not Identified



Bolt Withdrawal at Dolphin C



**Bolt Withdrawal at Dolphin G**

# APPENDIX C

## TABLES 1 – 12

## SPREADSHEETS

# Port of Guam
## Seismic Analysis of Berthing Dolphins A, B, C, D & G

Analysis Parameters
Vstatic = ZICW/Rw, Z = 0.3, I = 1.0, C = 2.75, Rw = 3; V = 0.275W
Vdynamic = 94UBC, S1 soil, scaled to 0.3g, **unreduced** by Rw
**Bolts** = 3/4" dia. ss 304 epoxy anchors with 6-3/4" embed, Vallow = 5030#, Tallow = 7430#
(note: FS = 4 per mfr on test data, assumed 4,000 psi conc; ChemSet data not available, used Ramset Epcon 7 product data)
Ship P = ship impact perpendicular to face, Ship V = ship impact at 3' from face, Ship M = V times dist to CG of dolphin deck

Explanation of Static and Dynamic Load Cases
**DLS1** Static seismic northerly direction, perpendicular ship impact into face of dolphin, parallel ship impact in westerly direction
**DLS2** Static seismic northerly direction, perpendicular ship impact into face of dolphin, parallel ship impact in easterly direction
**DLS3** Static seismic westerly direction, perpendicular ship impact into face of dolphin, parallel ship impact in westerly direction
**DLS4** Static seismic easterly direction, perpendicular ship impact into face of dolphin, parallel ship impact in easterly direction
**DDY1** Dynamic seismic east-west direction, perpendicular ship impact into face of dolphin, parallel ship impact in westerly direction
**DDY2** Dynamic seismic east-west direction, perpendicular ship impact into face of dolphin, parallel ship impact in easterly direction
**DDY3** Dynamic seismic north-south direction, perpendicular ship impact into face of dolphin, parallel ship impact in westerly direction
**DDY3** Dynamic seismic north-south direction, perpendicular ship impact into face of dolphin, parallel ship impact in easterly direction

**Note:** Also conducted UBC 94 static and dynamic analyses with DL only; no impact forces.
Checked req'd bolt tension to resist plastic capacity of 22" pipe section.

Table 1 - Summary of Modal Analyses, Ship Impact Loads, and Static/Dynamic Base Shears

| Dolphin | Wt./Mass (Wt = kips) | T, Mode 1 | T, Mode 2 | T, Mode 3 (T = sec.) | Ship P (kips) | Ship V (kips) | Ship M (in-kips) | Vstatic (kips) | Vdynamic (kips) |
|---|---|---|---|---|---|---|---|---|---|
| A | 568/1.47 | 0.63 | 0.61 | 0.41 | 141 | 141 | 27264 | 156 | 217 |
| B | 533/1.38 | 0.3 | 0.29 | 0.26 | 141 | 141 | 27264 | 147 | 307 |
| C | 1113/2.88 | 0.46 | 0.31 | 0.29 | 80 | 24 | 5616 | 306 | 756 |
| D | 1155/2.99 | 0.51 | 0.36 | 0.33 | 80 | 24 | 5616 | 318 | 738 |
| G | 490/1.27 | 1.73 | 0.33 | 0.3 | 25 | 8 | 1128 | 135 | 313 |

Notes:
Piles at Dolphin A are twice as long as piles at Dolphin B
Dolphin G has no batter piles in EW direction, thus very flexible

1

# Port of Guam
## Seismic Analysis of Berthing Dolphins A, B, C, D & G

Table 2 - Maximum Static Displacements (inches)

| Dolphin | DLSI1 | DLSI2 | DLSI3 | DLSI4 |
|---|---|---|---|---|
| A | 4.29 | 3.49 | 3.56 | 3.85 |
| B | 0.96 | 0.85 | 0.82 | 0.96 |
| C | 0.67 | 0.21 | 0.67 | |
| D | 0.82 | 0.27 | 0.3 | 0.83 |
| G | 0.53 | 0.53 | 9.26 | 9.26 |

Table 3 - Maximum Dynamic Displacements (inches)

| Dolphin | DDYI1 | DDYI2 | DDYI3 | DDYI4 |
|---|---|---|---|---|
| A | 3.88 | 3.88 | 4.29 | 3.86 |
| B | 1.14 | 1.31 | 1.32 | 0.74 |
| C | 0.71 | 0.71 | 1.54 | 1.53 |
| D | 1.72 | 1.73 | 0.97 | 0.9 |
| G | 5.49 | 5.49 | 0.62 | 0.99 |

