CARLSMITH BALL LLP

DAVID LEDGER
ELYZE McDONALD
134 West Soledad Avenue
Bank of Hawaii Bldg., Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Tel No. (671) 472-6813

COZEN O'CONNOR

FORREST BOOTH
ERIK M. KOWALEWSKY
425 California Street, Suite 2400
San Francisco, CA 94104-2215
Tel No. (415) 617-6100

Attorneys for Plaintiff
S.J. Gargrave Syndicate at Lloyds

**FILED**
DISTRICT COURT OF GUAM
'APR 29 2005 *p*
**MARY L.M. MORAN**
**CLERK OF COURT**



IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| S.J. GARGRAVE SYNDICATE AT LLOYDS,<br><br>          Plaintiff,<br><br>vs.<br><br>BLACK CONSTRUCTION CORPORATION, WINZLER & KELLY, and ENGINEERING MANAGEMENT & PLANNING SERVICES CORPORATION,<br><br>          Defendants. | CIVIL CASE NO. CV03-00009<br><br>**PLAINTIFF'S OPPOSITION TO EMPSCO'S EMERGENCY MOTION FOR PROTECTIVE ORDER AND MOTION IN LIMINE RESTRICTING EXPERT'S TESTIMONY AT TRIAL; DECLARATION OF FORREST BOOTH; EXHIBITS A-H; DECLARATION OF SERVICE** |

## I.  INTRODUCTION

Pursuant to this Court's Order filed herein on April 26, 2005, Plaintiff S.J.

GARGRAVE SYNDICATE AT LLOYDS (hereinafter "Plaintiff") herewith files its Opposition

to EMPSCO's Emergency Motion for Protective Order and Motion in Limine Restricting Expert's Testimony at Trial (hereinafter the "Motion"). EMPSCO's Motion should be denied because Plaintiff's recent supplementation of its expert's report was not only appropriate, but in fact was **required** by the Federal Rules of Civil Procedure. EMPSCO's recent motions for summary judgment and judgment on the pleadings, alleging that EMPSCO did nothing wrong, were **denied** by the Court. Now EMPSCO seeks to keep Plaintiff from proving, through its expert, what EMPSCO did wrong. This Motion is equally ill-considered and it, too, should be denied.

## II. STATEMENT OF FACTS

Plaintiff insures the Port Authority of Guam (hereinafter the "Port Authority"). On December 28, 1995, Defendant EMPSCO entered into a contract with the Port Authority to provide (1) professional structural engineering design services and (2) construction supervision for the repair and upgrade of the F-1 fuel pier belonging to the Port Authority. <u>See</u> contract between EMPSCO and the Port Authority, attached as Exhibit F to the Declaration of Forrest Booth, filed herewith (hereinafter the "Booth Declaration"), p. 10, ¶ 17 (Professional Liability) and Scope of Work, p. 12, ¶ 1. The contract provided that EMPSCO would perform its services in a "workmanlike and diligent manner" (Exhibit F, p. 2), and that EMPSCO would perform all work "necessary for a full and complete design ...". *Id.* EMPSCO assumed "entire responsibility and liability for any and all damage ... of any kind or nature whatever ... to all property, caused by, resulting from, arising out of or occurring in connection with the execution of the scope of work by [EMPSCO], its agents and employees." *Id.*, p. 4. Finally, the contract provided that

> [EMPSCO] warrants that it is an experienced construction manager, properly and duly licensed under the government of Guam. It hereby certifies and warrants that it shall see that the

2.

contractor shall carry out and perform the work in a proper manner; and if done improperly by the contractor, then [EMPSCO] hereunder shall be liable, like other professionals, for damages and the Port's attorneys fees as a result of [EMPSCO's] improper or negligent acts ...

*Id.*, p. 10.

In fact, EMPSCO performed its services to the Port negligently, carelessly, and in a manner which falls well below the standard of care required of professional structural engineers. See the supplemental report of Plaintiff's expert structural engineer Elliott Boone, attached as Exhibit B to the Booth Declaration. Accordingly, on December 23, 2003, Plaintiff filed its First Amended Complaint herein, adding EMPSCO as a defendant in the litigation, and alleging claims against EMPSCO for breach of contract, breach of warranty of workmanlike performance, and negligent property damage.

On November 12, 2004, EMPSCO filed motions for summary judgment and for judgment on the pleadings in this matter. The motions were denied by Judge Jones on April 8, 2005. See Judge Jones' Order attached as Exhibit E to the Booth Declaration, p. 21, ¶¶ 5 and 6. Having tried summary judgment and lost, EMPSCO now seeks the same relief via a different route, namely its misnamed Motion in Limine to prevent Plaintiff's expert Elliott Boone from expressing his opinions, first disclosed over a year ago,[1] that EMPSCO's services to the Port fell below the standard of care required of a professional engineer. EMPSCO's so-called Motion in Limine is at least honest enough to not claim that EMPSCO was either surprised by Mr. Boone's supplemental report, or that EMPSCO would suffer any real hardship by attending Mr. Boone's

---

[1]      Plaintiff's theories against EMPSCO were first disclosed in Plaintiff's First Amended Complaint in December of 2003; EMPSCO has known of them for 17 months now. In addition, Mr. Boone's initial report, issued May 12, 2004, clearly described some of the shortcomings of EMPSCO, the Engineer of Record: "It is the Engineer's responsibility to see that critical elements of his design are correctly completed in accordance with his intentions. If an equal were to be allowed, proper engineering practice would have been to see that adequate inspection was undertaken to assure the design would function as intended." Boone report, Exhibit G to the Booth Declaration, p. 9. It cannot be disputed that EMPSCO was the Engineer of Record on this project. See Port Authority letter appointing EMPSCO Engineer of Record, Exhibit D to the Booth Declaration.

3.

deposition in California (in person or by telephone) on May 12, 2005, to which date and place the other two Defendants have readily agreed. Plaintiff's supplemental disclosure of Mr. Boone's opinions was not only appropriate, but was required. See, *infra*, section III. A. EMPSCO's Motion must be denied.

## III. DISCUSSION

### A. Plaintiff Had The Duty, As Well As The Right, To Supplement Its Expert Witness Disclosure To Make It Complete, And Timely Did So

EMPSCO's argument is based entirely on the mistaken premise that, because Federal Rule of Civil Procedure 26(a)(2)(B)[2] requires an initial disclosure of "a complete statement of all opinions to be expressed" by an expert, Mr. Boone cannot later supplement his report, such as to address facts obtained after Plaintiff's May 12, 2004, expert disclosure.[3]

EMPSCO has not read the entire Rule. Under Rule 26(e), Plaintiff had the *legal duty* to supplement its May 12, 2004, disclosure to take into account newly acquired information:

> "A party who has made a disclosure under subdivision (a) . . . *is under a duty to supplement or correct the disclosure . . . to include information thereafter acquired* if . . . (1) . . . the party learns that in some material respect the information disclosed is incomplete or incorrect . . . *With respect to testimony of an expert*

---

[2]   Hereinafter, textual references to "Rule" are to the specified Federal Rule of Civil Procedure.

[3]   EMPSCO's Motion neglects to mention the authority on which it must be based, Rule 37(c)(1). That Rule provides in pertinent part that "[a] party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) . . . is not, unless such failure is harmless, permitted to use as evidence . . . any witness or information not so disclosed," and/or may be subject to other sanctions. Fed. R. Civ. P. 37(c)(1). As discussed below, *Plaintiff has complied fully with its obligations under Rule 26(a) and 26(e)(1)*. However, it is appropriate to note that, even where a party has not complied, "[p]recluding testimony from the expert under this rule *is a drastic remedy* and should only be applied in cases where the party's conduct represents *flagrant bad faith and callous disregard of the federal rules*." *McNerney v. Archer Daniels Midland Co.*, 164 F.R.D. 584, 587 (W.D.N.Y. 1995) (emphasis added); *accord, Sullivan v. Glock, Inc.*, 175 F.R.D. 497, 504 (D. Md. 1997); *Reed v. Binder*, 165 F.R.D. 424, 431 (D.N.J. 1996). EMPSCO has not even attempted to make such a showing. Further, in *McNerney*, the court remedied the failure it found, not by precluding the expert's testimony, but by allowing the aggrieved party to depose the expert outside the discovery period. 164 F.R.D. at 587; *accord, Galentine v. Holland Am. Line*, 333 F.Supp.2d 991, 994-95 (W.D. Wash. 2004) and *Absolute Envtl. Serv. v. McKinley*, No. A03-0199CV, 2005 WL 820415, at *1 (D. Alaska Apr. 4, 2005) (both cases ruling that the remedy of a further deposition was appropriate, on similar facts). Of course, in this case Mr. Boone's deposition has not yet been taken. If, despite Plaintiff's thorough disclosures, EMPSCO believes it does not understand Mr. Boone's opinions, its remedy is clear; it can attend his deposition and ask questions.

4.

> *from whom a report is required under subdivision (a)(2)(B) the*
> *duty extends . . . to information contained in the report . . .."*

Fed. R. Civ. P. 26(e) (emphasis added).

> Subdivision (e) provides that a party is not under a continuing
> burden [to supplement discovery responses] except as expressly
> provided ... An exception is ... [provided] as to expert trial
> witnesses in order to carry out the provisions of Rule 26(b)(4). *See*
> *Diversified Products Corp. v. Sports Center Co.*, 42 F.R.D. 3
> (D.Md. 1967).

Advisory Committee Notes to the 1970 Amendment to Rule 26, Subdivision (e) –
Supplementation of Responses.

All supplementation must be complete "by the time the party's disclosures under
Rule 26(a)(3) are due." Fed. R. Civ. P. 26(e). Under both the default rule in Rule 26(a)(3) and
Section 3.e. of the Court's June 11, 2003, Scheduling Order,[4] the cut-off date is therefore 30 days
before trial, or **May 13, 2005**. Plaintiff more than met that deadline.

Plaintiff advised counsel for EMPSCO in detail of its theories against EMPSCO
by letter dated April 19, 2005. See Exhibit A to the Booth Declaration. Plaintiff then made its
supplemental expert disclosure on **April 22, 2005**, Booth Declaration, Exhibit C, more than three
weeks before the cutoff, and as soon as practicable after acquiring and digesting new information
concerning, *inter alia*, the role of EMPSCO in designing and approving the repairs to the F-1
Pier.

Plaintiff herein has clearly acted as required by Rule 26. That being said, some
courts have engaged in a further analysis to ensure that technically timely supplements to an
expert disclosure are not used as "ambush tactics." *See Tucker v. Ohtsu Tire & Rubber Co.,*
*Ltd.*, 49 F.Supp.2d 456, 461 (D. Md. 1999); *Potomac Elec. Power Co. v. Electric Motor Supply,*

---

[4]        This section of the original Scheduling Order has not been altered or modified by the subsequent
amendments to the Scheduling Order.

5.

*Inc.*, 192 F.R.D. 511, 514 (D. Md. 2000). Applying each of the four factors identified by the *Tucker* court[5] to this case, Mr. Boone's April 21, 2005, supplemental disclosure is appropriate and not the result of "ambush tactics":

1.   "The explanation for making the supplemental disclosure at the time it was made." *Tucker*, 49 F.Supp.2d at 461. Here, Plaintiff received the information on which the supplemental disclosure is based in part, after discovery cut-off, Booth Declaration, ¶ 9, and Mr. Boone required some time to digest the new information and to form his opinions.

2.   "[T]he importance of the supplemental information to the proposed testimony of the expert, and the expert's importance to the litigation." *Id.* The information addressed in the supplemental disclosure fills in gaps in Plaintiff's knowledge concerning EMPSCO's precise role in the repair of the F-1 Pier, and provides further support for EMPSCO's liability herein. Mr. Boone is Plaintiff's primary expert concerning the required standard of care by structural engineers and contractors, and his testimony will be central to Plaintiff's case against all three of the Defendants herein.

3.   "[P]otential prejudice to an opposing party." *Id.* There is absolutely no prejudice to EMPSCO. EMPSCO has known of the theories against it since December of 2003, when the First Amended Complaint was filed. It has had the details of Plaintiff's theories since April 19, 2005, when counsel for Plaintiff wrote to counsel for EMPSCO (Exhibit A to the Booth Declaration) and it has had Plaintiff's supplemental disclosure since

---

[5]   The *Tucker* court cited the following cases as the source of the factors: *Reliance Ins. Co. v. Louisiana Land & Exploration Co.*, 110 F.3d 253, 257 (5th Cir. 1997) and *Sullivan, supra*, 175 F.R.D. at 506-07.

6.

