BERMAN O'CONNOR MANN & SHKLOV
DANIEL J. BERMAN
ROBERT J. O'CONNOR
Suite 503, Bank of Guam Building
111 Chalan Santo Papa
Hagåtña, Guam 96910
Phone: (671) 477-2778
Fax: (671) 499-4366

Attorneys for Defendant
Winzler & Kelly Consulting Engineers



IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| S.J. GARGRAVE SYNDICATE AT LLOYD'S,<br><br>Plaintiff,<br><br>vs.<br><br>BLACK CONSTRUCTION CORP., WINZLER & KELLY CONSULTING ENGINEERS and ENGINEERING MANAGEMENT & PLANNING SERVICES CORP.,<br><br>Defendants. | Civ. No. CIV 03-0009<br><br>WIZNLER & KELLY'S OPPOSITION TO PLAINTIFF'S RULE 52(b) MOTION TO AMEND ORDER |

### REQUEST FOR ORAL ARGUMENT

Winzler & Kelly requests that the court hear oral argument on this motion. An "Agreement to Hearing Date" will be submitted shortly pursuant to District of Guam Local Rule 17.1.

### A RULE 52 MOTION SHOULD NOT BE USED TO REHASH OLD THEORIES, OR ADVANCE NEW ONES THAT COULD HAVE BEEN ARGUED BEFORE

This is not a proper Rule 52(b) motion. It points to no newly discovered evidence, intervening change of law, or any other circumstance that would justify the court overturning a decision it has already made after thorough briefing and argument. It does not more than repeat old arguments that the court already rejected the first time it

1

considered the motion, and advance new theories that could and should have been raised earlier. Rule 52(b) "is not intended as a vehicle for securing a rehearing on the merits," Hekkila v. Barber, 164 F.Supp. 587, 592 (N.D.Cal. 1958), Minneapolis-Honeywell Regulator Co. v. Midwestern Instruments, Inc., 188 F.Supp. 248, 254 (N.D. Ill. 1960); Davis v. Matthews, 450 F.Supp. 308, 218 (E.D.Cal. 1978), and Rule 52(b) motions "are not intended merely to relitigate old matters nor are such motions intended to allow the parties to present the case under new theories." Adams v. James, 526 F.Supp. 80, 86 (M.D.Ala. 1981); Evans, Inc. v. Tiffany & Co., 416 F.Supp. 224, 244 (N.D.Ill. 1976). See also, e.g., Gutierrez v. Ashcroft, 289 F.Supp. 2d 555, 561 (D.N.J. 2003) ("The purpose of Rule 52(b) is to allow a court to correct manifest errors of law or fact, or in limited circumstances to present newly discovered evidence, but not to relitigate old issues, to advance new theories, or to secure a rehearing on the merits."); Diocese of Winona v. Interstate Fire and Casualty Co., 89 F.3d 1386, 1397 (8th Cir. 1996) ("Motions to amend a judgment cannot be used to raise arguments which could have been raised prior to the issuance of judgment."). It should be denied for this reason, without even considering its dubious merits.[1] If the court does consider the merits of the motion, however, it should be denied on that basis as well, for the reasons set out below.

---

[1] Indeed, this is not really a Rule 52 motion at all. Rule 52 sets out the procedure for seeking amendments to a court's findings of facts after a non-jury trial. It has no application to a decision on a motion for judgment on the pleadings, where the court makes no findings of fact in the first place, but simply decides the issue on the pleadings as they stand, assuming all well-pled facts to be true and considering no others. See Rule 52(a) ("Findings of fact are unnecessary on decisions of motions under Rule 12 or 56[.]").

For the same reason, the various factual assertions that the Syndicate makes in its motion, but that are derived from sources outside the Complaint (see, e.g., the references to the expert witness Boone's report on page 2 of Plaintiff's Motion, and the rehashed, but still unsupported, allegations of damage to "catwalks," "manifolds" and the like) are improper and should be disregarded by the court.

2

## EAST RIVER IS WIDELY APPLIED OUTSIDE OF ADMIRALTY

The Syndicate wishes to escape from East River Steamship Corp. v. Transamerica Delaval, Inc, 476 U.S. 858 (1986), because East River applied the economic loss doctrine to bar a tort claim for damage to whole ship turbines that was caused by a defective *component* of those turbines. See East River, 476 U.S. at 860 ("the first-stage steam reversing ring virtually had disintegrated and had caused additional damage to other parts of the turbine"); id. at 875 ("For the first three counts, the defective turbine components allegedly injured only the turbines themselves. Therefore, a strict products-liability theory of recovery is unavailable to the charterers."). Because this holding conflicts with the Syndicate's new and erroneous theory that a component must, for purposes of the economic loss doctrine, be considered in isolation from the whole product of which it forms a part, the Syndicate argues that East River does not apply here because it is an admiralty case, and this is not. See Plaintiff's Motion at 3.

