**FILED**
DISTRICT COURT OF GUAM

JUN - 3 2005

MARY L.M. MORAN
CLERK OF COURT

(177)

# IN THE DISTRICT COURT OF GUAM

## TERRITORY OF GUAM

\* \* \*

| | |
|---|---|
| S.J. GARGRAVE SYNDICATE AT LLOYDS, ) | |
| Plaintiff, ) | |
| vs. ) | CIVIL CASE |
| ) | NO. CV03-00009 |
| BLACK CONSTRUCTION CORPORATION, ) | |
| WINZLER & KELLY CONSULTING ) | |
| ENGINEERS, and ENGINEERING ) | |
| MANAGEMENT & PLANNING SERVICES ) | |
| CORPORATION, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

TRANSCRIPT OF PROCEEDINGS

BEFORE

THE HONORABLE A. WALLACE TASHIMA
Designated Judge

**HEARING ON MOTIONS**

**FRIDAY, DECEMBER 3, 2004**
\* \* \*

```
1    APPEARANCES:

2

3    FOR THE PLAINTIFFS:

4    LAW OFFICES OF CARLSMITH & BALL, LLP
     BY:  DAVID LEDGER, Esq.
5         ELYZE McDONALD, Esq.
     Bank of Hawaii Building, Suite 401
6    134 West Soledad Avenue
     Hagatna, Guam  96910
7
     and also
8    LAW OFFICES OF COZEN & O'CONNOR
     BY:  FORREST BOOTH, Esq. (Telephonically)
9    425 California Street, Suite 2400
     San Francisco, CA  94104-2215
10

11

12   FOR DEFENDANT BLACK CONSTRUCTION CORPORATION:

13   KLEMM, BLAIR, STERLING & JOHNSON
     Attorneys At Law
14   BY:  THOMAS C. STERLING, Esq.
     1008 Pacific News Building
15   238 Archbishop Flores Street
     Hagatna, Guam 96910
16

17   FOR DEFENDANT WINZLER & KELLY ENGINEERING:

18   BERMAN, O'CONNOR, MANN & SHKLOV
     Attorneys At Law
19   BY:  ROBERT J. O'CONNOR, Esq.
     Suite 503, Bank of Guam Building
20   111 Chalan Santo Papa
     Hagatna, Guam  96910
21

22   FOR DEFENDANT ENGINEERING MANAGEMENT & PLANNING:

23   LAW OFFICES OF TARPLEY & MORONI, LLP
     BY:  THOMAS M. TARPLEY, Esq.
24   Suite 402, Bank of Hawaii Building
     134 West Soledad Avenue
25   Hagatna, Guam  96910
```

```
 1        HAGATNA, GUAM, FRIDAY, DECEMBER 3, 2004; 9:00 A. M.

 2                          * * *

 3             THE COURT:  Let's have the clerk call the

 4   case.

 5             THE CLERK:  Civil case 03-00009, S.J. Gargrave

 6   Syndicate at Lloyds versus Black Construction

 7   Corporation, Winzler and Kelly, and Engineering

 8   Management and Planning Services Corporation; motions

 9   and all hearings set for calender today, and scheduling

10   conference.

11             Counsel, please state your appearances.

12             THE COURT:  Let's get the appearances of -- I

13   think we have somebody on the phone so let's get that

14   appearance first.  Is that right, we have somebody --

15             THE CLERK:  Yes.

16             MR. BOOTH:  Yes, Your Honor.  Thank you, Your

17   Honor.  This is Forrest Booth of Cozen O'Connor in San

18   Francisco, counsel for plaintiff.

19             THE COURT:  Okay.

20             MR. LEDGER:  Good morning, Your Honor, David

21   Ledger with Carlsmith Ball for plaintiffs.

22             MS. McDONALD:  Elyze McDonald representing

23   Plaintiffs.

24             MR. STERLING:  Good morning, Your Honor,

25   Thomas Sterling here on behalf of Black Construction
```

1   Corporation.

2           MR. O'CONNOR:  Good morning, Your Honor,

3   Robert O'Connor on behalf of Winzler & Kelly

4   Engineering.

5           MR. TARPLEY:  Tom Tarpley on behalf of EMPSCO.

6           THE COURT:  Okay.  Now, there are lots of

7   motions pending.  One reason I don't want to put this

8   hearing off is there's another matter in this case

9   that's bothering me and I want to raise it with counsel

10  today.  But I guess we'll -- well, I think most of the

11  motions--I guess I can't say which defendant--but all

12  of the motions are made by defendants, so let me, why

13  don't we just have just a, without too much argument,

14  I'd like to hear, you know, just a very short statement

15  from each defendant of, one, you know, summarizing your

16  motion, in effect, and then I'm going to hear from the

17  plaintiff, then come back to the defendant.  All right?

18          So let's hear, which defendant wants to be

19  first?

20          MR. STERLING:  Your Honor, with your

21  permission I'll go first on behalf of Black.

22          THE COURT:  All right.

23          MR. STERLING:  Thank you, Your Honor.

24          Your Honor, the Black Construction Corporation

25  has three pending motions today.  They've all been

```
 1   briefed, I don't have an awful lot to add, but I'll try
 2   to just hit the high points on each one of them.
 3            The first motion is -- the plaintiff's claim
 4   is based upon a claim in subrogation in which they're
 5   seeking approximately 6.3 million dollars for various
 6   items of damage.  We are taking the position in our
 7   first motion that since they are suing in subrogation
 8   pursuant to a loss in subrogation form, they are
 9   limited, as a matter of law, to recovery for the claims
10   for which they have paid the Port Authority of Guam,
11   which is approximately 1.94 million for the cost of
12   repair of the dolphins.  There were many other items of
13   Port property damage in the earthquake for which they
14   paid, but we take the position they are limited --
15            THE COURT:  Wait a minute.  Did you say that
16   they paid?  You just said there were many items --
17            MR. STERLING:  Well, the total payments made
18   to the Port Authority was seven and a half million
19   dollars, but that was not --
20            THE COURT:  By the Syndicate?  By the
21   plaintiff, right?
22            MR. STERLING:  By the plaintiff.  And that's
23   pertaining to various buildings and facilities in
24   addition to the dolphins --
25            THE COURT:  Right.
```

1       MR. STERLING: -- the pier that we're dealing

2   with.

3       THE COURT: All right.

4       MR. STERLING: The total payment in connection

5   with those dolphins was approximately 1.97 million

6   dollars. We take the position in subrogation that's

7   all they can recover, up to that amount for the cost of

8   repair.

9       Now, they have argued, without citing any

10  authority, that the loss in subrogation form is in fact

11  an assignment of all the Port's claims, and we submit

12  that --

13      THE COURT: Including economic damage?

14      MR. STERLING: Correct. And we take the

15  position that that fails factually today because they

16  have presented no facts to show there was any

17  consideration for such an assignment; the policy

18  obligated the Port to convey subrogation rights only.

19      We also take the position that if there was

20  assignment, there should be some evidence of the

21  negotiation of this assignment, and the consideration,

22  which has not been presented here today.

23      And, finally, we have shown in our papers that

24  one of the claims they claim the Port assigned to them

25  without payment was in fact the covered claim under the

```
 1   policy for economic loss for business interruption.  So
 2   we're saying if they want the court to find there's a
 3   triable issue that this was in fact an assignment, they
 4   should have presented some facts showing negotiation,
 5   showing  consideration, and showing some basis for the
 6   court to assign covered claims without a payment.  So
 7   we say it's a subrogation form, that's all it is, and
 8   they should be limited.
 9            We've also moved to dismiss the negligence
10   claim --
11            THE COURT:  This is your second motion?
12            MR. STERLING:  Correct, we move on to our
13   second motion.  And the other defendants have very
14   similar motions, so --
15            THE COURT:  Right.  In fact, some just joined
16   your motion, right?
17            MR. STERLING:  That's correct, Your Honor.
18   And we have argued that since we have a written
19   contract with the Port under which we did the repair
20   work on these dolphins, the Economic Loss Doctrine
21   prevents them from suing in tort, so we've moved to
22   dismiss their negligence theory.  And it's really a
23   summary judgment because they have, first of all,
24   I would point out that if we are sitting in admiralty
25   jurisdiction, which I believe we're not based on
```

1  Judge Goodwin's decision that I cited that says if

2  it's simply a wharf case, there is no admiralty

3  jurisdiction, so I cited that brief -- or that case

4  in my brief.

5          THE COURT:  What case is that?

6          MR. STERLING:  I'm sorry, let me grab my brief

7  real quick and I can --

8          THE COURT:  Well, go ahead, and I'll ask you

9  if it's the one.  Go ahead.

10         MR. STERLING:  It's cited in my brief.  So we

11 take the position if it's an admiralty case, the court

12 is sitting in admiralty jurisdiction, it's very clear

13 under the Supreme Court's decision in East River, I

14 believe is the name of the case, that the economic

15 doctrine -- loss doctrine --

16         THE COURT:  East River is not Judge Goodwin's

17 case.

18         MR. STERLING:  No, it's a Supreme Court case.

19         THE COURT:  Right.

20         MR. STERLING:  Having to do if we're sitting

21 here in admiralty jurisdiction, it's clear the Economic

22 Loss Doctrine would bar a tort claim for a defective

23 product.

24         THE COURT:  You're not talking -- are you

25 talking about the Royal Insurance versus Pier 39 case?

