# ORIGINAL

●                    ●

**FILED**
DISTRICT COURT OF GUAM
JUN 1-9 2005
MARY L.M. MORAN
CLERK OF COURT

(183)

CARLSMITH BALL LLP

DAVID LEDGER
ELYZE McDONALD
134 West Soledad Avenue
Bank of Hawaii Bldg., Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Tel No. (671) 472-6813

COZEN O'CONNOR

FORREST BOOTH
ERIK M. KOWALEWSKY
425 California Street, Suite 2400
San Francisco, CA 94104-2215
Tel No. (415) 617-6100

Attorneys for Plaintiff
S.J. Gargrave Syndicate at Lloyds

## IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| S.J. GARGRAVE SYNDICATE AT LLOYDS, <br><br> Plaintiff, <br><br> vs. <br><br> BLACK CONSTRUCTION CORPORATION, WINZLER & KELLY, and ENGINEERING MANAGEMENT & PLANNING SERVICES CORPORATION, <br><br> Defendants. | CIVIL CASE NO. CV03-00009 <br><br> **DECLARATION OF FORREST BOOTH IN OPPOSITION TO EMPSCO'S RENEWED MOTION TO LIMIT TESTIMONY OF PLAINTIFF'S EXPERT AT TRIAL; DECLARATION OF SERVICE** |

I, Forrest Booth, declare:

1.      I am an attorney duly licensed to practice law before all courts in the State

of California, and am admitted *pro hac vice* herein. I am a member of the law firm of Cozen

O'Connor, counsel of record for Plaintiff S.J. GARGRAVE SYNDICATE AT LLOYDS (hereinafter "Plaintiff").

2. Plaintiff's expert structural engineer, Elliott Boone, provided his first report in this matter on May 12, 2004. He provided a supplemental report on April 21, 2005. Between those dates, the following depositions were taken in this case:

| | |
|---|---|
| Reynaldo Arce | September 22, 2004 |
| Frank Dennis | July 21, 2004 |
| Lito Gutierrez | September 24, 2004 and October 17, 2004 |
| N.C. Macario | September 20, 2004 |
| Simeon delos Santos | September 21, 2004 |
| Jurgen Unterberg | September 23, 2004 |
| Edward Williamson | June 16, 2004 |

Attached hereto and marked as Exhibit A are copies of the cover sheets of the transcripts of those depositions, showing the dates on which they were taken. I provided copies of the transcripts of each of these depositions, with the exception of the deposition of Edward Williamson, to Mr. Boone shortly after I received them from Guam, or wherever else they were taken.

3. I have reviewed my records in this matter, and between the dates of Mr. Boone's first and supplemental reports, I had 4 lengthy meetings in person with Mr. Boone to discuss this case, and provide more information to him which I had received from my investigators and through discovery herein. In addition, I had at least 17 telephone conferences with Mr. Boone, and exchanged several dozen emails with him for the same reason. A review of my records indicates that I transmitted documents to Mr. Boone on 10 occasions between

May 12, 2004, and April 21, 2005.

4. Attached hereto and marked as Exhibit B is a true and correct copy of the cover page and certain other pages of the deposition of N.C. Macario, taken in this case on November 20, 2004.

5. Since becoming involved in this case, I have tried to secure copies of the files and records of N.C. Macario & Associates, Inc., who acted as construction manager for the Port Authority of Guam in connection with the repairs and upgrading of the F-1 Pier following the 1993 earthquake. Mr. Boone expressed to me an interest in reviewing those files and records. I was unable to secure those files and records, or view them, and my investigator was advised that they no longer exist.

6. Attached hereto and marked as Exhibit C are true and correct copies of certain documents regarding Contract Submittal 12 which were provided to me as part of Defendants EMPSCO's and Black's initial disclosures in this case. I provided copies of these documents to Mr. Boone for his review. These documents were available in the conference room during the deposition of Mr. Boone on May 12 and 13, 2005.

7. Attached hereto and marked as Exhibit D are true and correct copies of certain documents regarding Contract Submittal 18a which were provided to me by Defendants EMPSCO and Black as part of their initial disclosures in this case. I provided copies of these documents to Mr. Boone for his review. These documents were available in the conference room during the deposition of Mr. Boone on May 12 and 13, 2005.

8. Attached hereto and marked as Exhibit E is a true and correct copy of a letter dated October 16, 1995 from the Port Authority of Guam to EMPSCO. This document was provided to me as part of EMPSCO's initial disclosure in this case.

9.      Attached hereto and marked as Exhibit F is a true and correct copy of a letter I sent to counsel for EMPSCO, dated April 19, 2005.

10.     Attached hereto and marked as Exhibit G is a true and correct copy of Mr. Boone's initial report in this matter, dated May 12, 2004.

11.     Attached hereto and marked as Exhibit H are true and correct copies of the first pages of the Engineering Documentation Report, Design Calculations, Specifications and Engineering Drawings for the Repairs and Upgrading of the F-1 Pier.  These documents were produced to me as part of EMPSCO's initial disclosure in this case.

12.     Attached hereto and marked as Exhibit I is a true and correct copy of Mr. Boone's supplemental report, dated April 21, 2005.

13.     Attached hereto and marked as Exhibit J are true and correct copies of the cover pages and certain other pages of the deposition of Elliott Boone, taken May 12 and 13, 2005.

14.     Attached hereto and marked as Exhibit K is a true and correct copy of a letter dated November 28, 1995, from EMPSCO to the Port Authority of Guam, with attachments.  This document was produced to counsel for Plaintiff by EMPSCO as part of its initial disclosure in this case.


Sworn this 6th day of June, 2005 under penalty of perjury under the laws of the State of California and of the United States at San Francisco, California.

FORREST BOOTH

## DECLARATION OF SERVICE

I, David Ledger, hereby declare under penalty of perjury of the laws of the United

States, that on June ___9___ , 2005, I caused to be served, via hand delivery, a true and correct copy

of **DECLARATION OF FORREST BOOTH IN OPPOSITION TO EMPSCO'S**

**RENEWED MOTION TO LIMIT TESTIMONY OF PLAINTIFF'S EXPERT AT TRIAL**

upon Defendants Counsel of record as follows:

> Robert J. O'Connor, Esq.
> Daniel J. Berman, Esq.
> Berman O'Connor Mann & Shklov
> Suite 503, Bank of Guam Building
> 111 Chalan Santo Papa
> Hagåtña, Guam 96910

> Thomas C. Sterling, Esq.
> Klemm Blair Sterling & Johnson, P.C.
> Suite 1008, Pacific News Building
> 238 Archbishop Flores Street
> Hagåtña, Guam 96910

and

> Thomas M. Tarpley, Esq.
> Law Offices of Tarpley & Moroni, LLP
> Suite 402, Bank of Hawaii Building
> 134 West Soledad Avenue
> Hagåtña, Guam 96910

Executed this __9th__ day of June, 2005 at Hagåtña, Guam.

DAVID LEDGER

SANFRAN1\33745\1 123206.000

# EXHIBIT A

IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| S.J. GARGRAVE SYNDICATE AT LLOYDS,)<br><br>    Plaintiff,<br><br>  vs.<br><br>BLACK CONSTRUCTION CORPORATION, WINZLER & KELLY, and ENGINEERING MANAGEMENT & PLANNING SERVICES CORPORATION,<br>    Defendants. | ) CIVIL CASE NO. CV03-00009<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COPY**

### DEPOSITION OF REYNALDO ARCE

Taken on behalf of the Defendant Winzler & Kelly

    BE IT REMEMBERED That, pursuant to the Guam Rules of Civil Procedure, the Deposition of Reynaldo Arce was taken before Veronica Flores, Registered Professional Reporter, on Wednesday, the 22nd day of September 2004, at 9:39 a.m. in the Law Offices of Carlsmith Ball, Suite 401, Bank of Hawaii Building, Hagatna, Guam 96910.

Veronica A. Flores, CSR-RPR
Certified Shorthand Reporter
Tel: (671) 734-1041 * Fax: (671) 734-1045
E-mail: floresroni@hotmail.com

1              IN THE DISTRICT COURT OF GUAM

2

3    S.J. GARGRAVE SYNDICATE      CIVIL CASE NO. CV03-00009
     AT LLOYDS,

4

5                Plaintiff,

6       vs.

7    BLACK CONSTRUCTION
     CORPORATION, WINZLER & KELLY,
     and ENGINEERING MANAGEMENT &
8    PLANNING SERVICES CORPORATION,

9               Defendants.

10    ————————————————————

11       DEPOSITION OF FRANK EDGERTON DENNIS

12

13        Taken on behalf of Plaintiff,

14     at the Law Offices of Carlsmith Ball LLP,

15         2200 American Savings Tower,

16      1001 Bishop Street, Honolulu, Hawaii,

17         commencing at 9:35 a.m.,

18   on Wednesday, July 21st, 2004, pursuant to Notice.

19

20

21

22    BEFORE:          HEDY COLEMAN,  CSR  NO.  116
                     Notary Public, State of Hawaii
23                    Certified Shorthand Reporter

24

25

Case 1:03-cv-00009   Document 200   Filed 06/09/2005   Page 8 of 30



1                    DISTRICT COURT OF GUAM

2

3  S.J. GARGRAVE SYNDICATE          )  CIVIL CASE NO. 03-00009
   AT LLOYDS,                       )

4              Plaintiff,           )

5         vs.                       )

6  BLACK CONSTRUCTION               )         DEPOSITION OF
   CORPORATION, et al.              )      JOSELITO GUTIERREZ

7                                   )       SEPTEMBER 23, 2004
             Defendants.            )

8  _____ )

9

10         The deposition of Joselito Gutierrez, called by
   Defendant EMPSCO for examination, pursuant to notice and

11  pursuant to the Rules of Civil Procedure, taken at the law
   offices of Tarpley & Moroni, Suite 402, Bank of Hawaii Bldg.,

12  134 West Soledad Avenue, Hågåtña, Guam, on the 23rd day of
   September, 2004, at the hour of 1:45 p.m.

13
          That at said time and place there transpired the

14  following:

15                A P P E A R A N C E S :

16  For the Plaintiff:          CARLSMITH BALL
                                By: Stephen Smith, Esq.

17  For Defendant
   Black Construction Corp.      KLEMM BLAIR STERLING & JOHNSON

18  Banking Corporation, Ltd.:   By: Thomas Sterling, Esq.

19  For Defendant Winzler        O'CONNOR BERMAN DOTTS & BANES
    & Kelly                      By: Robert O'Connor, Esq.

20
   For Defendant EMPSCO          TARPLEY & MORONI

21                               By: Thomas M. Tarpley, Esq.

22  Also Present: Butch Arce, EMPSCO

23

24

25                    Cecilia F. Flores
                Freelance Stenotype Reporter
                    Tel: (671) 632-0727
                    Fax: (671) 632-5363
                 E-mail: flores@ite.net

# IN THE DISTRICT COURT OF GUAM

LESLIE WILTON,

        Plaintiff,

    vs.

BLACK CONSTRUCTION CORPORATION
and WINZLER & KELLY CONSULTING
ENGINEERS,

        Defendants.

) Civil Case No. CV03-00009
)
)
)
)
)
)
)
)
)
)

📄 **COPY**

## DEPOSITION OF JOSELITO GUTIERREZ

Taken on Behalf of the Plaintiff

BE IT REMEMBERED That pursuant to the Federal Rules of Civil Procedure, the deposition of **JOSELITO GUTIERREZ** was taken before Cecille A. Flores, a Certified Shorthand Reporter, on Friday, the 17th day of October 2003, in the law offices of Carlsmith Ball, Suite 401, Bank of Hawaii Building, 134 West Soledad Avenue, Hagatna, Guam.

8954

4.

```
 1                    DISTRICT COURT OF GUAM

 2
     S.J. GARGRAVE SYNDICATE        )  CIVIL CASE NO. 03-00009
 3   AT LLOYDS                      )
                                    )
 4           Plaintiff,             )
                                    )
 5        vs.                       )
                                    )
 6   BLACK CONSTRUCTION             )         DEPOSITION OF
     CORPORATION, et al.            )         N.C. MACARIO
 7                                  )      SEPTEMBER 20, 2004
             Defendants.           )
 8   _____)

 9

10          The deposition of N.C. Macario, called by Defendant
     Black Construction Corporation for examination, pursuant to
11   notice and pursuant to the Rules of Civil Procedure, taken at
     the Conference Room of Carlsmith Ball, Suite 401, Bank of
12   Hawaii Bldg., 134 West Soledad Avenue, Hágatña, Guam, on the
     20th day of September, 2004, at the hour of 1:35 p.m.
13
            That at said time and place there transpired the
14   following:

15              A P P E A R A N C E S :

16   For the Plaintiff:         CARLSMITH BALL
                                By: Stephen Smith, Esq.
17   For Defendant
     Black Construction Corp.   KLEMM BLAIR STERLING & JOHNSON
18   Banking Corporation, Ltd.: By: Thomas Sterling, Esq.

19   For Defendant Winzler      O'CONNOR BERMAN DOTTS & BANES
      & Kelly:                  By: Robert O'Connor, Esq.
20
     For Defendant EMPSCO:      TARPLEY & MORONI
21                              By: Thomas M. Tarpley, Esq.

22   Also Present: Butch Arce, EMPSCO

23

24
                     Cecilia F. Flores
25            Freelance Stenotype Reporter
                  Tel: (671) 632-0727
                  Fax: (671) 632-5363
                E-mail: flores@ite.net
```

5.

# IN THE DISTRICT COURT OF GUAM

S.J. GARGRAVE SYNDICATE AT )    CIVIL CASE NO. CV03-00009
LLOYDS, )
                 )
         Plaintiff, )
                 )
     vs. )
                 )
BLACK CONSTRUCTION CORPORATION, )
WINZLER & KELLY, and ENGINEERING)
MANAGEMENT & PLANNING SERVICES )
CORPORATION, )
                 )
         Defendants. )

**COPY**

## DEPOSITION OF SIMEON S. DELOS SANTOS

Taken on Behalf of the Defendant EMPSCO

        BE IT REMEMBERED That, pursuant to the Federal Rules of Civil Procedure, the deposition of **SIMEON S. DELOS SANTOS** was taken before Cecille A. Flores, a Certified Shorthand Reporter, on Tuesday, the 21st day of September 2004, at 9:00 a.m. in the offices of Carlsmith Ball, 134 West Soledad Avenue, Bank of Hawaii Building, Suite 401, Hagatna, Guam.

Flores Court Reporting
Suite 2E, Jugo Building
618 Route 8
Barrigada, Guam 96913
Tel: (671) 734-1041 * Fax: (671) 734-1045

# IN THE DISTRICT COURT OF GUAM

S.J. GARGRAVE SYNDICATE AT )    CIVIL CASE NO. CV03-00009
LLOYDS, )
                 )
           Plaintiff, )
                 )
      vs. )
                 )
BLACK CONSTRUCTION CORPORATION, )
WINZLER & KELLY, and ENGINEERING)
MANAGEMENT & PLANNING SERVICES )
CORPORATION, )
                 )
          Defendants. )

**□ COPY**

## DEPOSITION OF JURGEN H.W. UNTERBERG

Taken on Behalf of Defendant Black Construction

         BE IT REMEMBERED That, pursuant to the Federal Rules of Civil Procedure, the deposition of JURGEN H.W. UNTERBERG was taken before Cecille A. Flores, a Certified Shorthand Reporter, on Thursday, the 23rd day of September 2004, at 10:00 a.m. in the offices of Klemm, Blair, Sterling & Johnson, Suite 1008, Pacific News Building 238 Archbishop Flores Street, Hagatna, Guam.

