BERMAN O'CONNOR MANN & SHKLOV
DANIEL J. BERMAN
ROBERT J. O'CONNOR
Suite 503, Bank of Guam Building
111 Chalan Santo Papa
Hagåtña, Guam 96910
Telephone: (671) 477-2778
Facsimile: (671) 499-4366

Attorneys for Defendant
Winzler & Kelly Consulting Engineers

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF GUAM

| | |
|---|---|
| S.J. GARGRAVE SYNDICATE AT LLOYDS,<br><br>Plaintiff,<br><br>v.<br><br>BLACK CONSTRUCTION CORPORATION, WINZLER & KELLY CONSULTING ENGINEERS and ENGINEERING, MANAGEMENT & PLANNING SERVICES CORPORATION,<br><br>Defendants. | CIVIL CASE NO.: CIV03-00009<br><br>EXHIBITS TO DEFENDANT WINZLER & KELLY CONSULTING ENGINEERS' POINTS AND AUTHORITIES IN OPPOSITION TO ENGINEERING, MANAGEMENT & PLANNING SERVICES CORPORATION'S RENEWED MOTION TO LIMIT TESTIMONY OF PLAINTIFF'S EXPERT AT TRIAL |

Attached hereto are the two exhibits referred to in Winzler & Kelly Consulting Engineers' June 2, 2005 brief opposing Engineering, Management & Planning Services Corporation's Motion to Limit Testimony of Plaintiff's Expert, which were inadvertently omitted from that pleading.

Exhibit "A" – Webb Hayes' Report of November 2, 2004; and

Exhibit "B" – Elliott Boone's Report of May 12, 2004.

Both of the above reports have been in the possession of all parties and their counsel for over six months.

Dated this 13th day of June, 2005.

Respectfully submitted,

BERMAN O'CONNOR MANN & SHKLOV
Attorneys for Defendant
      Winzler & Kelly Consulting Engineers


By: _____
    DANIEL J. BERMAN

2003-08-050613-PL-Ehbts-Opp E's Renewed Mtn.doc



Mr. Robert O'Conner
O'Conner Berman Dotts & Banes
Second Floor, Nauru Bldg.
Saipan, MP 96950-1969

**Date:** November 2, 2004
**Our ref.** 2004-35

Subject:      **FOXTROT PIER F-1**
              **PORT AUTHORITY OF GUAM**
              Winzler & Kelly

## GENERAL

The undersigned have been retained to evaluate the repair scheme for the Foxtrot F-1 petroleum wharf at Apra Harbor, Territory of Guam, and develop opinions as to the suitability of this repair scheme and its ability to resist loads. We have reviewed the EMPSCO design documentation, and various other documents listed in the References Section below.

## QUALIFICATIONS OF WEBB W. HAYES

After graduating from the University of California at Berkeley I began my civil engineering career in January of 1958. I was with the firm of Earl and Wright from January 1959 to January 1985. For the last fourteen years at Earl and Wright I was president and CEO. I was chairman of the joint company, John Brown - Earl and Wright from 1973 through 1983. I was president of my own firm, Bay Phoenix Consulting Engineers, until 1991 when the firm ceased trading. After a brief time with Peter Cully & Associates, I spent nine years with GKO & Associates. In June of 2002, I joined the firm of Ben C. Gerwick, Inc., where I am currently employed.

I hold valid California Certificate number C-12409 as a Civil Engineer, which was issued in 1960 and California Certificate number S-1361 as a Structural Engineer, which was issued in 1965. I have previously been registered as a civil engineer in Oregon, Washington, Alaska, Texas and Louisiana; however, these registrations are no longer current.

Earl and Wright was a major civil and structural engineering firm in San Francisco that was very strong in marine engineering. The company designed many wharves in the San Francisco Bay Area, Alaska and the Philippines before becoming a major force in the design of offshore drilling platforms. In 1969 the company was acquired by SEDCO, which later became the largest offshore drilling company in the world. Most of the wharf projects were petroleum tanker facilities. These facilities ranged from barge terminals to terminals for VVLCC's and included the LPG terminal at Yanbu, Saudi Arabia and two liquid tanker terminals for Honam Petroleum (Caltex) in Honam, Korea. Earl and Wright did design bulk cargo terminals for the Alaska Railroad in Seward and Whittier, Alaska, and the U.S. Army Corps of Engineers in Haines, Alaska. Many of the projects had to be innovative to solve environmental and operational problems, such as moving ice and the lack of heavy construction equipment.

Bay Phoenix designed the berth for the Battleship Missouri at Hunters Point in San Francisco, CA. Bay Phoenix also performed studies and designed modifications to the Domtar Gypsum's bulk terminal, at Antioch, CA, to prevent the constant damage which occurred to the wharf while docking conveyor ships.

**EXHIBIT "A"**

While at GKO & Associates, I developed the layout and orientation of the permanent berth for the California Maritime Academy training ship, Golden Bear, at Vallejo, CA. I also developed the configuration for an island type crude oil off-loading terminal in San Francisco Bay off of Richmond, CA for VLCC tankers. This project was done for Wickland Oil Company, now ST Services, but not constructed for commercial reasons. I evaluated and analyzed marine terminals for UNOCAL (Now Conoco Phillips) at Rodeo, CA; Tosco Refining Corporation's (Now TESORO Refining Corporation) Amorco tanker terminal at Martinez, CA; Tosco Refining Corporation's (TESORO) tanker terminal at Avon, CA; and Shore Terminals tanker terminals at Selby and Martinez, CA.

The analysis and certification work outlined above led to the development of a new terminal for Tosco Refining Corp. (TESORO) at Avon, CA. I developed the terminal configuration to serve the full range of vessels that call at the Avon Terminal from barges to 105,000 DWT tankers. I also designed modifications to and new mooring dolphins for the Tesoro Amorco terminal, in Martinez, CA. to increase the ship size certification to 185,000 DWT. Finally I designed upgrades to the Conoco Phillips Rodeo Terminal to meet California State Lands Commission standards (MOTEMS). I am currently supervising the design of a third berth to that terminal for a 200,000 DWT tanker requiring redesign of the entire fender system.

With regard specifically to bulk terminals, I developed a preliminary configuration and terminal arrangement for a general cargo wharf and two bulk cargo wharves at Selby, CA for Wickland Properties Company. The two bulk cargo wharves were configured for a fixed loader and line hauling as the main option for bulk transfer, although a moveable loader was considered. The two bulk wharves were tandem and envisioned multiple breasting dolphins, at approximately 100 foot spacing and two inshore breast line mooring dolphins per berth.

I also was retained to evaluate a line-haul, fixed loader, coke loading facility, belonging to Diablo Services, a subsidiary of Tosco Refining Corp. This work involved analysis of mooring line loading and mooring forces, imposed by environmental conditions, for the purpose of obtaining certification from the California State Lands Commission for the maximum size bulk vessels that will be permitted to load or unload at the terminal facility. While performing this evaluation I was able to observe the shifting operation of the coke ship on several occasions

I have observed chip ships shift at two terminals in Oregon, two terminals in Washington, one terminal in Australia and at the Louisiana Pacific Terminal in Eureka, California.

I have served as an expert witness on a case involving the allision of the M/V Kure with a chip terminal wharf in Samoa, CA. This case was Kure Shipping S.A. and Patt Manfield & Co. vs Louisiana Pacific Corporation and Louisiana Pacific Samoa, Inc., U.S.D.C. Northern District Case No. C98-0648 MMC. The case did go to trial in early 2001 and I did testify in deposition and in trial. I am currently serving as an expert witness on an arbitration stemming from this case in London, United Kingdom. This arbitration, IN THE MATTER OF AN ARBITRATION BETWEEN: - THE SWEDISH CLUB (Claimants) and NIPPON YUSEN KAISHA (Respondents), is in case development and has not yet been arbitrated. I was retained as an expert witness around 1968 on a case regarding the failure, during construction, of portions of the Anchorage City Dock in Anchorage, Alaska. Although I did testify in deposition, the case was settled out of court and I did not testify in trial.

