KLEMM, BLAIR, STERLING & JOHNSON
A PROFESSIONAL CORPORATION
1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
AGANA, GUAM 96910
TELEPHONE 477-7857

By THOMAS C. STERLING

Attorneys for    *Defendant Black Construction Corporation*

FILED
DISTRICT COURT OF GUAM
OCT -7 2005
MARY L.M. MORAN
CLERK OF COURT

IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| S.J. GARGRAVE SYNDICATE AT LLOYDS,<br><br>        Plaintiff,<br><br>  vs.<br><br>BLACK CONSTRUCTION CORPORATION and WINZLER & KELLY CONSULTING ENGINEERS and ENGINEERING, MANAGEMENT & PLANNING SERVICES CORPORATION,<br><br>        Defendants. | CIVIL CASE NO. CV03-00009<br><br>**DEFENDANT BLACK CONSTRUCTION CORPORATION'S DEPOSITION DESIGNATIONS PURSUANT TO RULE 26(a)(3)(B)** |

Defendant **BLACK CONSTRUCTION CORPORATION** intends to present testimony of the following unavailable witness through deposition testimony.

    1.    **BEN CASEY (VIDEOTAPE DEPOSITION).**

Black intends to offer the following portions of Mr. Casey's testimony and reserves its right to offer additional foundational testimony if that testimony is not presented by the Plaintiff in its case-in-chief.

    Page 24, line 4, through page 24, line 16;

    Page 108, line 20, through page 114, line 5;

Page 115, line 13, through page 124, line 4;

Page 128, line 4, through page 130, line 7; and

Page 141, line 22, through page 143, line 7.

KLEMM, BLAIR, STERLING & JOHNSON
A PROFESSIONAL CORPORATION

DATED: OCTOBER 7, 2005      BY: *[signature]*

**THOMAS C. STERLING**
*Attorneys for Defendant Black Construction Corporation*

```
E62\27946-29
G:\WORD97\OFFICE\WORDDOC\PLD\TCS\250-BCC'S DEPO
DESIGNATIONS RE GARGRAVE V BLACK ET AL.DOC
```

KLEMM, BLAIR,
STERLING & JOHNSON
A PROFESSIONAL CORPORATION
1008 PACIFIC NEWS BLDG
238 ARCHBISHOP
F.C. FLORES ST.
HAGÅTÑA, GUAM 96910
TELEPHONE 477-7857

- 2 -

Case 1:03-cv-00009    Document 238    Filed 10/07/2005    Page 2 of 12

```
 1              IN THE DISTRICT COURT OF GUAM
 2   S.J. GARGRAVE SYNDICATE AT LLOYDS,)
         Plaintiff,                    )
 3                                     )
     vs.                               )   CIVIL CASE NO. CV03-00009
 4                                     )
     BLACK CONSTRUCTION CORPORATION,   )
 5   WINZLER & KELLY, and ENGINEERING  )
     MANAGEMENT & PLANNING SERVICES    )
 6   CORPORATION,                      )
         Defendants.                   )
 7
 8
 9
10        ******************************************
11                ORAL AND VIDEOTAPED DEPOSITION OF
12                           BEN CASEY
13                        MARCH 23, 2004
14        ******************************************
15
16
17
18        ORAL AND VIDEOTAPED DEPOSITION of BEN CASEY, produced as a
19   witness at the instance of the Plaintiff, and duly sworn, was
20   taken in the above-styled and numbered cause on the 23rd day of
21   March 2004, from 10:32 a.m. CST to 3:57 p.m. CST, before Dalia
22   F. Inman, CSR, in and for the State of Texas, reported by
23   machine shorthand, at the offices of Cozen O'Connor, 1717 Main
24   Street, Suite 2300, Dallas, Texas, pursuant to the agreements
25   stated on the record and the Federal Rules of Civil Procedure.
```

## Page 21

1 thread. It's a very fat thread unlike a bolt that has a very
2 fine thread on it.
3   Q   Okay. And so what you described as the temporary
4 repair that Smithbridge did consisted of installing those bars
5 and concrete and working on the 25 piles. Right?
6   A   That's -- that's correct.
7   Q   Okay.
8   A   What -- what we did is we -- we thought of a process
9 that would be, hopefully, economical and -- and sufficient at
10 the same time to do a temporary repair and stabilize that
11 structure without having to do a hundred percent of the piles.
12 So we -- we tried to find a system that we would think would be
13 sufficient in design capacity by only having to repair 25 to
14 make it -- make it stable.
15       This was done in conjunction with Duenas &
16 Associates, as the designer for -- for this particular system,
17 and which we thought would be a good method to tie the piles
18 to -- back to the concrete pier cap or mooring -- concrete
19 mooring pad.
20   Q   Okay. You referred to Duenas & Associates as the
21 designer. Did Smithbridge Guam have any input into the design?
22   A   Yes. Yeah. Absolutely. It's -- in construction
23 nowadays, we work very closely with our designers to come up
24 with practical and constructible-type solutions for our
25 construction. It does two things. Hopefully the client will

## Page 22

1 get a good value for it and we don't have to try and
2 value-engineer it after it's been designed. So a close --
3 close association with the designers at the time helps -- helps
4 on designing the repair once instead of going backwards and
5 forth trying to come up with it.
6       So we at Smithbridge had -- had came up with the
7 philosophy of how to tie these down, and Duenas worked with us
8 to -- to come up with the design calculations that would
9 make -- make it work in -- in terms of requiring being signed
10 off and -- and designed by -- by a -- an engineering
11 consultancy company.
12   Q   Okay. So if I understand your answer, the su-- the
13 suggestion to use the Dywidag bar was a Smithbridge suggestion?
14   A   Absolutely. Yes.
15   Q   Okay. Is this a product you'd used before?
16   A   We had -- we had seen this product used, and Albert
17 Smith, the managing director, had used it on another occasion
18 for -- for tying or -- or making the connection point there.
19       It -- it would be common practice for a concrete
20 pile to be anchored into the concrete slab by some form of --
21 of metal-type connection, whether that was rebar or stress bar
22 anyway. So we just -- we just sort of made it a -- or -- or
23 thought of the design a bit further and refined it to try and
24 work for the situation.
25   Q   Okay. Do these Dywidag bars come in different sizes?

