1  BERMAN O'CONNOR MANN & SHKLOV
   DANIEL J. BERMAN
2  ROBERT J. O'CONNOR
   Suite 503, Bank of Guam Building
3  111 Chalan Santo Papa
   Hagåtña, Guam 96910
4  Telephone: (671) 477-2778
   Facsimile: (671) 477-4366
5
   Attorneys for Defendant
6  Winzler & Kelly Consulting Engineers

**FILED**

DISTRICT COURT OF GUAM

OCT - 7 2005

MARY L.M. MORAN
CLERK OF COURT

7
8              UNITED STATES DISTRICT COURT
9              FOR THE DISTRICTOF GUAM

10  S.J. GARGRAVE SYNDICATE AT          )   CIVIL CASE NO.: CIV03-00009
    LLOYDS,                             )
11                                      )
                  Plaintiff,            )   FRCP RULE 26(a)(3) AND LOCAL
12                                      )   RULE 16.7(d)(2)(A) AND (B)
            v.                          )   DISCOVERY MATERIAL
13                                      )   DESIGNATIONS OF
    BLACK CONSTRUCTION                  )   DEFENDANT WINZLER & KELLY
14  CORPORATION, WINZLER & KELLY        )   CONSULTING ENGINEERS
    CONSULTING ENGINEERS and            )
15  ENGINEERING, MANAGEMENT &           )
    PLANNING SERVICES CORPORATION,      )
16                                      )
                  Defendants.           )
17  _____)

18

19      **COMES NOW** Defendant Winzler & Kelly Consulting Engineers ("Winzler & Kelly"),

20  by and through its counsel Berman O'Connor Mann & Shklov to: (1) designate herein   those

21  witnesses whose testimony will be presented by Winzler & Kelly by means of a deposition at

22  the upcoming trial of this action; and (2) to designate excerpts from interrogatory answers to be

23  offered at trial other than for impeachment or rebuttal.

24

25      (1) Designation of Witnesses Who Will Testify by Means of Deposition Transcript.

26

27      Winzler & Kelly intends to present the deposition transcript of Ben Casey, specifically

28  his testimony at pages 7–8, 18–19, 37–40, 58–60, 86–89, 123–126, 138–141 and 144–148 of his

    deposition.  (Transcript pages are attached hereto.)

**ORIGINAL**

Winzler & Kelly intends to present the deposition testimony of <u>Bruce Swanney</u>. The pages of the transcript that will be used are 85–92, 95–97, 99–105, 111, 117–119, 124, 137-138 and 153–160 of his deposition. (Transcript pages are attached hereto.)

2. Interrogatory Answers

Winzler & Kelly intends to present as evidence at trial the following answers to interrogatories:

- Plaintiff's Response to Black Construction Corporation's Fist Set of Interrogatories. Interrogatories 1 through 5, 7, 9. January 26, 2004.

- Plaintiff's "Third Supplemental Answers" to Winzler & Kelly's First Set of Interrogatories. Interrogatories No. 10. January 20, 2004.

- Plaintiff's "Third Supplemental Response" to Winzler & Kelly's First Set of Interrogatories. May 20, 2005.

- Defendant Black Construction Corporation's Response to Plaintiff's First Set of Interrogatories. Interrogatory Nos. 3, 4, 5, 6, 7, and 8. April 23, 2004.

- Plaintiff's "Supplemental Answers" to Winzler & Kelly's First Set of Interrogatories. November 10, 2003. All interrogatories, all answers.

- Plaintiff's "Second Supplemental Response" to Black Construction Corporation's First Set of Interrogatories. May 26, 2005. Interrogatory Nos. 1 and 2.

1       • Plaintiff's Response to Engineering, Management & Planning Services

2       Corporation's First Set of Interrogatories. April 29, 2004. Interrogatory Nos. 1, 2, 3,

3       and 4.

4

5       The deposition designations herein are exchanged pursuant to FRCP Rule 26(a)(3)(B).

6

7       Dated this 7th day of October, 2005.

8                         Respectfully submitted,

9                         BERMAN O'CONNOR MANN & SHKLOV
                                Attorneys for Defendant

10                                Winzler & Kelly Consulting Engineers

11

12                By: _____

13                          DANIEL J. BERMAN

14

15  2003-08-051007-PL-DiscMaterialDesignation-FINAL.doc

16

17

18

19

20

21

22

23

24

25

26

27

28

1    recall.  I'd appreciate it if you don't recall, just say so.

2    I'd appreciate it if you didn't guess.  Estimates are a

3    different thing.  Obviously, estimates sometimes are

4    appropriate.  But don't make a -- just a complete guess.

5              Now, going to the process of the deposition, we

6    noticed your deposition, but you're here as a volunteer; we

7    didn't issue a subpoena.  I appreciate your cooperation.

8              Let's start with -- excuse me, with your

9    background.  You were born in New Zealand, as I understand.  Is

10   that right?

11       A     That's correct.  Yeah.

12       Q     Okay.  Can you give us your educational background in

13   New Zealand?

14       A     Graduated from high school.  Went to a community

15   college, which is a technical college or institute, completed a

16   New Zealand certificate of engineering, which is a diploma

17   level, civil engineering diploma.  That includes, to receive

18   that diploma, a minimum of three years' direct work experience

19   as well.  Following that, I was working with the ministry of

20   works in New Zealand.  I gained a scholarship to go to

21   university and complete my civil engineering degree as a

22   bachelor of engineering.  That would be my formal education in

23   terms of the highest degree from a university.

24             Since then, in the -- 18 to 20 years of direct

25   experience in the construction industry.  I've been on several

1    construction-related project management-type courses.

2        Q       Okay.  Your bachelor's of engineering, is that with a

3    specialty in civil engineering?

4        A       The bachelor of engineering is specific to civil

5    engineering.

6        Q       Civil?  Okay.

7        A       Yes.

8        Q       In the New Zealand system, do you have a bachelor's

9    degree in structural engineering as well --

10       A       My -- my apologies.  I -- I do understand that

11   question.

12               Civil engineering in New Zealand is -- is very

13   much structural orientated with soils and fluids and highway

14   engineering as sort of the roundabout add-ons onto the

15   structural engineering degree.  So I would consider my degree

16   would have probably a 65 percent rating against -- or for,

17   sorry, structural engineering, in particular earthquake

18   engineering, precast concrete and concrete design.

19       Q       Earthquakes are a significant problem in New Zealand,

20   I understand.  Is that right?

21       A       That is correct.  In my first year out of -- out of

22   university, I worked for a consultant's company called Becker,

23   Carter, Hollings & Turner.  My 12 months' experience with them

24   was involved in the rebuild of Tasman Pulp and Paper Plant

25   doing earthquake design and earthquake remediation repairs to a

1      A      Yes.  Because Shell -- Shell were the ones that

2   needed a facility that was operational, so it affected them

3   more.  The bureaucracy on Guam is the government doesn't move

4   terribly quickly, and -- and Shell had more ability to make the

5   contract move quicker.

6      Q      Okay.  While you were with Smithbridge Guam, did you

7   do other projects for the Port?

8      A      Yes.  We -- we had completed a contract for the

9   precast concrete generator buildings, which was four -- four

10  precast concrete structures to protect their existing backup

11  generators.  That was a sealed bid proposal, and it was funded

12  by FEMA after the Typhoon Paka damage in 1997.

13     Q      Are those the buildings that -- with, sort of,

14  porthole windows and slightly curved walls on them?

15     A      That's correct.  Yeah.

16     Q      Interesting designs.

17            Okay.  Did Smith -- Smithbridge Guam send a

18  formal proposal to Shell for the repair work on the F-1

19  dolphins?

20     A      Yes, they did.  Uh-huh.

21     Q      Okay.  To your knowledge, were there others -- other

22  contracting companies that submitted bids to do that work?

23     A      I'm not sure what the process was.  All I know that

24  at some time, we were set in a negotiating position to -- to

25  get the contract with the RFP.  So I'm unaware of any -- any

1  other bids or other contractors.  I'm not sure.

2      Q     Okay.  Putting aside whether you know the details of

3  any other bids that might have been submitted, do you know

4  whether there were any other proposals submitted to Shell?

5      A     No, I don't know.

6      Q     Okay.  What was the nature of the proposal that you

7  submitted to Shell?  Was it to repair all of the damaged piles

8  that might -- that were damaged in the earthquake?

9      A     No, not at all.  It was specifically a temporary

10 repair to stabilize the existing structure to -- to make it

11 safe, that further damage couldn't be -- damage control

12 basically to ensure that the facility didn't cause any other

13 damage if there was a typhoon or another earthquake.  So it was

14 a -- it was a temporary repair.

