LAW OFFICES
**TARPLEY & MORONI, LLP**
A Law Firm including a Professional Corporation
Bank of Hawaii Building
134 West Soledad Avenue, Ste 402
Hagåtña, Guam 96910
Telephone: (671) 472-1539
Fax: (671) 472-4526

7ZP7
Attorney *for* Defendant Engineering, Management
& Planning Services Corporation

**FILED**
DISTRICT COURT OF GUAM

OCT ᶦ- 7 2005

MARY L.M. MORAN
CLERK OF COURT

IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| S.J. GARGRAVE SYNDICATE AT LLOYDS, | CIVIL CASE NO. CV03-00009 |
| Plaintiff, | |
| v. | |
| BLACK CONSTRUCTION CORPORATION, WINZLER & KELLY CONSULTING ENGINEERS and ENGINEERING, MANAGEMENT, & PLANNING SERVICES CORPORATION, | **EMPSCO'S DESIGNATION OF DEPOSITION EXCERPTS FOR USE AT TRIAL** |
| Defendants. | |

Pursuant to the stipulation of the parties, EMPSCO designates the following portions of depositions it anticipates it will use at trial. The relevant pages are attached.

    1.   **Deposition of Frank Dennis**

        pp. 67-77

        pp. 81-84

        pp. 128-9

        pp. 158-9

        pp. 185-232

**ORIGINAL**

1      2.    <u>**Deposition of Ben Casey**</u>

2            pg. 29

3            pp. 37-39

4            pg. 46

5            pp. 82-84

6            pp. 86-89

7            pp. 119-124

8            pp. 132-134

9      3.    <u>**Deposition of Simeon S. Delos Santos**</u>

10           pp. 4-153:13 (as this makes up major bulk of this

11           deposition, copies of which all parties have, I will not

12           reproduce the transcript here unless a party specifically

13           requests it).

14     Dated this _____ day of October, 2005.

15                            TARPLEY & MORONI, LLP

16

17                            By:_____

18                               THOMAS M. TARPLEY, JR.,
                                 Attorney for Defendant EMPSCO

19

20

21

22

23

24

25

26

27

28

S.J. Gargrave Syndicate At Lloyds v. Black Construction
Corporation, et. al., CV03-00009
EMPSCO'S DESIGNATION OF DEPOSITION EXCERPTS FOR
USE AT TRIAL                                    **Page 2 of 2**

Case 1:03-cv-00009    Document 243    Filed 10/07/2005    Page 2 of 30

IN THE DISTRICT COURT OF GUAM

S.J. GARGRAVE SYNDICATE       CIVIL CASE NO. CV03-00009
AT LLOYDS,

           Plaintiff,

   vs.

BLACK CONSTRUCTION
CORPORATION, WINZLER & KELLY,
and ENGINEERING MANAGEMENT &
PLANNING SERVICES CORPORATION,

        Defendants.

---

DEPOSITION OF FRANK EDGERTON DENNIS

Taken on behalf of Plaintiff,

at the Law Offices of Carlsmith Ball LLP,

2200 American Savings Tower,

1001 Bishop Street, Honolulu, Hawaii,

commencing at 9:35 a.m.,

on Wednesday, July 21st, 2004, pursuant to Notice.

BEFORE:          HEDY COLEMAN, CSR NO. 116
                 Notary Public, State of Hawaii
                 Certified Shorthand Reporter

1      A    Yes, I think so.

2      Q    Did you examine breasting dolphin H at all, the

3   one that was completely rebuilt in 1996, to determine why it

4   had not suffered any damage in this earthquake?

5      A    We could not examine it to determine why it

6   suffered or didn't suffer damage.  We could only examine it

7   to see if it had suffered damage.

8      Q    Okay.

9      A    We had a quick look at it.  We did not look at it

10  closely.

11     Q    Okay.  Did you receive any drawings of how that

12  dolphin had been rebuilt in '96?

13     A    I've certainly got copies of the drawings, so the

14  question you asked me previously, was I given any other

15  information, I should have said that I had a copy of the

16  contract drawings, those drawings did include a drawing of

17  dolphin H.

18     Q    When you say the contract drawings, are you

19  referring to the repairs done in the '95-'96 time frame?

20     A    Yes.

21     Q    Yeah.  So did you get a full set or a reduced size

22  set of those drawings?

23     A    I got both.

24     Q    Okay.  Did you ask for any documents or

25  information from anyone that you did not receive during your

1  visit to Guam?

2      A    I don't think so.  Oh, I'm sorry.  Can I retract

3  that.

4      Q    Sure.

5      A    I asked for drawings of the original construction,

6  which I didn't get.

7      Q    Okay.  Did you ask for any calculations that had

8  been done in connection with the original construction?

9      A    No.

10      Q    Okay.  Did you receive any calculations done in

11  connection with the repairs in '95 and '96?

12      A    No, not on this visit.

13      Q    Okay.  On the third page of Exhibit 5, under your

14  "Comments" section, the paragraph referring to the dolphins,

15  it says, "There is no doubt that the pile to concrete deck

16  connection has failed on nearly all the piles on dolphins A,

17  B, C, D, and G, and the reason appears to be the poor

18  quality of the bolt epoxy or incorrect placement."

19      What did you mean by "incorrect

20  placement?"

21      A    Placement means the act of drilling the hole and

22  putting the bolt into it with epoxy around it.  There are

23  several things that can go wrong with the bolt placement.

24  The hole -- do you want me to --

25      Q    Well, let me ask you, first of all, this is

1    referring to the installation of the bolts upside down

2    underneath the concrete caps, right?

3         A    Yes.

4         Q    Okay.  And there are several things that can go

5    wrong in the placement of those bolts, is that what you're

6    saying?

7         A    There are several things that can go wrong with

8    the placement of those bolts in favorable conditions, that

9    is, when you're right way up.  These can be made a lot worse

10   when you're upside down.

11        Q    Okay.  And you said "favorable conditions."  Does

12   that mean working from above and down into a structure?

13        A    Yes.

14        Q    Okay.  So I take it you're saying it's harder to

15   install the bolts when you're working from the underside,

16   going up, is that right?

17        A    Yes.

18        Q    Was there any problem with the way the holes were

19   drilled as far as you could tell?

20        A    We did see one case of a double hole; otherwise I

21   could see no problem with the holes.

22        Q    I think you referred to the fact that they were

23   very small and you couldn't get your finger into them.  Was

24   that a criticism of the size that they were drilled?

25        A    No.  The bolt size -- the bolt hole size is

1    determined by the size of the fixing, the size of the bolt

2    you are putting in.  If you are putting in a

3    three-quarter-inch bolt, you have to drill a

4    seven-eighths-inch hole or something.

5        Q    Or larger?

6        A    It's determined -- no, no, no.  It's fixed,

7    because the epoxy you put in is measured; or should be, to

8    fit the hole.  So you have to drill the hole that the

9    manufacturer suggests you drill.

10        Q    Okay.  In any of the documentation you reviewed,

11    did you see any manufacturer's suggested diameter or size

12    for the drilling of these holes?

13        A    I did not have documentation for the bolt that was

14    specified; I only had documentation for similar product.

15    They recommend the bolt size -- the hole size.

16        Q    Okay.  In examining the holes that some of the

17    bolts had been removed from or been pulled out from, did you

18    see that any provision had been made for letting air escape

19    when they were putting the epoxy in?

20        A    No.

21        Q    Is that something that's normally done in an epoxy

22    installation such as this?

23        A    Not on a bolt of this size.

24        Q    Okay.  The last paragraph says, "There is little

25    doubt that the recent earthquake caused the pile head bolts

1    to fail."

2            I take it that was a conclusion you

3    reached based upon your observations at the

4    dolphins?

5        A    Yes.

6        Q    Okay.  And then you go on, "Just how the dolphins

7    would have performed had the bolts been properly fixed is

8    debatable."

9            What did you mean by that?

10       A    Well, if -- if all the bolts had remained in

11   position, and the epoxy had set properly, it is quite

12   possible that the dolphin would have been all right.  It's

13   very difficult to tell.  But I think on dolphin A, which is

14   the one that suffered the least damage, a lot of the

15   bolts -- most of the bolts that were still in place were on

16   that dolphin that suffered the least damage.

17           I can't say.  It was not a particularly

18   big earthquake, so I would have expected that the

19   loads imposed on the dolphins from that source would

20   have been well below the design level.

21       Q    Okay.  You go on to the next page, "Dolphin H,

22   which was a new construction in 1996, with the piles held in

23   by four adequately anchored number eight, one-inch bars

24   suffered very little damage."

25           How were you made aware that there were

1  one-inch bars used on the new construction of

2  dolphin H?

3      A    The drawing for that dolphin was included in the

4  contract set.

5      Q    Okay.  When it says one-inch bars, is that

6  referring to one-inch bolts?

7      A    It's a reinforcing bar; it's not the bolt.

8      Q    Okay.  And does the one-inch reinforcing bar have

9  more tensile strength than a bolt -- sorry -- than the

10  three-quarter-inch bolt?

11      A    I don't know if you can really answer that

12  question.  It's a different -- it's a different thing,

13  really.  An one-inch reinforcing bar has got a cross

14  sectional area of 450 square millimeters.  I don't know what

15  that is in square inches.  And a three-quarter-inch bolt has

16  got a cross sectional area of probably something like

17  250 square millimeters.

18          So, the area with three-quarter-inch bolt

19  is only half the area of an one-inch reinforcing

20  bar, so the grade of steel becomes an issue.  You

21  can't just say one is stronger than the other.

22      Q    Because it would depend on what it's made of?

23      A    Depends on what it's made of.

24      Q    Okay.  Lower down on that same page, then you

25  discuss the tension capacity of the connections, and it

1    says, there's a note, "Note that these bars were to be

2    drilled and grouted 508 millimeters, 20 inches, into the

3    underside of the concrete deck, which may not have been

4    enough to develop the full strength."

5         Does this refer to the 20 inches?

6    A    Sorry.

7    Q    All right.  Does this refer to the earlier design

8    of the repair of the dolphins following the 1993 earthquake?

9    A    Yes.

10   Q    Okay.  Why is it that 20 inches may not have been

11   enough to develop the full strength of the design?

12   A    To develop the full strength of a reinforcing bar,

13   codes require you to have something like 30 diameters

14   embedded in the concrete.  So that is 30 inches.

15        Now, that is a code requirement.  But in

16   actual fact, that requirement is determined by the

17   strength of the material you are embedded in.  When

18   you drill a hole and put mortar in, it is quite

19   likely that the strength of the mortar will be

20   considerably stronger than concrete; therefore, you

21   can get away with a much shorter embedded length.

22   So it's quite possible that 20 inches, depending on

23   what sort of mortar they used, would have been quite

24   adequate.

25   Q    And when you say mortar, would that include epoxy

1   in that kind of a situation?

2       A    Epoxy or cement.

3       Q    Okay.  Now, for new dolphin H, you come up with a

4   force of either 85 tons or 57 tons,depending on -- is that

5   grade of steel, 415?

6       A    Well, grade 415, to my language, grade 60 is

7   yours.

8       Q    Okay, grade 60 or grade 40?

9       A    Yes.

10      Q    Is that the breaking point of an one-inch bar made

11  of that kind of steel?

12      A    It's not the breaking load, it is what's called

13  the yield load.

14      Q    Yield load, okay.

15      A    The breaking load is, say, 10 percent higher.

16      Q    Okay.  And is that information that was provided

17  to you or did you calculate that?

18      A    No, that is what the steel manufacturers are

19  required to -- well, that's what the code requires steel

20  manufacturers to make bolts -- reinforcing bars to that

21  standard.

22      Q    Okay.

23      A    That yield load is the probably the 90 percentile

24  number; in other words, most will be higher, a few will be

25  lower.

1    Q    And is that information that's available on a

2    table somewhere that you can look up?

3    A    Oh, yes.  Yes.

4    Q    Okay.  Now, for the bolts, the paragraph below

5    that, "Alternative repair connection for dolphins A, B, C,

6    D, and G, through eight, three-quarter-inch bolts," is that

7    information, the eight, three-quarter-inch bolts, that was

8    taken from the drawing that you saw prepared by Winzler &

9    Kelly?

10    A    No.  Oh, sorry.  Could you repeat that question.

11    Q    Okay.  That configuration, eight bolts,

12    three-quarter-inch bolts, six and three-quarter inches long,

13    is that information that you took from the Winzler & Kelly

14    drawing?

15    A    Yes.

16    Q    Okay.  And just so we identify it, we've

17    previously marked that as Exhibit 17.  Let me just show you

18    that, make sure we're talking about the same drawing.  Is

19    that the drawing you referred to?

20    A    Yes.

21    Q    Okay.  So going back to Exhibit 5, you have

22    ultimate bond strength in 3,000-psi concrete, and ultimate

23    bond strength in 4,000-psi concrete.  Is that information

24    that you looked up in a table or you calculated?

