BERMAN O'CONNOR MANN & SHKLOV
Suite 503, Bank of Guam Building
111 Chalan Santo Papa
Hagåtña, Guam 96910
Phone: (671) 477-2778
Fax: (671) 499-4366

Attorneys for Defendant Winzler & Kelly Consulting Engineers

IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| S.J. GARGRAVE SYNDICATE AT LLOYD'S | Civ. No. CIV 03-0009 |
| Plaintiff, | |
| vs. | WINZLER & KELLY'S TRIAL BRIEF |
| BLACK CONSTRUCTION CORP., WINZLER & KELLY CONSULTING ENGINEERS, et al., | Trial: November 8, 2005 |
| Defendants. | |

## I. INTRODUCTION

Plaintiff insurer (a syndicate of Lloyd's of London) seeks damages from Winzler & Kelly (W&K) (an engineering firm) for W&K's alleged breach of a design subcontract for repair work to F-1 Pier at the Port of Guam -- a contract of which the Syndicate claims its insured, the Port Authority of Guam, was a third-party beneficiary. As set out in greater detail herein, however:

* The Port was not a third-party beneficiary of the subcontract.

* W&K did not breach the subcontract.

* W&K's actions caused no damages to the Port Authority.

* The Syndicate seeks damages far in excess of what the Port sustained.

### A. The Overall Background of the Case

F-1 (or Foxtrot) Pier is a pier at the Port of Guam. Connected to it by catwalks are concrete satellite docks called "dolphins," which stand on steel piles rising from the seabed. First constructed in 1969, they deteriorated badly over time, until 97 piles were repaired and re-

connected to their dolphins in 1996-7. Each of the three Defendants in this matter -- W&K, Black Construction, and EMPSCO -- was involved in some capacity in this repair work.

After a 2001 earthquake, it was discovered that some piles had pulled loose from their dolphins. The Syndicate alleges that this was caused by the quake, and resulted from defective design and repair work by the Defendants. Had the repairs been done properly, the Syndicate contends, the pile-to-dolphin connections would have withstood the earthquake without loosening. The Syndicate therefore brought this action, asserting claims for negligence, breach of contract, and breach of the maritime warranty of workmanlike performance against each Defendant. The negligence and warranty claims have since been dismissed, and the case now consists of three breach of contract claims -- one against each Defendant. Black and EMPSCO allegedly breached contracts with the Port itself. The claim against W&K is based on a third-party-beneficiary theory, for alleged breach of its subcontract with Black.

### B. W&K's Involvement In the Case.

W& K is an architectural / engineering firm based in California, with an office on Guam. Its salient involvement in the repair work was: 1) it was hired by Black, the general contractor, to prepare an alternate design for pile repair, for Black to propose as a substitute for EMPSCO's original pile repair design; 2) it agreed to come up with such a design for a fee of $2875; and 3) it did come up with a proposed alternate design -- set out in a drawing known as VE-1 -- and submitted that design to Black.

The Syndicate now asserts a third-party beneficiary claim against W&K for breach of its design subcontract with Black. According to the complaint, the alternate design was not strong enough to withstand an earthquake, and the pile connections that were repaired in accordance

2

with that design therefore failed when the 2001 quake struck. The Syndicate seeks damages of $5 million, jointly and severally from the Defendants, including W&K.

## II. FACTS OF THE CASE

### A. The Dolphins at Foxtrot Pier.

F-1 Pier is used by Shell Oil as an off-loading facility for oil and gas. It consists of a main wharf, four "berthing" (or "breasting") dolphins, and two "mooring" dolphins.[1] The underside of a dolphin looks like the combination of tripod and a table. It has multiple legs (piles), some straight up-and-down and others angled (batter piles) to provide extra horizontal resistance to the enormous berthing and mooring forces exerted against them by docking vessels. Vessels which visit F-1 to off-load oil are extremely large and heavy. Every dolphin used for berthing[2] must therefore have a fendering system to cushion it, and to protect its piles and its pile-to-deck connections from the forces exerted by ships.

### B. Deterioration of the Dolphin Piles.

The Port did little to maintain the dolphins, and the piles gradually deteriorated, with especially severe corrosion around the waterline (the "splash zone"). In 1993, an earthquake struck (8.1 on the Richter Scale), resulting in still more damage to the dolphins and piles. After the quake, engineers were hired by Shell to assess F-1's condition. According to their report (the "Candac Report"), the facility was "in an advanced state of disrepair, due primarily to corrosion of the piles, with earthquake damage exacerbating the disrepair." The Report recommended, "All berthing and mooning dolphins must be replaced or repaired as soon as possible," either by "the repair of all pile tops in the splash zone, or their replacement with new structures." Nothing was done, however, until two years later, when Shell's own engineer reinspected F-1,

---

[1] Vessels dock in direct contact with berthing dolphins, while their lines are tied to mooring dolphins.

and reported that the pier and dolphins were "poorly maintained" and had further deteriorated "since the Candac Report on the order of 20%." The Port then decided to repair the piles.

