KLEMM, BLAIR, STERLING & JOHNSON
A PROFESSIONAL CORPORATION
1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
AGANA, GUAM 96910
TELEPHONE 477-7857

By **THOMAS C. STERLING**

Attorneys for   *Defendant Black Construction Corporation*



FILED
DISTRICT COURT OF GUAM
OCT 11 2005
MARY L.M. MORAN
CLERK OF COURT

IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| S.J. GARGRAVE SYNDICATE AT LLOYDS, <br><br> Plaintiff, <br><br> vs. <br><br> BLACK CONSTRUCTION CORPORATION and WINZLER & KELLY CONSULTING ENGINEERS and ENGINEERING, MANAGEMENT & PLANNING SERVICES CORPORATION, <br><br> Defendants. | CIVIL CASE NO. CV03-00009 <br><br><br><br><br><br> **DEFENDANT BLACK CONSTRUCTION CORPORATION'S TRIAL BRIEF** |

Defendant **BLACK CONSTRUCTION CORPORATION** (hereinafter "Black") joins in the Statements of Facts and legal arguments advanced in the trial brief of Winzler & Kelly ("Winzler") which is being filed contemporaneously herewith inasmuch as the arguments set forth in that brief are equally applicable to Black. Nevertheless, Black believes that some additional facts and legal authorities should be provided to assist the Court in the proper determination of this action since the plaintiff, the

S.J. Gargrave Syndicate, has, in Black's view, no damage case under any legally cognizable theory.

**ADDITIONAL FACTS**

Black bid approximately $2.1 million to perform the original EMPSCO scope of work which involved encapsulation of all of the dolphin pilings, the construction of the necessary connections between the pilings and pile caps, the epoxy repair of cracks and spalling of the concrete pile caps, and the installation of a number of fenders to protect the dolphins from berthing vessels. The scope of work also involved the complete reconstruction of one dolphin, Dolphin H, which had previously been struck by a vessel and was, at the time of replacement, lying upside down on the bottom of Apra Harbor.

Inasmuch as the Port Authority of Guam ("Port") could not afford $2.1 million for the project, and the Port needed to accomplish something, if possible, Black proposed the alternative Pile Buck technique whereby the existing piles would be cut off below the waterline, a steel tubing section would then be welded onto the piling with the attachment of the piling to the pile cap to be accomplished with a flange at the top of the piling connected by 8 epoxy bolts. Utilization of this technique eliminated the need for encapsulation and allowed the cost of the project to be reduced from $2.1 million to $1.4 million. Thus, for approximately $1.4 million, the Port obtained a new Dolphin H, the repair and reattachment of 107

pilings, the installation of fenders, and an epoxy repair of cracks and spalls in the dolphin caps.

The evidence will show that neither Peter MacLeod, who adjusted the claim for Lloyds of London[1], nor Frank Dennis, who designed what Gargrave likes to refer to as the "temporary repair", were aware of the design parameters established by the Port in connection with the EMPSCO design, the inability of the Port to fund the EMPSCO design, the necessity to reduce the scope of the project to accommodate the Port's funding, the substantial reduction in cost accomplished as a result of the redesign, or the total amount paid to Black for the repair.

After the October 2001 earthquake, Mr. MacLeod, who is not an engineer, viewed the condition of the dolphins and immediately concluded that the damage which he saw resulted from the earthquake and was caused by defective construction and inadequate design. He then retained Smithbridge Construction on a design/build, time and charges basis (without competitive bidding or, for that matter, even a competitive proposal) to perform repairs. Frank Dennis, a New Zealand structural engineer, then working for Smithbridge, designed a piling to dolphin attachment based upon what he considered to be "sound engineering practice" rather than any specific design parameters

---

[1] The plaintiff, Gargrave, was one of the Lloyd's syndicates that paid the Port's claim. Gargrave's share was 22%. The other syndicates, that paid the other 78%, are not before the Court.

- 3 -

established by anyone. MacLeod then funded an initial repair (i.e. reattachment) of 26 of the pilings which cost something in the vicinity of from $400,000 to $500,000 subject to proof at trial. That number was then extrapolated out to reflect a repair cost for all 107 pilings and, as a result, Lloyds of London ultimately ended up paying the Port approximately $2 million to reattach 107 pilings.[2]

The $1.2 million cost proposal to complete the balance of the pilings (after the "temporary repair") submitted by Smithbridge was prepared by Ben Casey who will testify by deposition in this case. Casey admitted in his deposition that his estimate, which served as the basis for Lloyd's settlement with the Port, included items, such as crack and spall repairs, which were totally unrelated to any alleged design or construction deficiencies and he was unable to indicate how much these amounts were.

