ORIGINAL

CARLSMITH BALL LLP

DAVID LEDGER
STEPHEN C. SMITH
ELYZE McDONALD
134 West Soledad Avenue
Bank of Hawaii Bldg., Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Tel No. (671) 472-6813

COZEN O'CONNOR

FORREST BOOTH
425 California Street, Suite 2400
San Francisco, CA 94104-2215
Tel No. (415) 617-6100

Attorneys for Plaintiff
S.J. Gargrave Syndicate at Lloyds



FILED
DISTRICT COURT OF GUAM

OCT 2 0 2005

MARY L.M. MORAN
CLERK OF COURT

IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| S.J. GARGRAVE SYNDICATE AT LLOYDS, <br><br> Plaintiff, <br><br> vs. <br><br> BLACK CONSTRUCTION CORPORATION, WINZLER & KELLY, and ENGINEERING MANAGEMENT & PLANNING SERVICES CORPORATION, <br><br> Defendants. | CIVIL CASE NO. CV03-00009 <br><br> **PLAINTIFF'S MOTION IN LIMINE TO PRECLUDE REFERENCE TO DAMAGE BY SHIPS; DECLARATION OF SERVICE** |

Plaintiff S.J. GARGRAVES SYNDICATE AT LLOYDS (hereinafter "Plaintiff")

hereby moves the Court *in limine* for an order precluding Defendants and their counsel, under the

doctrine of judicial estoppel, from mentioning, referring to or arguing that any damage to the F-1

Pier in Apra Harbor, Guam was caused by a ship impacting said pier, *i.e.* by a "hard docking". The Defendants are trying to have it both ways; they previously persuaded this Court that it lacks admiralty jurisdiction over Plaintiff's claims because "no ships were involved". Defendants now, through counsel and the testimony of retained litigation experts, have reversed course and plan to argue that the damage to the F-1 Pier, agreed by eyewitnesses to have been caused by the 2001 earthquake in Guam, was actually caused by ships banging into the Pier during hard dockings. The Defendants should be estopped from making such a fundamental change in their legal position, after the Court based its rulings (striking Plaintiff's maritime claims) on the contrary position the Defendants were then espousing. Defendants should not be allowed to gain such an unfair advantage and deliberately manipulate this Court.[1]

## I.    THE COURT'S MEMORANDUM ORDER RE JURISDICTION

On March 24, 2005, the Honorable A. Wallace Tashima issued his Memorandum Order Re Jurisdiction (hereinafter "Memorandum Order") in this case. While upholding the existence of the Court's diversity jurisdiction, the Court ruled that it lacked admiralty jurisdiction under 28 U.S.C. § 1333(1). Memorandum Order, p. 6. The Court relied in part on Royal Ins. Co. v. Pier 39 Ltd. Partnership, 738 F.2d 1035 (9th Cir. 1984). That case held that, for there to be admiralty jurisdiction in a case relating to the construction or maintenance of docks or piers, "... breach of the contract to construct or maintain the dock [must help to] cause a tort clearly within the branch of admiralty jurisdiction." 738 F.2d at 1038.

In attempting to persuade the Court that there was no admiralty jurisdiction over Plaintiff's claims, Defendants repeatedly stated that no damage caused by ships is involved in

---

[1] *See* Russell v. Rolfs, 893 F.2d 1033, 1037 (9th Cir. 1990) (State of Washington prohibited from arguing in federal court the opposite of what it had previously argued in state court). Taking inconsistent positions amounts to "playing fast and loose with the courts", Rockwell Int'l Corp. v. Hanford Atomic Metal Trades Council, 851 F.2d 1208, 1210 (9th Cir. 1988), and is "an affront to judicial dignity". *Id.* (citations omitted).

this case. In Defendants' Joint Brief Re Diversity and Admiralty Jurisdiction (hereinafter the "Brief"), the Defendants state that "... it is absolutely clear that the injury here did not occur on navigable waters **nor was it caused by a vessel** on navigable water." *See* Exhibit F hereto, pp. 14-15 (emphasis added). Defendants made this statement as part of their argument that Plaintiff's claims herein do not meet the first prong of the jurisdiction test under the Admiralty Extension Act, *infra*. *Id*. For further emphasis, Defendants stated that "No vessel is even involved in this case." *Id.*, at 16. This position was taken by, and the Brief was filed on behalf of, all Defendants jointly. It is therefore the binding legal position of each and all of them. Counsel repeated their position in oral argument before the Court on December 3, 2004: "In our case, we don't have a ship, we don't have a shipowner ..." *See* Exhibit G hereto, Transcript of Proceedings Before the Honorable A. Wallace Tashima, p. 53, ll. 21-22.

The Defendants herein had to demonstrate to the Court (J. Tashima) that no ships were involved in this case, in order to prevail in their argument that the Court lacked admiralty jurisdiction. The Admiralty Extension Act, 46 U.S.C. § 740, provides that:

> The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land.

Had Defendants argued to Judge Tashima in 2004 (as they are arguing now) that any of the damage to the F-1 Pier was caused by a ship banging into it, there would have been clear admiralty jurisdiction over such claims ("caused by a vessel ..."), pursuant to 46 U.S.C. § 740. Judge Tashima ruled that such jurisdiction was not present, relying on the Defendants' oral and written statements that no ships were involved in any way.

## II. JUDICIAL ESTOPPEL PRECLUDES DEFENDANTS FROM REVERSING THEIR POSITION

The doctrine of judicial estoppel, sometimes referred to as the

doctrine of preclusion of inconsistent positions, is invoked to prevent a party from changing its position over the course of judicial proceedings when such positional changes have an adverse impact on the judicial process ... "The policies underlying preclusion of inconsistent positions are 'general consideration[s] of the orderly administration of justice and regard for the dignity of judicial proceedings.'" ... Judicial estoppel is most commonly applied to bar a party from making a factual assertion in a legal proceeding which directly contradicts an earlier assertion made in the same proceeding or a prior one.

Russell v. Rolfs, *supra*, n.1, 893 F.2d at 1037 (citations omitted).

An attorney's admissions, such as during oral argument, constitute judicial admissions. U.S. v. Wilmer, 799 F.2d 495, 502 (9th Cir. 1986). Absent egregious circumstances, a party is bound by his attorney's admission. Magallanes-Damian v. INS, 783 F.2d 931, 934 (9th Cir. 1986). Defendants herein should be judicially estopped from reversing the positions they have previously espoused. Risetto v. Plumbers and Steamfitters Local 343, 94 F.3d 597, 600 (9th Cir. 1996) (holding that judicial estoppel, or the doctrine of preclusion of inconsistent positions, precludes a party from gaining one advantage in a case by taking one position, and then seeking a second advantage by later taking an incompatible position). In Risetto, a plaintiff who had previously collected workers' compensation benefits for temporary total disability, was precluded in a later lawsuit from arguing that, during the same time period, she was able to perform a job adequately, without limitations. The Court applied judicial estoppel to protect **itself** from such manipulation. *Id.*, at 603. The Court itself is the interested party when a litigant reverses a position previously taken. *Id.*

Here, the Defendants prevailed before Judge Tashima on their assertion that the Court lacked admiralty jurisdiction, because they stated that no vessel was involved in causing Pier damage. A party need only assert a position for judicial estoppel to apply; prevailing on it is not necessary. It is irrelevant whether it is a legal or factual assertion. Helfand v. Gerson, 105

F.3d 530, 534 (9th Cir. 1997) (holding that judicial estoppel applies to a party's stated position, regardless of whether it is an expression of intention, a statement of fact, or a legal assertion). The Court in <u>Helfand</u> ruled that the integrity of the judicial process is threatened when a litigant gains an advantage by the manipulative assertion of inconsistent positions, be they factual or legal. *Id.*, at 535.

