CARLSMITH BALL LLP

DAVID LEDGER
STEVEN C. SMITH
ELYZE McDONALD
134 West Soledad Avenue
Bank of Hawaii Bldg., Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Tel No. (671) 472-6813

COZEN O'CONNOR

FORREST BOOTH
425 California Street, Suite 2400
San Francisco, CA 94104-2215
Tel No. (415) 617-6100

Attorneys for Plaintiff
S.J. Gargrave Syndicate at Lloyds

**FILED**
DISTRICT COURT OF GUAM

OCT 25 2005

MARY L.M. MORAN
CLERK OF COURT

IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| S.J. GARGRAVE SYNDICATE AT LLOYDS,<br><br>Plaintiff,<br><br>vs.<br><br>BLACK CONSTRUCTION CORPORATION, WINZLER & KELLY, and ENGINEERING MANAGEMENT & PLANNING SERVICES CORPORATION,<br><br>Defendants. | CIVIL CASE NO. CV03-00009<br><br>**PLAINTIFF'S MOTION IN LIMINE TO PRECLUDE TESTIMONY BY KENNETH W. COLLARD, JR., CONCERNING REPAIRS WHICH ARE IMPOSSIBLE; DECLARATION OF SERVICE** |

Plaintiff S.J. GARGRAVES SYNDICATE AT LLOYDS hereby moves the Court

*in limine* for an order precluding Defendant Black Construction Corporation ("Black") from

offering speculative testimony from one of its designated experts, Kenneth W. Collard, Jr., or

any other witness, concerning a proposed method of repairing the Port Authority of Guam's F-1 Pier, which method was and is physically impossible.

## I. EVIDENCE WHICH IS IRRELEVANT OR SPECULATIVE IS IMPERMISSIBLE AT TRIAL

This Court has the authority, and indeed the obligation, to exclude evidence at trial which is irrelevant, speculative or confusing because erroneous. F.R.E. 402, 403. Mr. Collard, one of the experts designated by Defendant Black, submitted an expert report, the major portions of which are attached hereto as Exhibit A. In his report, Mr. Collard, a contractor who is not a licensed engineer, states that his company could have repaired the dolphins of the F-1 Pier for the ridiculously low sum of $124,400,[1] even though Plaintiff paid over $1.9 million to have full repairs of the earthquake damage competently performed.[2]

The reason Mr. Collard, a Monday morning quarterback, could make this ridiculously low (moot) offer is that doing the work in the manner he proposed would have been **physically impossible**. His report, Exhibit A hereto, states, at p. 3,

> My repair estimate is based on 2001-2002 costs for repairs to reinstall the stainless-steel studs into the 100 pile flange-to-concrete connections as per the criteria laid out on Winzler & Kelly's (W&K) VE-1 drawing .... (Emphasis in original).

However, he immediately follows this statement with a caveat which makes his "offer" meaningless:

> Also, for the purposes of my estimate, I have assumed that the overall condition of the five dolphins intended for repair will be consistent with the condition of the dolphins and pilings present at the time when BCC [Black] made the initial pile flange-to-concrete connections back in 1996 and 1997 and generally, the same overall

---

[1] Exhibit A hereto, p. 3; Attachment D thereto.

[2] His "offer" is moot in any case, because the work has already been done by another contractor, and paid for by Plaintiff.

condition of the dolphins just prior to the October 2001 earthquake ....

*Id.*

In essence, Mr. Collard says that if the holes originally drilled by Black in the concrete caps were clean and undamaged, and still lined up perfectly with the holes in the steel pile flanges, he could reinstall new bolts and epoxy for a low sum.

Of course, Mr. Collard's assertion is ridiculous. As noted above, Mr. Collard assumes that the dolphins and piles are in the "same overall condition" as they were **prior** to the 2001 earthquake. This is nonsense; the repairs which Plaintiff paid for were needed precisely **because** of the 2001 earthquake, which sheared off most of the flange bolts, moved the concrete caps both up and down and sideways, and drove some piles deeper into the seabed.

Mr. Collard's own report clearly shows that the condition which he placed on his "offer" in fact did not exist after the 2001 earthquake. In describing the condition of the "battered" piles (piles installed at a 45° angle) on both dolphins C and D, he states that

> The battered piles have been first forced back ... and then, in some instances, remained in its [sic] pushed-back position. In other locations, the pile has sprung back but not to its original position ...

Collard report, p. 4.

If some piles are in a "pushed-back position", and the rest are otherwise not in their original positions, how does Mr. Collard propose to simply reinsert new bolts into the existing (but now mis-aligned) holes? Obviously, this could not be done.

After the 2001 earthquake, many of the piles came nowhere near to lining up with their original location, as is shown by some of the photographs attached to Mr. Collard's **own report**. *See* his photographs of breasting dolphin G, photographs G-12, G-14, and C-13. Better photographs of the misaligned piles after the 2001 earthquake, taken by counsel for Plaintiff

herein, are attached as Exhibit B hereto. Some have been offset by almost two feet from the original position which Mr. Collard assumes they are still in!

