# ORIGINAL

CARLSMITH BALL LLP

DAVID LEDGER
STEPHEN C. SMITH
ELYZE McDONALD
134 West Soledad Avenue
Bank of Hawaii Bldg., Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Tel No. (671) 472-6813

COZEN O'CONNOR

FORREST BOOTH
425 California Street, Suite 2400
San Francisco, CA 94104-2215
Tel No. (415) 617-6100

Attorneys for Plaintiff
S.J. Gargrave Syndicate at Lloyds

**FILED**
DISTRICT COURT OF GUAM

OCT 26 2005

MARY L.M. MORAN
CLERK OF COURT

## IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| S.J. GARGRAVE SYNDICATE AT LLOYDS,<br><br>Plaintiff,<br><br>vs.<br><br>BLACK CONSTRUCTION CORPORATION, WINZLER & KELLY, and ENGINEERING MANAGEMENT & PLANNING SERVICES CORPORATION,<br><br>Defendants. | CIVIL CASE NO. CV03-00009<br><br>**PLAINTIFF'S MOTION IN LIMINE TO PRECLUDE EVIDENCE, TESTIMONY, AND REFERENCE TO DEFENDANT WINZLER & KELLY'S EXPERT'S ANALYSIS REGARDING BERTHING FORCES ON PIER F-1 AND ITS DOLPHINS; DECLARATION OF SERVICE** |

## I.    INTRODUCTION

Plaintiff S.J. GARGRAVES SYNDICATE AT LLOYDS (hereinafter "Plaintiff")

hereby moves this Court for an order *in limine* excluding any and all evidence, references to

evidence, testimony (expert or otherwise), or argument relating to, or derived from, any analysis of ship berthing forces performed and reported upon by Defendant's purported expert by Webb Hayes.

Mr. Hayes is the liability expert retained by Winzler & Kelly Consulting Engineers (hereinafter "Winzler & Kelly") for this case. *See* Winzler & Kelly's July 16, 2004 Expert Witness Disclosure attached hereto as Exhibit B. Winzler & Kelly's attorney later e-mailed a 58-page report entitled "Summary of Results" and "Ben C. Gerwick, Inc. Berthing Energy Calculations" (attached hereto as Exhibit A and dated May 4, 2005) to Plaintiff's attorney on May 5, 2005, approximately 10 months **after** it was due pursuant to this Court's March 15, 2005 Stipulation and Order to Amend Scheduling Order (and pursuant to Federal Rule of Civil Procedure 26).

The untimely report on berthing forces of May 4, 2005 was due not later than July 16, 2004. This is no innocent oversight, nor is it a case of being a day or two late. More importantly, however, it is a blatant reversal of position by Winzler & Kelly, after they convinced this Court that no ships were involved in this case and no ships had caused damage to the Pier.

Winzler & Kelly's attorney e-mailed his client's report on berthing forces to Plaintiff's counsel on May 5, 2005. The report is improper and untimely, either as an initial expert disclosure or a rebuttal report. Furthermore, Defendant Winzler & Kelly has admitted, and moved this Court for a legal ruling based on the fact that, no damage to Pier F-1 and/or its dolphins was caused by vessels. Consequently, it would be unjust and unfairly prejudicial to

Plaintiff for Winzler & Kelly to now be allowed to present evidence, consisting of its severely delinquent expert report, concerning berthing forces on Pier F-1 and/or its dolphins.[1]

## II.    WINZLER & KELLY'S PRIOR POSITION

In attempting to persuade the Court that there was no admiralty jurisdiction over Plaintiff's claims, Defendants repeatedly asserted and admitted that no damage caused by ships is involved in this case. In Defendants' Joint Brief Re Diversity and Admiralty Jurisdiction (hereinafter the "Brief"), the Defendants state that "… it is absolutely clear that the injury here did not occur on navigable waters **nor was it caused by a vessel** on navigable water." *See* Exhibit F hereto, pp. 14-15 (emphasis added). Then, several months later and approximately 10 months **after** the discovery cut-off, Winzler & Kelly served a 58-page report purporting to explain that the damage to the F-1 Pier and its dolphins **was** caused by vessels banging into the Pier during hard dockings. Defendants Black and EMPSCO have also adopted this surreptitious "hard docking" theory after jointly arguing that  the damage was not caused by a vessel.

Before Judge Tashima, Defendants argued that Plaintiff's claims herein did not meet the first prong of the jurisdiction test under the Admiralty Extension Act, 46 U.S.C. § 740. For further emphasis, Defendants stated that "In our case, we don't have a ship, we don't have a shipowner …" *See* Exhibit G hereto, p.53. This position was taken by, oral argument was made and the Brief was filed on behalf of, all Defendants jointly.  It is therefore the binding legal

---

[1]  Winzler& Kelly is "playing fast and loose" with this Court by asserting a position directly contrary to its legal theory advanced before Judge Tashima (who sat for this case by designation).  At that time, Winzler & Kelly vehemently argued that no vessels were involved in causing the damage claimed in this lawsuit, and it prevailed.  Winzler & Kelly defeated Plaintiff's claim that this Court had admiralty jurisdiction over this lawsuit, which this Court clearly does have under 46 U.S.C. § 740 if ships are involved in damage to structures on land.  As a result of that ruling, Plaintiff is no longer entitled to assert certain causes of action against Defendants.  Winzler & Kelly has now brazenly reversed its position. Winzler & Kelly now argues that damage to the pier **was** caused by the docking of ships, and not by the 2001 earthquake, and it has belatedly submitted analytical data pertaining to alleged berthing forces of vessels.

position of each and all of them. Counsel repeated their position in oral argument before the Court on December 3, 2004: "In our case, we don't have a ship, we don't have a shipowner ..."

The delinquent berthing forces analysis performed by Mr. Hayes (and by his associate, Ted Trenkwalder, who is also a Ben C. Gerwick, Inc. employee), any evidence derived therefrom, and the materials that Mr. Hayes reviewed pertaining to fenders and/or berthing analysis on the F1 Pier and/or its dolphins should be excluded because they were served approximately 10 months after the discovery cut-off.

Defendants' newly-crafted position, which is supported by the report of Mr. Hayes and Mr. Trenkwalder, will be unduly prejudicial to Plaintiff. Winzler & Kelly e-mailed the 58-page report to Plaintiff's attorney on May 5, 2005, which was approximately 10 months after the July 16, 2004 deadline for disclosure of expert reports, and more than 6 months after the November 18, 2004 deadline for disclosure of supplemental expert reports (pursuant to the Court's August 19, 2004 Stipulation and Order).

The untimely report of Mr. Hayes served on May 5, 2005 does not even purport to be a "supplemental expert report". Rather, it is titled "Summary of Results" and "Ben C. Gerwick, Inc. Berthing Energy Calculations". No explanation whatever is given for Winzler & Kelly's flaunting of the Court's Order and deadlines. The report is untimely and must be excluded as inadmissible evidence under Fed.R.Civ.Proc. 26(a)(2)(B) and the Federal Rules of Evidence.

## III. ARGUMENT

In his deposition taken on May 12, 2005, Mr. Hayes testified that the only documents that he reviewed after Winzler & Kelly produced his expert report filed on July 16, 2004 were transcripts from depositions that had been taken in this lawsuit. Mr. Hayes testified, in part, as follows:

Q.   Okay. This expert disclosure, in your initial
     report, was filed with the court on July 16th, 2004.
     Did you review any documents after that date, that are
     not listed on the references in the report?

A.   Depositions.

Q.   Which depos did you review?

A.   I don't have a list of them. If you have a
     list, I could go down and pick off the ones that I've
     reviewed. Delos Santos was one.

*See* excerpts from deposition of Webb Hayes taken on May 12, 2005 attached hereto as
Exhibit C, pp. 13-14.

Even though Mr. Hayes was in possession of the documents contained in the 58-page report, they were not served upon Plaintiff until May 4, 2005. Winzler & Kelly failed to provide the report entitled "Summary of Results" and "Ben C. Gerwick, Inc. Berthing Energy Summary" (the latter containing data for five different tonnages of ships) and supporting documentation to Plaintiff's counsel, as required, by July 16, 2004. Therefore counsel did not have these documents to review before taking Mr. Hayes' deposition. Winzler & Kelly's July 16, 2004 expert disclosure contains neither a "Summary of Results" nor the "Ben C. Gerwick, Inc. Berthing Energy Summary". The reports and supporting documentation were due 10 months earlier on July 16, 2004, pursuant to Fed.R.Civ.Proc. 26(a)(2)(B):

> Rule 26. General Provisions Governing Discovery; Duty of
> Disclosure
>
> (a) Required Disclosures; Methods to Discovery Additional Matter
>
> (2) Disclosure of Expert Testimony.
>
> (A) In addition to the disclosures required by paragraph (1), a party

shall disclose to other parties the identity of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence.

(B) Except as otherwise stipulated or directed by the court, this disclosure shall, with respect to a witness who is retained . . . be accompanied by a written report prepared and signed by the witness. **The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions** . . . (Emphasis added).

Rule 26(a)(2)(B) is mandatory: "[t]he report **shall** contain . . . the data or other information considered by the witness in forming the opinions." (Emphasis added). Mr. Hayes' "Summary of Results" and "Ben C. Gerwick, Inc. Berthing Energy Calculations" produced on May 4, 2005 are nothing more than an excessively delinquent expert report.

All of the contents of these documents and all references to this information must be excluded as inadmissible evidence. F.R.E. 403 provides that:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

If the prejudicial effect outweighs the probative value, the trial court should exclude the evidence. *See* People v. Cardenas, 31 Cal.3d 897, 904 (1982). "[T]he fundamental rule [is] that relevant evidence whose probative value is outweighed by its prejudicial effect should not be admitted." *Id.*, quoting People v. Haston, 69 Cal.2d 233, 246 (1968). Here, Plaintiff will be unfairly prejudiced on two bases: 1) Winzler & Kelly has now reversed its position and will attempt to argue that the damage to Pier F-1 and the dolphins **was** caused by berthing forces and the hard docking of vessels; and 2) the documents upon which Mr. Hayes will now base this new hard docking theory were served 10 months too late.

All Defendants, including Winzler & Kelly, vehemently argued and previously persuaded this Court (Judge Tashima) that it lacks admiralty jurisdiction over Plaintiff's claims because "no ships were involved". Now, Winzler & Kelly is attempting to argue the opposite, that ships **were** involved and that the berthing forces created by those ships caused the damage to Pier F1 and the dolphins that are the subject of this lawsuit. Winzler & Kelly's delinquent production is a 180° reversal of course. This Court should preclude from evidence any and all references to the delinquent berthing forces analysis and results reported by Webb Hayes and/or Ted Trenkwalder of Ben C. Gerwick, Inc. on behalf of Winzler & Kelly.

If Mr. Hayes' delinquent report and supporting materials (attached hereto as Exhibit A) had been disclosed in a timely manner, Plaintiff would have provided rebuttal testimony. The report having come so late, Plaintiff cannot do so, nor can Plaintiff examine Mr. Hayes on his work and his conclusions.

On July 21, 2004, Winzler & Kelly's attorney sent a "slightly revised expert report by Ben Gerwick, Inc." *See* letter from Winzler & Kelly's attorney attached hereto as Exhibit D. Winzler & Kelly's "revised report" (contained in Exhibit D hereto) provided neither the "Summary of Results" nor "Ben C. Gerwick, Inc. Berthing Energy Summary".

On November 4, 2004, three weeks after the October 15th due date, Winzler & Kelly's attorney sent another "amended report from Winzler & Kelly's experts Webb Hayes and Ted Trenkwalder". *See* letter from Winzler & Kelly's attorney attached hereto as Exhibit E. Winzler & Kelly's "amended report" (attached to Exhibit E) likewise contained neither the "Summary of Results" nor the "Ben C. Gerwick, Inc. Berthing Energy Summary". Winzler & Kelly had several opportunities to disclose the information and reports of its experts in a timely

manner and chose not to do so. Plaintiff will be severely prejudiced if Winzler & Kelly is allowed to get away with flaunting the rules in this manner.

## IV. CONCLUSION

Plaintiff requests that the Court order that Defendants, their counsel, witnesses and experts be precluded from mentioning, referring to or basing any argument upon ships berthing at F-1 Pier and/or any berthing forces analysis and results performed, collected by or reported on by Webb Hayes and/or Ted Trenkwalder and/or Ben C. Gerwick, Inc..

DATED: Hagåtña, Guam, October 26, 2005.

CARLSMITH BALL LLP

DAVID LEDGER
STEPHEN C. SMITH
ELYZE McDONALD
Attorneys for Plaintiff
S.J. Gargrave Syndicate at Lloyds

## DECLARATION OF SERVICE

I, David Ledger, hereby declare under penalty of perjury of the laws of the United States, that on October 26, 2005, I caused to be served, via hand delivery, a true and correct copy of **PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE EVIDENCE AND TESTIMONY PERTAINING TO DEFENDANT WINZLER & KELLY'S EXPERT'S ANALYSIS REGARDING BERTHING FORCES ON PIER F-1 AND ITS DOLPHINS**; upon Defendants' Counsel of record as follows:

> Robert J. O'Connor, Esq.
> Daniel J. Berman, Esq.
> Berman O'Connor Mann & Shklov
> Suite 503, Bank of Guam Building
> 111 Chalan Santo Papa
> Hagåtña, Guam 96910
>
> Thomas C. Sterling, Esq.
> Klemm Blair Sterling & Johnson, P.C.
> Suite 1008, Pacific News Building
> 238 Archbishop Flores Street
> Hagåtña, Guam 96910

and

> Thomas M. Tarpley, Esq.
> Law Offices of Tarpley & Moroni, LLP
> Suite 402, Bank of Hawaii Building
> 134 West Soledad Avenue
> Hagåtña, Guam 96910

Executed this 26th day of October, 2005 at Hagåtña, Guam.

DAVID LEDGER

SANFRAN1\34043\1 123206.000

# EXHIBIT A

SAIPAN OFFICE
Second Floor, Nauru Building
P.O. Box 501969
Saipan, MP 96950-1969
Telephone: (670) 234-5684/5
Fax: (670) 234-5683
E-mail: attorneys@saipan.com

HONOLULU OFFICE
Suite 2800, Pacific Tower
Bishop Square, 1001 Bishop Street
Honolulu, Hawaii 96813-3580
Telephone: (808) 585-8858
Fax: (808) 599-4198
E-mail: mark@shklovlaw.com

# O'CONNOR BERMAN DOTTS & BANES
## ATTORNEYS AT LAW
### SAIPAN OFFICE
www.pacific-lawyers.com

GUAM OFFICE
Suite 503, Bank of Guam Bldg.
111 Chalan Santo Papa
Hagåtña, Guam 96910
Telephone: (671) 477-2778
Fax: (671) 477-4366
E-mail: bermlaw@kuentos.guam.net

POHNPEI OFFICE
Second Floor, Ace Commercial Building
P.O. Box 1491, Kolonia, Pohnpei,
Federated States of Micronesia, 96941
Telephone: (691) 320-2868
Fax: (691) 320-5450
E-mail: bermlaw@mail.fm

May 4, 2005

**BY E-MAIL**

Forrest Booth, Esq.
Cozen O'Connor
425 California Street, Suite 2400
San Francisco, California 94104

*Re: Gargrave v. Black Construction, et al.; Guam District Court CV 03-0009*

Dear Forrest:

Attached to this letter are some documents showing a berthing forces analysis done by Webb Hayes as well as some materials he reviewed on fenders and one page from Transen. This will help you understand his analysis of the forces on pier F-1 and its dolphins in connection with the formulation of his opinions.

Yours truly,

/s/
Robert J. O'Connor

cc: Thomas C. Sterling, Esq. (by e-mail)
    Thomas M. Tarpley, Esq. (by e-mail)

2003-08-050504-LTR-FBooth.doc

## Summary of Results

1) The Berthing Forces the dolphin should have been designed for:

    • According to pg 0096 of the Engineering Documentation Report for "Repairs and Upgrading to Foxtrot "F-1" Pier" (pg 31 of this document) submitted by EMPSCO-Engineering Consultants the intent of this project is to up-grade the fender system to accommodate the berthing of 150,000 DWT vessel.

    • In accordance with BS6349: Part 4: 1994 the Normal berthing energy for a 150,000 DWT vessel is $E_N = 106$ tonne-m (766 k-ft). This assumes a berthing velocity of 98 mm/s (0.32ft/s). Ben C. Gerwick, Inc used the Brolsma table to calculate the vessel's velocity and assumed easy berthing, exposed (pg 6 of this document).

    • The velocities calculated by Ben C. Gerwick, Inc. are very close to the values used in the Candac Limited "Report on Damaged Structures, F1 Facility Guam, for Shell Guan, Inc." that states a 125,000 DWT tanker berthing velocity will be 1.0 mm/s (0.33ft/s) (pg 53 of this document).

    • Berthing energies for 125,000, 105,000, and 90,000 DWT vessels were also calculated. See pg 5 of this document.

2) If the dolphin was to be designed for a 150,000 DWT vessel with a Normal berthing energy of $E_N = 106$ tonne-m (766 k-ft) the following Fenders would have been selected. Two fender manufactures were considered.

    • Trellex Fenders: (2 Unit Fender Elements)
      (2)-MV1450x1500B Fenders: Energy Absorption = 110.4 tonne-m (798 k-ft)
                                    Reaction Force = 166 tonne (366 kips)

    • Bridgestone Fenders: (1 Cone Fender Element)
      (1)-SUC2000H-R1 Fender: Energy Absorption = 125.1 tonne-m (905 k-ft)
                                    Reaction Force = 142.5 tonne (314 kips)

    • For the minimum fender size requirements for 125,000, 105,000, and 90,000 DWT vessels or when a 1.25 factor of safety is applied to the design energies to account for possible accidental berthing see pgs 13 and 17 of this document.

3) The berthing forces and Fenders selected by EMPSCO are as follows:

    • According to pg 0010 of the Design Calculations for "Repairs and Upgrading to Foxtrot "F-1" Pier" (see 42 of this document) submitted by EMPSCO-Engineering Consultants the Fendering system for Dolphins "C" and "D" are designed for an impact load of $E_N = 77.5$ tonne-m (560 k-ft). On pg 0008 (pg 41 of this document) they indicate that the berthing

velocity for a 150,000 DWT vessel is 60 mm/s (0.2 ft/s). It is not clear how the design energy is calculated and if the stated velocity or vessel size is used in its calculation.

- A possible source of the Empsco design berthing energy is the original design basis used by Transen Associates, Limited (pg 56 of this document). The Transen design basis indicates that "each breasting dolphin ("C" and "D") and fendering system shall be designed for 280 ft-ton" which is equal to $E_N = 77.5$ tonne-m (560 k-ft). According to pg 0096 of the Engineering Documentation Report for "Repairs and Upgrading to Foxtrot "F-1" Pier" (pg 31 of this document) submitted by EMPSCO-Engineering Consultants "As documented in Transen Associates, Limited, Reference 9, the original design analysis for breasting and mooring dolphins are based on 90,000 DWT-tanker."

- According to pg 0024 of the Design Calculations for "Repairs and Upgrading to Foxtrot "F-1" Pier" (pg 43 of this document) submitted by EMPSCO-Engineering Consultants the fender system selected for Dolphins "C" and "D" was a Bridgestone SUC1150H-RH cone fender. The properties are as follows:
  (1)-SUC1150H-RH Fender: Energy Absorption = 38.7 tonne-m (280 k-ft)
  Reaction Force = 76.5 tonne (168.7 kips)

- According to sheet S-15 of the drawings "Repair & Upgrade to Foxtrot (F-1) Pier stamped As-built January 28, 1997 by Black Const. Corporation (pg 58 of this document) the fender system installed for Dolphins "C" and "D" was a Trellex MV1250x900A unit fender. The properties are as follows:
  (2)-MV1250x900A Fenders: Energy Absorption = 70.2 tonne-m (506 k-ft)
  Reaction Force = 122.4 tonne (270 kips)

4) Based on EMPSCO's design the dolphin will behave as follows.
  - Assuming the EMPSCO design energy occurs and the original selected fenders were installed the fender system will not have enough energy capacity. The impact energy calculated by EMPSCO, $E_N = 77.5$ tonne-m (560 k-ft), is twice as much as the Energy Absorption capacity of the designed fender, (1)-SUC2000H-R1 Fender Energy Absorption = 38.7 tonne-m (280 k-ft). This means the dolphin will need to deflect a significant distance to absorb the remaining energy. In addition, once the design fenders reach their maximum deflection of 55% the reaction force seen by the dolphins will start to increase exponentially.

  - According to the As-built drawings, the installed fenders will be slightly overstressed. The impact energy calculated by EMPSCO, $E_N = 77.5$ tonne-m (560 k-ft), is slightly greater then the Energy Absorption capacity

Foxtrot Pier 1
Port Authority of Guam

Ben C. Gerwick, Inc.
Prepared by: JPC
Job #: 2004-35

of the installed fenders, (2)-MV1250x900A Fenders: Energy Absorption = 70.2 tonne-m (506 k-ft). This means the dolphin will experience a higher reaction forces then the rated value of the (2)-MV1250x900A Fenders.

- If the berthing energies calculated assuming an easy berthing, exposed situation were to occur for either the design or as-built drawing fenders, both would not have enough energy capacity. The impact energy calculated $E_N = 106$ tonne-m (766 k-ft), is significantly larger then the Energy Absorption capacity of the designed fender, (1)-SUC2000H-R1 Fender Energy Absorption = 38.7 tonne-m (280 k-ft) or the installed fenders, (2)-MV1250x900A Fenders: Energy Absorption = 70.2 tonne-m (506 k-ft). This again will cause the dolphin to deflect a significant distance to absorb the remaining energy and cause larger then expected forces transferred to the dolphin.

# Ben C. Gerwick, Inc. Berthing Energy Calculations

## Berthing Energy Summary

| Vessel Deadweight (DWT) tonnes | Displacement ($M_D$) tonnes | Berthing Velocity ($v_B$) m/s | ft/s | $C_M$ | $C_E$ | $C_C$ | $C_S$ | Normal Energy ($E_N$) kN-m | tonne-m | kip-ft | Abnormal Energy ($E_{AB}$)=1.25*$E_N$ kN-m | tonne-m | kip-ft |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 150000 | 186000 | 0.098 | 0.32 | 1.683 | 0.691 | 1 | 1 | 1039 | 106 | 766 | 1298 | 132 | 957 |
| 125000 | 156000 | 0.105 | 0.34 | 1.688 | 0.674 | 1 | 1 | 978 | 100 | 721 | 1223 | 125 | 902 |
| 105000 | 131200 | 0.113 | 0.37 | 1.699 | 0.652 | 1 | 1 | 928 | 95 | 684 | 1160 | 118 | 855 |
| 75000 | 96000 | 0.128 | 0.42 | 1.705 | 0.619 | 1 | 1 | 830 | 85 | 612 | 1037 | 106 | 765 |

| EMPSCO | | | | | | | | 759 | 77 | 560 | | | |

$$E_N = 1/2*M_D*v_B^2*C_M*C_E*C_C*C_S$$

FRASER DESIGN

Berthing velocities will depend upon the ease or difficulty of the approach, exposure of the berth and the size of the vessel. Conditions are normally divided into five categories as on the right.

