# ORIGINAL

CARLSMITH BALL LLP

DAVID LEDGER
STEPHEN C. SMITH
ELYZE McDONALD
134 West Soledad Avenue
Bank of Hawaii Bldg., Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Tel No. (671) 472-6813

COZEN O'CONNOR

FORREST BOOTH
425 California Street, Suite 2400
San Francisco, CA 94104-2215
Tel No. (415) 617-6100

Attorneys for Plaintiff
S.J. Gargrave Syndicate at Lloyds



**FILED**
DISTRICT COURT OF GUAM
OCT 2 6 2005
MARY L.M. MORAN
CLERK OF COURT

IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| S.J. GARGRAVE SYNDICATE AT LLOYDS,<br><br>               Plaintiff,<br><br>vs.<br><br>BLACK CONSTRUCTION CORPORATION, WINZLER & KELLY, and ENGINEERING MANAGEMENT & PLANNING SERVICES CORPORATION,<br><br>               Defendants. | CIVIL CASE NO. CV03-00009<br><br>**PLAINTIFF'S MOTION IN LIMINE TO PRECLUDE EVIDENCE, TESTIMONY, AND REFERENCE TO DEFENDANTS' EXPERTS' OPINION THAT THE 1996-97 REPAIRS TO THE PIER AND DOLPHINS WERE 1) TEMPORARY; OR 2) WERE DESIGNED TO BRING THE PIER BACK TO ONLY 40% OF ITS ORIGINAL STRENGTH; DECLARATION OF SERVICE** |

Plaintiff S.J. GARGRAVES SYNDICATE AT LLOYDS (hereinafter "Plaintiff")

hereby moves this Court for an order *in limine* excluding any and all evidence, testimony, and

reference to Defendants' experts' opinions that the 1996-97 repairs to the Shell F-1 Pier and dolphins were 1) temporary; or 2) were designed to bring the Pier back to only 40% of its original strength.

## I.     INTRODUCTION

In August of 1993, the island of Guam suffered a severe earthquake, estimated to be a magnitude of 8.0. The earthquake did significant damage to a number of the piers, docks, dolphins and other facilities and property owned and operated by The Port Authority of Guam (hereinafter "The Port"). Shortly thereafter, The Port contracted with Engineering Management & Planning Services Corporation (hereinafter "EMPSCO") to provide The Port with engineering services, inspection services, construction consultation, soils investigation, plans, specifications, bid documents and estimates for the repair work at the F-1 Pier and dolphins. See EMPSCO's contract Scope of Work, attached hereto as Exhibit A. The contract entered into between The Port and EMPSCO does not state that the work to be performed under the contract was either a "temporary repair" or a repair to bring the Pier back to only 40% of the its original strength.

The Port awarded the repair contract to Black Construction Corporation (hereinafter "Black") on April 8, 1996 (hereinafter "Port-Black contract). Black then entered into a contract with Winzler & Kelly (hereinafter "Black-Winzler contract") for certain engineering design services and to advise it concerning repairing the damage which the 1993 earthquake had caused. This work included preparing initial drawings for the repairs, and would have required performing certain engineering calculations (which Winzler failed to perform). Neither the Port-Black contract nor the Black-Winzler contract state that the work to be performed under the contract was either a "temporary repair" or a repair to bring the Pier back to only 40% of the its original strength.

The Port-Black Contract states, in pertinent part, that:

> Any modification of this agreement or additional obligation assumed by either party in connection with this agreement shall be binding only if evidenced in writing signed by each party or an authorized representative of each party.

*See*, Exhibit C attached hereto, p.5, ¶ XVIII.

There were no subsequent agreements stating that the work to be performed was for either a "temporary repair" or a repair to bring the Pier to 40% of the its original strength.

During the course of the project, to reduce costs for its client the Port, Black Construction suggested that a number of changes be made to the proposed work. The repair work was performed on the basis of a design prepared for Black by Winzler, which was developed pursuant to a written contract between Black and Winzler. Winzler prepared the design, including stamped and signed drawings, without performing a single calculation to determine the forces which the structure would encounter. In fact, the "back of a napkin" drawing which Winzler prepared and Black utilized resulted in a connection between the piles and concrete dolphin caps which was only one-half to one-seventh as strong as it needed to be. See May 12, 2004 report of structural engineer Elliott Boone, attached hereto as Exhibit B, p.8. The repair work was performed under Winzler's general supervision.

On or about October 13, 2001, the island of Guam suffered a second earthquake. Although it was substantially less powerful than the earthquake of 1993 (7.0 versus 8.0), this earthquake, too, did serious damage to the dolphins owned by The Port, which had previously been repaired by Black pursuant to the plans and specifications prepared by, and under the supervision of, Winzler. The work done in 1996-97 was essentially wiped out. Of the 216 bolts Black installed in Dolphin A, only 2 remained undisturbed after the second earthquake. See the Boone Report, Exhibit B hereto, p.3.

Defendants' experts will attempt to offer testimony at trial that the 1996-97 repairs and upgrades were intended to be "temporary" repairs only and only designed to bring the Pier to 40% of its original strength. They so speculated during their depositions. There is absolutely **no evidentiary basis** to support this theory.

In deposition, Defendants' experts (particularly Dean Gillham and Webb Hayes) admitted that the contracts to perform the work did **not** state that the 1996-97 repairs to the Pier and dolphins were temporary in nature, or that they were only designed to bring the Pier back to 40% of its original strength. Furthermore, there are clauses in the pertinent contracts forbidding their terms to be altered except in writing (and no such written changes exist). Therefore extrinsic evidence that contradicts the terms of the contracts should not be allowed. The testimony of Defendants' experts purports to show an intent of the contracts for repairs which is directly contrary to the clear and unambiguous terms of those written agreements. Such testimony is inadmissible as a matter of law under the parol evidence rule. Plaintiff therefore requests an order excluding any testimony by any defense expert regarding such an incorrect "understanding" or "intent" of the contracts.

## II.   ARGUMENT

### A.   Opinion Testimony Of "Temporary" Repairs Must Be Precluded Because Such Testimony Is Based Solely Upon Speculation

Black's expert, Dean Gillham, opined in deposition that the 1996-97 repairs were temporary, but admitted that no documentation exists to support his theory:

> Q.   Okay. What I am trying to find out is,
>
> are you aware of any evidence in the case or any other
>
> indications or statements by the Port Authority to EMPSCO
>
> or anyone else that it was just looking for a temporary

repair?

A.    I am not aware of any correspondence or communications
      between the Port and EMPSCO to that affect (sic).

Q.    Okay. How about between anybody involved in this case
      that indicates that this was a temporary repair, other than the opinion
      you're giving today that it's an engineering conclusion?

A.    There are other documents that I have reviewed and
      received from Mr. Sterling that are referred to this as
      temporary repair.

Q.    Okay. Which documents are those?

A.    I can't remember off hand.

*See* excerpts from deposition of Dean Gillham taken on April 25, 2005 attached hereto as
Exhibit D, pp. 20-21.

Winzler's expert, Webb Hayes, testified in part, as follows:

Q.    Last sentence in that paragraph says, "It is
      apparent that the work to be done was to be of an
      expedient nature."

      What do you mean by "expedient nature"?

A.    Temporary.

Q.    Okay. What do you mean by "temporary"?

A.    To get us by until the next failure. Pardon me.

Q.    Did "temporary" have a time period associated with it?
      Are you saying for six months, or a year, or --

A.  It could be any of those. Or a day. This whole repair, in the whole system, was just in danger of collapse for the next ship that came in.

Q.  And that was even after the repairs were done in '95/'96 --

A.  Correct.

Q.  -- in your view? Okay. Have you reviewed the specifications for the '95/'96 repair job?

A.  I think I have, yes.

Q.  Is there any reference in those specifications to it being a temporary repair?

A.  I don't remember if there is a reference. I -- I don't recollect on those -- on EMPSCO's – the specifications EMPSCO was given says that. I think it did say that on the subsequent repair.

. . .

Q.  I'm referring to the '95/'96 work that was done. Are you aware of any of the either designers or contractors involved in that project being told that this was a temporary repair?

A.  Not that I could see.

*See* excerpts from deposition of Webb Hayes taken on May 12, 2005 attached hereto as Exhibit E, pp. 51-53.

### B.  Opinion Testimony That 1996-97 Repairs Were Only Designed To Bring The Pier Back To 40% Of Its Original Strength Must Be Precluded Because Such Testimony Is Based Upon Speculation

The Black-Winzler contract, the Port-EMPSCO contract, EMPSCO's contract specifications and the plans all refer to the project as "Repairs and **Upgrading**", not a "temporary repair" or a repair to 40% of the Pier's original strength. Defendants cannot produce

any document that states that the 1996-97 repairs were designed to bring the Pier up to less than its original strength. Nevertheless, Defendants' experts will attempt to offer unfounded testimony that the repairs were designed to be "temporary" and to only 40% of the Pier's original strength. This speculative and self-serving testimony must be precluded as confusing and misleading under Federal Rule of Evidence ("F.R.E.") 403, and because it lacks sufficient facts or data under F.R.E. 702.

## C. The Parol Evidence Rule Bars Testimony From Defendants' Experts That The Repairs Were Designed To Be "Temporary" And To Only 40% Of The Pier's Original Strength

The parol evidence rule prohibits the introduction of extrinsic evidence to vary or contradict the terms of an integrated written instrument. Tahoe Nat'l Bank v. Phillips, 4 Cal.3d 11, 22-23 (1971). Here, that would be testimony that the repairs were designed to be "temporary" and to less than the Pier's original strength. The application of the parol evidence rule involves a two-part analysis. First, the court must determine whether the writing was intended to be an integration, a complete and final expression of the parties' agreement. Masterson v. Sine, 68 Cal.2d 222, 225 (1968). The parol evidence rule prohibits the introduction of any extrinsic evidence to vary or contradict the terms of an integrated written instrument. The rule is based upon the premise that the written instrument is the expressed agreement of the parties. See Tahoe Nat'l Bank, *supra*, 4 Cal.3d at 22-23, 92.

The second part of the parol evidence analysis requires the court to consider whether the argument is susceptible of the meaning urged by the party offering the evidence. Pacific Gas & Electric Co. v. G.W. Thomas Drayage Co., 69 Cal.2d 33, 37 (1968). That case held that extrinsic evidence is admissible to interpret or explain the meaning of language used in an instrument when that language is reasonably susceptible of the interpretation suggested by the extrinsic evidence. Id. at 37-40. However, it is well settled that extrinsic evidence is not

admissible to give the language used in a written instrument a meaning to which it is not reasonably susceptible. <u>People ex rel Dept. of Parks & Recreation v. West-A-Rama, Inc.</u>, 35 Cal.App.3d 786, 791 (1974); <u>Oakland-Alameda v. Oakland Raiders</u>, 197 Cal.App.3d 1049, 1058-1059 (1988) (court excluded extrinsic evidence after determining that the use of the word "term" in a rent adjustment clause was not reasonably susceptible of the interpretation suggested by appellants); <u>Blumenfeld v. R.H. Macy & Co.</u>, 92 Cal.App.3d 38, 45-46 (1979) (court excluded extrinsic evidence after determining that an assignment clause was not reasonably susceptible of the interpretation urged by respondents).

