BERMAN O'CONNOR MANN & SHKLOV
DANIEL J. BERMAN
ROBERT J. O'CONNOR
Suite 503, Bank of Guam Building
111 Chalan Santo Papa
Hagåtña, Guam 96910
Telephone: (671) 477-2778
Facsimile: (671) 477-4366

Attorneys for Defendant
Winzler & Kelly Consulting Engineers

**FILED**
DISTRICT COURT OF GUAM

OCT 27 2005

MARY L.M. MORAN
CLERK OF COURT

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF GUAM

| | |
|---|---|
| S.J. GARGRAVE SYNDICATE AT LLOYDS,<br><br>Plaintiff,<br><br>v.<br><br>BLACK CONSTRUCTION CORPORATION, WINZLER & KELLY CONSULTING ENGINEERS and ENGINEERING, MANAGEMENT & PLANNING SERVICES CORPORATION,<br><br>Defendants. | CIVIL CASE NO.: CIV03-00009<br><br>DEFENDANT WINZLER & KELLY CONSULTING ENGINEERS' MOTION IN LIMINE TO EXCLUDE EXPERT TESTIMONY; CERTIFICATE OF SERVICE |

## INTRODUCTION

This is a motion to exclude all testimony from Mr. Boone on seismic forces and how they impacted the F-1 dolphins. The Plaintiff's sole expert is Elliot Boone. He admits in his deposition that he is not a seismologist[1] and that an individual whose name he does not know and whose qualifications are unknown to him prepared the seismological data upon which the tables in his report were based. Mr. Boone relies upon these tables to give his opinions on the

---

[1] *"Defendants' Counsel:* Are you a seismologist? *Mr. Boone:* No." May 13, 2005 Deposition of Elliot Boone at 29.

-1-

ORIGINAL

seismic forces that impact the F-1 dolphins. This makes the data in these tables and any opinions and conclusions based upon that data unreliable and inadmissible.

Even worse, Plaintiff's counsel has refused, despite pointed requests, to provide the underlying data from which the Defendants' experts could analyze the accuracy of the tables which form the basis for Mr. Boone's opinions. Here is testimony from Mr. Boone's May 13, 2005 deposition requesting this data:

> Defendants' Counsel: So you say in your report, this output/input information can be made available if requested. And since you have invited in your report that it be requested, I formally request that you and your attorney give that to us within the next week, if physically possible. If not, as soon thereafter as possible.[2]

This underlying data, which had been requested *before* Mr. Boone's deposition as well as during his deposition, was *never* presented to the Defendants so that the Defendants could test the reliability of the tables and computer analysis done by the unknown computer analyst with the unknown qualifications.[3]

## ARGUMENT

**1) Mr. Boone Is Not A Seismologist.**

An expert witness can only "opine on matters within the reasonable confines of his subject area and cannot render expert opinion on an entirely different field or discipline (internal citations omitted)." *Dreyer v. Ryder Automotive Carrier Group, Inc.*, 367 F.Supp.2d 413, 416 (W.D. NY. 2005) (where an otherwise impressive *curriculum vitae* did not preclude the exclusion of proffered expert testimony outside of that individuals area of expertise).

---

[2] May 13, 2005 Deposition of Elliot Boone at 162-163.

[3] Contrast this to Plaintiff's in limine motion which seeks to limit Defendants' expert testimony because some of the expert's analysis was given to Plaintiff nine days before that expert's deposition.

Regarding the damage done to the F-1 dolphins, Mr. Boone "assumed . . . that it was caused by the 2001 earthquake."[4] In fact, he believes that these seismic forces were "the largest force available."[5] However, simply because an individual is a structural engineer and "has some experience in identifying the sources of structural problems" does not enable them to be qualified as an expert witness with regard to seismic events. *Ballard v. Buckley Powder Co.*, 60 F.Supp.2d 1180, 1183 (D.Kan. 1999) (disallowing the opinion as to the source and effect of a seismic event offered by a structural engineer). Mr. Boone is not a seismologist, yet he opines at great length as to seismic events, their origin and their effect upon marine structures. He should not be allowed to do so.

