BERMAN O'CONNOR MANN & SHKLOV
DANIEL J. BERMAN
ROBERT J. O'CONNOR
Suite 503, Bank of Guam Building
111 Chalan Santo Papa
Hagåtña, Guam 96910
Phone: (671) 477-2778
Fax: (671) 477-4366



FILED
DISTRICT COURT OF GUAM

OCT 2 7 2005 ąp

MARY L.M. MORAN
CLERK OF COURT

Attorneys for Defendant
Winzler & Kelly Consulting Engineers

## IN THE DISTRICT COURT OF GUAM

| | | |
|---|---|---|
| S.J. GARGRAVE SYNDICATE AT LLOYD'S, | ) ) ) | Civ. No. CIV 03-00009 |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | WINZLER & KELLY'S OPPOSITION TO PLAINTIFF'S |
| BLACK CONSTRUCTION CORP., WINZLER & KELLY CONSULTING ENGINEERS and ENGINEERING MANAGEMENT & PLANNING SERVICES CORP., | ) ) ) ) ) ) | MOTION IN LIMINE RE WINZLER & KELLY'S EXPERT'S ANALYSIS RE BERTHING FORCES ON PIER F-1 AND ITS DOLPHINS; CERTIFICATE OF SERVICE |
| Defendants. | ) ) ) | Trial: November 8, 2005 |

The Syndicate has filed a motion in limine to preclude Winzler & Kelly's expert witness Webb Hayes from testifying regarding his analysis of the effect of ships' berthing forces on the dolphins at F-1 Pier. This motion states two grounds: 1) that Winzler & Kelly has changed its position regarding the cause of damage to the dolphins, from formerly arguing that such damage was not caused by ships' forces, to now arguing that it *was* caused by such forces; and 2) that Webb Hayes' calculations were provided late. Both grounds are unavailing, and the motion should be denied, for the reasons set forth below.



## Winzler & Kelly Has Never Changed Its Position Regarding Damage By Ships

The first ground is merely a rehash of the Syndicate's earlier motion in limine to preclude any evidence that the damage to the dolphins was caused by ships. It is to be distinguished from the earlier motion only in that it misrepresents the facts with even greater gusto. According to the Syndicate's new motion, not only did Winzler & Kelly "admit" that the damage was not caused by ships, it "vehemently argued" the point. Plaintiff's Motion at 3 fn. 1. Having then successfully "convinced" the court that no ships had damaged the pier, id. at 2, Winzler & Kelly (supposedly) not only "reversed its position" one hundred and eighty degrees, but did so "blatant[ly]," id., and "brazenly," id. at 3 fn. 1, yet at the same time also "surreptitious[ly]," id. at 3. When it comes to casting aspersions on Winzler & Kelly, consistency is apparently thrown to the wind as readily as is truth.

The fact is, as set out in full detail in Winzler & Kelly's opposition to the earlier motion (already submitted), that Winzler & Kelly has, from the very outset of this litigation, and with the full knowledge of both the Plaintiff and Judge Tashima, taken the position that the damage to the dolphins was caused by ships. It is the Syndicate, and only the Syndicate, who has maintained that it was not. Therefore, to the extent this motion is based on Winzler & Kelly's nonexistent "change of position" on the causation issue, it should be denied, for all the reasons set out in the opposition to the earlier motion, which is incorporated herein by reference. See Winzler & Kelly's Opposition to Plaintiff's Motion in Limine to Preclude Reference to Damage by Ships (October 26, 2005).

## The Disclosures Were Timely, and Plaintiff Was Not Prejudiced.

The second ground for the instant motion to preclude expert testimony -- that Winzler & Kelly provided its expert report late -- is equally without merit. Winzler & Kelly's original July 16, 2004, Expert Disclosure (attached as Exhibit B to Plaintiff's Motion) set forth the substance and basis of Mr. Hayes' opinion in a detailed report, which plainly and unequivocally concluded:

> It is my opinion that the damage to the dolphin piles and connection was due to excessive berthing loads and not by any seismic forces.

