KLEMM, BLAIR, STERLING & JOHNSON
A PROFESSIONAL CORPORATION
1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
AGANA, GUAM 96910
TELEPHONE 477-7857

By **THOMAS C. STERLING**

Attorneys for  *Defendant Black Construction Corporation*


FILED
DISTRICT COURT OF GUAM
OCT 28 2005
MARY L.M. MORAN
CLERK OF COURT

# IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| S.J. GARGRAVE SYNDICATE AT LLOYDS,<br><br>Plaintiff,<br><br>vs.<br><br>BLACK CONSTRUCTION CORPORATION and WINZLER & KELLY CONSULTING ENGINEERS and ENGINEERING, MANAGEMENT & PLANNING SERVICES CORPORATION,<br><br>Defendants. | CIVIL CASE NO. CV03-00009<br><br>**DEFENDANT BLACK CONSTRUCTION CORPORATION'S OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE TO PRECLUDE EVIDENCE, TESTIMONY, AND REFERENCES TO DEFENDANTS' EXPERTS' OPINION THAT THE 1996-97 REPAIRS TO THE PIER AND DOLPHINS WERE 1) TEMPORARY; OR 2) WERE DESIGNED TO BRING THE PIER BACK TO ONLY 40% OF ITS ORIGINAL STRENGTH** |

This Motion is yet another attempt by Plaintiff Gargrave to essentially litigate this case through Motions in Limine presenting selected facts and Gargrave's view of reality.

One of the primary issues in this case in connection with the design deficiency claim is whether this was a "band-aid" repair because that was all the Port could pay for or whether the designers in this case were obligated to prepare a design which would allow the dolphins to withstand earthquakes, typhoons, collisions with berthing vessels, and whatever else

the Port might have liked if it could have afforded to pay for it. (See, Black's Trial Brief filed herein on October 11, 2005, p. 8).

What the design parameters were which had to be met by EMPSCO and Winzler is one of the key issues to be litigated in this case. As indicated in Black's Trial Brief at pages 3-4, Lloyds of London stepped in and funded a repair of purported "earthquake damage" resulting from alleged design and construction deficiencies without any knowledge whatsoever of the design parameters which had been imposed by the Port in connection with the original design. The fact that Lloyds never knew what the original design parameters were at the time it undertook its repair is easily documented. In Mr. Boone's report, (Exhibit "B" to Gargrave's Motion), the sum total of his discussion of the design elements is contained in the first paragraph under the heading "Previous Repair History" at page 2. The report is silent as to the design parameters. Similarly, Mr. Frank Dennis, who designed the repair ultimately funded by Lloyds, was also oblivious as to the original design criteria. He was specifically questioned in his deposition as to what he was asked to do in connection with the repair and whether he was provided with any design parameters that he should meet. (See excerpts attached as Exhibit "A" hereto). At page 168, Mr.

Dennis clearly indicated in his discussions with Mr. Casey concerning the repair that:

He never indicated any design parameters.

The Defendants at trial are prepared to submit substantial evidence that the Port's design parameters were limited by its budget and were intended to be a temporary[1] repair only. Attached hereto as Exhibit "B" are excerpts from EMPSCO's Engineering Documentation Report which was prepared in connection with its dolphin repair design for the Port.[2] That document, which discusses the design parameters under which EMPSCO was operating, has several statements which support the proposition that this was a "temporary" repair. For example, on the first page of the Executive Summary (Bates stamped 0074):

> Due to the nature and urgency of the project, a complete structural analysis was not warranted and excluded from the scope of work.

Gargrave intends to argue to the jury that the complete structural analysis was required. Hence, their desire to exclude any evidence to the contrary.

It is further noted on the same page:

> It is recommended to further study and compare the cost feasibility between repair versus replacement.

---

[1] Discovery has indicated that the word "temporary" is a word that lawyers use but engineers have a hard time dealing with.

[2] This document should be included in Gargrave's Trial Exhibit Book since it was included as a document to be used on its initial Rule 26 Disclosures but the Exhibit Book has not yet been served and filed. Hence, an excerpt is being used here.

- 3 -

Thus, it was clearly contemplated that, in the future, the Port was going to have to determine whether to perform additional repairs or simply demolish and replace the dolphins. In Black's view, this looks like evidence that the repairs being implemented were "temporary". There is more. EMPSCO noted at Bates number 0087:

> Due to the nature of the damage and the urgency of effecting immediate repairs, the quantitative evaluation of the structural elements by performing structural analysis is not included in the scope of work of this contract.
>
> <u>It is anticipated that a detailed structural analysis will be considered in future studies</u> when a comparative cost analysis between repair versus replacement becomes an integral part of a future contract requirement. (Emphasis added)

There is clear evidence that this was a "temporary repair" only.

