# ORIGINAL ●   ●

CARLSMITH BALL LLP

DAVID LEDGER
STEPHEN C. SMITH
ELYZE McDONALD
134 West Soledad Avenue
Bank of Hawaii Bldg., Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Tel No. (671) 472-6813

COZEN O'CONNOR

FORREST BOOTH
425 California Street, Suite 2400
San Francisco, CA 94104-2215
Tel No. (415) 617-6100

Attorneys for Plaintiff
S.J. Gargrave Syndicate at Lloyds

**FILED**
DISTRICT COURT OF GUAM
NOV - 1 2005 ᒐρ
**MARY L.M. MORAN**
**CLERK OF COURT**

## IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| S.J. GARGRAVE SYNDICATE AT LLOYDS,<br><br>Plaintiff,<br><br>vs.<br><br>BLACK CONSTRUCTION CORPORATION, WINZLER & KELLY, and ENGINEERING MANAGEMENT & PLANNING SERVICES CORPORATION,<br><br>Defendants. | CIVIL CASE NO. CV03-00009<br><br><br>**PLAINTIFF'S NOTICE OF PORTION OF DEPOSITION TRANSCRIPTS OF BRUCE SWANNEY MARKED WITHOUT COUNTER MARKINGS; DECLARATION OF SERVICE** |

Pursuant to Local Rule 32.1, Plaintiff hereby files the marked deposition transcript of Bruce Swanney indicating in margins the testimony it plans to offer.

4842-2484-3264.1.055639-00001

Pursuant to Stipulation between Counsel, the deposition transcripts is not counter marked. Defendants will submit their objections pertaining to the marked testimony.

DATED: Hagåtña, Guam, November 1, 2005.

CARLSMITH BALL LLP

_(signature)_

DAVID LEDGER
STEPHEN C. SMITH
ELYZE McDONALD
Attorneys for Plaintiff
S.J. Gargrave Syndicate at Lloyds

## DECLARATION OF SERVICE

I, Elyze McDonald, hereby declare under penalty of perjury of the laws of the United States, that on November 1, 2005, I caused to be served, via hand delivery, a true and correct copy of PLAINTIFF'S NOTICE OF PORTION OF DEPOSITION TRANSCRIPTS OF BRUCE SWANNEY MARKED WITHOUT COUNTER MARKINGS upon Defendants' Counsel of record as follows:

>Robert J. O'Connor, Esq.
>Daniel J. Berman, Esq.
>Berman O'Connor Mann & Shklov
>Suite 503, Bank of Guam Building
>111 Chalan Santo Papa
>Hagåtña, Guam 96910
>
>Thomas C. Sterling, Esq.
>Klemm Blair Sterling & Johnson, P.C.
>Suite 1008, Pacific News Building
>238 Archbishop Flores Street
>Hagåtña, Guam 96910

and

>Thomas M. Tarpley, Esq.
>Law Offices of Tarpley & Moroni, LLP
>Suite 402, Bank of Hawaii Building
>134 West Soledad Avenue
>Hagåtña, Guam 96910

Executed this 1st day of November 2005 at Hagåtña, Guam.

ELYZE McDONALD

3.

IN THE DISTRICT COURT OF GUAM

S.J. GARGRAVE SYNDICATE AT )
LLOYDS, )
     Plaintiff, )
      )
     v. ) Civil Case No. CV03-00009
      )
BLACK CONSTRUCTION CORPORATION, )
WINZLER & KELLY, and ENGINEERING )
MANAGEMENT & PLANNING SERVICES )
CORPORATION, )
      )
     Defendants. )
_____ )

VIDEOTAPED DEPOSITION OF BRUCE SWANNEY

Tempe, Arizona
March 25, 2004
9:45 a.m.

Prepared for:
FORREST BOOTH, ESQ.
(Certified Copy)

Reported by:
AMY MERRIFIELD, RPR
AZ CCR #50097
IL CSR #84-4027

**BROWN
& TOLEU ltd.**
Court Reporters

4500 S. Lakeshore Dr., Suite 280
Tempe, Arizona 85282

Telephone (602) 254-5479 or (480) 491-8500
FAX (602) 254-5013 or (480) 491-8506

1      A.     Would I go over them?

2      Q.     Yes.

3      A.     Okay.  If you could show them to me.

4              Do you want me to tell you what they were,

5 or --

6      Q.     Yes.  Tell me what they were.

7      A.     Okay.  We went over the Winzler & Kelly

8 file, the job file for the project.  He showed me the

9 complaint.  He showed me some question-and-answer

10 sessions, interrogatories, I believe, they're called.

11     Q.     Right.

12     A.     He showed me some depositions from -- by

13 two employees of Black Construction.  He showed me the

14 Ossel report.  There may be some more.  I can't recall

15 right now.

16     Q.     Okay.  Are you still employed by Winzler &

17 Kelly?

18     A.     No.

19     Q.     Okay.  Did you bring with you from your

20 employment at Winzler & Kelly any documents concerning

21 the job in Guam?

22     A.     Bring with me here today?

23     Q.     No.  To your -- with you when you left

24 Guam?

25     A.     No.

Q.   Okay.  When did you leave the employment of Winzler & Kelly?

A.   March 2002?  2001 or 2002.

Q.   It's one or the other?

A.   It's one or the other.

6    Q.   Okay.  Can you give me your educational

7    background, starting with high school?

8    A.   Yes.  I went to high school.  The name of

9    the high school was Terrarula College.  It's located in

10   the town of Pahiatua in New Zealand.  I was there from,

11   I believe, 1963 to 1967 -- maybe 1962 to 1967.

12   Somewhere in there.

13   Q.   Okay.  Did you go on to college or --

14   A.   Yes.

15   Q.   -- university after that?

16   A.   Yes, I did.

17   Q.   And where was that?

18   A.   I went to the University of Canterbury and

19   Christ Church, New Zealand, and I --

20   Q.   Did you graduate?

21   A.   I graduated, yes.

22   Q.   With what degree?

23   A.   Bachelor of Civil Engineering.

24   Q.   What year was that?

25   A.   1971.

1    Q.    All right.  Did you have any

2 specialization within civil engineering?

3    A.    I -- I opted for the -- the structural

4 courses that I -- all the structural courses I could.

5    Q.    Okay.  Do you hold any professional

6 licenses as an engineer?

7    A.    Yes, I do.

8    Q.    Can you tell me what those are?

9    A.    I'm a registered engineer in New Zealand,

10 although I do not hold a current annual practicing

11 certificate.

12    Q.    Let me ask you what that means.

13        Does that mean that it has lapsed in some

14 way?

15    A.    I could go back there and pay the money

16 and get one.

17    Q.    Okay.  So, in essence, you're inactive?

18    A.    Yes, I guess that's a fair statement.

19    Q.    Okay.  And when did you become registered

20 in New Zealand?

21    A.    1975 or '6.

22    Q.    Okay.  And when did that registration

23 lapse or become inactive?

24    A.    When I had left New Zealand, I -- I no

25 longer renewed it.  And that was in 1979.

1      Q.      Is that still active?

2      A.      Yes.

3      Q.      All right.  Anywhere else?

4      A.      No.

      Q.      Have you ever had any of your licenses or accreditations as an engineer suspended or withdrawn by the issuing agency?

      A.      No.

      Q.      Okay.

10      A.      I don't know.  You might -- I was licensed

11 in Guam.  I don't know if that's relevant.

12      Q.      Okay.  All right.  And did you allow that

13 to lapse?

14      A.      Yes.

15      Q.      Okay.  You allowed it to lapse as opposed

16 to it being withdrawn by the government in Guam?

17      A.      Correct.

18      Q.      Okay.  When was the Guam accreditation

19 issued?

20      A.      I think 1991 or '2, thereabouts.

21      Q.      Okay.  And when did that lapse?

22      A.      Well, I'm not -- I left Guam in September

23 '99.  Probably lapsed sometime in the year 2000.

24      Q.      Okay.  Did you let it lapse because you

25 didn't plan to go back and practice in Guam anymore?

1      A.     I'd applied for a job with Winzler &

2  Kelly.  They were advertising in the local newspaper.

3  And they contacted me and interviewed me and offered me

4  a job in Guam.

5      Q.     Were they offering -- were they

6  advertising specifically for a job in Guam?

