· · **ORIGINAL** ●       ●

CARLSMITH BALL LLP

DAVID LEDGER
STEPHEN C. SMITH
ELYZE McDONALD
134 West Soledad Avenue
Bank of Hawaii Bldg., Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Tel No. (671) 472-6813

COZEN O'CONNOR

FORREST BOOTH
425 California Street, Suite 2400
San Francisco, CA 94104-2215
Tel No. (415) 617-6100

Attorneys for Plaintiff
S.J. Gargrave Syndicate at Lloyds

**FILED**
DISTRICT COURT OF GUAM
NOV - 1 2005
**MARY L.M. MORAN
CLERK OF COURT**

IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| S.J. GARGRAVE SYNDICATE AT LLOYDS, <br><br> Plaintiff, <br><br> vs. <br><br> BLACK CONSTRUCTION CORPORATION, WINZLER & KELLY, and ENGINEERING MANAGEMENT & PLANNING SERVICES CORPORATION, <br><br> Defendants. | CIVIL CASE NO. CV03-00009 <br><br> **PLAINTIFF'S NOTICE OF PORTION OF DEPOSITION TRANSCRIPTS OF BEN CASEY MARKED WITHOUT COUNTER MARKINGS; DECLARATION OF SERVICE** |

Pursuant to Local Rule 32.1, Plaintiff hereby files the marked deposition transcript of

Ben Casey indicating in margins the testimony it plans to offer.

Pursuant to Stipulation between Counsel, the deposition transcripts is not counter marked. Defendants will submit their objections pertaining to the marked testimony.

DATED: Hagåtña, Guam, November 1, 2005.

CARLSMITH BALL LLP

*Elyze McDonald*

DAVID LEDGER
STEPHEN C. SMITH
ELYZE McDONALD
Attorneys for Plaintiff
S.J. Gargrave Syndicate at Lloyds

## DECLARATION OF SERVICE

I, Elyze McDonald, hereby declare under penalty of perjury of the laws of the United States, that on November 1, 2005, I caused to be served, via hand delivery, a true and correct copy of PLAINTIFF'S NOTICE OF PORTION OF DEPOSITION TRANSCRIPTS OF BEN CASEY MARKED WITHOUT COUNTER MARKINGS upon Defendants' Counsel of record as follows:

> Robert J. O'Connor, Esq.
> Daniel J. Berman, Esq.
> Berman O'Connor Mann & Shklov
> Suite 503, Bank of Guam Building
> 111 Chalan Santo Papa
> Hagåtña, Guam 96910

> Thomas C. Sterling, Esq.
> Klemm Blair Sterling & Johnson, P.C.
> Suite 1008, Pacific News Building
> 238 Archbishop Flores Street
> Hagåtña, Guam 96910

and

> Thomas M. Tarpley, Esq.
> Law Offices of Tarpley & Moroni, LLP
> Suite 402, Bank of Hawaii Building
> 134 West Soledad Avenue
> Hagåtña, Guam 96910

Executed this 1st day of November 2005 at Hagåtña, Guam.

_____
ELYZE McDONALD

1                IN THE DISTRICT COURT OF GUAM

2  S.J. GARGRAVE SYNDICATE AT LLOYDS,)

        Plaintiff,                )

3                                  )

   vs.                            )      CIVIL CASE NO. CV03-00009

4                                  )

   BLACK CONSTRUCTION CORPORATION,  )

5  WINZLER & KELLY, and ENGINEERING )

   MANAGEMENT & PLANNING SERVICES   )

6  CORPORATION,                     )

        Defendants.               )

7

8

9

10   *********************************************

11         ORAL AND VIDEOTAPED DEPOSITION OF

12                   BEN CASEY

13                MARCH 23, 2004

14   *********************************************

15

16              **ORIGINAL**

17

18      ORAL AND VIDEOTAPED DEPOSITION of BEN CASEY, produced as a

19  witness at the instance of the Plaintiff, and duly sworn, was

20  taken in the above-styled and numbered cause on the 23rd day of

21  March 2004, from 10:32 a.m. CST to 3:57 p.m. CST, before Dalia

22  F. Inman, CSR, in and for the State of Texas, reported by

23  machine shorthand, at the offices of Cozen O'Connor, 1717 Main

24  Street, Suite 2300, Dallas, Texas, pursuant to the agreements

25  stated on the record and the Federal Rules of Civil Procedure.

1  recall.  I'd appreciate it if you don't recall, just say so.

2  I'd appreciate it if you didn't guess.  Estimates are a

3  different thing.  Obviously, estimates sometimes are

4  appropriate.  But don't make a -- just a complete guess.

5           Now, going to the process of the deposition, we

6  noticed your deposition, but you're here as a volunteer; we

7  didn't issue a subpoena.  I appreciate your cooperation.

8           Let's start with -- excuse me, with your

9  background.  You were born in New Zealand, as I understand.  Is

10 that right?

11     A    That's correct.  Yeah.

12     Q    Okay.  Can you give us your educational background in

13 New Zealand?

14     A    Graduated from high school.  Went to a community

15 college, which is a technical college or institute, completed a

16 New Zealand certificate of engineering, which is a diploma

17 level, civil engineering diploma.  That includes, to receive

18 that diploma, a minimum of three years' direct work experience

19 as well.  Following that, I was working with the ministry of

20 works in New Zealand.  I gained a scholarship to go to

21 university and complete my civil engineering degree as a

22 bachelor of engineering.  That would be my formal education in

23 terms of the highest degree from a university.

24          Since then, in the -- 18 to 20 years of direct

25 experience in the construction industry.  I've been on several

LegaLink Dallas
global court reporting * legal videography * trial services
800-966-4567
www.legalink.com

1    construction-related project management-type courses.

2        Q      Okay.  Your bachelor's of engineering, is that with a

3    specialty in civil engineering?

4        A      The bachelor of engineering is specific to civil

5    engineering.

6        Q      Civil?  Okay.

7        A      Yes.

8        Q      In the New Zealand system, do you have a bachelor's

9    degree in structural engineering as well --

10       A      My -- my apologies.  I -- I do understand that

11   question.

12              Civil engineering in New Zealand is -- is very

13   much structural orientated with soils and fluids and highway

14   engineering as sort of the roundabout add-ons onto the

15   structural engineering degree.  So I would consider my degree

16   would have probably a 65 percent rating against -- or for,

17   sorry, structural engineering, in particular earthquake

18   engineering, precast concrete and concrete design.

19       Q      Earthquakes are a significant problem in New Zealand,

20   I understand.  Is that right?

21       A      That is correct.  In my first year out of -- out of

22   university, I worked for a consultant's company called Becker,

23   Carter, Hollings & Turner.  My 12 months' experience with them

24   was involved in the rebuild of Tasman Pulp and Paper Plant

25   doing earthquake design and earthquake remediation repairs to a

**BEN CASEY**                     3/23/2004

1    Q      Okay.

2    A      -- as briefly as I can.

3            I then moved to London.  I started working for a

4    contractor called PJ Carey & Sons.  I worked for them for

5    approximately 18 months.  We did heavy civil construction

6    infrastructure-type work for supermarkets.  And one -- or two

7    particular projects I worked on there was a Sainsbury

8    supermarket and also the Wembley exhibition halls of which we

9    did all the foundation and concrete work for that project.

10           We -- or my -- myself and my wife then began

11   working for a company called Transform Work or Cane Brothers

12   based out of Northern Ireland.  We were subcontractors doing

13   form work, concrete, and rebar placement on bridging

14   structures.  I worked with this company for approximately four

15   years both in England and Northern Ireland and some work in

16   Germany.  I then moved -- during that period with Cane

17   Brothers, I moved to Northern Ireland and based myself there.

18   Had several jobs in the six-year period when I lived in

19   Northern Ireland mainly for contractors, but for one year had a

20   consultancy-type management company where we did implementation

21   of ISO-9000 quality management system into construction

22   companies.

23           After Northern Ireland, I moved back to New

24   Zealand and then worked with the company that is a affiliate of

25   Smithbridge Guam called -- at the time it was McConnell, Smith

1   New Zealand and then transferred to Guam as a project manager

2   in 1998.  That was just after Typhoon Paka, which was in 1997.

3           Five years in Guam, three years as contracts

4   manager for the McConnell, Smith then, now known as Smithbridge

5   Guam, and the last two years were the general manager of this

6   company.  We primarily did heavy civil construction -- or -- or

7   heavy construction would be a better definition in the United

8   States -- that consisted of marine works; marine work repair;

9   piling, both concrete and steel ship piling and H-piling; and a

10  lot of precast concrete erection and precast con-- concrete

11  construction.

12      Q   What year did you go back to New Zealand?

13      A   199-- I -- it was the beginning of 1996.

14      Q   Okay.  How much of the work that you did while you

15  were with Smithbridge Guam was federal government work?

16      A   Probably about 80 percent.

17      Q   And 20 percent private sector?

18      A   That would be correct.

19      Q   Okay.  I take it from your prior answer that you

20  didn't ever become licensed as an engineer in Guam.  Is that

21  right?

22      A   No.  When I first moved to Guam, our visa status was

23  L1.  L1 is a transfer from -- from an existing company in New

24  Zealand, and part of that working visa was that we could not

25  be -- become a professional engineer.  So no.

pulp and paper plant after the 1987 Edgecumbe earthquake, which

was a 6.3 magnitude earthquake.

Q    Okay.  And what university was your bachelor's degree

from?

