1 | BERMAN O'CONNOR MANN & SHKLOV
DANIEL J. BERMAN
2 | ROBERT J. O'CONNOR
Suite 503, Bank of Guam Building
3 | 111 Chalan Santo Papa
Hagåtña, Guam 96910
4 | Telephone: (671) 477-2778
Facsimile: (671) 477-4366
5 |
Attorneys for Defendant
6 | Winzler & Kelly Consulting Engineers

7 |

8 | UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF GUAM
9 |

10 | S.J. GARGRAVE SYNDICATE AT        )    CIVIL CASE NO.: CIV03-00009
LLOYDS,                           )
11 |                                  )
Plaintiff,           )    DEFENDANT WINZLER & KELLY
12 |                                  )    CONSULTING ENGINEERS'
v.                )    NOTICE OF PORTION OF
13 |                                  )    DEPOSITION TRANSCRIPTS OF
BLACK CONSTRUCTION                )    BRUCE SWANNEY MARKED
14 | CORPORATION, WINZLER & KELLY     )    WITHOUT COUNTER MARKING;
CONSULTING ENGINEERS and          )    CERTIFICATE OF SERVICE
15 | ENGINEERING, MANAGEMENT &        )
PLANNING SERVICES CORPORATION,    )
16 |                                  )
Defendants.          )
17 | _____ )

18 |

19 |

20 |         Pursuant to Local Rule 32.1 and a stipulation between parties, Defendant Winzler &

21 | Kelly Consulting Engineers ("Winzler & Kelly") hereby files the marked deposition transcript

22 | of Bruce Swanney indicating in margins the testimony it plans to offer.

23 |

24 |         Pursuant to stipulation between counsel, the deposition transcripts are not counter

25 | marked. Plaintiff was to have submitted its objections to this testimony on or before November

26 | 1, 2005.

27 |

28 | ORIGINAL

Dated this 3rd day of November, 2005.

Respectfully submitted,

BERMAN O'CONNOR MANN & SHKLOV
Attorneys for Defendant
Winzler & Kelly Consulting Engineers


By: _____
ROBERT J. O'CONNOR

```
1      Q.      Is that still active?

2      A.      Yes.

3      Q.      All right.  Anywhere else?

4      A.      No.

5      Q.      Have you ever had any of your licenses or

6  accreditations as an engineer suspended or withdrawn by

7  the issuing agency?

8      A.      No.

9      Q.      Okay.

10     A.      I don't know.  You might -- I was licensed

11 in Guam.  I don't know if that's relevant.

12     Q.      Okay.  All right.  And did you allow that

13 to lapse?

14     A.      Yes.

15     Q.      Okay.  You allowed it to lapse as opposed

16 to it being withdrawn by the government in Guam?

17     A.      Correct.

18     Q.      Okay.  When was the Guam accreditation

19 issued?

20     A.      I think 1991 or '2, thereabouts.

21     Q.      Okay.  And when did that lapse?

22     A.      Well, I'm not -- I left Guam in September

23 '99.  Probably lapsed sometime in the year 2000.

24     Q.      Okay.  Did you let it lapse because you

25 didn't plan to go back and practice in Guam anymore?
```

1     A.    Right, yes.

2     Q.    All right.  Can you tell me what your

3 first employment was in the engineering field?

4     A.    The first job I had was for the City

5 Engineers Department, the City of Wellington in

6 New Zealand.  I had -- I was an assistant engineer in

7 the structural division.

8     Q.    What were your primary responsibilities?

9     A.    Structural design of City-funded housing

10 projects and checking submitted drawings for building

11 apartments.

12     Q.    Did that job require you to be a

13 registered engineer in New Zealand?

14     A.    No.

15     Q.    Did you get your registration in

16 New Zealand right after graduation?

17     A.    No.

18     Q.    That was about -- I think you said about

19 four years later, wasn't it?

20     A.    Maybe more than that.

21     Q.    '75 to '79?

22     A.    I graduated in '71.

23     Q.    '71, okay.

24     A.    And I think my registration was 1977, I

25 think my New Zealand registration was now that I think

1    Q.    Which hotel did you do an addition to?

2    A.    I think it was the Dieche, the -- they

3 built some more hotel rooms across the street, across

4 the other side of San Vitoria.

5    Q.    Now, are you aware that this lawsuit

6 primarily involves the dolphins at the Shell F-1 pier

7 in Guam?

8    A.    Yes.

9    Q.    Okay.  Prior to the work you did for

10 Winzler & Kelly on the Shell F-1 dolphins, did you ever

11 work on the repair of dolphins consisting of piles

12 driven into the sea bed and concrete caps?

13   A.    On a different project?

14   Q.    On a different project, right.

15   A.    I don't think so.

16   Q.    Okay.  Did you ever work on any prior

17 projects involving earthquake damage to piers and

18 docks?

19   A.    After -- after the major earthquake in

20 '90, '93, we did -- we got -- had a contract for the

21 Navy doing inspection and documenting the extent of the

22 damage of most of their wharf structures.

23   Q.    That's at the Navy base in Guam?

24   A.    Yes.

25   Q.    Okay.  Were you also involved in the

1   actual repairs, or was this documenting what the damage

2   was?

3        A.    This was documenting what the damage was

4   and developing preliminary repairs -- repair

5   procedures.

6        Q.    Uh-huh.  Did you also get involved in the

7   actual repair work?

8        A.    No.

9        Q.    Okay.  When you first went to Guam, how

10  many engineers were employed in the Winzler & Kelly

11  Guam office?

12       A.    How many licensed engineers?

13       Q.    Let's start with licensed engineers.

14       A.    I'm guessing a little bit, but I'd guess

15  four.

16       Q.    Who was in charge of the office when you

17  first went to work on Guam?

18       A.    The Guam manager's name was Jeff Miller.

19       Q.    Jeff Miller?

20       A.    Yes.

21       Q.    Okay.  And did he remain in charge of the

22  office the whole time you were there?

23       A.    No.

24       Q.    How long was he in charge?

25       A.    He left about a year after I started, I

1      Q.      Okay.  What was the first approach that

2  anyone made to you and asked you to do any work in

3  connection with earthquake damage to the dolphins at

4  the F-1 facility?

5      A.      The person that approached me was Roland

6  Miller, and he had been contacted by Shell Oil, Shell

7  of Guam.

8      Q.      Do you know who at Shell Guam had

9  contacted Mr. Miller?

10      A.      No.  No, I don't.

11      Q.      How long after the earthquake was that

12  approach made, do you know?

13      A.      I'm guess it'd be at least a year.

14      Q.      As I understand it, the '93 earthquake was

15  August 8th of '93; is that right?

16      A.      I think that's right.

17      Q.      Okay.

18      A.      August something.

19      Q.      Were you on Guam when the earthquake

20  happened?

