

**FILED**
DISTRICT COURT OF GUAM

NOV - 3 2005 ᐭ

**MARY L.M. MORAN**
**CLERK OF COURT**

1  BERMAN O'CONNOR MANN & SHKLOV
   DANIEL J. BERMAN
2  ROBERT J. O'CONNOR
   Suite 503, Bank of Guam Building
3  111 Chalan Santo Papa
   Hagåtña, Guam 96910
4  Telephone: (671) 477-2778
   Facsimile: (671) 477-4366
5
   Attorneys for Defendant
6  Winzler & Kelly Consulting Engineers

7
8                **UNITED STATES DISTRICT COURT**

9                  **FOR THE DISTRICTOF GUAM**

10  S.J. GARGRAVE SYNDICATE AT          )   **CIVIL CASE NO.: CIV03-00009**
    LLOYDS,                             )
11                                      )
            **Plaintiff,**              )   **DEFENDANT WINZLER & KELLY**
12                                      )   **CONSULTING ENGINEERS'**
            **v.**                      )   **NOTICE OF PORTION OF**
13                                      )   **DEPOSITION TRANSCRIPTS OF**
    BLACK CONSTRUCTION                  )   **BEN CASEY MARKED WITHOUT**
14  CORPORATION, WINZLER & KELLY        )   **COUNTER MARKING;**
    CONSULTING ENGINEERS and            )   **CERTIFICATE OF SERVICE**
15  ENGINEERING, MANAGEMENT &           )
    PLANNING SERVICES CORPORATION,      )
16                                      )
            **Defendants.**             )
17  _____)

18
19
20          Pursuant to Local Rule 32.1 and a stipulation between parties, Defendant Winzler &

21  Kelly Consulting Engineers ("Winzler & Kelly") hereby files the marked deposition transcript

22  of Ben Casey indicating in margins the testimony it plans to offer.

23
24          Pursuant to stipulation between counsel, the deposition transcripts are not counter

25  marked. Plaintiff was to have submitted its objections to this testimony on or before November

26  1, 2005.

27
28                          ORIGINAL

1    Dated this 3rd day of November, 2005.

2

3                                   Respectfully submitted,

4                                   BERMAN O'CONNOR MANN & SHKLOV

5                                   Attorneys for Defendant

                                      Winzler & Kelly Consulting Engineers

6

7                                   By: _____

                                       ROBERT J. O'CONNOR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    A    Yes.  Because Shell -- Shell were the ones that

2   needed a facility that was operational, so it affected them

3   more.  The bureaucracy on Guam is the government doesn't move

4   terribly quickly, and -- and Shell had more ability to make the

5   contract move quicker.

6    Q    Okay.  While you were with Smithbridge Guam, did you

7   do other projects for the Port?

8    A    Yes.  We -- we had completed a contract for the

9   precast concrete generator buildings, which was four -- four

10  precast concrete structures to protect their existing backup

11  generators.  That was a sealed bid proposal, and it was funded

12  by FEMA after the Typhoon Paka damage in 1997.

13   Q    Are those the buildings that -- with, sort of,

14  porthole windows and slightly curved walls on them?

15   A    That's correct.  Yeah.

16   Q    Interesting designs.

17        Okay.  Did Smith -- Smithbridge Guam send a

    formal proposal to Shell for the repair work on the F-1

    dolphins?

     A    Yes, they did.  Uh-huh.

     Q    Okay.  To your knowledge, were there others -- other

    contracting companies that submitted bids to do that work?

     A    I'm not sure what the process was.  All I know that

    at some time, we were set in a negotiating position to -- to

    get the contract with the RFP.  So I'm unaware of any -- any

LegaLink Dallas                                              800-966-4567
global court reporting * legal videography * trial services      www.legalink.com
Case 1:03-cv-00009    Document 351    Filed 11/03/2005    Page 3 of 23

1    other bids or other contractors.  I'm not sure.

