BLAIR STERLING JOHNSON
MOODY MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

By VINCENT LEON GUERRERO
*Attorneys for Defendant Black Construction Corporation*

**FILED**
DISTRICT COURT OF GUAM
NOV 17 2005
MARY L.M. MORAN
CLERK OF COURT

## IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| S.J. GARGRAVE SYNDICATE AT LLOYDS, | CIVIL CASE NO. CV03-00009 |
| Plaintiff, | |
| vs. | |
| BLACK CONSTRUCTION CORPORATION and WINZLER & KELLY CONSULTING ENGINEERS and ENGINEERING, MANAGEMENT & PLANNING SERVICES CORPORATION, | **DEFENDANT BLACK CONSTRUCTION CORPORATION'S DESIGNATION OF DEPOSITION EXCERPTS FOR USE AT TRIAL** |
| Defendants. | |

Defendant **BLACK CONSTRUCTION CORPORATION** hereby designates the following portions of depositions it anticipates it will use at trial. The relevant pages are attached.

    1.   <u>**DEPOSITION OF NEMENCIO MACARIO:**</u>

        p. 5-7

        p. 10

        p. 13-16

        p. 18-19

        p. 22-31

        p. 48-50

        p. 54-55

**ORIGINAL**

1

2

p. 63

3

p. 66-67

4

5

6

BLAIR STERLING JOHNSON

7

MOODY MARTINEZ & LEON GUERRERO

A PROFESSIONAL CORPORATION

8

9

DATED: NOVEMBER _16_, 2005

BY: _Vincent Ferbon_

10

VINCENT LEON GUERRERO

*Attorneys for Defendant Black Construction Corporation*

11

12

V62;63\27946-29
G:\WORD97\OFFICE\WORDDOC\PLD\VLG\127-BCC'S DESIGNATION OF
TRANSCRIPT RE GARGRAVE V BLACK ET AL.DOC

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BLAIR STERLING JOHNSON
MOODY MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 2 -

1   educational background including the schools you've attended

2   and any degrees you have obtained?

3       A.   I went to study in the Philippines.  I got my

4   elementary and high school at Saint Joseph Academy in Las

5   Pinas, and then my Bachelor's Degree in Civil Engineering

6   from Mapua Institute and Technology in 1976.

7       Q.   Could you spell those two schools for Mrs. Flores

8   to make it easier for her?

9       A.   Saint Joseph, S-t period.

10      Q.   No, she's got that, Las Pinas and --

11      A.   Oh, Las Pinas, L-a-s, Pinas, P-i-n-a-s.

12      Q.   Any other town where you mentioned a school?

13      A.   That's the town.

14      Q.   Las Pinas, okay.

15      A.   And other college is in Manila.

16      Q.   How long have you lived in Guam?

17      A.   Since 1978.

18      Q.   And what caused you to first come to Guam?

19      A.   Oh, my father lives here already.

20      Q.   Are you licensed as an engineer here in Guam?

21      A.   Yes, sir.

22      Q.   When did you first become licensed?

23      A.   In 1986.

24      Q.   And what particular field is that that you are

25   licensed in?

1       A.    That's civil engineering.

2       Q.    I'd like to refer you back to 1996.  Do you recall

3    your firm was involved in the renovation of Foxtrot Pier and

4    the Foxtrot dolphins?

5       A.    Yes, sir.

6       Q.    And how is it you first became involved in that

7    particular project?

8       A.    We did some preliminary assessment on the

9    earthquake damage during 1993.

10      Q.    And how did that assessment of earthquake damage

11   translate into further involvement a few years later?  Meaning,

12   you did the assessment after the 1993 earthquake.  Why did that

13   cause you to get involved in the renovation in 1996?

14      A.    The renovation work, there was a request for

15   proposal from the Port Authority for Construction Management

16   Services.

17      Q.    I'm going to show you some contracts we have here.

18   The first I want to show you is a contract, consultant

19   agreement dated January 4th, 1995 with a cover letter dated

20   December 15th, 1994.  We'll mark this as Exhibit 1 to this

21   deposition.

22            (Exhibit No. 1 marked: Consultant Agreement.)