Table 4 - Worst-Case Pile Reactions at Dolphin - Static Seismic Combos (kips and inch-kips)
(worst case is max. tension in the connection)

| Dolphin | Vx | Vy | Vz | Mx | My | Mz | Gov. Case |
|---|---|---|---|---|---|---|---|
| A | 198.32 | 0.72 | 470.22 | 438.7 | -107.85 | -401.82 | DLSI4 |
| B | 1.44 | 113.7 | 256.57 | 1196.37 | -288.51 | 87.1 | DLSI1 |
| C | 0.17 | -0.7 | 148.72 | 276.59 | 70.48 | 7.85 | DLSI3 |
| D | -0.19 | -66.89 | 158.98 | 137.44 | -70.32 | 0.14 | DLSI3 |
| G | -19.9 | 12.29 | 48.43 | 4081.82 | 59.01 | 1733.92 | DLSI3 |

# Port of Guam
## Seismic Analysis of Berthing Dolphins A, B, C, D & G

Table 5 - Worst-Case Pile Reactions at Dolphin - Dynamic Seismic Combos (kips and inch-kips)
(worst case is max. tension in the connection)

| Dolphin | Vx | Vy | Vz | Mx | My | Mz | Gov. Case |
|---|---|---|---|---|---|---|---|
| A | 176.4 | 1.06 | 418.66 | 642.13 | 70.49 | -208.26 | DDY14 |
| B | 124.98 | 0.2 | 293.13 | 84.87 | 76.79 | 226.39 | DDY12 |
| C | 111.31 | 0.96 | 273.55 | 374.62 | -171.32 | 114.62 | DDY14 |
| D | 121.04 | 0.03 | 289.21 | 59.54 | -174.59 | 23.26 | DDY13 |
| G | 58.16 | 0.93 | 155.97 | 314.41 | 925.3 | 188.26 | DDY13 |

Table 6 - Worst-Case Bolt Loads - Static Seismic Combos (kips)

| Dolphin | Vmax | Tmax | Vallow | Tallow | Vm/Va | [blacked] | Tm/Ta |
|---|---|---|---|---|---|---|---|
| A | 29.2 | 68.7 | 5.03 | 7.43 | 5.81 | 9.25 | 6.65 |
| B | 14.2 | 56.7 | 5.03 | 7.43 | 2.82 | 7.63 | 5.24 |
| C | 0.1 | 24.9 | 5.03 | 7.43 | 0.02 | 3.35 | 2.16 |
| D | 8.5 | 24.5 | 5.03 | 7.43 | 1.69 | 3.30 | 3.41 |
| G | [blacked] | | 5.03 | 7.43 | 4.41 | 13.26 | 7.13 |

Not valid as some bolts are in compression; model is valid only for all bolts in tension
Using sum of 5/3 roots $V_m/V_a$ and $T_m/T_a$

Table 7 - Worst-Case Bolt Loads - Dynamic Seismic Combos (kips)

| Dolphin | Vmax | Tmax | [blacked] | [blacked] | Vm/Vu | Tm/Tu | [blacked] |
|---|---|---|---|---|---|---|---|
| A | 24.3 | 66.9 | 20.12 | 29.72 | 1.21 | 2.25 | 2.75 |
| B | 17.4 | 41.2 | 20.12 | 29.72 | 0.86 | 1.39 | 2.13 |
| C | 12.5 | 42.7 | 20.12 | 29.72 | 0.62 | 1.44 | 1.99 |
| D | 14.9 | 38.0 | 20.12 | 29.72 | 0.74 | 1.28 | 2.00 |
| G | 7.4 | 41.8 | 20.12 | 29.72 | 0.37 | 1.41 | 1.78 |

Based on 4x allowables assuming failure mode is bond strength
Using sum of 5/3 roots $V_m/V_a$ and $T_m/T_a$

Case 1:03-cv-00009    Document 164    Filed 04/25/2005    Page 26 of 30

# Port of Guam
## Seismic Analysis of Berthing Dolphins A, B, C, D & G

Table 8 - DL + 94UBC Spectra Scaled to Vstatic; no ship impact - Worst Case Pile Reactions (global, kips and inch-kips)

| Dolphin | Vx | Vy | Vz | Mx | My | Mz |
|---|---|---|---|---|---|---|
| A | 63.94 | 0.42 | 154.75 | 263.89 | 409.27 | 82.91 |
| B | 31.17 | 0.3 | 74.54 | 102.58 | 166.03 | 52.26 |
| C | 61.96 | -0.001 | 154.08 | 18.16 | -191.46 | -0.3 |
| D | 70.94 | 0.32 | 177.44 | 177.84 | -275.55 | 44.73 |
| G | 0.59 | 0.02 | 187.35 | 3.31 | 197.79 | 4.32 |