4836-3219-2768.1.055639-00001

Case 1:03-cv-00009   Document 169   Filed 04/29/2005   Page 6 of 40

*Inc.*, 192 F.R.D. 511, 514 (D. Md. 2000). Applying each of the four factors identified by the *Tucker* court[5] to this case, Mr. Boone's April 21, 2005, supplemental disclosure is appropriate and not the result of "ambush tactics":

1.   "The explanation for making the supplemental disclosure at the time it was made." *Tucker*, 49 F.Supp.2d at 461. Here, Plaintiff received the information on which the supplemental disclosure is based in part, after discovery cut-off, Booth Declaration, ¶ 9, and Mr. Boone required some time to digest the new information and to form his opinions.

2.   "[T]he importance of the supplemental information to the proposed testimony of the expert, and the expert's importance to the litigation." *Id.* The information addressed in the supplemental disclosure fills in gaps in Plaintiff's knowledge concerning EMPSCO's precise role in the repair of the F-1 Pier, and provides further support for EMPSCO's liability herein. Mr. Boone is Plaintiff's primary expert concerning the required standard of care by structural engineers and contractors, and his testimony will be central to Plaintiff's case against all three of the Defendants herein.

3.   "[P]otential prejudice to an opposing party." *Id.* There is absolutely no prejudice to EMPSCO. EMPSCO has known of the theories against it since December of 2003, when the First Amended Complaint was filed. It has had the details of Plaintiff's theories since April 19, 2005, when counsel for Plaintiff wrote to counsel for EMPSCO (Exhibit A to the Booth Declaration) and it has had Plaintiff's supplemental disclosure since

---

[5]   The *Tucker* court cited the following cases as the source of the factors: *Reliance Ins. Co. v. Louisiana Land & Exploration Co.*, 110 F.3d 253, 257 (5th Cir. 1997) and *Sullivan, supra*, 175 F.R.D. at 506-07.

*Inc.*, 192 F.R.D. 511, 514 (D. Md. 2000). Applying each of the four factors identified by the *Tucker* court[5] to this case, Mr. Boone's April 21, 2005, supplemental disclosure is appropriate and not the result of "ambush tactics":

1.   "The explanation for making the supplemental disclosure at the time it was made." *Tucker*, 49 F.Supp.2d at 461. Here, Plaintiff received the information on which the supplemental disclosure is based in part, after discovery cut-off, Booth Declaration, ¶ 9, and Mr. Boone required some time to digest the new information and to form his opinions.

2.   "[T]he importance of the supplemental information to the proposed testimony of the expert, and the expert's importance to the litigation." *Id.* The information addressed in the supplemental disclosure fills in gaps in Plaintiff's knowledge concerning EMPSCO's precise role in the repair of the F-1 Pier, and provides further support for EMPSCO's liability herein. Mr. Boone is Plaintiff's primary expert concerning the required standard of care by structural engineers and contractors, and his testimony will be central to Plaintiff's case against all three of the Defendants herein.

3.   "[P]otential prejudice to an opposing party." *Id.* There is absolutely no prejudice to EMPSCO. EMPSCO has known of the theories against it since December of 2003, when the First Amended Complaint was filed. It has had the details of Plaintiff's theories since April 19, 2005, when counsel for Plaintiff wrote to counsel for EMPSCO (Exhibit A to the Booth Declaration) and it has had Plaintiff's supplemental disclosure since

---

[5]   The *Tucker* court cited the following cases as the source of the factors: *Reliance Ins. Co. v. Louisiana Land & Exploration Co.*, 110 F.3d 253, 257 (5th Cir. 1997) and *Sullivan, supra*, 175 F.R.D. at 506-07.

April 22, 2005, Booth Declaration, Exhibit C. Mr. Boone's deposition is set for May 12, 2005. EMPSCO has plenty of time to prepare for and attend Mr. Boone's deposition. As the *Tucker* court said, "To be sure, [EMPSCO] would rather not undertake the time and expense of further discovery regarding [Mr. Boone's] opinions, but this alone is not sufficient to grant [its] motion." *Id.* at 463.[6]

4.      "The availability of a continuance to mitigate any prejudice." *Id.* at 461. There is no prejudice here, and Plaintiff submits that the availability of a continuance is immaterial.

In short, EMPSCO's Motion in Limine is without basis. Plaintiff's supplemental disclosure was **required** by Rule 26(e), was timely, and EMPSCO has suffered no prejudice by it.

**B.      There Is No Basis For Restricting The Scope Of Black's And Winzler & Kelly's Questioning Of Mr. Boone**

EMPSCO's request for a protective order limiting Mr. Boone's deposition testimony is overbroad. It is legally insupportable and must be denied, since the requested relief is inappropriate. If EMPSCO feels aggrieved, it should address its request for relief to the trial court, at the time of trial. "The duty [to supplement discovery responses] will normally be enforced ... through sanctions imposed by the trial court, including exclusion of evidence, continuance, or other action, as the court may deem appropriate." Advisory Committee Notes to the 1970 Amendment to Rule 26, Subdivision (e) – Supplementation of Responses. There was

---

[6]      Indeed, the court in *Tucker* recognized that new opinions expressed by an expert for the first time even *at deposition*, if timely, are "a form of supplementation permitted by Rule 26(e)(1)." 49 F.Supp.2d at 460; *accord Ways v. City of Lincoln*, 206 F.Supp.2d 978, 989 (D. Neb. 2002) ("Thus, even if deposition testimony sets forth opinions not disclosed in a Rule 26(a)(2)(B) report, it does not necessarily follow that such testimony is inadmissible . . . ").

7.

no reason for EMPSCO to bother the Court prematurely at this time.

Next, as discussed above at **III. A.**, Plaintiff has timely made all necessary disclosures, and Mr. Boone's testimony will not be limited to the issues in his May 12, 2004, report.[7] There can be no issue of "annoyance, embarrassment, oppression, or undue burden or expense" involved in EMPSCO's attending the deposition to protect its interests. Fed. R. Civ. P. 26(c); *cf. Tucker, supra*, 49 F.Supp. 2d at 463 (holding that the time and expense of conducting further discovery regarding recently-disclosed expert opinions is not sufficient to grant a motion to exclude that expert's testimony).[8]

Moreover, even if the Court were to give credence to EMPSCO's argument that Plaintiff is precluded from offering Mr. Boone's opinions against EMPSCO – which the Court should not – there would still be no basis for issuing a protective order. Such an order would deprive the other Defendants, Black and Winzler & Kelly, of their rights to properly defend themselves. Both Black and Winzler & Kelly have the right to "depose any person who has been identified as an expert whose opinions may be presented at trial." Fed. R. Civ. P. 26(b)(4). Indeed, Winzler & Kelly went one step further, and included in the list of experts whose opinions it may offer at trial, "[a]ny and all individuals designated as experts by any other party . . .," such as Mr. Boone. See, Winzler & Kelly's Expert Disclosure, filed July 16, 2004, Exhibit H to the Booth Declaration, p. 2, ¶ 2. Winzler & Kelly and Black will no doubt wish to question Mr. Boone about issues which might tend to show that EMPSCO, and not either of them, is liable for Plaintiff's damages.

---

[7]     Although, if Mr. Boone's testimony were limited to the issues in his May 12, 2004, report, that testimony would still include the bases for the liability of the engineer of record, which was EMPSCO. See, n. 1, *supra*.

[8]     EMPSCO's counsel has already personally attended several depositions in this case. If EMPSCO is so concerned about the cost of flying to San Francisco to attend the deposition of Plaintiff's key expert, its counsel may certainly participate telephonically.

8.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff requests that the Court deny EMPSCO's
Motion in its entirety.

DATED: Hagåtña, Guam, 28th April, 2005.

CARLSMITH BALL LLP

DAVID LEDGER
ELYZE McDONALD
Attorneys for Plaintiff
S.J. Gargrave Syndicate at Lloyds

CARLSMITH BALL LLP

DAVID LEDGER
ELYZE McDONALD
134 West Soledad Avenue
Bank of Hawaii Bldg., Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Tel No. (671) 472-6813

COZEN O'CONNOR

FORREST BOOTH
ERIK M. KOWALEWSKY
425 California Street, Suite 2400
San Francisco, CA 94104-2215
Tel No. (415) 617-6100

Attorneys for Plaintiff
S.J. Gargrave Syndicate at Lloyds

## IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| S.J. GARGRAVE SYNDICATE AT LLOYDS, | CIVIL CASE NO. CV03-00009 |
| Plaintiff, | |
| vs. | DECLARATION OF FORREST BOOTH IN OPPOSITION TO EMPSCO'S EMERGENCY MOTION FOR PROTECTIVE ORDER AND MOTION IN LIMINE RESTRICTING EXPERT'S TESTIMONY AT TRIAL; DECLARATION OF SERVICE |
| BLACK CONSTRUCTION CORPORATION, WINZLER & KELLY, and ENGINEERING MANAGEMENT & PLANNING SERVICES CORPORATION, | |
| Defendants. | |

I, Forrest Booth, declare:

1.     I am an attorney duly licensed to practice law before all courts in the State

of California, and am admitted *pro hac vice* herein.  I am a member of the law firm of Cozen

O'Connor, counsel of record for Plaintiff S.J. GARGRAVE SYNDICATE AT LLOYDS (hereinafter "Plaintiff").

2.    Recently, all counsel in this matter had a conference call to discuss the scheduling of expert depositions. During that conference call, Thomas M. Tarpley, Jr., attorney for Defendant EMPSCO, stated that he did not need to attend the deposition of Elliott H. Boone, one of Plaintiff's two experts herein, because Mr. Boone would not be expressing any opinions regarding negligence, breach of contract and other errors and omissions by EMPSCO. I immediately faxed a letter to Mr. Tarpley, on April 19, 2005, advising him that he was incorrect in his assumption. I pointed out the areas in which Mr. Boone believes EMPSCO's services were deficient, negligent, and below the required standard of care for professional engineers and designers. A true and correct copy of the April 19, 2005, letter is attached hereto as Exhibit A.

3.    On April 21, 2005, Mr. Boone provided me with his Supplemental Report. A true and correct copy of the Supplemental Report is attached hereto as Exhibit B. I distributed the Supplement Report to all counsel in this case by email on April 22, 2005. A copy of the transmittal email is attached hereto as Exhibit C. Mr. Boone's Supplemental Report clearly states that it is based upon new information which he has received, and that his second report supplements his first.

4.    EMPSCO was appointed the Engineer of Record by the Port Authority of Guam for the F-1 Pier Repair and Upgrade project by letter dated October 16, 1995. A true and correct copy of that letter is attached hereto and marked as Exhibit D. This document was produced to us by EMPSCO as part of its Initial Disclosures in this litigation.

5.    Attached hereto and marked as Exhibit E is a true and correct copy of a portion of this Court's Order herein dated April 18, 2005 (Judge Robert Clive Jones), *inter alia,*

2.

denying EMPSCO's motion for summary judgment. <u>See,</u> p. 21, ¶¶ 5 and 6 thereof.

6.       Attached hereto and marked as Exhibit F is a true and correct copy of the contract between EMPSCO and the Port Authority of Guam, dated December 28, 1995.

7.       Attached hereto and marked as Exhibit G is a true and correct copy of Elliott H. Boone's initial expert report herein, dated May 12, 2004.

8.       Attached hereto and marked as Exhibit H is a true and correct copy of Winzler & Kelly's expert disclosure, filed herein on July 16, 2004.

9.       Although formal discovery in this matter closed on November 5, 2004 (pursuant to the Scheduling Order filed herein on August 19, 2004), Plaintiff since that date has continued its investigation of the facts surrounding the damage to the Port's F-1 Pier resulting from the errors and omissions of the Defendants. Plaintiff's investigation, and that of its experts, investigators and consultants, has resulted in the development of additional facts which support Plaintiff's case herein. This informal investigation was necessitated, in part, because Plaintiff was prevented from taking the depositions of two important witnesses, Rod Bismonte and Perfecto Jose. Mr. Jose, although under subpoena, failed to appear for his deposition. I continued to provide Mr. Boone on a regular basis with newly-discovered evidence, after the date of discovery cut-off, to ensure that he would be fully informed in expressing his opinions and conclusions herein. Some of the newly-discovered information bears upon the liability of EMPSCO herein, in the opinion both Mr. Boone and of counsel for Plaintiff.

/ / /

/ / /

/ / /

/ / /

3.

Sworn this 28th day of April, 2005 under penalty of perjury under the laws of the State of California and of the United States at San Francisco, California.

_____

FORREST BOOTH

4.