The relevance of East River to this case, however, does not depend on this being an admiralty case. The economic loss doctrine that East River adopted is what the East River court itself called, even then, "the majority land-based approach." East River, supra, 476 U.S. at 868. Moreover, East River itself has been since broadly adopted as the definitive statement of the economic loss doctrine by "land-based" state courts across the nation, entirely outside the realm of admiralty. See Memorandum In Support of Motion For Judgment on the Pleadings on Second Cause of Action (Negligence Against Winzler & Kelly) at 4-5, and cases cited. Indeed, in its original motion on this issue, Winzler & Kelly specifically argued that the economic loss doctrine should apply in this case "whether we regard this as an admiralty or a diversity matter," since in diversity, the law of Guam would control, and "there is every reason to believe that [the Supreme Court of Guam] would adopt the rule, as have the majority of states, as well as the neighboring

3

CNMI, particularly since East River." See id. at 6. This court evidently agreed, following East River despite finding no admiralty jurisdiction.

**GUAM SUPREME COURT WOULD ANALYZE THE ISSUE INDEPENDENTLY**

The Syndicate is thus correct that Guam law controls, but it greatly overstates the influence of California law on Guam. That influence is strictly limited to situations involving the construction of California statutes adopted by Guam. Two of the three cases cited by the Syndicate on this issue construe Guam statutes derived from California originals. See Camacho v. Du Sung Corp., 121 F.3d 1315, 1317 (9th Cir. 1997) ("this provision was adopted from [the] California Civil Code"), Taber v. Maine, 67 F.3d 1029, 1033 (2nd Cir. 1995) ("the relevant Guam statute is identical to, and indeed derives from, the California Civil Code"). The Syndicate's third cited case disregards California law altogether, because the particular Guam statute at issue derived not from that state, but rather from Michigan. See Guam v. Agualo, 948 F.2d 1116, 1118 (9th Cir. 1991) ("Because the Guam statute is identical to the Michigan statute after which it is patterned, we view Michigan law to be persuasive in this circumstance."). Thus they are to be clearly distinguished from this case, which presents a question of common law, not one of statutory construction. See also, e.g., Dueñas v. Department of Public Works, 1992 WL 97213 (D. Guam. App. Div. 1992) at *3 ("The Ninth Circuit has stated generally that when Guam law is unclear, California law is persuasive. However, those Ninth Circuit cases have all involved statutes adopted from California."); Dueñas v. Yama's Co., Inc., 1991 WL 255834 (D. Guam. App. Div. 1991) at *7 (where Guam law not based on California's, California decisions have "no particular persuasive primacy on Guam").

The Syndicate's cases are also to be distinguished on the ground that they all predate the establishment of the Guam Supreme Court. Both Camacho and Agualo are appeals to the Ninth Circuit from that court's predecessor, the former Appellate Division

4

of the District Court of Guam. Whatever the approach of the Appellate Division may have been, the new Supreme Court has made it clear that it does not defer to California case law even as to questions of statutory construction, much less common law, but instead will undertake an independent analysis:

> We reject Appellant's mistaken belief that we are obligated to adopt California precedent. While it is a generally accepted rule of statutory interpretation that a jurisdiction adopting a statute from another accepts the construction placed on it by the original jurisdiction, this court will not blindly adopt another jurisdiction's interpretation on this basis alone. To do otherwise would be a sacrifice of our own reasoned analysis and independent thinking. Accordingly, we will disregard another jurisdiction's construction if it is ill reasoned, based on antiquated grounds, or simply inapplicable to Guam. We will likewise disregard previous authority if it is at odds with local laws as a whole or Guam's applicable customs.

Custodio v. Boonprakong, 1999 Guam 5 ¶ 11 (citations omitted). See also, e.g., Sumitomo Construction Co. v. Zhong Ye, 1997 Guam 8 ¶ 2 ("The Appellate Division previously held that California authority should be used to interpret Guam's arbitration statutes. . . . [W]e will use our own independent and reasoned analysis of the issues before us."). In all likelihood, therefore, the Supreme Court of Guam would follow the majority rule of East River, even if California did not do so.[2]

---

[2] In addition to overstating the influence of California law on Guam, the Syndicate also overstates the extent to which California law itself deviates from East River. The Syndicate's position rests on three California cases: Jimenez v. Superior Court, 29 Cal. 4th 473 (2003); Robinson Helicopter Co. v. Dana Corp., 34 Cal.4th 979 (2004); and North American Chemical Co. v. Superior Court, 59 Cal. App.4th (*not* Cal.4th, as cited by Plaintiff) 764 (1997). None of these has the impact that Plaintiff claims.