1    MR. STERLING:  I'm not sure I cited that one.

2  That could be the one.

3    THE COURT:  All right, go ahead.

4    MR. STERLING:  Also on the, if we're sitting

5  in diversity jurisdiction, which we think we are,

6  then the question becomes what is the local law in

7  connection with the Economic Loss Doctrine.  My

8  research, and I think co-defendants have done the

9  same research, to the best of our knowledge Guam's

10  Supreme Court has not decided whether the Economic Loss

11  Doctrine will be applied in Guam to prevent negligence

12  claims from being asserted out of breach of --

13    THE COURT:  By the way, let me ask a question

14  now.  I didn't look this up, but I thought about this

15  as I considered the papers, that issue.  Guam Supreme

16  Court doesn't have a certification procedure, does it,

17  where the Federal Court --

18    MR. STERLING:  It does from the Superior

19  Court, I believe, Your Honor, but I'm not sure how it

20  would be certified out of the court -- and I wish I'd

21  looked that up because I had a funny feeling you might

22  ask me that.  But I --

23    THE COURT:  But you're not familiar with it,

24  Federal Court to certify a question to the Territorial

25  Supreme Court, you know, a question of Guam law?

1          MR. STERLING:  I would assume you can do that.

2    I didn't look up the specific procedures --

3          THE COURT:  But you don't know, you can't give

4    me a specific statute or rule on that?

5          MR. STERLING:  No, I cannot.  Maybe I can be

6    helped by somebody else.

7          THE COURT:  Go ahead.

8          MR. STERLING:  But I'd like to maybe simplify

9    that for you a little bit.  In our brief, we argued

10   that the Economic Loss Doctrine should be the law of

11   Guam and should be applied, and we believe the Supreme

12   Court would apply it.  Gargrave in opposition --

13         THE COURT:  Wait a minute.  When you say it

14   should be the law of Guam, you mean it shouldn't be

15   recoverable?

16         MR. STERLING:  Right.

17         THE COURT:  Recoverable in tort?

18         MR. STERLING:  Should not be recoverable in

19   tort.  The Economic Loss Doctrine, the majority view

20   which is gradually growing everywhere, we believe the

21   Supreme Court would probably adopt that as the majority

22   view and would prevent tort claim for a simple breach

23   of contract.

24         Perhaps to simplify Your Honor's question, in

25   the opposition filed by Gargrave, they didn't question

1   whether the Economic Loss Doctrine should be applied so

2   as to bar a tort claim; rather they argued that they

3   were entitled to bring a tort claim under the Economic

4   Loss Doctrine because there was related property

5   damage.  However, we would point out that factually,

6   they haven't carried their burden of doing that.  All

7   they did is refer to some other damage to Port

8   facilities that occurred in the earthquake.

9           And what we say is if they are alleging that a

10  failure of bolts connecting pilings to a slab sitting

11  on top of those pilings damaged electrical lines and

12  water lines and other facilities over on the pier, and

13  I don't even know where else because they weren't real

14  specific about what they were talking about, they

15  should have presented some evidence of that, which they

16  have not done.

17          So they did not dispute that the Economic Loss

18  Doctrine should be applied to bar a negligence claim;

19  they factually tried to argue around it.  But we submit

20  they haven't submitted any facts to support the

21  contention that those pilings -- the failure of those

22  connections damaged anything other than the connections

23  themselves.  And therefore, there was strictly economic

24  loss, there should strictly be a contractual recovery.

25          Finally, the third motion is to dismiss the

1   claim based upon the Maritime Implied Warranty of

2   workmanlike performance.  I've cited the Knight case,

3   K-N-I-G-H-T, out of the Ninth Circuit, 1998 case, which

4   clearly indicates that this Ryan Implied Maritime

5   Warranty, recognized by the Supreme Court in Ryan, has

6   been limited to very, very limited application in this

7   circuit, specifically dealing with seaworthiness

8   claims, seamen injuries, hundred percent indemnity

9   claims, simply a different animal than we have here.

10  So, based on the Knight case, I would submit that the

11  maritime warranty does not fly.

12          There has been some opposition that has, in my

13  view, kind of blurred the distinction between are we

14  talking about implied construction contract warranties,

15  are we talking about express contract warranties, or

16  implied maritime warranties.  My motion only goes to

17  the Implied Maritime Warranty, and we submit that under

18  clear Ninth Circuit authority, it does not exist in

19  this case.  Mr. O'Connor did a lot more briefing on

20  that issue than I did, so I'd like to defer to him.

21          Finally, there's been a 56(f) affidavit filed

22  basically contending that the plaintiff needs to take

23  two additional depositions of Mr. Jose, Mr. Bismonte.

24  There have been a lot of factual materials filed with

25  the court.  And just to summarize my position on that,

1  there's been no adequate showing by Gargrave what these

2  people are expected to say that is going to defeat any

3  of these motions, there's been no showing why these

4  people weren't deposed previously, and therefore we

5  just think under Ninth Circuit authority there's an

6  inadequate showing to justify 56(f) relief, and we

7  would ask the court to decide the motions on the

8  merits.

9         THE COURT:  All right.  Now before you sit

10  down, I want to make sure about your position.  You

11  just said you don't believe there's admiralty

12  jurisdiction, right?

13         MR. STERLING:  Basically --

14         THE COURT:  Now, that goes back to, I guess,

15  whatever -- this is the first case I ever heard the

16  word dolphin used with respect to, you know, a piece of

17  construction, I guess.  But, explain to me now what you

18  believe either the record shows or, you know, it's

19  common knowledge as to what a dolphin is.

20         MR. STERLING:  I did address that in a

21  footnote in my brief.  But what a dolphin is--and I

22  didn't know what a dolphin was when I first read the

23  complaint but I know now, and certainly, other parties

24  can disagree if my representation is inaccurate--

25  basically when you have a large pier or dock, such as

1    here we have the F-1 pier which Shell utilizes to bring

2    its tankers in, they don't tie their tankers up

3    directly against those piers; they tie up or berth

4    against dolphins.

5         And what these dolphins are, there's about

6    five or six of them out there, and they are two kinds,

7    they are berthing dolphins and mooring dolphins.  The

8    berthing dolphins are actually adjacent to the pier

9    itself.  The mooring dolphins are out away from the

10   pier itself.  When the ship comes up to the dock, it

11   actually bumps up against the berthing dolphins and

12   ties off with ropes on the mooring dolphins.  So these

13   are simply what -- they don't crash into the pier, they

14   don't tie off in the pier, they tie off and park up

15   against the dolphins.

16        And what these dolphins are, are basically

17   large concrete slabs, several feet thick, 15 or 20 feet

18   across, maybe larger than that, they're big, big

19   concrete slabs that are sitting on top of a large

20   number of pilings, and they are connected to these

21   pilings, as of the time of the earthquake at issue in

22   this litigation, with an epoxy bolt system designed by

23   Winzler and Kelly initially--there's some contention

24   that we didn't go with exactly the way they designed--

25   I'll let Mr. O'Connor discuss that--and then bolted in.

1          THE COURT:  But the dolphins, and then below

2     the platform, the cab, it's a group of pilings; right?

3          MR. STERLING:  Correct, into the water.

4          THE COURT:  And they're driven into the --

5     into the earth at the bottom of the harbor?

6          MR. STERLING:  Correct, they are -- they sit

7     on pilings.

8          THE COURT:  Just like the pilings in an

9     ordinary wharf would be driven into the bottom of the

10    bay?

11         MR. STERLING:  Exactly, same concept as far

12    as I know.

13         THE COURT:  All right.  I think that's

14    sufficient for now, unless somebody is going to

15    disagree with it.  I'll give everybody a chance to be

16    heard on that.  It doesn't appear to me there's any

17    disagreement on that definition, but I just wanted to

18    make sure.

19         All right.  Thank you very much.

20         MR. STERLING:  Thank you.

21         THE COURT:  All right.  Any other defendants

22    want to add to his remarks?  You don't have to go over

23    the motions in which you joined, merely joined.  If

24    there's something else you want to add, though, feel

25    free to do so.  Anybody else want to be heard on the

Case 1:03-cv-00009    Document 193    Filed 06/03/2005    Page 15 of 50

1    defense side?

2          MR. O'CONNOR:  Bob O'Connor for Winzler and

3    Kelly.  I have nothing to add to his, to Black's

4    motions.

5          THE COURT:  But do you want to add something

6    else, though?

7          MR. O'CONNOR:  For Winzler and Kelly --

8          THE COURT:  Why don't you get up to the

9    lectern so we can get you recorded.

10         MR. O'CONNOR:  Your Honor, Winzler and Kelly

11   has filed three of its own motions.

12         THE COURT:  Right.  Go ahead, you know, give

13   me the kind of summary of those that Mr. Sterling gave

14   us of his motions.

15         MR. O'CONNOR:  Okay.  The first motion is a

16   motion for summary judgment on the fifth cause of

17   action for breach of contract.  And the gist of this

18   motion is that Winzler and Kelly is accused of

19   preparing the design to connect the piles to the

20   underside of the dolphin deck.

21         And Winzler and Kelly's design is composed

22   of two integral component parts.  One is that there's

23   a flange that connects the top half of the pile to the

24   bottom half of the dolphin, and around the flange are

25   eight holes into which are inserted eight six-and-

1   three-quarter inch bolts.  The second part of this

2   design, and integral to the design, is a system by

3   which you anchor those bolts into the holes that have

4   been drilled into the bottom of the dolphin.  Winzler

5   and Kelly specified both components:

6          Number one, eight bolts going into the flange;

7   number two, the Redi-Chem anchoring system, which is a

8   capsule that you insert into the bolt hole.  Inside of

9   the capsule is a glass vial, so that inside the glass

10  capsule, with the glass vial inside of it, are two

11  different chemical compounds in pre-measured

12  quantities.  You then insert the bolt into the glass

13  capsule, breaking the vial inside, and stirring up the

14  two compounds, which guarantees two things:  One, that

15  the chemical compounds are in the right proportion;

16  number two, that the chemical compounds completely fill

17  the hole; and number three, that it hardens and covers

18  the bolt from the top to the bottom.