Flores Court Reporting
Suite 2E, Jugo Building
618 Route 8
Barrigada, Guam 96913
Tel: (671) 734-1041 * Fax: (671) 734-1045

```
1              IN THE DISTRICT COURT OF GUAM
                          - - -
2    S.J. GARGRAVE SYNDICATE :
     LLOYDS                 :
3              PLAINTIFF    :  CIVIL CASE NO.
               v.           :  CV03-00009
4    BLACK CONSTRUCTION      :
     CORPORATION, WINZLER &  :
5    KELLY, and ENGINEERING, :
     MANAGEMENT & PLANNING   :
6    SERVICES CORPORATION    :       COPY
               DEFENDANTS    :
7

                          - - -
8                JUNE 16, 2004
                          - - -
9
10             Oral deposition of EDWARD
11   WILLIAMSON, taken pursuant to notice,
12   was held at the Law Offices of Cozen
13   O'Connor, 1900 Market Street,
14   Philadelphia, Pennsylvania 19103,
15   commencing at 9:16 a.m. on the above
16   date, before Stanley D. Krevitz, Jr., a
17   court reporter and notary public in the
18   Commonwealth of Pennsylvania.
19
20
21                        - - -
22        ESQUIRE DEPOSITION SERVICES
          1880 John F. Kennedy Boulevard
23                  15th Floor
          Philadelphia, Pennsylvania 19103
24                (215) 988-9191
```

# EXHIBIT B

```
 1                  DISTRICT COURT OF GUAM

 2
    S.J. GARGRAVE SYNDICATE        )  CIVIL CASE NO. 03-00009
 3  AT LLOYDS                      )
                                   )
 4           Plaintiff,            )
                                   )
 5      vs.                        )
                                   )
 6  BLACK CONSTRUCTION             )        DEPOSITION OF
    CORPORATION, et al.            )        N.C. MACARIO
 7                                 )      SEPTEMBER 20, 2004
             Defendants.           )
 8  _____)

 9

10          The deposition of N.C. Macario, called by Defendant
    Black Construction Corporation for examination, pursuant to
11  notice and pursuant to the Rules of Civil Procedure, taken at
    the Conference Room of Carlsmith Ball, Suite 401, Bank of
12  Hawaii Bldg., 134 West Soledad Avenue, Hågatña, Guam, on the
    20th day of September, 2004, at the hour of 1:35 p.m.
13
            That at said time and place there transpired the
14  following:

15                  A P P E A R A N C E S :

16  For the Plaintiff:           CARLSMITH BALL
                                 By: Stephen Smith, Esq.
17  For Defendant
    Black Construction Corp.     KLEMM BLAIR STERLING & JOHNSON
18  Banking Corporation, Ltd.:   By: Thomas Sterling, Esq.

19  For Defendant Winzler        O'CONNOR BERMAN DOTTS & BANES
     & Kelly:                    By: Robert O'Connor, Esq.
20
    For Defendant EMPSCO:        TARPLEY & MORONI
21                               By: Thomas M. Tarpley, Esq. •

22  Also Present: Butch Arce, EMPSCO

23

24
                     Cecilia F. Flores
25            Freelance Stenotype Reporter
                  Tel: (671) 632-0727
                  Fax: (671) 632-5363
                E-mail: flores@ite.net
```

1      A.   This is normally for if there is any additional
2  design required that the Port requires, we can do the design.
3      Q.   To your recollection, was there any design work the
4  Port required that you actually had to do?
5      A.   None, sir.
6      Q.   Let's look down at Services point two where it says
7  "Contract Administration," subpart A1.a.  It says:
8           "Administer the contract as the authorized
9           representative of the PAG."
10 Can you explain to me what you understood your role to be as
11 the authorized representative of PAG, meaning were you their
12 onsite representative to protect their interests?
13     A.   Yes, sir.
14     Q.   Was there anybody else there from PAG who
15 supervised you and told you what to do, as far as running
16 this job?
17     A.   No, nobody, sir, except We have, what would you
18 call that, we have interface with Mr. Simeon Delos Santos.
19     Q.   All right.  Mr. Delos Santos, can you tell me what
20 his responsibilities were on this job?
21     A.   Basically supervising us.                        .
22     Q.   And how often did he come out and supervise you, if
23 you know, and I don't want you to guess?
24     A.   Irregular.
25     Q.   Irregular.

N.C. Macario: September 20, 2004

1    coordinate the review by the design engineers.  My first
2    question is what does CQC mean?
3         A.    Contractor's quality control.
4         Q.    And would that involve all submittals or just
5    certain submittals?
6         A.    The CQC is supposed to do all submittals.
7         Q.    Now when it says coordinate the review by the
8    design engineers, who did you understand the design engineers
9    for this repair project to be?
10        A.    The engineers of record, sir.
11        Q.    And who was the engineer of record, according to
12   your understanding?
13        A.    EMPSCO, sir.
14        Q.    So this is just a general question, I'm not talking
15   about any particular submittal.  But when a submittal came to
16   you or your representatives, can you tell me generally how
17   you handled it, what you did with it?
18        A.    What we do is we look at the submittals, check back
19   with the contract requirements -- you know, if it meets the
20   requirements, then it's approved.  Or if it's required or
21   there's comment, then we send it back.                    .
22        Q.    Now what involvement in that process, if any, did
23   the design engineers, EMPSCO, have?  Meaning, did you consult
24   with them on every submittal or only on submittals that you
25   felt you needed input from them?  What was their involvement

N.C. Macario: September 20, 2004

1    in general?

2        A.    Yeah, there are submittals that requires their

3    approval.

4        Q.    And can you tell me which submittals it was that

5    required EMPSCO's approval, if that's a fair question?

6        A.    If there's something like deviation on design, then

7    it goes to the engineer of record, sir.

8        Q.    So if there was a submittal that involved -- or

9    when you say deviation on design, what do you mean?

10       A.    Well, it changed, sir.  Say the requirement is --

11   well, the one they're submitting is different from what's on

12   the design requirement, and then there is a note that says

13   they are deviating, then we submit it to the engineers.

14       Q.    Just so I'm clear then, if it was a submittal that

15   was not a deviation, there was no change, no proposed value

16   engineering or whatever, you would just compare that

17   submittal against the contract requirements, and your company

18   would approve it or disapprove it, correct?

19       A.    Yes, sir.

20       Q.    But if there was some sort of a deviation that

21   involved a design change, then it would be submitted to        •

22   EMPSCO for their review and comments?

23       A.    Yes, sir.

24       Q.    Let's look at B2.b. here.  This says one of your

25   responsibilities was to evaluate and make recommendations on

1   12, did you take a look at them?

2          A.   We did look, sir.

3          Q.   Tell me about that.  What did you do?

4          A.   It's a deviation from the contract so that's why

5   we know it's not for our approval already, so we forward it

6   to EMPSCO.

7          Q.   When you looked at them, you mean that literally

8   you just looked at them, or you made a study of them?  Did

9   you do any of your own calculations?  Did you do anything

10  besides look at them?

11         A.   We did not do any calculations.  We just review it

12  more for constructability.

13         Q.   Okay.

14         A.   And then, you know, it has to be approved by the

15  engineer of record.

16         Q.   Right.  When you say you reviewed the

17  constructability, who, as in a person, did this review?

18         A.   I did the review, sir.

19         Q.   Did you find it constructable?

20         A.   Yes, sir.

21         Q.   And after you made that review, you sent the plans

22  to EMPSCO?

23         A.   Yes, sir, essentially at the same time.  When I saw

24  it has to be approved by them, we sent it.  We only retained

25  one copy. That's what I did.

N.C. Macario: September 20, 2004

1      A.    Okay, sir.

2      Q.    Is this the letter you received from Black in

3   response to Exhibit No. 8, the May 22nd letter?

4      A.    Yes, sir.

5      Q.    You'll see number one talks about structural

6   calculation data for piles from Winzler & Kelly.

7      A.    Yes, sir.

8      Q.    What did you do with that information?

9      A.    I forwarded that to EMPSCO.

10      Q.    Did you forward EMPSCO this entire letter?

11      A.    All we received are submitted to them.

12      Q.    I'm sorry?

13      A.    All the submittals like this is forwarded, sir.

14      Q.    Okay.  When you received the structural calculation

15   data, did you do an independent review of it?

16      A.    No, sir.

17      Q.    Did you do an independent review of anything else

18   contained in the letter, any of the substantive information

19   contained?

20      A.    Only like if we are not required to review them,

21   then we don't review, sir.                                    .

22      Q.    My question is, did you do any independent review

23   of the material submitted by Black?  Let me rephrase.  I'm

24   sorry, sir.  When you received this letter, Exhibit 9, and

25   the materials that came with it, did you do any independent

N.C. Macario: September 20, 2004

1   review of those materials, or did you merely pass it on to
2   EMPSCO?

3       A.   We passed it to EMPSCO, sir.

4       Q.   Now Exhibit No. 10, am I correct that this is the
5   response you received from EMPSCO in response to Exhibit No.
6   9?

7       A.   Yes, sir.

8       Q.   Was there anything, any other documents or
9   substantive information that came with this letter?

10      A.   No, sir, just what's here.

11      Q.   Just what's here; thank you.  Now could I have you
12  look at Exhibit No. 11?  And please correct me if I'm wrong,
13  but does this indicate that after receiving -- or strike
14  that.  Am I correct that you sent with this letter the
15  calculations from Winzler & Kelly to Black Construction?

16      A.   Yes, sir.

17      Q.   Now I want to go back.  I have a couple of
18  questions about an area that I didn't understand really well,
19  so I want to go back and ask you about it. You were examined
20  on random spot checks you did of the bolts that went into the
21  cap of the epoxy; is that correct?

22      A.   Yes, sir.

23      Q.   Could you describe for me again the way that those
24  random checks were carried out?

25      A.   What we did was essentially identify which bolt

N.C. Macario: September 20, 2004

1    A.   He may have questions, but I just can't remember
2    right now.
3    Q.   If he had questions, would you have taken any notes
4    of your conversation?
5    A.   Oh, yeah, if we had.
6    Q.   Do you still have those notes?
7    A.   I'm sorry, sir, we had a lot of typhoon damage.  We
8    have no files on F-1.
9    Q.   You have no files on F-1?
10    A.   We have some, but more on the contract part, not
11    the project management part.
12    Q.   You didn't keep any files on your computer or
13    anything like that?
14    A.   Oh, those computers are gone.
15    Q.   I take it that your structural assessment of the
16    pier of F-1 was also in the same files?
17    A.   Yes, sir.
18    Q.   You don't have that anymore, right?
19    A.   No more.
20    Q.   I think you were asked a series of questions, or at
21    least one question where the answer was just prior to turning
22    over the job to the Port, the final inspection, that there
23    was no extra look at the bolts because of the previous random
24    inspection; is that correct?
25    A.   Yes, sir.

N.C. Macario: September 20, 2004

# EXHIBIT C



**EMPSCO**

ENGINEERING, MANAGEMENT & PLANNING SERVICES CORPORATION

20 MARCH 1996

TO:     **CAPT. EULOGIO C. BERMUDES**
        General Manager
        **PORT AUTHORITY OF GUAM**
        1026 Cabras Highway, Suite 201
        Piti, Guam 96925

ATTN:   **SIMEON DE LOS SANTOS**
        C.I.P. Coordinator

SUBJ:   **REPAIRS AND UPGRADING TO FOXTROT "F-1" PIER**
        Apra Harbor, Guam M.I.

REF:    (a)    PAG Fax Transmittal dated 20 March 1996

Dear Capt. Bermudes:

Upon review of reference (a) regarding BCC's proposal for the above subject project, the following comments are forwarded:

1.   BCC's recommendation to implement Proposal "B" is acceptable and meets the same standards of repair as the original design.

2.   EMPSCO recommends that PAG accept BCC revised basic contract proposal of $1,407,682 with the following conditions:

     a.   The proposed repair shall conform to the requirements of Shell Guam, Inc. as stipulated in the contract documents.

     b.   Repairs shall be done to all existing piles as indicated in the contract documents.

     c.   A unit cost per pile basis for repair should be established and agreed upon. The total number of piles in need of repairs may be adjusted and subject to an appropriate deductive change in the total contract amount.

Foxtrot "F-1" Pier
Page two (2)

3.  PAG shall designate a construction manager/representative to instruct and approve on site as to which piles are in need of replacement.

4.  All applicable submittal requirements as stipulated in the contract documents based on the original design shall be strictly adhered to and shall remain valid.

Should you need further assistance please inform our office.

Si Yuus' Maase

EMPSCO-Engineering Consultants

PETRONILO O. VILLALUZ, P.E.
Managing Engineer



**EMPSCO** ENGINEE—G, MANAGEMENT & PLANNING —RVICES CORPORATION

**ERING CONSULTANTS**

22 May 1996

**FILE COPY**

TO: **N.C. MACARIO ASSOCIATES**

ATTN: **MANUELITO GOLEZ**

SUBJ: **REPAIRS AND UPGRADING TO FOXTROT "F-1" PIER**
Apra Harbor, Guam, MI.

REF: Submittal No. 12 - Proposed Pile Repair Details; W&K Drawing Sheet VE-1
Job No. 96424204 dated 04/04/96

Gentlemen:

Our review of Submittal No. 12 raises the following comments:

1.  The general concept outlining the proposed method of repair is hereby approved in concept.

2.  Specifications requirements for welds should clearly be indicated.

3.  Establish and Identify lengths of new pile sections.

4.  Provide statements by way of describing on orderly progression of the work involve.

5.  Provide structural calculations verifying that proposed repair meets design requirements.

6.  In reference to detail No. 3 of Sheet VE-1; there is concern regarding the condition of the base plate attachment to the existing concrete pile cap. It is assumed that the a portion of the existing corroded steel pile is embedded into the concrete pile cap. How does the contractor intend to treat this existing condition prior to installing the new base plate.

This submittal is hereby forwarded with our action recommending "approval as noted".

Yours truly,

**EMPSCO-Engineering Consultants**

**BUTCH ARCE**

Received by: _____
Date: _____ 5/23/96
N.C. Macario & Assoc., Inc.

Suite 245 Julale Shopping Center, Agana Guam 96910 ∙ P.O. Box 21794, GMF, Guam 96921
Tel (671) 477–5716/4716 ∙ Telefax (671) 472–2136
Saipan Office: P.O. Box 144 Pearl River, Gualo Rai, Saipan, MP 96950
Tel (670) 234–9213



May 24, 1996

NCM-04

NC Macario and Associates, Inc.
Suite 201 Boon Bldg., 1270 North Marine Drive
Tamuning, Guam, 96911
Tel 646-0901  Fax 464-0991

Attention     :    Nemencio C. Macario

Subject        :    Repairs and Upgrading to Foxtrot "F-1" Pier, Apra Harbor

Gentlemen:

This is in reference to Submittal no. 12 and 12c Existing Steel Pile Repairs.  Attached herewith
six (6) sets of additional information for the materials required for pile repairs as follows;

1.  Structural calculation data for piles from Winzler and Kelly.

2.  Additional information regarding the gap of the splice ring and the piles to be joined
    should not exceed 1/8" and to provide 3/8" fillet weld all around top and bottom of
    the splice.

3.  Certificate of Compliance for the epoxy coating for the 15'-0" long piles from
    Cal-Steel Coating Company.  Color of the epoxy coating as required by the contract
    specification as follows;

|   |   |   |   |   |
|---|---|---|---|---|
| a. | Primer | - | Formula 150 | -Green |
| b. | Intermediate Coat | - | Formula 152 | -White |
| c. | Top Coat | - | Formula 156 | - Red |

Respectfully Yours,
Black Construction Corporation

Rod F. Bismonte
QC Engineer

DEFENDANT'S DEPOSITION
EXHIBIT

Received by: _____
Date: _5/24/96_____
N.C. Macario & Assoc., Inc.