Over the course of 46 years in the design of marine structures I have acquired an understanding of the evolution of wharf design, the dynamic aspects of docking a ship, the complexities of mooring a ship and the sensitivity of line handling on vessel position and mooring line loads.

## QUALIFICATIONS OF TED W. TRENKWALDER:

After graduating from the University of California at Davis, I began my civil engineering career in January of 1980. I was with the firm of Earl and Wright from January 1980 to January 1989. During that period, I returned to the University of California at Berkeley and received a Master's Degree in Structural Engineering and Structural Mechanics. I was a senior engineer at Vickerman-Zachary-Miller until 1992. After a brief time with Peter Cully & Associates, I spent eight years with GKO & Associates. In May of 2002, I joined the firm of Ben C. Gerwick, Inc., where I am currently employed.

I hold valid California Certificate number C-35585 as a Civil Engineer, which was issued in 1983 and California Certificate number S-3731 as a Structural Engineer, which was issued in 1993. I have previously been registered as a civil engineer in Oregon, Louisiana, and Hawaii: however, these registrations are no longer current.

Earl and Wright was a major civil and structural engineering firm in San Francisco that was very strong in marine engineering. The company designed many offshore platforms in New Zealand, Australia, the North Sea, Africa, and the Gulf of Mexico. They also designed unloading terminals in the Philippines. The platforms were fixed, pile supported structures that required extensive analyses for seismic, wave, current, and wind loads. The terminal projects were petroleum tanker facilities.

While at Vickerman-Zachary-Miller, I designed wharves for container and navy vessels. The Schnitzer Pier and Pier 35 berths were designed for scrap metal containers and submarines respectively. VZM also designed buildings for waterfront support. I was responsible for the analysis and design of the NYK Maintenance & Repair Building, Administration Building, and Container Freight Storage building at the Port of Los Angeles.

At GKO & Associates, I analyzed, designed, and provided construction assistance for the new concrete cap and pipe pile berth and mooring dolphins for the California Maritime, at Vallejo, CA. I also completed a mooring assessment for tankers at the Wickland Martinez Terminal, which led to interaction with the State Lands Commission and the beginning of the MOTEMS manual. I evaluated and analyzed marine terminals for UNOCAL at Rodeo, CA; Tosco Refining Corporation Amorco tanker terminal at Martinez, CA; Tosco Refining Corporation terminal at Avon, CA; and Shore Terminals tanker terminals at Selby and Martinez, CA.

The analysis and design work outlined above led to the development of a new terminal for Tosco Refining Corp. at Avon, CA. I provided design assistance on the new mooring dolphins and walkways for the Tesoro Amorco terminal, in Martinez, CA. to increase the ship size certification to 185,000 DWT. Finally I designed upgrades to the Conoco Phillips Rodeo Terminal to meet California State Lands Commission standards (MOTEMS) requirements.

With regard specifically to bulk terminals, I analyzed and designed the proposed terminal arrangement for a general cargo wharf and two bulk cargo wharves at Selby, CA for Wickland Properties Company. The two bulk cargo wharves were configured for a fixed loader and incorporated the existing marine terminal. I also analyzed and designed the improvements to the Levin Richmond Terminal to accommodate a new cement unloader. The existing timber and concrete pier was assessed and improvements designed to meet the latest seismic requirements. I am presently designing improvements to the Berths 35-37 to allow for larger crane loads and deeper draft vessels at the Port of Oakland.

Over the course of 25 years in the design of marine structures I have acquired an understanding of the evolution of wharf design, seismic analysis and design, the complexities of mooring a ship and the sensitivity of line handling on vessel position and mooring line loads.

I have not served as an expert witness on any prior cases.

## CASH & ASSOCIATES CALCULATIONS:

Ben C. Gerwick has not received the SAP computer model, geometry, output or calculations, to make a comparative analysis for the pier dolphins.

## BASIS FOR DESIGN:

Although the Port's contract with EMPSCO refers to the 1994 Uniform Building Code (UBC), there is no reference to this code in the Engineering Documentation Report or the calculations prepared by EMPSCO. It is questionable whether or not the 1994 UBC applied. It appears that the Port Authority of Guam waived EMPSCO's requirement to adhere to the 1994 UBC when they approved the drawings and specifications, and then put these documents out to bid.

The Port's funding limitations may have severely limited the berthing forces that the repaired breasting and mooring dolphins could be designed to resist and most likely required that a seismic upgrade be omitted from the scope of the repair work.

## PERFORMANCE OF W&K CONNECTION DESIGN FOR THE 2001 EARTHQUAKE:

The Winzler & Kelly connection detail provided on drawing VE-1 has capacity to resist seismic, mooring, and berthing loads. The dolphin capacity is directly related to the pile to cap connection capacity and the number of connections. Ben C. Gerwick prepared computer models to determine the ultimate capacities for Dolphins 'A' and 'C'.

The site specific response provided by Kleinfelder shows that the maximum applied seismic loads ranged between 0.1 g and 0.21 g at the project site. The ultimate capacities of the dolphins exceed the forces generated by accelerations in this range. Therefore, it is our opinion that, if properly constructed, the Winzler & Kelly alternate repair system would not have failed in the October 2001 earthquake.

## THE ALTERNATIVE PILE REPAIR SYSTEM:

The bid price for the wharf repair, as originally designed, was well in excess of the owner's budget. The Port then invited Black Construction Company to submit alternatives to the original design which would lower the cost of the repair to the point where the port could proceed with the project. Winzler & Kelly was retained to develop an alternative pile repair scheme based on ideas from Black Construction Company.

The pile repair system, designed by EMPSCO, was the major cost element in the project. The implementation of the shear connectors was difficult and costly but the installation of the reinforcing steel dowels 20" into the existing concrete from under the dolphin was extremely difficult and costly. Further, properly installing these bolts and insuring that the epoxy completely filled the 20" deep hole was almost impossible.

Winzler & Kelly developed a scheme which used epoxy anchor bolts which are installed after a vial, filled with epoxy, has been inserted into the cleaned hole. The bolt is turned after the vial has been ruptured and the epoxy bond is achieved. The epoxy specified has a very short cure time, which makes installation simpler to accomplish than it is using a long cure epoxy, since the bolts must be held in place during cure.

The epoxy installation specified by EMPSCO, required that the epoxy be injected into the hole from below. With this method it is very difficult to vent the entrapped air from the hole and achieve complete penetration of the epoxy. In our opinion, the ability to achieve a competent bolt installation

using the method proposed by Winzler & Kelly is much more assured than the installation method specified.

## W&K APPROVED CONNECTION REVIEWED BY ENGINEER OF RECORD:

Winzler & Kelly provided a drawing, entitled *"Proposed Pile Repair Detail"*, to the Contractor for submittal to EMPSCO, the Engineer of Record, for review and approval. On May 22, 1996, EMPSCO reviewed Submittal No. 12, Proposed Pile Repair Details – Winzler & Kelly drawing Sheet VE-1 dated 4/4/96. (Note BCG only has the drawing dated 4/2/96, which does not include a stamped and signed drawing). The submittal was returned to Black Construction "Approved as Noted", with six (6) conditions, which included "Provide structural calculations verifying that the proposed repair meets the design requirements."

Winzler & Kelly had no knowledge that the alternative was actually being constructed by Black Construction or that it had received conditional approval.   Had design calculations been submitted, the acceptability of the alternative would have been vetted and possibly modified, disapproved or approved as submitted.