## Page 23

1   A   Yeah. Obviously the -- when the design was
2 completed, Duenas obviously come back and -- and say what --
3 what diameter this bar's required to do this -- this particular
4 amount of work in the situation. So yes.
5   Q   Okay. Do you know whether they performed any
6 comparison between -- of the -- let's say, the sheer strength
7 of the Dywidag bar compared to the 3/4-inch bolts that had been
8 previously used to secure the piles?
9   A   Certainly not in conjunction with ourselves. I think
10 we had done -- we actually did a comparison just to know what
11 the possible strength was of -- of those bars would be correct.
12 But I don't think we were involved in a direct design analysis
13 as such. There might have been -- they may have done some
14 quick checks just to see what the capacity of -- of putting
15 bolts back in might have been, yes.
16   Q   Okay. You say "we weren't involved," do you mean
17 Smithbridge wasn't involved in doing that kind of a comparison?
18   A   I -- I don't recall exactly how -- how or what we
19 decided on -- on the method of not going to bolts and going to
20 a Dyvidag bar, but I'm sure there was probably some preliminary
21 consideration where we considered it for -- for the design
22 repair. It was put out -- out very soon basically because --
23 how can I say this? We had seen a failure in that at the time,
24 so therefore there was no point in trying to do a similar-type
25 repair as a temporary repair, so -- so we stuck with our

## Page 24

1 Dyvidag system.
2       In terms of Duenas doing a check on it, I don't
3 recall.
4   Q   Okay. So I take it there was never any serious
5 consideration of simply re-epoxying the bolts, the eight bolts
6 per flange as had originally been -- the repair done after the
7 1991 earthquake?
8   A   As -- as I recall, looking at the situation from a
9 boat when we were doing some visual inspections coming to think
10 of the best way to repair it, basically we would've been trying
11 to put a bolt back in a -- in a hole that had some sort of
12 failure in it anyway, and we were trying to stay away from the
13 possible failure mode that had already happened.
14   Q   Okay. So that was -- excuse me. Reinstalling the
15 bolts was never seriously considered in the 2001 time frame?
16   A   No, it wasn't.
17   Q   Okay. Were the Dywidag bars in common use in the
18 construction industry in the year 2001, say?
19   A   I would -- Dyvidag, tie bars, tie bolts, she bolts
20 are -- are used all throughout the heavy construction industry
21 all around the world. Yes. Definitely.
22   Q   Would they have been in common use back in the
23 '95-'96 time frame?
24   A   Yes. Absolutely. Uh-huh.
25   Q   This isn't a recent invention that has just come

LegaLink Dallas
global court reporting * legal videography * trial services

800-966-4567
www.legalink.com

6 (Pages 21 to 24)

Case 1:03-cv-00009   Document 238   Filed 10/07/2005   Page 4 of 12

## Page 105

1 preload of that 6,550 PSI.
2  Q   Is this a hydraulic jack that you're using?
3  A   It would be a hydraulic pumping-jacking system.
4 Correct.
5  Q   And basically you're -- the -- the jack is pushing
6 down on the top of the pile cap, trying to pull the bolt up out
7 of the hole?
8  A   No. It has -- it has, like, a jig that -- let me
9 see.
10      My finger would be the best bet. You have the
11 concrete at this level.
12 Q   Uh-huh.
13 A   Then you have the -- the washer above the concrete.
14 Then you have the nut that's -- it's called the lock-down nut.
15 Then we would have enough thread above that that we could put a
16 jig -- a steel frame --
17 Q   Uh-huh.
18 A   -- and a -- and a second temporary nut that holds the
19 jig onto the top of the bolt. Then we would have a jack -- I
20 think in this case we -- we used two 100-ton jacks -- either
21 side of the jig. And one of the jacks would've been hard on
22 the concrete -- or -- or sorry, two jacks would've been hard on
23 the concrete, and the top of the jacks would have been
24 connected to the steel jig; and as you pump up the pressure,
25 the jig would -- would travel upwards, hence putting the

## Page 106

1 tension onto the bolt.
2  Q   Okay. So ultimately the force, though, is from the
3 jacks down onto the surface of the pile -- I'm sorry, on the
4 surface of the cap, and it's pull -- it's attempting to pull
5 the bolt out of the hole?
6  A   That's correct. Yes.
7  Q   Okay.
8  A   Uh-huh. Yeah.
9  Q   And the first test is at -- to 4,000 PSI. That's --
10 that's hydraulic pressure in the jack. Is that right?
11 A   That -- that is pure hydraulic pressure onto the
12 jack. You can convert that to a physical force by dividing --
13 if you go and find out which jack we used, the area head of the
14 jack, the cylinder in the jack --
15 Q   Uh-huh.
16 A   -- has so many square inches. And if you put that
17 into the PSI, you can then calculate the -- the direct force.
18 But in our industry, most people know that, so you just -- you
19 physically write down the -- the pressure that's read off the
20 gauge.
21 Q   Okay. And does this -- I guess it's page 4 of the
22 exhibit -- indicate that all of the repaired piles and Dywidag
23 bolts passed the inspection test?
24 A   All the ones that are lifted -- listed here, if
25 they're listed and they're listed good, they -- that means they

## Page 107

1 would've had that loading put on them prior to the nut putting
2 down. So yes, we can assume that all the bolts were under
3 these conditions.
4  Q   Okay.
5  A   And might I add, this appears to actually be a field
6 -- what we call a field document which would also be what we
7 call a live document. And just by looking at the -- the -- the
8 hand that's written this, it's -- it's not consistent, so it
9 wasn't written in one day. It was added to as each test was
10 done and -- at a different time.
11 Q   And because the dates range from the middle of July
12 until, I guess, the middle of August --
13 A   Uh-huh.
14 Q   -- sorry, I guess it's the end of June to the middle
15 of August --
16 A   Uh-huh.
17 Q   -- was it the practice to do a test after you
18 completed a particular pile rather than wait to do them all at
19 the end?
20 A   Yeah. We would've want to have got certain piers
21 signed off as they were completed. So my thought here is that
22 they've been completed as we go. So as soon as all the bolts
23 in that dolphin are complete, we -- we know that that
24 structure's then safe.
25 Q   Okay.