15     Q     Okay.  Just so the record is clear.  We've -- we've

16 seen documents referring to two types of temporary repairs on

17 the dolphins.  One is some -- what appears to me to be angle

18 irons that were welded around from one pile to another, three,

19 four, five feet off the water, shall we say.  The other

20 temporary repair, or what we've seen described as a temporary

21 repair, consisted of the work that I believe Smithbridge Guam

22 did, which consisted of drilling a hole down all the way

23 through the cap on the -- on the dolphin, attaching a -- or

24 inserting a Dywidag bar, filling it with -- partly with

25 concrete, and then concreting over the top.

1   proposal to do some work for either Shell or the Port?

2       A     Yes, at that time.  We -- we were doing several

3   contracts in and around the port and for the U.S. Navy.  And

4   you're always looking for areas where you can possibly go and

5   get some business.  So yes.

6       Q     Okay.  What was the first time you went to the Shell

7   F-1 Pier after the 2001 earthquake?

8       A     I -- I can't recall the exact date, but I am assuming

9   within two weeks of the earthquake.

10      Q     Okay.  Did you go out -- walk out on the surface of

11  the dolphins?

12      A     Yes.  We went out on the surface of the dolphins.

13  And I think we also went down some of the existing facility

14  ladders to have a quick look underneath.

15      Q     Okay.  The metal boarding ladders that they have that

16  run down to the -- toward the water?

17      A     That's correct.  Yes.  Uh-huh.

18      Q     Okay.  Did you also take a boat and go out

19  underneath?

20      A     Yeah.  The late -- at a later stage.  We -- we took a

21  couple of boat trips on several occasions to -- to look at the

22  damage further, yes.

23      Q     Okay.  What did you notice when you got in the boat

24  and were underneath the dolphins?  What was the state of·

25  their -- of the damage that you could see?

1    A    Obviously the -- the -- the major damage that we saw

2 was that a very large number of the -- of the bolts that

3 anchored the top of the pile to the underside of the concrete

4 were either partly out or were not in existence at all.

5    Q    They disappeared completely?

6    A    That's correct.

7    Q    Okay.

8    A    Uh-huh.

9    Q    And some were hanging, partly pulled out?

10   A    Some were -- some were pang-- hanging p-- partly out.

11 Some of the piles had displaced themselves in a horizontal

12 position; in a couple of cases eight or nine inches, and in

13 those cases there were no bolts left at all.

14   Q    Okay.  Were some of the batter piles hanging down and

15 no longer affixed to the caps?

16   A    That's -- that's correct.  There were several --

17 several piles on several of the dol-- dolphins that had no

18 attachment to the -- to the underside of the concrete pier at

19 all.

20   Q    Okay.  Did it appear to you that the displacement of

21 the piles and the fact the bolts were no longer in existence

22 was damage that was caused by the earthquake in 2001?

23        MR. STERLING:  I'm -- I'm going to enter an

24 objection as to qualification of this witness to give that type

25 of expert opinion.

1           Go ahead and answer.

2      Q      (BY MR. BOOTH)  You can answer.

3      A      My -- my experience, there were -- there were two

4  things that looked as though that had happened.  As -- as a

5  contractor who does this sort of retrofit type of repair -- and

6  I've had a lot of experience in retrofit -- fit repairs.  One,

7  the epoxy that holds the bolt in was soft and -- and pliable

8  which would indicate that the chemical reaction to harden epoxy

9  in this circumstance hadn't -- hadn't reacted or mixed properly

10 and provided a hard epoxy.  That was even on several occasions.

11 The other -- the other instance was where it did look as though

12 the actual earthquake had pulled the bolts out.

13          So there were two separate instances where, one,

14 it looked as though the bolts had possibly fallen out on their

15 own -- own behalf prior to the earthquake and instances where

16 some of these bolts had definitely been pulled out as a direct

17 cause of the earthquake.

18     Q      Okay.  You mentioned that some of the piles had been

19 displaced horizontally eight or nine inches, I think you said.

20 Did it appear that that had been caused by the earthquake?

21     A      Yes.  The direct displacement -- I felt that the

22 direct displacement had been the concrete cap had -- had moved

23 and left some of the piles in the same position, and some of

24 the piles that were still connected had actually a vertical --

25 or sorry, a horizontal displacement with them.  So the whole

1  cap had basically moved and left some of the piles that had

2  disconnected in their existing position.

3      Q      Okay.  So the ones that were -- that appeared to be

4  displaced, in fact, were still in their original position, but

5  the entire cap had been moved by the earthquake.  Is that

6  right?

7      A      That was my opinion, yes.

8      Q      Okay.  In addition to horizontal movement, was there

9  any movement vertically where the piles had either raised up or

10  been pushed down by the earthquake force?

11     A      We didn't feel -- I didn't think that there had been

12  a vertical displacement, no.  But the final position where the

13  concrete cap had rested, because the structure had raker piles

14  on it, if it had displaced horizontally, it would've also

15  displaced a certain amount vertically.  But the piles -- the --

16  the relative level of the piles hadn't changed.  It was -- if

17  you have a raker pile like this and a concrete cap on it like

18  this and you push it this way, that raises the cap; it doesn't

19  necessarily push the pile up or down.

20     Q      Okay.

21     A      Is that understandable?

22     Q      So I understand you -- yeah.

23            It's a good thing we have a videotape because

24  the way you've illustrated it makes it much clearer.

25            If you push the concrete cap toward -- in the

LegaLink Dallas
global court reporting * legal videography * trial services
800-966-4567
www.legalink.com

1    concrete?

2        A       That's correct.  The -- it was the plug -- the plug

3    design to -- was designed to support the new concrete, not the

4    pillow.

5        Q       Going to Exhibit 6 again, the second page talks about

6    a detail showing 1-inch diameter ASTM A307 bolts.

7        A       Uh-huh.

8        Q       And are those the ones shown on the detail drawing

9    next to it -- excuse me -- which are installed horizontally

10   through the concrete plug?

11       A       Yes.  That -- that's -- no.  These are installed

12   through the -- the new concrete, not the plug.  The plug

13   would've been below that level.

14       Q       Okay.  But they're installed through the concrete to

15   provide resistance to withdrawal of the concrete and plug.

16   Right?

17       A       That's correct.  After we had put in our -- our

18   initial design to do the temporary repair, both Shell and the

19   Port Authority of Guam came back to us and they con-- they were

20   concerned that the -- the concrete fill or the grout fill may

21   shrink and -- and create a void so therefore there would be no

22   friction connection between the inner surface of the pile and

23   -- and the new concrete repair.  So they preferred and

24   suggested that we come up with a design and -- and put some

25   additional bolts through the pile in this situation.

1        So we didn't consider it to be essential in our

2   preliminary design because we felt that -- or our designers

3   felt that we would get sufficient friction capacity.  However,

4   the client both, being Shell, and -- and the owners, being the

5   Port Authority, really didn't want to take that risk or -- of

6   the design, so they insisted that we incorporate these bolts

7   into the -- into the repair.

8       Q     Did your design or the design that Duenas &

9   Associates came up with incorporate any chemicals to be added

10  to the concrete to slow down the hardening process or in any

11  way improve the adherence to the side of the column?

12      A     The method -- from what I recall, the design concrete

13  that was used would've been a -- a -- a concrete designed to

14  have very little shrinkage in it.  I can't recall the exact

15  design criteria or what the additives were put in, but it -- it

16  would've been a -- with the effect to produce low shrinkage.

17  Correct.

18      Q     Okay.  Just so the record is clear, though, the --

19  the 1-inch diameter bolts that Mr. Camacho is referring to on

20  the second page of Exhibit 6 are the bolts that go horizontally

21  through the pile to hold the concrete; they don't go up into

22  the cap.  Right?

23      A     That's correct.

24      Q     Okay.

25      A     Yeah.  And they were bolts and braces designed, as

1  we -- as I said, from both the client and the owner, which --

2  which they insisted they wanted incorporated in the temporary

3  repair.

4      Q     Okay.

5      A     Because you'll see no reference to them prior to --

6  or -- or in the earlier discussions or earlier scopes of work.

7      Q     Okay.  So it was just a little extra added security

8  to make sure that the whole column of concrete wasn't pulled

9  up?

10     A     That's correct.  Yeah.

11     Q     Okay.

12           Look at the very last page of Exhibit 6.  Did

13  Smithbridge have any input into the selection of the individual

14  piles to be repaired during the temporary repair?

15     A     No.  My recollection, now that I see this drawing, is

16  that Frank Dennis from OCEL came up with the initial selection

17  as per this plan.  And this is primarily what was decided on --

18  on the locations and positions of the piles that were being

19  repaired.

20     Q     Okay.  Was any consideration given to which piles

21  would be easiest to repair, or was it all done pursuant to the

22  recommendation of the engineers as to which needed to be done

23  for structural strength?