25    A    No.  That information comes from the manufacturer

1    of the bolt.

2        Q    Manufacturer of which bolt then?

3        A    It's the manufacturer of an equivalent product to

4    the one that was specified.

5        Q    Okay.

6        A    It is not the one that was specified.

7        Q    Were you able to get manufacturer's data from the

8    manufacturer of the Redi-Chem product that was specified on

9    Exhibit 17?

10        A    It did not appear to be a product that was readily

11    available.

12        Q    So you weren't able to find that?

13        A    No.

14        Q    Okay.  But you determined an equivalent product?

15        A    Yes.

16        Q    Okay.  What is 3,000-psi concrete versus

17    4,000-psi?

18        A    It is the normal strength, crushing strength, of

19    the concrete.  When you make concrete, you make samples --

20    you take samples from the concrete, and these are tested in

21    a compression machine, and they break at a certain strength.

22    And you can manipulate strength of concrete by altering the

23    constituents like cement and water.

24        Q    Yes?

25        A    When you build structures, most of the design

1  codes refer to a nominal concrete compression strength.

2  Now, the more -- the higher the strength, the better the

3  concrete.

4          The 3,000-psi refers to the concrete of

5  the existing structure.  It was built 30, 40 years

6  ago.  I would hope that it wasn't built with

7  concrete that was less than 3,000-psi.

8      Q    Did any of the documents you reviewed tell you

9  what the original concrete was that was used to build?

10     A    No, no.  But my feeling would be that at that

11  time, 3,000 to 4,000-psi would have been a reasonable

12  assessment.

13     Q    Okay.  To your knowledge, was any of the concrete

14  in the Shell F-1 facility ever tested for what its

15  compression strength is?

16     A    No.

17     Q    All right.  So going back to the comments you

18  made, the ultimate bond strength would be 11.8 tons in

19  3,000-psi concrete, that's a number that came from the bolt

20  manufacturer of a similar product?

21     A    Yes.

22     Q    Okay.

23     A    That is when the bolt pulled out of the concrete.

24     Q    Right.  And what is ultimate tensile bolt strength

25  of 12.1 tons?

1    first principles, or by experience.

2         And then you multiply the stressors you

3    get from those loads by a factor, which is also laid

4    down in codes, to get a higher series of  stressors,

5    which are then compared with the maximums you could

6    expect to get from the materials you are using.  In

7    other words, if the thing will break at a hundred

8    tons, then you can safely put on a hundred tons,

9    divided by 1.67, whatever that might be, 60 tons.

10        Q    Okay.

11        A    It's a means of establishing a level at which you

12   can load the structure compared with what the thing will

13   break at, if you like.

14        Q    And the reason that you do that is for a margin of

15   error or a margin of safety, is that right?

16        A    Margin of safety.

17        Q    Okay.  In other words, you never design it such

18   that the expected forces the structure will see will be the

19   maximum theoretical force that that material can handle, is

20   that right?

21        A    That depends on the type of load and the code you

22   are working to, but, generally speaking, for most loads that

23   is the case.  For earthquake loads, you design it for the

24   capacity of the structure.  There's a reason for that.

25        Q    Okay.

1        A      But, generally speaking, for most of the loads you

2   have a large margin between what you can safely put on it

3   and what it will fall down at.

4        Q      Okay.  Do you also have a margin of safety when

5   you're designing for earthquake?

6        A      No.

7        Q      And why is that?

8        A      It's a philosophical thing.  When you design for

9   an earthquake, or how we design in New Zealand for

10  earthquakes and how you design in California for them, is

11  you assume the structure will fail.  It's actually designed

12  to fail, but it's designed to fail in a particular manner.

13           It's designed to form ductile mechanisms

14  which can absorb energy by deformation but without

15  losing strength.  So you have to apply your maximum

16  earthquake load to it to make it fail.  So the

17  earthquake load determination is done so that can be

18  achieved.  So you are actually applying to it a

19  failure load.  If you get that earthquake, then

20  you'll get damage, but not necessarily collapse,

21  because that's how you design these modern

22  structures.

23       Q      So if I understand what you're saying, you're

24  designing it such that the structure will absorb energy,

25  causing damage, but not catastrophic failure of the

1  structure?

2      A    That's right.

3      Q    Okay.

4      A    And the level of damage that you can absorb really

5  depends on the importance of the structure.  If the

6  structure is going to have people in it, it is very

7  important; if it's not going to have people in it, then it's

8  not quite so important.

9      Q    Okay.

10     A    But that -- that earthquake loads are really

11  failure loads.

12     Q    Okay.  Now, when you refer to a factor of safety

13  of 1.67 in Exhibit 5, is that a calculation that will lead

14  to a structure that will resist earthquakes or a structure

15  that will be damaged but not fail in an earthquake?

16     A    The determination of earthquake loads and the

17  design for limiting damage is a modern thing.  You would not

18  expect to have that sort of finesse in detailing in a

19  structure that's 30 years old.

20     Q    So when it was originally built?

21     A    So you cannot assume that a current or that the --

22  that the dolphins in Guam were designed to that sort of

23  standard.  You have to assume that they were designed to a

24  lesser standard.  You have to apply different rules.  The

25  different rules mean that you have to apply a much higher

1  earthquake load to it.

2      Q    In other words, to be conservative, you apply a

3  higher earthquake load?

4      A    Yes.

5      Q    Okay.  And is a factor of safety of 1.67 a

6  conservative factor?

7      A    Yes.  It's a conservative -- well, it's a

8  conservative factor of safety for recognized highly tested

9  materials such as steel and concrete, reinforced concrete,

10  which you have a fair degree of control over the

11  manufacturer or the construction.  1.67 is not, as I have

12  said somewhere, an adequate factor of safety for epoxy bolt,

13  and the manufacturers recognize this.

14      Q    Okay.  So 1.67 would be more appropriate when you

15  were designing a concrete structure and building it as new

16  construction?

17      A    Yes.  In these days, in 1960, what have you, yes.

18      Q    Just to finish up what you said, and then I think

19  we ought to take a break, you said that you wouldn't expect

20  the structure of the dolphins having been built 30 or 40

21  years ago to be built to modern standards in the modern era,

22  I think is the word you used.  Would the 1995-96 time frame

23  when the repairs were done be considered the modern era?

24      A    Yes.

25      Q    Or would you expect then that the standards that

1     A    No.

2     Q    Okay.  Were you made aware of the results of the

3  calculations that Duenas & Associates performed?

4     A    Yes, briefly.

5     Q    Were you given copies of their work?

6     A    I think I was, but not at the time.

7     Q    Were you made aware that they agreed with the idea

8  of using one-and-three-quarter-inch Dywidag bars for repairs

9  of certain piles?

10    A    Yes.  That's about the limit of what I got.

11    Q    Okay.  You never saw calculations that they did?

12    A    No.

13    MR. BOOTH:  Mark as Exhibit 11, the OCEL Consultant's

14  fax memo of 3-1-02.

15                (Whereupon, Exhibit 11 was

16                marked for identification.)

17  BY MR. BOOTH:

18    Q    My first question, Mr. Dennis, is is this a memo

19  that you sent on January the 3rd, 2002?

20    A    Yes.

21    Q    Starting in the middle of the document, it says

22  from any point -- sorry -- "From my point of view, I would

23  not have relied on short bolts for a joint like this, not

24  only because of placement problems, but because the detail

25  is unsatisfactory and the safe working load of the bolts

1    group is less than half the pre-1993 joint (27 tons to

2    68 tons)."

3              What do you mean by saying "the detail is

4    unsatisfactory?"

5         A     This is what I was referring to previously.  If

6    the bolts are anchored into -- some of the concrete they're

7    anchored into is unreinforced, you can't guarantee that the

8    bolts are actually penetrating the reenforceing layer.

9         Q     Okay.  The last sentence says "The use of epoxy

10   bolts is widespread around the world, but not, I suspect,

11   for connections such as these in an earthquake zone."

12        A     Where does that say that?  Sorry.

13        Q     Looks to me like the last sentence.

14        A     Oh, here we are.  Yup, yup, yup.

15        Q     Are you aware of any restrictions on the use of

16   epoxy for connections in earthquake or structures being

17   designed for earthquake resistance?

18        A     No, I'm not.

19        Q     Well, this is just based on your experience?

20        A     No.  Fixing bolts with epoxy is a perfectly

21   acceptable method of connecting two pieces together,

22   provided the two pieces connecting are adequately detailed.

23        Q     Okay.  Meaning sufficiently large and sufficiently

24   deeply embedded?

25        A     Providing you can -- yes.  Providing you can avoid

1    Q    I want to look at the next page, if we could, of

2  that report, and the paragraph, second from the bottom.

3  About halfway through, you said "Whichever way the design is

4  done, the maximum bolt design load is less than half that of

5  the reinforced concrete option.  This does not prove the

6  bolts will fail; it requires a design level earthquake or a

7  mooring or berthing incident to generate the maximum

8  forces," et cetera.

9         What is a "design level earthquake" you're

10  referring to there?

11    A    In the context of the work I did on dolphin B, it

12  would be an earthquake that would produce a horizontal load

13  of around about 200 tons.  That is the work that I did.  To

14  generate the maximum loads in the piles, you have to apply

15  the maximum forces on the structure.

16    Q    Well, I guess what I'm driving at is you're saying

17  it will not fail.  Even though it's perhaps not what we'd

18  like to see, it does not mean it's going to fail; in order

19  for it to fail, we have to have a design level earthquake --

20    A    Yes.

21    Q    -- or berthing forces.  Subsequent to 1996, to

22  your knowledge, did Guam sustain a design level earthquake?

23    A    Subject to 1996?

24    Q    Subsequent to 1996.

25    A    I suspect not.

1      Q    So --

2      A    The earthquake that occurred subsequent to 1996

3  was a fraction of the one that occurred in 1993, wasn't it?

4      Q    I would say so.  I was there for both of them.  So

5  if there wasn't a design level earthquake, then did you

6  ever -- well, let me ask you this.

7           Did you ever do any analysis or ask

8  somebody to do any analysis for you as to the forces

9  associated with this October 2001 earthquake?

10     A    No.

11     Q    Did you ever do any analysis during your design

12  and work for MacLeod or Smithbridge on this case to

13  determine whether the physical condition of the dolphins

14  that you observed in October 2001 was consistent with the

15  forces generated by the October 2001 earthquake?

16     A    The physical appearance of the dolphins in 2001 --

17  the physical appearance of the deck-to-pile joints was

18  consistent with earthquake loading.

19     Q    Okay.  Let me make sure of a couple other things.

20  Now, would it be fair to say that the material written in

21  these reports we're talking about, where you're documenting

22  the condition of those dolphins, is accurate?

23     A    I think so.

24     Q    So if I, for instance, where -- just looking back

25  at the December 19 report, I forget if it's 13 or it's a

1    cooperation.

2                              EXAMINATION

3    BY MR. O'CONNOR:

4        Q    Mr. Dennis, did you meet Terry Thompson in

5    connection with your work on this project in Guam?

6        A    The name is not familiar.

7        Q    Okay.  You made a comment in response to one of

8    Mr. Sterling's questions that the physical appearance of the

9    deck-to-pile joints was consistent with an earthquake.

10       A    Earthquake load.  Earthquake type incident.

11       Q    Yes?

12       A    Yes.

13       Q    Was the physical appearance of the deck-to-pile

14   joints also consistent with the damage you would see from a

15   berthing incident?

16       A    To be fair, it probably could be --

17       Q    Okay.

18       A    -- except on dolphins A and B.

19       Q    And why do you say except dolphins A and B?

20       A    Well, they're a long way from the berth line.

21       Q    Well, when I say berthing incident, I mean to

22   include as a subset, mooring forces.

23       A    It's very hard to get a mooring incident.

24       Q    When you say a very hard to get a mooring

25   incident, what do you mean?

1    A    Well, a berthing incident is an impact.

2    Q    Right.

3    A    Mooring lines are flexible, they stretch.  So if

4    you get a load on a mooring line, it comes on very slowly on

5    the dolphin.  And you do not normally get that sort of

6    failure with a slowly applied load.

7    Q    But if you had a gust of wind or if the ship

8    backed up while it was still tied to dolphin A  and dolphin

9    B, would you see that effect?

10   A    No.  There is -- there is a lot of flexibility in

11   the mooring line.

12   Q    To me that's curious, because when I look at your

13   drawings of the pile-to-deck disconnections on dolphins A

14   and B, I don't see what I would think you would normally see

15   if there was an earthquake.  In other words, all of the

16   connections having some sort of an effect.  What I see from

17   your drawings is that the only connections that are

18   disturbed in dolphins A and B are the ones closest to the

19   mooring force?

20   A    Uh-huh.

21   Q    How can you describe those disconnections as being

22   consistent with an earthquake if they seem to me to be

23   inconsistent with an earthquake?