### C. Cost Limitations Were Imposed On the Repair Work From the Beginning.

In 1995, the Port issued a request for proposals for an architect to design repairs and renovations of the piles. The contract was awarded to EMPSCO, and provided for "[r]epairs to existing support piles of Dolphins A, B, C, D and G." EMPSCO asked the Port that it be allowed to perform a seismic and structural analysis of F-1, but the Port refused. The Port also slashed EMPSCO's proposed engineering work by more than 60 percent, and the project included this construction cost limitation:

> The project shall be designed to permit construction of the repair and improvement of the facility *within a construction contract price to be provided by the Government.*

Scope of Work at 2, § 4 (emphasis added). The restrictions imposed by the Port meant that the repairs could necessarily be only of a temporary, stop-gap nature, to hold things together for a few years until the pier could be replaced or a more comprehensive rehabilitation could be done.

EMPSCO, working within these constraints, prepared plans and specifications for the pile repair. Their proposed method of repair consisted of "jacketing" all bent and broken piles in an inner concrete shell, then "encapsulating" them in an outer shell of polymer (a synthetic substance). The piles would be connected to the dolphins with rebar inserted eleven inches up into predrilled holes in the concrete deck and secured in these holes with an epoxy cement. Evidence will show that this connection was *not* designed to resist seismic forces.

EMPSCO's designs were put out to bid, and Black was the low bidder at $2.1 million. After the award was made, however, the Port advised Black that it could not afford to pay that

---

[2] Even the two "mooring dolphins" act as berthing dolphins for relatively smaller vessels.

much for the project. In fact, it advised Black that it only had a budget of $1.4 million, and asked if Black could think of some way to do the project even less expensively.

### D. Further Economizing on the Repair Work.

The most obvious place to economize was on the "jacketing" and "encapsulation" of the piles, since these constituted a major cost under the original plan. Black therefore proposed to use a cheaper method of pile repair, whereby existing piles would be cut off below the waterline, and new tops spliced onto them, then bolted to the underside of the dolphin deck with epoxy-secured bolts. Using this method, neither "jacketing" nor "encapsulation" would be necessary. Black received approval from the Port and EMPSCO to change the pile repair method. This change saved about $700,000, reducing Black's contract to $1.4 million.

Black then hired W&K to draft a proposal depicting the new repair method for approval by the Port. The scope of work to be performed by W&K was:

Design and detail an alternate repair system as follows:

    a.    Cut the existing piles off at approximately 4'-0" below MLLW elevation.

    b.    Attach in a new section of epoxy coated steel pipe extending from the top of the existing pile to approximately 4'-0" below MLLW to the underside of the concrete platform. The new section of pile will be welded to the existing pile with a steel sleeve and attached to the underside of the platform with epoxy anchor bolts or similar. The installation procedures for the new sections of pile will probably include drilling one or more holes through the thickness of the concrete platform.

In return, W&K would be paid a fee of $2,875. Pursuant to this agreement, W&K produced the drawing known as VE-1, depicting and describing a proposed repair method.[3]

---

[3] "VE" means "value engineering," and is used by engineers to designate proposed cost-cutting measures.

### E. The Design of VE-1.

VE-1 depicts a method for splicing new top sections onto existing piles, and for securing the new tops to the dolphins. The latter is accomplished by anchors consisting of eight bolts per pile, each bolt 6 3/4" long, passing upward through a flanged ring encircling the top of each pile, into the underside of the dolphin, secured by an epoxy adhesive. An extremely significant element of VE-1 is the following requirement, which was printed on the design drawing itself:

> Adhesive anchors to be stainless steel red head "Redi-Chem" by Phillips Drill Co., Catalog No. CE3495 or approved equal. Install per manufacturer's recommended procedures.

Epoxy for securing bolts consists of two chemical compounds that must be mixed in exactly the right proportion. In the Redi-Chem system, these compounds come in pre-packaged glass capsules, each containing precisely measured amounts of liquid polyester resin, quartz aggregate, and a catalyst. During installation, the capsules (one inside the other) are inserted into the bolt-hole, and then the anchor rod is used to break the capsules and mix the adhesive by attaching it to a drill. Inserting the capsule in this manner displaces all air from the hole, and the mixing action ensures that the adhesive completely fills and coats the inside surfaces of the hole and the anchor rod. This anchoring system was not selected randomly, but deliberately, because it is much more easily constructible, thus more likely of success, than other systems. Nevertheless, and contrary to the explicit requirements of VE-1, Black did not use Redi-Chem.[4]

### F. Changes Made to VE-1.

Instead, Black used a substantially inferior system, "Anchor-It," which requires adhesive to be mixed on-site by the contractor, then manually injected upward into the hole with gun-like machine -- a clumsy operation under the best of circumstances, made all the more so when done

---

[4] VE-1 allowed for an "approved equal" to be used instead of Redi-Chem -- "approved," in this context, meaning approved by the drafter of the proposal, W&K -- but Black never asked W&K to approve any substitute system.

6

over water. Black asked EMPSCO and the Port's construction manager Macario for permission to substitute Anchor-It for Redi-Chem, and they both approved it. However, no one consulted W&K, nor did W&K agree to the substitution, despite the fact that even the Anchor-It system includes the caveat: "Use of the anchors must be approved by the design engineer."