These facts are all highly significant since, in Black's view, Gargrave misunderstands the proper measure of damages in a design and construction deficiency case and, as such, Gargrave has no damage case at all which can properly go to the jury.

//

//

---

[2] "Reattach" is probably the improper word to use in many instances since the testimony at trial will clearly reveal that a substantial number of the pilings were still intact and did not need to be reattached at all. Thus, some of the existing attachments installed by Black 5 years earlier had to be removed so as to allow Smithbridge to accomplish its "repair".

- 4 -

# THE PROPER MEASURE OF DAMAGES

The only claim against Black which remains in this action is a breach of contract/warranty claim based upon the allegation that Black performed defective construction work. This claim is based upon the allegation that a substantial number of the 856 epoxy bolts installed by Black to connect 107 pilings to the dolphins were inadequate due to soft epoxy or some other defect in the construction process. The measure of damages for a contractor's defective performance of his contract with the owner is the cost of repairing or replacing the defective construction. County Asphalt Paving Co. v. 1861 Group Ltd., 908 S.W.2d 184 (Mo.App. 1995); Fowler v. Campbell, 612 N.E.2d 596 (Ind.App. 1993); Bhattarai v. Stein, 849 P.2d 1153 (Or.App. 1993); Reale v. Linder, 514 N.Y.S.2d 1004 (1987); Fullerton v. McGowan, 507 A.2d 473 (1986); Shell v. Schmidt, 330 P.2d 817 (Cal.App. 1959).

Thus, should the jury determine that Black's installation of the epoxy bolts was inadequate for any reason, Gargrave is entitled to recover the cost of repair. Gargrave has no witness to testify to the cost of repair. This is properly an area which should be addressed through expert testimony and Gargrave has no expert who is prepared to testify as to <u>any</u> damage issue.

Gargrave is not presenting a case based upon the cost of repair nor is it presenting a cased based upon the cost of redesign. Rather, Gargrave is presenting a case based upon the

- 5 -

total cost of redesign and constructing an entirely different structure, much better than that originally designed and constructed.

Gargrave's damage case, while simple to present, is wholly deficient as a matter of law. Gargrave's plan at trial, which at this point cannot be changed, is to present evidence that the Winzler design was inadequate, that Black's construction was defective, and that it spent approximately $2 million to settle with the Port representing the cost of redesigning and constructing <u>an entirely different substantially improved system</u>. Gargrave's basic position is because, in its view, Winzler and Black provided defective design and construction in connection with the original $1.4 million contract, the Port gets to keep 107 repaired pilings as well as the fendering system[3] and that Winzler and Black are obligated to pay $2 million for a vastly improved piling to dolphin connection!

The fact that Gargrave has never focused on the proper measure of damages in a design/construction case is perhaps best demonstrated by its initial Trial Brief filed herein on May 16, 2005 and its Supplemental Trial Brief filed recently both of which completely ignore the proper measure of damages in a design and construction defect case. Gargrave's novel position is that whatever it spent, for whatever reason, as the <u>Port's</u>

---

[3] Actually, most of the fenders have been destroyed by berthing incidents subsequent to installation.

- 6 -

<u>property insurer</u> in settling an earthquake claim is properly chargeable to Black and Winzler.

Gargrave is suing in subrogation pursuant to a subrogation receipt. As such, it stands in the shoes of the Port. Its claims are no greater than those which could have been asserted by the Port for a breach of its contract with Black. The amounts spent by Gargrave/Lloyds to settle the Port's property insurance claim are wholly irrelevant and will be the subject of a motion *in limine* at the appropriate time. Gargrave, if it intends to present a case, must present a case based upon accepted theories of contractual liability for design and construction defects. Gargrave has a number of allocation issues which it has ignored and which cannot be fixed at this point.