## III. DEFENDANTS 180° REVERSAL OF COURSE

Having prevailed before Judge Tashima, and having secured a ruling that there is no admiralty jurisdiction over this case, Defendants have now made a complete 180° turn. Winzler & Kelly's expert, Webb W. Hayes, has offered the opinion that **all** of the damage to the F-1 Pier which was observed after the 2001 earthquake was caused by ships striking the Pier. "It is my opinion that the damage to the dolphin piles and connection was due to excessive berthing loads and not by [sic] any seismic forces." *See* Exhibit A hereto, p. 7/7.

Likewise, the expert retained by Black Construction Corporation (hereinafter "Black"), Dean Gillham, offered the opinion that

> The damages to berthing dolphins observed after October 2001 were the result of berthing forces well in excess of the berthing force limitations set by the [Port Authority of Guam]. These damages were not the result of the October 2001 Guam Earthquake.

*See* Exhibit B hereto, p. 2. Mr. Gillham repeats this opinion several times. "**[A]ll evidence points to the damages to the berthing dolphins being due to excessive [ship] berthing forces, and none of the evidence points to the damage being due to an earthquake.**" *See* Exhibit B hereto, p. 10 (emphasis in original).

Another expert retained by Black, Kenneth W. Collard (Jr.), has also testified regarding what he believes is damage caused by ships to the F-1 Pier. "There is sufficient evidence to satisfy me that vessel berthing damage has continued over the years … In my

opinion, this type of damage is not consistent with 'earthquake damage'." *See* Exhibit C hereto, p. 4. Unlike the other litigation experts retained by the Defendants, Mr. Collard at least can point to one incident which he alleges resulted in damage to the F-1 Pier caused by a ship: the docking of the M/V YUYO BREEZE on December 27, 1996. It is Mr. Collard's testimony that the YUYO BREEZE rode up on a large wave and contacted one of the fenders on Dolphin G, causing some piles to separate from the concrete cap of the pile. *See* Exhibit C hereto, pp. 3-4.

Defense counsel have telegraphed the new argument they are now planning to make, that damage to the F-1 Pier was caused by ship strikes. Counsel now want it to appear that ships, not the 2001 earthquake, caused most of the bolts to fall out of the pile caps, and sheared off others. The following examination is illustrative:

> Q: During the construction project, there were a lot of ships that banged into the dolphins on a lot of occasions, weren't there?
>
> A: I believe so. I'm not sure exactly when.
>
> Q: Were you aware about the Yuyu Breeze docking there on December 27, 1996 and putting strain on the epoxy anchor bolts?
>
> A: I cannot remember.
>
> Q: Do you remember the Gopher State Ship smacking into the corner of Dolphin H and creating damage?
>
> A: I cannot remember. It might have happened, but it was way back.
>
> Q: Do you remember in January of '96 a vessel called the Kosian smacking into Dolphin H?
>
> A: Like I said, I cannot remember. It might have happened. I'm not sure.
>
> Q: How about December 31, '96? Do you remember a ship named Taining hitting form work and scaffolding on Dolphin H?
>
> A: Again, I cannot remember.
>
> Q: Do you remember when the SKS Trent hit Dolphin C and

created some damage during construction?

A: No, I don't remember.

Q: How about the ship Great Promise? Do you recall it in December of '96 hitting Dolphin H and Dolphin G?

A: No.

Q: Do you recall as a result of some of these ships hitting dolphins that the anchor bolts were loosened?

A: No.

See Exhibit D hereto, the deposition of Joselito Gutierrez, p. 33, l. 24 to p. 35, l. 1.[2]

---

[2] Similar questions were asked of other witnesses:

Q: Would a berthing vessel striking the side of a dolphin at what I'll call an excessive speed, creating an excessive load, would that type of event in your view shear a bolt such as we've -- as you have documented existed at Fox Trot?

A: It could.

Q: What else could do it, if you know?

A: In this situation? Only an earthquake.

See Exhibit E hereto, the deposition of Frank Edgerton Dennis, p. 234, ll. 8-15.

Q: And let's assume that a ship smacks into the dolphin on the south side, hard enough to knock the pile connection loose from the batter pile, boom, like this.

A: Un-huh.

*Id.*, p. 236, l. 24 to p. 237, l. 3.

Q: So if we had a ship hitting the dolphin, coming north to south, and it disconnected the batter pile which is slanted east to west --

A: Un-huh.

Q: -- loosening it from underneath the dolphin, it would have a

The Defendants are trying to have it both ways. The damage allegedly caused by ships (which Plaintiff denies happened), if true, would place the Defendants' claims herein squarely within 46 U.S.C. §740, The Admiralty Extension Act ("all cases of damage or injury ... caused by a vessel ..."). Defendants should be estopped from completely reversing course and changing the position they have espoused (to Plaintiff's detriment) throughout this litigation, at least up until March of 2005. The Court made its decision in its Memorandum Order (that there is no admiralty jurisdiction herein) based upon the representations of Defendants and their counsel that no ships were involved in the events which are the subjects of this lawsuit. The entire complexion of the lawsuit changed, based upon the Court's Memorandum Order. Following Judge Tashima's ruling, Judge Jones, on April 8, 2005,[3] struck Plaintiff's Seventh, Eighth and Ninth admiralty-based causes of action against the Defendants for breach of the maritime warranty of workmanlike performance, which warranty is implied in every maritime contract by Ryan Stevedoring Co., Inc. v. Pan-Atlantic Steamship Corp., 350 U.S. 124 (1956). The basis of Judge Jones' ruling was that this case does not involve a ship or a shipowner[4] and is not an admiralty case.

The Defendants made an election in 2004 regarding whether or not to argue that ship-caused damage was involved in this case. They chose to deny that any ships were involved.

---

natural tendency after it was loosened to fall east to west, wouldn't it?

A: Yes.

Q: Perpendicular to the direction from which the ship hit the dolphin?

A: Yes.

*Id.*, p. 237, l. 22 to p. 238, l. 7.
[3] *See* Order, filed herein on that date, p. 15, ll. 13-14.
[4] *Id.*, p. 15, ll. 10-11.

They prevailed, to Plaintiff's detriment. They should now be held to that election, and forbidden to manipulate this Court.[5] It would threaten the integrity of the judicial process,[6] and would be both extremely prejudicial and grossly unfair to Plaintiff to first lose its maritime causes of action based on the Defendants' admission that no ship-caused damage is involved, and then have the Defendants be able to about-face and defend against Plaintiff's earthquake-damage claims on the basis that all the damage to the F-1 Pier was actually caused by ships! If the Defendants are to be allowed to argue that ships caused the damage, then Plaintiff respectfully submits that the Court must now overturn Judge Jones' ruling of April 8, 2005 and reinstate Plaintiffs' maritime causes of action herein.