A document prepared and submitted by Mr. Collard with his report demonstrates the absurdity of his assumption that the dolphins were in the "same overall condition" as they were prior to the October 2001 earthquake. Attachment C to Mr. Collard's report, his "Condition Found Report", relating to a survey he performed about one year post-earthquake on December 23, 2002, states that

> There has been extensive movement of the (repair) piles that were installed in 1996 and 1997. Many of the pile tops/flanges have become separated from the concrete completely or the studs/bolts are missing and/or loose. There are numerous locations where there is a significant gap between the pile tops/flanges and the concrete bottom.

Attachment C to Collard report, Exhibit A hereto, p. 1.

"Extensive movement" of the piles after the 2001 earthquake is hardly consistent with their being in the "same overall condition" as before it. Any testimony Mr. Collard could give at trial, in addition to being untruthful, would be very likely to confuse the jury, and therefore should be excluded. F.R.E. 403.

It would be wrong, and prejudicial to Plaintiff, to allow Mr. Collard to speculate about a type and method of repair which could not possibly have been used on the F-1 Pier. Since the piles no longer lined up, and yet were supporting hundreds of tons of concrete (the weight of the 4 to 6 foot thick pile caps above them), the entire cap would have had to be moved back into its original position, or the caps jacked up and the piles winched back into position with heavy equipment. Obviously, Mr. Collard in his report makes no reference to, and no

charge for, such service. The cost thereof would have been prohibitive.[3] It would be confusing and grossly unfair to the Plaintiff to have the jury hear this speculative testimony about an irrelevant and impossible repair technique. *See*, Cunningham v. Rendez-Vous, 669 F.2d 676 (4th Cir. 1983) (speculation by expert which is not supported by material facts was properly excluded).

Mr. Collard's testimony is irrelevant because it concerns a hypothetical repair method which has not been used, and could never be used. The conditions Mr. Collard placed on his "offer" he knew full well did not exist/could not be met. Accordingly, such prejudicial testimony should be excluded and held to be irrelevant under F.R.E. 402 and 403. *See*, Holbrook v. Lykes Bros., 80 F.3d 777 (3d Cir. 1996) (relevant evidence properly excluded under F.R.E. 403 when probative value outweighed by unfair prejudice or possible confusion).

## II. CONCLUSION

Plaintiff's motion *in limine* herein should be granted. Defendant Black should be precluded from offering testimony, through Mr. Collard or any other witness, concerning a physically impossible repair technique which has never been used on the F-1 Pier, and never

///

///

///

///

///

///

---

[3] This is why the repair technique utilized by the Port the second time was totally different from the first. It involved drilling down through the pile cap from above and installing one oversized post tensioning rod per pile, rather than eight small bolts.

could be. Such testimony would be speculation, is irrelevant, would mislead the jury,[4] and must be excluded.

DATED: Hagåtña, Guam, October 25, 2005.

CARLSMITH BALL LLP

DAVID LEDGER
STEVEN C. SMITH
ELYZE McDONALD
Attorneys for Plaintiff
S.J. Gargrave Syndicate at Lloyds

---

[4] F.R.E. 403.

# DECLARATION OF SERVICE

I, David Ledger, hereby declare under penalty of perjury of the laws of the United

States, that on October 25, 2005, I caused to be served, via hand delivery, a true and correct copy

of **PLAINTIFF'S MOTION IN LIMINE TO PRECLUDE TESTIMONY BY
KENNETH W. COLLARD, JR., CONCERNING REPAIRS WHICH ARE IMPOSSIBLE**

upon Defendants Counsel of record as follows:

> Robert J. O'Connor, Esq.
> Daniel J. Berman, Esq.
> Berman O'Connor Mann & Shklov
> Suite 503, Bank of Guam Building
> 111 Chalan Santo Papa
> Hagåtña, Guam 96910
>
> Thomas C. Sterling, Esq.
> Klemm Blair Sterling & Johnson, P.C.
> Suite 1008, Pacific News Building
> 238 Archbishop Flores Street
> Hagåtña, Guam 96910

and

> Thomas M. Tarpley, Esq.
> Law Offices of Tarpley & Moroni, LLP
> Suite 402, Bank of Hawaii Building
> 134 West Soledad Avenue
> Hagåtña, Guam 96910

Executed this 25th day of October, 2005 at Hagåtña, Guam.

DAVID LEDGER

SANFRAN1\34178\1 123206.000

# EXHIBIT
# "A"

# PROMARINE TECHNOLOGY
P.O. BOX 11021
TAMUNING, GUAM 96931
Tel: (671)789-7001   Fax: (671)789-7002
www.promarinetech.com

July 15, 2004

**EXPERT WITNESS REPORT**
**DAMAGE ASSESMENT**
**FOXTROT "F-1" PIER, PORT AUTHORITY OF GUAM**

**Prepared for:**
Klemm, Blair, Sterling & Johnson
Hagåtña, Guam

**Re:** S.J. Gargrave Syndicate at Lloyds vs. Black Construction Corporation
U.S. District Court Case No. CV03-00009

## I. Qualifications

I, Kenneth W. Collard (Jr.), am the President and General Manager of ProMarine Technology (PMT), a marine construction and ship repair contractor licensed both on Guam and the Commonwealth of the Northern Mariana Islands. Besides the portion of the work that deals with marine construction, PMT also works directly under the U.S. Navy making underwater repairs and inspections and performing underwater maintenance on their large surface-support vessels, including, for example, the *USS Frank Cable*, and the Navy's Los Angeles class submarines. PMT also performs ship repairs and maintenance to local civilian shipping firms such as Madson and CSX. PMT has been certified with the *American Bureau of Shipping* for over 7 years.