The most widely used guide to berthing speeds is the Brolsma table, adopted by BS[1], PIANC[2] and other standards. For ease of use, speeds for main vessel sizes are tabulated.

| | |
|---|---|
| a | Easy berthing, sheltered |
| b | Difficult berthing, sheltered |
| c | Easy berthing, exposed |
| d | Good berthing, exposed |
| e | Difficult berthing, exposed |

## BERTHING VELOCITIES



For vessels between 10,000t and 500,000t the following formulas can be used with reasonable accuracy:-

$$V_{(a)} \approx 5995.1 \cdot M_D^{-0.4423}$$

$$V_{(b)} \approx 8405.5 \cdot M_D^{-0.4431}$$

$$V_{(c)} \approx 10885 \cdot M_D^{-0.3859}$$

$$V_{(d)} \approx 12452 \cdot M_D^{-0.3746}$$

$$V_{(e)} \approx 12893 \cdot M_D^{-0.3825}$$

| Vessel | Velocity (v/v) | Velocity (s/s) |
|---|---|---|
| 75,000 | 0.128 | 0.41 |
| 105,000 | 0.112 | 0.36 |
| 125,000 | 0.105 | 0.34 |
| 150,000 | 0.098 | 0.31 |

## BERTHING VELOCITIES

| MD (tonne) | V(a) (mm/s) | V(b) (mm/s) | V(c) (mm/s) | V(d) (mm/s) | V(e) (mm/s) |
|---|---|---|---|---|---|
| 1,000 | 179 | 347 | 518 | 671 | 868 |
| 2,000 | 151 | 285 | 443 | 574 | 722 |
| 3,000 | 135 | 266 | 402 | 522 | 647 |
| 4,000 | 126 | 249 | 378 | 489 | 594 |
| 5,000 | 117 | 233 | 352 | 459 | 561 |
| 10,000 | 95 | 191 | 288 | 378 | 452 |
| 20,000 | 75 | 155 | 229 | 306 | 359 |
| 30,000 | 64 | 135 | 200 | 266 | 309 |
| 40,000 | 57 | 121 | 177 | 238 | 277 |
| 50,000 | 52 | 112 | 163 | 219 | 254 |
| 100,000 | 39 | 86 | 126 | 170 | 200 |
| 200,000 | 27 | 62 | 94 | 129 | 156 |
| 300,000 | 21 | 48 | 76 | 108 | 132 |
| 400,000 | 19 | 44 | 71 | 99 | 125 |
| 500,000 | 18 | 41 | 68 | 96 | 121 |

76

# Berthing Energy Calculations
in accordance with
BS6349 : Part 4 : 1994

## PROJECT INFORMATION

| Project Title | Winsor & Kelly |
|---|---|
| Country | Guam |
| Project Reference | 2004-35 |
| Prepared By | JPC |

## SHIP DATA

| Ship Category | | Tanker |
|---|---|---|
| Deadweight | dwt | 150,000 t |
| Displacement | $M_D$ | 186,000 t |
| Overall Length | $L_{OA}$ | 285.0 m |
| Length Between Perpendiculars | $L_{BP}$ | 270.0 m |
| Beam | B | 49.50 m |
| Laden Draft | D | 16.90 m |
| Freeboard | F | 8.20 m |
| Block Coefficient | $C_B$ | 0.803 |

## BERTHING DATA

| Berthing Mode | | Dolphin Berthing |
|---|---|---|
| Structure Type | | Open Structure |
| Eccentricity Calculation Method | | Simplified Calculation |
| Under Keel Clearance | $K_D$ | 2.00 m |
| Impact from Bow | x | 35.00 % |
| | | 94.50 m |
| Radius of Gyration | K | 70.89 m |
| Impact to Centre of Mass | R | 47.46 m |
| Berthing Angle | α | 1.00 deg |
| Velocity Vector Angle | γ | 90.00 deg |
| Added Mass Coefficient | $C_M$ | 1.683 |
| Eccentricity Coefficient | $C_E$ | 0.691 |
| Berth Configuration Coefficient | $C_C$ | 1.000 |
| Softness Coefficient | $C_S$ | 1.000 |

## BERTHING ENERGY

| Berthing Velocity | $V_B$ | 98 mm/s | (0.32 ft/s) |
|---|---|---|---|
| | "c" | Easy berthing, exposed | |
| Normal Energy | $E_N$ | 1039 kNm | (766 k·ft) |
| | | 105.9 t-m | |
| Factor of Safety | $F_S$ | 1.25 * | |
| | $E_A$ | 1298 kNm | |
| | | 132.4 t-m | |

For further information about this
spreadsheet, please contact Fentek:-

Tel : +44 1666 827660

*User defined

# Berthing Energy Calculations
In accordance with
BS6349 : Part 4 : 1994

## PROJECT INFORMATION

| Project Title | | Winsor & Kelly |
|---|---|---|
| Country | | Guam |
| Project Reference | | 2004-35 |
| Prepared By | | JPC |

## SHIP DATA

| Ship Category | | Tanker |
|---|---|---|
| Deadweight | dwt | 125,000 t |
| Displacement | $M_D$ | 156,000 t |
| Overall Length | $L_{OA}$ | 270.0 m |
| Length Between Perpendiculars | $L_{BP}$ | 255.0 m |
| Beam | B | 46.50 m |
| Laden Draft | D | 16.00 m |
| Freeboard | F | 7.50 m |
| Block Coefficient | $C_B$ | 0.802 |

## BERTHING DATA

| Berthing Mode | | Dolphin Berthing |
|---|---|---|
| Structure Type | | Open Structure |
| Eccentricity Calculation Method | | Simplified Calculation |
| Under Keel Clearance | $K_D$ | 2.00 m |
| Impact from Bow | x | 34.20 % |
| | | 87.21 m |
| Radius of Gyration | K | 66.91 m |
| Impact to Centre of Mass | R | 46.52 m |
| Berthing Angle | α | 1.00 deg |
| Velocity Vector Angle | γ | 90.00 deg |
| Added Mass Coefficient | $C_M$ | 1.688 |
| Eccentricity Coefficient | $C_E$ | 0.674 |
| Berth Configuration Coefficient | $C_C$ | 1.000 |
| Softness Coefficient | $C_S$ | 1.000 |

## BERTHING ENERGY

| Berthing Velocity | $V_B$ | 105 mm/s | (0.34 ft/s) |
|---|---|---|---|
| | "c" | Easy berthing, exposed | |
| Normal Energy | $E_N$ | 978 kNm | (721 k-ft) |
| | | 99.7 t-m | |
| Factor of Safety | $F_S$ | 1.25 * | |
| | $E_A$ | 1223 kNm | |
| | | 124.7 t-m | |

For further information about this
spreadsheet, please contact Fentek:-

Tel : +44 1666 827660

*User defined

# Berthing Energy Calculations
in accordance with
## BS6349 : Part 4 : 1994

## PROJECT INFORMATION

| Project Title | Winsor & Kelly |
|---|---|
| Country | Guam |
| Project Reference | 2004-35 |
| Prepared By | JPC |

## SHIP DATA

| Ship Category | | Tanker |
|---|---|---|
| Deadweight | dwt | 105,000 t |
| Displacement | $M_D$ | 131,200 t |
| Overall Length | $L_{OA}$ | 254.0 m |
| Length Between Perpendiculars | $L_{BP}$ | 239.8 m |
| Beam | B | 43.70 m |
| Laden Draft | D | 15.28 m |
| Freeboard | F | 6.94 m |
| Block Coefficient | $C_B$ | 0.799 |

## BERTHING DATA

| Berthing Mode | | Dolphin Berthing |
|---|---|---|
| Structure Type | | Open Structure |
| Eccentricity Calculation Method | | Simplified Calculation |
| Under Keel Clearance | $K_D$ | 2.00 m |
| Impact from Bow | x | 33.20 % |
| | | 79.61 m |
| Radius of Gyration | K | 62.78 m |
| Impact to Centre of Mass | R | 45.83 m |
| Berthing Angle | $\alpha$ | 1.00 deg |
| Velocity Vector Angle | $\gamma$ | 90.00 deg |
| Added Mass Coefficient | $C_M$ | 1.699 |
| Eccentricity Coefficient | $C_E$ | 0.652 |
| Berth Configuration Coefficient | $C_C$ | 1.000 |
| Softness Coefficient | $C_S$ | 1.000 |

## BERTHING ENERGY

| Berthing Velocity | $V_B$ | 113 mm/s | (0.37 ft/s) |
|---|---|---|---|
| | "c" | Easy berthing, exposed | |
| Normal Energy | $E_N$ | 928 kNm | (684 k-ft) |
| | | 94.6 t-m | |
| Factor of Safety | $F_S$ | 1.25 * | |
| | $E_A$ | 1160 kNm | |
| | | 118.2 t-m | |

For further information about this
spreadsheet, please contact Fentek:-

Tel : +44 1666 827660

*User defined

# Berthing Energy Calculations
### In accordance with
### BS6349 : Part 4 : 1994

## PROJECT INFORMATION

| Project Title | Winsor & Kelly |
|---|---|
| Country | Guam |
| Project Reference | 2004-35 |
| Prepared By | JPC |

## SHIP DATA

| | | | |
|---|---|---|---|
| Ship Category | | Tanker | |
| Deadweight | dwt | 75,000 | t |
| Displacement | $M_D$ | 96,000 | t |
| Overall Length | $L_{OA}$ | 230.0 | m |
| Length Between Perpendiculars | $L_{BP}$ | 218.0 | m |
| Beam | B | 39.00 | m |
| Laden Draft | D | 13.75 | m |
| Freeboard | F | 5.80 | m |
| Block Coefficient | $C_B$ | 0.801 | |

## BERTHING DATA

| | | |
|---|---|---|
| Berthing Mode | | Dolphin Berthing |
| Structure Type | | Open Structure |
| Eccentricity Calculation Method | | Simplified Calculation |
| Under Keel Clearance | $K_D$ | 2.00 m |
| Impact from Bow | x | 31.50 % |
| | | 68.67 m |
| Radius of Gyration | K | 57.16 m |
| Impact to Centre of Mass | R | 44.80 m |
| Berthing Angle | α | 1.00 deg |
| Velocity Vector Angle | γ | 90.00 deg |
| Added Mass Coefficient | $C_M$ | 1.705 |
| Eccentricity Coefficient | $C_E$ | 0.619 |
| Berth Configuration Coefficient | $C_C$ | 1.000 |
| Softness Coefficient | $C_S$ | 1.000 |

## BERTHING ENERGY

| | | | |
|---|---|---|---|
| Berthing Velocity | $V_B$ | 128 mm/s | ( 0.42 ft/s ) |
| | "c" | Easy berthing, exposed | |
| Normal Energy | $E_N$ | 830 kNm | ( 612 t-ft ) |
| | | 84.6 t-m | |
| Factor of Safety | $F_S$ | 1.25 * | |
| | $E_A$ | 1037 kNm | |
| | | 105.8 t-m | |

For further information about this
spreadsheet, please contact Fentek:-

Tel : +44 1666 827660

*User defined



Calculation of Impact from Bow for Berthing Energy

SITE PLAN: FOXTROT "F-1" PIER
SCALE: 1" = 30'-0"

| DWT | L_bp m | Dolphin Spacing m | Bow to Point of Impact m | x % L_bp |
|-----|--------|-------------------|--------------------------|----------|
| 150000 | 270 | 80.8 | 94.6 | 0.350 |
| 125000 | 255 | 80.8 | 87.1 | 0.342 |
| 105000 | 239.8 | 80.8 | 79.5 | 0.332 |
| 75000 | 218 | 80.8 | 68.6 | 0.315 |

# Ben C. Gerwick, Inc. Fender Selection

## Trellex Fender Summary

| Vessel Deadweight (DWT) | Normal Energy ($E_N$) | Fender Size | 57.5% Rated Reaction | | Abnormal Energy ($E_{Ab}$=1.25*$E_N$) | Fender Size | 57.5% Rated Reaction | |
|---|---|---|---|---|---|---|---|---|
| | | | Energy Absoption | Reaction Force | | | Energy Absoption | Reaction Force |
| tonnes | tonne-m | | tonne-m | tonne | tonne-m | | tonne-m | tonne |
| 150000 | 106 | (2)-MV1450x1500B | 110.4 | 166.0 | 132 | (2)-MV1600x1500B | 134.4 | 183.6 |
| 125000 | 100 | (2)-MV1450x1000A | 105.2 | 158.0 | 125 | (2)-MV1600x1000A | 128.0 | 174.4 |
| 105000 | 95 | (2)-MV1450x1000A | 105.2 | 158.0 | 118 | (2)-MV1600x1000A | 128.0 | 174.4 |
| 75000 | 85 | (2)-MV1600x1000B | 89.6 | 122.0 | 106 | (2)-MV1450x1500B | 110.4 | 166.0 |

| EMPSCO | 77 | (2)-MV1250x900A (As-Built Fender) | 70.2 | 122.4 | | | | |
| | | Rated Reactions listed on As-Built drawings for (2)-MV1250x900A | 42.3 | 74.4 | | | | |



# Trellex Fender

# MV ELEMENT SELECTION
## STANDARD SIZES

Several other lengths L are available on request.
Ask your nearest Svedala Office for advice.

**PERFORMANCE VALUES IN THE TABLE ARE VALID FOR ONE SINGLE ELEMENT**

Single element may be used, but they are normally placed in pairs of 2, 4, 6 or more elements behind a shield or panel.

| Element size H x L<br>Compound A or B | Rated performance for one element | | | | | |
|---|---|---|---|---|---|---|
| | E<br>Tonne-m | R<br>Tonne | E<br>kNm | R<br>kN | E<br>Ft-kips | R<br>Klps |
| MV 300 x 600 B | 0.9 | 6.8 | 9 | 66 | 6 | 15 |
| x 600 A | 1.3 | 9.8 | 13 | 95 | 9 | 21 |
| x 900 B | 1.4 | 10.3 | 14 | 101 | 10 | 22 |
| x 900 A | 2.0 | 14.7 | 20 | 144 | 14 | 32 |
| x 1200 B | 1.8 | 13.7 | 18 | 134 | 13 | 30 |
| x 1200 A | 2.6 | 19.6 | 26 | 192 | 19 | 43 |
| x 1500 B | 2.3 | 17.2 | 22 | 168 | 16 | 38 |
| x 1500 A | 3.3 | 24.5 | 32 | 240 | 24 | 54 |
| MV 400 x 1000 B | 2.8 | 15.3 | 27 | 150 | 20 | 34 |
| x 1000 A | 4.0 | 21.8 | 39 | 214 | 29 | 48 |
| x 1500 B | 4.2 | 22.9 | 41 | 224 | 30 | 50 |
| x 1500 A | 6.0 | 32.7 | 59 | 321 | 43 | 72 |
| x 2000 B | 5.6 | 30.6 | 55 | 300 | 41 | 67 |
| x 2000 A | 8.0 | 43.6 | 78 | 428 | 58 | 96 |
| x 2500 B | 7.0 | 38.2 | 68 | 375 | 51 | 84 |
| x 2500 A | 10.0 | 54.6 | 98 | 530 | 72 | 120 |
| x 3000 B | 8.4 | 45.8 | 83 | 449 | 61 | 101 |
| x 3000 A | 12.0 | 65.4 | 117 | 642 | 87 | 144 |
| MV 500 x 1000 B | 4.3 | 19.0 | 43 | 187 | 32 | 42 |
| x 1000 A | 6.2 | 27.2 | 61 | 267 | 45 | 60 |
| x 1500 B | 6.5 | 28.6 | 64 | 280 | 47 | 63 |
| x 1500 A | 9.3 | 40.8 | 91 | 400 | 67 | 90 |
| x 2000 B | 8.7 | 38.2 | 85 | 374 | 63 | 84 |
| x 2000 A | 12.3 | 54.4 | 121 | 534 | 90 | 120 |
| MV 550 x 1000 B | 5.3 | 21.0 | 52 | 206 | 38 | 46 |
| x 1000 A | 7.6 | 30.0 | 75 | 294 | 55 | 66 |
| x 1500 B | 8.0 | 31.5 | 78 | 309 | 58 | 69 |
| x 1500 A | 11.4 | 45.0 | 112 | 441 | 82 | 99 |
| MV 600 x 1000 B | 6.3 | 22.8 | 62 | 224 | 46 | 50 |
| x 1000 A | 9.0 | 32.6 | 88 | 320 | 65 | 72 |
| x 1500 B | 9.5 | 34.2 | 93 | 336 | 69 | 76 |
| x 1500 A | 13.5 | 48.9 | 133 | 480 | 98 | 108 |
| MV 750 x 1000 B | 9.8 | 28.7 | 96 | 282 | 71 | 63 |
| x 1000 A | 14.0 | 41.0 | 137 | 402 | 101 | 90 |
| x 1500 B | 14.7 | 43.1 | 144 | 423 | 106 | 95 |
| x 1500 A | 21.0 | 61.5 | 206 | 603 | 152 | 136 |
| MV 800 x 1000 B | 11.2 | 30.5 | 110 | 299 | 81 | 67 |
| x 1000 A | 16.0 | 43.6 | 157 | 428 | 116 | 96 |
| x 1500 B | 16.8 | 45.8 | 165 | 449 | 122 | 101 |
| x 1500 A | 24.0 | 65.4 | 238 | 642 | 174 | 144 |
| x 2000 B | 22.4 | 61.0 | 220 | 599 | 162 | 134 |
| x 2000 A | 32.0 | 87.2 | 314 | 856 | 232 | 192 |
| MV 1000 x 900 B | 15.8 | 34.3 | 155 | 337 | 113 | 76 |
| x 900 A | 22.5 | 49.0 | 221 | 481 | 162 | 108 |
| x 1000 B | 17.5 | 38.1 | 172 | 374 | 126 | 84 |
| x 1000 A | 25.0 | 54.4 | 245 | 534 | 180 | 120 |
| x 1500 B | 26.3 | 57.1 | 258 | 560 | 190 | 126 |
| x 1500 A | 37.5 | 81.6 | 368 | 800 | 270 | 180 |
| x 2000 B | 35.0 | 76.2 | 343 | 748 | 252 | 168 |
| x 2000 A | 50.0 | 108.8 | 490 | 1068 | 360 | 240 |
| MV 1250 x 900 B | 24.6 | 42.8 | 241 | 420 | 177 | 95 |
| x 900 A | 35.1 | 61.2 | 344 | 600 | 253 | 135 |
| x 1000 B | 27.3 | 47.6 | 268 | 467 | 197 | 105 |
| x 1000 A | 39.0 | 68.0 | 383 | 667 | 282 | 150 |
| x 1500 B | 41.0 | 71.4 | 402 | 701 | 296 | 158 |
| x 1500 A | 58.5 | 102.0 | 574 | 1001 | 423 | 225 |
| x 2000 B | 54.6 | 95.2 | 536 | 934 | 395 | 210 |
| x 2000 A | 78.0 | 136.0 | 766 | 1334 | 564 | 300 |
| MV 1450 x 1000 B | 36.8 | 55.3 | 361 | 543 | 266 | 122 |
| x 1000 A | 52.6 | 79.0 | 516 | 775 | 380 | 174 |
| x 1500 B | 55.2 | 83.0 | 542 | 813 | 399 | 183 |
| x 1500 A | 78.9 | 118.5 | 774 | 1162 | 570 | 261 |
| x 2000 B | 73.6 | 110.6 | 722 | 1085 | 532 | 244 |
| x 2000 A | 105.2 | 158.0 | 1032 | 1550 | 760 | 348 |
| MV 1600 x 1000 B | 44.8 | 61.0 | 440 | 599 | 323 | 135 |
| x 1000 A | 64.0 | 87.2 | 628 | 855 | 462 | 192 |
| x 1500 B | 67.2 | 91.6 | 659 | 898 | 485 | 202 |
| x 1500 A | 96.0 | 130.8 | 942 | 1283 | 603 | 288 |
| x 2000 B | 89.6 | 122.1 | 879 | 1197 | 647 | 269 |
| x 2000 A | 128.0 | 174.4 | 1256 | 1710 | 924 | 384 |

*Empsco Fender* (handwritten annotation at MV 1250 x 900 A row)



E = Energy absorption

R = Reaction force

F = Compression force

R = F

r = Rated deflection

Svedala MV elements are available in two standard compounds A and B.

The softer compound B gives lower values E and R than compound A for the same size of element.

The rated values in the table are valid for a deflection of 57.5% of H.

For performance ratings at other deflections, use the curves on page 9 in conjunction with the ratings in the table.

When selecting a MV element it will minimize reaction force, panel size and often cost if the element chosen has the maximum H permitted and the minimum E required by the application.

For use of single elements, odd number of elements and other special applications contact your nearest Svedala office.

Examples of applications see pages 3, 7 and 26.

*(handwritten)* As-Built Drawings for Foxtrot Pier F1 show that there is a MV Element at each berthing point. Design values are 2x as shown in the table.

8

# PERFORMANCE CURVES

Valid for all sizes and rubber compounds



Rated values at 300 mm/s deflection.
Performance tolerance ±10% of rated.



Detailed curves for all element sizes available on request.

Ben C. Gerwick, Inc.
Prepared by: JPC
Job #: 2004-35

Foxtrot Pier F1
Port Authority of Guam

## Bridgestone Fender Summary

| Vessel Deadweight (DWT) | Normal Energy ($E_N$) | 52.5% Rated Reaction | | | Abnormal Energy ($E_{ab}$)=1.25*$E_N$ | 52.5% Rated Reaction | | |
|---|---|---|---|---|---|---|---|---|
| | | Fender Size | Energy Absoption | Reaction Force | | Fender Size | Energy Absoption | Reaction Force |
| tonnes | tonne-m | | tonne-m | tonne | tonne-m | | tonne-m | tonne |
| 150000 | 106 | SUC2000H-R1 | 125.1 | 142.5 | 132 | SUC2000H-R0 | 156.4 | 178.1 |
| 125000 | 100 | SUC2000H-R1 | 125.1 | 142.5 | 125 | SUC2000H-R1 | 125.1 | 142.5 |
| 105000 | 95 | SUC1700H-R0 | 96.0 | 128.7 | 118 | SUC2000H-R1 | 125.1 | 142.5 |
| 75000 | 85 | SUC1700H-R0 | 96.0 | 128.7 | 106 | SUC2000H-R1 | 125.1 | 142.5 |
| EMPSCO | 77 | SUC1150H-RH (Designed Fender) | 38.7 | 76.5 | | | | |

BRIDGESTONE

# CELL FENDER SERIES



Case 1:03-cv-00009    Document 281    Filed 10/26/2005    Page 29 of 37

# 2 TABLE OF PERFORMANCE

## TABLE OF PERFORMANCE:

| Size of Fender | Rubber Grade | 52.5% (Rated Deflection) | | 55 % | |
|---|---|---|---|---|---|
| | | Reaction Force: tons | Energy Absorption: ton-m. | Reaction Force: tons | Energy Absorption: ton-m. |
| SUC400H | R1 | | | 6.1 | 1.1 |
| | R0 | | | 7.6 | 1.3 |
| | RH | | | 9.8 | 1.7 |
| | RS | | | 11.4 | 2.0 |
| | RE | | | 12.8 | 2.2 |
| SUC500H | R1 | | | 9.5 | 2.1 |
| | R0 | | | 11.8 | 2.6 |
| | RH | | | 15.4 | 3.4 |
| | RS | | | 17.7 | 3.9 |
| | RE | | | 20.0 | 4.4 |
| SUC630H | R1 | | | 14.9 | 4.1 |
| | R0 | | | 18.6 | 5.1 |
| | RH | | | 24.2 | 6.7 |
| | RS | | | 28.0 | 7.7 |
| | RE | | | 31.5 | 8.7 |
| SUC800H | R1 | | | 22.9 | 8.0 |
| | R0 | | | 29.8 | 10.4 |
| | RH | | | 38.5 | 13.5 |
| | RS | | | 44.6 | 15.6 |
| | RE | | | 50.3 | 17.6 |
| SUC1000H | R1 | | | 37.9 | 16.6 |
| | R0 | | | 47.3 | 20.7 |
| | RH | | | 61.5 | 26.9 |
| | RS | | | 71.0 | 31.0 |
| | RE | | | 80.0 | 35.0 |
| SUC1150H | R1 | | | 50.1 | 25.2 |
| | R0 | | | 62.6 | 31.5 |
| | RH | | | 81.4 | 40.9 |
| | RS | | | 93.9 | 47.2 |
| | RE | | | 105.8 | 53.2 |
| SUC1250H | R1 | | | 59.2 | 32.3 |
| | R0 | | | 73.9 | 40.4 |
| | RH | | | 96.1 | 52.6 |
| | RS | | | 110.9 | 60.6 |
| | RE | | | 125.0 | 68.3 |
| SUC1450H | R1 | | | 79.6 | 50.5 |
| | R0 | | | 99.5 | 63.1 |
| | RH | | | 129.4 | 82.0 |
| | RS | | | 149.3 | 94.7 |
| | RE | | | 168.2 | 106.6 |
| SUC1600H | R1 | 91.2 | 64.1 | 96.9 | 67.8 |
| | R0 | 114.0 | 80.1 | 121.2 | 84.8 |
| | RH | 148.2 | 104.1 | 157.5 | 110.2 |
| | RS | 171.0 | 120.1 | 181.7 | 127.2 |
| | RE | 192.6 | 135.3 | 204.7 | 143.3 |

EMPSCO FENDER → SUC1150H

(x-f.)