The evidence that will be offered by Defendants' experts does not prove a meaning to which the language in the contracts is reasonably susceptible. There is nothing ambiguous about the contracts for the design, repair and upgrading of the F-1 Pier. The Specifications prepared for the project by Defendant EMPSCO are entitled "Specifications for Repairs and Upgrading to Foxtrot 'F-1' Pier Apra Harbor Guam, MI". *See* Exhibit F hereto, the cover page thereof. The contract between Black and the Port states that "... the Port Authority intends to construct REPAIRS AND UPGRADING OF FOXTROT PIER 'F-1' ..." *See* Exhibit C hereto, p.1. The dictionary defines "upgrade" as "... to raise the quality of (as a manufactured product) ...". <u>Webster's New Collegiate Dictionary</u> (1976 ed.). The F-1 Pier was being improved in order to allow it to accommodate much larger ships than it was originally designed to handle: EMPSCO stated that "F-1 was originally designed to accommodate a 90,000 DWT tanker vessel. This project proposes to accommodate larger tankers up to 150,000 DWT ..." EMPSCO's Design Calculations for Repairs and Upgrading to Foxtrot 'F-1' Pier, Apra Harbor, Guam, MI", Exhibit G hereto, p.6-6. The words "repairs" and "upgrading" and the clearly-expressed intention to raise the ship-handling capacity of the Pier from 90,000 DWT to

150,000 DWT cannot possibly be reconciled with the Defendants' position that the work to be done was "temporary", or was intended to restore the Pier to less than its full original strength; in fact, the strength (capacity) of the Pier was being significantly **increased**.

It is well settled that the modern thrust of contract law is to avoid the concept of "intention" and look for <u>expressed intent</u> under an objective standard. <u>Mission Valley East, Inc. v. County of Kern</u>, 120 Cal.App.3d 89, 97 (1980); *see also,* <u>Medical Operations</u> <u>Management v. National Health Laboratories,</u> 176 Cal.App.3d 886, 893 (1986); 1 B. Witkin, <u>Summary of California Law</u> § 684 (9th ed. 1987). Here, the Court should not stray beyond the expressed intent of the parties as set forth in the contracts for the design, repair and upgrading of the F-1 Pier and dolphins. The contracts are clear. There can be no dispute as to the plain and ordinary meanings of the contractual language.

**D.     Defendants' Experts' Purported Testimony Will Not Assist The Trier Of Fact To Understand A Fact In Issue**

Defendants' purported theories that the 1996-97 repairs to the Pier and dolphins were temporary in nature and only designed to bring the Pier back to less than its original strength would not be probative because they are not based on facts. Cf., <u>Stuart v. U.S.</u>, 23 F.3d 1483 (9th Cir. 1994) (excluding expert testimony on "standard" police procedures in a case involving border patrol procedures).

In <u>Maffei v. Northern Ins. Co. of N.Y.</u>, 12 F.3d 892 (9th Cir. 1993), the Court of Appeals found that an insurance expert's declaration was properly excluded, on a motion for summary judgment, when proffered with regard to interpreting an exclusion in an insurance policy. The expert merely described his background, recited the policy language, and then stated that, based upon his experience and expertise, the exclusion did not apply. <u>Maffei</u>, 12 F.3d at 898-899.     The Court found this insufficient.     His recitation of the "facts" were patently

insufficient to support his opinion, and made it clear he was merely a "hired gun", brought in to tell a story. Defendants' attempts herein through their "hired guns" to argue that the 1996-97 repairs to the Pier and dolphins were temporary in nature and only designed to bring the Pier back to 40% of its original strength are similarly insufficient and unsupported by the contracts for the repairs.

## E. Such Testimony Is Based On Subjective Speculation, Not On Facts And Should Be Excluded

In <u>Kemp v. Tyson Seafood Group</u>, 2000 WL 1062105 (D.Minn. 2000), Defendants sought to exclude the testimony of plaintiffs' damages expert, whose conclusions, embodied in a 1 ½ page expert report, were based solely on his "knowledge" and "experience" in the business of selling frozen foods, but were not predicated on historical sales data. His conclusions were also "bereft of any generally accepted analytical model upon which future projections could be responsibly computed." The Court held that "an expert's mere belief in the legitimacy of his opinions is insufficient to allow the admissibility of the conclusions reached." <u>Kemp v. Tyson Seafood Group</u> at p. 5. The Court also held that

> Both *Daubert*, and *Kumho*, make clear that the day of the expert, who merely opines, and does so on the basis of vague notions of experience, is over. Experts are now held to a level of accountability that requires factual predicates, in historical fact, or in competent evidence, which allows a factfinder to independently verify the accuracy of the expert's results. Absent such reliable verification, the expert's opinion is not admissible. <u>Kemp v. Tyson Seafood Group</u> at p. 7.

The U.S. Supreme Court stated in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993) that "knowledge" connotes more than mere subjective belief or unsupported conclusion. <u>Daubert</u> at p. 590. Since Defendants' experts' pronouncements are completely without factual basis, they are not helpful to the trier of fact herein. These opinions are unreliable and inadmissible.

## III. CONCLUSION

Plaintiff requests that the Court order that Defendants, their counsel, witnesses and experts be precluded from mentioning, referring to or basing any argument on the assertion that the 1996-97 repairs and upgrades to the Pier and dolphins were 1) temporary; or 2) were designed to bring the Pier back to less than its original strength.

DATED: Hagåtña, Guam, October 26, 2005.

CARLSMITH BALL LLP

DAVID LEDGER
STEPHEN C. SMITH
ELYZE McDONALD
Attorneys for Plaintiff
S.J. Gargrave Syndicate at Lloyds

## DECLARATION OF SERVICE

I, David Ledger, hereby declare under penalty of perjury of the laws of the United States, that on October 26, 2005, I caused to be served, via hand delivery, a true and correct copy of **PLAINTIFF'S MOTION IN LIMINE TO PRECLUDE EVIDENCE, TESTIMONY, AND REFERENCE TO DEFENDANTS' EXPERTS' OPINION THAT THE 1996-97 REPAIRS TO THE PIER AND DOLPHINS WERE 1) TEMPORARY; OR 2) WERE DESIGNED TO BRING THE PIER BACK TO ONLY 40% OF ITS ORIGINAL STRENGTH**; upon Defendants' Counsel of record as follows:

Robert J. O'Connor, Esq.
Daniel J. Berman, Esq.
Berman O'Connor Mann & Shklov
Suite 503, Bank of Guam Building
111 Chalan Santo Papa
Hagåtña, Guam 96910

Thomas C. Sterling, Esq.
Klemm Blair Sterling & Johnson, P.C.
Suite 1008, Pacific News Building
238 Archbishop Flores Street
Hagåtña, Guam 96910

and

Thomas M. Tarpley, Esq.
Law Offices of Tarpley & Moroni, LLP
Suite 402, Bank of Hawaii Building
134 West Soledad Avenue
Hagåtña, Guam 96910

Executed this 26th day of October, 2005 at Hagåtña, Guam.

_____
DAVID LEDGER

SANFRAN1\34258\1 123206.000

**EXHIBIT A**

SCOPE OF WORK

FOR

FILE COPY

### REPAIRS AND IMPROVEMENTS TO EXISTING F-1
FUEL PIER (SHELL PIER)

## 1. INTENT AND DESCRIPTION

The Port Authority of Guam is intending to correct deficiencies, repair damages and construct improvements to existing Fuel Pier "F-1" (Shell Pier). The purpose of this contract is to obtain professional services for the design of such repairs and improvements. The project includes the inspection, identification of necessary repairs to existing dolphin, main wharf, walkway and improvements to existing Fuel Pier "F-1". The project also includes all the required soil investigation, shop drawing and catalog submittal review, and construction consultation.

## 2. LOCATION

The project is located at Pier "F-1" (Shell Pier) Apra Harbor, Cabras Islands Guam, M.I.

## 3. DESIGN PARAMETERS

1. Report on damaged structures F-1 Facility Guam for Shell Guam, Inc. prepared by Candac Limited dated August 1993.

2. Structural Assessment of the Foxtrot (F-1) Pier, Apra Harbor prepared by N.C. Macario & Associates, Inc.

3. Ultra Sonic gauging report, main pier support pillars pier (F-1) Guam, prepared by Guam Oceaneers/N.C. Macario & Associates, Inc.

4. Subsurface Soil Investigation Foxtrot I Pier Facility Improvement/Repair Cabras Island and prepared by Geo-Engineering & Testing, Inc. dated July 13, 1993.

5. Uniform Building code (UBC) - 1994 Edition.

6. American Concrete Institute (ACI) Code - 1989 Edition.

Case 1:03-cv-00009    Document 282    Filed 10/26/2005    Page 14 of 36

4. **CONSTRUCTION COST LIMITATION**

The project shall be designed to permit construction of the repair and improvement of the facility within a construction contract price to be provided by the Government. If the consultant during the preliminary cost analysis finds that the repairs and improvements cannot be built within the allotted amount, the matter should be brought to the attention of the General Manager immediately.

Consultant shall prepare a construction cost estimate for the proposed repairs and improvements.

5. **SOILS REPORT**

The Consultant shall review and interpret all subsurface exploration, geotechnical and soils report furnished by Port Authority of Guam for the project.

The soils investigation shall include the following information:

a. General soil composition

b. General subsurface conditions

c. Compactibility of soil

6. **ENVIRONMENTAL PROTECTION PLAN**

The Consultant shall review the Environmental Impact Assessment Report and U.S. Army Corps of Engineers permit application furnished by Port Authority of Guam. The Consultant shall advise Port Authority of Guam on any problems that may be encountered during the permitting process.

5 - 53

7. **DESIGN ITEM AND CONSIDERATION**

The general description of work shall include but not limited to the following:

1. Repairs to existing support piles of Dolphins A, B, C, D and G.

2. Repairs to walkways support piles P1, P2, and P3.

3. Removal of existing piles and pile cap of Dolphins H.

4. Removal and replacement of damaged air buffer fenders C and D.

5. Repair cracks at precast concrete deck units, girders and main beam at main wharf area including supporting piles.

6. Repair spalls and deteriorated concrete surfaces at main wharf area.

7. Repair cracks/spalls at access ramp.

8. Repair cracks and spalls at pile caps.

9. Removal and replacement of existing fendering system.

10. Installation of new cathodic protection system.

11. Repair Bollard connections to main wharf.

12. Removal and Replacement of damaged dolphin "H".

8. **SUBMITTALS**

Submittals shall be made in accordance with the following schedule:

| Submittal | Due Date | Drawings | Specifications | Cost Estimates |
|---|---|---|---|---|
| 35% Design Documents | 46 Calendar days after NTP | 5 Copies | 5 Copies | 5 Copies |
| Final Design Documents | 45 Calendar days after receipt of 35% review comments | 5 Copies | 5 Copies | 5 Copies |

Case 1:03-cv-00009    Document 282    Filed 10/26/2005    Page 16 of 36

9.   **GOVERNMENT REVIEW**

The Port Authority of Guam will work closely with the Consultant to expedite

design reviews.  Reviews will normally be "On Board".