**2) Mr. Boone's Testimony Is Based Upon Unverified Data And Therefore, Unreliable.**

Mr. Boone's opinions and report are manifestly unreliable. For an expert's opinion to be admissible at trial, it "[m]ust have a reliable basis in the knowledge and experience of [the expert's] discipline (internal quotations omitted)." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148 (1999). This "knowledge" requires:

> more than subjective belief or unsupported speculation.... [I]n order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation--i.e., "good grounds," based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.

*Jinro America Inc. v. Secure Investments, Inc.*, 266 F.3d 993, 1005 (9th Cir. 2001) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)).

Mr. Boone's opinions are unreliable because they are based upon data generated by a source unknown to him and not verified as to accuracy. An expert may rely upon data that may,

---

[4] May 13, 2005 Deposition of Elliot Boone at 222.
[5] *Id* at 36.

itself, not be admissible at trial, but this data must be verified. The Ninth Circuit has recognized that "where such [expert] testimony's . . . data . . . or their application are called sufficiently into question, . . . the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of [the relevant] discipline." *Jinro America Inc.* 266 F.3d 993, 1005 (quoting *Kuhmon Tire Co., Ltd. v. Carmichael,* 526 U.S. 137 (1999)). Specifically:

> [w]here an expert fails to verify the accuracy of data upon which the expert creates a statistical analysis or renders an opinion, ***the resultant analysis and opinion are inherently unscientific requiring exclusion*** of such evidence under *Daubert* (emphasis added).

*Dreyer v. Ryder Automotive Carrier Group, Inc.,* 367 F.Supp2d 413, 446 (W.D.N.Y. 2005)(disqualifying an expert witness because of a failure to verify applicable data).[6]

Here, Mr. Boone's opinion regarding the sufficiency of the VE-1 design is supported by his "Seismic Analysis of Berthing Dolphins A, B, C, D & G" (a table representing this analysis is attached to his report at "Appendix C"). ***The data that Mr. Boone utilized in making this analysis is not his.***[7] In fact, Mr. Boone farmed out the generation of this data to another gentleman by the name of Said Hilmy ("Mr. Hilmy").[8] Mr. Boone knows Mr. Hilmy, has worked with Mr. Hilmy on past occasions and is familiar with Mr. Hilmy's professional qualifications.[9] This is all well and good, however, ***Mr. Hilmy did not generate the data upon which Mr. Boone based his opinions.***[10] Mr. Hilmy, in fact, assigned this task to someone else in

---

[6] *See also Cooper v. Travelers Indemnity Co. Of Illinois,* 113 Fed.Appx 198, 201 (2004) (upholding the exclusion of testimony by an expert who did not verify the accuracy of the underlying data of his opinion).

[7] May 13, 2005 Deposition of E. Boone at 77-78.

[8] *Id* at 77-78.

[9] *Id* at 143-144.

[10] *Id* at 143 ("I believe [Mr. Hilmy] assigned [the calculations] to another individual").

his office, and at the time he formulated his opinion, *Mr. Boone had no idea who this person was, what their qualifications were or what possible chance they had of generating good data.*[11]

Despite this utter lack of knowledge of the accuracy of this underlying data, Mr. Boone did not endeavor to ensure its complete accuracy. Instead, Mr. Boone "discussed it" with Mr. Hilmy (another person who did not generate the data).[12] Furthermore, this discussion only involved Mr. Boone reading through "some" of the data input upon which he bases his opinions.[13] Finally, when asked if he could define what "some" meant as expressed in a percentage of the calculations that he verified, Mr. Boone (instead of providing some scientific rationale for what he did and did not verify) said *"I have no idea."*[14] In summation, Mr. Boone took calculations performed by someone he did not know, with qualifications he did not know, arbitrarily verified "some" of the calculations for accuracy and used these calculations as the central support for his opinion.

A term borrowed from computer programming, G.I.G.O, or "Garbage In, Garbage Out" is especially appropriate here. If Mr. Boone used unverified data from an unknown and unverified source, his opinion should be given the same respect as is due this data . . . none.

---

[11] *Id* at 143-144.
[12] *Id* at 143-144.
[13] *Id* at 143-144.
[14] *Id* at 143-144.