Id. at p. 2.10. Mr. Hayes has never deviated from this position, and reiterated it in his July 21 and November 4 amended reports. See Plaintiff's Exhibits D and E. This opinion was shared by the other expert witnesses who filed reports in July 2004, so Plaintiff cannot credibly claim to have been surprised by it on May 4, 2005. In its original disclosures, moreover, Winzler & Kelly not only reserved all rights to supplement the Hayes report, it specifically stated:

> The documents upon which Ben C. Gerwick, Inc. . . . based their opinions are set forth in their reports, which is served herewith. *Backup calculations, worksheets and computer analyses will be provided if requested.*

Exhibit B to Plaintiff's Motion, at p. 2.2, paragraph 1(A) (emphasis added). These calculations and worksheets being voluminous, Winzler & Kelly left it up to Plaintiff whether it wanted to see them or not -- a practice observed by all of the parties at the time, including the Plaintiff. Plaintiff made no request to see the documents at that time.

Eventually, Plaintiff did make such a request, and Winzler & Kelly provided the calculations on May 4, 2005.[1] Contrary to its claims in the instant motion, Plaintiff was not prejudiced in the least by receiving the calculations at that time. Plaintiff did not even take the deposition of Mr. Hayes until one week later, on May 12, 2005. See Exhibit C to Plaintiff's Motion. At that deposition, Plaintiff's counsel examined Mr. Hayes thoroughly and at length about his opinion on berthing forces, and on the May 4 documents in particular. See Transcript of Deposition of Webb Hayes at page 66, line 11 to page 73, line 13, attached hereto as Exhibit 1 (questioning regarding various parts of the May 5 documents). Furthermore, even if Plaintiff had not had the opportunity to depose Mr. Hayes, or felt that the opportunity was somehow insufficient and wished to depose him further about the documents, it could have made its motion at the time, as EMPSCO did back on April 25, when it felt it had been unfairly prejudiced by a late change of opinion from Plaintiff's expert, Mr. Boone. Plaintiff did not so, however, and instead waited until the very eve of trial to attempt to ambush Winzler & Kelly by seeking to preclude all testimony by its key expert witness.

In fact, Plaintiff's response to EMPSCO's earlier motion in limine is instructive for the light it casts on the present motion. Plaintiff pointed out that a party is under a continuing duty to supplement its expert disclosures; that the deadline for such supplementation did not occur until 30 days before trial, i.e. (given the original trial schedule in this matter) May 13, 2005; and that any supplementation before that date was therefore timely. See Plaintiff's Opposition To EMPSCO's Emergency Motion For

---

[1] By contrast, Plaintiff to this day has not responded to a similar request from Winzler & Kelly for the calculations prepared by *its* expert witness, Elliott Boone.

Protective Order and Motion in Limine Restricting Expert's Testimony at Trial (April 29, 2005) at 5 (attached hereto as Exhibit 2). Plaintiff further noted that, even where a party has not complied with the expert disclosure rules, "precluding testimony from the expert . . . *is a drastic remedy* and should only be applied in cases where the party's conduct represents *flagrant bad faith and callous disregard of the federal rules*." Id. at 4 fn. 3 (quoting McNerney v. Archer Daniels Midland Co., 164 F.R.D. 584, 587 (W.D.N.Y. 1995)) (emphasis added by Plaintiff). See also, e.g., Wechsler v. Macke Int'l Trade, Inc., 221 F.R.D. 619, 622-23 (C.D.Cal. 2004) (denying motion in limine to preclude expert from testifying regarding second supplemental report, where such report was provided within the 30-day pre-trial deadline of Rule 26(e), the expert's original report had put the opposing party on notice regarding the subject matter of his opinion, and the party offering the expert was willing to make him available for deposition regarding the information in the supplemental report).

Accordingly, the motion in limine should be denied.

Respectfully submitted this 27th day of October, 2005.

> BERMAN O'CONNOR MANN & SHKLOV
> Attorneys for Winzler & Kelly
>
> By: _Sanl Berm_____
>
> Daniel J. Berman

## CERTIFICATE OF SERVICE

I, Thomas Anderson, hereby declare under penalty of perjury of the laws of the
Unites States, that on the 27th day of October, 2005, I will cause to be served, via
facsimile transmission a true and correct copy of **WINZLER & KELLY'S MOTION
IN LIMINE TO PRECLUDE EVIDENCE OR ARGUMENT THAT THE PORT
WAS A THIRD-PARTY BENEFICIARY OF WINZLER & KELLY'S
SUBCONTRACT WITH BLACK; CERTIFICATE OF SERVICE** upon The Hon.
Judge Robert Clive Jones, Plaintiff and Defendants Counsel of record as follows:

> The Hon. Judge Robert Clive Jones
> United States District Judge
> United States District Court for the District of Nevada
> 333 Las Vegas Bldv. South
> Las Vegas, NV 89101
> Telefax: (702) 464-5491
>
> David Ledger, Esq.
> Carlsmith Ball LLP
> 134 West Soledad Avenue
> Bank of Hawaii Building, Suite 401
> P.O. Box BF
> Hagåtña, Guam 96932-5027
> Telefax: (671) 477-4375
>
> Attorneys for Plaintiff S.J. Gargrave Syndicate at Lloyds
>
> Thomas C. Sterling, Esq.
> Klemm, Blair, Sterling & Johnson
> Suite 1008, Pacific News Building
> 238 Archbishop F.C. Flores Street
> Hagåtña, Guam 96910
> Telefax: (671) 472-4290
>
> Attorneys for Defendant Black Construction Corporation
>
> Thomas M. Tarpley, Esq.
> Tarpley & Moroni, LLP

6

Suite 402, Bank of Hawaii Bldg.
134 W. Soledad Avenue
Hagåtña, Guam 96910
Telefax: (671) 472-4526

Attorneys for Defendant
Engineering, Management & Planning Services Corporation

Dated this 27th day of October, 2005.

*Thomas Anderson*

2003-08-051026-PL-M in limine re webb hayes-OPP.doc

1      Q.   Okay.   In the second of the two paragraphs you

2  added, you say, "The port's failure to communicate these

3  docking restrictions (see Simeon delos Santos

4  deposition) to anyone was negligent."

5           What is the source of your information that the

6  port failed to communicate docking restrictions?

7      A.   Delos Santos deposition indicated they had not

8  communicated these restrictions.

9      Q.   Okay.   Anything other than that?

10     A.   No.

11     Q.   Would you now turn to the largest of the

12  exhibits.   Is that 5?

13          MR. O'CONNOR:   Yes.

14          MR. BOOTH:   Exhibit 5.   That was provided to us May

15  4th, 2005.

16          MR. TARPLEY:   I'm sorry.   Did you make copies of

17  that?   Oh.   This is the latest.   Okay.

18          MR. BOOTH:   Yeah.   There are some here.

19          Actually, why don't we take a five-minute break

20  before we launch into this.

21          (Brief recess.)

22          MR. BOOTH:   Back on the record.

23     Q.   Let's turn back to Exhibit 5, Mr. Hayes.   On

24  the first page, "Summary of Results," in the first

25  bullet point you have, "The intent of this project is to

                                                          66

Case 1:03-cv-00009   Document 296   Filed 10/27/2005   Page 8 of 18   EX. 1

1   upgrade the fender system."

2          Was it your understanding that the intention

3   was to upgrade only the fender system, or to upgrade the

4   pier as a whole?

5      A.   Well, it was to upgrade the fender system, and

6   not upgrade the pier.

7      Q.   And not upgrade the pier?

8      A.   (Indicating affirmatively.)

9      Q.   Okay.  In the next bullet point, the last two

10  lines, you assumed easy berthing, exposed.  And I

11  believe that's Category C on the table, which appears on

12  -- it's Bates No. 76 -- no, it's Page No. 76 out of

13  whatever it was photocopied out of.  Page 6 of your

14  report, Exhibit 5.

15     A.   Yeah.

16     Q.   Why did you assume it was a C, or an easy

17  berthing, exposed?

18     A.   That's pretty conservative.

19     Q.   Did you have any --

20     A.   I mean, it will render lower energies.

21     Q.   Okay.  As opposed to difficult, exposed?

22     A.   Yes.

23     Q.   All right.  Have you seen any documents which

24  rate the Port of Guam, Apra Harbor, on those two

25  categories for how difficult the berth is and how

Case 1:03-cv-00009    Document 296    Filed 10/27/2005    Page 9 of 18

1    exposed it is?

2        A.   No.

3        Q.   Okay.  So that's an assumption you made that

4    you thought was appropriate?

5        A.   Yes.

6        Q.   Okay.  On Page 2 of your supplemental summary

7    of results, on Paragraph 4, the first bullet point says,

8    "Assuming the EMPSCO design energy occurs, and the

9    original selected fenders were installed."

10           My question is, which are the original selected

11   fenders?

12       A.   The Bridgetone SU 1150.  Is that it?  Designed

13   by -- selected by EMPSCO.

14       Q.   Selected by EMPSCO.  Okay.  Do you know why the

15   ones originally selected by EMPSCO were not installed?