The Court may inquire as to where the 40% figure came from. Included as Exhibit "A" in Gargrave's Motion is the Scope of Work applicable to EMPSCO's contract. Under paragraph 3 on the first page entitled "Design Parameters", the first item listed is a Report on Damaged Structures prepared by Candac Limited. Attached hereto as Exhibit "C" is an excerpt from that report which indicates as follows:

> The main berthing dolphins, that is Dolphins C and D do have some residual structural capacity. This capacity is assessed to be 40% of the original design capacity.

The 40% figure is supported by a document referred to in the design parameters of EMPSCO's scope of work.

Moreover, in terms of the "temporary repair" issue, the Scope of Work applicable to EMPSCO in paragraph 4 included a Construction Cost Limitation which indicated as follows:

> The project shall be designed to permit construction of the repair and improvement of the facility within a construction contract price to be provided by the Government.

The evidence at trial will show that the original bid from Black for the entire scope of work was $2.1 million but that the Port could not afford to pay that amount. As such, the redesign was accomplished and the cost was lowered to $1.4 million for all of the work which the Port could afford to pay for. Lloyds, without any knowledge whatsoever of what had occurred in connection with the reduction in cost, paid almost $2 million simply to reconnect 107 pilings!

Finally, the fact that the Winzler & Kelly design was subject only to the "same standards of repair" as the original design is established by Joint Defense Exhibit D25, a memorandum from F. Philip Carbullido, Esq., the Port's legal counsel, dated March 20, 1996 (Exhibit "D" attached hereto) in which he indicates as follows:

> Specifically, we should request EMPSCO if Proposal "B" will meet the same standards of repair as the original design. Black's Proposal "B" will save the Port an additional $120,000. If EMPSCO as our consulting engineer advises us that Proposal "B" meets the same construction repair standards as the original design, then we should proceed and accept Proposal "B".

- 5 -

The design parameters (i.e. standard of repair) applicable to the 1996-1997 dolphin repair contract is a primary issue to be litigated in this case. Substantial evidence will be presented that the design parameters were limited by cost considerations. Such was well known by the Port, approved by the Port, and accepted by the Port. The fact that Gargrave was unaware of this at the time it paid $2 million to upgrade the facility is no basis upon which to exclude evidence pertaining to the actual design parameters.

The Motion in Limine should be denied.

**RESPECTFULLY SUBMITTED** this 28th day of October, 2005.

KLEMM, BLAIR, STERLING & JOHNSON
A PROFESSIONAL CORPORATION

BY: *[signature]*
THOMAS C. STERLING
*Attorneys for Defendant Black Construction Corporation*

**ATTACHMENTS: EXHIBITS "A" – "D"**

E62\27946-29
G:\WORD97\OFFICE\WORDDOC\PLD\TCS\263-DEF BCC'S OPP TO MTN IN LIMINE
TO EXCLUDE EVIDENCE, TESTIMONY ETC RE GARGRAVE V BLACK ET AL.DOC

```
 1                IN THE DISTRICT COURT OF GUAM
 2
 3    S.J. GARGRAVE SYNDICATE      CIVIL CASE NO. CV03-00009
      AT LLOYDS,
 4
                     Plaintiff,
 5
         vs.
 6
      BLACK CONSTRUCTION
 7    CORPORATION, WINZLER & KELLY,
      and ENGINEERING MANAGEMENT &
 8    PLANNING SERVICES CORPORATION,
 9                   Defendants.
10    ──────────────────────────────
11           DEPOSITION OF FRANK EDGERTON DENNIS
12
13            Taken on behalf of Plaintiff,
14        at the Law Offices of Carlsmith Ball LLP,
15              2200 American Savings Tower,
16         1001 Bishop Street, Honolulu, Hawaii,
17                commencing at 9:35 a.m.,
18    on Wednesday, July 21st, 2004, pursuant to Notice.
19
20
21
22       BEFORE:           HEDY COLEMAN, CSR  NO. 116
                           Notary Public, State of Hawaii
23                         Certified Shorthand Reporter
24
25
```