7      A.     I don't think so.  I don't remember.

8  Possibly, now that I think about it.

9      Q.     So when did you begin employment with

10  Winzler & Kelly?

11      A.     December '89.

12      Q.     Okay.  Did you move directly to Guam at

13  that time?

14      A.     Yes.

15      Q.     Okay.  Were you ever employed by Winzler &

16  Kelly anywhere other than Guam?

17      A.     Yes.  I worked for them for -- after I had

18  left Guam, I worked in the Santa Rosa office.

19      Q.     Okay.  So you went to Guam December of

20  '89 and --

21      A.     Right.

22      Q.     -- when did you leave Guam?

23      A.     September '99.

24      Q.     Okay.  So almost ten years?

25      A.     Yeah.

Q.    Okay.  When you first were employed by Winzler & Kelly, what was your job title?

A.    Engineer.

Q.    Okay.  I think you said you got a license or a certification in Guam in about '91?

A.    Somewhere around there, yeah.

Q.    So about a year-and-a-half after you joined Winzler?

A.    Yes.  Yeah.

Q.    Okay.  Did your job title change at any time while you were employed in Guam by Winzler & Kelly?

A.    When -- when I -- I'm not sure if I was ever really assigned a proper job title, but it's what I chose to put on my business card, I suppose.

Q.    Okay.

A.    And when I got licensed, I was a structural engineer for them.

Q.    Okay.  During the time that you were a resident in Guam, did you ever work for any other company other than Winzler & Kelly?

A.    No.

Q.    Okay.  What types of projects did you work on while you were in Guam with Winzler & Kelly?

A.    What types?  It was very wide ranging.  I

1    Q.    Which hotel did you do an addition to?

2    A.    I think it was the Dieche, the -- they

3  built some more hotel rooms across the street, across

4  the other side of San Vitoria.

        Q.    Now, are you aware that this lawsuit

  primarily involves the dolphins at the Shell F-1 pier

  in Guam?

        A.    Yes.

        Q.    Okay.  Prior to the work you did for

  Winzler & Kelly on the Shell F-1 dolphins, did you ever

  work on the repair of dolphins consisting of piles

  driven into the sea bed and concrete caps?

        A.    On a different project?

        Q.    On a different project, right.

        A.    I don't think so.

16    Q.    Okay.  Did you ever work on any prior

17  projects involving earthquake damage to piers and

18  docks?

19    A.    After -- after the major earthquake in

20  '90, '93, we did -- we got -- had a contract for the

21  Navy doing inspection and documenting the extent of the

22  damage of most of their wharf structures.

23    Q.    That's at the Navy base in Guam?

24    A.    Yes.

25    Q.    Okay.  Were you also involved in the

1      A.      That's my recollection.

       Q.      Okay.  What did Mr. Miller tell you?

       A.      He told me that we'd been approached by
Shell Guam to do some fast-track work for them to
repair this facility.

       Q.      Can you tell me what you mean by
"fast-track work"?

       A.      Well, they -- the government of Guam was
in the process of developing a repair procedure for
the -- for the facility, but as is the nature with
government work, it's subject to a lot of intermediate
reviews and bureaucracy, and the project was not
proceeding as fast as Shell would have liked it to.  So
they approached Winzler & Kelly.

15     Q.      When you say "the project," is that repair

16 of the '93 earthquake damage?

17     A.      I'm not sure if all the damage was related

18 to the earthquake.  There may have been some

19 preexisting damage, just due to general deterioration.

20     Q.      Okay.  Well, when you said the project

21 wasn't proceeding as fast as they would have liked,

22 what was the project?

23     A.      The development of the rehabilitation

24 procedures.

25     Q.      Okay.

1      A.     The design of the rehabilitation

2 procedures.

Q.     Did you understand who was involved in the design of the rehabilitation procedures at that time?

A.     Who was -- who was involved -- I don't understand.  Who was doing the work for the government?

Q.     Who was doing the -- well, was it the government, or was it someone on the outside that was doing what you --

A.     It was a private engineering company under contract for the government.

Q.     Okay.  And who was that?

A.     EMPSCO.

Q.     Okay.  So were you aware at the time that Mr. Miller came and discussed the project with you that EMPSCO already had a contract to do a plan for some work on the dolphins?

A.     I didn't know until Mr. Miller told me.

Q.     But he did tell you?

A.     Uh-huh.

Q.     Okay.  What specifically did he tell you that Shell Guam had asked Winzler & Kelly to do?

A.     To develop a set of construction drawings for Shell to submit to the -- to submit to the Port Authority for the rehabilitation of the piers.

Q.     Okay.  Was it simply the dolphins at the F-1 facility, or was it more extensive than that?

A.     My impression was it was just the dolphins, but I can't be sure of that.

Q.     Did Mr. Miller give you any documents or any correspondence from Shell Guam telling what they wanted done?

A.     No, he didn't give me any documents.

Q.     Okay.  Did you work on any -- with anyone else in the Winzler & Kelly office on this project, or was it solely your project?

A.     Well, I had the arch -- some CAD guys working on it.

MR. BOOTH:  Okay.

MR. O'CONNOR:  Which project?

MR. BOOTH:  Pardon?

MR. O'CONNOR:  Which project?

MR. BOOTH:  Oh, that was his term.

THE WITNESS:  The project for Shell?

Q.     BY MR. BOOTH:  The work -- the work that Mr. Miller gave you to do --

A.     For Shell.

Q.     -- in connection with Shell's request, yes.

A.     Okay.  Well, we ended up using our

engineers in our San Francisco office to do some of the work.

Q.    Was that because the Shell Guam office -- the Winzler & Kelly Guam office was very busy as a result of the earthquake?

A.    There was that issue, plus the San Francisco office had some senior engineers who had experience in this type of analysis.

Q.    Okay.

A.    They had the computer programs; we didn't.

Q.    Okay.  You said the San Francisco office. Do you mean the Santa Rosa office, or is --

A.    San Francisco.

Q.    -- there a San Francisco office --

A.    They have a San Francisco office, as well.

Q.    Okay.  Did Mr. Miller provide you with any drawings that had been prepared by EMPSCO?

A.    No.

Q.    Did he provide you with any information of the layout of the dolphins at F-1?

A.    Mr. Miller?  No.  No.

Q.    Okay.  Did he tell you that you needed to go out and get that information for yourself?

A.    He had arranged for a meeting with Shell Guam, for me to meet with chair chief engineer.

1      Q.      Did you go out and look at it after the

2  meeting?

3      A.      Yes.

4      Q.      Did you go with Mr. Dean or Marilou?

5      A.      I think I went with Marilou.

6      Q.      Was that part of the same meeting when you

7  first met with Doug Dean, or did that happen later?

8      A.      No, it happened later.  It was later.

9      Q.      Okay.  What did the Shell Guam engineers

10  tell you they wanted to have done?

11      A.      They wanted the pier structures

12  rehabilitated to the original condition.

13      Q.      Did they describe to you what condition

14  the dolphins were in at that time when you first met

15  with the Shell Guam engineers?

16      A.      Could you repeat that again?

17      Q.      When you first had your meeting with Doug

18  Dean and Marilou --

19      A.      Yeah.

20      Q.      -- Shell Guam engineers, did they tell you

21  what condition the dolphins were in?

22      A.      They told me they were damaged and in poor

23  shape.

24      Q.      Okay.  Did they describe what the damage

25  was?

1        A.      Only in general terms.

2        Q.      Did they show you any photographs?

3        A.      I don't remember.

4        Q.      Okay.  About how long did this meeting

5   take place?  Just rough estimate.  I mean, is it a

6   ten-minute meeting or a two-hour meeting?

7        A.      Probably around an hour.

8               MR. BOOTH:  Okay.

9               MR. O'CONNOR:  When you get off that

10  meeting, Mr. Booth, could we take a break?  It's been

11  an hour.

12              MR. BOOTH:  Yeah.

13              Okay.  Good time to take a break.

14              THE VIDEOGRAPHER:  We're going off the

15  record.  The time is approximately 10:41 a.m.

16              (A recess was taken from 10:41 a.m.

17  to 10:48 a.m.)

18              THE VIDEOGRAPHER:  We're back on the

19  record to continue the videotaped deposition of Bruce

20  Swanney.  The time is approximately 10:48 a.m.

21        Q.      BY MR. BOOTH:  Mr. Swanney, we were

22  talking about the meeting you had with Doug Dean and

23  Marilou at Shell Guam.  Did they give you specific

24  instructions at that meeting as to what they wanted you

25  and Winzler & Kelly to do?