A    University of Canterbury in Christchurch.

6    Q    Does New Zealand have a system of issuing civil

7  engineers' licenses?

8    A    Yes.  It has what they call a member of IPENZ, which

9  is the Institute of Professional Engineers of New Zealand,

10  IPENZ.

11    Q    Okay.  And are you a member of IPENZ?

12    A    No.  Because of my experience, I basically left New

13  Zealand within 18 months of completing my degree.  I have not

14  been back in New Zealand a sufficient length of time to sit

15  down and basically do the qualifications.  I have read through

16  the qualifications required, and I would've achieved them many,

17  many years ago to actually qualify.  But because of being in

18  the construction industry as a contractor, it's not nearly as

19  important to be registered as if I was working for a design

20  consultant like a company of Winzler & Kelly or something of

21  equivalence.

22    Q    Okay.  So you've satisfied the requirements but you

23  haven't done the residency in New Zealand part in order to be a

24  member of the society.  Is that right?

25    A    No.  IPENZ would actually give me like a

1  grandfather-type associate membership if I applied for it and

2  had time.

3      Q    Okay.

4      A    My -- my personal career and what I'm doing now, I

5  really don't have the time to sit down and do it, and it's not

6  a -- not a necessity.

7      Q    Uh-huh.

8           Okay.  Do you hold any engineering licenses from

9  any other country or any other jurisdiction other than New

10 Zealand?

11     A    No.

12     Q    Okay.  You said you left New Zealand about 18 months

13 after graduating and getting your degree.  Where did you go at

14 that time?

15     A    I went to Belize.  I worked for a international

16 consultancy company called Becker Worley or -- which was part

17 of the Worley international group.  We were construction

18 managers for a world bank-funded project in Belize in Central

19 America of which I had 15 months' time there.  We were doing

20 drainage projects, culverts, drainage control on highways --

21     Q    Uh-huh.

22     A    -- in Belize.

23     Q    And what was your next employment after that?

24     A    My next -- well, how 'bout we just start going

25 through my resume --

1    Q      Okay.  I'd like to finish out with your employment

2    experience and then get back to Guam.

3               When did you leave Guam?

4    A      Formally left Guam in April -- the first week in

5    April in 2003.

6    Q      Okay.  And what employment did you take after that?

7    A      Me and my wife decided -- who -- who is -- lives --

8    or whose parents live in Mississippi -- we decided to set up

9    our own construction company in heavy construction.

10   Q      Okay.  And that's in Houston.  Is that right?

11   A      We are based in a small town north of Houston called

12   Conroe.  And we have been set up since April 2003.  We gained

13   our first federal contracts, officially in terms of contract

14   date, in January 2004.

15   Q      I'd like to go back to your employment with

16   Smithbridge Guam.  How did your responsibilities change when

17   you became general manager in Guam?

18   A      Probably the main difference was that a couple of the

19   younger engineers that were under my wing over the last few

20   years became my contracts -- took my contracts manager

21   position.  When I took -- become the general manager, my

22   overseeing with -- of them was -- was fairly similar.  I think

23   possibly I took on more of a -- a financial -- more financial

24   responsibilities, more of the sorting out bureaucratic problems

25   and issues with the company that became a bigger role.  But

1  probably in terms of still at the -- at the coldface in terms

2  of work, I probably only changed about 40 percent.  So 60

3  percent of my job was still fairly similar.  I still very much

4  controlled the construction that the company did.

5       Q     As general manager were you the highest ranking

6  Smithbridge employee on Guam?

7       A     That's correct.

8       Q     Okay.  So the person that you would report to as your

9  boss was back in New Zealand?

10      A     Yeah.  He -- he was in New Zealand at one stage.

11  Then he -- he transferred a company and set up a new company in

12  Brisbane.  His name's Albert Smith.

13      Q     Okay.  So I'm sure this is self-evident.  But since

14  you arrived in Guam in 1998, I take it you were not involved in

15  any of the repairs that were done on the Shell F-1 Pier in the

16  1996-'97 time period.  Is that right?

17      A     That's correct.

18      Q     Okay.  Did you learn at any time whether Smithbridge

19  had been involved in any way in those repairs in the '95, '96,

20  '97 time frame?

21      A     From what I'm aware of, no.

22      Q     Okay.  Were you physically on Guam during the

23  earthquake in October of 2001?

24      A     Yes, I was.

25      Q     Okay.  Good rock and roll?

BEN CASEY                          3/23/2004

1    A       It was -- it was a single hit.  It was -- it was

2    funny.  You could hear it coming and then it hit.  There was a

3    very large jolt, and then there was a bit of a rumble

4    afterwards.  It was -- it was more like that.

5    Q       Uh-huh.  What time of day did that occur?

6    A       From my recollection, I'm -- I'm -- I'm thinking it

7    was sort of 12:00 or 1 o'clock in the morning.

8    Q       Okay.  So you were at home?

9    A       Yes.  That's correct.

10   Q       Okay.

11   A       Uh-huh.

12   Q       Okay.

13   A       Might've even been 2 o'clock in the morning.

14   Q       Okay.  Now, can you tell me how Smithbridge Guam

15   became involved in the repairs to the dolphins on the Shell F-1

16   Pier in 2001?

17   A       We had heard that a gentleman, Mr. Peter MacLeod,

18   was -- I'm not sure of his official title -- but was assessing

19   the damage for the underwriters and he may have possibly been

20   looking for a -- a contractor to help and -- and the -- the

21   possibility of getting some repair work for that contract.

22   Q       Okay.  Prior to this time when you started looking

23   for involvement in the 2001 repairs, had you known Peter

24   MacLeod?

25   A       No, I had not.

Q    Okay.  So you basically met him in connection with the work at the Shell F-1 Pier?

A    That's correct.  As part of my job as general manager, I had to go out and look for work, and that's -- that's how we met.

Q    Okay.  I assume that you're familiar with the concept of an RFP, or a request for a proposal, request for quote?

A    Yes.  Yes, I am.

Q    Did the Port of Guam or anyone put out an RFP for the work on the dolphins at F-1?

A    My recollection is that -- that -- that Shell had insisted -- Shell were the user of that facility.  They had requested the RFP with them, and Shell had then gone to the Port with the proposal to get the work completed.

Q    Okay.

A    So it was very much through the -- the user request rather than the owner of the facility, from what I understand.

Q    Okay.  And I think our understanding is that Shell leases this facility on a long-term basis from the Port.  So Shell -- I think the word you used was "user." Shell is the user, and the Port is the owner.  Is that right?

A    My understanding, that is correct.

Q    Okay.  So in terms of the -- the party that was the moving party in getting the repairs done from your side, it appeared to be Shell initially.  Right?

1    A    Yes.  Because Shell -- Shell were the ones that

2  needed a facility that was operational, so it affected them

3  more.  The bureaucracy on Guam is the government doesn't move

4  terribly quickly, and -- and Shell had more ability to make the

5  contract move quicker.

6    Q    Okay.  While you were with Smithbridge Guam, did you

7  do other projects for the Port?

8    A    Yes.  We -- we had completed a contract for the

9  precast concrete generator buildings, which was four -- four

10 precast concrete structures to protect their existing backup

11 generators.  That was a sealed bid proposal, and it was funded

12 by FEMA after the Typhoon Paka damage in 1997.

13   Q    Are those the buildings that -- with, sort of,

14 porthole windows and slightly curved walls on them?

15   A    That's correct.  Yeah.

16   Q    Interesting designs.

17        Okay.  Did Smith -- Smithbridge Guam send a

18 formal proposal to Shell for the repair work on the F-1

19 dolphins?

20   A    Yes, they did.  Uh-huh.

21   Q    Okay.  To your knowledge, were there others -- other

22 contracting companies that submitted bids to do that work?

23   A    I'm not sure what the process was.  All I know that

24 at some time, we were set in a negotiating position to -- to

25 get the contract with the RFP.  So I'm unaware of any -- any

1   other bids or other contractors.  I'm not sure.

2       Q    Okay.  Putting aside whether you know the details of

3   any other bids that might have been submitted, do you know

4   whether there were any other proposals submitted to Shell?

5       A    No, I don't know.

6       Q    Okay.  What was the nature of the proposal that you

7   submitted to Shell?  Was it to repair all of the damaged piles

8   that might -- that were damaged in the earthquake?

9       A    No, not at all.  It was specifically a temporary

10  repair to stabilize the existing structure to -- to make it

11  safe, that further damage couldn't be -- damage control

12  basically to ensure that the facility didn't cause any other

13  damage if there was a typhoon or another earthquake.  So it was

14  a -- it was a temporary repair.

15      Q    Okay.  Just so the record is clear.  We've -- we've

16  seen documents referring to two types of temporary repairs on

17  the dolphins.  One is some -- what appears to me to be angle

18  irons that were welded around from one pile to another, three,

19  four, five feet off the water, shall we say.  The other

20  temporary repair, or what we've seen described as a temporary

21  repair, consisted of the work that I believe Smithbridge Guam

22  did, which consisted of drilling a hole down all the way

23  through the cap on the -- on the dolphin, attaching a -- or

24  inserting a Dywidag bar, filling it with -- partly with

25  concrete, and then concreting over the top.

1          Help me out --

2     A     Yeah.

3     Q     -- as how we can describe those two different repair

4  processes.