21      A.      Yes.

22      Q.      Okay.  But your understanding is that

23  Mr. Miller's approach -- or Mr. Miller's contact with

24  Shell Guam didn't take place until about a year after

25  that?

1    A.    That's my recollection.

2    Q.    Okay.  What did Mr. Miller tell you?

3    A.    He told me that we'd been approached by

4    Shell Guam to do some fast-track work for them to

5    repair this facility.

6    Q.    Can you tell me what you mean by

7    "fast-track work"?

8    A.    Well, they -- the government of Guam was

9    in the process of developing a repair procedure for

10   the -- for the facility, but as is the nature with

11   government work, it's subject to a lot of intermediate

12   reviews and bureaucracy, and the project was not

13   proceeding as fast as Shell would have liked it to.  So

14   they approached Winzler & Kelly.

15   Q.    When you say "the project," is that repair

16   of the '93 earthquake damage?

17   A.    I'm not sure if all the damage was related

18   to the earthquake.  There may have been some

19   preexisting damage, just due to general deterioration.

20   Q.    Okay.  Well, when you said the project

21   wasn't proceeding as fast as they would have liked,

22   what was the project?

23   A.    The development of the rehabilitation

24   procedures.

25   Q.    Okay.

1      Q.    What was the first thing you did after the

2 meeting with Mr. Dean concerning the repair of the

3 dolphins?

4      A.    I don't remember.

5      Q.    Were you the engineer at Winzler & Kelly

6 Guam that was in overall charge of the work you were

7 doing -- Winzler & Kelly was doing for Shell Guam on

8 the dolphins?

9      A.    I was -- I was the Guam engineer.  The

10 actual engineering work was done at San Francisco.

11     Q.    Okay.  Who was it done by in

12 San Francisco?

13     A.    Larry Lewis.

14     Q.    Larry Lewis?

15     A.    Yes.

16     Q.    Okay.  And he's in the San Francisco

17 office, as opposed to the Santa Rosa office?

18     A.    Yes.

19     Q.    Okay.  Is he still with Winzler & Kelly?

20     A.    I don't know.

21     Q.    Okay.  When you say the actual design

22 work, are you referring to the drawing, VE-1?

23     A.    No.

24     Q.    Okay.  What was the design work?

25     A.    It was the development of -- what was --

        All right.  So is it fair to call what
came out of the meeting with Mr. Dean and Marilou the
Shell project?

        A.      Yes.

        Q.      Okay.  That's one project.  What other
projects were there?

        A.      The second project was the work we did for
Black Construction.

        Q.      Okay.  So let's be specific.  What was the
Shell project?

        A.      The Shell project was a rehabilitation
project for the -- for the piles and piers.

        Q.      The piles and pierce?

        A.      Piles.  Piles, as I recall.  I'm not sure
what you mean by the piers.  I mean, the whole thing is
pier F-1.

        Q.      Well, let's be specific here.

        A.      Okay.

        Q.      I'm going to show you what we marked the
day before yesterday as Exhibit 7 -- or 8, I think.  8.

        A.      Okay.

        Q.      Exhibit 8, which is a representation of
the Shell facility in Guam.  And our prior testimony
has been that dolphins A and B are referred to as the
mooring dolphins?

1    Exhibit 17 that said "proposal" or "draft," or

2    something like that?

3           A.      That was submitted to someone, or --

4           Q.      Yes.

5           A.      I mean, there was preliminary additions of

6    this as part of the normal design process, but...

7           Q.      I understand that, but I'm talking about

8    out -- that went outside of Winzler & Kelly.

9           A.      Not that I recall.

10          Q.      Okay.  Was there ever a preliminary

11   version of drawing 17 that was stamped with something

12   like "not for construction" or "for discussion only"?

13          A.      Not that I recall.

14          Q.      Okay.  At the time you produced

15   Exhibit 17, did you have a set of the EMPSCO drawings

16   available?

17          A.      I had at least the parts that we needed.

18   I'm not sure if I had a full set.  I had at least parts

19   of them.

20          Q.      Okay.  And you say what you needed.  Does

21   that mean you had the ones that pertain to the piles?

22          A.      Yes.

23          Q.      Okay.  There is no indication on

24   Exhibit 17 that any pile is to be treated differently

25   than any other pile.  Is that a fair description of the

1   design that is represented by Exhibit 17, namely, that

2   this method of attaching pile to cap would be used on

3   each of the piles?

4       A.      Yes, it is.

5       Q.      And each of the piles would be cut off

6   four feet below mean low or low water and a splice put

7   in to attach the new tube to the old pile?

8       A.      That was our intent, yes.

9       Q.      Okay.  And a flange would be produced --

10  manufactured for the top of each pile that had six

11  holes for bolts through it?

12      A.      Yes.

13      Q.      Okay.  So there's no separate plan for

14  certain piles and different plan for others, it was the

15  same treatment for each, right?

16      A.      Correct.

17      Q.      Okay.  How long did it take Winzler &

18  Kelly to produce the drawing which is Exhibit 17?

19      A.      Do you mean to draft it or from the time

20  we were engaged by Black to the time it was issued?

21      Q.      The latter.  From the time you were

22  engaged by Black until this drawing was produced and

23  delivered to Black.

24      A.      I don't remember.

25      Q.      Would it -- would it be a matter of

1    24 hours?  Would it be a matter of weeks?  Would it be

2    a matter of months?

3            A.      Weeks.

4            Q.      Weeks?

5            A.      Weeks.

6            Q.      Okay.  As much as a month?

7            A.      I doubt it.

8            Q.      Okay.  Was the process that you produced

9    this drawing and then delivered it to Black?

10           A.      Yes.

11           Q.      Okay.  Did you also deliver it to EMPSCO

12   or the Port or anyone else?

13           A.      No.

14           Q.      No?

15           A.      No.

16           Q.      Okay.  Do you know if either Black or

17   anyone else passed a copy of your drawing on to EMPSCO

18   or the Port?

19           A.      I don't know that they did.  I'd

20   anticipate that they would.

21           Q.      Okay.  Did you go to any meetings after

22   the drawing had been delivered to Black where there was

23   discussion with either Black or EMPSCO or the Port

24   about putting this design into operation, construction?