2        Q    Okay.  Putting aside whether you know the details of

3    any other bids that might have been submitted, do you know

4    whether there were any other proposals submitted to Shell?

5        A    No, I don't know.

6        Q    Okay.  What was the nature of the proposal that you

7    submitted to Shell?  Was it to repair all of the damaged piles

8    that might -- that were damaged in the earthquake?

9        A    No, not at all.  It was specifically a temporary

10   repair to stabilize the existing structure to -- to make it

11   safe, that further damage couldn't be -- damage control

12   basically to ensure that the facility didn't cause any other

13   damage if there was a typhoon or another earthquake.  So it was

14   a -- it was a temporary repair.

15       Q    Okay.  Just so the record is clear.  We've -- we've

16   seen documents referring to two types of temporary repairs on

17   the dolphins.  One is some -- what appears to me to be angle

18   irons that were welded around from one pile to another, three,

19   four, five feet off the water, shall we say.  The other

20   temporary repair, or what we've seen described as a temporary

21   repair, consisted of the work that I believe Smithbridge Guam

22   did, which consisted of drilling a hole down all the way

23   through the cap on the -- on the dolphin, attaching a -- or

24   inserting a Dywidag bar, filling it with -- partly with

25   concrete, and then concreting over the top.

1  yes, their -- their docking and their -- when they had ships on
2  the facility, it did prove difficult to work.
3      Q      And hot work is welding or cutting steel?
4      A      Yes.  Or -- or any piece of tool, in particular our
5  drilling equipment that were electric, that could possibly
6  create a spark.
7      Q      So it even included electrical hand tools?
8      A      Yes.  Uh-huh.
9      Q      Okay.  When was the first time that you went to see
10 the dol-- excuse me.  Excuse me.
              When was the first time you went to see the
   dolphins at F-1?
       A      I actually recall looking at the facility prior to --
   prior to us actually doing the repair or even prior to -- prior
   to the earthquake.
       Q      You had seen the facility prior to the 2001
   earthquake?
       A      From what -- yes, I had.  Yes.
       Q      Okay.
       A      Uh-huh.
       Q      And did that include walking out on the dolphins?
       A      My re-- recollection isn't terribly clear on this.
   I -- if I remember, I had been in a boat around that facility
   prior to the earthquake.
       Q      Okay.  Was that in connection with making some

LegaLink Dallas
global court reporting * legal videography * trial services
800-966-4567
www.legalink.com
Case 1:03-cv-00009   Document 351   Filed 11/03/2005   Page 5 of 23

1  proposal to do some work for either Shell or the Port?

2      A    Yes, at that time.  We -- we were doing several

3  contracts in and around the port and for the U.S. Navy.  And

4  you're always looking for areas where you can possibly go and

5  get some business.  So yes.

6      Q    Okay.  What was the first time you went to the Shell

7  F-1 Pier after the 2001 earthquake?

8      A    I -- I can't recall the exact date, but I am assuming

9  within two weeks of the earthquake.

10     Q    Okay.  Did you go out -- walk out on the surface of

11  the dolphins?

12     A    Yes.  We went out on the surface of the dolphins.

13  And I think we also went down some of the existing facility

14  ladders to have a quick look underneath.

15     Q    Okay.  The metal boarding ladders that they have that

16  run down to the -- toward the water?

17     A    That's correct.  Yes.  Uh-huh.

18     Q    Okay.  Did you also take a boat and go out

19  underneath?

20     A    Yeah.  The late -- at a later stage.  We -- we took a

21  couple of boat trips on several occasions to -- to look at the

22  damage further, yes.

23     Q    Okay.  What did you notice when you got in the boat

24  and were underneath the dolphins?  What was the state of

25  their -- of the damage that you could see?