23   BY MR. STERLING: (Continuing)

24      Q.    Showing you what's been marked as Exhibit No. 1,

25   and we'll run some more of the copies, I just forgot Mr.

1  Macario is unrepresented.  Is this the contract that you got

2  involved in as a result of that request for proposals, if you

3  recall?

4      A.   Yes, sir, I think this is it.  Yeah, I think so,

5  sir.

6      Q.   Can you tell, just generally, what your

7  understanding of what the scope of services were in general

8  terms you were going to provide pursuant to that contract?

9      A.   Generally is to administer the contract, follow the

10  design plans, and --

11      Q.   Well, let me see if I can help you, Mr. Macario.  I

12  know it's been several years since you've been involved in

13  this and you haven't been involved in this case.  As I look

14  at this contract we just marked as Exhibit 1, it appears to

15  me that the primary purpose of this contract was to do a

16  structural evaluation of F-1.  In fact, if you look at the

17  second page of that particular exhibit, it says:

18          "The consultant will provide services in the

19          evaluation of damage to Port Facility F-1."

20      A.   Okay.

21      Q.   I'm not trying to tell you what to say, but I just

22  think this original contract was to do a structural

23  evaluation.  And did you in fact do a structural evaluation;

24  does that sound correct?

25      A.   Yes, sir.

1          A.    Yes, sir.

2          Q.    Can you tell me why this amendment was executed?

3          A.    There is a design -- or there's a contract out from

4     the Port Authority to have the repairs done so they need a

5     construction management service.

6          Q.    You say there was a design out. Who prepared that

7     design, if you know?

8          A.    Oh, that's EMPSCO, sir.

9          Q.    And in connection with the execution of this

10    particular amendment, which is Exhibit 2, did you have an

11    opportunity to review the repair design that had been

12    performed by EMPSCO, just in general terms?

13         A.    Yes, just a general overview.

14         Q.    Can you tell me, once again just in general terms,

15    what the scope of services were that you were going to

16    provide pursuant to this amendment in connection with the

17    repair project?

18         A.    It's basically the administration of the contract,

19    look at the quality of work and ...

20         Q.    That's fair enough. We're going to walk through

21    this a little bit and look at a few of the provisions here.

22               I'd like you to look at the Exhibit C to this

23    agreement which starts on the fifth page.

24         A.    Okay.

25         Q.    Now am I correct that this particular contract

1      Q.    How about yourself?  How often did you actually go

2  out to the project site during this work?

3      A.    Sometimes once a week or twice a week, like that.

4  It depends upon the requirement.

5      Q.    Can you describe generally to what extent?  I know

6  it was your company and you had employees who went out there

7  and were naturally in the field most of the time.  But to

8  what extent did you monitor what was going on?  Only

9  occasionally, or did you get daily reports?  How did you keep

10  up to date on this project?

11      A.    I get the daily reports and I talk to Mr. Golez

12  every day, and I do point out if there's, you know, some

13  issues.

14      Q.    All right.  Let's look at Exhibit "C" here that we

15  have in front of you.  I want to talk about some of the

16  provisions indicating what your company was supposed to do.

17  Under Section 1 on "Intent," the second bullet point says you

18  were supposed to inspect and insure that all work is

19  accomplished in accordance with approved contract documents.

20  To your knowledge, what did Mr. Golez and his associates do

21  in connection with this particular contractual obligation, in

22  general?

23      A.    They monitored the actual construction work, like

24  placement or repair, materials, like that.

25      Q.    Now you know this project involved the repair of

1    the Dolphins and involved repair of the pilings.  It involved
2    attachment of the pilings to the pile caps with an epoxy bolt
3    system.  Do you know to what extent they were actually
4    monitoring this?
5         A.   Yes, I remember we did even do a proof test of the
6    anchor bolts.
7         Q.   Do what?  I'm sorry.
8         A.   You know the epoxy anchor bolts?
9         Q.   Yes.
10        A.   They did a load test of that one.
11        Q.   And how do you know that that occurred?
12        A.   It was done during the reports, and I did mention
13   to Mr. Golez, you know, what to look for.
14        Q.   So did you instruct Mr. Golez to do a load test on
15   the epoxy anchor bolts?
16        A.   We did require the load test.
17        Q.   All right, can you tell me specifically how this
18   load test was accomplished?  And recognize we're a bunch of
19   lawyers here, so try to make it simple for us.
20        A.   Okay.
21        Q.   And we do understand that it's an upward
22   installation of an epoxy bolt system.  So what, to your
23   understanding, did your people do to load test those bolts
24   and check the adequacy of the epoxy installation?
25        A.   I can't remember fully the setup, but I know the