Table 9 - Worst-Case Bolt Loads for DL + 94 UBC Spectra Scaled to Vstatic; No ship impact

| Dolphin | Vxmax | Tmax | Vallow | Tallow | Vm/Va | Tm/Ta | D/C |
|---|---|---|---|---|---|---|---|
| A | 7.36 | 31.18 | 5.03 | 7.43 | 1.46 | 4.20 | 3.61 |
| B | 3.49 | 14.13 | 5.03 | 7.43 | 0.69 | 1.90 | 2.27 |
| C | 7.75 | 22.2 | 5.03 | 7.43 | 1.54 | 2.99 | 3.23 |
| D | 8.47 | 27.57 | 5.03 | 7.43 | 1.68 | 3.71 | 3.55 |
| G | 0.13 | 27.93 | 5.03 | 7.43 | 0.03 | 3.76 | 2.33 |

Table 10 - DL + Vstatic, No Ship Impact - Worst Case Pile Reactions Dolphin A only for comparison purposes (global, kips and inches).

| Dolphin | Vx | Vy | Vz | Mx | My | Mz |
|---|---|---|---|---|---|---|
| A | 57.84 | 0.34 | 140.37 | 207.5 | 232.3 | -110.79 |

Table 11 - DL + Vstatic, No Ship Impact - Worst Case Bolt Loads Dolphin A only (global, kips and inches)

| Dolphin | Vxmax | Tmax | Vallow | Tallow | Vm/Va | Tm/Ta | D/C |
|---|---|---|---|---|---|---|---|
| A | 8.15 | 25.54 | 5.03 | 7.43 | 1.62 | 3.44 | 3.43 |

Table 12 - Bolt Loads for Plastic Capacity of 22" Dia. Pile/0.375" thick - Mp = 6314 "-k based on 36 ksi yield

Tmax = 143k, which is nearly 5x greater than published tension test capacity of 29.72 kips
D/C = 4.8

PHILADELPHIA
ATLANTA
CHARLOTTE
CHERRY HILL
CHICAGO
DALLAS
DENVER
HOUSTON
LAS VEGAS
LONDON
LOS ANGELES

## COZEN
## O'CONNOR
### ATTORNEYS

NEWARK
NEW YORK
SAN DIEGO
SAN FRANCISCO
SEATTLE
TRENTON
WASHINGTON, DC
WEST CONSHOHOCKEN
WICHITA
WILMINGTON

SUITE 2400   425 CALIFORNIA STREET   SAN FRANCISCO, CA 94104-2215
415.617.6100   800.818.0165   415.617.6101 FAX   www.cozen.com

**Forrest Booth**
Direct Phone 415.617.6105
fbooth@cozen.com

April 19, 2005

VIA FACSIMILE

Thomas M. Tarpley, Esq.
Law Offices of Tarpley & Moroni, LLP
Suite 402, Bank of Hawaii Building
134 West Soledad Avenue
Hagåtña, Guam 96910

Re:   Port Authority of Guam
      Our File No.:   123206

Dear Tom:

As you know, we have scheduled the deposition of one of Plaintiff's two experts, Elliott Boone, for May 12th in San Francisco. You have indicated that you probably will not attend this deposition, since in your view Plaintiff's expert has no opinions that EMPSCO breached the duty of care or otherwise did anything wrong in connection with the Shell F-1 pier project. This is not correct. In Mr. Boone's report of May 12, 2004, he clearly states that it is the engineer of record's responsibility to see that critical elements of his design are correctly completed. Your client EMPSCO was the engineer of record on this project. EMPSCO approved in writing the fatally-defective design which Winzler & Kelly prepared for Black, thereby directly causing damage to the Port's property, in the opinion of Plaintiff's expert.

Mr. Boone also believes that EMPSCO's services in this matter fell below the required standard of care, because calculations supporting the Winzler & Kelly design were never provided, and EMPSCO never followed up to determine why they were not. EMPSCO's service also fell below the standard of care because testing of epoxy was a code requirement in this installation, and EMPSCO should have required that it be done, but failed to do so. EMPSCO's work was also deficient because EMPSCO approved the Anchor-It epoxy product as a substitute for the product Winzler & Kelly specified, when the Anchor-It product is specifically not recommended by its manufacturer for overhead use. Furthermore, to the extent it is an engineering and not a legal question, Mr. Boone is of the opinion that EMPSCO did not perform its services in a "workmanlike" manner, as was required by its contract with the Port.

April 19, 2005
Page 2

---

I bring these matters to your attention so that you can evaluate whether or not to attend Mr. Boone's deposition.

Very truly yours,

COZEN O'CONNOR

By:    Forrest Booth

FB/dhd

SANFRAN\1316781\1 099997.000