**EXHIBIT A**

PHILADELPHIA
ATLANTA
CHARLOTTE
CHERRY HILL
CHICAGO
DALLAS
DENVER
HOUSTON
LAS VEGAS
LONDON
LOS ANGELES



**COZEN**
**O'CONNOR**
ATTORNEYS

NEWARK
NEW YORK
SAN DIEGO
SAN FRANCISCO
SEATTLE
TRENTON
WASHINGTON, DC
WEST CONSHOHOCKEN
WICHITA
WILMINGTON

SUITE 2400    425 CALIFORNIA STREET    SAN FRANCISCO, CA 94104-2215
415.617.6100    800.818.0165    415.617.6101 FAX    www.cozen.com

April 19, 2005

**Forrest Booth**
Direct Phone 415.617.6105
fbooth@cozen.com

**VIA FACSIMILE**

Thomas M. Tarpley, Esq.
Law Offices of Tarpley & Moroni, LLP
Suite 402, Bank of Hawaii Building
134 West Soledad Avenue
Hagåtña, Guam 96910

Re:     Port Authority of Guam
        Our File No.:    123206

Dear Tom:

As you know, we have scheduled the deposition of one of Plaintiff's two experts, Elliott Boone, for May 12th in San Francisco. You have indicated that you probably will not attend this deposition, since in your view Plaintiff's expert has no opinions that EMPSCO breached the duty of care or otherwise did anything wrong in connection with the Shell F-1 pier project. This is not correct. In Mr. Boone's report of May 12, 2004, he clearly states that it is the engineer of record's responsibility to see that critical elements of his design are correctly completed. Your client EMPSCO was the engineer of record on this project. EMPSCO approved in writing the fatally-defective design which Winzler & Kelly prepared for Black, thereby directly causing damage to the Port's property, in the opinion of Plaintiff's expert.

Mr. Boone also believes that EMPSCO's services in this matter fell below the required standard of care, because calculations supporting the Winzler & Kelly design were never provided, and EMPSCO never followed up to determine why they were not. EMPSCO's service also fell below the standard of care because testing of epoxy was a code requirement in this installation, and EMPSCO should have required that it be done, but failed to do so. EMPSCO's work was also deficient because EMPSCO approved the Anchor-It epoxy product as a substitute for the product Winzler & Kelly specified, when the Anchor-It product is specifically not recommended by its manufacturer for overhead use. Furthermore, to the extent it is an engineering and not a legal question, Mr. Boone is of the opinion that EMPSCO did not perform its services in a "workmanlike" manner, as was required by its contract with the Port.

I bring these matters to your attention so that you can evaluate whether or not to attend Mr. Boone's deposition.

Very truly yours,

COZEN O'CONNOR


By:     Forrest Booth

FB/dhd

SANFRAN1\31678\1 099997.000

**EXHIBIT** B



**CASH & ASSOCIATES**
Engineering and Architecture

Elliott H. Boone
Randy H. Mason
Wilfrido B. Simbol
Kerry M. Simpson

April 21, 2005

Attention: Mr. Forrest Booth
Cozen O'Connor Attorneys
424 California Street, Suite 2400
San Francisco, CA 94194-2215

Attention: Mr. David Ledger
Carlsmith Ball LLP
P.O. Box BF
Hagatna, Guam 96932-5027

Subject:     FOXTROT F-1 PIER
            PORT AUTHORITY OF GUAM
            Cozen O'Connor Reference No. 123206
            (C&A Project No. 6090.00)

Gentlemen:

In light of the additional information which you have provided, I have reviewed and given more thought to this assignment. As a result of this effort, I have reached some additional conclusions to those set forth in my letter May 12, 2004.

I have concluded a review of the documentation provided to me relating to the role of Engineering, Management & Planning Services Corporation (EMPSCO), Agana, Guam as engineering consultants retained under contract to the Port Authority of Guam (PAG) in the Foxtrot F-1 Pier matter. EMPSCO was retained under contract by the PAG to prepare construction contract documents, commonly referred to as plans and specifications, in a format suitable for pubic bid . As part of that contract EMPSCO was also required to review and comment on the Contractor's proposed methods of repair, and on the products and materials to be used in the repairs and upgrade to the Foxtrot F-1 Pier.

At the conclusion of the bidding process, PAG received a suggested change to the construction documents from the apparent low bidder, Black Construction Corporation (BCC). The suggested change, depicted in the drawing known as Sheet VE-1, was prepared by Winzler & Kelley (W&K), was accepted by the PAG and was incorporated into the construction contract and constructed by BCC.

BCC submitted its Submittal No 12 - Proposed Pile Repair Details: W&K Drawing Sheet VE-1 Job No 9642404 (dated 04/04/96) to EMPSCO as part of the review process established in Specification Section 01300, Submittals. The review comments returned by EMPSCO were as follows:

5772 Bolsa Avenue, Suite 100 ■ Huntington Beach, CA 92649 USA ■ TEL:714.895.2072 ■ FAX 714.895.1291
Mail: P.O. Box 2715, Huntington Beach, CA 92647-0715 ■ Web Site: www.cashossociates.com ■ A California Corporation

Case 1:03-cv-00009    Document 169    Filed 04/29/2005    Page 18 of 40

Mr. Forrest Booth
Cozen O'Connor Attorneys
Mr. David Ledger
Carlsmith Ball LLP
April 21, 2005

FOXTROT F-1 PIER
PORT AUTHORITY OF GUAM
Cozen O'Connor Reference No. 123206
(C&A Project No. 6090.00)
Page 2

Our review of Submittal No. 12 raises the following comments:

1. The general concept outlining the proposed method of repair is hereby approved in concept.

2. Specifications requirements for welds should clearly be indicated.

3. Establish and Identify lengths of new pile sections.

4. Provide statements by way of describing on (sic) orderly progression of the work involve (sic).

5. Provide structural calculations verifying that proposed repair meets design requirements. (emphasis added)

6. In reference to detail NO. 3 of Sheet VE-1; there is concern regarding the condition of the base plate attachment to the existing concrete pile cap. It is assumed that the a (sic) portion of the existing corroded steel pile is embedded into the concrete pile cap. How does the contractor intend to treat this existing condition prior to installing the new base plate.

This submittal is hereby forwarded with our action recommending "approval as noted".

I noted that of the six items, five of them require action by BCC. I find no response to an essential element of the repair, i.e., that calculations be provided verifying that the proposed repair meets the design requirements or that such information was subsequently reviewed by EMPSCO, as required as a condition of their approval.

Regarding Submittal No 18a, Epoxy Bolts for Steel Plate Anchor, the review comments returned by EMPSCO were as follows:

Review of submittal No . 18a is hereby forwarded with the following comments:

(a) This submittal applies to the use of epoxy resin materials
(b) Submit other pertinent items relevant to the use of epoxy bolts for this project.
(c) Submit manufacturer's certificate of compliance.
(d) Submit test datas (sic) by independent laboratory testing.

We recommend approval of this submittal subject to the above comments.

The review by EMPSCO does not reflect the fact that BCC was requesting a substitution of the epoxy system shown on drawing Sheet VE-1, which should have drawn more attention from the Engineer of Record for VE-1, W&K. EMPSCO should have insisted that W&K, as Engineer of Record for that design, approve the substitution prior to EMPSCO's review of it. More serious is the fact that I can find nothing in my review of the information provided to me which shows that

Mr. Forrest Booth
Cozen O'Connor Attorneys
Mr. David Ledger
Carlsmith Ball LLP
April 21, 2005

FOXTROT F-1 PIER
PORT AUTHORITY OF GUAM
Cozen O'Connor Reference No. 123206
(C&A Project No. 6090.00)
Page 3

EMPSCO confirmed that the capacity of the substitute epoxy system in Submittal 18a met the requirements of the project, the calculations for which were requested in the response to Submittal Number 12.

The critical importance of the conditions attached to both of the approvals given following EMPSCO 's review of Submittal Numbers 12 and 18a cannot be overstated. Submittal No. 12 requested calculations verifying that the (substitute VE-1) proposal met the design requirements. Yet EMPSCO knowingly permitted construction to proceed while this basic question relating to the adequacy of the proposed design went unresolved, and never followed up to see why the calculations were not submitted as requested. EMPSCO approved the use of the Anchor-It epoxy system in Submittal Number 18a without recognizing that it was a substitution of materials and did so without knowing if the substitute epoxy system did or did not meet the capacity requirements of the design, the details of which they had requested in the prior Submittal Number 12. In my opinion, it was the responsibility of EMPSCO to confirm that the conditions of their approval were met, and to insist that construction not proceed until satisfactory resolution was at hand. EMPSCO should also have insisted on a special inspection of the epoxy installation, and on testing of the bolts after installation, a code requirement, to confirm proper installation and bolt performance. Their failure to do so falls far short of the standard of care that is expected of an engineering firm in these circumstances.

If you have any questions please contact me.

Very truly yours,

CASH & ASSOCIATES

Elliott H. Boone, S.E.
Executive Vice President

EHB:cd
G:project/ehb/6090000-42505.doc

**EXHIBIT C**

## Booth, Forrest

| | |
|---|---|
| **From:** | Booth, Forrest |
| **Sent:** | Friday, April 22, 2005 1:39 PM |
| **To:** | 'Thomas C. Sterling'; 'Thomas M. Tarpley'; 'O'Connor Berman Dotts & Banes' |
| **Cc:** | 'Dean Robb'; 'David Ledger'; 'Stephen Smith' |

**Subject:** Boone supplemental report

Gentlemen:

Enclosed is the supplement to Mr. Boone's report, based on the new information we have gathered. I just received it.

4/28/2005

**EXHIBIT D**

[REPRODUCED AT GOVERNMENT OF GUAM EXPENSE]



# PORT AUTHORITY OF GUAM
## ATURIDAT I PUETTON GUAHAN
GOVERNMENT OF GUAM
1026 Cabras Highway
Suite 201
Piti, Guam 96925

Telephone: (671) 477-5931/35
(671) 477-2683/85
Telex: (721) 6689 PAGGUM
Facsimile: (671) 477-2689

**OCT 16 1995**

Mr. Petronilo Q. Villaluz, P.E.
Managing Engineer
EMPSCO - Engineering Consultants
Suite 245 Julale Shopping Center
Agana, Guam 96910

        Subject:  RFP for the Design and Upgrade of Existing F-1 Fuel
                  Pier (Shell Fuel Pier).

Hafa Adai Mr. Villaluz:

This letter is to inform you that the Port selection committee has
selected your firm to perform the A/E Design and up-grade of the F-
1 fuel pier.

The Port now wishes to proceed to discuss the Scope of Work more in
detail, and negotiate a contract with your firm at the earliest.
Please contact Mr. Bill Payne Officer-In-Charge Planning and
Development at 477-5931/35 ext. 310, or Mr. Simeon Delos Santos at
477-5931 ext.357 so we can arrange a meeting.

                        Si Yu'os Ma'ase,

                        E.C. BERMUDES
                        General Manager

Pong,
I'll be informing you on the meeting as
soon as it can be arranged.

Simeon



Commonwealth Now!

**EXHIBIT E**

**FILED**
DISTRICT COURT OF GUAM

APR 1-8 2005

MARY L.M. MORAN
CLERK OF COURT

DISTRICT COURT OF GUAM

TERRITORY OF GUAM

| | |
|---|---|
| S.J. GARGRAVE SYNDICATE AT LLOYDS, | |
| Plaintiff, | Civil Case No. 03-00009 |
| vs. | |
| BLACK CONSTRUCTION CORPORATION, WINZLER & KELLY, and ENGINEERING MANAGEMENT & PLANNING SERVICES CORPORATION, | ORDER |
| Defendants. | |

This matter is before the Court on the following motions: 1) Defendant, Black Construction Corporation's Motion for Partial Summary Judgment, or Alternatively, to Dismiss; 2) Defendant, Winzler & Kelly's Motion for Judgment on the Pleadings, on Ninth Cause of Action; 3) Defendant, Winzler & Kelly's Motion for Judgment on the Pleadings, on Second Cause of Action; 4) Defendant, Winzler & Kelly's Motion for Judgment on the Pleadings, on Fifth Cause of Action; 5) Defendant, Engineering, Management, & Planning Services Corporation for Summary Judgment and for Judgment on the Pleadings. After hearing argument from counsel and reviewing the parties' submissions, as well as relevant caselaw and authority, the Court hereby memorializes the bases for its rulings herein.

**COPY**



RECEIVED
CARLSMITH BALL
Date: 6-4-11-05
Time: 2:11p.m. For: [signature]

1  concluded that properly installed bolts may have performed satisfactorily in the recent earthquake,
2  the bolt group redesign was inadequate for anticipated horizontal seismic load factors incident to
3  a design level earthquake or mooring or berthing accident.

4      The Court finds that the OCEL report and Mr. Boone's report raise genuine issues of
5  material fact sufficient that preclude this Court from granting summary judgment on this count.
6  Accordingly, the Court denies Winzler & Kelly's Motion for Summary Judgment and for Judgment
7  on the Pleadings as to the Fifth cause of action.