To begin with, the statement in North American Chemical regarding a distinction between goods and services (see Plaintiff's Motion at 7) was recently described as "certainly nothing more than dictum," not followed even by other California appellate courts. Platte Anchor Bolt, Inc. v. IHI, Inc., 352 F.Supp.2d 1048, 1053 (N.D.Cal. 2004).

Robinson Helicopter, meanwhile, has nothing to do with this motion at all. It held that the economic loss doctrine does not bar a claim for *fraud* – a point that is immaterial to a motion to reconsider an order dismissing a claim not for fraud, but rather for *negligence*, based on the economic loss doctrine. Robinson Helicopter did not disturb the longstanding rule that the economic loss doctrine is an effective and available defense against a negligence claim. On the contrary, it reaffirms that principle. See id., 34

5

## MAJORITY RULE TREATS ENTIRE PRODUCT AS AN INTEGRATED UNIT

What then is the majority rule on this issue? Gunkel v. Renovations, Inc., 822 N.E.2d 150 (Ind. 2005), the recent case on which on which the Syndicate relies, recommends us to Myrtle Beach Pipeline Corp. v. Emerson Electric Co., 843 F.Supp. 1027 (D.S.C. 1993) "for an extensive discussion of the subject" of the distinction between "the product itself" and "other property." 822 N.E.2d at 154 n. 3. Myrtle Beach Pipeline itself describes the law on the subject as follows:

> Most of the law addressing the issue of what constituted "other property" is concerned with whether the other property is merely a component part of the overall product itself. *If such is the case, then the courts uniformly hold that the economic loss doctrine precludes recovery in tort against the manufacturer of the component because the component is integrated into the whole product and the purchaser bargained for the whole product, not merely a component of it.*

Myrtle Beach Pipeline, 843 F.Supp. at 1057 (emphasis added), citing Laurens Electric Cooperative v. Altec Industries, 889 F.2d 1323, 1325 (4th Cir. 1989) (holding that a defective derrick mounted to a truck is a single, integrated product for purposes of the economic loss doctrine), King v. Hilton-Davis, 855 F.2d 1047, 1051-54 & n. 4 (3rd Cir. 1988) (holding that potatoes treated with a chemical that inhibits premature sprouting are a single product, not separate components of potatoes and chemicals and thus plaintiff's tort claim was precluded by the economic loss doctrine), Shipco 2295, Inc. v. Avondale Shipyards, Inc., 825 F.2d 925, 929-30 (5th Cir. 1987) (holding that "product" as contemplated under East River means "finished product" and thus plaintiff could not maintain a tort action against manufacturer of the product proper or manufacturer of a

---

Cal.4th at 989 ("We have also applied the economic loss rule to negligence actions"); id. at 990 ("If every negligent breach of a contract gives rise to tort damages the limitation would be meaningless."); id. at 991 ("Dealing with affirmative acts of fraud and misrepresentation raises different policy concerns than those raised by negligence or strict liability claims").

Jimenez, the case on which the Syndicate relies most heavily on this motion, is discussed *infra*.

6

defective component integrated into the product), American Home Assurance Co. v. Major Tool and Machine, Inc., 767 F.2d 446, 3448 (8th Cir. 1985) (holding that "other property" does not include parts of a single product that is composed of various components and therefore a turbine assembler was barred by the economic loss doctrine from recovering in tort against manufacturers of defective component parts of the turbine).

Nor is it the approach of the Synidcate's cases really so different from that of the states that follow the majority rule of East River and the cases cited in Myrtle Beach Pipeline. The Syndicate relies heavily on Jimenez v. Superior Court, 29 Cal. 4th 473 (2003), in which the court, according to the Syndicate, "affirmatively declared that the economic loss rule does not bar recovery in tort for damage which a defective product causes to other portions of a larger product." Plaintiff's Motion at 4. The court declared no such thing. It stated only that the economic loss rule "does not *necessarily* bar" such recovery. Id. at 483 (emphasis added). The Syndicate's strategic omission of the crucial word "necessarily" transforms what is in fact an exception into a rule, thus not only distorting the actual holding of the Jimenez court, but also ignoring the statement of the author of that opinion, in his own separate concurrence, that Jimenez "*does not* hold … that the economic loss rule can *never* bar recovery for damages that one part of or element of a finished product causes to other parts or elements of the same finished product." Jimenez, 29 Cal.4th at 485 (Kennard, J., concurring). The majority provides no guidance for telling the difference, but Judge Kennard writes: "the crucial inquiry for applying the economic loss doctrine in this context is whether the component part has been so integrated into the overall unit that it has lost its separate identity." Id. This is consistent with the approach described in Myrtle Beach Pipeline.