19         We agree, Winzler and Kelly agrees that the

20  first component of their design was used, that is,

21  the flange with the eight holes and the eight bolts

22  going into the holes.  But the second component of

23  the design, that is, the Redi-Chem anchoring system

24  was not used.  And the design plan itself says that

25  it's required to be used, that it must be used, the

 1    Redi-Chem system must be used, or its approved equal.

 2    It is uncontroverted fact in this motion for summary

 3    judgment that "or approved equal" requires the

 4    construction company to get the approval of the

 5    engineer who made the design.

 6         It's also uncontroverted that Winzler and

 7    Kelly was never asked to agree to the substitution

 8    that was made.  The substitution that was made was

 9    Anchor-It system where you take a gun and you shoot

10    up an un-predetermined amount of chemicals into this

11    hole and maybe they'll mix properly, maybe they won't,

12    maybe they'll fill the hole, maybe they won't; and as

13    a result, maybe the epoxy will harden, maybe it  won't,

14    maybe the bolts will be covered, maybe they won't.

15    The uncontroverted facts before this court are that

16    hundreds of bolts were found after the earthquake, they

17    were not covered all the way to the top, the holes were

18    not filled all the way, and the epoxy --

19         THE COURT:  Well, give me, just tell me, to

20    shorten your presentation, is that as actually -- as

21    the dolphins are actually constructed, they didn't

22    follow your design, or that it was a different design,

23    or is it a combination of the two?

24         MR. O'CONNOR:  They only followed one of the

25    two major components of our design.  The bolts then

1    pulled apart in the earthquake and --

2         THE COURT: So they partly -- they followed

3    your design in part, but the part that failed was not

4    the part you designed; is that what your case comes

5    down to? Or is it something different.

6         MR. O'CONNOR: Pretty much. That our design

7    wasn't followed, and therefore we can't be held liable

8    for a design that we didn't create.

9         THE COURT: And you never -- or you were not

10   even asked to approve the design change?

11        MR. O'CONNOR: Correct.

12        THE COURT: All right. Do you have any other

13   motion?

14        MR. O'CONNOR: Another motion for judgment

15   on the pleadings on the second cause of action for

16   negligence. And this again is the Economic Loss

17   Doctrine that Mr. Sterling talked to you about, so I

18   don't want to go into that in any more detail, other

19   than to point out that the Syndicate's response to our

20   motion is that the Economic Loss Doctrine doesn't apply

21   because there's no privity of contract between Winzler

22   and Kelly and the Port Authority. And the cases we've

23   cited to the court show that privity of contract is not

24   required, third party beneficiary situation is

25   perfectly acceptable. In fact, the East River case

1  and the Fairmont Shipping case were both third party

2  beneficiary contracts.

3          The third motion, Your Honor --

4          THE COURT: Now, that's a theory under

5  admiralty law; is that right?

6          MR. O'CONNOR: Yes.

7          THE COURT: All right, go ahead.

8          MR. O'CONNOR: And they claim that this is

9  a maritime admiralty action, and we're bound on the

10 judgment of the pleadings, we're bound by that

11 allegation in their complaint.

12         The third and last cause of action, Your

13 Honor, is a motion for judgment on the pleadings on

14 the ninth cause of action. This is also something

15 that Mr. Sterling briefly touched on. This involves

16 the implied breach -- breach of an implied warranty

17 of workmanlike performance. And for the reasons

18 stated by Mr. Sterling, we believe that there ought

19 to be judgment on the pleadings in this case. The

20 Ryan Stevedoring Company case applies to a maritime

21 situation. It's very limited, it requires that there

22 be strict liability and unseaworthiness.

23         There was no strict liability in this case,

24 there was no unseaworthiness because the dolphins are

25 not ships, the Port is not a ship owner, and there is

1    no strict liability imposed upon the Port.

2         Secondly, under those lines of cases, they

3    have to be seeking indemnity or be a party in a case

4    where someone is seeking to impose indemnity against

5    you.  Nobody in this case is suing the Port Authority;

6    the Port Authority has not been held liable.  So for

7    that reason the Ryan implied warranty of workmanlike

8    performance would not apply, and the court ought to

9    grant judgment on the pleadings.

10        THE COURT:  Okay.  Thank you.

11        Then we have the third defendant with the long

12   name, right?

13        MR. TARPLEY:  We shorten it to EMPSCO, Your

14   Honor.

15        THE COURT:  All right.

16        MR. TARPLEY:  EMPSCO is a Johnny-come-lately

17   to this lawsuit.  They were brought in by the plaintiff

18   as an afterthought, and it is our position that they

19   brought them in on a mistaken understanding of the

20   facts.  We think we've put forward the true facts here

21   that would entitle us to get EMPSCO out of this

22   lawsuit.  Plaintiff's expert hasn't even said that

23   EMPSCO actually did anything wrong.

24        There are some things that are not contested,

25   Your Honor.  It is not contested that EMPSCO was hired

1    by the Port to do a repair design for the Port to let

2    out to bid for construction, and they did that.  And

3    Black was the lowest bidder at 2.1 million, and the

4    Port said, well, that's just too high, and then Black

5    suggested a cheaper method of repair, and they obtained

6    their own engineer, Winzler and Kelly, to come up with

7    an alternate repair design involving a different

8    method, which is a standard method, but it's a

9    different method than what EMPSCO proposed.  And their

10   engineer did the design, stamped it and signed it, and

11   that has special significance for Winzler and Kelly

12   responsibility under the standards of engineers.

13          It is not contested that Black and the Port

14   did not contract to do the EMPSCO repair design; it was

15   Winzler and Kelly's repair design.

16          THE COURT:  Well, tell me what are your

17   motions?

18          MR. TARPLEY:  Okay, we have four motions, Your

19   Honor.  One is, we've said that the third and sixth

20   causes of action, which is for negligence and breach of

21   contract, should be dismissed for summary judgment, and

22   that the eighth of cause of action for the implied

23   warranty of workmanlike performance be dismissed under

24   12(b)(6) just for judgment on the pleadings, Your

25   Honor.

1             And we've also brought a motion to -- the

2    plaintiff failed to file its timely opposition and in

3    the method that's required under the rules, so we also

4    move to strike the plaintiff's opposition that they

5    filed, Your Honor.

6             The plaintiff alleges that EMPSCO negligently

7    approved the Winzler and Kelly VE-1 repair, they also

8    allege that EMPSCO breached its contract by approving

9    Black's substitution of Anchor-It epoxy system when the

10   Redi-Chem was no longer on the market.  And they also

11   allege that EMPSCO negligently supervised Black's work

12   as the construction manager for the Port Authority.

13            And what we have basically shown is, is that,

14   one, EMPSCO was not the construction manager.  There

15   was a clause in its contract that was boilerplate, that

16   both the Port and EMPSCO say was not applicable to

17   them.  They did not perform construction management

18   services, they weren't paid to perform construction

19   management services; that was done by M.C. Macario who

20   was hired separately.  So M.C. Macario was the

21   construction manager who was supervising Black, not

22   EMPSCO, so that should -- and that seems to be

23   uncontested, so that allegation should be dismissed.

24            And furthermore, EMPSCO had no contractual

25   duty, or was not asked to perform any technical review

1    of Winzler and Kelly's design; the technical

2    responsibility for that design was Winzler and Kelly.

3    All EMPSCO did, as an accomodation to the Port, was

4    just review it in general and do what he calls a

5    compliance submittal review, not a technical review; he

6    said just make sure you got your calculations in, do

7    all that, and that would be okay, but it was not doing

8    a technical review to check whether or not that would

9    be sufficient to meet the code or whatever.  They

10   weren't asked to do that.  That responsibility is with

11   Winzler and Kelly by signing and stamping that.

12        And furthermore, EMPSCO had no contract to

13   review any submittals either, so there could not be

14   any breach of contract for reviewing this change that

15   should have gone to Winzler and Kelly.  And all they

16   said was go get the manufacturer's test data and put

17   that in the file and whatnot, but that's all they did.

18        And so we say that the plaintiff has not come

19   forward and said that was a breach of the standard of

20   care of EMPSCO.  And we're just saying that that issue

21   is one that is beyond the normal knowledge, the common

22   knowledge of the jurors and requires expert opinion.

23   And they had their time to designate an expert to back

24   up the negligence claims, and they haven't done that,

25   they just simply haven't done that.  So they just lack

1    the critical element of proof at this juncture and

2    that's why we're entitled to summary judgment.  And

3    that's it, Your Honor.

4          THE COURT:  Okay, thank you.

5          Okay, who's going to speak for the plaintiff?

6          MS. McDONALD:  Your Honor, Mr. Booth will

7    speak first.

8          MR. BOOTH:  Your Honor, if it please the

9    court, we have, Ms. McDonald and I have divided up the

10   motions.  I would like to respond to Black's motion,

11   which was the first matter that was discussed today.

12   And also, EMPSCO's -- I'm sorry -- I would like to

13   discuss EMPSCO's motion, which is the last item that

14   was discussed today, and Winzler's motion for summary

15   judgment on breach of contract.  And Ms. McDonald will

16   address Black's motion, and Winzler's other two motions

17   on the fifth and ninth causes of action.

18         THE COURT:  Go ahead.

19         MR. BOOTH:  Okay.  I'd like to start, Your

20   Honor, with the Winzler and Kelly motion, which is

21   motion for summary judgment on the fifth cause of

22   action for breach of contract.  The first point I'd

23   like to make, Your Honor, is that while the engineer

24   who stamped and signed Winzler and Kelly's drawing,

25   whose name is Bruce Swanney, has submitted now a

1    contrary declaration, he said very clearly in the

2    deposition testimony that we cited that this was his

3    design -- he was not equivocal about it in any way --

4    it's Page 163 of his deposition, which is attached to

5    the declaration we provided.  He was very clear about

6    that.  He designed the connection between the piles and

7    the cap.