**EMPSCO-ENGINEERING CONSULTANTS**
P.O. BOX 21794 GMF, GUAM 96921
TEL(671)477-4716/5716 FAX(671)472-2136

| TO: | N.C. MACARIO ASSOCIATES | | |
|---|---|---|---|
| ATTN: | MANUELITO GOLEZ | | |
| DATE: | 28 MAY 1996 | | |
| FROM: | BUTCH ARCE | | |
| SUBJECT: | FOXTROT "F-1" PIER | | |
| NO. OF PAGE (S) | **1** | FAX NO.: | **(671) 646-0991** |

Ref:     Submittal # 12 and 12c  —  SUPPLEMENTAL INFO.
         N.C. Macario transmittal letter dated 28 May 1996.

**MESSAGE:**

Review of above submittal is forwarded herewith with our action
recommending approval as noted.

Contractor shall provide other related documents pertinent
to this submittal as required under the contract documents.

*[signature]*
5-28-96

DEFENDANT'S DEPOSITION
EXHIBIT
*[handwritten]*



# N.C. MACARIO & ASSOCIATES, INC.

Engineering • Planning • Construction Management
Suite 201 Boon Building • 1270 North Marine Drive • Tamuning, Guam 96911 • Tel. (671) 646-0901 • Fax (671) 646-0991

## LETTER OF TRANSMITTAL

TO:     **BLACK CONSTRUCTION**

DATE:     **29-May-96**

JOB NO.     **94-63**

RE:     **FOXTROT 'F-1' PIER**

ATTN:     **MR. ROD BISMONTE**

**GENTLEMEN: WE ARE SENDING YOU**

( ) HEREWITH     ( ) DELIVERED BY HAND     ( ) UNDER SEPARATE COVER
VIA:    **PICK-UP**     THE FOLLOWING ITEMS:

( ) PLANS         ( ) PRINTS        ( ) SHOP DRAWINGS     ( ) DISKETTES     ( ) SAMPLES
( ) SPECIFICATIONS   ( ) ESTIMATES    ( ) BASIS OF DESIGN    ( ) COPY OF LETTER   (X) OTHERS

| COPIES | DATE | DRAWING NO. | D E S C R I P T I O N |
|---|---|---|---|
| 3 | 29-May | | Supplemental Info for Sub #12 & 12c. |
| | | | - Structural Calculations from Winzler & Kelly |
| | | | - Addt'l Info regarding splice ring |
| | | | - Certificate of compliance for epoxy coating |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

> DEFENDANT'S DEPOSITION EXHIBIT

## THESE ARE TRANSMITTED AS INDICATED BELOW

( ) FOR YOUR USE     ( ) FOR REVIEW & APPROVAL     (X) APPROVED AS NOTED
( ) AS REQUESTED     ( ) APPROVED FOR CONSTRUCTION     ( ) RETURNED FOR CORRECTIONS
( ) FOR YOUR FILES     ( ) RETURNED AFTER LOAN TO US     ( ) RECOMMEND APPROVAL FOR PAYMENT

**REMARKS:**

- Please note EMPSCO's comments regarding this submittal
    Submit all items specified by EMPSCO.

Signed: _____

Copy To:   **FILE**

Received by: _____

Date _____

*IF INCLOSURES ARE NOT AS NOTED KINDLY NOTIFY US AT ONCE.*

# EXHIBIT D

# TRANSMITTAL FORM

JOB ORDER _____

CONTRACT _____

TITLE   **REPAIRS & UPGRADING TO FOXTROT F-1 PIER**

FROM:   **BLACK CONSTRUCTION CORPORATION, P.O. Box 24667, GMF, Guam, 96921**          May 20, 1996
                              (CONTRACTOR)                                              ( DATE )

TO :    **PORT AUTHORITY OF GUAM**          SUBMITTAL NO.   **18a**          RESUBMITTAL OF SUBMITTAL NUMBER _____

ATTN:   **SIMEON DE LOS SANTOS - CIP COORDINATOR**          _____

SUBJ.:  SUBMITTAL FOR PROJECT _____          LINE ITEM _____          IN   ACCORDANCE   WITH

        SPECIFICATION PARAGRAPH          Section 05500, para. 1.2.1 Epoxy Bolts for Steel Plate Anchor _____

TRANSMITTED HEREWITH ARE :          Six (6) copies of Epoxy Anchor Bolts

FOR :   ( X )  ACCEPTANCE OR APPROVAL          ( )  CLARIFICATION          ( )  SELECTION          ( ) _____

IT  IS  HEREBY  CERTIFIED  THAT  THE  MATERIAL  SUBMITTED  HEREIN  CONFORMS  TO  CONTRACT  REQUIREMENTS  AND  CAN  BE  INSTALLED
IN THE ALLOCATED SPACES.

                                                  CONTRACTOR'S SIGNATURE          Rod F. Biamonte, QC Mgr.

FROM :  Rod F. Biamonte

TO :    HG Nevario & Associates, Inc.          _____ (SIGNATURE)          _____          JT-20-96 ( DATE )

                                                  FOR  REVIEW  AND  COMMENT  NO  LATER

        THAN   **May 24, 1996**   ( MAXIMUM 5 WORKING DAYS )

FROM :  _____          ( DATE )

TO :    _____          ( )  APPROVED:   ( )  RETURNED FOR CORRECTION:   ( )  SOURCE INSPECTION REQUIRED:
                                     ( )  APPROVED AS NOTED:   ( )  DISAPPROVED
                                     ( )

REMARKS :

FROM :  _____          ( DATE )

TO :    _____
        SUBMITTAL IS:   ( )  APPROVED:   ( )  RETURNED FOR CORRECTION:   ( )  SOURCE INSPECTION REQUIRED:

REMARKS :          X  APPROVED AS NOTED
                   ( SEE BURSCO'S COMMENTS )



**E...PSCO-ENGINEERING CONSULTANTS**
P.O. BOX 21794 GMF, GUAM 96921
TEL(671)477–4716/5716 FAX(671)472–2136

| TO: | N.C. MACARIO ASSOCIATES |
|---|---|
| ATTN: | MANUELITO GOLEZ |
| DATE: | 24 MAY 1996 |
| FROM: | BUTCH ARCE |
| SUBJECT: | FOXTROT "F-1" PIER |

| NO. OF PAGE (S) | **1** | FAX NO.: | **(671) 646–0991** |
|---|---|---|---|

REF:     Submittal No. 18a – Epoxy Bolts for Steel Plate Anchor

Review of submittal No. 18a is hereby forwarded with the
following comments:

(a)      This submittal applies to the use of epoxy resin materials

(b)      Submit other pertinent items relevant to the use of epoxy bolts
for this project.

(c)      Submit manufacturer's certificate of compliance.

(d)      Submit test datas by independent laboratory testing.

We recommend approval of this submittal subject to the above comments.

5-24-96

## N.C.MACARIO & ASSOCIATES, INC.
*Engineering • Planning • Construction Management*

Boon Bldg., Suite 201, 1270 N. Marine Dr., Tamuning, GU 96911   Telephone: (671) 646-0901 / 02 / 05
P.O. Box 784 Agana, Guam 96910                                    Fax: (671) 646-0991

## LETTER OF TRANSMITTAL

| TO: | BLACK CONSTRUCTION | DATE: | 28-May-96 |
|---|---|---|---|
| | | JOB NO. | 94-53 |
| | | RE: | FOXTROT 'F-1' PIER |

ATTN:   MR. ROD BISMONTE

GENTLEMEN: WE ARE SENDING YOU

( ) HEREWITH     ( ) DELIVERED BY HAND     ( ) UNDER SEPARATE COVER
VIA:   PICK-UP    THE FOLLOWING ITEMS:

| ( ) PLANS | ( ) PRINTS | ( ) SHOP DRAWINGS | ( ) DISKETTES | ( ) SAMPLES |
|---|---|---|---|---|
| ( ) SPECIFICATIONS | ( ) ESTIMATES | ( ) BASIS OF DESIGN | ( ) COPY OF LETTER | (X) OTHERS |

| COPIES | DATE | DRAWING NO. | DESCRIPTION |
|---|---|---|---|
| 3 | 28-May | | Sub # 15a - Product Data - Epoxy Bolts for Steel Plate Anchors |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

### THESE ARE TRANSMITTED AS INDICATED BELOW

( ) FOR YOUR USE     ( ) FOR REVIEW & APPROVAL     (X) APPROVED AS NOTED
( ) AS REQUESTED     ( ) APPROVED FOR CONSTRUCTION     ( ) RETURNED FOR CORRECTIONS
( ) FOR YOUR FILES     ( ) RETURNED AFTER LOAN TO US     ( ) RECOMMEND APPROVAL FOR PAYMENT

REMARKS:
    - Please note EMPSCO's comments regarding this submittal
     Submit all items specified by EMPSCO.

Signed: _____

Copy To:   FILE            Received by: _____

                             Date

## EXHIBIT "A"

EMPSCO-ENGINEERING CONSULTANTS
P.O. BOX 21794 GMF, GUAM 96921
TEL(671)477-4716/5716  FAX(671)472-2136

| TO: | N.C. MACARIO & ASSOCIATES |
|---|---|
| ATTN: | MANUELITO GOLEZ |
| DATE | JUNE 13, 1995 |
| FROM: | BUTCH ARCE |
| SUBJECT: | FOXTROT "F-1" PIER |

| NO. OF PAGE (S) | 1 | FAX NO.: | 646-0991 |
|---|---|---|---|

Re:     Supplemental Data for Submittal # 18-a
        Epoxy Fastening Systems

Remarks:

        Review of above reference submittal is hereby approve.



# N.C. MACARIO & ASSOCIATES, INC.

Engineering • Planning • Construction Management
Suite 201 Boon Building • 1270 North Marine Drive • Tamuning, Guam 96911 • Tel. (671) 646-0901 • Fax (671) 646-0991

## LETTER OF TRANSMITTAL

**TO:** BLACK CONSTRUCTION CORP.

**DATE:** 17-Jun-96

**JOB NO.** 94-63

**RE:** FOXTROT 'F-1' PIER

**ATTN:** MR. ROD BISMONTE

### GENTLEMEN: WE ARE SENDING YOU

( ) HEREWITH     ( ) DELIVERED BY HAND     ( ) UNDER SEPARATE COVER

VIA:   EXPRESS ONE    THE FOLLOWING ITEMS:

( ) PLANS     ( ) PRINTS     ( ) SHOP DRAWINGS     ( ) DISKETTES     ( ) SAMPLES

( ) SPECIFICATIONS     ( ) ESTIMATES     ( ) BASIS OF DESIGN     ( ) COPY OF LETTER     (X) OTHERS

| COPIES | DATE | DRAWING NO. | DESCRIPTION |
|--------|--------|-------------|-------------|
| 1 | 17-Jun | | Sub # 12b - Pipe Pile Driving Equipment |
| 3 | 17-Jun | | Sub # 18a - Epoxy Fastening System |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

## THESE ARE TRANSMITTED AS INDICATED BELOW

( ) FOR YOUR USE     ( ) FOR REVIEW & APPROVAL     ( ) APPROVED AS NOTED

( ) AS REQUESTED     (X) APPROVED     ( ) RETURNED FOR CORRECTIONS

( ) FOR YOUR FILES     ( ) RETURNED AFTER LOAN TO US     ( ) RECOMMEND APPROVAL FOR PAYMENT

**REMARKS:**

**Signed:**

**Copy To:** FILE

**Received by:** 10:07 a.m.

_____ Date

*IF ENCLOSURES ARE NOT AS NOTED KINDLY NOTIFY US AT ONCE*



August 5, 1996                                    NCM-23

NC Macario and Associates, Inc.
Suite 201 Boon Bldg. 1270 North Marine Drive
Tamuning, Guam, 96911
Tel 646-0901 Fax 646-0991

Attention      : Nemencio C. Macario

Subject        : Repairs and Upgrading to Foxtrot F-1 Pier, Apra Harbor
                 Reference- Submittal No. 18

Gentlemen:

We are submitting for record / file attached drawings for the non-typical cases of pile top plates
including the confirming statement of the structural engineer (Winzler & Kelly) that this plates are
in conformance with the intent of the structural design for the pile repairs.

Case 1, 2 and 4 as shown on the drawing occurs at Dolphins C and D while case 3 occurs mostly
at Dolphin G. For information these non-typical case plates was factory fabricated and factory
coated with epoxy.

Sincerely,
Black Construction Corporation

Rod F. Bismonte
Project Engineer

General Contractors   **PO Box** 24667, GMF Guam 96921   **Telephone** (671) 646-4861–5   **Fax** (671) 646-9086   **Telex** 7216110

# EXHIBIT E



## PORT AUTHORITY OF GUAM
## ATURIDAT I PUETTON GUAHAN
GOVERNMENT OF GUAM
1026 Cabras Highway
Suite 201
Piti, Guam 96925

Telephone: (671) 477-5931/35
(671) 477-2683/85
Telex: (721) 6689 PAGGUM
Facsimile: (671) 477-2689

OCT 16 1995

Mr. Petronilo Q. Villaluz, P.E.
Managing Engineer
EMPSCO - Engineering Consultants
Suite 245 Julale Shopping Center
Agana, Guam 96910

Subject: RFP for the Design and Upgrade of Existing F-1 Fuel
Pier (Shell Fuel Pier).

Hafa Adai Mr. Villaluz:

This letter is to inform you that the Port selection committee has
selected your firm to perform the A/E Design and up-grade of the F-
1 fuel pier.

The Port now wishes to proceed to discuss the Scope of Work more in
detail, and negotiate a contract with your firm at the earliest.
Please contact Mr. Bill Payne Officer-In-Charge Planning and
Development at 477-5931/35 ext. 310, or Mr. Simeon Delos Santos at
477-5931 ext.357 so we can arrange a meeting.

Si Yu'os Ma'ase,

E.C. BERMUDES
General Manager

*Dong*
*I'll be informing you on the meeting as
soon as it can be arranged.*

*Simeon*

25 - 1

PLAINTIFF'S
EXHIBIT
25



Commonwealth Now!

# EXHIBIT F

PHILADELPHIA
ATLANTA
CHARLOTTE
CHERRY HILL
CHICAGO
DALLAS
DENVER
HOUSTON
LAS VEGAS
LONDON
LOS ANGELES



**COZEN**
_____
**O'CONNOR**
ATTORNEYS

NEWARK
NEW YORK
SAN DIEGO
SAN FRANCISCO
SEATTLE
TRENTON
WASHINGTON, DC
WEST CONSHOHOCKEN
WICHITA
WILMINGTON

SUITE 2400   425 CALIFORNIA STREET   SAN FRANCISCO, CA  94104-2215
415.617.6100   800.818.0165   415.617.6101 FAX   www.cozen.com

April 19, 2005

**VIA FACSIMILE**

**Forrest Booth**
Direct Phone 415.617.6105
fbooth@cozen.com

Thomas M. Tarpley, Esq.
Law Offices of Tarpley & Moroni, LLP
Suite 402, Bank of Hawaii Building
134 West Soledad Avenue
Hagåtña, Guam 96910

Re:   Port Authority of Guam
      Our File No.:   123206

Dear Tom:

As you know, we have scheduled the deposition of one of Plaintiff's two experts, Elliott Boone, for May 12th in San Francisco. You have indicated that you probably will not attend this deposition, since in your view Plaintiff's expert has no opinions that EMPSCO breached the duty of care or otherwise did anything wrong in connection with the Shell F-1 pier project. This is not correct. In Mr. Boone's report of May 12, 2004, he clearly states that it is the engineer of record's responsibility to see that critical elements of his design are correctly completed. Your client EMPSCO was the engineer of record on this project. EMPSCO approved in writing the fatally-defective design which Winzler & Kelly prepared for Black, thereby directly causing damage to the Port's property, in the opinion of Plaintiff's expert.

Mr. Boone also believes that EMPSCO's services in this matter fell below the required standard of care, because calculations supporting the Winzler & Kelly design were never provided, and EMPSCO never followed up to determine why they were not. EMPSCO's service also fell below the standard of care because testing of epoxy was a code requirement in this installation, and EMPSCO should have required that it be done, but failed to do so. EMPSCO's work was also deficient because EMPSCO approved the Anchor-It epoxy product as a substitute for the product Winzler & Kelly specified, when the Anchor-It product is specifically not recommended by its manufacturer for overhead use. Furthermore, to the extent it is an engineering and not a legal question, Mr. Boone is of the opinion that EMPSCO did not perform its services in a "workmanlike" manner, as was required by its contract with the Port.