The drawing title *"Proposed Pile Repair Detail"* is evidence to the effect that the alternative was in the preliminary stage of development. It was reasonable for Winzler & Kelly to rely on EMPSCO, the engineer-of-record, to determine the design criteria for the project and further, it was reasonable to rely on EMPSCO's approval of the VE-1 drawing as confirmation that the work met these criteria.

EMPSCO was the most knowledgeable about the intent of the design and the critical nature of certain details, namely the pile to cap connection. Black Construction should have complied with the ER's request for the six conditions of the submittal. Nevertheless, EMPSCO had a duty to inform the client and Macario & Associates, the party responsible for project oversight, that approval of the alternative pile repair system was subject to conditions. Macario & Associates should have discovered that the repair was not in accordance with the drawings and rejected the installation.

The obligation for quality control was, by specification, the responsibility of the contractor. Further the Port retained Macario & Associates to provide project oversight and inspection. Winzler & Kelly was not retained to perform this activity and had no duty to provide this service. In addition Winzler & Kelly was unaware the alternative pile repair system was being implemented which completely absolves them of any duty in this regard.

## ANCHOR SYSTEMS AND APPROVED EQUAL:

At the request of Black Construction Company, Winzler and Kelly developed drawing VE-1, Proposed Pile Repair Details for Dolphins A, B, C, and D in April 1996.  The drawing contained two notes that read:

1.      THIS DRAWING IS TO BE READ IN CONJUNCTION WITH DRAWINGS AND SPECIFICATIONS FOR PROJECT – REPAIR & UPGRADING TO FOXTROT "F-1" PIER – PREPARED BY EMPSCO ENGINEERING CONSULTANTS, DATED 1/10/96.

2.      ADHESIVE ANCHORS TO BE STAINLESS STEEL RED HEAD "REDI-CHEM" BY PHILLIPS DRILL CO., CATALOG NO. CE3495 OR APPROVED EQUAL.  INSTALL PER MANUFACTURERS RECOMMENDED PROCEDURE.

Drawing VE-1 notes relied upon Black Construction and EMPSCO to review the proposed detail in accordance with the drawings and specifications developed by EMPSCO and to install the REDI-CHEM anchor in accordance to their recommended procedure. To the best of our knowledge, neither Black Construction Company nor EMPSCO reviewed the proposed detail in accordance to the

EMPSCO contract documents or installed the detail in accordance to Redi-Chem's recommended procedure. It is the understood the words "or approved equal" means the engineer who specified the use of a detail or product, in this case Bruce Swanney, is the individual who should have reviewed the substitution and approved it if it was an acceptable substitution.

Winzler and Kelly notified Black Construction and the PAG that the proposed detail should be read in accordance with the design documents. Although EMPSCO's review and approval of the detail requested structural calculations, we understand that Winzler & Kelly was never advised of the approval conditions. EMPSCO should have advised the Port Authority whether the Black Construction proposed anchor system was appropriate for the design conditions and strong enough.

Winzler and Kelly proposed adhesive anchor system contained readily available installation procedures and capacities. The Red Head Redi-Chem concrete anchoring system publishes a seven step installation procedure to produce ultimate loads for bolt tension and shear. Black Construction Company substituted an adhesive anchor system, Anchor-It, that also included published installation procedure and capacities.

The EMPSCO anchor system has more capacity than the proposed alternative or the installed anchor system. The Redi-Chem and Anchor-It systems differ but may be of comparable strength if the actual concrete strength governs the capacity.

## PERFORMANCE OF W&K CONNECTION DESIGN:

The EMPSCO design did not consider seismic loading on the dolphins. Their design report, which sets forth the criteria to be used, acknowledges that Transen Associates Limited considered seismic forces, but makes no reference to the magnitude of these forces or any seismic criteria to be used. There is no evidence in the EMPSCO calculations that any structural analysis or seismic evaluation was performed. Failure to undertake a structural analysis of the wharf shows less than a reasonable standard of care was used for the EMPSCO design. It is apparent that the work to be done was to be of an expedient nature to permit tanker operations immediately and was to be a temporary repair.

EMPSCO states the new fender system is designed to accept a 150,000 DWT vessel. Assuming adequate water depth, the displacement of such a vessel is approximately 187,000 Long Tons. The fender selected by EMPSCO for dolphins C & D are a Bridgestone SUC 1150H Rubber Grade RH. The rated energy absorption capacity is 280 ft kips (38.7 $T_m$ Meters). The reaction on the dolphin, when this amount of energy has been absorbed, is 168.7 kips (76.5 Tonnes). The total kinetic energy of that ship approaching at 0.2 ft/sec (the design velocity) is 260 ft kips. The worst case eccentricity coefficient is 1.0. Therefore, the design energy absorbed by each fender is 260 ft kips. The load on the fender after absorbing this amount of energy is 160 kips. The connection at the top of the piles can resist this load. The allowable horizontal force on the dolphin perpendicular to the docking face is 297 kips. For the connections to begin to fail, the horizontal load would need to increase to 565 kips.

The design energy level utilizes this fender at the end of its energy absorbing range. The design fender deflection (compression) is 50%; whereas, the maximum deflection is 56%. The difference in approach velocity for the design ship to achieve this deflection is 0.013 ft/sec, or from 0.200 to 0.213 ft/sec. At this point the reaction force on the dolphin is 180 kips. The alternative design, shown on VE-1, would have met the berthing forces required by the EMPSCO Vessel berthing criteria. If the approach velocity exceeds, say, 0.215 ft/sec, the reaction force increases asymptotically, since the fender can no longer absorb energy. The remaining ship energy will be absorbed through failure of the dolphin pile connection and, finally, the dolphin piles.

In our opinion, the selection of this fender provides very little reserve capacity for energy absorption. This, coupled with an extremely low design approach velocity, increases the potential for a dolphin system overload at, what would still be considered, a very low approach velocity. The Marine Oil Terminal Engineering and Maintenance Standards (MOTEMS), of the California State Lands Commission, recommend a minimum approach velocity of 0.26 ft/sec for existing berths in favorable site conditions and 0.33 ft/sec for moderate site conditions. Favorable site conditions require wind < 38 knots and wave height < 6.5 ft. Moderate site conditions allow wind > 38 knots and wave height < 6.5 ft.

This site could be classified as Moderate. If we accept the classification of "Favorable" and use 0.26 ft/sec as the design berthing velocity, the design energy of the ship would have been 440 ft kips (61 $T_m$ Meters). It is not possible for the selected fender system to absorb this much energy and the resultant force on the dolphin would cause failure of the pile connection and possibly, the piles.

We understand that the wharf was used during construction, before new fenders were installed. During construction the fender was either not there, heavily deteriorated or rubber tractor tires were used. The fender system at this time had virtually no energy absorbing capability. We understand that the fender units specified have not been installed to this date or there was a period of time when the design fenders were not present when ships were berthed at the wharf. Tractor tires have very little energy absorbing capacity and fully compress under very little load. If ships approached the wharf at velocities much lower than 0.2 ft/sec extreme loads would have occurred that would have damaged the dolphins.

The damaged pile connections, observed after the 2001 earthquake, were not the connections designed by Winzler & Kelly. The bolt adhesive did not meet Winzler & Kelly's specification and the bolts were not installed properly. Thus it is impossible for the plaintiff to show how Winzler & Kelly's connection would have performed. Any conclusions related to the performance of the connection design, based on the observed damage, would be highly speculative.

It has been noted that one or both dolphins C & D were permanently displaced 16 inches toward shore. For this displacement to occur, the batter piles or their connections had to fail. For a permanent displacement to exist, the batter piles had to fail in bending or the top connection shear from the concrete. A seismic event is oscillatory and due to the relative weakness of the soils for pile tension, as compared to compression, we would expect any permanent displacement to be in the opposite direction, away from the shore.