## Page 108

1  A   Rather than doing them on the same day.
2      MR. BOOTH: Thanks. I think that's all the
3 questions I have at the moment.
4      THE WITNESS: Only an hour.
5      MR. STERLING: 45 minutes actually.
6      Okay. Why don't we just go ahead and start up -
7 here.
8      Forrest, with your approval, I'm going to ask if
9 we can use Mr. MacLeod's exhibits to avoid unnecessary
10 paperwork.
11     MR. BOOTH: Sure.
12     MR. STERLING: And I have copies of these.
13            EXAMINATION
14 BY MR. STERLING:
15 Q   I'd like you, if you could, to turn to MacLeod
16 Exhibit Q, if you would, please.
17     MR. STERLING: Forrest, I don't know if you have
18 an additional copy, so...
19     MR. BOOTH: Thanks.
20 Q   (BY MR. STERLING) This is your estimate that you
21 discussed previously. Who actually prepared this estimate; was
22 it you or somebody else at Smithbridge?
23 A   No. It looks like my estimate.
24 Q   Okay. You indicate on here that you had an allowance
25 of $50,000 for design fees and local building permits.

LegaLink Dallas
global court reporting * legal videography * trial services
800-966-4567
www.legalink.com

27 (Pages 105 to 108)

Case 1:03-cv-00009   Document 238   Filed 10/07/2005   Page 5 of 12

## Page 109

1  A    Uh-huh.
2  Q    Do you know how much of this 50,000 was design fee?
3  A    No, I've got no idea.
4  Q    Do you know how much you allocated for local building
5 permits?
6  A    I -- I've got no idea. It's standard -- when -- when
7 you're putting in an RFP or an estimate in -- in this, and this
8 certainly wasn't -- if -- if you see, this was for the complete
9 repair, not the temporary repair. You -- you have to have a
10 rough idea of -- of how much it's going to be. Design fees in
11 Guam generally ranged from, sort of, four or five percent right
12 up to eight percent of the contract value. Local permit fees,
13 on recollection now, for about a million-dollar contract, if I
14 recall, it wasn't uncommon to have a $20,000 building fee of
15 that sort of magnitude.
16  Q    Now, you mentioned earlier in your testimony that
17 this $1,420,000 number also included a percentage for overhead
18 and a percentage for profit. Do you remember what those
19 percentages were that you used in building this number?
20  A    Not offhand, no. I'd have to look back through
21 the -- through the actual estimate itself.
22  Q    All right. There's actually three separate items
23 included in this propo-- where would that estimate be? Do you
24 know?
25  A    Good question. Should -- should be somewhere in --

## Page 110

1 in the Smithbridge estimate files. I -- I'm guessing.
2  Q    Okay. Now, this has three separate items: the pile
3 repair, the design and permits, and also epoxy injection of
4 cracks and spall repair.
5  A    Uh-huh.
6  Q    Did you add overhead and profit to all three of these
7 components in building this number; meaning, did you add them
8 up, get a lump sum, and then add overhead and profit on all
9 those components?
10  A    I can't recall the method I actually used to estimate
11 this particular project. There are several different ways you
12 can estimate.
13  Q    Okay.
14  A    One -- one is --
15  Q    My question is, do you recall whether you added
16 overhead and profit to all these items? Yes or no?
17  A    Oh, is there overhead and profit in this figure here?
18 Absolutely there is.
19  Q    But my question is a little different and that is,
20 for instance, when you got the number for Item 3, which is
21 crack repair and spall repair --
22  A    Uh-huh.
23  Q    -- would that have been a number that you built
24 overhead and profit into in coming up with $1,420,000?
25  A    Well, hold it. You -- you're asking two different

## Page 111

1 questions here. There is some ambiguity. When -- when I say I
2 can't specifically say until I see the estimate, if you have a
3 look on Item 2, I've -- I've set a sum. I haven't defined
4 whether that allowance has overhead and profit in it. I --
5 I -- I haven't been definitive. I can't recall unless I see
6 the estimate.
7         If you go, then, to Item 3, Item 3 actually
8 doesn't have a figure that's related to it, not that I can see.
9  Q    Right.
10  A    So therefore, I'm -- I'm confused at your question.
11  Q    Well, my question is, when you built your estimate
12 you would've had a number for provide 800 linear feet of epoxy
13 injections to cracks --
14  A    That's correct.
15  Q    -- et cetera.
16  A    Uh-huh.
17  Q    And when you had that number and you were, then,
18 working it out to come up with your proposal number, would
19 overhead and profit have been added on to this particular
20 Item 3 component?
21  A    Oh, absolutely.
22  Q    Okay. Now --
23  A    That's how we make money.
24  Q    All right. Item 3, just for my information, this
25 didn't have anything to do with failed connections between the