24     A     The position of these piles was 100 percent the

25  decision of the consultant.  Our -- our design actually gave us

1    Smithbridge Guam, did you have occasion to work with Winzler &

2    Kelly as designers on any of the projects that you did?

3        A      No.  We never worked with Winzler & Kelly direct.

4    But we did have personal contact with them through the Guam

5    Contractors' Association.

6        Q      Did you ever meet Bruce Swanee, who was an engineer

7    at Winzler & Kelly?

8        A      No.  I think Bruce was in Guam before my time.

9        Q      Did you ever work with EMSCO while you were at

10   Smithbridge Guam?

11       A      My recollection is we may have been involved with

12   EMSCO on possibly some Department of Education buildings many

13   years ago, just in precast concrete but nothing certainly on a

14   regular basis or -- or in -- in my time as a -- as a general

15   manager of Smithbridge.

16       Q      Okay.

17              Prior to the October 2001 earthquake, did you

18   ever notice any damage on the Shell F-1 dolphins that appeared

19   to have been caused by ship strikes or heavy docking?

20       A      Not in terms of the major structure.  I had noticed

21   on occasion that some of the -- what they call the ship

22   fendering system, which is attached to the concrete -- that

23   some of the ship fendering system had some ship damage.  But in

24   terms of the primary structure, no, definitely not.

25       Q      Did you ever notice if any of the bolts had been

1  dislodged from any of the piles?

2      A      The attachment bolts?

3      Q      Attachment bolts, yeah.

4      A      Yeah.  As I mentioned earlier, on a previous

5  occasion, I had a chance to visit this facility, and we had

6  noticed in the past that some bolts had appeared to be falling

7  out prior to that earthquake.

8      Q      Could you tell what had caused those to fall out?

9      A      We never looked at them or inspected them close

10 enough to be able to make a fair opinion on that.

11     Q      Okay.

12             Did you notice any of the piles had epoxy around

13 the tops that had run out of the holes?

14     A      Yeah.  On -- after the 2001 earthquake, on close

15 inspection, there were several areas where epoxy had sort of

16 settled onto the flange, and it had appeared that they had run

17 out of the -- out of the hole that they had initially been --

18 or that the epoxy had initially been placed into.

19     Q      And when you use the word "flange," that's the round

20 piece at the top of the pile that has the holes through it

21 through which the eight bolts were installed up into the cap?

22     A      That is correct.

23     Q      Okay.

24             Where was the white bucket with the bolts in

25 them -- in it when you left Guam?

1      A      From what I can recall, still in my old office in

2   Smithbridge up on Route 15.

3      Q      Okay.

4             Did you feel the epoxy that was on those bolts

5   to see if any of it was still soft?

6      A      Not actually on the bolt itself.  But when -- when we

7   inspected the facility, there are several areas where you could

8   actually get ahold of the epoxy and grab it and peel it off,

9   like on the flange or where it had dripped through the bolt

10  hole on the flange.  But not -- not specifically on the bolt,

11  no.

12     Q      Okay.  When you recovered some of that from the

13  flange or from the cap, was it still soft and pliable?

14     A      Yes, it was.  Uh-huh.

15     Q      Okay.  Could you tell what kind of epoxy it was?

16     A      No.  You couldn't -- couldn't make that assessment.

17     Q      Okay.  In 2001, when you were inspecting the damage

18  that was caused by the earthquake, was there any discussion by

19  anyone as to whether this facility had exceeded its useful life

20  and ought to be replaced rather than repaired?

21     A      I'm not sure whether it was just after the earthquake

22  or a long period of time after the earthquake, but I had heard

23  discussions through the Port -- and I can't particularly

24  remember the source that those comments came from.  But we had

25  heard that the Port's opinion was that they felt the facility

1  was -- was a writeoff.  And we obviously didn't agree with

2  that.  We felt that the facility was still definitely in a --

3  in a good repairable condition, you know.  The concrete on the

4  mooring dolphins was sound.  It didn't have a lot of spawling

5  or anything like that, so it hadn't physically deteriorated

6  much.

7          The surveys and inspections that we did on the

8  lower structure in terms of the piles themselves under the

9  water -- I think we -- we were asked to survey two piles out of

10  every -- off every dolphin, and there was not great or large

11  amounts of corrosion on the piles; so therefore, we considered

12  the pile condition was -- was still reasonable and had some

13  serviceable life left in them.  So we -- we considered that it

14  should've been repaired, yeah.

15     Q     Was a subcontractor hired to do an ultrasonic test of

16  the metal on the -- some of the piles?

17     A     That's correct.  There was an ultrasound done to

18  check the thickness of the shell.  Correct.

19     Q     And that indicated that there was sufficient

20  thickness that the -- the steel hadn't corroded away?

21     A     Correct.  With a comparison of -- of the results that

22  we got against the original design thickness of -- of the

23  shell, it appeared that there wasn't large amounts of corrosion

24  evident.

25          MR. BOOTH:  Thank you.

1  version of this letter for?

2      A      No, absolutely not.

3      Q      Okay.  But he wanted changes; you were willing to

4  make them?

5      A      Yeah.  Because it really -- it -- I'm trying to

6  befriend this guy to -- with the possibility of winning --

7  winning a contract to make money to survive.  Yeah.

8      Q      Okay.

9      A      It's -- it's not uncommon for consultants to ask for

10 wordings to be changed in documents like this prior to them

11 presenting them to their client.

12     Q      Okay.

13     A      That would be normal practice.

14     Q      I had another question for you going back to

15 Exhibit Q, which was your $1.4 million quotation.

16     A      Yeah.

17     Q      And there's a reference in there in specifically

18 excluded items that says repairs to the already-damaged ship

19 fendering system, and you mentioned earlier in your testimony

20 here today that some of the fenders were damaged.

21     A      Some of the ship fenders were damaged, yes.

22     Q      Yes.  And when you say "some," do you recall which

23 ones were damaged?

24            And you might want to refer to the Exhibit

25 No. 8.

```
 1      A      I'd love to see the photograph because the photos

 2  tell the whole story.  At least two -- if -- if we have a look

 3  at these exhibits on dolphin C, G, H, and D, I know at least

 4  two of these fenders were extensively damaged by -- by ships.

 5      Q      And when did you do that?  When you did your

 6  inspection on --

 7      A      Well -- no.  This -- this -- this type of damage

 8  is -- is -- is a fender damage that -- that happens in general

 9  everyday shipping operations.  It really had nothing to do with

10  the repairs that we were considering.

11      Q      I understand that.

12      A      Plus -- plus we weren't -- plus we weren't indicated

13  or asked to price to replace the fenders.

14      Q      No.  I know that.  But what my question is, you

15  indicate on here you -- you had already seen that there was,

16  you said, extensive damage to some of the fenders.

17      A      Yeah.

18      Q      And I'm just trying find out which ones, if you

19  recall.

20      A      No.  I -- I couldn't tell you that without seeing

21  some photos.

22      Q      And do you recall when you noticed they were damaged,

23  meaning when you went to inspect for the purpose of preparing

24  your estimate or --

25      A      No, I don't recall that.  No.
```

1     Q     Okay.  And when you say extensively damaged, what --

2  what type of fenders were these?  Were these like steel

3  fenders?  What were they --

4     A     No.  They were -- I don't know the exact terminology

5  because I'm -- I'm not into ship fenders.  And usually the port

6  authorities, or the people that are physically using these, use

7  them all the time.

8          The -- one thing I do know is they are a

9  protection system to protect the pier, and usually they're an

10 energy absorber so -- both to protect the ship and the pier

11 facility.  So if one -- if one's damaged, it -- it's designed

12 to -- to fail if -- if -- if it's had a load so it doesn't put

13 ship loads into the facility or -- or vice versa, loads from

14 the pier facility into the ship.  You know, it's designed to

15 take the load to -- to stop damage of the structure and -- and

16 of the ship.

17    Q     But in any event, there were photographs taken at the

18 time that would show this -- this fender damage, if you -- if

19 you know?

20    A     Well, because it wasn't specific, the repair for the

21 fenders, there -- there's -- possibly there could be some

22 photos showing the damage or possibly not.

23    Q     Okay.  So when you say they had failed, were they

24 basically smashed?  I mean, I'm trying to get some

25 characterization of what you saw.

1    A    Well, from what I recall, they were still intact

2  there as a whole; but, you know, there -- there was some damage

3  and the absorbing rubber behind had split.

4    Q    The name Simon Guard has come up here today.

5    A    Uh-huh.

6    Q    Was he actually the project manager for the temporary

7  repair?

8    A    That would be correct.

9    Q    Yeah.  You were the general manager at the time, so

10  you weren't actually in the field all the time?

11    A    I -- I -- I'd take a role that I'd be in the field as

12  much as I can.  And I would have visited that facility probably

13  at least once a week.  When I was doing the estimates and

14  things like that, I was probably there two or three times a

15  week.  When they began the work, I probably would've been

16  there, again, maybe a couple of times a week to ensure that my

17  project managers are doing their job and getting the work up on

18  schedule and going.