24   A    The position of the pile in the dolphin is not

25   necessarily an indication of where the maximum load will

187

1   come.  Earthquake loads are not necessarily in any

2   particular direction; they can be in any direction.

3       Q    Earthquake loading through the entire dolphin,

4   they would affect all the piles, wouldn't they?

5       A    No.  The earthquake load affects the block --

6   well, the earthquake load is generated by an acceleration on

7   the ground.  The ground moves, the dolphin is a block of

8   concrete sitting above it, which, because of its inertia,

9   does not want to move.  And the only thing that connects the

10  ground to the concrete are the piles.  And they behave --

11  they don't all behave the same.  It depends on where they're

12  located as to how they perform.

13      But what you got to remember with earthquake responses

14  is they're cyclic.  They're not just in one direction; the

15  direction reverses.  So that's why you tend to get bolts on

16  both sides of the pile can be worked out.  They're not

17  necessarily pulled out from one go.  They're worked out on

18  successive cycles.

19      Q    How do you explain it, if it was an earthquake

20  that caused the damage to dolphin A, that the only piles

21  that -- that failed are the piles on the side of the dolphin

22  facing the ship?

23      A    Well, it's quite possible that those piles

24  actually had fewer bolts properly secured, if you like.

25      Q    So there could have been a coincidence that the

1    piles closest to the ship just happened to have less bolts

2    properly secured?

3        A    It is possible.  I mean, the response is not that

4    everything will fail at once; the failure can be

5    progressive.

6        Q    Wouldn't that be a remarkable coincidence?

7        A    It's not a coincidence at all.

8        Q    Here's your drawing.  I'm showing you Exhibit 6.

9        A    Yes.

10       Q    And here is the piles that you say failed.  And

11   I've sort of colored them in with blue ink.

12       A    Yes.

13       Q    Do you see that they're all facing towards where

14   the ship would be moored, correct?

15       A    More or less, yes.

16       Q    And none of the piles that are on the other side

17   of the dolphin have -- if we're the same -- let's say this

18   was a map.

19       A    I see what you're saying.

20       Q    And the ship is moored to the east of dolphin A.

21   That's where all the piles are disconnected on where they've

22   all failed, correct?

23       A    Yes.

24       Q    And none of the piles on the western half of the

25   dolphin A  have failed.

1      A    No, they haven't.

2      Q    And only one of them in the northern part?

3      A    Yes.

4      Q    That part of the dolphin which is furthest away

5  from the ship, correct?

6      A    Yes.

7      Q    And you're saying that that's just a coincidence?

8      A    It's not a coincidence.  Why is it a coincidence?

9  You can't tell from that, just because the ship's moored to

10  the bottom left-hand corner,.

11      Q    Bottom right-hand corner?

12      A    Which pile is going to have the maximum load on

13  it, just by looking at it.

14      Q    Well, wouldn't you expect if the dolphins was

15  affected by earthquakes forces, that all of the piles in

16  dolphin A would be affected equally?  And isn't it queer

17  that only the piles that were disturbed by the earthquake

18  all happened to be clustered on one side closest to the

19  ship?

20          We'll see the same thing, by the way, when

21  we get to dolphin B.

22      A    Here is an output, 200 tons in what I call the X

23  direction, which is applied in one of the principal

24  directions of the dolphins.  They -- and this is Exhibit 10.

25          They show you the varying loads in the

1    various piles for that.  And there's nothing like

2    the same in any of them.  They're all completely

3    different.

4            Now, I've applied that load in two

5    directions on dolphin B, and both -- that's in two

6    directions at right angles, both that way and that

7    way.  And I got that sort of variation in the pile

8    loads in each case.  There is nothing consistent

9    about them at all.

10    Q    So if the piles are all loaded differently?

11    A    The piling are all loaded differently.

12    Q    Why is it that only the piles on the eastern half

13    of the dolphin then fail?

14    A    Well, perhaps they're the ones that have the

15    highest load on them.

16    Q    Perhaps, or they are?  Why don't you look at your

17    notes.

18    A    I'll look at my notes.  This is a hypothetical

19    load that I've put on them.  The highest pile loading in

20    this -- 128 tons on pile 11.  Pile 11 is that one.  And that

21    is for a load in.

22    Q    Why don't you show me.

23    A    I've said the negative X direction.  For a load of

24    200 tons in the negative X direction, that's X there, so a

25    negative X direction is that way.  According to me, the

1    pile -- highest pile is at the -- the highest load is at

2    node 211, and 211 is that one.

3        Q    How about on this drawing?

4        MR. BOOTH:  That's A, that's B, so you're comparing

5    apples and oranges here.

6        A    What you want is a load in that direction.

7    BY MR. O'CONNOR:

8        Q    Let's talk about A.

9        A    I haven't done A; I've only done B.  I've only

10   analyzed dolphin B.

11       Q    Okay.  So as far as A is --

12       A    It's a similar dolphin.  But what I'm -- what I'm

13   saying is that you --

14       Q    So you have no calculations for dolphin A which

15   would prove your thesis?

16       A    No.

17       Q    So let's move to dolphin B.  Now, your thesis is

18   perhaps the piles that failed in dolphin B are the ones that

19   have the highest loads on them?  Is that correct?

20       A    For a load.

21       Q    Can you answer that question.  Is that correct?

22       A    I'm sorry, what was the question?

23       Q    Your thesis is that the piles that would have

24   failed in dolphin B, were the ones that had the highest

25   loads on them?

1       A       Yes, probably.

2       Q       Okay.  So let's go to your calculations and see

3   how they match up.

4       A       Well, for a load of 200 tons, in what I call the

5   positive Y direction, which is that way, at the highest load

6   is at node 211, again, which was 80,000 or 80 tons.  And 211

7   is -- what's 211? -- that one.

8       Q       This one?

9       A       It's -- the pile is in this corner.

10      Q       Okay.  So on Exhibit 6, page three, that would be

11  upper left-hand corner?

12      A       The next one.

13      Q       Correct?

14      A       Yes.

15      Q       Okay.  And that has one of the highest loads

16  according to your calculation also?

17      A       According to my calculation, that is one of the

18  highest loads.

19      Q       Unfortunately, for your theory that's not one of

20  those that failed, though, is it?

21      A       Not necessarily, no.

22      Q       What do you mean not necessarily.  I mean you show

23  it as not failing, right?

24      A       No, I haven't showed it as failing at all.

25      Q       Right.

1    A    I have generated in a model the highest load at

2  that pile.  That does not mean to have failed, because the

3  load I have generated is actually not very high, it's only

4  80 tons.

5    Q    So it's your theory the piles that have the high

6  loads are the ones that should have failed in the

7  earthquake, or the ones that have the low loads are the ones

8  that should have failed in an earthquake?

9    A    I have made a model of a dolphin.  I have applied

10  two hypothetical loads in two directions.  I've applied four

11  loads to a dolphin to assess the pile loads in them.  That

12  is all I have done.  I have -- I am not saying that that is

13  the maximum load you can necessarily get; it may be possible

14  to generate higher loads.  It is an indication only.

15    Q    I don't think that's respondsing to my question.

16    A    What's your question?

17    Q    Let's listen to it.  The question I'm asking --

18  first I'm making an observation that seems pretty odd that

19  in dolphin A and dolphin B, that the only piles that are

20  failing, according to your drawings, are the pilings that

21  are closest to the ship.

22        And it looks inconsistent with how I

23  thought an earthquake would affect piles in a

24  dolphin.  I thought that you then told me that no,

25  that's not inconsistent; that the piles that failed

Case 1:03-cv-00009    Document 243-2    Filed 10/07/2005    Page 2 of 32

1   in dolphin A and dolphin B are the piles that had

2   the highest loads on them. If I'm not correct, tell

3   me.

4       A   One, two, three, and four, or one, two and three,

5   which are the three across the front, had both nearly

6   80 tons in them.

7       Q   Okay. How about the ones in the upper left-hand

8   corner?

9       A   The ones in the upper left-hand corner are, which

10   are 11, 13, and 14, very small loads. 14 has 80, which is a

11   very heavy load. It's that one. So the heaviest loaded

12   pile are the ones that have actually failed if you counted

13   them correctly.

14       Q   Well, at one point in time you pointed to a pile

15   that didn't fail, then you pointed to a pile that did fail.

16       A   No. There's a plan of the dolphin in the sense

17   that you have it. Here is the output of 200 tons in the

18   negative Y direction. That is positive Y towards you. The

19   negative Y direction is this way.

20       Q   Uh-huh?

21       A   The most heavily loaded piles are one -- 201, 202,

22   203.

23       Q   201, 202, 203?

24       A   Yeah.

25       Q   Yeah?

1    A    214 and 215, which are those two.  Those three and

2    those two are the heaviest loaded ones.

3    Q    Good.  Hold on for a second.  We're on page three

4    of Exhibit 6, and you're referring to -- what's this?

5        MR. BOOTH:  Page six.

6        MR. O'CONNOR:  Page six of Exhibit 6, which is some of

7    your calculations.

8        MR. BOOTH:  That's six Exhibit 10.

9        MR. O'CONNOR:  Exhibit 6.

10   Q    And you have looks like 17 separate pile -- piles,

11   one through 17.  And the numbers adjacent to them represent

12   what?

13   A    It's the number you see there, which is the point

14   at the bottom of the pile, it doesn't occur there.  It

15   occurs out here somewhere where the bottom of the pile is.

16   It's what's called -- it's these -- it's what is called a

17   node at the tip of the pile.  It occurs 60 feet below the

18   deck.  They are down there.  There's the deck, there are the

19   pile tips, numbers.

20   Q    So what I'd like you to do is take these numbers

21   one through 17, write them in on here so I can see which

22   pile is there.

23       MR. BOOTH:  Well, wait a minute.  You're going to have

24   to make that an exhibit then.  Is this the original?

25       MR. O'CONNOR:  No.

1    MR. BOOTH:  That's your copy.  Okay, why don't you do

2    it on the original -- the original exhibit, which is under

3    your pile right here.  This one.

4        A    This?

5        MR. BOOTH:  Page -- what is it?

6        MR. O'CONNOR:  If we're taking Exhibit 6, page three.

7    Mr. Dennis is writing in the circles on the dolphin B on

8    page three.  Each circle represents a pile.

9        MR. BOOTH:  Okay.  Excuse me.  Mr. Dennis, would you do

10   it on this exhibit, please.

11       MR. O'CONNOR:  So he's now going to write inside six,

12   each circle, the number of the pile here that he is taking

13   from Exhibit 10, page six.

14       MR. BOOTH:    Okay.

15       MR. STERLING:  We'll go off the record for a second.

16            (Discussion held off the record.)

17       A    Those piles, those five and there's another one

18   which I can't readily identify, are all around about

19   80 tons.  All the others are down in the 20, 30 or less.  So

20   those five there are the most heavily loaded ones.

21   BY MR. O'CONNOR:

22       Q    Okay, go ahead and write them.

23       A    Pardon.

24       Q    Go ahead and fill in the others.

25       A    I'll have to do it on this because that doesn't

1   look like the model.  This is a model, that's the real pile.

2   The model is not necessarily an exact replica of this

3   because this was done solely for the purposes of

4   establishing what a maximum and minimum load was.

5        Q    How about this one here?

6        A    Two hundred thirteen, negative 22 tons.  The one

7   on the other corner is 217, negative 20 tons for that load.

8   If you reverse the load, you will more or less reverse the

9   forces.  Two hundred minus 22.  The other corner, 204 minus

10  21.  Those ones there had the highest loaded ones by a long

11  way.

12       Q    Indicating?

13       MR. BOOTH:  Indicating numbers 201, 202, 203, 214, and

14  215.

15       A    Again, you have to remember that I did this purely

16  to effect a Stage 1 -- I did this solely, purely to effect

17  the Stage 1 repair, not to carry out a precise analysis of

18  each dolphin.

19  BY MR. O'CONNOR:

20       Q    Got you.  Did Peter MacLeod, when he was using

21  your services, ask you to render an opinion on the effect of

22  missing fenders on berthing forces?

23       A    Did he?

24       Q    Yes.

25       A    No, he didn't.

1    Q    What effect do missing fenders or broken fenders

2  have on berthing forces?

3    A    They make them very high.

4    Q    I may have misunderstood you, but I thought that

5  you had said, correct me if I'm wrong, that the dolphins

6  that have the shortest pile connections to the seabed are

7  the dolphins that are most likely to have the strongest

8  earthquake forces?

9    A    That's correct.

10    Q    Why then would dolphin A, which is one of the

11  shorter dolphins, wasn't it?

12    A    No, dolphin A is the longest.

13    Q    Was it the longest?  Okay.  And that's why you

14  think it had the least earthquake damage?

15    A    Yes, basically.  It's the same size and

16  configuration -- it may have a different number of piles

17  than B, but it is the same size, but it is in much deeper

18  water.

19    Q    In your opinion, why is it that so few piles in

20  dolphin A failed, but almost all of the the piles in

21  dolphin D failed?