### G. The Dolphins Were Not Adequately Fendered.

Compounding the problem was the fact that, during and after the repair work, the dolphins were insufficiently protected from the berthing and mooring forces exerted on them by large ships. EMPSCO designed fenders that required vessel pilots to dock at an unusually slow speed and tight angle of approach. It warned the Port that these angles and velocities must be "strictly followed," and that any deviation would "normally result in a catastrophic effect on the fendering system as well as the ship," but the Port never communicated these instructions to the vessel pilots or to the harbormaster. Instead, tankers continued to berth at F-1 as before, and there were several incidents of ships colliding with dolphins with enough force to break fenders and loosen pile-to-deck connections. The broken fenders were never replaced, further multiplying the forces exerted on the piles by subsequent ships. These berthing and mooring forces, acting on unprotected pile connections already weak due to improper installation, eventually caused many piles to disconnect from the dolphins long before the 2001 earthquake.

### H. Damages Assessed After 2001 Earthquake.

Another earthquake struck in October 2001, but the F-1 dolphins, although weakened by berthing forces and improper installation, did not collapse. During post-quake inspection, the Port noticed that some piles were disconnected, and some pile connections had loose bolts. The Port made a claim with its insurer, the Syndicate, who hired consultants (Frank Dennis of OCEL and Ben Casey of Smithbridge) to assess the damage. Both concluded that 50% of the 800 bolts

had soft or leaking epoxy; and that many bolts had too little epoxy coverage. Dennis wrote, "Had the bolts all been properly installed, the joint would probably have not failed," and "If all the bolts had remained in position and the epoxy had set properly, it is quite possible that the dolphin would have been alright."

### III. LEGAL ISSUES: THE PORT WAS NOT A THIRD-PARTY BENEFICIARY.

A third-party beneficiary is one whom the parties intend to benefit by agreeing to pay a debt owed to him, make a gift to him, or the like.[5] The Port was not a third-party beneficiary of W&K's design subcontract with Black, because that subcontract exhibits no intent to benefit the Port, and all benefit the Port derives from it is purely incidental.[6] It is not sufficient that the subcontract was intended to be performed at the Port's facility, or that performance would ultimately benefit the Port as owner of the pier.[7] On the contrary:

> A [Black] contracts to erect a building [dock] for C [the Port]. B [W&K] then contracts with A [Black] to supply lumber [a design] needed for the building [dock]. *C [the Port] is an incidental beneficiary of B [W&K] 's promise*[.]

Restatement (Second) of Contracts § 302, illus. 19 (emphasis added). Several recent cases applying this principle to similar facts demonstrate that the Port was not a third-party beneficiary

---

[5] See Restatement (Second) of Contracts § 302.

[6] See, e.g., State ex rel. Stovall v. Reliance Ins. Co., 107 P.3d 1219, 1231 (Kan. 2005) ("[A]n intent to benefit a third person must be clearly expressed in the contract."); G & P Elec. Co. v. Dumont Const. Co., 15 Cal. Rptr. 757, 762 (1961) ("Not every person who secures a benefit from a contract is entitled to maintain an action. An incidental beneficiary cannot maintain an action."); Nelson v. Anderson Lumber Co., 99 P.3d 1092 (Idaho 2004) ("[T]he third party must show that the contract was made for his or her direct benefit and that he or she is more than a mere incidental beneficiary.")

[7] See, e.g., Pierce Assoc. v. Nemours Foundation, 865 F.2d 530, 538 (3rd Cir. 1989) ("In every construction subcontract the owner is the one which ultimately benefits from its performance. However, this does not create a third-party beneficiary relationship."); G & P Elec., supra, 15 Cal. Rptr. at 763 ("While the [owners] would receive the benefit of having the electrical work performed by virtue of [the subcontractor] performing its subcontract with [the general contractor], this factor alone would not make the . . . subcontract a contract for the express benefit of the [owners]."); Stovall, supra, 107 P.3d at 1232 ("Knowledge that a contract will benefit a third party is not intent to benefit the third party.") (quoting Noller v. General Motors Corp., 772 P.2d 271 (Kan. 1989)).

of the subcontract between W&K and Black,[8] and the lack of third-party beneficiary liability is made all the more clear by the fact that the prime contract between the Port and Black provided:

> Any and all contracts between the Contractor [Black] and its subcontractors shall not be construed as creating any contractual relation between any subcontractor and the Port Authority.

Construction Contract at Paragraph I(b). Such language as this has been held to categorically preclude the owner from recovering as a third-party beneficiary of the subcontract.[9]

## IV. THERE WAS NO BREACH OF CONTRACT

### A. There Was No Breach of Any Explicit Terms of the Subontract.

The first question in a contract action is, "What are the terms of the contract?" Here, Black engaged W& K to propose a revised design for the repairs to the piles, based on the principle of splicing new tops onto the piles and bolting them to the dolphins. Black engaged these services for a $2875 fee. The contract, in other words, was a simple purchase order.