For example, the evidence at trial will establish that final inspection of the dolphins occurred in June 1997. The evidence will establish that the dolphins functioned as intended through the 2001 earthquake and thereafter. Thus, regardless of whether the design and construction was adequate or inadequate, the Port obtained the benefit of Black's repair for over 4 years before the 2001 earthquake hit. The law is very clear that an owner who has obtained the benefit of construction work for a number of years before a failure is not entitled to the full cost of replacement on failure but that that cost must be prorated so that the owner does not obtain a windfall. <u>R.I.</u>

- 7 -

Turnpike, etc. v. Bethlehem Steel, 415 A.2d 1295 (S.Ct.R.I. 1980) [contractor entitled to credit for useful life of paint installed since owner got use of it for 3 years before it failed and had to be replaced]; 525 Mainstreet Corp. v. Eagle Roofing Co., Inc., 168 A.2d 33 (S.Ct.N.J. 1961) [roof with 5 year life span failed after about 3 so measure of damages was replacement cost prorated by a period during which original roof functioned]. In Allied Chemical Corp. v. Van Buren School Dist., 575 S.W.2d 445 (Ark.S.Ct. 1979) [replacement costs prorated since owner had use of facility for a period of time prior to failure] the Court stated:

> The purpose of awarding damages for a breach of contract is to place the injured party in as good position as he would have been had the contract been performed.

Gargrave has completely ignored the need to propose some proration based on past use.

The evidence at trial will establish that the repair which Black effectuated in 1996 was basically a "band aid" repair since that was all the Port could afford to pay for. MacLeod, without a clue as to what had actually occurred in the past, simply assumed that Winzler had been hired to design and construct a repair which would bring the dolphins into a condition where they would withstand typhoons, earthquakes, atomic bombs, or anything else that structural engineers, in a perfect world, with an adequate construction budget, design for.

- 8 -

Since MacLeod had no idea as to what the design intent of the original "band-aid" repair had been, he compensated the Port for the cost of performing an upgrade which the Port had never previously been able to fund. In short, the Port experienced a massive windfall based on MacLeod's failure to properly adjust the loss and this windfall to the Port cannot properly, as a matter of law, be passed by Gargrave, suing in subrogation, onto Black and Winzler.

A case on point is <u>City of Westminster v. Centric-Jones Constructors</u>, 100 P.3d 472 (Colo.App. 2003) [cert. granted and pending], in which a water treatment plant failed during construction allegedly due to both design and construction defects. The owner of the project settled with the design engineers but the lawsuit against the contractor continued. In the meantime, the owner redesigned and completed the project in a manner which indisputably involved substantial upgrades beyond that which the owner had originally agreed to pay for. In its lawsuit against the contractor, the owner introduced the cost it had incurred in connection with the redesign and reconstruction effort without in any manner attempting to allocate its damages to reflect those resulting from the original breach as opposed to the costs incurred in upgrading the facility beyond that which the contractor had originally agreed to construct. The Court noted as follows:

//

> The general measure of damages for breach of a construction contract is that amount required to place the owner 'in the same position he would have occupied had the breach not occurred.' (citations omitted) This rule protects defendants against speculative awards that would otherwise provide plaintiffs with an economic windfall. 100 P.3d at 478

***

> Thus, where the plaintiff's own evidence of damages includes advantage beyond the benefit of the bargain, the plaintiff <u>must present more than an itemized total cost of replacement.</u> (emphasis added) 100 P.3d at 478.

The Court in <u>City of Westminster</u> affirmed the trial court's ruling which denied any recovery to the owner on the ground that the owner had simply presented evidence of all it had spent to redesign and rebuild the structure without making any effort to allocate those amounts to any particular breach or to the responsibility of any particular party. In so holding, the Court noted as follows:

> <u>Accordingly, we conclude the [owner] did not present a reasonable basis on which the jury could apportion damages.</u> We also reject the [owner's] other challenges to the directed verdict. 100 P.3d at 479-480 (Emphasis added)

Gargrave's damage evidence in this case is indisputably deficient under the rule set forth in <u>City of Westminster</u>. Gargrave has sued EMPSCO, the original designer, contending that EMPSCO shares blame for the problems which occurred. Gargrave has sued Winzler contending that Winzler's design was the cause of the problem. Gargrave has sued Black claiming that Black's deficient construction was the cause of the problem. There will

be undisputed evidence presented of berthing damage to the dolphins which was sustained prior to the 2001 earthquake. The evidence will show that portions of the project were undamaged and were ripped out as part of the "repair". The evidence will show that Gargrave funded a redesign and reconstruction effort without any knowledge whatsoever as to the design parameters in existence between its subrogor, the Port, and the parties which Gargrave is suing. The evidence will be undisputed that Gargrave spent approximately $2 million to redesign and upgrade the piling to dolphin connections which had been <u>a very small part of the work under a prior contract which had been in the total amount of only $1.4 million</u>.