## IV.    CONCLUSION

Plaintiff requests that the Court order that Defendants, their counsel, witnesses and experts be precluded from "playing 'fast and loose with [this] Court'"[7] by mentioning, referring to or basing any argument upon any damage to the F-1 Pier being caused by the docking or berthing of any ship or vessel.

DATED: Hagåtña, Guam, October 20, 2005.

CARLSMITH BALL LLP

for

DAVID LEDGER
STEPHEN C. SMITH
ELYZE McDONALD
Attorneys for Plaintiff
S.J. Gargrave Syndicate at Lloyds

---

[5] *See*, Helfand, *supra*, 105 F.3d at 535.
[6] *Id.*
[7] Rockwell Int'l Corp., *supra*, 851 F.2d at 1210.

## DECLARATION OF SERVICE

I, Joseph Razzano, hereby declare under penalty of perjury of the laws of the United States, that on October 20, 2005, I caused to be served, via hand delivery, a true and correct copy of **PLAINTIFF'S MOTION IN LIMINE TO PRECLUDE REFERENCE TO DAMAGE BY SHIPS** upon Defendants Counsel of record as follows:

> Robert J. O'Connor, Esq.
> Daniel J. Berman, Esq.
> Berman O'Connor Mann & Shklov
> Suite 503, Bank of Guam Building
> 111 Chalan Santo Papa
> Hagåtña, Guam 96910
>
> Thomas C. Sterling, Esq.
> Klemm Blair Sterling & Johnson, P.C.
> Suite 1008, Pacific News Building
> 238 Archbishop Flores Street
> Hagåtña, Guam 96910

and
> Thomas M. Tarpley, Esq.
> Law Offices of Tarpley & Moroni, LLP
> Suite 402, Bank of Hawaii Building
> 134 West Soledad Avenue
> Hagåtña, Guam 96910

Executed this 20 day of October, 2005 at Hagåtña, Guam.

_Joseph C. Razzano_
JOSEPH RAZZANO

SANFRAN1\33746\1 123206.000

BERMAN O'CONNOR MANN & SHKLOV
DANIEL J. BERMAN
ROBERT J. O'CONNOR
Suite 503, Bank of Guam Building
111 Chalan Santo Papa
Hagåtña, Guam 96910
Telephone: (671) 477-2778
Facsimile: (671) 499-4366

Attorneys for Defendant:
*WINZLER & KELLY CONSULTING ENGINEERS*

FILED
DISTRICT COURT OF GUAM
JUL 16 2004
MARY L. M. MORAN
CLERK OF COURT

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF GUAM

| | |
|---|---|
| S.J. GARGRAVE SYNDICATE AT LLOYDS, <br><br> Plaintiff, <br><br> vs. <br><br> BLACK CONSTRUCTION CORPORATION, WINZLER & KELLY CONSULTING ENGINERS and ENGINEERING, MANAGEMENT & PLANNING SERVICES CORPORATION, <br><br> Defendants. | CIVIL CASE NO.: CIV03-00009 <br><br> **EXPERT DISCLOSURE OF DEFENDANT WINZLER & KELLY CONSULTING ENGINEERS DECLARATION OF SERVICE** |

Pursuant to Fed.R.Civ.P. 26(a)(2), Defendant Winzler & Kelly Consulting Engineering, by and through its counsel, provides the following disclosure setting forth information about the people whose expert opinions Defendant Winzler & Kelly Consulting Engineering may offer in evidence at trial:

1. Ben C. Gerwick, Inc. by and through Webb W. Hayes, S.E. and Ted W. Trenkwalder, S.E.; Tel.: (510) 839-8972; Physical address: 1300 Clay Street, Suite 450, Oakland, CA 94612.

2. Kleinfelder, Inc. by and through Zia Zafir, Ph.D., P.E. and Edward Rinne, P.E., G.E.; Tel.: (925) 484-1700; Physical address: 7133 Koll Center Parkway Suite 100, Pleasanton,

E:\Jean\Plds\3109.wpd    1

CONFORMED COPY
Date: 7/16/04
Time: 2:58 pm   EM

Mr. Robert O'Conner
O'Conner Berman Dotts & Banes
Second Floor, Nauru Bldg.
Saipan, MP 96950-1969

 **Ben C. Gerwick, Inc.**
Member of the COWI Group
Consulting Engineers
1300 Clay Street, Suite 450
Oakland, CA 94612
Tel. 510.839.8972
Fax. 510.839.9715
http://www.gerwick.com/

Date: July 14, 2004
Our ref. 2004-35

Subject: **FOXTROT PIER F-1**
**PORT AUTHORITY OF GUAM**
Winzler & Kelly

## GENERAL

The undersigned has been retained to evaluate the repair scheme for the Foxtrot F-1 petroleum wharf
at Apra Harbor, Territory of Guam, and develop opinions as to the suitability of this repair scheme
and its ability to resist loads. I have reviewed the EMPSCO design documentation, and various other
documents listed in the References Section below.

## QUALIFICATIONS

After graduating from the University of California at Berkeley I began my civil engineering career in
January of 1958. I was with the firm of Earl and Wright from January 1959 to January 1985. For the
last fourteen years at Earl and Wright I was president and CEO. I was chairman of the joint company,
John Brown - Earl and Wright from 1973 through 1983. I was president of my own firm, Bay Phoe-
nix Consulting Engineers, until 1991 when the firm ceased trading. After a brief time with Peter
Cully & Associates, I spent nine years with GKO & Associates. In June of 2002, I joined the firm of
Ben C. Gerwick, Inc., where I am currently employed.

I hold valid California Certificate number C-12409 as a Civil Engineer, which was issued in 1960 and
California Certificate number S-1361 as a Structural Engineer, which was issued in 1965. I have pre-
viously been registered as a civil engineer in Oregon, Washington, Alaska, Texas and Louisiana;
however, these registrations are no longer current.

Earl and Wright was a major civil and structural engineering firm in San Francisco that was very
strong in marine engineering. The company designed many wharves in the San Francisco Bay Area,
Alaska and the Philippines before becoming a major force in the design of offshore drilling platforms.
In 1969 the company was acquired by SEDCO, which later became the largest offshore drilling com-
pany in the world. Most of the wharf projects were petroleum tanker facilities. These facilities
ranged from barge terminals to terminals for VVLCC's and included the LPG terminal at Yanbu,
Saudi Arabia and two liquid tanker terminals for Honam Petroleum (Caltex) in Honam, Korea. Earl
and Wright did design bulk cargo terminals for the Alaska Railroad in Seward and Whittier, Alaska,
and the U.S. Army Corps of Engineers in Haines, Alaska. Many of the projects had to be innovative
to solve environmental and operational problems, such as moving ice and the lack of heavy construc-
tion equipment.

velocities much lower than 0.2 ft/sec extreme loads would have occurred that would have damaged the dolphins.