Prior to establishing ProMarine Technology in 1994, I was a co-owner, the contractor license holder (both A and B) and the general manager of General Construction Inc., a Guam-based marine contractor constructing, repairing and maintaining seawalls, wharfs and piers, pile driving, and providing specialized commercial diving services.

Prior to establishing General Construction, Inc. in 1991, I was the general manager for Tridon Corporation, a Guam-based marine contractor who brought me (via contract) to Guam from Seattle, Washington in 1988, to co-supervise their underwater subcontract portion of the construction of the U.S. Navy's Kilo Wharf, a 550-foot concrete wharf at the mouth of Apra Harbor, Guam.

Prior to my services with Tridon Corporation, I was a mechanical engineer and project superintendent beginning in 1975 for Packard Construction, Inc., a Washington-based heavy mechanical construction company specializing in the construction of both water and sewage treatment plants, water intake pump stations, sewage booster pump stations and water distribution force mains in the Pacific Northwest region. During my services with Packard Construction, Inc., I supervised numerous emergency restoration projects for the U.S. Army Corps of Engineers immediately following the Mt. St. Helens (Washington) volcanic eruption of May 1980. These

emergencies consisted of restoring many cities river-water intake systems and subsequent water treatment facilities that were either severely damaged or buried from the ash and debris caused by the volcano.

I have over 29 years of experience in both the heavy mechanical and marine construction industries of which over half of those years has dealt solely with marine construction. My current resume and company profile, which provides additional information about my qualifications as an expert, is attached to this report as **Attachment A** and **Attachment B**.

## II. Background

In May 2004, I was retained by Mr. Thomas Sterling of Klemm, Blair, Sterling & Johnson and Black Construction Corporation (BCC) for the purpose of analyzing the two mooring dolphins and three of the four breasting dolphins at the Foxtrot "F-1" Pier, Apra Harbor, in order to formulate an opinion on the cost for repairs and whether the damage to the existing piling flange-to-concrete connections was caused by the 7.0 magnitude earthquake of October 13, 2001 or by some other cause. A site visit was performed on May 27, 2004 in which over one hundred digital photos of the underside of breasting dolphins C, D and G and mooring dolphins A and B were taken from a boat. Photos were also taken of all four breasting dolphin's existing fenders. All of these photos can be made available, if requested.

Prior to the above assessment survey, I have extensive personal knowledge of the F-1 Pier and its dolphins. Since January of 1998, the Port Authority of Guam's (PAG) engineering department has contracted PMT to perform both above and below-water post-typhoon and post-earthquake damage assessment surveys on PAG's wharves, piers and marinas including F-1 Pier and submit "condition found reports" accompanied with photographs. For example, the latest *Condition Found Report* by PMT submitted to PAG engineering on January 22, 2003 is attached as **Attachment C** to this report.

In addition, in November of 2003, Shell Oil Guam (Shell) contracted PMT to inspect and perform non-destructive testing on F-1's main pier and access ramp pilings. 396 Ultrasonic thickness-testing readings were taken on 16 of the 78 existing piles both above and below the water line in order for Shell to formulate an opinion of the overall structural integrity of the existing piles. PMT also submitted a *Condition Found Report* detailing the extensive corrosion/deterioration/damage ratings of all 78 pilings along with photos corroborating our findings.

Also, in June of 1996, PMT entered into a sub-contract agreement with BCC to perform the underwater work portion of BCC's *Repairs and Upgrading to Foxtrot "F-1" Pier* contract with the PAG (#PAG96-0010). I was the on-site diving supervisor for the underwater repair work to all the pilings, which we successfully completed in May of 1997.

## III. Opinions, Related Observations and Conclusions

### IIIa. Repair Estimate

At the request of BCC, and after the May 27, 2004 on-site survey, I prepared an estimate for the repairs to F-1 Pier's five (of 6) dolphins and is attached to this report as **Attachment D**. This cost estimate is based on the damage allegedly sustained from a 7.0 magnitude earthquake that occurred on October 13, 2001. This 2001 earthquake allegedly caused the original epoxied stainless-steel bolts to dislodge, drop and/or fall out of their individual pile flange-to-concrete connection holes due

to the (alleged) incorrect installation method by Black Construction Corporation (BCC) back in 1996 and 1997.

My repair estimate is based on 2001-2002 costs for repairs to <u>reinstall</u> the stainless-steel studs into the 100 pile flange-to-concrete connections as per the criteria laid out on Winzler & Kelly's (W&K) VE-1 drawing titled *"Proposed Pile Repair Details"* (Repairs to Dolphins A, B, C & D) dated 04/04/96 but utilizing the materials of BCC's Submittal 18a, *Epoxy Bolts for Steel Plate Anchor* (dated May 20, 1996), an approved equal by both EMPSCO-Engineering Consultants and N.C. Macario & Associates, Inc. June 13, 1996 and June 17, 1996 respectively.