## 2. TABLE OF PERFORMANCE

| Size of Fender | Deflection Rubber Grade | 52.5 % (Rated Deflection) | | 55 % | |
|---|---|---|---|---|---|
| | | Reaction Force: tons | Energy Absorption: ton-m. | Reaction Force: tons | Energy Absorption: ton-m. |
| SUC1700H | R1 | | | 109.4 | 81.4 |
| | R0 | | | 136.8 | 101.7 |
| | RH | | | 177.8 | 132.2 |
| | RS | | | 205.2 | 152.5 |
| | RE | | | 231.1 | 171.9 |
| SUC2000H | R1 | | | 161.4 | 132.5 |
| | R0 | | | 189.3 | 165.6 |
| | RH | | | 246.1 | 215.3 |
| | RS | | | 283.9 | 248.4 |
| | RE | | | 319.9 | 279.8 |
| SUC2250H | R1 | | | 226.0 | 222.4 |
| | R0 | | | 265.9 | 261.7 |
| | RH | | | 345.7 | 340.2 |
| | RS | | | 398.9 | 392.5 |
| | RE | | | 449.4 | 442.3 |
| SUC2500H | R1 | | | 279.1 | 305.1 |
| | R0 | | | 328.3 | 359.0 |
| | RH | | | 426.8 | 466.7 |
| | RS | | | 492.5 | 538.5 |
| | RE | | | 554.9 | 606.7 |
| | | | | Tolerance: | ± 10 % |

| Size of Fender | Deflection Rubber Grade | 47.5 % (Rated Deflection) | | 50 % | |
|---|---|---|---|---|---|
| | | Reaction Force: tons | Energy Absorption: ton-m. | Reaction Force: tons | Energy Absorption: ton-m. |
| C3000H | R1 | | | 440.0 | 465.0 |
| | R0 | | | 520.0 | 545.0 |
| | RH | | | 675.0 | 720.0 |
| | RS | | | — | — |
| | RE | | | — | — |
| | | | | Tolerance: | ± 10 % |

Conversion Table:

| | Reaction Force: | To: | | | | Energy Absorption | To: | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Ton | kN | Kips | | | Ton-m | kN-m | Ft-Kips |
| From: | Ton | — | ×9.807 | ×2.205 | From: | Ton-m | — | ×9.807 | ×7.235 |
| | kN | ×0.1020 | — | ×0.2248 | | kN-m | ×0.1020 | — | ×0.738 |
| | Kips | ×0.454 | ×4.45 | — | | Ft-Kips | ×0.138 | ×1.36 | — |

## 3. DIMENSIONS AND PERFORMANCE

# SUC1150H

**(1) Dimensions**



Approx. Weight ≈ 1200 kg
(2645 lbs)

Unit: mm (Inch)

**(2) Location of bolt holes**



Unit: mm (Inch)

## 3. DIMENSIONS AND PERFORMANCE

# SUC1150H

### (3) Performance

| Deflection | 52.5 % (Rated Deflection) | | 55.0 % | |
| Rubber Grade | Reaction Force: tons kN Kips | Energy Absorption: ton-m kNm Ft-kips | Reaction Force: tons kN Kips | Energy Absorption: ton-m kNm Ft-kips |
| --- | --- | --- | --- | --- |
| R1 | 47.? 461.9 103.8 | 23.8 233.? 172.? | 50.1 491.3 110.5 | 25.2 247.1 182.3 |
| R0 | 58.? 574.? 130.? | 29.? 291.? 2??.? | 62.6 613.9 138.0 | 31.5 308.9 227.9 |
| RH | 76.5 750.2 168.? | 38.7? 379.? 2?9.? | 81.4 798.3 179.5 | 40.9 401.1 295.9 |
| RS | 88.? 1197.? 1??.? | ?4.? 4??.? 3?3.? | 93.9 920.8 207.0 | 47.2 462.9 341.5 |
| RE | 99.5 975.0 219.? | 50.? 4??.? 3??.? | 105.8 1,037.5 233.3 | 53.2 521.7 384.9 |

Tolerance: ± 10 %

### (4) Performance Curve



※ "Intermediate rubber grades giving performance characteristics ± 5% or ± 10% on above standard rubber grades are available on request."

## 3. DIMENSIONS AND PERFORMANCE

# SUC1700H

**(1) Dimensions**



Approx. Weight = 3700 kg
(8160 lbs)

Unit: mm (Inch)

**(2) Location of bolt holes**



Unit: mm (Inch)

## 3. DIMENSIONS AND PERFORMANCE

# SUC1700H

### (3) Performance

| Deflection | 52.5 % (Rated Deflection) | | 55.0 % | |
| Rubber Grade | Reaction Force: tons kN Kips | Energy Absorption: ton-m kNm Ft-kips | Reaction Force: tons kN Kips | Energy Absorption: ton-m kNm Ft-kips |
|---|---|---|---|---|
| R1 | *(illegible)* | *(illegible)* | 109.4 1,072.8 241.2 | 81.4 798.3 588.9 |
| R0 | *(illegible)* | *(illegible)* | 136.8 1,341.5 301.6 | 101.7 997.3 735.8 |
| RH | *(illegible)* | *(illegible)* | 177.8 1,743.6 392.0 | 132.2 1,296.4 956.5 |
| RS | *(illegible)* | *(illegible)* | 205.2 2,012.3 452.5 | 152.5 1,495.5 1,103.3 |
| RE | *(illegible)* | *(illegible)* | 231.1 2,266.3 509.6 | 171.9 1,685.8 1,243.7 |

Tolerance: ± 10 %

### (4) Performance Curve



※ "Intermediate rubber grades giving performance characteristics ± 5% or ± 10% on above standard rubber grades are available on request."

## 3. DIMENSIONS AND PERFORMANCE

# SUC2000H

**(1) Dimensions**



Approx. Weight = 5000 kg
(11,025 lbs)

Unit: mm (inch)

**(2) Location of bolt holes**



Unit: mm (inch)

## 3. DIMENSIONS AND PERFORMANCE

# SUC2000H

### (3) Performance

| Deflection | 52.5 % (Rated Deflection) | | 55.0 % | |
|---|---|---|---|---|
| Rubber Grade | Reaction Force: tons kN Kips | Energy Absorption: ton-m kNm Ft-kips | Reaction Force: tons kN Kips | Energy Absorption: ton-m kNm Ft-kips |
| R1 | *(illegible)* | *(illegible)* | 151.4 1,484.7 333.8 | 132.5 1,299.4 958.6 |
| R0 | *(illegible)* | *(illegible)* | 189.3 1,856.4 417.4 | 165.6 1,624.0 1,198.1 |
| RH | *(illegible)* | *(illegible)* | 246.1 2,413.4 542.7 | 215.3 2,111.4 1,557.7 |
| RS | *(illegible)* | *(illegible)* | 283.9 2,784.1 626.0 | 248.4 2,436.0 1,797.2 |
| RE | *(illegible)* | *(illegible)* | 319.9 3,137.1 705.4 | 279.8 2,743.9 2,024.4 |

Tolerance: ± 10 %

### (4) Performance Curve



※ "Intermediate rubber grades giving performance characteristics ± 5% or ± 10% on above standard rubber grades are available on request."

# EMPSCO Documentation Report



PORT AUTHORITY OF GUAM
GOVERNMENT OF GUAM
1026 CABRAS HIGHWAY
SUITE 201 PITI GUAM 96925

# ENGINEERING DOCUMENTATION REPORT

FOR

## REPAIRS AND UPGRADING TO FOXTROT "F-1" PIER
## APRA HARBOR                    GUAM, MI.

SUBMITTED BY:

**EMPSCO–Engineering Consultants**
o   Suite 246 Julale Shopping Center
    Agana, Guam 96910

o   2nd Floor Island Commercial Building
    Gualo Rai Saipan MP 96950



0071

Case 1:03-cv-00009     Document 281-2     Filed 10/26/2005     Page 2 of 32

## 6.2 DOCKING SHIP

The maximum impact caused by a ship striking the dock when berthing is based upon certain assumptions as to the ships operation with respect to the angle and speed with which it approaches the dock. The speed of approach will have to be assumed and it is this velocity where the greatest uncertainty exists, considering that the effect on the energy varies as the square of velocity. Reference 1 has indicated this velocity will be between 0.15 and 1.0 ft. per second, normal to the dock. Heavier ships docking in protected locations and with tug assistance can attain velocities below 0.5 ft. per second.

### A. Berthing Energy

The kinetic energy of impact is $E = 1/2 \, MV^2$; substituting $W/g$ for the mass M, the energy formula is given by:

$$E = 1/2 \times W/g \times V^2$$

The energy to be absorb by the fender system and dock is 1/2E. The remaining one-half is assumed to be absorbed by the ship and water. This energy 1/2E must be absorbed by the fender system in bringing the ship to rest. This system of calculating energy is the most frequently used since it is based on the energy formulas.

As per original design criteria (Reference 9), each breasting dolphin "C" or "D" and the fendering system was designed for 280 Ft-Ton impact energy.

### B. Statistical Data

Considering the factors and the difficulty of obtaining the proper berthing coefficient and to obtain a correct mathematical relationship between energy and velocity; Dent and Saurin, Reference 2 has proposed as statistical approach based on recorded impacts to provide a sound basis for fender system design. Reference 2 has recommended that for a berth exposed to

0094

Case 1:03-cv-00009    Document 281-2    Filed 10/26/2005    Page 3 of 32

moderate wind and waves as well as a moderate approach to the berth, the following energy values should be used:

1.    16.8 feet-kips per 1000 DWT of design ship at yield stress in the fenders (2.32 meters-tons/1000 DWT);

2.    11.2 feet-kips per 1000 DWT as a normal maximum related to approximately maximum working stress in breasting structures and fenders (1.55 meter-tons/1000 DWT).

For berths located in protected harbors, five-eights of the above figures are recommended.

The statistical data provided by Reference 2 are in many respects applicable to Pier F-1 where berthing conditions are considered favorable.

It is therefore reasonable to assume that a larger vessel will berth at a lesser velocity then a smaller vessel.

## C. Lateral Loads

A moored ship subjects the fender system to impacts caused by winds, waves and currents. Loads from the mooring lines pull the ship into or along the dock or hold it against the force of the wind or current. Analysis on the adequacy of the mooring points is beyond the scope of this report.

The maximum wind force is equal to the exposed area of the broadside of the ship in light condition multiplied by the wind pressure to which a shape factor of 1.3 is applied. Quinn, Reference 1, has recommended a design maximum wind pressure of 20 pounds per square foot.

Considering that Pier F-1 is located in a protected harbor, wave forces for this case is assumed to be minimal and thus considered to have lesser impact on the fendering system as compared

0095

to berthing forces. Further it is assumed that the ship is generally berthed parallel to the current and therefore this force will seldom be a controlling factor.

A review of the design calculations by Transen Associates, Limited, Reference 9, indicates that seismic forces were considered in the design.

## D. Type of Vessel

The size, shape and tonnage of the ship will control the whole design process of the fendering system.

As documented in Transen Associates, Limited, Reference 9, the original design analysis for the breasting and mooring dolphins are based on 90,000-DWT Tanker.

As previously stated, it is the intent of this project to up-grade the fendering system to accommodate the berthing of 150,000 DWT vessel. A list of vessel accommodation preferences, most of which had berthed at dock F-1 is shown in Table 1. Based on Port Authority records, the vessel - M/T Oriental Phoenix (138,400 DWT) has been accommodated at Berth F-1 on December 1980.

## E. Docking Maneuvers

From Quinn, Reference 1, it stated that for design purpose we assume that the ship approaches the berth at some angle along its fore or aft axis and makes a quarter point contact near the bow or stern with the fender. It is also accepted that the maximum allowable angle of approach between the ships axis and the berthing line is 10 to 15 degrees out of a parallel position and any approach having a higher angular value is undesirable. Although the above design approach is commonly used it does not actually describe the berthing of the large ships. Usually the ship will arrive off the berth and parallel to it at a velocity of less than half a knot. The docking will almost always be tug assisted otherwise there is too great a chance of damage either to the ship, the fender system, or the fender support structure. The ship then stops dead in the water and

0096

TABLE 1: F-1 Dock - Vessel Accommodation Preferences

| Ships Name | Draft (feet) | LOA (feet) | BCM (m) | DWT |
|---|---|---|---|---|
| F-1 Dock Limits | 55.0 | 900 | 146.0 | |
| Williams E. Crain | 55.1 | 901 | 139.3 | 155.149 |
| Tromso (fleet) | 52.9 | 898 | 138.1 | 139,497 |
| Largest Vessel to Berth at F-1 Dock Oriental Phoenix | | 902.17 | 137.5 | 138,392 |
| North Pacific | 47.6 | 807 | 122.5 | 107,596 |
| Pacific Isis | 45.2 | 738 | | 69,999 |
| Lucy | 43.7 | 754 | 115.2 | 66,183 |
| Halia | 40.0 | 601 | 92.0 | 46,995 |
| Highseas | 41.1 | 584 | 83.8 | 45,018 |
| Melodia | 38.6 | | 86.9 | 41,450 |
| GPA RFO Tanker St. Nikolai | 39.7 | 600 | 91.7 | 45,576 |
| Shell Product Tanker Elona | 35.9 | 555 | 81.4 | 31,487 |
| Esso Tees | 31.1 | 558 | 84.4 | 21,455 |
| LPG Tankers Victoria Lily Cheltenham | 15.9 18.9 | 326 326 | 45.0 | 3,785 3,400 |
| Mother Ships Crane Silver | | | | 4,000 |
| Perseiners | | | | 1,300 |

0097

the tugs then push and pull the ship with the assistance of the ships lines broadside on to the fenders. The last 10 to 15 meters the ship slows down to reduce impact and to contact the fenders simultaneously. This ideal is almost never realized and from the observations of several tug assisted large container ship berthing the angle to the berthing line was in the order of 1/2 to 1 degrees. It is therefore reasonable to assume that the operational angle of approach for large ships would be under 3 degrees.

This procedure of bringing the ship parallel to the berthing line and having the ship trench as many fenders simultaneously as possible forms the basis of our berthing criteria.

Observations and Measurements of berthing velocities in European for 150,000 DWT bulk carriers and 200,000 DWT tankers shows that the maximum recorded velocity 5 meters from the dock was 14.6 cm/sec (0.48 ft/sec) and 1/2 meter from the dock the maximum recorded velocity was 6.0 cm/sec (0.2 ft/sec).



Table 2 shows design berthing velocities as recommended by "Modern Fendering Systems" (Reference 3). This study cites measurements for tankers in Europort and recommends that tankers above 30,000 DWT use the design berthing valves shown in Table 3.



0098



Table 2 - Design Berthing Velocities

| Position | Approach | Berthing Velocity in | |
|----------|----------|--------|---------|
| | | ft/sec | (m/sec) |
| Exposed | Difficult | .66 | (.20) |
| | Good | .56 | (.17) |
| | Easy | .46 | (.14) |
| Sheltered | Difficult | .36 | (.11) |
| | Easy | .26 | (.08) |

From: Modern Fendering Systems, (Reference 3).

0099

Any disparity between the recommended/assumed designed valves and the unquantified descriptive terms for the berthing environment will normally result in a catastrophic effect on the fender system as well as the ship.

### F. Fender System

#### 1. General Considerations:

The primary parameter in fender design for the F-1 docking facility is the kinetic energy of the design vessel that must be absorbed at the time of berthing impact. Numerous types of energy absorbing devices have evolved and these may primarily classified under three major headings: springs; gravity and hydraulic or hydro-pneumatic. The most commonly designed fenders are the spring type which is further classified into; steel cantilever piles, rubber fenders, or a combination of both.



Different schemes to absorb energy vary widely in their respective stiffnesses. The stiffer fenders deflect a small amount producing high reaction forces, whereas softer fenders undergo large deflections and generate lower reaction forces. Softer fenders tend to be larger and the degree of softness is generally limited by size constraints. On one hand, the limiting factor in how stiff a fender can be is the level of the reaction force that the vessel and dock can withstand. In effect, as a fender becomes stiffer, the whole berthing load is transmitted directly from the ship to the pier.

#### 2. Design Considerations

From a design standpoint, fenders for Wharf F-1 are originally design to accommodate the berthing of 90,000 DWT vessels.



In December 1980, a study by Dravo Van Houten (DVH), Consulting Engineers made the recommendation for the replacement of the fender system to accommodate the mooring of a 125,000 DWT tanker at pier F-1. As documented in DVH's report, these replacement fenders

0100

consists of two Yokohama 1,800 by 2,400 Air Block Type fenders. DVH's report is contained in Appendix F.

Due to increased cargo handling, Shell Guam, Inc. has made the decision to upgrade the present vessel handling capability of F-1 to accommodate the 150,000 DWT vessel.

In view of the requirement to upgrade Pier F-1 fendering system the following criteria are established:

o     Absorb and dissipate the kinetic energy of a mooring vessel up to the 150,000 DWT.

o     Provide adequate separation between the ship and the breasting structures.

o     Exert a reaction pressure below the allowable limits of the pier or the ship's hull



o     Be durable and capable of performing even when mechanically damaged.

o     Be capable of overload without causing significant damaged to vessel or breasting dolphin.

o     Resists degradation due to environmental factors.

o     Require minimal maintenance.

0101

## 7.1 INTENT

The general intent under which the proposed rehabilitation measures are being implemented is based on the following:

A.    To perform necessary repairs to extend the serviceability of the pile structures.

B.    To accommodate the berthing of a 150,000 DWT using the existing breasting dolphins.

C.    To install a cathodic protection system for corrosion protection.



b) Replace heavily corroded sections and joints

c) Replace all anchor bolts

d) Where dissimilar metals as defined by MIL-STD-889 are in contract, protect surfaces with a coat conforming to FS-TT-P-664 to prevent galvanic or corrosive action.

e) Provide epoxy coating on metal surfaces.

f) Replace defective woodplanks and coat entire surface of planks with wood preservative.

## 7.5 REPLACEMENT OF FENDERS

Wharf F-1 terminal was originally built to handle 90,000 DWT tankers. Subsequent study indicated that a 125,000 DWT crude tanker can be safety moored at F-1 provided that air buffer fenders where installed. This study resulted the installation of two Yokohama 1,800 x 2,400 air block type fenders on each dolphins "C" and "D". For existing dolphin "G", the original fender design using Lord 5F-705 fender system with portslide bumpers still remains in service.

The decision made by Shell Guam Inc. to accommodate the mooring of 150,000 DWT at F-1 is the basis for the replacement of the fendering system at F-1. Based on our evaluation, analysis showed that by using a Bridgestone Cell series type fender, the reaction force from the 150,000 DWT was well within the allowable reaction force to the existing dolphin. This allowable reaction was based on report by Candac Limited, Reference 6. The report stated that the current capacity of the dolphin is assessed at forty percent of the original design capacity.

To ensure the functionality of this fender system, it is necessary that certain assumptions and criterias with respect to berthing velocity and docking maneuvers are strictly followed. A discussion of these criterias was previously presented in Section 6.0 of this report.

Case 1:03-cv-00009    Document 281-2    Filed 10/26/2005    Page 12 of 32

# **EMPSCO Design Calculations**



PORT AUTHORITY OF GUAM
GOVERNMENT OF GUAM
1026 CABRAS HIGHWAY
SUITE 201 PITI GUAM 96925

PORT AUTHORITY OF GUAM

## DESIGN CALCULATIONS

FOR

Ben C. Gerwlck, Inc.

JUN 7 2004

**Received**

## REPAIRS AND UPGRADING TO FOXTROT "F-1" PIER
## APRA HARBOR                    GUAM, MI.

SUBMITTED BY:

*EMPSCO-Engineering Consultants*

o   Suite 245 Julale Snopping Center
    Agana, Guam 96910

o   2nd Floor Island Commercial Building
    Gualo Rai Saipan MP 96950

APPROVED BY:

EULOGIO A. BERMUDES
General Manager
PORT AUTHORITY OF GUAM

0001

| DWT OF TANKER M TONS | BERTHING VELOCITY MAXIMUM M/S (f/s) | ANGLE OF APPROACH DEGREES | METHOD OF BERTHING (WITH TUG ASSISTANCE) |
|---|---|---|---|
| 75,000 | 0.10 (0.33) | Under 10 Degrees | Quarter point contact |
| 105,000 | 0.085 (0.28) | Under 3 Degrees | Parallel |
| 125,000 | 0.075 (0.25) | 1/2 to 1 Degrees | Parallel |
| 150,000 | 0.060 (0.20) | 1/2 to 1 degrees | Parallel |

6.　Other Requirements and Conditions:

(A)　Analysis for Wind Load

Recommended wind velocity is 75 MPH. For larger vessels, consider the effect of Dolphins "G" and "H" to resist wind force without exceeding allowable pile cap reaction.

As per original design only dolphins "C" and "D" are considered to resist design wind forces.

typ\Dolphins

0008



**EMPSCO**
Engineering Management
& Planning Services Corporation
SUITE 245 JULALE SHOPPING CENTER BLDG.
P.O. Box 21794, GMF GUAM 96921    TEL.(671)477-5716 · Fax(671)472-2136
2ND FLR. ICE BLDG.  GUALO RAI SAIPAN, CNMI    TEL. (670) 234-9213

ANALYSIS OF EXISTING DOLPHINS "C" & "D"

REF. TRANSEN ENGINEER LTD.

GORCO / DET. OF MOORING DOLPHINS "B" & "E"
AND EXISTING DOLPHIN "D" "C"
SHT. 151 THRU 510
DATED 16 APR 1967

FROM GEN. NOTES : SHT. S-2

DESIGN PILE LOADS:
22" Ø x 3/8" THK    →  120 TONS
16" Ø x 5/8" THK    →  100 TONS

FENDERING SYSTEM FOR DOLPHINS C and D ARE DESIGNED
FOR THE FOLLOWING:

1.  BOW IMPACT LOAD    →  280 FT-TONS
                        = 560 FT KIPS

2.  LOAD IN EITHER DIRECTION APPLIED
    TO FENDER FACE    →  1/3 OF FENDERING
                        DESIGN IMPACT
                        LOAD

3.  PILES    →  22" Ø W/ CONC. FILLED

PROJECT:  SHELL POINT - WHARF REPAIR
LOCATION:  PAGO HARBOUR
DESIGNED BY:  RV          CHECKED BY:              0010
DATE:  22 AUG 95          SHEET:      OF



## 3. DIMENSIONS AND PERFORMANCE

# SUC1160H    *NORMAC BERTHING*

### (3) Performance

| Rubber grade | Rated reaction force Tons Kips | Maximum reaction force Tons Kips | Rated energy absorption Ton-M Ft-Kips | Maximum energy absorption Ton-M Ft-Kips |
|---|---|---|---|---|
| RE | | 106.3 233.3 | 50.2 363.2 | 53.2 384.9 |
| RS | | 93.9 207.0 | 44.6 322.7 | 47.2 341.5 |
| RN | | 81.4 179.5 | 38.7 260.0 | 40.9 295.9 |
| R0 | 59.0 129.9 | 62.6 138.0 | 29.7 214.9 | 31.5 227.9 |
| R1 | 47.1 103.9 | 50.1 110.5 | 23.3 172.2 | 25.2 182.3 |

Rated deflection: 52.5%  
Maximum deflection: 55%  
Tolerance: ± 10%

### (4) Performance Curve



0024

*"Intermediate rubber grades giving performance characteristics ±5% or ±10% on above standard rubber grades are available on request."*

C  D

## 3. DIMENSIONS AND PERFORMANCE

# SUC1150H

### (1) Dimensions



Set View (A)

8 - φ60 (1.37)

View (A)
37 (1.46)

W 1.5/8"

290
(11.42)

P.C.D. φ1300 (51.18)

φ1500 (60.06)

1150 (45.27)

Approx. Weight = 1200 kg
(2645 lbs)

Unit: mm (inch)

### (2) Location of bolt holes



Case 1

1126 (44.33)

φ620 (25.59)

Case 2

1126
(44.33)

556
(25.59)



**EMPSCO**
Engineering Management
& Planning Services Corporation
SUITE 245 JULALE SHOPPING CENTER BLDG.
P.O. Box 21754, GMF GUAM 96921    TEL(671)477-5716    Fax(671)472-2136
2ND FLR. CC BLDG., CUILO Rd SAIPAN, CNMI    TEL. (670) 234-9213

EVALUATION OF BREASTING DOLPHIN "G" & "H"

REF: DRAWING No. S-13, S-10, S-11
BREASTING DOLPHIN "G" & "H"
for GUAM OIL & REFINING CO. DIV.
Prepared by: THOMAS N. PAHKEN & Assoc.
Date: 5-5-78

① BATTER PILES. 8 EA

○ VERT PILES 7 EA

(# TOTAL)

NOTE: BATTER PILES
ARE OFFSET FROM M-J
DIRECTION.
w/n.s.