10.   **RELATIONS WITH OTHER GOVERNMENT AGENCIES**

All directions within the scope of this contract will be issued by the General

Manager, Port Authority of Guam, and the Consultant shall not accept such

direction from others. Information provided by other agencies which seemingly

conflicts with information provided by the General Manager will be discussed

immediately.   This policy is not intended to prevent the Consultant from

obtaining necessary design information from other agencies.

11.   **RESPONSIBILITY OF THE CONSULTANT**

The Consultant shall be responsible for the professional and technical accuracy

and the coordination of all designs, drawings, specifications and other work of

materials furnished by him under this contract.   The Consultant without

additional cost to the Government, shall correct or revise all errors or

deficiencies in his work.

12.   **GOVERNMENT RESPONSIBILITIES**

The Port Authority of Guam shall be responsible for the following:

a.   Port Authority of Guam will furnish the Consultant with the as-built

drawings of the existing facilities affected by this scope of work which

are available at PAG file.

5 - 55

b.  The Port Authority of Guam shall provide, if requested, assistance necessary for the Consultant and its agents access to the project site.

c.  Environmental Impact Assessment Report, U.S. Army Corps of Engineers. Nationwide Permit, Territorial Seashore Permit Clearance as required during the processing of Government of Guam Building Permit.

AGREED:                                          APPROVED:          

PETRONILO Q. VILLALUZ, P.E.                      CAPT. EULOGIO BERMUDES
Managing Engineer                                General Manager
EMPSCO Engineering Consultants                   Port Authority of Guam

Date: _NOV. 28, 1995_                            Date: _____

Case 1:03-cv-00009     Document 282     Filed 10/26/2005     Page 18 of 36

**EXHIBIT B**



**CASH & ASSOCIATES**
Engineering and Architecture

Elliott H. Boone
Randy H. Mason
Wilfrido B. Simbol
Kerry M. Simpson

May 12, 2004

Attention: Mr. Forrest Booth
Cozen O'Connor Attorneys
425 California Street, Suite 2400
San Francisco, CA 94104-2215

Attention: Mr. David Ledger
Carlsmith Ball LLP
P.O. Box BF
Hagatna, Guam 96932-5027

Subject:      FOXTROT PIER F1
              PORT AUTHORITY OF GUAM
              COZEN O'CONNOR REFERENCE NO. 123206
              (C&A Project No. 6090.00)

Gentlemen

The purpose of this report is to summarize the results of my investigation of structural damage observed at Foxtrot "F1" Pier in Apra Harbor, the sole motor fuel (gasoline and diesel) import location for Shell Guam Inc.

The scope of this investigation included the following tasks:

      1.     Visit the site to visually observe the reported damage.

      2.     Review project technical data and correspondence relating to the original design and subsequent repairs.

      3.     Render an opinion as to the adequacy of the repair design prepared by Winzler & Kelly.

      4.     Render an opinion of the connections installed by the Contractor.

The documents reviewed to develop this report are contained in Appendix A, Reference Listing.

## BACKGROUND

Apra Harbor is considered a protected harbor with favorable berthing conditions. Information reviewed relating to the Foxtrot "F1" facility indicated that it was constructed in 1970 and originally designed to accommodate 90,000 DWT tanker vessels. The pier consists of an access ramp from the shore leading to the main wharf supporting the bulk fuel unloading arms.

5772 Bolsa Avenue, Suite 100 ■ Huntington Beach, CA 92649 USA ■ TEL:714.895.2072 ■ FAX 714.895.1291
Web Site: www.cashassociates.com ■ A California Corporation

Cozen O'Connor Attorneys
Mr. Forrest Booth
Carlsmith Ball LLP
Mr. David Ledger
May 12, 2004

FOXTROT PIER F1
PORT AUTHORITY OF GUAM
Cozen O'Connor Reference No. 123206
(C&A Project No. 6090.00)
Page 2

Catwalks, from the wharf, lead to offshore mooring dolphins "A" and "B". Two additional mooring dolphins, "E" and "F", are located onshore. Tanker berthing forces are absorbed by four breasting dolphins; "C", "D", "G" and "H" located outboard of the wharf. Breasting dolphins "C" and "D" were designed to accommodate the 90,000 DWT vessels, while breasting dolphins "G" and "H" were provided to accommodate smaller 21,000 to 28,000 DWT vessels.

## PREVIOUS REPAIR HISTORY

The Foxtrot "F1" facility was operational at the time of the 8.1 magnitude earthquake in August 1993 and the resulting damage from this event was significant. Preparation of contract documents for repair of the damage sustained by the facility pier was awarded to EMPSCO Engineering Consultants of Agana, Guam by the Port Authority in late 1994. The Port Authority approved contract documents prepared by EMPSCO for bid and local contractors were required to submit their proposals on January 26, 1996.

The apparent low bidder for the project was Black Construction Company, Tamung, Guam, however, their bid for the work as described in the plans and specifications exceeded the Port Authority's budget. In order to proceed with the project, Black Construction Company was requested to submit alternates that would reduce their bid. In response to that request, Black Construction Company using an alternate design developed by Winzler & Kelly Consulting Engineers, Agana, Guam made a revised proposal to the Port Authority.

The alternate design for the repair was identified on Drawing Sheet VE-1 (copy attached) prepared under the supervision of Bruce Swanney, of Winzler & Kelly. Mr. Swanney is registered to practice as a Structural Engineer in the Territory of Guam and his professional engineering seal appears on that drawing, dated April 4, 1996.

At his deposition, Bruce Swanney stated that the sole calculation undertaken in the design of the pile flange to deck connection, shown on Drawing Sheet VE-1, was to assume that the connection would only be required to resist pile withdrawal loads equal to one half the pile axial capacity of 200 tons. No calculations relating to the design shown on Drawing Sheet VE-1 were available for my review.

In general, the repair shown on Sheet VE-1, involved removing approximately 15 feet of the upper portion each of the existing steel pipe piles under the deck of the mooring and breasting dolphins. A 22-inch diameter replacement was then spliced to the remaining pile section, which is connected to the underside of the dolphin deck with a 1-inch thick flange plate, welded to the new section of pipe pile. The flange was, in turn, connected to the underside of the dolphin using 8-3/4 inch diameter, Grade 304 stainless steel bolts, embedded in epoxy.

As-built details and other documents of completed repairs were made available to Cash & Associates for review and are listed in Appendix A, Reference Listing.

It is our understanding that the facility was operational from the date that work was completed until 13 October 2001, when a subsequent 7.0 magnitude earthquake again damaged the facility.

Cozen O'Connor Attorneys
Mr. Forrest Booth
Carlsmith Ball LLP
Mr. David Ledger
May 12, 2004

FOXTROT PIER F1
PORT AUTHORITY OF GUAM
Cozen O'Connor Reference No. 123206
(C&A Project No. 6090.00)
Page 3

## VISUAL OBSERVATIONS

Oceaneer Enterprises, Inc, Piti, Guam performed a post-earthquake survey of the mooring and breasting dolphins on October 13, 2001. Their visual observation of the damage revealed that the epoxy securing the stainless steel bolts embedded into the underside of the dolphin had failed. In a high percentage of the total number bolts, the epoxy had failed to harden or in some cases was absent. In more than one bolt location epoxy that had flowed out of the predrilled hole was observed in and around the steel flange below it.

Of the 216 bolts securing the piles of Dolphin A, only two (2) remained undisturbed by the event. Failure of the epoxy is a technical consideration that is not part of this report, however, it is highly unusual for nearly all the connecting elements to fail if the design meets the service requirements contained in the Uniform Building Code.

On March 3, 2004, I was afforded the opportunity to observe the damage from the water using a port provided pram. At the time of my observations, initial repairs to the 2001 earthquake damage had been undertaken and pier Foxtrot "F1" was partially operational. Safety considerations prevented observations from beneath the deck. Dolphin H did not sustain damage as it had been completely replaced as part of the 1996 repairs, however unrepaired damage was clearly evident on Dolphins A, B C D and G. Each of these dolphins, with the exception of Dolphin H, exhibited common bolt withdrawal damage at the flange.

Digital photographs of the pile flange bolt failure, taken on the March 3, 2004, are included in Appendix B, Photographs.

## BOLT FAILURE

Review of the information provided to Cash & Associates indicated that Black Construction Company had submitted and the Port Authority (through their Projects representatives) had approved, with conditions, a substitution of the epoxy system used in anchoring the bolts to the concrete deck. The epoxy system proposed on Drawing Sheet VE-1 was Redi-Chem Anchors manufactured by Phillips Drill Company, Catalog Number CE 3495. The epoxy components (Parts A & B) of the Redi-Chem Anchor are encased in separate glass capsules that combine when the glass is ruptured after insertion in a predrilled hole. In practice, the threaded rod ruptures the capsule when forced through it and the components are then combined by rotation of the threaded rod with an ordinary power drill. The advantage of this system is that the components are pre-measured and mixing is assured once the threaded rod is spun for a few seconds with a drill.

Anchor-It Epoxy Systems, Solidbond HR 200, was the substitute product submitted (Project Submittal 18a, Epoxy Fastening System) by Black Construction Co as an equal to the specified Redi-Chem System. Approval was conditioned by four comments, Conditions (c) and (d), submit manufacturers certificate of compliance and submit test data by independent testing laboratory, and were never to the best of my knowledge received. Furthermore, the ICBO approval for use of this product (Report No. 4398) requires:

Cozen O'Connor Attorneys
Mr. Forrest Booth
Carlsmith Ball LLP
Mr. David Ledger
May 12, 2004

FOXTROT PIER F1
PORT AUTHORITY OF GUAM
Cozen O'Connor Reference No. 123206
(C&A Project No. 6090.00)
Page 4

> *Special inspection in accordance with Section 306(a) 12 of the code shall be provided for all anchor installations.*

The Anchor-It Epoxy System relies on combining the two components in a mixing nozzle, which is then injected into the predrilled hole. In overhead installations, a plug is inserted into the predrilled hole to prevent the run out of the epoxy. The bolt is then inserted through the plug and the mixture allowed to cure. There are two inherent problems installing anchors in overhead applications. The first is assuring that adequate but not excessive epoxy is injected in the hole. Too little epoxy and there is insufficient material to assure a complete bond through the entire depth or if too much, the seal formed by the plug is voided and the epoxy will leak.

The system of mixing for the Anchor-It Epoxy is significantly more complex than that proposed by the Redi-Chem Epoxy System. The complexity of the overhead bolt installation combined with the critical nature of the bolt to pile connection should have placed a responsibility on Black Construction Co. to notify the port of the need for special inspection.

Black Construction Co. as a matter of proper construction practice, should have been aware of the critical importance of the pile flange to concrete connection. The performance of individual dolphins in berthing and mooring operations, not to mention seismic events, relied on the capacity of that connection. During the bolt installation process, the loss of epoxy would have been evident to those installing the materials on a daily basis. The critical nature this element should have made it obvious to Black Construction that minimum testing to establish full epoxy cure should have been undertaken as part of their ordinary quality control described in Section 1400 of the project specifications. This could have been accomplished with an ordinary deep socket and automotive torque wrench.