## CONCLUSION

The Court should exclude any expert opinion testimony from Plaintiff's expert Elliot Boone regarding seismic forces or earthquake damage to the F-1 dolphins as well as any reference to the tables attached to his report. All are based upon data from an unknown assistant with unknown qualifications and are therefore unreliable. Additionally, Plaintiff *never* supplied Defendants, before, during or after Mr. Boone's deposition, the underlying data upon which these tables and expert opinions were based. For the aforementioned reasons, Mr. Boone should not offer any expert opinions on seismic forces or their effects upon the F-1 dolphins.

Dated this 27th day of October, 2005.

Respectfully submitted,

BERMAN O'CONNOR MANN & SHKLOV
Attorneys for Defendant
Winzler & Kelly Consulting Engineers

By: *Catherine Bejun Cavad*
for DANIEL J. BERMAN

## CERTIFICATE OF SERVICE

I, CHRISTINE PANGELINAN, hereby declare under penalty of perjury of the laws of the Unites States, that on the 27th day of October, 2005, I will cause to be served, via facsimile transmission, a true and correct copy of **DEFENDANT WINZLER & KELLY CONSULTING ENGINEERS' MOTION IN LIMINE TO EXCLUDE EXPERT TESTIMONY; CERTIFICATE OF SERVICE** upon The Hon. Judge Robert Clive Jones, Plaintiff and Defendants Counsel of record as follows:

The Hon. Judge Robert Clive Jones
United States District Judge
United States District Court for the District of Nevada
333 Las Vegas Bldv. South
Las Vegas, NV 89101
Telefax: (702) 464-5491

David Ledger, Esq.
Carlsmith Ball LLP
134 West Soledad Avenue
Bank of Hawaii Building, Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Telefax: (671) 477-4375

Attorneys for Plaintiff S.J. Gargrave Syndicate at Lloyds

Thomas C. Sterling, Esq.
Klemm, Blair, Sterling & Johnson
Suite 1008, Pacific News Building
238 Archbishop F.C. Flores Street
Hagåtña, Guam 96910
Telefax: (671) 472-4290

Attorneys for Defendant Black Construction Company

Thomas M. Tarpley, Esq.
Tarpley & Moroni, LLP
Suite 402, Bank of Hawaii Bldg.
134 W. Soledad Avenue
Hagåtña, Guam 96910
Telefax: (671) 472-4526

Attorneys for Defendant
    Engineering, Management & Planning Services Corporation

Dated this 27th day of October, 2005.

_____
CHRISTINE PANGELINAN

2003-08-051026-PL-MIN Excl Expert Testimony.doc

1  Q. Are you a seismologist?
2  A. No.
3  Q. Do you consider yourself an expert with regard
4  to the forces and effects of earthquakes on marine
5  structures?
6  A. I think I know a bit about it.
7  Q. Do you consider yourself an expert?
8  A. Expert -- yes, I consider myself an expert.
9  Q. On the causes of -- and effects of earthquake
10 forces on marine structures?
11 A. You would have to define the word "expert,"
12 because there are people with -- who have spent their
13 whole lives studying that one area.
14 Q. And how much of your life have you spent
15 studying this area?
16 A. I've dealt with it for most of my career.
17 Q. Earthquake effects on dolphins?
18 A. No, earthquake --
19 Q. On marine structures?
20 A. No. On marine structures, I believe is what
21 you said.
22 Q. Most of your adult life you've dealt with that?
23 A. Most of my professional career. My first
24 employer after leaving college was the Port of Long
25 Beach. And I was involved in marine structures there,

1  Q. Did you look at all of them?
2  A. All of the dolphins? Yes.
3  Q. Mooring and berthing?
4  A. Yes. A, B, C, D, and I think G.
5  Q. And this was about two and a half years after
6  the October earthquake?
7  A. It was in -- I was there in March of 2004,
8  so --
9  Q. Okay. And do you have an opinion as to what
10 caused the bolts that you saw to be loosened, to become
11 loosened?
12 A. Yes, I do.
13 Q. What's that opinion?
14 A. I believe it's due to seismic activity.
15 Q. Why do you believe that?
16 A. Because it was the largest force available.
17 Q. What's stronger, berthing forces into a dolphin
18 that has broken fenders, or earthquake forces?
19 A. It depends on the earthquake and it depends on
20 the size of the ships that called.
21 Q. Okay. Let's talk about the October 2001
22 earthquake and compare that to 90,000 deadweight ton, to
23 150,000 deadweight ton ships.
24 A. I would say that, in my opinion, that the
25 seismic forces would be larger, assuming that the vessel