16       A.   No.

17       Q.   Did you form any opinion as to the energy

18   absorption capacity of the ones Black did install,

19   compared to the ones EMPSCO originally specified?

20       A.   I believe the Trellex fenders that EMPSCO did

21   install had about twice the energy absorption capacity

22   as the ones selected by EMPSCO.  With associated double

23   the reaction.

24       Q.   Did you form any opinion that the change by

25   Black of the fenders that EMPSCO had originally

Case 1:03-cv-00009   Document 296   Filed 10/27/2005   Page 10 of 18

1    specified had any impact on or any effect on the damage

2    to the pier?

3        A.  Yes.

4        Q.  And what was that?

5        A.  Well, we felt -- I mean, we feel that those

6    fenders failed, or their effective energy absorption was

7    exceeded, and that the loads placed on the dolphins were

8    excessive.  That doesn't mean it wouldn't have also

9    happened with the EMPSCO --

10       Q.  Okay.  Do you think that the original fenders

11   specified by EMPSCO would have been a better choice than

12   the ones Black selected?

13       A.  No.

14       Q.  You think the change made by Black made any

15   difference?

16       A.  No.

17       Q.  Okay.  Let's go quickly through some of the

18   charts that are on your report, Exhibit 5.  Page 5 there

19   is a chart that is headed "Berthing Energy Summary."

20   And it has data for five different tonnages of ships.

21   But the first several columns are empty for EMPSCO.

22       Did you not have that information, from what

23   EMPSCO had available to it?

24       A.  No.

25       Q.  Okay.  Looking at Page 7, which is the first of

69

Case 1:03-cv-00009   Document 296   Filed 10/27/2005   Page 11 of 18

1    the berthing energy calculations that you did -- first

2    of all, does this and its following pages come from a

3    particular software package?

4        A.   No.

5        Q.   How were these calculated?

6        A.   I think these were -- were just a summary of

7    possibly a spreadsheet.

8        Q.   Okay.

9        A.   I think it is a spreadsheet, actually.

10       Q.   At the bottom, under "Berthing Energy," you

11   have a line entitled "Factor of safety, 1.25."

12            Can you tell me what that means?

13       A.   That's the -- that's just the recommended

14   factor that CIMF and PIANC, other organizations suggest,

15   and I think MOTEMS does too, suggest you apply to the

16   energy of the ship to give you a cushion for the unusual

17   docking incident.

18       Q.   So is that -- you should use a fender that's

19   1.25 the rate of what you expect the energy to be?

20       A.   You would work it the other way around.  You

21   would increase the energy of the ship by 1.25, and

22   select a fender that operates properly for that

23   particular amount of energy.

24       Q.   Okay.  Again, for each of these five

25   calculations you've assumed an easy berthing, exposed

70

Case 1:03-cv-00009   Document 296   Filed 10/27/2005   Page 12 of 18

1    condition, right?

2         A.   I --

3         Q.   Which is C on the chart?

4         A.   Yes.   Yes.

5         Q.   Okay.   Turning to Page 13, "Trellex Fender

6    Summary," you list four different fender sizes, and then

7    the actual used by EMPSCO.

8              Is your conclusion that the fender specified by

9    EMPSCO was not sufficient for this purpose?

10        A.   Well, this -- I'm a little bit confused about

11   this MV-1250x900.   That's the as-built fender.   I don't

12   know whether it's specified by EMPSCO.   Is that what

13   you're referring to?

14        Q.   Yes.

15        A.   It's the as-built fender.   What was the

16   question?

17        Q.   Okay.   The energy absorption is considerably

18   lower than what you have listed on the lines above that.

19   Is it your conclusion that the as-built fender is not

20   sufficiently strong for this installation purpose?

21        A.   The as-built -- "strong" is not the right --

22   the right way to go.

23        Q.   All right.

24        A.   What we're saying is, is that the energy

25   absorption capacity of the as-built fender is not -- is

71

Case 1:03-cv-00009   Document 296   Filed 10/27/2005   Page 13 of 18

1  not capable of stopping the ship without an excessive

2  amount of horizontal force being exerted on the dolphin.

3  How's that?

4      Q.  All right.  And did you form any conclusion

5  along those lines with regard to the fender that EMPSCO

6  originally spec'd?

7      A.  It would have collapsed, with less energy

8  absorbed.

9      Q.  When you say "collapsed," is the fender, then,

10  permanently damaged, or has it simply reached the end of

11  its ability to absorb energy?