1  project with Mr. Casey since September 2002, before he left
2  Smithbridge?
3     A    No.
4     MR. BOOTH: Okay, I thank you. I think that's all the
5  questions I have at the moment. Now these gentleman get a
6  turn.
7     MR. STERLING: Do you want to go to first?
8     MR. STERLING: Maybe I could change places with you so
9  we're not across the room here and have to turn our backs.
10                        EXAMINATION
11 BY MR. STERLING:
12    Q    I wanted to go back to talking about when you
13 first got involved in this project. And you said you met
14 with Ben Casey when you first came to Guam within a couple
15 weeks after the 1993 earthquake. What specifically did he
16 ask you to do at that time?
17    A    He asked me to provide him with a proposal to
18 repair the pile-to-deck connection.
19    Q    Now, did he indicate to you at that time what the
20 design parameters were of that or, as you've told us
21 earlier, that he just said he wanted to repair and you
22 approached it in terms of what you felt good engineering
23 practice was going to be?
24    A    He never indicated any design parameters.
25    Q    You also said you met Peter MacLeod during that

1  trip for about an hour. We're talking about the
2  October 2001 trip?
3      A    It was a very brief meeting, right.
4      Q    During that meeting did Mr. MacLeod discuss design
5  parameters with you?
6      A    No.
7      Q    During that meeting did Mr. MacLeod discuss with
8  you various options that might be considered in the repair
9  of the dolphins?
10     A    No.
11     Q    So after that first trip to Guam, where you talked
12 to Mr. Casey and he asked for repair, and you spoke with
13 Mr. MacLeod and didn't speak with the design parameters, you
14 went back to New Zealand, and you started working up on your
15 proposal, which ultimately became what we call the temporary
16 repair, is that correct?
17     A    I had actually started working before I went to
18 Guam on that.
19     Q    That's where you reported in where one of your
20 reports to Mr. MacLeod that you were doing analysis of
21 mooring and berthing forces?
22     A    I believe so.
23     Q    Okay. All right. After you went back to New
24 Zealand and were continuing with that design, when was the
25 next time that you talked to Ben Casey about the design, to

1 the best of your recollection?

2 Q Well, let me try this a different way. It's
3 getting late in the day. I'm going to see if I can cut
4 right to the chase.

5 Did you ever talk to Ben Casey at any time about the
6 design parameters that you would follow in your repair design?

7

8 A I can't recall that I did.

9 Q Did you ever talk to Peter MacLeod at any time
10 about the design parameters that you were to use, meaning
11 he's telling you what type of parameters he wants?

12 A No, I don't recall that he did.

13 Q Did you ever have any meetings with any
14 representatives of Shell Guam where they talked about the
15 design parameters that they felt you should meet in
16 connection with your repair?

17 A I never met with them, no.

18 Q I'm going to go ahead and look at some of these
19 same reports that Forrest talked to you about, because I
20 think they'll speed up the process here, although he has
21 talked about a lot of things I wanted to.

22 Let's see if I can find the ones I want to talk about.
23 Okay, let's start with Exhibit 3, as soon as I find it.

24 All right. Let's look, if we could, please, at Exhibits
25 No. 3 and No. 5. These are two reports dated in December of



PORT AUTHORITY OF GUAM
GOVERNMENT OF GUAM
1026 CABRAS HIGHWAY
SUITE 201 PITI GUAM 96925

# ENGINEERING DOCUMENTATION REPORT

FOR

**REPAIRS AND UPGRADING TO FOXTROT "F-1" PIER**
**APRA HARBOR**           **GUAM, MI.**

SUBMITTED BY:

**EMPSCO–Engineering Consultants**

o   Suite 245 Julale Shopping Center
    Agana, Guam 96910

o   2nd Floor Island Commercial Building
    Gualo Rai Saipan MP 96950

0071

This report describes the proposed repairs and improvements to the existing facilities at Fuel Pier F-1 (Shell Pier) at Apra Harbor, Guam. These facilities consists of the concrete main wharf, breasting and mooring dolphins, catwalk structures and piling supports. The improvement of Pier F-1, included the upgrading of fender systems on the existing breasting dolphins and the design of cathodic protection system. Rehabilitation schemes are discussed in the report and prepared in the form of a contract documents and are provided with construction cost estimates.

Only a visual structural assessment of the facility was done. Due to the nature and the urgency of the project, a complete structural analysis was not warranted and excluded from the scope of work. Quality assurance and forensic applications of non-destructive testing and evaluation are also excluded.

The scope of work, in summary, requires the preparation of plans and specifications for the implementation of repairs and improvements to the facility. A similar work has been reported upon in a separate document entitled "Report on Damaged Structures F-1 Facility Guam" dated August 1992. This report was prepared by Candac Limited. In April 1995, a report entitled "Structural Assessment of the Foxtrot (F-1) Pier, Apra Harbor" was prepared by N.C. Macario and Associates, Inc., for the Port Authority of Guam.