A.    How -- how do you mean specific?

Q.    Well, was it --

A.    They wanted -- they asked us to produce documents, construction drawings.

Q.    Okay.  To produce a design of how work could be done on the dolphins?

A.    Yes.

Q.    Okay.  Were you given access to work that EMPSCO had done in connection with design work on the dolphins?

A.    I think we had a copy of at least parts of their drawings, if not the whole set, but -- their work wasn't complete still at this point.  So the information we had from them was preliminary.

Q.    Okay.  EMPSCO had a contract with the Port to do the design work, right?

A.    Yeah.

Q.    Had the work that EMPSCO had done so far been produced to Shell Guam or given to Shell Guam?

A.    I don't think.

MR. O'CONNOR:  Objection, foundation.

THE WITNESS:  Yeah, I don't --

Q.    BY MR. BOOTH:  Okay.  Well, you said EMPSCO's design work was not complete.  How did you know that?

A. Well, if it was complete, they wouldn't -- they wouldn't have been asking us to do it.

Q. So you concluded that their work was not complete?

A. Yes.

Q. Okay. Were you aware that Winzler & Kelly had bid on the contract which EMPSCO ultimately got?

A. No, I was not.

Q. Okay. Were you made aware of that at any time?

A. No.

Q. Did you do any of the design -- I guess you didn't do any design work then on the proposal that Winzler & Kelly made that ultimately resulted in an unsuccessful bid to the Port?

A. Sorry, what was that again?

Q. Okay. I don't want to use the wrong terms here, and maybe you -- maybe my terminology is hanging you up here.

Various design entities, including Winzler & Kelly and EMPSCO, made proposals, bids, or whatever --

A. Proposals.

Q. -- the proper term is -- proposals to the Port.

1        Q.      Okay.  And so you understood it to be
2   outside of the design work that EMPSCO had been hired
3   by the Port to do?

4        A.      Yes.

5        Q.      Okay.

6        A.      How do you mean "outside"?

7        Q.      Well, EMPSCO had already been hired to do
8   design and engineering work concerning repair of the
9   dolphins, right?

10       A.      Right.

11       Q.      Okay.  And you were being hired to do
12  design work concerning repair of the dolphins?

13       A.      Uh-huh.

         Q.      Okay.  How was your work to integrate with
    what EMPSCO was going to do?

         A.      Oh, I think there were two different --
    two different entities.  Shell's interest, as I
    understood it, was to hurry the process along, the
    Government of Guam procedures were slowing them down,
    and they were getting frustrated.

         Q.      Okay.  But you understood at the time that
    you had your meeting with Doug Dean that you were being
    asked to look at engineering for the dolphins, which
    was an issue that EMPSCO was also looking at, right?

         A.      Yes.  Yes.

Q.    Okay.  Were you made aware at that first meeting of what EMPSCO's proposal was for repair of the dolphins and pilings?

A.    I don't remember.

Q.    Okay.  Were you made aware of any desire on the part of Shell Guam or the Port to reduce the cost of the repair of the dolphins?

A.    No.

MR. O'CONNOR:  You're talking about at this meeting?

MR. BOOTH:  Yeah, at the meeting.

Q.    BY MR. BOOTH:  Did the Port ever pursue an appeal to the Department of Public Works against the retention of Winzler & Kelly by Shell Guam?

A.    I don't know.  Did the Port?

Q.    Yes.

A.    I don't know.

Q.    Okay.  Did you ever go to any hearings at the Appeals Board of the Department of Public Works while you were in Guam?

A.    I went to some appeal board meetings, yes.

Q.    Okay.  Did any of them have to do with the retention of Winzler & Kelly on the repair of the dolphins?

A.    No.

1    Q.    What was the first thing you did after the

2    meeting with Mr. Dean concerning the repair of the

3    dolphins?

4    A.    I don't remember.

     Q.    Were you the engineer at Winzler & Kelly

     Guam that was in overall charge of the work you were

     doing -- Winzler & Kelly was doing for Shell Guam on

     the dolphins?

     A.    I was -- I was the Guam engineer.  The

     actual engineering work was done at San Francisco.

     Q.    Okay.  Who was it done by in

     San Francisco?

     A.    Larry Lewis.

     Q.    Larry Lewis?

     A.    Yes.

     Q.    Okay.  And he's in the San Francisco

     office, as opposed to the Santa Rosa office?

     A.    Yes.

19   Q.    Okay.  Is he still with Winzler & Kelly?

20   A.    I don't know.

21   Q.    Okay.  When you say the actual design

22   work, are you referring to the drawing, VE-1?

23   A.    No.

24   Q.    Okay.  What was the design work?

25   A.    It was the development of -- what was --

All right. So is it fair to call what came out of the meeting with Mr. Dean and Marilou the Shell project?

A.    Yes.

Q.    Okay. That's one project. What other projects were there?

A.    The second project was the work we did for Black Construction.

Q.    Okay. So let's be specific. What was the Shell project?

A.    The Shell project was a rehabilitation project for the -- for the piles and piers.

Q.    The piles and pierce?

A.    Piles. Piles, as I recall. I'm not sure what you mean by the piers. I mean, the whole thing is pier F-1.

Q.    Well, let's be specific here.

A.    Okay.

Q.    I'm going to show you what we marked the day before yesterday as Exhibit 7 -- or 8, I think. 8.

A.    Okay.

Q.    Exhibit 8, which is a representation of the Shell facility in Guam. And our prior testimony has been that dolphins A and B are referred to as the mooring dolphins?

```
 1        A.      Right.

 2        Q.      Dolphins C, D, E, and F are the breasting

 3   dolphins --

 4        A.      C, D, G, and H.

 5        Q.      I'm sorry, I can't read upside down.  C,

 6   D, G, and H, right, are the breasting dolphins?

 7        A.      Right.

 8        Q.      And what's labeled on Exhibit 8 as the

 9   main wharf is also referred to by a lot of people as

10   the pier.

11        A.      All right.

12        Q.      And the stand-alone structures supported

13   by piles into the sea bed, dolphins A and B, C and D,

14   are referred to as the dolphins?

15        A.      And they're all supported on piles.

16        Q.      Okay.  So --

17                MR. O'CONNOR:  G and H are dolphins, too,

18   aren't they?

19                THE WITNESS:  Yeah.  He's got that.

20        Q.      BY MR. BOOTH:  Uh-huh.  They're here, too,

21   right.

                  Okay.  So going back to what you described

     as the Shell project or the first project, that project

     specifically had to do only with piles; is that right?

          A.      The -- yes, as I recall.
```

1    contractors and bid this job to see how much it would

2    cost?

         A.    No.  No, it had -- never had made it that

far.

         Q.    Why did it not make it that far?

         A.    As I understand it, it was submitted by

Shell to the Port Authority of Guam, and it was

rejected.

         Q.    Okay.  Rejected by the Port?

         A.    Yes.

         Q.    Okay.  Do you know why it was rejected?

         A.    No.

         Q.    Did you hear that the rejection had to do

with the proposed cost?

         A.    No, I --

         Q.    Okay.  In what you called the Shell

project, did you -- was Winzler & Kelly working by

itself on this project or in conjunction with another

designer?

         A.    We were by ourself, yes.

         Q.    Did anyone other than you in the Shell

Guam office work on this project?

23       A.    The Shell project?

24       Q.    Yes.

25       A.    Mr. Miller, to some extent.  And I may

1   may have to fly things in.

2       Q.    Okay.  What was your next involvement

3   after you were told that your proposal for the Shell

4   project was not going to be built with the dolphins at

5   F-1?

6       A.    That would be the work we did for Black

7   Construction.

8       Q.    I'd like you to look at what's been marked

9   as Exhibit C, Mr. Swanney, and just ask you if you

10   recall having seen that before?

11       A.    Yes.  I recognize this first paragraph.

12   Yes, I've seen this before.

13       Q.    Okay.  Do you know whether you received

14   that during the Shell project or later?

15       A.    Later, yeah.

16       Q.    You think later?

17       A.    Yes, after this case got underway.

18       Q.    Okay.  So you had -- you did not see it

19   while you were an employee of Winzler & Kelly working

20   in Guam?

21       A.    I don't think so.

22       Q.    Okay.  All right.  Let's move on to the

23   second project that you described, which you described

24   as the work you did for Black Construction.