5     A     Yeah.

6     Q     Let's start with the first one, the angle iron.

7     A     The first one, the angle iron.  From what I'm aware,

8  Smithbridge had absolutely no involvement in this temporary

9  repair.  It was something that Shell had taken on themselves

10 with, from what I'm aware, no design input to try and stabilize

11 what they thought might be a -- a -- a way to stabilize the

12 structure initially on a -- on a very first-off basis.

13    Q     Okay.  So that was a real Band-Aid initial attempt at

14 stabilizing things?

15    A     I would think so, yes.

16    Q     Okay.  So the work that you have referred to as the

17 temporary work, I believe, consisted of work on 25 piles.  Is

18 that right?

19    A     Correct.  Yes.

20    Q     Okay.  And help me with the pronunciation of this

21 proprietary product.  Is it Dywidag bar?

22    A     Dyvidag [phonetic] bar.  It is just a high -- high

23 tensile-type thread bar with -- with a -- it becomes

24 proprietary because it has a -- a thread on it that's used

25 in -- in the heavy concrete industry, which is a very broad

1   thread.  It's a very fat thread unlike a bolt that has a very

2   fine thread on it.

3        Q    Okay.  And so what you described as the temporary

4   repair that Smithbridge did consisted of installing those bars

5   and concrete and working on the 25 piles.  Right?

6        A    That's -- that's correct.

7        Q    Okay.

8        A    What -- what we did is we -- we thought of a process

9   that would be, hopefully, economical and -- and sufficient at

10  the same time to do a temporary repair and stabilize that

11  structure without having to do a hundred percent of the piles.

12  So we -- we tried to find a system that we would think would be

13  sufficient in design capacity by only having to repair 25 to

14  make it -- make it stable.

15            This was done in conjunction with Duenas &

16  Associates, as the designer for -- for this particular system,

17  and which we thought would be a good method to tie the piles

18  to -- back to the concrete pier cap or mooring -- concrete

19  mooring pad.

20       Q    Okay.  You referred to Duenas & Associates as the

21  designer.  Did Smithbridge Guam have any input into the design?

22       A    Yes.  Yeah.  Absolutely.  It's -- in construction

23  nowadays, we work very closely with our designers to come up

24  with practical and constructible-type solutions for our

25  construction.  It does two things.  Hopefully the client will

1   get a good value for it and we don't have to try and

2   value-engineer it after it's been designed.  So a close --

3   close association with the designers at the time helps -- helps

4   on designing the repair once instead of going backwards and

5   forth trying to come up with it.

6           So we at Smithbridge had -- had came up with the

7   philosophy of how to tie these down, and Duenas worked with us

8   to -- to come up with the design calculations that would

9   make -- make it work in -- in terms of requiring being signed

10  off and -- and designed by -- by a -- an engineering

11  consultancy company.

12      Q    Okay.  So if I understand your answer, the su-- the

13  suggestion to use the Dywidag bar was a Smithbridge suggestion?

14      A    Absolutely.  Yes.

15      Q    Okay.  Is this a product you'd used before?

16      A    We had -- we had seen this product used, and Albert

17  Smith, the managing director, had used it on another occasion

18  for -- for tying or -- or making the connection point there.

19          It -- it would be common practice for a concrete

20  pile to be anchored into the concrete slab by some form of --

21  of metal-type connection, whether that was rebar or stress bar

22  anyway.  So we just -- we just sort of made it a -- or -- or

23  thought of the design a bit further and refined it to try and

24  work for the situation.

25      Q    Okay.  Do these Dywidag bars come in different sizes?

A      Yeah.  Obviously the -- when the design was

completed, Duenas obviously come back and -- and say what --

what diameter this bar's required to do this -- this particular

amount of work in the situation.  So yes.

Q      Okay.  Do you know whether they performed any

comparison between -- of the -- let's say, the sheer strength

of the Dywidag bar compared to the 3/4-inch bolts that had been

previously used to secure the piles?

A      Certainly not in conjunction with ourselves.  I think

we had done -- we actually did a comparison just to know what

the possible strength was of -- of those bars would be correct.

But I don't think we were involved in a direct design analysis

as such.  There might have been -- they may have done some

quick checks just to see what the capacity of -- of putting

bolts back in might have been, yes.

Q      Okay.  You say "we weren't involved," do you mean

Smithbridge wasn't involved in doing that kind of a comparison?

A      I -- I don't recall exactly how -- how or what we

decided on -- on the method of not going to bolts and going to

a Dyvidag bar, but I'm sure there was probably some preliminary

consideration where we considered it for -- for the design

repair.  It was put out -- out very soon basically because --

how can I say this?  We had seen a failure in that at the time,

so therefore there was no point in trying to do a similar-type

repair as a temporary repair, so -- so we stuck with our

1   Dyvidag system.

2                   In terms of Duenas doing a check on it, I don't

3   recall.

4       Q       Okay.  So I take it there was never any serious

5   consideration of simply re-epoxying the bolts, the eight bolts

6   per flange as had originally been -- the repair done after the

7   1991 earthquake?

8       A       As -- as I recall, looking at the situation from a

9   boat when we were doing some visual inspections coming to think

10  of the best way to repair it, basically we would've been trying

11  to put a bolt back in a -- in a hole that had some sort of

12  failure in it anyway, and we were trying to stay away from the

13  possible failure mode that had already happened.

14      Q       Okay.  So that was -- excuse me.  Reinstalling the

15  bolts was never seriously considered in the 2001 time frame?

16      A       No, it wasn't.

17      Q       Okay.  Were the Dywidag bars in common use in the

18  construction industry in the year 2001, say?

19      A       I would -- Dyvidag, tie bars, tie bolts, she bolts

20  are -- are used all throughout the heavy construction industry

21  all around the world.  Yes.  Definitely.

22      Q       Would they have been in common use back in the

23  '95-'96 time frame?

24      A       Yes.  Absolutely.  Uh-huh.

25      Q       This isn't a recent invention that has just come

along as a new product?

A    No, not at all.

3    Q    Okay.  Had you seen them used in Guam in the 1995-'96

4    time frame?  Sorry.  You didn't get there until '98.  Let's --

5    let's start with '98.

6    A    Well, from what I recall, each contractor has his own

7    methods on how he builds and does things, because as a

8    contractor, you don't get to see or be involved in the

9    nitty-gritty of a lot of construction that you can see.  So in

10   particular, if it was one of our contracts, we would know about

11   it.  If it was used in the general industry, we probably

12   wouldn't get to -- to see or know where it was involved in Guam

13   in any detail.

14   Q    Okay.  But you had seen them used on Smithbridge

15   projects for several years prior to the 2001 period when they

16   were used on these dolphins.  Right?

17   A    Yes.  That's correct.

18   Q    Okay.

19   A    Uh-huh.

20   Q    You mentioned that it's important that the design be

21   practical and constructible.  What did you mean by

22   constructible?

23   A    Constructible is a term that contractors use.  Or --

24   or buildability might be another similar word.  It's where a

25   designer may not have a lot of practical experience out in the

1   yes, their -- their docking and their -- when they had ships on

2   the facility, it did prove difficult to work.

3       Q    And hot work is welding or cutting steel?

4       A    Yes.  Or -- or any piece of tool, in particular our

5   drilling equipment that were electric, that could possibly

6   create a spark.

7       Q    So it even included electrical hand tools?

8       A    Yes.  Uh-huh.

9       Q    Okay.  When was the first time that you went to see

10  the dol-- excuse me.  Excuse me.

11              When was the first time you went to see the

12  dolphins at F-1?

13      A    I actually recall looking at the facility prior to --

14  prior to us actually doing the repair or even prior to -- prior

15  to the earthquake.

16      Q    You had seen the facility prior to the 2001

17  earthquake?

18      A    From what -- yes, I had.  Yes.

19      Q    Okay.

20      A    Uh-huh.

21      Q    And did that include walking out on the dolphins?

22      A    My re-- recollection isn't terribly clear on this.

23  I -- if I remember, I had been in a boat around that facility

24  prior to the earthquake.

25      Q    Okay.  Was that in connection with making some

1    proposal to do some work for either Shell or the Port?

2        A    Yes, at that time.  We -- we were doing several

3    contracts in and around the port and for the U.S. Navy.  And

4    you're always looking for areas where you can possibly go and

5    get some business.  So yes.

6        Q    Okay.  What was the first time you went to the Shell

7    F-1 Pier after the 2001 earthquake?

8        A    I -- I can't recall the exact date, but I am assuming

9    within two weeks of the earthquake.

10       Q    Okay.  Did you go out -- walk out on the surface of

11   the dolphins?

12       A    Yes.  We went out on the surface of the dolphins.

13   And I think we also went down some of the existing facility

14   ladders to have a quick look underneath.

15       Q    Okay.  The metal boarding ladders that they have that

16   run down to the -- toward the water?

17       A    That's correct.  Yes.  Uh-huh.

18       Q    Okay.  Did you also take a boat and go out

19   underneath?

20       A    Yeah.  The late -- at a later stage.  We -- we took a

21   couple of boat trips on several occasions to -- to look at the

22   damage further, yes.

23       Q    Okay.  What did you notice when you got in the boat

24   and were underneath the dolphins?  What was the state of

25   their -- of the damage that you could see?

A        Obviously the -- the -- the major damage that we saw
was that a very large number of the -- of the bolts that
anchored the top of the pile to the underside of the concrete
were either partly out or were not in existence at all.

Q        They disappeared completely?

A        That's correct.

Q        Okay.

A        Uh-huh.