25           A.      No.

```
 1        Q.      Okay.   Did you hear anything more about
 2   the design after you delivered the drawing to Black?
 3        A.      No.
 4        Q.      Okay.   Did you have occasion to visit the
 5   F-1 facility at any time when Black was working on it?
 6        A.      Yes, I did go out there once.
 7        Q.      Just once?
 8        A.      Once.
 9        Q.      Okay.   Was that just for general interest,
10   or was there a particular reason why you were called
11   out there?
12        A.      One of Black's subcontractors called me.
13        Q.      Who was that?
14        A.      I think it was the -- I think his name was
15   Ken Collard for Pro Marine.
16        Q.      Ken Collard?
17        A.      Collard, yeah.
18        Q.      C-o-l-l-a-r-d?
19        A.      I think so, yes.
20        Q.      And who did he work for?
21        A.      Pro Marine.
22        Q.      Pro Marine?
23                They were the divers?
24        A.      They were doing some -- yeah, some
25   underwater cutting and some demolition work at the
```

1 time.

2      Q.     What did Mr. Collard ask you to come out

3 and see?

4      A.     He was concerned about a non-typical

5 condition that had happened out there, a construction

6 sequencing thing that he wanted -- wanted us to look at

7 and give him an opinion on.

8      Q.     Was he concerned about cutting a

9 particular pile that might be supporting something?

10      A.     Yes, he was.

11      Q.     Okay.  Do you remember which of the

12 dolphins that was on?

13      A.     No.  It was one -- it was either -- ot was

14 either A or B.

15      Q.     One of the mooring dolphins?

16      A.     Yes.

17      Q.     Okay.  And did you give him assurance that

18 it was okay to proceed?

19      A.     Not -- not right away, no.

20      Q.     Okay.  You went back and did some analysis

21 of it?

22      A.     Yes.  We -- we that thanked him for

23 telling us to come -- asking us to come take a look at

24 it, and I told him we'll see what you need to do, if

25 anything.

1      Q.      Okay.  Did you recommend any changes in

2   the construction sequencing as a result of looking at

3   that problem?

4      A.      Not in the sequencing, no.

5      Q.      Okay.  Did you recommend any changes in

6   any of Black's procedures to accommodate the atypical

7   situation you found?

8      A.      Yes.  We recommended preloading a pile

9   before it was attached back to the concrete dick.

10     Q.      Okay.  Just one?

11     A.      Just one.

12     Q.      Okay.  Is that the only time you visited

13  the facility while construction was going on?

14     A.      Yes.

15     Q.      All right.  At any time during your work

16  for Black, were you given an idea of how much money the

17  Port could save by utilizing the design that's

18  contained in Exhibit 17 versus what EMPSCO had

19  previously projected?

20     A.      No.

21     Q.      Mr. Tavillas didn't ever give you any idea

22  that it would save X dollars?

23     A.      Not that I recall.

24     Q.      Okay.  Did you learn at some point that

25  your concept embodied in drawing 17 -- Exhibit 17,

1    would be used by Black?

2         A.    Yes.

3         Q.    Okay.  Did you attend any meetings where

4    the Port discussed that design?

5         A.    I don't remember any.

6         Q.    Did you have any meeting with EMPSCO where

7    they discussed the design?

8         A.    No, I never had any meetings with EMPSCO.

9               MR. BOOTH:  Okay.  Could I have the roll

10   of drawings, please?

11              I assure you, I'm not going to go over

12   every page of these, but I would like to have you take

13   a look at a few.

14              I know you're familiar with the concept of

15   as-built, but I'll just point out to you this set is

16   stamped as-built by Black Construction and dated 30th

17   April 1997, and I will mark this set all as Exhibit 18.

18              (Exhibit No. 18 was marked for purposes of

19   identification.)

20        Q.    BY MR. BOOTH:  My first question,

21   Mr. Swanney, is:  Is this a set of drawings that were

22   available to you at Winzler & Kelly at the time you

23   were doing your work for Black, albeit that they

24   weren't stamped as-built, but is this a set that you

25   had?

1     A.     I'm not sure if I had this complete set.

2   It's been a long time since I've seen them.  But I

3   certainly had at least parts of them.

4              Does that answer your question?

5     Q.     Well, my question is:  Does this appear to

6   have more drawings than what you had available to you?

7     A.     I think so, yes.

8     Q.     Okay.  Are there some of these drawings

9   that do not pertain to the dolphins?

10    A.     I don't know.  I mean, there are some of

11  these drawings that I wouldn't -- I wouldn't need

12  anyway.  I wouldn't need this sheet.

13    Q.     Okay.  So your recollection is you had

14  whatever drawings EMPSCO had that pertained to the

15  dolphins that were going to be worked on?

16             MR. O'CONNOR:  Objection, no foundation.

17  He doesn't know what EMPSCO had.

18    Q.     BY MR. BOOTH:  Did you ever ask EMPSCO for

19  any drawings that they did not provide to you?

20    A.     No.  No.

21    Q.     Did you ever ask Black for any drawings

22  that they did not provide to you?

23    A.     No.

24    Q.     Okay.  Did you ever get the feeling that

25  there must be other drawings out there that you wish

1    you had but you didn't have?

2           A.    No.

3           Q.    Okay.  So you had what information --

4           A.    I had the information I needed.

5           Q.    -- that you needed.

6                 Okay.  And was the -- was all the

7    information that you received provided to you by Black?

8           A.    Yes, I believe so.

9           Q.    Okay.  You didn't -- you don't recall any

10   instance where you went directly to EMPSCO to ask for

11   something?

12          A.    No.  I never went to EMPSCO.

13          Q.    Okay.  Did you ever have any meetings with

14   EMPSCO at all?

15          A.    No.

16                (Exhibit No. 19 was marked for purposes of

17   identification.)

18          Q.    BY MR. BOOTH:  Okay.  I marked a letter as

19   Exhibit 19.  I will hand that to you, Mr. Swanney.

20   This is a letter from Mr. Bismonte at Black to N.C.

21   Macario and Associates, August 5th of '96.

22                Black says, "We are submitting for

23   record/file attached drawings for the non-typical cases

24   of pile top plates."

25                Do you recall seeing some drawings of

1    A.    Yes.

2    Q.    Before Winzler & Kelly?

3    A.    Yes.

4    Q.    Okay.  But to your knowledge, you had no

5 discussions with Macario on the repair of the dolphins;

6 is that right?

7    A.    That's correct.

8    Q.    All right.  Other than being asked to

9 produce the drawing which we had marked as Exhibit 17,

10 were you consulted at any other time by Black on any

11 other aspects of the project on the dolphins?

12    A.    No, I don't think so.  Well, there was the

13 condition that required the pre-loading of the pile.

14    Q.    Okay.

15    A.    They consulted us on that.  The rest of

16 the consultations were probably them faxing me sketches

17 on various items and me responding.

18    Q.    Such as with the two-pile cap situation --

19    A.    Yeah.

20    Q.    -- that we talked about?

21    A.    That's the one I can remember right now.

22    Q.    Okay.  Do you know why Black was asking

23 you to do those particular projects as opposed to

24 EMPSCO?

25    A.    Probably because it's not -- the engineer

1    of record is the Port's engineer of record.  There's

2    often a perceived conflict of him working for both the

3    owner and the contractor.