LegaLink Dallas
global court reporting * legal videography * trial services
800-966-4567
www.legalink.com
Case 1:03-cv-00009    Document 351    Filed 11/03/2005    Page 6 of 23

1    A      Obviously the -- the -- the major damage that we saw

2  was that a very large number of the -- of the bolts that

3  anchored the top of the pile to the underside of the concrete

4  were either partly out or were not in existence at all.

5    Q      They disappeared completely?

6    A      That's correct.

7    Q      Okay.

8    A      Uh-huh.

9    Q      And some were hanging, partly pulled out?

10   A      Some were -- some were pang-- hanging p-- partly out.

11 Some of the piles had displaced themselves in a horizontal

12 position; in a couple of cases eight or nine inches, and in

13 those cases there were no bolts left at all.

14   Q      Okay.  Were some of the batter piles hanging down and

15 no longer affixed to the caps?

16   A      That's -- that's correct.  There were several --

17 several piles on several of the dol-- dolphins that had no

18 attachment to the -- to the underside of the concrete pier at

19 all.

20   Q      Okay.  Did it appear to you that the displacement of

21 the piles and the fact the bolts were no longer in existence

22 was damage that was caused by the earthquake in 2001?

23          MR. STERLING:  I'm -- I'm going to enter an

24 objection as to qualification of this witness to give that type

25 of expert opinion.

LegaLink Dallas                                    800-966-4567
global court reporting * legal videography * trial services              www.legalink.com
Case 1:03-cv-00009    Document 351    Filed 11/03/2005    Page 7 of 23

1  Smithbridge Guam, did you have occasion to work with Winzler &
2  Kelly as designers on any of the projects that you did?
3      A    No.  We never worked with Winzler & Kelly direct.
4  But we did have personal contact with them through the Guam
5  Contractors' Association.
6      Q    Did you ever meet Bruce Swanee, who was an engineer
7  at Winzler & Kelly?
8      A    No.  I think Bruce was in Guam before my time.
9      Q    Did you ever work with EMSCO while you were at
10 Smithbridge Guam?
11     A    My recollection is we may have been involved with
12 EMSCO on possibly some Department of Education buildings many
13 years ago, just in precast concrete but nothing certainly on a
14 regular basis or -- or in -- in my time as a -- as a general
15 manager of Smithbridge.
16     Q    Okay.
17          Prior to the October 2001 earthquake, did you
18 ever notice any damage on the Shell F-1 dolphins that appeared
19 to have been caused by ship strikes or heavy docking?
20     A    Not in terms of the major structure.  I had noticed
21 on occasion that some of the -- what they call the ship
22 fendering system, which is attached to the concrete -- that
23 some of the ship fendering system had some ship damage.  But in
24 terms of the primary structure, no, definitely not.
25     Q    Did you ever notice if any of the bolts had been

LegaLink Dallas
global court reporting * legal videography * trial services
800-966-4567
www.legalink.com
Case 1:03-cv-00009   Document 351   Filed 11/03/2005   Page 8 of 23

1   dislodged from any of the piles?

2       A       The attachment bolts?

3       Q       Attachment bolts, yeah.

4       A       Yeah.  As I mentioned earlier, on a previous

5   occasion, I had a chance to visit this facility, and we had

6   noticed in the past that some bolts had appeared to be falling

7   out prior to that earthquake.

8       Q       Could you tell what had caused those to fall out?

9       A       We never looked at them or inspected them close

10  enough to be able to make a fair opinion on that.

11      Q       Okay.

12              Did you notice any of the piles had epoxy around

13  the tops that had run out of the holes?

14      A       Yeah.  On -- after the 2001 earthquake, on close

15  inspection, there were several areas where epoxy had sort of

16  settled onto the flange, and it had appeared that they had run

17  out of the -- out of the hole that they had initially been --

18  or that the epoxy had initially been placed into.

19      Q       And when you use the word "flange," that's the round

20  piece at the top of the pile that has the holes through it

21  through which the eight bolts were installed up into the cap?