1    anchor bolts, they did -- the load test was basically more
2    pull out, so the anchor bolts are set, you know, cured, then
3    they load like a pulling jack to pull the anchors.
4         Q.    All right.  Now in terms of this load test, was it
5    done, to your knowledge, on every bolt, a random sampling?
6    Can you give us some idea of how often this was done?
7         A.    It's a random sampling, sir.
8         Q.    To your knowledge based on your review of the
9    various reports, and we have them, but to your knowledge,
10   were there failures of these bolts that required
11   reinstallation, or did you find generally the epoxy was
12   adequately set?  How would you describe what the results of
13   the load test indicated to you?
14        A.    The load tests were okay, sir.
15        Q.    Were there any instances, to your recollection,
16   where you found load tests where the epoxy bolts failed?
17        A.    I don't know personally.
18        Q.    If there were failures of epoxy bolts, would you
19   expect that to have been indicated in your inspector's daily
20   reports?
21        A.    Yes, sir.
22        Q.    I want to mark as an exhibit, this will be Exhibit
23   3.
24                    (Exhibit No. 3 marked: N.C. Macario's
25                    Report No. 105 dated 12/27/96.)

1    BY MR. STERLING: (Continuing)

2         Q.    What I'm showing you as Exhibit 3 is a report

3    that's Report No. 105 on N.C. Macario & Associates letterhead

4    concerning construction observation report, signed by Mr.

5    Caronongan, for December 27th, 1996. And my question for you

6    is, is that the standard daily report that you just referred

7    to that would have been issued by your inspectors?

8         A.    Yes, sir.

9         Q.    So just to make your testimony clear, if your

10   inspectors had done a load test on the epoxy bolts and found

11   a failure that required corrective action, would you have

12   expected your inspector to indicate that on the daily report?

13        A.    Yes, sir.

14        Q.    So if we wanted to do an evaluation to find out

15   whether there were bolt failures on load tests, we should

16   review all of these daily reports to see what they said;

17   would that be fair?

18        A.    Yes, sir.

19        Q.    I also want to indicate that I pulled out this

20   December 27th, 1996 report for a specific purpose. Can you

21   read the reference down there at the bottom to Dolphin "G",

22   for the record?

23        A.    "Dolphin "G", the storm is causing the docked

24   ships' hull to rub against the installed rubber tire in this

25   dolphin, putting too much strain on the anchor bolts. Crew

1    A.    This is normally for if there is any additional
2    design required that the Port requires, we can do the design.
3    Q.    To your recollection, was there any design work the
4    Port required that you actually had to do?
5    A.    None, sir.
6    Q.    Let's look down at Services point two where it says
7    "Contract Administration," subpart A1.a.  It says:
8              "Administer the contract as the authorized
9              representative of the PAG."
10   Can you explain to me what you understood your role to be as
11   the authorized representative of PAG, meaning were you their
12   onsite representative to protect their interests?
13   A.    Yes, sir.
14   Q.    Was there anybody else there from PAG who
15   supervised you and told you what to do, as far as running
16   this job?
17   A.    No, nobody, sir, except we have, what would you
18   call that, we have interface with Mr. Simeon Delos Santos.
19   Q.    All right.  Mr. Delos Santos, can you tell me what
20   his responsibilities were on this job?
21   A.    Basically supervising us.
22   Q.    And how often did he come out and supervise you, if
23   you know, and I don't want you to guess?
24   A.    Irregular.
25   Q.    Irregular.

1     A.    Yes.

2     Q.    And when you say irregular, can you give me some

3 idea of whether he was out there once a week, once a month,

4 you called him on the phone?  How did that work?

5     A.    There's no set period or visit by him.

6     Q.    But in the day-to-day operation of this project, if

7 Black needed some instructions as to what they were supposed

8 to do from PAG, would they talk to your inspector to get

9 those instructions?