8                              **CONCLUSION**

9      Based upon the foregoing, the Court hereby orders the following:

10     1. The Court GRANTS in part the Motion for Partial Summary Judgment, filed by Black
11  Construction and joined by defendants, EMPSCO and Winzler & Kelly, as to the limitation of
12  damages sought by the plaintiff. The plaintiff's right of recovery is limited to the extent of its
13  payment to its insured for the damages allegedly caused by the defendant(s).

14     2. The Court GRANTS defendant, Black Construction's Motion for Partial Summary
15  Judgment or, Alternatively, to Dismiss as to Counts One and Seven of the First Amended
16  Complaint.

17     3. The Court GRANTS defendant, EMPSCO's Motion for Summary Judgment and for
18  Judgment on the Pleadings as to Counts Three and Eight of the First Amended Complaint.

19     4. The Court GRANTS defendant, Winzler & Kelly's Motions for Judgment on the
20  Pleadings as to Counts Two and Nine of the First Amended Complaint.

21     5. Finding that there are issues of fact concerning Counts Five and Six of the First
22  Amended Complaint, the Court DENIES EMPSCO's Motion for Summary Judgment and for
23  Judgment on the Pleadings as to Count Six and Winzler & Kelly's Motion for Summary Judgment
24  on Fifth Cause of Action.

25     6. The Court DENIES EMPSCO's Motion to Strike.

26     7. The Court GRANTS Winzler & Kelly's Motion to Strike.

27     8. The Court DENIES the plaintiff's Motion to Strike the Declaration of Albert H. Tsutsui, A.I.A.

28

21



**EXHIBIT** F

(REPRODUCED AT GOVERNMENT OF GUAM EX)

# AGREEMENT
## BETWEEN
## PORT AUTHORITY OF GUAM
## AND
## EMPSCO - ENGINEERING CONSULTANTS

THIS AGREEMENT is made this _28th_ day of _DECEMBER_ 1995, by and between **PORT AUTHORITY OF GUAM**, a public corporation, whose address is 1026 Cabras Highway, Suite 201, Piti, Guam 96925 ("Port") and **EMPSCO-ENGINEERING CONSULTANTS** duly licensed and authorized to do business in Guam, whose address is Suite 245 Julale Shopping Center, Agana, Guam 96910 ("Consultant").

## RECITALS

WHEREAS, the Port desires to engage the professional services of a Consultant to provide bid documents, plans specifications and estimates for the repairs and upgrade to the F-1 Fuel Pier (Shell Pier); and

WHEREAS, the Port, after engaging in a competitive selection procurement process in accordance with GSA Procurement Regulation Section 3-207 is prepared to award this contract to Consultant as the best qualified offeror;

## AGREEMENT

NOW, THEREFORE, for and in consideration for the above recitals, the covenants and agreements hereinafter set forth, and

(REPRODUCED AT GOVERNMENT OF GUAM EXE

for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

      1.    Scope of Services:

      a.    Consultant agrees to fully and completely perform the scope of services set forth in Exhibit A attached hereto, which is incorporated herein by this reference, all to the Port's satisfaction.

      b.    Consultant shall perform work which is incidental to the scope of services, but necessary for a full and complete design, although not specifically referred to therein without additional compensation.



      c.    Consultant shall furnish, at its expense, proper and adequate equipment, machinery labor, tools and supplies necessary to perform the scope of work in a safe, workmanlike and diligent manner, and shall provide and have available at all times for use by its employees engaged in the performance of such work all safety appliances needed for the maximum protection of its employees against injuries.

      d.    Port may, at any time, by written order, make changes to the scope of services. If such changes cause an increase or decrease in the compensation due herein, or in the time required for the performance of the services, then equitable adjustment shall be negotiated between the parties and reflected by written amendment to this Agreement.

      2.    Time:

      Consultant shall perform and complete the services on or before March 8,

- 2 -

(REPRODUCED AT GOVERNMENT OF GUAM EXI

1996. Any additional services, if required by Port, shall be performed by Consultant within additional time period(s) to be determined by mutual agreement.

    3.    <u>Compensation</u>:

        a.    Port agrees to compensate Consultant for the services described in paragraph 1 (a) the total amount of ONE HUNDRED SIXTY THOUSAND AND 00/100 DOLLARS ($160,000.00). Compensation shall be paid by the Port pursuant to the progress payment schedule described in subparagraph (b) within thirty (30) days of invoice and upon the Port's determination that Consultant has fully and satisfactorily performed the services required for each said progress payment.

        b.    The breakdown of the contract price which will be used for determining progress payments shall be as follows:

            (i)    Upon the satisfactory completion of thirty-five percent (35%) of the scope of services, Port shall pay Consultant $50,400.00.

            (ii)    Upon the satisfactory completion of sixty-five percent (65%) of the scope of services, Port shall pay Consultant $46,800.00.

        c.    Upon the satisfactory completion of the ninety-five percent (95%) of the scope of services Port shall pay Consultant $46,800.00.

        d.    Upon the satisfactory completion of the entire scope of services, Port shall pay Consultant the contract balance of $16,000.00.

        e.    Port may in it sole judgment withhold such amounts from the sums due or to become payable under this Agreement, as may be necessary to:

            (i)    Protect the Port from any liability resulting from the work

- 3 -

*(REPRODUCED AT GOVERNMENT OF GUAM EX.*

performed under this Agreement:

(ii)     Repair, restore or compensate for any real or personal property which has been damaged as a result of the fault or negligence of Consultant or its employees while performing the work under this Agreement.

f.     The Port's review, approval and payment of fees for services by Consultant shall not constitute a waiver of any rights or cause of action arising out of Consultant's failure to fully and completely perform its duties under this Agreement and Consultant shall be and remain liable to the Port for all damages, costs and attorney's fees which the Port may suffer or incur as a result of Consultant's negligent performance of any of the services required herein.

4.     Indemnification:

The Consultant hereby assumes entire responsibility and liability for any and all damage or injury of any kind or nature whatever (including death resulting therefrom) to all persons, whether employees of the Consultant or otherwise, and to all property caused by, resulting from, arising out of or occurring in connection with the execution of the scope of work by Consultant, its agents and employees.  Should any claims for such damage or injury (including death resulting therefrom) be made or asserted, the Consultant agrees to indemnify and save harmless Port, its Board of Directors, its officers, agents, servants and employees from and against any and all such claims and further from and against any and all loss, cost, expense, liability, damage or injury, including legal fees and disbursements, that Port, its officers, agents, servants or employees may directly or indirectly sustain, suffer or incur as a result thereof and the Consultant agrees to and

- 4 -

does hereby assume, on behalf of Port, its officers, agents, servants or employees upon or by reason of such claims which defense, shall be tendered by counsel, selected by consultant with approval of the Port, and to pay on behalf of Port, its officers, agents, servants and employees, upon demand the amount of any judgment that may be entered against Port, its officers, agents, servants or employees in any such action.

     5.     Insurance:

Consultant shall, at its sole expense and for the benefit of Consultant and Port, provide and keep in full force and effect during the term of this Agreement, insurance against liability for bodily injury with limits of not less than $300,000.00 per person, $1,000,000.00 per occurrence, and property loss liability insurance with a limit of not less than $100,000 per loss, all in respect to bodily injury or property loss arising out of the duties and obligations of Consultant under the terms of the Agreement. In addition, Consultant shall also provide and keep in full force and effect during the term of this Agreement, workmen's compensation insurance with limits of not less than $100,000 per employee. Consultant shall furnish to the Port certificates of insurance evidencing the existence of such insurance. No policy of insurance may be cancelled without providing the Port thirty (30) days advance written notice. If the aforesaid policies are cancelled, Consultant shall immediately notify the Port of such cancellation. All insurance required under this Paragraph shall be written with responsible companies with originals of the policies and renewals available for the Port's review during reasonable hours.

     6.     Termination:

          a.     In case of unreasonable slow progress, carelessness, inattention, or

- 5 -

(REPRODUCED AT GOVERNMENT OF GUAM EXP

incompetency in the performance of any particular job or work herein contracted for, or in the event of a breach by Consultant of any of the provisions of this Agreement, or in the event Consultant shall conduct such work in a manner as, in the sole opinion of Port, shall endanger Port's equipment, property, or surrounding property, Port shall have the right to terminate this Agreement immediately and all its obligations hereunder, paying Consultant for work performed to time of termination less such sums as may be made withheld by Port pursuant to Paragraph 3(e) of this Agreement.

b.  Port shall have the right to terminate this Agreement at any time whatsoever and for any reason, including but not limited to, the Port's decision to abandon the project. In the event the project is terminated or this contract is terminated and the Consultant is not in default of this Agreement, then Consultant shall be paid for its services based on the amount of work performed up to the date of termination.

7.  Independent Consultant Relationship:

It is expressly understood between the parties to this Agreement that Consultant, its agents, or assigns are not employees or agents of the Port for any purpose whatsoever. Consultant is solely an independent contractor under the relationship created by this Agreement. Consultant does not have, nor does it hold itself out as having, any right, power, or authority to create any contract or obligation, either express or implied, on behalf of, in the name of, or binding upon the Port, or to pledge the Port's credit, or to extend credit in the Port's name. In addition, nothing contained in this Agreement shall be deemed or construed by the parties hereto, or by any third party, to create the relationship of principal and agent, or a partnership or a joint venture,

- 6 -

(REPRODUCED AT GOVERNMENT OF GUAM EXP.

or of any association between the Port and Consultant.

8.    Compliance with Laws and Regulations:

In the performance of work provided for herein, Consultant agrees that the work shall be conducted in full compliance with any and all applicable laws, rules and regulations adopted or promulgated by any governmental agency or regulatory body, both territorial and federal. Consultant assumes full responsibility for the payment of all contributions, payroll taxes or assignments, territorial or federal, as to all employees engaged in the performance of work hereunder, and further agrees to meet all requirements that may be specified under regulations of administrative officials or bodies charged with enforcement of any territorial or federal laws on this subject. Consultant further agrees to furnish Port, upon request, a certificate or other evidence of compliance with territorial or federal laws covering contributions, taxes, business licenses, work permits, workmen's compensation and assessments on payrolls. Consultant assumes and agrees to pay any and all gross receipts, compensation, use, transaction, sales or other taxes or assessments of whatever nature or kind levied or assessed as a consequence of the work to be performed or on the compensation to be paid under this Agreement.

9.    Notice:

Any notice to be given hereunder shall be deemed sufficiently given if in writing and delivered either in person or enclosed in an envelope properly stamped and addressed to the concerned party at the address above written.

10.    Amendment and Waiver:

- 7 -

'(REPRODUCED AT GOVERNMENT OF GUAM EXP

a.    Neither the agreement nor any provision hereof may be changed, waived, altered, amended, or discharged orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, alteration, amendment or discharge is sought.

b.    Failure by either party to object to any failure of performance by the other party of any provision of the Agreement shall not constitute a waiver of, or estoppel against, the right of such party to require such performance by the other. Nor shall any failure to object constitute a waiver or estoppel with respect to succeeding failure of performance.

11.    <u>Severability</u>:

If any part of this Agreement is held by a court of competent jurisdiction, an official opinion or statement of any Federal or Territorial official or regulatory agency or law, to be invalid, void or unenforceable, the remainder of this Agreement shall remain in full force and effect, and shall in no way be affected. If any provision is held to be invalid, void, or unenforceable as referred to herein, the parties shall modify said portion and negotiate in good faith a modification of the provision insofar as possible under any law, regulation, or opinion.

12.    <u>Attorney's Fees</u>:

If any legal action, suit or other proceedings is brought for the enforcement of this Agreement or because of any alleged dispute, breach or default in connection with any of the provisions of this Agreement, the successful or prevailing party shall be entitled to recover reasonable attorney's fees and court cost incurred in the action, suit or

- 8 -

proceeding, in addition to any other remedy or relief to which it may be entitled.

    13.    <u>Access to Records</u>:

        Consultant shall maintain all books, documents, papers, accounting records and other evidence concerning the expenses and costs incurred in its performance and shall make such material available to Port for inspection and copying upon request during the contract term and for a period of three (3) years thereafter.

    14.    <u>Agreements Outside of Contract</u>:

        This contract contains the complete agreement concerning the relationship and arrangements between the parties and shall, as of the effective date hereof, supersede all other agreements between the parties. The parties stipulate that neither of them has made any presentation with respect to the subject matter of this Agreement or any representations including the execution and delivery hereof except such representations as are specifically set forth herein and each of the parties hereto acknowledges that it has relied on its own judgment in entering into this Agreement. The parties hereto further acknowledge that any payment or representations that may have heretofore been made by either of them to the other are of no effect and that neither of them has relied thereon in connection with his or its dealings with the others.