7

Gunkel, the Syndicate's other principal authority, approached the question by looking to the underlying rationale of the economic loss doctrine – namely, that "the law should permit the parties to a transaction to allocate the risk that an item sold or a service performed does not live up to expectations." Id. at 155. The court wrote:

> We think that the theory supporting the economic loss doctrine supplies the answer to whether damage to "other property" is involved. Only the supplier furnishing the defective property or service is in a position to bargain with the purchaser for allocation of the risk that the product or service will not perform as expected. *If a component is sold to a first user as a part of the finished product, the consequences of its failure are fully within the rationale of the economic loss doctrine. It therefore is not "other property."*

Id. at 155 (emphasis added). Applying this principle to the facts of the case, the court held that the façade of the house was "other property," because "J & N added the façade under an arrangement with the Gunkels that was independent of the contract with Renovations to build the home." Id. at 156. Application of the same principle to the facts of *this* case would result in the opposite conclusion, because the pile attachment design was an integral part of the total pier repair project, for which the Port Authority did not separately deal with Winzler & Kelly. Instead, the design came as part and parcel of the Port Authority's contract with Black.

### THE PROJECT IS THE PRODUCT, NOT THE RING AND THE BOLTS

The ultimate problem with the Syndicate's motion is that it is again trying to recreate its case after the fact, upon discovering that its original theories of recovery are not going to work. Yet however the Syndicate may try to characterize it now, this is not, and never has been, a case about simply adding some defective parts to an "existing structure." See Plaintiff's Rule 52(b) Motion at 2 (attempting to redefine the product provided as "8-inch bolts and flange collars"). It is instead a case about an allegedly defective repair job to a pier and dolphins that had sustained "severe damage" in an

8

earthquake. See First Amended Complaint at paragraph 7. The repair design and work (what the Syndicate in its Complaint calls "the Project") was the product itself. The gravamen of the Complaint is that the repair work damaged itself, undid itself, destroyed itself, when put to the test of another earthquake, because of its own faulty nature.

This was the Syndicate's own original view of its case. Even when Defendants pointed out in their motions that a claim of this type can be brought in contract, but not in negligence, because of the economic loss doctrine, the Syndicate did not dispute that the pier and dolphins, as repaired, were the product itself. It never argued then, as it does now, that only "the 8-inch bolts and flange collars" were the product contracted for, and that the repaired pier and dolphins were "other property" outside the scope of the economic loss doctrine. On the contrary, the Syndicate at least implicitly conceded the point that the repaired pier and dolphins were themselves the product contracted for, but argued that *other* property, separate and distinct from the pier and dolphins, had *also* been damaged *in addition to them*, and that *this* "other property" was what took the claim outside the scope of the economic loss doctrine. Plaintiff' Opposition to Winzler & Kelly's Motion For Judgment on the Pleadings on Second Cause of Action (Negligence) (November 19, 2004) at 10 ("There was damage to a great deal more than just the F-1 dolphins.").

The "other property" that the Syndicate referred to then consisted of "pipelines, electrical lines, water lines, fire mains, catwalks, manifolds and other equipment." See id. at 9-10. Winzler & Kelly pointed out that this "other property" made its first appearance in the Syndicate's brief in opposition, and was never asserted in the complaint, and therefore ought not to be considered. See Defendant Winzler & Kelly Consulting Engineers' Reply In Support of Motion For Judgment on the Pleadings on Second Cause of Action (November 26, 2004) at 7. The Court agreed. See April 8 Order

9

at 10-11. Thus was foiled the Syndicate's first attempt at re-characterize its claim so as to circumvent its legal deficiency.

The Syndicate now makes a second attempt to do the same thing. Its new argument finds no support in the complaint, nor was it advanced in the Syndicate's arguments on the motion. It is an entirely new, post hoc invention, designed, like the "catwalks" and "manifolds," to circumvent the inescapable fact that the Syndicate really is trying to assert a claim in negligence for a product's damage to itself. Such a claim is still barred by the economic loss doctrine, however, and the Syndicate's motion should therefore be denied.

## CONCLUSION

Plaintiff mischaracterizes the service contracted for, and misconstrues the law regarding the distinction in the economic loss doctrine between the "product itself" and "other property." Its position should therefore have been rejected, even if it had been advanced last November in direct opposition to Defendants' motions for judgment on the negligence claims. The same position should certainly be rejected *now*, after those motions have already been argued and decided. Rule 52, as stated above, does not provide a forum for a disappointed party to "relitigate old issues, to advance new theories, or to secure a rehearing on the merits." That is precisely what the Syndicate is trying to do, and the court should reject the attempt, and deny the motion.

//

//

Respectfully submitted this sixth day of May, 2005.

                                      BERMAN O'CONNOR MANN & SHKLOV
                                      Attorneys for Winzler & Kelly

By: _____
        Catherine Bejerana Camacho