8        What the court needs to understand is, in the

9    original construction before the period we're talking

10   about, the piles actually went up into the underside of

11   the concrete cap.  That provided a much more rigid and

12   firm connection.  What Winzler and Kelly proposed is

13   that the remains of that connection be simply cut off

14   completely, a metal circular flange provided around the

15   top of the pile and eight bolts stuck up into it.

16       Now, while EMPSCO's original design, which was

17   found to be too expensive, required eight steel rods 20

18   inches long, Winzler and Kelly came in with a design of

19   bolts only six-and-three-quarter inches long, and they

20   were grossly undersized for the service that they were

21   to see.  Winzler and Kelly is the engineer of record

22   with regard to the design of the connection between the

23   piles and the cap.  That is what Mr. Swanney testified

24   to.  He's the one that proposed they cut off the piles

25   four feet below the waterline, that they weld on new

1    piles, 22-inch steel piles, that they weld the flange

2    around the top, and they secure them with eight- inch

3    bolts.

4            Now, what Mr. Sterling, counsel for Black, has

5    advised us of for the first time in his papers is that

6    the Redi-Chem product that Winzler and Kelly specified

7    in fact was not even on the market anymore, that it had

8    been withdrawn by the manufacturer.  We would like to

9    pursue that issue.  But assuming that is correct,

10   again, that goes to the negligence of Mr. Swanney's

11   design for calling for Black to use a product that was

12   no longer available on the market.

13           But even if it was, if you look at our

14   expert's report, and the expert's name is Elliot Boone,

15   B-O-O-N-E, and that's attached to the declaration of

16   Mr. Tarpley so I didn't bother to provide a second copy

17   of it, Mr. Boone's report clearly says that even if the

18   original Winzler and Kelly specified Redi-Chem product

19   had been used, and even if the epoxy had set properly,

20   it was still grossly under-strength for the service

21   that was needed to hold up what Mr. Sterling accurately

22   described as very large, heavy concrete blocks.

23           THE COURT:  By the way, do you agree with his

24   definition or description of what a dolphin is, at

25   least the kind that's involved in this case?

1    MR. BOOTH: Basically, yes, Your Honor, if I
2  could add one fact that I think will illuminate it for
3  the court. Dolphins are to save the cost of building a
4  solid pier all the way along; they provide a hard point
5  where the ships can tie off its bow lines and its stern
6  lines, and the middle part of the ship breasts against
7  the breasting dolphins, and it just saves the cost of
8  having to build a solid concrete pier that's about 800
9  feet long for these big tankers.

10    THE COURT: Okay. Thank you.

11    MR. BOOTH: The reason that we asked for a
12  postponement of the hearings, Your Honor, and the
13  reason I think it's important if the court doesn't feel
14  confident in simply denying the motions here today is
15  that Mr. Jose, who we actually had set for a deposition
16  and who simply failed to show up for his deposition,
17  was the senior vice president of Black who signed the
18  contract between Black and the Port. He's also the
19  person that would have had the ultimate authority in
20  discussions with Winzler and Kelly and -- with Winzler
21  and Kelly as the engineer of record on the connection
22  between the piles and the cap, and also with EMPSCO as
23  the overall engineer of record for the whole project.

24    The Anchor-It product that was the epoxy
25  product that Black substituted obviously was chosen by

1    somebody; I believe Mr. Jose will be able to illuminate

2    that issue for us.  He will also, since he signed the

3    contract, be able to illuminate certain terms of the

4    contract between both the Port and Black on the first

5    hand, and on the second, between Black and Winzler and

6    Kelly, because as the court knows, Winzler and Kelly

7    was brought into this by Black, not by the Port, and

8    there's no direct contract between the Port and Winzler

9    and Kelly.

10          Another issue that's important on that, Your

11   Honor, is that it is customary in the construction

12   business, as Mr. Boone points out in his expert report,

13   to get a special inspection of installations of epoxy

14   where the pull-out of the bolts is critical to the

15   design.  There is also a standard to do a torque test,

16   just like a standard automotive torque wrench, put it

17   on the bolt after basically the epoxy has been allowed

18   to harden and see whether they are -- whether the bolts

19   are firm or not.  That was never done in this case; it

20   was never specified by Winzler and Kelly that it should

21   be done, it was never conducted by Black.  And EMPSCO

22   approved the design without any recommendation that a

23   torque test be done, or a special inspection be done

24   of the epoxy.

25          And a final critical point that Mr. Jose can

1   testify about is whether Black, the construction

2   company, ever asked Winzler and Kelly for any

3   calculations to support the design Winzler and Kelly

4   had done.  I think it is undisputed that Winzler and

5   Kelly did no calculations.  That's what Mr. Swanney

6   testified to at his deposition.  But EMPSCO --

7           THE COURT:  Are you saying -- just a minute --

8   are you saying that it was Black's responsibility to,

9   in effect to, you know, double-check on the Winzler and

10  Kelly engineer?

11          MR. BOOTH:  In a sense, yes, that's correct,

12  Your Honor, because they brought Winzler and Kelly in.

13          THE COURT:  Well, who's the engineer of

14  record, according to you?

15          MR. BOOTH:  Well, overall the engineer of

16  record is EMPSCO.  But there is a --

17          THE COURT:  Then why should it be Black's job

18  to check up on this other engineer?

19          MR. BOOTH:  Because to the extent they changed

20  Black's design, which they did -- sorry -- they changed

21  EMPSCO's design, Black brought in Winzler and Kelly and

22  used Winzler and Kelly's design.  And EMPSCO, in

23  approving Winzler and Kelly's design, specifically

24  asked, "where are the supporting calculations," and

25  Black never provided any, Winzler and Kelly never

1    provided any.  But I think it's an important issue in

2    the case whether Black ever asked Winzler and Kelly for

3    any.

4         I think if Black never asked for those

5    calculations after being told they should be provided,

6    that's a liability issue on Black.  If Black asked

7    Winzler and Kelly for them and Winzler and Kelly never

8    produced them, that's a liability issue on Winzler and

9    Kelly, although it's also a problem for Black because

10   they should have followed up on it.

11        In Winzler's motion for summary judgment on

12   the fifth cause of action, Your Honor, they say that

13   the design might have held, and might have been strong

14   enough, if the originally specified Redi-Chem product

15   had been used.  Mr. Boone's expert report directly

16   contradicts that; it is they were not strong enough

17   even if the bolts had been properly installed, and even

18   if the epoxy had set up properly.  So there's a direct

19   factual dispute on that issue.

20        Mr. Boone also demonstrates at page 7 of his

21   report that the Winzler design is deficient.  The bolts

22   connected through the collars are somewhere between

23   one-third and one-seventh as strong as they need to be

24   for the earthquake zone that Guam is, which was at that

25   time rated as a 3, now been upgraded to a more severe

1    4.

2         Mr. Boone's report also points out that

3    Winzler and Kelly was deficient in not asking, not

4    calling for a special inspection of this product.  And

5    the reason for that is obvious.  This product is soft,

6    wet, gooey epoxy being installed upside down in a hole

7    by a worker reaching up over his head, so of course

8    gravity is going to try and pull that down out of the

9    hole.  So a special inspection by the manufacturer's

10   representative is called for in situations like that to

11   insure, first of all, that the epoxy does not run out

12   of the hole; and second, that after it's set up, that

13   it is sufficiently hard that it holds the bolts in

14   place.  And as Mr. Boone said at page 8 of his report,

15   a reasonable analysis by Winzler and Kelly would have

16   revealed these deficiencies, but no calculations were

17   done by Winzler and Kelly.

18        The only other thing I would want to respond

19   to with regard to this motion, Your Honor, is that one

20   of the other counsel for Winzler and Kelly, Mr. Forman,

21   submitted a declaration in response, and in connection

22   with their reply brief.  I would lodge an objection

23   under Federal Rule of Evidence 602 to that entire

24   declaration, since nothing that he testifies to is of

25   personal knowledge.  He submits his declaration based

1    on "I'm advised and believe".

2            THE COURT:  Just a minute.  Give me the name

3    of that declarant again.

4            MR. BOOTH:  The declarant's name is Forman,

5    F-O-R-M-A-N, Your Honor, and I believe he is an

6    associate of Mr. O'Connor's.

7            THE COURT:  And that was filed with the reply?

8            MR. BOOTH:  With the reply, yes, Your Honor.

9            THE COURT:  For now I just note your

10   objection.  Go ahead.

11           MR. BOOTH:  Thank you.  Unless the court has

12   any further questions, those are my comments on that

13   motion.

14           THE COURT:  All right.  And then someone else

15   is going to address the other motions?  All right, I

16   see one of your co-counsel standing up.

17           All right, thank you.

18           MR. BOOTH:  I was also going to address the

19   EMPSCO motion, Your Honor, but I can do that now or

20   later.

21           THE COURT:  Why don't you go ahead and do it

22   now.

23           MR. BOOTH:  Okay, thank you, Your Honor.

24           Our position on EMPSCO's motion for summary

25   judgment is also that, Your Honor, that this is a

premature motion. We have not even yet had to answer

EMPSCO's counterclaim in this case, which is not due

for another six days or five days. The motions, as you

know, were filed some two months before the cut-off

date for filing dispositive motions in this case.