I bring these matters to your attention so that you can evaluate whether or not to attend Mr. Boone's deposition.

Very truly yours,

COZEN O'CONNOR

By:     Forrest Booth

FB/dhd

SANFRAN1\31678\1 099997.000

# EXHIBIT G



**CASH & ASSOCIATES**
Engineering and Architecture

Elliott H. Boone
Randy H. Mason
Wilfrido B. Simbol
Kerry M. Simpson

May 12, 2004

Attention: Mr. Forrest Booth
Cozen O'Connor Attorneys
425 California Street, Suite 2400
San Francisco, CA 94104-2215

Attention: Mr. David Ledger
Carlsmith Ball LLP
P.O. Box BF
Hagatna, Guam 96932-5027

Subject:    FOXTROT PIER F1
            PORT AUTHORITY OF GUAM
            COZEN O'CONNOR REFERENCE NO. 123206
            (C&A Project No. 6090.00)

Gentlemen

The purpose of this report is to summarize the results of my investigation of structural damage observed at Foxtrot "F1" Pier in Apra Harbor, the sole motor fuel (gasoline and diesel) import location for Shell Guam Inc.

The scope of this investigation included the following tasks:

1.      Visit the site to visually observe the reported damage.

2.      Review project technical data and correspondence relating to the original design and subsequent repairs.

3.      Render an opinion as to the adequacy of the repair design prepared by Winzler & Kelly.

4.      Render an opinion of the connections installed by the Contractor.

The documents reviewed to develop this report are contained in Appendix A, Reference Listing.

## BACKGROUND

Apra Harbor is considered a protected harbor with favorable berthing conditions. Information reviewed relating to the Foxtrot "F1" facility indicated that it was constructed in 1970 and originally designed to accommodate 90,000 DWT tanker vessels. The pier consists of an access ramp from the shore leading to the main wharf supporting the bulk fuel unloading arms.

5772 Bolsa Avenue, Suite 100 ■ Huntington Beach, CA 92649 USA ■ TEL:714.895.2072 ■ FAX 714.895.1291
Web Site: www.cashassociates.com ■ A California Corporation

Cozen O'Connor Attorneys
Mr. Forrest Booth
Carlsmith Ball LLP
Mr. David Ledger
May 12, 2004

FOXTROT PIER F1
PORT AUTHORITY OF GUAM
Cozen O'Connor Reference No. 123206
(C&A Project No. 6090.00)
Page 2

Catwalks, from the wharf, lead to offshore mooring dolphins "A" and "B". Two additional mooring dolphins, "E" and "F", are located onshore. Tanker berthing forces are absorbed by four breasting dolphins; "C", "D", "G" and "H" located outboard of the wharf. Breasting dolphins "C" and "D" were designed to accommodate the 90,000 DWT vessels, while breasting dolphins "G" and "H" were provided to accommodate smaller 21,000 to 28,000 DWT vessels.

## PREVIOUS REPAIR HISTORY

The Foxtrot "F1" facility was operational at the time of the 8.1 magnitude earthquake in August 1993 and the resulting damage from this event was significant. Preparation of contract documents for repair of the damage sustained by the facility pier was awarded to EMPSCO Engineering Consultants of Agana, Guam by the Port Authority in late 1994. The Port Authority approved contract documents prepared by EMPSCO for bid and local contractors were required to submit their proposals on January 26, 1996.

The apparent low bidder for the project was Black Construction Company, Tamung, Guam, however, their bid for the work as described in the plans and specifications exceeded the Port Authority's budget. In order to proceed with the project, Black Construction Company was requested to submit alternates that would reduce their bid. In response to that request, Black Construction Company using an alternate design developed by Winzler & Kelly Consulting Engineers, Agana, Guam made a revised proposal to the Port Authority.

The alternate design for the repair was identified on Drawing Sheet VE-1 (copy attached) prepared under the supervision of Bruce Swanney, of Winzler & Kelly. Mr. Swanney is registered to practice as a Structural Engineer in the Territory of Guam and his professional engineering seal appears on that drawing, dated April 4, 1996.

At his deposition, Bruce Swanney stated that the sole calculation undertaken in the design of the pile flange to deck connection, shown on Drawing Sheet VE-1, was to assume that the connection would only be required to resist pile withdrawal loads equal to one half the pile axial capacity of 200 tons. No calculations relating to the design shown on Drawing Sheet VE-1 were available for my review.

In general, the repair shown on Sheet VE-1, involved removing approximately 15 feet of the upper portion each of the existing steel pipe piles under the deck of the mooring and breasting dolphins. A 22-inch diameter replacement was then spliced to the remaining pile section, which is connected to the underside of the dolphin deck with a 1-inch thick flange plate, welded to the new section of pipe pile. The flange was, in turn, connected to the underside of the dolphin using 8-3/4 inch diameter, Grade 304 stainless steel bolts, embedded in epoxy.

As-built details and other documents of completed repairs were made available to Cash & Associates for review and are listed in Appendix A, Reference Listing.

It is our understanding that the facility was operational from the date that work was completed until 13 October 2001, when a subsequent 7.0 magnitude earthquake again damaged the facility.

Cozen O'Connor Attorneys
Mr. Forrest Booth
Carlsmith Ball LLP
Mr. David Ledger
May 12, 2004

FOXTROT PIER F1
PORT AUTHORITY OF GUAM
Cozen O'Connor Reference No. 123206
(C&A Project No. 6090.00)
Page 3

## VISUAL OBSERVATIONS

Oceaneer Enterprises, Inc, Piti, Guam performed a post-earthquake survey of the mooring and breasting dolphins on October 13, 2001. Their visual observation of the damage revealed that the epoxy securing the stainless steel bolts embedded into the underside of the dolphin had failed. In a high percentage of the total number bolts, the epoxy had failed to harden or in some cases was absent. In more than one bolt location epoxy that had flowed out of the predrilled hole was observed in and around the steel flange below it.

Of the 216 bolts securing the piles of Dolphin A, only two (2) remained undisturbed by the event. Failure of the epoxy is a technical consideration that is not part of this report, however, it is highly unusual for nearly all the connecting elements to fail if the design meets the service requirements contained in the Uniform Building Code.

On March 3, 2004, I was afforded the opportunity to observe the damage from the water using a port provided pram. At the time of my observations, initial repairs to the 2001 earthquake damage had been undertaken and pier Foxtrot "F1" was partially operational. Safety considerations prevented observations from beneath the deck. Dolphin H did not sustain damage as it had been completely replaced as part of the 1996 repairs, however unrepaired damage was clearly evident on Dolphins A, B C D and G. Each of these dolphins, with the exception of Dolphin H, exhibited common bolt withdrawal damage at the flange.

Digital photographs of the pile flange bolt failure, taken on the March 3, 2004, are included in Appendix B, Photographs.

## BOLT FAILURE

Review of the information provided to Cash & Associates indicated that Black Construction Company had submitted and the Port Authority (through their Projects representatives) had approved, with conditions, a substitution of the epoxy system used in anchoring the bolts to the concrete deck. The epoxy system proposed on Drawing Sheet VE-1 was Redi-Chem Anchors manufactured by Phillips Drill Company, Catalog Number CE 3495. The epoxy components (Parts A & B) of the Redi-Chem Anchor are encased in separate glass capsules that combine when the glass is ruptured after insertion in a predrilled hole. In practice, the threaded rod ruptures the capsule when forced through it and the components are then combined by rotation of the threaded rod with an ordinary power drill. The advantage of this system is that the components are pre-measured and mixing is assured once the threaded rod is spun for a few seconds with a drill.

Anchor-It Epoxy Systems, Solidbond HR 200, was the substitute product submitted (Project Submittal 18a, Epoxy Fastening System) by Black Construction Co as an equal to the specified Redi-Chem System. Approval was conditioned by four comments, Conditions (c) and (d), submit manufacturers certificate of compliance and submit test data by independent testing laboratory, and were never to the best of my knowledge received. Furthermore, the ICBO approval for use of this product (Report No. 4398) requires:

Cozen O'Connor Attorneys
Mr. Forrest Booth
Carlsmith Ball LLP
Mr. David Ledger
May 12, 2004

FOXTROT PIER F1
PORT AUTHORITY OF GUAM
Cozen O'Connor Reference No. 123206
(C&A Project No. 6090.00)
Page 4

*Special inspection in accordance with Section 306(a) 12 of the code shall be provided for all anchor installations.*

The Anchor-It Epoxy System relies on combining the two components in a mixing nozzle, which is then injected into the predrilled hole. In overhead installations, a plug is inserted into the predrilled hole to prevent the run out of the epoxy. The bolt is then inserted through the plug and the mixture allowed to cure. There are two inherent problems installing anchors in overhead applications. The first is assuring that adequate but not excessive epoxy is injected in the hole. Too little epoxy and there is insufficient material to assure a complete bond through the entire depth or if too much, the seal formed by the plug is voided and the epoxy will leak.

The system of mixing for the Anchor-It Epoxy is significantly more complex than that proposed by the Redi-Chem Epoxy System. The complexity of the overhead bolt installation combined with the critical nature of the bolt to pile connection should have placed a responsibility on Black Construction Co. to notify the port of the need for special inspection.

Black Construction Co. as a matter of proper construction practice, should have been aware of the critical importance of the pile flange to concrete connection. The performance of individual dolphins in berthing and mooring operations, not to mention seismic events, relied on the capacity of that connection. During the bolt installation process, the loss of epoxy would have been evident to those installing the materials on a daily basis. The critical nature this element should have made it obvious to Black Construction that minimum testing to establish full epoxy cure should have been undertaken as part of their ordinary quality control described in Section 1400 of the project specifications. This could have been accomplished with an ordinary deep socket and automotive torque wrench.

## SERVICE LOADING

Service load requirements for the dolphins at the Foxtrot "F1" facility fall into four categories as follows:

### Gravity Loads

Gravity loads on the surface due to equipment, product and personnel. These loads are insignificant in comparison to berthing, mooring and seismic loads

### Berthing Loads

Dynamic loads due to berthing forces generated during docking and/or maneuvering transmitted through the fender system to the structural elements. The critical elements in determining berthing forces are the vessel size combined with approach velocity and direction during this operation. According to the calculations prepared by EMPSCO Consulting Engineers, the facility was designed to accommodate 90,000 DWT vessels. Confirmation of the vessel size calling at Foxtrot "F1" was not received from Shell Guam Inc.

Cozen O'Connor Attorneys
Mr. Forrest Booth
Carlsmith Ball LLP
Mr. David Ledger
May 12, 2004

FOXTROT PIER F1
PORT AUTHORITY OF GUAM
Cozen O'Connor Reference No. 123206
(C&A Project No. 6090.00)
Page 5

It is generally accepted that the most severe angle at which the vessel will approach the berth is 10 degrees, measured relative to the centerline or keel relative to the face of the fender. Vessel speed is less exact and can vary with the capability of the pilot and tug assist at the berth. For design purposes, J.U. Brolsma, et al, developed the generally accepted variables for approach velocity, in his 1977 paper " On Fender Design and Berthing Velocities" presented to the PIANC 24th Congress, Leningrad. From Brolsma's graph of these variables, the approach velocity for a 100,000 DWT vessel is approximately 0.03 to 0.04 cm/sec. The as-built drawings identify the fenders as Trellex-Morse type MV 1250X900A and 1000X900A fenders for dolphins C/D and G/H respectively. The berthing energy obtained from the application manual for Type MV fenders published by Trellex-Morse in 1993 is as follows:

*Dolphins C/D, 355 Ft-Kips with a reaction force at maximum compression of 189 Kips for the MV 1250x900A fender*

*Dolphins G/H, 226 Ft-Kips with a reaction force at maximum compression of 151 Kips for the MV 1000X900A fender.*

A separate load acting parallel and equal to approximately one third the reaction force also is considered. The location of this load, at the face of the fender, induces a torsional moment around the pile group of the dolphin. The effect of torsional moment was considered in the overall berthing and mooring analysis that follows.

## Mooring Loads

Mooring dolphins at the Foxtrot "F1" facility are Dolphins A and B offshore and E and F onshore. Mooring loads generated by wind acting through mooring lines are limited to 100 tons by the Capstan Hook Assembly located at the center of each dolphin. . The capacity of this assembly was obtained from shop drawing data (Submittal Number 13) provided with other information to Cash & Associates. In my evaluation of the forces generated by the Capstan Hook Assembly, I have assumed that the mooring lines are positioned at an angle of 45 degrees to the face of the dolphin and at an angle above the horizon of 30 degrees. These angles will vary with each ship that is moored, its position relative to the loading arms on the main pier and with the tide.

## Seismic Loads

Seismic loading generated by earthquake activity and the resulting analyses are based on the 1994 Edition of the Uniform Building Code (UBC) which was the governing code in the Territory of Guam at the time of the original design. Two approaches were implemented; one using static analysis and the other using a computer generated dynamic analysis. The static analysis is based on the premise that the dolphins are non-building structures and therefore subject to a particular set of code requirements for determining the seismic forces in the structure. The computer generated dynamic analyses were based on the 1994 UBC Response Spectra (S1 Soil Profile assumed), scaled to 0.3 for Seismic Zone 3 (Guam). The results of the static analyses were used to check allowable bolt forces versus the code static force levels on a

Cozen O'Connor Attorneys
Mr. Forrest Booth
Carlsmith Ball LLP
Mr. David Ledger
May 12, 2004

FOXTROT PIER F1
PORT AUTHORITY OF GUAM
Cozen O'Connor Reference No. 123206
(C&A Project No. 6090.00)
Page 6

working stress basis; whereas the dynamic analysis results was used to check anchor bolt adequacy using ultimate test capacities compared to the response spectra results unreduced by Rw (which would be 3 for this type of structure). As a general check on the compatibility of static and dynamic analyses, additional analyses were conducted using the dynamic analysis results scaled to the static level base shears.

Computer models of Dolphins A, B, C, D and H were developed and considered each of the loads described above.

**Computer Modeling**

SAP 2000 computer models were developed for each of the five dolphin structures noted above. The models were based entirely on the information presented in the as-built drawings prepared by EMPSCO Consulting Engineers and made available for review to Cash and Associates. The models were linear and three-dimensional, using thick concrete shell elements for the dolphin decks (which varied from about 4 feet to over 8 feet thick), and frame elements to model the piles (typically 22 inch diameter steel pipe).

The models were made as realistic as was reasonably achievable by modeling the pile depths in accordance with the seafloor contours provided in the as-built drawings; that is, each pile has a unique length/depth based on whether it is a vertical or battered pile, and at what depth it achieves effective fixity at the seafloor. Based on our experience, it was assumed that the effective depth of fixity was 8.5 feet below the surface seafloor contours as presented on the as-built drawings. For battered piles, we developed a methodology for determining point of pile fixity at the seafloor by establishing a system of linear equations, one equation for the pile and one equation for the sloping seafloor, and solved the set of equations for each pile to find the point of intersection.

Ship berthing forces consist of a component of force applied perpendicular to and toward the face of the dolphin, and a component parallel to the dolphin, acting in either parallel direction at a distance of 3 feet from the face of the dolphin. This offset resulted in a significant additional moment applied to the center of gravity (c.g.) of the dolphin deck.