EMPSCO based its design and fender selection on very low berthing forces. These very low berthing forces were in turn based on very low berthing velocities and very shallow berthing angles (see EMPSCO's Engineering Documentation Report, paragraph E). It is imperative that velocity and approach angle restrictions be communicated to the harbor pilots, ship captains, tug captains and others responsible for port operations. A failure of the docking ship to adhere to these restrictions would result in the fenders being damaged or destroyed and such damage or destruction would subject the dolphins to extremely high berthing forces that would cause severe damage, including damage to the pile-to-deck connection.

The Port was, and is, the entity responsible for communicating such docking restrictions to these parties. The Port's failure to communicate these docking restrictions (see Simeon Delos Santos deposition) to anyone was negligent.

It is our opinion that the damage to the dolphin piles and connection was due to excessive berthing loads and not by any seismic forces.

**REFERENCES:**

- Guam Oil and Refining Company Structural Design Calculations dated xxx, pp94.
- Trasen Associates LTD Structural Drawings S-1 – S-10 dated April 18, 1969.
- EMPSCO Structural Design Calculations for Repair and Upgrading to Foxtrot "F-1" Pier Apra Harbor dated xxx, pp 90.
- EMSCO Structural Drawings S-0 – S17 dated January 10, 1996.
- Geo-Engineering & Testing Inc, Subsurface Soil Investigation Foxtrot I Pier Facility Improvement / Repair dated July 13, 1995, pp 9 with Plates 1-6.
- Cash & Associates Report dated May 12, 2004, pp 20
- Kleinfelder Report dated July, 14, 2004.
- Marine Oil Terminal Engineering and Maintenance Standards (MOTEMS), California State Lands Commission.

Sincerely,

BEN C. GERWICK, INC.

*[signature]*

Webb W. Hayes, S.E.
Senior Engineer

BEN C. GERWICK, INC.

*[signature]*

Ted W. Trenkwalder, S.E.
Senior Engineer



**CASH & ASSOCIATES**
Engineering and Architecture

Elliott H. Boone
Randy H. Mason
Wilfrido B. Simbol
Kerry M. Simpson

May 12, 2004

RECEIVED

Law Office
TARPLEY & MO... LLP

Attention: Mr. Forrest Booth
Cozen O'Connor Attorneys
425 California Street, Suite 2400
San Francisco, CA 94104-2215

Attention: Mr. David Ledger
Carlsmith Ball LLP
P.O. Box BF
Hagatna, Guam 96932-5027

Subject:     FOXTROT PIER F1
             PORT AUTHORITY OF GUAM
             COZEN O'CONNOR REFERENCE NO. 123206
             (C&A Project No. 6090.00)

Gentlemen

The purpose of this report is to summarize the results of my investigation of structural damage observed at Foxtrot "F1" Pier in Apra Harbor, the sole motor fuel (gasoline and diesel) import location for Shell Guam Inc.

The scope of this investigation included the following tasks:

1.    Visit the site to visually observe the reported damage.

2.    Review project technical data and correspondence relating to the original design and subsequent repairs.

3.    Render an opinion as to the adequacy of the repair design prepared by Winzler & Kelly.

4.    Render an opinion of the connections installed by the Contractor.

The documents reviewed to develop this report are contained in Appendix A, Reference Listing.

**BACKGROUND**

Apra Harbor is considered a protected harbor with favorable berthing conditions. Information reviewed relating to the Foxtrot "F1" facility indicated that it was constructed in 1970 and originally designed to accommodate 90,000 DWT tanker vessels. The pier consists of an access ramp from the shore leading to the main wharf supporting the bulk fuel unloading arms.

---

5772 Bolsa Avenue, Suite 100 ■ Huntington Beach, CA 92649 USA ■ TEL:714.895.2072 ■ FAX 714.895.1291
Web Site: www.cashassociates.com ■ A California Corporation

**EXHIBIT "B"**

Cozen O'Connor Attorneys
Mr. Forrest Booth
Carlsmith Ball LLP
Mr. David Ledger
May 12, 2004

FOXTROT PIER F1
PORT AUTHORITY OF GUAM
Cozen O'Connor Reference No. 123206
(C&A Project No. 6090.00)
Page 2

Catwalks, from the wharf, lead to offshore mooring dolphins "A" and "B". Two additional mooring dolphins, "E" and "F", are located onshore. Tanker berthing forces are absorbed by four breasting dolphins; "C", "D", "G" and "H" located outboard of the wharf. Breasting dolphins "C" and "D" were designed to accommodate the 90,000 DWT vessels, while breasting dolphins "G" and "H" were provided to accommodate smaller 21,000 to 28,000 DWT vessels.

## PREVIOUS REPAIR HISTORY

The Foxtrot "F1" facility was operational at the time of the 8.1 magnitude earthquake in August 1993 and the resulting damage from this event was significant. Preparation of contract documents for repair of the damage sustained by the facility pier was awarded to EMPSCO Engineering Consultants of Agana, Guam by the Port Authority in late 1994. The Port Authority approved contract documents prepared by EMPSCO for bid and local contractors were required to submit their proposals on January 26, 1996.

The apparent low bidder for the project was Black Construction Company, Tamung, Guam, however, their bid for the work as described in the plans and specifications exceeded the Port Authority's budget. In order to proceed with the project, Black Construction Company was requested to submit alternates that would reduce their bid. In response to that request, Black Construction Company using an alternate design developed by Winzler & Kelly Consulting Engineers, Agana, Guam made a revised proposal to the Port Authority.

The alternate design for the repair was identified on Drawing Sheet VE-1 (copy attached) prepared under the supervision of Bruce Swanney, of Winzler & Kelly. Mr. Swanney is registered to practice as a Structural Engineer in the Territory of Guam and his professional engineering seal appears on that drawing, dated April 4, 1996.

At his deposition, Bruce Swanney stated that the sole calculation undertaken in the design of the pile flange to deck connection, shown on Drawing Sheet VE-1, was to assume that the connection would only be required to resist pile withdrawal loads equal to one half the pile axial capacity of 200 tons. No calculations relating to the design shown on Drawing Sheet VE-1 were available for my review.

In general, the repair shown on Sheet VE-1, involved removing approximately 15 feet of the upper portion each of the existing steel pipe piles under the deck of the mooring and breasting dolphins. A 22-inch diameter replacement was then spliced to the remaining pile section, which is connected to the underside of the dolphin deck with a 1-inch thick flange plate, welded to the new section of pipe pile. The flange was, in turn, connected to the underside of the dolphin using 8-3/4 inch diameter, Grade 304 stainless steel bolts, embedded in epoxy.

As-built details and other documents of completed repairs were made available to Cash & Associates for review and are listed in Appendix A, Reference Listing.

It is our understanding that the facility was operational from the date that work was completed until 13 October 2001, when a subsequent 7.0 magnitude earthquake again damaged the facility.

Cozen O'Connor Attorneys
Mr. Forrest Booth
Carlsmith Ball LLP
Mr. David Ledger
May 12, 2004

FOXTROT PIER F1
PORT AUTHORITY OF GUAM
Cozen O'Connor Reference No. 123206
(C&A Project No. 6090.00)
Page 3

## VISUAL OBSERVATIONS

Oceaneer Enterprises, Inc, Piti, Guam performed a post-earthquake survey of the mooring and breasting dolphins on October 13, 2001. Their visual observation of the damage revealed that the epoxy securing the stainless steel bolts embedded into the underside of the dolphin had failed. In a high percentage of the total number bolts, the epoxy had failed to harden or in some cases was absent. In more than one bolt location epoxy that had flowed out of the predrilled hole was observed in and around the steel flange below it.

Of the 216 bolts securing the piles of Dolphin A, only two (2) remained undisturbed by the event. Failure of the epoxy is a technical consideration that is not part of this report, however, it is highly unusual for nearly all the connecting elements to fail if the design meets the service requirements contained in the Uniform Building Code.