## Page 112

1 pilings and the dolphins, did it?
2  A    Some of the spall repair would've -- sorry. Can you
3 ask that question again?
4  Q    Okay.
5  A    Didn't have -- have any relationship to the
6 earthquake --
7  Q    Well --
8  A    -- damage or the status -- I'm --
9  Q    Right. This lawsuit largely involves the failure of
10 the pilings --
11  A    Uh-huh.
12  Q    -- to the dolphins. Okay?
13  A    Right.
14  Q    And the need to go back --
15  A    Uh-huh.
16  Q    -- and repair that connection.
17        My question to you is, was this Item 3 related
18 to the need to repair those connections or was it related just
19 to earthquake damage to the caps?
20  A    This Item 3 would've been directly related to the
21 earthquake damage or -- or the condition of the pier. It
22 would've had no direct relationship to the connection except
23 for some instances and where there was spawling appeared around
24 where the connection was in particular.
25  Q    Okay. But as we sit here today, you don't know

LegaLink Dallas
global court reporting * legal videography * trial services

800-966-4567
www.legalink.com

28 (Pages 109 to 112)

Case 1:03-cv-00009   Document 238   Filed 10/07/2005   Page 6 of 12

### Page 113

1  exactly how much you included in this estimate for Item 3.
2  Correct?
3     A    No. But with -- with some research -- I -- I know
4  for a fact that's a fairly small number. In terms of the 1.4
5  million, it's -- it's -- it would be less than a hundred
6  thousand; I know that for sure. So it's relatively small
7  compared to the overall contract value.
8     Q    Okay. Now, when you prepared this estimate, who
9  asked you to prepare it?
10    A    It's -- it's been -- this initial document that we're
11 referring to, Exhibit Q, was directly sent to -- sent to
12 Mr. MacLeod at MacLeod Claims Management. So initially this --
13 this would've been sent to Peter and requested by Peter.
14    Q    Okay. Did he tell you at the time he requested it
15 what he wanted it for; meaning, did he tell you, "I'm going to
16 award a contract to do this work," or "I need it to negotiate
17 with the Port"? Or did he tell you what he wanted it for?
18    A    He would have indicated to me that there may have
19 been a possibility of -- of winning a contract. And as -- as a
20 -- as a commercially-orientated contractor, I go on all my
21 leads possible to try and win work for our company.
22    Q    Okay. So just so I understand your testimony,
23 MacLeod indicated to you, "If you give us a proposal, there's a
24 possibility you might get the work"?
25    A    No. He indicated to me that "If -- if you can help

### Page 114

1  me prepare a proposal, you can certainly be on a list of
2  contractors to bid this contract."
3     Q    Do you know whether he got proposals similar to this
4  from any other contractors?
5     A    Not that I'm aware of, no.
6     Q    Talking just in general -- and I'll just use, like,
7  Casey Exhibit 10 for an example, which it -- it's just got
8  as-built stamps on it.
9     A    Uh-huh.
10    Q    Looking at the various documents that we've looked at
11 today and at other times having to do with the temporary repair
12 job, I've never seen anything that has a building permit stamp
13 on it. Did you get a building permit for this job?
14    A    I think if you have a look back through the
15 documentation, there is a letter from Duenas requesting either
16 a waiver or -- or something to the Public Works asking that --
17 because this is a temporary-type repair and not a permanent
18 repair, that the building permit for the temporary repair
19 wasn't -- wasn't required. However, if you refer then back to
20 this document, Exhibit Q, which is for the total repair, the
21 building permit would've been included because it was a
22 permanent repair.
23    Q    Okay. But basically in connection with this
24 temporary repair using this technique designed by Dennis and
25 Duenas, you did not need a building permit, to your knowledge,

### Page 115

1  because it was a temporary repair. Correct?
2     A    No. What I said is that Duenas wrote a letter and
3  contacted Department of Public Works, who issued building
4  permits, to assist whether a permit was required.
5     Q    Okay. So you did not get a building permit, correct,
6  because they said it wasn't required?
7     A    Correct.
8     Q    Okay.
9     A    When you say "they," we're referring to the Public
10 Works?
11    Q    Public Works.
12    A    Yes.
13    Q    I'm going to show you now, if I could, what is
14 MacLeod Exhibit R. You can turn to that if you would, please.
15 And this is what I like to refer to -- and correct me if I'm
16 wrong -- as the -- the first version of this November 10th,
17 2001, letter before editing.
18    A    Okay.
19    Q    Who -- why did you prepare this letter? What was the
20 purpose of this, if you recall?
21    A    On first contact with Mr. MacLeod, who isn't a civil
22 engineer or isn't a contractor, my -- my opinion was that
23 Peter, in the initial stages, was looking for someone that
24 could give him some help, some information, some -- something
25 about this facility. I contacted him, and -- and because of

### Page 116

1  that, he used me as a person or -- or Smithbridge as a company
2  to help in -- in some initial thoughts on -- on what may have
3  happened there.
4     Q    Okay.
5     A    As you see, this is a very -- this is within four
6  weeks of -- of the earthquake. So...
7     Q    And when you say you became aware that Mr. MacLeod
8  was looking for some help on this facility, how did you become
9  aware, if you recall? Terry Thompson, by any chance?
10    A    I -- I think Mr. Thompson may -- I didn't know Terry
11 Thompson prior to knowing Peter MacLeod, but Terry Thompson had
12 -- had either worked with Peter or had known of our company
13 in -- in some other capacity, and I'm unaware of what that
14 capacity might be.
15    Q    Okay. So going back to this Exhibit R, then, when
16 you learned that Peter was looking for some help on this pier
17 and dolphin issue, did you just gratuitously send him this
18 letter? Did you speak with him first?
19    A    No. No, no. I heard that Peter was in -- in Guam
20 after the earthquake doing insurance assessments for -- for
21 damage, and I managed to get ahold of Peter. And I think
22 somebody had given me Terry Thompson's name, who I've already
23 said I didn't know prior to this, and I managed to get a phone
24 number, and I managed to contact them prior to them flying out,
25 I think even that same day that I initially met them.