19    Q    But Simon was the project manager for this repair?

20    A    That's correct.  Yeah.

21    Q    Is he an engineer?  Do you know?

22    A    Yeah, he's a civil engineer.  Similar qualifications

23  to myself.

24    Q    Did he have any involvement in the design of the

25  temporary repair?

1   particular design.

2       Q      Okay.  You mentioned there were other considerations.

3   Do you recall any other considerations?

4       A      Considerations --

5       Q      In terms of why this -- repairing it using the same

6   technique that Black·had used -- why this wasn't feasible.

7       A      Well, the primary reason would've been the epoxy, as

8   I said.  And I -- no, I don't.  That -- that primarily would've

9   been the failure of the epoxy in a -- in a vertical position.

10              MR. STERLING:  Okay.  Why don't we go ahead and

11  change the tape here.  There's about five minutes left.  Is

12  that good with you?

13              MR. BOOTH:  Yes.

14              MR. STERLING:  Because then we can finish up

15  without changing again.

16              Let's go off the record.

17              VIDEOGRAPHER:  This concludes Videotape No. 2.

18  Time off the record is 3:18 p.m.

19              (Break taken.)

20              VIDEOGRAPHER:  Here begins Videotape

21  No. 3, March 23rd, 2004.  We are back on the record at 3:21

22  p.m.

23      Q      (BY MR. STERLING)  I'd just like to clarify some

24  observations you made.  Earlier you indicated that when you

25  were inspecting after the earthquake in the bolt -- in the boat

1    under the dolphins that -- I think you said some of the bolts

2    could simply be pulled out because the epoxy was soft, and then

3    you said later that you weren't sure whether you had, in fact,

4    pulled any out or not.  Did you, in fact -- when you were

5    inspecting after the earthquake, were you in a position to

6    actually pull on some of the bolts?

7         A    Yes.

8         Q    And if so, how did you go about that?

9         A    Yes.  In some of the locations, we could reach the

10   physical bolt.  My gray area there on whether we actually --

11   was whether we actually had collected a bolt at that stage.  My

12   recollection was that we definitely had our hand on the bolts

13   and we could definitely move them.  There was sufficient

14   movement to -- that they were loose in the holes but not

15   necessarily the fact that we could physically pull one out

16   because of the angle or how it was wedged in -- in that

17   condition.  So...

18        Q    You also mentioned that you had observed some holes

19   where there was no epoxy -- leaking epoxy, and I just wanted to

20   clarify.  I think you said the situations where you could

21   observe that was where there was no bolt at all.  Is that

22   correct?

23        A    No.  There was some situations where the bolt was

24   hanging half out of the hole where I mentioned that they were

25   actually loose.  There are indications there where -- where the

1   epoxy had been leaking and was soft in those instances as well.

2       Q      Okay.  Do you recall how many bolts you saw that were

3   in that condition?

4       A      I'm going to say as a percentage, of which there's a

5   hundred piles, 800 bolts, that at least 50 percent of those

6   showed that damage.

7       Q      You also indicated that when you did an inspection

8   that some of the pilings were basically 8 or 9 inches from

9   where they had been originally on the cap --

10      A      Uh-huh.

11      Q      -- and it was your view that the cap had, I think,

12  lifted and basically physically moved.  Is that what your

13  testimony was?

14      A      Maybe not lifted and moved but in a different

15  position to where -- I can refer to the specific dolphins.

16  Dolphin C and dolphin D were the two dolphins that I'm

17  referring to.  In the plans, they have a transition point

18  underneath where they actually sit at two different levels, and

19  there's a -- a batter on the bottom surface of the concrete

20  like this.  Those particular dolphins were where -- where this

21  case had happened.

22              Now, when I say it had moved, the final position

23  indicated that it had displaced -- either with some existing

24  piles still connected had moved this way, and the piles that

25  were disconnected showed that they were out of position

1  laterally by approximately 8 inches.

2      Q      And it's your recollection that that observation was

3  made on dolphin C or G.  Is that correct?

4      A      No.  Specifically dolphin C and dolphin D --

5      Q      Okay.

6      A      -- only.

7      Q      To your knowledge, did Simon Guard ever propose to

8  Frank Dennis that the piles be reattached using a mechanical

9  attachment?

10     A      As a civil engineer, mechanical attachment or rigid

11 connection is -- I mean, what we have done is -- would be

12 considered a mechanical attachment because it is -- it is

13 physically a piece of steel, therefore, it is a mechanical

14 attachment.

15     Q      That's probably a bad question, and I realized it

16 when I asked it.

17     A      Uh-huh.  Okay.

18     Q      To your knowledge, did Simon Guard ever propose to

19 Frank Dennis a method of repair that Frank Dennis rejected as

20 inadequate strength?

21     A      No, not that I'm aware of.

22     Q      Since you prepared the estimate for -- for the -- for

23 what we referred to as the full repair, you know, $1.4 million

24 estimate, do you know approximately how much per piling was --

25 what -- what the cost was per piling to make the connection?

1    Q      Mr. Casey, my name is Bob O'Connor.

2           How many bolts did you find on the seabed and

3    put in that white bucket, you personally?

4    A      Me personally?  Somewhere between 10 and 15.

5    Q      And how about Mr. Unterberg?

6    A      Unterberg -- because we didn't physically have the

7    bolts and what I recall -- I'm not sure.  Maybe 3 or 4.

8    Q      And the other company, Pacific Foundation?

9    A      Pacific Foundations.  I think if there's more than 10

10   or 15 in that bucket, they -- the difference was from them.

11   Maybe 6 to 10, somewhere in that sort of figure possibly.

12   Q      Did any of you map where on the seabed you found the

13   bolts?

14   A      No.  But because I was physically there, they are

15   basically all under those dolphins as though they had dropped

16   just directly down.

17   Q      Are they marked in any way so that we know who is the

18   one who picked the bolt off the seabed; you, Pacific Oceanear,

19   or Mr. Unterberg?

20   A      Not at all?  We -- we didn't think that that was

21   important to do at the time for any reason.

22   Q      You said that you may have pulled some bolts out with

23   your hand.

24   A      Uh-huh.

25   Q      Would those bolts have gone into the white bucket?

```
 1    A      If -- if they were left around to collect them up,
 2  I -- I think at some stage Peter -- Peter MacLeod had said to
 3  us, "Hey, there's -- there a possibility that this is going to
 4  go further; make sure you save the bolts."  And then we
 5  would've gathered up what ones we had from whichever location
 6  and put them in the bucket.
 7    Q      So there's no way to know where the bolts in that
 8  bucket came from, who's the one that collected them?
 9    A      There's no definitive way to say whether Ben Casey
10  picked them up, whether Jungen Unterberg picked them up, or
11  whether Pacific Foundations picked them up.  That is correct.
12    Q      Okay.  Did you -- before you did any of the repair
13  work, did you do -- did you cause to be done or do any study of
14  the earthquake, for instance, what the forces were, what
15  direction the forces are going in, what the vertical and
16  horizontal, east-west, north-s -- north-south forces were?
17    A      No.  Not -- not in that specific, no, not at all.
18    Q      Okay.  Do you have any prior experience with
19  repairing dolphins that are damaged in earthquakes?
20    A      Not a direct relationship as an earthquake repair to
21  a dolphin, no.
22    Q      Okay.  Do you know why fendering is important for
23  dolphins?
24    A      Are we -- are we specifically talking about ship
25  fendering as per the breasting dolphins?
```

1    Q    Yes.

2    A    Or a fendering system?

3    Q    For the berthing dolphins.

4    A    For the -- for the berthing dolphins.  Yes,

5  they're -- as I said previously -- an energy-absorbent device

6  to protect the ship and the -- and the primary structure from

7  damage.

8    Q    What kind of damage to the -- to the primary

9  structure?

10    A    Whatever damage can be put on the structure from

11  excessive loading due to misdirection of a ship in a berthing

12  situation.

13    Q    So with these particular dolphins, if a ship were to

14  strike against the dolphins, that could loosen the bolts before

15  you repaired it?

16    A    That's -- I -- I think there's -- there's a few

17  assumptions you're making there.  Depending on the condition of

18  the bolts prior to the bolt -- the boat hitting them, if we're

19  asking can the ship put a lateral or horizontal load into the

20  dolphin via the ship fender, yes, it can.

21    Q    And could the result of that force of the ship into

22  the dolphin loosen the bolts?

23    A    Not if -- not if the bolts are in the design capacity

24  when it was built.

25    Q    Doesn't it depend how hard the ship hits the dolphin?

1      A      I -- you're trying -- trying to make an assumption

2  that a ship may have hit the -- hit the dolphin at a -- at a --

3  an excessively high angle of impact.  I can't tell you that.