22    A    Dolphin?

23    Q    D.

24    A    Which one is it?

25    Q    (Indicating.)

1      A    Dolphin D is twice the size of dolphin A, and it's

2  probably in shallower water.

3      Q    Okay.  Dolphin D is about the same size as dolphin

4  C?

5      A    They are identical.

6      Q    Same depth of water, roughly?

7      A    Dolphin C is in 40 to 55 feet of water, and

8  dolphin D is in 55 to 75 feet of water.  They're quite deep.

9  Dolphin B  is a shallowest, 20 to 40 feet.

10     Q    So dolphin D is in shallower water than dolphin C?

11     MR. BOOTH:  Other way around.

12     A    Dolphin C is in shallower water than dolphin --

13  BY MR. O'CONNOR:

14     Q    So it would have had stronger earthquake forces

15  than dolphin D?

16     A    Pardon.

17     Q    The forces of -- the earthquake forces affecting

18  dolphin C would have been stronger than those affecting

19  dolphin D?

20     A    Yes.

21     Q    Why then was dolphin D -- why did dolphin D have

22  substantially more failed piles than dolphin C?

23     A    I can't answer that.

24     Q    Does it seem strange to you that if this was

25  earthquake damage, you have two dolphins the same size,

1   almost adjacent to each, other that the dolphin that had the

2   shortest distance to the seabed had less damage than the

3   other dolphin?

4        A    No.

5        Q    Why?

6        A    Well, it's not a precise thing.  Just because you

7   calculate a higher load on one dolphin doesn't necessarily

8   mean that when that load is applied, that the damage is

9   going to be sustained in an identical manner or a different

10  manner.  It's not that precise.

11       Q    Did you ever do any analysis of the earthquake

12  forces from this earthquake to see if it was capable of

13  doing this kind of damage?

14       A    From which earthquake?

15       Q    The October 2001 earthquake.

16       A    To see if it could do that damage?

17       Q    Yeah.

18       A    No.

19       Q    But you agree, berthing forces could have done the

20  damage that was done to dolphin C, G, and D?

21       A    No, I didn't agree to that.  I said it's possible

22  for berthing incident to damage piles.  I didn't say that it

23  necessarily did it for these ones.

24       Q    But could berthing forces have created the kinds

25  of failure that you saw in dolphin D?

1    A    Dolphin D.  It would have to be a very severe

2  berthing incident to have done that.

3    Q    Okay.  And could the kinds of failure you see in

4  dolphin G have occurred as a result of berthing forces?

5    A    Dolphin G?

6    Q    Dolphin G, yes.

7    A    I find it unlikely.

8    Q    But it could have been, right?

9    A    I would disagree that it could have been.

10   Q    So in your opinion, it would be impossible for the

11 damage you see in dolphin G to have occurred from a severe

12 berthing incident?

13   A    It's not impossible.

14   Q    So it's possible?

15   A    It's possible.

16   Q    Okay.  And is it possible for the kinds of damage

17 you see to dolphin C to have occurred from a berthing

18 incident?

19   A    It is possible.

20   Q    Okay.  I'm kind of curious about one of the

21 answers that I thought you gave to Mr. Sterling, but I'm not

22 sure.  I'm referring to the 19 December 2001 letter from you

23 to Smithbridge.

24   A    Nineteen?

25   Q    December, 2001.

202

1      A      I'm sorry.  Five, is it?

2      Q      I don't have -- I don't have it marked so I'm not

3   sure.  It may be Exhibit 5.

4      MR. BOOTH:  Yeah, it's number five.

5      A      Yes.

6   BY MR. O'CONNOR:

7      Q      I'm referring to page two.  Under breasting

8   dolphin C, where it says that the connection of the four

9   transfers batter piles near each end show evidence that the

10  dolphins moved 16 inches towards the berth, all the

11  connecting bolts have been pulled out, sheared off or bent

12  over, this is something you saw?

13     A      I've got a picture of it in --

14     Q      Is it something you saw?

15     A      -- exhibit whatever that is.  Yes, I saw it.

16     Q      Okay.  It's an accurate statement?

17     A      As it turns out, it is not an accurate statement.

18     Q      You saw it, but it's not accurate?

19     A      The statement is not accurate.  The 16 inches is

20  accurate.

21     Q      Okay.  And what's inaccurate about it?  Is this a

22  movement towards the berth or not?

23     A      It cannot be determined which is moved which way.

24  The piles might have moved, the block of concrete might have

25  moved, they both might have moved.  You cannot determine

Case 1:03-cv-00009    Document 243-2    Filed 10/07/2005    Page 11 of 32

1    which had moved.  All you can say is that there's been a

2    relative movement between the concrete and the pile.

3        Q    Can you give me an opinion as to whether this

4    movement is more consistent with the berthing incident or

5    more consistent with an earthquake?

6        A    That movement is not consistent with anything if

7    you don't know what is moved.

8        Q    Okay.  But if it had been a movement towards the

9    berth, which is what you wrote down, that would have been

10   more consistent with the berthing incident than an

11   earthquake, wouldn't it?

12       A    It could be interpret that way, yes, if the

13   dolphin has moved.

14       Q    When you saw some bolts that were bent, correct?

15       A    Uh-huh.

16       Q    You can't say uh-huh; you have to give an answer.

17       A    I saw bolts that were bent.

18       Q    And did you make note of which direction they are

19   bent in?

20       A    No.

21       Q    Do you recall which direction they were bent in?

22       A    No.

23       Q    So you don't know whether or not they were bent

24   towards the berth or away from the berth?

25       A    I have noted which direction the pile has moved

1    relative to the concrete.  If it was a large movement, if

2    the piles -- if the bolts were just bent, I have not noted

3    which way they were bent.

4        Q    Okay.  Did you note whether or not the bolts were

5    all bent in the same direction?

6        A    No.

7        Q    Further down the same page, under breasting

8    dolphin D, the fourth paragraph says there's evidence of

9    about 290 millimeters, 11.5 inches movement towards the

10   berth, and 100 meters -- millimeters, four inches

11   longitudinally.

12            Is that what you saw?

13       A    That is the same as the previous one.  What I saw

14   was a relative movement between the pile and the concrete.

15   I cannot tell which moved which way.

16       Q    Okay.  And when did you decide to change your

17   opinion about what you wrote down here?

18       A    When I was questioned about it.

19       Q    Would that have been yesterday, by Mr. Ledger?

20       A    I can't answer that.  It may have been today.

21       Q    Either today --

22       A    When I was questioned about it.

23       Q    By Mr. Booth or Mr. Ledger?

24       A    By Mr. Sterling.

25       Q    All right.  Did you discuss this issue with

1  Mr. Ledger yesterday?

2       A    I think we did, yes.

3       Q    At that point in time did you change your view?

4       A    I don't -- I can't say when I changed my view.

5  But to actually say which part of the dolphin has moved is

6  very difficult without a survey.

7       Q    Why can't you say when you changed your view?  I

8  mean, if it happened today or yesterday, that's pretty eaasy

9  for you to remember.

10      A    I don't know when I changed my view.  I might have

11  changed my view the year -- the second time I went to Guam.

12      Q    You may have then, but you've just recently

13  testified that you changed your view yesterday or today.  I

14  just want to know whether you changed your view when you

15  were having the conversation with Mr. Ledger yesterday?

16      A    No, I don't think I did.

17      Q    Did you change your view today?

18      A    I can't -- I'll retract that.  I don't know when I

19  changed it.  I don't know whether I actually had the view I

20  had when I wrote this.  It may have been an unfortunate

21  choice of words at the time.

22      Q    You seem to be expressing the opinion here today

23  that you -- that you have some doubts that the damage that

24  you've seen to these dolphins could have occurred

25  exclusively as a result of berthing forces, correct?

1    A    Will you repeat that.

2    Q    You don't believe that the damage that you saw to

3  all these dolphins occurred exclusively from berthing

4  forces, correct?

5    A    I don't think any of the damage occurred from

6  berthing forces.

7    Q    So you don't think that even one or two bolts

8  might have been knocked out or loosened because of a

9  berthing incident?

10    A    The evidence does not point to that, no.

11    Q    Which evidence?

12    A    H'm?

13    Q    Which evidence?

14    A    What I saw.

15    Q    What you saw.  You saw loosened bolts and missing

16  bolts, correct?

17    A    Yes.

18    Q    How would you know if any one of those particular

19  bolts was loosened from an earthquake or a berthing

20  incident?

21    A    I'll retract that then.  I don't know.

22    Q    Okay.  Hypothetically, if a berthing incident had

23  loosened a couple bolts in a pile-to-deck connection, just a

24  couple, let's say, and then an earthquake came along and

25  there was force applied to the remaining bolts in that

Case 1:03-cv-00009    Document 243-2    Filed 10/07/2005    Page 15 of 32

1    connection, those bolts would have a lot less strength than

2    before the berthing incident, and more likely to fail, would

·3   they not?

4         A    True.

5         Q    Did you ever make any inquiries of Mr. MacLeod or

6    The Port Authority with regard to berthing incidents at

7    these dolphins?

8         A    No.

9         Q    Are you aware that there were several berthing

10   incidents at these dolphins before the earthquake?

11        A    I was aware that there had been berthing incidents

12   from the condition of the fenders.

13        Q    Okay.  And the condition of the fenders was what?

14        A    Not very good.

15        Q    They were broken?

16        A    I think one might have even been missing.

17        Q    So a dolphin that has a broken or missing fender

18   is subject to a lot more stress from a berthing incident

19   than a dolphin that has an operative fender, correct?

20        A    Yes.

21        Q    And therefore more likely for the bolts to be

22   loosened by a berthing incident, correct?

23        A    Yes.

24        Q    When you saw these bolts that had come loose, did

25   you see any or many bolts hanging down loose that still had

1   chunks of concrete attached to them?

2       A    You mean epoxy?

3       Q    Concrete.   There would be epoxy around the bolt,

4   and then concrete attached to the epoxy.

5       A    No.

6       Q    You didn't see any of those?

7       A    No.

8       Q    On the bottom of this same exhibit, page one --

9   page three, the last paragraph, you wrote, "There was little

10  doubt that the recent earthquake caused the pile head bolts

11  to fail.  Just how the dolphins would have performed had the

12  bolts been properly fixed is debatable."

13          What did you mean by that last sentence?

14  By that last sentence did you mean that it's

15  possible that if the bolts had been properly placed,

16  that the dolphins' connections wouldn't have failed

17  in this earthquake?

18      A    It can be shown that that is the case, yes.

19      Q    Help me out on this; you're the engineer, I'm not.

20  On the top of the next page, you write, "Dolphin H, which

21  was the new construction in 1996, with the piles held in by

22  four adequately anchored No. 8 one-inch bar, suffered very

23  little damage."

24          Here is my confusion.   If the earth -- if

25  an earthquake is the force that caused all this

1    damage to all these dolphins, in some cases

2    disconnecting all of the piles on the dolphins,

3    granted dolphin H is a new construction, but why is

4    it that you don't see any damage to dolphin H

5    connections?

6        A    The capacity of the joint in dolphin H, from

7    memory, is 43 tons.  And because that is new construction,

8    if you like, you can have confidence that you can probably

9    sustain that 43 tons.  The capacity of eight

10   three-quarter-inch Chem-set anchors is 96 tons.  That's the

11   failure capacity according to the manufacturer.

12       The confidence that you apply to those bolts indicates

13   that you have a working load capacity of around about 30 tons.

14   So it is possible to justify the bolt joints failing at

15   30 tons, whereas a reinforcing joint won't fail until 43 tons.

16   It's not an absolute thing.  You cannot say categorically that

17   the bolts will fail at 30 tons.  They might.

18       Q    But why is it you don't see any damage in dolphin

19   H?

20       A    Well, the earthquake was not a very big one --

21       Q    Right.

22       A    -- in Guam terms.

23       Q    So you don't expect -- even though you see a total

24   failure of two dolphins, total failure of every pile, you

25   don't expect to find any damage in the dolphin in between

1   those two?

2      A   No, that doesn't surprise me, because up until

3   1993, presumably the existing dolphins hadn't suffered very

4   much damage either.

5      Q   When you said you were using the FOS of 3.5 for

6   the bolt arrangement, you said you did that because that's

7   what the trade uses.  The trade is what now?

8      A   I beg your pardon.

9      Q   The trade?  When you refer to the trade?

10     A   Yes.

11     Q   What were you referring to?

12     A   Published catalogs from bolt manufacturers.

13     Q   Okay.  You also said in response to one of

14  Mr. Booth's questions that "Our code requires bolt to

15  penetrate the reinforced concrete."

16         When you were saying -- referring to "our

17  code," were you referring to the New Zealand code?