The Syndicate reads much more into the contract than is really there. W&K never agreed to produce a design that would resist seismic forces (although it believes VE-1 would have resisted the forces produced by the 2001 quake, had it been followed). It agreed to provide an alternative to EMPSCO's design, which itself was not designed to resist seismic forces. Indeed, it was specifically asked to design a connection using an epoxy-bolt system, and it did so. Detailed structural calculations of resistance to seismic forces could not have been done for the

---

[8] See, e.g., Nelson, supra, 99 P.3d 1092 (no third party beneficiary status where the subcontract "added nothing to the [owner's] entitlement"); Stovall, supra, 107 P.3d at 1232 (no third-party beneficiary status where "there is no language clearly expressing an intent for the subcontractors to assume a direct duty to the [owner]"); Weseloh Family Limited Partnership v. K. L. Wessel Construction Co., 22 Cal.Rptr.3d 660, 668 (App. 2004) (no third party beneficiary status where "[t]here was no intended beneficiary clause in any contract related to the design," even though the subcontractor knew the identity of the owner).

[9] See, e.g., G & P Elec., supra, 15 Cal. Rptr. at 763 (holding that owner was not third-party beneficiary of subcontract where prime contract and subcontract provided that "nothing contained in the contract documents shall create any contractual relation between any subcontractor and the Owner"); Pierce Assoc., supra, 865 F.2d at 537-38 (same holding based on the language, "Nothing contained in the Contract Documents shall create any contractual relationship between the Owner or the Architect and any Subcontractor or Sub-subcontractor").

9

contract price of $2875, or anything close to it. If full seismic calculations had been done, W&K would have had to charge Black much more for the work, and Black would have had to pass on that cost to the Port, substantially raising the cost of the repairs, and defeating the whole purpose of the design change, which was to cut costs. (In fact, when EMPSCO proposed to do such seismic calculations for the original design, the Port explicitly told it not to do them.) The Port, or its insurer the Syndicate, should not receive the windfall of the value of a much more substantial service than it was willing to pay for at the time.[10] Finally, contrary to the Syndicate's contention, W&K did not supervise construction. Although Black occasionally consulted W&K engineer Bruce Swanney about problems that came up during other aspects of the pier repair work, W&K was not asked to, and did not, supervise or inspect the attachment of the piles to the dolphins, the only work at issue in this case.

### B. There Was No Breach of Any Implicit Terms of the Subontract.

The Syndicate will likely argue that W&K breached a warranty of workmanlike performance implicit in its contract with Black. An architect, however, does not warrant a particular result, such as ability to "withstand" an earthquake. Instead, he impliedly warrants only that he will perform his work with the reasonable level of skill customary to his profession.[11] The only reasonable conclusion to be drawn from the evidence will be that W&K's

---

[10] See, e.g., St. Joseph Hosp. v. Corbetta Construction Co., 316 N.E.2d 51, 58-63 (Ill. App. 1974) (holding that hospital, which sued architect and contractor for installing wall paneling that did not conform to city fire code, could not recover from them the extra cost of the more expensive conforming paneling that it installed later).

[11] See, e.g., State ex rel. Risk Management Div of Dept. of Finance & Admin. v. Gathman-Matotan Architects and Planners., 653 P.2d 166, 169 (N.M. App. 1982) (rejecting concept of "implied warranty or sufficiency of plans and specifications," and holding instead that an architect does not "promise a certain result," and "'warranties' his work only to the extent that he will use the skill customarily demanded of his profession"); Kemper Architects v. McFall, Konkel & Kimball Consulting Engineers, 843 P.2d 1178, 1186 (Wyo. 1992) (citing City of Mounds View v. Walijarvi, 263 N.W.2d 420, 424 (Minn. 1978)) ("[A]n architect cannot be certain that a structural design will interact with natural forces as anticipated. Because of the inescapable possibility of error which inheres in these services, the law has traditionally required, not perfect results, but rather the exercise of that skill and judgment which can reasonably expected from similarly situated professionals.").

proposal was prepared with all the reasonable skill customary to the engineer's profession. Mere evidence that damage occurred does not mean it occurred because of any lack of reasonable skill on the part of W&K. On the contrary, even the best possible design is not damage-proof. Success in engineering is not measured by having no damage sustained at all during a violent event such as an earthquake, but rather by avoiding major structural failure and loss of life. W&K's contract with Black did not, either explicitly or implicitly, require the pile-dolphin connection to be designed so as to withstand an earthquake without even loosening.

Far from being deficient, W&K's design, *even after* it was altered for the worse by Black, and *despite* there being no fendering in place to protect against berthing forces, *still* ended up saving over $700,000; successfully resisted excessive berthing forces *and* a significant earthquake without major structural failure; and resulted in the F-1 Pier being kept in continuous operation for more than eight years, without missing a day of work despite the abuse it endured during that time. This despite the fact that it was a cheaper replacement for EMPSCO's original design, which itself was expected to last only about five years! The Syndicate is expected to claim that W&K engineer Bruce Swanney made only cursory calculations in drawing up VE-1, but such evidence is not even relevant in a contract action, where the success of the repairs testifies to the sufficiency of the proposal.[12] Also, evidence that Swanney did only some basic calculations would not indicate any lack of customary skill, since, in the profession, only rudimentary calculations are required for a mere proposal of this type. At any rate, Swanney did more than just rudimentary calculations, since in preparing VE-1 he drew on knowledge obtained from working on a previous F-1 repair design that was never implemented.