Gargrave, as a matter of law, is required to present the jury with some basis for it to determine what portion of the $2 million it spent was for berthing damage or upgrades and which portion of the $2 million it spent was directly chargeable to breaches by Winzler, EMPSCO or Black. This is a matter for expert testimony. Gargrave has no experts who are prepared to testify as to its damages. Any effort by Gargrave to present evidence pertaining to how much it paid the Port for the dolphins, or anything else, will be objected to as irrelevant based on the applicable measure of damages and, if Black's

//

//

//

objection is sustained, Gargrave will have no case to go to the jury.[4]

The fact that this is also a defective design case changes nothing. Where a design is defective, the owner's recovery is limited to the cost of the original defective item. The plaintiff cannot recover the cost of redesigned, better construction. Neal v. Sazon, 486 So. 2d 832 (La.App. 1986).

For example, in St. Joseph Hospital v. Corbetta Const. Co., Inc., 316 N.E.2d 51 (Ill.App. 1974), the Court refused to provide the plaintiff with a recovery for the cost of upgrading its facility to a proper design where the original design, which had a much lower price tag, had been defective. The Court made some statements in that case which are equally applicable to this:

> Compensation is the basic principle of damages. For breach of contract the injured party is entitled to be compensated for losses which are the natural consequence and proximate result of the breach. The purpose of such compensation is to place the injured party in as good a position as that in which full performance would have placed him. <u>He is not entitled because of a breach to be put in a better position than he would have been had the contract been fully performed.</u> (Emphasis added) 316 N.E.2d at 60.

//

---

[4] Black had always planned to raise this issue pretrial by a motion for summary judgment. However, its initial partial dispositive motions, which were a preliminary step toward a final dispositive motion, was filed in August 2004, approximately 3 months prior to the motion deadline, but was not decided until approximately 8 months later due to the Court's issuance <u>sua sponte</u> of an OSC re Jurisdiction and Federal Court Judge assignment issues completely beyond Black's control.

KLEMM, BLAIR, STERLING & JOHNSON
A PROFESSIONAL CORPORATION
1008 PACIFIC NEWS BLDG
238 ARCHBISHOP
F.C. FLORES ST.
HAGÅTÑA, GUAM 96910

And, in a quote specifically applicable to our case, the Court noted:

> Certainly the [owner] should not receive, without paying more than it originally had agreed to pay for the [original material], a windfall in the form of the more expensive [material] and the extra labor costs required by its more difficult installation, merely because its architect initially failed to specify it. The same applies to [other materials] which were necessary and were furnished in the reconstruction but were not included in [the defendant's] original plans and specifications. (Emphasis added).

Significantly, in St. Joseph Hospital, evidence established the value of the upgrades so an award to the plaintiff for the proper amount was possible. In the instant matter, Gargrave has no proof as to the cost of repair, the value of the upgrades, the cost of repair of berthing damage, the value of original work that was undamaged, or any other items which should result in adjustments to its $2 million claim. No jury award based on anything other than pure speculation is possible.

The principle that the owner of a project cannot benefit through the breach of its contract with a contractor is recognized repeatedly in many cases. Gargrave, suing in subrogation, can have no greater breach of contract claims against Black and Winzler than the Port had. As such, Gargrave cannot recover more than any owner can for the breach of a construction contract.

Black does not dispute that Gargrave paid approximately $2 million to the Port for damage to the dolphins. Regardless, the

important point is that the measure of damages for breach of a construction contract is the cost of repair, not the cost of redesign and reconstruction into something bigger and better that the owner always wanted but could not afford to pay for.

Gargrave has no witness on its Witness List prepared to testify as to the proper measure of damages in a design/construction defect case. As such, Black intends to move <u>In Limine</u> to prevent introduction of any evidence of what Gargrave paid to settle the insurance claim absent an appropriate foundation tying it into some viable damage theory.

**RESPECTFULLY SUBMITTED** this 11th day of October, 2005.

KLEMM, BLAIR, STERLING & JOHNSON
A PROFESSIONAL CORPORATION

BY: _____
THOMAS C. STERLING
*Attorneys for Defendant Black Construction Corporation*

E62\27946-29
G:\WORD97\OFFICE\WORDDOC\PLD\TCS\252-BCC'S
TRIAL BRIEF RE GARGRAVE V BLACK ET AL.DOC

KLEMM, BLAIR,
STERLING & JOHNSON
A PROFESSIONAL CORPORATION
1008 PACIFIC NEWS BLDG
238 ARCHBISHOP
F.C. FLORES ST.
HAGÅTÑA, GUAM 96910

- 14 -