The damaged pile connections, observed after the 2001 earthquake, were not the connections designed by Winzler & Kelly. The bolt adhesive did not meet Winzler & Kelly's specification and the bolts were not installed properly. Thus it is impossible for the plaintiff to show how Winzler & Kelly's connection would have performed. Any conclusions related to the performance of the connection design, based on the observed damage, would be highly speculative.

It has been noted that one or both dolphins C & D were permanently displaced 16 inches toward shore. For this displacement to occur, the batter piles or their connections had to fail. For a permanent displacement to exist, the batter piles had to fail in bending or the top connection shear from the concrete. A seismic event is oscillatory and due to the relative weakness of the soils for pile tension, as compared to compression, I would expect any permanent displacement to be in the opposite direction, away from the shore.

It is my opinion that the damage to the dolphin piles and connection was due to excessive berthing loads and not by any seismic forces.

REFERENCES:

- Guam Oil and Refining Company Structural Design Calculations dated xxx, pp94.

- Trasen Associates LTD Structural Drawings S-1 – S-10 dated April 18, 1969.

- EMPSCO Structural Design Calculations for Repair and Upgrading to Foxtrot "F-1" Pier Apra Harbor dated xxx, pp 90.

- EMSCO Structural Drawings S-0   S17 dated January 10, 1996.

- Geo-Engineering & Testing Inc. Subsurface Soil Investigation Foxtrot I Pier Facility Improvement / Repair dated July 13, 1995, pp 9 with Plates 1-6.

- Cash & Associates Report dated May 12, 2004, pp 20

- Kleinfelder Report dated July, 14, 2004.

- Marine Oil Terminal Engineering and Maintenance Standards (MOTEMS), California State Lands Commission.

Sincerely,

BEN C. GERWICK, INC.                                    BEN C. GERWICK, INC.

*[signature: W W Hayes]*                                *[signature: Ted W. Trenkwalder]*

Webb W. Hayes, S.E.                                     Ted W. Trenkwalder, S.E.
Senior Engineer                                        Senior Engineer

P:\2004\2004-354-export\reports\Pier F-1 FINAL Report 7-14-04(Rev).doc



# Fox Trot Pier Damage Evaluation Report

**Prepared by:**

GK2 inc.

Julale Center Suite 230 · P.O. Box 3207, Hagåtña, Guam 96932
Tel. (671) 477-9224 · Fax: (671) 477-3456 · E-Mail: gk2@gk2guam.com

EXHIBIT B

## SYNOPSIS OF CONCLUSIONS

- The intent of the bid package for Foxtrot Pier was to allow temporary use (with berthing forces limited to 40%of the original design capacity) of Foxtrot Pier until permanent repairs or replacement could be implemented. As such, seismic design was not included in the preparation of the bid document package prepared by EMPSCO, and therefore was not a requirement of the BCC alternative design.

- The Black Construction Corp. (BCC) alternative design met the intent of the Port Authority of Guam (PAG) bid package, and met all the berthing and mooring design criteria specified by the PAG and the PAG consultants. These criteria did not include seismic design.

- The epoxy bolts used for the BCC alternative design were approved by the PAG, and the installation of the bolts was inspected and approved by the PAG Construction Manager.

- The damages to berthing dolphins observed after October 2001 were the result of berthing forces well in excess of the berthing force limitations set by the PAG. These damages were not the result of the October 2001 Guam Earthquake.

**************************************************

For Dolphin C, Ocel observed *The connection of the four transverse batter piles near each end show evidence that the dolphin has moved 16 inches toward the berth.* In addition, Ocel observed with respect to Dolphin D, *There is evidence of about 290 mm (11.5 inches) movement towards the berth and 100 mm (4 inch) longitudinally.* Ocel apparently did not observe any significant movements **away** from the berth, only **toward** the berth.

Since an earthquake would result in movements both toward the berth and away from the berth, the fact that Dolphin C and Dolphin D apparently experienced large lateral movement toward the berth, but not away from the berth casts, serious doubt on the validity of any conclusion that the observed movement was the result of an earthquake, Such evidence strongly suggests these movements were the result of large berthing forces, not earthquake forces.

**To summarize, all evidence points to the damages to the berthing dolphins being due to excessive berthing forces, and none of the evidence points to the damage being due to an earthquake.** As a result, I conclude the observed damages to Dolphins C and D, as addressed in various reports following the 2001 earthquake, were not the result of the earthquake; they were the result of berthing forces;

    **a)** That exceeded the fender capacity.

    **b)** That exceeded the maximum allowable impact forces stipulated by EMPSCO.

    **c)** That exceeded the impact loads established by the PAG.

    **d)** That exceeded the seismic forces produced by the 2001 earthquake.

# PROMARINE TECHNOLOGY

P.O. BOX 11021
TAMUNING, GUAM 96931
Tel: (671)789-7001  Fax: (671)789-7002
www.promarinetech.com

July 15, 2004

**EXPERT WITNESS REPORT**
**DAMAGE ASSESMENT**
**FOXTROT "F-1" PIER, PORT AUTHORITY OF GUAM**

**Prepared for:**
Klemm, Blair, Sterling & Johnson
Hagåtña, Guam

**Re:** S.J. Gargrave Syndicate at Lloyds vs. Black Construction Corporation
U.S. District Court Case No. CV03-00009

## I. Qualifications

I, Kenneth W. Collard (Jr.), am the President and General Manager of ProMarine Technology (PMT), a marine construction and ship repair contractor licensed both on Guam and the Commonwealth of the Northern Mariana Islands. Besides the portion of the work that deals with marine construction, PMT also works directly under the U.S. Navy making underwater repairs and inspections and performing underwater maintenance on their large surface-support vessels, including, for example, the *USS Frank Cable*, and the Navy's Los Angeles class submarines. PMT also performs ship repairs and maintenance to local civilian shipping firms such as Madson and CSX. PMT has been certified with the *American Bureau of Shipping* for over 7 years.

Prior to establishing ProMarine Technology in 1994, I was a co-owner, the contractor license holder (both A and B) and the general manager of General Construction Inc., a Guam-based marine contractor constructing, repairing and maintaining seawalls, wharfs and piers, pile driving, and providing specialized commercial diving services.

Prior to establishing General Construction, Inc. in 1991, I was the general manager for Tridon Corporation, a Guam-based marine contractor who brought me (via contract) to Guam from Seattle, Washington in 1988, to co-supervise their underwater subcontract portion of the construction of the U.S. Navy's Kilo Wharf, a 550-foot concrete wharf at the mouth of Apra Harbor, Guam.

Prior to my services with Tridon Corporation, I was a mechanical engineer and project superintendent beginning in 1975 for Packard Construction, Inc., a Washington-based heavy mechanical construction company specializing in the construction of both water and sewage treatment plants, water intake pump stations, sewage booster pump stations and water distribution force mains in the Pacific Northwest region. During my services with Packard Construction, Inc., I supervised numerous emergency restoration projects for the U.S. Army Corps of Engineers immediately following the Mt. St. Helens (Washington) volcanic eruption of May 1980. These

to the (alleged) incorrect installation method by Black Construction Corporation (BCC) back in 1996 and 1997.