Referring to Note #2 of W&K's VE-1 drawing, it should be noted that according to a number of suppliers, the Red Head line from Phillips Drill Company was bought out 15 years ago. The "Redi Chem" glass capsule was incorporated into ITW's (EPCON) Ramset/Red Head line, which is not compatible for an overhead application and therefore not recommended by the manufacturer.

Also, for the purposes of my estimate, I have assumed that the overall condition of the five dolphins intended for repair will be consistent with the condition of the dolphins and pilings present at the time when BCC made the initial pile flange-to-concrete connections back in 1996 and 1997 and generally, the same overall condition of the dolphins just prior to the October 2001 earthquake since it is apparently the Plaintiff's position that the dolphins were in good condition prior to the earthquake.

The $124,400.00 proposal (Attachment D) is comprised of $10,010.00 for repair materials, $66,159.00 for labor including 21.78% for applicable taxes and insurance, and $27,675.00 for equipment. I have taken that sub-total and added 15% for overhead and profit and then added 4.17% to cover Guam's Gross Receipts Tax.

### IIIb. Vessel Berthing Damage

During F-1's repairs and the construction of the new (replacement) "H" breasting dolphin in 1996 and 1997, PAG engineering informed BCC that the original dolphin "H" was struck by a vessel during its berthing sequence with enough force to break it loose from the 14 original pilings with the dolphin eventually ending upside down on the harbor bottom with portions of the broken piles extending upwards posing a possible navigational hazard to deep-drafted vessels berthing (up) to the F-1 Pier.

At PAG's direction, BCC had PMT survey the dolphin's broken piles and take depth readings of all the piling tops. From the results of our survey, both Shell and PAG engineering concluded that there were only two of the broken piles that extended (up) shallow enough to pose a hazard. PAG then directed BCC to initiate a "change order" for their removal. On March 7, 1997, PMT cut the two piles approximately five feet up from the dolphin's base by means of an underwater cutting torch.

Between December 26th and December 30th, 1996, the sea state in Apra Harbor was very rough due to Typhoon *Fern* passing clockwise to the south, west and north (in that order) of Guam. On December 27th, the vessel *MV Yuyo Breeze* was being moored up against F-1 Pier. During the mooring sequence, I personally observed the vessel come in solid, non-giving contact with only Dolphin G's fender on the up swing of a large (water) surface swell. During this "up-swing", and plus being in solid contact with the flat fender, the upward, rising force of the vessel caused the

concrete dolphin to lift and separate from approximately six (of the 14 total) of the outboard pile flanged connections recently completed by BCC.

Typically for any vessel berthing at F-1 during the course of BCC's 1996-1997 F-1 Pier repair project, all construction was stopped and put on stand-by until an all clear to resume construction was given by Shell. It was during this stand-by time for this particular berthing that myself and several of my crewmembers witnessed the above incident.

As indicated in the above personally witnessed vessel berthing damage incident, the lift of the dolphin and the subsequent separation of the pile flange-to-concrete connection caused numerous epoxied bolts to be pulled out of the concrete and in some instances, pulled out the epoxied bolt with a portion of the existing concrete attached. There is sufficient evidence to satisfy me that vessel berthing damage has continued over the years due to the existing condition of F-1's three (of 4) breasting dolphins. There are also instances where the force from an impact has been sufficient enough to either pull out and bend the flange bolts or shear the bolts entirely. In my opinion, this type of damage is not consistent with "earthquake damage". Several photos taken during the May 27th, 2004 on-site survey of the dolphins illustrate this particular process and are attached to this report as **Attachment E**.

There is also damage to several "battered" piles on both Dolphin C and D consistent with a lateral, forceful impact or impacts by a berthing vessel causing stress and possible deflection to the piles. The battered piles have been first forced back, away from the vessel, on the initial impact and then, in some instances, remained in its pushed-back position. In other locations, the pile has sprung back but not to its original position leaving significant angular gaps and pulled out or sheared bolts in most instances. Again, this type of damage is not consistent with "earthquake damage". Examples of this process are attached to this report as **Attachment F**.