FORCES ON BREASTING DOLPHIN.

1) TOTAL IMPACT ENERGY = 120 FT-TONS

2) BREASTING LOAD = 35 TONS NORMAL TO
FENDER SYSTEM.

SELECT FENDERING SYSTEM SUCH THAT REACTION ON PILE
CAP DOES NOT EXCEED 35 TONS AT DESIGN DISPLACEMENT

PROJECT: _____ SIZE _____ CONTOUR-1 _____ WEIGHT _____ 200 LB

LOCATION: _____ APRA HARBOUR

DESIGNED BY: _____    CHECKED BY: _____    0015

DATE: _____    SHEET ____ OF ____



**EMPSCO**
Engineering Management
& Planning Services Corporation
SUITE 245 JULALE SHOPPING CENTER BLDG.
P.O. Box 21794, GMF GUAM 96921   TEL (671)477-5716   Fax (671)472-2136
2ND FL. ICC BLDG.  CHALO AN SAIPAN, CM96   TEL (670) 234-9213

Consider Dolphins "G" & "H" to be used by 28,000 DWT
Vessel

$$\bar{E} = \frac{W \bar{v}^2}{g} = \frac{(28,000)\left[2,240 \times (0.332)^2\right]}{64.4}$$

$$= 105,994 \ \text{ft·lb} \qquad \text{Say} \qquad 108,000 \ \text{ft·lb} \ \text{ft·lb}$$

Assume load to reaction ratio = 0.45

Total reaction on pile cap = 0.45 × 108 = 48.6 Kips

@ 0.50 ⟶ Reaction = $\frac{108,000}{2}$ = 54,000 lb = 54 Kips

For 120 ft·ton impact load

⟹ load to reaction ratio = 0.45

Total reaction = (0.45)(120) = 54 Kips

(according to fender)

Plus ⅓ of the resulting remaining impact load acting normal to fender face in either direction

Reaction normal = 0.30 (54) = 16.2 Kips.

PROJECT: _____

LOCATION: _____

DESIGNED BY: _____ CHECKED BY: _____   0020

DATE: _____          SHEET _____ OF _____

## 3. DIMENSIONS AND PERFORMANCE

# SUC1000H

### (3) Performance

| Rubber grade | Rated reaction force Tons Kips | Maximum reaction force Tons Kips | Rated energy absorption Ton-M Ft-Kips | Maximum energy absorption Ton-M Ft-Kips |
|---|---|---|---|---|
| RE | | 80.0 176.4 | 33.0 238.8 | 33.0 263.2 |
| RS | | 71.0 156.6 | 29.3 212.0 | 31.0 224.3 |
| RH | | 61.5 135.6 | 26.4 183.8 | 26.9 194.6 |
| RO | | 47.3 104.3 | 19.5 141.1 | 20.7 149.8 |
| RT | 178.6 | 37.9 83.6 | 15.6 112.9 | 16.6 120.1 |

Rated deflection: 52.5%
Maximum deflection: 55%

Tolerance: ± 10%

*Noemic Beeming*

### (4) Performance Curve



*"Intermediate rubber grades giving performance characteristics ±5% or ±10% on above standard rubber grades are available on request."*

# 3. DIMENSIONS AND PERFORMANCE

## SUC1000H

### (1) Dimensions



Approx. Weight = 790 kg
(1740 lbs)

Unit: mm (Inch)

### (2) Location of bolt holes



Case 1

Case 2

Unit: mm (Inch)

0029

## Candac Limited Report

FILE          FILE

                                    FILE

# REPORT ON

# DAMAGED STRUCTURES

# F1 FACILITY

Ben C. Gerwick, Inc.

JUN 7 2004

Received

# GUAM

## For

## Shell Guam, Inc

## By

## Candac Limited

Candac Limited
Level 1, Building 3, Pymble Corporate Centre
20 Bridge Street, PYMBLE NSW 2073

0129

during construction or that the concrete quality of at least the cracked units was inadequate.

The aggregate used for the concrete was a limestone type and hence is porous. This would seriously effect the long term durability of the structure.

## 2.5    Comparison of Repair vs Replacement of Structure

A full cost analysis comparing the costs of repairing the dolphins with the costs of replacement should be carried out. To achieve this a proposed repair procedure is outlined in appendix b.

## 2.6    Further Investigation

It is recommended that a quantitative assessment of the degree of carbonation of the concrete structures be performed.

This would involve the coring of the concrete at selected locations, both on top of the concrete structures and underneath the structures, to at least the depth of the reinforcement.

The degree of carbonation could be assessed using techniques to determine the pH of the concrete.

If carbonation had progressed in excess of 50% of the concrete cover, then serious consideration should be given to replacement. The effect of the degree of carbonation should be assessed by a person with expertise in this type of work.

## 3    ASSESSMENT OF CURRENT CAPACITY OF THE STRUCTURE

The main berthing dolphins, that is dolphins C and D do have some residual structural capacity. This capacity is assessed to be 40% of the original design capacity.

The assessment of the capacity is detailed in appendix a. The capacity determined assumes that no corrosion allowance was made in the original design, but a corrosion allowance cannot be assumed based on the available information.

The berthing forces on the dolphins are directly proportional to the berthing velocity of the vessel. This is because the fendering system is (as documented by the Dravo Van Houten report) of the air buffer type. These fenders are believed to be Yokohama 1800 x 2400 air buffers. At least one of these air buffers is broken. The broken air buffers are to be replaced if the structure is to be repaired.

The Dravo Van Houten report indicates that the entire berthing

0134

system was checked for a vessel of 126000 DWT with a velocity of 0.33 ft per second when the original fendering system was replaced over ten years ago by the Yokohama air buffers. Hence the revised berthing velocity for this design vessel is 0.14 ft per second. As a matter of course the tug operators should use this velocity for all berthing procedures associated with the facility.

On dolphin D, the easternmost dolphin, one of the two air buffers is punctured and hence has no effect. The remaining buffer is still effective and since the berthing velocity has been reduced to below 50% of the design velocity then this arrangement is satisfactory.

Dolphin D appears to be in slightly better condition than dolphin C. Vessels should berth against dolphin D and then be swung around to dolphin C. The third points or less of the vessel should contact dolphin D. The center of the vessel should not be contacted with dolphin D during the berthing operation. This is to enable as little energy as possible to be imparted to dolphin D during berthing.

To ensure that the mooring dolphins are not overloaded during mooring berthed vessels must leave the mooring before high winds eventuate. To enable the vessel to leave safely, the vessel should leave when the wind velocity reaches 20 knots. This is conservative but is necessary to ensure a vessel is not caught at the mooring when winds exceed 35 knots.

The vessel would preferably be orientated such that the bow faced to the west. This would enable the anchors of the vessel to be set, so as to reduce the loads on mooring dolphins A and B.

## 4    INSPECTION REPORT

### 4.1    Introduction

Following the 8 August 1993 earthquake of 8.1 on the Richter Scale piled structures forming the Foxtrot 1 facility at Cabras Island were inspected to ascertain the degree of damage exhibited by these piled structures, and to determine proposed methods of repair.

The structures were inspected on 20 August and 21 by divers and by boat.

### 4.2    Piles

The piles for all structures consist of steel elements driven into the harbour bottom. These piles all exhibited various degrees of corrosion and some exhibited damage due to the earthquake.

0135

| PROJECT  F F GUAM | | DATE: AUG '15 | |
|---|---|---|---|
| | BY: JA | CHECKED: JA | PAGE: 2 |

DRAVO VAN HOUTEN REPORT

ORIGINAL BERTHING CRITERIA
- 90000 DWT SHIP
- WIND AREA 45500 square feet
- WIND VELOCITY 75 MPH
- 1EA IT PER MOORING POINT

AIR BUFFERS TWO YOKOHAMA 1800 X 2000 ?
HAVE BEEN INSTALLED.

A COMMENTARY OF THE CALCULATIONS FOR THE
EFFECT OF THE AIR BUFFERS IS INCLUDED
THIS STATES

25000 DWT TANKER BERTHING VELOCITY WILL
BE 0.5 FT per second

126,000 DWT TANKER BERTHING VELOCITY WILL
BE 0.33 FT per second

THE ABOVE IS A SAFE ASSESSMENT CONSIDERING
THE FAVOURABLE BERTHING CONDITIONS

WATERS ARE CALM
VERY LITTLE CURRENT
BERTH IS APPROXIMATELY ALIGNED
WITH N E TRADE WINDS 10-15 KNOTS
S F TRADE WINDS ARE LIGHTER

YOKOHAMA AIR BUFFERS PROVIDE A UNIFORM
FORCE TO THE DOLPHINS

HENCE THAT FORCE WHICH THE DOLPHIN IS
SUBJECTED TO IS DIRECTLY PROPORTIONAL TO THE
VELOCITY OF THE BERTHING VESSEL. THAT IS THE FORCE
IMPARTED TO THE DOLPHINS IS PROPORTIONAL TO THE DISPLACEMENT.
THIS IS MORE ONEROUS THAN THE TYPICAL ENERGY
METHOD OF DOLPHIN STRUCTURAL ACTION WHERE THE
ENERGY IMPARTED TO THE DOLPHINS IS PROPORTIONAL
TO THE VELOCITY SQUARED OF THE VESSEL

BECAUSE OF THIS, THE ALLOWABLE BERTHING
VELOCITY FOR THE DESIGN VESSEL IS DIRECTLY
PROPORTIONAL TO THE LOSS OF PILE CAPACITY

THE DOLPHINS HAVE BEEN DESIGNED FOR 2 YOKOHAMA
AIR BUFFERS ON DOLPHIN D. ONE OF THESE
BUFFERS IS NO LONGER WORKING. THE REACTION THERE
TO THE IMPOSED DISPLACEMENT OF THE BUFFERS IS DIRECTLY PROPORTIONAL
TO THE IMPOSED DISPLACEMENT OF THE BUFFERS I.E TO THE
VELOCITY OF THE VESSEL.

IT IS THUS CONSERVATIVE TO ASSUME A REDUCTION
IN BERTHING VELOCITY TO 10% OF THE DESIGN
VELOCITY.

HENCE BERTHING VELOCITY  126000 DWT VESSEL

$$V_B = 0.4 \times 0.33 \quad M \text{ per second}$$

$$= 0.132 \quad M \text{ per second}$$

SAY 0.14 DUE TO ABOVE CONSERVATIVE
ASSUMPTIONS

THIS CORRESPONDS TO A REDUCTION IN BERTHING
ENERGY TO $\left(\frac{0.14}{0.33}\right)^2 \times 100 = 18\%$ OF DESIGN

ENERGY

FOR SMALLER VESSELS THE VELOCITY COULD
BE INCREASED TO ALLOW FOR THE DECREASE IN
MASS THIS IS A LINEAR RELATIONSHIP.

HOWEVER, TO ENSURE THAT THE PILE
CAPACITIES ARE NOT EXCEEDED THE VELOCITY
SHOULD BE 0.14 M PER SECOND MAXIMUM.

THE EFFECT OF THE NUMEROUS PITS HAS BEEN
DETERMINED. IT HAS BEEN ASSUMED THAT THE
PITS TYPICALLY CAN BE CONSIDERED TO BE
HOLES OF ABOUT 8" DIAMETER, WITH UP TO
2 PER CROSS-SECTION. THIS,

**Transen Associates Limited Design Basis**

## NOTES:

1. ALL DESIGN LOADS ARE IN SHORT TONS.

2. THE DOLPHINS SHALL HAVE THE CAPACITY TO SAFELY RESIST THE HAWSER PULL LOADS SHOWN AND WITHIN THE SHADED SECTORS SHOWN AND WITHIN VERTICAL ANGLES FROM THE HORIZONTAL AS FOLLOWS:
   DOLPHINS "A" & "E" -15°
   DOLPHINS B & E "-17½°
   DOLPHINS C & D" -15°

3. ONLY ONE SECTOR LOAD ON A PARTICULAR DOLPHIN SHALL ACT AT ANY ONE TIME.

4. BREASTING LOADS ARE SHOWN AS THE TOTAL FORCE ACTING ON THE DOLPHINS ("C" and "D") AND SHALL BE CONSIDERED TO ACT UNIFORMLY OVER THE ENTIRE BREASTING FACE. THE BREASTING LOADS SHALL NOT ACT CONCURRENT WITH HAWSER PULL LOADS.

5. EACH BREASTING DOLPHIN ("C" and "D") AND FENDERING SYSTEM SHALL BE DESIGNED FOR 280 FT.-TON IMPACT ENERGY PLUS ⅓ OF THE RESULTING TERMINAL IMPACT LOAD TO ACT CONCURRENTLY AND IN EITHER DIRECTION PARALLEL TO THE FENDER FACE. IMPACT DESIGN LOAD SHALL NOT BE CONSIDERED TO ACT SIMULTANEOUSLY WITH BREASTING LOADS OR HAWSER PULL LOADS.

6. DESIGN OF BREASTING DOLPHINS AND FENDERING SYSTEM SHALL CONSIDER THAT THE TANKER MAY BERTH AT AN ANGLE OF UP TO 10° AND MAY MAKE CONTACT WITH THE FENDER FACE ON EITHER DOLPHIN WITH THE CURVED SECTION OF THE BOW OR THE STRAIGHT PORTION OF THE SIDE.

7. IF DOLPHIN "A" WILL BE USED AS A TURNING DOLPHIN FOR MANEUVERING OF TANKERS IT SHALL BE DESIGNED TO ACCOMODATE 390 FT-TON IMPACT ENERGY PLUS ⅓ OF THE RESULTING TERMINAL IMPACT LOAD TO ACT CONCURRENTLY and IN EITHER DIRECTION PARALLEL TO THE FENDER FACE.

8. EACH BOLLARD OR QUICK RELEASE HOOK TO BE CAPABLE OF SEPARATELY RESISTING THE BREAKING STRENGTH OF A 1½"⌀ STEEL HAWSER OF 82 TONS.

**Black Const. Corporation As-Built Drawings**

Repair & Upgrade to Foxtrot (F-1) Pier - S-14 : Stamped As-built Jan. 28, 1997 by Black Const. Corp.

58



| ITEM | COMPONENT | DESCRIPTION | QTY PER ASS'Y | TOTAL QTY |
|---|---|---|---|---|
| 1 | T1259A | FENDER ELEMENT, MV1250 X 900A | 2 | 8 |
| 2 | 2817M-2 | FRONTAL PANEL, RED, 8' X 96"W X 144"H | 1 | 4 |
| 3 | H47213 | BOLT, 2" X 4 1/2" LG, UNC, A307, GALV. | 8 | 32 |
| 4 | H46313 | WASHER, MV1250, 1/4" X 3 1/2" X 4 3/8", W/2 1/8" DIA. HOLE, CHAMFERED, A36 STL, GALV. (SEE REF. #817991) | 8 | 32 |
| 5 | H43184 | ANCHOR SLEEVE, 2" X 20", GALV., TAPPED OVERSIZE FOR GALV. NUT, EXISTING CONCRETE, REF. DWG. B19016 | 4 | 16 |
| 6 | K43540 | CHAIN ANCHOR BRACKET, DOUBLE, 1" LONG-LINK DOCK CHAIN, EXISTING CONCRETE, GALV. | 2 | 8 |
| 7 | H46543 | CHAIN, 1" LONG-LINK DOCK X 43 3/8" (11 LINKS), GALV. | 2 | 8 |
| 8 | H46131 | CHAIN, 1" LONG-LINK DOCK X 33" (8 LINKS), GALV. | 2 | 8 |
| 9 | HA5084 | ANCHOR SHACKLE, 1", ALLOY, GALV. | 8 | 32 |
| 10 | H43556 | THREADED ROD, 1 1/4" X 15 1/2" LG, UNC, A307, GALV. (SEE REF. #817991) | 4 | 16 |
| 11 | H46551 | NUT, 1 1/4", UNC, HEAVY HEX, A194, GR. 2H, GALV. | 4 | 16 |
| 12 | H45773 | WASHER, 1 1/4", SAE, GALV. | 4 | 16 |
| 13 | H21127 | EPCON® SYSTEM CERAMIC 6® FORMULA | 5 | 25 |
| 14 | H21136 | THREADLOCKER 262, 1.69 OZS. | --- | 1 |

APPLY THREADLOCKER IN REPAIR KIT TO THREADS OF BOLT.

NOTES:
1. ALL DIMENSIONS SHOWN ARE NOMINAL. REFER TO ACCOMPANYING DRAWINGS FOR TOLERANCES.
2. PANEL ELEVATION WILL BE ±2" AND PANEL WILL BE PARALLEL TO DOCK ±2".
3. TIGHTEN ALL BOLTS AND/OR NUTS UNTIL FENDERS ARE SEATED AGAINST DOCK FACE, AND THE WASHERS ARE SNUGLY SEATED. WHEN TIGHTENING BOLTS AND/OR NUTS TO SEAT THE FENDER ELEMENTS, DO NOT ALLOW THE WASHER UNDER THE NUT AND/OR BOLT HEAD TO BE EMBEDDED MORE THAN 1/32".
4. COLORS:
   RUBBER – BLACK
   STEEL FRONTAL PANEL – RED
   UHMW PADS – BLACK

FENDER SYSTEM PERFORMANCE
@ 1 mm/sec

APPROXIMATE WEIGHTS

EPOXY BONDING PRIOR TO POURING CONCRETE

This drawing contains proprietary information from TRELLEX MORSE. Any reproduction, dissemination, or use of the information without written approval from TRELLEX MORSE is prohibited.

Trellex Morse

# EXHIBIT B

1   BERMAN O'CONNOR MANN & SHKLOV
    DANIEL J. BERMAN
2   ROBERT J. O'CONNOR
    Suite 503, Bank of Guam Building
3   111 Chalan Santo Papa
    Hagåtña, Guam 96910
4   Telephone: (671) 477-2778
    Facsimile: (671) 499-4366
5
    Attorneys for Defendant:
6   *WINZLER & KELLY CONSULTING ENGINEERS*

DISTRICT FILED COURT OF GUAM
JUL 16 2004
MARY L. M. MORAN
CLERK OF COURT

7

8                   UNITED STATES DISTRICT COURT

9                     FOR THE DISTRICT OF GUAM

10  S.J. GARGRAVE SYNDICATE AT LLOYDS,        )   CIVIL CASE NO.: CIV03-00009
                                              )
11                  Plaintiff,                )
                                              )
12          vs.                               )   **EXPERT DISCLOSURE OF**
                                              )   **DEFENDANT WINZLER &**
13  BLACK CONSTRUCTION CORPORATION,           )   **KELLY CONSULTING ENGINEERS**
    WINZLER & KELLY CONSULTING                )   **DECLARATION OF SERVICE**
14  ENGINEERS and ENGINEERING,                )
    MANAGEMENT & PLANNING SERVICES            )
15  CORPORATION,                              )
                                              )
16                  Defendants.               )
                                              )
17  _____)

18

19          Pursuant to Fed.R.Civ.P. 26(a)(2), Defendant Winzler & Kelly Consulting Engineering,

20  by and through its counsel, provides the following disclosure setting forth information about the

21  people whose expert opinions Defendant Winzler & Kelly Consulting Engineering may offer in

    evidence at trial:

22          1.      Ben C. Gerwick, Inc. by and through Webb W. Hayes, S.E. and Ted W.

23  Trenkwalder, S.E.; Tel.: (510) 839-8972; Physical address: 1300 Clay Street, Suite 450, Oakland,

24  CA 94612.

25          2.      Kleinfelder, Inc. by and through Zia Zafir, Ph.D., P.E. and Edward Rinne, P.E.,

26  G.E.; Tel.: (925) 484-1700; Physical address: 7133 Koll Center Parkway Suite 100, Pleasanton,

27

28  E:\Jean\Plds\3109.wpd                     1

ORIGINAL DATE
Date: 7/16/04
Time: 2:52 pm

Witness   Hayes
PHFDeft
Exhibit      2
Consisting of   18  Pages
Date  6-12-05
JOAN MARTIN

S.J. GARGRAVE, ET AL. vs. BLACK CONSTRUCTION, ET AL.
EXPERT DISCLOSURE OF DEFENDANT WINZLER & KELLY
CONSULTING ENGINEERS; DECLARATION OF SERVICE

CIV03-00009

PAGE  2

CA 94566.

     A.     The documents upon which Ben C. Gerwick, Inc. and Messrs. Zafir and Rinne based their opinions are set forth in their reports, which is served herewith. Backup calculations, worksheets and computer analyses will be provided if requested.

     B. and C.  Mr. Hayes's qualifications are included in the report, listing a summary of his qualifications, the publications he has authored during the past ten years, his previous experience as an expert, and the compensation he will be paid for study and testimony in this matter. Mr. Zafir's curriculum vitae is attached listing the same.

     2.    Any and all individuals designated as experts by any other party, notwithstanding that subsequent to such designation, any such party may be dismissed from the case and/or withdraws such person's designation.

     3.    Defendant Winzler & Kelly Consulting Engineers reserves all of its rights pursuant to Fed.R.Civ.P. 26, under federal maritime law and under the laws of Guam to supplement, revise or withdraw or add hereto.

     Since discovery in this action has not yet been completed and depositions of experts have not yet been taken or completed, Defendant Winzler & Kelly Consulting Engineers expressly reserves the right to name or call additional experts as the need arises during the course of discovery and investigation in preparation for trial of this matter, and after Plaintiff and Co-Defendants disclose their experts and theories and the facts upon which they base such theories. Timely notice of such supplemental experts will be provided pursuant to Fed.R.Civ.P. 26 and such

E:\Jean\Plds\3109.wpd

2

2.2

3

4 witnesses will be made available for the purpose of being deposed prior to trial in this action.

5       Defendant Winzler & Kelly Consulting Engineers further reserves the right to

6

7 consult with and retain the services of additional expert witnesses to testify on its behalf at trial

8 for purposes of impeachment and/or rebuttal testimony.

9       Dated this 16th day of July, 2004.

10

11                 Respectfully submitted,

12                 BERMAN O'CONNOR MANN & SHKLOV
                Attorneys for Defendant:
13                 *WINZLER & KELLY CONSULTING ENGINEERS*

14

15       By:    *Daniel Berman*

16             DANIEL J. BERMAN

17

18

19

20

21

22

23

24

25

26

27

28  E:\Jean\Plds\3109.wpd           3

23



**Ben C. Gerwick, Inc.**
Member of the COWI Group

Consulting Engineers
1300 Clay Street, Suite 450
Oakland, CA 94612
Tel.    510.839.8972
Fax.    510.839.9718
http://www.gerwick.com/

Mr. Robert O'Conner
O'Conner Berman Dotts & Banes
Second Floor, Nauru Bldg.
Saipan, MP 96950-1969

Date: July 14, 2004
Our ref. 2004-35

Subject:    **FOXTROT PIER F-1**
            **PORT AUTHORITY OF GUAM**
            **Winzler & Kelly**

### GENERAL

The undersigned has been retained to evaluate the repair scheme for the Foxtrot F-1 petroleum wharf
at Apra Harbor, Territory of Guam, and develop opinions as to the suitability of this repair scheme
and its ability to resist loads. I have reviewed the EMPSCO design documentation, and various other
documents listed in the References Section below.