## SERVICE LOADING

Service load requirements for the dolphins at the Foxtrot "F1" facility fall into four categories as follows:

### Gravity Loads

Gravity loads on the surface due to equipment, product and personnel. These loads are insignificant in comparison to berthing, mooring and seismic loads

### Berthing Loads

Dynamic loads due to berthing forces generated during docking and/or maneuvering transmitted through the fender system to the structural elements. The critical elements in determining berthing forces are the vessel size combined with approach velocity and direction during this operation. According to the calculations prepared by EMPSCO Consulting Engineers, the facility was designed to accommodate 90,000 DWT vessels. Confirmation of the vessel size calling at Foxtrot "F1" was not received from Shell Guam Inc.

Cozen O'Connor Attorneys
Mr. Forrest Booth
Carlsmith Ball LLP
Mr. David Ledger
May 12, 2004

FOXTROT PIER F1
PORT AUTHORITY OF GUAM
Cozen O'Connor Reference No. 123206
(C&A Project No. 6090.00)
Page 5

It is generally accepted that the most severe angle at which the vessel will approach the berth is 10 degrees, measured relative to the centerline or keel relative to the face of the fender. Vessel speed is less exact and can vary with the capability of the pilot and tug assist at the berth. For design purposes, J.U. Brolsma, et al, developed the generally accepted variables for approach velocity, in his 1977 paper " On Fender Design and Berthing Velocities" presented to the PIANC 24th Congress, Leningrad. From Brolsma's graph of these variables, the approach velocity for a 100,000 DWT vessel is approximately 0.03 to 0.04 cm/sec. The as-built drawings identify the fenders as Trellex-Morse type MV 1250X900A and 1000X900A fenders for dolphins C/D and G/H respectively. The berthing energy obtained from the application manual for Type MV fenders published by Trellex-Morse in 1993 is as follows:

*Dolphins C/D, 355 Ft-Kips with a reaction force at maximum compression of 189 Kips for the MV 1250x900A fender*

*Dolphins G/H, 226 Ft-Kips with a reaction force at maximum compression of 151 Kips for the MV 1000X900A fender.*

A separate load acting parallel and equal to approximately one third the reaction force also is considered. The location of this load, at the face of the fender, induces a torsional moment around the pile group of the dolphin. The effect of torsional moment was considered in the overall berthing and mooring analysis that follows.

**Mooring Loads**

Mooring dolphins at the Foxtrot "F1" facility are Dolphins A and B offshore and E and F onshore. Mooring loads generated by wind acting through mooring lines are limited to 100 tons by the Capstan Hook Assembly located at the center of each dolphin. . The capacity of this assembly was obtained from shop drawing data (Submittal Number 13) provided with other information to Cash & Associates. In my evaluation of the forces generated by the Capstan Hook Assembly, I have assumed that the mooring lines are positioned at an angle of 45 degrees to the face of the dolphin and at an angle above the horizon of 30 degrees. These angles will vary with each ship that is moored, its position relative to the loading arms on the main pier and with the tide.

**Seismic Loads**

Seismic loading generated by earthquake activity and the resulting analyses are based on the 1994 Edition of the Uniform Building Code (UBC) which was the governing code in the Territory of Guam at the time of the original design. Two approaches were implemented; one using static analysis and the other using a computer generated dynamic analysis. The static analysis is based on the premise that the dolphins are non-building structures and therefore subject to a particular set of code requirements for determining the seismic forces in the structure. The computer generated dynamic analyses were based on the 1994 UBC Response Spectra (S1 Soil Profile assumed), scaled to 0.3 for Seismic Zone 3 (Guam). The results of the static analyses were used to check allowable bolt forces versus the code static force levels on a

Cozen O'Connor Attorneys
Mr. Forrest Booth
Carlsmith Ball LLP
Mr. David Ledger
May 12, 2004

FOXTROT PIER F1
PORT AUTHORITY OF GUAM
Cozen O'Connor Reference No. 123206
(C&A Project No. 6090.00)
Page 6

working stress basis; whereas the dynamic analysis results was used to check anchor bolt adequacy using ultimate test capacities compared to the response spectra results unreduced by Rw (which would be 3 for this type of structure). As a general check on the compatibility of static and dynamic analyses, additional analyses were conducted using the dynamic analysis results scaled to the static level base shears.

Computer models of Dolphins A, B, C, D and H were developed and considered each of the loads described above.

**Computer Modeling**

SAP 2000 computer models were developed for each of the five dolphin structures noted above. The models were based entirely on the information presented in the as-built drawings prepared by EMPSCO Consulting Engineers and made available for review to Cash and Associates. The models were linear and three-dimensional, using thick concrete shell elements for the dolphin decks (which varied from about 4 feet to over 8 feet thick), and frame elements to model the piles (typically 22 inch diameter steel pipe).

The models were made as realistic as was reasonably achievable by modeling the pile depths in accordance with the seafloor contours provided in the as-built drawings; that is, each pile has a unique length/depth based on whether it is a vertical or battered pile, and at what depth it achieves effective fixity at the seafloor. Based on our experience, it was assumed that the effective depth of fixity was 8.5 feet below the surface seafloor contours as presented on the as-built drawings. For battered piles, we developed a methodology for determining point of pile fixity at the seafloor by establishing a system of linear equations, one equation for the pile and one equation for the sloping seafloor, and solved the set of equations for each pile to find the point of intersection.

Ship berthing forces consist of a component of force applied perpendicular to and toward the face of the dolphin, and a component parallel to the dolphin, acting in either parallel direction at a distance of 3 feet from the face of the dolphin. This offset resulted in a significant additional moment applied to the center of gravity (c.g.) of the dolphin deck.

Because both static and dynamic seismic analyses were conducted, and ship berthing and mooring forces were applied, numerous possible load combinations were considered. That is, the seismic forces can act positively or negatively in both the North/South and East/West directions, and the parallel ship berthing forces can act in either a westerly or easterly direction. The perpendicular ship berthing force was applied into the face (i.e. northerly) for all load cases. Based on a number of preliminary analyses, it was determined that 8 different load cases of static and dynamic seismic and berthing and mooring forces had to be considered for each pile structure. These load cases are detailed in Appendix C, Tables 1 through 11. Note that the static and dynamic analyses without ship berthing and mooring were also conducted to obtain a preliminary understanding of the connection adequacy based on code seismic requirements alone. Additionally, the plastic moment capacity of a 22-inch diameter pile was compared to the

Cozen O'Connor Attorneys
Mr. Forrest Booth
Carlsmith Ball LLP
Mr. David Ledger
May 12, 2004

FOXTROT PIER F1
PORT AUTHORITY OF GUAM
Cozen O'Connor Reference No. 123206
(C&A Project No. 6090.00)
Page 7

capacity of the anchor bolts in the repair connection as an additional measurement of the adequacy of the connection.

## Analyses of Pile Flange Connection

The focus of the stress analysis work was solely on the anchor bolt capacity, primarily because this was the predominant mode of failure in these connections as a result of the 2001 earthquake. Thus, a simple model of the 8-bolt anchor bolt connection was developed to determine bolt loads based on the output from the detailed dolphin computer models. Specifically, the end forces in global coordinates from the piles at the underside of the dolphins were taken from the main computer analyses of the dolphins, and inserted into the three dimensional SAP 2000 model of the 8-bolt connection to determine forces in each bolt. All six (6) components of force (shears, tension and moments) were input. This simplified model of the 8-bolt connection was based on the assumption of a rigid based plate and large tension forces in combination with large bending forces that resulted in all bolts being in combined shear and tension. The analysis results proved this assumption to be correct for nearly every governing pile in each dolphin.

## Analysis, Results and Conclusions

Refer to the Appendix C, Tables 1 through 12 for details. For the purposes of determining the adequacy of the anchor bolts, manufacturer's data on the maximum allowable load per bolt was used for comparing to calculated demands. Since the specified Redi-Chem Anchors are no longer available, a similar glass capsule anchor bolt of the same size, material type and embedment was used in our analysis. The product selected is manufactured by ITW Ramset/Red Head, Catalog Reference Epcon A7 Adhesive Anchor. Manufacturer's data for ¾-inch diameter stainless steel bolts with a concrete embedment depth of 6-3/4 inches was used. This data showed that the maximum design load for shear and tension is based on bond capacity of the epoxy material. Those loads are 5,030 pounds in shear and 7,430 pounds in tension. The manufacturer notes that these values are based on a factor of safety of 4 applied to test results, so "ultimate" or test capacities for these bolts, when properly installed, were calculated to be 20,120 pounds in shear, and 29,720 pounds in tension.

The results of the seismic analysis, both with and without ship berthing and mooring forces, can be summarized as follows (note that gravity loads are included in all cases):

> The bolts, even if properly installed, are inadequately designed based on any reasonable interpretation and application of the requirements of the 1994 UBC.

➤ Based on static seismic analysis requirements for non-building structures of this type, in conjunction with the specified ship berthing and mooring forces, the demand/capacity (D/C) ratios vary from 3.4 to 7.1 on a working stress basis. A D/C of 1.0 maximum is acceptable; any values over 1.0 indicate an overstress condition.

Cozen O'Connor Attorneys
Mr. Forrest Booth
Carlsmith Ball LLP
Mr. David Ledger
May 12, 2004

FOXTROT PIER F1
PORT AUTHORITY OF GUAM
Cozen O'Connor Reference No. 123206
(C&A Project No. 6090.00)
Page 8

> Based on dynamic analysis results, in conjunction with ship berthing and mooring forces, D/C ratios vary from 1.8 to 2.8 when comparing raw earthquake force levels to ultimate test capacities of the anchor bolts.

> Based on dynamic analyses scaled down to static based shear levels for working stress comparison purposes, and eliminating the ship berthing and mooring forces, the D/C ratios vary from 2.3 to 3.6 on a working stress level.

> For Dolphin A, applying only the static seismic forces yields a D/C of 3.43, whereas the dynamic result scaled to the static base shear for this same dolphin yielded a D/C of 3.61.

As shown above, all reasonable avenues of investigation have been considered and, in each case, it was shown that the anchor bolts are significantly overstressed for code level requirements regardless of whether berthing or mooring loads are considered in conjunction with seismic forces. The demand to capacity ratios for the bolts indicate that the design on Drawing Sheet VE-1 is incapable of meeting the requirements of the intended use of the Foxtrot "F1" facility, namely berthing and mooring of 90,000 DWT tankers. Detailed summaries of all loading combinations, displacements, reactions, bolt loadings for static and dynamic analysis and other details of the computer investigation are contained in Appendix C, Tables 1 through 12.

Technical information (i.e., code citations and equations, calculations, modeling details, and computer input and output data) are kept to a minimum in the narratives presented herein for brevity and simplicity. This information can be made available, if requested. Appendix C, Tables 1 through 12, are spreadsheets of project results and contain an appropriate amount of technical data as necessary to communicate the results of this work.

## EXECUTIVE SUMMARY

Seismic analyses of Dolphins A, B, C, D and G were conducted in accordance with the 1994 Edition of the Uniform Building Code (UBC). Computer runs were made with and without ship berthing and mooring forces acting in combination with earthquake forces. The adequacy of the anchor bolt designs in the failed connections was measured through the use of Demand/Capacity (D/C ratios). The "Demand" is the earthquake force level (in combination with gravity forces, and in some cases ship berthing and mooring forces), and "Capacity" is based on the anchor bolt manufacturer's test data, which has been approved for use by the International Conference of Building Officials (ICBO), the governing code authority. D/C ratios in excess of 1.0 are not acceptable as they indicate excessive stress levels.