36

1 look at the code to give you a proper interpretation of
2 the facts in this case.
3   Q. All right. We'll get to the code, but just for
4 our purposes now, you don't remember why you picked RW
5 Factor 3?
6   A. I do remember why we picked RW-3, because that
7 is the RW factor that most resembles a dolphin.
8   Q. Okay. And this is -- is this something that
9 you decided in this case, or is this something that you
10 had used before?
11   A. As I recall, there was little bit of discussion
12 as to why, which RW. And I talked with the individual
13 doing the analysis, the computer analysis, and we came
14 to a joint conclusion on that.
15   Q. Okay. So you didn't do the computer
16 analysis --
17   A. I did not.
18   Q. -- somebody else did? Did you already tell me
19 who that was?
20   A. I don't believe I did.
21   Q. Who was it?
22   A. The gentleman's name is Said Hilmy. S-a-i-d
23 H-i-l-m-y.
24   Q. And he works for Cash?
25   A. No.

77

1    Q.  Who does he work for?
2    A.  He works for a company called IDS, Integrated
3    Design Services.
4    Q.  So you and he consulted together over what RW
5    factor to use?
6    A.  We did.
7    Q.  And together you agreed to use 3?
8    A.  Yes.
9    Q.  I don't know much more now than when I asked
10   you, but we'll get that Uniform Building Code out.
11           What was the berthing design criteria for the
12   Black repair project?
13   A.  I have no idea.
14   Q.  Okay.
15   A.  There doesn't appear to be any.
16   Q.  Do you know whether the fenders EMPSCO called
17   for were actually installed?
18   A.  I believe they were not, based on the as-built
19   drawings.
20   Q.  Okay.  Do you have an opinion as to whether or
21   not the fenders that EMPSCO called for were adequate?
22   A.  In what sense?
23   Q.  For Dolphin System F-1, were they adequate to
24   resist berthing forces and protect the dolphins from the
25   expected vessels that were going to --

A. In the seismic portion of the calculations.

Q. Okay. Exactly how did you do that? If I was to go look at your calculations, what would I be looking for?

A. In the calculations that you see here, or in the more detailed calculations that are not here. I mean, that's -- figuring out the weight of that pile head is merely knowing its dimensions in plan, okay, and its depth. And assuming that we can all agree that concrete weighs about 150 pounds a cubic foot.

Q. So if I'm going to be looking over your calculations, I'm going to find that input of the deadweight where?

A. It would be in the hand portion, or the input to the SAP 2000 program. I can't tell you exactly where it is.

Q. I understand.

A. You know.

Q. But did you personally do these calculations, or did you --

A. I already said no. I had Said Hilmy perform the calculations under my supervision.

Q. And he's the one who input this data into the computers?

A. I believe he assigned it to another individual

143

1  in his office, under his supervision. And I worked with
2  Said Hilmy in the past.
3       Q. Okay. And the conclusions that were reached,
4  that found their way into your tables, are conclusions
5  that Said reached as a result of his computer analysis?
6       A. It's a conclusion that we reached after we both
7  discussed not only the input, which are the input
8  parameters which comprise not only the size of the
9  concrete elements, but the length and diameter of the
10 concrete piles, but the output. And the output is a
11 function of -- various other things.
12      Q. Who prepared the tables that are attached to
13 your report?
14      A. They were actually prepared by Said Hilmy,
15 under Said Hilmy's direction, and my supervision.
16      Q. So Said didn't prepare them either, someone
17 else prepared them for Said?
18      A. That's correct.
19      Q. Do you know who that was?
20      A. No, I do not. I can find it out. I have
21 access to that information.
22      Q. Was it someone in his company?
23      A. Yes.
24      Q. Okay. Someone in his company prepared the
25 tables at his supervision?

```
 1      A.   Uh-huh (affirmative).
 2      Q.   And then you sat down with Said and went over
 3 those tables so that you could verify that they were
 4 accurate, is that what happened?
 5      A.   Essentially.
 6      Q.   Okay.  And how did you check on their accuracy?
 7      A.   Said and I discussed it.
 8      Q.   Did you read through all of his inputs?
 9      A.   If you use all, okay, if you use the word
10 "all," I've got to say I don't know.
11      Q.   Okay.
12      A.   All right?  If you say "some," I'll say yes.
13      Q.   Okay.  Can you give me any percentages?  What
14 does "some" mean?
15      A.   No.
16      Q.   Does it mean 10 percent, 80 percent?
17      A.   I have no idea.
18      Q.   Okay.  We'll come back to that later.  But I
19 want to go to your report on Page 4 and 5.  Bottom of 4,
20 going to Page 5.
21      A.   Okay.
22      Q.   You're talking about berthing loads.
23      A.   Mooring loads.
24      Q.   And berthing loads.  And you say that the --
25      A.   We're on Page 4?
```