12      A.  If the fender is fully collapsed, it generally

13  results in damage to the rubber and damage to the

14  fender.  And that sort of depends on the type of fender.

15      Q.  Partly depending on whether it's air-inflated

16  or --

17      A.  Well, that's a different issue.  Yokohama-type

18  fenders are totally different.

19      Q.  Starting at Page 28 of your report, there is

20  the EMPSCO engineering documentation report.  Is that

21  the same document that's sometimes been referred to as

22  the basis of design, in this case?

23      A.  You might refer to it as a basis for design.

24      Q.  Okay.

25      A.  It's really -- they don't date anything, so

Case 1:03-cv-00009    Document 296    Filed 10/27/2005    Page 14 of 18

1    it's pretty interesting to -- when you try and figure

2    out what's happening to who.  But it -- it is, in

3    essence, both a basis for design and an explanation of

4    what they did.

5         Q.   In the work that you did on this case, Mr.

6    Hayes, did you make any assumption regarding the

7    concrete that the pile caps was made of?  Whether it was

8    2000, 3,000, 6,000 pounds, whatever?

9         A.   We didn't make any assumption.

10        Q.   Did that play any role at all in the work that

11   you did in forming your opinions?

12        A.   We didn't see a concrete failure, per se, so we

13   didn't -- it didn't enter the picture.

14        Q.   Okay.  In your work for Winzler & Kelly in this

15   case, did you look at the damage suffered by the mooring

16   dolphins, A and B?

17        A.   Yes.

18        Q.   Okay.  Did you see any photographs of A and B

19   after the second earthquake?

20        A.   No.

21        Q.   Okay.  Did you form any conclusions as to how

22   -- or opinions as to how A and B came to be damaged?

23        A.   My opinion is that A and B were damaged in the

24   line loads, mooring line loads.

25        Q.   Did you see any numbers, or did you do any

73

Case 1:03-cv-00009   Document 296   Filed 10/27/2005   Page 15 of 18



CARLSMITH BALL LLP

DAVID LEDGER
ELYZE McDONALD
134 West Soledad Avenue
Bank of Hawaii Bldg., Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Tel No. (671) 472-6813

COZEN O'CONNOR

FORREST BOOTH
ERIK M. KOWALEWSKY
425 California Street, Suite 2400
San Francisco, CA 94104-2215
Tel No. (415) 617-6100

Attorneys for Plaintiff
S.J. Gargrave Syndicate at Lloyds



COPY

RECEIVED
APR 2 9 2005
BERMAN O'CONNOR
MANN & SHKLOV

FILED
DISTRICT COURT OF GUAM
APR 2 9 2005
MARY L.M. MORAN
CLERK OF COURT

IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| S.J. GARGRAVE SYNDICATE AT LLOYDS,<br><br>Plaintiff,<br><br>vs.<br><br>BLACK CONSTRUCTION CORPORATION, WINZLER & KELLY, and ENGINEERING MANAGEMENT & PLANNING SERVICES CORPORATION,<br><br>Defendants. | CIVIL CASE NO. CV03-00009<br><br>**PLAINTIFF'S OPPOSITION TO EMPSCO'S EMERGENCY MOTION FOR PROTECTIVE ORDER AND MOTION IN LIMINE RESTRICTING EXPERT'S TESTIMONY AT TRIAL; DECLARATION OF FORREST BOOTH; EXHIBITS A-H; DECLARATION OF SERVICE** |

## I.    INTRODUCTION

Pursuant to this Court's Order filed herein on April 26, 2005, Plaintiff S.J.

GARGRAVE SYNDICATE AT LLOYDS (hereinafter "Plaintiff") herewith files its Opposition

4836-3219-2768.1.055639-00001

EX. 2

deposition in California (in person or by telephone) on May 12, 2005, to which date and place the other two Defendants have readily agreed. Plaintiff's supplemental disclosure of Mr. Boone's opinions was not only appropriate, but was required. *See*, *infra*, section III. A. EMPSCO's Motion must be denied.