Recommended repairs to the facility include removal and replacement of deteriorated concrete, re-construction of damaged steel piles, installation of new fender system to accommodate 150,000 DWT vessels, repair of catwalk structures and the design of cathodic protection system for the facility.

The total estimated cost of all repairs and improvements is $_____. This cost is based on a 35 percent completion stage of the contract documents.

It is recommended to further study and compare the cost feasibility between repair versus replacement.

The evaluation and recommendation for structural repairs addresses the structural components of the dock facilities. Due to the nature of the damage and the urgency of affecting immediate repairs, the quantitative evaluation of the structural elements by performing structural analysis is not included in the scope of work of this contract.

It is anticipated that a detailed structural analysis will be considered in future studies when a comparative cost analysis between repair versus replacement becomes an integral part of a future contract requirement.

# REPORT ON

# DAMAGED STRUCTURES

# F1 FACILITY

# GUAM

# For

# Shell Guam, Inc

# By

# Candac Limited

Candac Limited
Level 1, Building 3, Pymble Corporate Centre
20 Bridge Street, PYMBLE  NSW  2073

EXHIBIT "C"

during construction or that the concrete quality of at least the cracked units was inadequate.

The aggregate used for the concrete was a limestone type and hence is porous. This would seriously effect the long term durability of the structure.

## 2.5 Comparison of Repair vs Replacement of Structure

A full cost analysis comparing the costs of repairing the dolphins with the costs of replacement should be carried out. To achieve this a proposed repair procedure is outlined in appendix b.

## 2.6 Further Investigation

It is recommended that a quantitative assessment of the degree of carbonation of the concrete structures be performed.

This would involve the coring of the concrete at selected locations, both on top of the concrete structures and underneath the structures, to at least the depth of the reinforcement.

The degree of carbonation could be assessed using techniques to determine the pH of the concrete.

If carbonation had progressed in excess of 50% of the concrete cover, then serious consideration should be given to replacement. The effect of the degree of carbonation should be assessed by a person with expertise in this type of work.

## 3 ASSESSMENT OF CURRENT CAPACITY OF THE STRUCTURE

The main berthing dolphins, that is dolphins C and D do have some residual structural capacity. This capacity is assessed to be 40% of the original design capacity.

The assessment of the capacity is detailed in appendix a. The capacity determined assumes that no corrosion allowance was made in the original design, but a corrosion allowance cannot be assumed based on the available information.

The berthing forces on the dolphins are directly proportional to the berthing velocity of the vessel. This is because the fendering system is (as documented by the Dravo Van Houten report) of the air buffer type. These fenders are believed to be Yokohama 1800 x 2400 air buffers. At least one of these air buffers is broken. The broken air buffers are to be replaced if the structure is to be repaired.

The Dravo Van Houten report indicates that the entire berthing

LAW OFFICES
## CARBULLIDO, PIPES & BORDALLO
YOUNG'S PROFESSIONAL BUILDING, SUITE 100
788 NORTH MARINE DRIVE
UPPER TUMON, GUAM 96911

F. PHILIP CARBULLIDO
RICHARD A. PIPES
OLIVER W. BORDALLO

CYNTHIA V ECUBE
SANDRA D. LYNCH
SCOTT W. JOHANSEN
MELINDA T. ALCANTARA

# MEMORANDUM

**VIA FACSIMILE**
**477-2689**

**TO:** Mr. Simeon Delos Santos
Port Authority of Guam

**FROM:** F. Philip Carbullido, Esq.

**SUBJECT:** Repairs and Upgrading To Foxtrot "F-1" Pier

**DATE:** March 20, 1996

---

I have reviewed Black Construction's letter dated March 15, 1996 regarding its Proposal "A" and Proposal "B" for the above entitled repairs. I suggest you immediately send Black's proposal to EMPSCO for its review and recommendation. Specifically, we should request EMPSCO if Proposal "B" will meet the same standards of repair as the original design. Black's Proposal "B" will save the Port an additional $120,000.00. If EMPSCO, as our consulting engineer advises us that Proposal "B" meets the same construction repair standards as the original design, then we should proceed and accept Proposal "B".

If you have any questions regarding this matter, do not hesitate to contact me.

F. PHILIP CARBULLIDO

FPC:amh:PAG:Santos.01

**EXHIBIT "D"**