25       Is that a fair way to describe it?

A.     Yes.

Q.     Okay.  What was the origin of that work?

A.     I don't remember how the initial contact
was made, how -- how it all started.  I don't remember
if Black called us.  That's probably what happened.

Q.     Do you recall a situation similar to what
you described on the Shell project where Mr. Miller
came to you and said:  We've been asked by Black to do
some work?

A.     I don't recall that, no.

Q.     Okay.  Do you recall anyone at Black
Construction coming to you directly and saying:  We'd
like to retain Winzler & Kelly to do something for us?

A.     I don't recall if they did or not.

Q.     At about the time that you began -- that
Winzler & Kelly began working for Black Construction on
the F-1 project, were they working -- was Winzler &
Kelly working with Black on other projects?

A.     I don't -- we had done work for Black.  I
don't know if there were any ongoing at that time or
not.

Q.     Okay.  What was the first thing you
personally remember doing for Black Construction on the
F-1 dolphins?

A.     Meeting with Mr. Tavillas.

Q.    Who is he?

A.    He's the estimator for Black Construction.

Q.    Was that at his office?

A.    Yes.

Q.    Okay.  Do you recall whoever else might have been present at that meeting?

A.    I don't think anyone was.

Q.    Okay.  What did Mr. Tavillas tell you?

A.    That they were -- had either been awarded the construction contract for Pier F-1, or they were apparent low bidder, I'm not quite sure which. However, the proposed contract amount is higher than the Port Authority's budget, and that the Port Authority had requested them to investigate ways of reducing the construction cost.

Q.    You said he told you that Black had either been awarded the contract or was the apparent low bidder --

A.    Right.

Q.    -- is that right?

Okay.  But regardless of whether they had actually received the contract or not, the Port was still interested in trying to reduce the cost; is that right?

A.    Yes.  Yes.

1     Q.    Okay.  Did you see a copy of the contract

2    that Black had with the Port?

3     A.    No.

4     Q.    Did you see it at any time?

5     A.    No, I don't think so.

6     Q.    Okay.  Did Mr. Tavillas tell you that he

7    was asking Winzler & Kelly to help reduce the cost of

8    just the work on the piles under the dolphins, or was

9    it more general than that?

10     A.    Just the work on the piles.

11     Q.    Did he give you an indication of what the

12    cost that Black had bid for just the work on the piles

13    had been?

14     A.    No.  And no.  I don't recall us discussing

15    any of the numbers.

16     Q.    Okay.  Did he describe to you the design

17    that the Black proposal was based upon, or the Black

18    contract was based upon?

19     A.    The EMPSCO design is what it was based on.

20     Q.    It was based on the EMPSCO design?

21     A.    Yeah.

22     Q.    Okay.  So it was concrete encapsulated

23    piles with reinforcing rod coming down from the caps,

24    right?

25     A.    Yes.

Q.      Okay.  Did he give you any indication of
how he would like you to approach the question of
reducing the cost of working on the piles?

A.      Yes.  One of the -- one of the constraints
on the project had been removed by the Port, I guess,
and the constraint that -- we were working on and
EMPSCO was working on the work for Shell was that there
was to be no underwater welding, no hot work near the
fuel pier.  Shell Oil didn't want it.  That requirement
had -- had gone away.  And so the option of splicing in
a new length of steel pile rather than encapsulating
the old one was now acceptable to the Port and to
Shell.

Q.      Your understanding is that the no hot work
on the fuel pier was an objection that Shell had
raised, right?

A.      I think so, yes.

Q.      Okay.  Because of the potential of fire or
explosion, right?

A.      Yeah.

Q.      Okay.  Is that something you discussed
with Shell when you were doing the Shell project?

A.      No.

Q.      Okay.  Were you made aware that -- when
you were working on the proposal for Shell, that there

1  was a requirement of no welding on the piers?

2       A.    Yes.

       Q.    Okay.  So if my understanding is correct,

the removal of that prohibition on welding opened up

other possibilities of how you could approach this

project from a design standpoint; is that right?

       A.    Correct, yeah.

       Q.    Okay.  Other than telling you that no hot

work embargo had been lifted, did Mr. Tavillas give you

any other guidelines or suggestion about how you might

go about reducing the cost?

       A.    We -- I don't recall specifically, no.

       Q.    Did you talk with him specifically about

whether the concept of concrete encapsulation would be

retained, or if you would go a different route?

       A.    We -- we -- we were focusing pretty much

on the option of splicing in a new length of steel

pile.  It was -- it was his opinion that that could be

done a lot cheaper than the concrete encapsulation.

       Q.    Okay.  Was the idea of splicing in new

pile his idea, or a Black idea I should say, or a

Winzler & Kelly idea?

       A.    I don't really recall.  I think it was a

Black idea.

25     Q.    Okay.  And the drawing that you have in

1    front of you, Exhibit 17, utilizes that concept of

2    splicing the existing piles at a depth of four feet

3    below mean low or low water, right?

4        A.    Yes.

5        Q.    Okay.  Was it your thought to use that

6    technique basically from your first discussion with

7    Mr. Tavillas --

8        A.    Yes.

9        Q.    -- or did you explore any other

10   possibilities?

11       A.    No, we didn't explore any other

12   possibilities.

13       Q.    Okay.  From your first discussion with

14   Mr. Tavillas, was it your proposal to you -- to put a

15   flange or collar around the top of each pile and use

16   bolts up into the concrete cap?

17       A.    I don't know where that idea originated

18   from.

     Q.    At the early stages of your discussion

with Black, did you discuss any other possible ways of

affixing the piles to the caps?

     A.    No.

     Q.    Did you have multiple meetings with Mr.

Tavillas to flesh out and develop this design?

     A.    I had more than one meeting with him.  And

we were in contact by telephone and fax with what --
what -- what our thoughts were and what I had uncovered
at his request.

Q.    Did you have further face-to-face meetings
with him?

A.    I had more than one.  I don't know if I
had a whole series.

Q.    Okay.  Is there anyone else from Black
that was involved in the process other than
Mr. Tavillas?

A.    Yeah, Mr. Gutierrez and Mr. Bismonte.

Q.    What was Mr. Gutierrez' position, if you
know?

A.    He -- I believe he was the Black employee,
like the project manager or -- I'm not sure what they'd
want to call him.

Q.    You understood him to basically have the
project manager position?

A.    Yes.

Q.    Project manager --

A.    For Black.

Q.    For Black for the Shell F-1 pier project?

A.    Yes.

Q.    Okay.  How about Mr. Bismonte?  What was
his --

A.    I'm not sure what his title was.

Q.    Okay.  Is Mr. Gutierrez an engineer, to your knowledge?

A.    He's not a licensed engineer.

Q.    Okay.  Do you know if he had engineering training?

A.    I believe he did.  I think I saw that in his deposition.

Q.    Okay.  How about Mr. Bismonte, is he an engineer?

A.    Not a licensed engineer.

Q.    Did he appear to have engineering training?

A.    I'm not aware of any.

Q.    Okay.  How about Mr. Tavillas, was he a licensed engineer?

A.    No.

Q.    Did he have engineering training?

A.    Yes, I believe he had.

Q.    Okay.  Whose decision was it to produce the drawing which is Exhibit 17?

A.    Whose decision was it?

Q.    Uh-huh.

A.    We entered into a contract with Black Construction to produce it.

Q.      Okay.  So your understanding is that a drawing or some drawings were required by the contract you entered into?

A.      Our proposal to Black means that we'll produce a drawing.

Q.      Okay.  And the drawing would encompass your design proposal or how to repair the piles, correct?

A.      Yes.

Q.      Okay.  Was there more than one drawing similar to Exhibit 17 produced for Black?

A.      No.

Q.      This is the drawing that satisfied your contractual obligation to Black, right?

A.      Yes.

MR. BOOTH:  Okay.  Let's change the tape.

THE VIDEOGRAPHER:  We're going off the record.  The time is approximately 11:42 a.m.  This is the end of video cassette number 1 in the deposition of Bruce Swanney.

(A recess was taken from 11:42 a.m. to 11:53 a.m.)

THE VIDEOGRAPHER:  We're back on the record to continue the videotaped deposition of Bruce Swanney.  The time is approximately 11:53 a.m.  This is

1    the beginning of video cassette number 2.