Q        And some were hanging, partly pulled out?

A        Some were -- some were pang-- hanging p-- partly out.
Some of the piles had displaced themselves in a horizontal
position; in a couple of cases eight or nine inches, and in
those cases there were no bolts left at all.

Q        Okay.  Were some of the batter piles hanging down and
no longer affixed to the caps?

A        That's -- that's correct.  There were several --
several piles on several of the dol-- dolphins that had no
attachment to the -- to the underside of the concrete pier at
all.

Q        Okay.  Did it appear to you that the displacement of
the piles and the fact the bolts were no longer in existence
was damage that was caused by the earthquake in 2001?

                 MR. STERLING:  I'm -- I'm going to enter an
objection as to qualification of this witness to give that type
of expert opinion.

Go ahead and answer.

Q      (BY MR. BOOTH)   You can answer.

A      My -- my experience, there were -- there were two
things that looked as though that had happened.  As -- as a
contractor who does this sort of retrofit type of repair -- and
I've had a lot of experience in retrofit -- fit repairs.   One,
the epoxy that holds the bolt in was soft and -- and pliable
which would indicate that the chemical reaction to harden epoxy
in this circumstance hadn't -- hadn't reacted or mixed properly
and provided a hard epoxy.   That was even on several occasions.
The other -- the other instance was where it did look as though
the actual earthquake had pulled the bolts out.

So there were two separate instances where, one,
it looked as though the bolts had possibly fallen out on their
own -- own behalf prior to the earthquake and instances where
some of these bolts had definitely been pulled out as a direct
cause of the earthquake.

Q      Okay.   You mentioned that some of the piles had been
displaced horizontally eight or nine inches, I think you said.
Did it appear that that had been caused by the earthquake?

A      Yes.   The direct displacement -- I felt that the
direct displacement had been the concrete cap had -- had moved
and left some of the piles in the same position, and some of
the piles that were still connected had actually a vertical --
or sorry, a horizontal displacement with them.   So the whole

cap had basically moved and left some of the piles that had

disconnected in their existing position.

Q      Okay.  So the ones that were -- that appeared to be

displaced, in fact, were still in their original position, but

the entire cap had been moved by the earthquake.  Is that

right?

A      That was my opinion, yes.

8     Q      Okay.  In addition to horizontal movement, was there

9     any movement vertically where the piles had either raised up or

10    been pushed down by the earthquake force?

11    A      We didn't feel -- I didn't think that there had been

12    a vertical displacement, no.  But the final position where the

13    concrete cap had rested, because the structure had raker piles

14    on it, if it had displaced horizontally, it would've also

15    displaced a certain amount vertically.  But the piles -- the --

16    the relative level of the piles hadn't changed.  It was -- if

17    you have a raker pile like this and a concrete cap on it like

18    this and you push it this way, that raises the cap; it doesn't

19    necessarily push the pile up or down.

20    Q      Okay.

21    A      Is that understandable?

22    Q      So I understand you -- yeah.

23            It's a good thing we have a videotape because

24    the way you've illustrated it makes it much clearer.

25            If you push the concrete cap toward -- in the

1   boat with Mr. Dennis and inspect the dolphins?

2       A       That's correct.

3       Q       Okay.  Was that the boat inspection you referred to

4   previously, or was that a later one?

5       A       Yes.  That must've been the first one.  I -- I

6   apologize.  I couldn't remember exactly the -- the time that I

7   did inspect after the earthquake.  But I'm assuming that this

8   document -- we have seen this document.  We assume the dates

9   are correct.

10      Q       Okay.  Did you read the letter or report dated 19th,

11  December 2001 when it came in to you?

12      A       Yes, I would've read that report.

13      Q       Okay.  Did that appear to be an accurate reflection

14  of -- of the condition that you saw when you went on the boat

15  with Mr. Dennis and looked at the underside of the piles --

16      A       Yes.

17      Q       -- the underside of the caps, sorry?

18      A       Yes.  This would be a good representation of what I

19  saw at the same time with Mr. Dennis.

20      Q       Okay.  Did anyone, during that inspection trip,

21  actually pull any of the bolts out of the holes on the

22  underside of the caps?

23      A       Yeah.  We had recovered several of the b-- b--

24  several of the bolt -- bolts on that occasion.  We had also

25  recovered several of the bolts on the seafloor in two

1    instances; one, when Captain Jungen Unterberg did a survey of

2    it, he recovered some bolts.  And also on a following survey

3    when we were evaluating the condition of the steel pile, a

4    company called Pacific Foundations also recovered several of

     the bolts.

6         Q    Okay.  I'll ask you a little bit more about those in

7    a minute.

8              Who retained Captain Unterberg?

9         A    My recollection initially is that Peter MacLeod

10   had -- had possibly requested Captain Unterberg to do a

11   preliminary survey for him.  And after that instance, we had

12   then -- from what I recall, had involved Captain Unterberg on

13   another occasion to help with a survey on the pier.

14        Q    Okay.  Did he write any reports to Smithbridge?

15        A    No, not that I'm aware of or I can remember.

16        Q    Okay.  Did you ask Captain Unterberg to pick up the

17   bolts -- any bolts on the seafloor that he saw during his

18   diving?

19        A    No.  He -- he just picked them up.

20        Q    On his own volition as it were?

21        A    Yes.  We're -- that would be a good assumption.

22        Q    Okay.

               Did you personally dive in it -- on or around

24   the F-1 dolphins?

25        A    In a recreational capacity, yes.

Q    Okay.  But not as part of the job you were doing for Smithbridge?

A    No.

Q    Okay.  You didn't make a dive specifically to look at the undersea condition or how far the piles were driven into the seafloor or anything like that?

A    Yes, I did look at -- at these.  There is a -- a -- a conflict of safety as a professional diver versus a personal diver representing a company in this capacity.  I probably shouldn't have dove on the structure just because of the safety circumstances.

Q    Uh-huh.  But you were curious to see what it looked like?

A    Oh, I -- I was -- as a construction manager, I -- I was very curious of the structure, yes.

Q    Okay.  Did you see anything notable as far as the -- the subsea portion of this facility?

A    No.  I didn't recognize anything in the lower -- below sea level structure that was abnormal apart from several bolts, also, that I had picked up on the seafloor.

Q    Ultimately the bolts ended up in a white five-gallon bucket, which I saw in your office at Smithbridge at one point in Guam.  Were the ones that you collected, the ones that Captain Unterberg collected, and the ones that came from any other source all, sort of, put collectively into the white

bucket?

     A     I can't recall.  I -- I don't think so.  I think the
ones that I had in my white bucket were the ones that I had
collected and the ones that Pacific Foundation had collected.

     Q     Okay.

     A     Is my recollection.

     Q     Okay.  So we'll have to ask Captain Unterberg where
the ones he collected went?

     A     Yes, sir.

     Q     Okay.  Was the letter or report dated December 19th,
2001, from Frank Dennis given to Duenas & Associates for them
to factor into their repair proposal?

     A     Yes.  Absolutely.  They -- they looked at this
document, from what I'm aware, and that helped them in their
final design and for -- for the project as this was an initial
design that we had requested.  My understanding as the engineer
of record, it was Duenas' responsibility to then do their
independent design check to ensure that the assumptions of
these designs were correct or this analysis was correct.

     Q     Okay.  Do you know what the type of concrete is
that --

               MR. BOOTH:  Strike that.

     Q     (BY MR. BOOTH)  Do you know what Duenas & Associates
used as the characteristics of the concrete on the caps of the
dolphins?

1    Q       The work that you did did not involve installing this

2    spacer, or whatever the word would be, in Exhibit 6 that goes

3    between the top of the pile and the underside of the cap?

4    A       That's correct.  Smithbridge had no involvement in

5    that flange-type connection.

6    Q       Okay.  Was the proposal of Duenas & Associates

7    submitted to Shell for approval?

8    A       My recollection is the design-build proposal went via

9    Shell to the Port Authority to approve.

10   Q       So it went first to Shell for its approval?

11   A       That's correct.

12   Q       Right.  Okay.

13   A       Uh-huh.

14   Q       Did -- to your knowledge, did Shell play any role in

15   the design of the repairs as they were constructed by

16   Smithbridge?

17   A       Yes, they did in an early stage.  I -- I recall

18   several meetings with Mr. Dean at -- at the Shell tank farm in

19   PD where we had discussed some options that he -- he wanted our

20   designers to evaluate to see whether, you know, those

21   thoughts or -- could be inter-- incorporated into the design.

22   Q       Okay.

23   A       Yeah.

24   Q       Is the F-1 pier and dolphins the only way that Shell

25   has in Guam to bring fuel into the island?

1      A     From what I'm aware of, yes.

2      Q     Okay.  So if the F-1 dolphins and pier were out of

3   business or unavailable, Shell Guam would be out of business,

4   as far as you know?

5      A     As far as I know, yes.

6      Q     Okay.

7      A     Uh-huh.

8      Q     In your inspections of the underside of the caps by

9   boat, did you notice any of the bolts that were bent over, say,

10   at a 45-degree angle or so?

11      A     Yeah.  There were -- there were a couple of bolts,

12   from what I recall, that were bent over, and I think they were

13   probably cause to some of the earthquake action.

14            Possib-- no, I won't -- I won't surmise.  My --

15   my thought was that if there was a bent bolt there, as -- as

16   the pile had pulled out from the concrete, it had then -- in

17   the reverse direction, had -- had possibly smacked down on the

18   bolt and bent the bolt over is -- is my thought of it.