4        Q.    Were those situations where Black was

5    unhappy with something that had been done by EMPSCO so

6    they turned to Winzler & Kelly for additional --

7        A.    No, it's just that they -- they really

8    couldn't consult EMPSCO.  They needed to find their own

9    engineer.

10        Q.    Okay.  I'm going to ask you to look at one

11   page, which is sheet 5 of 22, sheet No. S-1A, and ask

12   you, Mr. Swanney, if the sketch or detail in the upper

13   left-hand corner appears to be a Winzler & Kelly

14   sketch?

15        A.    No, it's not.

16        Q.    Do you know who produced that?

17        A.    I believe it was Black Construction.

18        Q.    Black?

19        A.    Yes.

20        Q.    Okay.  How about the one in the middle of

21   the page below it?

22        A.    Yes, I believe that was Black

23   Construction, also.

24        Q.    Okay.  And then how about the one in the

25   lower left which says split pile repair details for

1  pile No. 10 dolphin A?  Do you know who produced that

2  drawing?

3          A.      I believe it was Black Construction, also.

4          Q.      Okay.  Did you -- have you seen these?

5          A.      Yes.

6          Q.      Before today?

7          A.      I've seen these.

8          Q.      Okay.  Did you have them at the time you

9  were doing the work for Black?

10         A.      Which -- which work for Black?

11         Q.      Okay.  I thought there was only one work

12 for Black.

13         A.      We didn't have this at the beginning of

14 the project, if that's what you're asking.

15         Q.      Okay.  But at some point --

16         A.      These are to do with this -- this

17 non-typical condition in the pre-loading of the one

18 pile.

19         Q.      Okay.  This indicates a -- what I've

20 called a spacer --

21         A.      Yes.

22         Q.      -- a roughly, I think two-and-a-half inch?

23 Is it more than that?  Six inch?

24         A.      What's --

25         Q.      The --

1        Q.     Was it during the repair project on the

2 dolphins?

3       ·A.     Yes.  Yes.

4        MR. BOOTH:  Okay.  That may be all that I

5 need out of this set.  Let me just check.

6        I thought there was one more.

7        THE WITNESS:  Okay.

8        Q.     BY MR. BOOTH:  Now, looking at the very

9 last page of this set, which appears to be a drawing

10 VE-1, the end --

11       A.     With some additional material added.

12       Q.     That's what I was about to ask you about.

13        Is that your handwriting on this last

14 sheet?

15       A.     No.  No, it's not.

16       Q.     Do you know whose handwriting it is?

17       A.     No.

18       Q.     Referring to detail No. 4, it says:  See

19 revision on submittal No. 18.  And, apparently, there's

20 been a change to the drawing indicating

21 three-eighths-inch as opposed to whatever it used to

22 say.

23       A.     I think it was a quarter.

24       Q.     Quarter-inch?

25       A.     Yeah.

1    Q.    Do you know who made that change?

2    A.    On this drawing?

3    Q.    Yes.

4    A.    No, I don't.

5    Q.    Okay.  Now, this drawing still has your

6 stamp on it and your signature, right?

7    A.    Yes.

8    Q.    Okay.  But someone else has made a --

9    A.    It shouldn't have.

10    Q.    Okay.  It shouldn't have?

11    A.    No.

12    Q.    And why should it not have?  Because it's

13 no longer --

14    A.    Because it's been changed.

15    Q.    Because it's been changed?

16    A.    Yes.

17    Q.    Okay.

18    A.    Normally, as-built drawings have the

19 stamps taken off.

20    Q.    Have the --

21    A.    They remove them.

22    Q.    -- engineer's stamp taken off?

23    A.    Right.  Just a record set.

24    Q.    Okay.  And detail No. 2 above it also has

25 a comment:  See revised comment?

1      A.     Connector.

2      Q.     -- connector on submittal No. 18?

3      A.     Yeah.

4      Q.     And, again, three-eighths-inch has been

5 put in place of one-quarter.

6            Do you know who made that note?

7      A.     No, I don't.

8      Q.     Okay.  The small drawing or sketch on the

9 right-hand side entitled Submittal No. 18 does not

10 appear on the copy of Exhibit 17.

11            Do you know who prepared this?

12      A.     It's Black Construction Corporation.

13      Q.     Okay.  So it's your understanding that was

14 prepared by Black?

15      A.     Yes.  Yes, and I've seen that one before.

16      Q.     And now you're pointing to the one above

17 it also entitled Submittal No. 18.

18            Have you seen both of those or only the

19 top one?

20      A.     I don't recall seeing this one before.

21      Q.     Okay.  Looking at the one on top, the

22 uppermost of the two submittal No. 18s, does that

23 accurately depict your proposal for how the dolphins

24 were to be repaired?

25      A.     No.  It's a -- it's a slight change from

1   what I'd proposed.  This is the system I'd proposed.

2        Q.     You're pointing out a section -- the

3   drawing labeled section 2?

4        A.     Yes.

5        Q.     And what is changed in the submittal

6   No. 18 to the right of it?

7        A.     They've gone from -- the system I detailed

8   shows two hemispherical half circles which would be

9   placed against the side of the pile, one from each

10  side, and welded in place.

11       Q.     Welded after they're put around the pile?

12       A.     Yes.

13       Q.     Okay.

14       A.     The sketch produced by Black indicates

15  one -- one piece of metal circular that would be -- and

16  they call it a slip ring, which would mean it would be

17  slipped over the pile and lowered down into its right

18  position, then welded into place.

19       Q.     Okay.  So instead of having to make two

20  welds, the proposal in submittal No. 18 only has one

21  weld only on one side?

22       A.     That's the weld here.  There's still the

23  weld around the circumference of the pile --

24       Q.     Right.

25       A.     -- which would be the same in both cases.

1    Q.    Right.  Okay.  Do you recall any

2  discussion with Black as to why that change was made?

3    A.    They -- they figured that that's more

4  convenient for them to do it that way.

5    Q.    Okay.  Were you consulted before they made

6  that change?

7    A.    Yes.

8    Q.    Okay.  And is it your understanding that

9  the proposal detailed by Black as submittal No. 18 is

10  what was actually used?

11    A.    I don't know that.  I never saw it.

12    Q.    Okay.  My question is this.  This drawing

13  is stamped as-built.

14    A.    Right.

15    Q.    Yet it has two different details of how to

16  do the same work.

17    A.    Oh, I see.

18    Q.    My question is which one was actually

19  used?

20    A.    Okay.  This one.

21    Q.    Okay.  Pointing to the one Black did as --

22  or that you believe Black did as submittal No. 18?