22      A       That is correct.

23      Q       Okay.

24              Where was the white bucket with the bolts in

25  them -- in it when you left Guam?

1     A      From what I can recall, still in my old office in

2 Smithbridge up on Route 15.

3     Q      Okay.

             Did you feel the epoxy that was on those bolts

5 to see if any of it was still soft?

6     A      Not actually on the bolt itself.  But when -- when we

7 inspected the facility, there are several areas where you could

8 actually get ahold of the epoxy and grab it and peel it off,

9 like on the flange or where it had dripped through the bolt

10 hole on the flange.  But not -- not specifically on the bolt,

11 no.

12    Q      Okay.  When you recovered some of that from the

13 flange or from the cap, was it still soft and pliable?

14    A      Yes, it was.  Uh-huh.

15    Q      Okay.  Could you tell what kind of epoxy it was?

16    A      No.  You couldn't -- couldn't make that assessment.

17    Q      Okay.  In 2001, when you were inspecting the damage

18 that was caused by the earthquake, was there any discussion by

19 anyone as to whether this facility had exceeded its useful life

20 and ought to be replaced rather than repaired?

21    A      I'm not sure whether it was just after the earthquake

22 or a long period of time after the earthquake, but I had heard

23 discussions through the Port -- and I can't particularly

24 remember the source that those comments came from.  But we had

25 heard that the Port's opinion was that they felt the facility

LegaLink Dallas                                      800-966-4567
global court reporting * legal videography * trial services        www.legalink.com
Case 1:03-cv-00009    Document 351    Filed 11/03/2005    Page 10 of 23

1    Q    (BY MR. BOOTH)  So I take it you did not agree with

2  the opinion that the facility had to be torn down and rebuilt?

3    A    I think if I had agreed with it, maybe the -- one of

4  these letters here might've had a -- had a rebuild price on it

5  rather than a repair price on it.

6    Q    Okay.  While you were involved in the project, did

7  the Port of Guam come around to the agreement that -- to an

8  agreement that it should be repaired rather than replaced?

9    A    I -- I can't remember whether it was specific in

10 saying that it -- it could be repaired or -- or it could be

11 replaced, but certainly they were in agreement that the

12 temporary repair goes ahead and it doesn't sit there in

13 disrepair.

14   Q    If the decision had been taken to replace the

15 dolphins entirely rather than rebuild them, is that work that

16 Smithbridge would've been able to do?

17   A    Oh, absolutely.  Yes.

18   Q    That's work you would've bid on?

19   A    Absolutely.  Yeah.

20        MR. BOOTH:  Just for identification, I'd like to

21 mark this as the next exhibit so we have something to refer to

22 here.

23        COURT REPORTER:  That will be No. 8.

24        (Exhibit 8 marked.)

25        MR. BOOTH:  Thank you.

LegaLink Dallas
global court reporting * legal videography * trial services
800-966-4567
www.legalink.com
Case 1:03-cv-00009    Document 351    Filed 11/03/2005    Page 11 of 23

1 version of this letter for?

2    A    No, absolutely not.

3    Q    Okay.  But he wanted changes; you were willing to

4 make them?

5    A    Yeah.  Because it really -- it -- I'm trying to

6 befriend this guy to -- with the possibility of winning --

7 winning a contract to make money to survive.  Yeah.

8    Q    Okay.

9    A    It's -- it's not uncommon for consultants to ask for

10 wordings to be changed in documents like this prior to them

11 presenting them to their client.

12    Q    Okay.

13    A    That would be normal practice.

14    Q    I had another question for you going back to

15 Exhibit Q, which was your $1.4 million quotation.

16    A    Yeah.

17    Q    And there's a reference in there in specifically

18 excluded items that says repairs to the already-damaged ship

19 fendering system, and you mentioned earlier in your testimony

20 here today that some of the fenders were damaged.

21    A    Some of the ship fenders were damaged, yes.

22    Q    Yes.  And when you say "some," do you recall which

23 ones were damaged?