10    A.    Can you rephrase?

11    Q.    Well, I'm just trying to find out if Black is out

12 on the job site, who's authorized on behalf of PAG to tell

13 them what to do?  Was that your company?

14    A.    That's our company, yes, sir.

15    Q.    And other than irregular involvement by Mr. Delos

16 Santos of the Port Authority, there was nobody else from the

17 Port on that job site; is that correct?

18    A.    That is correct.

19    Q.    Okay.

20    A.    We do have these progress meetings, sir.  That's

21 the involvement of the -- you know.

22    Q.    Is that when you would --

23    A.    We report to the Port Authority for monthly

24 progress, like that.  We do have those.

25    Q.    I've looked at some documentation that indicate

1    in general?

2        A.    Yeah, there are submittals that requires their

3    approval.

4        Q.    And can you tell me which submittals it was that

5    required EMPSCO's approval, if that's a fair question?

6        A.    If there's something like deviation on design, then

7    it goes to the engineer of record, sir.

8        Q.    So if there was a submittal that involved -- or

9    when you say deviation on design, what do you mean?

10       A.    Well, it changed, sir.  Say the requirement is --

11   well, the one they're submitting is different from what's on

12   the design requirement, and then there is a note that says

13   they are deviating, then we submit it to the engineers.

14       Q.    Just so I'm clear then, if it was a submittal that

15   was not a deviation, there was no change, no proposed value

16   engineering or whatever, you would just compare that

17   submittal against the contract requirements, and your company

18   would approve it or disapprove it, correct?

19       A.    Yes, sir.

20       Q.    But if there was some sort of a deviation that

21   involved a design change, then it would be submitted to

22   EMPSCO for their review and comments?

23       A.    Yes, sir.

24       Q.    Let's look at B2.b. here.  This says one of your

25   responsibilities was to evaluate and make recommendations on

1    the contractor's CQC requests for material or equipment

2    substitutions.  The construction manager shall be responsible

3    for approving such requests upon concurrence by the design

4    engineers and PAG.  Were there any situations where there was

5    a request for a material or equipment substitution, to your

6    recollection, where you had to go to PAG to get their

7    concurrence?

8         A.   Yes, sir.

9         Q.   Can you give me an example of an occasion when you

10   had to go to PAG for a concurrence?

11        A.   I think there was a change for the piles, the

12   problem.  Yeah, I think the pile connection.

13        Q.   Okay, so we're going to talk about that one

14   specifically.  Now when you had to go to PAG for concurrence,

15   who was the person at PAG who you would go to to get their

16   concurrence?

17        A.   Mr. Delos Santos.

18        Q.   Did he have a particular job title on this project?

19        A.   He's a CIP engineer, capital improvements.

20        Q.   Let's look at the next page, page five of this

21   Exhibit "C," and look down under "Construction Inspection and

22   Quality Control."  This indicates that, as far as inspections

23   under subpart C1.a., you were to provide periodic

24   construction observation, inspection of the construction of

25   the project to ensure that the work is accomplished in

1    accordance with the contract documents. To your knowledge,

2    did your company provide those services?

3          A.    Yes, sir.

4          Q.    It also indicates here that you were to provide

5    competent personnel in sufficient numbers to properly inspect

6    every phase of the project. To your knowledge, did your

7    company provide those services?

8          A.    Yes, sir.

9          Q.    Let's take a look at page six, subpart C at the top

10   of the page. This particular section indicates that you were

11   authorized to issue stop work orders for a portion of or the

12   entire project; is that correct?

13         A.    Yes, sir.

14         Q.    To your knowledge, did your company ever issue any

15   stop work orders to Black telling them to stop work because

16   they were doing things wrong?

17         A.    I don't remember, sir.

18         Q.    Let me see if I can get you to clarify this. I

19   realize you were not the primary person there day to day.

20   Mr. Golez was. But when you say "I don't remember," meaning

21   I don't remember if we did it at all or I don't remember a

22   specific instance, or I don't know? What are you saying, I

23   don't remember or I don't know?