    15.    <u>Best Efforts of Consultant</u>:

        Consultant agrees that Consultant will at all times faithfully, industriously, and to the very best of Consultant's ability, experience, and talents perform all of the duties that may be required from Consultant pursuant to the express and implicit terms hereof, to the sole satisfaction of the Port.

- 9 -

(REPRODUCED AT GOVERNMENT OF GUAM EXP

16. <u>Miscellaneous</u>:

a. Any attempt to assign or subcontract any work required by this Agreement by Consultant without Port's prior written consent shall constitute a default of this Agreement and any such attempted assignment shall be null and void.

b. The descriptive headings of the several sections and subsections in this Agreement are inserted for convenience only and shall not be deemed to affect the meaning or construction of any provision hereof.

c. Time is of the essence concerning all provisions of this Agreement.

d. All briefs, memoranda, reports, summaries and other documents used by or furnished to Consultant during the course of this Agreement shall remain the Port's property including all publication rights and copyright interest and may be used by the Port without Consultant's consent.

e. This Agreement is made under, and shall be governed and construed in accordance with, the laws, statutes and regulations of the Territory of Guam.

17. <u>Professional Liability</u>. Consultant warrants that it is an experienced construction manager, properly and duly licensed under the Government of Guam. It hereby certifies and warrants that it shall see that the contractor shall carry out and perform the work in a proper manner; and if done improperly by the contractor, then Consultant hereunder shall be liable, like other professionals, for damages and the Port's attorney's fees as a result of Consultant's improper or negligent acts in performing its duties, and the terms and conditions under this contract. Consultant's liability hereunder shall continue even after the completion of the project and shall run for a period of five

- 10 -

(5) years after any defect or any problems are discovered by the Port.

18.  Ownership of Work and Designs:

All work, drawings, specifications and designs by the Consultant shall belong to the Port and Port shall have the right to use them in any way whatsoever and make modifications thereto. If the Port has another consultant to modify or change the plans, etc., then Consultant's name on such plans, designs, specifications and work shall be deleted on the plans, designs, specifications, etc.

IN WITNESS WHEREOF, the parties have executed this Agreement the day and year first above written.

**EMPSCO ENGINEERING CONSULTANTS**

By: _____
PETRONILO Q. VILLALUZ, P.E.
Managing Engineer

Date: 12/28/95

**PORT AUTHORITY OF GUAM**

By: _____
EULOGIO C. BERMUDES
General Manager

Date: 12-28-95

**CERTIFIED FUNDS AVAILABLE:**

_____
FRANKLIN E. BADAR,
Certifying Officer

Date: 12/29/95

**APPROVED AS TO FORM:**

CARBULLIDO, PIPES & BORDALLO

By: _____
F. PHILIP CARBULLIDO, ESQ.
Legal Counsel
Port Authority of Guam

Date: 12/28/95

FPC:amn\F#1696.__\fpc\pag\EMPSCO.K

- 11 -

(REPRODUCED AT GOVERNMENT OF GUAM EXPRND

# SCOPE OF WORK

## FOR

## REPAIRS AND IMPROVEMENTS TO EXISTING F-1 FUEL PIER (SHELL PIER)

### 1. INTENT AND DESCRIPTION

The Port Authority of Guam is intending to correct deficiencies, repair damages and construct improvements to existing Fuel Pier "F-1" (Shell Pier). The purpose of this contract is to obtain professional services for the design of such repairs and improvements. The project includes the inspection, identification of necessary repairs to existing dolphin, main wharf, walkway and improvements to existing Fuel Pier "F-1". The project also includes all the required soil investigation, shop drawing and catalog submittal review, and construction consultation.

### 2. LOCATION

The project is located at Pier "F-1" (Shell Pier) Apra Harbor, Cabras Islands Guam, M.I.

### 3. DESIGN PARAMETERS

1. Report on damaged structures F-1 Facility Guam for Shell Guam, Inc. prepared by Candac Limited dated August 1993.

2. Structural Assessment of the Foxtrot (F-1) Pier, Apra Harbor prepared by N.C. Macario & Associates, Inc.

3. Ultra Sonic gauging report, main pier support pillars pier (F-1) Guam, prepared by Guam Oceaneers/N.C. Macario & Associates, Inc.

4. Subsurface Soil Investigation Foxtrot I Pier Facility Improvement/Repair Cabras Island and prepared by Geo-Engineering & Testing, Inc. dated

(REPRODUCED AT GOVERNMENT OF GUAM EXPEN

SCOPE OF WORK
REPAIRS AND IMPROVEMENTS TO EXISTING
F-1 (FUEL PIER (SHELL PIER)
Page Two (2)

4.    CONSTRUCTION COST LIMITATION

The project shall be designed to permit construction of the repair and improvement of the facility within a construction contract price to be provided by the Government. If the consultant during the preliminary cost analysis finds that the repairs and improvements cannot be built within the allotted amount, the matter should be brought to the attention of the General Manager immediately.

Consultant shall prepare a construction cost estimate for the proposed repairs and improvements.

5.    SOILS REPORT

The Consultant shall review and interpret all subsurface exploration, geotechnical and soils report furnished by Port Authority of Guam for the project.

The soils investigation shall include the following information:

a.    General soil composition

b.    General subsurface conditions

c.    Compactibility of soil

6.    ENVIRONMENTAL PROTECTION PLAN

The Consultant shall review the Environmental Impact Assessment Report and

(REPRODUCED AT GOVERNMENT OR GUAM EXPEN)

SCOPE OF WORK
REPAIRS AND IMPROVEMENTS TO EXISTING
F-1 (FUEL PIER (SHELL PIER)
Page Three (3)

7.    DESIGN ITEM AND CONSIDERATION

The general description of work shall include but not limited to the following:

1.    Repairs to existing support piles of Dolphins A, B, C, D and G. — *DONE*

2.    Repairs to walkways support piles P1, P2, and P3.

3.    Removal of existing piles and pile cap of Dolphins H. — *DONE*

4.    Removal and replacement of damaged air buffer fenders C and D.

5.    Repair cracks at precast concrete deck units, girders and main beam at
      main wharf area including supporting piles.    *DONE*

6.    Repair spalls and deteriorated concrete surfaces at main wharf area.

7.    Repair cracks/spalls at access ramp.

8.    Repair cracks and spalls at pile caps. - *DONE*

9.    Removal and replacement of existing fendering system.    *DONE*

10.   Installation of new cathodic protection system.

11.   Repair Bollard connections to main wharf.

12.   Removal and Replacement of damaged dolphin "H".    *DONE*

8.    SUBMITTALS

Submittals shall be made in accordance with the following schedule:

| Submittal | Due Date | Drawings | Specifications | Cost Estimates |
|---|---|---|---|---|
| 35% Design Documents | 45 Calendar days after NTP | 5 Copies | 5 Copies | 5 Copies |
| Final Design | 45 Calendar | 5 Copies | 5 Copies | 5 Copies |

(REPRODUCED AT THE GOVERNMENT OF GUAM EXPENSE)

SCOPE OF WORK
REPAIRS AND IMPROVEMENTS TO EXISTING
F-1 (FUEL PIER (SHELL PIER)
Page Four (4)

9. GOVERNMENT REVIEW

The Port Authority of Guam will work closely with the Consultant to expedite design reviews. Reviews will normally be "On Board".

10. RELATIONS WITH OTHER GOVERNMENT AGENCIES

All directions within the scope of this contract will be issued by the General Manager, Port Authority of Guam, and the Consultant shall not accept such direction from others. Information provided by other agencies which seemingly conflicts with information provided by the General Manager will be discussed immediately. This policy is not intended to prevent the Consultant from obtaining necessary design information from other agencies.

11. RESPONSIBILITY OF THE CONSULTANT

The Consultant shall be responsible for the professional and technical accuracy and the coordination of all designs, drawings, specifications and other work of materials furnished by him under this contract. The Consultant without additional cost to the Government, shall correct or revise all errors or deficiencies in his work.

12. GOVERNMENT RESPONSIBILITIES

The Port Authority of Guam shall be responsible for the following:

a.    Port Authority of Guam will furnish the Consultant with the as-built

(REPRODUCED AT GOVERNMENT OF GUAM EXPEN

SCOPE OF WORK
REPAIRS AND IMPROVEMENTS TO EXISTING
F-1 (FUEL PIER (SHELL PIER)
Page Five (5)

b.  The Port Authority of Guam shall provide, if requested, assistance
    necessary for the Consultant and its agents access to the project site.

c.  Environmental Impact Assessment Report, U.S. Army Corps of
    Engineers  Nationwide Permit, Territorial Seashore Permit Clearance as
    required during the processing of Government of Guam Building Permit.

AGREED:                                    APPROVED:

PETRONILO Q. VILLALUZ, P.E.                CAPT. EULOGIO BERMUDES
Managing Engineer                          General Manager
EMPSCO Engineering Consultants             Port Authority of Guam

Date:  NOV. 28, 1995                       Date:  11 - 30 - 95

**EXHIBIT G**



**CASH & ASSOCIATES**
Engineering and Architecture

Elliott H. Boone
Randy H. Mason
Wilfrido B. Simbol
Kerry M. Simpson

May 12, 2004

Attention: Mr. Forrest Booth
Cozen O'Connor Attorneys
425 California Street, Suite 2400
San Francisco, CA 94104-2215

Attention: Mr. David Ledger
Carlsmith Ball LLP
P.O. Box BF
Hagatna, Guam 96932-5027

Subject:      FOXTROT PIER F1
             PORT AUTHORITY OF GUAM
             COZEN O'CONNOR REFERENCE NO. 123206
             (C&A Project No. 6090.00)

Gentlemen

The purpose of this report is to summarize the results of my investigation of structural damage observed at Foxtrot "F1" Pier in Apra Harbor, the sole motor fuel (gasoline and diesel) import location for Shell Guam Inc.

The scope of this investigation included the following tasks:

     1.     Visit the site to visually observe the reported damage.

     2.     Review project technical data and correspondence relating to the original design and subsequent repairs.

     3.     Render an opinion as to the adequacy of the repair design prepared by Winzler & Kelly.

     4.     Render an opinion of the connections installed by the Contractor.

The documents reviewed to develop this report are contained in Appendix A, Reference Listing.

## BACKGROUND

Apra Harbor is considered a protected harbor with favorable berthing conditions. Information reviewed relating to the Foxtrot "F1" facility indicated that it was constructed in 1970 and originally designed to accommodate 90,000 DWT tanker vessels. The pier consists of an access ramp from the shore leading to the main wharf supporting the bulk fuel unloading arms.

5772 Bolsa Avenue, Suite 100 ▪ Huntington Beach, CA 92649 USA ▪ TEL:714.895.2072 ▪ FAX 714.895.1291
Web Site: www.cashassociates.com ▪ A California Corporation

Cozen O'Connor Attorneys
Mr. Forrest Booth
Carlsmith Ball LLP
Mr. David Ledger
May 12, 2004

FOXTROT PIER F1
PORT AUTHORITY OF GUAM
Cozen O'Connor Reference No. 123206
(C&A Project No. 6090.00)
Page 2

Catwalks, from the wharf, lead to offshore mooring dolphins "A" and "B". Two additional mooring dolphins, "E" and "F", are located onshore. Tanker berthing forces are absorbed by four breasting dolphins; "C", "D", "G" and "H" located outboard of the wharf. Breasting dolphins "C" and "D" were designed to accommodate the 90,000 DWT vessels, while breasting dolphins "G" and "H" were provided to accommodate smaller 21,000 to 28,000 DWT vessels.

## PREVIOUS REPAIR HISTORY

The Foxtrot "F1" facility was operational at the time of the 8.1 magnitude earthquake in August 1993 and the resulting damage from this event was significant. Preparation of contract documents for repair of the damage sustained by the facility pier was awarded to EMPSCO Engineering Consultants of Agana, Guam by the Port Authority in late 1994. The Port Authority approved contract documents prepared by EMPSCO for bid and local contractors were required to submit their proposals on January 26, 1996.

The apparent low bidder for the project was Black Construction Company, Tamung, Guam, however, their bid for the work as described in the plans and specifications exceeded the Port Authority's budget. In order to proceed with the project, Black Construction Company was requested to submit alternates that would reduce their bid. In response to that request, Black Construction Company using an alternate design developed by Winzler & Kelly Consulting Engineers, Agana, Guam made a revised proposal to the Port Authority.

The alternate design for the repair was identified on Drawing Sheet VE-1 (copy attached) prepared under the supervision of Bruce Swanney, of Winzler & Kelly. Mr. Swanney is registered to practice as a Structural Engineer in the Territory of Guam and his professional engineering seal appears on that drawing, dated April 4, 1996.