I think the issue with regard to EMPSCO's

motion is, very specifically, what they assumed by

contract that they would do. EMPSCO's contract, which

is attached to Mr. Arce's declaration, A-R-C-E, that

EMPSCO provided to the court, provides by written

contract that they will do about eight different

things. They will provide inspection services, they

will provide soils investigation, construction

management services, compliance submittal review, and

specifically, plans and specifications, bid documents

and estimates. And those four items, Your Honor, are

incorporated by reference by Winzler and Kelly when

Winzler and Kelly changed the original EMPSCO design

and said Winzler and Kelly's drawing and Winzler and

Kelly's design must be read in connection with EMPSCO's

design, and only where Winzler's design changes,

EMPSCO's design is Winzler and Kelly's design to be

predominant.

Therefore, it goes back to my comment earlier

that, overall, EMPSCO was still the engineer of record

1    on this project, which is why they bear some

2    responsibility for why it failed. And although the

3    actual design of the connection was Mr. Swanney's of

4    Winzler and Kelly, EMPSCO specifically approved that

5    design when it was submitted to them, but with some

6    *caveats*. One *caveat* was, please provide the

7    calculations to demonstrate that this is a strong

8    enough design.

9          The contract, equally importantly, Your

10    Honor, provides that EMPSCO will provide all services

11    necessary for a full and complete design. That's

12    paragraph 1(b) of the contract, which is again attached

13    to Mr. Arce's declaration. It also says, EMPSCO will

14    provide professional services for the design and

15    repairs of the improvements to the pier. And in that

16    connection, Mr. Arce's declaration says at paragraph 3

17    they will provide 40, four-zero, hours of structural

18    engineering work.

19          Now, Mr. Tarpley has minimized or tried to

20    minimize the role that EMPSCO actually played in this

21    project, but the facts belie that statement. Not only

22    were they overall the engineer of record, but they

23    provided significant amounts of structural engineering

24    and design work to the Port. Furthermore, as the

25    project went along, the Port requested EMPSCO

1    specifically to review Winzler and Kelly's design--

2    that's Mr. Arce's declaration at paragraph 7--and

3    EMPSCO in fact did that, reviewed the design for

4    appropriateness.

5         And Mr. Arce said in his declaration that

6    Winzler and Kelly's design would meet the applicable

7    repair standard required in this situation.  Now, that

8    is flatly contradicted by Mr. Boone's report.  So,

9    again, we have a very important factual distinction,

10   factual dispute, that is, in two parties testifying

11   directly contrary to each other on this exact point.

12   Mr. Boone said the design that Winzler and Kelly

13   specified, even if it had been properly installed by

14   Black, was between one-third and one-seventh as strong

15   as it needed to be under the circumstances.  That

16   directly contradicts Mr. Arce's declaration.

17        Furthermore, EMPSCO undertook to see that

18   Black did the job properly; in other words, to

19   supervise Black's performance.  That's paragraph 17 of

20   the contract.  But it's also an undertaking in another

21   part of the contract, in paragraph 1(c), to see that

22   the job is done in a workmanlike manner.

23        So, I submit that there are fundamental and

24   very material disputes here about what EMPSCO did, what

25   EMPSCO was obligated to do, and the meaning of these

1  approvals that they gave of a design that was clearly

2  defective, and therefore summary judgment is not

3  appropriate.

4          That's what I have to say on that, Your Honor.

5          THE COURT:  Okay.  Let me hear from your

6  co-counsel then on the other motion, which I guess is

7  the Black motion?

8          MS. McDONALD:  Yes, I will address the Black

9  motion first, Your Honor, and the issue of subrogation.

10          The issue of subrogation or assignment is

11  rather simple, and that's just by looking at the

12  terminology that the parties used, and that's included

13  in Exhibit A to my declaration.  And it says that "the

14  Port hereby assigns and transfers to plaintiff each and

15  all claims and demands against any person, persons, et

16  cetera, arising from or connected with such loss or

17  damage".  There is no simpler or more plain language

18  that could have been used to effect assignment of all

19  rights of the Port to recover through the plaintiff.

20          Moving on to the economic loss rule, and I

21  would first like to address the arguments that Winzler

22  presented.  With regard to East River, the Supreme

23  Court concluded that recovery for damage to the product

24  itself is most naturally understood as a warranty

25  claim, and the Supreme Court's concern stems from

1  contract law drowning in a sea of port.

2       *East River* itself emphasizes the importance of

3  privity when it comes to the types of remedies that are

4  available when a party is injured either by itself or

5  by another product.  When contractual privity exists,

6  the parties can bargain for restricted liability by

7  expanding warranties in exchange for price and for

8  taking into account foregone business opportunities.

9  These same considerations do not exist when the parties

10 do not have a contractual relationship.  As *East River*

11 explicitly states, in a warranty action where the loss

12 is purely economic, the limitation of liability derives

13 from requirements of foreseeability and of privity.

14      The contract here is not with Winzler, thus

15 the economic loss rule which limits contractual based

16 reasons on contract law principles does not apply where

17 there's a lack of privity.  *East River* instructs that

18 contractual privity is the underlying requirement for

19 limiting the contractual business basis.  Tort law, on

20 the other hand, provides remedies for all other

21 situations, especially where a party cannot avail

22 itself of contractual remedies due to a lack of a

23 contract.  In this event, contractual law does not

24 drown in a sea of port.

25      With respect to Black's arguments on economic

1   loss, there are genuine issues of material fact and law

2   regarding whether only the defective product has been

3   damaged, and Mr. Booth talked extensively about that.

4   Finally, on the arguments regarding warranty

5   of workmanlike performance, the defendants attempt to

6   construct a non-existent dichotomy in the law of the

7   warranty of workmanlike performance.  The warranty does

8   stem -- its origin in admiralty does stem from _Ryan_,

9   but it survives on its own as an independent theory of

10  recovery, and that's acknowledged in Schoenbaum on

11  Admiralty.

12  In _Fairmont Shipping_, vessel owners brought an

13  action against an oil company to recover for damage to

14  the vessel when it grounded on a dike due to the

15  alleged negligence of tugs furnished by an oil company.

16  The Second Circuit noted that _Fairmont Shipping_, like

17  the case at bar, does not involve an indemnity problem

18  which was presented in _Ryan_.  The issue in _Fairmont_

19  should be more appropriately where the oil company

20  contracts to provide tug assistance impose an implied

21  warranty to perform the services in a workmanlike

22  manner.

23  Similarly here, the issue is whether

24  defendants performed in a workmanlike manner.  The

25  Second Circuit stated that all that _Ryan_ did was to

1    confirm that the warranty extended to admiralty

2    contracts.  A thorough reading of Fairmont demonstrates

3    that the warranty is an admiralty contract outside of

4    Ryan indemnity.  It is a fairly simple concept that

5    implied in maritime contracts is a warranty that a

6    party perform in a workmanlike manner.

7             The plaintiff's complaint adequately lays out

8    the foundational facts for a workmanlike -- a warranty

9    for workmanlike performance claim, and judgment on the

10   pleadings would be improper, and neither party is

11   entitled to judgment on the pleadings or summary

12   judgment on these warranties.

13            Unless the court has any questions --

14            THE COURT:  Well, no, but I'm interested

15   more on this distinction between subrogation and

16   assignment  --

17            MS. McDONALD:  The basic --

18            THE COURT:  -- which you haven't addressed.

19            MS. McDONALD:  The basic distinction is that

20   the --

21            THE COURT:  Well, first of all, what do you

22   claim?  Do you claim you have a general assignment of

23   all rights?

24            MS. McDONALD:  We claim that they's both

25   subrogation and an assignment.  Subrogation for the

1    amounts that were paid, and that there's an

2    assignment --

3          THE COURT:  What language do you point to in

4    the instrument that gives you a general assignment?

5          MS. McDONALD:  In Exhibit A, Your Honor, the

6    loss and subrogation form, it says very clearly that

7    "the assured agrees to full settlement from Lloyds of

8    London," and then in the middle of the paragraph, "and

9    in consideration of which the undersigned hereby

10   assigns and transfers to said company each and all

11   claims and demands against any person..."

12         THE COURT:  Each and all claims what?

13         MS. McDONALD:  "Each and all claims and

14   demands against any person, persons, corporation or

15   property, arising from or connected with such loss or

16   damage, and said company is subrogated in the place of

17   and..."

18         THE COURT:  It says, doesn't it, that such

19   loss or damage usually is taken to refer to the loss or

20   damage on which the claims have been paid.  In other

21   words, you know, it's like -- let me try and make a

22   real simple analogy -- just take ordinary personal

23   injury litigation, very common, for instance, when an

24   insurance company, say you have your car insured with

25   a thousand dollar deductible, let's say it's an older

```
 1   Mercedes so it's only worth 20,000, so, you know, the
 2   insurance company sues the other side for $19,000,
 3   they'll ask you the courtesy, would you want us to sue
 4   on your behalf for the other thousand, all right, they
 5   don't assume that they have the right to keep that.
 6   And certainly, you know, they don't assume from that
 7   subrogation they have the right to sue for personal
 8   injuries to you, arising out of that accident, which is
 9   what I think you're purporting to do, isn't it?
10            MS. McDONALD:  There are damages that are
11   beyond the amount that is specifically subrogated for
12   which the assignment covers, and that's --
13            THE COURT:  Well, you know, but the language
14   you point to doesn't necessarily encompass all these
15   damages, does it?
16            MS. McDONALD:  If it's a general assignment
17   based on just the language of the --
18            THE COURT:  Well, it's not a general
19   assignment, that's the problem.  Is it?
20            MS. McDONALD:  Just based on the language,
21   Your Honor --
22            THE COURT:  It's a loss and -- you know, it's
23   called a loss and subrogation, right?  Doesn't say it
24   covers entirely a general assignment.
25            MS. McDONALD:  The title itself just says --
```

```
 1            THE COURT:  What's your best case authority
 2    that you have this right to sue for other damages
 3    besides the claim you paid?
 4            MS. McDONALD:  Well, generally an assignment
 5    is just a transfer of all claims that --
 6            THE COURT:  But that's the problem.  This is a
 7    subrogation.
 8            MR. BOOTH:  Your Honor, could I be heard on
 9    that?
10            THE COURT:  No.  This is her argument.
11            MR. BOOTH:  Thank you, Your Honor.
12            THE COURT:  I don't believe in double-teaming.
13            MS. McDONALD:  Well, this is all we have, Your
14    Honor, that there's just the plain language --
15            THE COURT:  Do you have a case that directly
16    supports your position?
17            MS. McDONALD:  Not before me, Your Honor.
18            THE COURT:  Okay.  Anything else you want to
19    add?
20            MS. McDONALD:  That's all, Your Honor.
21            THE COURT:  Okay.  I'm going to give the
22    defense an opportunity for brief rebuttal.
23            All right.  Thank you.
24            MR. STERLING:  With your permission, Your
25    Honor, I'll go first.
```

1          THE COURT:  Go ahead.

2          MR. STERLING:  In terms of the assignment

3     issue, I'm not going to go any further with that; I

4     think the questions Your Honor raised point out the

5     problem we have with the assignment theory.  It is

6     unsupported by case authority, it's simply a word in a

7     subrogation agreement.  And we did cite authority for

8     the fact that the term "assigned" is used routinely in

9     subrogation agreements.