Because both static and dynamic seismic analyses were conducted, and ship berthing and mooring forces were applied, numerous possible load combinations were considered. That is, the seismic forces can act positively or negatively in both the North/South and East/West directions, and the parallel ship berthing forces can act in either a westerly or easterly direction. The perpendicular ship berthing force was applied into the face (i.e. northerly) for all load cases. Based on a number of preliminary analyses, it was determined that 8 different load cases of static and dynamic seismic and berthing and mooring forces had to be considered for each pile structure. These load cases are detailed in Appendix C, Tables 1 through 11. Note that the static and dynamic analyses without ship berthing and mooring were also conducted to obtain a preliminary understanding of the connection adequacy based on code seismic requirements alone. Additionally, the plastic moment capacity of a 22-inch diameter pile was compared to the

Cozen O'Connor Attorneys
Mr. Forrest Booth
Carlsmith Ball LLP
Mr. David Ledger
May 12, 2004

FOXTROT PIER F1
PORT AUTHORITY OF GUAM
Cozen O'Connor Reference No. 123206
(C&A Project No. 6090.00)
Page 7

capacity of the anchor bolts in the repair connection as an additional measurement of the adequacy of the connection.

## Analyses of Pile Flange Connection

The focus of the stress analysis work was solely on the anchor bolt capacity, primarily because this was the predominant mode of failure in these connections as a result of the 2001 earthquake. Thus, a simple model of the 8-bolt anchor bolt connection was developed to determine bolt loads based on the output from the detailed dolphin computer models. Specifically, the end forces in global coordinates from the piles at the underside of the dolphins were taken from the main computer analyses of the dolphins, and inserted into the three dimensional SAP 2000 model of the 8-bolt connection to determine forces in each bolt. All six (6) components of force (shears, tension and moments) were input. This simplified model of the 8-bolt connection was based on the assumption of a rigid based plate and large tension forces in combination with large bending forces that resulted in all bolts being in combined shear and tension. The analysis results proved this assumption to be correct for nearly every governing pile in each dolphin.

## Analysis, Results and Conclusions

Refer to the Appendix C, Tables 1 through 12 for details. For the purposes of determining the adequacy of the anchor bolts, manufacturer's data on the maximum allowable load per bolt was used for comparing to calculated demands. Since the specified Redi-Chem Anchors are no longer available, a similar glass capsule anchor bolt of the same size, material type and embedment was used in our analysis. The product selected is manufactured by ITW Ramset/Red Head, Catalog Reference Epcon A7 Adhesive Anchor. Manufacturer's data for ¾-inch diameter stainless steel bolts with a concrete embedment depth of 6-3/4 inches was used. This data showed that the maximum design load for shear and tension is based on bond capacity of the epoxy material. Those loads are 5,030 pounds in shear and 7,430 pounds in tension. The manufacturer notes that these values are based on a factor of safety of 4 applied to test results, so "ultimate" or test capacities for these bolts, when properly installed, were calculated to be 20,120 pounds in shear, and 29,720 pounds in tension.

The results of the seismic analysis, both with and without ship berthing and mooring forces, can be summarized as follows (note that gravity loads are included in all cases):

> The bolts, even if properly installed, are inadequately designed based on any reasonable interpretation and application of the requirements of the 1994 UBC.

➢ Based on static seismic analysis requirements for non-building structures of this type, in conjunction with the specified ship berthing and mooring forces, the demand/capacity (D/C) ratios vary from 3.4 to 7.1 on a working stress basis. A D/C of 1.0 maximum is acceptable; any values over 1.0 indicate an overstress condition.

Cozen O'Connor Attorneys
Mr. Forrest Booth
Carlsmith Ball LLP
Mr. David Ledger
May 12, 2004

FOXTROT PIER F1
PORT AUTHORITY OF GUAM
Cozen O'Connor Reference No. 123206
(C&A Project No. 6090.00)
Page 8

> Based on dynamic analysis results, in conjunction with ship berthing and mooring forces, D/C ratios vary from 1.8 to 2.8 when comparing raw earthquake force levels to ultimate test capacities of the anchor bolts.

> Based on dynamic analyses scaled down to static based shear levels for working stress comparison purposes, and eliminating the ship berthing and mooring forces, the D/C ratios vary from 2.3 to 3.6 on a working stress level.

> For Dolphin A, applying only the static seismic forces yields a D/C of 3.43, whereas the dynamic result scaled to the static base shear for this same dolphin yielded a D/C of 3.61.

As shown above, all reasonable avenues of investigation have been considered and, in each case, it was shown that the anchor bolts are significantly overstressed for code level requirements regardless of whether berthing or mooring loads are considered in conjunction with seismic forces. The demand to capacity ratios for the bolts indicate that the design on Drawing Sheet VE-1 is incapable of meeting the requirements of the intended use of the Foxtrot "F1" facility, namely berthing and mooring of 90,000 DWT tankers. Detailed summaries of all loading combinations, displacements, reactions, bolt loadings for static and dynamic analysis and other details of the computer investigation are contained in Appendix C, Tables 1 through 12.

Technical information (i.e., code citations and equations, calculations, modeling details, and computer input and output data) are kept to a minimum in the narratives presented herein for brevity and simplicity. This information can be made available, if requested. Appendix C, Tables 1 through 12, are spreadsheets of project results and contain an appropriate amount of technical data as necessary to communicate the results of this work.

## EXECUTIVE SUMMARY

Seismic analyses of Dolphins A, B, C, D and G were conducted in accordance with the 1994 Edition of the Uniform Building Code (UBC). Computer runs were made with and without ship berthing and mooring forces acting in combination with earthquake forces. The adequacy of the anchor bolt designs in the failed connections was measured through the use of Demand/Capacity (D/C ratios). The "Demand" is the earthquake force level (in combination with gravity forces, and in some cases ship berthing and mooring forces), and "Capacity" is based on the anchor bolt manufacturer's test data, which has been approved for use by the International Conference of Building Officials (ICBO), the governing code authority. D/C ratios in excess of 1.0 are not acceptable as they indicate excessive stress levels.

We found that for all cases considering seismic, ship berthing and mooring loads, the D/C ratios varied from 1.78 to 7.13. In all cases where no ship berthing and mooring loads were considered in combination with seismic loads, the D/C ratios varied from 2.27 to 3.61. Based on these findings, it can be concluded that the design of the anchor bolts was not adequate relative to 1994 UBC requirements.

Cozen O'Connor Attorneys
Mr. Forrest Booth
Carlsmith Ball LLP
Mr. David Ledger
May 12, 2004

FOXTROT PIER F1
PORT AUTHORITY OF GUAM
Cozen O'Connor Reference No. 123206
(C&A Project No. 6090.00)
Page 9

Reasonable analysis by Winsler & Kelley would have revealed deficiencies in their design. Even a simple static analysis would have shown that the bolts connecting the pile flange to the dolphins were insufficient in diameter and/or number. Disregarding the deficiencies in the design, the critical nature of this connection should have required Winsler & Kelley to request Black Construction Co. to assure that special inspection was taken during the installation of the epoxy, regardless of what product was used. This requirement would be even more important since their product specification (Note 2 of Drawing Sheet VE-1) refers to the Redi-Chem Epoxy System or **approved equal**. This opens the door for substitution and, owing to the variability in product application, it is the Engineer's responsibility to see that critical elements of his design are correctly completed in accordance with his intentions. If an equal were to be allowed, proper engineering practice would have been to see that adequate inspection was undertaken to assure the design would function as intended.

The substitution of the epoxy system was proposed by Black Construction Co. for their advantage, be it either in product availability or at lower cost. Black Construction Co. had a similar duty as Winzler & Kelly to the success of the project, namely to complete a repair project that met the functional requirements of the design. Black Construction Co. had a quality control requirement established in the specifications for this project, but absent that, it was their substitute product, Anchor-It Epoxy, that required special inspection. It would then follow that Black Construction Co, should have provided special inspection or insisted that the Port Authority provide it. Even if special inspection was not provided Black Construction Co. was aware of the critical nature of this connection and even a simple automotive torque wrench test would have identified uncured epoxy. Proper construction practice cannot be ignored where installation is difficult and the element under installation is so critical to the project.

I thank you for this opportunity to be of service in this matter. If you have any questions, please contact me.

Very truly yours,
CASH & ASSOCIATES

Elliott H. Boone, S.E.
Executive Vice President

EHB:cd
G:projects/ehb/609000/Rule26reportpdf.doc

Attachments:

Drawing Sheet VE-1, Winzler & Kelly (Reduced Copy)
Appendix A     Reference Listing
Appendix B     Photographs
Appendix C     Table 1 – 11 Spreadsheets



# APPENDIX A

## REFERENCE LISTING

# APPENDIX A

## REFERENCE LISTING

<table>
<tr><td colspan="2" align="center"><b><u>Port Authority of Guam</u></b><br><br>INDEX OF DOCUMENTS AND TESTIMONY REVIEWED<br>The following is a partial listing.</td></tr>
<tr><td><b>Number</b></td><td><b>Subject of Documents</b></td></tr>
<tr><td>1</td><td>Drawings, Calculations, Correspondence and other documents produced in litigation by Winzler & Kelly concerning the repairs performed in 1996 – Bates Nos. 00028-00462</td></tr>
<tr><td>2</td><td>Shell F-1 Pier Temporary Repair Evaluation prepared by Duenas & Associates</td></tr>
<tr><td>3</td><td>As Built drawings prepared by Black Construction Co for the project</td></tr>
<tr><td>4</td><td>Winzler & Kelly Drawing VE-1</td></tr>
<tr><td>5</td><td>Structural Calculations for Repairs to Dolphins A, B, C, &D Foxtrot (F-1) Pier prepared by Winzler & Kelly dated December 1995</td></tr>
<tr><td>6</td><td>Responses of Black Construction to Plaintiff S. J. Gargrave's First Set of Interrogatories</td></tr>
<tr><td>7</td><td>Report of video survey, Pier F 1, Commercial Port of Guam, Oceaneer Enterprises, Piti, Guam. Report number GUA-J-01-2519-UW</td></tr>
<tr><td>8</td><td>Various other documents produced by councel relative to this matter contained in 8 four inch thick three ring binders</td></tr>
<tr><td>9</td><td>Deposition of Bruce Swanney of Winzler & Kelly</td></tr>
</table>

1 of 1

# APPENDIX B

## PHOTOGRAPHS



Dolphin A



Bolt Withdrawal at Dolphin A



**Bolt Withdrawal at Dolphin B**



**Bolt Withdrawal at Dolphin C**



**Bolt Withdrawl – Dolphin Not Identified**



**Bolt Withdrawal at Dolphin C**



**Bolt Withdrawal at Dolphin G**

# APPENDIX C

## TABLES 1 – 12
## SPREADSHEETS

# Port of Guam
## Seismic Analysis of Berthing Dolphins A, B, C, D & G

**Analysis Parameters**

Vstatic = ZICW/Rw, Z = 0.3, I = 1.0, C = 2.75, Rw = 3; V = 0.275W

Vdynamic = 94UBC, S1 soil, scaled to 0.3g, **unreduced by Rw**

Bolts = 3/4" dia. ss 304 epoxy anchors with 6-3/4" embed, Vallow = 5030#, Tallow = 7430#

(note: FS = 4 per mfr on test data, assumed 4,000 psi conc.; ChemSet data not available, used Ramset Epcon 7 product data)

Ship P = ship impact perpendicular to face, Ship V = ship impact at 3' from face, Ship M = V times dist to CG of dolphin deck

**Explanation of Static and Dynamic Load Cases**

| | |
|---|---|
| **DLSI1** | Static seismic northerly direction, perpendicular ship impact into face of dolphin, parallel ship impact in westerly direction |
| **DLSI2** | Static seismic northerly direction, perpendicular ship impact into face of dolphin, parallel ship impact in easterly direction |
| **DLSI3** | Static seismic westerly direction, perpendicular ship impact into face of dolphin, parallel ship impact in westerly direction |
| **DLSI4** | Static seismic easterly direction, perpendicular ship impact into face of dolphin, parallel ship impact in easterly direction |
| **DDYI1** | Dynamic seismic east-west direction, perpendicular ship impact into face of dolphin, parallel ship impact in westerly direction |
| **DDYI2** | Dynamic seismic east-west direction, perpendicular ship impact into face of dolphin, parallel ship impact in easterly direction |
| **DDYI3** | Dynamic seismic north-south direction, perpendicular ship impact into face of dolphin, parallel ship impact in westerly direction |
| **DDYI3** | Dynamic seismic north-south direction, perpendicular ship impact into face of dolphin, parallel ship impact in easterly direction |
| **Note:** | Also conducted UBC 94 static and dynamic analyses with DL only; no impact forces. |
| | Checked req'd bolt tension to resist plastic capacity of 22" pipe section. |

**Table 1 - Summary of Modal Analyses, Ship Impact Loads, and Static/Dynamic Base Shears**

| Dolphin | Wt./Mass (Wt = kips) | T, Mode 1 (T = sec.) | T, Mode 2 | T, Mode 3 | Ship P (kips) | Ship V (kips) | Ship M (in-kips) | Vstatic (kips) | Vdynamic (kips) |
|---|---|---|---|---|---|---|---|---|---|
| A | 568/1.47 | 0.63 | 0.61 | 0.41 | 141 | 141 | 27264 | 156 | 217 |
| B | 533/1.38 | 0.3 | 0.29 | 0.26 | 141 | 141 | 27264 | 147 | 307 |
| C | 1113/2.88 | 0.46 | 0.31 | 0.29 | 80 | 24 | 5616 | 306 | 756 |
| D | 1155/2.99 | 0.51 | 0.36 | 0.33 | 80 | 24 | 5616 | 318 | 738 |
| G | 490/1.27 | 1.73 | 0.33 | 0.3 | 25 | 8 | 1128 | 135 | 313 |

**Notes:**

Piles at Dolphin A are twice as long as piles at Dolphin B

Dolphin G has no batter piles in EW direction, thus very flexible

1

# Port of Guam
## Seismic Analysis of Berthing Dolphins A, B, C, D & G

Table 2 - Maximum Static Displacements (inches)

| Dolphin | DLSI1 | DLSI2 | DLSI3 | DLSI4 |
|---------|-------|-------|-------|-------|
| A | 3.85 | 3.56 | 3.49 | 4.29 |
| B | 0.96 | 0.85 | 0.82 | 0.98 |
| C | 0.21 | 0.21 | 0.67 | 0.67 |
| D | 0.3 | 0.27 | 0.82 | 0.83 |
| G | 0.53 | 0.53 | 9.26 | 9.26 |

Table 3 - Maximum Dynamic Displacements (inches)

| Dolphin | DDYI1 | DDYI2 | DDYI3 | DDYI4 |
|---------|-------|-------|-------|-------|
| A | 3.88 | 3.88 | 4.29 | 3.86 |
| B | 1.14 | 1.31 | 1.32 | 0.74 |
| C | 0.71 | 0.71 | 1.54 | 1.53 |
| D | 1.72 | 1.73 | 0.97 | 0.9 |
| G | 5.49 | 5.49 | 0.62 | 0.99 |

Table 4 - Worst-Case Pile Reactions at Dolphin - Static Seismic Combos (kips and inch-kips)
(worst case is max. tension in the connection)

| Dolphin | Vx | Vy | Vz | Mx | My | Mz | Gov. Case |
|---------|------|------|------|------|------|------|-----------|
| A | 198.32 | 0.72 | 470.22 | 438.7 | -107.85 | -401.82 | DLSI4 |
| B | 1.44 | 113.7 | 256.57 | 1196.37 | -288.51 | 87.1 | DLSI1 |
| C | 0.17 | -0.7 | 148.72 | 276.59 | 70.48 | 7.85 | DLSI3 |
| D | -0.19 | -66.89 | 158.98 | 137.44 | -70.32 | 0.14 | DLSI3 |
| G | -19.9 | 12.29 | 48.43 | 4081.82 | 59.01 | 1733.92 | DLSI3 |