On March 3, 2004, I was afforded the opportunity to observe the damage from the water using a port provided pram. At the time of my observations, initial repairs to the 2001 earthquake damage had been undertaken and pier Foxtrot "F1" was partially operational. Safety considerations prevented observations from beneath the deck. Dolphin H did not sustain damage as it had been completely replaced as part of the 1996 repairs, however unrepaired damage was clearly evident on Dolphins A, B C D and G. Each of these dolphins, with the exception of Dolphin H, exhibited common bolt withdrawal damage at the flange.

Digital photographs of the pile flange bolt failure, taken on the March 3, 2004, are included in Appendix B, Photographs.

## BOLT FAILURE

Review of the information provided to Cash & Associates indicated that Black Construction Company had submitted and the Port Authority (through their Projects representatives) had approved, with conditions, a substitution of the epoxy system used in anchoring the bolts to the concrete deck. The epoxy system proposed on Drawing Sheet VE-1 was Redi-Chem Anchors manufactured by Phillips Drill Company, Catalog Number CE 3495. The epoxy components (Parts A & B) of the Redi-Chem Anchor are encased in separate glass capsules that combine when the glass is ruptured after insertion in a predrilled hole. In practice, the threaded rod ruptures the capsule when forced through it and the components are then combined by rotation of the threaded rod with an ordinary power drill. The advantage of this system is that the components are pre-measured and mixing is assured once the threaded rod is spun for a few seconds with a drill.

Anchor-It Epoxy Systems, Solidbond HR 200, was the substitute product submitted (Project Submittal 18a, Epoxy Fastening System) by Black Construction Co as an equal to the specified Redi-Chem System. Approval was conditioned by four comments, Conditions (c) and (d), submit manufacturers certificate of compliance and submit test data by independent testing laboratory, and were never to the best of my knowledge received. Furthermore, the ICBO approval for use of this product (Report No. 4398) requires:

Cozen O'Connor Attorneys
Mr. Forrest Booth
Carlsmith Ball LLP
Mr. David Ledger
May 12, 2004

FOXTROT PIER F1
PORT AUTHORITY OF GUAM
Cozen O'Connor Reference No. 123206
(C&A Project No. 6090.00)
Page 4

*Special inspection in accordance with Section 306(a) 12 of the code shall be provided for all anchor installations.*

The Anchor-It Epoxy System relies on combining the two components in a mixing nozzle, which is then injected into the predrilled hole. In overhead installations, a plug is inserted into the predrilled hole to prevent the run out of the epoxy. The bolt is then inserted through the plug and the mixture allowed to cure. There are two inherent problems installing anchors in overhead applications. The first is assuring that adequate but not excessive epoxy is injected in the hole. Too little epoxy and there is insufficient material to assure a complete bond through the entire depth or if too much, the seal formed by the plug is voided and the epoxy will leak.

The system of mixing for the Anchor-It Epoxy is significantly more complex than that proposed by the Redi-Chem Epoxy System. The complexity of the overhead bolt installation combined with the critical nature of the bolt to pile connection should have placed a responsibility on Black Construction Co. to notify the port of the need for special inspection.

Black Construction Co. as a matter of proper construction practice, should have been aware of the critical importance of the pile flange to concrete connection. The performance of individual dolphins in berthing and mooring operations, not to mention seismic events, relied on the capacity of that connection. During the bolt installation process, the loss of epoxy would have been evident to those installing the materials on a daily basis. The critical nature this element should have made it obvious to Black Construction that minimum testing to establish full epoxy cure should have been undertaken as part of their ordinary quality control described in Section 1400 of the project specifications. This could have been accomplished with an ordinary deep socket and automotive torque wrench.

## SERVICE LOADING

Service load requirements for the dolphins at the Foxtrot "F1" facility fall into four categories as follows:

### Gravity Loads

Gravity loads on the surface due to equipment, product and personnel. These loads are insignificant in comparison to berthing, mooring and seismic loads

### Berthing Loads

Dynamic loads due to berthing forces generated during docking and/or maneuvering transmitted through the fender system to the structural elements. The critical elements in determining berthing forces are the vessel size combined with approach velocity and direction during this operation. According to the calculations prepared by EMPSCO Consulting Engineers, the facility was designed to accommodate 90,000 DWT vessels. Confirmation of the vessel size calling at Foxtrot "F1" was not received from Shell Guam Inc.

Cozen O'Connor Attorneys
Mr. Forrest Booth
Carlsmith Ball LLP
Mr. David Ledger
May 12, 2004

FOXTROT PIER F1
PORT AUTHORITY OF GUAM
Cozen O'Connor Reference No. 123206
(C&A Project No. 6090.00)
Page 5

It is generally accepted that the most severe angle at which the vessel will approach the berth is 10 degrees, measured relative to the centerline or keel relative to the face of the fender. Vessel speed is less exact and can vary with the capability of the pilot and tug assist at the berth. For design purposes, J.U. Brolsma, et al, developed the generally accepted variables for approach velocity, in his 1977 paper " On Fender Design and Berthing Velocities" presented to the PIANC 24th Congress, Leningrad. From Brolsma's graph of these variables, the approach velocity for a 100,000 DWT vessel is approximately 0.03 to 0.04 cm/sec. The as-built drawings identify the fenders as Trellex-Morse type MV 1250X900A and 1000X900A fenders for dolphins C/D and G/H respectively. The berthing energy obtained from the application manual for Type MV fenders published by Trellex-Morse in 1993 is as follows:

> *Dolphins C/D, 355 Ft-Kips with a reaction force at maximum compression of 189 Kips for the MV 1250x900A fender*

> *Dolphins G/H, 226 Ft-Kips with a reaction force at maximum compression of 151 Kips for the MV 1000X900A fender.*

A separate load acting parallel and equal to approximately one third the reaction force also is considered. The location of this load, at the face of the fender, induces a torsional moment around the pile group of the dolphin. The effect of torsional moment was considered in the overall berthing and mooring analysis that follows.

## Mooring Loads

Mooring dolphins at the Foxtrot "F1" facility are Dolphins A and B offshore and E and F onshore. Mooring loads generated by wind acting through mooring lines are limited to 100 tons by the Capstan Hook Assembly located at the center of each dolphin. . The capacity of this assembly was obtained from shop drawing data (Submittal Number 13) provided with other information to Cash & Associates. In my evaluation of the forces generated by the Capstan Hook Assembly, I have assumed that the mooring lines are positioned at an angle of 45 degrees to the face of the dolphin and at an angle above the horizon of 30 degrees. These angles will vary with each ship that is moored, its position relative to the loading arms on the main pier and with the tide.

## Seismic Loads

Seismic loading generated by earthquake activity and the resulting analyses are based on the 1994 Edition of the Uniform Building Code (UBC) which was the governing code in the Territory of Guam at the time of the original design. Two approaches were implemented; one using static analysis and the other using a computer generated dynamic analysis. The static analysis is based on the premise that the dolphins are non-building structures and therefore subject to a particular set of code requirements for determining the seismic forces in the structure. The computer generated dynamic analyses were based on the 1994 UBC Response Spectra (S1 Soil Profile assumed), scaled to 0.3 for Seismic Zone 3 (Guam). The results of the static analyses were used to check allowable bolt forces versus the code static force levels on a

Cozen O'Connor Attorneys
Mr. Forrest Booth
Carlsmith Ball LLP
Mr. David Ledger
May 12, 2004

FOXTROT PIER F1
PORT AUTHORITY OF GUAM
Cozen O'Connor Reference No. 123206
(C&A Project No. 6090.00)
Page 6

working stress basis; whereas the dynamic analysis results was used to check anchor bolt adequacy using ultimate test capacities compared to the response spectra results unreduced by Rw (which would be 3 for this type of structure). As a general check on the compatibility of static and dynamic analyses, additional analyses were conducted using the dynamic analysis results scaled to the static level base shears.