### Page 117

1  Q  And so did you speak with Peter and he asked you to
2 generate a report on your views of the pier and dolphin? I'm
3 just wondering what caused you -- what you were asked to do and
4 why you prepared this letter.
5  A  Well, as I -- as I previously said, as a commercial
6 contractor, we're out looking for work whichever -- whichever
7 way we can get it. And Peter -- obviously Shell F-1 Pier had
8 damage that had to be fixed, and Peter was -- Peter was the
9 vehicle that I personally as -- as a general manager could see
10 to approach to -- to try and win some construction work.
11  Q  Okay. So, then, do I understand your answer to be
12 you understood there might be a job there; you prepared this
13 letter to send it to Peter to say, "Here's what we can do for
14 you"?
15  A  Yeah. It's a bit of a -- a get to know the person;
16 you know, how good is this guy; you know, how -- what sort of
17 experience do these guys have. So I'm obviously going to give
18 him a letter with as much knowledge and as much help as I can
19 to help this man.
20  Q  Okay. Then if you could turn to MacLeod Exhibit S,
21 which is this version.
22  A  Uh-huh. Yeah.
23  Q  Can you tell me how it was you received that? Was it
24 faxed back to you or -- or handed to you? How is it that you
25 became aware that Peter wanted you to edit what you previously

### Page 118

1 had sent to him as Exhibit R?
2  A  On analysis of this piece of paper, I think there's
3 plenty of fax stamps and times and dates on here. I'm going to
4 assume that it was faxed to us.
5  Q  Okay.
6  A  I -- I mean, I can't recall our movements on the 10th
7 of November 2001, so I'm assuming they were faxed to us.
8  Q  Okay. And just as an instruction, if at any time you
9 don't know something or you don't remember something, please
10 feel free to say so. That's an acceptable answer.
11  A  Yeah. Uh-huh.
12  Q  Okay.
13     Was this, in -- in -- in your experience,
14 unusual to -- to have -- you send somebody a proposal to
15 basically solicit some work and they send it back to you --
16 edit it and ask you to send it to them again?
17  A  No. Because at this early stage of -- of any get to
18 know anyone or get to know where the money source is or the
19 money stream or to get to know who may be issuing the RFP at
20 the time, you know, there -- this is early stages. This is
21 four weeks after -- after an earthquake; and, you know, nobody
22 knew where the money was going to come from. Nobody knew who
23 was going to issue the RFP. Nobody knew who was allowed to
24 issue the RFP. Or nobody knew who was allowed to sign the
25 contract.

### Page 119

1 So I'm going a hundred percent on -- on a person
2 I'd met a couple of weeks beforehand, on -- on his request.
3  Q  Okay. When you met Mr. MacLeod a couple of weeks
4 beforehand, did you understand who he represented, meaning
5 Lloyds of London?
6  A  I knew he was representing an underwriter. Whether
7 it was particularly Lloyds of London or whether it was some
8 connection with AM Insurance, I -- I didn't know, no.
9  Q  Okay. Looking at page 2 of this MacLeod Exhibit S,
10 earlier, Mr. Booth questioned you concerning the change --
11 well, let me ask you this question.
12     Before today, sitting in this room during this
13 deposition, when was the last time you saw this Exhibit S?
14  A  Oh, I can't recall. But it's very simple to assume
15 probably at the time we were doing the changes to it.
16  Q  Okay. Did you discuss it with Mr. Booth at all
17 before you came in here today to give your testimony?
18  A  No. No, I have not.
19  Q  You mentioned earlier today in response to his
20 questioning concerning the edit that changed the word
21 "disrepair" to "damage" --
22  A  Uh-huh.
23  Q  -- in the first paragraph --
24  A  Yeah.
25  Q  -- and -- and you -- you said -- and -- if -- if I

### Page 120

1 got my notes correct, you said it didn't matter to me one way
2 or the other. Why was that? That you didn't -- you put
3 "disrepair." MacLeod wanted it changed to "damage." You said
4 it doesn't matter to me.
5  A  I -- I'm a civil engineer. I -- I work in nuts and
6 bolts, concrete, steel, black and white. I'm not a person with
7 an English degree. I'm -- I'm -- I'm not a person that is --
8 is too concerned about how I describe something.
9     Peter -- Peter asked me to write "damage" in
10 there; I write "damage" in there. It means the same -- as a
11 civil engineer, the same.
12  Q  Meaning it has to be repaired. Correct?
13  A  Meaning that there is damage requiring repair.
14 Correct.
15  Q  Down in the next paragraph having to do with the fuel
16 pier, he also indicated to delete language, "The corrosion is
17 so extensive that the piles have no significant structural
18 steel left."
19     You -- you also removed that in the final draft.
20 Is that correct?
21     And I have the final draft. I mean, I want to
22 be fair to you here.
23  A  Okay. This -- this particular clause here is
24 actually referring to the main section of the fuel pier.
25  Q  Yeah.

LegaLink Dallas
global court reporting * legal videography * trial services

800-966-4567
www.legalink.com

30 (Pages 117 to 120)

Case 1:03-cv-00009   Document 238   Filed 10/07/2005   Page 8 of 12

### Page 121

1  A   And if I can refer back to your Exhibit 8, it's
2  referred to here as the main wharf.
3  Q   Yes, I'm familiar with that. But my question is, did
4  you, in fact, make that change to remove the reference to
5  corrosion is so extensive that the piles have no significant
6  structural steel left?
7  A   You tell me.
8  Q   Okay.
9  A   Show me the final document, and I'll tell you if it
10 was removed or not.
11 Q   Okay. This would be -- I'm not sure which exhibit
12 this was with our friend Mr. MacLeod. Let me check.
13      MR. O'CONNOR: T.
14      MR. STERLING: Was it T?
15      MR. O'CONNOR: I think so.
16      MR. STERLING: Could you check T, and then if it
17 is --
18      MR. O'CONNOR: Either R or T.
19      MR. BOOTH: The notebook in front of you has
20 them all in order there. You can just flip to T.
21      MR. STERLING: That's it. Okay.
22      MR. BOOTH: It's either S or T.
23 Q   (BY MR. STERLING) It's Exhibit T. That's Exhibit T,
24 and you can refer to the second page just to speed this up.
25 A   Well, obviously not. It's still in there, the