4  I'm -- you know, I -- I think if a ship had -- as a personal

5  opinion, if a ship had hit a dolphin and created damage to

6  loosen the bolts, it probably would've made some damage to the

7  ship as well and it would probably be reported.

8      Q      Okay.  So in other words, a ship could've hit the

9  dolphins and could've loosened the bolts?  Whether it was

10  reported or not, that's what could've happened?

11      A      There is a slight possibility that could've happened,

12  yes.

13      Q      And with --

14      A      But it -- but it couldn't have happened to dolphins A

15  and B because a ship has no relative contact to those until the

16  ship is actually breasted against these dolphins before the

17  mooring ropes go onto them.

18      Q      By A and B, you're talking about -- show me that.  A

19  and B, or A and D?

20      A      A and B.  A and B.

21      Q      Okay.  Could a -- could a rope tied on to dolphin A

22  and B with a lot of stress in a storm, for instance, pull the

23  bolts loose?

24      A      From my understanding, operating procedures in a

25  storm that no boats are tied up to a pier facility during a

1  storm.  So no.

2      Q      But if they were, could it have pulled the bolts

3  apart?

4      A      Well, you're assuming something again that --

5      Q      I'm assuming.

6      A      Yeah, that's an assumption.

7      Q      Could've done that?

8      A      Well --

9             MR. BOOTH:  Don't speculate.  If you know,

10  answer.

11     A      Yeah.

12     Q      It's possible?

13            MR. BOOTH:  Anything's possible.

14     A      Anything's possible.  Yeah.  Exactly.

15            MR. BOOTH:  I object to that.

16     A      You know, if a plane -- plane hit this building

17  today, is it going to fall down?  Possibly.

18     Q      (BY MR. O'CONNOR)  I'm asking.  That's what I'm

19  asking.

20     A      Well, as an engineer, yes, a ship could put a load on

21  that specific dolphin in a storm condition.  But I don't think

22  that's relative because the procedures are that ships don't

23  dock during storms.

24     Q      Right.  And the procedures are that ships don't smack

25  into the side of dolphins, but it happens?

1    design that is represented by Exhibit 17, namely, that

2    this method of attaching pile to cap would be used on

3    each of the piles?

4         A.    Yes, it is.

5         Q.    And each of the piles would be cut off

6    four feet below mean low or low water and a splice put

7    in to attach the new tube to the old pile?

8         A.    That was our intent, yes.

9         Q.    Okay. And a flange would be produced --

10   manufactured for the top of each pile that had six

11   holes for bolts through it?

12        A.    Yes.

13        Q.    Okay. So there's no separate plan for

14   certain piles and different plan for others, it was the

15   same treatment for each, right?

16        A.    Correct.

17        Q.    Okay. How long did it take Winzler &

18   Kelly to produce the drawing which is Exhibit 17?

19        A.    Do you mean to draft it or from the time

20   we were engaged by Black to the time it was issued?

21        Q.    The latter. From the time you were

22   engaged by Black until this drawing was produced and

23   delivered to Black.

24        A.    I don't remember.

25        Q.    Would it -- would it be a matter of

1  24 hours?  Would it be a matter of weeks?  Would it be

2  a matter of months?

3        A.        Weeks.

4        Q.        Weeks?

5        A.        Weeks.

6        Q.        Okay.  As much as a month?

7        A.        I doubt it.

8        Q.        Okay.  Was the process that you produced

9  this drawing and then delivered it to Black?

10       A.        Yes.

11       Q.        Okay.  Did you also deliver it to EMPSCO

12  or the Port or anyone else?

13       A.        No.

14       Q.        No?

15       A.        No.

16       Q.        Okay.  Do you know if either Black or

17  anyone else passed a copy of your drawing on to EMPSCO

18  or the Port?

19       A.        I don't know that they did.  I'd

20  anticipate that they would.

21       Q.        Okay.  Did you go to any meetings after

22  the drawing had been delivered to Black where there was

23  discussion with either Black or EMPSCO or the Port

24  about putting this design into operation, construction?

25       A.        No.

1          Q.      Okay.  Did you hear anything more about

2     the design after you delivered the drawing to Black?

3          A.      No.

4          Q.      Okay.  Did you have occasion to visit the

5     F-1 facility at any time when Black was working on it?

6          A.      Yes, I did go out there once.

7          Q.      Just once?

8          A.      Once.

9          Q.      Okay.  Was that just for general interest,

10    or was there a particular reason why you were called

11    out there?

12         A.      One of Black's subcontractors called me.

13         Q.      Who was that?

14         A.      I think it was the -- I think his name was

15    Ken Collard for Pro Marine.

16         Q.      Ken Collard?

17         A.      Collard, yeah.

18         Q.      C-o-l-l-a-r-d?

19         A.      I think so, yes.

20         Q.      And who did he work for?

21         A.      Pro Marine.

22         Q.      Pro Marine?

23                 They were the divers?

24         A.      They were doing some -- yeah, some

25    underwater cutting and some demolition work at the

1    time.

2         Q.      What did Mr. Collard ask you to come out

3    and see?

4         A.      He was concerned about a non-typical

5    condition that had happened out there, a construction

6    sequencing thing that he wanted -- wanted us to look at

7    and give him an opinion on.

8         Q.      Was he concerned about cutting a

9    particular pile that might be supporting something?

10        A.      Yes, he was.

11        Q.      Okay.  Do you remember which of the

12   dolphins that was on?

13        A.      No.  It was one -- it was either -- ot was

14   either A or B.

15        Q.      One of the mooring dolphins?

16        A.      Yes.

17        Q.      Okay.  And did you give him assurance that

18   it was okay to proceed?

19        A.      Not -- not right away, no.

20        Q.      Okay.  You went back and did some analysis

21   of it?

22        A.      Yes.  We -- we that thanked him for

23   telling us to come -- asking us to come take a look at

24   it, and I told him we'll see what you need to do, if

25   anything.

1     Q.     Okay.  Did you recommend any changes in

2  the construction sequencing as a result of looking at

3  that problem?

4     A.     Not in the sequencing, no.

5     Q.     Okay.  Did you recommend any changes in

6  any of Black's procedures to accommodate the atypical

7  situation you found?

8     A.     Yes.  We recommended preloading a pile

9  before it was attached back to the concrete dick.

10     Q.     Okay.  Just one?

11     A.     Just one.

12     Q.     Okay.  Is that the only time you visited

13  the facility while construction was going on?

14     A.     Yes.

15     Q.     All right.  At any time during your work

16  for Black, were you given an idea of how much money the

17  Port could save by utilizing the design that's

18  contained in Exhibit 17 versus what EMPSCO had

19  previously projected?

20     A.     No.

21     Q.     Mr. Tavillas didn't ever give you any idea

22  that it would save X dollars?

23     A.     Not that I recall.

24     Q.     Okay.  Did you learn at some point that

25  your concept embodied in drawing 17 -- Exhibit 17,

1  would be used by Black?

2      A.      Yes.

3      Q.      Okay.  Did you attend any meetings where

4  the Port discussed that design?

5      A.      I don't remember any.

6      Q.      Did you have any meeting with EMPSCO where

7  they discussed the design?

8      A.      No, I never had any meetings with EMPSCO.

9              MR. BOOTH:  Okay.  Could I have the roll

10  of drawings, please?

11             I assure you, I'm not going to go over

12  every page of these, but I would like to have you take

13  a look at a few.

14             I know you're familiar with the concept of

15  as-built, but I'll just point out to you this set is

16  stamped as-built by Black Construction and dated 30th

17  April 1997, and I will mark this set all as Exhibit 18.

18             (Exhibit No. 18 was marked for purposes of

19  identification.)

20      Q.      BY MR. BOOTH:  My first question,

21  Mr. Swanney, is:  Is this a set of drawings that were

22  available to you at Winzler & Kelly at the time you

23  were doing your work for Black, albeit that they

24  weren't stamped as-built, but is this a set that you

25  had?

1      A.      I'm not sure if I had this complete set.

2  It's been a long time since I've seen them.  But I

3  certainly had at least parts of them.

4          Does that answer your question?

5      Q.      Well, my question is:  Does this appear to

6  have more drawings than what you had available to you?

7      A.      I think so, yes.

8      Q.      Okay.  Are there some of these drawings

9  that do not pertain to the dolphins?

10     A.      I don't know.  I mean, there are some of

11  these drawings that I wouldn't -- I wouldn't need

12  anyway.  I wouldn't need this sheet.

13     Q.      Okay.  So your recollection is you had

14  whatever drawings EMPSCO had that pertained to the

15  dolphins that were going to be worked on?

16          MR. O'CONNOR:  Objection, no foundation.

17  He doesn't know what EMPSCO had.

18     Q.      BY MR. BOOTH:  Did you ever ask EMPSCO for

19  any drawings that they did not provide to you?