18     A   Yes.

19     Q   Not the Uniform Building Code?

20     A   Not the --

21     Q   You were not referring to the Uniform Building

22  Code?

23     A   Of Guam?

24     Q   Right.

25     A   No.

1    Q    Are you licensed in Guam?

2    A    No.

3    Q    Are you licensed anywhere besides New Zealand?

4    A    No.

5    Q    And you were talking about how it was important to

6    have the bolt go up -- go deep enough into the concrete so

7    it gets up to or beyond the reinforced portion of the

8    concrete, so that the bolt wouldn't simply pull out a chunk

9    of concrete.  Correct?

10   A    Yes.

11   Q    And if a bolt does get up to the level of the

12   reinforcement, then it's less likely that it will just pull

13   out and bring a chunk of concrete with it, correct?

14   A    It could, it could.

15   Q    It could, but it's less likely?

16   A    If it gets through the reinforcing?

17   Q    Yes.

18   A    That's correct.

19   Q    And the reason why you want to get it at least up

20   to the concrete reinforcing is because you don't want it to

21   be pulled loose and take out a chunk of concrete with it?

22   A    No.  You want it to get past the reinforcing.

23   Q    Because otherwise it might pull out and take a

24   chunk of concrete with it?

25   A    As I have already testified, for earthquake loads,

1    you are not permitted to consider concrete has any

2    strength --

3        Q    Right.

4        A    -- when it's not reinforced.

5        Q    Pardon me?

6        A    When it's not reinforced.

7        Q    And if you don't get up there to wherever the

8    reinforcement is, the danger is that the bolt will just yank

9    out and pull a chunk concrete out with it, is that right?

10       A    That is one possibility.

11       Q    That was the possibility you referred to?

12       A    Yes.

13       Q    Okay.  And you didn't see any bolt disconnected

14   from any dolphin that had a chunk of concrete --

15       A    No.

16       Q    -- attached to it, did you?

17       A    No, I didn't.

18       Q    Let me refer you to your 21 December 2001 letter

19   to MacLeod.

20       A    Which number is that?

21       Q    I don't know the exhibit number, but it's the

22   December 21, 2001.

23       MR. STERLING:  It's number three.

24       MR. BOOTH:  Three?

25       A    Yeah.

1    BY MR. O'CONNOR:

2        Q    Your first paragraph in that letter, you say,

3    "These structures were reportedly damaged in an earthquake

4    approximately two months earlier."

5             Reported to you by whom?

6        A    Yes.  Ben Casey.

7        Q    Okay.  And had you had a chance to inspect it by

8    this time?

9        A    Well, I inspected it on the 7th of December.

10       Q    Okay.  Why do you say reported the damage if you

11   had a chance to inspect it yourself?  Did you have doubts as

12   to whether or not earthquake damage caused these damages?

13       A    No, I don't think so.

14       Q    Why did you use the word reportedly?

15       A    I have no idea.

16       Q    Page three, the second paragraph, where you say,

17   "It is possible that had the bolts been properly installed,

18   the pile-to-deck connection would have performed

19   satisfactorily in the recent earthquake."

20           Are you referring here now to the pier or just to the

21   pier?  Or are you referring to dolphins?

22       A    What do you mean, the pier?

23       Q    Well, the structure that's not dolphins A, B, C,

24   D, G and H.  Sometimes it's called the wharf.

25       A    There were no bolts put into the pier.

1    Q    Right.  So we're talking about the dolphins?

2    A    We're talking about the dolphins.

3    Q    But you say, "It is possible, had the bolts been

4  properly installed, the pile-to-deck connection would have

5  performed satisfactorily in the recent earthquake."

6         So, if Winzler & Kelly's design had been

7  followed, it's possible that the-pile-to-deck

8  connections would not have disconnected, is that

9  correct?

10         MR. BOOTH:  I object to the form of the question.

11  Where he said Winzler & Kelly design was not followed,

12  Mr. Swanney testified he was.  S-W-A-N-N-E-Y.

13    A    So will you repeat your question.

14  BY MR. O'CONNOR:

15    Q    Yeah.  Is it possible that if the Winzler & Kelly

16  design had been followed, and the bolts installed properly,

17  that the pile-to-deck connections would have performed

18  satisfactorily in this earthquake?

19    A    Yes, it's -- that's possible.

20    Q    Your final conclusion on the same page says, "The

21  design of the 1996 repair of the pile-to-deck joint was at

22  best marginal to safely resist the loads that could be

23  imposed upon it."

24         And by that design are you referring to

25  the Winzler & Kelly design VE-1?

1     A    Yes.

2     Q    Let me refer to Exhibit 11. I suspect that this

3 exhibit may be used sometime in trial, and it's all in your

4 handwriting. And several of your words, I can't read or

5 could be subject to different interpretations, so what I'd

6 like to ask you to do is read the entire thing for the

7 record.

8     A    "Port Authority of Guam."

9     Q    And let me identify it a little bit better. This

10 is a the January 3, 2002 memo handwritten on OCEL

11 Consultants Limited stationery. Go ahead.

12     MR. STERLING: For the record, I'm going to step out

13 for just a minute. He can do this while I'm gone.

14     A    This is a facsimile to Peter MacLeod, headed to

15 "Port Authority of Guam -- Shell F-1 pier."

16     "Here is my letter to you re the pier and

17 dolphins at the Shell F-1 pier, Port of Guam.

18     Yeah. "I decided to rewrite the

19 Smithbridge report rather than edit theirs. And as

20 you can see from the date, I have been stewing over

21 it for two weeks or so.

22     "To my mind, there is no doubt that the

23 bolt installation was faulty, be it 'past use-by

24 date,' epoxy -- epoxy, placement procedures or

25 whatever. The design issue is not so clear" --

1     sorry.

2             "The design issue is not so clear-cut as

3     it depends on opinion, what loads are applicable to

4     the structure and the strength of the bits and

5     pieces.

6             "From my point of view, I would not have relied on short

7     bolts for a joint like this, not only because of the placement

8     problems, but because the detail is unsatisfactory and the

9     safe working load of the bolt group is less than half the

10    pre-1999 joint," in brackets, "27 tons to 68 tons."

11        Q    Can we go back.  It's "less than half the pre-1993

12    joint" is that what it says.

13        A    1993 joint, yes.

14        Q    Sorry to interrupt.  Go ahead.

15        A    And, brackets, "27 tons to 68 tons).  Our man in

16    Shell (New Plymouth) was most uncomplimentary, and

17    (actually unprintable) when the joint was described to him.

18            "He said in his experience," Shell were

19    leasors, not builders -- "that Shell were leasors,

20    not builders and owners.  And" whatever Shell do to

21    their -- "whatever Shell do, their procedures

22    require at least compliance with local building

23    bylaws, if these are more stringent than their own

24    standards.  The use of epoxy bolt is widespread

25    around the world but not, I suspect, for connections

1    such as these in an earthquake zone."  That's it, I

2    signed it.

3        Q    Yeah, my copy doesn't show the next line.  Is it

4    just "Regards," your signature?

5        A    "Regards," and "Seasons Greetings, Frank Dennis."

6        Q    Okay.  And maybe we can stipulate for the record,

7    Mr. Booth, that when he says "full stop," the reporter, she

8    just put a period?

9        MR. BOOTH:  That means period.

10       MR. O'CONNOR:  All right.  That's a New Zealand thing.

11       A    English.  Pardon me.

12       MR. O'CONNOR:  English.

13       MR. STERLING:  English.

14       MR. O'CONNOR:  You want to take a five-minute break

15   now.

16       THE REPORTER:  Sure.

17       MR. O'CONNOR:  Okay, take a break.

18       MR. BOOTH:  Okay.

19       (At 5:07 p.m., a recess was taken until  5:15 p.m.)

20   BY MR. O'CONNOR:

21       Q    Mr. Dennis, will you look at the October 1st, 2002

22   letter from you to Peter MacLeod.

23       MR. BOOTH:  Exhibit 12?

24       MR. O'CONNOR:  Exhibit 12.

25       Q    Page two, you wrote, "There may be some merit in

1  reducing the size of the bar, but the savings will be

2  small."

3       And my question is, why did you write

4  that?  Is this in response to some question?

5       A    We discussed -- Ben Casey and I and maybe Peter

6  MacLeod, but certainly Ben Casey and I, discussed what we

7  would do if Smithbridge were awarded a contract to repair

8  all the piles.  And we agreed that we would use the same

9  system.  We agreed in principle that the concrete should

10  fill the piles rather than be held in the top, and we agreed

11  that we would look at the reducing the size of the bar if

12  possible.

13       Q    Okay.  So are you responding to some letter that

14  he wrote you or some phone conversation?

15       A    No.  I can't recall if it was a phone conversation

16  or not.  I was in Guam at the time, but -- because I was in

17  Guam in September 2002, so I was probably sitting in his

18  office, talking to him about it.  It was a discussion that

19  what we would do if he got the contract to finish it, to

20  finish repairing all the piles.  Obviously, the smaller the

21  bar you use, the easier it is to put in.  Everything is

22  cheaper with a smaller bar.

23       Q    Okay.  Let me refer you to the fourth -- fifth

24  page of Exhibit 13.  Let's make it the sixth page.  This is

25  your paragraph number two, "Pile -- Dolphin Connection?"

1      A    Uh-huh.

2      Q    And the second sentence there says, "The EMPSCO

3 calculations focus on the loads that can be transmitted

4 through fenders; that is berthing and wind for the

5 reconstruction of the Dolphin H, and modifications to

6 Dolphin G."

7        You say their calculations focus on these

8 loads.  Did they have any seismic calculations?

9      A    No, not that I saw.

10     Q    Okay.  Did you ever hear of them doing anything?

11     A    No.

12     Q    In the next page, the last paragraph, third

13 sentence, I think I the fifth line down, let me read -- let

14 me go back and read part of this paragraph to you.

15        Starting with the second or the third

16 sentence, "N C Macario," M-A-C-A-R-I-O, "and

17 Associates, (Mr. McMarco is, we believe, a

18 structural engineer) were employed as Project

19 Managers by March 1995."

20     MR. BOOTH:  -- six.

21     MR. O'CONNOR:  Is that a six?  Okay, sorry.

22     A    It's a six.

23 BY MR. O'CONNOR:

24     Q    "One of these organizations," and you're referring

25 to Mr. Macario and EMPSCO, "should have advised the Port

1    Authority whether the Black proposal was appropriate for the

2    conditions and strong enough.  And if they did not know,

3    they should have advised the Port Authority to seek further

4    advice."

5           What did you mean by that?

6       A    Well, normally, when a consulting engineer has

7    prepared a proposal for an organization like the Port

8    company, and the contractor comes back with an alternative,

9    somebody in the Port company checks it or has it checked.

10      Q    So EMPSCO or Macario should have checked VE-1?

11      A    Yes, they should have.

12      Q    And by checking it, do you mean they should have

13   done calculations, models?  What should they have done?

14      A    Presumably, EMPSCO had the forces which had to be

15   resistant from their previous work.  What they should have

16   done or what somebody should have done was to look at the

17   details to see if it was appropriate and strong enough.

18      Q    Okay.  And you're expressing an opinion that both

19   EMPSCO and Macario had this responsibility, in your opinion?

20      A    No, I don't know who had the responsibility.  I

21   don't know if EMPSCO were still employed by The Port company

22   as design consultants.  I don't know if Macario was employed

23   by the Port company in any other than an administrative

24   role.  I don't know what their -- what their brief was.

25      Q    If they were the engineer of record, then they had

1   a responsibility to review it?

2       A    I don't know what you mean by engineer of record,

3   but that's probably -- the answer to that is probably yes.

4       Q    And if Macario was the construction manager, it

5   would have a responsibility to review it?

6       A    I think so.

7       Q    And by review it, you mean do some calculations or

8   determine --

9       A    Arrange to have them done.

10      Q    On the next page, third paragraph, you're

11  referring to investment one, and you say, "Our conclusion

12  was that the bolted joint was marginal."

13           When you say "our conclusion," you mean

14  your company OCEL, you mean yourself?

15      A    Yes.

16      Q    What do you mean?

17      A    Our company.  Well, we normally write our reports

18  in that fashion.

19      Q    Okay.  English again, huh?

20      A    Something, yes.

21      Q    But this was actually your personal conclusion?

22      A    It is my personal conclusion as well, yes.

23      Q    All right.  And by "marginal," you meant what?

24      A    The way we assess the strength of connections is

25  that we assess the capacity of the connection, that is, the

1   load at which it fails; not completely, but the load at

2   which it starts to fail.

3       Q    I think by marginal, I meant were you referring to

4   the Uniform Building Code?

5       A    No, I'm not.  I'm explaining what I mean by

6   marginal.

7       Q    Okay, sorry.

8       A    The capacity of the joint is a load at which it

9   fails.  I have given in one of the reports the capacity of

10  the original reinforced concrete connection, which I believe

11  was 112-tons.  That is the load at which it fails.  The

12  capacity of the eight three-quarter-inch stainless steel

13  bolts was, I think from memory, 96 tons.  That is a load at

14  which the joint fails.