---

[12] "Evidence relevant to proof of damages under contract law is that which deals solely with the end result, that is, the quality of the structure, whereas that relevant in negligence law is both the builder's conduct and the resultant quality of the structure." Annotation, "Modern Status of Rule as to Whether Cost of Correction or Difference in

## V. WINZLER & KELLY DID NOT CAUSE ANY DAMAGE TO THE PORT

If a contract is breached, the next question is, "Was the breach the cause of any injury incurred by the plaintiff?" It was not, for two reasons: 1) the damage to the dolphins was caused by berthing forces of ships, not the 2001 earthquake; and 2) even if W&K's design was defective, *it was not used*, and thus could not have caused any damage to the dolphins.

### A. The Damage to the Dolphins Was Caused By Ships' Forces, Not the Earthquake.

Since the Syndicate sues only for earthquake damage, its entire case rests on the assumption that the conditions observed *after* the 2001 earthquake (loose bolts, etc.) were *caused by* the quake. The Syndicate has thus fallen into the classic logical error of "post hoc ergo propter hoc." In fact, most if not all of the damage to the piles was of a type that could not have been caused by the quake. Instead, it was caused by the berthing and mooring forces of tankers and other ships that docked at F-1 over a period of years prior to the quake ever occurring.

Also, this damage occurred not because of anything wrong with the repair design, but because the Port did not fender the dolphins so as to adequately protect against ships' forces; then, when the inadequate fenders were destroyed, the Port did not repair or replace them. Even undamaged, the fendering could only live up to its limited utility if the pilots of docking ships were cautioned about its deficiencies, and advised to approach the docks with unusual care and at an unusually narrow angle and speed. The Port knew this, yet failed to advise the pilots.

The evidence will also show that the constant berthing and mooring of ships exerts forces and stresses on a dock far in excess of anything caused by the 2001 quake, and that even a repair method specifically designed, with full seismic analysis, to hold together through an earthquake of the magnitude of the 2001 quake, could not have resisted the constant battering of the ships.

---

Value of Structures is Proper Measure of Damages For Breach of Construction Contract," 41 A.L.R.4th 131 (citing Lieber v. Bridges, 650 S.W.2d 688 (Mo. App. 1983)).

The viability of any dock serving ships of this type requires adequate fendering and responsible docking practices; no dock, however well engineered, will last long without these.

### B. W&K's Design Was Not Used, Thus Could Not Have Caused Any Damage.

The evidence will show that *only one element* of W&K's pile connection design was actually used: the use of eight 6 3/4" bolts per pile passing upward through a collar into the dolphin. The other, at least equally important, component of the design was *not* used – the method of securing the bolts to the dolphin.

VE-1 called for use of the Redi-Chem system or an "approved equal." The specific Redi-Chem product called for in VE-1 was no longer available at the time of construction, but several comparable capsule systems were. Black, however, used an entirely different system, without W&K's approval. Because the repair work was *not* done in accordance with W&K's design, that design, even if inadequate in the abstract, did not cause, and could not have caused, any damage that may have been sustained by the Port. Moreover, even the Syndicate's own investigators concede that the connections *probably would have* held up had VE-1 been followed.

If anything was defective about the repairs, it lay in the execution, not the design. Bolts connecting the piles to the dolphins had dropped from their holes, or were only partly attached. The epoxy with which they were supposed to have been secured was soft in some places, and in others had run out of the holes partly or completely, leaving only bare bolts and empty holes. Black, not W&K, installed those bolts, and did so using an epoxy installation system substantially different from the one W&K had prescribed. EMPSCO and the Port approved Black's change of system, but W&K never did, and never would have, since "Anchor-It" was far more likely than "Redi-Chem" to create exactly this problem -- the inadequate bonding of the bolts. The longstanding rule applicable to such situations is:

> When a case is based upon negligence of an architect or engineer in preparing plans, it is *essential* that the plaintiff prove that construction of the project designed was accomplished *in compliance with the plans and specifications provided by the defendant, at least with respect to that portion of the work claimed to be defective.*[13]

The issue is one of causation -- i.e., plans that are not followed cannot cause damages. Even if VE-1 were a bad design, that is utterly immaterial, because the anchoring system prescribed in VE-1 was undisputedly not used. W&K thus cannot be liable for any resulting damages.

## VI. THE SYNDICATE CANNOT ESTABLISH DAMAGES

### A. Damages Should Be Calculated By Value Differential, and There Is No Differential.

There are two methods of calculating damages for breach of contract -- cost-of-repair and difference-in-value. "Difference-in-value" refers to "the difference between the value that the performance would have had if there had been no breach and the value of such performance as was actually rendered."[14] That method is employed where the cost of repair is "clearly disproportionate" to the difference in value,[15] and such disproportionality is presumed when the