My repair estimate is based on 2001-2002 costs for repairs to reinstall the stainless-steel studs into the 100 pile flange-to-concrete connections as per the criteria laid out on Winzler & Kelly's (W&K) VE-1 drawing titled *"Proposed Pile Repair Details"* (Repairs to Dolphins A, B, C & D) dated 04/04/96 but utilizing the materials of BCC's Submittal 18a, *Epoxy Bolts for Steel Plate Anchor* (dated May 20, 1996), an approved equal by both EMPSCO-Engineering Consultants and N.C. Macario & Associates, Inc. June 13, 1996 and June 17, 1996 respectively.

Referring to Note #2 of W&K's VE-1 drawing, it should be noted that according to a number of suppliers, the Red Head line from Phillips Drill Company was bought out 15 years ago. The "Redi Chem" glass capsule was incorporated into ITW's (EPCON) Ramset/Red Head line, which is not compatible for an overhead application and therefore not recommended by the manufacturer.

Also, for the purposes of my estimate, I have assumed that the overall condition of the five dolphins intended for repair will be consistent with the condition of the dolphins and pilings present at the time when BCC made the initial pile flange-to-concrete connections back in 1996 and 1997 and generally, the same overall condition of the dolphins just prior to the October 2001 earthquake since it is apparently the Plaintiff's position that the dolphins were in good condition prior to the earthquake.

The $124,400.00 proposal (Attachment D) is comprised of $10,010.00 for repair materials, $66,159.00 for labor including 21.78% for applicable taxes and insurance, and $27,675.00 for equipment. I have taken that sub-total and added 15% for overhead and profit and then added 4.17% to cover Guam's Gross Receipts Tax.

## IIIb. Vessel Berthing Damage

During F-1's repairs and the construction of the new (replacement) "H" breasting dolphin in 1996 and 1997, PAG engineering informed BCC that the original dolphin "H" was struck by a vessel during its berthing sequence with enough force to break it loose from the 14 original pilings with the dolphin eventually ending upside down on the harbor bottom with portions of the broken piles extending upwards posing a possible navigational hazard to deep-drafted vessels berthing (up) to the F-1 Pier.

At PAG's direction, BCC had PMT survey the dolphin's broken piles and take depth readings of all the piling tops. From the results of our survey, both Shell and PAG engineering concluded that there were only two of the broken piles that extended (up) shallow enough to pose a hazard. PAG directed BCC to initiate a "change order" for their removal. On March 7, 1997, PMT cut the two piles approximately five feet up from the dolphin's base by means of an underwater cutting torch.

Between December 26th and December 30th, 1996, the sea state in Apra Harbor was very rough due to Typhoon *Fern* passing clockwise to the south, west and north (in that order) of Guam. On December 27th, the vessel *MV Yuyo Breeze* was being moored up against F-1 Pier. During the mooring sequence, I personally observed the vessel come in solid, non-giving contact with only Dolphin G's fender on the up swing of a large (water) surface swell. During this "up-swing", and plus being in solid contact with the flat fender, the upward, rising force of the vessel caused the

3

concrete dolphin to lift and separate from approximately six (of the 14 total) of the outboard pile flanged connections recently completed by BCC.

Typically for any vessel berthing at F-1 during the course of BCC's 1996-1997 F-1 Pier repair project, all construction was stopped and put on stand-by until an all clear to resume construction was given by Shell. It was during this stand-by time for this particular berthing that myself and several of my crewmembers witnessed the above incident.

As indicated in the above personally witnessed vessel berthing damage incident, the lift of the dolphin and the subsequent separation of the pile flange-to-concrete connection caused numerous epoxied bolts to be pulled out of the concrete and in some instances, pulled out the epoxied bolt with a portion of the existing concrete attached. There is sufficient evidence to satisfy me that vessel berthing damage has continued over the years due to the existing condition of F-1's three (of 4) breasting dolphins. There are also instances where the force from an impact has been sufficient enough to either pull out and bend the flange bolts or shear the bolts entirely. In my opinion, this type of damage is not consistent with "earthquake damage". Several photos taken during the May 27th, 2004 on-site survey of the dolphins illustrate this particular process and are attached to this report as **Attachment E**.

There is also damage to several "battered" piles on both Dolphin C and D consistent with a lateral, forceful impact or impacts by a berthing vessel causing stress and possible deflection to the piles. The battered piles have been first forced back, away from the vessel, on the initial impact and then, in some instances, remained in its pushed-back position. In other locations, the pile has sprung back but not to its original position leaving significant angular gaps and pulled out or sheared bolts in most instances. Again, this type of damage is not consistent with "earthquake damage". Examples of this process are attached to this report as **Attachment F**.

In addition to the damage sustained to the breasting dolphin's flanged connections having been caused, in my opinion, by berthing vessels, the single flat-faced fender attached to each breasting dolphin installed by BCC in 1996 and 1997 are severely damaged and none are capable of performing as originally designed. Dolphins C and D each have a 8-foot wide by 12-foot high flat-faced fender and dolphins G and H each have a 6-foot wide by 10-foot high flat-faced fender. It is impossible for these damaged fenders to absorb the impact from a berthing vessel as originally intended placing more lateral force on the dolphins, specifically the flanged connections. Because the fenders are damaged and not performing as intended, vessels have repeatedly struck the concrete dolphins chipping the concrete corners and in some places, the bottom portion of the concrete dolphins have spalled due to such impacts. Photos of these fenders are attached to this report as **Attachment G**.

The damage observed at F-1 Pier is consistent with documented F-1 damage reports which include:
- Berthing damage (by vessel impact) on May 17, 2001 to Dolphin D, it's catwalks and fender.
- Berthing damage (by vessel impact) on Feb. 9, 1997 to Dolphin C's new fender recently installed by BCC.
- Berthing damage (by vessel impact) on Dec. 27, 1996 to Dolphin G's outer 6 (of 14) pile flange-to-concrete connections recently completed by BCC.
- The complete (un-salvageable) destruction of the original Dolphin H (by impact) by a berthing vessel the early part of 1994. The vessel was a large tanker being positioned by 3 tugs piloted by Captain Roldan from Guam Tug, Inc. as per Captain Stan Hall who witnessed the incident.

# IN THE DISTRICT COURT OF GUAM

LESLIE WILTON,

          Plaintiff,

    vs.

BLACK CONSTRUCTION CORPORATION
and WINZLER & KELLY CONSULTING
ENGINEERS,

         Defendants.

) Civil Case No. CV03-00009
)
)
) 🗋 **COPY**
)
)
)
)
)
)

## DEPOSITION OF JOSELITO GUTIERREZ

Taken on Behalf of the Plaintiff

BE IT REMEMBERED That pursuant to the Federal
Rules of Civil Procedure, the deposition of JOSELITO
GUTIERREZ was taken before Cecille A. Flores, a Certified
Shorthand Reporter, on Friday, the 17th day of October 2003,
in the law offices of Carlsmith Ball, Suite 401, Bank of
Hawaii Building, 134 West Soledad Avenue, Hagatna, Guam.