In addition to the damage sustained to the breasting dolphin's flanged connections having been caused, in my opinion, by berthing vessels, the single flat-faced fender attached to each breasting dolphin installed by BCC in 1996 and 1997 are severely damaged and none are capable of performing as originally designed. Dolphins C and D each have a 8-foot wide by 12-foot high flat-faced fender and dolphins G and H each have a 6-foot wide by 10-foot high flat-faced fender. It is impossible for these damaged fenders to absorb the impact from a berthing vessel as originally intended placing more lateral force on the dolphins, specifically the flanged connections. Because the fenders are damaged and not performing as intended, vessels have repeatedly struck the concrete dolphins chipping the concrete corners and in some places, the bottom portion of the concrete dolphins have spalled due to such impacts. Photos of these fenders are attached to this report as **Attachment G.**

The damage observed at F-1 Pier is consistent with documented F-1 damage reports which include:
- Berthing damage (by vessel impact) on May 17, 2001 to Dolphin D, it's catwalks and fender.
- Berthing damage (by vessel impact) on Feb. 9, 1997 to Dolphin C's new fender recently installed by BCC.
- Berthing damage (by vessel impact) on Dec. 27, 1996 to Dolphin G's outer 6 (of 14) pile flange-to-concrete connections recently completed by BCC.
- The complete (un-salvageable) destruction of the original Dolphin H (by impact) by a berthing vessel the early part of 1994. The vessel was a large tanker being positioned by 3 tugs piloted by Captain Roldan from Guam Tug, Inc. as per Captain Stan Hall who witnessed the incident.

4

## IIIc. Smithbridge Charges for F-1 Repairs

According to documentation provided to me, Smithbridge charged $412,729.48 to repair 25 of the 100 existing piles at F-1 Pier back in 2002. This equates to a unit cost of $16,509.14 per pile repair. Also, Smithbridge spent a total of 121.5 working days on the project with an overall cost average of $3,396.95 per day.

After reviewing the documentation that was provided to me regarding the amounts that Smithbridge charged for the 2002 repair work, I concluded that there was sufficient evidence to support that; overall, Smithbridge's invoices were grossly inflated due to aggressive equipment charges and excessively high overhead and profit percentages.

In Ben Casey's deposition, Mr. Casey states that Smithbridge "...used what they call the U.S. Army Corps of Engineers' standard equipment-type rates and schedule, which is a published document with approved government rates on it." The published document that Mr. Casey, I believe, is referring to is the USACE's EP 1110-1-8 (volume 12) 31 July 03 publication. It consists of 250 pages (not including the many appendixes). In it explains the formulas to figure the hourly rates for an enormous number of various types and classifications of equipment. With those classifications list several hourly rate formulas which includes the hourly rate for a new piece of equipment compared to that of a used piece of equipment; formulas for adding a percentage for maintenance and fuel costs; additional percentage rates regarding the engine horsepower of a particular piece of equipment; even tire wear formulas. These rates and corresponding formulas are numerous in quantity.

Also within this vast publication lays out the formula for calculating equipment standby hourly rates (Section IX) and the conditions a contractor has to abide by in order to charge for a piece of equipment that is present at the job site but is not in use for a particular day or accumulated days. Referring to several of Smithbridge's payment periods (1, 2, 3 & 4), Smithbridge charged the full daily rate for equipment that was allegedly on site for more days, including non-working weekends, then the actual number of working days charged for that period. Smithbridge listed no stand-by rates for equipment that allegedly was on site but not documented as being used as so stipulated in the USACE EP 1110-1-8. It should be mentioned that Smithbridge has not provided hand written daily dairies to substantiate the quantities for materials, labor and equipment for payment periods 2, 3, 4, 5 and 6. Smithbridge's daily site diaries for payment periods 4, 5 and 6 are computer generated and all the pieces of equipment listed are charged the full daily rate without any indication the equipment was used that particular day.

My opinion is that Smithbridge charged overly inflated equipment sums each payment period and that those sums clearly indicate that no equipment stand by rates were provided to their client(s).

Mr. Casey also states on page 70 of his deposition "We had also used figures for overheads and allowable profits that had also been predetermined by the U.S. Audit department..." The "predetermined" worksheet that he is referring to, I believe, is the U.S. Navy Facilities worksheet number NAVFAC 4330/43 (10/95) that Smithbridge used in each payment period to arrive at their invoicing total. Smithbridge has modified the worksheets to reflect their portion of the work and has inserted the percentages for overhead and profit in the applicable blanks to suit them. Several of the overhead and profit portions of the worksheet are, in my opinion, excessive and I believe that if

5

Smithbridge attempted to use many of these percentages on a U.S. Navy project not only the U.S. Navy, but the U.S. Audit Department would reject them as being excessively high.

When I insert the materials, labor and equipment figures from my proposal (refer to the end of sub-section IIIa) into the above NAVFAC worksheet and used the same overhead and profit percentages that Smithbridge used to calculate their invoices; my proposal total would be approximately $53,000.00 higher due to the (higher) percentages that Smithbridge used.

Referring to page 3 of **Attachment H** attached to this report, Smithbridge made approximately $169,500.00 in overhead, insurance and profit. That equates to approximately 41% of the overall project total. Note that I had to input averages for payment (period) 07 due to missing Smithbridge documentation. Regardless, 41%, in my opinion, is a highly inflated figure. However, myself as well as numerous other contractors can only dream of being able to charge that high of percentages for overhead, insurance and profit. If this contract had been awarded on any sort of competitive (bid) basis, I believe the reasonable cost to the insurer would have been between $112,729.00 to $121,403.00 lower than what Smithbridge charged.

Again, referring to page 3 of Attachment H, when you insert the sub-total amount of $243,186.00 (refer to the above note) for materials, labor and equipment that Smithbridge (theoretically) used, add to that reasonable insurance, overhead and profit percentages, for example the 15% I used in my proposal, and then add the 4.17% for Guam Gross Receipts Tax, the cost for the repair work, if competitively bid, would have been in the neighborhood of $291,326.00 to $300,000.00.