### QUALIFICATIONS

After graduating from the University of California at Berkeley I began my civil engineering career in
January of 1958. I was with the firm of Earl and Wright from January 1959 to January 1985. For the
last fourteen years at Earl and Wright I was president and CEO. I was chairman of the joint company,
John Brown - Earl and Wright from 1973 through 1983. I was president of my own firm, Bay Phoe-
nix Consulting Engineers, until 1991 when the firm ceased trading. After a brief time with Peter
Cully & Associates, I spent nine years with GKO & Associates. In June of 2002, I joined the firm of
Ben C. Gerwick, Inc., where I am currently employed.

I hold valid California Certificate number C-12409 as a Civil Engineer, which was issued in 1960 and
California Certificate number S-1361 as a Structural Engineer, which was issued in 1965. I have pre-
viously been registered as a civil engineer in Oregon, Washington, Alaska, Texas and Louisiana;
however, these registrations are no longer current.

Earl and Wright was a major civil and structural engineering firm in San Francisco that was very
strong in marine engineering. The company designed many wharves in the San Francisco Bay Area,
Alaska and the Philippines before becoming a major force in the design of offshore drilling platforms.
In 1969 the company was acquired by SEDCO, which later became the largest offshore drilling com-
pany in the world. Most of the wharf projects were petroleum tanker facilities. These facilities
ranged from barge terminals to terminals for VVLCC's and included the LPG terminal at Yanbu,
Saudi Arabia and two liquid tanker terminals for Honam Petroleum (Caltex) in Honam, Korea. Earl
and Wright did design bulk cargo terminals for the Alaska Railroad in Seward and Whittier, Alaska,
and the U.S. Army Corps of Engineers in Haines, Alaska. Many of the projects had to be innovative
to solve environmental and operational problems, such as moving ice and the lack of heavy construc-
tion equipment.

2.4

Bay Phoenix designed the berth for the Battleship Missouri at Hunters Point in San Francisco, CA. Bay Phoenix also performed studies and designed modifications to the Domtar Gypsum's bulk terminal, at Antioch, CA, to prevent the constant damage which occurred to the wharf while docking conveyor ships.

While at GKO & Associates, I developed the layout and orientation of the permanent berth for the California Maritime Academy training ship, Golden Bear, at Vallejo, CA. I also developed the configuration for an island type crude oil off-loading terminal in San Francisco Bay off of Richmond, CA for VLCC tankers. This project was done for Wickland Oil Company, now ST Services, but not constructed for commercial reasons. I evaluated and analyzed marine terminals for UNOCAL (Now Conoco Phillips) at Rodeo, CA; Tosco Refining Corporation's (Now TESORO Refining Corporation) Amorco tanker terminal at Martinez, CA; Tosco Refining Corporation's (TESORO) tanker terminal at Avon, CA; and Shore Terminals tanker terminals at Selby and Martinez, CA.

The analysis and certification work outlined above led to the development of a new terminal for Tosco Refining Corp. (TESORO) at Avon, CA. I developed the terminal configuration to serve the full range of vessels that call at the Avon Terminal from barges to 105,000 DWT tankers. I also designed modifications to and new mooring dolphins for the Tesoro Amorco terminal, in Martinez, CA. to increase the ship size certification to 185,000 DWT. Finally I designed upgrades to the Conoco Phillips Rodeo Terminal to meet California State Lands Commission standards (MOTEMS). I am currently supervising the design of a third berth to that terminal for a 200,000 DWT tanker requiring redesign of the entire fender system.

With regard specifically to bulk terminals, I developed a preliminary configuration and terminal arrangement for a general cargo wharf and two bulk cargo wharves at Selby, CA for Wickland Properties Company. The two bulk cargo wharves were configured for a fixed loader and line hauling as the main option for bulk transfer, although a moveable loader was considered. The two bulk wharves were tandem and envisioned multiple breasting dolphins, at approximately 100 foot spacing and two inshore breast line mooring dolphins per berth.

I also was retained to evaluate a line-haul, fixed loader, coke loading facility, belonging to Diablo Services, a subsidiary of Tosco Refining Corp. This work involved analysis of mooring line loading and mooring forces, imposed by environmental conditions, for the purpose of obtaining certification from the California State Lands Commission for the maximum size bulk vessels that will be permitted to load or unload at the terminal facility. While performing this evaluation I was able to observe the shifting operation of the coke ship on several occasions

I have observed chip ships shift at two terminals in Oregon, two terminals in Washington, one terminal in Australia and at the Louisiana Pacific Terminal in Eureka, California.

I have served as an expert witness on the a case involving the allision of the M/V Kure with a chip terminal wharf in Samoa, CA and on a case regarding the failure, during construction, of portions of the Anchorage City Dock in Anchorage, Alaska.

Over the course of 46 years in the design of marine structures I have acquired an understanding of the evolution of wharf design, the dynamic aspects of docking a ship, the complexities of mooring a ship and the sensitivity of line handling on vessel position and mooring line loads.

## CASH & ASSOCIATES CALCULATIONS:

Ben C. Gerwick has not received the SAP computer model, geometry, output nor calculations, to make a comparative analysis for the pier dolphins.

## BASIS FOR DESIGN:

Although the Port's contract with EMPSCO refers to the 1994 Uniform Building Code (UBC), there is no reference to this code in the Engineering Documentation Report or the calculations prepared by EMPSCO. It is questionable whether or not the 1994 UBC applied. It appears that the Port Authority of Guam waived EMPSCO's requirement to adhere to the 1994 UBC when they approved the drawings and specifications, and then put these documents out to bid.

The Port's funding limitations may have severely limited the berthing forces that the repaired breasting and mooring dolphins could be designed to resist and most likely required that a seismic upgrade be omitted from the scope of the repair work.

## PERFORMANCE OF W&K CONNECTION DESIGN FOR THE 2001 EARTHQUAKE:

The Winzler & Kelly connection detail provided on drawing VE-1 has capacity to resist seismic, mooring, and berthing loads. The dolphin capacity is directly related to the pile to cap connection capacity and the number of connections. Ben C. Gerwick prepared computer models to determine the ultimate capacities for Dolphins 'A' and 'C'.

The site specific response provided by Kleinfelder shows that the maximum applied seismic loads ranged between 0.1 g and 0.21 g at the project site. The ultimate capacities of the dolphins exceed the forces generated by accelerations in this range. Therefore, it is our opinion that, if properly constructed, the Winzler & Kelly alternate repair system would not have failed in the October 2001 earthquake.

## THE ALTERNATIVE PILE REPAIR SYSTEM:

The bid price for the wharf repair, as originally designed, was well in excess of the owner's budget. The Port then invited Black Construction Company to submit alternatives to the original design which would lower the cost of the repair to the point where the port could proceed with the project. Winzler & Kelly was retained to develop an alternative pile repair scheme based on ideas from Black Construction Company.

The pile repair system, designed by EMPSCO, was the major cost element in the project. The implementation of the shear connectors was difficult and costly but the installation of the reinforcing steel dowels 20" into the existing concrete from under the dolphin was extremely difficult and costly. Further, properly installing these bolts and insuring that the epoxy completely filled the 20" deep hole was almost impossible.

Winzler & Kelly developed a scheme which used epoxy anchor bolts which are installed after a vial, filled with epoxy, has been inserted into the cleaned hole. The bolt is turned after the vial has been ruptured and the epoxy bond is achieved. The epoxy specified has a very short cure time, which makes installation simpler to accomplish than it is using a long cure epoxy, since the bolts must be held in place during cure.

The epoxy installation specified by EMPSCO, required that the epoxy be injected into the hole from below. With this method it is very difficult to vent the entrapped air from the hole and achieve complete penetration of the epoxy. In my opinion, the ability to achieve a competent bolt installation using the method proposed by Winzler & Kelly is much more assured than the installation method specified.

## W&K APPROVED CONNECTION REVIEWED BY ENGINEER OF RECORD:

Winzler & Kelly provided a drawing, entitled *"Proposed Pile Repair Detail"*, to the Contractor for submittal to EMPSCO, the Engineer of Record, for review and approval. On May 22, 1996, EMPSCO reviewed Submittal No. 12, Proposed Pile Repair Details – Winzler & Kelly drawing Sheet VE-1 dated 4/4/96. (Note BCG only has the drawing dated 4/2/96, which does not include a stamped and signed drawing). The submittal was returned to Black Construction "Approved as Noted", with six (6) conditions, which included "Provide structural calculations verifying that the proposed repair meets the design requirements."

Winzler & Kelly had no knowledge that the alternative was actually being constructed by Black Construction or that it had received conditional approval. Had design calculations been submitted, the acceptability of the alternative would have been vetted and possibly modified, disapproved or approved as submitted. The drawing title *"Proposed Pile Repair Detail"* is evidence to the effect that the alternative was in the preliminary stage of development. It was reasonable for Winzler & Kelly to rely on EMPSCO, the engineer-of-record, to determine the design criteria for the project and further, it was reasonable to rely on EMPSCO's approval of the VE-1 drawing as confirmation that the work met these criteria.

EMPSCO was the most knowledgeable about the intent of the design and the critical nature of certain details, namely the pile to cap connection. Black Construction should have complied with the ER's request for the six conditions of the submittal. Nevertheless, EMPSCO had a duty to inform the client and Macario & Associates, the party responsible for project oversight, that approval of the alternative pile repair system was subject to conditions. The alternative pile repair system was not, therefore, approved for construction and should not have been used. Macario & Associates should have discovered that the repair was not in accordance with the drawings and rejected the installation.

The obligation for quality control was, by specification, the responsibility of the contractor. Further the Port retained Macario & Associates to provide project oversight and inspection. Winzler & Kelly was not retained to perform this activity and had no duty to provide this service. In addition Winzler & Kelly was unaware the alternative pile repair system was being implemented which completely absolves them of any duty in this regard.

## ANCHOR SYSTEMS AND APPROVED EQUAL:

At the request of Black Construction Company, Winzler and Kelly developed drawing VE-1, Proposed Pile Repair Details for Dolphins A, B, C, and D in April 1996. The drawing contained two notes that read:

1. THIS DRAWING IS TO BE READ IN CONJUNCTION WITH DRAWINGS AND SPECIFICATIONS FOR PROJECT - REPAIR & UPGRADING TO FOXTROT "F-1" PIER -- PREPARED BY EMPSCO ENGINEERING CONSULTANTS, DATED 1/10/96.

2.7

2. ADHESIVE ANCHORS TO BE STAINLESS STEEL RED HEAD "REDI-CHEM" BY PHILLIPS DRILL CO., CATALOG NO. CE3495 OR APPROVED EQUAL. INSTALL PER MANUFACTURERS RECOMMENDED PROCEDURE.

Drawing VE-1 notes relied upon Black Construction and EMPSCO to review the proposed detail in accordance with the drawings and specifications developed by EMPSCO and to install the REDI-CHEM anchor in accordance to their recommended procedure. To the best of my knowledge, neither Black Construction Company nor EMPSCO reviewed the proposed detail in accordance to the EMPSCO contract documents or installed the detail in accordance to Redi-Chem's recommended procedure. It is the understood the words "or approved equal" means the engineer who specified the use of a detail or product, in this case Bruce Swanney, is the individual who should have reviewed the substitution and approved it if it was an acceptable substitution.

Winzler and Kelly notified Black Construction and the PAG that the proposed detail should be read in accordance with the design documents. Although EMPSCO's review and approval of the detail requested structural calculations from Winzler & Kelly, I understand that Winzler & Kelly was never advised of the approval conditions; otherwise, they would have supplied calculations for EMPSCO's review. EMPSCO should have advised the Port Authority whether the Black Construction proposed anchor system was appropriate for the design conditions and strong enough.

Winzler and Kelly proposed adhesive anchor system contained readily available installation procedures and capacities. The Red Head Redi-Chem concrete anchoring system publishes a seven step installation procedure to produce ultimate loads for bolt tension and shear. Black Construction Company substituted an adhesive anchor system, Anchor-It, that also included published installation procedure and capacities. A comparison of the systems with information provided is outlined below:

| Published Design Information | RED HEAD Redi-Chem | Anchor-It |
|---|---|---|
| Bolt Rebar System | (8) ¾" Ø Stainless | (8) ¾" Stainless |
| Embedment Depth | 6 ¾ Inches | 6 ¾ Inches |
| Recommended Cure Time (>68° f) | 10 min. | 2 hours and 30 min |
| Allowable Tension Capacity | 6,313 lbs | 3,783 lbs |
| Allowable Shear Capacity | 3,820 lbs | 3,020 lbs |

Notes:
1. The published capacities for Redi-Chem and Anchor-It are based on A307 bolt information.
2. The RED HEAD capacity is based on concrete strength of 6,300 psi.
3. The Anchor-It capacity is based on concrete strength of 2,000 psi.

The EMPSCO anchor system has more capacity than the proposed alternative or the installed anchor system. The Redi-Chem and Anchor-It systems may be of comparable strength if the actual concrete strength governs the capacity. However the cure time for the Anchor-It system is fifteen times longer than the Redi-Chem system.

PERFORMANCE OF W&K CONNECTION DESIGN:

The EMPSCO design did not consider seismic loading on the dolphins. Their design report, which sets forth the criteria to be used, acknowledges that Transen Associates Limited considered seismic forces, but makes no reference to the magnitude of these forces or any seismic criteria to be used.

There is no evidence in the EMPSCO calculations that any structural analysis or seismic evaluation was performed. Failure to undertake a structural analysis of the wharf shows less than a reasonable standard of care was used for the EMPSCO design. It is apparent that the work to be done was to be of an expedient nature to permit tanker operations immediately and was to be a temporary repair.

EMPSCO states the new fender system is designed to accept a 150,000 DWT vessel. Assuming adequate water depth, the displacement of such a vessel is approximately 187,000 Long Tons. The fender selected by EMPSCO for dolphins C & D are a Bridgestone SUC 1150H Rubber Grade RH. The rated energy absorption capacity is 280 ft kips (38.7 $T_m$ Meters). The reaction on the dolphin, when this amount of energy has been absorbed, is 168.7 kips (76.5 Tonnes). The total kinetic energy of that ship approaching at 0.2 ft/sec (the design velocity) is 260 ft kips. The worst case eccentricity coefficient is 1.0. Therefore, the design energy absorbed by each fender is 260 ft kips. The load on the fender after absorbing this amount of energy is 160 kips. The connection at the top of the piles can resist this load. The allowable horizontal force on the dolphin perpendicular to the docking face is 297 kips. For the connections to begin to fail, the horizontal load would need to increase to 565 kips.

The design energy level utilizes this fender at the end of its energy absorbing range. The design fender deflection (compression) is 50%; whereas, the maximum deflection is 56%. The difference in approach velocity for the design ship to achieve this deflection is 0.013 ft/sec, or from 0.200 to 0.213 ft/sec. At this point the reaction force on the dolphin is 180 kips. The alternative design, shown on VE-1, would have met the berthing forces required by the EMPSCO Vessel berthing criteria. If the approach velocity exceeds, say, 0.215 ft/sec, the reaction force increases asymptotically, since the fender can no longer absorb energy. The remaining ship energy will be absorbed through failure of the dolphin pile connection and, finally, the dolphin piles.

In my opinion, the selection of this fender provides very little reserve capacity for energy absorption. This, coupled with an extremely low design approach velocity, increases the potential for a dolphin system overload at, what would still be considered, a very low approach velocity. The Marine Oil Terminal Engineering and Maintenance Standards (MOTEMS), of the California State Lands Commission, recommend a minimum approach velocity of 0.26 ft/sec for existing berths in favorable site conditions and 0.33 ft/sec for moderate site conditions. Favorable site conditions require wind < 38 knots and wave height < 6.5 ft. Moderate site conditions allow wind > 38 knots and wave height < 6.5 ft.

This site could be classified as Moderate. If we accept the classification of "Favorable" and use 0.26 ft/sec as the design berthing velocity, the design energy of the ship would have been 440 ft kips (61 $T_m$ Meters). It is not possible for the selected fender system to absorb this much energy and the resultant force on the dolphin would cause failure of the pile connection and possibly, the piles.

We understand that the wharf was used during construction, before new fenders were installed. During construction the fender was either not there, heavily deteriorated or rubber tractor tires were used. The fender system at this time had virtually no energy absorbing capability. We understand that the fender units specified have not been installed to this date or there was a period of time when the design fenders were not present when ships were berthed at the wharf. Tractor tires have very little energy absorbing capacity and fully compress under very little load. If ships approached the wharf at

velocities much lower than 0.2 ft/sec extreme loads would have occurred that would have damaged the dolphins.

The damaged pile connections, observed after the 2001 earthquake, were not the connections designed by Winzler & Kelly. The bolt adhesive did not meet Winzler & Kelly's specification and the bolts were not installed properly. Thus it is impossible for the plaintiff to show how Winzler & Kelly's connection would have performed. Any conclusions related to the performance of the connection design, based on the observed damage, would be highly speculative.

It has been noted that one or both dolphins C & D were permanently displaced 16 inches toward shore. For this displacement to occur, the batter piles or their connections had to fail. For a permanent displacement to exist, the batter piles had to fail in bending or the top connection shear from the concrete. A seismic event is oscillatory and due to the relative weakness of the soils for pile tension, as compared to compression, I would expect any permanent displacement to be in the opposite direction, away from the shore.

It is my opinion that the damage to the dolphin piles and connection was due to excessive berthing loads and not by any seismic forces. .

REFERENCES:

- Guam Oil and Refining Company Structural Design Calculations dated xxx, pp94.
- Trasen Associates LTD Structural Drawings S-1 – S-10 dated April 18, 1969.
- EMPSCO Structural Design Calculations for Repair and Upgrading to Foxtrot "F-1" Pier Apra Harbor dated xxx, pp 90.
- EMSCO Structural Drawings S-0   S17 dated January 10, 1996.
- Geo-Engineering & Testing Inc. Subsurface Soil Investigation Foxtrot I Pier Facility Improvement / Repair dated July 13, 1995, pp 9 with Plates 1-6.
- Cash & Associates Report dated May 12, 2004, pp 20
- Kleinfelder Report dated July, 14. 2004.
- Marine Oil Terminal Engineering and Maintenance Standards (MOTEMS), California State Lands Commission.

Sincerely,

BEN C. GERWICK, INC.

Webb W. Hayes, S.E.
Senior Engineer

BEN C. GERWICK, INC.

Ted W. Trenkwalder, S.E.
Senior Engineer

P:\2004\2004-20\reports\Foxtrot Pier F-1 FINAL Report 7-14-04\Rev6.doc

2.10



# Memo

To:            Robert J. O'Connor, Esq., Berman O'Connor Mann & Shklov

From:          Zia Zafir, Ph.D., P.E. and Edward Rinne, P.E., G.E.

Date:          July 14, 2004

Project No.:   02301PROP

Re:            Ground Motions at Foxtrot Pier, Apra Harbor, Guam

This memorandum transmits the results of our preliminary assessment of probable ground motions at Foxtrot Pier in Apra Harbor, Guam due to the M7.0 October 12, 2001 earthquake.

## Seismicity of Guam

Guam is the largest island of the Mariana Islands in Pacific Ocean. It rises steeply from the ocean floor, a short distance from the Mariana Trench, the deepest place on the earth. Historically, this portion of the world is very active seismically and Guam has felt several moderate to large earthquakes in the past. Discussions about some of the historical earthquakes are presented below.

The most significant earthquake in the recent history was the M8.1 August 1993 earthquake, located at about 80 km offshore of Guam. The earthquake did not cause any deaths and no spectacular damage was observed usually expected of this magnitude of earthquake. The probable epicentral distance from the site was about 56 km. The most common geologic effects were ground fissures, horizontal displacements, differential settlements, and sand boils. Liquefaction and lateral spreading were observed in limited areas. Several tall hotel buildings in Tumon Bay area were damaged (Earthquake Engineering Research Institute, 1993).

Based on the information presented on Earthquake History of Guam (available at website http://neic.usgs.gov/neis/states/guam/guam_history.html), the earthquakes of 1825 and 1834 caused significant damage to buildings on the island. Another earthquake on January 25, 1849 produced strong vertical and horizontal movements and damage was reported at Agana and nearby towns. Relatively moderate earthquakes of July 1862 and May 16, 1892 resulted in some cracked walls.

The earthquake of September 22, 1902 at Agana was quite significant. Some houses were completely destroyed and almost all of the stone buildings suffered significant damage. Several landslides were observed in the area and many bridges were damaged, interrupting travel between Agana and the port of Piti, at a distance of about 8 km.

An M7.4 December 1909 earthquake, at an epicentral distance of about 250 kilometers southwest of Guam, caused some damage at Agana. The M5.2 earthquake of January 1978, centered near the east coast of Guam caused considerable damage on the island. Many homes and at least two government buildings were damaged.

02301PROP/SAC4M058                    Page 1 of 3                    July 14, 2004
Copyright 2004 KleinRelder, Inc

2.11

Since we could not find any ground motion recordings near the project site, we have estimated the probable ground motions using deterministic methods with appropriate attenuation relationship. Based on the preliminary fault plane solution by NEIC, it seems that the October 2001 event was probably an Intraplate event. Therefore, we believe that attenuation relationship by Youngs et al. (1997) for an Intraplate event is the most appropriate for this site. Although the epicentral distance to the site is about 94 km for the October 2001 event, we have assumed a site to rupture distance of about 80 km. Assuming the site is a rock site, our estimated 50th percentile (median) and 84th percentile (median + 1 sigma) peak ground acceleration (PGA) values are 0.10g and 0.21g at the project site. We believe that the ground motions at the site due to the October 2001 M7 earthquake were probably within this range.

### References

Earthquake Engineering Research Institute (1993), "The Guam Earthquake of August 8, 1993", EERI Special Report, October.

Seno, T. and Yoshida, M. (2004), "Where and why do large shallow intraslab earthquakes occur?", Physics of the Earth and Planetary Interiors, 141, 183-206.

Youngs, R.R., Chiou, S.-J., Silva, W.J., and Humphrey, J.R. (1997), "Strong Ground Motion Attenuation Relationships for Subduction Zone Earthquakes", Seismological Research Letters, 68, 1, 58-73.

Case 1:03-cv-00009     Document 281-3     Filed 10/26/2005     Page 13 of 23

*Summary of Experience*

Dr. Zafir has more than 17 years of experience in the field of geotechnical and earthquake engineering and research. Dr. Zafir has been actively involved on seismic hazard evaluations and seismic retrofit for renowned national and international projects. In addition to California, he has been involved in seismic design projects in Nevada, Oregon, Washington, Arizona, New Mexico, Utah, Bangladesh, and Russia. These projects cover both transportation facilities and commercial and residential developments. Some of his significant projects include seismic hazard evaluations of: ground motions for seismic retrofit of Golden Gate Bridge in San Francisco, seismic feasibility studies for Tacoma Narrows Bridge in the state of Washington, ground motion studies for Jamuna River Bridge in Bangladesh, ground motion criteria for two fissile material storage facilities in Russia, Applegate Dam in Oregon, New Hogan Dam in California, Aircraft Rescue and Fire Fighting Facility at Oakland Airport, more than 50 schools in San Francisco Bay Area, several hospitals and correctional facilities in California, and several commercial centers throughout the state of California. Dr. Zafir was also part of the project ATC-32 in which he developed new ARS curves for Caltrans, which are included in the 2001 Caltrans Seismic Design Criteria. He has also developed a design manual for foundation stiffness under seismic loading and conducted a week-long workshop for the State of Washington Department of Transportation. In addition, he has recently developed site specific design ground motions for the expansion of Pier G at Port of Long Beach. Currently he is involved in developing ground motion criteria for Chemical and Metallurgical Research facility at Los Alamos National Laboratory in New Mexico. In addition, he is the lead seismic engineer for the HNTB-led design team for the Civil Line segment of the BART extension from Fremont to San Jose. He has published and presented more than twenty papers in international journals and conferences.