We found that for all cases considering seismic, ship berthing and mooring loads, the D/C ratios varied from 1.78 to 7.13. In all cases where no ship berthing and mooring loads were considered in combination with seismic loads, the D/C ratios varied from 2.27 to 3.61. Based on these findings, it can be concluded that the design of the anchor bolts was not adequate relative to 1994 UBC requirements.

Cozen O'Connor Attorneys
Mr. Forrest Booth
Carlsmith Ball LLP
Mr. David Ledger
May 12, 2004

FOXTROT PIER F1
PORT AUTHORITY OF GUAM
Cozen O'Connor Reference No. 123206
(C&A Project No. 6090.00)
Page 9

Reasonable analysis by Winsler & Kelley would have revealed deficiencies in their design. Even a simple static analysis would have shown that the bolts connecting the pile flange to the dolphins were insufficient in diameter and/or number. Disregarding the deficiencies in the design, the critical nature of this connection should have required Winsler & Kelley to request Black Construction Co. to assure that special inspection was taken during the installation of the epoxy, regardless of what product was used. This requirement would be even more important since their product specification (Note 2 of Drawing Sheet VE-1) refers to the Redi-Chem Epoxy System or **approved equal**. This opens the door for substitution and, owing to the variability in product application, it is the Engineer's responsibility to see that critical elements of his design are correctly completed in accordance with his intentions. If an equal were to be allowed, proper engineering practice would have been to see that adequate inspection was undertaken to assure the design would function as intended.

The substitution of the epoxy system was proposed by Black Construction Co. for their advantage, be it either in product availability or at lower cost. Black Construction Co. had a similar duty as Winzler & Kelly to the success of the project, namely to complete a repair project that met the functional requirements of the design. Black Construction Co. had a quality control requirement established in the specifications for this project, but absent that, it was their substitute product, Anchor-It Epoxy, that required special inspection. It would then follow that Black Construction Co, should have provided special inspection or insisted that the Port Authority provide it. Even if special inspection was not provided Black Construction Co. was aware of the critical nature of this connection and even a simple automotive torque wrench test would have identified uncured epoxy. Proper construction practice cannot be ignored where installation is difficult and the element under installation is so critical to the project.

I thank you for this opportunity to be of service in this matter. If you have any questions, please contact me.

Very truly yours,
CASH & ASSOCIATES

Elliott H. Boone, S.E.
Executive Vice President

EHB:cd
G:/projects/ehb/609000/Rule26reportpdf.doc

Attachments:

Drawing Sheet VE-1, Winzler & Kelly (Reduced Copy)
Appendix A    Reference Listing
Appendix B    Photographs
Appendix C    Table 1 – 11 Spreadsheets



# APPENDIX A

## REFERENCE LISTING

# APPENDIX A

## REFERENCE LISTING

<table>
<tr><td colspan="2" align="center"><strong>Port Authority of Guam</strong><br><br>INDEX OF DOCUMENTS AND TESTIMONY REVIEWED<br>The following is a partial listing.</td></tr>
<tr><td><strong>Number</strong></td><td><strong>Subject of Documents</strong></td></tr>
<tr><td>1</td><td>Drawings, Calculations, Correspondence and other documents produced in litigation by Winzler & Kelly concerning the repairs performed in 1996 – Bates Nos. 00028-00462</td></tr>
<tr><td>2</td><td>Shell F-1 Pier Temporary Repair Evaluation prepared by Duenas & Associates</td></tr>
<tr><td>3</td><td>As Built drawings prepared by Black Construction Co for the project</td></tr>
<tr><td>4</td><td>Winzler & Kelly Drawing VE-1</td></tr>
<tr><td>5</td><td>Structural Calculations for Repairs to Dolphins A, B, C, &D Foxtrot (F-1) Pier prepared by Winzler & Kelly dated December 1995</td></tr>
<tr><td>6</td><td>Responses of Black Construction to Plaintiff S. J. Gargrave's First Set of Interrogatories</td></tr>
<tr><td>7</td><td>Report of video survey, Pier F 1, Commercial Port of Guam, Oceaneer Enterprises, Piti, Guam. Report number GUA-J-01-2519-UW</td></tr>
<tr><td>8</td><td>Various other documents produced by councel relative to this matter contained in 8 four inch thick three ring binders</td></tr>
<tr><td>9</td><td>Deposition of Bruce Swanney of Winzler & Kelly</td></tr>
</table>

# APPENDIX B

## PHOTOGRAPHS



**Dolphin A**



**Bolt Withdrawal at Dolphin A**



**Bolt Withdrawal at Dolphin B**



**Bolt Withdrawal at Dolphin C**



**Bolt Withdrawl – Dolphin Not Identified**



**Bolt Withdrawal at Dolphin C**



**Bolt Withdrawal at Dolphin G**

# APPENDIX C

## TABLES 1 – 12
## SPREADSHEETS

# Port of Guam
## Seismic Analysis of Berthing Dolphins A, B, C, D & G

### Analysis Parameters

Vstatic = ZICW/Rw, Z = 0.3, I = 1.0, C = 2.75, Rw = 3; V = 0.275W

Vdynamic = 94UBC, S1 soil, scaled to 0.3g, unreduced by Rw

Bolts = 3/4" dia. ss 304 epoxy anchors with 6-3/4" embed, Vallow = 5030#, Tallow = 7430#
(note: FS = 4 per mfr on test data, assumed 4,000 psi conc.; ChemSet data not available, used Ramset Epcon 7 product data)

Ship P = ship impact perpendicular to face, Ship V = ship impact at 3' from face, Ship M = V times dist to CG of dolphin deck

### Explanation of Static and Dynamic Load Cases

DLSt1    Static seismic northerly direction, perpendicular ship impact into face of dolphin, parallel ship impact in westerly direction
DLSt2    Static seismic northerly direction, perpendicular ship impact into face of dolphin, parallel ship impact in easterly direction
DLSt3    Static seismic westerly direction, perpendicular ship impact into face of dolphin, parallel ship impact in westerly direction
DLSt4    Static seismic easterly direction, perpendicular ship impact into face of dolphin, parallel ship impact in easterly direction
DDYt1    Dynamic seismic east-west direction, perpendicular ship impact into face of dolphin, parallel ship impact in westerly direction
DDYt2    Dynamic seismic east-west direction, perpendicular ship impact into face of dolphin, parallel ship impact in easterly direction
DDYt3    Dynamic seismic north-south direction, perpendicular ship impact into face of dolphin, parallel ship impact in westerly direction
DDYt3    Dynamic seismic north-south direction, perpendicular ship impact into face of dolphin, parallel ship impact in easterly direction
Note:    Also conducted UBC 94 static and dynamic analyses with DL only; no impact forces.
         Checked req'd bolt tension to resist plastic capacity of 22" pipe section.

### Table 1 - Summary of Modal Analyses, Ship Impact Loads, and Static/Dynamic Base Shears

| Dolphin | Wt./Mass (Wt = kips) | T, Mode 1 (T = sec.) | T, Mode 2 | T, Mode 3 | Ship P (kips) | Ship V (kips) | Ship M (in-kips) | Vstatic (kips) | Vdynamic (kips) |
|---------|----------------------|----------------------|-----------|-----------|---------------|---------------|------------------|----------------|-----------------|
| A | 568/1.47 | 0.63 | 0.61 | 0.41 | 141 | 141 | 27264 | 156 | 217 |
| B | 533/1.38 | 0.3 | 0.29 | 0.26 | 141 | 141 | 27264 | 147 | 307 |
| C | 1113/2.88 | 0.46 | 0.31 | 0.29 | 80 | 24 | 5616 | 306 | 756 |
| D | 1155/2.99 | 0.51 | 0.36 | 0.33 | 80 | 24 | 5616 | 318 | 738 |
| G | 490/1.27 | 1.73 | 0.33 | 0.3 | 25 | 8 | 1128 | 135 | 313 |

### Notes:

Piles at Dolphin A are twice as long as piles at Dolphin B
Dolphin G has no batter piles in EW direction, thus very flexible

1

**Port of Guam**
**Seismic Analysis of Berthing Dolphins A, B, C, D & G**

Table 2 - Maximum Static Displacements (inches)

| Dolphin | DLSI1 | DLSI2 | DLSI3 | DLSI4 |
|---------|-------|-------|-------|-------|
| A | 3.85 | 3.56 | 3.49 | 4.29 |
| B | 0.96 | 0.85 | 0.82 | 0.98 |
| C | 0.21 | 0.21 | 0.67 | 0.67 |
| D | 0.3 | 0.27 | 0.82 | 0.83 |
| G | 0.53 | 0.53 | 9.26 | 9.26 |

Table 3 - Maximum Dynamic Displacements (inches)

| Dolphin | DDYI1 | DDYI2 | DDYI3 | DDYI4 |
|---------|-------|-------|-------|-------|
| A | 3.88 | 3.88 | 4.29 | 3.86 |
| B | 1.14 | 1.31 | 1.32 | 0.74 |
| C | 0.71 | 0.71 | 1.54 | 1.53 |
| D | 1.72 | 1.73 | 0.97 | 0.9 |
| G | 5.49 | 5.49 | 0.62 | 0.99 |

Table 4 - Worst-Case Pile Reactions at Dolphin - Static Seismic Combos (kips and inch-kips)
(worst case is max. tension in the connection)

| Dolphin | Vx | Vy | Vz | Mx | My | Mz | Gov. Case |
|---------|------|------|-------|---------|---------|---------|-----------|
| A | 198.32 | 0.72 | 470.22 | 438.7 | -107.85 | -401.82 | DLSI4 |
| B | 1.44 | 13.7 | 256.57 | 1196.37 | -288.51 | 87.1 | DLSI1 |
| C | 0.17 | -0.7 | 148.72 | 276.59 | 70.48 | 7.85 | DLSI3 |
| D | -0.19 | -66.89 | 158.98 | 137.44 | -70.32 | 0.14 | DLSI3 |
| G | -19.9 | 12.29 | 48.43 | 4081.82 | 59.01 | 1733.92 | DLSI3 |

2

# Port of Guam
## Seismic Analysis of Berthing Dolphins A, B, C, D & G

### Table 5 - Worst-Case Pile Reactions at Dolphin - Dynamic Seismic Combos (kips and inch-kips)
(worst case is max. tension in the connection)

| Dolphin | Vx | Vy | Vz | Mx | My | Mz | Gov. Case |
|---|---|---|---|---|---|---|---|
| A | 176.4 | 1.06 | 418.66 | 642.13 | 70.49 | -208.26 | DDYI4 |
| B | 124.98 | 0.2 | 293.13 | 84.87 | 76.79 | 226.39 | DDYI2 |
| C | 111.31 | 0.96 | 273.55 | 374.52 | -171.32 | 114.62 | DDYI4 |
| D | 121.04 | 0.03 | 289.21 | 59.54 | -174.59 | 23.26 | DDYI3 |
| G | 58.16 | 0.93 | 155.97 | 314.41 | 925.3 | 188.26 | DDYI3 |