Case 1:03-cv-00009   Document 291   Filed 10/27/2005   Page 15 of 18

1  Q. And would the numbers be the same?

2  A. I assume so, yes.

3  Q. Okay. Did you do any checking of the tables
4  vis-a-vis the computer output to make sure that they
5  were consistent?

6  A. I can't recall.

7  Q. Did you do a computer analysis of EMPSCO's
8  design?

9  A. No. I think it would be moot, because it
10 wasn't built.

11 Q. Well, neither was Winzler & Kelly's design.
12 Why did you do a dynamic analysis?

13 A. It seemed appropriate.

14 Q. Also gave you higher numbers?

15 A. Dynamic analysis could give -- would give me
16 more confidence in what the results were.

17 Q. Did it also give you higher numbers?

18 A. It could.

19 Q. Did it?

20 A. I think so.

21 Q. Okay.

22 A. I believe so.

23 Q. So you do say, in your report, this
24 output/input information can be made available if
25 requested. And since you have invited in your report

1  that it be requested, I formally request that you and
2  your attorney give that to us within the next week, if
3  physically possible. If not, as soon thereafter as
4  possible. And I'm referring there to the second full
5  paragraph on Page 8.
6       When you say, in your first paragraph on Page
7  8, that you're comparing raw earthquake force levels to
8  ultimate test capacities, what do you mean by "raw
9  earthquake force levels"? Is that unreduced force --
10    A.  It's unreduced.
11    Q.  And by "unreduced," that means without this RW
12 factor that we talked about?
13    A.  He said RW. Yeah. Yes.
14    Q.  Okay. And if it -- if you had put in the RW
15 factor, that number would have gone down?
16    A.  It's divided by 3.
17    Q.  You divide by 3, so it would go down?
18    A.  Down.
19    Q.  You divide 1.8 by 3?
20    A.  No.
21    Q.  Oh. Okay. I see what you're talking about.
22 But the 1.8 would have gone down to what?
23    A.  I can't say. It's a complicated -- more
24 complicated than that.
25    Q.  Do you know whether it would have gone below

1  on the Foxtrot dolphins had been caused by the 2001
2  earthquake?
3      A.  Could you repeat that, please?
4      Q.  Did you make any analysis to determine whether
5  the damage to the F-1 dolphins was caused by a 2001
6  earthquake, or by berthing forces?
7      A.  It was assumed by me that it was caused by the
8  2001 earthquake.
9      Q.  Okay.  So the answer is no, you did not do any
10 analysis, you just assumed that, correct?
11     A.  That's right.
12     Q.  Now, when you did your analysis of the Winzler
13 & Kelly design, was it your purpose to compare the
14 design with minimum code requirements, or compare their
15 design with what you consider to be good engineering
16 practice?
17     A.  I think both.  But minimum code requirements
18 would have been the minimum.
19     Q.  Are you familiar with a gentleman named Frank
20 Dennis?
21     A.  Yes.  I mean, I'm not -- no, I'm not familiar
22 with him.  Have I ever met him, no, I've not.  I do know
23 he's involved in this matter.
24     Q.  Are you aware that he was the designer for what
25 has been called as the temporary repair that was done