## III. DISCUSSION

### A. Plaintiff Had The Duty, As Well As The Right, To Supplement Its Expert Witness Disclosure To Make It Complete, And Timely Did So

EMPSCO's argument is based entirely on the mistaken premise that, because Federal Rule of Civil Procedure 26(a)(2)(B)[2] requires an initial disclosure of "a complete statement of all opinions to be expressed" by an expert, Mr. Boone cannot later supplement his report, such as to address facts obtained after Plaintiff's May 12, 2004, expert disclosure.[3]

EMPSCO has not read the entire Rule. Under Rule 26(e), Plaintiff had the *legal duty* to supplement its May 12, 2004, disclosure to take into account newly acquired information:

> "A party who has made a disclosure under subdivision (a) . . . *is under a duty to supplement or correct the disclosure . . . to include information thereafter acquired* if . . . (1) . . . the party learns that in some material respect the information disclosed is incomplete or incorrect . . . *With respect to testimony of an expert*

---

[2]  Hereinafter, textual references to "Rule" are to the specified Federal Rule of Civil Procedure.

[3]  EMPSCO's Motion neglects to mention the authority on which it must be based, Rule 37(c)(1). That Rule provides in pertinent part that "[a] party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) . . . is not, unless such failure is harmless, permitted to use as evidence . . . any witness or information not so disclosed," and/or may be subject to other sanctions. Fed. R. Civ. P. 37(c)(1). As discussed below, *Plaintiff has complied fully with its obligations under Rule 26(a) and 26(e)(1)*. However, it is appropriate to note that, even where a party has not complied, "[p]recluding testimony from the expert under this rule *is a drastic remedy* and should only be applied in cases where the party's conduct represents *flagrant bad faith and callous disregard of the federal rules*." *McNerney v. Archer Daniels Midland Co.*, 164 F.R.D. 584, 587 (W.D.N.Y. 1995) (emphasis added); *accord, Sullivan v. Glock, Inc.*, 175 F.R.D. 497, 504 (D. Md. 1997); *Reed v. Binder*, 165 F.R.D. 424, 431 (D.N.J. 1996). EMPSCO has not even attempted to make such a showing. Further, in *McNerney*, the court remedied the failure it found, not by precluding the expert's testimony, but by allowing the aggrieved party to depose the expert outside the discovery period. 164 F.R.D. at 587; *accord, Galentine v. Holland Am. Line*, 333 F.Supp.2d 991, 994-95 (W.D. Wash. 2004) and *Absolute Envtl. Serv. v. McKinley*, No. A03-0199CV, 2005 WL 820415, at *1 (D. Alaska Apr. 4, 2005) (both cases ruling that the remedy of a further deposition was appropriate, on similar facts). Of course, in this case Mr. Boone's deposition has not yet been taken. If, despite Plaintiff's thorough disclosures, EMPSCO believes it does not understand Mr. Boone's opinions, its remedy is clear; it can attend his deposition and ask questions.

4.

> *from whom a report is required under subdivision (a)(2)(B) the duty extends . . . to information contained in the report . . ."*

Fed. R. Civ. P. 26(e) (emphasis added).

> Subdivision (e) provides that a party is not under a ·continuing burden [to supplement] discovery responses] except as expressly provided ... An exception is ... [provided] as to expert trial witnesses in order to carry out the provisions of Rule 26(b)(4). *See Diversified Products Corp. v. Sports Center Co.,* 42 F.R.D. 3 (D.Md. 1967).

Advisory Committee Notes to the 1970 Amendment to Rule 26, Subdivision (e) – Supplementation of Responses.

All supplementation must be complete "by the time the party's disclosures under Rule 26(a)(3) are due." Fed. R. Civ. P. 26(e). Under both the default rule in Rule 26(a)(3) and Section 3.e. of the Court's June 11, 2003, Scheduling Order,[4] the cut-off date is therefore 30 days before trial, or **May 13, 2005**. Plaintiff more than met that deadline.

Plaintiff advised counsel for EMPSCO in detail of its theories against EMPSCO by letter dated April 19, 2005. See Exhibit A to the Booth Declaration. Plaintiff then made its supplemental expert disclosure on **April 22, 2005**, Booth Declaration, Exhibit C, more than three weeks before the cutoff, and as soon as practicable after acquiring and digesting new information concerning, *inter alia*, the role of EMPSCO in designing and approving the repairs to the F-1 Pier.

Plaintiff herein has clearly acted as required by Rule 26. That being said, some courts have engaged in a further analysis to ensure that technically timely supplements to an expert disclosure are not used as "ambush tactics." *See Tucker v. Ohtsu Tire & Rubber Co., Ltd.,* 49 F.Supp.2d 456, 461 (D. Md. 1999); *Potomac Elec. Power Co. v. Electric Motor Supply,*

---

[4]     This section of the original Scheduling Order has not been altered or modified by the subsequent amendments to the Scheduling Order.