Q.    BY MR. BOOTH:  Mr. Swanney, were any of
the other offices of Winzler & Kelly consulted in the
preparation of the drawing which is marked as
Exhibit  17?

A.    No -- I'm sorry.  I probably had some
discussion with Larry Lewis.

Q.    But was this produced in Guam?

A.    Yes.

Q.    Okay.  More or less in the center of the
bottom of the drawing, there's a stamp with your name
on it.  Is that your official registered Guam engineer
stamp?

A.    Yes, it is.

Q.    And is that your signature --

A.    Yes, it is.

Q.    -- through the stamp?

Is there a date when that drawing was
stamped and signed?

A.    No, there's not.  There's a date over
here.

Q.    Was it your custom and practice to stamp
your drawings, more or less about the date they were
produced?

A.    Yes.

Q.      Okay.   So, presumably, this was early
April of 1996?

A.      Yes.

Q.      Okay.   And just before the break, I think
you indicated that this was the only drawing that was
produced as part of this project for Black; is that
right?

A.      Yes.   That's the only drawing that we
produced.

10      Q.      Okay.   Did Black or anyone else produce

11  other drawings at the same time?

12      A.      No.

13      Q.      Okay.   When you answer that it was the

14  only drawing that we produced, that makes me think

15  there must be some drawing --

16      A.      No, the other drawing --

17      Q.      -- someone else produced.

18      A.      -- the EMPSCO, the original EMPSCO

19  drawings that -- to accompany this one.

20      Q.      Okay.   We'll look at those in a minute.

21              To your knowledge, was there ever an

22  addition of this drawing, Exhibit 17, that was stamped

23  as built?

24      A.      No.

25      Q.      Was there ever a preliminary version of

1    Exhibit 17 that said "proposal" or "draft," or

2    something like that?

3         A.    That was submitted to someone, or --

4         Q.    Yes.

5         A.    I mean, there was preliminary additions of

6    this as part of the normal design process, but...

7         Q.    I understand that, but I'm talking about

8    out -- that went outside of Winzler & Kelly.

9         A.    Not that I recall.

10        Q.    Okay.  Was there ever a preliminary

11   version of drawing 17 that was stamped with something

12   like "not for construction" or "for discussion only"?

13        A.    Not that I recall.

14        Q.    Okay.  At the time you produced

15   Exhibit 17, did you have a set of the EMPSCO drawings

16   available?

17        A.    I had at least the parts that we needed.

18   I'm not sure if I had a full set.  I had at least parts

19   of them.

20        Q.    Okay.  And you say what you needed.  Does

21   that mean you had the ones that pertain to the piles?

22        A.    Yes.

23        Q.    Okay.  There is no indication on

24   Exhibit 17 that any pile is to be treated differently

25   than any other pile.  Is that a fair description of the

design that is represented by Exhibit 17, namely, that this method of attaching pile to cap would be used on each of the piles?

A.    Yes, it is.

Q.    And each of the piles would be cut off four feet below mean low or low water and a splice put in to attach the new tube to the old pile?

A.    That was our intent, yes.

Q.    Okay.  And a flange would be produced -- manufactured for the top of each pile that had six holes for bolts through it?

A.    Yes.

Q.    Okay.  So there's no separate plan for certain piles and different plan for others, it was the same treatment for each, right?

A.    Correct.

Q.    Okay.  How long did it take Winzler & Kelly to produce the drawing which is Exhibit 17?

A.    Do you mean to draft it or from the time we were engaged by Black to the time it was issued?

Q.    The latter.  From the time you were engaged by Black until this drawing was produced and delivered to Black.

A.    I don't remember.

Q.    Would it -- would it be a matter of

1    A.    I'm not sure if I had this complete set.

2  It's been a long time since I've seen them.  But I

3  certainly had at least parts of them.

4         Does that answer your question?

5    Q.    Well, my question is:  Does this appear to

6  have more drawings than what you had available to you?

7    A.    I think so, yes.

8    Q.    Okay.  Are there some of these drawings

9  that do not pertain to the dolphins?

10   A.    I don't know.  I mean, there are some of

11  these drawings that I wouldn't -- I wouldn't need

12  anyway.  I wouldn't need this sheet.

13   Q.    Okay.  So your recollection is you had

14  whatever drawings EMPSCO had that pertained to the

15  dolphins that were going to be worked on?

16         MR. O'CONNOR:  Objection, no foundation.

17  He doesn't know what EMPSCO had.

18   Q.    BY MR. BOOTH:  Did you ever ask EMPSCO for

19  any drawings that they did not provide to you?

20   A.    No.  No.

21   Q.    Did you ever ask Black for any drawings

22  that they did not provide to you?

23   A.    No.

24   Q.    Okay.  Did you ever get the feeling that

25  there must be other drawings out there that you wish

you had but you didn't have?

    A.      No.

    Q.      Okay.  So you had what information --

    A.      I had the information I needed.

    Q.      -- that you needed.

          Okay.  And was the -- was all the
information that you received provided to you by Black?

    A.      Yes, I believe so.

    Q.      Okay.  You didn't -- you don't recall any
instance where you went directly to EMPSCO to ask for
something?

    A.      No.  I never went to EMPSCO.

    Q.      Okay.  Did you ever have any meetings with
EMPSCO at all?

    A.      No.

          (Exhibit No. 19 was marked for purposes of
identification.)

    Q.      BY MR. BOOTH:  Okay.  I marked a letter as
Exhibit 19.  I will hand that to you, Mr. Swanney.
This is a letter from Mr. Bismonte at Black to N.C.
Macario and Associates, August 5th of '96.

          Black says, "We are submitting for
record/file attached drawings for the non-typical cases
of pile top plates."

          Do you recall seeing some drawings of

1   No. 18s refers to section 1 and -- of the old drawing,

2   and sections 2 and 4 of the old drawing are covered by

3   the upper one --

4           A.      Yes.

5           Q.        -- submittal 18, right?

6           A.      Yeah.

        Q.      All right.  Do you know if any

calculations were done by anybody at Winzler & Kelly

before the drawing which is Exhibit 17 was produced?

        A.      There were some very simple calculations

done.  There were no formal calculations done.

        Q.      Okay.  And by "simple calculations," do

you mean what engineers sometimes call hand

calculations as opposed to a computer run?

        A.      No.  I mean a quick scribble on a piece of

paper rather than something on a calculation sheet or

something that's bound and submitted.

        Q.      Okay.  At any time after they received the

drawing which is Exhibit 17, did Black advise you that

they were going to utilize this design in the actual

construction on the dolphins?

        A.      I don't think they called me up and told

me.  I somehow found out.  I'm not quite sure how.

        Q.      Okay.  Did you find out when you went down

at the request of Pro Marine, or did you --

A.     I think I'd known before that.  I knew the work was underway.

Q.     Okay.  After you found out that the work was underway utilizing the design that you produced for Black, did you advise Black that you had not done any formal computer calculations to support the design?

MR. O'CONNOR:  Objection.  He didn't say that he knew it was underway.  He said he thinks he found out, so he's not sure.

MR. BOOTH:  He said at some point he found out.

MR. O'CONNOR:  He said, "I think I found out."

MR. BOOTH:  Well, let me ask that.

Q.     BY MR. BOOTH:  At some point you found out that your design, which is incorporated into Exhibit 17, was actually used by Black, right?

A.     Yeah.

Q.     And it might have been when you went down at the request of Pro Marine, or it might have been some other --

A.     I think it was before that.

Q.     Before that.  Okay.  So you -- you knew that the work was going on based on the design that you produced?

A.    Yes.

Q.    Okay.  At any time after you learned that they were actually using your design, did you advise them that you had not done a full spread of computer calculations to support the design?

A.    No, I didn't.

Q.    Okay.  In producing the drawing which is Exhibit  17, what shear forces did you anticipate that the bolts would see?

A.    The shear forces on the bolts?

Q.    Uh-huh.

A.    The shear forces are very low, if not insignificant.

Q.    Okay.  Did you think they were insignificant and disregard them?

A.    I wouldn't say I disregarded them, but I knew they would not be the governing -- the force that governed the design of the connection.

Q.    Okay.  What was the force that would govern this design?

A.    The tension force.

Q.    Okay.  The tension force is the attempt to pull out or raise the cap relative to the pile, and, therefor, pull the bolts out of the cap, right?