19      Q     Okay.

20      A     From what I can recall.

21      Q     Had -- prior to the work on the Shell F-1 dolphins,

22   had you worked with Tom Camacho before?

23      A     Yes.  I -- as -- as I previously said, we worked on

24   the GPA wall repair on Cabras 4 where Tom had helped on some

25   temporary design repairs for a wall that had -- a concrete wall

1    that had been damaged at the Cabras 4 power plant.

2        Q        I'd like you to look at Exhibit 6.

3        A        Uh-huh.

4        Q        And my first question is -- a copy of this is

5    addressed to Simon Guard at Smithbridge.  Is Mr. Guard someone

6    who worked for you?

7        A        Simon Guard was my contracts manager while I was the

8    general manager at Smithbridge.

9        Q        Okay.  The first paragraph of the letter from

10   Mr. Camacho references that the work is not considered

11   permanent and is only a short-term or interim solution to

12   address stabilization.  Is it your recollection when the first

13   proposal was made by Smithbridge Guam that the work proposed,

14   including the Dywidag bars, was only meant to be a short-term

15   solution?

16       A        The Dyvidag proposal was always considered a

17   short-term proposal; but in -- in due consideration, we

18   would've hoped that that repair may have been mirrored or would

19   not have to be reworked when the permanent repair was going to

20   be completed.

21       Q        Okay.

22       A        There's nothing -- nothing worse than doing a

23   temporary repair that then gets wasted completely again when a

24   permanent repair is done.

25       Q        In other words, you don't want to have to redo it

1    when you come back to do the permanent repair?

2        A      Well, it cost more money.

3        Q      Okay.

4               Was there any discussion in this time frame,

5    meaning in early 2002, of how the permanent repair would've

6    been done or the repair to the other piles that you weren't

7    repairing at this time?

8        A      Yeah.  We had always considered that a permanent

9    repair scenario would be to carry on the way we were going with

10   that similar-type repair.

11       Q      Okay.  So a permanent repair could have been

12   installing the Dywidag bars on all of the piles?

13       A      That's correct.  Yeah.

14       Q      Okay.  Would anything else have had to have been done

15   to make it a permanent repair other than that?

16       A      Sorry.  I don't quite understand that question.  Can

17   you --

18       Q      Okay.  If the permanent repair consisted of doing

19   the -- doing each pile with a Dywidag bar and concrete --

20       A      Uh-huh.

21       Q      -- is that all that would've had to have been done to

22   make it a permanent repair, just do the other 75 piles?

23       A      Yeah.  There would've had to probably be -- or

24   definitely been some final design analysises completed and some

25   drawings, etc.; but yeah, my recollection was -- would be to

1  the ability to do any -- any pile with this method.  It

2  didn't -- our -- our method wasn't dependent on difficulty

3  because they're all the same difficulty to do this type of

4  repair.

5       Q    Okay.  And as I understand the design, it

6  contemplates drilling a hole down through the cap, which in

7  some cases was, what, 5 or 6 feet in thickness.  Is that right?

8       A    Correct.  Yes.

9       Q    Yeah.  And you had the capacity also to drill at an

10 angle so that you'd drill into the batter piles as well?

11      A    That's correct.

12      Q    Okay.  How was the -- how is the drill aligned so as

13 to properly meet the angle of the batter pile?

14      A    Very good engineering setup and positioning and setup

15 prior to the drill going through the concrete.

16      Q    Physically, how do you do that when, you know, you're

17 standing on the top of the cap and you can't see where the

18 batter pile meets on the underside?

19      A    By surveying the pile above the water -- above the

20 water, you can locate the position relative to the pile cap

21 and -- and calculate the rake and the position at the

22 intersection point underneath the pile cap.  That translation

23 of rake and the angle can then be calculated through the

24 concrete to the top position.  So if -- if it's coming through

25 like that, we know this position here at the underside; and if

1    that's the top position, we can translate that angle and locate

2    the exact position on the top --

3       Q     Okay.

4       A     -- accurate enough to be able to drill the hole and

5    locate the center of the pile.

6       Q     Okay.  Is there some flexibility in installing the

7    Dywidag bar after the hole is drilled so that you can be a half

8    an inch off one way or the other?

9       A     Yes.  Yeah.  We -- we chose on a -- I think it was a

10   4-inch hole.  It may have been a 5- or 6-inch hole.  I need to

11   go and check back.  But even if it was the smaller 4-inch hole,

12   with a 1 3/4-inch Dyvidag bar, there's good tolerance of plus

13   or minus an inch in that location.

14      Q     Okay.

15            How long after the temporary repair of the 24 or

16   25 piles was completed did you leave Guam?

17      A     We had completed the work, from what I recall --

18   and -- I may be wrong -- in March of two thousand and -- 2003

19   or -- no.  I -- I can't recall the exact date that we completed

20   the work without going back and having a look at the daily

21   records.  Sorry.

22      Q     Okay.

23            Was the repair proposal by Duenas and the work

24   that Smithbridge did similar to some other work that you had

25   done on Guam for the Navy?

1          Paragraph 2 says, "We reviewed the available

2   as-built (half size) drawings." Do you recall who provided the

3   as-built drawings?

4       A     My recollection is that we received a copy of the

5   drawings either via Peter MacLeod or via Shell of the

6   building -- of the as-built drawings.

7       Q     Do you recall whether those were the as-built

8   drawings from when the piers were originally built in 1970s, or

9   whenever it was, or the as-repair drawings after the '91

10  repairs?

11      A     My recollection is that they were the as-repaired

12  drawings for the 1996 repair, but included in them were some

13  original as-built drawings from the original construction.

14      Q     Okay.

15      A     It was a combination.

16      Q     You referred to a safety consideration of the -- in

17  the state of the caps. Were you referring to a risk to the

18  personnel of Shell that had to work on the piers?

19      A     I was referring to an operational risk of the whole

20  facility if Shell were trying use the facility to -- to dock

21  and -- dock ships and unload fuel. The structure was

22  considered, in my opinion, very unstable.

23      Q     Following the 2001 earthquake it was considered --

24  you thought it was unstable?

25      A     Definitely.  Yes.

Q    Okay.  So that presented a hazard of personal injury for people that were working on it?

A    Yes.  It definitely created a hazard for personal injury.  When -- when there's no earthquake or no loading or no acts of God that can be forced on the structure, the lump of concrete was quite happy just sitting on the piles.  But it was the unknown circumstance that I considered it to be in a dangerous state.

Q    Okay.  And the dangerous condition would be that the cap would actually fall off the piles.  Right?

A    Absolutely.  Yes.  Uh-huh.

Q    Okay.  And that could also produ-- excuse me.  That could also damage a ship or produce oil pollution or lots of other bad things.  Right?

A    Absolutely.  Yes.

Q    Okay.  Was Shell concerned about this?

A    Yes.  Yeah.

Q    Okay.

A    Uh-huh.

Q    Were they trying to push the design of the ultimate temporary repairs along to get them done more quickly?

A    Absolutely.  They were -- they were doing, as you've seen, some bracing repairs.  And they also did a couple of initial-type connection repairs to some piles themselves as well while this was going through the bureaucracy to try and --

try and get a temporary solution and our contract in place.

Q     Okay.  Was final approval required by the Port before the temporary repairs could be done?

A     Yes.  Uh-huh.

Q     The Port had to sign off on it, in other words?

A     The Port had to approve that we go ahead and repair it for Shell, yes.

Q     Okay.  Now, the actual contract that Smithbridge Guam had to do the temporary repair work was actually signed by AM Insurance, wasn't it?

A     In conjunction with Shell, if I recall, yes.

Q     Uh-huh.  Okay.

      Do you know why that was?

A     My assumptions, it was -- it was where the -- the money was to pay for the temporary repair and who -- who it was instructed by and -- and where it actually came from.  So my -- my recollection, it was just because the channeling of the money was coming from an insurance background or an insurance pot.

Q     Okay.

      I'd like you to look at what was marked as Exhibit Q in the prior deposition.  That's a Smithbridge letter dated the 18th of November.  I'll just ask you if you recall having sent that letter.

A     Yeah.  Uh-huh.  I do.

1    Q    I -- I believe our copy that we have as Exhibit Q is

2    not signed.  But did that letter actually get sent, to your

3    recollection?

4    A    It's possible that it may have been sent in the form,

5    or it is possible that it may have been sent in another form.

6    I can't recall exactly.

7    Q    Okay.  But you recall putting in a bid, essentially,

8    of $1,420,000 to repair the twenty -- the 75 piles which had

9    not yet been repaired in the temporary repair?

10   A    Can I have a look at that document again?

11   Q    Yeah.  Yeah.  It's the second line, I think.

12   A    Yes, I do recall that now.  Yeah.  That's correct.

13   Q    Okay.  Thanks.

14        Do you know how the bid price of $1,420,000 was

15   calculated?

16   A    It would've been calculated on a -- on a -- on a best

     estimate available at the time for -- for the work.

18   Q    Is there a --

19   A    May I ask the date that was --

20   Q    18th, November 2002.

21   A    Okay.  Yeah.

22        MR. BOOTH:  Why don't we go off the record and

23   change the tape.