23    A.    That's what this drawing indicates,

24  anyway.  This note here, yeah, they could have put a

25  big X through it.

1     Q.     NIC or something?

2     A.     Yeah.

3     Q.     Okay.  There's a note beside section 1

4 that says:  See submittal No. 18, as well.  Do you know

5 what, if any part, of the section 1 drawing was

6 changed?

7     A.     It would appear to be this.

8     Q.     Okay.  Pointing to the lower of the two

9 submittal No. 18s?

10     A.     Yes.

11     Q.     But my question is specifically what is

12 shown in detail 1 has been changed?

13     A.     Well, it's not a solid plate anymore.

14 It's an annular plate.  I think the thickness is the

15 same.  It's a one-inch thick plate.  Eight bolts.

16 That's all that jumps out at me now is it's now an

17 annular plate rather than a solid circular plate.

18     Q.     Okay.  And looking at detail No. 4, in

19 addition to the change from one-quarter-inch to

20 three-eighths, and the difference between two

21 hemispheres or just a one weld, as detailed in

22 submittal No. 18, are those the changes between --

23     A.     This one refers to this way.  These two

24 are covered by this one.  This one is this one.

25     Q.     Okay.  So the lower of the two submittal

1   No. 18s refers to section 1 and -- of the old drawing,

2   and sections 2 and 4 of the old drawing are covered by

3   the upper one --

4           A.      Yes.

5           Q.       -- submittal 18, right?

6           A.      Yeah.

7           Q.      All right.  Do you know if any

8   calculations were done by anybody at Winzler & Kelly

9   before the drawing which is Exhibit 17 was produced?

10          A.      There were some very simple calculations

11  done.  There were no formal calculations done.

12          Q.      Okay.  And by "simple calculations," do

13  you mean what engineers sometimes call hand

14  calculations as opposed to a computer run?

15          A.      No.  I mean a quick scribble on a piece of

16  paper rather than something on a calculation sheet or

17  something that's bound and submitted.

18          Q.      Okay.  At any time after they received the

19  drawing which is Exhibit 17, did Black advise you that

20  they were going to utilize this design in the actual

21  construction on the dolphins?

22          A.      I don't think they called me up and told

23  me.  I somehow found out.  I'm not quite sure how.

24          Q.      Okay.  Did you find out when you went down

25  at the request of Pro Marine, or did you --

1          Q.       Okay. Whereas a compression load would be

2 the cap pushing down on the pile?

3          A.       Right.

4          Q.       And I take it that the compression forces

5 were not terribly significant either because the pile

6 is -- the weight of the concrete is always pressing

7 down on the pile, right?

8          A.       The compression forces are very

9 significant design of the piles. They weren't very

10 significant in the design of the attachment --

11          Q.       Because of the connection?

12          A.       Right.

13          Q.       Sorry.

14          A.       Yeah.

15          Q.       That was my question. There were not of

16 great concern with regard to the connection between the

17 pile and the cap?

18          A.       Right. Right.

19          Q.       Okay. What forces did you anticipate that

20 the bolts would see in tension as you were putting

21 together the design which is Exhibit 17?

22          A.       We used the project design criteria,

23 which -- of which the uniform building code was part

24 of, and the soils report.

25          Q.       And were the project design criteria

1      Q.     Okay.  What was your understanding when

2  these dolphins were originally built?

3      A.     What was --

4      Q.     When were they originally built?

5      A.     When do I think they were --

6      Q.     Uh-huh.

7      A.     I believe it was sometime in the '60s.

8      Q.     Okay.  So they were something like 25 to

9  30 years old at the time you were doing the work?

10     A.     Yes.

11     Q.     Okay.  With regard to designing this

12  project for earthquake resistance, you said you

13  referred to the Guam building code?

14     A.     Yes.

15     Q.     What building -- what earthquake zone was

16  Guam in in the time frame you were looking at it, 1994,

17  '95?

18     A.     It was in the UBC zone -- zone 3.

19     Q.     Okay.  I understand that's been changed

20  recently, right?  It's now a 4?

21     A.     Yes.

22     Q.     And do you know when the change took

23  place?

24     A.     I think it was right around the time of

25  this project.

1    Q.    Was -- in fact, it was created -- it was

2    caused in large part by the '93 earthquake, wasn't it?

3    A.    Yeah.  Yes.  Oh, absolutely.

4    Q.    Okay.  Did you, in putting together your

5    design which is Exhibit 17, did you do any even rough

6    calculations as to the forces that the dolphins would

7    see when a tanker of a given size came in to dock?

8    A.    No, I did not.

9    Q.    Okay.  And do you know if anyone else at

10   Winzler & Kelly did?

11   A.    Not as part of this project.

12   Q.    Okay.  You looked at that a little bit for

13   Shell earlier, you said?

14   A.    Yes.  Yeah.

15   Q.    Okay.  Did you ever advise Black that this

16   design, Exhibit 17, was not to be used for

17   construction?

18   A.    No.

19   Q.    I will show you what has previously been

20   marked as Exhibit FF, a letter from Black Construction

21   dated May 1st, 1996, and ask you whether you've ever

22   seen that, Mr. Swanney?

23   A.    Yes, I think I have seen it.

24   Q.    Do you recall if you got a copy of it?

25   A.    At the time, no.

1   provided to you in Guam?

2        A.    No.

3        Q.    Okay.  Turning back to Exhibit 17 and the

4   notes in the upper left-hand corner, it says this

5   drawing -- note 1 says:  This drawing is to be read in

6   conjunction with the drawings and specifications for

7   the project, essentially drawn by EMPSCO.

8             But the drawings prepared by EMPSCO

9   envision concrete encapsulation, right?

10       A.    Yes.

11       Q.    So, to the extent this drawing provides a

12  different design, it supersedes the EMPSCO drawings,

13  right?

14       A.    Parts of the EMPSCO drawings.

15       Q.    Right.  So even though it doesn't say it,

16  this drawing 17, when in conflict with an EMPSCO

17  drawing, supersedes the EMPSCO drawing, right?

18       A.    Yes, for -- yes, for -- for these items.

19            MR. BOOTH:  Okay.

20            MR. O'CONNOR:  For the record, it's the

21  upper right-hand corner.

22            MR. BOOTH:  I'm sorry, upper right.

23  You're right.  It's kind of hard doing this 90 degrees

24  off.

25       Q.    BY MR. BOOTH:  Again, looking at the notes

1  in the upper right-hand corner of the drawing, there's

2  no provision in there for any specific testing of the

3  bolts after they're installed, is there?

4          A.      Not -- not in that statement --

5          Q.      Okay.

6          A.      -- there's no specific provision.

7          Q.      Did you ever discuss with Black any

8  particular test protocol or any particular testing that

9  should have been done of the epoxy bolts after --

10  anchor bolts after they were installed?