24         And you might want to refer to the Exhibit

25 No. 8.

LegaLink Dallas
global court reporting * legal videography * trial services
800-966-4567
www.legalink.com

1    A    I'd love to see the photograph because the photos

2  tell the whole story.  At least two -- if -- if we have a look

3  at these exhibits on dolphin C, G, H, and D, I know at least

4  two of these fenders were extensively damaged by -- by ships.

5    Q    And when did you do that?  When you did your

6  inspection on --

7    A    Well -- no.  This -- this -- this type of damage

8  is -- is -- is a fender damage that -- that happens in general

9  everyday shipping operations.  It really had nothing to do with

10 the repairs that we were considering.

11   Q    I understand that.

12   A    Plus -- plus we weren't -- plus we weren't indicated

13 or asked to price to replace the fenders.

14   Q    No.  I know that.  But what my question is, you

15 indicate on here you -- you had already seen that there was,

16 you said, extensive damage to some of the fenders.

17   A    Yeah.

18   Q    And I'm just trying find out which ones, if you

19 recall.

20   A    No.  I -- I couldn't tell you that without seeing

21 some photos.

22   Q    And do you recall when you noticed they were damaged,

23 meaning when you went to inspect for the purpose of preparing

24 your estimate or --

25   A    No, I don't recall that.  No.

LegaLink Dallas                                    800-966-4567
global court reporting * legal videography * trial services        www.legalink.com
Case 1:03-cv-00009    Document 351    Filed 11/03/2005    Page 13 of 23

1    Q    Okay.  And when you say extensively damaged, what --

2  what type of fenders were these?  Were these like steel

3  fenders?  What were they --

4    A    No.  They were -- I don't know the exact terminology

5  because I'm -- I'm not into ship fenders.  And usually the port

6  authorities, or the people that are physically using these, use

7  them all the time.

8            The -- one thing I do know is they are a

9  protection system to protect the pier, and usually they're an

10  energy absorber so -- both to protect the ship and the pier

11  facility.  So if one -- if one's damaged, it -- it's designed

12  to -- to fail if -- if -- if it's had a load so it doesn't put

13  ship loads into the facility or -- or vice versa, loads from

14  the pier facility into the ship.  You know, it's designed to

15  take the load to -- to stop damage of the structure and -- and

16  of the ship.

17    Q    But in any event, there were photographs taken at the

18  time that would show this -- this fender damage, if you -- if

19  you know?

20    A    Well, because it wasn't specific, the repair for the

21  fenders, there -- there's -- possibly there could be some

22  photos showing the damage or possibly not.

23    Q    Okay.  So when you say they had failed, were they

24  basically smashed?  I mean, I'm trying to get some

25  characterization of what you saw.

LegaLink Dallas
global court reporting * legal videography * trial services
800-966-4567
www.legalink.com
Case 1:03-cv-00009    Document 351    Filed 11/03/2005    Page 14 of 23

1    A    Well, from what I recall, they were still intact

2  there as a whole; but, you know, there -- there was some damage

3  and the absorbing rubber behind had split.

4    Q    The name Simon Guard has come up here today.

5    A    Uh-huh.

6    Q    Was he actually the project manager for the temporary

7  repair?

8    A    That would be correct.

9    Q    Yeah.  You were the general manager at the time, so

10 you weren't actually in the field all the time?

11   A    I -- I -- I'd take a role that I'd be in the field as

12 much as I can.  And I would have visited that facility probably

13 at least once a week.  When I was doing the estimates and

14 things like that, I was probably there two or three times a

15 week.  When they began the work, I probably would've been

16 there, again, maybe a couple of times a week to ensure that my

17 project managers are doing their job and getting the work up on

18 schedule and going.

19   Q    But Simon was the project manager for this repair?

20   A    That's correct.  Yeah.

21   Q    Is he an engineer?  Do you know?

22   A    Yeah, he's a civil engineer.  Similar qualifications

23 to myself.