24         A.    I don't remember issuing any stop work order.

25         Q.    Now, if the stop work had been issued, would Mr.

1    Golez have done that himself, or would he have, to your

2    knowledge, conferred with you before he issued a stop work on

3    the project?

4         A.   If it's like safety, they should just go issue stop

5    work.

6         Q.   All right.  If it's just a failure of the work to

7    comply with the contract documents and it doesn't involve

8    life safety, would you have expected him to confer with you

9    before he stopped the project?

10        A.   Yes, sir.

11        Q.   Do you have any recollection of any occasion where

12   he conferred with you asking for your input on stopping the

13   project?

14        A.   I'm sorry, sir, I don't remember any.

15        Q.   Let's look down at subparagraph 2 on that same

16   page, quality control and testing.  And subpart 2.a.

17   indicates you have the authority to enforce all provisions of

18   the contract documents dealing with the quality of

19   workmanship; is that correct?

20        A.   Yes, sir.

21        Q.   Now when it came to dealing with the quality of

22   workmanship, who was the primary person to do that for Port

23   Authority?  Was it Mr. Delos Santos or was it your company?

24        A.   Our company, sir.

25        Q.   Subpart C also indicates that you were to ensure

1    that all construction work is accomplished according to the

2    contract documents.  When it came to ensuring that all work

3    was accomplished in accordance with the contract documents,

4    who was primarily responsible for that from the Port?  Was it

5    Mr. Delos Santos or was it your company?

6         A.    Can you repeat, sir?

7         Q.    Okay.  When it came to assuring that all

8    construction work was accomplished according to contract

9    documents, who had primary responsibility on behalf of the

10   Port for making sure that was done?  Was that Mr. Delos

11   Santos or was that Macario & Associates?

12        A.    Our firm, sir.

13        Q.    I'm going to mark as an additional exhibit as No.

14   4.  This is a second amendment to this contract, which I

15   think was just to modify the compensation or whatever.  I'd

16   just like you to look at it and tell me what you understand

17   the purpose of this second amendment to be.

18                        (Exhibit No. 4 marked: Second Amendment

19                         to Construction Agreement.)

20   BY MR. STERLING: (Continuing)

21        Q.    Can you tell me what the purpose of that was?  When

22   I looked at it, it seemed to me it was just a continuation of

23   a prior amendment.  Can you tell me what it was?

24        A.    Yeah, I think this is just a continuation of the

25   work, and they added more requirements for copies of the

1    reports, and then they added the underwater inspection.

2         Q.    Okay, thank you.  I don't know if I asked you this

3    already, but you mentioned as part of your initial services

4    in connection with the structural assessment you prepared a

5    report.  Do you still have a copy of that report?

6         A.    No more, sir.

7         Q.    Other than the Port Authority, do you have any idea

8    who might have a copy of that structural assessment?  I'm

9    just not sure if we have a copy or not.

10        A.    It's only the Port that we dealt with then.

11        Q.    We'll look at another document here again having to

12   do with inspection.  Let's go ahead and mark this as Exhibit

13   5.

14                         (Exhibit No. 5 marked: Contractor

15                          Production Report.)

16   BY MR. STERLING: (Continuing)

17        Q.    And Exhibit 5, I'll just indicate for you and for

18   the record, is just a sample of daily reports that were

19   prepared by Black in the construction of this project.  And

20   this particular report, Exhibit 5, is report number 91.  The

21   question I have for you, whose form is this?  Is this a

22   standard Macario daily report form, or where did this form

23   come from, if you know?

24        A.    From Black Construction, sir.

25        Q.    I'm going to ask you questions about this Exhibit

1  No. 5, although I'll just indicate for everyone here that I

2  have a whole book full of these. I didn't choose to bring

3  them all in here today, so I pulled this one out as an

4  example. So my questions are just generally in connection

5  with the preparation of this type of report. Do you know who

6  prepared this type of daily report on behalf of Black?

7      A.   It's Dedicatoria.

8      Q.   So down at the bottom it says Leonard R.

9  Dedicatoria. That's D-e-d-i-c-a-t-o-r-i-a. What was Mr.

10 Dedicatoria's position on this job?

11     A.   He's the project superintendent, I believe.

12     Q.   And do you know why it was he prepared this report?

13 Was it required by you? Was it a standard Black procedure?

14 Why did they prepare these daily production reports?

15     A.   It's a requirement under the contract.

16     Q.   So after Mr. Dedicatoria prepared this type of

17 report, what was done with it?