At his deposition, Bruce Swanney stated that the sole calculation undertaken in the design of the pile flange to deck connection, shown on Drawing Sheet VE-1, was to assume that the connection would only be required to resist pile withdrawal loads equal to one half the pile axial capacity of 200 tons. No calculations relating to the design shown on Drawing Sheet VE-1 were available for my review.

In general, the repair shown on Sheet VE-1, involved removing approximately 15 feet of the upper portion each of the existing steel pipe piles under the deck of the mooring and breasting dolphins. A 22-inch diameter replacement was then spliced to the remaining pile section, which is connected to the underside of the dolphin deck with a 1-inch thick flange plate, welded to the new section of pipe pile. The flange was, in turn, connected to the underside of the dolphin using 8-3/4 inch diameter, Grade 304 stainless steel bolts, embedded in epoxy.

As-built details and other documents of completed repairs were made available to Cash & Associates for review and are listed in Appendix A, Reference Listing.

It is our understanding that the facility was operational from the date that work was completed until 13 October 2001, when a subsequent 7.0 magnitude earthquake again damaged the facility.

Cozen O'Connor Attorneys
Mr. Forrest Booth
Carlsmith Ball LLP
Mr. David Ledger
May 12, 2004

FOXTROT PIER F1
PORT AUTHORITY OF GUAM
Cozen O'Connor Reference No. 123206
(C&A Project No. 6090.00)
Page 3

## VISUAL OBSERVATIONS

Oceaneer Enterprises, Inc, Piti, Guam performed a post-earthquake survey of the mooring and breasting dolphins on October 13, 2001. Their visual observation of the damage revealed that the epoxy securing the stainless steel bolts embedded into the underside of the dolphin had failed. In a high percentage of the total number bolts, the epoxy had failed to harden or in some cases was absent. In more than one bolt location epoxy that had flowed out of the predrilled hole was observed in and around the steel flange below it.

Of the 216 bolts securing the piles of Dolphin A, only two (2) remained undisturbed by the event. Failure of the epoxy is a technical consideration that is not part of this report, however, it is highly unusual for nearly all the connecting elements to fail if the design meets the service requirements contained in the Uniform Building Code.

On March 3, 2004, I was afforded the opportunity to observe the damage from the water using a port provided pram. At the time of my observations, initial repairs to the 2001 earthquake damage had been undertaken and pier Foxtrot "F1" was partially operational. Safety considerations prevented observations from beneath the deck. Dolphin H did not sustain damage as it had been completely replaced as part of the 1996 repairs, however unrepaired damage was clearly evident on Dolphins A, B C D and G. Each of these dolphins, with the exception of Dolphin H, exhibited common bolt withdrawal damage at the flange.

Digital photographs of the pile flange bolt failure, taken on the March 3, 2004, are included in Appendix B, Photographs.

## BOLT FAILURE

Review of the information provided to Cash & Associates indicated that Black Construction Company had submitted and the Port Authority (through their Projects representatives) had approved, with conditions, a substitution of the epoxy system used in anchoring the bolts to the concrete deck. The epoxy system proposed on Drawing Sheet VE-1 was Redi-Chem Anchors manufactured by Phillips Drill Company, Catalog Number CE 3495. The epoxy components (Parts A & B) of the Redi-Chem Anchor are encased in separate glass capsules that combine when the glass is ruptured after insertion in a predrilled hole. In practice, the threaded rod ruptures the capsule when forced through it and the components are then combined by rotation of the threaded rod with an ordinary power drill. The advantage of this system is that the components are pre-measured and mixing is assured once the threaded rod is spun for a few seconds with a drill.

Anchor-It Epoxy Systems, Solidbond HR 200, was the substitute product submitted (Project Submittal 18a, Epoxy Fastening System) by Black Construction Co as an equal to the specified Redi-Chem System. Approval was conditioned by four comments, Conditions (c) and (d), submit manufacturers certificate of compliance and submit test data by independent testing laboratory, and were never to the best of my knowledge received. Furthermore, the ICBO approval for use of this product (Report No. 4398) requires:

Cozen O'Connor Attorneys
Mr. Forrest Booth
Carlsmith Ball LLP
Mr. David Ledger
May 12, 2004

FOXTROT PIER F1
PORT AUTHORITY OF GUAM
Cozen O'Connor Reference No. 123206
(C&A Project No. 6090.00)
Page 4

*Special inspection in accordance with Section 306(a) 12 of the code shall be provided for all anchor installations.*

The Anchor-It Epoxy System relies on combining the two components in a mixing nozzle, which is then injected into the predrilled hole. In overhead installations, a plug is inserted into the predrilled hole to prevent the run out of the epoxy. The bolt is then inserted through the plug and the mixture allowed to cure. There are two inherent problems installing anchors in overhead applications. The first is assuring that adequate but not excessive epoxy is injected in the hole. Too little epoxy and there is insufficient material to assure a complete bond through the entire depth or if too much, the seal formed by the plug is voided and the epoxy will leak.

The system of mixing for the Anchor-It Epoxy is significantly more complex than that proposed by the Redi-Chem Epoxy System. The complexity of the overhead bolt installation combined with the critical nature of the bolt to pile connection should have placed a responsibility on Black Construction Co. to notify the port of the need for special inspection.

Black Construction Co. as a matter of proper construction practice, should have been aware of the critical importance of the pile flange to concrete connection. The performance of individual dolphins in berthing and mooring operations, not to mention seismic events, relied on the capacity of that connection. During the bolt installation process, the loss of epoxy would have been evident to those installing the materials on a daily basis. The critical nature this element should have made it obvious to Black Construction that minimum testing to establish full epoxy cure should have been undertaken as part of their ordinary quality control described in Section 1400 of the project specifications. This could have been accomplished with an ordinary deep socket and automotive torque wrench.

## SERVICE LOADING

Service load requirements for the dolphins at the Foxtrot "F1" facility fall into four categories as follows:

### Gravity Loads

Gravity loads on the surface due to equipment, product and personnel. These loads are insignificant in comparison to berthing, mooring and seismic loads

### Berthing Loads

Dynamic loads due to berthing forces generated during docking and/or maneuvering transmitted through the fender system to the structural elements. The critical elements in determining berthing forces are the vessel size combined with approach velocity and direction during this operation. According to the calculations prepared by EMPSCO Consulting Engineers, the facility was designed to accommodate 90,000 DWT vessels. Confirmation of the vessel size calling at Foxtrot "F1" was not received from Shell Guam Inc.

Cozen O'Connor Attorneys
Mr. Forrest Booth
Carlsmith Ball LLP
Mr. David Ledger
May 12, 2004

FOXTROT PIER F1
PORT AUTHORITY OF GUAM
Cozen O'Connor Reference No. 123206
(C&A Project No. 6090.00)
Page 5

It is generally accepted that the most severe angle at which the vessel will approach the berth is 10 degrees, measured relative to the centerline or keel relative to the face of the fender. Vessel speed is less exact and can vary with the capability of the pilot and tug assist at the berth. For design purposes, J.U. Brolsma, et al, developed the generally accepted variables for approach velocity, in his 1977 paper " On Fender Design and Berthing Velocities" presented to the PIANC 24th Congress, Leningrad. From Brolsma's graph of these variables, the approach velocity for a 100,000 DWT vessel is approximately 0.03 to 0.04 cm/sec. The as-built drawings identify the fenders as Trellex-Morse type MV 1250X900A and 1000X900A fenders for dolphins C/D and G/H respectively. The berthing energy obtained from the application manual for Type MV fenders published by Trellex-Morse in 1993 is as follows:

> *Dolphins C/D, 355 Ft-Kips with a reaction force at maximum compression of 189 Kips for the MV 1250x900A fender*

> *Dolphins G/H, 226 Ft-Kips with a reaction force at maximum compression of 151 Kips for the MV 1000X900A fender.*

A separate load acting parallel and equal to approximately one third the reaction force also is considered. The location of this load, at the face of the fender, induces a torsional moment around the pile group of the dolphin. The effect of torsional moment was considered in the overall berthing and mooring analysis that follows.

**Mooring Loads**

Mooring dolphins at the Foxtrot "F1" facility are Dolphins A and B offshore and E and F onshore. Mooring loads generated by wind acting through mooring lines are limited to 100 tons by the Capstan Hook Assembly located at the center of each dolphin. . The capacity of this assembly was obtained from shop drawing data (Submittal Number 13) provided with other information to Cash & Associates. In my evaluation of the forces generated by the Capstan Hook Assembly, I have assumed that the mooring lines are positioned at an angle of 45 degrees to the face of the dolphin and at an angle above the horizon of 30 degrees. These angles will vary with each ship that is moored, its position relative to the loading arms on the main pier and with the tide.

**Seismic Loads**

Seismic loading generated by earthquake activity and the resulting analyses are based on the 1994 Edition of the Uniform Building Code (UBC) which was the governing code in the Territory of Guam at the time of the original design. Two approaches were implemented; one using static analysis and the other using a computer generated dynamic analysis. The static analysis is based on the premise that the dolphins are non-building structures and therefore subject to a particular set of code requirements for determining the seismic forces in the structure. The computer generated dynamic analyses were based on the 1994 UBC Response Spectra (S1 Soil Profile assumed), scaled to 0.3 for Seismic Zone 3 (Guam). The results of the static analyses were used to check allowable bolt forces versus the code static force levels on a

Cozen O'Connor Attorneys
Mr. Forrest Booth
Carlsmith Ball LLP
Mr. David Ledger
May 12, 2004

FOXTROT PIER F1
PORT AUTHORITY OF GUAM
Cozen O'Connor Reference No. 123206
(C&A Project No. 6090.00)
Page 6

working stress basis; whereas the dynamic analysis results was used to check anchor bolt adequacy using ultimate test capacities compared to the response spectra results unreduced by Rw (which would be 3 for this type of structure). As a general check on the compatibility of static and dynamic analyses, additional analyses were conducted using the dynamic analysis results scaled to the static level base shears.

Computer models of Dolphins A, B, C, D and H were developed and considered each of the loads described above.

## Computer Modeling

SAP 2000 computer models were developed for each of the five dolphin structures noted above. The models were based entirely on the information presented in the as-built drawings prepared by EMPSCO Consulting Engineers and made available for review to Cash and Associates. The models were linear and three-dimensional, using thick concrete shell elements for the dolphin decks (which varied from about 4 feet to over 8 feet thick), and frame elements to model the piles (typically 22 inch diameter steel pipe).

The models were made as realistic as was reasonably achievable by modeling the pile depths in accordance with the seafloor contours provided in the as-built drawings; that is, each pile has a unique length/depth based on whether it is a vertical or battered pile, and at what depth it achieves effective fixity at the seafloor. Based on our experience, it was assumed that the effective depth of fixity was 8.5 feet below the surface seafloor contours as presented on the as-built drawings. For battered piles, we developed a methodology for determining point of pile fixity at the seafloor by establishing a system of linear equations, one equation for the pile and one equation for the sloping seafloor, and solved the set of equations for each pile to find the point of intersection.

Ship berthing forces consist of a component of force applied perpendicular to and toward the face of the dolphin, and a component parallel to the dolphin, acting in either parallel direction at a distance of 3 feet from the face of the dolphin. This offset resulted in a significant additional moment applied to the center of gravity (c.g.) of the dolphin deck.

Because both static and dynamic seismic analyses were conducted, and ship berthing and mooring forces were applied, numerous possible load combinations were considered. That is, the seismic forces can act positively or negatively in both the North/South and East/West directions, and the parallel ship berthing forces can act in either a westerly or easterly direction. The perpendicular ship berthing force was applied into the face (i.e. northerly) for all load cases. Based on a number of preliminary analyses, it was determined that 8 different load cases of static and dynamic seismic and berthing and mooring forces had to be considered for each pile structure. These load cases are detailed in Appendix C, Tables 1 through 11. Note that the static and dynamic analyses without ship berthing and mooring were also conducted to obtain a preliminary understanding of the connection adequacy based on code seismic requirements alone. Additionally, the plastic moment capacity of a 22-inch diameter pile was compared to the

Cozen O'Connor Attorneys
Mr. Forrest Booth
Carlsmith Ball LLP
Mr. David Ledger
May 12, 2004

FOXTROT PIER F1
PORT AUTHORITY OF GUAM
Cozen O'Connor Reference No. 123206
(C&A Project No. 6090.00)
Page 7

capacity of the anchor bolts in the repair connection as an additional measurement of the adequacy of the connection.