10          A large part of what Mr. Booth said pertaining

11    to why he needs to depose Mr. Bismonte and Mr. Jose is

12    really not directed at all to my motion, the facts that

13    he discussed.  But I would point out that many of these

14    factual issues he says he wants to explore are not laid

15    out in his 56(f) affidavit.  So until we heard from him

16    this morning, it's the first time I knew these are the

17    facts he says he needs to explore.  And I could stand

18    here for the next five or 10 or 15 minutes and explain

19    to you where in the record these facts already exist,

20    if they knew where to look for them.  But I'm not going

21    to do.  I think those facts, these issues that he says

22    he needs to explore should have been in his 56(f)

23    affidavit, we could have responded to them in an

24    appropriate fashion.  If Your Honor would like me to

25    address what I characterize the record as, I can, but

1 I think really he should have put it in his affidavit;

2 he shouldn't just tell us this morning this is what he

3 intends to discover.

4 If he wants to know whose idea it was to

5 change the product, he has the submittals, it has names

6 all over it. If he wants to know why a special

7 inspection wasn't performed, the submittals say a

8 special inspection should be performed, that under the

9 Uniform Building Code, a special inspection is the

10 owner's responsibility. That's them.

11 If he wanted to know if Black asked for

12 calculations, I could point out in the record where

13 they did and I could present those documents. And I

14 could also present documents that shows that Winzler

15 and Kelly provided them. So, to make a very long story

16 much shorter than -- well, to make it short, it should

17 have been in his 56(f) affidavit, and all of us could

18 have responded.

19 And unless the court has questions, I'll

20 submit.

21 THE COURT: No.

22 MR. STERLING: Thank you, Your Honor.

23 THE COURT: All right. Either of the other

24 defendants want to be heard in rebuttal?

25 MR. O'CONNOR: Yes, Your Honor, Bob O'Connor

1  on behalf of Winzler and Kelly.  I'd like to be heard

2  briefly in response to Mr. Booth's argument on the

3  fifth cause of action for summary judgment.

4        He said to the court that Bruce Swanney, the

5  engineer for Winzler and Kelly, submitted a contrary

6  declaration to his deposition -- to his declaration

7  testimony, saying that, oh, no, no, Winzler and

8  Kelly --

9        THE COURT:  Deposition testimony.

10        MR. O'CONNOR:  Yes.  He said that, he

11  submitted to the court deposition testimony which

12  refuted Bruce Swanney's declaration to the court.  I'm

13  going to read to you that testimony, because it's very

14  brief, and you'll see that it doesn't refute it.

15        Okay.  Question by Mr. Booth.

16        THE COURT:  Well, give me what page are you

17  reading from?

18        MR. O'CONNOR:  Page 9 of Mr. Booth's

19  opposition brief.

20        THE COURT:  All right, go ahead.

21        MR. O'CONNOR:  And this comes from Mr.

22  Swanney's deposition.

23             "Okay.  With regard to design, you're the

24             one who came up with -- sorry -- Winzler and

25             Kelly is the one that came up with the eight

1                bolts per pile; right?"

2                    "Yeah, we figured eight bolts was

3                adequate, yes."

4                    "Okay.  So you were the designer of that

5                connection between the pile and the cap;

6                right?"

7                    "Yes."

8                    "Okay.  And nobody ever came back and

9                questioned that design?"

10                    "No."

11        What were they talking about?  They were

12    talking about the eight bolts per pile.  They were not

13    talking about the Redi-Chem.

14        And Mr. Swanney says in his declaration that

15    they followed the eight bolts per pile part of my

16    design, but they didn't follow the Redi-Chem, the epoxy

17    system, and they were both integral to my design.  That

18    is not contradicted by that deposition testimony at

19    all.

20        Mr. Booth also says, Your Honor, there's some

21    documents submitted to the court by Black that Redi-

22    Chem was not even on the market.  Your Honor, Black did

23    not submit any such declaration.  There is no such

24    evidence --

25        THE COURT:  Well, did somebody else submit it?

1      MR. O'CONNOR:  Nobody did.  There is no

2  evidence before the court that Redi-Chem was not on the

3  market.  But let's assume there was evidence that --

4      THE COURT:  Well, I don't know if he said --

5  I don't remember whether Mr. Booth said, you know, they

6  submitted that evidence, or somebody on behalf of Black

7  told him, maybe Mr. Sterling or somebody else, I don't

8  know, but, I mean, I'm not sure exactly what form it's

9  supposed to be in.  But what your position is, there's

10  no such evidence in the record?

11      MR. O'CONNOR:  There's no such evidence in

12  the record, but it doesn't matter if there were such

13  evidence in the record.  Supposing there were evidence

14  in the record that Redi-Chem was not on the market,

15  what difference does it make?  The specifications on

16  VE-1 said "Redi-Chem or approved equal".  So if

17  Redi-Chem wasn't on the market, then you would come

18  to Mr. Swanney and say, okay, here's an approved equal,

19  would you please approve it.  Nobody ever did that.

20      THE COURT:  Well, do you know, do you know in

21  fact what was used?  Was Redi-Chem used?

22      MR. O'CONNOR:  Anchor-It system was used; it

23  was a completely different system where you use a gun

24  to shoot up epoxy into a hole instead of using capsules

25  to cover the whole breadth of the hole.

1           THE COURT:  All right.

2           MR. O'CONNOR:  Then Mr. Booth said, well, I've

3    got a declaration from an expert here that says even if

4    the entire Winzler and Kelly design were used, it would

5    have been inadequate.  So what?  It wasn't used.  This

6    is a lawsuit based upon damages as a result of an

7    earthquake through a design.  Maybe our design would

8    have been inadequate, maybe our design would have been

9    worse than the design that was used, but our design was

10   not used.  Therefore, we cannot be held liable for our

11   design if it wasn't used.

12           He says that, you know, Mr. O'Connor pointed

13   out some statements by OSO, an engineering firm from

14   New Zealand, that says the bolts would have worked if

15   they had been installed properly.  But, Your Honor,

16   this has been contradicted by my expert, Mr. Boone.

17   What he neglected to tell the court was that OSO,

18   the New Zealand engineer, was also his expert.

19           He continued to say to the court, Black used

20   Winzler and Kelly's design.  Black did not use Winzler

21   and Kelly's design.  He urged the court that Winzler

22   and Kelly should have called for special inspection

23   of installation because the gun used to shoot up --

24   because this gun was used instead of the system that

25   they had required, the Redi-Chem system.  But why

1    should Winzler and Kelly have called for special

2    inspections?  Winzler and Kelly's design did not call

3    for shooting it up with the gun; it called for a

4    capsule, which wouldn't need special inspection.

5    Secondly, Winzler and Kelly's design specifically

6    said, quote, "install per manufacturer's recommended

7    procedures".

8         Finally, Winzler and Kelly was not hired to

9    supervise or inspect Black.  The Port hired Macario to

10   inspect Black.  The Port maybe hired EMPSCO to inspect

11   Black.  The Port hired Black to have quality control to

12   inspect itself.  But Winzler and Kelly was never hired

13   to inspect somebody, some contractor to install a

14   design designed by somebody else.

15        The contract that Winzler and Kelly signed,

16   according to plaintiff's complaint, was, and I quote:

17   "To provide, revise, design an engineering

18   specifications and engineering drawings."  Period.

19   According to the plaintiff's complaint, Winzler and

20   Kelly was not hired to do any supervision of the

21   installation.

22        With regard to the Economic Loss Doctrine

23   motion for judgment on the pleadings, the lady for

24   Carlsmith argued that the East River decision

25   emphasizes the importance of privacy -- of privity,

1   and that the <u>Saratoga Fishing</u> case emphasizes the

2   importance of privity.  I don't deny that it does.

3   Both of those cases say the Economic Loss Doctrine

4   works, the rationale for it works because when two

5   parties enter into a commercial contract, at the time

6   they're negotiating the contract, they can negotiate

7   for warranties; if they don't get a warranty, they can

8   pay a lower price.  And it's at that initial bonding

9   together of the contract between the initial

10  contracting parties that there's the most power exists

11  for negotiating different warranties.