2

# Port of Guam
## Seismic Analysis of Berthing Dolphins A, B, C, D & G

Table 5 - Worst-Case Pile Reactions at Dolphin - Dynamic Seismic Combos (kips and inch-kips)
(worst case is max. tension in the connection)

| Dolphin | Vx | Vy | Vz | Mx | My | Mz | Gov. Case |
|---|---|---|---|---|---|---|---|
| A | 176.4 | 1.06 | 418.66 | 642.13 | 70.49 | -208.26 | DDYI4 |
| B | 124.98 | 0.2 | 293.13 | 84.87 | 76.79 | 226.39 | DDYI2 |
| C | 111.31 | 0.96 | 273.55 | 374.52 | -171.32 | 114.62 | DDYI4 |
| D | 121.04 | 0.03 | 289.21 | 59.54 | -174.59 | 23.26 | DDYI3 |
| G | 58.16 | 0.93 | 155.97 | 314.41 | 925.3 | 188.26 | DDYI3 |

Table 6 - Worst-Case Bolt Loads - Static Seismic Combos (kips)

| Dolphin | Vmax | Tmax | Vallow | Tallow | Vm/Va | Tm/Ta | |
|---|---|---|---|---|---|---|---|
| A | 29.2 | 68.7 | 5.03 | 7.43 | 5.81 | 9.25 | 6.65 |
| B | 14.2 | 56.7 | 5.03 | 7.43 | 2.82 | 7.63 | 5.24 |
| C | 0.1 | 24.9 | 5.03 | 7.43 | 0.02 | 3.35 | 2.16 |
| D | 8.5 | 24.5 | 5.03 | 7.43 | 1.69 | 3.30 | 3.41 |
| G | ▮ | | 5.03 | 7.43 | 4.41 | 13.26 | 7.13 |

Not valid as some bolts are in compression; model is valid only for all bolts in tension
Using sum of 5/3 roots Vm/Va and Tm/Ta

Table 7 - Worst-Case Bolt Loads - Dynamic Seismic Combos (kips)

| Dolphin | Vmax | Tmax | | Vm/Vu | Tm/Tu | |
|---|---|---|---|---|---|---|
| A | 24.3 | 66.9 | | 1.21 | 2.25 | 2.75 |
| B | 17.4 | 41.2 | | 0.86 | 1.39 | 2.13 |
| C | 12.5 | 42.7 | | 0.62 | 1.44 | 1.99 |
| D | 14.9 | 38.0 | | 0.74 | 1.28 | 2.00 |
| G | 7.4 | 41.8 | | 0.37 | 1.41 | 1.78 |

Based on 4x allowbles assuming failure mode is bond strength
Using sum of 5/3 roots Vm/Va and Tm/Ta

3

# Port of Guam
## Seismic Analysis of Berthing Dolphins A, B, C, D & G

Table 8 - DL + 94UBC Spectra Scaled to Vstatic; no ship impact - Worst Case Pile Reactions (global, kips and inch-kips)

| Dolphin | Vx | Vy | Vz | Mx | My | Mz |
|---|---|---|---|---|---|---|
| A | 63.94 | 0.42 | 154.75 | 263.89 | 409.27 | 82.91 |
| B | 31.17 | 0.3 | 74.54 | 102.58 | 166.03 | 52.26 |
| C | 61.96 | -0.001 | 154.08 | 18.16 | -191.46 | -0.3 |
| D | 70.94 | 0.32 | 171.44 | 177.84 | -275.65 | 44.73 |
| G | 0.59 | 0.02 | 187.35 | 3.31 | 197.79 | 4.32 |

Table 9 - Worst-Case Bolt Loads for DL + 94 UBC Spectra Scaled to Vstatic: No ship impact

| Dolphin | Vmax | Tmax | Vallow | Tallow | Vm/Va | Tm/Ta | D/C |
|---|---|---|---|---|---|---|---|
| A | 7.36 | 31.18 | 5.03 | 7.43 | 1.46 | 4.20 | 3.61 |
| B | 3.49 | 14.13 | 5.03 | 7.43 | 0.69 | 1.90 | 2.27 |
| C | 7.75 | 22.2 | 5.03 | 7.43 | 1.54 | 2.99 | 3.23 |
| D | 8.47 | 27.57 | 5.03 | 7.43 | 1.68 | 3.71 | 3.55 |
| G | 0.13 | 27.93 | 5.03 | 7.43 | 0.03 | 3.76 | 2.33 |

Table 10 - DL + Vstatic, No Ship Impact - Worst Case Pile Reactions Dolphin A only for comparison purposes (global, kips and inches)

| Dolphin | Vx | Vy | Vz | Mx | My | Mz |
|---|---|---|---|---|---|---|
| A | 57.84 | 0.34 | 140.37 | 207.5 | 232.3 | -110.79 |

Table 11 - DL + Vstatic, No Ship Impact - Worst Case Bolt Loads Dolphin A only (global, kips and inches)

| Dolphin | Vmax | Tmax | Vallow | Tallow | Vm/Va | Tm/Ta | D/C |
|---|---|---|---|---|---|---|---|
| A | 8.15 | 25.54 | 5.03 | 7.43 | 1.62 | 3.44 | 3.43 |

Table 12 - Bolt Loads for Plastic Capacity of 22" Dia. Pile/0.375" thick - Mp = 6314 "-k based on 36 ksi yield

Tmax = 143k, which is nearly 5x greater than published tension test capacity of 29.72 kips

D/C = 4.8

# EXHIBIT H



**PORT AUTHORITY OF GUAM**
**GOVERNMENT OF GUAM**
**1026 CABRAS HIGHWAY**
**SUITE 201 PITI GUAM 96925**

## ENGINEERING DOCUMENTATION REPORT

FOR

**REPAIRS AND UPGRADING TO FOXTROT "F–1" PIER**
**APRA HARBOR                     GUAM, MI.**

SUBMITTED BY:

**EMPSCO–Engineering Consultants**

o   Suite 245 Julale Shopping Center
Agana, Guam 96910

o   2nd Floor Island Commercial Building
Gualo Rai Saipan MP 96950

Case 1:03-cv-00009    Document 200-3    Filed 06/09/2005    Page 7 of 30

1.



PORT AUTHORITY OF GUAM
GOVERNMENT OF GUAM
1026 CABRAS HIGHWAY
SUITE 201 PITI GUAM 96925

# DESIGN CALCULATIONS

FOR

# REPAIRS AND UPGRADING TO FOXTROT "F–1" PIER
# APRA HARBOR                    GUAM, MI.

SUBMITTED BY:

**EMPSCO–Engineering Consultants**

o    Suite 245 Julale Shopping Center
     Agana, Guam 96910

o    2nd Floor Island Commercial Building
     Gualo Rai Saipan MP 96950

APPROVED BY:

**EULOGIO A. BERMUDES**
General Manager
PORT AUTHORITY OF GUAM

2.



**PORT AUTHORITY OF GUAM**
**GOVERNMENT OF GUAM**
**1026 CABRAS HIGHWAY**
**SUITE 201 PITI GUAM 96925**

**FILE COPY**

## SPECIFICATIONS

FOR

**REPAIRS AND UPGRADING TO FOXTROT "F-1" PIER**
**APRA HARBOR                          GUAM, MI.**

SUBMITTED BY:

**EMPSCO–Engineering Consultants**

o      Suite 245 Julale Shopping Center
       Agana, Guam 96910

o      2nd Floor Island Commercial Building
       Gualo Rai Saipan MP 96950

APPROVED BY:

**EULOGIO A. BERMUDES**
General Manager
PORT AUTHORITY OF GUAM

4 - 1

3.

This certifies that this work was prepared by me or under my direct supervision.
01/10/04

GRD — GRADE
GTA — GUAM TELEPHONE AUTHORITY
GV — GATEVALVE
GW — GUY WIRE
HL — HEADWALL
HGWL — HEIGHT
HOR. — HORIZONTAL
ID — INSIDE DIAMETER
IMPVMT — IMPROVEMENT
IN. — INCH
INV. — INVERT
LB — POUND
LF — LINEAL FEET
MIN. — MINUTE
MAX — MAXIMUM
MIN — MINIMUM
MH — MANHOLE

STR. — STRONG
TL — TELEPHONE LINE
TB — TELEPHONE BOX
TEL. — TELEPHONE
THK — THICK
TMH — TELEPHONE MANHOLE
TYP. — TYPICAL
VB — VALVE BOX
VC — VINYL CHLORIDE
VERT. — VERTICAL
VIT. — VITREOUS
W — WEST
WS — WIDTH OF TRENCH
W/ — WITH
WLP — WOODEN LIGHT POLE
WMH — WATER MANHOLE
WPP — WOODEN POWER POLE
N. — NORTH

| NO. | DATE | BY | R E V I S I O N | APPROVAL |
|---|---|---|---|---|

**EMPSCO**
Engineering Management
& Planning Services Corporation

| DESIGN | DRAWN | CHECKED |
|---|---|---|
| RMCA | JGL | PQV |

**PORT AUTHORITY OF GUAM**
GOVERNMENT OF GUAM

REPAIR & UPGRADING TO FOXTROT T-T PIER
APRA HARBOR, GUAM

TITLE SHEET; LOCATION MAP, VICINITY MAP, SHEET CONTENTS, ABBREVIATION

| | DATE |
|---|---|
| EULOGIO A. BERMUDES | |
| GENERAL MANAGER, PAG | |

SCALE AS SHOWN

SHT 1 OF 22

SHT. NO. T-1

4.

# EXHIBIT I



April 21, 2005

Attention: Mr. Forrest Booth
Cozen O'Connor Attorneys
424 California Street, Suite 2400
San Francisco, CA 94194-2215

Attention: Mr. David Ledger
Carlsmith Ball LLP
P.O. Box BF
Hagatna, Guam 96932-5027

Subject:    FOXTROT F-1 PIER
            PORT AUTHORITY OF GUAM
            Cozen O'Connor Reference No. 123206
            (C&A Project No. 6090.00)

Gentlemen:

In light of the additional information which you have provided, I have reviewed and given more thought to this assignment. As a result of this effort, I have reached some additional conclusions to those set forth in my letter May 12, 2004.

I have concluded a review of the documentation provided to me relating to the role of Engineering, Management & Planning Services Corporation (EMPSCO), Agana, Guam as engineering consultants retained under contract to the Port Authority of Guam (PAG) in the Foxtrot F-1 Pier matter. EMPSCO was retained under contract by the PAG to prepare construction contract documents, commonly referred to as plans and specifications, in a format suitable for pubic bid . As part of that contract EMPSCO was also required to review and comment on the Contractor's proposed methods of repair, and on the products and materials to be used in the repairs and upgrade to the Foxtrot F-1 Pier.

At the conclusion of the bidding process, PAG received a suggested change to the construction documents from the apparent low bidder, Black Construction Corporation (BCC). The suggested change, depicted in the drawing known as Sheet VE-1, was prepared by Winzler & Kelley (W&K), was accepted by the PAG and was incorporated into the construction contract and constructed by BCC.

BCC submitted its Submittal No 12 - Proposed Pile Repair Details: W&K Drawing Sheet VE-1 Job No 9642404 (dated 04/04/96) to EMPSCO as part of the review process established in Specification Section 01300, Submittals. The review comments returned by EMPSCO were as follows:

5772 Boisa Avenue, Suite 100 ■ Huntington Beach, CA 92649 USA ■ TEL:714.895.2072 ■ FAX 714.895.1291
Mail: P.O. Box 2715, Huntington Beach, CA 92647-0715 ■ Web Site: www.cashassociates.com ■ A California Corporation

Case 1:03-cv-00009    Document 200-3    Filed 06/09/2005    Page 12 of 30

Mr. Forrest Booth
Cozen O'Connor Attorneys
Mr. David Ledger
Carlsmith Ball LLP
April 21, 2005

FOXTROT F-1 PIER
PORT AUTHORITY OF GUAM
Cozen O'Connor Reference No. 123206
(C&A Project No. 6090.00)
Page 2

Our review of Submittal No. 12 raises the following comments:

1.   The general concept outlining the proposed method of repair is hereby approved in concept.

2.   Specifications requirements for welds should clearly be indicated.

3.   Establish and Identify lengths of new pile sections.

4.   Provide statements by way of describing on (sic) orderly progression of the work involve (sic).

5.   Provide structural calculations verifying that proposed repair meets design requirements. (emphasis added)

6.   In reference to detail NO. 3 of Sheet VE-1; there is concern regarding the condition of the base plate attachment to the existing concrete pile cap. It is assumed that the a (sic) portion of the existing corroded steel pile is embedded into the concrete pile cap. How does the contractor intend to treat this existing condition prior to installing the new base plate.

This submittal is hereby forwarded with our action recommending "approval as noted".

I noted that of the six items, five of them require action by BCC. I find no response to an essential element of the repair, i.e., that calculations be provided verifying that the proposed repair meets the design requirements or that such information was subsequently reviewed by EMPSCO, as required as a condition of their approval.

Regarding Submittal No 18a, Epoxy Bolts for Steel Plate Anchor, the review comments returned by EMPSCO were as follows:

Review of submittal No . 18a is hereby forwarded with the following comments:

(a)   This submittal applies to the use of epoxy resin materials
(b)   Submit other pertinent items relevant to the use of epoxy bolts for this project.
(c)   Submit manufacturer's certificate of compliance.
(d)   Submit test datas (sic) by independent laboratory testing.

We recommend approval of this submittal subject to the above comments.

The review by EMPSCO does not reflect the fact that BCC was requesting a substitution of the epoxy system shown on drawing Sheet VE-1, which should have drawn more attention from the Engineer of Record for VE-1, W&K. EMPSCO should have insisted that W&K, as Engineer of Record for that design, approve the substitution prior to EMPSCO's review of it. More serious is the fact that I can find nothing in my review of the information provided to me which shows that

Mr. Forrest Booth
Cozen O'Connor Attorneys
Mr. David Ledger
Carlsmith Ball LLP
April 21, 2005

FOXTROT F-1 PIER
PORT AUTHORITY OF GUAM
Cozen O'Connor Reference No. 123206
(C&A Project No. 6090.00)
Page 3

EMPSCO confirmed that the capacity of the substitute epoxy system in Submittal 18a met the requirements of the project, the calculations for which were requested in the response to Submittal Number 12.

The critical importance of the conditions attached to both of the approvals given following EMPSCO 's review of Submittal Numbers 12 and 18a cannot be overstated. Submittal No. 12 requested calculations verifying that the (substitute VE-1) proposal met the design requirements. Yet EMPSCO knowingly permitted construction to proceed while this basic question relating to the adequacy of the proposed design went unresolved, and never followed up to see why the calculations were not submitted as requested. EMPSCO approved the use of the Anchor-It epoxy system in Submittal Number 18a without recognizing that it was a substitution of materials and did so without knowing if the substitute epoxy system did or did not meet the capacity requirements of the design, the details of which they had requested in the prior Submittal Number 12. In my opinion, it was the responsibility of EMPSCO to confirm that the conditions of their approval were met, and to insist that construction not proceed until satisfactory resolution was at hand. EMPSCO should also have insisted on a special inspection of the epoxy installation, and on testing of the bolts after installation, a code requirement, to confirm proper installation and bolt performance. Their failure to do so falls far short of the standard of care that is expected of an engineering firm in these circumstances.

If you have any questions please contact me.

Very truly yours,

CASH & ASSOCIATES

Elliott H. Boone, S.E.
Executive Vice President

EHB:cd
G:project/ehb/6090000-42505.doc

# EXHIBIT J

1          IN THE DISTRICT COURT OF GUAM

2

3

4

5    S.J. GARGRAVE SYNDICATE
     AT LLOYDS,
6
               Plaintiff,
7
     vs.                                    No.   CV03-00009
8
     BLACK CONSTRUCTION CORPORATION,
9    WINZLER & KELLY, and ENGINEERING
     MANAGEMENT & PLANNING SERVICES
10   CORPORATION,

11             Defendants.
     _____/
12          Deposition of

13      ELLIOTT H. BOONE, S.E.

14      Thursday, May 12, 2005

15

16

17

18   REPORTED BY:  JOAN MARTIN, CSR #6036

19

20

21

22

23             NOGARA REPORTING SERVICE
               130 Battery Street, Suite 580
24            San Francisco, California 94111
                    (415) 398-1889
25

1  opinion, a professional standard of care.