Computer models of Dolphins A, B, C, D and H were developed and considered each of the loads described above.

**Computer Modeling**

SAP 2000 computer models were developed for each of the five dolphin structures noted above. The models were based entirely on the information presented in the as-built drawings prepared by EMPSCO Consulting Engineers and made available for review to Cash and Associates. The models were linear and three-dimensional, using thick concrete shell elements for the dolphin decks (which varied from about 4 feet to over 8 feet thick), and frame elements to model the piles (typically 22 inch diameter steel pipe).

The models were made as realistic as was reasonably achievable by modeling the pile depths in accordance with the seafloor contours provided in the as-built drawings; that is, each pile has a unique length/depth based on whether it is a vertical or battered pile, and at what depth it achieves effective fixity at the seafloor. Based on our experience, it was assumed that the effective depth of fixity was 8.5 feet below the surface seafloor contours as presented in the as-built drawings. For battered piles, we developed a methodology for determining point of pile fixity at the seafloor by establishing a system of linear equations, one equation for the pile and one equation for the sloping seafloor, and solved the set of equations for each pile to find the point of intersection.

Ship berthing forces consist of a component of force applied perpendicular to and toward the face of the dolphin, and a component parallel to the dolphin, acting in either parallel direction at a distance of 3 feet from the face of the dolphin. This offset resulted in a significant additional moment applied to the center of gravity (c.g.) of the dolphin deck.

Because both static and dynamic seismic analyses were conducted, and ship berthing and mooring forces were applied, numerous possible load combinations were considered. That is, the seismic forces can act positively or negatively in both the North/South and East/West directions, and the parallel ship berthing forces can act in either a westerly or easterly direction. The perpendicular ship berthing force was applied into the face (i.e. northerly) for all load cases. Based on a number of preliminary analyses, it was determined that 8 different load cases of static and dynamic seismic and berthing and mooring forces had to be considered for each pile structure. These load cases are detailed in Appendix C, Tables 1 through 11. Note that the static and dynamic analyses without ship berthing and mooring were also conducted to obtain a preliminary understanding of the connection adequacy based on code seismic requirements alone. Additionally, the plastic moment capacity of a 22-inch diameter pile was compared to the

Cozen O'Connor Attorneys
Mr. Forrest Booth
Carlsmith Ball LLP
Mr. David Ledger
May 12, 2004

FOXTROT PIER F1
PORT AUTHORITY OF GUAM
Cozen O'Connor Reference No. 123206
(C&A Project No. 6090.00)
Page 7

capacity of the anchor bolts in the repair connection as an additional measurement of the adequacy of the connection.

## Analyses of Pile Flange Connection

The focus of the stress analysis work was solely on the anchor bolt capacity, primarily because this was the predominant mode of failure in these connections as a result of the 2001 earthquake. Thus, a simple model of the 8-bolt anchor bolt connection was developed to determine bolt loads based on the output from the detailed dolphin computer models. Specifically, the end forces in global coordinates from the piles at the underside of the dolphins were taken from the main computer analyses of the dolphins, and inserted into the three dimensional SAP 2000 model of the 8-bolt connection to determine forces in each bolt. All six (6) components of force (shears, tension and moments) were input. This simplified model of the 8-bolt connection was based on the assumption of a rigid based plate and large tension forces in combination with large bending forces that resulted in all bolts being in combined shear and tension. The analysis results proved this assumption to be correct for nearly every governing pile in each dolphin.

## Analysis, Results and Conclusions

Refer to the Appendix C, Tables 1 through 12 for details. For the purposes of determining the adequacy of the anchor bolts, manufacturer's data on the maximum allowable load per bolt was used for comparing to calculated demands. Since the specified Redi-Chem Anchors are no longer available, a similar glass capsule anchor bolt of the same size, material type and embedment was used in our analysis. The product selected is manufactured by ITW Ramset/Red Head, Catalog Reference Epcon A7 Adhesive Anchor. Manufacturer's data for ¾-inch diameter stainless steel bolts with a concrete embedment depth of 6-3/4 inches was used. This data showed that the maximum design load for shear and tension is based on bond capacity of the epoxy material. Those loads are 5,030 pounds in shear and 7,430 pounds in tension. The manufacturer notes that these values are based on a factor of safety of 4 applied to test results, so "ultimate" or test capacities for these bolts, when properly installed, were calculated to be 20,120 pounds in shear, and 29,720 pounds in tension.

The results of the seismic analysis, both with and without ship berthing and mooring forces, can be summarized as follows (note that gravity loads are included in all cases):

The bolts, even if properly installed, are inadequately designed based on any reasonable interpretation and application of the requirements of the 1994 UBC.

➤ Based on static seismic analysis requirements for non-building structures of this type, in conjunction with the specified ship berthing and mooring forces, the demand/capacity (D/C) ratios vary from 3.4 to 7.1 on a working stress basis. A D/C of 1.0 maximum is acceptable; any values over 1.0 indicate an overstress condition.

Cozen O'Connor Attorneys
Mr. Forrest Booth
Carlsmith Ball LLP
Mr. David Ledger
May 12, 2004

FOXTROT PIER F1
PORT AUTHORITY OF GUAM
Cozen O'Connor Reference No. 123206
(C&A Project No. 6090.00)
Page 8

> ➢ Based on dynamic analysis results, in conjunction with ship berthing and mooring forces, D/C ratios vary from 1.8 to 2.8 when comparing raw earthquake force levels to ultimate test capacities of the anchor bolts.

> ➢ Based on dynamic analyses scaled down to static based shear levels for working stress comparison purposes, and eliminating the ship berthing and mooring forces, the D/C ratios vary from 2.3 to 3.6 on a working stress level.

> ➢ For Dolphin A, applying only the static seismic forces yields a D/C of 3.43, whereas the dynamic result scaled to the static base shear for this same dolphin yielded a D/C of 3.61.

As shown above, all reasonable avenues of investigation have been considered and, in each case, it was shown that the anchor bolts are significantly overstressed for code level requirements regardless of whether berthing or mooring loads are considered in conjunction with seismic forces. The demand to capacity ratios for the bolts indicate that the design on Drawing Sheet VE-1 is incapable of meeting the requirements of the intended use of the Foxtrot "F1" facility, namely berthing and mooring of 90,000 DWT tankers. Detailed summaries of all loading combinations, displacements, reactions, bolt loadings for static and dynamic analysis and other details of the computer investigation are contained in Appendix C, Tables 1 through 12.

Technical information (i.e., code citations and equations, calculations, modeling details, and computer input and output data) are kept to a minimum in the narratives presented herein for brevity and simplicity. This information can be made available, if requested. Appendix C, Tables 1 through 12, are spreadsheets of project results and contain an appropriate amount of technical data as necessary to communicate the results of this work.

## EXECUTIVE SUMMARY

Seismic analyses of Dolphins A, B, C, D and G were conducted in accordance with the 1994 Edition of the Uniform Building Code (UBC). Computer runs were made with and without ship berthing and mooring forces acting in combination with earthquake forces. The adequacy of the anchor bolt designs in the failed connections was measured through the use of Demand/Capacity (D/C ratios). The "Demand" is the earthquake force level (in combination with gravity forces, and in some cases ship berthing and mooring forces), and "Capacity" is based on the anchor bolt manufacturer's test data, which has been approved for use by the International Conference of Building Officials (ICBO), the governing code authority. D/C ratios in excess of 1.0 are not acceptable as they indicate excessive stress levels.

We found that for all cases considering seismic, ship berthing and mooring loads, the D/C ratios varied from 1.78 to 7.13. In all cases where no ship berthing and mooring loads were considered in combination with seismic loads, the D/C ratios varied from 2.27 to 3.61. Based on these findings, it can be concluded that the design of the anchor bolts was not adequate relative to 1994 UBC requirements.