### Page 122

1  same -- the same word.
2      MR. O'CONNOR: Which one is R, Tom?
3      MR. STERLING: Is it R? I'm trying to figure
4  out -- hang on. Excuse me.
5      THE WITNESS: That's T.
6      MR. O'CONNOR: No. I think --
7  Q   (BY MR. STERLING) All right.
8  A   Where -- oh. The corrosion --
9  Q   The language --
10 A   Sorry.
11 Q   Yeah. The language, "The corrosion is so extensive
12 that the piles have no significant structural steel left."
13 A   Well, it looks as though it's been reworded to, "The
14 existing piles have extensive corrosion to the structural
15 tube."
16 Q   Let me ask you this. At the time you -- so you did
17 make that change? You did delete the language?
18 A   Yeah. It looks like it. Yeah.
19 Q   At the time you -- you did that, did anybody indicate
20 to you who this letter was going to and why it was necessary to
21 edit it? I mean, if it's going to Mr. MacLeod, you know, you
22 expressed -- he has it. So you must've thought it's going to
23 somebody else that he doesn't want this in there.
24      Did anybody ever tell you, meaning MacLeod --
25 did he ever tell you what he was going to use the edited

### Page 123

1  version of this letter for?
2  A   No, absolutely not.
3  Q   Okay. But he wanted changes; you were willing to
4  make them?
5  A   Yeah. Because it really -- it -- I'm trying to
6  befriend this guy to -- with the possibility of winning --
7  winning a contract to make money to survive. Yeah.
8  Q   Okay.
9  A   It's -- it's not uncommon for consultants to ask for
10 wordings to be changed in documents like this prior to them
11 presenting them to their client.
12 Q   Okay.
13 A   That would be normal practice.
14 Q   I had another question for you going back to
15 Exhibit Q, which was your $1.4 million quotation.
16 A   Yeah.
17 Q   And there's a reference in there in specifically
18 excluded items that says repairs to the already-damaged ship
19 fendering system, and you mentioned earlier in your testimony
20 here today that some of the fenders were damaged.
21 A   Some of the ship fenders were damaged, yes.
22 Q   Yes. And when you say "some," do you recall which
23 ones were damaged?
24      And you might want to refer to the Exhibit
25 No. 8.

### Page 124

1  A   I'd love to see the photograph because the photos
2  tell the whole story. At least two -- if -- if we have a look
3  at these exhibits on dolphin C, G, H, and D, I know at least
4  two of these fenders were extensively damaged by -- by ships.
5  Q   And when did you do that? When you did your
6  inspection on --
7  A   Well -- no. This -- this -- this type of damage
8  is -- is -- is a fender damage that -- that happens in general
9  everyday shipping operations. It really had nothing to do with
10 the repairs that we were considering.
11 Q   I understand that.
12 A   Plus -- plus we weren't -- plus we weren't indicated
13 or asked to price to replace the fenders.
14 Q   No. I know that. But what my question is, you
15 indicate on here you -- you had already seen that there was,
16 you said, extensive damage to some of the fenders.
17 A   Yeah.
18 Q   And I'm just trying find out which ones, if you
19 recall.
20 A   No. I -- I couldn't tell you that without seeing
21 some photos.
22 Q   And do you recall when you noticed they were damaged,
23 meaning when you went to inspect for the purpose of preparing
24 your estimate or --
25 A   No, I don't recall that. No.

Page 125

1 Q Okay. And when you say extensively damaged, what --
2 what type of fenders were these? Were these like steel
3 fenders? What were they --
4 A No. They were -- I don't know the exact terminology
5 because I'm -- I'm not into ship fenders. And usually the port
6 authorities, or the people that are physically using these, use
7 them all the time.
8 The -- one thing I do know is they are a
9 protection system to protect the pier, and usually they're an
10 energy absorber so -- both to protect the ship and the pier
11 facility. So if one -- if one's damaged, it -- it's designed
12 to -- to fail if -- if -- if it's had a load so it doesn't put
13 ship loads into the facility or -- or vice versa, loads from
14 the pier facility into the ship. You know, it's designed to
15 take the load to -- to stop damage of the structure and -- and
16 of the ship.
17 Q But in any event, there were photographs taken at the
18 time that would show this -- this fender damage, if you -- if
19 you know?
20 A Well, because it wasn't specific, the repair for the
21 fenders, there -- there's -- possibly there could be some
22 photos showing the damage or possibly not.
23 Q Okay. So when you say they had failed, were they
24 basically smashed? I mean, I'm trying to get some
25 characterization of what you saw.

Page 126

1 A Well, from what I recall, they were still intact
2 there as a whole; but, you know, there -- there was some damage
3 and the absorbing rubber behind had split.
4 Q The name Simon Guard has come up here today.
5 A Uh-huh.
6 Q Was he actually the project manager for the temporary
7 repair?
8 A That would be correct.
9 Q Yeah. You were the general manager at the time, so
10 you weren't actually in the field all the time?
11 A I -- I -- I'd take a role that I'd be in the field as
12 much as I can. And I would have visited that facility probably
13 at least once a week. When I was doing the estimates and
14 things like that, I was probably there two or three times a
15 week. When they began the work, I probably would've been
16 there, again, maybe a couple of times a week to ensure that my
17 project managers are doing their job and getting the work up on
18 schedule and going.
19 Q But Simon was the project manager for this repair?
20 A That's correct. Yeah.
21 Q Is he an engineer? Do you know?
22 A Yeah, he's a civil engineer. Similar qualifications
23 to myself.
24 Q Did he have any involvement in the design of the
25 temporary repair?