20     A.      No.  No.

21     Q.      Did you ever ask Black for any drawings

22  that they did not provide to you?

23     A.      No.

24     Q.      Okay.  Did you ever get the feeling that

25  there must be other drawings out there that you wish

1  you had but you didn't have?

2      A.      No.

3      Q.      Okay.  So you had what information --

4      A.      I had the information I needed.

5      Q.      -- that you needed.

6              Okay.  And was the -- was all the

7  information that you received provided to you by Black?

8      A.      Yes, I believe so.

9      Q.      Okay.  You didn't -- you don't recall any

10  instance where you went directly to EMPSCO to ask for

11  something?

12      A.      No.  I never went to EMPSCO.

13      Q.      Okay.  Did you ever have any meetings with

14  EMPSCO at all?

15      A.      No.

16              (Exhibit No. 19 was marked for purposes of

17  identification.)

18      Q.      BY MR. BOOTH:  Okay.  I marked a letter as

19  Exhibit 19.  I will hand that to you, Mr. Swanney.

20  This is a letter from Mr. Bismonte at Black to N.C.

21  Macario and Associates, August 5th of '96.

22              Black says, "We are submitting for

23  record/file attached drawings for the non-typical cases

24  of pile top plates."

25              Do you recall seeing some drawings of

1      A.      Yes.

2      Q.      Before Winzler & Kelly?

3      A.      Yes.

4      Q.      Okay.  But to your knowledge, you had no

5  discussions with Macario on the repair of the dolphins;

6  is that right?

7      A.      That's correct.

8      Q.      All right.  Other than being asked to

9  produce the drawing which we had marked as Exhibit 17,

10  were you consulted at any other time by Black on any

11  other aspects of the project on the dolphins?

12      A.      No, I don't think so.  Well, there was the

13  condition that required the pre-loading of the pile.

14      Q.      Okay.

15      A.      They consulted us on that.  The rest of

16  the consultations were probably them faxing me sketches

17  on various items and me responding.

18      Q.      Such as with the two-pile cap situation --

19      A.      Yeah.

20      Q.      -- that we talked about?

21      A.      That's the one I can remember right now.

22      Q.      Okay.  Do you know why Black was asking

23  you to do those particular projects as opposed to

24  EMPSCO?

25      A.      Probably because it's not -- the engineer

1  of record is the Port's engineer of record.  There's

2  often a perceived conflict of him working for both the

3  owner and the contractor.

4      Q.      Were those situations where Black was

5  unhappy with something that had been done by EMPSCO so

6  they turned to Winzler & Kelly for additional --

7      A.      No, it's just that they -- they really

8  couldn't consult EMPSCO.  They needed to find their own

9  engineer.

10     Q.      Okay.  I'm going to ask you to look at one

11 page, which is sheet 5 of 22, sheet No. S-1A, and ask

12 you, Mr. Swanney, if the sketch or detail in the upper

13 left-hand corner appears to be a Winzler & Kelly

14 sketch?

15     A.      No, it's not.

16     Q.      Do you know who produced that?

17     A.      I believe it was Black Construction.

18     Q.      Black?

19     A.      Yes.

20     Q.      Okay.  How about the one in the middle of

21 the page below it?

22     A.      Yes, I believe that was Black

23 Construction, also.

24     Q.      Okay.  And then how about the one in the

25 lower left which says split pile repair details for

1  pile No. 10 dolphin A?  Do you know who produced that

2  drawing?

3        A.      I believe it was Black Construction, also.

4        Q.      Okay.  Did you -- have you seen these?

5        A.      Yes.

6        Q.      Before today?

7        A.      I've seen these.

8        Q.      Okay.  Did you have them at the time you

9  were doing the work for Black?

10        A.      Which -- which work for Black?

11        Q.      Okay.  I thought there was only one work

12  for Black.

13        A.      We didn't have this at the beginning of

14  the project, if that's what you're asking.

15        Q.      Okay.  But at some point --

16        A.      These are to do with this -- this

17  non-typical condition in the pre-loading of the one

18  pile.

19        Q.      Okay.  This indicates a -- what I've

20  called a spacer --

21        A.      Yes.

22        Q.      -- a roughly, I think two-and-a-half inch?

23  Is it more than that?  Six inch?

24        A.      What's --

25        Q.      The --

1      Q.      Was it during the repair project on the

2   dolphins?

3      A.      Yes.  Yes.

4              MR. BOOTH:  Okay.  That may be all that I

5   need out of this set.  Let me just check.

6              I thought there was one more.

7              THE WITNESS:  Okay.

8      Q.      BY MR. BOOTH:  Now, looking at the very

9   last page of this set, which appears to be a drawing

10  VE-1, the end --

11     A.      With some additional material added.

12     Q.      That's what I was about to ask you about.

13             Is that your handwriting on this last

14  sheet?

15     A.      No.  No, it's not.

16     Q.      Do you know whose handwriting it is?

17     A.      No.

18     Q.      Referring to detail No. 4, it says:  See

19  revision on submittal No. 18.  And, apparently, there's

20  been a change to the drawing indicating

21  three-eighths-inch as opposed to whatever it used to

22  say.

23     A.      I think it was a quarter.

24     Q.      Quarter-inch?

25     A.      Yeah.

1    Q.    Do you know who made that change?

2    A.    On this drawing?

3    Q.    Yes.

4    A.    No, I don't.

5    Q.    Okay.  Now, this drawing still has your

6  stamp on it and your signature, right?

7    A.    Yes.

8    Q.    Okay.  But someone else has made a --

9    A.    It shouldn't have.

10    Q.    Okay.  It shouldn't have?

11    A.    No.

12    Q.    And why should it not have?  Because it's

13  no longer --

14    A.    Because it's been changed.

15    Q.    Because it's been changed?

16    A.    Yes.

17    Q.    Okay.

18    A.    Normally, as-built drawings have the

19  stamps taken off.

20    Q.    Have the --

21    A.    They remove them.

22    Q.      -- engineer's stamp taken off?

23    A.    Right.  Just a record set.

24    Q.    Okay.  And detail No. 2 above it also has

25  a comment:  See revised comment?

1       A.     Connector.

2       Q.     -- connector on submittal No. 18?

3       A.     Yeah.

4       Q.     And, again, three-eighths-inch has been

5 put in place of one-quarter.

6             Do you know who made that note?

7       A.     No, I don't.

8       Q.     Okay.  The small drawing or sketch on the

9 right-hand side entitled Submittal No. 18 does not

10 appear on the copy of Exhibit 17.

11             Do you know who prepared this?

12       A.     It's Black Construction Corporation.

13       Q.     Okay.  So it's your understanding that was

14 prepared by Black?

15       A.     Yes.  Yes, and I've seen that one before.

16       Q.     And now you're pointing to the one above

17 it also entitled Submittal No. 18.

18             Have you seen both of those or only the

19 top one?

20       A.     I don't recall seeing this one before.

21       Q.     Okay.  Looking at the one on top, the

22 uppermost of the two submittal No. 18s, does that

23 accurately depict your proposal for how the dolphins

24 were to be repaired?

25       A.     No.  It's a -- it's a slight change from

1  what I'd proposed.  This is the system I'd proposed.

2       Q.     You're pointing out a section -- the

3  drawing labeled section 2?

4       A.     Yes.

5       Q.     And what is changed in the submittal

6  No. 18 to the right of it?

7       A.     They've gone from -- the system I detailed

8  shows two hemispherical half circles which would be

9  placed against the side of the pile, one from each

10 side, and welded in place.

11      Q.     Welded after they're put around the pile?

12      A.     Yes.

13      Q.     Okay.

14      A.     The sketch produced by Black indicates

15 one -- one piece of metal circular that would be -- and

16 they call it a slip ring, which would mean it would be

17 slipped over the pile and lowered down into its right

18 position, then welded into place.

19      Q.     Okay.  So instead of having to make two

20 welds, the proposal in submittal No. 18 only has one

21 weld only on one side?

22      A.     That's the weld here.  There's still the

23 weld around the circumference of the pile --

24      Q.     Right.

25      A.     -- which would be the same in both cases.

1  Q.  Right. Okay. Do you recall any

2 discussion with Black as to why that change was made?

3  A.  They -- they figured that that's more

4 convenient for them to do it that way.

5  Q.  Okay. Were you consulted before they made

6 that change?

7  A.  Yes.

8  Q.  Okay. And is it your understanding that

9 the proposal detailed by Black as submittal No. 18 is

10 what was actually used?

11  A.  I don't know that. I never saw it.

12  Q.  Okay. My question is this. This drawing

13 is stamped as-built.

14  A.  Right.

15  Q.  Yet it has two different details of how to

16 do the same work.

17  A.  Oh, I see.

18  Q.  My question is which one was actually

19 used?

20  A.  Okay. This one.

21  Q.  Okay. Pointing to the one Black did as --

22 or that you believe Black did as submittal No. 18?