15          So the failure load is very similar.  It

16  is not -- it's only 10 percent different.  The

17  difference between the two joints is the confidence

18  that you have in them.  But the reinforced concrete

19  joint confidence is much higher.  This leads to a

20  working load of about 68 tons, I think.

21          And the working load on the bolted joint

22  was only 27 tons, but the capacity is almost the

23  same.  So it's the confidence part of it, if you

24  like, where this marginal comes in.  It is quite

25  possible that the thing could have taken -- if it

1   was built properly, could have taken almost the same

2   failure load.  But you would not design it for

3   anything like the same load.  That's what I meant by

4   marginal.

5        Q    Thank you.  Your next sentence says, "Had the

6   bolts all been properly installed, the joint would probably

7   not have failed."

8        Is that your conclusion?

9        A    Yes.

10       Q    Okay.  The last page is page nine, and there's no

11  sincerely yours, no signature line, nothing else.

12       A    That's on page 10.

13       MR. BOOTH:  It's on page 10.

14       MR. O'CONNOR:  I'm on page nine.

15       A    It's on page 10.

16       MR. O'CONNOR:  Oh, is it?  Because I didn't get page

17  10.

18       MR. STERLING:  I didn't, either.  We got one today,

19  Bob.

20       MR. O'CONNOR:  No, that was my question.  I just

21  wondered if we were missing --

22       MR. BOOTH:  That's a prior copy of the document.  But

23  the exhibit I used today doesn't have this mistake by faxing

24  in the middle of page nine.

25       MR. O'CONNOR:  Okay, thanks.

1      Q    On the top of page nine, you say, "Potentially,

2   the most destructive of these is berthing impact because of

3   the considerable energy of a 100,000 tonne ship, even when

4   moving very slowly."

5           And you're discussing different forces.

6   When you're referring to different forces,

7   earthquakes forces?

8      A    Yes.

9      Q    Berthing forces are mooring forces?

10     A    Uh-huh.

11     Q    And in your opinion the most destructive forces of

12  those potentially is the berthing forces?

13     A    Yes.

14     Q    Towards the end of that paragraph, you wrote

15  "Obviously no ships master wants to berth his ship in such a

16  manner as to damage it.  However, accidents do happen and

17  judging by the cut off bolts (from old fender units?) and

18  the state of some of the existing rubber units, these are

19  reasonably common or the fender units are too small."

20          By that did you mean that what you saw

21  from the appearance of the cut-off bolts looked to

22  you as if that occurred as a result of berthing

23  forces?

24     A    Well, that's all that can have caused it.

25     Q    So only berthing force would have cut the bolts?

1      A      Well, I'm sorry.   Let me -- can I retract that

2  answer.   If the fender units are damaged in such a way that

3  the bolts cannot be undone, then you have no option but to

4  cut them off.

5      Q      All right.   So we're just talking about the bolts

6  connecting the fenders now?

7      A      Yes.

8      Q      You're not talking about the pile-to-deck

9  connections?

10     A      I'm talking about the fender bolts.

11     Q      Okay.   I have to jump around because these

12 gentlemen robbed a lot of my questions from me, so hold on.

13     A      It's all right.

14     Q      Did you review the EMPSCO design that Winzler &

15 Kelly modified?

16     A      Did I review it?

17     Q      Yes.

18     A      No, I didn't.

19     Q      You never did?

20     A      No.

21     Q      Not even in preparation for this deposition?

22     A      Can I ask what do you mean by review EMPSCO

23 design.

24     Q      Well, they drafted a design, they had some

25 drawings and plans?

1      A    Uh-huh.

2      Q    And did you look at it?

3      A    I looked at them.

4      Q    And I'm talking about the pile connection designs.

5      A    Yes, sir.

6      Q    In your opinion was that design a temporary repair

7  or a permanent repair?

8      A    EMPSCO's?

9      Q    Yes.

10     A    In my opinion, it's a permanent repair.

11     Q    Okay.

12         MR. O'CONNOR:  No more questions.

13         MR. BOOTH:  I have just a few more.  Ask the court

14  reporter to mark this as the next exhibit.  And for the

15  record, all Exhibit 14 is is another copy of the Exhibit 6,

16  photocopied in such a way that hopefully everything that

17  appears on the original will be on Exhibit 14.

18         I don't have any questions about that one,

19  Mr. Dennis.

20                    (Whereupon, Exhibit 14 was

21                    marked for identification.)

22                    FURTHER EXAMINATION

23  BY MR. BOOTH:

24     Q    Mr. Dennis, Mr. Sterling referred to the work that

25  has been done by Smithbridge in installing Dywidag bars in

1    some of the piles as a temporary repair.  My question is,

2    did you ever intend that work to be a temporary repair?

3         A    No.

4         Q    You expected that that would be a permanent repair

5    and part of the overall permanent repair of the piles?

6         A    Yes.

7         Q    And in your discussions with Mr. Casey of

8    Smithbridge, did he understand that Dywidag part of the work

9    to be a temporary repair?

10        A    No, I don't think so.

11        Q    In answer to a question Mr. O'Connor asked you,

12   you said that you thought that some of the damage that you

13   saw at the dolphins was possibly due to berthing.  But I

14   take it from your answer, comments in Exhibit 13, you didn't

15   think it was likely caused by berthing, is that right?

16        A    Could you repeat that.

17        Q    Okay.  In answer to a question that Mr. O'Connor

18   asked, you said you thought it was possible that the damage

19   that you saw to the dolphins was caused by one or more

20   berthing incidents involving a ship.

21             My question is, did you think that was the

22   likely cause?

23        MR. O'CONNOR:  Objection; leading.

24        A    No, I didn't.

25   BY MR. BOOTH:

1      Q    You thought it was likely caused by the

2   earthquake, right?

3      A    Uh-huh.

4      Q    Okay.

5   MR. O'CONNOR:  Same objection.

6      A    Pardon me.

7   MR. O'CONNOR:  Just for the record, same objection.

8   MR. BOOTH:  Okay.

9      Q    Are you familiar with a Yokohama fender?

10     A    I'm familiar with the -- with the company that

11  makes fenders, but I believe they are -- they make a range

12  of fenders.  Which one are you --

13     Q    They make a range of fenders in a range of sizes,

14  right?

15     A    Different shapes.

16     Q    Okay.  And if a ship comes into a berth where the

17  part of the berth doesn't have a rubber fendering system, is

18  the ship able to lower its own Yokohama type fender over to

19  be a bumper between the ship and the pier?

20     A    My understanding is that that sort of fender is

21  only used on sheet pile walls and things like that.  It is

22  not used on what I would refer to as a piled berth.  I think

23  a Yokohama fender is like a long sausage, is it not?

24     Q    Well, depends on how long, but they're usually --

25     A    Round.

1      Q    -- shaped like a Coke can, really, cylindrical.

2      A    But they need a wall similar to the ship.  The

3  ship's here, the wall is here, and the Yokohama fender is

4  between them.  You cannot put them between a ship and a pile

5  because the piles are not strong enough for that.  You can

6  only put them up against a wall.

7      Q    Okay.  But you can also put them between a ship

8  and a pile cap such as C, D and G in the Shell F-1

9  facilities, right?

10     A    I have never seen a ship lowering one of those

11  things like that.

12     Q    Okay.  You understood from your visits to Guam

13  that the sole purpose of the F-1 facility is the docking of

14  ships, right?

15     A    To discharge or load fuel, yes.

16     Q    Okay.  So any design work done in connection with

17  that facility should have taken account of the forces that

18  are encountered when ships dock at the facility, right?

19     A    Yes.

20     Q    In answer to one of Mr. O'Connor's questions, you

21  said EMPSCO, or Macario should have ascertained that the

22  Winzler & Kelly design was strong enough.  Could they have

23  made that or reached that conclusion by demanding Winzler &

24  Kelly to produce calculations showing that its design was

25  strong enough?

1      A    It's more than just calculations.  You have to, in

2   my opinion, comply with either the ground building code or

3   relevant marine standards; calculations alone are not

4   sufficient.

5      Q    Okay.  Could they have done what you think they

6   should have done in the circumstance by demanding that

7   Winzler & Kelly produce evidence that their design met the

8   applicable building code?

9      A    Probably.

10     Q    In other words, you weren't suggesting that EMPSCO

11  or Macario had to do their own separate finite element

12  analysis of the terminal or the pier based on their design?

13     A    No.

14     MR. BOOTH:  I'd like the court reporter to mark as

15  Exhibit 15, this photograph.

16                      (Whereupon, Exhibit 15 was

17                       marked for identification.)

18     MR. O'CONNOR:  For the record, I want to object to the

19  ultimate question you ask as assuming facts not in evidence

20  that Winzler & Kelly was asked to produce such calculations,

21  move to strike the answer.

22     MR. BOOTH:  And I don't think they did produce any

23  calculations.

24     MR. O'CONNOR:  Well, how could you if you're not asked.

25     MR. BOOTH:  By being good engineers and knowing you

1    should.

2         Q    For the record, Exhibit 15 is a black and white

3    copy of a colored photograph labeled G-12, "Breasting

4    Dolphin G," out of the Pro Marine Report dated July 15,

5    2004, expert witness report, damage assessment Fox Trot F-1

6    pier, Port Authority of Guam, prepared for Klemm Blair,

7    Sterling & Johnson.

8         I'm going to give you the benefit of seeing the colored

9    picture, Mr. Dennis.  And by looking at Exhibit 14, your

10   handwritten sketch, can you identify which pile is shown on

11   Exhibit 15 in the foreground.

12        A    No.  Exhibit what, 14?

13        Q    Or any of the other exhibits that you have in

14   front of you.

15        A    Yes, I can.

16        Q    Can you show me which one it is and where you're

17   looking.

18        A    (Indicating.)

19        Q    Is that Exhibit 14?

20        A    Yes.

21        Q    And which page?

22        A    Six.

23        Q    Thank you.  And which one does Exhibit 15 show?

24        A    That one.

25        Q    All right.  Can you put an X in blue ink in the

1    middle of that pile, and perhaps draw an arrow toward it

2    from the side so we can identify it later.

3         A    All right.

4         Q    And let's call that --

5         A    What exhibit is this?

6         Q    Exhibit 15.

7         A    Fifteen.

8         Q    And how do you know that that is the dolphin --

9    the pile that's shown on Exhibit 15?

10        A    Exhibit 15, page six, shows two piles that have

11   been displaced nine inches, but one of them has also dropped

12   nine inches.  The Exhibit 15 photograph -- Exhibit 15

13   photograph shows the piles still hard up against the

14   underside of the dolphin.

15        Q    Okay.

16        A    The pile mark has the comment "tight on deck,

17   bolts pulled over," which is consistent with the photograph.

18        Q    And looking at the sixth page of your handwritten

19   diagram of the dolphins, Exhibit 14, which side would the

20   ship moore to?

21        A    Bottom.

22        Q    Okay.  The part where the notch is cut out

23   essentially of the concrete?

24        A    Yes.

25        Q    Okay.  So the nine-and-a-half-inch displacement

1                    IN THE DISTRICT COURT OF GUAM

2    S.J. GARGRAVE SYNDICATE AT LLOYDS,)

         Plaintiff,                   )

3                                     )

     vs.                             )    CIVIL CASE NO. CV03-00009

4                                     )

     BLACK CONSTRUCTION CORPORATION,   )

5    WINZLER & KELLY, and ENGINEERING  )

     MANAGEMENT & PLANNING SERVICES    )

6    CORPORATION,                     )

         Defendants.                  )

7

8

9

10        *******************************************

11             ORAL AND VIDEOTAPED DEPOSITION OF

12                        BEN CASEY

13                     MARCH 23, 2004

14        *******************************************

15

16                        COPY

17

18        ORAL AND VIDEOTAPED DEPOSITION of BEN CASEY, produced as a

19   witness at the instance of the Plaintiff, and duly sworn, was

20   taken in the above-styled and numbered cause on the 23rd day of

21   March 2004, from 10:32 a.m. CST to 3:57 p.m. CST, before Dalia

22   F. Inman, CSR, in and for the State of Texas, reported by

23   machine shorthand, at the offices of Cozen O'Connor, 1717 Main

24   Street, Suite 2300, Dallas, Texas, pursuant to the agreements

25   stated on the record and the Federal Rules of Civil Procedure.

RECEIVED
N:38 via FedEx
APR 16 2004
ℕ𝕆ℝ
KLEMM BLAIR STERLING & JOHN

1    Q      Okay.  Are you familiar with the concept of engineer

2  of record?

3    A      Yes, I am.

4    Q      Okay.  Can you tell me what that concept means?

5    A      My understanding of the engineer of record is the

6  engineer that signs off and is responsible primarily for the

7  design of a -- of a -- of a structure or a facility.

8    Q      Okay.  Was there an engineer of record for the work

9  that Smithbridge did on repairing the dolphins in 2001?