---

[13] Covil v. Robert & Co. Assoc., 144 S.E.2d 450, 455 (Ga. App. 1965) (emphasis added, citations omitted). See also, e.g., Weseloh, supra, 22 Cal.Rptr.3d at 670 (finding engineer not liable for failure of retaining walls where there was "no evidence in the record that [the subcontractor] actually used [the engineer's] design without alteration in constructing the retaining walls"); Weston v. New Bethel Missionary Baptist Church, 598 P.2d 411, 414 (Wash. App. 1979) ("Since Jepson's plans were not followed or relied upon, Jepson could not be guilty of negligence that caused damages to plaintiff's property"); Wheat Street Two v. James C. Wise, Simpson, Aiken & Assoc., 208 S.E.2d 359, 362 (Ga.App. 1974) ("the architect cannot be held liable for negligent design if the negligent design is not a part of the proximate cause of the damages"); Balcom Industries v. Nelson, 454 P.2d 599, 601 (Col. 1969) (holding that "an architect is not liable if the employer has failed to follow the plans in an important particular and damages result which may have been due to such departure") (citing 5 Am.Jur.2d, Architects § 23); Sanders v. Kalamazoo Tank & Silo Co., 171 N.W. 523, 527 (Mich. 1917) ("We think the duty and burden were placed upon the plaintiff to show a substantial compliance with the plans and instructions"); Bayne v. Everham, 163 N.W. 1002 (Mich. 1917) (architect was entitled to directed verdict in his favor, in case where his plans and specifications were not followed); Lake v. McElfatrick, 34 N.E. 922, 924 (N.Y. 1893) (complaint against architect for breach of contract should have been dismissed, where "it was conceded that the [contractor] had not followed the plans . . . and it appeared that the failure . . . may have caused the loss").

[14] Restatement (Second) of Contracts § 347(a) and cmt. b.

[15] Restatement (Second) of Contracts § 348 and cmt. c. See also, e.g., Jacob & Youngs v. Kent, 129 N.E. 889 (N.Y. 1921) (per Cardozo, J.) (if disproportionately high or unreasonable cost would be incurred in bringing the structure up to the contract requirements, the measure of damages is the difference in value between the structure as built and the structure as contracted for).

14

costs of repair "represent a high percentage of the cost of the house."[16] This is such a case. The $5 million sought by the Syndicate is not only a "high percentage" of, but far exceeds, the total cost of designing and constructing the pile repairs ($1.4 million), not to mention the mere $2875 that W&K was paid to design VE-1. Under such circumstances, the difference-in-value approach, not cost-of-repair, must be followed in calculating damages.

The evidence will show that the dolphins as repaired were of at least equal value to the dolphins as they would have been had the original EMPSCO jacketing / encapsulation plan been followed. Even EMPSCO's plan was projected to last only about five years, and the dolphins as actually constructed had already lasted more than *nine* years before any problems were observed.[17] Under the difference-in-value approach, therefore, the Syndicate recovers nothing.[18]

### B. If Cost of Repair Is Basis For Damages, It Should Not Include Cost of Betterments Or of Repairs Unrelated to the F-1 Dolphins.

Even the cost-of-repair method would result in *total* damages of about $125,000.[19] Expert witness Kenneth Collard will testify that the cost of reconnecting the piles and restoring them to their previous condition would have been about $124,399. Since Collard will be the

---

[16] Freeman v. Maple Point, Inc., 574 A.2d 684 (Pa. Super. 1990).

[17] Cf. Allied Chemical Corp. v. Van Buren School Dist. No. 2, 575 S.W.2d 445 (Ark. 1979) (reducing *pro rata* plaintiff's damages for defectively constructed roof, where plaintiff had got eleven years' use out of the roof as built).

[18] If the Syndicate introduces no evidence of value differential, it will have failed to prove damages, and should recover nothing. See, e.g., Freeman, supra, 574 A.2d at 686 (holding that plaintiffs "did not properly establish damages" in a case where the cost of repair, which they had sought as their sole measure of damages, was almost 48% of the cost of the house, but plaintiffs had introduced no evidence of value differential); Witty v. C. Casey Homes, 430 N.E.2d 191 (Ill. App. 1981) (judgment for contractor where owner argued only for cost-of-repair damages and failed to introduce difference-in-value). Cf. Brewer v. Custom Builders Corp., 356 N.E.2d 565, 573 (Ill. App. 1976) ("If the party having the burden of proof establishes that he is entitled to damages, yet fails to establish a proper basis from which these damages can be computed, he is entitled to only nominal damages.").

[19] See generally Annotation, supra, 41 A.L.R.4th 131 at § 2(c) ("The owner's damages [under cost of repair approach] are limited to the cost of repairing the defects to conform to the original contract[.]"); id. at § 2(e) ("[I]f the work results in a structure having a greater market value than the structure if constructed according to the original plan, the contractor is entitled to an offset in the amount of such enhancement.").

only expert to testify on cost of repair, his testimony will be conclusive of the issue.[20] The Port paid the Smithbridge company a far greater sum -- in excess of $1.9 million -- to repair the piles, but Smithbridge went far beyond simple repair, and restored the dolphins and piles to a substantially better condition than previously. W&K is under no obligation to subsidize the Port's betterments.[21] Evidence will also show that Smithbridge's price was grossly inflated even for the extra work it did.[22] Finally, the amount sought by the Syndicate *above* $1.9 million has nothing at all to do with repairs to the dolphins, or even with the betterments to them, and ought not under any circumstances be recoverable.[23]

### C. The Syndicate Must Apportion Any Damages Among The Defendants.

Joint and several liability is a creature of tort law, and this action sounds in contract, not in tort.[24] In contract law, total damages must be apportioned among the parties based on their