Flores Court Reporting
Suite 2E, Jugo Building
618, Route 8
Barrigada, Guam 96913
Tel: (671) 734-1041 * Fax: (671) 734-1045

28954

**EXHIBIT D**

1    A    I do not know about their capacities.

2    Q    Did they look like they were in pretty bad shape?

3    A    I cannot -- I'm not in the capacity to answer that

4  if they are in bad shape or not.

5    Q    Did they look dilapidated?  Falling apart?

6    A    Yeah, they looked used, but as far as capacity, I

7  cannot answer that.

8    Q    The Candac report recommended concrete coring to

9  assess the degree of carbonation.  Are you aware of anybody

10  ever doing concrete coring to assess this?

11    A    No.

12    Q    Are you aware of the follow-up report in 1995 that

13  referred to the Candac report and said that since that time

14  the dolphins had deteriorated by another 20 percent?

15    A    No, I am not aware.

16    Q    Is part of your job to review the plans and

17  specifications to make sure that people are constructing the

18  project in conformity with those plans?

19    A    Yes.

20    Q    Had you also seen the previous plans and

21  specifications that EMPSCO had put together on how to repair

22  the dolphins?

23    A    No.

24    Q    During the construction project, there were a lot of

25  ships that banged into the dolphins on a lot of occasions,

Joselito Gutierrez: October 17, 2003

1   weren't there?

2       A    I believe so.  I'm not sure exactly when.

3       Q    Were you aware about the Yuyu Breeze docking there

4   on December 27, 1996 and putting strain on the epoxy anchor

5   bolts?

6       A    I cannot remember.

7       Q    Do you remember the Gopher State Ship smacking into

8   the corner of Dolphin H and creating damage?

9       A    I cannot remember.  It might have happened, but it

10  was way back.

11      Q    Do you remember in January of '96 a vessel called

12  the Kosian smacking into Dolphin H?

13      A    Like I said, I cannot remember.  It might have

14  happened.  I'm not sure.

15      Q    How about December 31, '96?  Do you remember a ship

16  named Taining hitting form work and scaffolding on Dolphin H?

17      A    Again, I cannot remember.

18      Q    Do you remember when the SKS Trent hit Dolphin C and

19  created some damage during construction?

20      A    No, I don't remember.

21      Q    How about the ship Great Promise?  Do you recall it

22  in December of '96 hitting Dolphin H and Dolphin G?

23      A    No.

24      Q    Do you recall as a result of some of these ships

25  hitting dolphins that the anchor bolts were loosened?

Joselito Gutierrez: October 17, 2003

1    A    No.

2    Q    You don't recall that?

3    A    I don't recall.

4    Q    You don't recall Black having to repair the anchor

5    bolt connections because of ship mooring problems?

6    A    Like I said, I did not recall. We may have, but I

7    cannot remember at this time.

8    Q    If you had, how would you repair it? Any different

9    from your original installation?

10   A    Probably not.

11   Q    It had to be a little different, wouldn't it? You'd

12   have to pull the bolt out and you'd have to somehow get rid

13   of the epoxy that's in the hole and put in some new epoxy,

14   wouldn't you?

15   A    I like I said, I'm not sure. If the bolt had fall

16   down, we probably would have just cleaned the hole and

17   reattach the bolt.

18   Q    How about during construction? Were there fenders

19   put on the dolphins?

20   A    Yes.

21   Q    Were these just big, rubber tires like they have out

22   there today or were they fancy, broad-based, air-filled,

23   black fenders?

24   A    They're not just tire, we ordered them. They're --

25   these are brand new fenders. It's part of the job.

Joselito Gutierrez: October 17, 2003

1    Q    So it's part of the job that you put brand new

2  fenders on all the dolphins?

3    A    Not all the dolphins, but the main front where the

4  -- the resting dolphins.

5    Q    Did you do that in the beginning of the project or

6  in the end of the project?

7    A    Towards the end of the project.

8    Q    There were a lot of ships docking during the

9  project?

10   A    Yes.

11   Q    Without the benefit of having fenders to absorb

12 their shock?

13   A    I believe they do have fenders there.  Their

14 existing tire fenders that they have there.

15   Q    It's just a big 'ole tractor tire?

16   A    Yes.

17   Q    Rod Bismonte, who is he?

18   A    He's the project engineer for this job.

19   Q    Is he a structural engineer?

20   A    No.

21   Q    Does he have an engineering degree?

22   A    I believe so.

23   Q    From the Philippines?

24   A    Yes.

25   Q    Does he have an engineering degree from any United

Joselito Gutierrez: October 17, 2003

1          IN THE DISTRICT COURT OF GUAM

2

3    S.J. GARGRAVE SYNDICATE          CIVIL CASE NO. CV03-00009
     AT LLOYDS,
4
                        Plaintiff,
5
         vs.
6
     BLACK CONSTRUCTION
7    CORPORATION, WINZLER & KELLY,
     and ENGINEERING MANAGEMENT &
8    PLANNING SERVICES CORPORATION,

9                       Defendants.

10   _____

11         DEPOSITION OF FRANK EDGERTON DENNIS

12

13         Taken on behalf of Plaintiff,

14      at the Law Offices of Carlsmith Ball LLP,

15          2200 American Savings Tower,

16      1001 Bishop Street, Honolulu, Hawaii,

17            commencing at 9:35 a.m.,

18   on Wednesday, July 21st, 2004, pursuant to Notice.

19

20

21

22   BEFORE:          HEDY COLEMAN,  CSR  NO. 116
                      Notary Public, State of Hawaii
23                    Certified Shorthand Reporter

24

25

**EXHIBIT E**

1    that you noted in the pile, which is also shown in Exhibit

2    15, is to either fore or aft of the longitudinal axis of a

3    ship that would be moored at that breasting dolphin?

4         A    Yes.

5         MR. BOOTH:  I think that's all the questions I have for

6    you at the moment.

7         MR. STERLING:  I just have a couple.  And with the

8    court reporter's permission, I'll ask them from over here.

9                     FURTHER EXAMINATION

10   BY MR. STERLING:

11        Q    You mentioned in some of your reports that you had

12   seen photographs of bolts that were sheered off.  Do you

13   think bolts being sheered off in an earthquake is consistent

14   with soft epoxy?

15        A    No.

16        Q    You said that based on your discussions with Ben

17   Casey and your understanding, this repair that you worked on

18   of these 26 pilings was not a "temporary repair," correct?

19        A    It was my understanding that it was part of a

20   complete repair.

21        Q    Did either Peter MacLeod or Ben Casey tell you why

22   they consistently call it a temporary repair?  That's not my

23   term.  Did they ever tell you --

24        A    No.

25        Q    -- why they call it that?

1      A    No.

2      Q    Now, if sheared off bolts is not consistent with

3 soft epoxy, what do you think it's consistent with?

4      A    To shear a bolt, you'd probably have to hold it

5 properly in both parts.  If there's any movement in one

6 part, it would tend to deform the bolt rather than cut it.

7 If the bolt sheared, the epoxy is probably hard.

8      Q    Would a berthing vessel striking the side of a

9 dolphin at what I'll call an excessive speed, creating an

10 excessive load, would that type of event in your view shear

11 a bolt such as we've -- as you have documented existed at

12 Fox Trot?

13      A    It could.

14      Q    What else could do it, if you know?

15      A    In this situation?  Only an earthquake.

16      Q    But for an earthquake to shear off a bolt like

17 that, if the epoxy had hardened and cured properly, would it

18 have to have been an earthquake that exceeded the design

19 load?