## IIId. Smithbridge's November 18th, 2002 Proposal addressed to MacLeod Claims Management

Although as indicated in a prior section of this report, it is my opinion that the "temporary repair" costs were grossly inflated in their November 18th, 2002 proposal for a "total repair", Smithbridge actually increased their unit cost from $16,509.14 to $18,933.33 per pile repair. This is an increase of $2,424.16 per pile.

Since PAG and Shell gave Smithbridge the notice to proceed utilizing Duenas & Associates' approved design and methodology for "temporary" repairs to 25 of the 100 piles at F-1 Pier, there is no need for additional design work costs as listed in Item 2 of their proposal since the same design and methodology would be submitted and subsequently approved for the remaining 75 piles. Again referring to their November 18th, 2002 proposal, Smithbridge states in Item 1 *Repair Pile to Concrete Connection as per previous Design*, "The repair is to be identical to that of the Previous Temporary Earthquake repair completed by Smithbridge in 2002 and Designed by OCEL Consultants and Duenas and Associates. The previous temporary Repairs are to be incorporated into and become part of the Final Repair." Also, there is no documentation supporting that either Shell nor Smithbridge obtained a building permit for Smithbridge's repair work on F-1 Pier which commenced in January of 2002 almost 4 months (15 weeks) after the October 13th, 2001 earthquake. Again, there is no information provided to me indicating the need for Smithbridge to charge for any building permits as per Item 2 of Smithbridge's proposal.

Additionally, Item 3 of Smithbridge's proposal lists providing repairs to 800 lineal feet of epoxy injection to cracks and 200 square feet of (concrete) spall repair. This is not a charge related to the damage to the pile's flanged connections the earthquake allegedly caused. Incidentally, according to

page 113 of Ben Casey's deposition, Item 3 would be an amount "…relatively small compared to the overall contract value" and "would be less than a hundred thousand" (dollars).

In my opinion, Smithbridge's increase of $2,424.16 per pile for the repairs to the remaining 75 piles, at an additional amount of $181,812.00, is neither necessary nor justified.

My opinions, some of which I have expressed above, are based upon the information that has been provided to me to date and I reserve the right to modify my opinions should additional relevant documentation or information be provided to me.

## IV.  Prior Relevant Publications

None

## V.  Prior Testimony in the last four years

Deposed August 5 and 6, 2002 by opposing council and gave in-court testimony October 2, 2002 as an expert witness for Michels Corporation in the Andrie, Inc. -vs- Michels Corporation multi-million dollar arbitration dispute in Grand Rapids, Michigan (American Arbitration Association Case No. 54 199 016111).

## VI.  Compensation for Expert Witness Services

5.27.04 F-1 Damage Assessment Survey
  (includes equipment, personnel, and consumables)      $275.00 per hour
Court Appearances and Depositions                       $217.50 per hour
Principal                                               $145.00 per hour

I thank you for this opportunity to be of service in this manner. If you have any questions or require further explanation regarding any portion of this report, please contact me.

Sincerely,

Ken Collard
President

Attachments:
    Attachment A - K.W. Collard Resume
    Attachment B - ProMarine Technology Company Profile
    Attachment C - PMT Job #31-02 *Condition Found Report* of PAG's piers and marinas
    Attachment D - PMT Cost Proposal for the Repairs to F-1 Pier
    Attachment E - Photos of various F-1 dolphin pile flange-to-concrete connections
    Attachment F - Photos of various F-1 dolphin pile flange-to-concrete connections
    Attachment G - Photos of the F-1 dolphin fenders
    Attachment H - Notations regarding Smithbridge's repair work figures and amounts

7

# ATTACHMENT C

PMT JOB #31-02 CONDITION FOUND REPORT OF PAG's PIERS AND MARINAS



P.O. BOX 11021
TAMUNING, GUAM 96931

TEL: 671/ 789-7001
FAX: 671/ 789-7002
E-mail: prmarine@ite.net

Web Site: www.promarinetech.com



# CONDITION FOUND REPORT

## Hagåtña (Agana) Boat Basin

On December 18th and 19th, 2002, debris from Super Typhoon Pongsona was removed from the marina to clear the inner channels for boat traffic. Divers hooked up and both a boom truck and crane removed the debris from the water. A "finger" (boat) pier was repositioned back into position after it had become unattached from the piling during the typhoon.

No underwater survey was requested but the condition of the existing marina sea walls should be reviewed to confirm the extremely deteriorated condition of the sheet piling below the water line (refer to the accompanying *5.20.02 Survey of Agana Boat Basin Sea Wall* files).