*Education*

Ph.D.  Geotechnical Engineering, University of Nevada, Reno, 1993
M.S.   Civil Engineering, Iowa State University, Ames, Iowa, 1987
B.S.   Civil Engineering, University College of Engineering, Taxila, Pakistan, 1983

*Registration*

P.E. (Civil) California (C60152)

*Professional Affiliations*

Member of the American Society of Civil Engineers
Member Earthquake Engineering Research Institute
Member of the Phi Kappa Phi Engineering Honor Society

### Select Project Experience

*Wild Goose Pipe Line,* Project engineer for assessing seismic stability and permanent ground deformation for a pipe line crossing over a fault and river crossing in Butte County, California. The project was reviewed by California Public Utilities Commission.

*Lower Northwest Interceptor Tunnels, Sacramento, California.* Lead seismic engineer for site-specific seismic design criteria for the design of two 2,000 feet long 15-foot diameter tunnels below the Sacramento River. The tunnels would enclose two 60-inch diameter sewer interceptor pipelines.

*Applied Technology Council (ATC-32) and California Department of Transportation.* Project engineer for revising seismic loading criteria for the design of bridges in the state of California. Developed new ARS curves for Caltrans, which are included in 2001 Caltrans Seismic Design Criteria.

*Pier G, Port of Long Beach, California.* Developed site specific design ground motions for the SSI analyses for the proposed expansion of Pier G at Port of Long Beach.

*Applegate Dam, Oregon.* Provided seismic design parameters for the seismic upgrading of the dam for US Army Corps of Engineers. Performed both static and pseudo-static slope stability analyses, deformational analyses and finite difference modeling using FLAC.

*Golden Gate Bridge, San Francisco, California.* Project engineer for development of multiple support ground motions for seismic retrofit of the Golden Gate Bridge.

*Tacoma Narrows Bridge, Tacoma, Washington.* Project engineer for development of multiple support motions for seismic vulnerability studies of the Tacoma Narrows bridge.

*Washington Department of Transportation, Washington.* Developed manual for seismic design of bridge foundations to be used by the design engineers at the Washington Department of Transportation.

*New Tacoma Narrows Bridge, Tacoma, Washington.* Project engineer for review of ground motions for seismic design of the New Tacoma Narrows bridge.

*Jamuna River Bridge, Bangladesh.* Seismic risk analysis and development of ground motions to be used in the dynamic analysis for the new 5 km long bridge in Bangladesh.

*SVP Correction Facility in Coalinga, California.* Lead seismic engineer to provide site-specific design ground motions for the design of the new correctional facility.

Case 1:03-cv-00009    Document 281-3    Filed 10/26/2005    Page 15 of 23

2.14

*United States Federal Penitentiary in Herlong, California.* Lead seismic engineer to provided site specific design ground motions for a new correctional facility.

*United States Penitentiary in Victorville, California.* Lead seismic engineer to perform seismic hazard study and to provide site specific design ground motions for a new correctional facility.

*Home Depot, Yuma, Arizona.* Lead seismic engineer to perform liquefaction studies and mitigation recommendations for the store in Yuma.

*Wal Mart Super Center, Yuma, Arizona.* Lead seismic engineer to assess liquefaction potential at the site and to develop mitigation measures, which included design and installation of Earthquake Drains at the site.

*Sam's Club, Yuma, Arizona.* Lead seismic engineer to assess liquefaction potential at the site and to develop mitigation measures, which included design and installation of Earthquake Drains at the site.

*MCAS Miramar, San Diego, California.* Lead seismic engineer to develop site-specific seismic design criteria for the new steel reservoir at the base.

*MCAS, Yuma, Arizona.* Lead seismic engineer to develop site-specific seismic design criteria and design response spectra for the water storage tanks at the base.

*Several High Rises including 560 Mission Street, 246 Second Street, and 532 Sutter Street in San Francisco, California.* Provided site specific design ground motions and geotechnical design parameters for the design of these buildings in downtown San Francisco.

*Oyster Point Hilton Hotel in South San Francisco, California.* Project manager for the geotechnical and seismic design and recommendations for a new hotel at Oyster point.

*SyBase Headquarters in Dublin, California.* Provided site specific design ground motions for new headquarters building.

*Route 101 Between Ralston and Hillsdale in San Mateo, California.* Seismic hazard evaluation and lateral capacities of piles for one bridge and soundwalls along the Highway.

*State Route 242, Concord, California.* Project engineer for faulting and seismic studies for seven bridges located on State Route 242.

*Napa State Hospital Reservoir in Napa, California.* Provided site specific design response spectra for a new reservoir.

*Easterly Wastewater Treatment Plant, in Vacaville, California.* Provided site specific design response spectra for the treatment plant.

*Lakeview Reservoir in Napa, California.* Provided site specific design response spectra for a new reservoir.

*San Francisco Executive Parkway, San Francisco, California.* Provided site specific design response spectra parameters for the design of the six to fifteen story buildings.

*River Park Towers, San Jose, California.* Provided site specific design response spectra parameters for the design of the 13- story building.

*New Hogan Dam, California.* Provided seismic design parameters for the seismic upgrading of the dam for US Army Corps of Engineers.

*Southern Nevada Water Authority, Las Vegas, Nevada.* Seismic risk analysis for several reservoirs and associated structures in southern Nevada.

*Alturas Intertie Project.* Performed the faulting and seismicity evaluation of 162 mile long 345 kV transmission line from Alturas, California to Reno, Nevada for Sierra Pacific Power Company.

*Marin County Civic Center, Marin County, California.* Project engineer for the ground motion studies for seismic upgrading of the civic center.

**Publications and Presentations**

Zafir, Z. "Liquefaction Assessment and Mitigation at Washoe Village in Reno". Presented at 28th Southwest Geotechnical Engineers Conference, May 12-15, 2003, Reno, Nevada.

Zafir, Z. "Bridge Foundation Design for Liquefaction Induced Lateral Spreads". Presented at 27th Southwest Geotechnical Conference, June 24-27, 2002, Scottsdale, Arizona.

Zafir, Z. "Seismic Foundation Stiffness for Bridges". Deep Foundations 2002 – An International Perspective on Theory, Design, Construction, and Performance, Geotechnical Special Publication No. 116, Proceedings of the International Deep Foundation Congress 2002, February 14-16, 2002, Orlando, p. 1421-1437.

Zafir, Z., M. Tabatabaie. "Development of Foundation Stiffness Design Charts for Bridges". Presented at 23rd Annual Southwest Geotechnical Engineers Conference, June 2-5 1998 at Reno, Nevada.

2003-08-040716-Zafir-Resume

218

### Publications and Presentations (Continued)

Norris, G., Z. Zafir, and R. Siddharthan. "An Effective Stress Understanding of Liquefaction Behavior". Environmental and Engineering Geoscience, Vol. IV, No.1, Spring, 1998.

Zafir, Z. and W. Vanderpool. "Lateral Response of Large Diameter Drilled Shafts: I-15/US 95 Load Test Program". Proceedings of the 33rd Symposium, Engineering Geology & Geotechnical Engineering, March 25-27, 1998 at Reno, Nevada, pp. 161-176.

Norris, G., R. Siddharthan, Z. Zafir and R. Madhu. "Liquefaction and Residual Strength of Sands from Drained Triaxial Tests". ASCE Journal of Geotechnical and Geoenvironmental Engineering, Vol. 123, No. 3, March 1997, pp. 220-228.

Singh, J.P., Z. Zafir and M. Tabatabaie. "Ground Motion Considerations for Seismic Retrofit Design of Long Span Bridges". Proceedings, National Seismic Conference on Bridges and Highways, San Diego California, December 10-13, 1995.

Zafir. Z., R. Siddharthan and P. Sebaaly. "Dynamic Pavement Strains from Moving Traffic Load". ASCE Journal of Transportation Engineering, Vol. 120, No. 5, Sept. - Oct., 1994, pp. 821-842.

Siddharthan, R., P. Sebaaly and Z. Zafir. "Dynamic Response Evaluation of Inclined Pavements with Interface Shear". Proceedings, International Conference on Vehicle-Road and Vehicle-Bridge Interaction, Holland, June, 1994.

Zafir, Z. and R. Siddharthan. "Response of Layered Soil Deposits to Moving Loads." Proceedings, Eighth International Conference of the Association for Computer Methods and Advances in Geomechanics, ed. Sriwardhane, H. and Zaman, M.M., Vol. II, May 22-28, 1994, Morgantown, West Virginia, pp. 1541-1546.

Siddharthan, R., P. Sebaaly and Z. Zafir. "Pavement Strains Induced by Spent Fuel Transportation Trucks." Presented at 73rd Annual TRB Meeting, Jan.9-13, 1994, Washington, D.C. Accepted for publication in Transportation Research Record.

Siddharthan, R., Z. Zafir and G. Norris. "Moving Load Response of Layered Soil I: Formulation". ASCE Journal of Engineering Mechanics, Vol. 119, No. 10, Oct. 1993, pp. 2052-2071.

Siddharthan, R., Z. Zafir and G. Norris. "Moving Load Response of Layered Soil II: Verification and Application". ASCE Journal of Engineering Mechanics, Vol. 119, No. 10, Oct. 1993, pp. 2072-2089.

Norris, G., Z. Zafir and R. Siddharthan. "Liquefaction and Residual Strength of Loose Sands from Drained Triaxial Tests," Proceedings of the 29th Symposium of Engineering Geology and Geotechnical Engineering, March 22-24, 1993, Reno, NV.

2.17

Norris, G., R. Siddharthan, Z. Zafir and P. Gowda, "Soil and Foundation Conditions and Ground Motion at Cypress Street Viaduct". Transportation Research Record 1411, TRB, 1993, pp. 61-69.

Norris, G., R. Siddharthan, Z. Zafir and P. Gowda, "Seismic Pile Foundation Stiffnesses at Cypress Street Viaduct". Transportation Research Record 1411, TRB, 1993 pp. 70-80.

Zafir, Z. and R. Siddharthan. "Dynamic Response of Elastic Layered Medium to Moving Loads." Proceedings, AIAA/ASME/ASCE/AHS/ASC 33rd Structures, Structural Dynamics & Materials Conference, Dallas, TX, April 13-15, 1992, Vol. 3, pp. 1549-1557.

Norris, G., R. Siddharthan, Z. Zafir, S. Abdel-Ghaffar and P. Gowda. "Soil-Foundation-Structure Behavior at the Oakland Outer Harbor Wharf." Proceedings, Seminar on Seismological and Engineering Implications of Recent Strong-Motion Data, CSMIP, Sacramento, CA, May 1991, pp. 11-1 to 11-11.

Siddharthan, R., G. Norris and Z. Zafir. "Pavement Material Properties Using Non-Destructive Testing". Proceedings, 3rd International Conference on Constitutive Laws for Engineering Materials, Tucson, ASME Press, Jan. 1991, pp. 859-862.

Zafir, Z. G. Norris, H. Ezzel and J. Martini. "Soil/Foundation Behavior at Cypress Overpass (I-880) in San Francisco Earthquake." Presented at 26th Annual Symposium on Engineering Geology & Geotechnical Engineering, Pocatello, Idaho, April 1990.

2.18

# EXHIBIT C

1        IN THE DISTRICT COURT OF GUAM

2

3

4

5  S.J. GARGRAVE SYNDICATE
    AT LLOYDS,
6
          Plaintiff,
7
  vs.                    No.  CV03-00009
8
  BLACK CONSTRUCTION CORPORATION,
9  WINZLER & KELLY, and ENGINEERING
    MANAGEMENT & PLANNING SERVICES
10  CORPORATION,

11          Defendants.
  _____/
12      Deposition of

13    WEBB W. HAYES, S.E.

14  Thursday, May 12, 2005

15

16

17

18  REPORTED BY:  JOAN MARTIN, CSR #6036

19

20

21

22

23          NOGARA REPORTING SERVICE
        130 Battery Street, Suite 580
24      San Francisco, California 94111
           (415) 398-1889
25

CERTIFIED COPY

Case 1:03-cv-00009    Document 281-3    Filed 10/26/2005    Page 21 of 23

1    it's hard to say.  I don't know.  We did it in the same
2    room, together.
3         Q.  Okay.  So you believe it's a joint effort by
4    both of you?
5         A.  Yes.
6         Q.  Is there any part you specifically recall you
7    did not author?
8         A.  I didn't author the statement relative to the
9    seismic -- or -- let me get it for you.
10        Q.  Are you looking at Exhibit 2?  The stamp is in
11   the lower left-hand corner there.  Is that Exhibit 2?
12        A.  Yes.
13        Q.  Okay.
14        A.  The performance of W&K connection design for
15   the 2001 earthquake.
16        Q.  Which page is that?
17        A.  3 of 7.
18        Q.  Okay.  Mr. Trenkwalder authored that?
19        A.  Yes.  But I reviewed it.
20        Q.  Even though you didn't write all of the report,
21   I take it that you are in agreement with the opinions
22   expressed in the report, is that right?
23        A.  I am.
24        Q.  Okay.  This expert disclosure, in your initial
25   report, was filed with the court on July 16th, 2004.

13

Case 1:03-cv-00009    Document 281-3    Filed 10/26/2005    Page 22 of 23

1    Did you review any documents after that date, that are

2    not listed on the references in the report?

3        A.  Depositions.

4        Q.  Which depos did you review?

5        A.  I don't have a list of them.  If you have a

6    list, I could go down and pick off the ones that I've

7    reviewed.  Delos Santos was one.

8        Q.  I just happen to have that list.

9        A.  Reynaldo Arce, parts of it; Ben Casey, parts of

10   it; Frank Dennis, parts of that; delos Santos.  And

11   that's it.

12       Q.  All, or part of Mr. delos Santos?

13       A.  I don't think I -- on Dean Gillham.  I think

14   all of delos Santos.

15       Q.  Okay.  Were those depos sent to you, the

16   transcripts?

17       A.  Yes.

18       Q.  Okay.  Did you ask for them, or were they sent

19   to you by the attorney representing Winzler?

20       A.  They were sent to me by the attorney

21   representing Winzler.

22       Q.  Have you asked to see any additional documents

23   that -- since the list that you prepared that was in

24   your initial report?

25       A.  I believe -- I can't remember.  I think we

14

Case 1:03-cv-00009    Document 281-3    Filed 10/26/2005    Page 23 of 23

# EXHIBIT D

SAIPAN OFFICE
Second Floor, Nauru Building
P.O. Box 501969
Saipan, MP 96950-1969
Telephone: (670) 234-5684/5
Fax (670) 234-5683
Email: aburnsy4@saipan.com

HONOLULU OFFICE
Suite 2800, Pacifia Tower
1001 Bishop Street
Honolulu, Hawaii 96813-3580
Telephone: (808) 585-8858
Fax: (808) 599-4193
Email: mark@sbklevilaw.com

GUAM OFFICE
Suite 503, Bank of Guam Bldg.
111 Chalan Santo Papa
Hagåtña, Guam 96910
Telephone: (671) 477-2778
Fax (671) 477-4366
E-mail: bermlaw@kuentos.guam.net

POHNPEI OFFICE
Second Floor, Ace Commercial Building
P.O. Box 1491, Kolonia, Pohnpei,
Federated States of Micronesia, 96941
Telephone: (691) 320-2958
Fax (691) 320-5450
E-mail: bermlaw@mail.fm

# O'CONNOR BERMAN DOTTS & BANES
## ATTORNEYS AT LAW
### SAIPAN OFFICE
www.pacific-lawyers.com

July 21, 2004

**BY TELEFAX**

David Ledger, Esq.
Carlsmith Ball LLP
134 West Soledad Avenue
Bank of Hawaii Building, Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027

Thomas C. Sterling, Esq.
Klemm, Blair, Sterling & Johnson
Suite 1008, Pacific News Building
Hagåtña, Guam 96910-5205

Thomas M. Tarpley, Esq.
Tarpley & Moroni, LLP
Suite 402, Bank of Hawaii Building
Hagåtña, Guam 96910

Re: *Lloyds v. Black Micro et al.*

Dear Gentlemen:

I attach a slightly revised expert report by Ben Gerwick Inc.

As the report had two authors, all references to the pronoun "I" where appropriate were replaced with "we". Relatedly, Gerwick has added a section as to Mr. Trenkwalder's qualifications. To clarify Mr. Trenkwalder has not authored any publications within the past 10 years nor during the preceding 4 years has he testified in any matter. We have also provided additional information as to Mr. Hayes' previous testimonies and he also has not published any articles within 10 years.

We hope to shortly provide you all a slightly revised report from Kleinfelder with similar clarifications and additions.

*2003-08-040721-LTR-Ledger-Sterling-Tarpley-rcr*

Witness Hayes
PHFDeft
Exhibit 3
Consisting of 11 Pages
Date 5-12-05
JOAN MARTIN

Ben C. Gerwick, Inc.
Member of the COWI Group

Consulting Engineers
1300 Clay Street, Suite 450
Oakland, CA 94612
Tel.    510.839.8972
Fax.    510.839.9715
http://www.gerwick.com/

Mr. Robert O'Conner
O'Conner Berman Dotts & Banes
Second Floor, Nauru Bldg.
Saipan, MP 96950-1969

Date: July 14, 2004
Our ref. 2004-35

Subject:    **FOXTROT PIER F-1**
            **PORT AUTHORITY OF GUAM**
            **Winzler & Kelly**

**GENERAL**

The undersigned have been retained to evaluate the repair scheme for the Foxtrot F-1 petroleum wharf at Apra Harbor, Territory of Guam, and develop opinions as to the suitability of this repair scheme and its ability to resist loads. We have reviewed the EMPSCO design documentation, and various other documents listed in the References Section below.

**QUALIFICATIONS OF WEBB W. HAYES**

After graduating from the University of California at Berkeley I began my civil engineering career in January of 1958. I was with the firm of Earl and Wright from January 1959 to January 1985. For the last fourteen years at Earl and Wright I was president and CEO. I was chairman of the joint company, John Brown - Earl and Wright from 1973 through 1983. I was president of my own firm, Bay Phoenix Consulting Engineers, until 1991 when the firm ceased trading. After a brief time with Peter Cully & Associates, I spent nine years with GKO & Associates. In June of 2002, I joined the firm of Ben C. Gerwick, Inc., where I am currently employed.

I hold valid California Certificate number C-12409 as a Civil Engineer, which was issued in 1960 and California Certificate number S-1361 as a Structural Engineer, which was issued in 1965. I have previously been registered as a civil engineer in Oregon, Washington, Alaska, Texas and Louisiana: however, these registrations are no longer current.

Earl and Wright was a major civil and structural engineering firm in San Francisco that was very strong in marine engineering. The company designed many wharves in the San Francisco Bay Area, Alaska and the Philippines before becoming a major force in the design of offshore drilling platforms. In 1969 the company was acquired by SEDCO, which later became the largest offshore drilling company in the world. Most of the wharf projects were petroleum tanker facilities. These facilities ranged from barge terminals to terminals for VVLCC's and included the LPG terminal at Yanbu, Saudi Arabia and two liquid tanker terminals for Honam Petroleum (Caltex) in Honam, Korea. Earl and Wright did design bulk cargo terminals for the Alaska Railroad in Seward and Whittier, Alaska, and the U.S. Army Corps of Engineers in Haines, Alaska. Many of the projects had to be innovative to solve environmental and operational problems, such as moving ice and the lack of heavy construction equipment.

Bay Phoenix designed the berth for the Battleship Missouri at Hunters Point in San Francisco, CA. Bay Phoenix also performed studies and designed modifications to the Domtar Gypsum's bulk

terminal, at Antioch, CA, to prevent the constant damage which occurred to the wharf while docking conveyor ships.

While at GKO & Associates, I developed the layout and orientation of the permanent berth for the California Maritime Academy training ship, Golden Bear, at Vallejo, CA. I also developed the configuration for an island type crude oil off-loading terminal in San Francisco Bay off of Richmond, CA for VLCC tankers. This project was done for Wickland Oil Company, now ST Services, but not constructed for commercial reasons. I evaluated and analyzed marine terminals for UNOCAL (Now Conoco Phillips) at Rodeo, CA; Tosco Refining Corporation's (Now TESORO Refining Corporation) Amorco tanker terminal at Martinez, CA; Tosco Refining Corporation's (TESORO) tanker terminal at Avon, CA; and Shore Terminals tanker terminals at Selby and Martinez, CA.

The analysis and certification work outlined above led to the development of a new terminal for Tosco Refining Corp. (TESORO) at Avon, CA. I developed the terminal configuration to serve the full range of vessels that call at the Avon Terminal from barges to 105,000 DWT tankers. I also designed modifications to and new mooring dolphins for the Tesoro Amorco terminal, in Martinez, CA. to increase the ship size certification to 185,000 DWT. Finally I designed upgrades to the Conoco Phillips Rodeo Terminal to meet California State Lands Commission standards (MOTEMS). I am currently supervising the design of a third berth to that terminal for a 200,000 DWT tanker requiring redesign of the entire fender system.

With regard specifically to bulk terminals, I developed a preliminary configuration and terminal arrangement for a general cargo wharf and two bulk cargo wharves at Selby, CA for Wickland Properties Company. The two bulk cargo wharves were configured for a fixed loader and line hauling as the main option for bulk transfer, although a moveable loader was considered. The two bulk wharves were tandem and envisioned multiple breasting dolphins, at approximately 100 foot spacing and two inshore breast line mooring dolphins per berth.

I also was retained to evaluate a line-haul, fixed loader, coke loading facility, belonging to Diablo Services, a subsidiary of Tosco Refining Corp. This work involved analysis of mooring line loading and mooring forces, imposed by environmental conditions, for the purpose of obtaining certification from the California State Lands Commission for the maximum size bulk vessels that will be permitted to load or unload at the terminal facility. While performing this evaluation I was able to observe the shifting operation of the coke ship on several occasions

I have observed chip ships shift at two terminals in Oregon, two terminals in Washington, one terminal in Australia and at the Louisiana Pacific Terminal in Eureka, California.

I have served as an expert witness on a case involving the allision of the M/V Kure with a chip terminal wharf in Samoa, CA. This case was Kure Shipping S.A. and Patt Manfield & Co. vs Louisiana Pacific Corporation and Louisiana Pacific Samoa, Inc., U.S.D.C. Northern District Case No. C98-0648 MMC. The case did go to trial in early 2001 and I did testify in deposition and in trial. I am currently serving as an expert witness on an arbitration stemming from this case in London, United Kingdom. This arbitration, IN THE MATTER OF AN ARBITRATION BETWEEN: - THE SWEDISH CLUB (Claimants) and NIPPON YUSEN KAISHA (Respondents), is in case development and has not yet been arbitrated. I was also retained as an expert witness around 1968 on a case regarding the failure, during construction, of portions of the Anchorage City Dock in

Case 1:03-cv-00009     Document 281-4     Filed 10/26/2005     Page 4 of 28

Anchorage, Alaska. Although I did testify in deposition, the case was settled out of court and I did not testify in trial.

Over the course of 46 years in the design of marine structures I have acquired an understanding of the evolution of wharf design, the dynamic aspects of docking a ship, the complexities of mooring a ship and the sensitivity of line handling on vessel position and mooring line loads.

## QUALIFICATIONS OF TED W. TRENKWALDER:

After graduating from the University of California at Davis, I began my civil engineering career in January of 1980. I was with the firm of Earl and Wright from January 1980 to January 1989. During that period, I returned to the University of California at Berkeley and received a Master's Degree in Structural Engineering and Structural Mechanics. I was a senior engineer at Vickerman-Zachary-Miller until 1992. After a brief time with Peter Cully & Associates, I spent eight years with GKO & Associates. In May of 2002, I joined the firm of Ben C. Gerwick, Inc., where I am currently employed.