### Table 6 - Worst-Case Bolt Loads - Static Seismic Combos (kips)

| Dolphin | Vmax | Tmax | Vallow | Tallow | Vm/Va | Tm/Ta | |
|---|---|---|---|---|---|---|---|
| A | 29.2 | 68.7 | 5.03 | 7.43 | 5.81 | 9.25 | 6.65 |
| B | 14.2 | 56.7 | 5.03 | 7.43 | 2.82 | 7.63 | 5.24 |
| C | 0.1 | 24.9 | 5.03 | 7.43 | 0.02 | 3.35 | 2.16 |
| D | 8.5 | 24.5 | 5.03 | 7.43 | 1.69 | 3.30 | 3.41 |
| G |  |  | 5.03 | 7.43 | 4.41 | 13.26 | 7.13 |

Not valid as some bolts are in compression; model is valid only for all bolts in tension
Using sum of 5/3 roots Vm/Va and Tm/Ta

### Table 7 - Worst-Case Bolt Loads - Dynamic Seismic Combos (kips)

| Dolphin | Vmax | Tmax | Vallow | Tallow | Vm/Vu | Tm/Tu | |
|---|---|---|---|---|---|---|---|
| A | 24.3 | 66.9 | 20.12 | 29.72 | 1.21 | 2.25 | 2.75 |
| B | 17.4 | 41.2 | 20.12 | 29.72 | 0.86 | 1.39 | 2.13 |
| C | 12.5 | 42.7 | 20.12 | 29.72 | 0.62 | 1.44 | 1.99 |
| D | 14.9 | 38.0 | 20.12 | 29.72 | 0.74 | 1.28 | 2.00 |
| G | 7.4 | 41.8 | 20.12 | 29.72 | 0.37 | 1.41 | 1.78 |

Based on 4x allowbles assuming failure mode is bond strength
Using sum of 5/3 roots Vm/Va and Tm/Ta

3

Case 1:03-cv-00009    Document 282-2    Filed 10/26/2005    Page 4 of 34

Table 8 - DL + 94UBC Spectra Scaled to Vstatic; no ship impact - Worst Case Pile Reactions (global, kips and inch-kips)

| Dolphin | Vx | Vy | Vz | Mx | My | Mz |
|---|---|---|---|---|---|---|
| A | 63.94 | 0.42 | 154.75 | 263.89 | 409.27 | 82.91 |
| B | 31.17 | 0.3 | 74.54 | 102.58 | 166.03 | 52.26 |
| C | 61.96 | -0.001 | 154.08 | 18.16 | -191.46 | -0.3 |
| D | 70.94 | 0.32 | 171.44 | 177.84 | -275.65 | 44.73 |
| G | 0.59 | 0.02 | 187.35 | 3.31 | 197.79 | 4.32 |

Table 9 - Worst-Case Bolt Loads for DL + 94 UBC Spectra Scaled to Vstatic; No ship impact

| Dolphin | Vmax | Tmax | Vallow | Tallow | Vm/Va | Tm/Ta | D/C |
|---|---|---|---|---|---|---|---|
| A | 7.36 | 31.18 | 5.03 | 7.43 | 1.46 | 4.20 | 3.61 |
| B | 3.49 | 14.13 | 5.03 | 7.43 | 0.69 | 1.90 | 2.27 |
| C | 7.75 | 22.2 | 5.03 | 7.43 | 1.54 | 2.99 | 3.23 |
| D | 8.47 | 27.57 | 5.03 | 7.43 | 1.68 | 3.71 | 3.55 |
| G | 0.13 | 27.93 | 5.03 | 7.43 | 0.03 | 3.76 | 2.33 |

Table 10 - DL + Vstatic, No Ship Impact - Worst Case Pile Reactions Dolphin A only for comparison purposes (global, kips and inches)

| Dolphin | Vx | Vy | Vz | Mx | My | Mz |
|---|---|---|---|---|---|---|
| A | 57.84 | 0.34 | 140.37 | 207.5 | 232.3 | -110.79 |

Table 11 - DL + Vstatic, No Ship Impact - Worst Case Bolt Loads Dolphin A only (global, kips and inches)

| Dolphin | Vmax | Tmax | Vallow | Tallow | Vm/Va | Tm/Ta | D/C |
|---|---|---|---|---|---|---|---|
| A | 8.15 | 25.54 | 5.03 | 7.43 | 1.62 | 3.44 | 3.43 |

Table 12 - Bolt Loads for Plastic Capacity of 22" Dia. Pile/0.375" thick - Mp = 6314 "-k based on 36 ksi yield

Tmax = 143k, which is nearly 5x greater than published tension test capacity of 29.72 kips
D/C = 4.8

4

**EXHIBIT C**

## CONSTRUCTION CONTRACT

THIS AGREEMENT AND CONTRACT, made and entered into this 8th day of April, 1996, by and between the Port Authority of Guam, a public corporation and autonomous instrumentality of the Government of Guam hereinafter referred to as "Port Authority", whose address is 1026 Cabras Highway, Suite 201, Piti, Guam 96925, and **BLACK CONSTRUCTION CORPORATION**, hereinafter referred to as the "Contractor", whose address is P.O. Box 24667, GMF, Guam 96921.

### WITNESSETH

WHEREAS, the Port Authority intends to construct REPAIRS AND UPGRADING OF FOXTROT PIER "F-1", PAG Project No. PAG 96 -001 D hereinafter called the "project", in accordance with the General Scope of Work prepared by the Port Authority.

WHEREAS, pursuant to the competitive sealed bidding procedures of the Guam procurement statute and regulations, the Port Authority issued Invitation to Bid No. PAG 96-0010 in order to solicit bids from building contractors desiring to perform the project construction;

WHEREAS, pursuant to the competitive sealed bidding procedures of the Guam procurement statute and regulations, after the bids in response to Invitation to Bid No. 96-0010 were opened, Contractor was determined to be the lowest responsible and responsive bidder and awarded the contract to perform the construction of the project to the Contractor.

NOW THEREFORE, the Port Authority and Contractor for the considerations hereinafter set forth, agree as follows:

I.      THE CONTRACTOR AGREES to furnish all the necessary labor, materials, equipment, tools and services necessary to perform and complete in a workmanlike manner all work required for the construction of the Project in strict compliance with the Contract Documents herein mentioned, which are hereby made part of the Contract.

(a)     Contract Time.  The Contractor agrees to commence work under this contract upon written notice to proceed, and to complete the project ready for use and operational within 240 calendar days of the commencement of the Contract as defined in the General Provisions of the Contract.

(b)     Sub-Contractors.  The Contractor agrees to bind every subcontractor by the terms of this Contract and the contract documents.  Any and all contracts between the Contractor and its subcontractors shall not be construed as creating any contractual relation between any subcontractor and the Port Authority.

II.     THE PORT AUTHORITY AGREES to pay, and the Contractor agrees to accept in payment for the performance of this Contract, the Contract amount of:

a. The Basic Bid Amount of Two Million One Hundred Forty Seven Thousand and Eight Hundred Dollars ($2,147,800.00)

b. Contractor shall be paid any and all sums including any added and/or deducted amounts resulting from any and all extra work and/or omitted work in connection therewith, in accordance with Section B-9 of the General Conditions of the Contract Documents described in Section III(i) and incorporated herein by reference.

III. CONTRACT DOCUMENTS. It is hereby mutually agreed that the following list of instruments, plans, specifications and documents which are attached hereto, bound herewith and incorporated herein by reference shall constitute the Contract Documents, all of which are made a part hereof, and collectively evidence and constitute the Contract between the parties, hereto, and they are as fully a part of this Contract, as if they were set our verbatim and in full herein, and are designated as follows:

a. Invitation to Bid
b. Instruction to Bidders
c. Proposal
d. Form of Non-collusion Affidavit
e. Bid Bond
f Certification of Bidders Regarding Equal Employment Authority
g. Performance and Payment Bond
h. Special Provisions
i. General Provisions
j. Labor Standards Provisions
k. Technical Specifications
l. Plans
m. Addendum(s)
n. Notice of Award
o. Notice to Proceed

IV. LIQUIDATED DAMAGES. Contractor agrees that if Contractor fails, neglects, or refuses to complete the work by the completion date as set forth above, then Contractor shall pay, or shall be assessed the sum of One Thousand No/100 Dollars ($1,000.00) per day for each calendar day of delay after the time stipulated for completing the work. The amount Contractor shall pay or be assessed for each calendar day in which the work is not completed after the specified completion date is not a penalty, but a reasonable estimated liquidated damages suffered by the Port Authority.

V. COVENANT AGAINST CONTINGENT FEES. The Contractor warrants that it has not employed any person to solicit or secure this contract upon any agreement for a commission, percentage, brokerage, or contingent fee. Breach of this warranty shall give the Port Authority the right to terminate the contract, or at its discretion, to deduct from the contract price or consideration the amount of such commissions, percentage,

- 2 -

brokerage or contingent fee. This warranty shall not apply to commissions payable by
contractors upon contracts or sales secured or made through bona fide established
commercial or selling agencies maintained by Contractor for the purpose of securing
business.

VI.   OTHER CONTRACTS. The Port Authority may award other contracts for additional
work, and the contractor shall fully cooperate with such other contractors and carefully
fit his own work to that provided under other contracts as may be directed by the General
Manager. The Contractor shall not commit or permit any act which will interfere with the
performance of work by any other contractor.

VII.   DISPUTES. Except as otherwise specifically provided in this contract, all disputes
concerning questions of fact arising under this contract shall be decided by the
Contracting Officer subject to written appeal by the Contractor within 30 days to the
Governor of Guam or his duly authorized representative, whose decision shall be the final
and conclusive upon the parties thereto. In the meantime, the Contractor shall diligently
proceed with the work as directed.

VIII.   CONTRACT BINDING. It is agreed that this Contract and all of the Covenants
hereof shall insure to the benefit of and be binding upon the Port Authority and the
Contractor respectively and its partners, successors, assigns and legal representatives.
Neither the Port Authority nor the Contractor shall have the right to assign, transfer or
sublet its interest or obligations hereunder without written consent of the other party.

IX.   LIENS. It is hereby mutually agreed by and between the parties hereto that neither
the Contractor or any other persons or companies working on the project or supplying
materials thereto, including but not limited to mechanics, contractors, subcontractors,
material persons or other persons can or will contract for or in any other manner have or
acquire any lien, claim or interest upon the building or works covered by this contract, or
the land upon which the same is situated.

X.   REPRESENTATIONS. The Contractor hereby makes the following representations
and certifications:

(a)   That Contractor has not knowingly influenced and promises that Contractor
will not knowingly influence a government employee to breach any of the
ethical standards set forth in Chapter 11 of the Guam Procurement
Regulations.

(b)   That Contractor has not violated, is not violating and promises that
Contractor will not violate the prohibition against gratuities and kickbacks
set forth in Section 11-206 of the Guam Procurement Regulations.

XI. NON GRATUITY. - The Contractor agrees that Contractor shall execute and file a

- 3 -

Non-Gratuity Affidavit as required by Section 11-206 of the Guam Procurement ~ ~ulations before final payment under this Contract is made by the Port Authority.

XII. ALTERATIONS. The following changes were made in this contract before it was signed by the parties hereto: None.

XIII. ATTORNEY'S FEES: If any legal action, suit or other proceeding is brought for the enforcement of this Agreement, or because of any alleged dispute, breach or default in connection with any of the provisions of this Agreement, the successful or prevailing party shall be entitled to recover reasonable attorney's fees and court costs incurred in the action, suit or proceeding, in addition to any other remedy or relief to which it may be entitled.