A.    Yes.

Q.      Okay.  Whereas a compression load would be the cap pushing down on the pile?

A.      Right.

Q.      And I take it that the compression forces were not terribly significant either because the pile is -- the weight of the concrete is always pressing down on the pile, right?

A.      The compression forces are very significant design of the piles.  They weren't very significant in the design of the attachment --

Q.      Because of the connection?

A.      Right.

Q.      Sorry.

A.      Yeah.

Q.      That was my question.  There were not of great concern with regard to the connection between the pile and the cap?

A.      Right.  Right.

Q.      Okay.  What forces did you anticipate that the bolts would see in tension as you were putting together the design which is Exhibit 17?

A.      We used the project design criteria, which -- of which the uniform building code was part of, and the soils report.

Q.      And were the project design criteria

something that were produced originally by EMPSCO?

    A.      Yes.  They're noted on EMPSCO's drawings.

    Q.      All right.  Did you examine those criteria to see whether they seemed to be appropriate?

    A.      Not specifically for that purpose.  I -- they -- it was the uniform building code, which was the current code in Guam, and it was the soils report specific to the site.  I had no reason to believe they wouldn't be appropriate.

    Q.      Okay.  I guess my question was a little different.  My question is:  Did you simply accept them, or did you review them in the process of putting together Exhibit 17 to see whether you agreed that they were appropriate?

    A.      We had -- we were a little bit of a fortunate position in that we had done the work for Shell previously, and the design parameters -- the design capacity of the -- of the pile, the tension force, as stated in the soils report, we were able -- we knew the original design of the pier was designed to do that through that parameter.  We had a very strong indication that that was the case.

    Q.      When you say "the original design," you mean when it was originally built?

    A.      Yes.

1    Q.    Okay.  What was your understanding when

2  these dolphins were originally built?

3    A.    What was --

4    Q.    When were they originally built?

5    A.    When do I think they were --

6    Q.    Uh-huh.

7    A.    I believe it was sometime in the '60s.

8    Q.    Okay.  So they were something like 25 to

9  30 years old at the time you were doing the work?

10    A.    Yes.

11    Q.    Okay.  With regard to designing this

   project for earthquake resistance, you said you

   referred to the Guam building code?

14    A.    Yes.

15    Q.    What building -- what earthquake zone was

16  Guam in in the time frame you were looking at it, 1994,

17  '95?

18    A.    It was in the UBC zone -- zone 3.

19    Q.    Okay.  I understand that's been changed

20  recently, right?  It's now a 4?

21    A.    Yes.

22    Q.    And do you know when the change took

23  place?

24    A.    I think it was right around the time of

25  this project.

Q.      Was -- in fact, it was created -- it was
caused in large part by the '93 earthquake, wasn't it?

A.      Yeah.  Yes.  Oh, absolutely.

Q.      Okay.  Did you, in putting together your
design which is Exhibit 17, did you do any even rough
calculations as to the forces that the dolphins would
see when a tanker of a given size came in to dock?

A.      No, I did not.

9    Q.      Okay.  And do you know if anyone else at
10   Winzler & Kelly did?

11   A.      Not as part of this project.

12   Q.      Okay.  You looked at that a little bit for
13   Shell earlier, you said?

14   A.      Yes.  Yeah.

15   Q.      Okay.  Did you ever advise Black that this
16   design, Exhibit 17, was not to be used for
17   construction?

18   A.      No.

19   Q.      I will show you what has previously been
20   marked as Exhibit FF, a letter from Black Construction
21   dated May 1st, 1996, and ask you whether you've ever
22   seen that, Mr. Swanney?

23   A.      Yes, I think I have seen it.

24   Q.      Do you recall if you got a copy of it?

25   A.      At the time, no.

1  precedes it called plan view of the facility?

2      A.     Well, I can't -- I've seen this one

3  before.

4      Q.     You've seen Exhibit 8 before?

5      A.     Yes.

6      Q.     Okay.  But not  --

7      A.     Not this one, no.

8      Q.     Which is part of Exhibit 20?

9      A.     Right.

10     Q.     Okay.  Looking at the second page of

11 Exhibit 20, in the scope -- change in scope of work, it

12 says that the Port and the contractor agree to delete

13 the concrete jacketing and instead use a new method,

14 quote, in accordance with the attached drawing prepared

15 by "Winzler & Kelly."

             Was there any other drawing prepared by

   Winzler & Kelly other than Exhibit 17 that could be

   referred to in the change of scope of work?

19     A.     No.

20            (Exhibit No. 21 was marked for purposes of

21 identification.)

22     Q.     BY MR. BOOTH:  Okay.  I'd like to mark as

23 Exhibit 21 a document on Winzler & Kelly's letterhead

24 entitled Specification for Repairs to Dolphins A, B,

25 C & D, and ask if you're familiar with that?

1  provided to you in Guam?

2      A.      No.

       Q.      Okay.   Turning back to Exhibit 17 and the
notes in the upper left-hand corner, it says this
drawing -- note 1 says:  This drawing is to be read in
conjunction with the drawings and specifications for
the project, essentially drawn by EMPSCO.

               But the drawings prepared by EMPSCO
envision concrete encapsulation, right?

10     A.      Yes.

11     Q.      So, to the extent this drawing provides a
12 different design, it supersedes the EMPSCO drawings,
13 right?

14     A.      Parts of the EMPSCO drawings.

15     Q.      Right.  So even though it doesn't say it,
16 this drawing 17, when in conflict with an EMPSCO
17 drawing, supersedes the EMPSCO drawing, right?

18     A.      Yes, for -- yes, for -- for these items.

19             MR. BOOTH:  Okay.

20             MR. O'CONNOR:  For the record, it's the
21 upper right-hand corner.

22             MR. BOOTH:  I'm sorry, upper right.
23 You're right.  It's kind of hard doing this 90 degrees
24 off.

       Q.      BY MR. BOOTH:  Again, looking at the notes

in the upper right-hand corner of the drawing, there's

no provision in there for any specific testing of the

bolts after they're installed, is there?

A.  Not -- not in that statement --

Q.  Okay.

A.  -- there's no specific provision.

Q.  Did you ever discuss with Black any

particular test protocol or any particular testing that

should have been done of the epoxy bolts after --

anchor bolts after they were installed?

A.  No.

Q.  Okay.  On previous jobs have you seen

requirements where once the bolt's installed, it's

torque tested?

A.  Some of them are required to be by --

depending on what the jurisdiction requires, what type

of building it is.  Sometimes they are, not all the

time.

Q.  Okay.  Did you have any understanding from

your discussions with Black whether the bolts would be

tested in any way after they were installed and the

epoxy hardened?

A.  No, I didn't.

Q.  Okay.  Note No. 2 says:  Adhesive anchors

to be a particular Redhead product or approved equal.

Did you have any discussion with Black about a substitution of a different product for the Redhead product that you specified in note 2?

A.    No, I didn't.

Q.    Did you know that Black had substituted a different product for the product set forth in note 2?

A.    Well, I know now.

Q.    You know now, right.

Did you know prior to leaving Guam?

A.    No.

MR. BOOTH:  Okay.

MR. O'CONNOR:  Should we take a break now?

MR. BOOTH:  Let me just finish a couple more things, and then I will, yeah.

Q.    BY MR. BOOTH:  Were you familiar with this specific Redhead product when you specified it in note No. 2?

A.    How do you mean "familiar" with it?

Q.    Had you called it out for use on prior jobs?

A.    Yes.

Q.    Okay.  Had you seen it used?

A.    I had seen it -- I'd seen similar products, actually, installed.  I'm not sure if I've seen this particular one installed.

Q.      Okay.  Did you personally specify it in

note No. 2, or was that done by somebody else?

A.      No, that was me.

Q.      Okay.  Why did you select that particular

5   product?

6       A.      It was the most appropriate for the

7   application.  It takes a lot of the construction

8   variables out of the installation.  It's a lot -- it

9   requires a lot less skill to install it, and there's

10  more -- it's more -- you're increasing your chances of

11  having the connection constructed correctly.

12      Q.      Okay.  And I understand this is a glass

13  cylinder that has previously measured amounts of

14  hardener and epoxy in it --

15      A.      Yes.

16      Q.      -- and then it's broken NC2, as we say, as

17  it's in the hole, and what do you do, spin the bolt in

18  order to mix it?

19      A.      The bolt's attached to impact drill, and

20  it goes in and breaks the glass and mixes the epoxy

21  and --

22      Q.      Okay.

23      A.      -- it's there.

Q.      By putting the words "or approved equal"

in note No. 2, were you allowing the contractor some

leeway in case he couldn't buy this particular product
on Guam?