24        VIDEOGRAPHER:  We're off the record at 12:33

25   p.m.

```
 1                    (Break taken.)

 2                    VIDEOGRAPHER:  Here begins Videotape No. 2,

 3      March 23rd, 2004.  We are on the record at 12:37 p.m.

 4           Q    (BY MR. BOOTH)  Mr. Casey, was there -- at the time

 5      you were with Smithbridge Guam, was there an approved rate

 6      schedule for construction work done for the U.S. Government on

 7      Guam?

 8           A    Yes, there was.  Yeah.

 9           Q    And is that what you used as a benchmark for the cost

10      in producing the bid that you submitted to Mr. MacLeod for the

11      repair work on the F-1 pier?

12           A    From what I recall, yes, we used what they call the

13      U.S. Army Corps of Engineers' standard equipment-type rates and

14      schedule, which is a published -- a published document with

15      approved government rates on it.  We had also used figures for

16      overheads and allowable profits that had also been

17      predetermined by the U.S. Audit Department in conjunction with

18      work that we had done on federal -- federal-type facilities.

19           Q    Had you previously used the Army Corps of Engineers'

20      approved rates on other work that you had done for the Port

21      Authority of Guam?

22           A    Not that I can recall.  Not for the Port Authority,

23      no.

24           Q    Does the temporary repair that Smithbridge Guam did

25      using the Dywidag bars provide a rigid connection between the
```

piles and the pile caps?

A    It's rigid in terms of an aesthetic position, but it does allow some flexibility for movement in -- in a situation like an earthquake.

Q    Is that part of the design consideration, to design in some flexibility so that when an earthquake shock takes place it can absorb it?

A    Absolutely.  As -- as part of engineering philosophy in designing for earthquakes, you want to try and create what we call a ductile joint rather than a rigid joint.  A ductile joint will have a -- a -- a small amount of flex -- flexibility so -- or to prevent damage whereas a rigid joint would possibly cause some damage in -- in smaller-type earthquakes, yes.

Q    Okay.  What element of the Dywidag bar installation provides the flexibility?

A    Basically, because you've got a rigid pile surface here and a -- and a rigid concrete surface here and you have a bar that joins the two which allows this type of movement in an earthquake and therefore the Dyvidag bar itself provides the ductility but also the permanent-type connection.

Q    Okay.  Can the bar move at all in the hole that's been drilled through the cap?

A    Yes, it can.

Q    Okay.

A    We -- the design allowed for some elastic elongation

in both the pile cap by surrounding -- putting a nonslip-type surface around the bar in the upper portion that is included into the pile and the upper portion in the concrete pile cap or pier -- pier cap. There was no physical grouting of that bar. It was done with what we call a lock-off nut and -- and a washer on the top surface of the concrete.

Q      Okay. So the -- the top washer and nut are not rigidly affixed into the concrete. Is that right?

A      No. No. They -- they work primarily on the bearing pressure of the -- of the nut pushed on the washer and the washer bearing down on the concrete surface around the hole.

Q      Okay. Is there more or less flexibility in the Dywidag design than in the previous design where there were eight bolts through a flange around the top of the pile?

MR. O'CONNOR: Objection. No foundation.

A      Yes. Absolutely. The -- the connection with the flange and the bolts is what we would call a rigid-type connection in design rather than a flexible-type design, or connection, should I say.

Q      (BY MR. BOOTH) So there's more flexibility in the Dywidag design than in the bolt design?

MR. O'CONNOR: Same objection. Also calls for expert opinion.

A      Abs-- absolutely.

Q      (BY MR. BOOTH) You can answer.

1      A      Yeah.

              Our design is definitely a -- a flexible --
2
3      flexible-type joint.  The other joint is -- is replicating what
4      we would call a -- a rigid connection.

5      Q      Okay.

       A      Which is nonflexible.

7      Q      I'd like you to look at what was previously marked as

8      Exhibit S, which is a draft of Exhibit R that I showed you

9      before with some handwritten annotations, which I'll represent

10     to you Peter MacLeod said at his deposition were his

11     handwriting.  And my first question is whether you re-- recall

12     receiving Exhibit S with those handwritten notes on it.

13     A      That's possible.

14     Q      Okay.

15     A      I --

16     Q      You don't recall?

17     A      Let me just read them.  Just one moment.

18     Q      Uh-huh.

19     A      Oh, yes, I do recall this.  Uh-huh.

20     Q      Okay.  Aside from what comments he's written on

21     there, do you recall Peter MacLeod expressing any concern about

22     the original draft of that document?

23     A      My recollection is -- is Peter was -- Peter had a

24     couple of hats to wear, and he -- he was trying to present a

25     proposal to either the owner or the user of -- of the -- of

1        A        My recollection was our initial inspection was of

2    two -- two of the mooring dolphins, C and -- C and D, of which

3    I refer to in this document on the first page, and we didn't

4    have a full inspection of that stage of all the dolphins, so we

5    had to make a reasonable assumption, which is being stated,

6    that the other dolphins had similar damage without physically

7    getting up close and -- and seeing it firsthand.

8        Q        Okay.  And that would be similar damage caused by the

9    earthquake?

10       A        Yes.  That's correct.

11       Q        Okay.

12       A        Uh-huh.

13       Q        At the time that Smithbridge and Duenas proposed the

14   repair of the 25 piles, was it your understanding that the

15   building code of Guam would apply to this repair?

16       A        Oh, absolutely.  Yeah.

17       Q        Okay.  And was that the uniform building code of

18   1993?  What -- what building code was that?

19       A        My recollection is that Guam, at the time, were

20   going -- trying to change the code requirements, but I think at

21   that stage it was UBC 1993, if that's the correct code.  Yeah.

22       Q        Okay.

23       A        The design -- that would've been the designer's

24   responsibility, Duenas, not Smithbridge's to con-- to ensure

25   that that happened.

1   there of -- of this.  And he had recovered some bolts at the

2   same time.

3       Q      Okay.  Did any of the bolts that were recovered off

4   the seabed have either marine growth or coral growth on them?

5       A      I -- I can't recall --

6              MR. STERLING:  I'm just going to enter an

7   objection for lack of foundation.

8       A      I can't recall totally.  Some of them had a bit of

9   algae-type growth on them, I suppose you can call that, but not

10  large amounts, no.

11      Q      (BY MR. BOOTH)  Okay.  How long after the earthquake

12  did you do your dive around the F-1 pier?

13      A      My recollection is probably within three months of --

14  of the earthquake.

15      Q      Okay.  Did you examine the bolts that were collected

16  in the white bucket?

17      A      Yes.  Uh-huh.

18      Q      Okay.  And did some of them appear to have a very

19  small amount of epoxy in the threads?

20      A      Yes.  Some of them had -- had some epoxy in the

21  thread.  I think the -- the -- the most noticeable thing about

22  that -- those bolts is that a lot of them had no epoxy on the

23  threads.

24      Q      Okay.  And did you or anyone at Smithbridge, to your

25  knowledge, clean any of the bolts after they were collected?

LegaLink Dallas                                              800-966-4567
global court reporting * legal videography * trial services        www.legalink.com
Case 1:03-cv-00009    Document 344-2    Filed 11/01/2005    Page 14 of 33

1    A    No, they did not.

2    Q    Okay.  They just put them in the bucket?

3    A    Correct.  Yeah.

4    Q    Okay.  Did any of them have pieces of concrete that

5    they had -- that had been pulled out of the hole and they had

6    been removed?

7    A    I can't recall that exactly.  No.

8    Q    Okay.  Did any of the bolts appear to be stainless

9    steel?

10   A    All the bolts, from my recollection, were stainless

11   steel.

12   Q    Okay.  In your various trips on the boat underneath

13   the pile caps, did you notice that some of the bolts, the heads

14   are heavily rusted?

15   A    There was two or three piles out of the -- I think

16   the hundred-odd piles on the facility that did have a different

17   type of bolt connection in them.  I -- I can't recall exactly

18   the type, but they were definitely not the typical stainless

19   steel connection.  But it was only isolated to two or three

20   piles from what I remember.

21   Q    Okay.  Of the bolts that you've seen collected from

22   various sources, have they all been a bolt in the sense of a --

23   -- a shaft with a molded head on it as opposed to a piece of

24   threaded rod with a nut that could sometimes serve as a head

25   for a bolt?

A    No.  What they were -- they would be what we would call a piece of stainless steel thread bar.  They definitely did not have a formed nut on the end and -- and -- or a head of the bolt on the end, and that bar had a physical nut and washer that would've been screwed onto that bar.  So basically what we had recovered was a thread bar with a nut and a washer on it --

Q    Okay.

A    -- on one end.

Q    For the ones that you examined, did they have a single nut or were they double-nutted?

A    Single nuts.

Q    Okay.

A    Uh-huh.

Q    So the nut was free to turn or would've been free to turn when it was originally put together?

A    Yeah.  Because that's how -- how it would've been constructed.

Q    Okay.

A    Uh-huh.

Q    Are you familiar with the term "special inspection" or "special inspector" in the construction business?

A    I could only assume what a special inspector could be or would be.  No, not unless someone had specifically written into a contract that a specialist was required to inspect.

Q    Okay.

1    dislodged from any of the piles?

2        A     The attachment bolts?

3        Q     Attachment bolts, yeah.

4        A     Yeah.  As I mentioned earlier, on a previous

5    occasion, I had a chance to visit this facility, and we had

6    noticed in the past that some bolts had appeared to be falling

7    out prior to that earthquake.

8        Q     Could you tell what had caused those to fall out?

9        A     We never looked at them or inspected them close

10   enough to be able to make a fair opinion on that.