11          A.      No.

12          Q.      Okay.  On previous jobs have you seen

13  requirements where once the bolt's installed, it's

14  torque tested?

15          A.      Some of them are required to be by --

16  depending on what the jurisdiction requires, what type

17  of building it is.  Sometimes they are, not all the

18  time.

19          Q.      Okay.  Did you have any understanding from

20  your discussions with Black whether the bolts would be

21  tested in any way after they were installed and the

22  epoxy hardened?

23          A.      No, I didn't.

24          Q.      Okay.  Note No. 2 says:  Adhesive anchors

25  to be a particular Redhead product or approved equal.

1    Did you have any discussion with Black
2  about a substitution of a different product for the
3  Redhead product that you specified in note 2?
4        A.    No, I didn't.
5        Q.    Did you know that Black had substituted a
6  different product for the product set forth in note 2?
7        A.    Well, I know now.
8        Q.    You know now, right.
9              Did you know prior to leaving Guam?
10       A.    No.
11             MR. BOOTH:  Okay.
12             MR. O'CONNOR:  Should we take a break now?
13             MR. BOOTH:  Let me just finish a couple
14  more things, and then I will, yeah.
15       Q.    BY MR. BOOTH:  Were you familiar with this
16  specific Redhead product when you specified it in note
17  No. 2?
18       A.    How do you mean "familiar" with it?
19       Q.    Had you called it out for use on prior
20  jobs?
21       A.    Yes.
22       Q.    Okay.  Had you seen it used?
23       A.    I had seen it -- I'd seen similar
24  products, actually, installed.  I'm not sure if I've
25  seen this particular one installed.

1    Q.    Okay.  Did you personally specify it in

2    note No. 2, or was that done by somebody else?

3    A.    No, that was me.

4    Q.    Okay.  Why did you select that particular

5    product?

6    A.    It was the most appropriate for the

7    application.  It takes a lot of the construction

8    variables out of the installation.  It's a lot -- it

9    requires a lot less skill to install it, and there's

10   more -- it's more -- you're increasing your chances of

11   having the connection constructed correctly.

12   Q.    Okay.  And I understand this is a glass

13   cylinder that has previously measured amounts of

14   hardener and epoxy in it --

15   A.    Yes.

16   Q.    -- and then it's broken NC2, as we say, as

17   it's in the hole, and what do you do, spin the bolt in

18   order to mix it?

19   A.    The bolt's attached to impact drill, and

20   it goes in and breaks the glass and mixes the epoxy

21   and --

22   Q.    Okay.

23   A.    -- it's there.

24   Q.    By putting the words "or approved equal"

25   in note No. 2, were you allowing the contractor some

1    leeway in case he couldn't buy this particular product

2    on Guam?

3         A.    Yes.

4         Q.    Okay.  But I take it you never actually

5    had any discussions as to what type of product from

6    some other manufacturer would be an approved equal?

7         A.    I'm sorry, I lost you there.

8         Q.    Did Black ever come -- or EMPSCO or anyone

9    ever come to you and say:  Would XYZ product be the

10   equivalent of what you specified.

11        A.    No, no one did.

12             MR. BOOTH:  Let's take our break now.

13             THE VIDEOGRAPHER:  We're going off the

14   record.  The time is approximately 12:47 p.m.

15             (A recess was taken from 12:47 p.m.

16   to 1:51 p.m.)

17             (Exhibit No. 22 was marked for purposes of

18   identification.)

19             THE VIDEOGRAPHER:  Back on the record to

20   continue the videotaped deposition of Bruce Swanney.

21   The time is approximately 1:51 p.m.

22        Q.    BY MR. BOOTH:  Mr. Swanney, I may have

23   misunderstood, but did you say in answer to a question

24   this morning that Winzler & Kelly originally designed

25   the pier F-1?

1    have to fly in or get sent in from the mainland US?

2         A.    I consider that was a possibility, yes.

3         Q.    Okay.  I believe you said that you weren't

4    aware that a substitution was made for the Reddy Cam

5    product until sometime long after you left Guam, right?

6         A.    Yes.

7         Q.    Okay.  Did you consider that by putting

8    the note 2 on the drawing, Exhibit 17, that you were

9    giving the contractor the obligation to determine that

10   if he used a product other than Reddy Cam, that it had

11   to be equal in terms of its shear and pull-out

12   strength?

13        A.    No.  My intent was that if any -- any

14   equals were to be considered for substitution, that

15   they were to be submitted to me for approval before

16   they -- before they were used.

17        Q.    Okay.  What factors would you have looked

18   at to determine if they were the equal, if they had

19   been submitted to you as a suggested alternative?

20        A.    The strength, I would -- whether or not

21   the product was -- was certified by the ICBO evaluation

22   service, whether they had and ICBO number, and the

23   method of installation, whether it would be appropriate

24   for this application.

25        Q.    Do you know whether the product that's

1    Q.    Okay.  Did they, in fact, do all the piles

2    on one dolphin first and then move on to the next one

3    in some sort of order?

4         A.    I don't know.

5         Q.    Okay.  Did anyone tell you not to ask

6    Winzler & Kelly California to do a complete computer

7    analysis of the design, Exhibit 17?

8         A.    Did anyone ask us not to do an analysis?

9         Q.    Did anyone within Winzler & Kelly tell you

10   not to?

11        A.    Anyone within Winzler & Kelly tell me not

12   to.

13             No.

14        Q.    Okay.  Did anyone outside Winzler & Kelly

15   tell you not to?

16        A.    No one told me not to.

17        Q.    Okay.  Were you given any financial

18   constraints on the amount of work you could do for

19   Black on -- in the design that led to Exhibit 17?

20        A.    We -- we laid out our scope of work, and I

21   believe that said that we weren't going to do an

22   analysis.

23        Q.    Okay.

24        A.    That was in our agreement.

25        Q.    Did you consider the rough calculations --

1    or I've forgotten exactly how you described them --

2    that you did do to be sufficient to produce the design

3    that is on Exhibit 17?

4        A.    Yes.

5        Q.    Okay.

6        A.    When I say "rough calculations," I don't

7    mean that the calculations were approximate or

8    anything.  They were probably just roughly written.

9        Q.    Roughly written?  Okay.

10        But are they properly described as hand

11    calculations, or --

12        A.    Yes, they were hand calculations, yes.

13        Q.    Okay.

14        A.    They were very simple.  It was simply a

15    matter of looking up the table for the bolts and

16    comparing it to the design load.  You have a pile load

17    of 10,000 pounds and the allowable load per bolt's

18    1,000 pounds, you need ten bolts.  That's the

19    calculation.