24   Q    Did he have any involvement in the design of the

25 temporary repair?

1  under the dolphins that -- I think you said some of the bolts

2  could simply be pulled out because the epoxy was soft, and then

3  you said later that you weren't sure whether you had, in fact,

4  pulled any out or not.  Did you, in fact -- when you were

5  inspecting after the earthquake, were you in a position to

6  actually pull on some of the bolts?

7       A    Yes.

8       Q    And if so, how did you go about that?

9       A    Yes.  In some of the locations, we could reach the

10 physical bolt.  My gray area there on whether we actually --

11 was whether we actually had collected a bolt at that stage.  My

12 recollection was that we definitely had our hand on the bolts

13 and we could definitely move them.  There was sufficient

14 movement to -- that they were loose in the holes but not

15 necessarily the fact that we could physically pull one out

16 because of the angle or how it was wedged in -- in that

17 condition.  So...

18      Q    You also mentioned that you had observed some holes

19 where there was no epoxy -- leaking epoxy, and I just wanted to

20 clarify.  I think you said the situations where you could

21 observe that was where there was no bolt at all.  Is that

22 correct?

23      A    No.  There was some situations where the bolt was

24 hanging half out of the hole where I mentioned that they were

25 actually loose.  There are indications there where -- where the

LegaLink Dallas
global court reporting * legal videography * trial services
800-966-4567
www.legalink.com

1  epoxy had been leaking and was soft in those instances as well.

2  Q     Okay. Do you recall how many bolts you saw that were

3  in that condition?

4  A     I'm going to say as a percentage, of which there's a

5  hundred piles, 800 bolts, that at least 50 percent of those

6  showed that damage.

7  Q     You also indicated that when you did an inspection

8  that some of the pilings were basically 8 or 9 inches from

9  where they had been originally on the cap --

10 A     Uh-huh.

11 Q     -- and it was your view that the cap had, I think,

12 lifted and basically physically moved. Is that what your

13 testimony was?

14 A     Maybe not lifted and moved but in a different

15 position to where -- I can refer to the specific dolphins.

16 Dolphin C and dolphin D were the two dolphins that I'm

17 referring to. In the plans, they have a transition point

18 underneath where they actually sit at two different levels, and

19 there's a -- a batter on the bottom surface of the concrete

20 like this. Those particular dolphins were where -- where this

21 case had happened.

22        Now, when I say it had moved, the final position

23 indicated that it had displaced -- either with some existing

24 piles still connected had moved this way, and the piles that

25 were disconnected showed that they were out of position

LegaLink Dallas
global court reporting * legal videography * trial services                    800-966-4567
www.legalink.com
Case 1:03-cv-00009    Document 351    Filed 11/03/2005    Page 17 of 23

BEN CASEY                                    3/23/2004

1  laterally by approximately 8 inches.

2      Q      And it's your recollection that that observation was

3  made on dolphin C or G.  Is that correct?

4      A      No.  Specifically dolphin C and dolphin D --

5      Q      Okay.

6      A      -- only.

7      Q      To your knowledge, did Simon Guard ever propose to

8  Frank Dennis that the piles be reattached using a mechanical

9  attachment?

10     A      As a civil engineer, mechanical attachment or rigid

11 connection is -- I mean, what we have done is -- would be

12 considered a mechanical attachment because it is -- it is

13 physically a piece of steel, therefore, it is a mechanical

14 attachment.

15     Q      That's probably a bad question, and I realized it

16 when I asked it.

17     A      Uh-huh.  Okay.

18     Q      To your knowledge, did Simon Guard ever propose to

19 Frank Dennis a method of repair that Frank Dennis rejected as

20 inadequate strength?