18     A.   We review also his reports.

19     Q.   And when you say we, who review it? Was that you

20 personally, Mr. Golez, somebody else?

21     A.   Mr. Golez or myself, sir.

22     Q.   How often did you actually review these daily

23 reports? They were ongoing, this is like number 91 for

24 example. I think there were a hundred and some. How many of

25 these did you personally review, to your best recollection?

1       A.    I can't remember, sir

2       Q.    And what was the purpose for which Macario's people

3    reviewed these?

4       A.    To ensure that the production or progress of the

5    work is going as scheduled, and see that that's what they see

6    in the actual job site.

7       Q.    All right.  Now, if there was a situation where

8    your people reviewed the daily -- well, strike that.  How

9    often were these things given to you?  Were they given to you

10   on a monthly basis, weekly, or daily?

11      A.    Daily.

12      Q.    So if there was an occasion where one of these

13   daily reports was turned over to Mr. Golez or whoever and

14   they reviewed it and disagreed with what was on this report,

15   what, if anything, would they do?

16      A.    They would have a correction done.

17      Q.    To your knowledge, were there ever any corrections

18   done on these daily production reports from Black?

19      A.    I don't remember, sir.

20      Q.    Now if I wanted to find out if there were

21   corrections on these, where would I look?  Where would the

22   correction have been made, by letter, on the report itself?

23      A.    There will be a report the next day, the following

24   day, sir.

25      Q.    And can you tell me where on this Exhibit 5 that

1    correction the following day would be placed?

2         A.    Yeah, either on the second page or under Remarks.

3         Q.    So if your firm disagreed with a daily report and

4    we wanted to review the daily reports to find out when that

5    occurred, we should look primarily in the Remarks section to

6    see something added by Mr. Golez or whoever?

7         A.    Yes, sir.

8         Q.    All right.  The next document I want to use is

9    Exhibit 6.  This is a Prefinal Inspection Report.

10                        (Exhibit 6 marked: Prefinal Inspection

11                         Report.)

12    BY MR. STERLING: (Continuing)

13         Q.    Can you tell me what the purpose of a prefinal

14    inspection report is, or this Prefinal Inspection Report was?

15         A.    The prefinal report is to look at the overall

16    condition of the project prior to turn over and see if

17    there's any other outstanding work that needs to be done.

18         Q.    So the purpose of this prefinal inspection was for

19    your people to go out there and make sure Black had finished

20    the work in accordance with the plans and specifications,

21    correct?

22         A.    Yes, sir.

23         Q.    And if you found any discrepancies, would you

24    expect to see your people list them here on this report?

25         A.    Yes, sir.

1      Q.    All right.  So if there were problems with the
2    epoxy bolt installation, would you have expected your people
3    to have inspected those bolts during the prefinal inspection?
4      A.    Not on the prefinal because the bolts would be done
5    a long time already.
6      Q.    All right.  So you would not have expected, just to
7    make it clear, them to inspect the bolts on the prefinal
8    inspection because, as you previously testified, they did
9    random load testing in different phases of the work, correct?
10      A.    Yes, sir.
11      Q.    So as far as you're concerned, that should have
12    been done already?
13      A.    Yes, sir.
14      Q.    And if there were problems with the epoxy bolt
15    installation, it should have been identified prior to this
16    prefinal inspection?
17      A.    Yes, sir.
18      Q.    I'd like you to focus now on, down here.  Let's
19    look at item number 7, fender system at D, H, G. and C.  Did
20    Black install fenders on those four dolphins?
21      A.    Yes, sir, I believe so.
22      Q.    All right.  There's a reference here, "Inspector's
23    Comments," "At C broken."  Do you know what that refers to?
24      A.    Probably a fender at Dolphin C.
25      Q.    And do you know how a fender at Dolphin C would

1   review of those materials, or did you merely pass it on to

2   EMPSCO?

3        A.   We passed it to EMPSCO, sir.

4        Q.   Now Exhibit No. 10, am I correct that this is the

5   response you received from EMPSCO in response to Exhibit No.