## Analyses of Pile Flange Connection

The focus of the stress analysis work was solely on the anchor bolt capacity, primarily because this was the predominant mode of failure in these connections as a result of the 2001 earthquake. Thus, a simple model of the 8-bolt anchor bolt connection was developed to determine bolt loads based on the output from the detailed dolphin computer models. Specifically, the end forces in global coordinates from the piles at the underside of the dolphins were taken from the main computer analyses of the dolphins, and inserted into the three dimensional SAP 2000 model of the 8-bolt connection to determine forces in each bolt. All six (6) components of force (shears, tension and moments) were input. This simplified model of the 8-bolt connection was based on the assumption of a rigid based plate and large tension forces in combination with large bending forces that resulted in all bolts being in combined shear and tension. The analysis results proved this assumption to be correct for nearly every governing pile in each dolphin.

## Analysis, Results and Conclusions

Refer to the Appendix C, Tables 1 through 12 for details. For the purposes of determining the adequacy of the anchor bolts, manufacturer's data on the maximum allowable load per bolt was used for comparing to calculated demands. Since the specified Redi-Chem Anchors are no longer available, a similar glass capsule anchor bolt of the same size, material type and embedment was used in our analysis. The product selected is manufactured by ITW Ramset/Red Head, Catalog Reference Epcon A7 Adhesive Anchor. Manufacturer's data for ¾-inch diameter stainless steel bolts with a concrete embedment depth of 6-3/4 inches was used. This data showed that the maximum design load for shear and tension is based on bond capacity of the epoxy material. Those loads are 5,030 pounds in shear and 7,430 pounds in tension. The manufacturer notes that these values are based on a factor of safety of 4 applied to test results, so "ultimate" or test capacities for these bolts, when properly installed, were calculated to be 20,120 pounds in shear, and 29,720 pounds in tension.

The results of the seismic analysis, both with and without ship berthing and mooring forces, can be summarized as follows (note that gravity loads are included in all cases):

> The bolts, even if properly installed, are inadequately designed based on any reasonable interpretation and application of the requirements of the 1994 UBC.

➤ Based on static seismic analysis requirements for non-building structures of this type, in conjunction with the specified ship berthing and mooring forces, the demand/capacity (D/C) ratios vary from 3.4 to 7.1 on a working stress basis. A D/C of 1.0 maximum is acceptable; any values over 1.0 indicate an overstress condition.

Cozen O'Connor Attorneys
Mr. Forrest Booth
Carlsmith Ball LLP
Mr. David Ledger
May 12, 2004

FOXTROT PIER F1
PORT AUTHORITY OF GUAM
Cozen O'Connor Reference No. 123206
(C&A Project No. 6090.00)
Page 8

> ➢ Based on dynamic analysis results, in conjunction with ship berthing and mooring forces, D/C ratios vary from 1.8 to 2.8 when comparing raw earthquake force levels to ultimate test capacities of the anchor bolts.
> ➢ Based on dynamic analyses scaled down to static based shear levels for working stress comparison purposes, and eliminating the ship berthing and mooring forces, the D/C ratios vary from 2.3 to 3.6 on a working stress level.
>
> ➢ For Dolphin A, applying only the static seismic forces yields a D/C of 3.43, whereas the dynamic result scaled to the static base shear for this same dolphin yielded a D/C of 3.61.

As shown above, all reasonable avenues of investigation have been considered and, in each case, it was shown that the anchor bolts are significantly overstressed for code level requirements regardless of whether berthing or mooring loads are considered in conjunction with seismic forces. The demand to capacity ratios for the bolts indicate that the design on Drawing Sheet VE-1 is incapable of meeting the requirements of the intended use of the Foxtrot "F1" facility, namely berthing and mooring of 90,000 DWT tankers. Detailed summaries of all loading combinations, displacements, reactions, bolt loadings for static and dynamic analysis and other details of the computer investigation are contained in Appendix C, Tables 1 through 12.

Technical information (i.e., code citations and equations, calculations, modeling details, and computer input and output data) are kept to a minimum in the narratives presented herein for brevity and simplicity. This information can be made available, if requested. Appendix C, Tables 1 through 12, are spreadsheets of project results and contain an appropriate amount of technical data as necessary to communicate the results of this work.

## EXECUTIVE SUMMARY

Seismic analyses of Dolphins A, B, C, D and G were conducted in accordance with the 1994 Edition of the Uniform Building Code (UBC). Computer runs were made with and without ship berthing and mooring forces acting in combination with earthquake forces. The adequacy of the anchor bolt designs in the failed connections was measured through the use of Demand/Capacity (D/C ratios). The "Demand" is the earthquake force level (in combination with gravity forces, and in some cases ship berthing and mooring forces), and "Capacity" is based on the anchor bolt manufacturer's test data, which has been approved for use by the International Conference of Building Officials (ICBO), the governing code authority. D/C ratios in excess of 1.0 are not acceptable as they indicate excessive stress levels.

We found that for all cases considering seismic, ship berthing and mooring loads, the D/C ratios varied from 1.78 to 7.13. In all cases where no ship berthing and mooring loads were considered in combination with seismic loads, the D/C ratios varied from 2.27 to 3.61. Based on these findings, it can be concluded that the design of the anchor bolts was not adequate relative to 1994 UBC requirements.

Cozen O'Connor Attorneys
Mr. Forrest Booth
Carlsmith Ball LLP
Mr. David Ledger
May 12, 2004

FOXTROT PIER F1
PORT AUTHORITY OF GUAM
Cozen O'Connor Reference No. 123206
(C&A Project No. 6090.00)
Page 9

Reasonable analysis by Winsler & Kelley would have revealed deficiencies in their design. Even a simple static analysis would have shown that the bolts connecting the pile flange to the dolphins were insufficient in diameter and/or number. Disregarding the deficiencies in the design, the critical nature of this connection should have required Winsler & Kelley to request Black Construction Co. to assure that special inspection was taken during the installation of the epoxy, regardless of what product was used. This requirement would be even more important since their product specification (Note 2 of Drawing Sheet VE-1) refers to the Redi-Chem Epoxy System or **approved equal**. This opens the door for substitution and, owing to the variability in product application, it is the Engineer's responsibility to see that critical elements of his design are correctly completed in accordance with his intentions. If an equal were to be allowed, proper engineering practice would have been to see that adequate inspection was undertaken to assure the design would function as intended.

The substitution of the epoxy system was proposed by Black Construction Co. for their advantage, be it either in product availability or at lower cost. Black Construction Co. had a similar duty as Winzler & Kelly to the success of the project, namely to complete a repair project that met the functional requirements of the design. Black Construction Co. had a quality control requirement established in the specifications for this project, but absent that, it was their substitute product, Anchor-It Epoxy, that required special inspection. It would then follow that Black Construction Co. should have provided special inspection or insisted that the Port Authority provide it. Even if special inspection was not provided Black Construction Co. was aware of the critical nature of this connection and even a simple automotive torque wrench test would have identified uncured epoxy. Proper construction practice cannot be ignored where installation is difficult and the element under installation is so critical to the project.

I thank you for this opportunity to be of service in this matter. If you have any questions, please contact me.

Very truly yours,
CASH & ASSOCIATES

Elliott H. Boone, S.E.
Executive Vice President

EHB:cd
G:\projects\ehb\609000\Rule26reportpdf.doc

Attachments:
Drawing Sheet VE-1, Winzler & Kelly (Reduced Copy)
Appendix A    Reference Listing
Appendix B    Photographs
Appendix C    Table 1 – 11 Spreadsheets



# APPENDIX A

## REFERENCE LISTING

# APPENDIX A

## REFERENCE LISTING

<u>**Port Authority of Guam**</u>

INDEX OF DOCUMENTS AND TESTIMONY REVIEWED

The following is a partial listing.

| Number | Subject of Documents |
|--------|---------------------|
| 1 | Drawings, Calculations, Correspondence and other documents produced in litigation by Winzler & Kelly concerning the repairs performed in 1996 – Bates Nos. 00028-00462 |
| 2 | Shell F-1 Pier Temporary Repair Evaluation prepared by Duenas & Associates |
| 3 | As Built drawings prepared by Black Construction Co for the project |
| 4 | Winzler & Kelly Drawing VE-1 |
| 5 | Structural Calculations for Repairs to Dolphins A, B, C, &D Foxtrot (F-1) Pier prepared by Winzler & Kelly dated December 1995 |
| 6 | Responses of Black Construction to Plaintiff S. J. Gargrave's First Set of Interrogatories |
| 7 | Report of video survey, Pier F 1, Commercial Port of Guam, Oceaneer Enterprises, Piti, Guam. Report number GUA-J-01-2519-UW |
| 8 | Various other documents produced by councel relative to this matter contained in 8 four inch thick three ring binders |
| 9 | Deposition of Bruce Swanney of Winzler & Kelly |

# APPENDIX B

## PHOTOGRAPHS



Dolphin A



Bolt Withdrawal at Dolphin A



**Bolt Withdrawal at Dolphin B**



**Bolt Withdrawal at Dolphin C**



**Bolt Withdrawl – Dolphin Not Identified**



**Bolt Withdrawal at Dolphin C**



**Bolt Withdrawal at Dolphin G**

# APPENDIX C

TABLES 1 – 12

SPREADSHEETS

# Port of Guam
## Seismic Analysis of Berthing Dolphins A, B, C, D & G

### Analysis Parameters

Vstatic = ZICW/Rw, Z = 0.3, I = 1.0, C = 2.75, Rw = 3; V = 0.275W

Vdynamic = 94UBC, S1 soil, scaled to 0.3g, unreduced by Rw

Bolts = 3/4" dia. ss 304 epoxy anchors with 6-3/4" embed, Vallow = 5030#, Tallow = 7430#

(note: FS = 4 per mfr on test data, assumed 4,000 psi conc.; ChemSet data not available, used Ramset Epcon 7 product data)

Ship P = ship impact perpendicular to face, Ship V = ship impact at 3' from face, Ship M = V times dist to CG of dolphin deck

### Explanation of Static and Dynamic Load Cases

DLSf1    Static seismic northerly direction, perpendicular ship impact into face of dolphin, parallel ship impact in westerly direction
DLSf2    Static seismic northerly direction, perpendicular ship impact into face of dolphin, parallel ship impact in easterly direction
DLSf3    Static seismic westerly direction, perpendicular ship impact into face of dolphin, parallel ship impact in westerly direction
DLSf4    Static seismic easterly direction, perpendicular ship impact into face of dolphin, parallel ship impact in easterly direction
DDY1     Dynamic seismic east-west direction, perpendicular ship impact into face of dolphin, parallel ship impact in westerly direction
DDY2     Dynamic seismic east-west direction, perpendicular ship impact into face of dolphin, parallel ship impact in easterly direction
DDY3     Dynamic seismic north-south direction, perpendicular ship impact into face of dolphin, parallel ship impact in westerly direction
DDY3     Dynamic seismic north-south direction, perpendicular ship impact into face of dolphin, parallel ship impact in easterly direction
Note:    Also conducted UBC 94 static and dynamic analyses with DL only; no impact forces.
         Checked req'd bolt tension to resist plastic capacity of 22" pipe section.

### Table 1 - Summary of Modal Analyses, Ship Impact Loads, and Static/Dynamic Base Shears

| Dolphin | Wt./Mass (Wt = kips) | T, Mode 1 (T = sec.) | T, Mode 2 | T, Mode 3 | Ship P (kips) | Ship V (kips) | Ship M (in-kips) | Vstatic (kips) | Vdynamic (kips) |
|---|---|---|---|---|---|---|---|---|---|
| A | 568/1.47 | 0.63 | 0.61 | 0.41 | 141 | 141 | 27264 | 156 | 217 |
| B | 533/1.38 | 0.3 | 0.29 | 0.26 | 141 | 141 | 27264 | 147 | 307 |
| C | 1113/2.88 | 0.46 | 0.31 | 0.29 | 80 | 24 | 5616 | 306 | 756 |
| D | 1155/2.99 | 0.51 | 0.36 | 0.33 | 80 | 24 | 5616 | 318 | 738 |
| G | 490/1.27 | 1.73 | 0.33 | 0.3 | 25 | 8 | 1128 | 135 | 313 |

### Notes:

Piles at Dolphin A are twice as long as piles at Dolphin B

Dolphin G has no batter piles in EW direction, thus very flexible

1

Case 1:03-cv-00009    Document 169-2    Filed 04/29/2005    Page 25 of 33

## Port of Guam
## Seismic Analysis of Berthing Dolphins A, B, C, D & G

Table 2 - Maximum Static Displacements (inches)

| Dolphin | DLSI1 | DLSI2 | DLSI3 | DLSI4 |
|---|---|---|---|---|
| A | 3.85 | 3.56 | 3.49 | 4.29 |
| B | 0.96 | 0.85 | 0.82 | 0.98 |
| C | 0.21 | 0.21 | 0.67 | 0.67 |
| D | 0.3 | 0.27 | 0.82 | 0.83 |
| G | 0.53 | 0.53 | 9.26 | 9.26 |