12          However, in the <u>East River</u> case, there wasn't

13  any privity.  In the <u>Saratoga Fishing</u> case, there

14  wasn't any privity; it was a beneficiary -- it was a

15  third party beneficiary theory.  Neither of those

16  cases, although they discuss the importance of privity

17  and the helpfulness of privity to the rational of the

18  doctrine, neither of those cases said that privity was

19  required.  In fact, in the <u>Saratoga Fishing</u> case, the

20  designer and the manufacturer sold it to a Mr. Madruga,

21  who added certain equipment to it, and then he sold it

22  to <u>Saratoga Fishing</u>.  <u>Saratoga Fishing</u> then turned

23  around and sued the designer.  That's a far bigger

24  distance as far as privity goes than we have in our

25  case.

1       And finally, with regard to privity, the

2   Port Authority in this case had that commercial power.

3   When the Port Authority negotiated its contract with

4   Black as a government entity, it had the power to

5   negotiate with Black, that if you're going to change

6   this design in any way, if you're going to change any

7   specifications in any way, you have to give us the

8   power to approve any change, you have to give us the

9   power to review any warranty you may get with regard

10  to any change.

11      So in this particular case, the issue of

12  privity, the issue of the importance of privity is not

13  present, because Black -- because the Port Authority

14  had more control over the negotiation of the Black

15  Winzler and Kelly contract than certainly the buyer of

16  that boat from Joe Madruga in Saratoga Fishing had --

17  the fellow who bought -- the company who bought the

18  boat from Joe Madruga had between himself and the

19  manufacturer, the designer of that boat.

20      Lastly, Your Honor, on the issue of implied

21  warranty, they ask the court to read Fairmont which

22  is -- with regard to Fairmont, you'll see that the

23  implied warranty of Ryan has been eroded. But I just

24  want to read one paragraph from Fairmont to demonstrate

25  finally, I hope, that Fairmont did not erode Ryan, but

1  instead underlined it, emphasized it, improved on it.

2  "We find the crucial elements of Ryan to be

3  as follows:  A shipowner, relying on the expertise of

4  another party, the contractor, enters into a contract

5  whereby the contractor agrees to perform services

6  without supervision or control by the shipowner."

7  There's no shipowner here, it's the Port who

8  owns the dolphin.  And in their brief that's where they

9  ended.  They didn't give the court the two crucial

10  elements, which are, number two, the improper, unsafe

11  or incompetent execution of such services which

12  foreseeably rendered the vessel unseaworthy, or bring

13  into play a pre-existing unseaworthy condition.

14  Dolphins can't be unseaworthy, and they're not vessels.

15  And finally, the third one, the ship's owner would

16  thereby be exposed to the liability regardless of

17  fault.

18  Fairmont did not erode the Ryan case at all;

19  it strengthened it and emphasized it and it pointed out

20  the importance of seaworthiness and strict liability.

21  In our case, we don't have a ship, we don't have a

22  shipowner, and the pier, the dolphins could not be

23  seaworthy or unseaworthy.

24  Thank you, Your Honor.

25  THE COURT:  Okay, thank you.

1           MR. TARPLEY:  Thank you, Your Honor, just

2   in response to some points on behalf of EMPSCO.

3           First, we would certainly concur with

4   Mr. Sterling's comments regarding that what Mr. Booth

5   has said in court today is certainly not on his 56(f)

6   affidavit, and that's where it should be to continue

7   this.  He said that it's premature because the

8   plaintiff hasn't even answered the counterclaim that

9   we have brought.

10          Your Honor, the counterclaim is for attorney's

11  fees under the contract for the prevailing party; it

12  has nothing to do with the merits of the plaintiff's

13  claims, and that's -- because they haven't answered

14  that yet is certainly no reason to delay summary

15  judgment of plaintiff's claims.

16          There was a lot Mr. Booth said that is

17  unsupported about this status of being the engineer

18  of record, Your Honor.  He claims that Winzler and

19  Kelly was the engineer of record for its own design,

20  but then he says that EMPSCO was the overall engineer

21  of record, that somehow he's implying that EMPSCO took

22  responsibility for the Winzler and Kelly design, and he

23  hasn't submitted any evidence, any opinions, or any law

24  that would support that EMPSCO was this engineer of

25  record and had certain duties and responsibilities

1   which it breached.  To the contrary, both Mr. Arce

2   and Albert Tsutsui have said that what this compliance

3   submittal review that was done by EMPSCO is, fell

4   within the standard of care.  And they just don't

5   reflect that at all, Your Honor.

6        The only thing EMPSCO warranted, and the only

7   thing that it would provide services for, is for its

8   own design.  And, you know, their subcontract which is

9   attached to the Arce declaration, Your Honor, clause 18

10  has a fairly unique clause in this.  For one, it says

11  that all works, drawings and specifications by EMPSCO

12  belongs to the Port.  Okay.  There's no copyright on

13  the architect or the designer.  It says:

14       The Port shall have the right to use them in

15  any way whatsoever and make modification thereto.  If

16  the Port has another consultant to modify or change the

17  plans, et cetera, then the consultant's name on such

18  plans, design, specifications and work shall be deleted

19  on the plans, designs and specifications.

20       So that clearly shows that they're not going

21  to be responsible for some other designer.  It wasn't

22  in this contract to review any other design or any

23  other engineer's alternate design, that's just simply

24  not in the contract.

25       The 40 hours of structural engineering work

1   which is in there was done, it was done to do EMSCO's

2   original design that was let out to bid.  It had

3   nothing to do with reviewing or approving some

4   alternate design by some other engineer who puts his

5   own stamp and signature on there.

6          He tries to create a question of fact by

7   saying that the Boone report opinion says that this

8   Winzler and Kelly design was insufficient, and

9   therefore, there's a question of fact.  This underlines

10  the big difference here.  The Boone report was a very

11  expensively-paid-for technical review, with

12  calculations and all sorts of testing, in-depth look at

13  that Winzler and Kelly design and see whether it met

14  all these things.  That is not what EMPSCO was paid,

15  nor did he have the time nor was he requested to do

16  that.

17         All EMPSCO did, and this is attached to

18  Mr. Booth's declaration, the approval of submittal

19  No. 12, it says "the general concept outlining the

20  proposed method of repair is hereby approved in

21  concept".  That's a far, far different thing than the

22  technical review performed by Mr. Boone in his report.

23  So there's apples and oranges.  That doesn't create a

24  question of fact.

25         The fact of the matter is, is that we have

1    expert evidentiary support that EMPSCO was not required
2    to do that, nor is it required under the engineering
3    laws of Guam, nor was he required in his contract to
4    perform that sort of a review, and that's not what he
5    was approving.
6         So, again, with regard to the construction
7    management services clause that was mistakenly included
8    in the contract, the fact of that mistake, that
9    information has been provided to plaintiff since July
10   in our supplemental response to production of
11   documents, and they've had five months to verify that.
12   So they can't just rely on that clause that both the
13   Port and Mr. Arce says has nothing to do with -- it was
14   in there by mistake, and he didn't perform those
15   services, nor was he paid for it. So construction
16   management supervision was just not part of his duties,
17   and therefore that doesn't apply either.
18        Thank you, Your Honor.
19        THE COURT: All right, thank you.
20        I think the argument's helpful to me in terms
21   of trying to get a handle on these motions. All right.
22   Number one, I'm going to take these motions under
23   submission.
24        A couple of other things, though. I notice
25   there's a, what's supposed to be a scheduling

1    conference. I think I'm just going to postpone that,

2    for this reason. In reviewing these papers, I have

3    pretty much come to the conclusion, although it's not

4    set in concrete, you know, I've pretty much come to the

5    conclusion that there's no admiralty jurisdiction.

6    Okay. I think Mr. Sterling is correct in reading the

7    Ninth Circuit case law.

8         Now, if there's no Ninth Circuit jurisdiction,

9    then diversity jurisdiction, you know, becomes more

10   important. And in the first amended complaint,

11   jurisdiction is pleaded in the alternative; first,

12   admiralty and maritime, then the allegation that there

13   is also complete diversity between the plaintiff and

14   the defendants. But the allegations to me don't show

15   that. They don't show the citizen of anybody

16   involved -- citizenship.

17        This is what I'm going to do on that issue,

18   because I think in a case like this, before you spend

19   three more years before the case is dismissed, I think

20   we have to make sure there's subject matter

21   jurisdiction. So at this time I'm going to ask the

22   parties to show cause why this action should not be

23   dismissed for lack of subject matter jurisdiction.

24   And the plaintiff, plaintiff has the burden and gets

25   the first opportunity to brief it.

1          And here's my concern.  You know, I think

2     under that Ninth Circuit case, it's pretty clear

3     there's no admiralty jurisdiction when what, you know,

4     what's involved is what's equivalent to a pier or a

5     wharf, a stationary object imbedded into the ground.

6     Ninth Circuit law to me is pretty clear on that, but

7     I'll give the plaintiff the opportunity to show it to

8     the contrary.

9          Second, on diversity jurisdiction, I don't

10    think the law of the Ninth Circuit is very clear, but

11    there is plenty of law that says, you know, a Lloyds

12    syndicate is treated pretty much the same as a

13    partnership; in other words, each name has to be

14    diverse with each defendant.  And, of course, we don't

15    even know who the names are.  And further, the

16    complaint doesn't even allege what the citizenship

17    of the defendants are, and that's the plaintiff's

18    obligation.

19         So, one, the plaintiff's got to show -- Well,

20    first of all, you know, I think you have to make a case

21    as to what the governing law is or should be on

22    diversity of citizenship as applies to an entity like

23    Lloyds, a syndicate at Lloyds.  And then under that

24    law, the plaintiff has the burden of showing that

25    there's complete diversity of citizenship between each

1    plaintiff and each defendant.

2          So I'm going to give the plaintiff -- how do

3    we do this?  Today is the 3rd of December.  I usually

4    say, I would say three weeks, but that's Christmas Eve.