2      Q.  And why, in relation to the 1994 Uniform

3  Building Code?

4      A.  Because that was the code in effect at the time

5  these repairs were made.

6      Q.  So what?

7      A.  Pardon?.

8      Q.  So what?

9      A.  I'm a little taken aback at that, "So what."  I

10  mean, you have to have a standard to design to.  And one

11  would assume that the local building code in effect at

12  the time, plus the --

13      Q.  Why would you assume that?  I mean, did the

14  contract say that?

15      A.  I have no idea what the contract said in

16  relation to that.  Generally speaking, the contracts

17  don't mention which code you design to.  I mean, if

18  you're referring to the contract between the owner and

19  the consultant, it's up to the consultant to choose the

20  code.  Furthermore, this project obtained a building

21  permit; and in that sense it would have been necessary

22  to comply with a building code, such as the 1994 Uniform

23  Building Code.

24      Q.  In your opinion, was this design adequate to

25  resist the Uniform Building Code seismic forces which

41

Case 1:03-cv-00009    Document 200-3    Filed 06/09/2005    Page 17 of 30

1   you thought applied?

2        A.   The Winzler & Kelly design?

3        Q.   Yes.

4        A.   I don't think so.

5        Q.   In your opinion, was this Winzler & Kelly

6   design adequate to resist the October 2001 earthquake?

7        A.   I don't think so.

8        Q.   How do you know?

9        A.   Calculations indicate that it did not.

10        Q.   Did you model that particular earthquake?

11        A.   Yes.  Let me rephrase that.  One of my

12   associates modeled it, under my supervision.

13        Q.   Okay.  Was it adequate -- was this design

14   adequate to repair the dolphins so they would last five

15   years?

16        A.   I have no way of knowing.

17        Q.   Well, you were there in March, and they were

18   still standing.

19        A.   I wouldn't call that standing.  They were

20   severely damaged.  As a matter of fact, one or more of

21   the piles were actually broken loose.

22        Q.   Are you aware whether or not there was any

23   disruption in service to that F-1 dolphin?

24        A.   I did not consider that.

25        Q.   You didn't consider that?



1    Q.   Okay.  But you haven't seen any since then?

2    A.   I have not read any of those documents.

3    Q.   Okay.

4    A.   It only seems logical that the risk is so high

5    that an incident of large proportion, of large

6    environmental damage and economic damage, could occur,

7    that the tenant would undertake such a program of

8    periodic inspection.

9    Q.   I want to go back a little bit to this

10   conversation we had way in the beginning about the 1994

11   Uniform Building Code applying to the design of the

12   repairs.

13   A.   Okay.

14   Q.   Does the 1994 building code, Uniform Building

15   Code, apply to dolphins, per se?

16   A.   I think it does.

17   Q.   And why do you think that?

18   A.   Can I make a parallel with things in the legal

19   area?  You have a set of laws that you apply to a given

20   case.  And for you to go outside the standard of care

21   would be, I want to say, not within your -- not within

22   your professional ability, you would not want to do

23   that.

24        As engineers, we have a certain responsibility

25   to design things that meet a certain standard of care.

100

1    Q.  Okay.  If VE-1 had been used as designed, with

2    both integrally related components, would it have

3    withstood normal berthing incidents to the dolphins, if

4    they had fenders?

5    A.  It's hard to -- that's hard to define or to

6    assess, okay, because you would have to tell me what

7    kinds of ships and what kinds of berthing forces and

8    what actually happened.  What I can tell you is VE-1 did

9    not meet the standard of care for seismic.  And that was

10   using the three-quarter inch -- 8 and three-quarter inch

11   diameter Redi-Chem anchors.

12   Q.  Let's forget about seismic.  Just berthing

13   forces.  And I'm talking about berthing forces from

14   90,000 deadweight ton vessels to 150,000 deadweight ton

15   vessels that docked in accordance with the instructions

16   put in the engineering documentation report.

17   A.  Can I --

18   Q.  Would VE-1 have failed if there were fenders --

19   if the fenders that had been installed by Black hadn't

20   broken, would VE-1 have failed under those conditions,

21   berthing conditions?

22   A.  At this moment it would be a good time for us

23   to take a short break, because I would like to review

24   what's in the report, okay?  Give me less than five

25   minutes?

120

1          IN THE DISTRICT COURT OF GUAM

2

3

4

5    S.J. GARGRAVE SYNDICATE
     AT LLOYDS,

6
                    Plaintiff,

7    vs.                                No. CV03-00009

8    BLACK CONSTRUCTION CORPORATION,
     WINZLER & KELLY, and ENGINEERING

9    MANAGEMENT & PLANNING SERVICES
     CORPORATION,

10
                    Defendants.

11   _____/
                 Deposition of

12
         ELLIOTT H. BOONE, S.E.

13
              Volume II

14
         Friday, May 13, 2005

15

16

17

18   REPORTED BY:   JOAN MARTIN, CSR #6036

19

20

21

22

23              NOGARA REPORTING SERVICE
                130 Battery Street, Suite 580

24            San Francisco, California 94111
                    (415) 398-1889

25

1    critical? I don't know. I would have to sit down and

2    ask Macario and say, "Do you know that the epoxy was

3    critical?" You know, the guy -- the guy is asked

4    essentially to be a construction manager. I would have

5    to know what his contract entailed.

6         Q.  Should the Port Authority have hired someone to

7    do a seismic analysis before they --

8         A.  No.  Essentially they had EMPSCO on one side,

9    and they had Winzler & Kelly on the other.  Both of

10   which were capable of doing it, both of which the port

11   had dealt with before.  With satisfactory results, I

12   might add.  I believe.  I -- I have no knowledge of

13   that, but I believe.

14        Q.  But I'm not sure that answered my question.

15   Should the port have required someone to do a seismic

16   analysis?

17        A.  I don't think that the owner, as such, should

18   have required it.  The 1994 Uniform Building Code

19   requires it.  And if you use the standard of care for

20   engineering, it's in the building code.              .

21        Q.  Okay.  Should the port have insisted or

22   required that someone have done a structural analysis

23   before repairs began?

24        A.  Again, the port's only requirement is to say,

25   fix the pier.  And it hired somebody who had the

135

1   professional qualifications to fix the pier.  The

2   professional qualifications are assumed to be adequate,

3   based on their registration and prior experience.

4       Q.  Is that a no?

5       A.  Ask the question again.

6       Q.  Should the port have required someone to do a

7   structural analysis on Pier F-1 before the repairs were

8   done?

9       A.  I don't think it was necessary.  I think it was

10  implied.

11      Q.  Should the port have replaced the defective

12  fenders immediately after they became defective?

13      A.  I don't think the port was responsible for

14  maintenance at Fox 1.

15      Q.  Who do you think was?

16      A.  That's Shell.  That's Shell's facility.

17      Q.  Should the port have had regular inspections of

18  F-1?

19      A.  Again, I -- should the port have?  In the legal

20  sense?  I would have to know the requirements of Shell's

21  contract or lease agreement with the port as to who was

22  responsible for, quote, maintenance.

23      Q.  Okay.  Should either Shell or the port have

24  made -- conducted regular inspections of F-1 --

25      A.  I think --

Case 1:03-cv-00009    Document 200-3    Filed 06/09/2005    Page 23 of 30

1  he had taken responsible charge of the design.

2      Q.  Okay.  And that's in accord with your own

3  opinion, correct?

4      A.  That would be my opinion.

5      Q.  Independent of the regulation?

6      A.  Yeah.

7      MR. TARPLEY:  I would like to mark as Exhibit E

8  your April 21, 2005, report.

9          (Exhibit E marked for identification.)

10     MR. TARPLEY:  Q.  Okay.  Is everything in this

11  report accurate today?

12     A.  Well, I wrote it.

13     Q.  And it's still accurate?

14     A.  I believe so.

15     Q.  Is there any new opinions that you have formed

16  with regard to EMPSCO that are not in this report?

17     A.  Since April 21st, no.

18     Q.  Were you paid separately for this report?

19     A.  Yes.

20     Q.  And how were you so paid?

21     A.  It was part of ongoing work.

22     Q.  On an hourly basis?

23     A.  On an hourly basis.

24     Q.  When were you first asked to render an opinion

25  regarding EMPSCO's work on this project?

191

1     A.   Counsel and I started discussing this after --
2  I want to say sometime after I received Macario's
3  deposition.  And I can't give you a -- a date on that,
4  when I received it, or when I even looked at it.
5     Q.   Well, you said discussed this.  This wasn't
6  done until April --
7     A.   That's right.
8     Q.   So when were you first asked to render a
9  report, this report?
10     A.   I can't give you a specific date.
11     Q.   Well --
12     A.   It could have been February or March of 2005.
13     Q.   So this would take you more than a month to
14  prepare?
15     A.   It could.  It could take me --
16     Q.   If it was February, that's two months.
17     A.   Yes.
18     Q.   All right.
19     A.   It could take me March -- I could have asked
20  for documents.
21     Q.   Well, how did the topic come up for you, with
22  regard to your opinion that's ultimately expressed in
23  this report?
24     A.   Started looking at several things, one of them
25  is Exhibit 12 and the other one Exhibit 18a.

192

1  some transmittals that were provided to me.

2      Q.  What do you mean by "transmittals"?  You mean

3  18a and 12, the comments by EMPSCO?

4      A.  That's right.

5      Q.  Those.  Is that the additional information

6  you're referring to?

7      A.  Yes.

8      Q.  Is there anything else that you're referring to

9  here?

10     A.  Can I take a minute to --

11     Q.  Please.  Please.

12     A.  I think there are two or three documents we're

13  talking about here.

14     Q.  That's it?

15     A.  Yeah.

16     Q.  So the additional information you're referring

17  to in the opening paragraph of your April 21st report is

18  two or three documents?

19     A.  That's right.

20     Q.  And that's the transmittals from EMPSCO  .

21  regarding Submittals 12 and 18a?

22     A.  It's not only from EMPSCO, I believe there are

23  some from Black Construction.  I believe there are some

24  from -- there's one from Macario.  If you would like, I

25  can pull them out.

Case 1:03-cv-00009    Document 200-3    Filed 06/09/2005    Page 26 of 30

1       Q.  Please.

2       A.  It will take five.

3       MR. TARPLEY:  Take a minute.

4           (Brief recess.)

5       MR. TARPLEY:  Exhibit F, please.

6           (Exhibit F marked for identification.)

7       MR. TARPLEY:  Are we back on the record?

8           Over the break the witness has produced a

9   three-page document which I've marked as F.  For point

10  of cross-reference, the first page has a previous

11  Defendant's deposition exhibit number, No. 11, on it.

12  And the second page has Defendant's Deposition Exhibit

13  9.  I don't know what depositions these refer to.

14          For the record, can we --

15      MR. BOOTH:  Macario, probably.

16      MR. TARPLEY:  Macario.  Okay.

17      MR. BOOTH:  I don't know.

18      THE WITNESS: That was one of the things where I --

19      MR. TARPLEY:  Q.  This you identify as the

20  additional information which you are referencing in your

21  April 21st report?

22      A.  That's the specific information that I'm

23  referencing, but it's not the only information that I

24  looked at and considered.

25      Q.  Well, wait a minute.

195

1    A.   From the time I -- from the time I wrote my

2    original report.

3        Q.   I'm -- I'm not asking for that.  I'm asking --

4    you've identified this as the --

5        A.   These two.

6        Q.   These three pages are the additional

7    information that you are referring to in the first

8    paragraph?

9        A.   Uh-huh (affirmative).

10       Q.   Okay.  And then in the second paragraph, you

11   state, "I have concluded a review of the documentation

12   provided to me."  That, again, is these three pages?

13       A.   No, there is lots of stuff.

14       Q.   Oh.  Okay.  So what --

15       A.   I --

16       Q.   -- what other documentation are you referring

17   to in the second paragraph?

18       A.   Well, there's Macario's deposition.  I mean, I

19   read that.

20       Q.   When was the first time you read that?      .

21       A.   It might have been October, November of 2004.

22       Q.   Okay.  And so --

23       A.   Let me just -- I've been working on the case

24   for -- this case for probably, what, a year and a half

25   now?  That's a lot of documents.  I wrote my report in

196

1    April of -- April, May, of 2004.  And there are

2    documents that have -- just like this document here,

3    from -- is it Tsutsui? -- that's a new document to me.

4         Q.   That's a new document?

5         A.   Yeah.

6         Q.   Okay.  I'm just trying to tie down what

7    documents you are referring to in this April 21st

8    report.  Okay.  You've identified the documents -- the

9    additional information that you're referring to in the

10   first paragraph.

11        Second paragraph you conclude a review of some

12   documentation that's provided to you.  And you're saying

13   that's different documentation than the three things

14   you're referring to in the first paragraph.

15        A.   That's right.

16        Q.   What is the documentation that you are

17   referring to in the second paragraph?

18        A.   One of the things would be EMPSCO's -- excuse

19   me, Macario's deposition.

20        Q.   And when was that given to you again?

21        A.   I -- I want to say October of 2004.

22        Q.   Well, was it provided to you in conjunction

23   with Mr. Booth's request that you focus on EMPSCO's

24   performance?

25        A.   No.

197

1    Q.  All right.  So what documents were you

2  referencing in response to Mr. Booth's request that you

3  focus in on EMPSCO's performance?

4    A.  There were lots of other documents, but when I

5  focused in on documents that I felt were pertinent,

6  okay, these were the ones that I felt were pertinent.

7    Q.  You're referring to Exhibit F here?

8    A.  Yeah.

9    Q.  These three?

10    A.  Yeah.

11    Q.  Okay.  Now, if we go to the second paragraph,

12  you begin your opinion here, and you reference the fact

13  that "EMPSCO was retained under contract by the PAG to

14  prepare construction contract documents commonly

15  referred to as plans and specifications."

16      Right?

17    A.  Yes.

18    Q.  And they were doing that for bid, right?

19    A.  Yes.

20    Q.  And -- but you already knew that long before.

21  In fact, you knew that when you did your first report --

22    A.  That's correct.

23    Q.  Okay.  And on your May 12 report, you refer to

24  that on Page 2, correct?

25    A.  Yes.  I'll stipulate to that.

198

1    And I don't see any opinions stated that anything EMPSCO

2    did was negligent, in your opinion, with regard to --

3         A.   No.   I think, I think Submittal No. 12, what

4    they did was to some extent what I would have done.

5         Q.   Okay.   Now, but then you go on to Submittal No.

6    18a.

7         A.   Uh-huh (affirmative).

8         Q.   And you talk about the review of the

9    substitution of the epoxy, correct?   Now, you already

10   knew about that before you did your first report.

11        A.   I don't believe I had seen the -- well, I --

12        Q.   Let's take a look at your initial report.

13        A.   Yes.   Yes.   I did know about the substitution.

14        Q.   Can you pull out Exhibit A?

15        A.   Yes.   I did know -- let me agree with you.   I

16   did know about it.

17        Q.   Just for the record, can you turn to Page 3?

18   You make comments about that, Submittal No. 18a,

19   correct?

20        A.   Uh-huh (affirmative).

21        Q.   So that's something that you knew.   This wasn't

22   new information, correct?

23        A.   This particular document was new.

24        Q.   What's that?

25        A.   This document right here, where it refers to

203

Case 1:03-cv-00009    Document 200-4    Filed 06/09/2005    Page 1 of 15

1    structural calculations from Winzler & Kelly.

2         Q.  Right.  But that, that all -- that's just a

3    transmittal from Macario to Black regarding the comments

4    made by EMPSCO, correct?

5         A.  Uh-huh (affirmative).

6         Q.  You have to say yes or no.

7         A.  Yes.

8         Q.  Okay.  And that's what you are referring to

9    here in your initial report of May 12th, 2004, at the

10   bottom of Page 3.  You go list -- you list those

11   conditions of EMPSCO, right?