Cozen O'Connor Attorneys
Mr. Forrest Booth
Carlsmith Ball LLP
Mr. David Ledger
May 12, 2004

FOXTROT PIER F1
PORT AUTHORITY OF GUAM
Cozen O'Connor Reference No. 123206
(C&A Project No. 6090.00)
Page 9

Reasonable analysis by Winsler & Kelley would have revealed deficiencies in their design. Even a simple static analysis would have shown that the bolts connecting the pile flange to the dolphins were insufficient in diameter and/or number. Disregarding the deficiencies in the design, the critical nature of this connection should have required Winsler & Kelley to request Black Construction Co. to assure that special inspection was taken during the installation of the epoxy, regardless of what product was used. This requirement would be even more important since their product specification (Note 2 of Drawing Sheet VE-1) refers to the Redi-Chem Epoxy System or **approved equal**. This opens the door for substitution and, owing to the variability in product application, it is the Engineer's responsibility to see that critical elements of his design are correctly completed in accordance with his intentions. If an equal were to be allowed, proper engineering practice would have been to see that adequate inspection was undertaken to assure the design would function as intended.

The substitution of the epoxy system was proposed by Black Construction Co. for their advantage, be it either in product availability or at lower cost. Black Construction Co. had a similar duty as Winzler & Kelly to the success of the project, namely to complete a repair project that met the functional requirements of the design. Black Construction Co. had a quality control requirement established in the specifications for this project, but absent that, it was their substitute product, Anchor-It Epoxy, that required special inspection. It would then follow that Black Construction Co, should have provided special inspection or insisted that the Port Authority provide it. Even if special inspection was not provided Black Construction Co. was aware of the critical nature of this connection and even a simple automotive torque wrench test would have identified uncured epoxy. Proper construction practice cannot be ignored where installation is difficult and the element under installation is so critical to the project.

I thank you for this opportunity to be of service in this matter. If you have any questions, please contact me.

Very truly yours,
CASH & ASSOCIATES

Elliott H. Boone, S.E.
Executive Vice President

EHB:cd
G:projects/ehb/609000/Rule26reportpdf.doc

Attachments:
      Drawing Sheet VE-1, Winzler & Kelly (Reduced Copy)
      Appendix A     Reference Listing
      Appendix B     Photographs
      Appendix C     Table 1 – 11 Spreadsheets



# APPENDIX A

## REFERENCE LISTING

# APPENDIX A

## REFERENCE LISTING

<table>
<tr>
<th colspan="2" align="center">Port Authority of Guam<br><br>INDEX OF DOCUMENTS AND TESTIMONY REVIEWED<br>The following is a partial listing.</th>
</tr>
<tr>
<th>Number</th>
<th>Subject of Documents</th>
</tr>
<tr>
<td>1</td>
<td>Drawings, Calculations, Correspondence and other documents produced in litigation by Winzler & Kelly concerning the repairs performed in 1996 – Bates Nos. 00028-00462</td>
</tr>
<tr>
<td>2</td>
<td>Shell F-1 Pier Temporary Repair Evaluation prepared by Duenas & Associates</td>
</tr>
<tr>
<td>3</td>
<td>As Built drawings prepared by Black Construction Co for the project</td>
</tr>
<tr>
<td>4</td>
<td>Winzler & Kelly Drawing VE-1</td>
</tr>
<tr>
<td>5</td>
<td>Structural Calculations for Repairs to Dolphins A, B, C, &D Foxtrot (F-1) Pier prepared by Winzler & Kelly dated December 1995</td>
</tr>
<tr>
<td>6</td>
<td>Responses of Black Construction to Plaintiff S. J. Gargrave's First Set of Interrogatories</td>
</tr>
<tr>
<td>7</td>
<td>Report of video survey, Pier F 1, Commercial Port of Guam, Oceaneer Enterprises, Piti, Guam. Report number GUA-J-01-2519-UW</td>
</tr>
<tr>
<td>8</td>
<td>Various other documents produced by councel relative to this matter contained in 8 four inch thick three ring binders</td>
</tr>
<tr>
<td>9</td>
<td>Deposition of Bruce Swanney of Winzler & Kelly</td>
</tr>
</table>

# APPENDIX B

## PHOTOGRAPHS



Dolphin A



Bolt Withdrawal at Dolphin A



**Dolphin A**



**Bolt Withdrawal at Dolphin A**



**Bolt Withdrawal at Dolphin B**



**Bolt Withdrawal at Dolphin C**



**Bolt Withdrawl – Dolphin Not Identified**



**Bolt Withdrawal at Dolphin C**



**Bolt Withdrawal at Dolphin G**

# APPENDIX C

## TABLES 1 – 12
## SPREADSHEETS

## Seismic Analysis of Berthing Dolphins A, B, C, D & G

Analysis Parameters

Vstatic = ZICW/Rw, Z = 0.3, I = 1.0, C = 2.75, Rw = 3; V = 0.275W

Vdynamic = 94UBC, S1 soil, scaled to 0.3g, **unreduced by Rw**

Bolts = 3/4" dia. ss 304 epoxy anchors with 6-3/4" embed, Vallow = 5030#, Tallow = 7430#

(note: FS = 4 per mfr on test data, assumed 4,000 psi conc.; ChemSet data not available, used Ramset Epcon 7 product data)

Ship P = ship impact perpendicular to face, Ship V = ship impact at 3' from face, Ship M = V times dist to CG of dolphin deck

Explanation of Static and Dynamic Load Cases

DLSI1   Static seismic northerly direction, perpendicular ship impact into face of dolphin, parallel ship impact in westerly direction
DLSI2   Static seismic northerly direction, perpendicular ship impact into face of dolphin, parallel ship impact in easterly direction
DLSI3   Static seismic westerly direction, perpendicular ship impact into face of dolphin, parallel ship impact in westerly direction
DLSI4   Static seismic easterly direction, perpendicular ship impact into face of dolphin, parallel ship impact in easterly direction
DDYI1   Dynamic seismic east-west direction, perpendicular ship impact into face of dolphin, parallel ship impact in westerly direction
DDYI2   Dynamic seismic east-west direction, perpendicular ship impact into face of dolphin, parallel ship impact in easterly direction
DDYI3   Dynamic seismic north-south direction, perpendicular ship impact into face of dolphin, parallel ship impact in westerly direction
DDYI3   Dynamic seismic north-south direction, perpendicular ship impact into face of dolphin, parallel ship impact in easterly direction
Note:   Also conducted UBC 94 static and dynamic analyses with DL only; no impact forces.
        Checked req'd bolt tension to resist plastic capacity of 22" pipe section.

### Table 1 - Summary of Modal Analyses, Ship Impact Loads, and Static/Dynamic Base Shears

| Dolphin | Wt./Mass (Wt = kips) | T, Mode 1 (T = sec.) | T, Mode 2 | T, Mode 3 | Ship P (kips) | Ship V (kips) | Ship M (in-kips) | Vstatic (kips) | Vdynamic (kips) |
|---------|----------------------|----------------------|-----------|-----------|---------------|---------------|------------------|----------------|-----------------|
| A | 568/1.47 | 0.63 | 0.61 | 0.41 | 141 | 141 | 27264 | 156 | 217 |
| B | 533/1.38 | 0.3 | 0.29 | 0.26 | 141 | 141 | 27264 | 147 | 307 |
| C | 1113/2.88 | 0.46 | 0.31 | 0.29 | 80 | 24 | 5616 | 306 | 756 |
| D | 1155/2.99 | 0.51 | 0.36 | 0.33 | 80 | 24 | 5616 | 318 | 738 |
| G | 490/1.27 | 1.73 | 0.33 | 0.3 | 25 | 8 | 1128 | 135 | 313 |

Notes:

Piles at Dolphin A are twice as long as piles at Dolphin B
Dolphin G has no batter piles in EW direction, thus very flexible

1

## Port of Guam
## Seismic Analysis of Berthing Dolphins A, B, C, D & G

Table 2 - Maximum Static Displacements (inches)

| Dolphin | DLSI1 | DLSI2 | DLSI3 | DLSI4 |
|---------|-------|-------|-------|-------|
| A | 3.85 | 3.56 | 3.49 | 4.29 |
| B | 0.96 | 0.85 | 0.82 | 0.98 |
| C | 0.21 | 0.21 | 0.67 | 0.67 |
| D | 0.3 | 0.27 | 0.82 | 0.83 |
| G | 0.53 | 0.53 | 9.26 | 9.26 |

Table 3 - Maximum Dynamic Displacements (inches)

| Dolphin | DDYI1 | DDYI2 | DDYI3 | DDYI4 |
|---------|-------|-------|-------|-------|
| A | 3.88 | 3.88 | 4.29 | 3.86 |
| B | 1.14 | 1.31 | 1.32 | 0.74 |
| C | 0.71 | 0.71 | 1.54 | 1.53 |
| D | 1.72 | 1.73 | 0.97 | 0.9 |
| G | 5.49 | 5.49 | 0.62 | 0.99 |

Table 4 - Worst-Case Pile Reactions at Dolphin - Static Seismic Combos (kips and inch-kips)
(worst case is max. tension in the connection)

| Dolphin | Vx | Vy | Vz | Mx | My | Mz | Gov. Case |
|---------|------|-------|--------|---------|---------|---------|-----------|
| A | 198.32 | 0.72 | 470.22 | 438.7 | -107.85 | -401.82 | DLSI4 |
| B | 1.44 | 113.7 | 256.57 | 1196.37 | -288.51 | 87.1 | DLSI1 |
| C | 0.17 | -0.7 | 148.72 | 276.59 | 70.48 | 7.85 | DLSI3 |
| D | -0.19 | -66.89 | 158.98 | 137.44 | -70.32 | 0.14 | DLSI3 |
| G | -19.9 | 12.29 | 48.43 | 4081.82 | 59.01 | 1733.92 | DLSI3 |

2

# Port of Guam
## Seismic Analysis of Berthing Dolphins A, B, C, D & G

Table 5 - Worst-Case Pile Reactions at Dolphin – Dynamic Seismic Combos (kips and inch-kips)
(worst case is max. tension in the connection)

| Dolphin | Vx | Vy | Vz | Mx | My | Mz | Gov. Case |
|---|---|---|---|---|---|---|---|
| A | 176.4 | 1.06 | 418.66 | 642.13 | 70.49 | -208.26 | DDYI4 |
| B | 124.98 | 0.2 | 293.13 | 84.87 | 76.79 | 226.39 | DDYI2 |
| C | 111.31 | 0.96 | 273.55 | 374.52 | -171.32 | 114.62 | DDYI4 |
| D | 121.04 | 0.03 | 289.21 | 59.54 | -174.59 | 23.26 | DDYI3 |
| G | 58.16 | 0.93 | 155.97 | 314.41 | 925.3 | 188.26 | DDYI3 |

Table 6 - Worst-Case Bolt Loads - Static Seismic Combos (kips)

| Dolphin | Vmax | Tmax | Vallow | Tallow | Vm/Va | Tm/Ta | ▉ |
|---|---|---|---|---|---|---|---|
| A | 29.2 | 68.7 | 5.03 | 7.43 | 5.81 | 9.25 | 6.65 |
| B | 14.2 | 56.7 | 5.03 | 7.43 | 2.82 | 7.63 | 5.24 |
| C | 0.1 | 24.9 | 5.03 | 7.43 | 0.02 | 3.35 | 2.16 |
| D | 8.5 | 24.5 | 5.03 | 7.43 | 1.69 | 3.30 | 3.41 |
| G | ▉ | ▉ | 5.03 | 7.43 | 4.41 | 13.26 | 7.13 |

▉ Not valid as some bolts are in compression; model is valid only for all bolts in tension
Using sum of 5/3 roots Vm/Va and Tm/Ta

Table 7 - Worst-Case Bolt Loads - Dynamic Seismic Combos (kips)

| Dolphin | Vmax | Tmax | ▉ | ▉ | Vm/Vu | Tm/Tu | ▉ |
|---|---|---|---|---|---|---|---|
| A | 24.3 | 66.9 | 20.12 | 29.72 | 1.21 | 2.25 | 2.75 |
| B | 17.4 | 41.2 | 20.12 | 29.72 | 0.86 | 1.39 | 2.13 |
| C | 12.5 | 42.7 | 20.12 | 29.72 | 0.62 | 1.44 | 1.99 |
| D | 14.9 | 38.0 | 20.12 | 29.72 | 0.74 | 1.28 | 2.00 |
| G | 7.4 | 41.8 | 20.12 | 29.72 | 0.37 | 1.41 | 1.78 |

▉ Based on 4x allowbles assuming failure mode is bond strength
Using sum of 5/3 roots Vm/Vu and Tm/Ta

3

# Port of Guam
## Seismic Analysis of Berthing Dolphins A, B, C, D & G

Table 8 - DL + 94UBC Spectra Scaled to Vstatic; no ship impact - Worst Case Pile Reactions (global, kips and inch-kips)

| Dolphin | Vx | Vy | Vz | Mx | My | Mz |
|---|---|---|---|---|---|---|
| A | 63.94 | 0.42 | 154.75 | 263.89 | 409.27 | 82.91 |
| B | 31.17 | 0.3 | 74.54 | 102.58 | 166.03 | 52.26 |
| C | 61.96 | -0.001 | 154.08 | 18.16 | -191.46 | -0.3 |
| D | 70.94 | 0.32 | 171.44 | 177.84 | -275.65 | 44.73 |
| G | 0.59 | 0.02 | 187.35 | 3.31 | 197.79 | 4.32 |

Table 9 - Worst-Case Bolt Loads for DL + 94 UBC Spectra Scaled to Vstatic; No ship impact

| Dolphin | Vmax | Tmax | Vallow | Tallow | Vm/Va | Tm/Ta | D/C |
|---|---|---|---|---|---|---|---|
| A | 7.36 | 31.18 | 5.03 | 7.43 | 1.46 | 4.20 | 3.61 |
| B | 3.49 | 14.13 | 5.03 | 7.43 | 0.69 | 1.90 | 2.27 |
| C | 7.75 | 22.2 | 5.03 | 7.43 | 1.54 | 2.99 | 3.23 |
| D | 8.47 | 27.57 | 5.03 | 7.43 | 1.68 | 3.71 | 3.55 |
| G | 0.13 | 27.93 | 5.03 | 7.43 | 0.03 | 3.76 | 2.33 |

Table 10 - DL + Vstatic, No Ship Impact - Worst Case Pile Reactions Dolphin A only for comparison purposes (global, kips and inches)

| Dolphin | Vx | Vy | Vz | Mx | My | Mz |
|---|---|---|---|---|---|---|
| A | 57.84 | 0.34 | 140.37 | 207.5 | 232.3 | -110.79 |

Table 11 - DL + Vstatic, No Ship Impact - Worst Case Bolt Loads Dolphin A only (global, kips and inches)

| Dolphin | Vmax | Tmax | Vallow | Tallow | Vm/Va | Tm/Ta | D/C |
|---|---|---|---|---|---|---|---|
| A | 8.15 | 25.54 | 5.03 | 7.43 | 1.62 | 3.44 | 3.43 |

Table 12 - Bolt Loads for Plastic Capacity of 22" Dia. Pile/0.375" thick - Mp = 6314 "-k based on 36 ksi yield

Tmax = 143k, which is nearly 5x greater than published tension test capacity of 29.72 kips
D/C = 4.8

4