Page 127

1 A Not that I'm aware of. As -- as contractors, we're
2 not designers, hence -- hence employing OCEL and Duenas.
3 Q You mentioned earlier some discussions among what you
4 referred to as the design-build group. Who was in the
5 design-build group?
6 A Well, initially it would've been ourselves and OCEL
7 to come up with the concept. And then consequently, that
8 followed on to ourselves and Duenas without the input of OCEL.
9 Q You introduced Frank Dennis to Peter MacLeod. Is
10 that correct?
11 A That would be correct. Yes.
12 Q Who actually hired and paid Dennis? Was he working
13 for Smithbridge, or was he working for MacLeod?
14 A I think in the early stages he was employed by us,
15 and we thought -- if you have a look through some invoices, we
16 would have paid some of his fees. I think in the later stage
17 when we weren't using him and we're into the contract, I -- I
18 think Peter employed Frank on a direct relationship.
19 Q Okay. There's an indication in some of the invoices
20 you submitted for the temporary repair --
21 A Uh-huh.
22 Q -- and I don't have a copy. I apologize for that.
23 But Bob has one if we need to look at it -- that shows OC --
24 OCEL is paid about $19,000 for design fees --
25 A Uh-huh.

Page 128

1 Q -- and Duenas & Associates was paid a thousand
2 dollars for design fees.
3 A Uh-huh.
4 Q So would it be fair to say that most of the design
5 work for the temporary repair was done by OCEL?
6 A Yes. Well, if you have a look through the -- the
7 documents, OCEL is on most of -- of the design functions work
8 and Duenas came back and checked that so there would be a lot
9 less work to do --
10 Q Okay.
11 A -- as -- as the -- as the designer. So yes, that
12 would be correct.
13 Q So you indicated that in the initial stages Dennis
14 worked for Smithbridge.
15 A Correct.
16 Q When he did this design work, who told him what
17 design parameters to use in connection with the repair, meaning
18 what kind of sizement forces, what kind of berthing forces,
19 etc., he should plan for in planning a repair?
20 A I recall discussions with the Port and Shell to get
21 these design loads.
22 Q And so in establish -- okay. You had -- my question
23 wasn't who did you talk to; my question was, who told Dennis
24 what design loads to use, if anyone?
25 A I can't recall that directly.

LegaLink Dallas
global court reporting * legal videography * trial services

800-966-4567
www.legalink.com

32 (Pages 125 to 128)

Case 1:03-cv-00009    Document 238    Filed 10/07/2005    Page 10 of 12

Page 129

1 Q But it wasn't you?
2 A No. I -- I have no experience in what a ship load
3 would be.
4 Q Okay.
5 A That -- that comes from the shipping and the -- and
6 the facility people.
7 Q All right.
8 A Just so -- so you know, depending on the size of the
9 ship is relative to the size of the load that you put on -- on
10 a facility.
11 Q Okay.
12 A I do know that.
13 Q So it wasn't you. Was there anybody else at
14 Smithbridge who would've told him?
15 A No.
16 Q To your knowledge, did MacLeod tell him what loads to
17 use?
18 A No. He's an insurance assessor.
19 Q Okay. Or was it left to his discretion, if you know,
20 just whatever he thought was necessary?
21 A I can't honestly recall, because I know for a fact
22 that we did talk to Shell about loads at some particular stage,
23 and we did talk to the Port Authority on loads, and -- and it
24 did come up as a discussion on one of the papers from Duenas.
25 So the loads were definitely discussed between the design

Page 130

1 personnel on this -- on this project.
2 Q You have previously referred to -- well, to your
3 knowledge, did anybody -- when you had those discussions about
4 the design loads with the Port, did anybody from the Port ever
5 show you documents pertaining to the design of the 1996 repair
6 and what the design parameters of that job were?
7 A Possibly; possibly not. I can't recall.
8    MR. STERLING: Okay. I'm going to mark a new
9 exhibit. This will be the first one I'm going to use. Let's
10 call it Casey A, I suppose.
11    MR. BOOTH: Wouldn't it make more sense just to
12 go straight through with a witness?
13    MR. STERLING: Oh, that's fine. We can call
14 it --
15    MR. BOOTH: Do you know where we ended?
16    COURT REPORTER: 14.
17    MR. STERLING: Okay. That's fine. We'll call
18 it 14. No problem.
19 Q (BY MR. STERLING) Okay. Have you ever seen this
20 before?
21    COURT REPORTER: Give me a minute to mark it.
22    MR. STERLING: Oh, I'm sorry.
23    COURT REPORTER: Okay.
24    MR. STERLING: That'll be Casey 14.
25    (Exhibit 14 marked.)

Page 131

1 A It appears that it's a document from Peter MacLeod
2 who's e-mailed myself.
3 Q (BY MR. STERLING) Okay. Do you have any specific
4 recollection of receiving this on or about December 21st, 2001?
5 A Not a direct recollection, no. But I can refresh my
6 memory by reading what it says.
7 Q Yeah. Please take a minute and do that because I'm
8 going to ask you a couple of specific questions about it.
9 A Okay.
10    Okay.
11 Q Okay. There's a reference to a up -- an update that
12 you provided to Peter MacLeod shortly before this e-mail. And
13 I know it's been a long time. Do you have any clear reflec--
14 recollection today as to the specifics of what you updated him
15 on?
16 A No. I couldn't tell you whether that was a phone
17 call or an e-mail. There -- there were several calls that we'd
18 partaken, so...
19 Q Okay. He talks here about Mel Junsay's concern. Was
20 Mel one of the port engineers that you referred to earlier that
21 you could not recall his name?
22 A That's correct. Mel at -- was at the time -- I can't
23 remember whether he was a senior engineer or -- or he had
24 someone above him.
25 Q Okay. From this e-mail it appears -- and correct me