23  A.  That's what this drawing indicates,

24 anyway. This note here, yeah, they could have put a

25 big X through it.

1      Q.     NIC or something?

2      A.     Yeah.

3      Q.     Okay.  There's a note beside section 1

4 that says:  See submittal No. 18, as well.  Do you know

5 what, if any part, of the section 1 drawing was

6 changed?

7      A.     It would appear to be this.

8      Q.     Okay.  Pointing to the lower of the two

9 submittal No. 18s?

10     A.     Yes.

11     Q.     But my question is specifically what is

12 shown in detail 1 has been changed?

13     A.     Well, it's not a solid plate anymore.

14 It's an annular plate.  I think the thickness is the

15 same.  It's a one-inch thick plate.  Eight bolts.

16 That's all that jumps out at me now is it's now an

17 annular plate rather than a solid circular plate.

18     Q.     Okay.  And looking at detail No. 4, in

19 addition to the change from one-quarter-inch to

20 three-eighths, and the difference between two

21 hemispheres or just a one weld, as detailed in

22 submittal No. 18, are those the changes between --

23     A.     This one refers to this way.  These two

24 are covered by this one.  This one is this one.

25     Q.     Okay.  So the lower of the two submittal

1    No. 18s refers to section 1 and -- of the old drawing,

2    and sections 2 and 4 of the old drawing are covered by

3    the upper one --

4         A.    Yes.

5         Q.       -- submittal 18, right?

6         A.    Yeah.

7         Q.    All right.  Do you know if any

8    calculations were done by anybody at Winzler & Kelly

9    before the drawing which is Exhibit 17 was produced?

10        A.       There were some very simple calculations

11   done.  There were no formal calculations done.

12        Q.    Okay.  And by "simple calculations," do

13   you mean what engineers sometimes call hand

14   calculations as opposed to a computer run?

15        A.    No.  I mean a quick scribble on a piece of

16   paper rather than something on a calculation sheet or

17   something that's bound and submitted.

18        Q.    Okay.  At any time after they received the

19   drawing which is Exhibit 17, did Black advise you that

20   they were going to utilize this design in the actual

21   construction on the dolphins?

22        A.    I don't think they called me up and told

23   me.  I somehow found out.  I'm not quite sure how.

24        Q.    Okay.  Did you find out when you went down

25   at the request of Pro Marine, or did you --

1      Q.      Was -- in fact, it was created -- it was

2      caused in large part by the '93 earthquake, wasn't it?

3      A.      Yeah.  Yes.  Oh, absolutely.

4      Q.      Okay.  Did you, in putting together your

5      design which is Exhibit 17, did you do any even rough

6      calculations as to the forces that the dolphins would

7      see when a tanker of a given size came in to dock?

8      A.      No, I did not.

9      Q.      Okay.  And do you know if anyone else at

10     Winzler & Kelly did?

11     A.      Not as part of this project.

12     Q.      Okay.  You looked at that a little bit for

13     Shell earlier, you said?

14     A.      Yes.  Yeah.

15     Q.      Okay.  Did you ever advise Black that this

16     design, Exhibit 17, was not to be used for

17     construction?

18     A.      No.

19     Q.      I will show you what has previously been

20     marked as Exhibit FF, a letter from Black Construction

21     dated May 1st, 1996, and ask you whether you've ever

22     seen that, Mr. Swanney?

23     A.      Yes, I think I have seen it.

24     Q.      Do you recall if you got a copy of it?

25     A.      At the time, no.

1           Did you have any discussion with Black

2    about a substitution of a different product for the

3    Redhead product that you specified in note 2?

4           A.    No, I didn't.

5           Q.    Did you know that Black had substituted a

6    different product for the product set forth in note 2?

7           A.    Well, I know now.

8           Q.    You know now, right.

9                 Did you know prior to leaving Guam?

10          A.    No.

11                MR. BOOTH:   Okay.

12                MR. O'CONNOR:   Should we take a break now?

13                MR. BOOTH:   Let me just finish a couple

14   more things, and then I will, yeah.

15          Q.    BY MR. BOOTH:   Were you familiar with this

16   specific Redhead product when you specified it in note

17   No. 2?

18          A.    How do you mean "familiar" with it?

19          Q.    Had you called it out for use on prior

20   jobs?

21          A.    Yes.

22          Q.    Okay.   Had you seen it used?

23          A.    I had seen it -- I'd seen similar

24   products, actually, installed.   I'm not sure if I've

25   seen this particular one installed.

1          Q.     Okay.  Did you personally specify it in

2    note No. 2, or was that done by somebody else?

3          A.     No, that was me.

4          Q.     Okay.  Why did you select that particular

5    product?

6          A.     It was the most appropriate for the

7    application.  It takes a lot of the construction

8    variables out of the installation.  It's a lot -- it

9    requires a lot less skill to install it, and there's

10   more -- it's more -- you're increasing your chances of

11   having the connection constructed correctly.

12         Q.     Okay.  And I understand this is a glass

13   cylinder that has previously measured amounts of

14   hardener and epoxy in it --

15         A.     Yes.

16         Q.     -- and then it's broken NC2, as we say, as

17   it's in the hole, and what do you do, spin the bolt in

18   order to mix it?

19         A.     The bolt's attached to impact drill, and

20   it goes in and breaks the glass and mixes the epoxy

21   and --

22         Q.     Okay.

23         A.     -- it's there.

24         Q.     By putting the words "or approved equal"

25   in note No. 2, were you allowing the contractor some

1    leeway in case he couldn't buy this particular product

2    on Guam?

3         A.    Yes.

4         Q.    Okay.  But I take it you never actually

5    had any discussions as to what type of product from

6    some other manufacturer would be an approved equal?

7         A.    I'm sorry, I lost you there.

8         Q.    Did Black ever come -- or EMPSCO or anyone

9    ever come to you and say:  Would XYZ product be the

10   equivalent of what you specified.

11        A.    No, no one did.

12             MR. BOOTH:  Let's take our break now.

13             THE VIDEOGRAPHER:  We're going off the

14   record.  The time is approximately 12:47 p.m.

15             (A recess was taken from 12:47 p.m.

16   to 1:51 p.m.)

17             (Exhibit No. 22 was marked for purposes of

18   identification.)

19             THE VIDEOGRAPHER:  Back on the record to

20   continue the videotaped deposition of Bruce Swanney.

21   The time is approximately 1:51 p.m.

22        Q.    BY MR. BOOTH:  Mr. Swanney, I may have

23   misunderstood, but did you say in answer to a question

24   this morning that Winzler & Kelly originally designed

25   the pier F-1?

1    have to fly in or get sent in from the mainland US?

2         A.    I consider that was a possibility, yes.

3         Q.    Okay.  I believe you said that you weren't

4    aware that a substitution was made for the Reddy Cam

5    product until sometime long after you left Guam, right?

6         A.    Yes.

7         Q.    Okay.  Did you consider that by putting

8    the note 2 on the drawing, Exhibit 17, that you were

9    giving the contractor the obligation to determine that

10   if he used a product other than Reddy Cam, that it had

11   to be equal in terms of its shear and pull-out

12   strength?

13        A.    No.  My intent was that if any -- any

14   equals were to be considered for substitution, that

15   they were to be submitted to me for approval before

16   they -- before they were used.

17        Q.    Okay.  What factors would you have looked

18   at to determine if they were the equal, if they had

19   been submitted to you as a suggested alternative?

20        A.    The strength, I would -- whether or not

21   the product was -- was certified by the ICBO evaluation

22   service, whether they had and ICBO number, and the

23   method of installation, whether it would be appropriate

24   for this application.

25        Q.    Do you know whether the product that's

1       Q.     Okay. Did they, in fact, do all the piles

2 on one dolphin first and then move on to the next one

3 in some sort of order?

4       A.     I don't know.

5       Q.     Okay. Did anyone tell you not to ask

6 Winzler & Kelly California to do a complete computer

7 analysis of the design, Exhibit 17?

8       A.     Did anyone ask us not to do an analysis?

9       Q.     Did anyone within Winzler & Kelly tell you

10 not to?

11       A.     Anyone within Winzler & Kelly tell me not

12 to.

13       No.

14       Q.     Okay. Did anyone outside Winzler & Kelly

15 tell you not to?

16       A.     No one told me not to.

17       Q.     Okay. Were you given any financial

18 constraints on the amount of work you could do for

19 Black on -- in the design that led to Exhibit 17?

20       A.     We -- we laid out our scope of work, and I

21 believe that said that we weren't going to do an

22 analysis.

23       Q.     Okay.

24       A.     That was in our agreement.

25       Q.     Did you consider the rough calculations --

1    or I've forgotten exactly how you described them --

2    that you did do to be sufficient to produce the design

3    that is on Exhibit 17?