10   A      In terms of your description of engineer of record,

11  my interpretation is that the engineer of record would be

12  Duenas & Associates.

13   Q      Okay.

14   A      Or my understanding of -- of an engineer -- engineer

15  of record.

16   Q      In addition to Mr. Camacho, did you have contact with

17  anybody else at Duenas on this project?

18   A      Yeah.  There was another engineer.  His first name

19  was Frankie, and I don't recall his last name.

20   Q      Okay.  Do you know whether he was a PE?

21   A      No.  I don't know whether he was a PE or not.  But I

22  would assume he was certainly a qualified civil engineer --

23  sorry, a degree-certified engineer.  I don't know whether he

24  was a PE or not.

25   Q      Okay.  Do you know how Duenas & Associates got

1  proposal to do some work for either Shell or the Port?

2      A     Yes, at that time.  We -- we were doing several

3  contracts in and around the port and for the U.S. Navy.  And

4  you're always looking for areas where you can possibly go and

5  get some business.  So yes.

6      Q     Okay.  What was the first time you went to the Shell

7  F-1 Pier after the 2001 earthquake?

8      A     I -- I can't recall the exact date, but I am assuming

9  within two weeks of the earthquake.

10     Q     Okay.  Did you go out -- walk out on the surface of

11 the dolphins?

12     A     Yes.  We went out on the surface of the dolphins.

13 And I think we also went down some of the existing facility

14 ladders to have a quick look underneath.

15     Q     Okay.  The metal boarding ladders that they have that

16 run down to the -- toward the water?

17     A     That's correct.  Yes.  Uh-huh.

18     Q     Okay.  Did you also take a boat and go out

19 underneath?

20     A     Yeah.  The late -- at a later stage.  We -- we took a

21 couple of boat trips on several occasions to -- to look at the

22 damage further, yes.

23     Q     Okay.  What did you notice when you got in the boat

24 and were underneath the dolphins?  What was the state of

25 their -- of the damage that you could see?

1     A     Obviously the -- the -- the major damage that we saw

2  was that a very large number of the -- of the bolts that

3  anchored the top of the pile to the underside of the concrete

4  were either partly out or were not in existence at all.

5     Q     They disappeared completely?

6     A     That's correct.

7     Q     Okay.

8     A     Uh-huh.

9     Q     And some were hanging, partly pulled out?

10    A     Some were -- some were pang-- hanging p-- partly out.

11 Some of the piles had displaced themselves in a horizontal

12 position; in a couple of cases eight or nine inches, and in

13 those cases there were no bolts left at all.

14    Q     Okay.  Were some of the batter piles hanging down and

15 no longer affixed to the caps?

16    A     That's -- that's correct.  There were several --

17 several piles on several of the dol-- dolphins that had no

18 attachment to the -- to the underside of the concrete pier at

19 all.

20    Q     Okay.  Did it appear to you that the displacement of

21 the piles and the fact the bolts were no longer in existence

22 was damage that was caused by the earthquake in 2001?

23            MR. STERLING:  I'm -- I'm going to enter an

24 objection as to qualification of this witness to give that type

25 of expert opinion.

LegaLink Dallas                                          800-966-4567
global court reporting * legal videography * trial services      www.legalink.com
Case 1:03-cv-00009    Document 243-3    Filed 10/07/2005    Page 14 of 32

1        Go ahead and answer.

2        Q      (BY MR. BOOTH)  You can answer.

3        A      My -- my experience, there were -- there were two

4    things that looked as though that had happened.  As -- as a

5    contractor who does this sort of retrofit type of repair -- and

6    I've had a lot of experience in retrofit -- fit repairs.  One,

7    the epoxy that holds the bolt in was soft and -- and pliable

8    which would indicate that the chemical reaction to harden epoxy

9    in this circumstance hadn't -- hadn't reacted or mixed properly

10   and provided a hard epoxy.  That was even on several occasions.

11   The other -- the other instance was where it did look as though

12   the actual earthquake had pulled the bolts out.

13            So there were two separate instances where, one,

14   it looked as though the bolts had possibly fallen out on their

15   own -- own behalf prior to the earthquake and instances where

16   some of these bolts had definitely been pulled out as a direct

17   cause of the earthquake.

18   Q      Okay.  You mentioned that some of the piles had been

19   displaced horizontally eight or nine inches, I think you said.

20   Did it appear that that had been caused by the earthquake?

21   A      Yes.  The direct displacement -- I felt that the

22   direct displacement had been the concrete cap had -- had moved

23   and left some of the piles in the same position, and some of

24   the piles that were still connected had actually a vertical --

25   or sorry, a horizontal displacement with them.  So the whole

```
 1   bucket?

 2       A     I can't recall.  I -- I don't think so.  I think the

 3   ones that I had in my white bucket were the ones that I had

 4   collected and the ones that Pacific Foundation had collected.

 5       Q     Okay.

 6       A     Is my recollection.

 7       Q     Okay.  So we'll have to ask Captain Unterberg where

 8   the ones he collected went?

 9       A     Yes, sir.

10       Q     Okay.  Was the letter or report dated December 19th,

11   2001, from Frank Dennis given to Duenas & Associates for them

12   to factor into their repair proposal?

13       A     Yes.  Absolutely.  They -- they looked at this

14   document, from what I'm aware, and that helped them in their

15   final design and for -- for the project as this was an initial

16   design that we had requested.  My understanding as the engineer

17   of record, it was Duenas' responsibility to then do their

18   independent design check to ensure that the assumptions of

19   these designs were correct or this analysis was correct.

20       Q     Okay.  Do you know what the type of concrete is

21   that --

22                   MR. BOOTH:  Strike that.

23       Q     (BY MR. BOOTH)  Do you know what Duenas & Associates

24   used as the characteristics of the concrete on the caps of the

25   dolphins?
```

LegaLink Dallas                                                    800-966-4567
global court reporting * legal videography * trial services        www.legalink.com
Case 1:03-cv-00009    Document 243-3    Filed 10/07/2005    Page 16 of 32

1    A    No.   What they were -- they would be what we would

2  call a piece of stainless steel thread bar.  They definitely

3  did not have a formed nut on the end and -- and -- or a head of

4  the bolt on the end, and that bar had a physical nut and washer

5  that would've been screwed onto that bar.  So basically what we

6  had recovered was a thread bar with a nut and a washer on it --

7    Q    Okay.

8    A    -- on one end.

9    Q    For the ones that you examined, did they have a

10  single nut or were they double-nutted?

11    A    Single nuts.

12    Q    Okay.

13    A    Uh-huh.

14    Q    So the nut was free to turn or would've been free to

15  turn when it was originally put together?

16    A    Yeah.  Because that's how -- how it would've been

17  constructed.

18    Q    Okay.

19    A    Uh-huh.

20    Q    Are you familiar with the term "special inspection"

21  or "special inspector" in the construction business?

22    A    I could only assume what a special inspector could be

23  or would be.  No, not unless someone had specifically written

24  into a contract that a specialist was required to inspect.

25    Q    Okay.

LegaLink Dallas                                    800-966-4567
global court reporting * legal videography * trial services      www.legalink.com
Case 1:03-cv-00009    Document 243-3    Filed 10/07/2005    Page 17 of 32

1           Have you seen certain products that are used in

2   the construction industry where the manufacturer suggests

3   that -- or even requires that after it's installed, it be

4   subject to a special inspection by either a manufacturer's

5   representative or someone with some special training?

6       A    Yes.  There's several instances in the construction

7   industry where you might use a proprietary-type system that the

8   manufacturer would either want some specially-trained personnel

9   to install the product or have one of their inspectors see the

10  product after installation.  That -- that is correct.

11      Q    Okay.

12      A    Uh-huh.

13      Q    Are you familiar with the use of special inspections

14  for the installation of epoxy anchor bolts?

15      A    There are some cases where an epoxy supplier for

16  various reasons, whether it's control of their product, may ask

17  for that and there are instances where they may not.  So...

18      Q    Okay.  In the use of epoxy anchor bolts in Guam, is

19  it good engineering practice to have a special inspection after

20  they're installed?

21      A    No.  I don't consider that would be a necessity, no.

22      Q    Okay.  Have you seen it specified by a design

23  professional that a special inspection be done of the

24  installation of epoxy anchor bolts?

25      A    There'll be times where you might do a trial setup

**LegaLink Dallas**
global court reporting * legal videography * trial services
800-966-4567
www.legalink.com
Case 1:03-cv-00009    Document 243-3    Filed 10/07/2005    Page 18 of 32

1  where the first one might have a trial test load possibly done

2  on it just to -- just to see what the results were and how the

3  system worked to verify that -- that the repair works and --

4  and -- and is constructible maybe, could be the right word

5  again.

6           But normally in -- in the construction industry,

7  it would be up -- the contractor with its own internal quality

8  management would ensure that these types of inspections were --

9  were completed so the contractor was happy that his work was --

10 was satisfactory as per the contract.

11     Q     Okay.

12     A     Most construction companies would have a quality

13 management system involved which would -- they would go and

14 check off that these were done.

15     Q     Okay.  Would good quality management involve the

16 torque testing of epoxy anchor bolts?

17     A     That -- that's possible.  As I said, you know, it's

18 possible that you might do a preload on the first pile to see

19 what -- how it works and how they work.  It's possible that

20 some clients or some engineers of record may require it.  But

21 it's -- it's certainly not a norm of the industry.

22     Q     Okay.  You said there might be a preload on a pile.

23 What -- what does that mean?

24     A     A preload -- or -- or test load might be a better

25 word rather than a preload.  A test load would be that you

LegaLink Dallas                                          800-966-4567
global court reporting * legal videography * trial services        www.legalink.com
Case 1:03-cv-00009    Document 243-3    Filed 10/07/2005    Page 19 of 32

1  Smithbridge Guam, did you have occasion to work with Winzler &
2  Kelly as designers on any of the projects that you did?

3      A      No.  We never worked with Winzler & Kelly direct.
4  But we did have personal contact with them through the Guam
5  Contractors' Association.

6      Q      Did you ever meet Bruce Swanee, who was an engineer
7  at Winzler & Kelly?

8      A      No.  I think Bruce was in Guam before my time.

9      Q      Did you ever work with EMSCO while you were at
10 Smithbridge Guam?

11     A      My recollection is we may have been involved with
12 EMSCO on possibly some Department of Education buildings many
13 years ago, just in precast concrete but nothing certainly on a
14 regular basis or -- or in -- in my time as a -- as a general
15 manager of Smithbridge.

16     Q      Okay.

17            Prior to the October 2001 earthquake, did you
18 ever notice any damage on the Shell F-1 dolphins that appeared
19 to have been caused by ship strikes or heavy docking?

20     A      Not in terms of the major structure.  I had noticed
21 on occasion that some of the -- what they call the ship
22 fendering system, which is attached to the concrete -- that
23 some of the ship fendering system had some ship damage.  But in
24 terms of the primary structure, no, definitely not.

25     Q      Did you ever notice if any of the bolts had been

1   dislodged from any of the piles?

2       A       The attachment bolts?

3       Q       Attachment bolts, yeah.

4       A       Yeah.  As I mentioned earlier, on a previous

5   occasion, I had a chance to visit this facility, and we had

6   noticed in the past that some bolts had appeared to be falling

7   out prior to that earthquake.

8       Q       Could you tell what had caused those to fall out?

9       A       We never looked at them or inspected them close

10  enough to be able to make a fair opinion on that.

11      Q       Okay.

12              Did you notice any of the piles had epoxy around

13  the tops that had run out of the holes?

14      A       Yeah.  On -- after the 2001 earthquake, on close

15  inspection, there were several areas where epoxy had sort of

16  settled onto the flange, and it had appeared that they had run

17  out of the -- out of the hole that they had initially been --

18  or that the epoxy had initially been placed into.

19      Q       And when you use the word "flange," that's the round

20  piece at the top of the pile that has the holes through it

21  through which the eight bolts were installed up into the cap?

22      A       That is correct.

23      Q       Okay.

24              Where was the white bucket with the bolts in

25  them -- in it when you left Guam?

LegaLink Dallas                                    800-966-4567
global court reporting * legal videography * trial services    www.legalink.com
Case 1:03-cv-00009   Document 243-3   Filed 10/07/2005   Page 21 of 32

1    A       From what I can recall, still in my old office in

2    Smithbridge up on Route 15.

3    Q       Okay.

4            Did you feel the epoxy that was on those bolts

5    to see if any of it was still soft?

6    A       Not actually on the bolt itself.  But when -- when we

7    inspected the facility, there are several areas where you could

8    actually get ahold of the epoxy and grab it and peel it off,

9    like on the flange or where it had dripped through the bolt

10   hole on the flange.  But not -- not specifically on the bolt,

11   no.

12   Q       Okay.  When you recovered some of that from the

13   flange or from the cap, was it still soft and pliable?