---

[20] See, e.g., Freeman v. Turner, 374 So.2d 354, 355 (Ala. Civ. App. 1979) (upholding verdict based on one party's evidence of cost of repair, where it was "the only evidence before the jury relative to the measure of damages."); Holland v. Green Mountain Swim Club, 470 P.2d 61, 64 (Colo. App. 1970) ("It became incumbent on the defendants at this point to introduce evidence to rebut [plaintiff's damage] testimony, which they failed to do.");

[21] See, e.g., B.M. Co. v. Avery, 2001 Guam 27 ¶ 38 ("[D]amages for breach of contract are intended to put the injured party in the same position, and *not* a better position, than he would be had the contract not been breached."); Harry J. Robb, Inc. v. Urdahl, 78 A.2d 387, 388 (D.C. App. 1951) (holding that plaintiff "is not entitled to be put in a better position than he would have been had the contract been fully performed.").

[22] See Annotation, supra, 4 A.L.R.4th 131 at § 4 ("The owner . . . must follow the least expensive method of repair."). Furthermore, "the most desirable evidence of cost of repair . . . is a firm competitive bid for the necessary remedial work," id. at § 9, but the Port engaged Smithbridge at an excessive price without competitive bidding.

[23] This includes $1 million sought for attorney and expert fees (which W&K never contracted to pay); $1.17 million for "policy deductible" and expenses related to insurance adjusting (which are the Syndicate's own expenses, not the Port's, thus not recoverable in this subrogation action), $500,000 for "manifold and piping" (which did not exist on the F-1 dolphins), and $100,000 for "other dolphin repairs" (of damage not deriving from the 1996-7 repair project).

[24] The Syndicate claims defendants are liable "in both tort and contract," Syndicate's Trial Brief at 4, but the court has ruled that, in *this* case, a tort claim is unavailable under the economic loss doctrine. And even if one were available, it would be an alternative to a contract claim, not in addition to it. Where both claims are available, a party may be liable in *either* tort *or* contract, but not *both*. See Annotation, supra, 41 A.L.R.4th 131 at § 3 ("Double recovery for breach of a construction contract and negligent construction is impermissible since a party may not recover twice for the same injury simply because he has two legal theories.") (citing Merrill Iron & Steel v. Minn-Dak Seeds, 334 N.W.2d 652, 656 (N.D. 1983)). See also Perry v. Robertson, 247 Cal.Rptr. 74, 78 (App. 1988) ("[T]he same act may be both a breach of contract and a tort," but "[w]hen such a hybrid cause of action arises, the

16

respective percentage contribution to causing them.[25] W&K is responsible only for damage caused by its own acts, not those of EMPSCO, Black, or the Port itself, and it is the Syndicate's responsibility to delineate who caused what damages.[26] The apportionment need not be precise -- a rough approximation is sufficient[27] -- but if the Syndicate fails to make any apportionment at all, it does so at the risk of obtaining no recovery.[28]

The evidence will show that W&K's proportionate contribution (if any) to the damages was by far the least of all the parties. In light of the various errors and omissions of all other parties,[29] W&K's design error (if any) cannot have contributed more than about 5% to the total damages. Indeed, it is evident from how the costs of repair were spent that the percentage is even less. Out of the $1.9 million that the Port (over)spent on repairs (and betterments) to the dolphins, *only $1000* (the payment to the Dueñas architectural firm) *was spent on producing a new design* in place of W&K's. Since the designs for the repairs, even given the betterments and inflated prices, cost only $1000, and since the design is the only part of the project attributable to

---

plaintiff may pursue both legal theories of recovery until an occasion for an election of remedies arises."). Here, there is no election to be made, because tort remedies -- like joint and several liability -- are already off the table.

[25] See, e.g., Calumet Const. Corp. v. Metropolitan Sanitary Dist. Of Greater Chicago, 533 N.E.2d 453, 456 (Ill. App. 1988); Alcan Elec. & Eng. Co. v. Samaritan Hosp., 2002 WL 26291 (Wash. App. 2002); Groves & Sons Co. v. Warner Co., 576 F.2d 524 (3rd Cir. 1978); Gateway Western Ry. Co. v. Morrison Metalweld Process Corp., 46 F.3d 860 (8th Cir. 1995) (all apportioning damages for breach of contract).

[26] The burden is on the plaintiff to show the proper apportionment by cause. See, e.g., City of Westminster v. Centric-Jones Constructors, 100 P.3d 472 (Colo. App. 2003).

[27] See, e.g., State of California ex rel Dept. of Transportation v. Guy V. Atkinson Co., 231 Cal Rptr. 382 (App. 1986); Centric-Jones, supra.; Arkansas Rice Growers Coop. Assn. v. Alchemy Industries, Inc., 797 F.2d 565, 571 (8th Cir. 1986) ("Once the existence, nature, and cause of damages has been established . . . a court will not deny recovery simply because the exact amount of damages is difficult to ascertain.")

[28] See, e.g., Centric-Jones, supra.

[29] In addition to Black's faulty installation and the Port's failure to fender the dolphins and warn ships, all parties (Black, the Port and EMPSCO) failed in their duties to guard against design defects. Any design proposal was supposed to be reviewed for suitability by several engineers, working for both Black and the Port, all with greater familiarity with the project than W&K, before being adopted. Black, EMPSCO, and the Port all approved VE-1. The system was replete with checks and balances, and damage could only be done if they *all* failed.