20      A    No.

21      Q    And why is that?

22      A    In any event less than a design load, you -- you

23 can get damage, but not necessarily fatal damage, if you

24 like.

25      Q    This is maybe a stupid lawyer question being asked

1    A    No, I didn't.

2    Q    So I think you already -- in response to the

3    question from Mr. O'Connor, you've already testified about

4    what you did tell them; that it marginally could resist the

5    forces anticipated, correct?

6    A    In my opinion, it is what's marginal joint from

7    the design points of view.

8    Q    And that is because of the what's called a

9    constructability issue with epoxy bolts, and you have to use

10   a large factor of safety, is that correct?

11   A    Correct.

12   MR. STERLING:  Thank you.

13   MR. O'CONNOR:  I got a question.

                        FURTHER EXAMINATION

15   BY MR. O'CONNOR:

16   Q    Let's go back to dolphin G.  Assume that a ship,

17   if it approached dolphin G, would approach it from the

18   south.  Okay?

19   A    From the south?

20   Q    From the south.  It will -- and let's also presume

21   that we have a berthing -- a batter pile that is slanted

22   from the sea floor, coming up at an angle from outside of

23   the dolphin, up under the dolphin, coming from the east.

24        And let's assume that a ship smacks into

25   the dolphin on the south side, hard enough to knock

```
 1    the pile connection loose from the batter pile,

 2    boom, like this.

 3         A    Uh-huh.

 4         Q    The batter pile has tension on it, forcing it,

 5    going from east to west, correct?

 6         A    Where did that tension come from?

 7         Q    Because the batter pile is slanted?

 8         A    It does not not mean it's got tension in it.

 9         Q    Well, it has some -- it has gravitational force.

10         A    If the slip ship is going that way?  If the ship

11    is going that way?

12         Q    Yes, ship is going --

13         A    Before --

14         Q    -- north to south.

15         A    Before the ship hits that block of concrete, all

16    the piles have got compression in them.

17         Q    Right.  But this particular pile, if

18    disconnected -- for instance, if you were to go to this pile

19    and unscrew the bolts, it would have a tendency to fall from

20    east to west, wouldn't it?

21         A    That would be the tendency, yes.

22         Q    So if we had a ship hitting the dolphin, coming

23    north to south, and it disconnected the batter pile which is

24    slanted east to west --

25         A    Uh-huh.
```

1    Q    -- loosening it from underneath the dolphin, it

2    would have a natural tendency after it was loosened to fall

3    east to west, wouldn't it?

4    A    Yes.

5    Q    Perpendicular to the direction from which the ship

6    hit the dolphin?

7    A    Yes.

8    Q    Okay.  Let me ask you one more question about the

9    temporary repair issue that Mr. Sterling touched on.

10        You said that you looked at the EMPSCO plans that

11   Winzler & Kelly modified.  Did you ever read the EMPSCO

12   engineering documentation report?

13   A    The only report I had from EMPSCO was their

14   calculation file.

15   Q    Maybe that's the same thing.  I'm not sure whether

16   we're both thinking about the same thing.  I'm thinking

17   about something actually had the title engineering

18   documentation report and what it had contained in it -- see

19   if this is refreshes your memory.

20        What it had in it was a discussion that

21   the need for repairs was urgent; that the urgency of

22   effecting repairs precluded them from doing a

23   detailed structural analysis; that they were not

24   going to evaluate dolphins A and B; that the repairs

25   would not address seismic forces; and that the

THOMAS C. STERLING
KLEMM, BLAIR, STERLING & JOHNSON, P.C.
1008 Pacific News Building
238 Archbishop F.C. Flores Street
Hagåtña , Guam 96910
Telephone: (671) 477-7857
Facsimile: (671) 472-4290
*Attorneys for Defendant Black Construction Corporation*

THOMAS M. TARPLEY, JR.
TARPLEY & MORONI, LLP
A Law Firm including a Professional Corporation
Bank of Hawaii Building
134 West Soledad Avenue, Suite 402
Hagåtña, Guam 96910
Telephone: (671) 472-1539
Facsimile: (671) 472-4526
*Attorneys for Defendant Engineering, Management*
*& Planning Services Corporation*

ROBERT J. O'CONNOR
O'CONNOR BERMAN DOTTS & BANES
Second Floor, Nauru Building
P.O. Box 501969
Saipan, MP 96950-1969
Telephone: (670) 234-5684
Facsimile: (670) 234-5683
*Attorneys for Defendant Winzler & Kelly Consulting Engineers*

## IN THE DISTRICT COURT OF GUAM

| | | |
|---|---|---|
| S.J. GARGRAVE SYNDICATE AT LLOYDS, | ) ) ) | CIVIL CASE NO. CV03-00009 |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | |
| BLACK CONSTRUCTION CORPORATION and WINZLER & KELLY CONSULTING ENGINEERS and ENGINEERING, MANAGEMENT & PLANNING SERVICES CORPORATION, | ) ) ) ) ) ) ) | DEFENDANTS' JOINT BRIEF RE DIVERSITY AND ADMIRALTY JURISDICTION |
| Defendants. | ) ) | |

//

01-28-05
2:00pm

burden of showing complete diversity falls on the party claiming diversity jurisdiction. See, e.g., <u>McNutt v. General Motors Acceptance Corp.</u>, 298 U.S. 178, 189 (1936). The Syndicate has not met its burden, and its complaint should therefore be dismissed.

## THERE IS NO ADMIRALTY JURISDICTION OVER THE CONTRACT OR TORT CLAIMS IN THIS CASE

Plaintiff, in an effort to overcome the precedential value of <u>Royal Ins. Co. of America v. Pier 39 Ltd.</u>, 738 F.2d 1035, 1037-1038 (9th Cir. 1984), extracts language from various cases to fashion an argument that <u>Royal Insurance</u> has been overruled by implication and would be decided differently today. Gargrave's argument will not survive close scrutiny since it conveniently ignores the facts and holdings of the cited cases.

Gargrave relies heavily upon the Supreme Court's Decision in <u>Exxon Corp. v. Central Gulf Line</u>, 500 U.S. 603, 114 L.Ed.2d 649, 111 S.Ct. 2071 (1991), for the proposition that the "trend in modern admiralty case law" is to expand the definition of maritime contracts suggesting that this new expansive definition will encompass the dock repair contract at issue in this case. The limited issue presented in <u>Exxon Corp.</u> was whether admiralty jurisdiction should properly extend to claims arising under agency contracts. Moreover, the claim at issue in <u>Exxon Corp.</u> did not involve a dock repair contract but, rather, unpaid bills for fuel furnished to a vessel which was clearly a maritime

- 12 -

damaged a tunnel under the river causing water from the river to travel down the tunnel flooding buildings adjoining the river. Gargrave maintains at p.14 of its brief that the Supreme Court in Grubart held "there is admiralty jurisdiction over tort cases involving repair work to dolphins." The case held no such thing.