## F-1 (Shell Oil) Pier

On December 23rd, 2002, an underwater and above-water survey (underneath the concrete structures) was conducted on the pilings and concrete structures that make up the main pier, ramp, associated dolphins and walkway supports of the F-1 fueling pier. *Note: No survey was requested by PAG or conducted by PMT last May.*

Dolphins (4 breasting, 2 mooring)

There has been extensive movement of the (repair) piles that were installed in 1996 and 1997. Many of the pile tops/flanges have become separated from the concrete completely or the studs/bolts are missing and/or loose. There are numerous locations where there is a significant gap between the pile tops/flanges and the concrete bottom. There appears to have been an attempt to secure the loose piles by means of lightweight angle-iron supports and braces, which have also deteriorated and in some places, buckled due to excessive piling movement and force.

There is extensive corrosion of the piles from the surf zone above the water line to approximately 3 feet below. This is due to the wave action and insufficient or non-existing cathodic protection. There is one pile on the first dolphin immediately to the west of the main pier that is broken (complete separation) 3 feet below the welded repair/transition ring.

The concrete structures have numerous cracks, spalling, and general deterioration of the concrete especially on the corners and where the previous (repair) pilings were attached to the concrete.

Ship Husbandry · AMERICAN BUREAU OF SHIPPING Recognized Underwater External Specialist · Salvage · Harbor Construction & Maintenance
Outfall Pipeline Construction & Repairs · NDT & ROV Services · Underwater Inspections and Surveys Including CCTV, Video & Photographic Services



These damaged areas have exposed rebar subsequently exposing the rebar to the salt water/air causing further deterioration to the designed integrity of the concrete structures.

Walkway Supports (3)
The H-piles that make up the supports are <u>extremely</u> deteriorated due to the wave action and to insufficient or non-existent cathodic protection. The concrete "caps" are in poor condition and have numerous areas of spalling exposing the rebar to the salt water/air.

Main Pier and Ramp
The main pier and ramp's piling is, again, in very poor condition due to the excessive degree of corrosion that is due to the wave action and a lack of substantial cathodic protection. The concrete has numerous areas that have cracks and spalling exposing the rebar to the elements.

Refer to the accompanying *12.23.02 F-1 Pier Photos* folder. Note that the red piles are the dolphin repair piles installed back in '96 and '97. The blackish-brown piles are the piles located under the main pier and ramp.

**Hotel Wharf**

On December 23rd, 2002, an underwater survey was conducted to ascertain what, if any, additional damage occurred to the wharf since our last survey conducted May 17, 2002 (refer to the *5.17.02 Survey of Hotel Wharf Sea Wall* file). No new or additional damage was observed or noted.

**Agat Marina (concrete) Pier**

On December 23rd, 2002, an underwater and above-water (underneath concrete pier) was conducted to ascertain if any additional damage was discovered from the survey performed last May of 2002 (refer to the *5.20.02 Survey of Agat Marina Concrete Pier* file). No new or additional damage was observed or noted.

**Warves F-3, F-4, F-5 and F-6 (PAG)**

On December 26th, 2002, an underwater survey was conducted to assess any additional damage to the pier sea walls, especially the 550' section of piers F-5 and F-6 that has a differently constructed configuration. There are still 4 of the flat fenders/bumpers that have been torn off the sea wall and are lying on the bottom (refer to the accompanying surveys of F-3 thru F-6 files (2)). No new or additional damage was observed or noted.

Ship Husbandry · AMERICAN BUREAU OF SHIPPING Recognized Underwater External Specialist · Salvage · Harbor Construction & Maintenance
Outfall Pipeline Construction & Repairs · NDT & ROV Services · Underwater Inspections and Surveys Including CCTV, Video & Photographic Services

Case 1:03-cv-00009    Document 279    Filed 10/25/2005    Page 18 of 29

49 - 30



## Golf (Mobil Oil) Pier

On January 21st, 2003, an underwater and above-water survey (underneath the concrete structures) was conducted on the pilings and concrete structures that make up the main pier, ramp, associated dolphins and walkway supports of the Golf fueling pier. *Note: No survey was requested by PAG or conducted by PMT last May.*

Dolphins (4 mooring, 2 breasting)
The piles are is relatively good condition due to the cathodic protection installed (at one time). However, 5 out of the 6 dolphins' zincs are missing or lying on the bottom. Nine (9) 4' zincs from the large dolphin, immediately to the east of the main pier, are lying on the bottom. The smaller dolphin furthest east of the main pier has only one 4' zinc remaining (attached). Corrosion is more obvious on the piles missing the zincs.

The large dolphin immediately to the east of the main pier has a flat fender lying on the bottom and has a (top 1 of 2) bent batter pile on the east side. The large dolphin on the west side of the main pier has a (top 1 of 2) bent batter pile on the west side.

The smaller dolphin furthest east of the main pier has a missing swivel hook on top (for mooring purposes). 2 walkways are missing connecting the 2 most easterly dolphins and the 2 most westerly dolphins. Railings from these 2 walkways are still lying on the bottom or against the batter piling of both the large dolphins on each side of the main pier.

The concrete structures have numerous cracks, spalling, and general deterioration of the concrete especially on the corners. These damaged areas have exposed rebar subsequently exposing the rebar to the salt water/air causing further deterioration to the designed integrity of the concrete structures.

Main Pier and Ramp
The main pier and ramp's piling is, again, in relatively good condition due to the cathodic protection installed (at one time). The main pier has all the original 2-2½' zincs still in place. However, the ramp to the main pier has two 2-2½' zincs missing.