I hold valid California Certificate number C-35585 as a Civil Engineer, which was issued in 1983 and California Certificate number S-3731 as a Structural Engineer, which was issued in 1993. I have previously been registered as a civil engineer in Oregon, Louisiana, and Hawaii: however, these registrations are no longer current.

Earl and Wright was a major civil and structural engineering firm in San Francisco that was very strong in marine engineering. The company designed many offshore platforms in New Zealand, Australia, the North Sea, Africa, and the Gulf of Mexico. They also designed unloading terminals in the Philippines. The platforms were fixed, pile supported structures that required extensive analyses for seismic, wave, current, and wind loads. The terminal projects were petroleum tanker facilities.

While at Vickerman-Zachary-Miller, I designed wharves for container and navy vessels. The Schnitzer Pier and Pier 35 berths were designed for scrap metal containers and submarines respectively. VZM also designed buildings for waterfront support. I was responsible for the analysis and design of the NYK Maintenance & Repair Building, Administration Building, and Container Freight Storage building at the Port of Los Angeles.

At GKO & Associates, I analyzed, designed, and provided construction assistance for the new concrete cap and pipe pile berth and mooring dolphins for the California Maritime, at Vallejo, CA. I also completed a mooring assessment for tankers at the Wickland Martinez Terminal, which led to interaction with the State Lands Commission and the beginning of the MOTEMS manual. I evaluated and analyzed marine terminals for UNOCAL at Rodeo, CA; Tosco Refining Corporation Amorco tanker terminal at Martinez, CA; Tosco Refining Corporation terminal at Avon, CA; and Shore Terminals tanker terminals at Selby and Martinez, CA.

The analysis and design work outlined above led to the development of a new terminal for Tosco Refining Corp. at Avon, CA. I provided design assistance on the new mooring dolphins and walkways for the Tesoro Amorco terminal, in Martinez, CA. to increase the ship size certification to 185,000 DWT. Finally I designed upgrades to the Conoco Phillips Rodeo Terminal to meet California State Lands Commission standards (MOTEMS) requirements.

C:\Documents and Settings\WWMMy Document\Winkler & Kelly\Forms Pier P-1 FINAL Report 7-16-04.doc

With regard specifically to bulk terminals, I analyzed and designed the proposed terminal arrangement for a general cargo wharf and two bulk cargo wharves at Selby, CA for Wickland Properties Company. The two bulk cargo wharves were configured for a fixed loader and incorporated the existing marine terminal. I also analyzed and designed the improvements to the Levin Richmond Terminal to accommodate a new cement unloader. The existing timber and concrete pier was assessed and improvements designed to meet the latest seismic requirements. I am presently designing improvements to the Berths 35-37 to allow for larger crane loads and deeper draft vessels at the Port of Oakland.

Over the course of 25 years in the design of marine structures I have acquired an understanding of the evolution of wharf design, seismic analysis and design, the complexities of mooring a ship and the sensitivity of line handling on vessel position and mooring line loads.

I have not served as an expert witness on any prior cases.

## CASH & ASSOCIATES CALCULATIONS:

Ben C. Gerwick has not received the SAP computer model, geometry, output or calculations, to make a comparative analysis for the pier dolphins.

## BASIS FOR DESIGN:

Although the Port's contract with EMPSCO refers to the 1994 Uniform Building Code (UBC), there is no reference to this code in the Engineering Documentation Report or the calculations prepared by EMPSCO. It is questionable whether or not the 1994 UBC applied. It appears that the Port Authority of Guam waived EMPSCO's requirement to adhere to the 1994 UBC when they approved the drawings and specifications, and then put these documents out to bid.

The Port's funding limitations may have severely limited the berthing forces that the repaired breasting and mooring dolphins could be designed to resist and most likely required that a seismic upgrade be omitted from the scope of the repair work.

## PERFORMANCE OF W&K CONNECTION DESIGN FOR THE 2001 EARTHQUAKE:

The Winzler & Kelly connection detail provided on drawing VB-1 has capacity to resist seismic, mooring, and berthing loads. The dolphin capacity is directly related to the pile to cap connection capacity and the number of connections. Ben C. Gerwick prepared computer models to determine the ultimate capacities for Dolphins 'A' and 'C'.

The site specific response provided by Kleinfelder shows that the maximum applied seismic loads ranged between 0.1 g and 0.21 g at the project site. The ultimate capacities of the dolphins exceed the forces generated by accelerations in this range. Therefore, it is our opinion that, if properly constructed, the Winzler & Kelly alternate repair system would not have failed in the October 2001 earthquake.

## THE ALTERNATIVE PILE REPAIR SYSTEM:

The bid price for the wharf repair, as originally designed, was well in excess of the owner's budget. The Port then invited Black Construction Company to submit alternatives to the original design which

would lower the cost of the repair to the point where the port could proceed with the project. Winzler & Kelly was retained to develop an alternative pile repair scheme based on ideas from Black Construction Company.

The pile repair system, designed by EMPSCO, was the major cost element in the project. The implementation of the shear connectors was difficult and costly but the installation of the reinforcing steel dowels 20" into the existing concrete from under the dolphin was extremely difficult and costly. Further, properly installing these bolts and insuring that the epoxy completely filled the 20" deep hole was almost impossible.

Winzler & Kelly developed a scheme which used epoxy anchor bolts which are installed after a vial, filled with epoxy, has been inserted into the cleaned hole. The bolt is turned after the vial has been ruptured and the epoxy bond is achieved. The epoxy specified has a very short cure time, which makes installation simpler to accomplish than it is using a long cure epoxy, since the bolts must be held in place during cure.

The epoxy installation specified by EMPSCO, required that the epoxy be injected into the hole from below. With this method it is very difficult to vent the entrapped air from the hole and achieve complete penetration of the epoxy. In our opinion, the ability to achieve a competent bolt installation using the method proposed by Winzler & Kelly is much more assured than the installation method specified.

## W&K APPROVED CONNECTION REVIEWED BY ENGINEER OF RECORD:

Winzler & Kelly provided a drawing, entitled *"Proposed Pile Repair Detail"*, to the Contractor for submittal to EMPSCO, the Engineer of Record, for review and approval. On May 22, 1996, EMPSCO reviewed Submittal No. 12, Proposed Pile Repair Details – Winzler & Kelly drawing Sheet VE-1 dated 4/4/96. (Note BCG only has the drawing dated 4/2/96, which does not include a stamped and signed drawing). The submittal was returned to Black Construction "Approved as Noted", with six (6) conditions, which included "Provide structural calculations verifying that the proposed repair meets the design requirements."

Winzler & Kelly had no knowledge that the alternative was actually being constructed by Black Construction or that it had received conditional approval. Had design calculations been submitted, the acceptability of the alternative would have been vetted and possibly modified, disapproved or approved as submitted.

The drawing title *"Proposed Pile Repair Detail"* is evidence to the effect that the alternative was in the preliminary stage of development. It was reasonable for Winzler & Kelly to rely on EMPSCO, the engineer-of-record, to determine the design criteria for the project and further, it was reasonable to rely on EMPSCO's approval of the VE-1 drawing as confirmation that the work met these criteria.

EMPSCO was the most knowledgeable about the intent of the design and the critical nature of certain details, namely the pile to cap connection. Black Construction should have complied with the ER's request for the six conditions of the submittal. Nevertheless, EMPSCO had a duty to inform the client and Macario & Associates, the party responsible for project oversight, that approval of the alternative pile repair system was subject to conditions. The alternative pile repair system was not, therefore,

Case 1:03-cv-00009    Document 281-4    Filed 10/26/2005    Page 7 of 28

approved for construction and should not have been used. Macario & Associates should have discovered that the repair was not in accordance with the drawings and rejected the installation.

The obligation for quality control was, by specification, the responsibility of the contractor. Further the Port retained Macario & Associates to provide project oversight and inspection. Winzler & Kelly was not retained to perform this activity and had no duty to provide this service. In addition Winzler & Kelly was unaware the alternative pile repair system was being implemented which completely absolves them of any duty in this regard.

ANCHOR SYSTEMS AND APPROVED EQUAL:

At the request of Black Construction Company, Winzler and Kelly developed drawing VE-1, Proposed Pile Repair Details for Dolphins A, B, C, and D in April 1996. The drawing contained two notes that read:

1. THIS DRAWING IS TO BE READ IN CONJUNCTION WITH DRAWINGS AND SPECIFICATIONS FOR PROJECT – REPAIR & UPGRADING TO FOXTROT "F-1" PIER – PREPARED BY EMPSCO ENGINEERING CONSULTANTS, DATED 1/10/96.

2. ADHESIVE ANCHORS TO BE STAINLESS STEEL RED HEAD "REDI-CHEM" BY PHILLIPS DRILL CO., CATALOG NO. CB3495 OR APPROVED EQUAL. INSTALL PER MANUFACTURERS RECOMMENDED PROCEDURE.

Drawing VE-1 notes relied upon Black Construction and EMPSCO to review the proposed detail in accordance with the drawings and specifications developed by EMPSCO and to install the REDI-CHEM anchor in accordance to their recommended procedure. To the best of our knowledge, neither Black Construction Company nor EMPSCO reviewed the proposed detail in accordance to the EMPSCO contract documents or installed the detail in accordance to Redi-Chem's recommended procedure. It is the understood the words "or approved equal" means the engineer who specified the use of a detail or product, in this case Bruce Swanney, is the individual who should have reviewed the substitution and approved it if it was an acceptable substitution.

Winzler and Kelly notified Black Construction and the PAG that the proposed detail should be read in accordance with the design documents. Although EMPSCO's review and approval of the detail requested structural calculations from Winzler & Kelly, we understand that Winzler & Kelly was never advised of the approval conditions; otherwise, they would have supplied calculations for EMPSCO's review. EMPSCO should have advised the Port Authority whether the Black Construction proposed anchor system was appropriate for the design conditions and strong enough.

Winzler and Kelly proposed adhesive anchor system contained readily available installation procedures and capacities. The Red Head Redi-Chem concrete anchoring system publishes a seven step installation procedure to produce ultimate loads for bolt tension and shear. Black Construction Company substituted an adhesive anchor system, Anchor-It, that also included published installation procedure and capacities. A comparison of the systems with information provided is outlined below:

| Published Design Information | RED HEAD Redi-Chem | Anchor-It |
|---|---|---|
| Bolt Reba System | (8) ½" Ø Stainless | (8) ¾" Stainless |
| Embedment Depth | 6 ¾ inches | 6 ¼ inches |
| Recommended Cure Time (68°F) | 10 min. | 2 hours and 30 min. |
| Allowable Tension Capacity | 6,313 lbs | 3,783 lbs |
| Allowable Shear Capacity | 3,820 lbs | 3,020 lbs |

Notes:
1. The published capacities for Redi-Chem and Anchor-It are based on A307 bolt information.
2. The RED HEAD capacity is based on concrete strength of 6, 300 psi.
3. The Anchor-It capacity is based on concrete strength of 2,000 psi.

The EMPSCO anchor system has more capacity than the proposed alternative or the installed anchor system. The Redi-Chem and Anchor-It systems may be of comparable strength if the actual concrete strength governs the capacity. However the cure time for the Anchor-It system is fifteen times longer than the Redi-Chem system.

## PERFORMANCE OF W&K CONNECTION DESIGN:

The EMPSCO design did not consider seismic loading on the dolphins. Their design report, which sets forth the criteria to be used, acknowledges that Transen Associates Limited considered seismic forces, but makes no reference to the magnitude of these forces or any seismic criteria to be used. There is no evidence in the EMPSCO calculations that any structural analysis or seismic evaluation was performed. Failure to undertake a structural analysis of the wharf shows less than a reasonable standard of care was used for the EMPSCO design. It is apparent that the work to be done was to be of an expedient nature to permit tanker operations immediately and was to be a temporary repair.

EMPSCO states the new fender system is designed to accept a 150,000 DWT vessel. Assuming adequate water depth, the displacement of such a vessel is approximately 187,000 Long Tons. The fender selected by EMPSCO for dolphins C & D are a Bridgestone SUC 1150H Rubber Grade RH. The rated energy absorption capacity is 280 ft kips (38.7 $T_m$ Meters). The reaction on the dolphin, when this amount of energy has been absorbed, is 168.7 kips (76.5 Tonnes). The total kinetic energy of that ship approaching at 0.2 ft/sec (the design velocity) is 260 ft kips. The worst case eccentricity coefficient is 1.0. Therefore, the design energy absorbed by each fender is 260 ft kips. The load on the fender after absorbing this amount of energy is 160 kips. The connection at the top of the piles can resist this load. The allowable horizontal force on the dolphin perpendicular to the docking face is 297 kips. For the connections to begin to fail, the horizontal load would need to increase to 565 kips.

The design energy level utilizes this fender at the end of its energy absorbing range. The design fender deflection (compression) is 50%; whereas, the maximum deflection is 56%. The difference in approach velocity for the design ship to achieve this deflection is 0.013 ft/sec, or from 0.200 to 0.213 ft/sec. At this point the reaction force on the dolphin is 180 kips. The alternative design, shown on VE-1, would have met the berthing forces required by the EMPSCO Vessel berthing criteria. If the approach velocity exceeds, say, 0.215 ft/sec, the reaction force increases

asymptotically, since the fender can no longer absorb energy. The remaining ship energy will be absorbed through failure of the dolphin pile connection and, finally, the dolphin piles.

In our opinion, the selection of this fender provides very little reserve capacity for energy absorption. This, coupled with an extremely low design approach velocity, increases the potential for a dolphin system overload at, what would still be considered, a very low approach velocity. The Marine Oil Terminal Engineering and Maintenance Standards (MOTEMS), of the California State Lands Commission, recommend a minimum approach velocity of 0.26 ft/sec for existing berths in favorable site conditions and 0.33 ft/sec for moderate site conditions. Favorable site conditions require wind < 38 knots and wave height < 6.5 ft. Moderate site conditions allow wind > 38 knots and wave height < 6.5 ft.

This site could be classified as Moderate. If we accept the classification of "Favorable" and use 0.26 ft/sec as the design berthing velocity, the design energy of the ship would have been 440 ft kips (61 $T_m$ Meters). It is not possible for the selected fender system to absorb this much energy and the resultant force on the dolphin would cause failure of the pile connection and possibly, the piles.

We understand that the wharf was used during construction, before new fenders were installed. During construction the fender was either not there, heavily deteriorated or rubber tractor tires were used. The fender system at this time had virtually no energy absorbing capability. We understand that the fender units specified have not been installed to this date or there was a period of time when the design fenders were not present when ships were berthed at the wharf. Tractor tires have very little energy absorbing capacity and fully compress under very little load. If ships approached the wharf at velocities much lower than 0.2 ft/sec extreme loads would have occurred that would have damaged the dolphins.

The damaged pile connections, observed after the 2001 earthquake, were not the connections designed by Winzler & Kelly. The bolt adhesive did not meet Winzler & Kelly's specification and the bolts were not installed properly. Thus it is impossible for the plaintiff to show how Winzler & Kelly's connection would have performed. Any conclusions related to the performance of the connection design, based on the observed damage, would be highly speculative.

It has been noted that one or both dolphins C & D were permanently displaced 16 inches toward shore. For this displacement to occur, the batter piles or their connections had to fail. For a permanent displacement to exist, the batter piles had to fail in bending or the top connection shear from the concrete. A seismic event is oscillatory and due to the relative weakness of the soils for pile tension, as compared to compression, we would expect any permanent displacement to be in the opposite direction, away from the shore.

It is our opinion that the damage to the dolphin piles and connection was due to excessive berthing loads and not by any seismic forces. .

REFERENCES:

- ▪ Guam Oil and Refining Company Structural Design Calculations dated xxx, pp94.
- ▪ Trasen Associates LTD Structural Drawings S-1 – S-10 dated April 18, 1969.

- EMPSCO Structural Design Calculations for Repair and Upgrading to Foxtrot "F-1" Pier Apra Harbor dated xxx, pp 90.
- EMSCO Structural Drawings S-0 – S17 dated January 10, 1996.
- Geo-Engineering & Testing Inc, Subsurface Soil Investigation Foxtrot I Pier Facility Improvement / Repair dated July 13, 1995, pp 9 with Plates 1-6.
- Cash & Associates Report dated May 12, 2004, pp 20
- Kleinfelder Report dated July, 14, 2004.
- Marine Oil Terminal Engineering and Maintenance Standards (MOTEMS), California State Lands Commission.

Sincerely,

BEN C. GERWICK, INC.

*[signature]*

Webb W. Hayes, S.E.
Senior Engineer

BEN C. GERWICK, INC.

*[signature]*

Ted W. Trenkwalder, S.E.
Senior Engineer

# EXHIBIT E

SAIPAN OFFICE
Second Floor, Nauru Building
P.O. Box 501969
Saipan, MP 96950-1969
Telephone: (670) 234-5684/5
Fax: (670) 234-5683
E-mail: attorneys@saipan.com

HONOLULU OFFICE
Suite 2800, Pacific Tower
Bishop Square, 1001 Bishop Street
Honolulu, Hawaii 96813-3380
Telephone: (808) 585-3251
Fax: (808) 599-4198
E-mail: mark@hklawlaw.com

GUAM OFFICE
Suite 503, Bank of Guam Bldg.
111 Chalan Santo Papa
Hagåtña, Guam 96910
Telephone: (671) 477-2778
Fax: (671) 477-4366
E-mail: bermlaw@kuentos.guam.net

POHNPEI OFFICE
Second Floor, Ace Commercial Building
P.O. Box 1491, Kolonia, Pohnpei
Federated States of Micronesia, 96941
Telephone: (691) 320-2868
Fax: (691) 320-5459
E-mail: bermlaw@mail.fm

## O'CONNOR BERMAN DOTTS & BANES
### ATTORNEYS AT LAW
### SAIPAN OFFICE
www.pacific-lawyers.com

November 4, 2004

**BY TELEFAX**

David Ledger, Esq.
Carlsmith Ball LLP
134 West Soledad Avenue
Bank of Hawaii Building, Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027

Thomas M. Tarpley, Esq.
Tarpley & Moroni, LLP
Bank of Hawaii Building
134 West Soledad Avenue, Suite 402
Hagåtña, Guam 96910

Thomas C. Sterling, Esq.
Klemm, Blair, Sterling & Johnson
Suite 1008, Pacific News Building
Hagåtña, Guam 96910-5205

Re: *Gargrave v. Black Construction, et al.; Guam District Court CV 03-0009*

Gentlemen:

Attached please find an amended report from Winzler & Kelly's experts Webb Hayes and Ted Trenkwalder.

The qualifications of Mr. Trenkwalder were added and changes were made on pages 6 and 7.

Yours truly,

Robert J. O'Connor

2003-08-041104-LTR-AllCounsel.doc

Witness _Hayes_
Pltf Deft
Exhibit
Consisting of ___ Pages
Date _9-13-05_
JOAN MARTIN

4.1



Mr. Robert O'Conner
O'Conner Berman Dotts & Banes
Second Floor, Nauru Bldg.
Saipan, MP 96950-1969.

Date: November 2, 2004
Our ref. 2004-35

Subject:    **FOXTROT PIER F-1**
            **PORT AUTHORITY OF GUAM**
            **Winzler & Kelly**

## GENERAL

The undersigned have been retained to evaluate the repair scheme for the Foxtrot F-1 petroleum
wharf at Apra Harbor, Territory of Guam, and develop opinions as to the suitability of this repair
scheme and its ability to resist loads. We have reviewed the BMPSCO design documentation, and
various other documents listed in the References Section below.

## QUALIFICATIONS OF WEBB W. HAYES

After graduating from the University of California at Berkeley I began my civil engineering career in
January of 1958. I was with the firm of Earl and Wright from January 1959 to January 1985. For the
last fourteen years at Earl and Wright I was president and CEO. I was chairman of the joint company,
John Brown - Earl and Wright from 1973 through 1983. I was president of my own firm, Bay
Phoenix Consulting Engineers, until 1991 when the firm ceased trading. After a brief time with Peter
Cully & Associates, I spent nine years with GKO & Associates. In June of 2002, I joined the firm of
Ben C. Gerwick, Inc., where I am currently employed.

I hold valid California Certificate number C-12409 as a Civil Engineer, which was issued in 1960 and
California Certificate number S-1961 as a Structural Engineer, which was issued in 1965. I have
previously been registered as a civil engineer in Oregon, Washington, Alaska, Texas and Louisiana:
however, these registrations are no longer current.

Earl and Wright was a major civil and structural engineering firm in San Francisco that was very
strong in marine engineering. The company designed many wharves in the San Francisco Bay Area,
Alaska and the Philippines before becoming a major force in the design of offshore drilling platforms.
In 1969 the company was acquired by SEDCO, which later became the largest offshore drilling
company in the world. Most of the wharf projects were petroleum tanker facilities. These facilities
ranged from barge terminals to terminals for VVLCC's and included the LPG terminal at Yanbu,
Saudi Arabia and two liquid tanker terminals for Honam Petroleum (Caltex) in Honam, Korea. Earl
and Wright did design bulk cargo terminals for the Alaska Railroad in Seward and Whittier, Alaska,
and the U.S. Army Corps of Engineers in Haines, Alaska. Many of the projects had to be innovative
to solve environmental and operational problems, such as moving ice and the lack of heavy
construction equipment.

Bay Phoenix designed the berth for the Battleship Missouri at Hunters Point in San Francisco, CA.
Bay Phoenix also performed studies and designed modifications to the Domtar Gypsum's bulk
terminal, at Antioch, CA, to prevent the constant damage which occurred to the wharf while docking
conveyor ships.

While at GKO & Associates, I developed the layout and orientation of the permanent berth for the California Maritime Academy training ship, Golden Bear, at Vallejo, CA. I also developed the configuration for an island type crude oil off-loading terminal in San Francisco Bay off of Richmond, CA for VLCC tankers. This project was done for Wickland Oil Company, now ST Services, but not constructed for commercial reasons. I evaluated and analyzed marine terminals for UNOCAL (Now Conoco Phillips) at Rodeo, CA; Tosco Refining Corporation's (Now TESORO Refining Corporation) Amorco tanker terminal at Martinez, CA; Tosco Refining Corporation's (TESORO) tanker terminal at Avon, CA; and Shore Terminals tanker terminals at Selby and Martinez, CA.

The analysis and certification work outlined above led to the development of a new terminal for Tosco Refining Corp. (TESORO) at Avon, CA. I developed the terminal configuration to serve the full range of vessels that call at the Avon Terminal from barges to 105,000 DWT tankers. I also designed modifications to and new mooring dolphins for the Tesoro Amorco terminal, in Martinez, CA. to increase the ship size certification to 185,000 DWT. Finally I designed upgrades to the Conoco Phillips Rodeo Terminal to meet California State Lands Commission standards (MOTEMS). I am currently supervising the design of a third berth to that terminal for a 200,000 DWT tanker requiring redesign of the entire fender system.

With regard specifically to bulk terminals, I developed a preliminary configuration and terminal arrangement for a general cargo wharf and two bulk cargo wharves at Selby, CA for Wickland Properties Company. The two bulk cargo wharves were configured for a fixed loader and line hauling as the main option for bulk transfer, although a moveable loader was considered. The two bulk wharves were tandem and envisioned multiple breasting dolphins, at approximately 100 foot spacing and two inshore breast line mooring dolphins per berth.

I also was retained to evaluate a line-haul, fixed loader, coke loading facility, belonging to Diablo Services, a subsidiary of Tosco Refining Corp. This work involved analysis of mooring line loading and mooring forces, imposed by environmental conditions, for the purpose of obtaining certification from the California State Lands Commission for the maximum size bulk vessels that will be permitted to load or unload at the terminal facility. While performing this evaluation I was able to observe the shifting operation of the coke ship on several occasions

I have observed chip ships shift at two terminals in Oregon, two terminals in Washington, one terminal in Australia and at the Louisiana Pacific Terminal in Eureka, California.