XIV. INDEMNIFICATION. The Contractor hereby assumes entire responsibility and liability for any and all damage or injury of any kind or nature whatsoever (including death resulting therefrom) to all persona, whether employees of the contractor or otherwise, and to all property damage caused by, resulting from, arising out of or occurring in connection with employees or agents. Should any claims for such damage or injury (including death resulting therefrom) be made or asserted, the Contractor agrees to indemnify and save harmless the Government, the Port Authority Board of Directors, and all Port Authority . officers, agents, servants and employees from and against any and all such claims and further from and against any and all loss, cost, expense, liability, damage or injury, including legal fees and disbursements, that the Port Authority, its officers, agents, yants or employees may directly or indirectly sustain, suffer or incur as a result thereof a. id the Contractor agrees to and does hereby assume, on behalf, of the Port Authority, its officers, agents, servants or employees upon or by reason of such claims which defense, shall be tendered by counsel, selected by Contractor with approval of the Port Authority, and to pay on behalf of the Port Authority, its officers, agents, servants and employees, upon demand the amount of any judgment that may be entered against the Port Authority, its officers, agents, servants or employees in any such action.

XV. INSURANCE. Contractor shall, at its sole expense and for the benefit of Contractor and the Port Authority, provide and keep in full force and effect during the term of this Contract, insurance against liability for bodily injury with limits of not less than Three Hundred Thousand Dollars ($300,000.00) per person, One Million Dollars ($1,000,000.00) per occurrence, and property loss liability insurance with a limit of not less than Three Thousand Dollars ($300,000.00) per loss, all in respect to bodily injury or property loss arising out of the duties and obligations of Contractor under the terms of this Contract. In addition, Contractor shall also provide and keep in full force and effect during the term of this Contract, workman's compensation insurance with limits of not less than One Hundred Thousand Dollars ($100,000.00) per employee. Contractor shall furnish to the Port Authority certificates of insurance evidencing the existence of such insurance. No policy of insurance may be cancelled without providing the Port Authority thirty (30) days advance written notice. All insurance required under this Paragraph shall be written with

- 4 -

responsible companies with originals of the policies and renewals available for the Port 'hority's review during reasonable hours.

XVI.   GOVERNING LAW.  It is agreed that this Contract shall be governed by, construed, and enforced in accordance with the laws of the territory of Guam.

XVII.   TIME OF THE ESSENCE.  It is specifically declared and agreed that time is of the essence of this Contract.

XVIII.  MODIFICATION OF AGREEMENT.  Any modification of this agreement or additional obligation assumed by either party in connection with this agreement shall be binding only if evidenced in writing signed by each party or an authorized representative of each party.

XIX.   NOTICES.  Any notice provided for or concerning this agreement shall be in writing and be deemed sufficiently given when sent by certified or registered mail if sent to the respective address of each party as set forth at the beginning of this agreement.

XX.   PARAGRAPH HEADINGS.  The titles to the paragraphs of this agreement are solely for the convenience of the parties and shall not be used to explain, modify, simplify, or aid in the interpretation of the provisions of this agreement.

IN WITNESS WHEREOF, the parties hereto have executed this contract as of the day and year first written.

BLACK CONSTRUCTION CORPORATION

Date:   **April 8, 1996**

By: _____

Name: **Perfecto O. Jose', Jr.**

Title:   **Senior Vice President**

- 5 -

## SUPPLEMENTAL AGREEMENT TO
## CONSTRUCTION CONTRACT

THIS SUPPLEMENTAL AGREEMENT AND CONTRACT, made and entered into this _____ day of _____, 1996, by and between the Port Authority of Guam a public corporation and autonomous instrumentality of the Government of Guam, hereinafter referred to as "Port Authority", whose address is 1026 Cabras Highway, Suite 201, Piti, Guam 96925, and **BLACK CONSTRUCTION CORPORATION**, hereinafter referred to as the "Contractor", whose address is P.O. Box 24667, GMF, Guam 96921.

### WITNESSETH

WHEREAS, the Port Authority intends to construct REPAIRS AND UPGRADING OF FOXTROT PIER "F-1", PAG Project No. _____ hereinafter called the "project", in accordance with the General Scope of Work prepared by the Port Authority of Guam.

WHEREAS, pursuant to the competitive sealed bidding procedures of the Guam procurement statute and regulations, the Port Authority issued Invitation to Bid No. PAG 96-0010 in order to solicit bids from building contractors desiring to perform the project construction;

WHEREAS, pursuant to the competitive sealed bidding procedures of the Guam procurement statute and regulations, after the bids in response to Invitation to Bid No. 96-0010 were opened, Contractor was determined to be the lowest responsible and responsive bidder and awarded the contract to perform the construction of the project to the Contractor.

WHEREAS, the Port Authority and Contractor entered into a Construction Contract which sets forth the rights, duties and responsibilities of each party with respect to the construction of the project.

WHEREAS, subsequent to the award of the contract for the construction of the project it was determined that certain items within the scope of work listed in the Basic Bid Schedule should be omitted and an alternative design method implemented.

WHEREAS, the items to be omitted from the Basic Bid Schedule change the total cost of the project by more than twenty five percent (25%) so that the parties are required to enter into a Supplemental Agreement.

NOW THEREFORE, the Port Authority and Contractor for the considerations hereinafter set forth, agree as follows:

## I.    CHANGE IN SCOPE OF WORK

The Port Authority and Contractor hereby agree to omit certain concrete jacketing and pile encapsulation work as provided for in the Basic Bid Schedule and in lieu of such work Contractor is to use a Total Upper Section Replacement Method, in accordance with the attached Drawing prepared by "Winzler and Kelly".

## II.    CONTRACT PRICE ADJUSTMENT

As a result of the omitted work, the total amount of compensation the Port Authority agrees to pay to Contractor and Contractor agrees to accept as payment in full for the performance of the Contract shall be reduced from Two Million Forty Seven Thousand And Eight Hundred Dollars ($2,147,800.00) to One Million Four Hundred Seven Thousand And Six Hundred Eighty Two Dollars ($1,407,682.00).

## III.    OTHER CONDITIONS

The Port Authority and Contractor further agree that:

A.    All repair and upgrade work shall conform to the requirements of Shell Guam, Inc. as specified in the Contract documents.

B.    All repair and upgrade work shall be performed on all existing piles as indicated in the Contract documents.

C.    A unit cost per pile for repair and upgrade should be established and agreed upon between the Port Authority and Contractor. The total number of piles in need of repairs may be adjusted and subject to an appropriate reduction in the total contract amount.

D.    The Port Authority shall designate an on-site construction manager to determine and approve which piles require repair or replacement, and that final determination to be concluded within seven (7) days of contract.

E.    All applicable submittal requirements as stipulated in the Contract Documents shall be complied with and shall remain in full force and effect.

## IV.    OTHER TERMS OF CONTRACT REMAIN IN EFFECT

All other terms and conditions of the Construction Contract and contract documents remain in effect.

- 2 -

IN WITNESS WHEREOF, the parties hereto have executed this contract as of the day and year first written.

BLACK CONSTRUCTION CORPORATION

Date: _____April 8, 1996_____

By: _____

Name: __Perfecto O. Jose', Jr.__

Title: __Senior Vice President__


I, __Mark J. Mamczarz__ , certify that I am the assistant secretary of the corporation named as the Contractor herein; that __Perfecto O. Jose', Jr.__ who signed this contract on behalf of the Contractor, that said contract was duly signed for and in behalf of said corporation by authority of its governing body, and is within the scope of its corporate powers.

_____
(Corporate Seal)

PORT AUTHORITY OF GUAM

By: CAPTAIN EULOGIO C. BERMUDES
General Manager

Dated: _____

– 3 –

APPROVED:                           CERTIFIED FUNDS AVAILABLE:

_____          _F___Badar_____
PAUL J. SOUDER, Chairman             **FRANKLIN E. BADAR, CONTROLLER**
                                     Certifying Officer

Dated:      _____      Dated:      _8/14/96_____


APPROVED AS TO FORM:

CARBULLIDO, PIPES & BORDALLO
Legal Counsel, Port Authority of Guam

_____
F PHILIP CARBULLIDO, ESQ.

Dated:      _8/12/96_____


SWJ:amn\PAG\Black.Sup

- 4 -

responsible companies with originals of the policies and renewals available for the Port 'hority's review during reasonable hours.

XVI.   GOVERNING LAW. It is agreed that this Contract shall be governed by, construed, and enforced in accordance with the laws of the territory of Guam.

XVII.   TIME OF THE ESSENCE. It is specifically declared and agreed that time is of the essence of this Contract.

XVIII.   MODIFICATION OF AGREEMENT. Any modification of this agreement or additional obligation assumed by either party in connection with this agreement shall be binding only if evidenced in writing signed by each party or an authorized representative of each party.

XIX.   NOTICES. Any notice provided for or concerning this agreement shall be in writing and be deemed sufficiently given when sent by certified or registered mail if sent to the respective address of each party as set forth at the beginning of this agreement.

XX.   PARAGRAPH HEADINGS. The titles to the paragraphs of this agreement are solely for the convenience of the parties and shall not be used to explain, modify, simplify, or aid in the interpretation of the provisions of this agreement.

IN WITNESS WHEREOF, the parties hereto have executed this contract as of the day and year first written.

BLACK CONSTRUCTION CORPORATION

Date:  April 8, 1996          By: _____

                              Name: Perfecto O. Jose', Jr.

                              Title:   Senior Vice President

- 5 -

I, __Mark J. Mamczarz__ , certify that I am the assistant secretary of the corporation named as the Contractor herein; that __Perfecto O. Jose', Jr.__ who signed this contract on behalf of the Contractor, that said contract was duly signed for and in behalf of said corporation by authority of its governing body, and is within the scope of its corporate powers.

(Corporate Seal)

PORT AUTHORITY OF GUAM

By: __CAPTAIN EULOGIO C. BERMUDES__
General Manager

Dated:

APPROVED:

PAUL J. SOUDER, Chairman

Dated:

APPROVED AS TO FORM:

CARBULLIDO, PIPES & BORDALLO
Legal Counsel, Port Authority of Guam

F. PHILIP CARBULLIDO, ESQ.

Dated: 8|12|96

CERTIFIED FUNDS AVAILABLE:

__FRANKLIN E. BADAR, CONTROLLER__
Certifying Officer

Dated: 8/14/96

- 6 -

**EXHIBIT D**

IN THE DISTRICT COURT OF GUAM

S.J. GARGRAVE SYNDICATE AT LLOYDS,    ) CIVIL CASE NO. CV03-00009
                                      )
                  Plaintiff,          )
                                      )
          vs.                         )
                                      )
BLACK CONSTRUCTION CORPORATION,       )
WINZLER & KELLY, and ENGINEERING      )
MANAGEMENT & PLANNING SERVICES        )
CORPORATION,                          )
                                      )
                  Defendants.         )
_____)

TRANSCRIPT OF

DEPOSITION OF

# DEAN GILLHAM

April 25, 2005

PREPARED BY:    GEORGE B. CASTRO

distinction between, say, what the Port of Guam
wanted or what EMPSCO may have thought it was
designing? Or are they the same thing?