    A.    Yes.

    Q.    Okay.  But I take it you never actually
had any discussions as to what type of product from
some other manufacturer would be an approved equal?

    A.    I'm sorry, I lost you there.

    Q.    Did Black ever come -- or EMPSCO or anyone
ever come to you and say:  Would XYZ product be the
equivalent of what you specified.

    A.    No, no one did.

          MR. BOOTH:  Let's take our break now.

          THE VIDEOGRAPHER:  We're going off the
record.  The time is approximately 12:47 p.m.

          (A recess was taken from 12:47 p.m.
to 1:51 p.m.)

          (Exhibit No. 22 was marked for purposes of
identification.)

          THE VIDEOGRAPHER:  Back on the record to
continue the videotaped deposition of Bruce Swanney.
The time is approximately 1:51 p.m.

    Q.    BY MR. BOOTH:  Mr. Swanney, I may have
misunderstood, but did you say in answer to a question
this morning that Winzler & Kelly originally designed
the pier F-1?

1    basis he's not been qualified as an expert in this

2    area.

3             Go ahead.

4             THE WITNESS:  Repeat the question, please.

5        Q.    BY MR. BOOTH:  Okay.  In your opinion, is

6    it the equal of the -- sorry.  Strike that.

7             In your opinion, is the product Anchor It

8    Epoxy System stainless steel bolts referred to in

9    Exhibit 22 the equal of the Reddy Cam product specified

10   in note 2?

11            MR. STERLING:  And hang on just a second.

12   One additional objection.  There's no foundation that

13   he's even familiar with the product, so there's no

14   basis for the comparison.

15       Q.    BY MR. BOOTH:  You can answer.

16       A.    I don't know.

17       Q.    You don't know if it is equal or not?

18       A.    Right.

19       Q.    Okay.  Was the Reddy Cam product specified

20   in note 2 readily available on Guam in the 1995-'96

21   time frame?

22       A.    I don't know.

23       Q.    Okay.  When you put the note 2 on the

24   drawing that is Exhibit 17, did you anticipate that

25   that was a product that the contractor was going to

1  question.

2      A.      Okay.

       Q.      You obviously were familiar at the time

you were doing your work on the dolphins, both for

Shell and for Black, with what the original design had

been, which was --

       A.      Yes.

       Q.      -- rerod coming down from the caps,

concrete filling the piles.

               Okay.  Was it your intention when you did

the design which is shown on drawing 17 to make a

connection between the piles and the caps of equal

strength to that design?

       A.      We didn't know what the original strength

was.  We didn't analyze it.  Our intent was to conform

to the project design criteria.

       Q.      Okay.  But the project design criteria

involved encapsulating the piles, right?

       A.      No, not the design criteria, no.

       Q.      Okay.  What did the design criteria

involve?

       A.      The design criteria was basically the

uniform building code and the soils report.

       Q.      Okay.  So your understanding was as long

as you came up with a design that met the building

code, that that would be adequate?

    A.      And the soils report.

    Q.      Okay.  What part of this design,
Exhibit 17, had to meet had the soils report?

    A.      The tension capacity of the pile was
limited by the soils report, was limited by the
embedment into the sea bed.

    Q.      Okay.

    A.      Way before the pile would fail, the -- it
would lift out of the sea bed.

    Q.      Okay.  Before the pile would fail in the
sense of the pile itself breaking?

    A.      Well, stretching.

    Q.      Or stretching, it would pull out of the
sea bed?

    A.      Yes.  That's what the soils report --

    Q.      Okay.  And did you prepare this design
shown on Exhibit 17 to be sufficiently strong that the
failure -- the first failure of the system would be
pulling the piles out of the sea bed, rather than
pulling the bolts out of the cap?

    A.      That was our intention.  But again, it
was -- it was left up to the engineer of record to make
that final determination.

    Q.      Okay.  And you had the soils report at the

time you did Exhibit 17?

    A.    Yes.

    Q.    Okay.  Did you get any approval in writing from the engineer of record of your design that's Exhibit 17?

    A.    I didn't, no.

    Q.    And you never saw anything coming back from them?

    A.    No.  Like I said before, the only -- the only notification that -- that we'd heard, we never received anything official, we heard through the grapevine that they were not using encapsulation; they were using a steel -- a steel pile option.  Whether it was exactly this, even I don't really know.

    Q.    Okay.

    A.    Or I didn't really know.

    Q.    And engineer of record that you just referred to is EMPSCO?

    A.    Yes.

    Q.    Okay.  Did you ever see an engineer of record letter appointing EMPSCO as engineer of record on this case, on this project?

    A.    A what?  A letter --

    Q.    A letter retaining EMPSCO or appointing EMPSCO as engineer of record?

1      A.      I saw their contract with the -- with the

2  Port of Guam, I think, which, in effect, does that.

3      Q.      Okay.  A minute ago you referred to ICBO.

4  Is that the International Conference of Building

5  Officials?

6      A.      Yes.

7      Q.      And they do approvals for various -- and

8  testing of various construction products?

9      A.      Yes.

10      Q.      Okay.  Mr. Swanney, did you ever advise

11  the Port of Guam that you wanted the engineer of record

12  to approve your design which was Exhibit 17?

13      A.      My understanding was with -- Black

14  Construction was our client, and our understanding with

15  them was that it was to be submitted to EMPSCO for

16  approval.

17      Q.      Okay.  But I'm asking, did you have any

18  direct communication with the Port about that?

19      A.      No.

20      Q.      In various projects that you worked on in

21  Guam, did you ever have occasion to specify that a

22  special inspection of a particular product or

23  installation be done?

24      A.      I don't remember.

25      Q.      Do you recall ever being involved in a

1      Q.     There was not?

2      A.     I didn't know.

3      Q.     You didn't know.

Okay. Did you have any occasion while you were working in Guam to put a notification on drawings that you prepared that they were prepared by you or under your direct supervision?

A.     Yes.

Q.     Okay. Is there any particular reason why that notification does not appear on Exhibit 17?

A.     No there's no particular reason why it doesn't.

Q.     Okay. In fact, it was prepared by you, right?

A.     Yes.

Q.     Okay.

A.     Under my direct supervision, rather than by me.

Q.     Okay. Well, let me ask you that.

The actual drawings, like sections 1, 2, 3 and 4, the details --

A.     Yes.

Q.     -- did you personally draw those?

A.     No. Not these ones, no.

Q.     Okay.

A.    I did not.

Q.    Were those drawn either by someone else at Winzler & Kelly --

A.    Yeah.

Q.    -- or by a computer?

A.    Someone else at Winzler & Kelly operating a computer.

Q.    Right.  Okay.  So nothing that appears on Exhibit 17 is actually in your handwriting; is that right?

A.    Correct.

Q.    Okay.

A.    Apart from my signature.

Q.    Apart from your signature, right.

Okay.  At the time that you were originally retained to do the work for Shell, did Shell advise you that this facility F-1 was critical to their operations in Guam?

A.    I don't recall them specifically saying that, but the whole premise of them hiring us is they were -- they were in a big hurry to get the thing back in service.

Q.    Okay.  Because this was the way they got fuel in and out from ships, right?

A.    Yes.

1    Q.    Okay.  Did they, in fact, do all the piles

2    on one dolphin first and then move on to the next one

3    in some sort of order?

4    A.    I don't know.

5    Q.    Okay.  Did anyone tell you not to ask

6    Winzler & Kelly California to do a complete computer

7    analysis of the design, Exhibit 17?

8    A.    Did anyone ask us not to do an analysis?

9    Q.    Did anyone within Winzler & Kelly tell you

10    not to?

11    A.    Anyone within Winzler & Kelly tell me not

12    to.

13          No.

14    Q.    Okay.  Did anyone outside Winzler & Kelly

15    tell you not to?

16    A.    No one told me not to.

17    Q.    Okay.  Were you given any financial

18    constraints on the amount of work you could do for

19    Black on -- in the design that led to Exhibit 17?

20    A.    We -- we laid out our scope of work, and I

21    believe that said that we weren't going to do an

22    analysis.

23    Q.    Okay.

24    A.    That was in our agreement.

2     Q.    Did you consider the rough calculations --

or I've forgotten exactly how you described them --
that you did do to be sufficient to produce the design
that is on Exhibit 17?