11       Q     Okay.

12             Did you notice any of the piles had epoxy around

13   the tops that had run out of the holes?

14       A     Yeah.  On -- after the 2001 earthquake, on close

15   inspection, there were several areas where epoxy had sort of

16   settled onto the flange, and it had appeared that they had run

17   out of the -- out of the hole that they had initially been --

18   or that the epoxy had initially been placed into.

19       Q     And when you use the word "flange," that's the round

20   piece at the top of the pile that has the holes through it

21   through which the eight bolts were installed up into the cap?

22       A     That is correct.

23       Q     Okay.

24             Where was the white bucket with the bolts in

25   them -- in it when you left Guam?

A    From what I can recall, still in my old office in

Smithbridge up on Route 15.

Q    Okay.

Did you feel the epoxy that was on those bolts

to see if any of it was still soft?

A    Not actually on the bolt itself.  But when -- when we

inspected the facility, there are several areas where you could

actually get ahold of the epoxy and grab it and peel it off,

like on the flange or where it had dripped through the bolt

hole on the flange.  But not -- not specifically on the bolt,

no.

Q    Okay.  When you recovered some of that from the

flange or from the cap, was it still soft and pliable?

A    Yes, it was.  Uh-huh.

Q    Okay.  Could you tell what kind of epoxy it was?

A    No.  You couldn't -- couldn't make that assessment.

Q    Okay.  In 2001, when you were inspecting the damage

that was caused by the earthquake, was there any discussion by

anyone as to whether this facility had exceeded its useful life

and ought to be replaced rather than repaired?

A    I'm not sure whether it was just after the earthquake

or a long period of time after the earthquake, but I had heard

discussions through the Port -- and I can't particularly

remember the source that those comments came from.  But we had

heard that the Port's opinion was that they felt the facility

1  was -- was a writeoff.  And we obviously didn't agree with

2  that.  We felt that the facility was still definitely in a --

3  in a good repairable condition, you know.  The concrete on the

4  mooring dolphins was sound.  It didn't have a lot of spawling

5  or anything like that, so it hadn't physically deteriorated

6  much.

7              The surveys and inspections that we did on the

8  lower structure in terms of the piles themselves under the

9  water -- I think we -- we were asked to survey two piles out of

10  every -- off every dolphin, and there was not great or large

11  amounts of corrosion on the piles; so therefore, we considered

12  the pile condition was -- was still reasonable and had some

13  serviceable life left in them.  So we -- we considered that it

14  should've been repaired, yeah.

15     Q     Was a subcontractor hired to do an ultrasonic test of

16  the metal on the -- some of the piles?

17     A     That's correct.  There was an ultrasound done to

18  check the thickness of the shell.  Correct.

19     Q     And that indicated that there was sufficient

20  thickness that the -- the steel hadn't corroded away?

21     A     Correct.  With a comparison of -- of the results that

22  we got against the original design thickness of -- of the

23  shell, it appeared that there wasn't large amounts of corrosion

24  evident.

25              MR. BOOTH:  Thank you.

Q     (BY MR. BOOTH)  So I take it you did not agree with

the opinion that the facility had to be torn down and rebuilt?

A     I think if I had agreed with it, maybe the -- one of

these letters here might've had a -- had a rebuild price on it

rather than a repair price on it.

Q     Okay.  While you were involved in the project, did

the Port of Guam come around to the agreement that -- to an

agreement that it should be repaired rather than replaced?

A     I -- I can't remember whether it was specific in

saying that it -- it could be repaired or -- or it could be

replaced, but certainly they were in agreement that the

temporary repair goes ahead and it doesn't sit there in

disrepair.

Q     If the decision had been taken to replace the

dolphins entirely rather than rebuild them, is that work that

Smithbridge would've been able to do?

A     Oh, absolutely.  Yes.

Q     That's work you would've bid on?

A     Absolutely.  Yeah.

       MR. BOOTH:  Just for identification, I'd like to

mark this as the next exhibit so we have something to refer to

here.

       COURT REPORTER:  That will be No. 8.

       (Exhibit 8 marked.)

       MR. BOOTH:  Thank you.

Q    (BY MR. BOOTH)   I don't recall who drew this drawing -- who prepared it actually, Mr. Casey, but it's in the documents that have been produced in the case.   And I just ask you first if you can identify it as a representation of the Shell F-1 Pier.

A    That's correct.   It is.

Q    Okay.   We've heard dolphins A and B referred to as mooring dolphins and C and D as breasting dolphins.   Do you know what the difference is in those two terms?

A    Yeah.   The dolphins C and D and also H and G, which are in part of the main pier there -- the breasting dolphin is where a ship when it berths, the physical side of the ship would be fendered off the breasting dolphin directly.   There would be direct contact there.

The mooring dolphins A and B are where the ship would have some tie-down ropes, large mooring ropes that come off the stern and the bow and the side of the ship which would then be connected by a mooring device that sits on these dolphins to hold that rope.

Q    Okay.   So unless the docking pilot is way, way off, the ship should not contact dolphins A and B directly?

A    That is very correct.

Q    Okay.

MR. BOOTH:   Although, that's how lawyers like me make lots of money when they do things like that.

1   dolphins A and B such that they're positioned higher and out of

2   the water on the inland side and into the water on the offshore

3   side so they can resist a line pull from the ship and it's

4   reversed on the breasting dolphins?

5       A    Without looking at the drawings -- if you don't mind,

6   let me refer back to -- to some of these.

7       Q    Oh, sure.

8       A    That -- that would be correct.  I mean, the picture

9   I'm looking at of dolphin B would have raker piles to resist

10  those loads from the mooring rope.  But I -- I will add

11  there -- there appears to be rakers in three of the four -- or

12  resisting three of the four lateral directions.

13      Q    Okay.

14      A    A pile can obviously resist load both in compression

15  and tension, so it can work in both directions.

16      Q    Okay.

17           Would you look at Exhibit R again, which is in

18  front of you here?

19      A    Uh-huh.

20      Q    I'm looking at the last two sentences -- last two

21  lines, rather, on the page under paragraph 2.  It says, "On

22  close inspection of mooring dolphin C and D, the retrofitted

23  connection had failed completely on all piles supporting the

24  concrete deck of the dolphin."

25           Was that your conclusion after you made your

1   inspection from the boat with Mr. Dennis?

2       A       Yes.  Absolutely.  Uh-huh.

3       Q       Okay.  When it says "the connection had failed

4   completely," does that mean that none of the bolts were

5   currently in the holes that they'd been inserted into?

6                   MR. STERLING:  Objection, leading.

7       A       Either -- either none of the holes were -- were in --

8   sorry.  None of the bolts were in the holes; or where there was

9   a bolt, maybe the nut was -- was displaced sufficiently that it

10  wasn't being -- it couldn't work as a connection.

11                  MR. O'CONNOR:  What page and paragraph?

12                  MR. BOOTH:  Page 1, paragraph 2.

13                  MR. STERLING:  This is Exhibit R?

14                  MR. BOOTH:  Yes.

15      Q       (BY MR. BOOTH)  If you go on to the next page now,

16  Mr. Casey, the next sentence -- actually the first sentence

17  that starts on the second page.

18                  MR. STERLING:  Can I just -- excuse me.  Can I

19  just see the front page?  There's several versions of this.  I

20  want to make sure I know which one we're dealing with.

21                  Okay.  That's fine.  Thank you.

22      Q       (BY MR. BOOTH)  Mr. Casey, the sentence that I'm

23  looking at says, "In some instances it appeared that the epoxy

24  did not bond properly in the hole."

25                  What did you mean by that?

A   On the majority of the holes, I couldn't see any
instance where the epoxy had actually bonded to the concrete.
In the majority of situations, the epoxy was either -- either
not there or it had layered itself onto the flange, as
previously discussed.  But in -- in most cases, where there was
no bolt in the hole, there was definitely no adhesion of the
epoxy to the -- to the surface of the -- of the concrete.

Q   And that's the surface of the concrete on the inside
of the hole that's drilled into the cap?

A   That's correct.

Q   Okay.  Could you see in any of your inspections
whether the bolts that had been installed were part of an
encapsulated glass, one-piece, if I can call it that,
installation where you install the glass cylinder and then spin
the bolt to mix the hardener with the epoxy?

A   There was nothing conclusive to say that it was a
premixed epoxy that had been injected into the hole or it was
an encapsulated-type glass epoxy system.

Q   Okay.

A   There was -- there was no definitive.

MR. BOOTH:  See, I'm shortening things up for
you.  Promised I would.

THE WITNESS:  Running out of questions.

Do you need to stop the tape for me to go and
get a coffee or not?

1  again if I'm wrong -- that Mel must have expressed some

2  concerns about the pile-load designs for the temporary repair

3  and you passed that on to Peter.  Is that correct?

4     A    I don't know whether it was me that passed those

5  concerns on or Mel had -- I -- I know Mel had direct contact

6  with Peter.  So it -- it could've been through me; it could've

7  been through Mel.  I -- I can't tell you that.

8     Q    Do you know what Mel's concerns were at that time

9  concerning the pile-load designs?

10    A    Not specifically, no.

11    Q    This e-mail says that -- I'm paraphrasing --

12    A    Uh-huh.

13    Q    -- that, you know, we need to make it very clear that

14 the temporary repair would bear no relationship to the strength

15 they had prior to the earthquake and that it will, in fact,

16 return it to a stronger or improved strength condition.