20            MR. BOOTH:  Okay.  I understand.

21            Let me mark another document as

22    Exhibit 24, which is which are the minutes of a meeting

23    dated December 11, 1995.

24            (Exhibit No. 24 was marked for purposes of

25    identification.)

1      A.      No.

2      Q.      Okay.  In paragraph 11, Ms. Baluyut says:

3  The Winzler & Kelly drawings are not a modification of

4  the project scope, but a presentation of a repair

5  procedure for selected piles.

6              Was there a discussion with Shell Guam

7  about a repair for only selected piles as opposed to

8  all of them?

9      A.      I don't recall.

10             (Exhibit No. 25 was marked for purposes of

11 identification.)

12     Q.      BY MR. BOOTH:  Okay.  I'd like you to look

13 at Exhibit 25, which is a memo to Larry Lewis from you,

14 dated March 10th, '97.

15             My question is:  The re line says:

16 Pier F-1 Construction Phase Services.

17     A.      Yes.

18     Q.      What construction phase services did

19 Winzler & Kelly provide on the F-1 project?

20     A.      We provided services to Black

21 Construction, addressing some construction phase

22 conditions that they needed our assistance on.

23     Q.      Okay.  And what construction phase

24 conditions were those?

25     A.      Well, this -- this was one that we've been

1  discussing before that required the pile -- the corner

2  pile to be pre-loaded due to a non-typical condition

3  with the pile next to it.

4        Q.    Okay.  Was it your understanding that the

5  project was underway and ongoing on March 10th of '97?

6        A.    Yes.  The demolition work was underway.

7              (Exhibit No. 26 was marked for purposes of

8  identification.)

9        Q.    BY MR. BOOTH:  Okay.  I'd like you to look

10 at Exhibit 26, which is a Port Authority of Guam letter

11 to the general manager of Shell Guam.  The

12 next-to-the-last paragraph, last line, says:  The Port

13 reserves the right to approve, disapprove, or alter the

14 design of Winzler & Kelly's work.

15       A.    Whereabouts are you looking?  Sorry.

16       Q.    There.

17       A.    Oh, okay. Yep.

18       Q.    At any time, did you hear from anyone that

19 the Port had changed or disapproved any portion of

20 Winzler & Kelly's work on the F-1 pier and dolphins?

21             MR. O'CONNOR:  This is for the Shell

22 design, the Shell project?

23             MR. BOOTH:  At any time.

24             THE WITNESS:  That the Port had changed

25 some of our design?

1    Q.    BY MR. BOOTH:  Uh-huh.

2    A.    No, I didn't hear that.

3    Q.    Okay.  I take it from your prior answers

4  that you had no -- you made no direct submissions to

5  the Port of any of your work, correct?

6    A.    Correct.

7    Q.    Okay.  Looking again at Exhibit 17,

8  Mr. Swanney, what is the significance of a licensed

9  engineer putting his stamp and signature on a drawing

10 such as this?

11   A.    What is the significance of it?

12   Q.    Uh-huh.

13   A.    It's -- it's required by the regulations

14 governing the practice of engineering in Guam that you

15 seal the work to certify, or otherwise, that the work

16 was prepared by you under your direct supervision.  It

17 also indicates that the work was prepared by a licensed

18 professional are a professional engineer licensed by

19 the state or territory to perform this kind of work.

20   Q.    Okay.  And does it also signify that the

21 work meets applicable building codes?

22   A.    Does it -- does it mean that it does?

23   Q.    Uh-huh.

24   A.    Not necessarily.

25   Q.    Okay.  Does it give the recipient of the

1    little more.  I can't remember the exact number.

2           Q.      Okay.  Maybe my question wasn't clear.

3    What I'm asking is the actual load that the piles would

4    see, just bearing the weight of a concrete cap, not the

5    maximum that the soil condition could bear.

6           A.      Oh.

7           MR. STERLING:  Okay.  We're talking --

8    we're talking about dolphins now, correct?  Because

9    your first question was pier, and I think that confused

10   him.

11          MR. BOOTH:  We're talking about dolphins,

12   yes.

13          THE WITNESS:  The maximum compression

14   loads are not just from the weight of -- the weight of

15   the pier.  They're typically from the lateral loads on

16   the raking pile, the batter piles.

17          Q.      BY MR. BOOTH:  The batter piles?

18          A.      Right.

19          Q.      Okay.

20          A.      Where one side is in tension, the other

21   side is in compression.

22          As part of my work for Shell, we compared

23   the applied loads to the allowable loads, the

24   compression loads and saw that none of them were

25   exceeded.

1      Q.    Okay.  And in calculating the maximum
2   compression loads that would be seen, did you take any
3   account of earthquake forces when you were doing the
4   work for Shell?
5      A.    Yes.  The earthquake forces transpired
6   that they were the critical -- the critical forces.
7      Q.    Okay.  By "critical," you mean the highest
8   loads that would be seen?
9      A.    Yeah.  The ones that govern the design of
10  the platform --
11     Q.    Okay.
12     A.    -- or the pile, really.
13     Q.    And the maximum compression loads were
14  seen on the batter piles, as opposed to the vertical
15  piles?
16     A.    Yes.  Yes.
17     Q.    Okay.  I left off with your employment
18  experience when we got to Winzler & Kelly Guam, you
19  said you left Winzler & Kelly '99?
20     A.    I left Guam in '99.
21     Q.    Sorry, '99.
22           And at that point, you remained with
23  Winzler & Kelly, but went to work in Santa Rosa; is
24  that right?
25     A.    Correct, yes.

1    Q.    Okay.  How long did you remain with
2  Winzler & Kelly in Santa Rosa?
3    A.    Approximately two years.
4    Q.    Until about 1991?
5    A.    No, no, 2000 --
6    Q.    2001?  Okay.
7    A.    Early 2002, I think I might have left
8  there.
9    Q.    Did you take another job after that?
10   A.    Yes.
11   Q.    What was that?
12   A.    It's the job I have now.  The name of the
13  company is Starling and Associates.
14   Q.    Starling?
15   A.    Yes.
16   Q.    Okay.  And is that here in the Phoenix --
17   A.    Tempe.
18   Q.    Tempe area?
19   A.    Yes.
20   Q.    What kind of a company is Starling?
21   A.    It's a structural engineering consultant.
22   Q.    What was your reason for leaving Winzler &
23  Kelly?
24   A.    My wife was living in Phoenix, and she
25  kind of won the tug of war.

1      Q.    All right.  I guess that explains it.  All

2  right.

3           And you've been with Starling ever since

4  you came to Tempe?

5      A.    Yes.

6           MR. BOOTH:  All right.  I think that's all

7  the questions I have at the moment.