21     A      No, not that I'm aware of.

22     Q      Since you prepared the estimate for -- for the -- for

23 what we referred to as the full repair, you know, $1.4 million

24 estimate, do you know approximately how much per piling was --

25 what -- what the cost was per piling to make the connection?

LegaLink Dallas                                                          800-966-4567
global court reporting * legal videography * trial services          www.legalink.com
Case 1:03-cv-00009    Document 351    Filed 11/03/2005    Page 18 of 23

BEN CASEY                    3/23/2004

1     A     Not directly.  But a quick calculation in my head

2  would -- would go, maybe 1.1 million divided by -- divided by

3  the 75 piles.  So we're probably talking, say, $15,000 per

4  pile, something in -- in that sort of range.

5     Q     Okay.  So you say 1.1, then.  Are you assuming that

6  the other 320 is basically design fees, the Item No. 3 on the

7  proposal, overhead and profit?

8     A     Yeah.  That -- that's possible.  Or there could've

9  been some unforeseen -- because this -- this estimate here is a

10 quotation and not a -- a final -- it's -- it's a guide to give

11 someone an idea of what -- what the repair might be.  But until

12 you really got into the nitty-gritty of what is definitely

13 included and what is definitely not, the client would ask for

14 some more figures on these design and permits, you know, some

15 more accurate figures.  The client would ask for this to be

16 more specifically written down.  So yeah, it -- it's fairly

17 hard and fairly gray there.  You know, I'm only trying to give

18 you a rough idea.

19    Q     That's okay.

20    A     Yeah.

21    Q     For purposes of my next question, that's all I need.

22    A     Yeah.

23    Q     If Peter MacLeod had asked you if you could do this

24 repair, such as you did on the temporary repair with these --

25 what do you call it -- the Z-wag bars --

LegaLink Dallas                                        800-966-4567
global court reporting * legal videography * trial services          www.legalink.com
Case 1:03-cv-00009   Document 351   Filed 11/03/2005   Page 19 of 23

BEN CASEY                           3/23/2004

1      Q      Mr. Casey, my name is Bob O'Connor.

2             How many bolts did you find on the seabed and

3      put in that white bucket, you personally?

4      A      Me personally?  Somewhere between 10 and 15.

5      Q      And how about Mr. Unterberg?

6      A      Unterberg -- because we didn't physically have the

7      bolts and what I recall -- I'm not sure.  Maybe 3 or 4.

8      Q      And the other company, Pacific Foundation?

9      A      Pacific Foundations.  I think if there's more than 10

10     or 15 in that bucket, they -- the difference was from them.

11     Maybe 6 to 10, somewhere in that sort of figure possibly.

12     Q      Did any of you map where on the seabed you found the

13     bolts?

14     A      No.  But because I was physically there, they are

15     basically all under those dolphins as though they had dropped

16     just directly down.

17     Q      Are they marked in any way so that we know who is the

18     one who picked the bolt off the seabed; you, Pacific Oceanear,

19     or Mr. Unterberg?

20     A      Not at all?  We -- we didn't think that that was

21     important to do at the time for any reason.

22     Q      You said that you may have pulled some bolts out with

23     your hand.

24     A      Uh-huh.

25     Q      Would those bolts have gone into the white bucket?

LegaLink Dallas
global court reporting * legal videography * trial services
800-966-4567
www.legalink.com
Case 1:03-cv-00009   Document 351   Filed 11/03/2005   Page 20 of 23

BEN CASEY                                    3/23/2004

1       A       If -- if they were left around to collect them up,

2    I -- I think at some stage Peter -- Peter MacLeod had said to

3    us, "Hey, there's -- there a possibility that this is going to

4    go further; make sure you save the bolts." And then we

5    would've gathered up what ones we had from whichever location

6    and put them in the bucket.

7       Q       So there's no way to know where the bolts in that

8    bucket came from, who's the one that collected them?

9       A       There's no definitive way to say whether Ben Casey

10   picked them up, whether Jungen Unterberg picked them up, or

11   whether Pacific Foundations picked them up. That is correct.