6   9?

7        A.   Yes, sir.

8        Q.   Was there anything, any other documents or

9   substantive information that came with this letter?

10       A.   No, sir, just what's here.

11       Q.   Just what's here; thank you.  Now could I have you

12   look at Exhibit No. 11?  And please correct me if I'm wrong,

13   but does this indicate that after receiving -- or strike

14   that.  Am I correct that you sent with this letter the

15   calculations from Winzler & Kelly to Black Construction?

16       A.   Yes, sir.

17       Q.   Now I want to go back.  I have a couple of

18   questions about an area that I didn't understand really well,

19   so I want to go back and ask you about it. You were examined

20   on random spot checks you did of the bolts that went into the

21   cap of the epoxy; is that correct?

22       A.   Yes, sir.

23       Q.   Could you describe for me again the way that those

24   random checks were carried out?

25       A.   What we did was essentially identify which bolt

1    that was to be tested, and then they --

2          Q.   Let me stop you there.  How did you decide that?

3          A.   We just picked the bolt.

4          Q.   Okay.

5          A.   And then do the actual testing.

6          Q.   Explain to me how the actual test worked.

7          A.   The test for the bolt is, whatever installed bolts

8    are, they put like a holder so that the jacking end that will

9    be pulling is connected to the bottom of the pile cap.

10         Q.   Okay.

11         A.   Then they press the hydraulic jack to pull out the

12   anchors, and then whatever reading, if we meet the reading

13   for the force required.

14         Q.   How often is this test conducted?

15         A.   I don't know how many we did, sir.

16         Q.   Who conducted the tests?

17         A.   Black Construction and my engineer who was there.

18         Q.   Mr. Golez?

19         A.   Yes, Mr. Golez.

20         Q.   Now, was the anchor attached right to the bolt, or

21   was the anchor attached to the cap?

22         A.   It's attached to the cap, sir.

23         Q.   Okay.  And then you applied hydraulic pressure and

24   pulled down; is that right?

25         A.   Yes, sir.

1    Q.   And on the jack there's a dial that reads how much

2    pressure is being exerted or pulled down; is that right?

3    A.   Right.

4    Q.   Now, did any of the bolts fail during this test?

5    A.   I don't remember any failures.

6    Q.   And what was the force that was applied?

7    A.   I can't remember now, sir.

8    Q.   Would Mr. Golez know that maybe?

9    A.   He may have because he was more into the

10   requirements.

11   Q.   Do you know who from Black Construction was

12   present?

13   A.   Should be Rod and Dedicatoria, but I'm not so sure,

14   I was not there.

15   Q.   Can you give me an idea of the number of tests that

16   were conducted?

17   A.   I can't remember, sir.

18   Q.   Now, you said Mr. Golez works in Washington State;

19   is that correct?

20   A.   Yes, sir.

21   Q.   Do you still have a personnel file for him

22   someplace at your office?

23   A.   No more, sir.

24   Q.   Do you have any payroll records for him?

25   A.   I will check if we can find, sir.

1      A.   He may have questions, but I just can't remember
2  right now.
3      Q.   If he had questions, would you have taken any notes
4  of your conversation?
5      A.   Oh, yeah, if we had.
6      Q.   Do you still have those notes?
7      A.   I'm sorry, sir, we had a lot of typhoon damage.  We
8  have no files on F-1.
9      Q.   You have no files on F-1?
10      A.   We have some, but more on the contract part, not
11  the project management part.
12      Q.   You didn't keep any files on your computer or
13  anything like that?
14      A.   Oh, those computers are gone.
15      Q.   I take it that your structural assessment of the
16  pier of F-1 was also in the same files?
17      A.   Yes, sir.
18      Q.   You don't have that anymore, right?
19      A.   No more.
20      Q.   I think you were asked a series of questions, or at
21  least one question where the answer was just prior to turning
22  over the job to the Port, the final inspection, that there
23  was no extra look at the bolts because of the previous random
24  inspection; is that correct?
25      A.   Yes, sir.

1       Q.   My question is, is at anytime after these random

2   inspections, was there any subsequent look taken at any of

3   the bolts?