Table 3 - Maximum Dynamic Displacements (inches)

| Dolphin | DDYI1 | DDYI2 | DDYI3 | DDYI4 |
|---|---|---|---|---|
| A | 3.88 | 3.88 | 4.29 | 3.86 |
| B | 1.14 | 1.31 | 1.32 | 0.74 |
| C | 0.71 | 0.71 | 1.54 | 1.53 |
| D | 1.72 | 1.73 | 0.97 | 0.9 |
| G | 5.49 | 5.49 | 0.62 | 0.99 |

Table 4 - Worst-Case Pile Reactions at Dolphin - Static Seismic Combos (kips and inch-kips)
(worst case is max. tension in the connection)

| Dolphin | Vx | Vy | Vz | Mx | My | Mz | Gov. Case |
|---|---|---|---|---|---|---|---|
| A | 198.32 | 0.72 | 470.22 | 438.7 | -107.85 | -401.82 | DLSI4 |
| B | 1.44 | 113.7 | 256.57 | 1196.37 | -288.51 | 87.1 | DLSI1 |
| C | 0.17 | -0.7 | 148.72 | 276.59 | 70.48 | 7.85 | DLSI3 |
| D | -0.19 | -66.89 | 158.98 | 137.44 | -70.32 | 0.14 | DLSI3 |
| G | -19.9 | 12.29 | 48.43 | 4081.82 | 59.01 | 1733.92 | DLSI3 |

2

# Port of Guam
## Seismic Analysis of Berthing Dolphins A, B, C, D & G

**Table 5 - Worst-Case Pile Reactions at Dolphin - Dynamic Seismic Combos (kips and inch-kips)**
(worst case is max. tension in the connection)

| Dolphin | Vx | Vy | Vz | Mx | My | Mz | Gov. Case |
|---|---|---|---|---|---|---|---|
| A | 176.4 | 1.06 | 418.66 | 642.13 | 70.49 | -208.26 | DDY14 |
| B | 124.98 | 0.2 | 293.13 | 84.87 | 76.79 | 226.39 | DDY12 |
| C | 111.31 | 0.96 | 273.55 | 374.52 | -171.32 | 114.62 | DDY14 |
| D | 121.04 | 0.03 | 289.21 | 59.54 | -174.59 | 23.26 | DDY13 |
| G | 58.16 | 0.93 | 155.97 | 314.41 | 925.3 | 188.26 | DDY13 |

**Table 6 - Worst-Case Bolt Loads - Static Seismic Combos (kips)**

| Dolphin | Vmax | Tmax | Vallow | Tallow | Vm/Va | Tm/Ta | |
|---|---|---|---|---|---|---|---|
| A | 29.2 | 68.7 | 5.03 | 7.43 | 5.81 | 9.25 | 6.65 |
| B | 14.2 | 56.7 | 5.03 | 7.43 | 2.82 | 7.63 | 5.24 |
| C | 0.1 | 24.9 | 5.03 | 7.43 | 0.02 | 3.35 | 2.16 |
| D | 8.5 | 24.5 | 5.03 | 7.43 | 1.69 | 3.30 | 3.41 |
| G | ▮ | ▮ | 5.03 | 7.43 | 4.41 | 13.26 | 7.13 |

Not valid as some bolts are in compression; model is valid only for all bolts in tension
Using sum of 5/3 roots Vm/Va and Tm/Ta

**Table 7 - Worst-Case Bolt Loads - Dynamic Seismic Combos (kips)**

| Dolphin | Vmax | Tmax | | | Vm/Vu | Tm/Tu |
|---|---|---|---|---|---|---|
| A | 24.3 | 66.9 | 20.12 | 29.72 | 1.21 | 2.25 |
| B | 17.4 | 41.2 | 20.12 | 29.72 | 0.86 | 1.39 |
| C | 12.5 | 42.7 | 20.12 | 29.72 | 0.62 | 1.44 |
| D | 14.9 | 38.0 | 20.12 | 29.72 | 0.74 | 1.28 |
| G | 7.4 | 41.8 | 20.12 | 29.72 | 0.37 | 1.41 |

Based on 4x allowbles assuming failure mode is bond strength
Using sum of 5/3 roots Vm/Va and Tm/Ta

3

## Port of Guam
## Seismic Analysis of Berthing Dolphins A, B, C, D & G

Table 8 - DL + 94UBC Spectra Scaled to Vstatic: no ship impact - Worst Case Pile Reactions (global, kips and inch-kips)

| Dolphin | Vx | Vy | Vz | Mx | My | Mz |
|---|---|---|---|---|---|---|
| A | 63.94 | 0.42 | 154.75 | 263.89 | 409.27 | 82.91 |
| B | 31.17 | 0.3 | 74.54 | 102.58 | 166.03 | 52.26 |
| C | 61.96 | -0.001 | 154.08 | 18.16 | -191.46 | -0.3 |
| D | 70.94 | 0.32 | 171.44 | 177.84 | -275.65 | 44.73 |
| G | 0.59 | 0.02 | 187.35 | 3.31 | 197.79 | 4.32 |

Table 9 - Worst-Case Bolt Loads for DL + 94 UBC Spectra Scaled to Vstatic: No ship impact

| Dolphin | Vmax | Tmax | Vallow | Tallow | Vm/Va | Tm/Ta | D/C |
|---|---|---|---|---|---|---|---|
| A | 7.36 | 31.18 | 5.03 | 7.43 | 1.46 | 4.20 | 3.61 |
| B | 3.49 | 14.13 | 5.03 | 7.43 | 0.69 | 1.90 | 2.27 |
| C | 7.75 | 22.2 | 5.03 | 7.43 | 1.54 | 2.99 | 3.23 |
| D | 8.47 | 27.57 | 5.03 | 7.43 | 1.68 | 3.71 | 3.55 |
| G | 0.13 | 27.93 | 5.03 | 7.43 | 0.03 | 3.76 | 2.33 |

Table 10 - DL + Vstatic, No Ship Impact - Worst Case Pile Reactions Dolphin A only for comparison purposes (global, kips and inches)

| Dolphin | Vx | Vy | Vz | Mx | My | Mz |
|---|---|---|---|---|---|---|
| A | 57.84 | 0.34 | 140.37 | 207.5 | 232.3 | -110.79 |

Table 11 - DL + Vstatic, No Ship Impact - Worst Case Bolt Loads Dolphin A only (global, kips and inches)

| Dolphin | Vmax | Tmax | Vallow | Tallow | Vm/Va | Tm/Ta | D/C |
|---|---|---|---|---|---|---|---|
| A | 8.15 | 25.54 | 5.03 | 7.43 | 1.62 | 3.44 | 3.43 |

Table 12 - Bolt Loads for Plastic Capacity of 22" Dia. Pile/0.375" thick - Mp = 6314 "-k based on 36 ksi yield

Tmax = 143k, which is nearly 5x greater than published tension test capacity of 29.72 kips
D/C = 4.8

4



**EXHIBIT H**

BERMAN O'CONNOR MANN & SHKLOV
DANIEL J. BERMAN
ROBERT J. O'CONNOR
Suite 503, Bank of Guam Building
111 Chalan Santo Papa
Hagåtña, Guam 96910
Telephone: (671) 477-2778
Facsimile: (671) 499-4366

Attorneys for Defendant:
*WINZLER & KELLY CONSULTING ENGINEERS*

FILED
DISTRICT COURT OF GUAM

JUL 16 2004

MARY L. M. MORAN
CLERK OF COURT

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF GUAM

| | |
|---|---|
| S.J. GARGRAVE SYNDICATE AT LLOYDS, ) | CIVIL CASE NO.: CIV03-00009 |
| Plaintiff, ) | |
| ) | |
| vs. ) | **EXPERT DISCLOSURE OF** |
| ) | **DEFENDANT WINZLER &** |
| BLACK CONSTRUCTION CORPORATION, ) | **KELLY CONSULTING ENGINEERS** |
| WINZLER & KELLY CONSULTING ) | **DECLARATION OF SERVICE** |
| ENGINEERS and ENGINEERING, ) | |
| MANAGEMENT & PLANNING SERVICES ) | |
| CORPORATION, ) | |
| ) | |
| Defendants. ) | |

Pursuant to Fed.R.Civ.P. 26(a)(2), Defendant Winzler & Kelly Consulting Engineering, by and through its counsel, provides the following disclosure setting forth information about the people whose expert opinions Defendant Winzler & Kelly Consulting Engineering may offer in evidence at trial:

1.    Ben C. Gerwick, Inc. by and through Webb W. Hayes, S.E. and Ted W. Trenkwalder, S.E.; Tel.: (510) 839-8972; Physical address: 1300 Clay Street, Suite 450, Oakland, CA 94612.

2.    Kleinfelder, Inc. by and through Zia Zafir, Ph.D., P.E. and Edward Rinne, P.E., G.E.; Tel.: (925) 484-1700; Physical address: 7133 Koll Center Parkway Suite 100, Pleasanton,

E:\Jenn\Plds\3109.wpd                    1

3

4  CA 94566.

5
6         A.      The documents upon which Ben C. Gerwick, Inc. and Messrs. Zafir and

7  Rinne based their opinions are set forth in their reports, which is served herewith.  Backup

8  calculations, worksheets and computer analyses will be provided if requested.

9         B. and C.  Mr. Hayes's qualifications are included in the report, listing a summary

10  of his qualifications, the publications he has authored during the past ten years, his previous

11  experience as an expert, and the compensation he will be paid for study and testimony in this

12  matter.  Mr. Zafir's curriculum vitae is attached listing the same.

13
14         2.      Any and all individuals designated as experts by any other party, notwithstanding

15  that subsequent to such designation, any such party may be dismissed from the case and/or

16  withdraws such person's designation.

17         3.      Defendant Winzler & Kelly Consulting Engineers reserves all of its rights pursuant

18  to Fed.R.Civ.P. 26, under federal maritime law and under the laws of Guam to supplement, revise

19  or withdraw or add hereto.

20
21         Since discovery in this action has not yet been completed and depositions of experts

22  have not yet been taken or completed, Defendant Winzler & Kelly Consulting Engineers expressly

23  reserves the right to name or call additional experts as the need arises during the course of

24  discovery and investigation in preparation for trial of this matter, and after Plaintiff and Co-

25  Defendants disclose their experts and theories and the facts upon which they base such theories.

26  Timely notice of such supplemental experts will be provided pursuant to Fed.R.Civ.P. 26 and such

27

28  E:\Jean\Plds\3109.wpd                                2

S.J. GARGRAVE, ET AL. vs. BLACK CONSTRUCTION, ET AL.
EXPERT DISCLOSURE OF DEFENDANT WINZLER & KELLY
CONSULTING ENGINEERS; DECLARATION OF SERVICE

CIV03-00009

PAGE 3

witnesses will be made available for the purpose of being deposed prior to trial in this action.

Defendant Winzler & Kelly Consulting Engineers further reserves the right to consult with and retain the services of additional expert witnesses to testify on its behalf at trial for purposes of impeachment and/or rebuttal testimony.

Dated this 16th day of July, 2004.

Respectfully submitted,

BERMAN O'CONNOR MANN & SHKLOV
Attorneys for Defendant:
*WINZLER & KELLY CONSULTING ENGINEERS*

By: DANIEL J. BERMAN

E:\Jean\Plds\3109.wpd                3

## DECLARATION OF SERVICE

I, David Ledger, hereby declare under penalty of perjury of the laws of the United States, that on April 28, 2005, I caused to be served, via hand delivery, a true and correct copy of **PLAINTIFF'S OPPOSITION TO EMPSCO'S EMERGENCY MOTION FOR PROTECTIVE ORDER AND MOTION IN LIMINE RESTRICTING EXPERT'S TESTIMONY AT TRIAL; DECLARATION OF FORREST BOOTH; EXHIBITS A-H; DECLARATION OF SERVICE** upon Defendants Counsel of record as follows:

> Robert J. O'Connor, Esq.
> Daniel J. Berman, Esq.
> Berman O'Connor Mann & Shklov
> Suite 503, Bank of Guam Building
> 111 Chalan Santo Papa
> Hagåtña, Guam 96910
>
> Thomas C. Sterling, Esq.
> Klemm Blair Sterling & Johnson, P.C.
> Suite 1008, Pacific News Building
> 238 Archbishop Flores Street
> Hagåtña, Guam 96910

and

> Thomas M. Tarpley, Esq.
> Law Offices of Tarpley & Moroni, LLP
> Suite 402, Bank of Hawaii Building
> 134 West Soledad Avenue
> Hagåtña, Guam 96910

Executed this 28th day of April, 2005 at Hagåtña, Guam.

DAVID LEDGER

SANFRAN1\33431\1 123206.000

10.

4836-3219-2768.1.055639-00001