5    Let's say four weeks, all right, give the plaintiff

6    four weeks, that's until December 31, to show cause why

7    this action should not be dismissed for lack of subject

8    matter jurisdiction.

9          I'm going to give the defendants, I guess I'll

10   also give them four weeks.  The reason I'm going to

11   give you four weeks, although I don't think you need

12   it, because I'm going to encourage the defendants to

13   meet and get together and file a single memorandum;

14   it's easier on me, and cheaper for your clients, I

15   don't know.  But, you know, I'm not trying to make you

16   do anything, but seems to me just on the issue of

17   jurisdiction here, interests are about the same.  But

18   I'm not saying you have to, but I'm going to encourage

19   you, all right, to maybe file a single memorandum.  So

20   to give you that extra time to consult, I'm going to

21   say then the defendants' memo on the order to show

22   cause is due to be filed and served on Friday, January

23   28th.  Then I'll give the plaintiff what, two weeks

24   thereafter, right, to file a reply.  And two weeks

25   would be what?  Did I say 28?

```
 1              THE CLERK:  January 28.

 2              THE COURT:  So two weeks from the 28th is

 3     what?  10th, is that right?  Would that be February

 4     10th?  I'm asking the clerk.

 5              (Conferring with the clerk.)

 6              THE COURT:  Two weeks after the 28th, all

 7     right?  And that's on the plaintiff's reply on the

 8     OSC re subject matter jurisdiction is due.

 9              And because I'm issuing that order to show

10     cause, I don't think it would be fruitful at this point

11     to try to go further with a status conference, and

12     we'll wait to see what happens on that.  And then

13     assuming, you know, there's jurisdiction under one

14     theory or the other, then I'll address the merits of

15     these motions; and then after the motions are

16     determined, at that time then I think, you know, set

17     the matter for further status conference.

18              Let me ask counsel who are here now, what are

19     the dates now under the scheduling order?

20              MR. O'CONNOR:  March 1st, Your Honor, is the

21     trial date.

22              THE COURT:  That's probably going to go, huh?

23              MR. O'CONNOR:  My understanding is there's

24     already a conflict with another visiting judge for a

25     trial on that week.
```

1          THE COURT:  Well, let me ask this now -- Well,

2     I don't think there'll be any more motions in the next

3     -- the motion period has not been cut off yet, right?

4          MR. O'CONNOR:  I think that's December 23rd.

5          THE COURT:  But I don't expect any further

6     motions now in this.  All right.  So why don't we just

7     leave things be, until briefing is completed on the

8     OSC, and then a decision issued on that and on these

9     motions.  And I'm pretty sure, you know, counsel can

10    rest assured that the March date is not going to hold.

11         Anything else?

12         MR. BOOTH:  Yes, Your Honor, could I be heard?

13         THE COURT:  Yes, go ahead.

14         MR. BOOTH:  Thank you.

15         Obviously, Your Honor, we have not done any

16    expert discovery in this case, and we had agreed that

17    expert depositions would be taken this week; that was

18    co-opted by these motions.  And that obviously is going

19    to be a significant and expensive undertaking for

20    everybody.  I would like to explore with the court

21    the possibility of a mediation.  We floated that

22    issue earlier on in the case, got no response from

23    the defendants, but it seems to me now that everybody

24    pretty much knows what the case looks like, and with

25    having done this motion practice, perhaps it would be

1    a timely thing to consider.

2            THE COURT:  You know, I'd require that

3    tomorrow if you were here, but you're not here, so

4    I can't do that.  It was your option not to show up

5    today.  But what are you suggesting, sometime in the

6    future?

7            MR. BOOTH:  I was suggesting sometime in the

8    future that's convenient for everyone, Your Honor.

9    With the exception of these motions today, the parties,

10    both sides have been pretty good at working out dates

11    and cooperating on the discovery part of this case, and

12    probably could reach agreement on a mediator as well.

13            THE COURT:  What's the -- does the defense

14    have any reaction to that?

15            MR. STERLING:  Your Honor, if I might very

16    briefly.  This mediation proposal was made a couple

17    of months ago in Hawaii, and at that point it was my

18    view then, and it's kind of my view now, that we are so

19    far apart on our respective views of what this case is

20    worth that I'm not sure it would be a fruitful exercise

21    at this point.

22            I think after some of these motions have been

23    decided, assuming we're still here in federal court,

24    and the case -- depending on how these motions go, that

25    we might be closer together and maybe have a gap that

1  can actually be bridged with a good mediator.  So I

2  think it's a little bit premature, that's my view, but

3  if the court wanted us to go, I would go.

4       THE COURT:  All right.  Now, are deposition

5  dates set for the experts?

6       MR. BOOTH:  No, Your Honor.

7       MR. STERLING:  We had tentatively proposed

8  doing them this week.  I would certainly, if it's

9  acceptable to the plaintiff, on behalf of my client,

10  indicate we would be happy to maintain the *status quo*

11  pending review of the jurisdictional issue, a decision

12  on the motions, and then another status conference

13  where issues such as mediation and a new schedule could

14  be addressed.  So if it would give Mr. Booth a comfort

15  zone, I don't see any reason to proceed with further

16  expensive discovery while these matters are under

17  advisement with the court, or to be under advisement

18  with the court.

19       MR. TARPLEY:  EMPSCO would join in that

20  comment.

21       THE COURT:  Let's do this.  So, Mr. Booth, you

22  don't have to worry about losing your rights on the --

23  well, first of all, each side designated experts;

24  right?

25       MR. STERLING:  Correct.

```
 1          THE COURT:  All right.  So we're talking about
 2   the depositions now, right?
 3          MR. BOOTH:  Yes, Your Honor.
 4          THE COURT:  So to assure you that you don't
 5   lose the right to depose each side, the experts, I'm
 6   going to right now, I'm going to take the trial date
 7   off calendar, all right, I'm taking the trial date off
 8   calendar; two, depending on what happens on this round
 9   of motions, I'll reopen the discovery period just for
10   expert discovery, all right, after -- for what, 30 days
11   after that ruling?  Is that enough time for you to
12   agree?  If not, I'm sure you can get an extension, but
13   say for a 30-day period after these motions are
14   decided, all right, we open expert discovery, and then
15   maybe at that time reset the trial date, something like
16   that.  And I'll hold the expert discovery open, and
17   then, in effect, that extra period will also give
18   everybody a chance to assess the chances of mediation
19   in that setting at that time.  Let me do it that way.
20   I think that's a better way to proceed.
21          So, in other words, so you people, except
22   for briefing the OSC, you know, you can sort of put
23   yourselves on hold then and not spend more of your
24   client's money during this period, and hold it open.
25   And then keep the possibility of mediation open also.
```

```
 1    All right?
 2            MR. O'CONNOR:  Your Honor, should we
 3    anticipate a hearing on that motion, or are you just
 4    going to decide on the --
 5            THE COURT:  I'm sorry, anticipate what?
 6            MR. O'CONNOR:  A hearing on that motion, or
 7    will you just decide --
 8            THE COURT:  Which motion?
 9            MR. O'CONNOR:  On the OSC.
10            THE COURT:  OSC?  I wasn't planning to.  I was
11    just planning on taking it under submission when the
12    briefing is completed.  That was my intention.  All
13    right?
14            MR. O'CONNOR:  Okay.
15            THE COURT:  Anything else?
16            MR. BOOTH:  Your Honor, on the diversity
17    again, on the diversity issue, could I get the
18    information from the parties, since discovery is now
19    closed, as to the corporate status and where they're
20    incorporated and so forth?
21            THE COURT:  You can probably get that off the
22    Web.
23            MR. STERLING:  I think that we're all Guam
24    corporations.  The issue on diversity is on that side
25    of the courtroom, Your Honor.
```

```
1            THE COURT:  Mr. Sterling says it's no secret.
2   Did you hear him?
3            MR. BOOTH:  I heard they were all Guam
4   corporations.
5            THE COURT:  He said they're all Guam
6   corporations.
7            MR. BOOTH:  Any dissent to that?
8                 (No response.)
9            MR. BOOTH:  Okay, I will take it then that
10  they're all Guam corporations.
11           THE COURT:  Just a minute.  Mr. O'Connor, did
12  you want to say something?
13           MR. O'CONNOR:  Winzler and Kelly may be a
14  California corporation.
15           THE COURT:  He's not sure.  Look it up on the
16  Web.  I'm not going to do your discovery for you right
17  now.  You should have done this before you filed your
18  suit.  All right?
19           MR. O'CONNOR:  I'll let Mr. Booth know by an
20  e-mail.
21           THE COURT:  Okay.  He'll let you know by
22  e-mail.
23           MR. BOOTH:  Thank you, Your Honor.
24           THE COURT:  You know, it sometimes pays to
25  come to court.
```

1          MR. BOOTH:  Well, Your Honor, if my wife lets

2     me --

3          THE COURT:  All right, this hearing is

4     concluded.  Court is adjourned.

5          MR. STERLING:  Thank you, Your Honor.

6          MR. BOOTH:  Thank you, Your Honor.

7          (Proceedings concluded.)

8                    * * *

9

10

11               CERTIFICATE OF REPORTER

12

13     CITY OF AGANA        )
                            ) ss.
14     TERRITORY OF GUAM    )

15

16          I, Wanda M. Miles, Official Court Reporter

17     of the District Court of Guam, do hereby certify the

18     foregoing pages 1-68, inclusive, to be a true and

19     correct transcript of the shorthand notes taken by me

20     of the within-entitled proceedings, at the date and

21     times therein set forth.

22          Dated this 3rd day of June, 2005.

23

24          _____
            Wanda M. Miles

25

Wanda M. Miles
Official Court Reporter
District Court of Guam