12        A.  That's right.

13        Q.  The very same ones.  Right.  It's the same ones

14   you're referring to here in your updated report of April

15   21st, correct?

16        A.  Yes.

17        Q.  So this wasn't new information you acquired.

18        A.  The first six points, we're talking about here?

19        Q.  Well, those aren't referred to in your report

20   of April 21st.

21        A.  But I knew about them.

22        Q.  All right.  Well, why don't you refer to them

23   in your report?

24        A.  It wasn't something that I was studying.

25        Q.  Okay.  So what does the significance of the

Case 1:03-cv-00009    Document 200-4    Filed 06/09/2005    Page 2 of 15

1    Redi-Chem anchor to the Anchor-It epoxy. And I never

2    saw any documentation that they actually saw the

3    calculations or reviewed them.

4        Q.  All right. But you knew that EMPSCO had

5    approved the substitution, back when you did your

6    initial report.

7        A.  I don't know that they -- I don't know that

8    they had approved it.

9        Q.  You didn't -- well. You refer to it on Page 3

10   of your initial report. You talk about the Anchor-It

11   epoxy systems being substituted; approval was

12   conditioned by four comments. You're referring to the

13   four comments from EMPSCO, correct?

14       A.  Page --

15       Q.  3.

16       A.  3.

17       Q.  Bottom, on your May 12, 2004 report. So this

18   wasn't new to you, that it had been approved by EMPSCO.

19   Do you see that, Mr. Boone? Would you agree?

20       A.  Yeah. But I did not know at that time, or was

21   not aware at that time that EMPSCO had not seen any

22   calculations.

23       Q.  That's not what I'm referring to. I'm

24   referring to your report here. I'm just -- okay? I'm

25   referring to your report, your latest report of April 21

208

1   the contract does not tell you to comply with the

2   Uniform Building Code.  It is assumed that since it is

3   the standard, the engineer who signs the drawings will

4   comply with the Uniform Building Code.

5       Q.  Now, you mentioned more than once the term

6   "rudimentary seismic design."

7       A.  Uh-huh (affirmative).

8       Q.  When it was pointed out to you yesterday that

9   seismic design was specifically excluded from EMPSCO's

10   scope of work, which was news to you at the time, you

11   said, well, they should have still done a rudimentary

12   design.  And you mentioned that again today to Mr.

13   Tarpley.

14       Can you describe for me what this rudimentary

15   seismic design should have entailed?

16       A.  Well, you can do a static analysis based on the

17   Uniform Building Code to come up with a base shear.

18       Q.  And how would you go about doing that?

19       A.  There's a formula in the 1994 UBC.

20       Q.  Which formula is that?  28-1, or 28-2?

21       A.  You want me to give you the exact number?  I

22   mean, I have a copy of the -- or had.

23       Q.  Is this the one (indicating)?

24       A.  Yes.  That's the one.

25       MR. STERLING:  Why don't we mark that as an

# EXHIBIT K

# EMPSON–ENGINEERING CONSULTANTS

Suite 245 Julale Shopping Center
Agana, Guam 96910
Tel. (671) 477–4716/5716  Fax. (671) 472–2136

**FILE COPY**

## LETTER OF TRANSMITTAL

DATE: **November 28, 1995**

TO: **CAPT. EULOGIO BERMUDES**

General Manager

PORT AUTHORITY OF GUAM

1026 Cabras Highway, Suite 201

Piti, Guam  96925

ATTN: **MR. SIMEON DELOS SANTOS**

RE: **REPAIRS AND IMPROVEMENTS TO EXISTING F–1 FUEL PIER (SHELL PIER)**

GENTLEMEN:

**received**
11/28/95

WE ARE SENDING YOU [ ] attached  [X] under separate cover via
**Hand Deliver**                                          the following terms:

| [ ]                    | [ ] prints        | [ ] plans   |
| [ ] shop drawings      | [ ] change order  | [ ] samples |
| [ ] copy of letter     | [ ]               |             |
| [ ] specifications     |                   |             |

| COPIES | DATE | NO. | DESCRIPTION |
|--------|------|-----|-------------|
| 1 Pages | 11/28/95 | 1 | Letter |
| 3 Pages | 11/28/95 | 2 | Negotiated fee Breakdown |
| 5 Pages | 11/28/95 | 3 | Revised Scope of Work |
| | | | |
| | | | |

REMARKS: _____

_____

_____

_____

_____

_____

RECEIVED BY: _____     FOR:

SIGNED:  PETRONILO Q. VILLALUZ, P.E.



November 28, 1995

# FILE COPY

**CAPT. EULOGIO BERMUDES**
General Manager
PORT AUTHORITY OF GUAM
1026 Cabras Highway, Suite 201
Piti, Guam 96925

REF:     **REPAIRS AND IMPROVEMENTS TO "F-1" (SHELL PIER)**
         **Apra Harbor Guam, M.I.**

**Dear Sir:**

This is in regards to the Architect-Engineer design services for the above referenced project.

Enclosures (1), (2) and (3) are forwarded for your review and approval.

During the fee negotiation conducted on November 27, 1995 with **Simeon Delos Santos** of Port Authority of Guam and Messrs. **Ernesto Capulong** and the undersigned of EMPSCO Engineering Consultants. The original fee proposal in the amount of **$296,864.00** (encl. 1) was reduced in the amount of **$160,000.00** (encl. 2).

The above will include the immediate repairs to the "F-1" (Shell Pier) facility. A detailed scope of A-E services is presented on the Scope of Work (encl. 3).

We sincerely appreciate the opportunity of allowing our firm to assist you on this project and we look forward to continue serving the Port Authority of Guam.

Sincerely,

**EMPSCO Engineering Consultants**

**PETRONILO Q. VILLALUZ, P.E.**
Managing Engineer

c:\wp51\port.3

2

REPAIRS AND UPGRADING OF "F-1" SHELL PIER
APRA HARBOR GUAM, MI.

**FILE COPY**

## FEE BREAKDOWN (NEGOTIATED)

| Item No. | Task Description | No. of Hours | Hourly Rate | Total Cost |
|----------|------------------|--------------|-------------|------------|
| A. | CONFERENCES AND SCOPING MEETINGS WITH PAG AND USING AGENCY: | | | |
| | Project Manager (PM) | 8 | 41.00 | 324 |
| | Civil Engineer (CE) | 24 | 38.00 | 912 |
| | Structural Engineer (SE) | 24 | 38.00 | 912 |
| | Electrical Engineer (EE) | 8 | 31.00 | 248 |
| | | | SUB-TOTAL = | 2,396 |
| B. | PREPARATION OF COMPLETE DRAWINGS, BASIS OF DESIGN AND DESIGN CALCULATIONS: | | | |
| | Project Manager | 24 | 41.00 | 984 |
| | Civil Engineer | 80 | 38.00 | 3,040 |
| | Structural Engineer | 40 | 38.00 | 1,520 |
| | Electrical Engineer | 60 | 31.00 | 1,860 |
| | CADD: | 204 | | |
| | (1) Civil | 240 | 15.43 | 3,703 |
| | (2) Structural | 480 | 15.43 | 7,406 |
| | (3) Electrical | 120 | 15.43 | 1,852 |
| | | | SUB-TOTAL = | 20,365 |
| C. | PREPARATION OF CONTRACT SPECIFICATIONS: | | | |
| | Specs/Report Writer | 60 | 38.00 | 2,280 |
| | Typist | 100 | 10.00 | 1,000 |
| | | | SUB-TOTAL = | 3,280 |

## D. PREPARATION OF COST ESTIMATES:

| | | | |
|---|---|---|---|
| Cost Estimator | 64 | 38.00 | 2,432 |
| Typist | 80 | 10.00 | 800 |

SUB-TOTAL = **3,232**

## E. ENGINEERING SERVICES:

### 1. Site Investigation

| | | | |
|---|---|---|---|
| PM | 24 | 41.00 | 984 |
| CE | 80 | 38.00 | 3,040 |
| SE | 80 | 38.00 | 3,040 |
| EE | 40 | 31.00 | 1,240 |
| SD | 120 | 15.43 | 1,852 |
| ED | 40 | 15.43 | 617 |

SUB-TOTAL = **10,773**

### 2. Underwater Inspection (Consultant)

**5,000**

### 3. Shop Drawing and Catalog Submittal Review

| | | | |
|---|---|---|---|
| PM | 16 | 41.00 | 656 |
| CE | 40 | 38.00 | 1,520 |
| SE | 80 | 38.00 | 3,040 |
| EE | 40 | 31.00 | 1,240 |
| Draftsman | 40 | 15.43 | 617 |

SUB-TOTAL = **7,073**

### 4. As-Built Drawing Preparation

| | | | |
|---|---|---|---|
| PM | 8 | 41.00 | 328 |
| CE | 24 | 38.00 | 912 |
| SE | 32 | 38.00 | 1,216 |
| EE | 12 | 31.00 | 372 |
| CADD | 40 | 15.43 | 617 |

SUB-TOTAL = **3,445**

4.

5.      **Geo-Technical Consultation** =           3,000

6.      **Construction Consultation Including Building Permit Processing Technical Assistance, during Pre-Bid Phase, and Bid Evaluation**

| | | | |
|---|---|---|---|
| PM | 16 | 41.00 | 656 |
| CE | 48 | 38.00 | 1,824 |
| SE | 64 | 38.00 | 2,432 |

                                                **SUB-TOTAL =**     **4,912**

## F.   REIMBURSABLES:

| | | |
|---|---|---|
| Mylars | : 25 EA x3.20 x 1 = | 81.00 |
| Blueprints | : 25 Orig. x20 sets x1.50 = | 750.00 |
| Copies | : 300 Orig. x20 Sets x0.15 = | 900.00 |
| Photos | : 1 Lot = | 250.00 |
| **Sub-Total** | | **$1,981.00** |
| + 4.17% GRT | | 83.00 |
| **TOTAL =** | | **$2,064.00** |

| | | | |
|---|---|---|---|
| Total Direct Cost | [2,396+20,365+3,280+3,232+10,773 +7,073+3,445+4,912] | = | 55,476 |
| 135% OH | [1.35 x 55,476] | = | 74,893 |
| 10% Profit | [0.10 ( 55,476+74,893] | = | 13,037 |
| Sub-Consultants | [3,000+5,000] | = | 8,000 |
| 5% Profit Over Sub-Consultants | [0.05 (3,000+5,000)] | = | 400 |
| Reimbursables | | = | 2,064 |
| 4.17% GRT | [55,476+74,893+13,037+8,000+400+2,064] | = | 6,416 |
| | **GRAND TOTAL FEE =** | | **$ 160,286** |
| | **ROUNDED VALUE =** | | **$ 160,000** |

wp/pier

5.

**FILE COPY**

1. **INTENT AND DESCRIPTION**

   The Port Authority of Guam is intending to correct deficiencies, repair damages and construct improvements to existing Fuel Pier "F-1" (Shell Pier). The purpose of this contract is to obtain professional services for the design of such repairs and improvements. The project includes the inspection, identification of necessary repairs to existing dolphin, main wharf, walkway and improvements to existing Fuel Pier "F-1". The project also includes all the required soil investigation, shop drawing and catalog submittal review, and construction consultation.

2. **LOCATION**

   The project is located at Pier "F-1" (Shell Pier) Apra Harbor, Cabras Islands Guam, M.I.

3. **DESIGN PARAMETERS**

   1. Report on damaged structures F-1 Facility Guam for Shell Guam, Inc. prepared by Candac Limited dated August 1993.

   2. Structural Assessment of the Foxtrot (F-1) Pier, Apra Harbor prepared by N.C. Macario & Associates, Inc.

   3. Ultra Sonic gauging report, main pier support pillars pier (F-1) Guam, prepared by Guam Oceaneers/N.C. Macario & Associates, Inc.

   4. Subsurface Soil Investigation Foxtrot I Pier Facility Improvement/Repair Cabras Island and prepared by Geo-Engineering & Testing, Inc. dated July 13, 1993.

   5. Uniform Building code (UBC) - 1994 Edition.

   6. American Concrete Institute (ACI) Code - 1989 Edition.

4.   **CONSTRUCTION COST LIMITATION**

The project shall be designed to permit construction of the repair and improvement of the facility within a construction contract price to be provided by the Government. If the consultant during the preliminary cost analysis finds that the repairs and improvements cannot be built within the allotted amount, the matter should be brought to the attention of the General Manager immediately.

Consultant shall prepare a construction cost estimate for the proposed repairs and improvements.

5.   **SOILS REPORT**

The Consultant shall review and interpret all subsurface exploration, geotechnical and soils report furnished by Port Authority of Guam for the project.

The soils investigation shall include the following information:

a.   General soil composition

b.   General subsurface conditions

c.   Compactibility of soil

6.   **ENVIRONMENTAL PROTECTION PLAN**

The Consultant shall review the Environmental Impact Assessment Report and U.S. Army Corps of Engineers permit application furnished by Port Authority of Guam. The Consultant shall advise Port Authority of Guam on any problems that may be encountered during the permitting process.

7. **DESIGN ITEM AND CONSIDERATION**

The general description of work shall include but not limited to the following:

1. Repairs to existing support piles of Dolphins A, B, C, D and G.

2. Repairs to walkways support piles P1, P2, and P3.

3. Removal of existing piles and pile cap of Dolphins H.

4. Removal and replacement of damaged air buffer fenders C and D.

5. Repair cracks at precast concrete deck units, girders and main beam at main wharf area including supporting piles.

6. Repair spalls and deteriorated concrete surfaces at main wharf area.

7. Repair cracks/spalls at access ramp.

8. Repair cracks and spalls at pile caps.

9. Removal and replacement of existing fendering system.

10. Installation of new cathodic protection system.

11. Repair Bollard connections to main wharf.

12. Removal and Replacement of damaged dolphin "H".

8. **SUBMITTALS**

Submittals shall be made in accordance with the following schedule:

| Submittal | Due Date | Drawings | Specifications | Cost Estimates |
|---|---|---|---|---|
| 35% Design Documents | 45 Calendar days after NTP | 5 Copies | 5 Copies | 5 Copies |
| Final Design Documents | 45 Calendar days after receipt of 35% review comments | 5 Copies | 5 Copies | 5 Copies |

9. **GOVERNMENT REVIEW**

The Port Authority of Guam will work closely with the Consultant to expedite design reviews. Reviews will normally be "On Board".

10. **RELATIONS WITH OTHER GOVERNMENT AGENCIES**

All directions within the scope of this contract will be issued by the General Manager, Port Authority of Guam, and the Consultant shall not accept such direction from others. Information provided by other agencies which seemingly conflicts with information provided by the General Manager will be discussed immediately. This policy is not intended to prevent the Consultant from obtaining necessary design information from other agencies.

11. **RESPONSIBILITY OF THE CONSULTANT**

The Consultant shall be responsible for the professional and technical accuracy and the coordination of all designs, drawings, specifications and other work of materials furnished by him under this contract. The Consultant without additional cost to the Government, shall correct or revise all errors or deficiencies in his work.

12. **GOVERNMENT RESPONSIBILITIES**

The Port Authority of Guam shall be responsible for the following:

a. Port Authority of Guam will furnish the Consultant with the as-built drawings of the existing facilities affected by this scope of work which are available at PAG file.

b.    The Port Authority of Guam shall provide, if requested, assistance necessary for the Consultant and its agents access to the project site.

c.    Environmental Impact Assessment Report, U.S. Army Corps of Engineers. Nationwide Permit, Territorial Seashore Permit Clearance as required during the processing of Government of Guam Building Permit.

**AGREED:**                             **APPROVED:**



_____       _____

**PETRONILO Q. VILLALUZ, P.E.**       **CAPT. EULOGIO BERMUDES**
Managing Engineer                   General Manager
**EMPSCO Engineering Consultants**     Port Authority of Guam

Date: _Nov. 28, 1995_____        Date: _____