Page 132

1 again if I'm wrong -- that Mel must have expressed some
2 concerns about the pile-load designs for the temporary repair
3 and you passed that on to Peter. Is that correct?
4 A I don't know whether it was me that passed those
5 concerns on or Mel had -- I -- I know Mel had direct contact
6 with Peter. So it -- it could've been through me; it could've
7 been through Mel. I -- I can't tell you that.
8 Q Do you know what Mel's concerns were at that time
9 concerning the pile-load designs?
10 A Not specifically, no.
11 Q This e-mail says that -- I'm paraphrasing --
12 A Uh-huh.
13 Q -- that, you know, we need to make it very clear that
14 the temporary repair would bear no relationship to the strength
15 they had prior to the earthquake and that it will, in fact,
16 return it to a stronger or improved strength condition.
17 A Uh-huh.
18 Q Did you, in fact, convey that to Mel Junsay as
19 instructed by Mr. MacLeod?
20 A I couldn't confirm or -- or deny whether that was
21 a -- a direct conversation, no.
22 Q Do you agree that the temporary repair that you
23 performed did, in fact, put these piles' connections into a
24 stronger or improved strength condition?
25 A Improved strength prior to the earthquake, or

LegaLink Dallas
global court reporting * legal videography * trial services

800-966-4567
www.legalink.com

33 (Pages 129 to 132)

Case 1:03-cv-00009    Document 238    Filed 10/07/2005    Page 11 of 12

## Page 141

1 laterally by approximately 8 inches.
2  Q   And it's your recollection that that observation was
3 made on dolphin C or G. Is that correct?
4  A   No. Specifically dolphin C and dolphin D --
5  Q   Okay.
6  A   -- only.
7  Q   To your knowledge, did Simon Guard ever propose to
8 Frank Dennis that the piles be reattached using a mechanical
9 attachment?
10 A   As a civil engineer, mechanical attachment or rigid
11 connection is -- I mean, what we have done is -- would be
12 considered a mechanical attachment because it is -- it is
13 physically a piece of steel, therefore, it is a mechanical
14 attachment.
15 Q   That's probably a bad question, and I realized it
16 when I asked it.
17 A   Uh-huh. Okay.
18 Q   To your knowledge, did Simon Guard ever propose to
19 Frank Dennis a method of repair that Frank Dennis rejected as
20 inadequate strength?
21 A   No, not that I'm aware of.
22 Q   Since you prepared the estimate for -- for the -- for
23 what we referred to as the full repair, you know, $1.4 million
24 estimate, do you know approximately how much per piling was --
25 what -- what the cost was per piling to make the connection?

## Page 142

1  A   Not directly. But a quick calculation in my head
2 would -- would go, maybe 1.1 million divided by -- divided by
3 the 75 piles. So we're probably talking, say, $15,000 per
4 pile, something in -- in that sort of range.
5  Q   Okay. So you say 1.1, then. Are you assuming that
6 the other 320 is basically design fees, the Item No. 3 on the
7 proposal, overhead and profit?
8  A   Yeah. That -- that's possible. Or there could've
9 been some unforeseen -- because this -- this estimate here is a
10 quotation and not a -- a final -- it's -- it's a guide to give
11 someone an idea of what -- what the repair might be. But until
12 you really got into the nitty-gritty of what is definitely
13 included and what is definitely not, the client would ask for
14 some more figures on these design and permits, you know, some
15 more accurate figures. The client would ask for this to be
16 more specifically written down. So yeah, it -- it's fairly
17 hard and fairly gray there. You know, I'm only trying to give
18 you a rough idea.
19 Q   That's okay.
20 A   Yeah.
21 Q   For purposes of my next question, that's all I need.
22 A   Yeah.
23 Q   If Peter MacLeod had asked you if you could do this
24 repair, such as you did on the temporary repair with these --
25 what do you call it -- the Z-wag bars --

## Page 143

1  A   Dyvidag. Uh-huh.
2  Q   Dyvidag -- Dyvidag bars. If he asked you to do that
3 for, say, 2 or $3,000 per piling, could you have done that for
4 him?
5  A   Absolutely not. The bar -- the bar itself, if I
6 recall, was nearly a thousand dollars. And it's just
7 purchasing a bar to get it on to site. So no, absolutely not.
8  Q   A thousand dollars -- oh, was -- how many of those
9 bars were there in each piling? Was it one?
10 A   One, yeah.
11 Q   Okay.
12     MR. STERLING: I'm not sure I have any more
13 questions which -- can we go off the record for about five
14 minutes?
15     MR. BOOTH: Sure.
16     MR. STERLING: Let me talk to Bob and make sure
17 we've covered our bases.
18     VIDEOGRAPHER: We're off the record at 3:28 p.m.
19     (Break taken.)
20     VIDEOGRAPHER: We are back on the record at 3:38
21 p.m.
22     MR. STERLING: Thank you, Mr. Casey. After
23 looking at my notes, I have no further questions.
24         EXAMINATION
25 BY MR. O'CONNOR:

## Page 144

1  Q   Mr. Casey, my name is Bob O'Connor.
2      How many bolts did you find on the seabed and
3 put in that white bucket, you personally?
4  A   Me personally? Somewhere between 10 and 15.
5  Q   And how about Mr. Unterberg?
6  A   Unterberg -- because we didn't physically have the
7 bolts and what I recall -- I'm not sure. Maybe 3 or 4.
8  Q   And the other company, Pacific Foundation?
9  A   Pacific Foundations. I think if there's more than 10
10 or 15 in that bucket, they -- the difference was from them.
11 Maybe 6 to 10, somewhere in that sort of figure possibly.
12 Q   Did any of you map where on the seabed you found the
13 bolts?
14 A   No. But because I was physically there, they are
15 basically all under those dolphins as though they had dropped
16 just directly down.
17 Q   Are they marked in any way so that we know who is the
18 one who picked the bolt off the seabed; you, Pacific Oceanear,
19 or Mr. Unterberg?
20 A   Not at all? We -- we didn't think that that was
21 important to do at the time for any reason.
22 Q   You said that you may have pulled some bolts out with
23 your hand.
24 A   Uh-huh.
25 Q   Would those bolts have gone into the white bucket?