4        A.      Yes.

5        Q.      Okay.

6        A.      When I say "rough calculations," I don't

7    mean that the calculations were approximate or

8    anything.  They were probably just roughly written.

9        Q.      Roughly written?  Okay.

10               But are they properly described as hand

11   calculations, or --

12       A.      Yes, they were hand calculations, yes.

13       Q.      Okay.

14       A.      They were very simple.  It was simply a

15   matter of looking up the table for the bolts and

16   comparing it to the design load.  You have a pile load

17   of 10,000 pounds and the allowable load per bolt's

18   1,000 pounds, you need ten bolts.  That's the

19   calculation.

20               MR. BOOTH:  Okay.  I understand.

21               Let me mark another document as

22   Exhibit 24, which is which are the minutes of a meeting

23   dated December 11, 1995.

24               (Exhibit No. 24 was marked for purposes of

25   identification.)

1    little more.  I can't remember the exact number.

2         Q.     Okay.  Maybe my question wasn't clear.

3    What I'm asking is the actual load that the piles would

4    see, just bearing the weight of a concrete cap, not the

5    maximum that the soil condition could bear.

6         A.     Oh.

7              MR. STERLING:  Okay.  We're talking --

8    we're talking about dolphins now, correct?  Because

9    your first question was pier, and I think that confused

10   him.

11             MR. BOOTH:  We're talking about dolphins,

12   yes.

13             THE WITNESS:  The maximum compression

14   loads are not just from the weight of -- the weight of

15   the pier.  They're typically from the lateral loads on

16   the raking pile, the batter piles.

17        Q.     BY MR. BOOTH:  The batter piles?

18        A.     Right.

19        Q.     Okay.

20        A.     Where one side is in tension, the other

21   side is in compression.

22             As part of my work for Shell, we compared

23   the applied loads to the allowable loads, the

24   compression loads and saw that none of them were

25   exceeded.

1      Q.    Okay.  And in calculating the maximum

2  compression loads that would be seen, did you take any

3  account of earthquake forces when you were doing the

4  work for Shell?

5      A.    Yes.  The earthquake forces transpired

6  that they were the critical -- the critical forces.

7      Q.    Okay.  By "critical," you mean the highest

8  loads that would be seen?

9      A.    Yeah.  The ones that govern the design of

10  the platform --

11      Q.    Okay.

12      A.    -- or the pile, really.

13      Q.    And the maximum compression loads were

14  seen on the batter piles, as opposed to the vertical

15  piles?

16      A.    Yes.  Yes.

17      Q.    Okay.  I left off with your employment

18  experience when we got to Winzler & Kelly Guam, you

19  said you left Winzler & Kelly '99?

20      A.    I left Guam in '99.

21      Q.    Sorry, '99.

22      And at that point, you remained with

23  Winzler & Kelly, but went to work in Santa Rosa; is

24  that right?

25      A.    Correct, yes.

 1          Q.     Okay.  How long did you remain with

 2     Winzler & Kelly in Santa Rosa?

 3          A.     Approximately two years.

 4          Q.     Until about 1991?

 5          A.     No, no, 2000 --

 6          Q.     2001?  Okay.

 7          A.     Early 2002, I think I might have left

 8     there.

 9          Q.     Did you take another job after that?

10          A.     Yes.

11          Q.     What was that?

12          A.     It's the job I have now.  The name of the

13     company is Starling and Associates.

14          Q.     Starling?

15          A.     Yes.

16          Q.     Okay.  And is that here in the Phoenix --

17          A.     Tempe.

18          Q.     Tempe area?

19          A.     Yes.

20          Q.     What kind of a company is Starling?

21          A.     It's a structural engineering consultant.

22          Q.     What was your reason for leaving Winzler &

23     Kelly?

24          A.     My wife was living in Phoenix, and she

25     kind of won the tug of war.

1      Q.    All right.  I guess that explains it.  All

2 right.

3           And you've been with Starling ever since

4 you came to Tempe?

5      A.    Yes.

6           MR. BOOTH:  All right.  I think that's all

7 the questions I have at the moment.

8           MR. O'CONNOR:  I have a few.

9

10                      EXAMINATION

11 BY MR. O'CONNOR:

12      Q.    Mr. Swanney, you told Mr. Booth that you

13 think you knew sometime before your only site visit

14 that Black was using VE-1?

15      A.    Yes.

16      Q.    Design VE-1 has several designs on it.

17 Can you be more specific about what you knew about

18 Black using VE-1 before this site visit?

19           MR. BOOTH:  I'd just interpose the

20 objection that he said he'd been to the site more than

21 once, but go ahead.

22           THE WITNESS:  I lost you, Bob.

23      Q.    BY MR. O'CONNOR:  All right.  You told

24 Mr. Booth that you think you knew sometime before this

25 one site visit where you saw the Pro Am work that was

1   going on --

2          A.      Oh, yes, yes.

3          Q.      -- that Black was using VE-1.  And VE-1

4   has several designs on it.  Could you be more specific

5   about what you knew about Black using VE-1 before that

6   site visit?

7          A.      Well, like I said, we didn't know -- we

8   didn't hear anything formally.  All I'd heard was

9   conversations from people I talked to, and I heard that

10  they were not using and encapsulation system.  And I

11  kind of assumed that they were using VE-1, but I didn't

12  know they were using it -- different parts of it or in

13  its entirety or not.

14         Q.      When you went to the site, you could see

15  the piles were not encapsulated, so you knew they were

16  splicing piles; is that right?

17         A.      When I -- when I went to the site during

18  construction, they were in the demolition -- they were

19  demolishing.

20         Q.      Oh.

21         A.      So they hadn't actually constructed

22  anything.

23         Q.      Okay.  So you didn't know whether or not

24  Black had used your design that required

25  six-and-three-quarter-inch bolts until this lawsuit was

1   filed?

2         A.      No.   No.

3         Q.      Did you know whether or not Black was

4   using the Reddy Cam anchor system before this lawsuit

5   was filed?

6         A.      Did I know whether or not they were using?

7         Q.      Yes.

8         A.      No, I didn't.

9         Q.      Did you know whether or not Black was

10  using eight bolts as opposed to six bolts or ten bolts,

11  or any other number before this lawsuit was filed?

12        A.      No, I didn't.

13        Q.      You told Mr. Booth you did see not advise

14  Black that VE-1 was not to be used for construction.

15  Do you remember that testimony?

16        A.      Yes.

17        Q.      What was the -- in your mind, what was the

18  import of putting the word "proposed" on VE-1?

19        A.      Proposed means that it's subject to review

20  and approval, in this case, by the engineer of record.

21        Q.      So did you assume that -- I'm sorry.

22        A.      I -- the whole relationship with Black

23  Construction was that the -- we were preparing a

24  document for submission to the engineer of record.  I

25  didn't feel like I had to tell them specifically that

1    it wasn't for construction.

2         Q.    So you assumed before they used it for

3    construction they would get EMPSCO's approval?

4         A.    Yes.

5         Q.    And, in fact, they did get EMPSCO's

6    approval, didn't they?

7         A.    Yes.

8         Q.    Was VE-1 meant to supersede any of

9    EMPSCO's plans or designs?

10             MR. BOOTH:  Objection; asked and answered.

11             Go ahead.

12             THE WITNESS:  Not without EMPSCO's

13    approval.

14        Q.    BY MR. O'CONNOR:  Okay.  You have a phrase

15    in the upper right-hand corner here which says:  This

16    drawing is to be -- oh, No. 2, adhesive anchors to be

17    stainless steel Redhead Reddy Cam by Phillips Drill

18    Company, Catalog No. CE3495, or approved equal.

19    Install per manufacturer's recommended procedures.

20             What did you mean by the phrase "or

21    approved equal"?

22        A.    That the contractor was at liberty to

23    submit an alternative anchoring system to me for

24    approval.

25        Q.    So you didn't mean you were giving leeway

1  to Black to just substitute whatever they thought was

2  equal?

3      A.    Correct.

4      Q.    Okay.  On Exhibit No. 19, it refers to

5  submittal No. 18.

6      Do you recall whether or not you ever saw

7  submittal No. 18?

8      A.    Not as submittal No. 18, no.  It was never

9  submitted to me.

10      Q.    Okay.  Did you apply your seal to the VE-1

11  drawing for any other purposes other than those that

12  you've testified to earlier?

13      A.    No.

14      MR. O'CONNOR:  Okay.  No more questions.

15      MR. BOOTH:  One or two more.

16      MR. STERLING:  No questions.

17      MR. BOOTH:  All right.

18      MR. STERLING:  Unless Bruce will feel

19  slighted unless I ask him something.

20      THE WITNESS:  Yeah, don't ask me

21  something.

22

23              REEXAMINATION

24  BY MR. BOOTH:

25      Q.    Mr. Swanney, did you ever make a written