14   A       Yes, it was.  Uh-huh.

15   Q       Okay.  Could you tell what kind of epoxy it was?

16   A       No.  You couldn't -- couldn't make that assessment.

17   Q       Okay.  In 2001, when you were inspecting the damage

18   that was caused by the earthquake, was there any discussion by

19   anyone as to whether this facility had exceeded its useful life

20   and ought to be replaced rather than repaired?

21   A       I'm not sure whether it was just after the earthquake

22   or a long period of time after the earthquake, but I had heard

23   discussions through the Port -- and I can't particularly

24   remember the source that those comments came from.  But we had

25   heard that the Port's opinion was that they felt the facility

LegaLink Dallas                                          800-966-4567
global court reporting * legal videography * trial services    www.legalink.com
Case 1:03-cv-00009    Document 243-3    Filed 10/07/2005    Page 22 of 32

1  was -- was a writeoff.  And we obviously didn't agree with

2  that.  We felt that the facility was still definitely in a --

3  in a good repairable condition, you know.  The concrete on the

4  mooring dolphins was sound.  It didn't have a lot of spawling

5  or anything like that, so it hadn't physically deteriorated

6  much.

7          The surveys and inspections that we did on the

8  lower structure in terms of the piles themselves under the

9  water -- I think we -- we were asked to survey two piles out of

10  every -- off every dolphin, and there was not great or large

11  amounts of corrosion on the piles; so therefore, we considered

12  the pile condition was -- was still reasonable and had some

13  serviceable life left in them.  So we -- we considered that it

14  should've been repaired, yeah.

15  Q      Was a subcontractor hired to do an ultrasonic test of

16  the metal on the -- some of the piles?

17  A      That's correct.  There was an ultrasound done to

18  check the thickness of the shell.  Correct.

19  Q      And that indicated that there was sufficient

20  thickness that the -- the steel hadn't corroded away?

21  A      Correct.  With a comparison of -- of the results that

22  we got against the original design thickness of -- of the

23  shell, it appeared that there wasn't large amounts of corrosion

24  evident.

25          MR. BOOTH:  Thank you.

1        So I'm going a hundred percent on -- on a person
2   I'd met a couple of weeks beforehand, on -- on his request.
3        Q    Okay.  When you met Mr. MacLeod a couple of weeks
4   beforehand, did you understand who he represented, meaning
5   Lloyds of London?
6        A    I knew he was representing an underwriter.  Whether
7   it was particularly Lloyds of London or whether it was some
8   connection with AM Insurance, I -- I didn't know, no.
9        Q    Okay.  Looking at page 2 of this MacLeod Exhibit S,
10  earlier, Mr. Booth questioned you concerning the change --
11  well, let me ask you this question.
12            Before today, sitting in this room during this
13  deposition, when was the last time you saw this Exhibit S?
14       A    Oh, I can't recall.  But it's very simple to assume
15  probably at the time we were doing the changes to it.
16       Q    Okay.  Did you discuss it with Mr. Booth at all
17  before you came in here today to give your testimony?
18       A    No.  No, I have not.
19       Q    You mentioned earlier today in response to his
20  questioning concerning the edit that changed the word
21  "disrepair" to "damage" --
22       A    Uh-huh.
23       Q    -- in the first paragraph --
24       A    Yeah.
25       Q    -- and -- and you -- you said -- and -- if -- if I

1  got my notes correct, you said it didn't matter to me one way

2  or the other.  Why was that?  That you didn't -- you put

3  "disrepair."  MacLeod wanted it changed to "damage."  You said

4  it doesn't matter to me.

5      A    I -- I'm a civil engineer.  I -- I work in nuts and

6  bolts, concrete, steel, black and white.  I'm not a person with

7  an English degree.  I'm -- I'm -- I'm not a person that is --

8  is too concerned about how I describe something.

9           Peter -- Peter asked me to write "damage" in

10 there; I write "damage" in there.  It means the same -- as a

11 civil engineer, the same.

12     Q    Meaning it has to be repaired.  Correct?

13     A    Meaning that there is damage requiring repair.

14 Correct.

15     Q    Down in the next paragraph having to do with the fuel

16 pier, he also indicated to delete language, "The corrosion is

17 so extensive that the piles have no significant structural

18 steel left."

19           You -- you also removed that in the final draft.

20 Is that correct?

21           And I have the final draft.  I mean, I want to

22 be fair to you here.

23     A    Okay.  This -- this particular clause here is

24 actually referring to the main section of the fuel pier.

25     Q    Yeah.

LegaLink Dallas                                          800-966-4567
global court reporting * legal videography * trial services          www.legalink.com
Case 1:03-cv-00009    Document 243-3    Filed 10/07/2005    Page 25 of 32

1    A    And if I can refer back to your Exhibit 8, it's
2  referred to here as the main wharf.

3    Q    Yes, I'm familiar with that.  But my question is, did
4  you, in fact, make that change to remove the reference to
5  corrosion is so extensive that the piles have no significant
6  structural steel left?

7    A    You tell me.

8    Q    Okay.

9    A    Show me the final document, and I'll tell you if it
10  was removed or not.

11   Q    Okay.  This would be -- I'm not sure which exhibit
12  this was with our friend Mr. MacLeod.  Let me check.

13            MR. O'CONNOR:  T.

14            MR. STERLING:  Was it T?

15            MR. O'CONNOR:  I think so.

16            MR. STERLING:  Could you check T, and then if it
17  is --

18            MR. O'CONNOR:  Either R or T.

19            MR. BOOTH:  The notebook in front of you has
20  them all in order there.  You can just flip to T.

21            MR. STERLING:  That's it.  Okay.

22            MR. BOOTH:  It's either S or T.

23   Q    (BY MR. STERLING)  It's Exhibit T.  That's Exhibit T,
24  and you can refer to the second page just to speed this up.

25   A    Well, obviously not.  It's still in there, the

1    same -- the same word.

2                    MR. O'CONNOR:  Which one is R, Tom?

3                    MR. STERLING:  Is it R?  I'm trying to figure

4    out -- hang on.  Excuse me.

5                    THE WITNESS:  That's T.

6                    MR. O'CONNOR:  No.  I think --

7        Q     (BY MR. STERLING)  All right.

8        A     Where -- oh.  The corrosion --

9        Q     The language --

10       A     Sorry.

11       Q     Yeah.  The language, "The corrosion is so extensive

12   that the piles have no significant structural steel left."

13       A     Well, it looks as though it's been reworded to, "The

14   existing piles have extensive corrosion to the structural

15   tube."

16       Q     Let me ask you this.  At the time you -- so you did

17   make that change?  You did delete the language?

18       A     Yeah.  It looks like it.  Yeah.

19       Q     At the time you -- you did that, did anybody indicate

20   to you who this letter was going to and why it was necessary to

21   edit it?  I mean, if it's going to Mr. MacLeod, you know, you

22   expressed -- he has it.  So you must've thought it's going to

23   somebody else that he doesn't want this in there.

24                    Did anybody ever tell you, meaning MacLeod --

25   did he ever tell you what he was going to use the edited

```
 1  version of this letter for?

 2      A      No, absolutely not.

 3      Q      Okay.  But he wanted changes; you were willing to

 4  make them?

 5      A      Yeah.  Because it really -- it -- I'm trying to

 6  befriend this guy to -- with the possibility of winning --

 7  winning a contract to make money to survive.  Yeah.

 8      Q      Okay.

 9      A      It's -- it's not uncommon for consultants to ask for

10  wordings to be changed in documents like this prior to them

11  presenting them to their client.

12      Q      Okay.

13      A      That would be normal practice.

14      Q      I had another question for you going back to

15  Exhibit Q, which was your $1.4 million quotation.

16      A      Yeah.

17      Q      And there's a reference in there in specifically

18  excluded items that says repairs to the already-damaged ship

19  fendering system, and you mentioned earlier in your testimony

20  here today that some of the fenders were damaged.

21      A      Some of the ship fenders were damaged, yes.

22      Q      Yes.  And when you say "some," do you recall which

23  ones were damaged?

24             And you might want to refer to the Exhibit

25  No. 8.
```

1   A     I'd love to see the photograph because the photos

2   tell the whole story.  At least two -- if -- if we have a look

3   at these exhibits on dolphin C, G, H, and D, I know at least

4   two of these fenders were extensively damaged by -- by ships.

5   Q     And when did you do that?  When you did your

6   inspection on --

7   A     Well -- no.  This -- this -- this type of damage

8   is -- is -- is a fender damage that -- that happens in general

9   everyday shipping operations.  It really had nothing to do with

10  the repairs that we were considering.

11  Q     I understand that.

12  A     Plus -- plus we weren't -- plus we weren't indicated

13  or asked to price to replace the fenders.

14  Q     No.  I know that.  But what my question is, you

15  indicate on here you -- you had already seen that there was,

16  you said, extensive damage to some of the fenders.

17  A     Yeah.

18  Q     And I'm just trying find out which ones, if you

19  recall.

20  A     No.  I -- I couldn't tell you that without seeing

21  some photos.

22  Q     And do you recall when you noticed they were damaged,

23  meaning when you went to inspect for the purpose of preparing

24  your estimate or --

25  A     No, I don't recall that.  No.

LegaLink Dallas
global court reporting * legal videography * trial services
800-966-4567
www.legalink.com
Case 1:03-cv-00009    Document 243-3    Filed 10/07/2005    Page 29 of 32

1  again if I'm wrong -- that Mel must have expressed some

2  concerns about the pile-load designs for the temporary repair

3  and you passed that on to Peter.  Is that correct?

4      A    I don't know whether it was me that passed those

5  concerns on or Mel had -- I -- I know Mel had direct contact

6  with Peter.  So it -- it could've been through me; it could've

7  been through Mel.  I -- I can't tell you that.

8      Q    Do you know what Mel's concerns were at that time

9  concerning the pile-load designs?

10     A    Not specifically, no.

11     Q    This e-mail says that -- I'm paraphrasing --

12     A    Uh-huh.

13     Q    -- that, you know, we need to make it very clear that

14  the temporary repair would bear no relationship to the strength

15  they had prior to the earthquake and that it will, in fact,

16  return it to a stronger or improved strength condition.

17     A    Uh-huh.

18     Q    Did you, in fact, convey that to Mel Junsay as

19  instructed by Mr. MacLeod?

20     A    I couldn't confirm or -- or deny whether that was

21  a -- a direct conversation, no.

22     Q    Do you agree that the temporary repair that you

23  performed did, in fact, put these piles' connections into a

24  stronger or improved strength condition?

25     A    Improved strength prior to the earthquake, or

1  improved strength prior to 1996?

2     Q     Prior to the earthquake.

3     A     Yes.    Absolutely.

4     Q     How about improved strength prior to 1996?

5     A     Because I didn't see the structure prior to the

6  repair, I think it's difficult for me to make an opinion on

7  that.

8     Q     There's also a reference here that Frank Dennis is

9  going to redraft the report and send separate reports.  Do you

10 know what -- what that pertains to?

11    A     I will say that -- I'm only guessing -- but this is

12 about the time where Frank was pulled away to work directly for

13 Peter on a report rather than for us, and I'm assuming that's

14 to reduce any conflict of interest.

15    Q     Shortly after this or on or about this very same day,

16 there are some reports from Frank Dennis that have to do, one,

17 with the condition of Foxtrot pier, and a separate one with the

18 condition of the dolphins.  Do you recall whether you ever saw

19 a report from Frank Dennis at about this time in which the

20 condition of Foxtrot and the condition of the dolphins were all

21 in one report that had to be redrafted?

22    A     I couldn't confirm or deny that unless I actually sat

23 down with the paperwork and went through it.

24    Q     Did Peter MacLeod ever indicate to you why they were

25 going to change -- redraft this report to -- to break the pier

1  and the dolphins into two separate reports?

2      A      Yes.  I think it was specifically related to the 1996

3  repair where the dolphins had a temporary repair done on them

4  and the main pier structure had no repair done on them.

5      Q      Okay.  Do you know when Mr. MacLeod figured that out?

6      A      No.

7      Q      Okay.  There's a reference in here to "Herman seems

8  to be the key.  He will move things along."

9             Do you know who Herman is?

10     A      Herman was a -- some -- somebody involved in the Port

11  Authority that dealt with construction and contracts and -- as

12  an administrator is my understanding.

13     Q      In your testimony today you've referred to Shell as

14  the owner of this project and the Port.  And you did, in fact,

15  contract with Shell.  At the time your company contracted with

16  Shell for this temporary repair, was it your understanding that

17  this was being done as opposed to contracting with Mr. --

18  Lloyds or the involved underwriter to basically bypass

19  government of Guam procurement requirements applicable to -- to

20  the Port Authority?

21     A      I -- I think you could fairly surmise anything you

22  want.

23     Q      I'm not asking --

24     A      If -- if we -- directly relative to this, there was a

25  contract to -- my understanding was that this facility needed

LegaLink Dallas                                          800-966-4567
global court reporting * legal videography * trial services        www.legalink.com
Case 1:03-cv-00009    Document 243-3    Filed 10/07/2005    Page 32 of 32