W&K, W&K's apportionment of the damages cannot be more than $1000. Foreseeability dictates a similar result.[30] The damages incurred were not foreseeable to W&K. W&K, having created VE-1 as a "proposal," could not have foreseen that it would be used as a final design without any more detailed analysis ever being done. It was foreseeable only that it would be reviewed by the engineer of record, and rejected if unsuitable.[31] If that had happened, W&K would have been liable to Black for the contract price -- $2875. It would have had to reimburse Black the price, or else do a new design at no cost to Black. And we reach the same conclusion when we consider that a third-party beneficiary cannot recover more than the actual contracting party could.[32] Since Black, in event of breach, could recover from W&K only the contract price, the Syndicate can recover only the same.

### D. Compensation Grossly Disproportionate to Contract Price Should Not Be Allowed.

Finally, it would be unjust to assess the full amount of damages sought against W&K, because it is so grossly disproportionate to the contract amount ($2875). In such circumstances, even foreseeable damages can be reduced or denied in the interest of justice:

> A court may limit damages for foreseeable loss by excluding recovery for loss of profits, by allowing recovery only for loss incurred in reliance, or otherwise if it concludes that in the circumstances *justice so requires in order to avoid disproportionate compensation.*

Restatement (Second) of Contracts § 351(3) (emphasis added). The comment indicates that this rule is particularly applicable to this case:

---

[30] Contract damages "are generally limited to those within the contemplation of the parties when the contract was entered into or at least reasonably foreseeable by them[.]" Erlich v. Menezes, 981 P.2d 978, 982 (Cal. 1999).

[31] W&K, having explicitly mandated the use of Redi-Chem "or approved equal," could not reasonably have anticipated that this would be disregarded, and the work done with a different, less constructible system.

[32] See, e.g., Marina Tenants Assn. v. Deauville Marina Development Co., 226 Cal. Rptr. 321, 327 (App. 1986) ("A third-party beneficiary cannot assert greater rights than those of the promisee under the contract."); Stephens v. Great Southern S. & L. Assn., 421 S.W.2d 332, 337 (Mo. App. 1967) ("One suing on a contract allegedly made for his benefit as a third-party beneficiary must accept the contract as it was made by the parties thereto; and he is in no better position than, and his rights are not greater than those of, the contracting party through whom he claims.").

> It is not always in the interest of justice to require the party in breach to pay damages for all of the foreseeable loss that he has caused. There are unusual instances in which it appears from the circumstances either that the parties assumed that one of them would not bear the risk of a particular loss or that, although there was no such assumption, it would be unjust to put the risk on that party. *One such circumstance is an extreme disproportion between the loss and the price charged by the party whose liability for that loss is in question.* The fact that the price is relatively small suggests that it was not intended to cover the risk of such liability. *Another such circumstance is an informality of dealing, including the absence of a detailed written contract, which indicates that there was no careful attempt to allocate all of the risks.* The fact that the parties did not attempt to delineate with precision all of the risks justifies a court in attempting to allocate them fairly.

Restatement (Second) of Contracts § 351, cmt. f (emphasis added).[33] The low contract price ($2875) and the informality of dealing (by way of a one-page purchase order) indicates that the extent of damages sought by the Syndicate was never in the contemplation of W&K when it entered into the design subcontract, and thus that it would be unjust to award them.

## VI. CONCLUSION

The Port was not a third-party beneficiary to W&K's design subcontract with Black. W&K did not breach that contract, nor could it have caused any of the damages sustained by the Port, because *its design was not used.* Nor did the earthquake even cause the damages, contrary to the Port's theory of the case. Finally, the Port's damages were far less than the amount that the Syndicate seeks, and W&K's portion of them is smaller still. Under no colorable theory of the law of damages is the Syndicate entitled to recover more than the contract price of $2875 from W&K, and in fact -- since its subrogor, the Port, was not a third-party beneficiary, and since, in any event, W&K neither breached its subcontract with Black nor caused any damage whatsoever to the Port -- the Syndicate is entitled to recover nothing at all.

---

[33] See also, e.g, Int'l Ore & Fertilizer Corp. v. SGS Control Services, 743 F.Supp. 250, 257-58 (S.D.N.Y. 1990) (denying $2,400,000 claim for breach of $150 contract); Vitol Trading S.A. v. SGS Control Services, 874 F.2d 76, 81 (2nd Cir. 1989) (denying $547,688 claim for breach of $220 contract). Cf. Evra Corp. v. Swiss Bank Corp., 673 F.3d 951, 956 (7th Cir. 1982) ("Swiss Bank did not have enough information to infer that if it lost a $27,000 payment order it would face liability in excess of $2 million."). See generally Hadley v. Baxendale, 156 Eng. Rep. 145 (1854) (leading case for principle that special damages not contemplated by the parties will not be awarded).

Respectfully submitted this  11  day of  October , 2005.

                                 BERMAN O'CONNOR MANN & SHKLOV
                                 Attorneys for Winzler & Kelly

By: _____

                                 **DANIEL J. BERMAN**