The Court in Grubart pointed out that, prior to the existence of the Extension Act, admiralty courts lacked jurisdiction over damage resulting from a ship's collision with a pier "for admiralty law treated the pier as an extension of the land." 513 U.S. at 532. The Court then noted that the first prong of the tort jurisdiction test under the Extension Act was whether the "tort occurred on navigable waters or whether injury suffered on land was caused by a vessel on navigable water." The second prong requires a "connection with maritime activity." 513 U.S. at 534. The Court then went on to analyze whether jurisdiction existed under the Extension Act and concluded that it did since the plaintiffs' flood damage on land had been caused by a vessel on navigable waters engaged in traditional maritime activities. The Court did not hold, as Gargrave asserts, that admiralty jurisdiction extends to any tort claim involving repair work on dolphins. Most importantly, for purposes of determining whether there is jurisdiction over the tort claim herein, it is absolutely clear that the injury here

- 14 -

did not occur on navigable waters nor was it caused by a vessel on navigable water. Thus, Gargrave's tort claim clearly fails to satisfy the first prong of the jurisdictional test.

In footnote 18 of its brief, Gargrave contends that there is a conflict in this Circuit concerning the Royal Insurance holding since another panel in Bohemia Inc. v. The Home Ins. Co., 725 F.2d 506, 510 (9th Cir. 1984), "reached the opposite conclusion". The holding in Bohemia, *supra*, was simply that:

> "[S]tate law will control the interpretation of a marine insurance policy only in the absence of federal statute, a judicially fashioned admiralty rule, or a need for uniformity in admiralty practice." 725 F.2d. at 510.

The Court in Bohemia did not, as Gargrave suggests, even address the issue of whether admiralty jurisdiction extends to contracts pertaining to docks.[5]

Gargrave refers to a number of cases cited in Royal Insurance asserting that in "cases like the instant suit involving damage to maritime property" Royal Insurance indicates that there would be admiralty jurisdiction. Royal Insurance says no such thing. The cases referred to were cited in Royal Insurance (738 F.2d at 1038) as examples of some courts assuming admiralty jurisdiction in connection with contracts in a situation where traditional maritime torts have occurred.

---

[5]    In Bohemia, a barge and tug collided with a small boat on a river in Oregon resulting in a drowning and personal injuries.

Berwind-White Coal Mining Co. v. City of New York, 135 F.2d 443 (2nd Cir. 1943), [submerged pilings in navigable waters sunk a barge]; Eastern Mass. St. Railway Co. v. Transmarine Corp., 42 F.2d 58 (1st Cir. 1930), [vessel pulled away from a dock and damaged another vessel]; D.M. Picton & Co. v. Eastes, 160 F.2d 189 (5th Cir. 1947), [motorboat struck submerged pilings in navigable waters and sunk]. No collision between vessels or damage to a vessel in navigable waters occurred in the instant case. No vessel is even involved in this case.

Gargrave argues that, because the defendants contend, as a defense, that the dock damage in this case occurred due to berthing incidents rather than faulty design or construction, admiralty jurisdiction exists pursuant to the Extension Act. Gargrave cites Sulphur Terminals Co. v. Pelican Marine Carriers Inc., 281 F.Supp. 570, 575 (E.D.La. 1968), for the suggestion that admiralty jurisdiction exists when there is an allegation that a dock has insufficient strength to support docking pressures. This argument is simply wrong. 46 U.S.C. App. §740 creates admiralty jurisdiction in a situation where a "vessel on navigable water" causes damage on land. Gargrave does not allege, nor can it if it intends to continue pursuing these defendants, that the damage to F1 pier was caused by a vessel striking it, which was the type of claim at issue in Sulphur Terminals, *supra*. Sulphur Terminals involved an action by a

- 16 -

Insurance. Thus, the Supreme Court decision in Sisson, through Justice Scalia's concurrence, directly supports the continued vitality of the Ninth Circuit's decision in Royal Insurance.

Royal Insurance continues to be cited with approval in this Circuit without any indication that it has been overruled in whole or in part by implication or otherwise. See, for example, La Reunion Francaise SA v. Barnes, 247 F.3d 1022, 1024 (9th Cir. 2001); Kathriner v. Unisea Inc., 975 F.2d 657, 663 (9th Cir. 1992).

### CONCLUSION RE ADMIRALTY JURISDICTION

In conclusion, there is no admiralty jurisdiction in connection with the contract claims alleged in this action since the contract at issue pertains to the repair of a dock and is not directly related to any specific vessel. Royal Insurance, supra. Moreover, there is no jurisdiction in connection with the tort claims alleged in this action since the injury occurred on land and was not caused by a vessel on navigable waters.[6]

//

//

//

//

---

[6] Moreover, inasmuch as the defendants have a motion pending for dismissal of all tort claims based upon the economic loss rule, the purported tort underpinnings of admiralty jurisdiction may well evaporate upon the Court's ruling on that motion.

- 18 -

# FILED

DISTRICT COURT OF GUAM

JUN - 3 2005

MARY L.M. MORAN
CLERK OF COURT

IN THE DISTRICT COURT OF GUAM

TERRITORY OF GUAM

* * *

| | |
|---|---|
| S.J. GARGRAVE SYNDICATE AT LLOYDS, ) | |
| Plaintiff, ) | |
| vs. ) | CIVIL CASE |
| ) | NO. CV03-00009 |
| BLACK CONSTRUCTION CORPORATION, ) | |
| WINZLER & KELLY CONSULTING ) | |
| ENGINEERS, and ENGINEERING ) | |
| MANAGEMENT & PLANNING SERVICES ) | |
| CORPORATION, ) | |
| Defendants. ) | |

TRANSCRIPT OF PROCEEDINGS

BEFORE

THE HONORABLE A. WALLACE TASHIMA
Designated Judge

**HEARING ON MOTIONS**

**FRIDAY, DECEMBER 3, 2004**
* * *

Wanda M. Miles
Official Court Reporter
District Court of Guam

EXHIBIT G

1   instead underlined it, emphasized it, improved on it.

2        "We find the crucial elements of <u>Ryan</u> to be

3   as follows: A shipowner, relying on the expertise of

4   another party, the contractor, enters into a contract

5   whereby the contractor agrees to perform services

6   without supervision or control by the shipowner."

7        There's no shipowner here, it's the Port who

8   owns the dolphin. And in their brief that's where they

9   ended. They didn't give the court the two crucial

10   elements, which are, number two, the improper, unsafe

11   or incompetent execution of such services which

12   foreseeably rendered the vessel unseaworthy, or bring

13   into play a pre-existing unseaworthy condition.

14   Dolphins can't be unseaworthy, and they're not vessels.

15   And finally, the third one, the ship's owner would

16   thereby be exposed to the liability regardless of

17   fault.

18        <u>Fairmont</u> did not erode the <u>Ryan</u> case at all;

19   it strengthened it and emphasized it and it pointed out

20   the importance of seaworthiness and strict liability.

21   In our case, we don't have a ship, we don't have a

22   shipowner, and the pier, the dolphins could not be

23   seaworthy or unseaworthy.

24        Thank you, Your Honor.

25        THE COURT: Okay, thank you.