The concrete on the main pier has numerous areas that have cracks and spalling exposing the rebar to the elements. The ramp's concrete is in relatively good condition.

Miscellaneous
There are 2 steel barges (app.6' wide X 12'long X 4' high) lying on the bottom approximately halfway between the ramp and the furthest east (smaller) dolphin in approximately 20' of water.

Refer to the accompanying *1.21.03 Golf Pier Photos* folder.


---END OF REPORT---

Ship Husbandry · AMERICAN BUREAU OF SHIPPING Recognized Underwater External Specialist · Salvage · Harbor Construction & Maintenance
Outfall Pipeline Construction & Repairs · NDT & ROV Services · Underwater Inspections and Surveys Including CCTV, Video & Photographic Services

# ATTACHMENT  D

PMT COST PROPOSAL FOR THE REPAIRS TO F-1 PIER



P.O. BOX 11021
TAMUNING, GUAM 96931

TEL: 671/ 789-7001
FAX: 671/ 789-7002

E-mail: prmarine@ite.net
www.promarinetech.com



July 8, 2004

Black Construction Corporation
P.O. Box 24667
GMF, Guam 96921

Attn: Mr. Rodrigo Bismonte

**RE: Repairs to Foxtrot "F-1" Pier Proposal**

The following is our proposal for the repairs to F-1's Mooring Dolphins A and B, and to Breasting Dolphins C, D and G in accordance to the criteria laid out on Winzler & Kelly's (W&K) VE-1 drawing titled *"Proposed Pile Repair Details"* (Repairs to Dolphins A, B, C & D) dated 04/04/96 and utilizing the materials of BCC's Submittal 18a, *Epoxy Bolts for Steel Plate Anchor* (dated May 20, 1996), approved by both EMPSCO-Engineering Consultants and N.C. Macario & Associates, Inc. June 13, 1996 and June 17, 1996 respectively.

Referring to Note #2 of W&K's VE-1 drawing, it should be noted that prior to and since October 13, 2001, the Red Head line from Phillips Drill Company was discontinued and is no longer available. The "Redi Chem" glass capsule was incorporated into the ITW (EPCON) Ramset/Red Head line, which is not compatible for an overhead application and therefore not recommended by the manufacturer.

This proposal is based on the damage allegedly sustained from an earthquake that occurred on October 13, 2001. This 2001 earthquake (allegedly) caused the epoxied stainless-steel bolts to drop out of their individual pile flange-to-concrete connection holes due to the (alleged) incorrect installation method by Black Construction Corporation (BCC) back in 1996 and 1997. This proposal reflects the cost for repairs to reinstall the stainless-steel studs into the 100 pile flange-to-concrete connection as per the above-approved method **at 2001-2002 costs and rates**.

It is generally understood by all that the overall condition of the five dolphins intended for repair will be consistent with the condition of the dolphins and pilings present at the time when BCC made the initial pile flange-to-concrete connections in 1996 and 1997.

**Proposal amount: One Hundred and Twenty-Four Thousand, Four Hundred Dollars (US$124,400.00).**

Ship Husbandry · AMERICAN BUREAU OF SHIPPING Recognized Underwater External Specialist · Salvage · Harbor Construction & Maintenance
Outfall Pipeline Construction & Repairs · NDT & ROV Services · Underwater Inspections and Surveys Including CCTV, Video & Photographic Services



Included:

- Labor, equipment, access and staging materials, repair materials and consumables for the completion of the repair work.
- Applicable insurance and taxes.

Not included:
- Repairs to any existing spalled or damaged concrete.
- Any Bonding or Permits

After delivery of the repair materials from off-island and our equipment mobilization, the duration for the F-1 Pier dolphin repairs consists of approximately 40 non-consecutive work-days to perform the actual repairs (as per the above-approved repair method) and 17 non-consecutive work-days for the construction and subsequent removal of the temporary access ways (stairways and ladders) and work platforms underneath the five dolphins.

Payment Terms:

The approved invoices for work completed will be issued on a monthly basis or upon final completion of the work. The approved invoices are required to be paid in full within 30 days from the date of issue.

No retention shall be held back on any payment due.

Thank you for this opportunity in providing you with our proposal. If you have any questions, please contact me.

Sincerely,

Ken Collard
President

Ship Husbandry · AMERICAN BUREAU OF SHIPPING Recognized Underwater External Specialist · Salvage · Harbor Construction & Maintenance
Outfall Pipeline Construction & Repairs · NDT & ROV Services · Underwater Inspections and Surveys Including CCTV, Video & Photographic Services

Case 1:03-cv-00009    Document 279    Filed 10/25/2005    Page 22 of 29
49 - 34

# ATTACHMENT E

PHOTOS OF VARIOUS F-1 PIER DOLPHIN FLANGE-TO-CONCRETE CONNECTIONS



**BREASTING DOLPHIN G**
G-12



**BREASTING DOLPHIN G**
G-14



**BREASTING DOLPHIN C**
C-13

# EXHIBIT "B"