I have served as an expert witness on a case involving the allision of the M/V Kure with a chip terminal wharf in Samoa, CA. This case was Kure Shipping S.A. and Patt Manfield & Co. vs Louisiana Pacific Corporation and Louisiana Pacific Samoa, Inc., U.S.D.C. Northern District Case No. C98-0648 MMC. The case did go to trial in early 2001 and I did testify in deposition and in trial. I am currently serving as an expert witness on an arbitration stemming from this case in London, United Kingdom. This arbitration, IN THE MATTER OF AN ARBITRATION BETWEEN: - THE SWEDISH CLUB (Claimants) and NIPPON YUSEN KAISHA (Respondents), is in case development and has not yet been arbitrated. I was also retained as an expert witness around 1968 on a case regarding the failure, during construction, of portions of the Anchorage City Dock in Anchorage, Alaska. Although I did testify in deposition, the case was settled out of court and I did not testify in trial.

Over the course of 46 years in the design of marine structures I have acquired an understanding of the evolution of wharf design, the dynamic aspects of docking a ship, the complexities of mooring a ship and the sensitivity of line handling on vessel position and mooring line loads.

## QUALIFICATIONS OF TED W. TRENKWALDER:

After graduating from the University of California at Davis, I began my civil engineering career in January of 1980. I was with the firm of Earl and Wright from January 1980 to January 1989. During that period, I returned to the University of California at Berkeley and received a Master's Degree in Structural Engineering and Structural Mechanics. I was a senior engineer at Vickerman-Zachary-Miller until 1992. After a brief time with Peter Cully & Associates, I spent eight years with GKO & Associates. In May of 2002, I joined the firm of Ben C. Gerwick, Inc., where I am currently employed.

I hold valid California Certificate number C-35585 as a Civil Engineer, which was issued in 1983 and California Certificate number S-3731 as a Structural Engineer, which was issued in 1993. I have previously been registered as a civil engineer in Oregon, Louisiana, and Hawaii; however, these registrations are no longer current.

Earl and Wright was a major civil and structural engineering firm in San Francisco that was very strong in marine engineering. The company designed many offshore platforms in New Zealand, Australia, the North Sea, Africa, and the Gulf of Mexico. They also designed unloading terminals in the Philippines. The platforms were fixed, pile supported structures that required extensive analyses for seismic, wave, current, and wind loads. The terminal projects were petroleum tanker facilities.

While at Vickerman-Zachary-Miller, I designed wharves for container and navy vessels. The Schnitzer Pier and Pier 35 berths were designed for scrap metal containers and submarines respectively. VZM also designed buildings for waterfront support. I was responsible for the analysis and design of the NYK Maintenance & Repair Building, Administration Building, and Container Freight Storage building at the Port of Los Angeles.

At GKO & Associates, I analyzed, designed, and provided construction assistance for the new concrete cap and pipe pile berth and mooring dolphins for the California Maritime, at Vallejo, CA. I also completed a mooring assessment for tankers at the Wickland Martinez Terminal, which led to interaction with the State Lands Commission and the beginning of the MOTEMS manual. I evaluated and analyzed marine terminals for UNOCAL at Rodeo, CA; Tosco Refining Corporation Amorco tanker terminal at Martinez, CA; Tosco Refining Corporation terminal at Avon, CA; and Shore Terminals tanker terminals at Selby and Martinez, CA.

The analysis and design work outlined above led to the development of a new terminal for Tosco Refining Corp. at Avon, CA. I provided design assistance on the new mooring dolphins and walkways for the Tesoro Amorco terminal, in Martinez, CA. to increase the ship size certification to 185,000 DWT. Finally I designed upgrades to the Conoco Phillips Rodeo Terminal to meet California State Lands Commission standards (MOTEMS) requirements.

With regard specifically to bulk terminals, I analyzed and designed the proposed terminal arrangement for a general cargo wharf and two bulk cargo wharves at Selby, CA for Wickland Properties Company. The two bulk cargo wharves were configured for a fixed loader and incorporated the existing marine terminal. I also analyzed and designed the improvements to the Levin Richmond Terminal to accommodate a new cement unloader. The existing timber and concrete pier was assessed and improvements designed to meet the latest seismic requirements. I am presently designing improvements to the Berths 35-37 to allow for larger crane loads and deeper draft vessels at the Port of Oakland.

Over the course of 25 years in the design of marine structures I have acquired an understanding of the evolution of wharf design, seismic analysis and design, the complexities of mooring a ship and the sensitivity of line handling on vessel position and mooring line loads.

· I have not served as an expert witness on any prior cases.

**CASH & ASSOCIATES CALCULATIONS:**

Ben C. Gerwick has not received the SAP computer model, geometry, output or calculations, to make a comparative analysis for the pier dolphins.

**BASIS FOR DESIGN:**

Although the Port's contract with EMPSCO refers to the 1994 Uniform Building Code (UBC), there is no reference to this code in the Engineering Documentation Report or the calculations prepared by EMPSCO. It is questionable whether or not the 1994 UBC applied. It appears that the Port Authority of Guam waived EMPSCO's requirement to adhere to the 1994 UBC when they approved the drawings and specifications, and then put these documents out to bid.

The Port's funding limitations may have severely limited the berthing forces that the repaired breasting and mooring dolphins could be designed to resist and most likely required that a seismic upgrade be omitted from the scope of the repair work.

**PERFORMANCE OF W&K CONNECTION DESIGN FOR THE 2001 EARTHQUAKE:**

The Winzler & Kelly connection detail provided on drawing VB-1 has capacity to resist seismic, mooring, and berthing loads. The dolphin capacity is directly related to the pile to cap connection capacity and the number of connections. Ben C. Gerwick prepared computer models to determine the ultimate capacities for Dolphins 'A' and 'C'.

The site specific response provided by Kleinfelder shows that the maximum applied seismic loads ranged between 0.1 g and 0.21 g at the project site. The ultimate capacities of the dolphins exceed the forces generated by accelerations in this range. Therefore, it is our opinion that, if properly constructed, the Winzler & Kelly alternate repair system would not have failed in the October 2001 earthquake.

**THE ALTERNATIVE PILE REPAIR SYSTEM:**

The bid price for the wharf repair, as originally designed, was well in excess of the owner's budget. The Port then invited Black Construction Company to submit alternatives to the original design which would lower the cost of the repair to the point where the port could proceed with the project. Winzler & Kelly was retained to develop an alternative pile repair scheme based on ideas from Black Construction Company.

The pile repair system, designed by EMPSCO, was the major cost element in the project. The implementation of the shear connectors was difficult and costly but the installation of the reinforcing steel dowels 20" into the existing concrete from under the dolphin was extremely difficult and costly. Further, properly installing these bolts and insuring that the epoxy completely filled the 20" deep hole was almost impossible.

Winzler & Kelly developed a scheme which used epoxy anchor bolts which are installed after a vial, filled with epoxy, has been inserted into the cleaned hole. The bolt is turned after the vial has been ruptured and the epoxy bond is achieved. The epoxy specified has a very short cure time, which makes installation simpler to accomplish than it is using a long cure epoxy, since the bolts must be held in place during cure.

The epoxy installation specified by EMPSCO, required that the epoxy be injected into the hole from below. With this method it is very difficult to vent the entrapped air from the hole and achieve complete penetration of the epoxy. In our opinion, the ability to achieve a competent bolt installation

using the method proposed by Winzler & Kelly is much more assured than the installation method specified.

**W&K APPROVED CONNECTION REVIEWED BY ENGINEER OF RECORD:**

Winzler & Kelly provided a drawing, entitled *"Proposed Pile Repair Detail"*, to the Contractor for submittal to EMPSCO, the Engineer of Record, for review and approval. On May 22, 1996, EMPSCO reviewed Submittal No. 12, Proposed Pile Repair Details – Winzler & Kelly drawing Sheet VE-1 dated 4/4/96. (Note BCG only has the drawing dated 4/2/96, which does not include a stamped and signed drawing). The submittal was returned to Black Construction "Approved as Noted", with six (6) conditions, which included "Provide structural calculations verifying that the proposed repair meets the design requirements."

Winzler & Kelly had no knowledge that the alternative was actually being constructed by Black Construction or that it had received conditional approval. Had design calculations been submitted, the acceptability of the alternative would have been vetted and possibly modified, disapproved or approved as submitted.

The drawing title *"Proposed Pile Repair Detail"* is evidence to the effect that the alternative was in the preliminary stage of development. It was reasonable for Winzler & Kelly to rely on EMPSCO, the engineer-of-record, to determine the design criteria for the project and further, it was reasonable to rely on EMPSCO's approval of the VE-1 drawing as confirmation that the work met these criteria.

EMPSCO was the most knowledgeable about the intent of the design and the critical nature of certain details, namely the pile to cap connection. Black Construction should have complied with the ER's request for the six conditions of the submittal. Nevertheless, EMPSCO had a duty to inform the client and Macario & Associates, the party responsible for project oversight, that approval of the alternative pile repair system was subject to conditions. Macario & Associates should have discovered that the repair was not in accordance with the drawings and rejected the installation.

The obligation for quality control was, by specification, the responsibility of the contractor. Further the Port retained Macario & Associates to provide project oversight and inspection. Winzler & Kelly was not retained to perform this activity and had no duty to provide this service. In addition Winzler & Kelly was unaware the alternative pile repair system was being implemented which completely absolves them of any duty in this regard.

**ANCHOR SYSTEMS AND APPROVED EQUAL:**

At the request of Black Construction Company, Winzler and Kelly developed drawing VE-1, Proposed Pile Repair Details for Dolphins A, B, C, and D in April 1996. The drawing contained two notes that read:

1.   THIS DRAWING IS TO BE READ IN CONJUNCTION WITH DRAWINGS AND SPECIFICATIONS FOR PROJECT – REPAIR & UPGRADING TO FOXTROT "F-1" PIER – PREPARED BY EMPSCO ENGINEERING CONSULTANTS, DATED 1/10/96.

2.   ADHESIVE ANCHORS TO BE STAINLESS STEEL RED HEAD "REDI-CHEM" BY PHILLIPS DRILL CO., CATALOG NO. C83495 OR APPROVED EQUAL. INSTALL PER MANUFACTURERS RECOMMENDED PROCEDURE.

Drawing VE-1 notes relied upon Black Construction and EMPSCO to review the proposed detail in accordance with the drawings and specifications developed by EMPSCO and to install the REDI-CHEM anchor in accordance to their recommended procedure. To the best of our knowledge, neither Black Construction Company nor EMPSCO reviewed the proposed detail in accordance to the

EMPSCO contract documents or installed the detail in accordance to Redi-Chem's recommended procedure. It is the understood the words "or approved equal" means the engineer who specified the use of a detail or product, in this case Bruce Swanney, is the individual who should have reviewed the substitution and approved it if it was an acceptable substitution.

Winzler and Kelly notified Black Construction and the PAG that the proposed detail should be read in accordance with the design documents. Although EMPSCO's review and approval of the detail requested structural calculations, we understand that Winzler & Kelly was never advised of the approval conditions. EMPSCO should have advised the Port Authority whether the Black Construction proposed anchor system was appropriate for the design conditions and strong enough.

Winzler and Kelly proposed adhesive anchor system contained readily available installation procedures and capacities. The Red Head Redi-Chem concrete anchoring system publishes a seven step installation procedure to produce ultimate loads for bolt tension and shear. Black Construction Company substituted an adhesive anchor system, Anchor-It, that also included published installation procedure and capacities.

The EMPSCO anchor system has more capacity than the proposed alternative or the installed anchor system. The Redi-Chem and Anchor-It systems differ but may be of comparable strength if the actual concrete strength governs the capacity.

## PERFORMANCE OF W&K CONNECTION DESIGN:

The EMPSCO design did not consider seismic loading on the dolphins. Their design report, which sets forth the criteria to be used, acknowledges that Transen Associates Limited considered seismic forces, but makes no reference to the magnitude of these forces or any seismic criteria to be used. There is no evidence in the EMPSCO calculations that any structural analysis or seismic evaluation was performed. Failure to undertake a structural analysis of the wharf shows less than a reasonable standard of care was used for the EMPSCO design. It is apparent that the work to be done was to be of an expedient nature to permit tanker operations immediately and was to be a temporary repair.

EMPSCO states the new fender system is designed to accept a 150,000 DWT vessel. Assuming adequate water depth, the displacement of such a vessel is approximately 187,000 Long Tons. The fender selected by EMPSCO for dolphins C & D are a Bridgestone SUC 1150H Rubber Grade RH. The rated energy absorption capacity is 280 ft kips (38.7 $T_m$ Meters). The reaction on the dolphin, when this amount of energy has been absorbed, is 168.7 kips (76.5 Tonnes). The total kinetic energy of that ship approaching at 0.2 ft/sec (the design velocity) is 260 ft kips. The worst case eccentricity coefficient is 1.0. Therefore, the design energy absorbed by each fender is 260 ft kips. The load on the fender after absorbing this amount of energy is 160 kips. The connection at the top of the piles can resist this load. The allowable horizontal force on the dolphin perpendicular to the docking face is 297 kips. For the connections to begin to fail, the horizontal load would need to increase to 563 kips.

The design energy level utilizes this fender at the end of its energy absorbing range. The design fender deflection (compression) is 50%; whereas, the maximum deflection is 56%. The difference in approach velocity for the design ship to achieve this deflection is 0.013 ft/sec, or from 0.200 to 0.213 ft/sec. At this point the reaction force on the dolphin is 180 kips. The alternative design, shown on VB-1, would have met the berthing forces required by the EMPSCO Vessel berthing criteria. If the approach velocity exceeds, say, 0.213 ft/sec, the reaction force increases asymptotically, since the fender can no longer absorb energy. The remaining ship energy will be absorbed through failure of the dolphin pile connection and, finally, the dolphin piles.

In our opinion, the selection of this fender provides very little reserve capacity for energy absorption. This, coupled with an extremely low design approach velocity, increases the potential for a dolphin system overload at, what would still be considered, a very low approach velocity. The Marine Oil Terminal Engineering and Maintenance Standards (MOTEMS), of the California State Lands Commission, recommend a minimum approach velocity of 0.26 ft/sec for existing berths in favorable site conditions and 0.33 ft/sec for moderate site conditions. Favorable site conditions require wind < 38 knots and wave height < 6.5 ft. Moderate site conditions allow wind > 38 knots and wave height < 6.5 ft.

This site could be classified as Moderate. If we accept the classification of "Favorable" and use 0.26 ft/sec as the design berthing velocity, the design energy of the ship would have been 440 ft kips (61 $T_m$ Meters). It is not possible for the selected fender system to absorb this much energy and the resultant force on the dolphin would cause failure of the pile connection and possibly, the piles.

We understand that the wharf was used during construction, before new fenders were installed. During construction the fender was either not there, heavily deteriorated or rubber tractor tires were used. The fender system at this time had virtually no energy absorbing capability. We understand that the fender units specified have not been installed to this date or there was a period of time when the design fenders were not present when ships were berthed at the wharf. Tractor tires have very little energy absorbing capacity and fully compress under very little load. If ships approached the wharf at velocities much lower than 0.2 ft/sec extreme loads would have occurred that would have damaged the dolphins.

The damaged pile connections, observed after the 2001 earthquake, were not the connections designed by Winzler & Kelly. The bolt adhesive did not meet Winzler & Kelly's specification and the bolts were not installed properly. Thus it is impossible for the plaintiff to show how Winzler & Kelly's connection would have performed. Any conclusions related to the performance of the connection design, based on the observed damage, would be highly speculative.

It has been noted that one or both dolphins C & D were permanently displaced 16 inches toward shore. For this displacement to occur, the batter piles or their connections had to fail. For a permanent displacement to exist, the batter piles had to fail in bending or the top connection shear from the concrete. A seismic event is oscillatory and due to the relative weakness of the soils for pile tension, as compared to compression, we would expect any permanent displacement to be in the opposite direction, away from the shore.

EMPSCO based its design and fender selection on very low berthing forces. These very low berthing forces were in turn based on very low berthing velocities and very shallow berthing angles (see EMPSCO's Engineering Documentation Report, paragraph E). It is imperative that velocity and approach angle restrictions be communicated to the harbor pilots, ship captains, tug captains and others responsible for port operations. A failure of the docking ship to adhere to these restrictions would result in the fenders being damaged or destroyed and such damage or destruction would subject the dolphins to extremely high berthing forces that would cause severe damage, including damage to the pile-to-deck connection.

In our opinion, the Port was, and is, the entity responsible for communicating such docking restrictions to these parties. The Port's failure to communicate these docking restrictions (see Simeon Delos Santos deposition) to anyone was negligent.

It is our opinion that the damage to the dolphin piles and connection was due to excessive berthing loads and not by any seismic forces.

**REFERENCES:**

- Guam Oil and Refining Company Structural Design Calculations dated xxx, pp94.
- Trason Associates LTD Structural Drawings S-1 – S-10 dated April 18, 1969.
- EMPSCO Structural Design Calculations for Repair and Upgrading to Foxtrot "F-1" Pier Apra Harbor dated xxx, pp 90.
- EMSCO Structural Drawings S-0 – S17 dated January 10, 1996.
- Geo-Engineering & Testing Inc, Subsurface Soil Investigation Foxtrot I Pier Facility Improvement / Repair dated July 13, 1995, pp 9 with Plates 1-6.
- Cash & Associates Report dated May 12, 2004, pp 20
- Kleinfelder Report dated July, 14, 2004.
- Marine Oil Terminal Engineering and Maintenance Standards (MOTEMS), California State Lands Commission.

Sincerely,

BEN C. GERWICK, INC.

Webb W. Hayes, S.E.
Senior Engineer

BEN C. GERWICK, INC.

Ted W. Trenkwalder, S.E.
Senior Engineer

# EXHIBIT F

**THOMAS C. STERLING**
**KLEMM, BLAIR, STERLING & JOHNSON, P.C.**
1008 Pacific News Building
238 Archbishop F.C. Flores Street
Hagåtña , Guam 96910
Telephone: (671) 477-7857
Facsimile: (671) 472-4290
*Attorneys for Defendant Black Construction Corporation*

**THOMAS M. TARPLEY, JR.**
**TARPLEY & MORONI, LLP**
A Law Firm including a Professional Corporation
Bank of Hawaii Building
134 West Soledad Avenue, Suite 402
Hagåtña, Guam 96910
Telephone: (671) 472-1539
Facsimile: (671) 472-4526
*Attorneys for Defendant Engineering, Management
& Planning Services Corporation*

**ROBERT J. O'CONNOR**
**O'CONNOR BERMAN DOTTS & BANES**
Second Floor, Nauru Building
P.O. Box 501969
Saipan, MP 96950-1969
Telephone: (670) 234-5684
Facsimile: (670) 234-5683
*Attorneys for Defendant Winzler & Kelly Consulting Engineers*


**FILED**
DISTRICT COURT OF GUAM
JAN 2 8 2005
MARY L.M. MORAN
CLERK OF COURT

# IN THE DISTRICT COURT OF GUAM

| | | |
|---|---|---|
| S.J. GARGRAVE SYNDICATE AT LLOYDS, | ) ) ) | CIVIL CASE NO. CV03-00009 |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | |
| BLACK CONSTRUCTION CORPORATION and WINZLER & KELLY CONSULTING ENGINEERS and ENGINEERING, MANAGEMENT & PLANNING SERVICES CORPORATION, | ) ) ) ) ) ) | **DEFENDANTS' JOINT BRIEF RE DIVERSITY AND ADMIRALTY JURISDICTION** |
| Defendants. | ) ) ) | |

//

damaged a tunnel under the river causing water from the river to travel down the tunnel flooding buildings adjoining the river. Gargrave maintains at p.14 of its brief that the Supreme Court in Grubart held "there is admiralty jurisdiction over tort cases involving repair work to dolphins." The case held no such thing.

The Court in Grubart pointed out that, prior to the existence of the Extension Act, admiralty courts lacked jurisdiction over damage resulting from a ship's collision with a pier "for admiralty law treated the pier as an extension of the land." 513 U.S. at 532. The Court then noted that the first prong of the tort jurisdiction test under the Extension Act was whether the "tort occurred on navigable waters or whether injury suffered on land was caused by a vessel on navigable water." The second prong requires a "connection with maritime activity." 513 U.S. at 534. The Court then went on to analyze whether jurisdiction existed under the Extension Act and concluded that it did since the plaintiffs' flood damage on land had been caused by a vessel on navigable waters engaged in traditional maritime activities. The Court did not hold, as Gargrave asserts, that admiralty jurisdiction extends to any tort claim involving repair work on dolphins. Most importantly, for purposes of determining whether there is jurisdiction over the tort claim herein, it is absolutely clear that the injury here

- 14 -

did not occur on navigable waters nor was it caused by a vessel on navigable water. Thus, Gargrave's tort claim clearly fails to satisfy the first prong of the jurisdictional test.

In footnote 18 of its brief, Gargrave contends that there is a conflict in this Circuit concerning the Royal Insurance holding since another panel in Bohemia Inc. v. The Home Ins. Co., 725 F.2d 506, 510 (9th Cir. 1984), "reached the opposite conclusion". The holding in Bohemia, *supra*, was simply that:

> "[S]tate law will control the interpretation of a marine insurance policy only in the absence of federal statute, a judicially fashioned admiralty rule, or a need for uniformity in admiralty practice." 725 F.2d. at 510.

The Court in Bohemia did not, as Gargrave suggests, even address the issue of whether admiralty jurisdiction extends to contracts pertaining to docks.[5]

Gargrave refers to a number of cases cited in Royal Insurance asserting that in "cases like the instant suit involving damage to maritime property" Royal Insurance indicates that there would be admiralty jurisdiction. Royal Insurance says no such thing. The cases referred to were cited in Royal Insurance (738 F.2d at 1038) as examples of some courts assuming admiralty jurisdiction in connection with contracts in a situation where traditional maritime torts have occurred.

---

[5]     In Bohemia, a barge and tug collided with a small boat on a river in Oregon resulting in a drowning and personal injuries.

- 15 -

# EXHIBIT G

FILED
DISTRICT COURT OF GUAM
JUN - 3 2005
MARY L.M. MORAN
CLERK OF COURT

1

IN THE DISTRICT COURT OF GUAM

TERRITORY OF GUAM

\* \* \*


S.J. GARGRAVE SYNDICATE AT LLOYDS, )
                                   )
          Plaintiff,        )
                                   )
     vs.                      )  CIVIL CASE
                                   )    NO. CV03-00009
BLACK CONSTRUCTION CORPORATION,  )
WINZLER & KELLY CONSULTING       )
ENGINEERS, and ENGINEERING       )
MANAGEMENT & PLANNING SERVICES   )
CORPORATION,                   )
                                   )
          Defendants.      )
————————————————————————————)


TRANSCRIPT OF PROCEEDINGS

BEFORE

THE HONORABLE A. WALLACE TASHIMA
Designated Judge


HEARING ON MOTIONS

FRIDAY, DECEMBER 3, 2004
\* \* \*


Wanda M. Miles
Official Court Reporter
District Court of Guam

1     instead underlined it, emphasized it, improved on it.

2          "We find the crucial elements of Ryan to be

3     as follows:  A shipowner, relying on the expertise of

4     another party, the contractor, enters into a contract

5     whereby the contractor agrees to perform services

6     without supervision or control by the shipowner."

7          There's no shipowner here, it's the Port who

8     owns the dolphin.  And in their brief that's where they

9     ended.  They didn't give the court the two crucial

10    elements, which are, number two, the improper, unsafe

11    or incompetent execution of such services which

12    foreseeably rendered the vessel unseaworthy, or bring

13    into play a pre-existing unseaworthy condition.

14    Dolphins can't be unseaworthy, and they're not vessels.

15    And finally, the third one, the ship's owner would

16    thereby be exposed to the liability regardless of

17    fault.

18          Fairmont did not erode the Ryan case at all;

19    it strengthened it and emphasized it and it pointed out

20    the importance of seaworthiness and strict liability.

21    In our case, we don't have a ship, we don't have a

22    shipowner, and the pier, the dolphins could not be

23    seaworthy or unseaworthy.

24          Thank you, Your Honor.

25          THE COURT:  Okay, thank you.