A   Well, my conclusion relates to the
documents produced by EMPSCO. I drew no
conclusion with the respect to what the report
wanted, with one exception. And that's that,
during the negotiations, EMPSCO had proposed
something like 240 hours of structural
engineering and the Port counter-proposed 12
hours. Now as an engineer that tells me one
thing and that's that the Port wasn't looking
for any structural analysis.

Q   Okay. Now I take it that this opinion
does not take into affect what the Port may
have actually wanted; is that correct?

A   I think it is a valid conclusion from
an engineering viewpoint that if the Port
wanted EMPSCO to prepare a comprehensive
structural analysis, they would not have
counter-proposed 12 hours. This is based on
the assumption that there were other engineers
negotiating with them and I do know that there
are other engineers who work for the Port.

Q   Okay. What I'm trying to find out is,

1  are you aware of any evidence in the case or

2  any other indication or statements by the Port

3  Authority to EMPSCO or anyone else that it was

4  just looking for a temporary repair?

5     A  I am not aware of any correspondence or

6  communications between the Port and EMPSCO to

7  that affect.

8     Q  Okay.  How about between anybody

9  involved in this case that indicates that this

10  was a temporary repair, other than the opinion

11  you're giving today that it's an engineering

12  conclusion?

13     A  There are other documents that I've

14  reviewed and received from Mr. Sterling that

15  are referred to this as temporary repair.

16     Q  Okay.  Which documents are those?

17     A  I can't remember of hand.

18     Q  Okay.  Now, when you say that the

19  berthing forces were going to be limited to 40

20  percent of the original design capacity, tell

21  me how you came up with the number, please?

22     A  That came from the documents produced

23  by EMPSCO.

24     Q  Okay.  And explain to me what that

25  means.

1   that is?

2      A    No.    I assume that was provided from

3   EMPSCO, but I don't know for sure.

4      Q    Okay.  Now, explain the significance of

5   the 40 percent of capacity in this document to

6   me.

7      A    Well, the significance to me is that a

8   permanent repair could not be based on 40

9   percent.   That implies to me that it's a stop

10  gap measure.

11     Q    Okay.  A stop gap -- prior to what?   A

12  permanent repair or replacement or?

13     A    In the report, EMPSCO stated, on 2 of

14  7, Attachment 1, "It is anticipated that a

15  detailed structural analysis will be considered

16  in future studies when a comparative cost

17  analysis between repair verses replacement

18  becomes an integral part of future contract

19  requirement."

20     Q    Okay.  And this sentence is what you

21  base your opinion that this particular repair

22  was only supposed to be temporary and only

23  handle 40 percent of original design capacity;

24  correct?

25     A    Yes, but there's more.   If you note,

1    immediately above that it says, "Due to the

2    nature of the damage and urgency of affecting

3    immediate repairs, the quantitative evaluation

4    of the structural elements by performing

5    structural analysis is not included in the

6    scope of work of this contract."

7         Q    Okay.

8         A    And also I believe EMPSCO has stated

9    the previous page, da-da-da-da-da-da.

10        Q    Okay.

11             MR. O'CONNOR:    For the record, he's

12   reading this from EMPSCO's Engineering

13   Documentation Report; is that right?

14             MR. SMITH:    Correct.

15   BY MR. SMITH:

16        Q    Okay.    Now, tell me what, in your

17   opinion, was going to be the use of this

18   particular pier if the repairs had been made to

19   40 percent of the original design capacity?

20        A    My interpretation of the document is,

21   is that, EMPSCO is saying that you have to

22   limit your berthing forces to the ones

23   stipulated in this document.

24        Q    Okay.    And practically speaking, how

25   would that work?

**EXHIBIT E**

1          IN THE DISTRICT COURT OF GUAM

2

3

4

5   S.J. GARGRAVE SYNDICATE
   AT LLOYDS,

6

7          Plaintiff,

8   vs.                   No.  CV03-00009

9   BLACK CONSTRUCTION CORPORATION,
   WINZLER & KELLY, and ENGINEERING

10  MANAGEMENT & PLANNING SERVICES
   CORPORATION,

11

12         Defendants.
   _____/

13        Deposition of

14    WEBB W. HAYES, S.E.

15   Thursday, May 12, 2005

16

17

18

19  REPORTED BY:  JOAN MARTIN, CSR #6036

20

21

22

23

24          NOGARA REPORTING SERVICE
        130 Battery Street, Suite 580

25     San Francisco, California 94111
          (415) 398-1889

Case 1:03-cv-00009    Document 282-2    Filed 10/26/2005    Page 25 of 34

1    same psi?

2         A.   I can't remember if we did, but I think it

3    would have been equivalent.

4         Q.   This table indicates 6300 psi concrete for the

5    Red Head product, but only 2,000 psi for the Anchor-It.

6    My question is, did you ever do an apples-to-apples

7    comparison, instead of two very different types of

8    concrete?

9         A.   No.

10         Q.   Going on, your next heading is "Performance of

11   W&K Connection Design."  You say, "The EMPSCO design did

12   not consider seismic loading on the dolphins."

13              Is the EMPSCO design the original concrete

14   encapsulation design?

15         A.   (Indicating affirmatively.)

16         Q.   Okay.

17   MR. O'CONNOR:  Did you get that?

18   MR. BOOTH:  Pardon?

19   MR. O'CONNOR:  I wanted to make sure she got his

20   answer.

21   MR. BOOTH:  Right.  She's the most important person

22   here.  We want to make sure she hears it.

23         Q.   What's the source of your information that

24   EMPSCO did not consider seismic loads?

25         A.   The seismic calculations included in their

                                                        50

Case 1:03-cv-00009   Document 282-2   Filed 10/26/2005   Page 26 of 34

1  calculations. It's specifically, I think, excluded, in

2  their design report. And I believe in the delos Santos

3  deposition, he makes reference to the fact that they

4  were instructed not to do seismic design or structural

5  analysis.

6      Q.  Do you believe there should have been a seismic

7  analysis done as part of the engineering work on this

8  project?

9      A.  There should have been a full structural design

10  of this repaired facility to include seismic, to include

11  berthing forces that are realistic. But that was

12  precluded, by the port's direction.

13     Q.  Berthing forces associated with what size ship?

14     A.  Whatever size ship you expect to have come into

15  berth.

16     Q.  Last sentence in that paragraph says, "It is

17  apparent that the work to be done was to be of an

18  expedient nature."

19         What do you mean by "expedient nature"?

20     A.  Temporary.

21     Q.  Okay. What do you mean by "temporary"?

22     A.  To get us by until the next failure. Pardon

23  me.

24     Q.  Did "temporary" have a time period associated

25  with it? Are you saying for six months, or a year,

51

Case 1:03-cv-00009    Document 282-2    Filed 10/26/2005    Page 27 of 34

1    or --

2         A.  It could be any of those.  Or a day.  This

3    whole repair, in the whole system, was just in danger of

4    collapse for the next ship that came in.

5         Q.  And that was even after the repairs were done

6    in '95/'96 --

7         A.  Correct.

8         Q.  -- in your view?  Okay.  Have you reviewed the

9    specifications for the '95/'96 repair job?

10        A.  I think I have, yes.

11        Q.  Is there any reference in those specifications

12   to it being a temporary repair?

13        A.  I don't remember if there is a reference.  I --

14   I don't recollect on those -- on EMPSCO's -- the

15   specifications EMPSCO was given says that.  I think it

16   did say that on the subsequent repair.

17        Q.  When you say "subsequent repair," what are you

18   referring to?

19        A.  The repair that was done, what, in -- in what

20   year?  The last repair that was done.

21        Q.  '95/'96 --

22        A.  Yeah.  No.

23        Q.  -- is it?  No?

24        A.  2000 -- after the earthquake.

25        Q.  Okay.

52

1        A.   It still says "temporary."

2        MR. O'CONNOR:   Smithbridge, I think he's talking

3    about.

4        MR. BOOTH:   Q.   The Smithbridge repair?

5        A.   Yes.

6        Q.   I'm referring to the '95/'96 work that was

7    done.  Are you aware of any of the either designers or

8    contractors involved in that project being told that

9    this was a temporary repair?

·10       A.   Not that I could see.

11       Q.   Did you investigate what the likely failure

12   mode would be for the design under VE-1, if it was

13   subjected to excessive force from either an earthquake

·14   or a ship berthing?

15       A.   We evaluated VE-1 for horizontal loads, if

16   that's --

17       Q.   And what did you conclude would be the first

18   point of failure, if the loads exceeded the capacity of

19   the design?

20       A.   I can't, I can't remember, but I would have

21   assumed it would have been the bolts.

22       Q.   Okay.  Bolts shearing off, or the bolts

23   withdrawing out of the holes?

24       A.   Probably withdrawing.

25       Q.   Okay.  On Page 8 you define the site of Pier

53

**EXHIBIT F**



PORT AUTHORITY OF GUAM
GOVERNMENT OF GUAM
1026 CABRAS HIGHWAY
SUITE 201 PITI GUAM 96925

# FILE COPY

## SPECIFICATIONS

- FOR

## REPAIRS AND UPGRADING TO FOXTROT "F-1" PIER
## APRA HARBOR                              GUAM, MI.

SUBMITTED BY:

**EMPSCO–Engineering Consultants**

o   Suite 245 Julale Shopping Center
    Agana, Guam 96910

o   2nd Floor Island Commercial Building
    Gualo Rai Saipan MP 96950

APPROVED BY:

_____

**EULOGIO A. BERMUDES**
General Manager
PORT AUTHORITY OF GUAM

A - 1

**EXHIBIT G**

# DESIGN CALCULATIONS

## FOR

## REPAIRS AND UPGRADING TO FOXTROT "F-1" PIER APRA HARBOR, GUAM M.I.

PREPARED BY:

**EMPSCO ENGINEERING CONSULTANTS
SUITE 245 JULALE SHOPPING CENTER
AGANA, GUAM 96910**

6 - 2

Case 1:03-cv-00009     Document 282-2     Filed 10/26/2005     Page 33 of 34



## GENERAL PROJECT DESCRIPTION:

Wharf Foxtrot F-1 (See Fig. 1) is an existing facility used primarily for docking of fuel tankers. This facility is located within a protected harbor where berthing conditions are favorable.

Wharf F-1 was originally designed to accommodate a 90,000 DWT tanker vessel. This project proposes to accommodate larger tankers up to 150,000 DWT by installing a new fendering system to the existing dolphins. Currently, the existing fenders are not functioning properly and will require replacement.

This facility was built in 1970. This facility consists of the following main wharf; access ramp; walkways; mooring dolphins "A", "B", "E" and "F", and breasting dolphins "C", "D", "G" and "H". Breasting dolphins "C" and "D" are designed to accommodate the 90,000 DWT tankers, while breasting dolphins "G" & "H" were provided to accomodate smaller vessels between 21,000 - 28,000 DWT.

Presently, all the above structures except dolphin "H", are existing and will undergo major structural repairs. Dolphins "H" will be replaced with a new structure similar to the original structure.

With the above general project description, the following outline and information data for the design of the fender system are provided

1.  Structure:

    A.  Condition of Structure:                     Existing

    B.  Age of Structure:                           25 Years

    C.  Type of Berthing Structure:                 Dolphin Type

    D.  Pile System:                                Steel Pipe with
                                                    Concrete Fill.