    A.    Yes.

    Q.    Okay.

    A.    When I say "rough calculations," I don't
mean that the calculations were approximate or
anything.  They were probably just roughly written.

    Q.    Roughly written?  Okay.

    But are they properly described as hand
calculations, or --

    A.    Yes, they were hand calculations, yes.

    Q.    Okay.

    A.    They were very simple.  It was simply a
matter of looking up the table for the bolts and
comparing it to the design load.  You have a pile load
of 10,000 pounds and the allowable load per bolt's
1,000 pounds, you need ten bolts.  That's the
calculation.

    MR. BOOTH:  Okay.  I understand.

    Let me mark another document as
Exhibit 24, which is which are the minutes of a meeting
dated December 11, 1995.

    (Exhibit No. 24 was marked for purposes of
identification.)

1    A.    No.

2    Q.    Okay.  In paragraph 11, Ms. Baluyut says:

3  The Winzler & Kelly drawings are not a modification of

4  the project scope, but a presentation of a repair

5  procedure for selected piles.

6         Was there a discussion with Shell Guam

7  about a repair for only selected piles as opposed to

8  all of them?

9    A.    I don't recall.

10        (Exhibit No. 25 was marked for purposes of

11  identification.)

      Q.    BY MR. BOOTH:  Okay.  I'd like you to look

at Exhibit 25, which is a memo to Larry Lewis from you,

dated March 10th, '97.

      My question is:  The re line says:

Pier F-1 Construction Phase Services.

      A.    Yes.

      Q.    What construction phase services did

Winzler & Kelly provide on the F-1 project?

      A.    We provided services to Black

Construction, addressing some construction phase

conditions that they needed our assistance on.

      Q.    Okay.  And what construction phase

conditions were those?

      A.    Well, this -- this was one that we've been

discussing before that required the pile -- the corner

pile to be pre-loaded due to a non-typical condition

with the pile next to it.

Q.     Okay.  Was it your understanding that the

project was underway and ongoing on March 10th of '97?

A.     Yes.  The demolition work was underway.

(Exhibit No. 26 was marked for purposes of

identification.)

Q.     BY MR. BOOTH:  Okay.  I'd like you to look

at Exhibit 26, which is a Port Authority of Guam letter

to the general manager of Shell Guam.  The

next-to-the-last paragraph, last line, says:  The Port

reserves the right to approve, disapprove, or alter the

design of Winzler & Kelly's work.

A.     Whereabouts are you looking?  Sorry.

Q.     There.

A.     Oh, okay. Yep.

Q.     At any time, did you hear from anyone that

the Port had changed or disapproved any portion of

Winzler & Kelly's work on the F-1 pier and dolphins?

MR. O'CONNOR:  This is for the Shell

design, the Shell project?

MR. BOOTH:  At any time.

THE WITNESS:  That the Port had changed

some of our design?

1    Q.      BY MR. BOOTH:  Uh-huh.

2    A.      No, I didn't hear that.

3    Q.      Okay.  I take it from your prior answers

4    that you had no -- you made no direct submissions to

5    the Port of any of your work, correct?

6    A.      Correct.

     Q.      Okay.  Looking again at Exhibit 17,

     Mr. Swanney, what is the significance of a licensed

     engineer putting his stamp and signature on a drawing

     such as this?

     A.      What is the significance of it?

     Q.      Uh-huh.

     A.      It's -- it's required by the regulations

     governing the practice of engineering in Guam that you

     seal the work to certify, or otherwise, that the work

     was prepared by you under your direct supervision.  It

     also indicates that the work was prepared by a licensed

     professional are a professional engineer licensed by

     the state or territory to perform this kind of work.

     Q.      Okay.  And does it also signify that the

     work meets applicable building codes?

     A.      Does it -- does it mean that it does?

     Q.      Uh-huh.

     A.      Not necessarily.

     Q.      Okay.  Does it give the recipient of the

drawing some comfort that the work has been done up to a certain professional standard?

A.     Yes.

Q.     Okay.  And is that standard embodied in the building code and good engineering practice?

A.     Yes.

Q.     Did you ever give Black any instruction, either verbally or in writing, as to how they should prepare the underside of the caps where the pile collar or flange meets the concrete cap?

A.     The underside of -- you mean the top of the flange?

Q.     The top of the flange meets the underside --

A.     Of the cap.

Q.     Right.

A.     No.

Q.     Okay.  This design contemplated the cutting of the rerod that came down from the cap into the pile, right?

A.     Yes.

Q.     Okay.  And originally there had been, if I understand it correctly, one concrete pore that went -- that encompassed the cap and down into the pile, right?

A.     That the pile was filled up with concrete?

1    A.    We either had a copy of it or we had a

2 copy of parts on it.

3    Q.    And was that the same for every pile in

4 the whole project?

5    A.    Well, just the tension piles.

6    Q.    Okay.  So the -- the tension load that the

7 pile could withstand before it pulled out of the sea

8 bed was 10 kips?

9    A.    That was -- that was the allowable load

10 recommended by the soils report that the tension in the

11 pile be limited to, meaning the original design, the

12 task that the original design engineer accomplished was

13 to put in enough piles in and appropriate configuration

14 that the tension load in any pile was not more than 10

15 kips.

16    Q.    Okay.  And that was under any foreseeable

17 loading condition that this --

18    A.    It was under the code.  The building code

19 described loads.

20    Q.    Under the building code loads.

21    A.    Yes.

22    Q.    Okay.  In your design which is Exhibit 17,

23 did you assume that all of the piles would see a

24 uniform loading?

25    A.    What was the question again?

1        MR. BOOTH:  Could you read back, please?

2        THE COURT REPORTER:  Sure.

3        (The record was read by the reporter as

4   requested.)

         THE WITNESS:  When we produced this

    drawing, we were designing to the project design

    criteria, which included the uniform building code for

    the design -- the recommended design tensile force in

    the pile, in the tension piles.  Some piles don't have

    any tension.

         Q.    BY MR. BOOTH:  Right.

         A.    So maybe the answer to your question, if

    you're asking are all the piles the same, no, they're

    not.

         Q.    Okay.  So the fix was the same; in other

    words, the eight-bolt treatment of each pile was the

    same?

         A.    Right.

         Q.    But some of the bolts -- some of the

    piles, because of their configuration, would not see

    any tension load at all, correct?

         A.    Correct.

23       Q.    Okay.  Did you form a conclusion or

24   opinion at any time when you were working for either

25   Shell or Black that any of the piles had been damaged

Q.     Okay.  And in calculating the maximum compression loads that would be seen, did you take any account of earthquake forces when you were doing the work for Shell?

A.     Yes.  The earthquake forces transpired that they were the critical -- the critical forces.

Q.     Okay.  By "critical," you mean the highest loads that would be seen?

A.     Yeah.  The ones that govern the design of the platform --

Q.     Okay.

A.     -- or the pile, really.

Q.     And the maximum compression loads were seen on the batter piles, as opposed to the vertical piles?

A.     Yes.  Yes.

Q.     Okay.  I left off with your employment experience when we got to Winzler & Kelly Guam, you said you left Winzler & Kelly '99?

A.     I left Guam in '99.

Q.     Sorry, '99.

And at that point, you remained with Winzler & Kelly, but went to work in Santa Rosa; is that right?

A.     Correct, yes.

1  negotiations as regards to our involvement in the

2  construction phase, you know.  In this case, we knew

3  that EMPSCO was involved, we knew that the Port

4  Authority had quality control management procedures in

5  place.  It wasn't -- I guess it wasn't a great surprise

6  that we never got any calls.

      Q.    Okay.  But with regard to the design,

you're the one that came up -- sorry.  Winzler & Kelly

is the one that came up with the eight bolts per pile,

right?

      A.    We -- yeah, we figured eight bolts is

adequate, yes.

      Q.    Okay.  So you were the designer of that

connection between the pile and the cap, right?

      A.    Yes.

      Q.    Okay.  And nobody ever came back and

questioned that design?

      A.    No.

19        MR. BOOTH:  Okay.  That's all I have.

20        Thanks.

21        MR. O'CONNOR:  Nothing further.

22        THE VIDEOGRAPHER:  This concludes the

23  videotaped deposition of Bruce Swanney.  The time is

24  approximately 2:56 p.m.

25        (The deposition was concluded at 2:56 p.m.)