17    A    Uh-huh.

18    Q    Did you, in fact, convey that to Mel Junsay as

19 instructed by Mr. MacLeod?

20    A    I couldn't confirm or -- or deny whether that was

21 a -- a direct conversation, no.

22    Q    Do you agree that the temporary repair that you

23 performed did, in fact, put these piles' connections into a

24 stronger or improved strength condition?

25    A    Improved strength prior to the earthquake, or

improved strength prior to 1996?

    Q     Prior to the earthquake.

    A     Yes. Absolutely.

4    Q     How about improved strength prior to 1996?

5    A     Because I didn't see the structure prior to the

6  repair, I think it's difficult for me to make an opinion on

7  that.

8    Q     There's also a reference here that Frank Dennis is

9  going to redraft the report and send separate reports. Do you

10  know what -- what that pertains to?

11    A     I will say that -- I'm only guessing -- but this is

12  about the time where Frank was pulled away to work directly for

13  Peter on a report rather than for us, and I'm assuming that's

14  to reduce any conflict of interest.

15    Q     Shortly after this or on or about this very same day,

16  there are some reports from Frank Dennis that have to do, one,

17  with the condition of Foxtrot pier, and a separate one with the

18  condition of the dolphins. Do you recall whether you ever saw

19  a report from Frank Dennis at about this time in which the

20  condition of Foxtrot and the condition of the dolphins were all

21  in one report that had to be redrafted?

22    A     I couldn't confirm or deny that unless I actually sat

23  down with the paperwork and went through it.

24    Q     Did Peter MacLeod ever indicate to you why they were

25  going to change -- redraft this report to -- to break the pier

1  structure like that.

2          OCEL has -- have a lot of experience in

3  marine -- marine work structures, and we can safely assume that

4  Frank had sufficient knowledge and experience to put an

5  acceptable design load on it.

6     Q    Also, Forrest this morning asked you about whether

7  there had been consideration of -- of repairing this damage

8  using the same procedure that Black had used, and you indicated

9  that that had never seriously been considered.  Do you have any

10 recollection of talking to Peter MacLeod specifically

11 concerning the possibility of -- of repairing this damage using

12 the same bolt procedure that Black had used?

13    A    It's -- it's possible that that conversation may have

14 taken place.  In our assessment, when -- when we did the

15 preliminary design concept, as I previously stated, we

16 considered that it was not a very good design repair.

17    Q    Okay.  Because basically it had failed already, you

18 felt it was inappropriate to simply go back and reinstall --

19    A    No.  No, actually not.  There was other

20 considerations.  When you epoxy bolts in a vertical underside

21 position, you have the problem that anything liquid has the

22 possibility of coming out of a hole.  This -- that whole design

23 concept was based on this philosophy.  And as -- as -- what I

24 consider myself to be a very good civil engineer and a good

25 contractor, I -- I would've thought -- had questions about that

particular design.

2    Q    Okay.  You mentioned there were other considerations.

3  Do you recall any other considerations?

4    A    Considerations --

5    Q    In terms of why this -- repairing it using the same

6  technique that Black had used -- why this wasn't feasible.

7    A    Well, the primary reason would've been the epoxy, as

8  I said.  And I -- no, I don't.  That -- that primarily would've

9  been the failure of the epoxy in a -- in a vertical position.

10           MR. STERLING:  Okay.  Why don't we go ahead and

11  change the tape here.  There's about five minutes left.  Is

12  that good with you?

13           MR. BOOTH:  Yes.

14           MR. STERLING:  Because then we can finish up

15  without changing again.

16           Let's go off the record.

17           VIDEOGRAPHER:  This concludes Videotape No. 2.

18  Time off the record is 3:18 p.m.

19           (Break taken.)

20           VIDEOGRAPHER:  Here begins Videotape

21  No. 3, March 23rd, 2004.  We are back on the record at 3:21

22  p.m.

23    Q    (BY MR. STERLING)  I'd just like to clarify some

24  observations you made.  Earlier you indicated that when you

25  were inspecting after the earthquake in the bolt -- in the boat

1  under the dolphins that -- I think you said some of the bolts

2  could simply be pulled out because the epoxy was soft, and then

3  you said later that you weren't sure whether you had, in fact,

4  pulled any out or not.  Did you, in fact -- when you were

5  inspecting after the earthquake, were you in a position to

6  actually pull on some of the bolts?

7      A    Yes.

8      Q    And if so, how did you go about that?

9      A    Yes.  In some of the locations, we could reach the

10 physical bolt.  My gray area there on whether we actually --

11 was whether we actually had collected a bolt at that stage.  My

12 recollection was that we definitely had our hand on the bolts

13 and we could definitely move them.  There was sufficient

14 movement to -- that they were loose in the holes but not

15 necessarily the fact that we could physically pull one out

16 because of the angle or how it was wedged in -- in that

17 condition.  So...

18     Q    You also mentioned that you had observed some holes

19 where there was no epoxy -- leaking epoxy, and I just wanted to

20 clarify.  I think you said the situations where you could

21 observe that was where there was no bolt at all.  Is that

22 correct?

23     A    No.  There was some situations where the bolt was

24 hanging half out of the hole where I mentioned that they were

25 actually loose.  There are indications there where -- where the

epoxy had been leaking and was soft in those instances as well.

Q       Okay.  Do you recall how many bolts you saw that were in that condition?

A       I'm going to say as a percentage, of which there's a hundred piles, 800 bolts, that at least 50 percent of those showed that damage.

Q       You also indicated that when you did an inspection that some of the pilings were basically 8 or 9 inches from where they had been originally on the cap --

A       Uh-huh.

Q       -- and it was your view that the cap had, I think, lifted and basically physically moved.  Is that what your testimony was?

A       Maybe not lifted and moved but in a different position to where -- I can refer to the specific dolphins. Dolphin C and dolphin D were the two dolphins that I'm referring to.  In the plans, they have a transition point underneath where they actually sit at two different levels, and there's a -- a batter on the bottom surface of the concrete like this.  Those particular dolphins were where -- where this case had happened.

        Now, when I say it had moved, the final position indicated that it had displaced -- either with some existing piles still connected had moved this way, and the piles that were disconnected showed that they were out of position

laterally by approximately 8 inches.

    Q    And it's your recollection that that observation was made on dolphin C or G. Is that correct?

    A    No. Specifically dolphin C and dolphin D --

    Q    Okay.

    A    -- only.

    Q    To your knowledge, did Simon Guard ever propose to Frank Dennis that the piles be reattached using a mechanical attachment?

    A    As a civil engineer, mechanical attachment or rigid connection is -- I mean, what we have done is -- would be considered a mechanical attachment because it is -- it is physically a piece of steel, therefore, it is a mechanical attachment.

    Q    That's probably a bad question, and I realized it when I asked it.

    A    Uh-huh.  Okay.

    Q    To your knowledge, did Simon Guard ever propose to Frank Dennis a method of repair that Frank Dennis rejected as inadequate strength?

    A    No, not that I'm aware of.

    Q    Since you prepared the estimate for -- for the -- for what we referred to as the full repair, you know, $1.4 million estimate, do you know approximately how much per piling was -- what -- what the cost was per piling to make the connection?

1  document prior to our work going ahead.  We did not contract or

2  request or have a requirement for Duenas to do an as-built

3  situation on our contract.

4       Q      And they were paid a thousand dollars for doing all

5  of that work?

6       A      Well, considering all you have to do is -- is look at

7  some drawings -- you know, it takes a couple of hours to go

8  through those drawings.  I've done it myself.

9       Q      Is that a yes?

10      A      Yeah, I assume so.  Yes.

11      Q      Okay.

12      A      Uh-huh.

13             MR. O'CONNOR:  No more questions.

14             THE WITNESS:  I've accepted it.

15             VIDEOGRAPHER:  Off the record, Counselors?

16             MR. BOOTH:  No.  I got a few more.

17             VIDEOGRAPHER:  Okay.

18             MR. BOOTH:  Just a few more.

19                     EXAMINATION

20  BY MR. BOOTH:

21      Q      Would you look again, Mr. Casey, at the drawing of

22  the dolphins A, B, C, and D.  I think it's 9 -- 8.  Exhibit 8.

23      A      Yeah.

24      Q      When you looked at the dolphins after the earthquake,

25  did all four of the dolphins A, B, C, and D have loose bolts?

1    A    Correct.

2    Q    Was there any difference in the number of loose bolts

3  that you saw in the mooring dolphins A and B versus the number

4  you saw in the breasting dolphins C and D?

5    A    Absolutely not.  They were representative and equal

6  all the way through.

7    Q    Was there any difference in the number of bolts per

8  pile installed in the breasting dolphins C and D versus the

9  mooring dolphins A and B?

10   A    No.  From my recollection, they were the same bolt

11  pattern on C and D as for B and A.

12   Q    Okay.  Was there any difference in any of the repair

13  work that you could see that had been done after the 1993

14  earthquake done to the mooring dolphins A and B versus the

15  repair work that had been done to the breasting dolphins C and

16  D?

17   A    Any difference of work; is that what you're asking?

18   Q    Right.  Yeah.

19   A    No.  The repair to dolphin A and B appeared to be of

20  very similar nature to -- as for dolphin C and D.

21   Q    When Smithbridge Guam was doing its work on the

22  dolphins, was there -- was it necessary for your employees to

23  actually get under the caps and work from the underside?

24   A    There was -- the installation of the bars -- of the

25  bars that we had talked about, that was work underneath the