8           MR. O'CONNOR:  I have a few.

9

10                    EXAMINATION

11  BY MR. O'CONNOR:

12      Q.    Mr. Swanney, you told Mr. Booth that you

13  think you knew sometime before your only site visit

14  that Black was using VE-1?

15      A.    Yes.

16      Q.    Design VE-1 has several designs on it.

17  Can you be more specific about what you knew about

18  Black using VE-1 before this site visit?

19           MR. BOOTH:  I'd just interpose the

20  objection that he said he'd been to the site more than

21  once, but go ahead.

22           THE WITNESS:  I lost you, Bob.

23      Q.    BY MR. O'CONNOR:  All right.  You told

24  Mr. Booth that you think you knew sometime before this

25  one site visit where you saw the Pro Am work that was

1    going on --

2        A.    Oh, yes, yes.

3        Q.    -- that Black was using VE-1.  And VE-1

4    has several designs on it.  Could you be more specific

5    about what you knew about Black using VE-1 before that

6    site visit?

7        A.    Well, like I said, we didn't know -- we

8    didn't hear anything formally.  All I'd heard was

9    conversations from people I talked to, and I heard that

10    they were not using and encapsulation system.  And I

11    kind of assumed that they were using VE-1, but I didn't

12    know they were using it -- different parts of it or in

13    its entirety or not.

14        Q.    When you went to the site, you could see

15    the piles were not encapsulated, so you knew they were

16    splicing piles; is that right?

17        A.    When I -- when I went to the site during

18    construction, they were in the demolition -- they were

19    demolishing.

20        Q.    Oh.

21        A.    So they hadn't actually constructed

22    anything.

23        Q.    Okay.  So you didn't know whether or not

24    Black had used your design that required

25    six-and-three-quarter-inch bolts until this lawsuit was

1  filed?

2      A.    No.  No.

3      Q.    Did you know whether or not Black was

4  using the Reddy Cam anchor system before this lawsuit

5  was filed?

6      A.    Did I know whether or not they were using?

7      Q.    Yes.

8      A.    No, I didn't.

9      Q.    Did you know whether or not Black was

10  using eight bolts as opposed to six bolts or ten bolts,

11  or any other number before this lawsuit was filed?

12      A.    No, I didn't.

13      Q.    You told Mr. Booth you did see not advise

14  Black that VE-1 was not to be used for construction.

15  Do you remember that testimony?

16      A.    Yes.

17      Q.    What was the -- in your mind, what was the

18  import of putting the word "proposed" on VE-1?

19      A.    Proposed means that it's subject to review

20  and approval, in this case, by the engineer of record.

21      Q.    So did you assume that -- I'm sorry.

22      A.    I -- the whole relationship with Black

23  Construction was that the -- we were preparing a

24  document for submission to the engineer of record.  I

25  didn't feel like I had to tell them specifically that

1   it wasn't for construction.

2        Q.    So you assumed before they used it for

3   construction they would get EMPSCO's approval?

4        A.    Yes.

5        Q.    And, in fact, they did get EMPSCO's

6   approval, didn't they?

7        A.    Yes.

8        Q.    Was VE-1 meant to supersede any of

9   EMPSCO's plans or designs?

10            MR. BOOTH:  Objection; asked and answered.

11            Go ahead.

12            THE WITNESS:  Not without EMPSCO's

13   approval.

14        Q.    BY MR. O'CONNOR:  Okay.  You have a phrase

15   in the upper right-hand corner here which says:  This

16   drawing is to be -- oh, No. 2, adhesive anchors to be

17   stainless steel Redhead Reddy Cam by Phillips Drill

18   Company, Catalog No. CE3495, or approved equal.

19   Install per manufacturer's recommended procedures.

20            What did you mean by the phrase "or

21   approved equal"?

22        A.    That the contractor was at liberty to

23   submit an alternative anchoring system to me for

24   approval.

25        Q.    So you didn't mean you were giving leeway

1   to Black to just substitute whatever they thought was

2   equal?

3       A.     Correct.

4       Q.     Okay.  On Exhibit No. 19, it refers to

5   submittal No. 18.

6              Do you recall whether or not you ever saw

7   submittal No. 18?

8       A.     Not as submittal No. 18, no.  It was never

9   submitted to me.

10      Q.     Okay.  Did you apply your seal to the VE-1

11   drawing for any other purposes other than those that

12   you've testified to earlier?

13      A.     No.

14            MR. O'CONNOR:  Okay.  No more questions.

15            MR. BOOTH:  One or two more.

16            MR. STERLING:  No questions.

17            MR. BOOTH:  All right.

18            MR. STERLING:  Unless Bruce will feel

19   slighted unless I ask him something.

20            THE WITNESS:  Yeah, don't ask me

21   something.

22

23                   REEXAMINATION

24   BY MR. BOOTH:

25      Q.     Mr. Swanney, did you ever make a written

| | |
|---|---|
| 1 | **CERTIFICATE OF SERVICE** |
| 2 | |
| 3 |     I, Joseph Perez hereby declare under penalty of perjury of the laws of the Unites States, |
| 4 | that on the 3rd day of November, 2005, I will cause to be served, via hand delivery a true and |
| 5 | correct copy of **DEFENDANT WINZLER & KELLY CONSULTING ENGINEERS'** |
| 6 | **NOTICE OF PORTION OF DEPOSITION TRANSCRIPTS OF BRUCE SWANNEY** |
| 7 | **MARKED WITHOUT COUNTER MARKING; CERTIFICATE OF SERVICE** upon |
| 8 | Plaintiff and Defendants Counsel of record as follows: |

9        David Ledger, Esq.
          Carlsmith Ball LLP
10      134 West Soledad Avenue
          Bank of Hawaii Building, Suite 401
11      P.O. Box BF
          Hagåtña, Guam 96932-5027
12      Telefax: (671) 477-4375

13      Attorneys for Plaintiff S.J. Gargrave Syndicate at Lloyds

14      Thomas C. Sterling, Esq.
          Klemm, Blair, Sterling & Johnson
15      Suite 1008, Pacific News Building
          238 Archbishop F.C. Flores Street
16      Hagåtña, Guam 96910
          Telefax: (671) 472-4290
17
      Attorneys for Defendant Black Construction Company
18
      Thomas M. Tarpley, Esq.
19      Tarpley & Moroni, LLP
          Suite 402, Bank of Hawaii Bldg.
20      134 W. Soledad Avenue
          Hagåtña, Guam 96910
21      Telefax: (671) 472-4526

22      Attorneys for Defendant
               Engineering, Management & Planning Services Corporation
23

24      Dated this _____ day of November, 2005.

25

26

27                      JOSEPH PEREZ

28    2003-08-051026-PL-Obj-ExpertTestimony.doc