12      Q       Okay. Did you -- before you did any of the repair

13   work, did you do -- did you cause to be done or do any study of

14   the earthquake, for instance, what the forces were, what

15   direction the forces are going in, what the vertical and

16   horizontal, east-west, north-s -- north-south forces were?

17      A       No. Not -- not in that specific, no, not at all.

18      Q       Okay. Do you have any prior experience with

19   repairing dolphins that are damaged in earthquakes?

20      A       Not a direct relationship as an earthquake repair to

21   a dolphin, no.

22      Q       Okay. Do you know why fendering is important for

23   dolphins?

24      A       Are we -- are we specifically talking about ship

25   fendering as per the breasting dolphins?

LegaLink Dallas                                      800-966-4567
global court reporting * legal videography * trial services          www.legalink.com
Case 1:03-cv-00009   Document 351   Filed 11/03/2005   Page 21 of 23

1    Q      Yes.

2    A      Or a fendering system?

3    Q      For the berthing dolphins.

4    A      For the -- for the berthing dolphins.  Yes,

5  they're -- as I said previously -- an energy-absorbent device

6  to protect the ship and the -- and the primary structure from

7  damage.

8    Q      What kind of damage to the -- to the primary

9  structure?

10   A      Whatever damage can be put on the structure from

11 excessive loading due to misdirection of a ship in a berthing

12 situation.

    Q      So with these particular dolphins, if a ship were to

strike against the dolphins, that could loosen the bolts before

you repaired it?

    A      That's -- I -- I think there's -- there's a few

assumptions you're making there.  Depending on the condition of

the bolts prior to the bolt -- the boat hitting them, if we're

asking can the ship put a lateral or horizontal load into the

dolphin via the ship fender, yes, it can.

21   Q      And could the result of that force of the ship into

22 the dolphin loosen the bolts?

23   A      Not if -- not if the bolts are in the design capacity

24 when it was built.

25   Q      Doesn't it depend how hard the ship hits the dolphin?

LegaLink Dallas
global court reporting * legal videography * trial services
800-966-4567
www.legalink.com
Case 1:03-cv-00009   Document 351   Filed 11/03/2005   Page 22 of 23

# CERTIFICATE OF SERVICE

I, Joseph Perez hereby declare under penalty of perjury of the laws of the Unites States, that on the 3rd day of November, 2005, I will cause to be served, via hand delivery a true and correct copy of **DEFENDANT WINZLER & KELLY CONSULTING ENGINEERS' NOTICE OF PORTION OF DEPOSITION TRANSCRIPTS OF BEN CASEY MARKED WITHOUT COUNTER MARKING; CERTIFICATE OF SERVICE** upon Plaintiff and Defendants Counsel of record as follows:

> David Ledger, Esq.
> Carlsmith Ball LLP
> 134 West Soledad Avenue
> Bank of Hawaii Building, Suite 401
> P.O. Box BF
> Hagåtña, Guam 96932-5027
> Telefax: (671) 477-4375

> Attorneys for Plaintiff S.J. Gargrave Syndicate at Lloyds

> Thomas C. Sterling, Esq.
> Klemm, Blair, Sterling & Johnson
> Suite 1008, Pacific News Building
> 238 Archbishop F.C. Flores Street
> Hagåtña, Guam 96910
> Telefax: (671) 472-4290

> Attorneys for Defendant Black Construction Company

> Thomas M. Tarpley, Esq.
> Tarpley & Moroni, LLP
> Suite 402, Bank of Hawaii Bldg.
> 134 W. Soledad Avenue
> Hagåtña, Guam 96910
> Telefax: (671) 472-4526

> Attorneys for Defendant
> Engineering, Management & Planning Services Corporation

Dated this _____ day of November, 2005.


_____
JOSEPH PEREZ

2003-08-051026-PL-Obj-ExpertTestimony.doc