4       A.   I don't remember, sir.

5       Q.   If there was from someone from Macario, who would

6   have done it?

7       A.   I would be Golez or Caronongan.

8       Q.   I'm sorry, who's the second person?

9       A.   Cesar Caronongan.

10      Q.   Okay.  I think I'm almost done.  Let me ask you a

11  couple more questions about calculations.  Did you actually

12  look at the calculations?

13      A.   It's just a browsed through, sir.

14      Q.   I'm sorry?

15      A.   I just looked through.

16      Q.   It's your understanding Winzler & Kelly had done

17  the calculations?

18      A.   Yes, sir.

19      Q.   Are you technically competent to even look at the

20  calculations?

21      A.   Yes, sir.

22      Q.   So you could go -- I mean, if you wanted to redo

23  them, you could?

24      A.   Yes, sir.

25      Q.   Have you ever in this matter dealing with the pile

1        Q.    So on average you would be at the site how many

2    hours a day?

3        A.    Not daily, sir.

4        Q.    But can you give me an average of how many hours a

5    day on the average you would visit the site, or how many

6    hours a week on average?

7        A.    Maybe one visit a week or as required only, sir.

8        Q.    So you would bring a structural engineer, meaning

9    you, to the site on an average of about once a week for about

10   an hour to two hours each visit?

11       A.    Yes, sir, maybe we can say that, sir.

12       Q.    Before Black started construction on the project,

13   did you have occasion to look at the dolphins and see how

14   many fenders there were and what conditions they were in?

15       A.    Yes, sir.

16       Q.    What do you recall?

17       A.    We recall a lot of the fenders are to be replaced,

18   then some of the -- we did there an actual walk-through

19   before they start, so we knew the conditions that we have,

20   what kind of piles.  You know, we need to identify the piles

21   to be repaired.

22       Q.    So when you did this walk-through before

23   construction began, you noticed that a lot of the fenders

24   were missing or broken?

25       A.    Yeah, some.  Fenders or piles, sir?

1    dolphin?

2         A.   That will be berthing dolphin.

3         Q.   Okay.  And instead of a fender, did it have a

4    tractor tire or something else hanging on the side of the

5    dolphin; if you recall?

6         A.   No, I don't recall, sir.

7         Q.   And when a dolphin doesn't have a fender on it,

8    what's the consequence if a ship bangs into the dolphin?

9         A.   Then the dolphin takes the full brunt of the

10   berthing force.

11        Q.   And as a result, could that loosen the bolts?

12        A.   It can.

13        Q.   It's a lot more likely to loosen the bolts if

14   there's no fender, right?

15        A.   Yes, sir.

16        Q.   Paragraph 9.8 of the construction contract for

17   these repairs says, and I want to quote it to you.  I don't

18   have a copy for you, but I'll read it to you.

19             "Within a reasonable time after the completion of

20             any contract and before the final acceptance, final

21             inspection must be made by the general manager,

22             Port Authority of Guam to determine whether the

23             work has been completed in accordance with the

24             contract plans and specifications."

25   Do you know whether that inspection took place?

1      A.   The BOD we did not do the inspection, but I'm not

2  sure if Mr. Golez had done that.

3      Q.   If there had been such an inspection, would your

4  company have been the one tasked to do it?

5      A.   Yes, we will be the one to ...  What I'm saying is

6  I'm not sure if Mr. Golez had done that during the time of

7  the turnover.

8      Q.   It says it must be made by the general manager of

9  the Port Authority of Guam, but I assume you were acting as

10  his representative?

11      A.   Yes, sir.

12      Q.   So that would have been you.

13      A.   Right.

14      Q.   And you don't recall whether you performed that

15  inspection?

16      A.   I may be off island on that time, but what I'm

17  saying is Mr. Golez may have done that.

18             MR. O'CONNOR:  No more questions.

19             MR. TARPLEY:  Can we take a two-minute break?

20  I just need to clarify something with my client.

21             (Exhibit No. 14 marked: Dec. 8, 1995

22             Memo from EMPSCO.)

23  BY MR. O'CONNOR: (Continuing)

24      Q.   Mr. Macario, I want to show you Exhibit 14, which

25  is a memo from EMPSCO that has attached to it several